FILED

APR 1 6 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| The Humane Society of the United States<br>2100 L Street NW<br>Washington, DC  20037;<br><br>Help Our Wolves Live ("HOWL")<br>4600 Emerson Avenue South<br>Minneapolis, MN  55409; and<br><br>Animal Protection Institute<br>P.O. Box 22505<br>Sacramento, CA  95822,<br><br>      Plaintiffs,<br><br>   v.<br><br>Dirk Kempthorne, Secretary of the Interior<br>Department of the Interior<br>1849 C Street NW<br>Washington, DC  20240;<br><br>United States Department of the Interior<br>1849 C Street NW<br>Washington, DC  20240; and<br><br>United States Fish and Wildlife Service<br>1849 C Street, NW<br>Washington, DC  20240,<br><br>      Defendants. | Case: 1:07-cv-00677<br>Assigned To : Friedman, Paul L.<br>Assign. Date : 4/16/2007<br>Description: Humane Society v. Kempthorne<br><br><br><br>**COMPLAINT FOR DECLARATORY<br>AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.      In this action for declaratory and injunctive relief, Plaintiffs, a coalition of

conservation and animal welfare organizations, challenge the federal government's decision

to remove the protections of the Endangered Species Act from gray wolves in the Great Lakes region.

2.      Although the gray wolf once roamed across most of North America, and historically numbered in the hundreds of thousands, by the 1960s the wolf had been almost completely extirpated from the 48 coterminous United States. With the 1973 passage of the Endangered Species Act ("ESA" or "the Act"), however, the wolf began making a comeback. Shielded from the unrestrained killing that drove it to the brink of extinction, the wolf started to recover in the Great Lakes region and in the northern Rocky Mountains. Yet even today, the wolf has only recovered across 5% of its historic range, and the existing wolf populations face ongoing threats to their long-term survival. Because the ESA mandates protection for a species that is endangered "throughout . . . a significant portion of its range," 16 U.S.C. § 1532(6), the wolf cannot legally be delisted.

3.      Nevertheless, in 2000 the United States Fish and Wildlife Service ("FWS") began a determined campaign to delist the gray wolf. Because the statutory mandates of the ESA prohibit delisting, the FWS has tried to sidestep this problem by using a legal tool designed to *increase* species protection – the "distinct population segment" – for delisting purposes.

4.      Under the ESA, the FWS can list a locally-vulnerable animal population as a distinct population segment ("DPS"), even when the species as a whole is neither threatened nor endangered. *Id.* § 1532(16). The purpose of extending ESA protections to such populations is "to protect and conserve species . . . before large-scale decline occurs that

would necessitate listing a species or subspecies throughout its entire range." 61 Fed. Reg. 4722, 4725 (Feb. 7, 1996).

5.      Neither the Act nor its implementing policies contemplate that a DPS could be used to hinder, rather than promote, species recovery. Yet that is precisely what the FWS has done in its drive to delist the wolf. Because the gray wolf only exists in two isolated pockets, the agency has created DPSs for these localized populations and then, by focusing on the wolf's situation within the confines of the DPS (while ignoring threats to the wolf everywhere else), the agency has declared the wolf to be recovered. This attempt to delist the wolf in a piecemeal fashion contravenes the ESA's purpose of conserving endangered species and their ecosystems. *See* 16 U.S.C. § 1531(b) ("The purposes of this chapter are to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such . . . species."). Indeed, through this scheme the FWS could justify delisting *any* endangered species whose populations were clustered in isolated pockets.

6.      The agency initially divvied up the gray wolf's range into three distinct population segments and downlisted the wolf within two of them. *See* 68 Fed. Reg. 15804 (Apr. 1, 2003). But two federal courts struck down the rule, finding the agency's use of the DPS to be arbitrary and capricious. Undeterred, the FWS quickly renewed its efforts to delist wolves in the western Great Lakes and northern Rocky Mountains, the only two regions within the coterminous U.S. that harbor gray wolves. This time, however, the FWS targeted these populations more directly. The agency crafted two new DPSs by drawing a wide circle

3

around each of the wolf populations. The DPS boundaries were designed to be narrow enough to show some connection to the wolf populations, yet broad enough to prevent further wolf recovery upon delisting.

7.    On February 8, 2007, the FWS issued a final rule that simultaneously designated and delisted the western Great Lakes distinct population segment of the gray wolf. *See* 72 Fed. Reg. 6052 (Feb. 8, 2007). That same day, the agency issued a proposal to designate and delist the northern Rocky Mountain DPS. *See* 72 Fed. Reg. 6106 (Feb. 8, 2007). If both rules are implemented, virtually every wolf in the coterminous United States will lose protection under the ESA. In other words, through its use of the DPS tool, the FWS will have accomplished the very thing that the ESA prohibits: delisting the gray wolf nationwide.

8.    Because the Great Lakes delisting rule violates federal law, The Humane Society of the United States, Help Our Wolves Live, and the Animal Protection Institute (collectively, "Plaintiffs"), bring this action against Secretary of the Interior Dirk Kempthorne, the Department of the Interior, and the FWS (collectively, "FWS"). Plaintiffs seek a declaration from this Court that the FWS violated the ESA and the Administrative Procedure Act by designating and delisting the western Great Lakes DPS. 72 Fed. Reg. 6052 (Feb. 8, 2007). Plaintiffs also seek an injunction to prevent implementation of this rule, and an order vacating the rule.

4

## JURISDICTION AND VENUE

9.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under United States law.

10.    Venue is proper in this judicial district because the defendants reside and the violation occurred in the District of Columbia. *See* 28 U.S.C. § 1391(e)(1); 16 U.S.C. § 1540(g)(3)(A).

## PARTIES

11.    Plaintiff The Humane Society of the United States ("The HSUS") is a non-profit charitable organization incorporated in 1954. The HSUS is the largest animal protection organization in the world, with over 10 million members and constituents. The HSUS's mission is to promote the humane treatment of animals and to foster respect, understanding, and compassion for all creatures. The HSUS has shown particular interest in endangered and threatened species, and supports efforts aimed at the protection and recovery of such species and their habitats. The HSUS regularly submits comments to government agencies concerning proposed actions that would affect animals. The HSUS publishes a magazine and maintains a website for its members and the general public, and it regularly disseminates information concerning the treatment of wild animals, including government decisions that affect wildlife. The HSUS has long been an active advocate for wolf protection and recovery. The HSUS's members enjoy studying, photographing, and viewing wildlife in their natural habitat, including wolves, and these members place great importance on their ability to appreciate wolves in the wild. The HSUS's members have thus attended

meetings of state and federal agencies and other interested parties concerning the wolf

situation. The HSUS and its members are harmed by the Great Lakes delisting rule because

its implementation will result in fewer wolves within the coterminous United States.

12.    Plaintiff Animal Protection Institute ("API"), founded in 1968, is a national

non-profit organization dedicated to advocating for the protection of animals from cruelty

and exploitation. API has tens of thousands of members and supporters living throughout the

country. API's work includes monitoring and studying the impacts of agency actions on

animals, including wolves and other carnivores. One of API's principal campaigns focuses

on wildlife protection, and API uses education and other methods to protect wild animals and

their habitat. API regularly submits comments to government agencies concerning proposed

actions that would affect animals. API publishes a magazine and maintains a website for its

members and the general public, and it regularly disseminates information concerning the

treatment of wild animals, including government decisions that affect animals. API's

members enjoy viewing wildlife, including wolves, as well as photographing and being able

to appreciate them in the wild. API and its members are harmed by the Great Lakes delisting

rule because its implementation will result in fewer wolves within the coterminous United

States.

13.    Plaintiff Help Our Wolves Live ("HOWL"), a Minnesota non-profit

organization founded in 1969, is an advocacy group whose purpose is to work for the

protection and preservation of the gray wolf and other endangered species. HOWL's

members enjoy observing and monitoring Minnesota's wolf population. HOWL uses

6

education and science to discourage human activities that adversely affect wildlife, and HOWL has provided comments to government agencies concerning proposed actions that would affect wild animals, such as wolves. HOWL and its members are harmed by the Great Lakes delisting rule because its implementation will result in fewer wolves within the coterminous United States.

14.      Defendants Secretary of the Interior Dirk Kempthorne, the United States Department of the Interior, and the United States Fish and Wildlife Service are charged with the administration of the Endangered Species Act. The defendants are responsible for ensuring the protection and recovery of species listed as endangered or threatened under the ESA. They are sued in their official capacities.

## LEGAL FRAMEWORK

### *The Endangered Species Act*

15.      The purpose of the ESA is to "provide a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] to provide a program for the conservation of such . . . species." 16 U.S.C. § 1531(b). To that end, all federal agencies must "seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of [the ESA]." *Id.* § 1531(c)(1).

16.      Under the ESA, the Secretary of the Interior, acting through the FWS, must list wildlife and plant species that are endangered or threatened with extinction. *Id.* § 1533(c)(1).

17.      The Act defines an "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). Similarly, the

7

Act defines a "threatened species" as "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

18.    For purposes of listing, reclassifying, or delisting a species, the "significant portion" of the range includes major geographical areas where the species was once present, regardless of whether the species currently exists in those areas. *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1145 (9th Cir. 2001).

19.    A species must be listed under the ESA if the FWS determines that the species is endangered or threatened due to any of the following factors:

   A.  the present or threatened destruction, modification, or curtailment of its habitat or range;

   B.  overutilization for commercial, recreational, scientific, or educational purposes;

   C.  disease or predation;

   D.  the inadequacy of existing regulatory mechanisms; or

   E.  other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1); 50 C.F.R. § 424.11(c) (hereafter referred to as the "five listing factors").

20.    Likewise, any change in the status of a species must be made in accordance with the five listing factors.  16 U.S.C. § 1533(c)(2)(B).

21.    Listing decisions under the ESA must be based solely upon "the best scientific and commercial data available." *Id.* §§ 1533(b)(1)(A), (c)(2); 50 C.F.R. § 424.11(b), (d).

22.   A species can be delisted only if the best available scientific and commercial data demonstrate that the species is neither endangered nor threatened because it is extinct, because it has recovered, or because the original listing decision was in error.  50 C.F.R. § 424.11(d).

23.   Recovery of a species is "not attained until the threats to the species as analyzed under section 4(a)(1) of the Act have been removed."  51 Fed. Reg. 19926, 19935 (June 3, 1986).  Accordingly, a species can be delisted based on recovery only if the best available scientific and commercial data indicate that it is no longer endangered or threatened under the five listing factors.  50 C.F.R. § 424.11(d)(2).

24.   The ESA directs the FWS to develop and implement recovery plans for listed species, unless such a plan would "not promote the conservation of the species."  16 U.S.C. § 1533(f).

25.   Each recovery plan shall include, to the maximum extent practicable, "a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species."  *Id.* § 1533(f)(1)(B)(i).

26.   Recovery plans should also include "objective, measurable criteria which, when met, would result in a determination . . . that the species be removed from the list."  *Id.* § 1533(f)(1)(B)(ii).  Satisfaction of these criteria, however, does not obviate the requirement that a species can only be delisted based on the five listing factors.  *Id.* § 1533(c)(2)(B); 50 C.F.R. § 424.11(d).

9

27.    Under the ESA, "any person may commence a civil suit on his own behalf . . . against the Secretary [of the Interior] where there is alleged a failure of the Secretary to perform any act or duty under section 1533 of this title which is not discretionary with the Secretary." 16 U.S.C. § 1540(g)(1)(C).

### The Distinct Population Segment Policy

28.    The ESA broadly defines a "species" to include "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16).

29.    Under this definition, the FWS can list a distinct population segment ("DPS") of a vertebrate species, even when the species as a whole is neither endangered nor threatened. *See, e.g.*, 68 Fed. Reg. 10388 (Mar. 5, 2003) (listing the Columbia Basin distinct population segment of the pygmy rabbit as an endangered species).

30.    By extending the protections of the ESA to locally-vulnerable populations, DPSs "protect and conserve species and the ecosystems upon which they depend before large-scale decline occurs that would necessitate listing a species or subspecies throughout its entire range." 61 Fed. Reg. 4722, 4725 (Feb. 7, 1996).

31.    In 1996, the FWS, together with the National Marine Fisheries Service, adopted a policy for determining when DPSs can be designated under the Act. *Id.* ("DPS Policy").

32.    Under the DPS Policy, the FWS must consider three elements in any decision regarding the status of a DPS under the ESA. These elements are:

  a. Discreteness of the population segment in relation to the remainder of the species to which it belongs;

  b. The significance of the population segment to the species to which it belongs; and

  c. The population segment's conservation status in relation to the Act's standards for listing (i.e., is the population segment, when treated as if it were a species, endangered or threatened?).

*Id.*

33. The DPS Policy recognizes a population segment as discrete if it satisfies either of the following conditions:

  a. It is markedly separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors. Quantitative measures of genetic or morphological discontinuity may provide evidence of this separation.

  b. It is delimited by international governmental boundaries within which differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist that are significant in light of [16 U.S.C. § 1533(a)(1)(D)].

*Id.*

34. The DPS Policy determines the significance of a population segment based on the following factors:

  a. Persistence of the discrete population segment in an ecological setting unusual or unique for the taxon;

  b. Evidence that loss of the discrete population segment would result in a significant gap in the range of a taxon;

  c. Evidence that the discrete population segment represents the only surviving natural occurrence of a taxon that may

11

be more abundant elsewhere as an introduced population
outside its historic range; or

    d. Evidence that the discrete population segment differs
markedly from other populations of the species in its
genetic characteristics.

*Id.*

35.     Once a population segment has satisfied these criteria, it can be considered for

listing as a DPS. As with a species or subspecies, a DPS must be evaluated "for endangered

or threatened status . . . based on the Act's definition of those terms and a review of the

factors enumerated in [16 U.S.C. § 1533(a)]." *Id.*

### The Administrative Procedure Act

36.     The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 553-59, 701-06,

provides for judicial review of final agency action such as the Great Lakes delisting rule.

37.     Under the APA, a reviewing court must hold unlawful and set aside agency

action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

## FACTUAL BACKGROUND

### The Gray Wolf

38.     The gray wolf (*Canis lupus*) is the largest member of the canine family, with

an average weight between 55 and 115 pounds. Female wolves weigh slightly less than

males. Wolves are mobile animals and often travel 10 to 30 miles per day.

39.     Wolves prey primarily on wild ungulates (hoofed animals) such as deer, elk,

moose, caribou, and bison. When necessary, they also eat smaller prey like snowshoe hare,

beaver, and rabbits. Some wolves also occasionally prey on livestock, although this is generally not their preferred food and often occurs in circumstances where natural prey species have been eliminated or greatly diminished.

40.    Wolves are habitat generalists, and when they are not being persecuted by humans, they can live anywhere that contains a sufficient population of large ungulates. Historically, wolves ranged across nearly all of North America, including the entire Great Lakes region.

41.    Wolves are social animals and wolf pups are dependent upon family units, or packs, for their survival. Wolf packs in the Great Lakes region generally have between 4 and 8 members, although packs with as many 16 wolves have been recorded. The territories of these packs average between 42 and 100 square miles. The pack itself usually consists of a dominant pair, their pups, and several other subordinate or young animals. The dominant pair leads the pack in hunting, finding den sites, and establishing the pack's territory.

42.    Wolf pups remain with their parents for at least the first year of life, while they learn to hunt. After that, these yearlings typically leave the pack to find mates and territories of their own. This process is called dispersal. Some wolves have been known to disperse more than 500 miles, although wolves usually travel a shorter distance before finding a suitable mate. Dispersal is essential to the viability of the gray wolf. By allowing wolves to interbreed over large geographic areas, dispersal helps maintain genetic diversity. Dispersal is also crucial to wolf recovery, because dispersing wolves often reoccupy areas in which wolves were previously eradicated.

13

## The Significance Of The Gray Wolf

43.     Although the Endangered Species Act applies to virtually any plant or animal threatened with extinction, protection of the gray wolf is particularly vital because the wolf is an "umbrella species." Umbrella species, many of which are large carnivores, are ecologically significant due to their large land-area requirements, which encompass the habitats of numerous smaller species. By conserving wolves, wildlife managers can thus protect multiple species and enhance biodiversity. This effectuates the ESA's broader goal of preserving functioning ecosystems, and not just individual species. *See* 16 U.S.C. § 1531(b). As the House of Representatives explained shortly before the Act's passage, "[t]he essential purpose of the Act is to provide a means for protecting the ecosystems upon which we and other species depend." H.R. Rep. No. 93-412, *reprinted in* Congressional Research Service, A Legislative History of the Endangered Species Act of 1973, at 149 (Feb. 1982).

44.     Because of their sensitivity to human impacts, large carnivores can also provide an early warning when the health of an ecosystem is imperiled.

45.     The ecological benefits of gray wolf recovery are well-documented. Numerous studies have shown that the loss of predator species, like the wolf, reduces biodiversity within ecosystems. In the United States, the elimination of the wolf throughout much of its historic range caused coyotes – which had never before existed outside the Great Plains – to explode in numbers. Coyotes have now taken over most of the wolf's historic range, and their predation activities have adversely affected other species. Because wolves tend to restore the natural balance of ecosystems, such as by displacing coyotes, the ripple

effects of wolf recovery benefit the broader environment. These effects have been seen in the Great Lakes region, where the migration of wolves to Isle Royale National Park corrected an over-population of moose that was damaging the Park's plant communities.

46.    Similarly, the ecology of Yellowstone National Park and surrounding areas has improved since the reintroduction of the wolf in the mid-1990s. In Yellowstone, the reintroduced wolves have changed the grazing behavior of elk and other ungulates along the region's waterways, thus allowing several tree species, including willow and cottonwood, to recover from over-browsing. Furthermore, the wolf's reintroduction bolstered biodiversity by creating shelter and habitat for beavers and songbirds, and by increasing potential trout habitat.

47.    Wolves often improve the health of large ungulates, like moose and elk, by culling weakened and diseased animals from the population. Wolves also benefit scavenger species such as bears, badgers, and eagles, which are provided a reliable food source on a year-round basis from the "leftovers" of wolf kills. Foxes, which are competitors of the coyote, have likewise benefited from the wolf's return. Since the reintroduction of wolves to Yellowstone, fox numbers have increased.

48.    Beyond its pure ecological importance, the gray wolf provides many other benefits to humans. For example, the wolf has great significance for many American Indian tribes in the Great Lakes region. According to the Anishinabe or Objibwa creation story, original man and his brother ma'iingun, the wolf, traveled together to name and visit all the plants, animals, and places on earth. Later they were instructed by the Creator to walk their

15

separate paths, and both were told they would be feared, respected, and misunderstood by the people who joined them on earth.

49.    Wolves also benefit individuals interested in observing and studying wildlife. Although relatively few people may get the opportunity to see or hear a wolf, such experiences provide substantial benefits to those who do. Many others benefit from the wolf simply because of its "existence value." To these people, most of whom might never see a wolf, they appreciate knowing that there are wolf populations in the coterminous United States.

### The Wolf Is Persecuted To The Brink Of Extinction

50.    As noted above, the gray wolf once ranged throughout most of North America. Prior to European contact, the total North American wolf population – including the gray wolf, red wolf, and Mexican wolf – may have numbered as many as 400,000. But these numbers began to drop precipitously as agricultural and industrial development spread over the continent. Increased development was accompanied by widespread persecution of the wolf by humans.

51.    Beginning in the eighteenth century, private citizens and local and state governments authorized and funded bounties intended to eliminate the wolf. The federal government also maintained an aggressive wolf control program until the 1950s. These combined efforts almost entirely eradicated the wolf from the 48 contiguous United States.

52.    This trend was mirrored in the Midwest, which was once home to numerous gray wolves. In the Dakotas, wolves were extirpated by the 1920s or 1930s. And by 1960,

the wolf had been eliminated from Wisconsin and Michigan. Despite the wolf's diminishing range in Minnesota, public bounties were paid up until 1965, and wolves were frequently killed until 1974.

53.    By the early 1970s, the only gray wolves living within the coterminous United States consisted of a small community in Isle Royale National Park and a remnant population, numbering fewer than 1000, in northeastern Minnesota.

### The Wolf's Recovery Begins

54.    The gray wolf was one of the first species to be listed under the Endangered Species Preservation Act of 1966, the forerunner of the ESA. 32 Fed. Reg. 4001 (Mar. 11, 1967). But these legal protections were limited, and it was the 1973 passage of the ESA that marked the true beginning of the wolf's recovery. In August 1974, the FWS listed various subspecies of wolves, including the eastern timber wolf, under the Act.

55.    Eventually, the FWS moved away from protection of individual wolf subspecies and decided instead to list the gray wolf at the species level. Accordingly, in 1978 the FWS listed the gray wolf as endangered throughout the coterminous United States and Mexico, except in Minnesota, where wolves were listed as threatened. 43 Fed. Reg. 9607 (Mar. 9, 1978).

56.    Listing under the ESA ensured that even in those states that still paid bounties and allowed wolf hunting, wolves would be protected.

57.    Protected by the ESA, the Minnesota gray wolf population began to recover. The population grew from approximately 1235 in 1978-79, to between 1500 and 1750 in

17

1988-89, and up to 2445 by 1997-98. The ESA's protections also allowed the wolf to begin reoccupying portions of its historic range. Between 1978 and 1998, the occupied wolf range in Minnesota expanded from approximately 14,038 square miles to 33,971 square miles.

58.    Meanwhile, wolves began dispersing from Minnesota into northern Wisconsin, and from there into the Upper Peninsula of Michigan. Wisconsin first reported a wolf pack in 1975, and Michigan recorded a breeding pair in 1991. As in Minnesota, the ESA's strict protections have allowed the wolf's recovery to begin in these states. By 2006, the FWS estimated there were approximately 3020 wolves in Minnesota, 465 in Wisconsin, and 434 in Michigan.

59.    After their reintroduction in the mid-1990s, wolves also began to recover in the northern Rocky Mountains. Today, the FWS estimates there are approximately 1243 wolves living in Idaho, Montana, and Wyoming.

60.    With its expansion in numbers, the gray wolf has now reoccupied a small portion of its historic range. At the time of the ESA's passage, the gray wolf had been reduced to 1% of its historic range within the coterminous United States. Since then, the wolf has returned to approximately 5% of its range. Despite this limited progress, the gray wolf remains extirpated across the vast majority of its historic range, both within the Great Lakes region and nationwide.

61.    Although the FWS initially listed the wolf, it has frequently undermined the wolf's protection under the ESA. In the 1970s, the FWS authorized an aggressive trapping program in northern Minnesota, which resulted in the take of 151 wolves over a four-year

period before a court stopped the practice. *See Fund for Animals v. Andrus*, Civ. No. 5-78-66, 11 Env't Rep. Cas. (BNA) 2189, 2200-01 (D. Minn. 1978). Likewise, despite the wolf's protected status in 1983 the FWS authorized public sport trapping of wolves in Minnesota. The courts invalidated these regulations, finding that the public hunting of wolves violates the ESA. *Sierra Club v. Clark*, 755 F.2d 608, 615 (8th Cir. 1985) (upholding the district court's conclusion that sport trapping is impermissible under the ESA).

### The FWS's Delisting Efforts

62.    Although the gray wolf's recovery was incomplete, in 2000 the FWS began an intensive campaign to delist the gray wolf throughout the country.

63.    The FWS started by publishing a proposed rule that sought to create four distinct population segments (DPSs) of gray wolves and to downlist the wolf to threatened status within three of them. 65 Fed. Reg. 43450 (July 13, 2000). This rule also proposed to delist the gray wolf entirely in many regions that historically supported wolf populations.

64.    The FWS finalized this proposal in 2003. *See* 68 Fed. Reg. 15804 (April 1, 2003) (the "2003 Rule"). Under the 2003 Rule, the agency created three DPSs, including an Eastern DPS that stretched from the Dakotas, through the Great Lakes region, and all the way to New England. The 2003 Rule also created a Western DPS that extended from the California/Mexico border up to Canada, and over to the eastern border of Montana and Wyoming. The 2003 Rule downlisted the gray wolf from endangered to threatened within both of these DPSs.

65.    On the same day that it published the 2003 Rule, the FWS issued an Advanced

Notice of Proposed Rule Making that announced the agency's intent to delist the gray wolf

entirely within the Eastern and Western DPSs. *See* 68 Fed. Reg. 15876 (April 1, 2003). The

FWS made good on its threat the following year, when it officially proposed to delist the gray

wolf in the Eastern DPS. *See* 69 Fed. Reg. 43664 (July 21, 2004).

66.    A coalition of environmental and animal welfare groups, including the

Plaintiffs in this case, challenged the 2003 Rule, and in January 2005 the federal district court

in Oregon struck down the rule as a violation of the ESA. *Defenders of Wildlife v. Sec'y,*

*U.S. Dep't of the Interior*, 354 F. Supp. 2d 1156 (D. Or. 2005). Independently, the federal

district court in Vermont reached the same result. *Nat'l Wildlife Fed'n v. Norton*, 386 F.

Supp. 2d 553 (D. Vt. 2005). These rulings found the 2003 Rule to be arbitrary and

capricious. By vacating the Rule, these decisions restored the gray wolf to endangered status

throughout the coterminous United States, except in Minnesota, where the wolf continued to

be listed as threatened.

67.    In striking down the 2003 Rule, both opinions disapproved of the boundaries

of the Eastern and Western DPSs. The courts found these boundaries to be much too broad

because they included a great deal of land outside the areas in which wolves were recovering.

The courts drew a sharp distinction between core wolf populations and unoccupied areas,

thus stressing the need for continued ESA protection within unoccupied areas of the wolf

range. As the District of Oregon put it, "the wolf DPS appears to be a tactic for downlisting

areas the FWS has already determined warrants listing, despite the unabated threats and low to nonexistent populations outside of the core areas." *Defenders*, 354 F. Supp. 2d at 1171.

68.    Despite judicial repudiation of its delisting efforts, the FWS remained undeterred. Immediately after the wolf's return to endangered status, the State of Wisconsin submitted an application to lethally take wolves pursuant to 16 U.S.C. § 1539(a)(1), which allows the limited take of an endangered species "for scientific purposes or to enhance the propagation or survival of the affected species." The FWS quickly issued a permit allowing Wisconsin to take up to 34 wolves in 2005. On September 13, 2005, this Court invalidated that permit because the FWS had failed to provide notice and comment before issuing the permit. *Defenders of Wildlife v. Norton*, Order Granting Permanent Injunction, Civ. No. 05-1573-ESH (D.D.C. Sept. 13, 2005). The following day, Wisconsin's resubmitted permit was published in the Federal Register, and in April 2006 the FWS issued a permit allowing Wisconsin to take 43 wolves in 2006. This Court again enjoined implementation of the permit, finding that the lethal take of endangered wolves was not authorized by the ESA. *Humane Soc'y of the United States v. Kempthorne*, Memorandum Opinion, Civ. No. 06-1279-CKK, 2006 WL 4172895 (D.D.C. Aug. 9, 2006).

69.    Meanwhile, the agency renewed its push to delist the gray wolf. In December 2005, the agency announced plans to delist the gray wolf populations in the northern Rocky Mountains and the western Great Lakes.

70.    In an effort to sidestep the problems associated with the 2003 DPS boundaries, the FWS drew the lines tighter this time. The new boundaries were designed to be narrow

enough to show some connection to the Great Lakes and the northern Rocky Mountain wolf populations, yet broad enough to ensure that – upon delisting – any further recovery of the wolf would be precluded.

71.    In March 2006, the FWS formally issued a proposed rule that sought to designate and delist the "western Great Lakes distinct population segment" of the gray wolf. 71 Fed. Reg. 15266 (Mar. 27, 2006).  The proposed DPS still had expansive boundaries, encompassing the eastern Dakotas, all of Minnesota, Wisconsin, and Michigan, and parts of Iowa, Illinois, Indiana, and Ohio.

72.    After releasing the proposal, the FWS received comments expressing opposition to and concerns about the proposal.  Plaintiffs, among other organizations and individuals, commented on the proposed rule, identifying factual and legal defects in the FWS's delisting proposal.  But the agency could not be dissuaded from delisting the wolf.

### The Great Lakes Delisting Rule

73.    On February 8, 2007, the FWS issued its final rule designating and simultaneously delisting the western Great Lakes DPS of the gray wolf.  *See* 72 Fed. Reg. 6052 (Feb. 8, 2007) (the "Final Rule").  As the agency had proposed the year before, the Final Rule carves out a DPS from the nationwide species-level listing of the gray wolf, and removes that DPS from the list of endangered and threatened species.

74.    In doing so, the FWS shirked its responsibility to ensure that the wolf recover "throughout all or a significant portion of its range."  16 U.S.C. § 1532(6).  The gray wolf

22

remains endangered across broad swaths of its historic range, and until the gray wolf has recovered across a significant portion of that range, the wolf cannot be delisted.

75.    Nor can the FWS use the DPS tool to circle up and delist the only two extant gray wolf populations in the coterminous United States. This tactic could be used to justify delisting virtually any species – no matter how endangered – whose remaining populations were clustered within a discrete area. Such a scheme seriously undermines the ESA's purpose of conserving endangered species and the ecosystems on which they depend. *Id.* § 1531(b).

76.    Similarly, the Final Rule flips the DPS Policy on its head. The ESA and the DPS Policy envisioned that distinct population segments would be used to protect a locally-imperiled population of an otherwise viable species. Here, by contrast, the FWS is designating DPSs in order to delist the only relatively viable populations of a species that is otherwise critically endangered.

77.    The boundaries of the western Great Lakes DPS are arbitrary and capricious. Contrary to the Final Rule's suggestion, this DPS does not represent a uniform biotype. The DPS lumps together many distinct habitats, including mixed coniferous forests, eastern broadleaf forests, and the Great Plains of North and South Dakota. All of these habitats once supported populations of the gray wolf.

78.    More fundamentally, the DPS boundaries contravene the ESA's requirement that species must achieve recovery across a significant portion of their range. The Minnesota and Wisconsin wolf management plans, which now govern wolf management in the absence

23

of federal protection, both sanction aggressive wolf control. Minnesota, in particular, has created a virtual "kill zone" by permitting the unregulated private take of wolves in the southern and western parts of the state. The broad boundaries of the DPS, when coupled with these state management plans, effectively preclude any further recovery of the gray wolf.

79.    In fact, the current range of the wolf will actually *shrink* under these state plans. In Minnesota, where an estimated 450 wolves live within the "kill zone," the state plan contemplates the destruction of a wolf community that is equal in size to the Wisconsin and Michigan populations. Even if the FWS could have lawfully created this DPS, the ESA's goal of species conservation would require the agency to draw the DPS boundaries much more narrowly, so that dispersing wolves were protected under the Act.

80.    The Minnesota and Wisconsin management plans, and the lack of plans in many other states, further underscore the wolf's continuing endangerment. Under the ESA, delisting is improper when existing regulatory mechanisms – i.e., state regulations – are inadequate. 16 U.S.C. § 1533(a)(1)(D). In this case, the states have not provided sufficient protections for the gray wolf.

81.    First, the states do not have the financial resources needed to protect and monitor the wolf. Wolf management programs require considerable resources. Until recently, many of these costs were borne by the federal government under the auspices of the ESA. But with delisting, this source of federal funds has dried up, and the states must now fund their own management programs.

24

82.   The Final Rule "rel[ies] heavily on the State wolf management plans for [its] assessment of the degree of protection and monitoring that will occur after Federal delisting," 72 Fed. Reg. at 6086, and the Rule blithely assumes that these "plans will be funded and implemented largely as written." *Id.* at 6068.  But Minnesota has expressed concerns about its ability to fund its program, and there is mounting evidence that the Minnesota plan is not being fully implemented.  The Minnesota plan calls for the hiring of a wolf specialist and a wolf research biologist, as well as the addition of three conservation officers "to ensure that enforcement of various provisions of the wolf plan is adequate."  Yet, on information and belief, the Minnesota Department of Natural Resources has not filled any of these positions, and is only actively working to fill one of them.  This is particularly troubling given that increased enforcement of Minnesota's laws "will be crucial in ensuring that illegal mortality does not significantly increase following Federal delisting."  72 Fed. Reg. at 6086.

83.   Second, even if the state management programs were fully funded and implemented, the gray wolf would not be adequately protected under state law.  Most states within the DPS have no management plans at all, and Michigan's plan is being revised, thus throwing doubt on the future of wolf recovery in that state.

84.   Even those states that do have management plans – Minnesota and Wisconsin – fail to protect the wolf.  As noted above, landowners throughout most of Minnesota now have enormous discretion to kill wolves, even when there is no immediate threat to livestock or domestic pets.  In this vast area, which is home to 450 wolves, the wolf receives hardly any legal protection.  The Minnesota plan also resurrects the old "bounty system" by paying

25

state-certified private predator controllers $150 for each wolf killed. Likewise, Wisconsin's plan significantly liberalizes the conditions under which wolves can be killed. And, as recently quoted in a local news source, the Wisconsin Department of Natural Resources intends to "aggressively" trap and destroy dozens of wolves upon delisting.

85.    Both state plans also recognize the possibility of a public wolf harvest once the FWS finishes its post-delisting monitoring program. *See* 16 U.S.C. § 1533(g) (mandating a five-year monitoring period). This contrasts with the protections of the ESA, which prohibits the hunting of endangered and threatened species. *See, e.g.*, *Sierra Club*, 755 F.2d 608 (finding that an FWS-sanctioned wolf hunt in Minnesota violated the ESA); *Fund for Animals, Inc. v. Turner*, Civ. A. No. 91-2201-MB, 1991 WL 206232 (D.D.C. Sept. 27, 1991) (enjoining an FWS-authorized grizzly bear hunt). The provisions of these state plans thus pose a serious threat to the wolf.

86.    The inadequacies of state management compound other threats to the gray wolf. For example, without adequate law enforcement, illegal wolf killings will likely surge. Even when wolves were protected under the ESA, human-related deaths thwarted the wolf's recovery. In Wisconsin, approximately half of the deaths of radio-collared wolves have come from human causes, such as vehicle accidents and illegal trapping and shooting. Similar figures have been reported for Minnesota and Michigan. But instead of addressing these problems, the Final Rule aggravates them by lifting the protections of the ESA.

87.    State management also increases the risk that disease will decimate wolf populations. Without adequately funded monitoring programs, the wolf remains vulnerable

26

to a catastrophic population loss from diseases like mange. Indeed, in recent years, mange has killed as many wolves in Wisconsin as illegal shooting. As the Wisconsin plan recognizes, wolves could suffer a significant decline if there were a severe mange outbreak. The lack of identified resources for state-level monitoring throughout the DPS creates a risk that such problems will go unnoticed – and unaddressed.

### The Eastern Timber Wolf Recovery Plan

88.     The Final Rule's failure to heed these threats is hardly surprising, given its heavy reliance on the Recovery Plan for the Eastern Timber Wolf. This plan, which was issued in 1978 and revised in 1992, focuses on the eastern timber wolf (*Canis lupus lycaon*), a subspecies that lost legal recognition when the FWS listed the gray wolf at the species level in 1978.

89.     The recovery plan's primary objective was "to maintain and reestablish viable populations of the eastern timber wolf in as much of its former range as is feasible." The plan also set forth specific criteria which, when met, would purportedly qualify the wolf for delisting. These criteria included the retention of a Minnesota population of 1251-1400 wolves and the establishment of a second population consisting of either (a) 100 wolves, if located within 100 miles of the Minnesota population, or (b) 200 wolves, if more than 100 miles from the Minnesota population. The modesty of these goals is underscored by the fact that the target population for Minnesota (1251 wolves) was almost identical to the wolf population at the time the plan was drafted (1235 wolves). By focusing repeatedly on these

27

criteria, the Final Rule effectively displaces the statutory requirements of the ESA with the recovery plan's criteria.

90.    More troubling still, by its own terms the recovery plan does not satisfy the delisting requirements of the ESA. As explained in a 1998 addendum, the recovery plan criteria were intended to ensure the wolf "is no longer in danger of extinction in the foreseeable future." In other words, the recovery plan was aimed solely at preventing *complete extinction* within the coterminous United States. The ESA, by contrast, requires a species to recover across "a significant portion of its range" prior to delisting. 16 U.S.C. § 1532(6).

91.    Even if the recovery plan's delisting criteria were adequate, the broader goals of the plan remain unfulfilled. The FWS has made no attempt to restore the wolf to "as much of its former range as is feasible." Nor has the FWS made any effort to reestablish wolves in the Adirondack Mountains, New Hampshire, or Maine, areas that were identified for wolf restoration in the recovery plan.

92.    Even as the FWS completed delisting in the Great Lakes, the agency moved ahead on its tandem effort to delist wolves in the West. On the same day it released the Final Rule, the FWS issued a proposed rule that sought to create a "northern Rocky Mountain DPS" that includes Montana, Wyoming, Idaho, as well as portions of Washington, Oregon, and Utah, and to remove this DPS from the list of endangered and threatened species. *See* 72 Fed. Reg. 6106 (Feb. 8, 2007). If the FWS finalizes this rule, these two rules would remove federal protection from virtually every gray wolf in the coterminous United States.

28

93.     These delisting efforts are part of a broader campaign by the agency to limit the scope of the Endangered Species Act. Over the past six years, the FWS has listed only 57 species, as compared with 512 species during the previous eight years. The FWS has also rejected numerous petitions to list threatened and endangered species.

94.     Meanwhile, the FWS has expended considerable effort to reduce ESA protections for species that were previously listed. For example, the FWS recently downlisted the American crocodile from endangered to threatened. *See* 72 Fed. Reg. 13027 (Mar. 20, 2007). And, by again invoking the DPS tool, on March 29 the FWS delisted grizzly bears in the greater Yellowstone area, notwithstanding the serious threats that grizzlies face throughout their range. *See* 72 Fed. Reg. 14866 (Mar. 29, 2007).

95.     Because delisting the western Great Lakes wolf population is unlawful, on February 12, 2007, Plaintiffs sent 60-day notice letters advising of their intent to file suit unless the FWS rescinds the Final Rule. *See* 16 U.S.C. § 1540(g)(2)(A).

## COUNT I
### (Violations of the ESA and the APA)

96.     Plaintiffs restate and incorporate the foregoing allegations.

### *The gray wolf remains endangered across a significant portion of its range*

97.     The ESA mandates protection for species that are endangered or threatened throughout all or a significant portion of their range. 16 U.S.C. § 1532(6), (20).

98.     Because the gray wolf remains endangered throughout a significant portion of its range, delisting of the wolf is impermissible.

29

99.    By delisting the gray wolf despite its endangered status, the Final Rule violates the ESA.

### *The five listing factors demonstrate the wolf's continuing endangerment*

100.    The ESA and its implementing regulations provide that a species has not recovered, and cannot be delisted, until the species is no longer threatened or endangered under the five listing factors of 16 U.S.C. § 1533(a)(1). 16 U.S.C. § 1533(c)(2)(B); 51 Fed. Reg. at 19935; 50 C.F.R. § 424.11(d)(2).

101.    The Final Rule violates the ESA and its implementing regulations because:

a)    The gray wolf's habitat and range are threatened by destruction, modification, and curtailment.

b)    The gray wolf is at risk of overutilization for commercial, recreational, scientific, and educational purposes.

c)    The gray wolf faces severe threats from disease and human predation.

d)    Without the ESA, the regulatory mechanisms protecting the gray wolf are inadequate. Few states (either within or outside the DPS) have wolf management plans, and those states that have plans fail to adequately protect existing wolf populations or ensure further recovery of the wolf.

e)    There are other manmade factors affecting the gray wolf's continued existence and recovery.

### *The FWS cannot lawfully designate the western Great Lakes DPS*

102.    The ESA and the DPS Policy direct that DPSs be designated "to protect and conserve species and the ecosystems upon which they depend before large-scale decline occurs that would necessitate listing a species or subspecies throughout its entire range." 61

30

Fed. Reg. at 4725. The DPS Policy further requires that distinct population segments have

significance for the species as a whole. *Id.*

103.   The Final Rule simultaneously designated and delisted the western Great

Lakes DPS of the gray wolf, thereby removing the protections of the ESA from a population

of wolves whose loss "would result in a significant gap in the range of the taxon." *Id.*

104.   By creating a DPS for delisting purposes, the Final Rule violates the ESA and

the DPS Policy.

105.   The Final Rule also violates the ESA and the DPS Policy because the

boundaries of the western Great Lakes DPS are arbitrary and capricious.  These boundaries

(a) hinder, rather than promote, recovery of the gray wolf; (b) include numerous distinct

habitats, rather than a uniform biotype; and (c) bear no resemblance to the current

distribution of the gray wolf.

### The Final Rule is not based on the best available data

106.   The ESA and its implementing regulations require that listing and delisting

decisions be made solely on the basis of the best scientific and commercial data available.  16

U.S.C. §§ 1533(b)(1)(A), (c)(2); 50 C.F.R. § 424.11.

107.   Because the decision to delist the gray wolf was not based on the best available

scientific and commercial data, the Final Rule violates the ESA.

### The Final Rule impermissibly overrelies on the Recovery Plan

108.   The ESA directs the FWS to develop recovery plans for endangered and

threatened species.  Under the ESA and its implementing regulations, however, the FWS

31

cannot delist a species based on the satisfaction of criteria set forth in a recovery plan. 16 U.S.C. § 1533(c)(2); 50 C.F.R. § 424.11(d).

109.    By overrelying on the criteria set forth in the Recovery Plan of the Eastern Timber Wolf, the Final Rule violates the ESA and its implementing regulations.

110.    Because the Final Rule violates the ESA and its implementing regulations and policies, the Final Rule is arbitrary, capricious, an abuse of discretion, and not in accordance with law. 5 U.S.C. § 706(2)(A).

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs request the following relief:

1.    A declaration that the FWS violated the ESA and its implementing regulations and policies, and that the Final Rule is arbitrary, capricious, an abuse of discretion, and not in accordance with law;

2.    An injunction preventing the FWS from implementing any aspect of the Final Rule;

3.    An order vacating the Final Rule;

4.    An order that Plaintiffs recover their costs, including reasonable attorneys' fees, incurred in connection with this action, as provided for under the Endangered Species Act, 16 U.S.C. § 1540(g)(4), the Equal Access to Justice Act, 28 U.S.C. § 2412(d), or other applicable law; and

5.      Such other relief as the Court deems just and proper.


Dated: April 16, 2007

Respectfully submitted,

*Rebecca G. Judd*

Rebecca G. Judd, D.C. Bar No. 486315
rjudd@hsus.org
Jonathan R. Lovvorn, D.C. Bar No. 461163
jlovvorn@hsus.org
The Humane Society of the United States
2100 L Street, NW
Washington, DC  20037
(202) 452-1100
(202) 778-6132 (facsimile)

Brian B. O'Neill, Minn. Bar No. 82521
boneill@faegre.com
Sanne H. Knudsen, Minn. Bar No. 0344552
sknudsen@faegre.com
Michael C. Soules, D.C. Bar No. 477911
msoules@faegre.com
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-3901
(612) 766-7000
(612) 766-1600 (facsimile)

*Attorneys for Plaintiffs The Humane Society of the United States, Help Our Wolves Live, and Animal Protection Institute*

33

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

677 PLF

## I (a) PLAINTIFFS

The Humane Society of the United States; Help Our Wolves Live ("HOWL"); and Animal Protection Institute

## DEFENDANTS

Secretary of the Interior Dirk Kempthorne; United States Department of the Interior; and United States Fish and Wildlife Service

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    11001
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Rebecca G. Judd
The Humane Society of the US.
2100 L Street, NW
Washington, DC 20037
202-452-1100

Case: 1:07-cv-00677
Assigned To : Friedman, Paul L.
Assign. Date : 4/16/2007
Description: Humane Society v. Kempthorne

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ○ 3 Federal Question (U.S. Government Not a Party)
- ◉ 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

- ○ **A. Antitrust**
  - ☐ 410 Antitrust

- ○ **B. Personal Injury/ Malpractice**
  - ☐ 310 ...

- ◉ **C. Administrative Agency Review**
  - ☐ 151 Medicare Act
  - **Social Security:**
    - ☐ 861 HIA ((1395ff)
    - ☐ 862 Black Lung (923)
    - ☐ 863 DIWC/DIWW (405(g)
    - ☐ 864 SSID Title XVI
    - ☐ 865 RSI (405(g)
  - **Other Statutes**
    - ☐ 891 Agricultural Acts
    - ☐ 892 Economic Stabilization Act
    - ☒ 893 Environmental Matters
    - ☐ 894 Energy Allocation Act
    - ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

- ○ **D. Temporary Restraining Order/Preliminary Injunction**
  - Any nature of suit from any category may be selected for this category of case assignment.
  - *(If Antitrust, then A governs)*

ty
lity
iability
y

Court Name: District of Columbia
Division: 1
Receipt Number: 4616003592
Cashier ID: dcallis
Transaction Date: 04/16/2007
Payer Name: FAEGRE BENSON

CIVIL FILING FEE
For: FAEGRE BENSON
Amount:      $350.00

CHECK
Check/Money Order Num: 721059
Amt Tendered: $350.00

Total Due:      $350.00
Total Tendered: $350.00
Change Amt:     $0.00

07-0677

Only when the bank clears the check, money order, or verifies credit of funds, is the fee or debt officially paid or discharged.  A $45 fee will be charged for a returned check.

- ○ **F. Pro Se General Civil**

| Forfeiture/Penalty | |
|---|---|
| ☐ 610 Agriculture | |
| ☐ 620 Other Food &Drug | |
| ☐ 625 Drug Related Seizure of Property 21 USC 881 | |
| ☐ 630 Liquor Laws | |
| ☐ 640 RR & Truck | |
| ☐ 650 Airline Regs | |
| ☐ 660 Occupational Safety/Health | |
| ☐ 690 Other | |

1 28 USC 158
rawal 28 USC 157

ons
Penalty
amus & Other
Rights
Condition

Rights

mark

its
US plaintiff or
ant
hird Party 26
609

☐ 460 Deportation

**Other Statutes**
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act)

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ **530 Habeas Corpus-General**<br>☐ **510 Motion/Vacate Sentence** | ☐ **442 Civil Rights-Employment**<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ **895 Freedom of Information Act**<br>☐ **890 Other Statutory Actions**<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ **152 Recovery of Defaulted Student Loans**<br>(excluding veterans) |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ **710 Fair Labor Standards Act**<br>☐ **720 Labor/Mgmt. Relations**<br>☐ **730 Labor/Mgmt. Reporting & Disclosure Act**<br>☐ **740 Labor Railway Act**<br>☐ **790 Other Labor Litigation**<br>☐ **791 Empl. Ret. Inc. Security Act** | ☐ **441 Voting (if not Voting Rights Act)**<br>☐ **443 Housing/Accommodations**<br>☐ **444 Welfare**<br>☐ **440 Other Civil Rights**<br>☐ **445 American w/Disabilities-Employment**<br>☐ **446 Americans w/Disabilities-Other** | ☐ **110 Insurance**<br>☐ **120 Marine**<br>☐ **130 Miller Act**<br>☐ **140 Negotiable Instrument**<br>☐ **150 Recovery of Overpayment & Enforcement of Judgment**<br>☐ **153 Recovery of Overpayment of Veteran's Benefits**<br>☐ **160 Stockholder's Suits**<br>☐ **190 Other Contracts**<br>☐ **195 Contract Product Liability**<br>☐ **196 Franchise** | ☐ **441 Civil Rights-Voting**<br>(if Voting Rights Act) |

**V. ORIGIN**

◉ **1 Original Proceeding**  ○ **2 Removed from State Court**  ○ **3 Remanded from Appellate Court**  ○ **4 Reinstated or Reopened**  ○ **5 Transferred from another district (specify)**  ○ **6 Multi district Litigation**  ○ **7 Appeal to District Judge from Mag. Judge**

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

*See attachment* Endangered Species Act, 16 U.S.C. 1531 et seq., U.S. Dept of Interior violated ESA by unlawfully issuing Final rule delisting Western Great Lakes DPS of gray wolf.

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23  ☐ | **DEMAND $** ................. Check YES only if demanded in complaint<br>**JURY DEMAND:**   YES ☐   NO ☐ |
|---|---|---|

| **VIII. RELATED CASE(S) IF ANY** | (See instruction) | YES ☐   NO ☒   If yes, please complete related case form. |
|---|---|---|

DATE **April 16, 2007**   SIGNATURE OF ATTORNEY OF RECORD *Rebecca J. Judd*

JTC

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

**I.**   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

**III.**   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

**IV.**   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

**VI.**   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.**   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.