**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| HUMANE SOCIETY OF THE UNITED STATES, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:07-cv-00677(PLF) |
| DIRK KEMPTHORNE, Secretary of the Interior, *et al.*, | ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| SAFARI CLUB INTERNATIONAL, *et al.* | ) ) | |
| Defendant-Intervenor Applicants. | ) ) | |

**REPLY OF SAFARI CLUB INTERNATIONAL, SAFARI CLUB INTERNATIONAL**
**FOUNDATION AND NATIONAL RIFLE ASSOCIATION TO PLAINTIFFS'**
**RESPONSE TO MOTION TO INTERVENE**

Safari Club International ("SCI"), Safari Club International Foundation ("SCIF"), and the National Rifle Association ("NRA"), (collectively "SCI *et al.*"), by and through their counsel, reply to Plaintiffs' Response to SCI *et al.'s* Motion to Intervene. Plaintiffs challenge SCI *et al.*'s ability to intervene "as of right" but contend that they do not oppose permissive intervention, provided that the court severely restricts the extent of SCI *et al.'s* participation. Plaintiffs' challenge to SCI *et al.*'s interest in wolf delisting and the outcome of this litigation as well as to the adequacy of Defendant Kempthorne *et al.*'s ("Federal Defendants") ability to defend SCI *et al.*'s interests are unfounded. The severe restrictions suggested by Plaintiffs for SCI *et al.*'s participation are neither appropriate nor required.

## SCI *et al*. Satisfy the Requirements for Intervention as of Right

The fact that Plaintiffs are willing to accede to SCI *et al*.'s permissive intervention should not thwart SCI *et al*.'s legally and factually supported intervention as of right. *See* Fed. R. Civ. P. 24(a) (anyone meeting standard "shall be permitted to intervene"). Plaintiffs' Response suggests a challenge to SCI *et al*.'s direct interest in wolf delisting and the outcome of this litigation, yet Plaintiffs fail to substantiate that challenge with any fact or argument to refute the information contained in the six declarations that SCI *et al*. included with their Motion to Intervene. In those statements, SCI and NRA members describe their encounters with wolves, the impact to their hunting success and enjoyment, as well as their concern for the safety of their family, friends and pets. *See* Motion to Intervene at 7 and Exhibits "B"- "G".

The substance of Plaintiff's challenge to SCI *et al*.'s intervention focuses on the adequacy of the Federal Defendants' defense of SCI *et al*.'s interests. Plaintiffs ignore the fact that the government and SCI *et al*. do not share identical positions. Federal Defendants wish to defend their decision to delist the wolf, but there is no reason to believe that Federal Defendants will stand up for SCI *et al*.'s position on wolf population management and control in areas where SCI and NRA members live and hunt. Nor can Federal Defendants be expected to support eventual wolf harvests as a sustainable use management tool for the species. The Federal Defendants are not on the ground in the three states encountering wolves during recreational activities.

As explained in SCI *et al*.'s Motion to Intervene, the burden of establishing inadequate representation by other parties to the litigation is "minimal," *Trbovich v. United Mine Workers of America*, 404 U.S. 528, 538 n.10 (1972), or "not onerous." *Dimond v. District of Columbia,* 792 F.2d 179, 192 (D.C. Cir. 1986). Although it is hardly surprising that SCI *et al*. and the Federal

Defendants want to see the same result in this litigation, that is no reason to deny SCI *et al*.'s intervention as of right.

Plaintiffs have made no attempt to distinguish or argue against many of the cases that SCI *et al*. cited in which the courts have recognized that a Federal agency could not adequately represent the interests of members of the public.  Motion to Intervene at 18-20, citing *Natural Resources Defense Council,* 561 F.2d 904, 912 (D.C. Cir. 1977); *American Horse Protection Ass'n v. Veneman*, 200 F.R.D. 153, 158 (D.D.C. 2001); Plaintiffs also fail to mention that in *Humane Soc'y of the United States v. Kempthorne*, Civ. No. 06-1279(CKK), the last case involving gray wolves to be considered by a District of Columbia district court—a case Plaintiffs cite to bolster their opposition to SCI *et al.'s* intervention—Judge Kollar-Kotelly granted SCI and SCIF's intervention as of right.  In that case, Plaintiffs Humane Society of the United States, Help Our Wolves Live and Animal Protection Institute, together with other animal rights groups, filed suit to challenge a permit issued by the U.S. Fish and Wildlife Service to Wisconsin that authorized state wildlife officials to use lethal methods to control "endangered" gray wolves that were preying on livestock and pets.  In her memorandum opinion dated August 9, 2006, Judge Kollar-Kotelly specifically dispelled any suggestion that the Federal Defendant's defense would be adequate to represent SCI and SCIF's more specific interest in the lethal management of then "endangered" gray wolves.

> SCI has met the aforementioned criteria necessary to intervene as of right as a defendant in the instant action.  . . .  SCI has a cognizable interest that may be impaired, as the requested relief in the instant case would modify the employment of what SCI defines as "sustainable use conservation" toward wolves in Wisconsin, in which SCI has demonstrated a longstanding interest. Furthermore, SCI's members who are residents of Wisconsin who have encountered wolves on their land will be affected if the lethal take of depredating wolves is prohibited. SCI has demonstrated that the government's interests differ from its own in that the FWS as a federal agency "bears an obligation to represent the interests of all

those who enjoy and seek to conserve wolves, including individuals who do not support sustainable use conservation . . . ." (citations omitted).

Judge Kollar-Kotelly's Memorandum Opinion is attached to this Reply as Exhibit "A." Judge Kollar-Kotelly also noted that SCI had previously been granted intervention as of right in the District Court for the District of Oregon in a case brought by animal rights groups to challenge the U.S Fish and Wildlife Service's reclassification of wolves from "endangered" to threatened" status. *Defenders of Wildlife v. Norton*, 354 F. Supp. 2d 1156, 1159 n.1 (D.Or. 2005).

As two federal District Courts dealing with cases involving wolf listing and conservation have previously recognized, the outcome of litigation about the status of wolves will affect SCI *et al*. differently than it will affect Federal Defendants. If Plaintiffs are successful, wolves will once again be listed as "endangered," and the U. S. Fish and Wildlife Service will reassume responsibility for the conservation of the species. However, it is members of SCI and the NRA who are the ones who would be directly affected by a restoration of Federal management of the species. Members of SCI and NRA enjoy recreational uses of wildlife that the U. S. Fish and Wildlife Service, as a federal agency, is simply incapable of undertaking. Hunters are the ones competing with wolves in Michigan, Minnesota and Wisconsin, losing prey to wolves, encountering wolves in the woods, being stalked by wolves while hunting, and losing their enjoyment and sense of security while pursuing recreational activities. *See* Motion to Intervene at 7. Thus, the Federal Defendants cannot possibly represent an interest that they do not share, much less *adequately* represent that interest.

## Restrictions on Intervention

Plaintiffs' goal in consenting to "permissive" intervention is apparently to place severe restrictions on the nature of SCI *et al*.'s participation in the case. Plaintiffs attempt to place not one, but two significant restrictions on SCI *et al.*'s ability to defend the delisting. First, Plaintiffs

want SCI *et al.* to file a single set of submissions in coordination with the U.S. Sportsmen's Alliance and Wisconsin Bear Hunters' Association ("Bear Hunters' Group") intervenor-applicants. Second, Plaintiffs want to further limit participation by reducing the total page allotments for the memoranda submitted by these intervenors as a group. In short, Plaintiffs want to reduce by half the potential briefing opportunities available to the two distinct groups and then further reduce by more than half the page limitations that would regularly be available to the group as a unit. In effect, Plaintiffs seek to penalize SCI *et al.* for intervening, by whittling away at SCI *et al.*'s ability to defend its interests. Plaintiffs purport to want to save the court from having to read multiple pages of legal argument, but there can be no denying the fact that it is Plaintiffs who, by filing this litigation, brought this task to this court's door.[1]

SCI *et al.* acknowledge that in other cases where they have sought intervenor status, SCI and SCIF have worked collaboratively with U.S. Sportsmen's Alliance and with other groups that have represented similar interests. In some cases, these collaborations have been instigated by the groups themselves and in other situations the coordination has been court ordered. In this case, however, SCI *et al.'s* interests and the interest of the Bear Hunters' group overlap but are not identical. Moreover, SCI *et al.* have long been involved independently of the Bear Hunters' group in the wolf cases and prefer to maintain that status in this case. Both groups represent hunters who support conservation and recreational opportunities, but the Bear Hunters' group has focused their representation on bear hunters from Wisconsin, and have chosen to offer the declarations of individual bear hunters whose hunting dogs have been threatened, attacked and/or

---

[1]    SCI *et al.* note that of the 17 animal rights groups that filed suit in federal district court in Oregon in 2003 to challenge the reclassification of grey wolves from "endangered" to "threatened" status, including Defenders of Wildlife, Sierra Club, American Lands Alliance, Animal Protection Institute, Center for Biological Diversity, Forest Watch, Hells Canyon Preservation Council, Help Our Wolves Live, Humane Society of the United States, Klamath Forest Alliance, Klamath Siskiyou Wildlands Center, Minnesota Wolf Alliance, Oregon Natural Resources Council, PEER, RESTORE the North Woods, Sinapu and Wildlands Project, only three of those groups decided to bring this suit to challenge the delisting of wolves.

harmed by gray wolves.  SCI *et al*. also have presented declarations of hunters from Michigan and Minnesota who have competed with wolves for prey, have lost prey to wolves, have been stalked by wolves, have been personally threatened by wolves.  The two groups share interests and experiences but these interests, experiences and concerns are not identical.

While collaboration between the two sets of intervenor-applicants is certainly feasible and unquestionably within the power of the court to require, courts are not required to mandate a joinder of the intervenor-applicants in order to facilitate the participation of multiple intervenors with shared but not necessarily identical interests.  For example in *Defenders of Wildlife v. Norton*, *supra*, the Oregon federal district court allowed several distinct intervenors to participate, brief and argue their positions separately.  Briefs and oral arguments were individually presented by representatives of the state of Wyoming, the state of Idaho, the state of Montana and a group of non-governmental intervenor defendants, including the Oregon Cattlemen's Association, Oregon Hunters' Association, the American Farm Bureau, Safari Club International and Safari Club International Foundation.  Here in the federal district court for the District of Columbia, Judge Gladys Kessler, in the case of *Fund for Animals v. Norton*, 295 F. Supp.2d 1, 2 (D.D.C. 2003) allowed separate participation by different groups of intervenors with similar but not identical interests.  One intervenor group composed of the Foundation for North American Wild Sheep, Grand Slam Club/OVIS, Conservation Force and several individual hunters and guides, filed briefs and argued separately from a another group of hunting organizations that included Safari Club International and Wildlife Conservation Fund of America.

If this court deems it necessary to somehow manage the participation of the intervenors who have justified their intervention in this case as of right, the court need not accept the

recommendations of the Plaintiffs and can instead simply order a reasonable reduction in the page allotments afforded each intervenor group. SCI *et al.* ask only that, in deciding on the nature and extent of the participation of the SCI *et al.* intervenor group, the court take into account SCI *et al.*'s long history of participation as an intervenor as of right in litigation involving gray wolf status, recovery and conservation, SCI *et al.*'s distinctive concern and stake in the outcome of this litigation and the significance of wolf conservation and management to SCI *et al.*'s support of sustainable use conservation.

WHEREFORE, SCI *et al.* respectfully request that this Court grant its Motion to Intervene as of right and that the Court allow SCI *et al.* to proceed on their own as an intervenor in this litigation, without limitation in their effort to defend against Plaintiffs' challenge to the delisting of the gray wolves of the Western Great Lakes Distinct Population Segment.

Respectfully Submitted,

*Anna M. Seidman*

Anna M. Seidman (D.C. Bar No. 417091)
Douglas S. Burdin (D.C. Bar No. 434107)
Safari Club International
501 2nd Street NE
Washington, D. C. 20002
Telephone: (202)-543-8733
Facsimile: (202)-543-1205
aseidman@sci-dc.org
dburdin@sci-dc.org

*Counsel for*
*Safari Club International and*
*Safari Club International Foundation*
*and the National Rifle Association*

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| HUMANE SOCIETY OF THE UNITED STATES, *et al*., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:07-cv-00677(PLF) |
| | ) | |
| DIRK KEMPTHORNE, Secretary of the Interior, *et al.*, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SAFARI CLUB INTERNATIONAL, *et al.* | ) | |
| | ) | |
| Defendant-Intervenor Applicants. | ) | |
| | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that the Reply of Safari Club International, Safari Club International Foundation and the National Rifle Association to Plaintiffs' Response To Motions To Intervene has been filed via the Court's ECF system and that system will effect service on the following:

Rebecca Gerber Judd
THE HUMANE SOCIETY OF THE UNITED STATES
2100 L Street, NW
Washington, DC 20037
(202) 676-2333
Email: rjudd@hsus.org

Brian B. O'Neill
Michael C. Soules
Sanne H. Knudsen
FAEGRE & BENSON, LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
(612) 766-7000

Email: boneill@faegre.com
Email: msoules@faegre.com
Email: sknudsen@faegre.com

Jimmy A. Rodriguez
U.S. DEPARTMENT OF JUSTICE
P.O. Box 7369
Washington, DC 20044
(202) 305-0342
Email: jimmy.rodriguez@usdoj.gov

William P. Horn
BIRCH, HORTON, BITTNER AND CHEROT
1155 Connecticut Avenue, NW
Suite 1200
Washington, DC 20036
(202) 659-5800
Email: whorn@dc.bhb.com

Respectfully Submitted,

Anna M. Seidman (D.C. Bar No. 417091)
Douglas S. Burdin (D.C. Bar No. 434107)
Safari Club International
501 2nd Street NE
Washington, D. C.  20002
Telephone: (202)-543-8733
Facsimile: (202)-543-1205
aseidman@sci-dc.org
dburdin@sci-dc.org

*Counsel for*
*Safari Club International and*
*Safari Club International Foundation*
*and the National Rifle Association*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

HUMANE SOCIETY OF THE UNITED
STATES, *et al.*,

    Plaintiffs,

      v.

DIRK KEMPTHORNE,
Secretary of the Interior, *et al.*,

    Defendants.

Civil Action No. 06–1279 (CKK)

**MEMORANDUM OPINION**
(August 9, 2006)


The gray wolf (*Canis lupus*) is classified as an endangered species in the state of

Wisconsin and throughout all but one of the remaining coterminous United States.  At issue in

the instant case is the legality of a lethal depredation control program allowing up to forty-three

*endangered* wolves to be killed in Wisconsin pursuant to a permit issued by the United States

Fish and Wildlife Service ("FWS") with the purpose of fostering greater social tolerance for

wolves.

    Plaintiffs The Humane Society of the United States, Animal Protection Institute, Friends

of Animals and Their Environment ("FATE"), Help Our Wolves Live ("HOWL"), Indigenous

Environmental Network, Klamath Forest Alliance, and RESTORE: The North Woods filed a

Complaint on July 19, 2006 for injunctive and declaratory relief against Defendants Dirk

Kempthorne in his capacity as Secretary of the Interior, the United States Department of the

Interior, H. Dale Hall in his capacity as Director of FWS, and FWS.  Presently before the Court is

the [5] Motion for Preliminary Injunction filed by Plaintiffs on July 25, 2006, requesting that the Court enjoin Defendants, their employees, agents, and all others acting in concert or participation with Defendants from allowing the killing of gray wolves pursuant to the lethal depredation control provisions of Permit No. TE111360–0, and that the Court direct FWS to immediately stop the Wisconsin Department of Natural Resources, its employees, agents, and any and all others acting in concert or participation with it, from any further killing of gray wolves pursuant to the lethal depredation control provisions of the same.

The Parties participated in a conference call on the record on July 26, 2006.  Defendants filed an Opposition to Plaintiffs' Motion for Preliminary Injunction on August 1, 2006. Additionally, Safari Club International and Safari Club International Foundation filed a Motion to Intervene, which the Court has granted as of right, and an Opposition to Plaintiffs' Motion for Preliminary Injunction.  Plaintiffs filed a Reply on August 3, 2006.  After considering all of the aforementioned filings, the relevant statutes and case law, and the administrative record, the Court shall GRANT Plaintiffs' Motion for Preliminary Injunction.  Based on the foregoing analysis, the Court concludes that Plaintiffs have demonstrated a substantial likelihood of success on the merits that a lethal depredation control program applied to an endangered species contravenes the plain meaning and clear intent of Congress as set forth in Section 10(a)(1)(A) of the Endangered Species Act.  Plaintiffs have additionally demonstrated irreparable injury, shown that the issuance of a preliminary injunction would on balance cause minimal harm to Defendants and Defendant-Intervenors, and demonstrated that the public interest supports granting preliminary injunctive relief.

## I: BACKGROUND

2

A.       *The Endangered Species Act*

"[T]he Endangered Species Act of 1973 represented the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978) (hereinafter "*TVA v. Hill*").  "'The plain intent of Congress in enacting this statute,' we recognized, 'was to halt and reverse the trend toward species extinction, whatever the cost.  This is reflected not only in the stated policies of the Act, but in literally every section of the statute.'" *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 699 (1995) (quoting *TVA v. Hill*, 437 U.S. at 184)).  The ESA further includes a congressional mandate to federal agencies, including the statement that "[i]t is further declared to be the policy of Congress that all Federal departments and agencies shall seek to *conserve* endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter."  16 U.S.C.A. § 1531(c)(1) (emphasis added).  To "conserve" is defined pursuant to 16 U.S.C. § 1532(3) as "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary.  Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the *extraordinary* case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking."  16 U.S.C. § 1532(3) (emphasis added).

The ESA allows the Secretary of the Interior to designate certain species of animal life as having protected status.  16 U.S.C. § 1533(a)(1).  *See also TVA v. Hill*, 437 U.S. at 159–60;

3

*Rancho Viejo, LLC v. Norton*, 323 F.3d 1062, 1064 (D.C. Cir. 2003). There are three different categories of federally-protected species under the ESA–endangered species, threatened species, and experimental populations. Endangered species are defined pursuant to 16 U.S.C. § 1532(6) as "any species which is in danger of extinction throughout all or a significant portion of its range other than a species of the Class Insecta determined by the Secretary to constitute a pest whose protection under the provisions of this chapter would present an overwhelming and overriding risk to man." 16 U.S.C. § 1532(6). Threatened species are defined pursuant to 16 U.S.C. § 1532(20) as "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). And experimental populations, sometime referred to as "10(j)" populations, are defined pursuant to 16 U.S.C. § 1539(j) and are treated similarly to threatened species with some defined exceptions. *See* 16 U.S.C. § 1539(j). Endangered species are afforded the highest level of protection of any species classification. *See TVA v. Hill*, 437 U.S. at 174 ("[E]xamination of the language, history, and structure of the [ESA] indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities.").

Section 9 of the ESA makes it unlawful to "take any [endangered] species within the United States or the territorial sea of the United States." 16 U.S.C. § 1538(a)(1)(B). To "take" an endangered species is defined by the ESA to include "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). Pursuant to Section 10(a)(1)(A) of the ESA, 16 U.S.C. § 1539(a)(1)(A), the Secretary of the Interior "may permit, under such terms and conditions as he shall prescribe–any act otherwise prohibited by [Section 9] of this title for scientific purposes or to enhance the

4

propagation or survival of the affected species, including, but not limited to, acts necessary for the establishment and maintenance of experimental populations pursuant to subsection (j) of this section."  Section 10(a)(1)(A) permits are generally referred to as either "scientific" or "recovery" permits.  *See Nat'l Ass'n of Home Builders v. Norton*, 298 F. Supp. 2d 68, 72 (D.D.C. 2003), *aff'd*, 415 F.3d 8 (D.C. Cir. 2005).  Regulations have been issued by the FWS which set forth the factors that the FWS "shall" consider when determining whether to issue a Section 10(a)(1)(A) permit:

> (i) Whether the purpose for which the permit is required is adequate to justify removing from the wild or otherwise changing the status of the wildlife sought to be covered by the permit;

> (ii) The probable direct and indirect effect which issuing the permit would have on the wild populations of the wildlife sought to be covered by the permit;

> (iii) Whether the permit, if issued, would in any way, directly or indirectly, conflict with any known program intended to enhance the survival probabilities of the population from which the wildlife sought to be covered by the permit was or would be removed;

> (iv) Whether the purpose for which the permit is required would be likely to reduce the threat of extinction facing the species of wildlife sought to be covered by the permit;

> (v) The opinions or views of scientists or other persons or organizations having expertise concerning the wildlife or other matters germane to the application; and

> (vi) Whether the expertise, facilities, or other resources available to the applicant appear adequate to successfully accomplish the objectives stated in the application.

50 C.F.R. § 17.22(a)(2).  The Court notes that these regulations are not at issue in the instant case (in other words, Plaintiffs do not contend that Defendants arbitrarily and capriciously applied such regulations in the issuance of the permit in question), but rather Plaintiffs contend that the authorization of a lethal depredation control program is contrary to Section 10(a)(1)(A) itself.

B.    *The Endangered Gray Wolf*

On March 9, 1978, the gray wolf was listed as an endangered species throughout the coterminous United States, with the exception of Minnesota where the gray wolf was classified as threatened.  *See* Pls.' Mem. Prelim. Inj. at 3; Defs.' Opp'n at 6 (citing 43 Fed. Reg. 9607 (March 9, 1978)); Final Rule to Reclassify and Remove the Gray Wolf from the List of Endangered and Threatened Wildlife in Portions of the Coterminous United States, 68 Fed. Reg. 15804, 15806 (April 1, 2003) ("April 2003 Final Rule").  On April 1, 2003, the FWS reclassified the gray wolf from endangered to threatened.  *See* April 2003 Final Rule.  Reclassifying the gray wolf from endangered to threatened allowed FWS to promulgate regulations with respect to the gray wolf pursuant to Section 4(d) of the ESA.  16 U.S.C. § 1533(d) ("Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species.").  FWS implemented Section 4(d) regulations as part of the April 2003 Final Rule that authorized "the full spectrum of depredation control actions, from nonlethal opportunistic harassment to lethal control of depredating wolves."  April 2003 Final Rule, 68 Fed. Reg. at 15868.  *See* Pls.' Mem. Prelim. Inj. at 4; Defs.' Opp'n at 8.  However, in *Defenders of Wildlife v. Norton*, 354 F. Supp. 2d 1156 (D. Or. 2005), the court held that the April 2003 Final Rule violated the ESA such that the gray wolf regained its endangered status.  *Defenders of Wildlife v. Norton*, 354 F. Supp. 2d 1156, 1174 (D. Or. 2005).  The court also enjoined FWS from implementing the depredation abatement program that had been authorized by FWS under Section 4(d) of the ESA.  *Id.*

C.    *The 2005 Wisconsin Subpermit and 2006 Wisconsin Permit*

6

In February of 2005, in light of the gray wolf's return to endangered status and Wisconsin's continued desire to control depredations by wolves, Wisconsin submitted a permit application to FWS requesting the authority to implement a depredation control program with respect to the endangered gray wolf pursuant to Section 10(a)(1)(A) of the ESA.  Pls.' Mem. Prelim. Inj. at 5, Ex. C (Memorandum from Ron Refsnider, Region 3 Listing Coordinator & Wolf Recovery Coordinator, to TJ Miller, Region 3 Endangered Species Program Manager (Mar. 17, 2005)).  On April 1, 2005, the FWS issued a Section 10(a)(1)(A) permit to the Wisconsin Department of Natural Resources, authorizing the lethal take of up to 34 wolves in 2005.  *See* Pls.' Mem. Prelim. Inj. at 6, Ex. D (Subpermit No. 05–03 A1, hereinafter "2005 subpermit"); Defs.' Opp'n at 9.  However, the 2005 subpermit was vacated via the issuance of a permanent injunction in *Defenders of Wildlife v. Norton*, Civil Action No. 05–1573 (D.D.C.), as Judge Ellen Huvelle determined during a hearing on plaintiffs' motion for preliminary injunction that FWS had failed to provide an opportunity for notice and comment before issuing the 2005 subpermit.  Pls.' Mem. Prelim. Inj. at 6, Ex. E (*Defenders of Wildlife v. Norton*, Order Granting Permanent Injunction, Civil Action No. 05–1573 (D.D.C. September 13, 2005)); Defs.' Opp'n at 9.  At the time the permanent injunction was granted, 29 of the 34 wolves authorized to be lethally taken in Wisconsin had already been killed.  *See* Pls.' Mem. Prelim. Inj. at 7, Ex. F (Tr. of Prelim. Inj. Hearing at 7, *Defenders of Wildlife v. Norton*, Civil Action No. 05–1573 (D.D.C.)).

After the 2005 subpermit was vacated by the court, Wisconsin's resubmitted permit application was published in the Federal Register on September 14, 2005.  *Id.* at 7, Ex. G (Memorandum from Field Supervisor, ES Field Office, Green Bay, WI, to Assistant Regional Director-Ecological Services, Fort Snelling, MN (ES/TE) (Apr. 20, 2006); Defs.' Opp'n at 9

(citing 70 Fed. Reg. 54401–02 (Sept. 14, 2005)).  The public comment period with respect to

Wisconsin's resubmitted permit application expired on October 14, 2005.  *Id.*  FWS prepared a

draft environmental assessment, which was made available for public comment on March 2,

2006, and thereafter issued the Final Environmental Assessment and an accompanying Decision

and Finding of No Significant Impact in April of 2006.  *See* Pls.' Mem. Prelim. Inj. at 8, Exs. B

& H; Defs.' Opp'n at 10.

On April 24, 2006, the FWS issued the permit at issue in the instant case, authorizing

Wisconsin to implement a lethal depredation control program with respect to the endangered

gray wolf.  *See* Pls.' Mem. Prelim. Inj. at 8, Ex. A (Permit Number TE111360–0, hereinafter

"permit" or "2006 permit"); Defs.' Opp'n at 10–11.  Section F of the permit allows the lethal

take of up to 43 endangered wolves for depredation control purposes.  *Id.*  Defendants state that

the rationale behind a lethal depredation control program "is that, in the absence of adequate

measures to control known depredating wolves, public support for wolf recovery and wolf

reintroduction programs will likely erode and individuals will resort to illegal killing to protect

their pets and livelihood."  Defs.' Opp'n at 8; *see also* Pls.' Mem. Prelim. Inj. at Exh. I at 2 (Set

of Findings: Wisconsin Department of Natural Rescoures Wolf Depredation Permit

(TE111360)).

On May 9, 2006, Plaintiffs sent a 60-day notice letter to FWS pursuant to 16 U.S.C. §

1540(g) requesting that FWS rescind the 2006 permit.  *See* Pls.' Mem. Prelim. Inj., Ex. J (Letter

re: Notice of Intent to Sue from Sanne H. Knudsen to Lynn Scarlett and H. Dale Hall (May 9,

2006)).  As of August 1, 2006, 17 wolves had been taken for depredation control purposes

pursuant to the permit at issue.  Defs.' Opp'n at 11 n.6.

## II: LEGAL STANDARD

*A.     Standard for Preliminary Injunctive Relief*

The decision whether to grant preliminary injunctive relief under Federal Rule of Civil Procedure 65(a) is reserved to the sound discretion of the Court.  *See* Fed. R. Civ. P. 65(a); *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1208 (D.C. Cir. 1989).  In assessing whether to grant preliminary injunctive relief, which is considered an extraordinary remedy in this circuit, *see Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969), a court must balance four factors: (1) whether the movant is substantially likely to succeed on the merits; (2) whether the movant would suffer irreparable injury if the injunction were not granted; (3) whether an injunction would substantially injure other interested parties; and (4) whether the public interest would be furthered by the injunction.  *See Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)); *Serono Labs, Inc. v. Shalala*, 158 F.3d 1313, 1317–18 (D.C. Cir. 1998).

"These factors interrelate on a sliding scale and must be balanced against each other.  'If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in the other areas are rather weak.'"  *Serono Labs*, 158 F.3d at 1318 (quoting *CityFed Fin. Corp.*, 58 F.3d at 746).  Accordingly, "[a]n injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury."  *CityFed Fin. Corp.*, 58 F.3d at 747.  Notwithstanding the fluid nature of this familiar four-part inquiry, "[i]t is particularly important for the [movant] to demonstrate a substantial likelihood of success on the merits."  *Barton v. Dist. of Columbia*, 131 F. Supp. 2d 236, 242 (D.D.C. 2001) (citing *Benten v. Kessler*, 505 U.S. 1084, 1085 (1992)).  If

9

the movant fails to do so, "it would take a very strong showing with respect to the other preliminary injunction factors to turn the tide in plaintiffs' favor." *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 366 (D.C. Cir. 1999).

In addition, a party seeking preliminary injunctive relief must demonstrate at least some irreparable injury because "the basis for injunctive relief in the federal courts has always been irreparable harm." *CityFed Fin.*, 58 F.3d at 747 (quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974)) (alterations omitted). In order to establish irreparable injury justifying preliminary injunctive relief, a plaintiff must establish injury that is great, certain, and actual, not merely theoretical. *Wisconsin Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985). "'The injury complained of [must be] of such *imminence* that there is a "clear and present" need for equitable relief to prevent irreparable harm.'" *Id.* (quoting *Ashland Oil, Inc. v. FTC*, 409 F. Supp. 297, 307 (D.D.C. 1976), *aff'd*, 548 F.2d 977 (D.C. Cir. 1976)) (emphasis in original).

B.      *Standard for Agency Review*

Plaintiffs in this case challenge Defendants' authorization of the lethal taking of up to 43 gray wolves for depredation control pursuant to Permit No. TE111360–0 as beyond the statutory authority conferred by and in direct violation of Section 10(a)(1)(A) of the ESA. The standard for the Court's review of such challenges is known as *Chevron* review, after the Supreme Court's decision in *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). The central question for the reviewing court under *Chevron* "is whether the agency's construction of the statute is faithful to its plain meaning, or, if the statute has no plain meaning, whether the agency's interpretation 'is based on a permissible construction of the statute.'" *Arent v. Shalala*,

10

70 F.3d 610, 615 (D.C. Cir. 1995) (quoting *Chevron*, 467 U.S. at 843).  Under the *Chevron*

analysis, a court first asks "whether Congress has directly spoken to the precise question at issue.

If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency,

must give effect to the unambiguously expressed intent of Congress."  *Chevron*, 467 U.S. at

842–43; *see also id.* at 843 n.9 ("[A]dministrative constructions which are contrary to clear

congressional intent" must be rejected by the court).  "When performing this first step, [courts]

employ traditional tools of statutory construction."  *Indep. Ins. Agents of Am., Inc. v. Hawke*, 211

F.3d 638, 643 (D.C. Cir. 2000) (citing *Chevron*, 467 U.S. at 842–43; *INS v. Cardoza-Fonseca*,

480 U.S. 421, 446 (1987)).  Among these tools is a statute's framework and legislative history.

*See Am. Fed'n of Labor & Congress of Indus. Orgs. v. Fed. Election Comm'n*, 333 F.3d 168, 172

(D.C. Cir. 2003) ("*AFL-CIO*"); *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F. Supp. 2d

114, 134 (D.D.C. 1999); *see also Natural Res. Def. Council v. Browner*, 57 F.3d 1122, 1127

(D.C. Cir. 1995) ("Reference to statutory design and pertinent legislative history may often shed

new light on congressional intent, notwithstanding statutory language that appears 'superficially

clear.'") (quoting *Am. Scholastic TV Programming Found. v. Fed. Commc'ns Comm'n*, 46 F.3d

1173, 1178 (D.C. Cir. 1995)).  However, canons of construction are only to be used during step

one of the *Chevron* analysis to determine if "Congress had a *specific* intent on the issue in

question."  *Mich. Citizens for an Indep. Press v. Thornburgh*, 868 F.2d 1285, 1292–93 (D.C. Cir.

1989) (emphasis in original).  In conducting this stage of the *Chevron* analysis, the Court "giv[es]

no deference to the agency's interpretation."  *AFL-CIO*, 333 F.3d at 173.

     If the court finds that "the statute is silent or ambiguous with respect to the specific issue,

the question for the court is whether the agency's answer is based on a permissible construction

of the statute." *Chevron*, 467 U.S. at 843.  "A statute is considered ambiguous if it can be read

more than one way." *AFL-CIO*, 333 F.3d at 173.  "The court need not conclude that the agency

construction was the only one it permissibly could have adopted to uphold the construction, or

even the reading the court would have reached if the question initially had arisen in a judicial

proceeding." *Chevron*, 467 U.S. at 843 n.11.  However, if the Agency's interpretation unduly

compromises the statute's "purposes, it is not a 'reasonable accommodation' under the Act, and

it would therefore not be entitled to deference." *Orloski v. Fed. Election Comm'n*, 795 F.2d 156,

164 (D.C. Cir. 1986) (quoting *Chevron*, 467 U.S. at 845); *see also Chevron*, 467 U.S. at 845

(providing that if the agency's "choice represents a reasonable accommodation of conflicting

policies that were committed to the agency's care by the statute, we should not disturb it unless it

appears from the statute or its legislative history that the accommodation is not one that Congress

would have sanctioned.") (quoting *United States v. Shimer*, 367 U.S. 374, 382 (1961)); *Common

Cause v. Fed. Election Comm'n*, 692 F. Supp. 1391, 1396 (D.D.C. 1987) ("[W]here the agency

interprets its statute in a way that flatly contradicts Congress's express purpose, the court may –

indeed must – intervene and correct the agency.").

      C.     *Application of* Chevron *in the Instant Case*

The first step of *Chevron* provides a statute-based review mechanism to determine

whether the statute itself provides the agency with any discretion to act in a particular way, rather

than providing a measure of the reasonableness of agency action.  The instant Circuit has

addressed the differences between *Chevron* review and "arbitrary and capricious" review under

the APA.  *See Arent v. Shalala*, 70 F.3d 610, 615–16 (D.C. Cir. 1995).  "[A] reviewing court's

inquiry under *Chevron* is rooted in statutory analysis and is focused on discerning the boundaries

of Congress' delegation of authority to the agency; and as long as the agency stays within that

delegation, it is free to make policy choices in interpreting the statute, and such interpretations

are entitled to deference." *Id*. at 615.  However, the two issues overlap at the margins such that

judicial review can exemplify such overlap between step two of *Chevron* and "arbitrary and

capricious" analysis.  *See Animal Legal Defense Fund, Inc. v. Glickman*, 204 F.3d 229, 234 (D.C.

Cir. 2000).[1]

    The Court notes that Defendants misconstrue the proper standard of review to be applied

in the instant case, largely ignoring the first step of *Chevron* analysis.  Defendants state that

"[t]he Court must apply the 'arbitrary and capricious' standard of the APA, 5 U.S.C. §

706(2)(A),(C), to the FWS's decision making in assessing the likelihood of success on the

merits.  5 U.S.C. § 706."  Defs.' Opp'n at 15.  However, review pursuant to the APA also

requires the Court to determine if agency action is "not in accordance with law" or "in excess of

statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. §

706(2)(A),(C).  In the instant case, the Court concludes that because Defendants' authorization of

a lethal depredation control program contravenes the clear and express intent of Congress and

consequently fails under the first step of *Chevron*, the Court should not proceed to the second

step of the *Chevron* analysis nor is there a need to determine whether Defendants were arbitrary

and capricious in their actions, as the actions at issue are contrary to an unambiguous statute and

---

[1]  Analysis under *Chevron* is sometimes inappropriate, particularly when neither of the
Parties contests that the statutory provision at issue is ambiguous or leaves room for ample
agency discretion.  *See, e.g., Fund for Animals, Inc. v. Turner*, Civ. No. 91–2201, 1991 WL
206232 at *3 (D.D.C. Sept. 27, 1991) (applying deferential standard of review to "agency
rulemaking" resulting in the promulgation of an FWS *regulation* authorizing a sport hunt of the
threatened grizzly bear).

consequently not in accordance with law and in excess of statutory authority.

### III:  DISCUSSION

    *A.    Substantial Likelihood of Success on the Merits*

    Plaintiffs make two umbrella arguments on the merits of why the Court should enjoin the lethal taking of gray wolves for depredation control purposes pursuant to Permit No. TE111360–0.  First, Plaintiffs argue that the lethal depredation control program authorized by the permit is "outside of the scope of the narrow take exception allowed by Section 10(a)(1)(A) of the Endangered Species Act ("ESA"), 16 U.S.C. § 1539(a)(1)(A)" because the lethal depredation control program–"to increase social tolerance"–contravenes the plain language, purposes, and policy of the ESA.  Pls.' Mot. Prelim. Inj. at 1–2; Pls.' Mem. Prelim. Inj. at 10–18.  Second, Plaintiffs argue that even if authorized killing to increase social tolerance were permissible under the ESA, the FWS nonetheless "has failed to provide any scientifically based factual support to show that the lethal depredation control program will affirmatively 'enhance the propagation or survival' of the wolf.  16 U.S.C. § 1539(a)(1)(A)."  Pls.' Mot. Prelim. Inj. at 2; Pls.' Mem. Prelim. Inj. at 21–25.  The Court shall examine fully Plaintiffs' first argument, concluding that it need not proceed to examine Plaintiffs' second argument under the second step of the *Chevron* analysis because it is clear from the language, framework, and legislative history of the ESA that a depredation control program involving the lethal taking of an endangered species[2] contravenes

---

    [2]  The Court notes that despite Defendants' pages of arguments describing the alleged recovery of the gray wolf, see generally Defs.' Opp'n, and Defendant-Intervenors' statement that a Proposed Rule was published to delist gray wolves in Wisconsin, see Intervs' Opp'n at 15, these passages are irrelevant to the Court's decision, which is predicated on the fact that the gray wolf is currently listed as an endangered species and as such is subject to the protections afforded to it pursuant to the ESA.

the clear intent of Congress as set forth in the ESA.

As noted above, under APA review, a court must first apply the "traditional tools of statutory construction to determine whether Congress has spoken to the precise question at issue." *Cal. Indep. Sys. Operator Corp. v. Fed. Energy Regulatory Comm'n*, 372 F.3d 395, 399 (D.C. Cir. 2004) (citing *Chevron*, 467 U.S. at 842–43 & n.9). Under step one of the *Chevron* analysis, if the intent of Congress is clear, the court (as well as the agency) must give effect to the unambiguously expressed intent of Congress. *Id.*; *see also Chevron*, 467 U.S. at 842–43. The court is to proceed to step two of the *Chevron* analysis – wherein it considers (1) whether the agency acted within its delegated authority, and (2) whether the agency's interpretation of the statute is reasonable – *only* if the statute is silent or ambiguous with respect to the specific issue. *Id.*; *see also Chevron*, 467 U.S. at 843–44. Defendants, who as noted above misconstrue the standard of review to be applied, are not entitled to any deference if, as in this case, the court determines that the statutory provision in question is neither silent nor ambiguous in precluding the specific action in question.

The instant Court recognizes that it is in uncharted legal waters, as the issue of whether lethal taking of endangered species for depredation control purposes violates the ESA is one of first impression. Plaintiffs' statement that "[n]o court has been asked to rule on the issue of whether the lethal taking of endangered species, supported not by science but justified solely by social policy reasons, exceeds the scope of the scientific take exception provided in Section 10(a)(1)(A)" is substantiated by the Court's own research. Pls.' Reply at 8. However, review of the existent statutory framework and case law reflective of the extremely high level of protection afforded to endangered species, coupled with the cautious approach courts have taken in

analyzing the lethal taking of threatened species pursuant to the ESA, leads the Court to conclude

that the lethal depredation control program authorized by the permit at issue in this case violates

Section 10(a)(1)(A) of the ESA.

      1.      <u>Plain Language of Section 10(a)(1)(A) of the ESA</u>

With respect to statutory construction, the Supreme Court has emphasized that "[i]n

ascertaining the plain meaning of the statute, the court must look to the particular statutory

language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v.*

*Cartier, Inc.*, 486 U.S. 281, 291(1988) (citations omitted). The "first step" in the canon of

statutory construction is to "begin with a 'plain language' analysis of the statutory text." *Cal.*

*Indep. Sys. Operator Corp.*, 372 F.3d at 400. That is, the court is to assume "that the legislative

purpose is expressed by the ordinary meaning of the words used." *Sec. Indus. Ass'n v. Bd. of*

*Governors*, 468 U.S. 137, 149 (1984) (internal quotation and citations omitted). "Where [] the

plain language of the statute is clear, the court generally will not inquire further into its

meaning." *Qi-Zhuo v. Meissner*, 70 F.3d 136, 140 (D.C. Cir. 1995).

Section 9 of the ESA makes it unlawful to "take any [endangered] species within the

United States or the territorial sea of the United States." 16 U.S.C. § 1538(a)(1)(B). To "take"

an endangered species is defined by the ESA to include "to harass, harm, pursue, hunt, shoot,

wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. §

1532(19). Pursuant to Section 10(a)(1)(A) of the ESA, the Secretary of the Interior "may permit,

under such terms and conditions as he shall prescribe–any act otherwise prohibited by [Section 9]

of this title for scientific purposes or to enhance the propagation or survival of the affected

species, including, but not limited to, acts necessary for the establishment and maintenance of

experimental populations pursuant to subsection (j) of this section."  16 U.S.C. § 1539(a)(1)(A).

The permit issued by Defendants at issue in this case authorizes the lethal "take" of up to 43 gray

wolves for depredation control purposes relying on the language of "propagation or survival of

the affected species."[3]

The language "propagation or survival of the affected species," is, on its face, antithetical

to the killing of 43 members of an endangered species barring some direct and immediate danger

imposed by the individual animals killed to other members of the species.  While the Court can

contemplate one circumstance in particular where a lethal take might be permitted to enhance the

propagation or survival of the species–where an individual wolf had mange or some other

communicable disease that could ultimately result in the death of other *wolves*–it is

counterintuitive to authorize the killing of *endangered* animals rather than to authorize some

non-lethal method of "take" to enhance their propagation or survival.

Defendants argue that Plaintiffs "incorrectly attemp[t] to make a distinction between

'lethal take' and 'non-lethal take,'" and that "[t]he ESA and its implementing regulations make

no such distinction," citing to the definition of "take" included in Section 9 of the ESA.  Defs.'

Opp'n at 17.  Defendants conclude that since Section 10 authorizes the FWS to permit "any act

otherwise prohibited by [Section 9]," that "based on the plain reading of the ESA, the FWS may

permit all forms of take under Section 10(a)(1)(A) as long as it is for 'scientific purposes or to

enhance the propagation or survival of the species.'"  Defs.' Opp'n at 17.   However, the Court

---

[3]  While the permit at issue includes provisions for the non-lethal take of wolves for
scientific purposes pursuant to Section 10(a)(1)(A), Plaintiffs do not contest these provisions in
the instant case.  *See* Pls.' Mem. Prelim. Inj., Ex. A (2006 permit).

notes that a plain reading of Section 10(a)(1)(A) requires at least a basic comprehension of the phrase "propagation or survival of the affected species."  Defendants' approach in the issuance of the permit at issue–that killing 43 allegedly depredating wolves will increase social tolerance for wolves and ultimately result in fewer illegal killings of wolves[4]–simply applies a labyrinthian analysis that does not comply with the text of the statute on its face.[5]

When faced with this precise issue during a hearing on a motion for preliminary injunction in *Defenders of Wildlife v. Norton*, Civil Action No. 05–1573 (D.D.C.), Judge Ellen Huvelle also noted the contradictions in Defendants' logic (or lack thereof).  While granting injunctive relief to Plaintiffs based on Defendants' failure to provide a notice and comment period with respect to the lethal depredation program permit issued in that case, during the course of the hearing, Judge Huvelle stated with respect to the merits of Plaintiffs' position, "I am baffled by the government's position here.  I have to be perfectly frank.  I have a hard time understanding the notion you kill the wolves to save the wolves."  Pls.' Mem. Prelim. Inj., Ex. F (Tr. of Prelim. Inj. Hearing at 11, *Defenders of Wildlife v. Norton*, Civil Action No. 05–1573 (D.D.C.)).  The instant Court is similarly confounded by Defendants' approach as applied to an *endangered* species in light of the language found in Section 10(a)(1)(A), which the Court finds

---

[4]  Defendants build their entire authorization policy around "[t]he threat [that] comes from intolerant stakeholders who–in the absence of an effective government-sanctioned wolf control program–will engage in unregulated and unsupervised takings to protect their pets and livelihood."  Defs.' Opp'n at 21–22.

[5]  Nonetheless, the Court will also address Defendants' argument in Section III(A)(2) of the instant Opinion to demonstrate that in addition to the plain language of Section 10(a)(1)(A), the statutory structure of the ESA also contradicts Defendants' assertion that Congress intended to make no distinction between lethal and non-lethal takings of endangered animals pursuant to Section 10(a)(1)(A) of the ESA.  *See infra* Section III(A)(2).

on its face would preclude a lethal depredation control program.

However, even assuming *arguendo* that the plain text of Section 10(a)(1)(A) left some room for interpretation, the first step of *Chevron* analysis requires the Court to rely on traditional methods of statutory interpretation that exceed in scope an isolated reading of the statutory provision in question. In analyzing both the statutory framework of the ESA and its legislative history, the Court has little doubt that Plaintiffs will succeed on the merits (as they have certainly demonstrated a substantial likelihood of doing so) in proving that a lethal depredation control program is unlawful pursuant to Section 10(a)(1)(A) of the ESA.

> 2.     Statutory Framework of the ESA

A review of Section 10(a)(1)(A) *in pari materia* with the ESA as a whole supports the Court's reading of the plain language of the statute and contradicts the Agency's construction. This Circuit follows the canon of statutory construction that holds that "[s]tatutory provisions *in pari materia* normally are construed together to discern their meaning." *Motion Picture Ass'n of Am., Inc. v. Fed. Commc'ns Comm'n*, 309 F.3d 796, 801 (D.C. Cir. 2002) (citing *Erlenbaugh v. United States*, 409 U.S. 239, 244 (1972) ("noting that the rule that statutes *in pari materia* should be construed together 'is . . . a logical extension of the principle that individual sections of a single statute should be construed together'")); *see also Holyoke Water Power Co. v. Fed. Energy Regulatory Comm'n*, 799 F.2d 755, 766 (D.C. Cir. 1986) ("The three sections are *in pari materia* and must be read together."); *FAIC Secs., Inc. v. United States*, 768 F.2d 352, 363 (D.C. Cir. 1985) ("[T]hese two statutes are *in pari materia* and must be construed together."). It is therefore appropriate for the Court to examine the statutory framework of the ESA in its

determination of the role that Section 10(a)(1)(A) plays therein. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) ("In determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation" as the "meaning–or ambiguity–of certain words or phrases may only become evident when placed in context."). *See also Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989) (a "fundamental canon of statutory construction [is] that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). Upon the Court's consideration of the statutory framework of the ESA as a whole and the heightened protection afforded to endangered species therein, the Court cannot construe Section 10(a)(1)(A) to authorize the lethal taking of the endangered gray wolf for depredation control purposes.

The ESA allows the Secretary of the Interior to designate certain species of animal life as having protected status. 16 U.S.C. § 1533(a)(1). *See also TVA v. Hill*, 437 U.S. at 159–60; *Rancho Viejo, LLC v. Norton*, 323 F.3d 1062, 1064 (D.C. Cir. 2003). As the Court noted in Section I(A) of this Opinion, there are three different categories of federally-protected species under the ESA–endangered species, threatened species, and experimental populations. Endangered species are defined pursuant to 16 U.S.C. § 1532(6) as "any species which is in danger of extinction throughout all or a significant portion of its range other than a species of the Class Insecta determined by the Secretary to constitute a pest whose protection under the provisions of this chapter would present an overwhelming and overriding risk to man." 16 U.S.C. § 1532(6). Threatened species are defined pursuant to 16 U.S.C. § 1532(20) as "any species which is likely to become an endangered species within the foreseeable future throughout

all or a significant portion of its range." 16 U.S.C. § 1532(20). And experimental populations, sometime referred to as "10(j)" populations, are defined pursuant to 16 U.S.C. § 1539(j) and are treated similarly to threatened species with some defined exceptions. *See* 16 U.S.C. § 1539(j). Endangered species are afforded the highest level of protection of any species classification. *See TVA v. Hill*, 437 U.S. at 174 ("[E]xamination of the language, history, and structure of the [ESA] indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities.").

A number of cases have held that *threatened* species, which as indicated in the above framework are afforded fewer protections than endangered species under the ESA, cannot be lethally taken with the ultimate goal of fostering fewer human-animal conflicts as a mechanism for allegedly preserving the species. In *Fund for Animals v. Turner*, the court enjoined FWS from authorizing a limited hunt of threatened grizzly bears in the Northern Continental Divide Ecosystem. *Fund for Animals, Inc. v. Turner*, Civ. No. 91–2201, 1991 WL 206232 (D.D.C. Sept. 27, 1991). The court rejected defendants' rationale that "a limited hunt of the grizzly bear creates a wariness of humans, which protects the bears by confining them to their range and reducing bear-human conflicts, and which, in the long run, promotes the conservation and recovery of the species[,]" *id*. at *7, instead ascertaining that

> [t]he difficulty is that the statute, as currently interpreted, does not authorize hunting whenever it would be a sound conservational tool. Congress has specifically limited the hunting of a threatened or endangered species to extraordinary cases of population pressures, and the Court is constrained to enforce that legislative restriction. *See Sierra Club v. Clark*, 577 F. Supp. 783, 790 (D. Minn. 1984) (concluding that "reduc[ing] the level of wolf-human contact" is not a valid basis for authorizing a regulated taking under the ESA), *aff'd in part and rev'd in part on other grounds*, 755 F.2d 608 (8th Cir. 1985).

*Id*.

Additionally, in *Sierra Club v. Clark*, the Eighth Circuit held that a public sport hunting season of a *threatened* species (the Eastern Timber Wolf in Minnesota) was unlawful and contrary to the plain language, statutory structure, and legislative history of the ESA. *Sierra Club v. Clark,* 755 F.2d 608 (8th Cir. 1985). The Court notes that Defendants' attention to *Sierra Club v. Clark* ignores the Eighth Circuit's actual holding while quoting dicta from the opinion very selectively. Defendants state that "[t]he only statement of law made by a United States Court of Appeals concerning the issue before this Court–whether the FWS may issue Section 10(a)(1)(A) permits for depredation control purposes–supports the FWS's position that limited depredation control actions enhance the survival of the species as a whole and are therefore properly permitted under Section 10(a)(1)(A)." Defs.' Opp'n at 18. However, the Eighth Circuit's comment to this effect is dicta (particularly as applied to endangered species, as *Sierra Club v. Clark* pertains to a threatened species), found in a footnote, and completely unaccompanied by any analysis. *See id*. at 614 n.8. Furthermore, the footnote refers to the potential for "the removal of depredating animals or the culling of diseased animals from a population" pursuant to Section 10(a)(1)(A) without distinguishing whether the provision refers to endangered or threatened species, which appears to be qualitatively and quantitatively different in its animal-focused approach from a lethal depredation control *program*. *Id*. Moreover, the footnote's mention of "removal" does not necessarily imply a lethal taking.

In light of the statutory framework set out above and the heightened level of protection given to endangered species by Congress and acknowledged by the courts, the Court will also return to Defendants' argument discussed in Section III(A)(1) that "[t]he ESA and its

22

implementing regulations make no such distinction" between a lethal and a non-lethal take. Defs.' Opp'n at 17. Defendants cite to the definition of "take" included in Section 9 of the ESA as including to "kill" amongst a variety of other actions including to harass, harm, pursue, and so forth. *Id.* As noted in Section III(A)(1), Defendants conclude that since Section 10 authorizes the FWS to permit "any act otherwise prohibited by [Section 9]," that "based on the plain reading of the ESA, the FWS may permit all forms of take under Section 10(a)(1)(A) as long as it is for 'scientific purposes or to enhance the propagation or survival of the species.'" Defs.' Opp'n at 17. However, as Plaintiffs point out, the broad definition of "take" in the ESA and prohibition thereof in Section 9 "underscores the high level of protection that Congress intended to afford endangered species." Pls.' Reply at 3. In considering the statutory framework providing the highest level of protection to endangered species and the narrow exception provided via Section 10(a)(1)(A) to enhance species survival, the Court agrees that

> [i]n light of the context of the exception–the broad take prohibition in combination with a limited scientific take exception meant to further species survival–the FWS cannot honestly contend that its authorization of a lethal, as opposed to non-lethal, depredation control program is irrelevant to the issue of whether it has exceeded the scope of its authority under Section 10(a)(1)(A). While it is true that Section 10(a)(1)(A) does not distinguish between lethal and non-lethal takes, the purpose of the exception makes clear that Congress would neither be indifferent to the severity nor degree of taking permitted by the FWS.

Pls.' Reply at 4.

In summary, the Court agrees that "[b]y using Section 10(a)(1)(A) to implement a lethal depredation control program for endangered wolves in Wisconsin, the FWS expands the scope of this otherwise limited exception to effectively erase any meaningful distinctions between the management measures permitted for endangered, threatened, and experimental populations."

Pls.' Mem. Prelim. Inj. at 15. The case law supports Plaintiffs' position, as both the Eighth

Circuit and instant District have explicitly disallowed programs involving the lethal taking of

*threatened* species, which are afforded lesser protections under the structure of the ESA than the

*endangered* gray wolf presently at stake.

### 3.   Legislative History

When the plain language of the statute in question and the reading of that provision in

relation to its related subparts contradicts the Agency's construction, the Agency may establish

the legitimacy of its construction by looking to the legislative history of the law at issue.

However, the presumption in favor of the plain language of the provision is rebuttable only in the

"rare cases [in which] the literal application of a statute will produce a result demonstrably at

odds with the intentions of its drafters." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235,

242 (1989) (internal quotation omitted). The Agency's burden in rebutting the clear language is

onerous: the Agency must "show either that, as a matter of historical fact, Congress did not

mean what it appears to have said, or that, as a matter of logic and statutory structure, it almost

surely could not have meant it." *Engine Mfrs. Ass'n v. Envtl. Prot. Agency*, 88 F.3d 1075, 1089

(D.C. Cir. 1996); *see also Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982) (courts

may ignore plain language in a narrow category of cases where "the literal application of a statute

will produce a result demonstrably at odds with the intentions of its drafters . . . .").

Here, Defendants cannot meet this high standard. Indeed, Defendants do not even make

much of an attempt in this regard. Defendants state that "the general principle that public

opposition can frustrate wolf recovery was recognized by Congress when it stated that the FWS

24

'could allow for the taking of [red wolves] if depredations occur or if the release of these

populations will continue to be frustrated by public opposition.'  *See* House Report No. 97–567,

34, reprinted at 1982 U.S.C.C.A.N. 2807, 2834 (1982)."  Defs.' Opp'n at 19–20.  Defendants

rightfully qualify their citation with a footnote, stating that "[t]his Congressional statement was

made in the context of experimental populations, but it nevertheless demonstrates clear

Congressional recognition of the fact that wolf recovery can be frustrated by public intolerance

due to depredations."  *Id*. at 20 n.9.  However, as Plaintiffs demonstrate, see Pls.' Reply at 8–9,

Defendants' selective quotation of the House Report does not reveal the context in which the

statement was made–as an example of the management flexibility provided by the inclusion of

the classification of experimental populations in the 1982 amendments:

> To encourage efforts to establish such experimental populations when the conservation needs of a species would be served by doing so, this amendment relaxes certain restrictions otherwise applicable to listed species . . . .  The Committee also expects that, where appropriate, the regulations could allow for the directed taking of experimental populations.  For example, the release of experimental populations of predators, such as red wolves, could allow for the taking of these animals if depredations occur or if the release of these populations will continue to be frustrated by public opposition.

H.R. Rep. No. 97–567 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 2807, 2833–34.  *See also*

*Gibbs v. Babbitt*, 214 F.3d 483, 487 (4th Cir. 2000) ("In order to increase the Service's flexibility

in reintroducing endangered species into portions of their historic range, Congress extensively

amended the ESA in 1982 . . . add[ing] section 10(j), which allows the FWS to designate as

'experimental populations' some reintroduced populations of endangered or threatened species.

Under the looser standards of section 10(j), members of an experimental population are generally

to be treated as threatened rather than endangered." (internal citations omitted)).

Because the plain language of Section 10(a)(1)(A) and the statutory framework of the ESA are clear, the Court agrees with Plaintiffs' assessment that "The ESA is congressional recognition that the value of species trumps the social tolerance that a person or group of people may have for a particular species."  Pls.' Reply at 14.  The legislative history of the ESA clearly demonstrates that Congress did not intend to authorize a lethal depredation control program of an endangered species.

"[T]he Endangered Species Act of 1973 represented the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."  *TVA v. Hill*, 437 U.S. at 180.  "'The plain intent of Congress in enacting this statute,' we recognized, 'was to halt and reverse the trend toward species extinction, whatever the cost.  This is reflected not only in the stated policies of the Act, but in literally every section of the statute.'"  *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 699 (1995) (quoting *TVA v. Hill*, 437 U.S. at 184)).  For a comprehensive review of the legislative history preceding the enactment of the ESA in 1973, the Court directs the reader to the seminal case *Tennessee Valley Authority v. Hill*.  *See id.* at 174–181.  The ESA further includes a congressional mandate to federal agencies, including the statement that "[i]t is further declared to be the policy of Congress that all Federal departments and agencies shall seek to *conserve* endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter."  16 U.S.C.A. § 1531(c)(1) (emphasis added).

In the course of congressional debates during the enactment of the ESA with respect to how "conserve" would be interpreted, the Senate's definition of conservation included instructions to manage protected species "at the optimum carrying capacity of their habitat,"

through techniques including "regulation and taking necessary to these ends."  S. 1983, 93rd

Cong., 1st Sess. §§ 4(e) & 3(1) (1973) (emphasis added), *cited in Sierra Club v. Clark*, 755 F.2d

at 616.  The conference eliminated this language such that the final Act's definition of

conservation includes a mandate that regulated taking can take place only "in the extraordinary

case where population pressures within a given ecosystem cannot otherwise be relieved."  16

U.S.C. § 1532(3).  The circumstances under which "taking" of endangered animals were to be

allowed were set forth in Section 10(a)(1)(A) and are "extremely narrow."  *See TVA v. Hill*, 437

U.S. at 180.  The conference report submitted with the ESA further iterates the level of caution

that Congress intended to be applied to the taking of endangered and threatened species covered

by the ESA:

> In extreme circumstances, as where a given species *exceeds the carrying capacity of its particular ecosystem* and where this pressure can be relieved in no other feasible way, this "conservation" might include authority for carefully controlled taking of surplus members of the species.  To state that this possibility exists, however, in no way is intended to suggest that this extreme situation is likely to occur–it is just to say that the authority exists in the unlikely event that it ever becomes needed.

Conf. Rep. No. 740, 93rd Cong., 1st Sess. 23, *reprinted in* 1973 *U.S. Code Cong. & Admin.*

*News* 2989, 3001–02, *cited in Fund for Animals, Inc. v. Turner*, 1991 WL 206232 at *5

(concluding that populations pressures cannot be defined to include increased movement of

threatened bears into inhabited areas and increased human-bear conflicts in and of themselves)

(emphasis added).  *Also cited in Sierra Club v. Clark,* 755 F.2d at 615–16 ("Because a

'conference report represents the final statement of terms agreed to by both houses, next to the

statute itself it is the most persuasive evidence of congressional intent.'  *Demby v. Schweiker*,

671 F.2d 507, 510 (D.C. Cir. 1981).  The unambiguous language of this conference report must

27

be given great weight.").

In summary, after analyzing the plain language, statutory framework, and legislative history of the statute, the Court concludes that congressional intent with respect to Section 10(a)(1)(A) of the ESA is remarkably clear and unambiguous in precluding the authorization of a lethal depredation program on the gray wolf where it is classified as endangered.  As such, the Court will not proceed with step two of the *Chevron* analysis, as the statute is neither silent nor ambiguous in its preclusion.  *See Cal. Indep. Sys. Operator Corp.*, 372 F.3d at 399 (D.C. Cir. 2004); *Chevron*, 467 U.S. at 843–44.[6]  Plaintiffs have therefore demonstrated a substantial likelihood (indeed, a *strong* likelihood) of success on the merits in demonstrating that Defendants acted contrary to law in their issuance of the permit at issue.[7]

B.      *Irreparable Injury*

Plaintiffs, citing to case law, argue that the deaths of a finite number of endangered wolves constitutes irreparable injury for the purposes of issuing a preliminary injunction.  *See*

---

[6]  The Parties include arguments stating their positions as to whether or not the lethal depredation program at issue comports with past agency position and practice.  *See* Pls.' Mem. Prelim. Inj. at 18–21; Defs.' Opp'n at 7–8.  These arguments need not be addressed, as they fall outside of the interpretative boundaries of step one of the *Chevron* analysis.

[7]  Defendants, in their Opposition, state that they "have no objection to the Court consolidating its ruling on Plaintiffs' motion for a preliminary injunction with a decision on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2)."  Defs.' Opp'n at 1 n.1.  But for Plaintiffs objection thereto in their Reply ("Plaintiffs do not think it is appropriate to consolidate this preliminary injunction motion with the merits as proposed by Defendants," Pls.' Reply at 15 n.5), the Court may have been inclined to consolidate its consideration of the instant preliminary injunction request with an ultimate determination on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2) in the Court's conclusion that Defendants' authorization of the lethal depredation control program in question was contrary to law and thus a violation of 5 U.S.C. § 706(2)(A).

Pls.'s Mem. Prelim. Inj. at 26–27. Defendants argue that irreparable harm occurs only when the take of endangered or threatened animals jeopardizes the entire species. Defs.' Opp'n at 29–31 ("[I]n order to demonstrate irreparable harm to the species for the purposes of their request for a preliminary injunction, Plaintiffs need to demonstrate not that individual wolves will be impacted, but that the actions at issue will jeopardize the species as a whole.").[8] Notwithstanding the Parties' conflicting views as to the appropriate legal basis under which the Court should evaluate irreparable injury, it is clear to the Court that the existing case law as well as the language, purpose, and history of the ESA as discussed in Section III(A) prohibit the Court from adopting the standard espoused by Defendants. The Court agrees with Plaintiffs' contention that "[r]equiring Plaintiffs to show jeopardy to the existence of a species in order to secure injunctive relief would stand the ESA on its head. Without the ability to enjoin illegal taking under the ESA, courts would be without power to prevent harm to endangered species before a species was on the brink of extinction." Pls.' Reply at 20.

"Environmental injury, by its nature, can seldom be adequately remedied by money

---

[8] Defendants cite to *Water Keeper Alliance v. Dep't of Defense*, 271 F.3d 21 (1st Cir. 2001) in support of their position. However, while this First Circuit opinion suggests that something more than "the death of even a single member of an endangered species" is required to demonstrate irreparable injury, the level of injury to the species required by the First Circuit via this opinion is not as great as Defendants suggest. *See, e.g., id*. at 34 ("In the absence of a more concrete showing of probable deaths during the interim period and of how these deaths may impact the species, the district court's conclusion that [Plaintiff] has failed to show potential for irreparable harm was not an abuse of discretion."). In the instant case, as will be explained further in Section III(C), Plaintiffs have demonstrated a very concrete probability of death of endangered wolves (in fact, 17 endangered wolves had been killed pursuant to the lethal take depredation provision of the permit as of August 1, 2006). Additionally, Defendants have neither refuted that the permit authorizes lethal taking of up to 10 percent of the endangered wolf population in Wisconsin, nor that such deaths will cause intra-pack hardships and stress on the species as indicated in affidavits submitted with Plaintiffs' Motion. *See infra* § III(C).

29

damages and is often permanent or at least of long duration, *i.e.*, irreparable.  If such injury is

sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction

to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).  A

number of cases assessing irreparable injury in the context of the ESA emphasize that harm to a

small number of animals is sufficient to demonstrate irreparable harm to an endangered, or even

a threatened, species.  *In Fund for Animals v. Turner,* the court rejected defendants' argument

that irreparable injury should be predicated on the possible eradication of a species, holding that

the killing of an estimated three *threatened* grizzly bears constituted irreparable injury.

> *TVA* does underscore the weight Congress has placed on the protection of
> endangered and threatened species.  As the Court stated, "the [ESA] indicates beyond
> doubt that Congress intended endangered species to be afforded the highest of priorities,"
> *id.* at 174, and a threatened species is one that the Secretary believes likely to become
> endangered within the foreseeable future.  In light of this Congressional mandate, the loss
> even of the relatively few grizzly bears that are likely to be taken through a sport hunt
> during the time it will take to reach a final decision in this case is a significant, and
> undoubtedly irreparable, harm.

*Turner*, 1991 WL 206232 at *8 (quoting *TVA v. Hill*, 437 U.S. at 174), *cited in Am. Rivers v.*

*U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 259 (D.D.C. 2003).  *See also Defenders of*

*Wildlife v. Norton*, 354 F. Supp. 2d 1156, 1174 (D. Or. 2005) ("[t]he death or injury of

endangered wolves due to the [Section] 4(d) rules is irreparable injury.").  *Compare Greater*

*Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1257 (10th Cir. 2003) ("Plaintiffs contend that a

proponent of a preliminary injunction under these circumstances, seeking to prevent harm to

members of a threatened or endangered species, need not show harm to the species as a whole.

We agree.").

The irreparable harm caused to the gray wolf absent injunctive relief is clear, as the

30

permit at issue authorizes the lethal take of 43 wolves–which Plaintiffs' stipulate (and

Defendants do not refute) constitutes approximately 10 percent of the gray wolf population in

Wisconsin. *See* Pls.' Mem. Prelim. Inj. at 9. In the FWS Biological Opinion dated April 20,

2006, with respect to the permit at issue, the FWS Field Supervisor, ES Field Office, Green Bay,

WI, acknowledged that "[t]he gray wolf is expected to be adversely affected by the proposed

action." Pls.' Mem. Prelim. Inj., Ex. G at 7. The Court concludes that applying the standard

articulated in the above cases, which recognizes the heightened degree of protection afforded to

endangered species, the lethal taking at issue in this case constitutes irreparable injury.

### C.    *Balance of Harms*

"Congress' enactment of the ESA clearly indicates that the balance of interests weighs

*heavily* in favor of protected species." *Am. Rivers*, 271 F. Supp. 2d at 261 (internal quotation and

citation omitted). As explained in Section III(B), it is clear that wolves taken pursuant to the

lethal take provision of the permit at issue will suffer irreparable injury. While death is the most

obvious harm inflicted upon endangered wolves in the absence of injunctive relief, Defendants

do not contest the more subtle effects such takings will have on the endangered wolf population.

According to the Declarations of Tom Herschelman and Karlyn Berg, taking of wolves pursuant

to the permit will "lead to the deaths of individual animals, disturb and stress intra-pack

relationships, and cause a decline in the area wolf population." Pls.' Mem. Prelim. Inj. at 28,

Herschelman Decl. ¶ 8, Berg Decl. ¶ 7.

Defendants claim that "[t]he issuance of an injunction will harm the state of Wisconsin by

eliminating its ability to effectively manage depredating wolves." Defs.' Opp'n at 32.

31

Defendants cite Wisconsin's need to control depredating wolves through the lethal depredation program at issue "because the wolf population has grown so rapidly." *Id*. Defendants further claim that "as a result of the fact that wolves occupy nearly all areas of suitable habitat . . . , suitable areas for translocating problem wolves are no longer available." Defs.' Opp'n at 33. Defendants and Defendant-Intervenors seem to miss the point–that wolves are presently classified as *endangered* species and congressionally are viewed first and foremost as such, rather than as a nuisance to residents or a threat to livestock or other game that residents may choose to hunt.[9] As the lethal take of 43 wolves allowed by the permit at issue qualifies as irreparable environmental injury, see Section III(B), such that " injury is sufficiently likely," the Court shall apply the principle that "the balance of harms will usually favor the issuance of an injunction to protect the environment" in granting Plaintiffs' request for preliminary injunctive relief. *See Amoco Prod. Co.*, 480 U.S. at 545. While 17 wolves had been killed as of August 1, 2006, more wolves would be lethally taken while the Parties await a final decision on the merits in the absence of preliminary injunctive relief.

D.      *Public Interest*

"Examination of the language, history, and structure of the [ESA] . . . indicates beyond a doubt that Congress intended endangered species to be afforded the highest of priorities." *TVA v.*

---

[9] The Court notes that a number of affidavits attached to Defendant-Intervenors' Opposition to Plaintiffs' Motion for Preliminary Injunction reflect resident complaints about "competing" with wolves as hunters for other game when hunting for sport, a concern which, in light of the gray wolf's endangered classification, clearly does not carry sufficient weight to be factored into the Court's balancing of the harms in issuing a preliminary injunction. Furthermore, the Court notes that Plaintiffs only challenge the lethal take provisions of the Wisconsin permit such that state agencies have other methods available for dealing with depredation concerns as authorized by the permit. *See* Pls.' Mem. Prelim. Inj. at 29.

*Hill*, 437 U.S. at 174.  The Supreme Court in *TVA v. Hill* "underscore[d] the weight Congress has placed on the protection of endangered and threatened species."  *Fund for Animals, Inc. v. Turner*, 1991 WL 206232 at \*8.  "Congress' enactment of the ESA clearly indicates that the balance of interests weighs *heavily* in favor of protected species."  *Am. Rivers*, 271 F. Supp. 2d at 261 (internal quotation and citation omitted).  In enacting the ESA, Congress has "spoken in the plainest of words, making it abundantly clear that it has given the policy of conservation of endangered species the highest of priorities."  *Id.* (internal quotation marks omitted).

Defendants state that "the public interest in the long-term health and recovery of the gray wolf population in Wisconsin will be best served by permitting the states to continue their depredation control activities," and that "granting Plaintiffs' request for a preliminary injunction will not further the ESA's overarching purpose of recovering species," citing the allegedly increased public support that will accompany lethal control of "problem" wolves.  Defs.' Opp'n at 33.  The Court finds this argument disingenuous, particularly in light of Defendants focus in its Opposition just a page earlier reflecting concerns about the "rapi[d]" growth of the gray wolf population in Wisconsin.  Congressional intent behind the adoption of the ESA and iterated throughout the language of the Act itself makes crystal clear that the "public interest" lies in the protection of the endangered gray wolf–not in the lethal taking of "problem" gray wolves in the hopes of creating a selected-for gray wolf population that never interferes with livestock or hunters' kills.  Simply put, the recovery of the gray wolf is not supported by killing 43 gray wolves.

## IV:  CONCLUSION

As succinctly stated by Plaintiffs, "[t]here is no support for the idea that Congress intended the FWS to cater to criminal behavior and cotton to social intolerance as a strategy for endangered species recovery." Pls.' Reply at 14. Based on the reasoning articulated throughout this Memorandum Opinion, the Court shall GRANT [5] Plaintiffs' Motion for Preliminary Injunction, preliminarily enjoin and restrain Defendants and their agents from authorizing the lethal take of any more gray wolves for depredation control purposes pursuant to Permit Number TE111360–0, and direct FWS to immediately stop the Wisconsin Department of Natural Resources and its agents from any further killing of gray wolves pursuant to the same. An appropriate Order accompanies this Memorandum Opinion.

Date:   August 9, 2006

                                  _/s/_____
                                  COLLEEN KOLLAR-KOTELLY
                                  United States District Judge