## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| HUMANE SOCIETY OF THE UNITED STATES, *et al.*, | ) ) ) | **Civ. No. 1:07-cv-00677-PLF** |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| KEMPTHORNE, *et al.*, | ) ) | |
| Defendants, | ) ) | |
| U.S. SPORTSMEN'S ALLIANCE, FOUNDATION, *et al.*, | ) ) ) | |
| Intervenor-Defendants, | ) ) | |
| SAFARI CLUB INTERNATIONAL, *et al.*, | ) ) ) | |
| Intervenor-Defendants. | ) ) | |

## MOTION OF CENTER FOR BIOLOGICAL DIVERSITY
## FOR LEAVE TO FILE *AMICUS CURIAE* BRIEF

The Center for Biological Diversity ("Center") – a national environmental advocacy organization with over a decade of experience in working to protect the nation's biodiversity through advocacy, policy, and litigation, and extensive experience with the federal agencies' administration of the Endangered Species Act, 16 U.S.C. § 1531, *et seq*. ("ESA") – respectfully moves the Court for leave to file an *amicus curiae* brief in this case.

This case presents issues of great importance that concern how federal defendants will implement the ESA to conserve and recover the nation's endangered and threatened wildlife – in particular, how the Fish and Wildlife Service ("FWS") may use its authority to list "distinct population segments" ("DPS") under the ESA. Specifically, this case concerns the lawfulness of FWS's decision to simultaneously create and delist a population of gray wolf that occurs in the

Great Lakes region, 72 Fed. Reg. 6052 (Feb. 8, 2007), where the DPS authority was intended by Congress to be a means to protect and recover certain populations of species before large-scale or species-wide decline occurs – *i.e.*, not to delist populations of a listed species that remains threatened with extinction throughout the vast majority of the conterminous 48 states. The Center's memorandum also explains that in delisting the WGL DPS, FWS simultaneously revised and reclassified the geographic scope of the previously-listed gray wolf species in the conterminous United States, without providing notice to the public that it was doing so, an opportunity to comment on that revision, or by applying the ESA's statutory listing factors to the decision to reclassify the listed entity. As an environmental advocacy organization with extensive experience with these issues, the Center is well-positioned to assist the Court in understanding what FWS has done in this case, the historical context of its actions, and the dangerous precedent that it will set for potentially hundreds of species if it is allowed to stand.

The Center notified Secretary Kempthorne of violations in connection with its designation and delisting of the Great Lakes gray wolf population by letter dated September 25, 2007. *See* Letter from Greenwald to Kempthorne (Sep. 25, 2007) (Exhibit A in support of Brief of Proposed *Amicus Curiae* Center for Biological Diversity). Thus, the interest of judicial economy will also be served if the Center is allowed to participate as *amicus curiae* in this proceeding, as opposed to participating as an intervenor or by filing another, related case.

In accordance with Local Rule 7(m), on November 14, 2007, counsel for the Center contacted counsel for the parties in this case. Counsel for plaintiffs stated that they consent to the Center's motion. Counsel for federal defendants and intervenor-defendants Safari Club, International, *et al*. stated that they take no position on the motion. Counsel for intervenor-defendants U.S. Sportsmen's Alliance, *et al*. did not return the Center's counsel's telephone

message before this motion was filed.


DATED: November 14, 2007                Respectfully submitted,


                                        ___/s/_____
                                        Amy R. Atwood
                                        D.C. Bar No. 470258
                                        Center for Biological Diversity
                                        P.O. Box 11374
                                        Portland, OR 97211
                                        503-283-5474 phone
                                        503-283-5528 fax
                                        atwood@biologicaldiversity.org

                                        Michael P. Senatore
                                        D.C. Bar No. 453116
                                        Center for Biological Diversity
                                        1601 Connecticut Avenue, N.W., Suite 701
                                        Washington, D.C. 20009
                                        202-232-1216 phone
                                        202-232-1217 fax
                                        msenatore@biologicaldiversity.org

                                        Attorneys for *Amicus Curiae*
                                        Center for Biological Diversity

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| HUMANE SOCIETY OF THE UNITED STATES, *et al.*, | ) ) ) | **Civ. No. 1:07-cv-00677-PLF** |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| KEMPTHORNE, *et al.*, | ) ) | |
| Defendants, | ) ) | |
| U.S. SPORTSMEN'S ALLIANCE, FOUNDATION, *et al.*, | ) ) ) | |
| Intervenor-Defendants, | ) ) | |
| SAFARI CLUB INTERNATIONAL, *et al.*, | ) ) ) | |
| Intervenor-Defendants. | ) ) | |

<u>**MOTION OF CENTER FOR BIOLOGICAL DIVERSITY**</u>
<u>**FOR LEAVE TO FILE *AMICUS CURIAE* BRIEF**</u>

The Center for Biological Diversity ("Center") – a national environmental advocacy organization with over a decade of experience in working to protect the nation's biodiversity through advocacy, policy, and litigation, and extensive experience with the federal agencies' administration of the Endangered Species Act, 16 U.S.C. § 1531, *et seq*. ("ESA") – respectfully moves the Court for leave to file an *amicus curiae* brief in this case.

This case presents issues of great importance that concern how federal defendants will implement the ESA to conserve and recover the nation's endangered and threatened wildlife – in particular, how the Fish and Wildlife Service ("FWS") may use its authority to list "distinct population segments" ("DPS") under the ESA.  Specifically, this case concerns the lawfulness of FWS's decision to simultaneously create and delist a population of gray wolf that occurs in the

Great Lakes region, 72 Fed. Reg. 6052 (Feb. 8, 2007), where the DPS authority was intended by Congress to be a means to protect and recover certain populations of species before large-scale or species-wide decline occurs – *i.e.*, not to delist populations of a listed species that remains threatened with extinction throughout the vast majority of the conterminous 48 states. The Center's memorandum also explains that in delisting the WGL DPS, FWS simultaneously revised and reclassified the geographic scope of the previously-listed gray wolf species in the conterminous United States, without providing notice to the public that it was doing so, an opportunity to comment on that revision, or by applying the ESA's statutory listing factors to the decision to reclassify the listed entity. As an environmental advocacy organization with extensive experience with these issues, the Center is well-positioned to assist the Court in understanding what FWS has done in this case, the historical context of its actions, and the dangerous precedent that it will set for potentially hundreds of species if it is allowed to stand.

The Center notified Secretary Kempthorne of violations in connection with its designation and delisting of the Great Lakes gray wolf population by letter dated September 25, 2007. *See* Letter from Greenwald to Kempthorne (Sep. 25, 2007) (Exhibit A in support of Brief of Proposed *Amicus Curiae* Center for Biological Diversity). Thus, the interest of judicial economy will also be served if the Center is allowed to participate as *amicus curiae* in this proceeding, as opposed to participating as an intervenor or by filing another, related case.

In accordance with Local Rule 7(m), on November 14, 2007, counsel for the Center contacted counsel for the parties in this case. Counsel for plaintiffs stated that they consent to the Center's motion. Counsel for federal defendants and intervenor-defendants Safari Club, International, *et al.* stated that they take no position on the motion. Counsel for intervenor-defendants U.S. Sportsmen's Alliance, *et al.* did not return the Center's counsel's telephone

message before this motion was filed.


DATED: November 14, 2007                    Respectfully submitted,


                                            ___/s/_____
                                            Amy R. Atwood
                                            D.C. Bar No. 470258
                                            Center for Biological Diversity
                                            P.O. Box 11374
                                            Portland, OR 97211
                                            503-283-5474 phone
                                            503-283-5528 fax
                                            atwood@biologicaldiversity.org

                                            Michael P. Senatore
                                            D.C. Bar No. 453116
                                            Center for Biological Diversity
                                            1601 Connecticut Avenue, N.W., Suite 701
                                            Washington, D.C. 20009
                                            202-232-1216 phone
                                            202-232-1217 fax
                                            msenatore@biologicaldiversity.org

                                            Attorneys for *Amicus Curiae*
                                            Center for Biological Diversity

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HUMANE SOCIETY OF THE UNITED STATES, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| KEMPTHORNE, *et al.*, | ) ) |
| Defendants, | ) ) |
| U.S. SPORTSMEN'S ALLIANCE, FOUNDATION, *et al.*, | ) ) ) |
| Intervenor-Defendants, | ) ) |
| SAFARI CLUB INTERNATIONAL, *et al.*, | ) ) ) |
| Intervenor-Defendants. | ) ) |

**Civ. No. 1:07-cv-00677-PLF**

## BRIEF OF PROPOSED *AMICUS CURIAE* CENTER FOR BIOLOGICAL DIVERSITY

### Introduction

This case presents issues of great importance that go to how federal defendants (Dirk Kempthorne, Secretary of the Department of the Interior ("Secretary"), U.S. Department of the Interior ("Department"), and U.S. Fish and Wildlife Service ("FWS")) may lawfully implement the Endangered Species Act, 16 U.S.C. § 1531, *et seq*. ("ESA") – one of the nation's bedrock environmental laws – to conserve and recover the nation's endangered and threatened wildlife.

In particular, this case concerns the listing of "distinct population segments" ("DPS") under the ESA, which was authorized by Congress as a means to protect and recover certain populations of species *before* large-scale or species-wide decline occurs, and the Secretary's abuse of that authority to accomplish the exact opposite – *i.e.*, to delist a population of wolves in

the Great Lakes, notwithstanding the fact that gray wolf remains threatened with extinction throughout the vast majority of the lower 48 states as the agency determined more than 20 years ago.  72 Fed. Reg. 6052 (Feb. 8, 2007) ("Final Rule").

As explained in greater detail below, the Secretary's piecemeal delisting of the gray wolf is not only patently inconsistent with the procedural and substantive requirements of the ESA, Congressional intent, and agency policy and historical practice, but could effectively end recovery of the endangered gray wolf in the conterminous United States by relegating that species to an uncertain legal status throughout the majority of its range where it plainly remains critically endangered.  Moreover, the Secretary's action here signals a dangerous new trend of piecemeal delisting of species which threatens the conservation and recovery of other federally-listed species.  Therefore, the Center for Biological Diversity – a national conservation organization that works to protect the nation's biodiversity – is filing this *amicus curiae* brief to assist the Court in understanding what FWS has done in this case, the historical context of its actions, and the dangerous precedent that it will set for potentially dozens, if not hundreds, of vertebrate species if it is allowed to stand.

## BACKGROUND

### I.    Statutory and Regulatory Scheme

The purpose of the ESA is to provide "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species . . .."  16 U.S.C. § 1531(b).  The Act defines "conserve, conserving, or conservation" to mean "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary."  16

2

U.S.C. § 1532(3).  The Supreme Court has described the ESA as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."  *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978).  As Judge Kessler of this court has observed, "[w]hen Congress enacted the [ESA] in 1973, it intended to bring about the 'better safeguarding, for the benefit of all citizens, [of] the Nation's heritage in fish, wildlife, and plants.'"  *Defenders of Wildlife v. Norton*, 239 F. Supp. 2d 9, 12 (D.D.C. 2002) (quoting 16 U.S.C. § 1531).

A species receives the protections of the ESA when FWS lists the species as "endangered" or "threatened."  A species is "endangered" when it is "in danger of extinction throughout all or a significant portion of its range . . .."  16 U.S.C. § 1532(6).  A "threatened" species is one that is likely to become an endangered species within the foreseeable future . . .."  16 U.S.C. § 1532(20).[1]

A designation of "endangered" triggers a broad scope of protections in the form of prohibitions, including prohibiting "take" under Section 9 of the ESA.  16 U.S.C. § 1538(a)(1)(B).  The term "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  A designation of "threatened" triggers Section 4(d) of the ESA, which provides that "whenever any species is listed as a threatened species . . . Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of threatened species."  16 U.S.C. § 1533(d).  In accordance with Section 4(d), FWS long ago promulgated a rule applying full extension of the protective regulations afforded to "endangered" species under Section 9 of the

---

[1]   The Secretary of the Interior has delegated to FWS responsibility for administering these aspects of the ESA with respect to terrestrial species, and the Secretary of Commerce has delegated to the National Marine Fisheries Service ("NMFS") (also known as "NOAA Fisheries") responsibility for administering these aspects of the ESA with respect to marine species.  50 C.F.R. § 402.01(b) (2006).

ESA to "threatened" species, subject to later case-by-case modifications.  50 C.F.R. § 17.31

(2006).

FWS is required to list, delist, or reclassify a species as endangered or threatened due to

any one or a combination of the following factors:

A)    the present or threatened destruction, modification, or curtailment of its
        habitat or range;
B)    overutilization for commercial, recreational, scientific, or educational
        purposes;
C)    disease or predation;
D)    the inadequacy of existing regulatory mechanisms; or
E)    other natural or manmade factors affecting its continued existence.

*Id.* at § 1533(a)(1); 50 C.F.R. § 424.11(c).  In addition to analysis under these five factors, FWS

is required to make listing determinations "solely on the basis of the best scientific and

commercial data available," without reference to the possible economic or other impacts of such

a determination.  16 U.S.C. § 1533(b)(1)(A); 50 C.F.R. § 424.11(c).

In 1978, Congress amended the ESA's definition of "species" to mean "any subspecies of

fish or wildlife or plants, and any *distinct population segment* of any species of vertebrate fish or

wildlife."  *Id.* § 1532(16) (emphasis added).  Congress did not define the term "distinct

population segment," which is not commonly used in scientific discourse, but instructed the

Secretary to exercise his authority with regard to DPSs "sparingly and only when the biological

evidence indicates that such action is warranted."  S. Rep. No. 96-151, at 7 (1979).  Thus, the

DPS authority was intended by Congress to be a tool for protecting certain imperiled population

segments where listing at the species or subspecies level is not warranted, not a means for the

piecemeal delisting of an endangered or threatened species that remains threatened with

extinction throughout the overwhelming majority of their ranges.  *See id.* ("the committee is

aware of the great potential for abuse of this authority [to list DPSs]"); *Defenders of Wildlife v.*

4

*Norton*, 239 F. Supp. 2d at 12 ("the legislative history of the statute reflects a 'consistent policy

decision by Congress that the United States should not wait until an entire species faces global

extinction before affording a domestic population segment of a species protected status'")

(quoting *Sw. Ctr. for Biological Diversity v. Babbitt*, 926 F. Supp. 920, 924 (D. Ariz. 1996)

(citing H.R. Rep. No. 412, 93d Cong., 1st Sess. 10 (1973), *reprinted in* 1978 U.S.C.C.A.N. 2989,

2998).

     Following the 1978 Amendments, FWS and NMFS exercised their authority with respect

to DPSs "relatively rarely" – between 1978 and 1994, "of nearly 300 native vertebrate species

listed under the Act, only about 20 [we]re given separate status as distinct population segments."

59 Fed. Reg. 65884 (Dec. 21, 1994).  These included imperiled populations of wood stork,

woodland caribou, least tern, roseate tern, silver rice rat, marbled murrelet, snowy plover, and

others.[2]  It is particularly noteworthy that over this period of time, consistent with Congress'

intent, FWS utilized the DPS authority almost exclusively to *list* imperiled population segments

where listing at a higher taxonomic level was not warranted, not to designate DPSs for the

express purpose of delisting them.

     Recognizing the importance of applying the term "distinct population segment" in a

"clear and consistent fashion," in 1996 FWS and NMFS developed a "Policy Regarding the

---

    [2]  *See* 49 Fed. Reg. 7332 (Feb. 28, 1984) (listing "U.S. breeding population of the wood
stork" as endangered species); 49 Fed. Reg. 7390 (Feb. 29, 1984) (listing "population of
woodland caribou . . . found in extreme northeastern Washington, northern Idaho, and southern
British Columbia" as endangered); 50 Fed. Reg. 21784 (May 28, 1985) (listing "interior
population" of the least tern as endangered); 52 Fed. Reg. 42064 (listing population of the
roseate tern "that nests in northeastern North America" as endangered and "Caribbean
population" that includes "birds that nest in the U.S. Virgin Islands, Puerto Rico, and Florida" as
threatened); 56 Fed. Reg. 19809 (Apr. 30, 1991) (listing "Lower Keys population of the rice rat,
or silver rice rat" as endangered); 57 Fed. Reg. 45328 (Oct. 1, 1992) (listing "Washington,
Oregon, and California population" of marbled murrelet as threatened); 58 Fed. Reg. 12864
(Mar. 5, 1993) (listing "Pacific coast population" of western snowy plover).

Recognition of Distinct Vertebrate Population Segments under the Endangered Species Act." 61

Fed. Reg. 4722 (1996) ("DPS Policy"). The DPS Policy provides that a DPS must be discrete

and significant in relation to the species to which it belongs. *Id*. at 4725. In addition to ensuring

consistency in DPS designations, *id*. at 4724, the DPS Policy is designed to allow FWS to

"protect and conserve species and the ecosystems upon which they depend before large-scale

decline occurs that would necessitate listing a species or subspecies throughout its entire range."

*Id*. at 4725. In this way, the DPS Policy is designed to increase species protection and further the

ESA's overall purpose of conserving imperiled species. *See Defenders of Wildlife v. Sec'y, U.S.*

*Dep't of the Interior*, 354 F. Supp. 2d 1156, 1160 (D. Or. 2005) (the DPS Policy's purpose is to

"allow FWS to list a DPS as threatened or endangered, and thereby provide a level of protection

that is different from other populations within the same species") (citing 61 Fed. Reg. at 4722).

Since promulgation of the DPS Policy in 1996, FWS has listed 18 DPSs. These include

populations of Steller's eider, copperbelly water snake, bog turtle, Peninsular bighorn sheep,

California bighorn sheep, mountain yellow-legged frog, pygmy rabbit, and others.[3]

However, despite Congress' concern that the DPS authority would have "great potential

for abuse", S. Rep. No. 96-151, at 7 (1979), in recent years FWS has begun to use the DPS

Policy increasingly as a tool to *delist* populations of imperiled species, or to downlist their status

from "endangered" to "threatened." For example, although the Columbia white-tail deer was

---

[3] *See* 62 Fed. Reg. 31748 (June 11, 1997) (listing Alaska breeding population of Steller's eider as threatened DPS); 62 Fed. Reg. 4183 (Jan. 29, 1997) (listing copperbelly water snake . . . in the northern portion", but not in the southern portion, of its range as threatened); 62 Fed. Reg. 59606 (Nov. 4, 1997) (listing bog turtle DPS); 63 Fed. Reg. 13134 (Mar. 18, 1998) (listing Peninsular bighorn sheep DPS "occupying the Peninsular Ranges of southern California" as endangered); 65 Fed. Reg. 20 (Jan. 3, 2000) (listing Sierra Nevada DPS of California bighorn sheep as endangered); 67 Fed. Reg. 44382 (July 2, 2002) (listing southern California DPS of mountain yellow-legged frog as endangered); 68 Fed. Reg. 10388 (Mar. 5, 2003) (listing Columbia Basin DPS of pygmy rabbit as endangered).

6

historically distributed throughout the bottomlands and prairie woodlands of western Oregon and southern Washington, in 2003 FWS used the DPS Policy to designate two relatively small, isolated DPSs – one for Douglas County, Oregon, and the other for the Columbia River – and delisted the Douglas County DPS.  68 Fed. Reg. 43647 (July 24, 2003); 32 Fed. Reg. 4001 (Mar. 11, 1967).  Earlier this year, FWS designated and downlisted a DPS of American crocodile that occurs in Florida, thereby splitting the U.S. population from the rest of the species, which had been listed as endangered under the ESA throughout its range since 1979.  72 Fed. Reg. 13027 (Mar. 20, 2007); 40 Fed. Reg. 44149 (Sep. 25, 1975); 44 Fed. Reg. 75074 (Dec. 18, 1979).  Also this year, FWS designated and delisted a grizzly bear population in the area of Yellowstone National Park, although the bear also had been previously listed throughout its range in the conterminous United States since 1975.  72 Fed. Reg. 14866 (Mar. 29, 2007); 40 Fed. Reg. 31734 (July 28, 1975).

Federal courts have rejected FWS's efforts to use the DPS Policy to reduce protections for deserving populations or species.  For example, in remanding FWS's decision to create five DPSs of bull trout but to list only two of them under the ESA, the U.S. District Court for the District of Oregon held that FWS cannot designate DPSs under the ESA unless it first "legitimately concludes, after proper and sustainable analysis, that listing of the entire species or the . . . population in the coterminous United States is either not warranted or warranted but precluded."  *Friends of the Wild Swan v. U.S. Fish and Wildlife Serv*., 12 F. Supp. 2d 1121, 1134 (D. Or. 1997); *see also id*. ("such a two-tiered approach would promote the ESA's goals of protecting endangered and threatened species and endangered and threatened population segments as quickly as possible").

The U.S. District Court for the Northern District of California recently set aside FWS's

use of the DPS Policy to subsume two endangered DPSs of California tiger salamander into a

species-wide listing as threatened, which had the effect of eliminating the DPSs and decreasing

the affected salamanders' protective status from endangered to threatened.  In *Ctr. for Biological*

*Diversity v. Kempthorne*, 2005 WL 2000928 (N.D. Cal. Aug. 19, 2005) (W.H.A.), Judge Alsup

concluded that FWS's use of the DPS Policy to subsume the DPSs' status violated the ESA,

where the scientific team charged with analyzing the species' status was "directed to eliminate

the DPS and down-list the species" by Department officials, including former Deputy Assistant

Secretary Julie MacDonald.  *Id*. at *15.[4]

Indeed, while this case concerns FWS's latest attempt to use the DPS Policy to remove

ESA protection – this time, for the newly-configured Western Great Lakes ("WGL") DPS, 72

---

[4]   MacDonald resigned in April of this year following release of a scathing report by the
Department's Inspector General, which found that she had been "heavily involved in editing,
commenting on, and reshaping the Endangered Species Program's scientific reports from the
field."  *See Investigative Report on Allegations Against Julie MacDonald, Deputy Assistant
Secretary for Fish, Wildlife, and Parks* (Mar. 29, 2007) ("IG Report") (Exhibit ("Ex.") B) at 1.
The IG Report explains that according to professional FWS staff (including the former Director
of the Endangered Species Program), MacDonald and other DOI political appointees "made
changes to [ESA] reports to reflect their political philosophy," and that MacDonald "regularly
bypassed managers to speak directly with field staff, often intimidating and bullying them into
producing documents that had the desired effect she and the former Assistant Secretary wanted."
*Id*. at 4.  The "desired effect" was to avoid and/or weaken federal safeguards for imperiled
species that had been advocated by the professional staff in FWS.  *See id*. at 4-5 ("The former ES
Director said that overall, MacDonald did not want to accept petitions to list species as
endangered, and did not want to designate critical habitats.  He said the overall effect was to
minimize the [ESA] as much as possible or ensnare it in court litigation, which happened
often.").  Indeed, the IG Report sets forth numerous examples of species listings, critical habitat
designations, and other ESA regulatory decisions that FWS's staff (including the current
Director of the Service) believed had been improperly influenced by nonscientific political
considerations during the last several years.  *Id*. at 16.  The IG Report's conclusions and
examples are consistent with a study that found that under the Bush Administration, FWS has
had more money for listing species than ever before, yet has listed the fewest number of species
since the Act was passed.  *See* D. Noah Greenwald *et al*., *The Listing Record, in The Endangered
Species Act at Thirty: Renewing the Conservation Promise* (Dale Goble *et al*. eds., 2005).

Fed. Reg. 6052 (Feb. 8, 2007) – two federal courts have set aside FWS's prior attempt to use the DPS Policy to reduce ESA protection for the gray wolf as inconsistent with the ESA.  *See Defenders of Wildlife v. Sec'y, U.S. Dep't of the Interior*, 354 F. Supp. 2d at 1172 ("FWS cannot interpret its DPS Policy in such a way as to avoid the clear statutory mandate that 'the Secretary shall . . . determine whether any species is an endangered species or threatened species because of [the listing factors].'") (quoting 16 U.S.C. § 1533(a)(1)); *Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553, 565 (D. Vt. 2005) (FWS's application of DPS Policy to designate and downlist gray wolf DPSs was "'inconsistent with the statute under which the regulations were promulgated'") (quoting *Mines v. Sullivan*, 981 F.2d 1068, 1070 (9th Cir. 1992)).  These decisions restored the gray wolf to endangered status throughout the coterminous United States, except in Minnesota, where the wolf continued to be listed as threatened.

## II.    The Gray Wolf

Gray wolves are the largest wild members of the *Canidae*, or dog family, with adults ranging from 40 to 175 pounds, depending upon sex and subspecies.  71 Fed. Reg. 15266 (Mar. 27, 2006).  Wolves' fur color is frequently a grizzled gray, but it can vary from pure white to coal black.  *Id*.

Wolves are social, mobile animals and often travel 10 to 30 miles per day in packs of two to twelve.  *Id*. at 15267.  Packs are primarily family groups consisting of a breeding pair, their pups from the current year, offspring from one or two previous years, and occasionally an unrelated wolf.  *Id*.

Wolves primarily are predators of medium and large mammals.  *Id*.  Wild prey species in North America include white-tailed deer, mule deer, moose, elk, caribou, bison, muskox, bighorn sheep and Dall sheep, and mountain goat.  *Id*. at 15266-67.  When necessary, wolves also eat

9

smaller prey like snowshoe hare, beaver, and muskrat, and, at times, small mammals, birds, and large invertebrates.  *Id*. at 15267.  Wolves are habitat generalists, and when they are not being persecuted by humans, they can live anywhere that contains a sufficient population of large ungulates.  First Amended Complaint (Dock. No. 12) at ¶ 41.

Wolves once roamed throughout North America and the conterminous United States and Alaska to southern Mexico (with limited geographic exceptions).  68 Fed. Reg. 15804, 15805 (Apr. 1, 2003).  Wolves coexisted with Native American nations, but European settlers persecuted wolves on a "widespread" basis with poisons, trapping, and shooting" that was sanctioned and carried out by Federal, State, and local government through official public policies.  *Id*.; *see also* 72 Fed. Reg. at 6125 (an "active eradication program is the sole reason that wolves were extirpated from the NRM").

FWS and its predecessor agency, the Bureau of Biological Survey, conducted a full-fledged gray wolf extermination program that wiped out wolves in the United States, as well as Mexico and large portions of Canada.  *See generally* Michael J. Robinson, *Predator Bureaucracy: The Extermination of Wolves and the Transformation of the West* (2005).  As a result of this extermination campaign, it is estimated that only several hundred wolves existed in Minnesota and Michigan, and (possibly) Montana by 1973, when the ESA was enacted.  68 Fed. Reg. at 15805.  The gray wolf was one of the first species to be listed under the Endangered Species Preservation Act of 1966.  32 Fed. Reg. 4001 (Mar. 11, 1967).

In August 1974, the FWS listed four subspecies of wolves under the newly-enacted ESA, including: the "Mexican wolf" of Mexico and southeastern U.S.; the "Northern Rocky Mountain wolf" of Wyoming, Montana, and Idaho; the "Texas gray wolf" of Texas and Mexico; and the "Eastern timber wolf" of the Great Lakes region.  *See* 43 Fed. Reg. 9607 (Mar. 9, 1978).  In

10

1978, FWS moved away from protection of these individual wolf subspecies and listed the

"entire species" of gray wolf "in Mexico and throughout the 48 conterminous States of the

United States" as endangered, except in Minnesota, where it was designated as "threatened."  *See*

42 Fed. Reg. 29527 (June 9, 1977) (proposed rule); 43 Fed. Reg. 9607 (final rule recognizing

*Canis Lupus* as "Endangered or Threatened to the south of Canada").

Since 1978, due to the substantive protections of the ESA, gray wolf numbers have

increased in two small fractions of the species' former range in the Northern Rockies and the

Great Lakes.  68 Fed. Reg. at 15805.  Between 1979 and 1998, the occupied wolf range in

Minnesota doubled in size, and wolves dispersed from Minnesota into northern Wisconsin and

into the Upper Peninsula of Michigan.  *See* 71 Fed. Reg. at 15269-71.  There are now wolves in

all three states, but the vast majority of the Great Lakes wolf population is still limited to

northern Minnesota.  *See id.*  The gray wolf remains extirpated across about 95 percent of its

historic range.  *See* Carroll, C, M.K. Phillips, C.A. Lopez-Gonzalez, and N.H. Schumaker. 2006.

Defining recovery goals and strategies for endangered species: the wolf as a case study.

Bioscience 56(1): 25-37 (Ex. C) (noting that the gray wolf "occup[ies] about 5% of the species'

historic range in the conterminous United States"); *see also* 43 Fed. Reg. at 9610 (the gray wolf

"once had a range that included most of Mexico and the 48 conterminous States of the United

States" but "now occurs in only a small fraction of this range").[5]

---

[5]  Limited recovery has also begun in the West.  Protected by the ESA, a few wolves
dispersing from Canada established a small resident population in Montana.  In the mid-1990s
FWS also reintroduced wolves to Yellowstone National Park and Idaho.  71 Fed. Reg. 6634,
6635-37 (Feb. 8, 2006).  In 2006, it is estimated that this population, which is an "experimental
population" under Section 10(j) of the Act, 16 U.S.C. § 1539(j), totaled approximately 1,243
wolves.  72 Fed. Reg. at 6108.  The Great Lakes region and the northern Rocky Mountains
contain the only sizeable gray wolf populations within the conterminous United States; in
addition to these populations, in the Southwest there is also a very small, "nonessential

In the Great Lakes region, this limited recovery has tracked the measures set forth in

FWS's Recovery Plan for the Eastern Timber Wolf.  FWS, Eastern Timber Wolf Recovery Plan

(1992).  This plan, which was issued in 1978 and revised in 1992, focuses on the "Eastern timber

wolf" (*Canis lupus lycaon*), a subspecies that lost legal recognition when the FWS listed the gray

wolf at the species level in 1978.

The plan contained modest goals.  Its primary objective was "to maintain and reestablish

viable populations of the eastern timber wolf in as much of its former range as is feasible."  *Id*. at

24.  The plan also set forth criteria which, when met, would purportedly qualify the wolf for

delisting.  These criteria included the retention of a Minnesota population of 1251-1400 wolves

and the establishment of a second population consisting of either (a) 100 wolves, if located

within 100 miles of the Minnesota population, or (b) 200 wolves, if more than 100 miles from

the Minnesota population.  *Id*. at 4.  The modesty of these goals is underscored by the fact that

the target population for Minnesota (1251 wolves), *id*. at 28, was almost identical to the wolf

population at the time the plan was drafted (1235 wolves).  *See* 72 Fed. Reg. at 6053 ("there

were 1,235 wolves in 138 packs in the winter of 1978-79").

By its own terms, however, the recovery plan did not satisfy the delisting requirements of

the ESA.  As explained in a 1998 addendum, the recovery plan criteria were intended to ensure

the wolf "is no longer in danger of extinction in the foreseeable future."  *See* Gray Wolf Eastern

Population Recovery Team, Addendum to Recovery Plan for the Eastern Timber Wolf (Jan. 10,

1998) (Ex. D) at 1.  Thus, the recovery plan's criteria were aimed at preventing complete

extinction within the United States, while the ESA prohibits delisting if a species is still

_____

experimental population" of the "Mexican gray wolf," 16 U.S.C. § 1539(j), which is a distinct
subspecies of gray wolf.  72 Fed. Reg. 44065, 44065-66 (Aug. 7, 2007).

threatened or endangered throughout "all or a significant portion of its range" prior to delisting. 16 U.S.C. § 1532(6).

In light of the limited recovery in the western Great Lakes, FWS has recently attempted to use the DPS Policy to designate and downlist wolf DPSs, and effectively end recovery efforts throughout the lower 48 states. In 2003, FWS issued a final rule that created three DPSs – Eastern, Western, and Southwestern – and reclassified the Eastern and Western DPSs from endangered to threatened status, thereby reducing the wolf's status throughout 30 states. 68 Fed. Reg. 15804 (Apr. 1, 2003). FWS based the decision to downlist solely on an analysis of threats to wolf populations in six states – Minnesota, Wisconsin, Michigan, Montana, Idaho, and Wyoming – *i.e.*, areas of limited recovery that largely comprise the wolf's "current range." *Id.* at 15810, 15857. The rule was struck down by two federal courts for violations of the ESA and the DPS Policy. *Defenders of Wildlife*, 354 F. Supp. 2d 1156 (overturning as contrary to ESA FWS's decision to downlist gray wolf DPSs based on purported achievement of gray wolf recovery plan goals, and in light of FWS's failure to apply ESA listing factors to species outside of current range); *Nat'l Wildlife Fed'n*, 386 F. Supp. 2d 553 (striking down final rule downlisting Eastern DPSs as contrary to the DPS Policy and ESA).

Undeterred, FWS has again attempted to use the DPS Policy to reduce gray wolf protection under the ESA – only this time, by delisting gray wolf populations in the western Great Lakes and proposing to do the same throughout the northern Rocky Mountains region. On February 8, 2007, FWS issued: (1) a proposed rule to designate and delist a Northern Rocky Mountain DPS, 72 Fed. Reg. 6106 (Feb. 8, 2007); and (2) a final rule designating and delisting a WGL DPS, *see* Final Rule, 72 Fed. Reg. 6052. For the WGL DPS, FWS removed ESA protection completely for the gray wolf in an area that encompasses and extends beyond the

species' current range in Minnesota, Wisconsin, and Michigan; the eastern half of North Dakota and South Dakota; the northern half of Iowa; the northern portions of Illinois and Indiana; and the northwestern portion of Ohio.

Without explicitly stating that it was doing so, offering an opportunity to comment, or applying the ESA's five listing factors, in designating and delisting the WGL DPS FWS also simultaneously *revised and reclassified* the geographic scope of the previously-listed entity – *i.e.*, "*Canis Lupus*" as "Endangered or Threatened to the south of Canada."  43 Fed. Reg. at 9607.  As a necessary result of FWS's Final Rule, the gray wolf is now protected as endangered in less but still a majority of its historic range in the coterminous United States, and its likelihood of full recovery is now in serious jeopardy.

.       In addition to providing insufficient notice or comment opportunity when it effectively revised and reclassified the previously-listed species and created this "remnant" entity outside of the WGL DPS, FWS also never analyzed the status of this new listing entity as Section 4 of the ESA plainly requires, and never expressly determined whether it is a species, subspecies, or DPS.  In addition, FWS never considered whether the species as a whole should remain listed.

As explained below, because FWS did not follow the procedural and substantive requirements of the ESA when it revised and geographically reclassified the wolf's status in the conterminous states, and because the ESA and the FWS's own DPS Policy do not authorize the creation of DPSs for the sole purpose of effecting the piecemeal delisting of a species that unquestionably remains threatened with extinction in the vast majority of its range, the FWS's WGL DPS wolf delisting rule is unlawful and establishes a dangerous precedent for potentially hundreds of other endangered or threatened species that have been long-protected under the Act but achieved limited recovery.  Accordingly, the final rule should be set aside.

14

## ARGUMENT

I. **FWS HAS UNLAWFULLY REVISED AND GEOGRAPHICALLY RECLASSIFIED THE ESA-LISTED GRAY WOLF IN THE CONTERMINOUS 48 UNITED STATES WITHOUT PROVIDING NOTICE AND AN OPPORTUNITY TO COMMENT ON THE REVISION OR CONDUCTING AN ENDANGERMENT ANALYSIS FOR THE RECLASSIFIED ENTITY.**

In creating and delisting the WGL DPS, FWS also effectively revised and geographically reclassified the previously-listed entity – "*Canis Lupus*" as "Endangered or Threatened to the south of Canada," 43 Fed. Reg. at 9607 – without complying with the procedural and substantive requirements of the ESA. First, the agency failed to adequately notify the public of this change and to provide it with a meaningful opportunity to comment on it. Second, it failed to analyze the status of this remnant entity based upon the ESA's five statutory listing factors and the best scientific data available, and instead focused its evaluations exclusively on the simultaneously created WGL DPS. Finally, the FWS failed to determine whether the revised and reclassified listed entity is a species, subspecies, or DPS. *See*, *e.g.*, 72 Fed. Reg. at 6056-57 (stating that the rule designates and delists WGL DPS, removes designated critical habitat for gray wolf in Minnesota and Michigan, and removes special regulations for gray wolf in Minnesota); *id.* at 6066 ("[w]e have considered only whether the gray wolf is threatened or endangered within this DPS"). This violates clear procedural and substantive requirements of the Act.

Under the ESA, the only way to revise or reclassify a listed species, subspecies, or DPS is by providing notice and an opportunity to comment; determining whether the revised entity is a species, subspecies, or DPS; and conducting an endangerment analysis of it pursuant to the ESA. 16 U.S.C. § 1533(b)(5)(A)-(6)(A) (requiring FWS to provide notice and issue proposed and final rules "[w]ith respect to any regulation proposed by the Secretary to implement a determination, designation, or revision" of a species' status as a threatened or endangered species); 16 U.S.C. §

1533(a)(1) (The Secretary shall by regulation promulgated in accordance with subsection (b) of this section determine whether any species is an endangered species or a threatened species because of any" one of five factors).[6]

     There is no question that FWS failed to provide adequate notice and comment opportunity here, where the agency only proposed to designate and delist the WGL DPS, remove designated critical habitat for gray wolf in Minnesota and Michigan, remove special regulations for gray wolf in Minnesota, and never provided notice or solicited public comment with respect to the listed species' status outside of the new WGL DPS.  72 Fed. Reg. at 6056-57.  Courts have held that FWS must provide notice and an opportunity to comment, according to specific statutory deadlines and rulemaking procedures under the APA, on any proposal to eliminate or revise a listed species' status under the ESA.  *See, e.g., Ctr. for Biological Diversity v. U.S. Fish and Wildlife Serv.*, 2005 WL 2000928 at *13 (finding that "FWS did not properly notice a proposal to eliminate . . . DPS status" for listed population of California tiger salamander); 16 U.S.C. § 1533(b)(4) ("Except as provided in paragraphs (5) and (6) of this subsection, the provisions of section 553 of title 5 (relating to rulemaking procedures), shall apply to any

---

    [6]  Again, the ESA's five statutorily prescribed factors are:

    (A)      the present or threatened destruction, modification, or curtailment of its habitat or range;

    (B)      overutilization for commercial, recreational, scientific, or educational purposes;

    (C)      disease or predation;

    (D)      the inadequacy of existing regulatory mechanisms; or

    (E)      other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1).  These factors are "equally important" and "a finding by the Secretary that a species is negatively affected by just one of the factors warrants a non-discretionary listing as endangered or threatened."  *Nat'l Wildlife Fed'n*, 386 F. Supp. 2d at 558 (citing 50 C.F.R. § 424.11(c)).

regulation promulgated to carry out the purposes of this chapter."); *Nat'l Wildlife Fed'n*, 386 F. Supp. 2d at 561 ("APA requires that '[g]eneral notice of a proposed rulemaking . . . shall include . . . either the terms or substance of the proposed rule or a description of the subjects and issues involved'") (quoting 5 U.S.C. § 553(b)(3)). FWS's failure to provide notice and comment on its concurrent decision to revise and reclassify the geographic scope of the listed gray wolf entity is a patent violation of the clear procedural requirements of the ESA and APA.

FWS similarly could not reclassify the geographic scope of the gray wolf's status in the conterminous states unless it first demonstrated, through application of the listing factors, that such reclassification is appropriate, 16 U.S.C. 1533(a)(1)), but that is not what happened, as FWS simply reclassified the geographic configuration of the listed gray wolf in the conterminous states without applying the listing factors to the new entity at all. *See* 72 Fed. Reg. at 6066 ("[w]e have considered only whether the gray wolf is threatened or endangered within this DPS"). This too is patently contrary to the ESA. *See Defenders of Wildlife v. Sec'y, U.S. Dep't of Interior*, 354 F. Supp. 2d at 1170 (emphasis added) (the Act "makes clear that a species shall retain its endangered status unless the Secretary, *by application of the listing factors*, demonstrates that downlisting is appropriate"); *see also id.* at 1172 ("FWS cannot interpret its DPS Policy in such a way as to avoid the clear statutory mandate that 'the Secretary shall . . . determine whether any species is an endangered species or threatened species because of [the listing factors].'") (quoting 16 U.S.C. § 1533(a)).[7]

---

[7] Where FWS commits such procedural and substantive violations in connection with listing determinations, designations, revisions, or reclassifications, the appropriate remedy is to vacate and remand the final rule – here, the Final Rule to designate and delist the WGL DPS. *See, e.g.*, *Nat'l Wildlife Fed'n*, 386 F. Supp. 2d at 568 (vacating and remanding final rule combining the Northeastern and Western Great Lakes DPSs of gray wolf and eliminating protection and recovery efforts in the former Northeastern Gray Wolf DPS area for APA notice

FWS's actions are also not only inconsistent with its own prior practice of using the DPS Policy to list species and not to delist them in piecemeal fashion, *see supra* at 4-5, but are inconsistent with its sister agency's application of the ESA's procedural and substantive requirements. For example, in an analogous situation, NMFS split the northern right whale species, which had been listed as an endangered species in the North Atlantic and North Pacific since 1970, 35 Fed. Reg. 08491 (June 2, 1970), into three separately-listed species, all of which retained their status as endangered. 68 Fed. Reg. 17560 (Apr. 10, 2003). Initially, NMFS believed that the revision was not subject to the listing provisions of the Act because it did not alter the scope of the original listing. Recognizing the error, NMFS later withdrew the revision, stating that the split was "procedurally and substantively flawed" because the agency had failed to "follow the public notice and comment procedural requirements outlined in section 4 for listing a species as endangered or threatened" and "meet the ESA's substantive requirements of conducting a review of the status of the species to determine whether each species is endangered or threatened as a result of any of the five listing factors in that section." 70 Fed. Reg. 01831 (Jan. 11, 2005).[8]

Moreover, FWS's failure to follow the ESA's procedural and substantive requirements with respect to the gray wolf will constrain recovery of that entity, whatever its configuration or

---

and comment opportunity violations); *Ctr. for Biological Diversity v. U.S. Fish and Wildlife Serv.*, 2005 WL 2000928 (remanding procedurally and substantively flawed listing revision to DPS); *Defenders of Wildlife v. Sec'y, U.S. Dep't of Interior*, 354 F. Supp. 2d at 1174 (enjoining and vacating gray wolf DPS rule).

[8] In 2006, NMFS completed a status review of the northern right whale under the ESA in response to a petition by CBD, and found that right whales in the northern hemisphere exist as two species – the North Pacific right whale (*Eubalaena japonica*) and the North Atlantic right whale (*E. glacialis*). NMFS also conducted a five factor threats analysis for both species, and determined that each of these species is in danger of extinction throughout its range. 71 Fed. Reg. 77694 (Dec. 27, 2006).

status.  Under the ESA and FWS policies, recovery of a species, subspecies, or DPS is

accomplished in significant part through FWS's development and implementation of a "recovery

plan" that delineates the conservation measures and management actions that are deemed

necessary to support recovery of a species.  *See* FWS, Policy and Guidelines for Planning and

Coordinating Recovery of Endangered and Threatened Species (May 1990) ("FWS Recovery

Guidelines") (excerpted pages attached as Ex. E) at 1; 16 U.S.C. § 1544(f)(1).[9]

FWS's Recovery Guidelines set forth two "priority systems" guide species recovery.

FWS Recovery Guidelines (Ex. E) at 4-5.  These systems rank the priority of listed species for

development and implementation of a recovery plan based on the magnitude of the threats to the

entity and other factors.  *See generally id*.  Of relevance here is the first of these priority systems,

the Recovery Priority System, which assigns species a rank of 1 to 18 according to the degree of

threat, recovery potential, presence of conflict, and the *taxonomic distinction* of the listed entity.

*See Id*.; *id*. at Appendix IV-4; *see also* FWS, Endangered and Threatened Species Listing and

Recovery Priority Guidelines, 48 Fed. Reg. 43098 (Sep. 21, 1983).  Under this priority system,

only designated *genera*, *species*, *subspecies*, or *populations – i.e.*, entities with a clearly defined

taxonomic distinction – can effectively be assigned a priority by the relevant FWS Region at the

time of listing, and therefore may get "in line" for recovery planning.  *See* 48 Fed. Reg. at 43098

("the loss of a full genus is of greater significance than the loss of a single species or population

---

[9]  Recovery is also accomplished through the ESA's prohibitions, including Section
7(a)(2), which prohibits all federal agencies from jeopardizing the continued existence of listed
species or adversely modifying their critical habitat, 16 U.S.C. § 1536(a)(2), and Section 9,
which prohibits any person from unlawfully taking a protected species.  16 U.S.C. §
1538(a)(1)(B).

of that species").[10]  Thus, as a practical matter, FWS's development and implementation of

recovery measures cannot occur for remnants of a previously-listed entity or leftovers from a

newly-designated and delisted DPS that have received no endangerment analysis pursuant to the

ESA's listing factors.

        In designating and delisting the WGL DPS, FWS effectively reclassified the geographic

scope of the listed gray wolf species in the conterminous states without applying the listing

factors to the revised species at all, and therefore did not explicitly determine the entity's

taxonomy or the specific threats to its survival and recovery.  Had this statutorily mandated

analysis been performed, the threats to this geographically reclassified wolf "species" would

have been clearly identified and analyzed and, in turn, that species, subspecies, or DPS would

have received a priority ranking for recovery planning based upon that analysis pursuant to

FWS's Recovery Guidelines.  In the absence of this recovery analysis and ranking, there

effectively can be no recovery planning for the wolf outside the WGL DPS, notwithstanding the

fact the species remains threatened with extinction in the vast majority of its range.  Thus, one

end result of the FWS's action here is that, although the wolf is still listed as endangered outside

of the WGL DPS, it exists in a state of regulatory limbo and its continued recovery has been

effectively truncated.

_____

        [10]  FWS's Listing and Recovery Priority Guidelines further explain:

        The Act includes populations of vertebrate animals in its definition of "species."
        Because this portion of the definition applies only to vertebrates, it appears
        inadvisable to incorporate it formally into the priority system.  The Service
        intends to generally afford vertebrate populations the same consideration as
        subspecies, but when a candidate subspecies and a candidate population have the
        same numerical priority, the candidate subspecies will generally have priority.

*Id.*

Furthermore, by leaving the gray wolf in significant portions of its historic range in the U.S. with unclear protection and a lack of recovery goals, the Final Rule fails to further the ESA's goal of conserving and recovering imperiled wildlife at the national level.  When Congress enacted the ESA, it sought "to better safeguard[], for the benefit of all citizens, the *Nation's heritage* in fish, wildlife, and plants."  16 U.S.C. § 1531(a)(5) (emphasis added).  Yet, by the Final Rule FWS would effectively end recovery of the gray wolf and relegate it to areas of the northern Great Lakes and the northern Rockies, rendering the Act's national conservation interest inconsequential.  *See* 16 U.S.C. § 1536(a)(1); *Nat'l Wildlife Fed'n*, 386 F. Supp. 2d 553.

In summary, FWS violated the ESA when it revised the 1978 listing rule for the wolf without affording the public adequate notice and a meaningful opportunity to comment on the full extent of that rule change.  Further, FWS based its revision to the 1978 listing rule and resulting change in the legal status of the wolf on a patently defective analysis of the ESA's statutory listing factors which only addressed wolves in the Great Lakes and entirely ignored the remainder and overwhelming majority of the species' historic range in the lower 48 states.  FWS's refusal to conduct these analyses violates the clear procedural and substantive requirements of the ESA, is inconsistent with FWS's prior practice and NMFS's application of the DPS Policy, and will effectively relegate recovery of this iconic species to five percent of its historic range in the conterminous states.  Carroll, *et al*. (Ex. C) (gray wolf "occup[ies] about 5% of the species' historic range in the conterminous United States"); *see also* 43 Fed. Reg. at 9610 (the gray wolf "once had a range that included most of Mexico and the 48 conterminous States of the United States" but "now occurs in only a small fraction of this range").  For these reasons, FWS's Final Rule must be struck down.

**II.     FWS ALSO ARBITRARILY USED THE DPS POLICY TO SUBDIVIDE THE LARGER, LOWER 48 LISTED WOLF IN VIOLATION OF THE ESA, THE LEGISLATIVE HISTORY, AND FWS'S DPS POLICY, AND THE FINAL RULE MUST BE STRUCK DOWN OR IT COULD SET A DANGEROUS PRECEDENT FOR HUNDREDS OF WILDLIFE SPECIES.**

In the Final Rule, FWS designated and delisted the WGL DPS without ever considering whether the species as a whole should remain listed under the ESA, and focused myopically on the status of the WGL DPS to the exclusion of any consideration of the status of the species overall.  *See* 72 Fed. Reg. at 6066 ("[w]e have considered only whether the gray wolf is threatened or endangered within this DPS").  Given the agency's three-decades of protection of the species, by ignoring the highly pertinent question of how the species is faring or whether it should remain listed at that level, FWS violated basic principles of administrative law.  *See*, *e.g.*, *Sierra Club v. Clark*, 755 F.2d 608, 619 (8th Cir. 1985) ("'an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance'") (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 42 (1983)); *see also State Farm*, 463 U.S. at 43 (reviewing court must "consider whether the decision was based on a consideration of the relevant factors").

FWS's failure to consider the species' status also contravenes the fundamental conservation goals of the ESA, which allow FWS to designate a DPS only if it first evaluates whether the entire species should be listed.  *See*, *e.g.*, *Friends of the Wild Swan*, 12 F. Supp. 2d at 1134 (emphasis added) (FWS cannot designate DPSs unless it first "legitimately concludes, after proper and sustainable analysis, that listing of the entire species or the . . . population in the coterminous United States is either not warranted or warranted but precluded").  Only through such an approach can FWS "promote the ESA's goals of protecting endangered and threatened

22

species and endangered and threatened population segments as quickly as possible." *Id.*; *cf.*, *Defenders of Wildlife v. Babbitt*, 958 F. Supp. 670, 685 (D.D.C. 1997) ("the fact that an animal population consisted of a mere 'remnant' of a larger historical population argued for, rather than against, protecting the species from further depletion.")

FWS's application of the DPS Policy to delist the gray wolf in piecemeal fashion is contrary to the underlying purpose of the DPS authority and the DPS Policy, which is intended to provide FWS with the flexibility to conserve populations *before* a species becomes threatened or endangered in all of its range. Congress specifically directed the Secretary to use the DPS authority "*sparingly*" – *i.e.*, not to create arbitrary DPSs, reduce protections by delisting the species in the DPS, and create uncertainty about the species' status or recovery priorities outside of the DPS. *See Defenders of Wildlife*, 354 F. Supp. 2d at 1169 (the purpose of the DPS Policy is to "allow FWS to list a DPS as threatened or endangered, and thereby provide a level of protection that is different from other populations within the same species"); *see also Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 842 (9th Cir. 2003) ("The FWS does not have to list an entire species as endangered when only one of its populations faces extinction."); *Sw. Ctr. for Biological Diversity v. Babbitt*, 926 F. Supp. 920, 924 (D. Ariz. 1996) (the text and legislative history reflect a "consistent policy decision by Congress that the United States should not wait until an entire species faces global extinction before affording a domestic population segment of a species protected status").

The ESA's legislative history addressing the definition of an "endangered species" also reflects that Congress structured the ESA in order to provide FWS with the authority to protect and recover imperiled species throughout all or a significant portion of their historic ranges – *i.e.*, not in a small fraction of their historic range. The ESA's two predecessor statutes defined the

23

term "endangered species" to require that the species be facing complete extinction to warrant

listing.  Under the Endangered Species Preservation Act of 1966, an endangered species was one

whose "existence is endangered because its habitat is threatened with destruction, drastic

modification, or severe curtailment, or because of overexploitation, disease, predation, or

because of other factors, and that its survival requires assistance."  Endangered Species

Preservation Act of 1966, Pub. L. No. 89-669 § 1(c), 80 Stat. 926, 926 (1966).  The Endangered

Species Conservation Act of 1969 identified an endangered species as one which is threatened

with "worldwide extinction."  Endangered Species Conservation Act, Pub. L. No. 91-135 § 3(a),

83 Stat. 275 (1969).  The Endangered Species Act of 1973, however, broadened the definition of

an endangered species to one facing "extinction throughout all or a significant portion of its

range."  Endangered Species Act of 1973, Pub. L. No. 93-205, § 3, 87 Stat. 884 (codified at 16

U.S.C. § 1532(6) (2000)).  The House Merchant Marine and Fisheries Committee stated that this

change represented "a significant shift in the definition in existing law, which considers a species

to be endangered only when it is threatened with worldwide extinction."  H.R. Rep. No. 93-412,

at 10 (1973); *see also Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1144 (9th Cir. 2001)

(discussing legislative history).  Thus, this statutory evolution reflects that Congress sought to

require listing well before a species faces worldwide extinction – and, by extension, to require

recovery of a species throughout all or a "significant portion" of its former range, not in a small

fraction thereof, before delisting is appropriate.

When Congress expanded the government's ability to list populations of species and

explicitly authorized the listing of DPSs in the Endangered Species Act Amendments of 1978,

Pub. L. No. 95-632, 92 Stat. 3751 (1978), it recognized "that there may be instances in which

FWS should provide for different levels of protection for populations of the same species.  The

original version of the ESA included within the definition of species "any subspecies of fish or wildlife or plants and any other group of fish or wildlife of the same species or smaller taxa in common spatial arrangement that interbreed when mature."  Pub. L. No. 93-205, § 3(11), 87 Stat. 884 (1973).  The 1978 amendment retained "subspecies" within the definition of species but eliminated the reference to "taxa in common spatial arrangement" and added instead the phrase "any distinct population segment of any species of vertebrate fish or wildlife."  Pub. L. No. 95-632, § 2(5).  Hence, for instance, "the U.S. population of an animal should not necessarily be permitted to become extinct simply because the animal is more abundant elsewhere in the world."  S. Rep. No. 96-151, at 11 (1979) (emphasis added).  Accordingly, many prominent species protected under the ESA, including the gray wolf and bald eagle, were listed as populations in the lower 48 states despite their abundance in Alaska and Canada.

Thus, consistent with these goals, Congress intended that the DPS authority would be used to protect imperiled populations where listing at a higher taxonomic level was unjustified, and there is nothing to suggest that Congress intended the agency to use this authority to do the opposite – *i.e.*, to eliminate protections for populations where the species or subspecies was threatened or endangered and thereby relegate a species' future persistence to those relatively small populations.  The DPS Policy recognizes this, stating that:

> Listing, delisting, or reclassifying distinct vertebrate population segments may allow the Services to protect and conserve species and the ecosystems upon which they depend before large-scale decline occurs that would necessitate listing a species or subspecies throughout its entire range.

61 Fed. Reg. at 4722.  By this language, the DPS Policy codifies Congress' intention that FWS designate DPSs sparingly.  *See id.* ("Congress has instructed the Secretary to exercise this authority with regard to DPS's '. . . sparingly and only when the biological evidence indicates

that such action is warranted.'") (quoting Senate Report 151, 96th Cong., 1st Sess.)).[11]

Nevertheless, disregarding Congressional intent and the DPS Policy, FWS used the DPS Policy as a tactic for subdividing the gray wolf species – an entity that FWS has already determined warrants listing "to the south of Canada" since 1978, 43 Fed. Reg. at 9607 – as a tactic for the express purpose of delisting it.  As such, "FWS's application of the DPS policy is patently 'inconsistent with the statute under which the regulations were promulgated.'"  *Nat'l Wildlife Fed'n*, 386 F. Supp. 2d at 565 (quoting *Mines v. Sullivan*, 981 F.2d 1068, 1070 (9th Cir. 1992)); *Friends of the Wild Swan*, 12 F. Supp. 2d at 1133 ("Listing of population segments is a proactive measure to prevent the need for listing a species over a larger range – not a tactic for subdividing a larger population the FWS has already determined . . . . warrants listing throughout a larger range."); *cf.*, *Defenders of Wildlife*, 354 F. Supp. 2d at 1170 ("[l]ike the bull trout DPS, the wolf DPS appears to be tactic for downlisting areas the FWS has already determined warrants listing").  Moreover, such misuse of the DPS authority and DPS Policy is precisely the kind of abuse that Congress was concerned about.  *See* S. Rep. No. 96-151, at 7 (1979) ("the committee is aware of the great potential for abuse of this authority [to list DPSs]").

Indeed, the Final Rule must be struck down, or it could set a potentially disastrous precedent for dozens, if not hundreds, of other federally-protected endangered and threatened species that have managed to recover in a small fraction of their former range.  As explained above, FWS has increasingly begun to use the DPS Policy to remove protections for such wide-ranging species as Columbia white-tail deer, crocodile, and grizzly bear.  *See supra* at 6-7.  Yet,

_____

[11]  In this connection, it is inconsequential that FWS has retained endangered status for the gray wolf outside of the DPS.  As explained above, FWS ignored the ESA's procedural and substantive requirements in doing so, and as a practical matter has relegated recovery of that listed entity – whatever its configuration – to a bureaucratic never-never land.  *See supra* at 15-21.

these examples and that of the gray wolf may be just a harbinger of what is to come, as FWS is currently undertaking dozens of five-year reviews of listed species, as required by the ESA.  16 U.S.C. § 1533(g) (requiring FWS to "implement a system in cooperation with the States to monitor effectively for not less than five years the status of all species which have recovered to the point at which the measures provided pursuant to this chapter are no longer necessary and which . . . have been removed from either of the lists").[12]

As part of these reviews for wildlife species, FWS is evaluating whether each listed species may be divided up into DPSs.  *See*, *e.g.*, FWS, Black-Capped Vireo *(Vireo atricapilla)*, 5-Year Review: Summary and Evaluation (June 19, 2007) (Ex. F) at 5 (requiring reviewers to specify whether there is "relevant new information that would lead you to consider listing this species as a DPS").  Thus, if FWS's misuse of the DPS Policy in connection with the gray wolf Final Rule is allowed to stand and FWS is permitted to slice up listed species in order to reduce ESA protections for them, the ESA's overall conservation purpose will be placed in jeopardy for dozens and dozens, and possibly hundreds, of listed wildlife species.

Accordingly, the Court should strike down FWS's latest attempt to use the DPS Policy as

---

[12]  *See also*, *e.g.*, 72 Fed. Reg. 54057 (Sep. 21, 2007) (announcing initiation of 5-year reviews of 16 Southeastern species); 72 Fed. Reg. 54061 (Sep. 21, 2007) (announcing initiation of 5-year reviews of 18 Caribbean species); 72 Fed. Reg. 42425 (Aug. 2, 2007) (announcing initiation of 5-year reviews of nine Southeastern species); 72 Fed. Reg. 41348 (July 27, 2007) (announcing initiation of 5-year reviews of three wildlife species in the Midwest Region); 72 Fed. Reg. 20134 (Apr. 23, 2007) (announcing 5-year review for 24 Southwestern species); 72 Fed. Reg. 19549 (Apr. 18, 2007) (announcing initiation of 5-year reviews of seven wildlife and two plant species in the Mountain-Prairie Region); 72 Fed. Reg. 10547 (Mar. 8, 2007) (announcing initiation of 5-Year reviews of 71 Species in Oregon, Hawaii, Commonwealth of the Northern Mariana Islands, and Guam); 72 Fed. Reg. 7064 (Feb. 14, 2007) (announcing initiation of 5-year reviews of 58 Species in California and Nevada); 72 Fed. Reg. 4018 (Jan. 29, 2007) (announcing initiation of 5-Year Reviews of 10 Listed Northeastern Species); 71 Fed. Reg. 56545 (Sep. 27, 2006) (announcing initiation of 5-year reviews of 37 Southeastern species); 71 Fed. Reg. 53127 (Sep. 8, 2006) (announcing initiation of 5-year reviews of 14 Southeastern species).

a tactic to subdivide an entity that FWS has already determined warrants listing at the national level – particularly where FWS failed to apply the ESA's procedural and substantive requirements to determine whether it still does.

## **CONCLUSION**

For these reasons as well as those demonstrated in plaintiffs' brief, FWS's designation and delisting of the WGL DPS should be vacated and remanded to the agency, and the status of gray wolves should revert back to endangered throughout the conterminous states and threatened in Minnesota.

DATED: November 14, 2007                    Respectfully submitted,


___/s/_____
Amy R. Atwood
D.C. Bar No. 470258
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211
503-283-5474 phone
503-283-5528 fax
atwood@biologicaldiversity.org

Michael P. Senatore
D.C. Bar No. 453116
Center for Biological Diversity
1601 Connecticut Avenue, N.W., Suite 701
Washington, D.C. 20009
202-232-1216 phone
202-232-1217 fax
msenatore@biologicaldiversity.org

Attorneys for *Amicus Curiae*
Center for Biological Diversity

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| HUMANE SOCIETY OF THE UNITED STATES, *et al.*, | ) ) ) | **Civ. No. 1:07-cv-00677-PLF** |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| KEMPTHORNE, *et al.*, | ) ) | |
| Defendants, | ) ) | |
| U.S. SPORTSMEN'S ALLIANCE, FOUNDATION, *et al.*, | ) ) ) | |
| Intervenor-Defendants, | ) ) | |
| SAFARI CLUB INTERNATIONAL, *et al.*, | ) ) ) | |
| Intervenor-Defendants. | ) ) | |

**[PROPOSED] ORDER ON MOTION OF CENTER FOR BIOLOGICAL**
**DIVISION TO FILE *AMICUS CURIAE* BRIEF**

Having reviewed the Motion Of Center for Biological Diversity For Leave To

File *Amicus Curiae* Brief, Brief Of Proposed *Amicus Curiae* Center For Biological

Diversity, Exhibits A through F, and supporting documents, it is hereby

ORDERED that Center for Biological Diversity's Motion is GRANTED, and it is

hereby further

ORDERED that Center for Biological Diversity shall be permitted to participate

in these proceedings as *amicus curiae*, including by filing a brief with the Court.

Dated this ____ day of _____, 2007,

_____

HONORABLE PAUL L. FRIEDMAN