## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| The Humane Society of the United States; Help Our Wolves Live ("HOWL"); Animal Protection Institute; and Friends of Animals and Their Environment, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | **Civil No. 1:07-cv-00677-PLF** |
| v. | ) ) | |
| Dirk Kempthorne, Secretary of the Interior; United States Department of the Interior; and United States Fish and Wildlife Service, | ) ) ) ) | |
| Defendants, | ) ) | |
| U.S. Sportsmen's Alliance Foundation, Wisconsin Bear Hunters Association, *et al.*, | ) ) ) | |
| Intervenor-Defendants, | ) ) | |
| Safari Club International, National Rifle Association, *et al.*, | ) ) ) | |
| Intervenor-Defendants. | ) ) | |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and LCvR 56.1, Plaintiffs The Humane Society of the United States, Help Our Wolves Live, Animal Protection Institute, and Friends of Animals and Their Environment (collectively, "Plaintiffs") move for summary judgment. As set forth in the accompanying Memorandum, there are no genuine issues of material fact in dispute, and Plaintiffs are entitled to judgment as a matter of law. In support of this motion, Plaintiffs submit the accompanying Memorandum, Statement Of Material Facts Not In Genuine Dispute, and exhibits.

Dated: November 14, 2007               Respectfully submitted,


/s/  Michael C. Soules & Rebecca G. Judd

Rebecca G. Judd, D.C. Bar No. 486315
rjudd@hsus.org
Jonathan R. Lovvorn, D.C. Bar No. 461163
jlovvorn@hsus.org
The Humane Society of the United States
2100 L Street, NW
Washington, DC  20037
(202) 452-1100
(202) 778-6132 (facsimile)

Brian B. O'Neill, Minn. Bar No. 82521
boneill@faegre.com
Sanne H. Knudsen, Minn. Bar No. 0344552
sknudsen@faegre.com
Michael C. Soules, D.C. Bar No. 477911
msoules@faegre.com
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-3901
(612) 766-7000
(612) 766-1600 (facsimile)

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| The Humane Society of the United States; Help Our Wolves Live ("HOWL"); Animal Protection Institute; and Friends of Animals and Their Environment, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil No. 1:07-cv-00677-PLF |
| v. | ) ) ) | |
| Dirk Kempthorne, Secretary of the Interior; United States Department of the Interior; and United States Fish and Wildlife Service, | ) ) ) ) | |
| Defendants, | ) ) | |
| U.S. Sportsmen's Alliance Foundation; Wisconsin Bear Hunters Association; *et al.*, | ) ) ) | |
| Intervenor-Defendants, | ) ) | |
| Safari Club International; National Rifle Association; *et al.*, | ) ) ) ) | |
| Intervenor-Defendants. | ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................2

      A.     Statutory Framework.......................................................................................2

      B.     Factual Background .......................................................................................6

             1.     The Gray Wolf ...................................................................................6

             2.     The Wolf Is Persecuted To The Brink Of Extinction.................................8

             3.     The Wolf's Recovery Begins.....................................................................9

             4.     FWS's Initial Delisting Effort................................................................11

             5.     FWS's Current Delisting Campaign.......................................................14

LEGAL STANDARD .......................................................................................................18

ARGUMENT ....................................................................................................................18

I.     THE AGENCY'S PIECEMEAL DELISTING OF THE GRAY WOLF
     VIOLATES THE ENDANGERED SPECIES ACT........................................................19

      A.     FWS's Effort To Sidestep The "Significant Portion Of [The]
            Range" Requirement Through Piecemeal Delisting Is Arbitrary,
            Capricious, And Contrary To Law.................................................................19

             1.     The Gray Wolf Remains Endangered Across A Significant
                    Portion Of Its Range. ............................................................................21

             2.     FWS Cannot Circumvent The Significant Portion Of The
                    Range Requirement By Carving Up The Wolf's Range Into
                    DPSs. ...................................................................................................23

      B.     FWS's Use Of DPSs As A Delisting Tool Is Arbitrary And
            Capricious.....................................................................................................28

II.    EVEN IF THE DPS COULD BE USED AS A DELISTING TOOL, THE
     BOUNDARIES OF THE WESTERN GREAT LAKES DPS ARE
     ARBITRARY AND CAPRICIOUS................................................................................31

III.   EVEN IF THE DESIGNATION OF THE WESTERN GREAT LAKES
     DPS WERE OTHERWISE PROPER, THE WOLF COULD NOT BE

DELISTED BECAUSE IT REMAINS ENDANGERED WITHIN THE DPS.......................................................................................................34

A.    The Existing Regulatory Mechanisms Fail To Protect The Gray Wolf.......................................................................................................35

B.    The Great Lakes Wolf Population Is Threatened By Disease And Human Predation. ...............................................................................39

C.    FWS Lacks Any Measures For Post-Delisting Monitoring. ...............................42

CONCLUSION...............................................................................................................43

# TABLE OF AUTHORITIES

## FEDERAL CASES

*American Wildlands v. Norton*, 193 F. Supp. 2d 244 (D.D.C. 2002) ...........................................31

*Biodiversity Legal Foundation v. Babbitt*, 943 F. Supp. 23 (D.D.C. 1996)................................36

*Ctr. for Biological Diversity v. Morgenweck*,
351 F. Supp. 2d 1137 (D. Colo. 2004) ...................................................................................36

*Ctr. for Biological Diversity v. Norton*, 411 F. Supp. 2d 1271 (D.N.M. 2005) ..........................20

*Defenders of Wildlife v. Babbitt*, 958 F. Supp. 670 (D.D.C. 1997) ............................................30

*Defenders of Wildlife v. Babbitt*, 130 F. Supp. 2d 121 (D.D.C. 2001) .............................5, 18, 24

*Defenders of Wildlife v. Kempthorne*, Civ. No. 04-1230,
2006 WL 2844232 (D.D.C. Sept. 29, 2006)...........................................................................22

*Defenders of Wildlife v. Norton*, 258 F.3d 1136 (9th Cir. 2001) ...........................4, 20, 23, 24, 28

*\*Defenders of Wildlife v. Norton*, 239 F. Supp. 2d 9 (D.D.C. 2002)...................................*passim*

*Defenders of Wildlife v. Norton*, Order Granting Permanent Injunction,
Civ. No. 05-1573-ESH (D.D.C. Sept. 13, 2005) ......................................................................13

*\*Defenders of Wildlife v. Sec'y, U.S. Dep't of the Interior*,
354 F. Supp. 2d 1156 (D. Or. 2005) ................................................................................*passim*

*Duncan v. Walker*, 533 U.S. 167 (2001) .................................................................................27

*\*Friends of the Wild Swan v. U.S. Fish & Wildlife Services*,
12 F. Supp. 2d 1121 (D. Or. 1997) ........................................................................25-26, 28, 30

*Humane Soc'y of the United States v. Kempthorne*,
481 F. Supp. 2d 53 (D.D.C. 2006).........................................................................................13

*James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085 (D.C. Cir. 1996)...................................18

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)..........35, 38-39

*Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835 (9th Cir. 2003) ......................................28

*Nat'l Wildlife Federation v. Norton*, 386 F. Supp. 2d 553 (D. Vt. 2005) ........................ 12, 34, 37

*Oregon Nat. Res. Def. Council v. Daley*,
6 F. Supp. 2d 1139 (D. Or. 1998) ...................................................................................... 36, 41

*Pharm. Research & Mfrs. of America v. Thompson*,
251 F.3d 219 (D.C. Cir. 2001) .............................................................................................. 18

*Save Our Springs v. Babbitt*, 27 F. Supp. 2d 739 (W.D. Tex. 1997) ............................................. 41

*Sierra Club v. Clark*, 577 F. Supp. 783 (D. Minn. 1984) ............................................................... 11

*\*Southwest Ctr. for Biological Diversity v. Babbitt*,
939 F. Sup. 49 (D.D.C. 1996) ...................................................................................... 35, 36, 40

*Tenn. Valley Authority v. Hill*, 437 U.S. 153 (1978) ............................................................ 2, 3, 32

## FEDERAL STATUTES

5 U.S.C. § 706 ............................................................................................................................ 18

16 U.S.C. § 1531 .................................................................................................................. 1, 2, 7

16 U.S.C. § 1532 ............................................................................................................... *passim*

16 U.S.C. § 1533 ............................................................................................................... *passim*

16 U.S.C. § 1536 .................................................................................................................... 4, 5

16 U.S.C. § 1538 ........................................................................................................................ 4

16 U.S. C. § 1539 ............................................................................................................... 10, 13

Fed. R. Civ. P. 56(c) ................................................................................................................. 18

## FEDERAL REGISTER

32 Fed. Reg. 4001 (Mar. 11, 1967) ............................................................................................. 9

43 Fed. Reg. 9607 (Mar. 9, 1978) ....................................................................................... *passim*

51 Fed. Reg. 19926 (June 3, 1986) ............................................................................................. 5

51 Fed. Reg. 6686 (Feb. 25, 1986) ............................................................................................ 20

58 Fed. Reg. 34926 (June 30, 1993) .......................................................................................... 20

iv

61 Fed. Reg. 4722 (Feb. 7, 1996) ..................................................................*passim*

65 Fed. Reg. 43450 (July 13, 2000) ........................................................... 12, 21, 22

68 Fed. Reg. 10388 (Mar. 5, 2003) ........................................................................5

68 Fed. Reg. 15804 (April 1, 2003) ......................................................................12

68 Fed. Reg. 15876 (April 1, 2003) ......................................................................12

68 Fed. Reg. 15879 (April 1, 2003) ......................................................................12

69 Fed. Reg. 43664 (July 21, 2004) ......................................................................16

71 Fed. Reg. 6634 (Feb. 8, 2006) ....................................................................10, 16

71 Fed. Reg. 15266 (Mar. 27, 2006) ...............................................................*passim*

72 Fed. Reg. 6052 (Feb. 8, 2007) ...................................................................*passim*

72 Fed. Reg. 6106 (Feb. 8, 2007) ....................................................................2, 17

72 Fed. Reg. 14866 (Mar. 29, 2007) .....................................................................17

72 Fed. Reg. 44065 (Aug. 7, 2007) ......................................................................10

## OTHER AUTHORITIES

Hausrath, Katherine, *The Designation of "Distinct Population Segments" Under the Endangered Species Act in Light of National Association of Homebuilders v. Norton*, 80 Chi.-Kent L. Rev. 449, 455-56 (2005) ......................................................29

H.R. Rep. No. 93-412 (1973) ...........................................................................3, 26

H.R. Rep. 95-1625 (Nov. 25, 1978) ......................................................................20

Leopold, Aldo, *A Sand County Almanac* 139-40 (1966) ............................................8

Minn. Stat. § 13.03 ...........................................................................................37

Pub. L. No. 81-135, § 3(a), 83 Stat. 375 (Dec. 5, 1969) ............................................3

Pub. L. No. 93-205, 87 Stat. 884 (1973) ................................................................5

Pub. L. No. 95-632, 92 Stat. 3751 (1978) ..............................................................5

S. Rep. No. 96-151 (1979)...........................................................................................................28

## INTRODUCTION

This case challenges the latest salvo in the federal government's ongoing effort to remove the protections of the Endangered Species Act from the gray wolf, a species that remains critically endangered in the 48 conterminous United States. Specifically, Plaintiffs challenge the government's decision to remove the Great Lakes wolf population from the list of threatened and endangered species. *See* 72 Fed. Reg. 6052 (Feb. 8, 2007).

Although the gray wolf once roamed across most of North America, by the 1960s the wolf had been almost completely extirpated from the conterminous United States. But with the 1973 passage of the Endangered Species Act ("ESA" or the "Act"), 16 U.S.C. § 1531 *et seq.*, the wolf began making a comeback. Shielded from the unrestrained killing that drove it to the brink of extinction, gray wolf populations started to recover in the Great Lakes region and in the northern Rocky Mountains. Nevertheless, even today the gray wolf remains extirpated across 95% of its historic range, and the existing wolf populations face ongoing threats to their long-term survival.

Despite the wolf's continuing endangerment, in recent years the United States Fish and Wildlife Service ("FWS" or "the agency") has repeatedly sought to remove the gray wolf from the endangered species list. Because the statutory mandates of the ESA preclude the wolf from being delisted, FWS has tried to sidestep the statute by using a legal tool designed to *increase* species protection – the "distinct population segment" – for the opposite purpose.

Under the ESA, FWS can list a locally-vulnerable animal population as a distinct population segment ("DPS"), even when the species as a whole is neither threatened nor endangered. 16 U.S.C. § 1532(16). The purpose of extending ESA protections to such populations is "to protect and conserve species . . . before large-scale decline occurs that would

necessitate listing a species or subspecies throughout its entire range." 61 Fed. Reg. 4722, 4725 (Feb. 7, 1996). Neither the Act nor its implementing policies contemplate that a DPS could be used to hinder, rather than promote, species recovery. Yet that is precisely what FWS has done in its drive to delist the wolf. Because the gray wolf is largely confined to two isolated pockets within the conterminous United States, the agency created DPSs for these localized populations. Then, by focusing on the wolf's situation within the DPSs (while ignoring threats to the wolf everywhere else), FWS has declared the wolf to be recovered.

Pursuant to this divide and conquer strategy, FWS removed the "western Great Lakes distinct population segment" of the gray wolf from the endangered species list. 72 Fed. Reg. 6052 (the "Final Rule"). On the very same day, the agency issued a proposal to delist the gray wolf population in the northern Rocky Mountains. 72 Fed. Reg. 6106 (Feb. 8, 2007). Once the latter rule is finalized, virtually every gray wolf within the conterminous United States will lose the protections of the ESA. This piecemeal delisting of the wolf contravenes the ESA's mandate that species be protected so long as they remain endangered "throughout all or a significant portion of [their] range." 16 U.S.C. § 1532(6). Because FWS's action is arbitrary, capricious, and contrary to the ESA, the Final Rule should be vacated.

## BACKGROUND

### A.    Statutory Framework

The Endangered Species Act is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978) ("*TVA*"). Recognizing the "esthetic, ecological, educational, historical, recreational, and scientific value" of our nation's plant and wildlife species, Congress enacted the ESA to conserve those species and the ecosystems on which they depend. 16 U.S.C. § 1531(a)-(b). In passing the ESA, Congress gave "the highest of priorities" to endangered species protection,

2

"thereby adopting a policy which it described as 'institutionalized caution.'" *TVA*, 437 U.S. at 194.

The ESA was the last in a series of laws enacted in the 1960s and 1970s that were aimed at protecting imperiled species. Earlier legislation, like the Endangered Species Conservation Act of 1969, only protected species facing total extinction. *See* Pub. L. No. 81-135, § 3(a), 83 Stat. 375 (Dec. 5, 1969) (describing endangered species as those threatened by "worldwide extinction"). The ESA, however, broadened the category of protected species in two important respects. First, the ESA extended protection to "threatened species," those species that were likely to become endangered within the foreseeable future. *See* 16 U.S.C. § 1532(20). Second, Congress expanded the definition of "endangered species" to include not only species facing complete extinction, but also those in danger of extinction throughout "a significant portion of [their] range." *Id.* § 1532(6).

Congress recognized the importance of these amendments at the time of the Act's passage. As the House Report explained, broadening the definition of "endangered species" represents "a significant shift in the definition in existing law, which considers a species to be endangered only when it is threatened with worldwide extinction." H.R. Rep. No. 93-412 (1973), *reprinted in* Congressional Research Service, *A Legislative History of the Endangered Species Act of 1973* 149 (1982) (hereafter "ESA Legislative History"); *see also id.* at 200 (statement of Rep. Price that the ESA "would protect species threatened in any significant portion of their range, rather than only those threatened with worldwide destruction").

To trigger the Act's protections, a species must be added to the list of endangered and threatened species. The decision to list a species is made by analyzing five categories of threats described in Section 4(a)(1) of the Act:

A.     the present or threatened destruction, modification, or curtailment of [the species'] habitat or range;

B.     overutilization for commercial, recreational, scientific, or educational purposes;

C.     disease or predation;

D.     the inadequacy of existing regulatory mechanisms; or

E.     other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1) (hereafter cited as the "Section 4(a)(1) threats").  The ESA directs the Fish and Wildlife Service[1] to examine these threats using the best available scientific data, and thus determine whether a species is threatened or endangered "throughout all or a significant portion of its range."  *Id.* § 1532(6), (20).  In the context of listing decisions, the "significant portion" of a species' range includes major geographical areas where the species was once viable, regardless of whether the species currently exists in those areas.  *Defenders of Wildlife v. Norton*, 239 F. Supp. 2d 9, 20 (D.D.C. 2002), *remedy vacated by consent*, 89 Fed. Appx. 273 (D.C. Cir. Mar. 3, 2004) ("*Defenders (lynx)*"); *see also Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1145 (9th Cir. 2001) ("*Defenders (lizard)*"); *Defenders of Wildlife v. Sec'y, U.S. Dep't of the Interior*, 354 F. Supp. 2d 1156, 1167-68 (D. Or. 2005) ("*Defenders (wolf)*").

Once listed, a species is protected by an array of measures designed to prevent its extinction and promote recovery.  In addition to prohibitions against the trafficking or taking of endangered species, 16 U.S.C. § 1538(a)(1), the Act requires FWS to utilize its programs in furtherance of the Act's purposes.  *Id.* § 1536(a)(1).  All federal agencies must ensure that their

---

[1] The Act's listing provisions apply directly to the Secretary of the Interior.  Because the Secretary has delegated his responsibility for managing endangered species to FWS, this Memorandum refers to the Defendants collectively as "FWS" or "the agency."

actions are "not likely to jeopardize the continued existence of any endangered species or threatened species."  *Id.* § 1536(a)(2).  Finally, the ESA requires FWS to develop and implement recovery plans for listed species.  *Id.* § 1533(f).

Decisions to reclassify an already-listed species are governed by the same standards used in listing species.  Thus, FWS must conduct the same Section 4(a)(1) threats analysis before removing a species from the endangered species list.  16 U.S.C. § 1533(c)(2)(B); *Defenders of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 133 (D.D.C. 2001) (noting that "the same five statutory factors must be considered in delisting as in listing") (quoting *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 111 (D.D.C. 1995)).  A species has not recovered, and cannot be delisted, "until the threats to the species as analyzed under section 4(a)(1) of the Act have been removed."  51 Fed. Reg. 19926, 19935 (June 3, 1986).  Accordingly, a species can only be delisted if, after examining threats to the species throughout its range, FWS reasonably concludes that the species has achieved recovery.

When the ESA was enacted in 1973, the "species" that could be listed under the Act were defined to include species, subspecies, and "any other group of fish or wildlife of the same species or smaller taxa in common spatial arrangement that interbreed when mature."  Pub. L. No. 93-205, 87 Stat. 884, 886 (1973).  In the 1978 ESA Amendments, Congress modified this definition by eliminating the reference to "taxa in common spatial arrangement" and replacing it with "distinct population segment of any species of vertebrate fish or wildlife."  Pub. L. No. 95-632, 92 Stat. 3751, 3752 (1978); *see also* 16 U.S.C. § 1532(16) (present definition of "species").  Under the amended definition, FWS can list a distinct population segment ("DPS") of a vertebrate species when the species as a whole is neither threatened nor endangered.  *See, e.g.*, 68 Fed. Reg. 10388 (Mar. 5, 2003) (listing the Columbia Basin distinct population segment of

the pygmy rabbit as an endangered species).  By extending the protections of the ESA to locally-vulnerable populations, DPSs can "protect and conserve species and the ecosystems upon which they depend before large-scale decline occurs that would necessitate listing a species or subspecies throughout its entire range."  61 Fed. Reg. at 4725.

In 1996, FWS, together with the National Marine Fisheries Service, adopted a policy for determining when DPSs can be designated under the Act.  *Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act*, 61 Fed. Reg. at 4725 ("DPS Policy").  Under the DPS Policy, FWS must consider three elements before listing a vertebrate population as a DPS.  These elements are: (a) the discreteness of the population segment in relation to the remainder of the species; (b) the significance of the population segment to the species as a whole; and (c) the population segment's conservation status in relation to the Act's standards for listing, *i.e.*, whether the population segment, when considered apart from the rest of the species, is threatened or endangered.  *Id.*

### B.    Factual Background

#### 1.    The Gray Wolf

The gray wolf (*Canis lupus*) is the largest member of the canine family.  Wolves prey primarily on wild ungulates (hoofed animals) such as deer, elk, moose, and bison, as well as smaller mammals like beavers and rabbits.  As habitat generalists, wolves can live almost anywhere with a sufficient ungulate population, so long as they are not being persecuted by humans.  Historically, wolves ranged across nearly all of North America, including the entire Great Lakes region.  *See* 71 Fed. Reg. 15266, 15267, 15277 (Mar. 27, 2006); Administrative Record Document ("AR Doc.") 215 at 5128; *id.* at 5264; *id.* at 5993; AR Doc. 228 at 8077.

Wolves are social animals and wolf pups are dependent upon family units, or packs, for their survival.  Wolf packs in the Great Lakes region typically have between 4 and 6 members,

although packs with more than 15 wolves have been recorded.  The territories of these packs average between 42 and 100 square miles.  AR Doc. 215 at 5125-26; *id.* at 5265.  Wolf pups generally remain with their parents for at least the first year of life, while they learn to hunt.  After that, many yearlings leave the pack to find mates and territories of their own.  This process, which is called dispersal, is essential to the viability of the gray wolf.  By allowing wolves to interbreed over large geographic areas, dispersal helps maintain genetic diversity.  Dispersal is also crucial to wolf recovery, because dispersing wolves often reoccupy areas in which wolves were previously extirpated.  AR Doc. 215 at 4765-66; *id.* at 5126, 5130; *id.* at 5265; *id.* at 5993.

The gray wolf plays an important role in ecosystems throughout North America.  As a large carnivore, the gray wolf functions as an "umbrella species" because conserving wolf habitat leads to the protection of many other species within its range.  AR Doc. 468B at 16281.  Wolf conservation thus enhances biodiversity, *id.*, thereby promoting the ESA's broader goal of preserving functioning ecosystems, and not just individual species.  *See* 16 U.S.C. § 1531(b) (stating the congressional purpose of conserving "the ecosystems upon which endangered species and threatened species depend").

Beyond its strict ecological importance, the gray wolf provides many other benefits to humans.  For example, the wolf has great significance for many American Indian tribes in the Great Lakes region.  Plaintiffs' First Amended Complaint for Declaratory and Injunctive Relief ¶ 49 ("Amended Complaint"); Federal Defendants' Answer ¶ 49 ("Answer").  Wolves also benefit individuals interested in observing and studying wildlife, and many people appreciate simply knowing that there are wolves in their area.  *See* AR Doc. 215 at 3743; *id.* at 5135, 5136; AR Doc. 418 at 11499-11500.

## 2.    The Wolf Is Persecuted To The Brink Of Extinction

As agricultural and industrial development began spreading across North America, wolves became the subject of widespread persecution.  Beginning in the seventeenth century, federal, state, and local governments authorized bounties intended to eliminate the gray wolf.  These combined efforts almost entirely eradicated the wolf from the 48 conterminous United States.  Amended Complaint ¶ 52; Answer ¶ 52; 71 Fed. Reg. at 15267; AR Doc. 215 at 4758-59.

This trend was mirrored in the Midwest.  In the Dakotas, wolves were extirpated by the 1920s or 1930s, and by 1960, the wolf had been eliminated from Wisconsin and Michigan.  Despite the wolf's diminishing range in Minnesota, public bounties were paid up until 1965, and wolves could legally be killed until 1974.  By the early 1970s, the only gray wolves living within the conterminous United States consisted of a small community located in Lake Superior's Isle Royale National Park and a remnant population, numbering fewer than 1000, in northeastern Minnesota.  Amended Complaint ¶¶ 53-54; Answer ¶¶ 53-54; AR Doc. 215 at 5267; *id.* at 5892-93.

The loss of the wolf had devastating effects on the ecosystems it once inhabited.  Aldo Leopold, one of the country's foremost ecologists and the founder of modern wildlife management, aptly described the impact of this loss:

> I have lived to see state after state extirpate its wolves.  I have watched the face of many a newly wolfless mountain, and seen the south-facing slopes wrinkle with a maze of new deer trails.  I have seen every edible bush and seedling browsed, first to anaemic desuetude, and then to death.  I have seen every edible tree defoliated to the height of a saddlehorn.  Such a mountain looks as if someone had given God a new pruning shears, and forbidden Him all other exercise. . . .

Aldo Leopold, "Thinking Like a Mountain," *A Sand County Almanac* 139-40 (1966).

### 3.    The Wolf's Recovery Begins

The gray wolf was among the first species to be listed under the Endangered Species Preservation Act of 1966, a forerunner of the ESA.  32 Fed. Reg. 4001 (Mar. 11, 1967).  But these legal protections were limited, and it was the 1973 passage of the ESA that marked the first serious protection for the wolf.  Soon after the Act's passage, FWS listed several subspecies of gray wolf, including the eastern timber wolf.  Due to administrative difficulties created by these various subspecies listings, FWS ultimately decided to relist the gray wolf at the species level. Accordingly, in 1978 FWS listed the gray wolf as endangered throughout the conterminous United States and Mexico, except in Minnesota, where wolves were listed as threatened.  43 Fed. Reg. 9607 (Mar. 9, 1978).

In its 1978 listing decision, FWS recognized the catastrophic loss of the gray wolf's range.  In the eastern United States, the agency found that the wolf's historic range – which encompassed "most of the region from Georgia to Maine, and between the Atlantic and the Great Plains" – had been reduced to northern Minnesota and the adjacent Isle Royale National Park. 43 Fed. Reg. at 9608, 9610.  In the West, FWS observed that except for the "occasional wanderer," the wolf had been restricted to remote areas of the Rocky Mountains.  *Id.* at 9610. The agency further noted that some states within the wolf's historic range, such as Washington and North Dakota, had no protections for the gray wolf.  *Id.* at 9611.  Applying the threats analysis required by Section 4(a)(1) of the ESA, 16 U.S.C. § 1533(a)(1), FWS concluded that "the entire species *Canis lupus* is Endangered or Threatened to the south of Canada."  *Id.* at 9607.

Once protected by the ESA, the Great Lakes wolf population began reoccupying portions of its historic range.  Between 1979 and 1998, the occupied wolf range in Minnesota more than doubled.  Meanwhile, wolves began dispersing from Minnesota into northern Wisconsin, and

from there into the Upper Peninsula of Michigan. Wisconsin first reported a wolf pack in 1975, and Michigan recorded a breeding pair in 1991. Today, there are wolves in all three states, though the vast majority of the Great Lakes wolf population remains in northern Minnesota. *See* 71 Fed. Reg. at 15269-71.

Limited recovery has also begun in the West. Aided by the protections of the ESA, a few wolves dispersing from Canada established a small resident population in Montana. Meanwhile, in the mid-1990s FWS reintroduced wolves to Yellowstone National Park and central Idaho. 71 Fed. Reg. 6634, 6635-37 (Feb. 8, 2006). Those wolves, which are currently managed as an experimental population under Section 10(j) of the Act, 16 U.S.C. § 1539(j), have also contributed to this nascent wolf recovery. Today, the Great Lakes region and the northern Rocky Mountains contain the only sizeable gray wolf populations within the conterminous United States.[2]

Just as the loss of the gray wolf crippled many ecosystems, their reemergence has benefited the broader environment. For example, the ecological health of Yellowstone National Park and surrounding areas has improved demonstrably since the wolf's reintroduction in the mid-1990s. The reintroduced wolves have bolstered biodiversity by creating habitat for beavers, songbirds, and trout. AR Doc. 228 at 7870, 7871; *id.* at 8043, 8045, 8047; *id.* at 8120-23. Red foxes, which are competitors of the coyote, have likewise benefited from the wolf's return, as

---

[2] Besides the Great Lakes and northern Rocky Mountains populations, the only other gray wolves in the conterminous United States consist of a small experimental population of the Mexican gray wolf in the Southwest. A distinct subspecies, the Mexican wolf is treated separately from gray wolves elsewhere in the country. *See, e.g.*, 72 Fed. Reg. 44065-66 (Aug. 7, 2007) ("Due to its previous status as a subspecies, the Service has continued to refer to the gray wolves in the southwestern United States as the 'Mexican gray wolf.'"). This nonessential experimental population is estimated to contain fewer than 60 wolves. *Id.* at 44068.

shown by their increasing numbers since the reintroduction of wolves to Yellowstone.  AR Doc.
228 at 8045; *id.* at 8122.  Wolves also benefit scavenger species such as grizzly bears, bald
eagles, and golden eagles, which are provided a reliable food source on a year-round basis from
the "leftovers" of wolf kills.  AR Doc. 215 at 5732-33; AR Doc. 228 at 8122; *id.* at 8196-97,
8201-02.

Though recent population trends are encouraging, the gray wolf's recovery is far from
complete.  At the time of the ESA's passage, the gray wolf had been reduced to 1% of its historic
range within the conterminous United States.  *See Sierra Club v. Clark*, 577 F. Supp. 783, 785
(D. Minn. 1984), *rev'd in part*, 755 F.2d 608 (8th Cir. 1985) (noting that "[t]he Eastern Timber
Wolf . . . now occupies only 1 percent of its original range"); AR Doc. 228 at 7869 (stating that
by the 1950s, the gray wolf "occup[ied] less than 1% of the species historic range").  Today,
despite its limited progress, the wolf remains extirpated across approximately 95% of its historic
range.  AR Doc. 228 at 7869 (noting that the gray wolf "occup[ies] about 5% of the species'
historic range in the conterminous United States").  These unoccupied portions of the wolf's
range include vast swaths of habitat where wolves could ultimately recover, including the Pacific
Northwest, the southern Rocky Mountains, and the forests of New England and upstate New
York.  The wolf has not yet recolonized any of these places.

Moreover, without the Act's protections, the existing gray wolf populations face serious
threats due to deficiencies in state management.  The inadequacies of state management
compound other threats to the gray wolf, including human persecution, disease outbreaks, and
habitat loss.  All of these threats imperil the long-term survival of the wolf.

### 4.    FWS's Initial Delisting Effort

Despite these ongoing threats, in 2000 FWS succumbed to political pressure from
hunting and ranching interests and decided to abandon its promising wolf recovery efforts.  The

agency thus began an intensive effort to remove the gray wolf from the endangered species list. But because FWS could not justify delisting the wolf under Section 4(a)(1) of the ESA, the agency tried to sidestep the statutory requirements by using the distinct population segment, a legal tool designed to *increase* species protection, for delisting purposes.

FWS began its delisting campaign by publishing a proposed rule that sought to divvy up the wolf's range into four distinct population segments and to downlist the wolf to threatened status within three of them.  65 Fed. Reg. 43450 (July 13, 2000).  FWS finalized the proposal in 2003.  *See* 68 Fed. Reg. 15804 (April 1, 2003) (the "2003 Downlisting Rule").  In this rule, the agency created three large DPSs, including an Eastern DPS that stretched from the Dakotas to New England and a Western DPS that extended from California to the eastern border of Montana and Wyoming.  The rule reclassified the gray wolf from endangered to threatened in both the Eastern and Western DPSs.  Simultaneously, FWS announced its intention to delist the wolf entirely within these DPSs.  *See* 68 Fed. Reg. 15876 (April 1, 2003); 68 Fed. Reg. 15879 (April 1, 2003).

A coalition of environmental and animal welfare groups, including the Plaintiffs in this action, challenged the 2003 Downlisting Rule, and in January 2005 the federal district court in Oregon struck down the rule as a violation of the ESA.  *See generally Defenders (wolf)*, 354 F. Supp. 2d 1156.  Independently, the federal district court in Vermont reached the same result. *Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553 (D. Vt. 2005).  These rulings found the 2003 Downlisting Rule to be arbitrary and capricious.  By vacating the rule, these decisions restored the gray wolf to endangered status throughout the conterminous United States, except in Minnesota, where the wolf remained threatened.

In striking down the 2003 Downlisting Rule, the District of Oregon found that the gray wolf had not recovered across a significant portion of its range. *See Defenders (wolf)*, 354 F. Supp. 2d at 1167-69. The court specifically noted the existence of suitable habitat in the Northeast and Pacific Northwest, and implied that recovery in the Dakotas might be possible as well. *Id.* at 1167. The court also disapproved of the boundaries of the Eastern and Western DPSs, finding them to be too broad because they were drawn to include unoccupied portions of the wolf range. As the court put it, "the wolf DPS appears to be a tactic for downlisting areas the FWS has already determined warrants listing, despite the unabated threats and low to non-existent populations outside of the core areas." *Id.* at 1171.

Undeterred by this judicial repudiation, FWS quickly issued a permit allowing the State of Wisconsin to kill 34 endangered wolves in 2005. In support of its decision, FWS cited Section 10(a) of the ESA, which allows the limited take of an endangered species "for scientific purposes or to enhance the propagation or survival of the affected species." 16 U.S.C. § 1539(a)(1)(A). This Court invalidated that permit because FWS had failed to provide notice and comment before issuing the permit. *Defenders of Wildlife v. Norton*, Order Granting Permanent Injunction, Civ. No. 05-1573-ESH (D.D.C. Sept. 13, 2005), *attached as* Exhibit A to the Declaration of Michael Soules in Support of Plaintiffs' Motion for Summary Judgment ("Soules Decl."). The following day, Wisconsin's resubmitted permit application was published in the Federal Register, and FWS issued another permit allowing the state to take 43 wolves in 2006. This Court again enjoined implementation of the permit, finding that the lethal take of endangered wolves was not authorized by the ESA. *Humane Soc'y of the United States v. Kempthorne*, 481 F. Supp. 2d 53 (D.D.C. 2006).

### 5.    FWS's Current Delisting Campaign

Meanwhile, the agency renewed its efforts to remove the gray wolf from the endangered species list.  Immediately after the District of Oregon's ruling, FWS began crafting a proposal to delist the gray wolf populations in the western Great Lakes and northern Rocky Mountains.  *See* AR Doc. 4 at 43.  In March 2005, the agency held a "National Gray Wolf Meeting" at Marymount University.  During and after this meeting, FWS considered three general approaches for dealing with the gray wolf.  These alternatives were identified in an "Options paper" that guided the agency's planning process.  The Options paper described these three alternatives and cited "pros" and "cons" of each approach.  *See, e.g.*, AR Doc. 35 at 156-61, Soules Decl., Ex. B.[3]  All three options were geared towards either downlisting or delisting the wolf, rather than calling for additional wolf recovery efforts.

Under Option 1, the agency would downlist the gray wolf to threatened status throughout the conterminous United States, while possibly retaining an endangered listing for the Mexican wolf in the Southwest.  AR Doc. 35 at 157.  According to FWS, one of the advantages of this option was that it was "[p]robably fastest overall."  *Id.* at 158.  But the agency was also concerned about this approach because the threats analysis required by Section 4(a)(1) of the ESA would have "to be done over an extremely large area."  *Id.* at 158; *cf.* 16 U.S.C. § 1533(a)(1).  In other words, FWS believed that one of the *disadvantages* of Option 1 was that it would require the agency to repeat the very analysis that resulted in the wolf's 1978 listing – assessing threats to the gray wolf's survival throughout the conterminous United States.

---

[3] As directed by LCvR 7(n), Plaintiffs will work with the Federal Defendants and Intervenor-Defendants to jointly prepare an appendix with relevant portions of the administrative record. For the convenience of the Court, Plaintiffs have also attached a few key documents from the record as exhibits to this Motion.

Options 2 and 3 were far different.  Option 2 called for the creation of two DPSs – one in the northern Rocky Mountains and one in the western Great Lakes – that would encompass the existing wolf populations plus a large swath of unoccupied wolf range which would capture most dispersing wolves.  *See* AR Doc. 35 at 158 (describing DPSs consisting of "core states + large dispersal area").  FWS favored this approach because it would lead to a quick delisting of the Great Lakes wolf population.  *Id.*  The agency feared, however, that if these wolf populations were delisted, then the gray wolf might remain forever endangered in the non-DPS remnants of the wolf's range.  *Id.*

Option 3 was similar to Option 2, except that the boundaries of the two DPSs would be drawn more narrowly.  AR Doc. 35 at 159.  As compared with the prior option, Option 3 gave dispersing wolves a greater opportunity to regain protected status by reaching the boundaries of the DPS.  But rather than laud the possibility that this could result in further wolf recovery, FWS worried that if wolves appeared in other states those states could be "forced" to engage in recovery efforts.  *Id.* at 159.

Under both Options 2 and 3, FWS recognized that carving up the wolf's range into DPSs would give it an excuse to avoid any consideration of the gray wolf's status elsewhere in the country.  Indeed, FWS believed that one of the principal benefits of Option 2 was that the 4(a)(1) threats analysis would be "conducted on smaller geographic areas."  AR Doc. 35 at 158; *see also* AR Doc. 48 at 201, Soules Decl., Ex. C (stating that a "pro" of Option 2 was that the agency would conduct the "[t]hreats analysis over [a] smaller area"); AR Doc. 23 at 115 (same).[4]

---

[4] The Options paper also confirmed FWS's decision to forgo any federal wolf recovery efforts in the Northeast, even though that had been a priority for decades.  *See* 1978 Recovery Plan for the Eastern Timber Wolf at 43-44, AR Doc. 215 at 5840-41.  Indeed, when the timber wolf recovery plan was revised in 1992, one of its primary objectives was to "[r]e-establish wolf populations in

(continued on next page)

Although FWS had apparently decided on Option 2 as early as July 2005, AR Doc. 66 at 280, the agency did not make the decision public until December, when it announced plans to delist the gray wolf populations in the northern Rocky Mountains and the western Great Lakes. Amended Complaint ¶ 70; Answer ¶ 70. In February 2006, FWS issued an Advanced Notice of Proposed Rulemaking stating its plans to designate and delist the "Northern Rocky Mountains distinct population segment" of the gray wolf. 71 Fed. Reg. 6634. And in March 2006, FWS formally proposed to designate and delist the "western Great Lakes distinct population segment." 71 Fed. Reg. 15266 ("Proposed Rule").

In an effort to avoid the problems associated with the DPS boundaries in the 2003 Downlisting Rule, FWS drew the lines tighter this time. The new boundaries were designed to show some nexus to the wolf populations in the Great Lakes and the northern Rocky Mountains, yet broad enough to ensure that – upon delisting – most wolves dispersing from these populations could not reach any portion of the wolf's range still protected by the ESA. By including a wide buffer around the existing populations, such that dispersing wolves would have little protection, FWS virtually eliminated the possibility that dispersers would recolonize additional parts of the wolf's historic range. The boundaries of the western Great Lakes DPS

---

(continued from previous page)

[the] Adirondack Mountains . . ., northwestern Maine/adjacent New Hampshire, and/or northeastern Maine." 1992 Recovery Plan for the Eastern Timber Wolf at 35, AR Doc. 215 at 5912 ("1992 Recovery Plan"). By 2004, however, the agency had jettisoned the notion of a federal recovery effort in the Northeast even though "a substantial amount of the historical range remains unoccupied." 69 Fed. Reg. 43664, 43672 (July 21, 2004). Of course, in *Defenders (wolf)* the District of Oregon concluded that the Northeast was a significant portion of the wolf's range. 354 F. Supp. 2d at 1167. But rather than take the hint, FWS instead began considering whether to "[d]elist the gray due to extinction." AR Doc. 35 at 156; *see also* AR Doc. 48 at 195 ("Delist in NE – use best argument"). One of the reasons FWS found this strategy attractive was that doing so would require no Section 4(a)(1) threats analysis. *Id.*

thus encompassed the eastern Dakotas, all of Minnesota, Wisconsin, and Michigan, and parts of Iowa, Illinois, Indiana, and Ohio.

After releasing the Proposed Rule, FWS received hundreds of comments from individuals and organizations. The vast majority of these comments expressed opposition to the agency's delisting proposal. AR Doc. 230 at 8476 (noting that 57% of comments opposed delisting the Great Lakes wolf population, whereas only 33% supported delisting). Like other groups, Plaintiffs provided extensive comments on the Proposed Rule, identifying the many factual and legal defects in FWS's proposal. *See* AR Doc. 228 at 7748-88. But the agency could not be dissuaded from delisting the wolf.

On February 8, 2007, FWS issued the Final Rule, which simultaneously designated and delisted the western Great Lakes DPS of the gray wolf. 72 Fed. Reg. 6052. That same day, the agency issued a proposed rule seeking to designate and delist the northern Rocky Mountains DPS. 72 Fed. Reg. 6106. Once both rules are fully implemented, virtually every wolf in the conterminous United States will lose protection under the ESA.

These delisting efforts are part of a larger campaign by the agency to limit the scope of the Endangered Species Act. Over the past six years, FWS has listed only 57 species, as compared with 512 species during the prior eight years. Amended Complaint ¶ 94; Answer ¶ 94. Meanwhile, FWS is expending considerable effort to reduce ESA protections for species that were previously listed. For example, by again invoking the DPS tool, FWS delisted grizzly bears in the greater Yellowstone area, notwithstanding the serious threats that grizzlies face throughout their range. *See* 72 Fed. Reg. 14866 (Mar. 29, 2007). To ensure that the gray wolf is protected until recovery has been achieved, The Humane Society of the United States, Help Our Wolves

Live, Animal Protection Institute, and Friends of Animals and Their Environment filed this suit for declaratory and injunctive relief.

## LEGAL STANDARD

Summary judgment is apepropriate when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Challenges brought under the ESA's citizen suit provision are reviewed according to the Administrative Procedure Act, 5 U.S.C. § 706 ("APA"). Under the APA, courts set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Judicial review of an agency action is to be "thorough, probing, [and] in-depth." *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1098 (D.C. Cir. 1996) (citation omitted). In conducting that review, "the Court considers whether the agency acted within the scope of its legal authority, whether the agency has explained its decision, whether the facts on which the agency purports to have relied have some basis in the record, and whether the agency considered the relevant factors." *Babbitt*, 130 F. Supp. 2d at 124 (citation omitted).

In assessing whether an agency has complied with its statutory mandate, a reviewing court "must give effect to the unambiguously expressed intent of Congress." *Pharm. Research & Mfrs. of Am. v. Thompson*, 251 F.3d 219, 224 (D.C. Cir. 2001) (citation omitted). Congressional intent is determined by relying on "traditional tools of statutory interpretation – text, structure, purpose, and legislative history." *Id.*

## ARGUMENT

By issuing the Final Rule, FWS has removed the protections of the ESA from one of only two sizeable populations of the gray wolf within the conterminous United States. In doing so, the agency threatens to thwart further wolf recovery while imperiling the Great Lakes

population.  FWS's action violates the ESA for four principal reasons.  First, by delisting

piecemeal parts of the gray wolf's range, FWS has unlawfully circumvented the requirement that

a species be protected so long as it remains endangered "throughout . . . a significant portion of

its range."  16 U.S.C. § 1532(6).  Second, the ESA and the DPS Policy preclude the agency from

using DPSs as a delisting tool.  Third, even *if* the agency could lawfully create a DPS for

delisting purposes, the boundaries of the western Great Lakes DPS contravene the ESA's

directive that species protection be given the highest of priorities.  Finally, even assuming the

creation of this DPS were otherwise permissible, a proper analysis of the Section 4(a)(1) threats

demonstrates that the Great Lakes wolf population remains endangered due to inadequate

regulatory mechanisms, human predation, and disease.  Accordingly, the Final Rule is arbitrary,

capricious, and unlawful, and should be vacated by this Court.

I.    **THE AGENCY'S PIECEMEAL DELISTING OF THE GRAY WOLF VIOLATES THE ENDANGERED SPECIES ACT.**

      A.    **FWS's Effort To Sidestep The "Significant Portion Of [The] Range" Requirement Through Piecemeal Delisting Is Arbitrary, Capricious, And Contrary To Law.**

As noted above, decisions to list, reclassify, or delist a species under the ESA must be

made by assessing the five categories of threats set forth in Section 4(a)(1).  16 U.S.C. §

1533(a)(1).  By conducting that threats analysis, FWS can determine whether a species is

threatened or endangered "throughout all or a significant portion of its range."  *Id.* § 1532(6),

(20).

Because Congress intended to protect any species at risk across "a significant portion of

its range," it is crucial that FWS apply the proper definition of this phrase.  An erroneous

definition would skew the entire Section 4(a)(1) threats analysis, since each of these factors must

be considered within the context of the species' range.  If FWS adopts an unreasonably narrow

19

definition of "range," the agency might wrongly focus on a small area within which the species is surviving, while ignoring serious threats to the species across the rest of its range.

Although "range" is not expressly defined in the ESA, in passing the 1978 ESA Amendments Congress clarified that "[t]he term 'range' . . . refers to the historical range of the species." H.R. Rep. 95-1625 (Nov. 25, 1978), *reprinted in* ESA Legislative History at 742. This reading of the Act, which is consistent with the statutory text, structure, and purpose, has been repeatedly confirmed by the courts. *See, e.g., Defenders (lynx)*, 239 F. Supp. 2d at 20 n.7 (rejecting FWS's "crabbed interpretation of the phrase . . . which would mean that a species that had once survived in a region, but no longer did, was not entitled to the protections of the ESA"); *Defenders (lizard)*, 258 F.3d at 1145; *Defenders (wolf)*, 354 F. Supp. 2d at 1167-68.[5]

Throughout most of the ESA's history, FWS has also recognized that the "range" referred to is the species' historic range. *See, e.g.*, 58 Fed. Reg. 34926, 34928 (June 30, 1993) (listing the Carolina heelsplitter as endangered after finding that it had "been eliminated from a significant portion of its historic range"); 51 Fed. Reg. 6686, 6688 (Feb. 25, 1986) (listing the northern aplomado falcon after finding that it was "endangered throughout its historic range"). The 1978 listing rule for the gray wolf also implicitly recognized this definition. *See* 43 Fed. Reg. at 9607 (listing the gray wolf throughout the conterminous United States after finding that "the species now occupies only a small part of its original range"). Accordingly, FWS must consider the Section 4(a)(1) threats within a species' historic range in determining whether that species remains endangered across "a significant portion of its range."

---

[5] The only published decision to endorse a contrary interpretation is *Center for Biological Diversity v. Norton*, 411 F. Supp. 2d 1271 (D.N.M. 2005).

1.      **The Gray Wolf Remains Endangered Across A Significant Portion Of Its Range.**

At the time of the gray wolf's listing, FWS recognized the numerous threats that existed throughout the wolf's historic range, including habitat destruction, human persecution, and inadequate regulatory mechanisms.  43 Fed. Reg. at 9611.  And because the gray wolf had been restricted to a "small part" of its historic range, the species required protection throughout the conterminous United States and Mexico.  As described *supra* at 9-11, the gray wolf has slowly made progress towards recovery, but it remains extirpated over the vast majority of its original range.  Moreover, there are numerous areas within the conterminous United States that contain suitable habitat and yet remain devoid of wolves.  These areas include the Northeast, parts of Michigan and North Dakota,[6] the Pacific Northwest, and other parts of the West.  *See Defenders (wolf)*, 354 F. Supp. 2d at 1167 & n.8 (discussing wolf habitat and dispersing wolves in the Northeast, Northwest, and the Dakotas); 65 Fed. Reg. at 43462 (identifying favorable wolf habitat in the Northeast); 71 Fed. Reg. at 15279 (discussing unoccupied wolf habitat in Michigan and North Dakota); 65 Fed. Reg. at 43474 (noting that "there is certainly habitat that could support wolves" in western states such as Oregon, Utah, and Colorado).[7]

---

[6] Although FWS has written off the possibility of wolf recovery in eastern North Dakota, the evidence suggests that wolf recovery is feasible within that state.  Indeed, the same study that FWS relied on in the Final Rule, *see* 72 Fed. Reg. at 6074, concluded that "the state of North Dakota can support a wolf population."  AR Doc. 468A at 14792; *see also id.* at 14791 (finding that "large areas of habitat exist within North Dakota in which human population density and road density is low").  The District of Oregon likewise noted the increasing dispersal of wolves into the Dakotas, 354 F. Supp. 2d at 1167, and FWS itself has recognized that suitable habitat exists in the Turtle Mountain region of North Dakota.  72 Fed. Reg. at 6073.

[7] There are other parts of the wolf's historic range that may contain suitable habitat.  *See, e.g.*, AR Doc. 57 at 230 (noting that some suitable wolf habitat "may exist in southern MO, southern IL, southern IN, southern OH, and in western and central PA").  To the best of Plaintiffs'

(continued on next page)

In *Defenders (lynx)*, this Court explained that the word "significant" in the phrase "significant portion of its range" means "a noticeably or measurably large amount." 239 F. Supp. 2d at 19; *see also Defenders of Wildlife v. Kempthorne*, Civil No. 04-1230, 2006 WL 2844232, at *12 n.9 (D.D.C. Sept. 29, 2006), Soules Decl., Ex. D (reaffirming the Court's prior holding). Although the Court did not adopt a bright-line percentage test for determining how much of a species' range is "significant," when FWS concluded that three-fourths of the Canada lynx's historic regions were "collectively not a significant portion of its range," the Court found this conclusion to be "counterintuitive and contrary to the plain meaning of the ESA phrase 'significant portion of its range.'" *Defenders (lynx)*, 239 F. Supp. 2d at 19. With respect to the gray wolf, FWS has acknowledged that "there are major geographic areas in which it is no longer viable but once was." *Id.* at 20 (citation omitted). *See, e.g.*, 65 Fed. Reg. at 43462, 43474. Just as three-fourths of the lynx's historic range is significant, so too is the 95% of the gray wolf's range from which the animal has been extirpated.

If FWS sought to downlist or delist the gray wolf, the agency would first have to analyze the Section 4(a)(1) threats across the wolf's range within the conterminous United States. And before making any change to the wolf's status, the agency must, "at a minimum," explain why these unoccupied portions of the wolf's range – which represent 95% of its historic range – do not constitute a "significant portion of its range." *Defenders (lynx)*, 239 F. Supp. 2d at 21. The need for an explanation is particularly crucial with respect to the wolf, because any such explanation would "appear[] to conflict with the plain meaning of the phrase 'significant

---

(continued from previous page)

knowledge, FWS has not thoroughly investigated the feasibility of wolf recovery in these or other places – such as northern California – with potentially suitable habitat.

portion.'" *Defenders (lynx)*, 239 F. Supp. 2d at 19; *see also Defenders (lizard)*, 258 F.3d at 1145 ("[W]here, as here, it is on the record apparent that the area in which the lizard is expected to survive is much smaller than its historical range, the Secretary must at least explain her conclusion that the area in which the species can no longer live is not a 'significant portion of its range.'").[8]

Thus, to properly delist the gray wolf within the conterminous United States, FWS would first have to conduct a Section 4(a)(1) threats analysis across the wolf's range, and then provide a reasonable explanation for why the Northeast, Pacific Northwest, etc., are no longer significant portions of its range.

## 2. FWS Cannot Circumvent The Significant Portion Of The Range Requirement By Carving Up The Wolf's Range Into DPSs.

In crafting the Final Rule, FWS recognized the inherent difficulties of trying to downlist or delist the gray wolf, a species that remains critically endangered throughout a significant portion of its range in the conterminous United States. Any such attempt would pose two difficulties: First, because reclassification or delisting of a species must be done by examining the Section 4(a)(1) threats, and because the gray wolf remains extirpated across most of its range, the inevitable conclusion of that analysis would be that the wolf is still endangered. FWS acknowledged this problem with respect to Option 1, which proposed downlisting the wolf to threatened status throughout the conterminous United States. The need to conduct the Section 4(a)(1) "threats analysis . . . over an extremely large area" was cited as a disadvantage of this approach. AR Doc. 35 at 158. The second difficulty posed by any downlisting effort is that the

---

[8] FWS would face an especially difficult burden in trying to downlist or delist the gray wolf, given that the District of Oregon has already found many unoccupied parts of the wolf's range to be significant. *See Defenders (wolf)*, 354 F. Supp. 2d at 1167.

agency would have to explain why the 95% of the wolf's range that remains unoccupied is not a "significant portion of its range." *See Defenders (lynx)*, 239 F. Supp. 2d at 19; *Defenders (lizard)*, 258 F.3d at 1145. Because this Court has already found that three-fourths is a "significant portion" of a species' range, 239 F. Supp. 2d at 19, it strains credulity to suggest that 95% is not.

In an effort to sidestep these obstacles to delisting, FWS began carving up the species' range under the guise of distinct population segments. By shrinking the area in which the threats analysis is conducted, FWS could avoid discussing the serious problems faced by the wolf range-wide. *See* AR Doc. 23 at 115 (describing an advantage of this approach as being able to "conduct threats analysis over [a] smaller area"). And by narrowing its focus to a small sliver of the wolf's range, it became easier for FWS to argue that the unoccupied parts of the range were insignificant. FWS has acknowledged as much, stating that this approach creates "[l]ess risk on the SPR issue because threats analysis conducted on smaller geographic areas." AR Doc. 35 at 158. FWS thus employed this line-drawing strategy by circling up the only two sizable gray wolf populations into a western Great Lakes DPS and a northern Rocky Mountains DPS.

This tactic, of carving up a species' range to circumvent the significant portion of the range requirement, fundamentally contravenes the ESA. As discussed above, a species can only be delisted based on an analysis of the Section 4(a)(1) threats. *Babbitt*, 130 F. Supp. 2d at 133 (noting that "the same five statutory factors must be considered in delisting as in listing") (citation omitted). In order for the "significant portion of [the] range" requirement to have any teeth, this threats analysis must be conducted at a meaningful geographic scale. If FWS were allowed to divvy up a species' range into small portions, and then focus solely on the threats

within those areas, FWS could justify delisting *any* endangered species whose remaining populations are clustered in isolated pockets.

Federal courts have rejected FWS's past attempts to focus the 4(a)(1) analysis on a small portion of a species' range. In *Defenders (lynx)*, this Court held that "FWS's exclusive focus on one region where the Lynx is more prevalent, despite its historic presence in three additional regions, is contrary to the expansive protection intended by the ESA." 239 F. Supp. 2d at 19. Likewise, in *Friends of the Wild Swan v. U.S. Fish & Wildlife Service*, the District of Oregon disallowed the very tactic employed here. 12 F. Supp. 2d 1121 (D. Or. 1997). In that case, where FWS had previously found the bull trout to be endangered throughout the conterminous United States, the agency tried to circumvent that finding by divvying up the trout's range into five DPSs. *Id.* at 1124. The court rejected this misuse of the DPS tool, concluding that "listing of population segments is a proactive measure to *prevent* the need for listing a species over a larger range – *not* a tactic for subdividing a larger population that USFWS has already determined . . . warrants listing throughout a larger range." *Id.* at 1133. These holdings apply with equal force here, where FWS has already listed the gray wolf at the species level. The agency cannot balkanize a species-level listing by delisting the occupied portions of the range as "recovered" while leaving a meaningless remnant listing throughout the depopulated parts of the range.

The sole difference between the Final Rule and the approach rejected in *Defenders (lynx)* is that here the agency has invoked the DPS tool. But FWS cannot employ that tool until it has analyzed the 4(a)(1) threats across the species' *entire* range and reasonably concluded that the species as a whole is neither endangered nor threatened. *See Friends of the Wild Swan*, 12 F. Supp. 2d at 1134 (FWS can "proceed[] on a population segment basis if it legitimately

concludes, after proper and sustainable analysis, that listing of the entire species . . . is either not warranted or warranted but precluded."). The Act requires FWS to follow this "two-tiered approach," of first determining whether the species as a whole is endangered before it considers whether to list a DPS. *Id.* Otherwise, one of the central innovations of the ESA – that protection be extended to species that are endangered throughout "a significant portion of [their] range" – would be eviscerated.[9]

If FWS were not required to consider whether the species as a whole is endangered, it could avoid listing species whose remaining populations are clustered in isolated pockets. The agency could simply designate DPSs for the currently-occupied portions of the range and restrict the 4(a)(1) threats analysis to those areas, without ever considering the unoccupied portions of the species' range.[10] This approach is especially problematic for endangered species with highly fragmented habitat or severely localized populations. FWS can easily find such populations to be "discrete" and thus eligible for designation as a DPS. By contrast, species that are relatively well-distributed across their range would not be "discrete," so their range could not be carved up into DPSs. This leads to the perverse result that those species whose populations are *most*

---

[9] As Congress emphasized at the time of the Act's passage, this amendment to the definition of "endangered species" was "a significant shift in the definition in existing law." H.R. Rep. No. 93-412 (1973) *reprinted in* ESA Legislative History at 149.

[10] Had this approach been followed for the gray wolf, the species might never have been listed. By 1978, the gray wolf's range had been reduced to the northern reaches of Minnesota, where a small but stable population had persisted for several decades. 43 Fed. Reg. at 9608, 9610. Under the approach adopted in the Final Rule, FWS could have designated a DPS for northern Minnesota and limited its 4(a)(1) threats analysis to the wolf's then-current range. This would have allowed the agency to avoid any assessment of the threats faced by the wolf elsewhere. And because the gray wolf population in northern Minnesota was stable, there would have been no need to list the species at all.

isolated "receive the *least* protection under the law.  Such a consequence flies in the face of the plain language of the ESA and its purpose." *Defenders (lynx)*, 239 F. Supp. 2d at 19-20.

The dangers of using DPSs in this fashion are equally apparent in the delisting context.  If FWS could delist the extant populations of an endangered species by using DPSs – as the agency has done here – FWS might then try to delist the unoccupied portions of the range *on the grounds of extinction.*  Indeed, that is precisely the fate FWS has in mind for the gray wolf.  *See, e.g.*, AR Doc. 35 at 159 (stating that a possible future step for Option 2 – the option implemented in the Final Rule – is to "[d]elist remaining states as extinct"); AR Doc. 48 at 204.[11]  This strategy of declaring the existing populations to be "recovered," while delisting the rest of the species' range based on "extinction," would effectively write the significant portion of the range requirement out of the statute.  *Cf. Duncan v. Walker*, 533 U.S. 167, 174, (2001) (courts must "give effect, if possible, to every clause and word of a statute").

In sum, delisting of the gray wolf is premature because the wolf, which remains extirpated across 95% of its historic range, is still endangered "throughout . . . a significant portion of its range."  16 U.S.C. § 1532(6).  Any attempt to downlist or delist the wolf must be accompanied by an analysis of the 4(a)(1) threats facing the gray wolf throughout its historic range in the conterminous United States.  *See id.* § 1533(a)(1).  If, after conducting the analysis required by Section 4(a)(1), FWS determines that some parts of the wolf's range are unnecessary to achieve recovery under the Act, the agency must, at a minimum, explain why those areas do not constitute a significant portion of the wolf's range.  *Defenders (lynx)*, 239 F. Supp. 2d at 21;

---

[11] While FWS mentioned the possibility of retaining an endangered listing for the non-DPS remnants, that alternative was disfavored by the agency.  *See* AR Doc. 35 at 159 (stating that the option of "leav[ing] remaining states endangered indefinitely" is "not a preference").

*Defenders (lizard)*, 258 F.3d at 1145.  Until the agency has followed these steps, and reached a

reasonable conclusion, the wolf cannot be delisted.  The agency's attempt to sidestep these

requirements by carving up the wolf's range into DPSs is contrary to law.

   B.    **FWS's Use Of DPSs As A Delisting Tool Is Arbitrary And Capricious.**

   In addition to violating the significant portion of the range requirement, 16 U.S.C.

§ 1532(6), the Final Rule represents an impermissible use of the DPS, which is a tool designed to

*increase* species protection, not reduce it.  *See Friends of the Wild Swan*, 12 F. Supp. 2d at 1133

("[L]isting of population segments is a proactive measure to *prevent* the need for listing a species

over a larger range – *not* a tactic for subdividing a larger population that USFWS has already

determined, based on the same information, warrants listing throughout a larger range."); DPS

Policy, 61 Fed. Reg. at 4725.

   Under the Act, DPSs can be designated when listing at the species or subspecies level is

not warranted, but where a local population of the species is facing additional threats.  *See*

*Defenders (wolf)*, 354 F. Supp. 2d at 1169 ("[I]f a distinct and significant population of an

unlisted species is struggling while other populations are faring well, FWS may designate the

struggling population as a DPS and list it as endangered."); *Nat'l Ass'n of Home Builders v.*

*Norton*, 340 F.3d 835, 842 (9th Cir. 2003) (noting that under the DPS Policy "[t]he FWS does

not have to list an entire species as endangered when only one of its populations faces

extinction").

   Legislative history confirms that Congress intended the DPS to be a tool for the

additional protection of species.  Concerned that overuse of the DPS tool would result in an

explosion of listings, Congress directed FWS to "list populations sparingly and only when the

biological evidence indicates that such action is warranted."  S. Rep. No. 96-151, at 7 (1979),

*reprinted in* ESA Legislative History at 1397; *see also* 61 Fed. Reg. at 4724 (acknowledging

Congress's instruction to make "sparing" use of DPSs).  Congress further restrained the use of

this tool by restricting DPSs to vertebrate fish and wildlife.  16 U.S.C. § 1532(16).  Congress was

not willing to incur the costs of protecting DPSs of insect and plant species, and instead was

focused on the protection of keystone species like the grizzly bear and gray wolf.  *See* Katherine

M. Hausrath, *The Designation of "Distinct Population Segments" Under the Endangered*

*Species Act in Light of National Association of Homebuilders v. Norton*, 80 Chi.-Kent L. Rev.

449, 455-56 (2005).

Instructing federal agencies to list DPSs "sparingly," and limiting this tool to vertebrates,

would make little sense if Congress intended DPSs to be used for delisting purposes.  Rather, as

the DPS Policy recognizes, DPSs were intended "to protect and conserve species and the

ecosystems upon which they depend *before* large-scale decline occurs that would necessitate

listing a species or subspecies throughout its entire range."  61 Fed. Reg. at 4725 (emphasis

added).

As discussed *supra* at 6, a vertebrate population must be both "significant" and "discrete"

to be designated as a DPS.  61 Fed. Reg. at 4725.  FWS considers several factors in determining

whether a vertebrate population is "significant" enough to warrant listing as a DPS, including

whether "loss of the discrete population segment would result in a significant gap in the range of

a taxon."  61 Fed. Reg. at 4725.  Of course, there would be no need to consider a population's

significance if a distinct population segment could properly be used for delisting purposes.

In the Final Rule, however, FWS shunted aside the ESA's intent that DPSs be used as a

"proactive measure" and instead wielded this tool to achieve the opposite effect.  FWS first

determined that the western Great Lakes wolf population is "significant" because, *inter alia*, the

loss of these gray wolves would result in a "significant gap in the range of the taxon."  72 Fed.

Reg. at 6059. Then, in a remarkable display of doublethink, the agency concluded that *because the Great Lakes population is significant,* it can be cordoned off from the rest of the gray wolf's range *and all ESA protections can be removed*. That is nonsensical. Under this logic, if the Great Lakes population were not "significant" to the species as a whole, FWS would not be permitted to create a distinct population segment and would instead be required to maintain the protections of the ESA.

Moreover, FWS's conclusion that the Great Lakes wolf population is "discrete" fails to acknowledge that its isolation from other wolf populations is *because* the wolf has been extirpated from vast swaths of its historic range. Indeed, the gray wolf's widespread extirpation was one of the reasons the wolf was originally listed. *See* 43 Fed. Reg. at 9610. Nevertheless, the Final Rule uses the fragmentation of the wolf population as an excuse for *delisting* wolves in the Great Lakes region. *See* 72 Fed. Reg. at 6059 (finding the Great Lakes population to be "discrete" because of its distance from the Northern Rocky Mountain population). This reasoning was rejected in *Friends of the Wild Swan*, where FWS justified its decision to divvy up the bull trout's range into DPSs based, in part, on the species' fragmented habitat. 12 F. Supp. 2d at 1124. The District of Oregon rejected that rationale because "fragmentation [and] isolation . . . are factors that contribute to the decline of the *entire* population of bull trout." *Id.* at 1133. Similarly, the severe fragmentation of the gray wolf's population merely underscores the need to retain a species-wide listing. Indeed, FWS's 1978 listing decision "recognized that the fact that an animal population consisted of a mere 'remnant' of a larger historical population argued for, rather than against, protecting the species from further depletion." *Defenders of Wildlife v. Babbitt*, 958 F. Supp. 670, 685 (D.D.C. 1997).

More fundamentally, by neglecting to explain why it used a *threat* to the gray wolf – the fragmentation of its population and habitat – as an excuse *not* to apply the protections of the ESA, FWS arbitrarily and capriciously "fail[ed] to consider an important part of the problem." *American Wildlands v. Norton*, 193 F. Supp. 2d 244, 256 (D.D.C. 2002) (citation omitted); *see also id.* at 255 (vacating FWS's finding because "the inclusion of hybrid fish in the population evaluated for protection is arbitrary to the extent that hybridization is identified as a threat to the population"). Because the Great Lakes population would no longer be "discrete" if the wolf recovered across its historic range, the very existence of this purportedly distinct population segment depends upon the lack of wolf recovery elsewhere. This perverse result demonstrates how far the Final Rule has strayed from congressional intent.

Once a locally-vulnerable population has been listed as a DPS, the agency is free to delist that DPS when it recovers. *See Defenders (wolf)*, 354 F. Supp. 2d at 1169 ("FWS can downlist a DPS if that discrete and significant population is no longer endangered"). But the Act requires symmetry for the listing and delisting of DPSs. A DPS must be designated and listed in the first instance in order for downlisting to later be considered. Nothing in the Act or the DPS Policy authorizes FWS to carve DPSs out of a species-level listing for the sole purpose of delisting that species. Just as FWS does "not consider entities for listing that are not primarily of conservation interest at a national level," it "must also refrain from delisting or reclassifying units" at the State or local level. 61 Fed. Reg. at 4724. FWS's use of the DPS as a delisting tool thus violates the ESA and the DPS Policy.

## II. EVEN IF THE DPS COULD BE USED AS A DELISTING TOOL, THE BOUNDARIES OF THE WESTERN GREAT LAKES DPS ARE ARBITRARY AND CAPRICIOUS.

Even if a DPS could be created for delisting purposes, the designation of the western Great Lakes DPS would still be impermissible because its boundaries, which were designed to

prevent further recovery of the wolf, are contrary to the Act's directive that endangered species "be afforded the highest of priorities."  *TVA*, 437 U.S. at 174.

In developing the Final Rule, the Rule's principal author declared that FWS has nearly unlimited discretion in establishing the boundaries of a DPS.  *See* AR Doc. 58 at 232 ("The boundary can be placed anywhere between the population that is the subject of the DPS and any other populations of the same taxon – Period!").  Indeed, though the ESA stresses the need to make listing decisions based on the best available science, 16 U.S.C. § 1533(b)(1)(A), and virtually all the criteria used to designate DPSs are based on biological and ecological features,[12] the principal author dismissed the importance of these considerations for delineating DPS boundaries:  "[I]t is difficult to see how FWS could be found to be 'arbitrary and capricious' *even if we established DPS boundaries based entirely on non-biological considerations*."  AR Doc. 58 at 233 (emphasis added).

Confident of its virtually unreviewable discretion, FWS established expansive boundaries for the DPS that extend far beyond the wolf's current distribution.  For example, the DPS includes vast swaths of North Dakota, South Dakota, and other states, even though these areas have no viable reproducing wolf populations.  Likewise, the western boundary of the DPS is approximately 200 miles outside of the wolf's current range.  *See* 72 Fed. Reg. at 6059.  As FWS explained, these boundaries were designed to include "a wolf movement zone around the core wolf populations."  *Id.* at 6060; *see also id.* (the DPS "includes the locations of most known dispersers from the core populations").

---

[12] The only exception is that international boundaries can be considered in determining whether a population is "discrete."  61 Fed. Reg. at 4725.

Establishing such broad boundaries is inconsistent with the "expansive protection intended by the ESA." *Defenders (lynx)*, 239 F. Supp. 2d at 19.  When a DPS is established for purposes of *listing* a species, the use of wide boundaries – based on the species' dispersal distances – provides the at-risk population greater protection and makes it more likely that it can recover across a significant portion of its range.  But assuming a DPS could be created for delisting purposes – it cannot, for the reasons stated in Part I – the boundaries should include, at most, core areas in which a species has fully recovered.  Retaining ESA protections for animals that leave the core recovery area promotes continued expansion across the species' historical range, as the ESA envisioned.

Here, however, the broad boundaries of the western Great Lakes DPS were designed to ensure that further recovery of the wolf would not occur.  Indeed, when this delisting proposal was being developed, FWS stated that an advantage of this approach was that it would "allow[] for management of dispersing wolves."  AR Doc. 35 at 158.  By "management," of course, FWS meant that dispersing wolves, without the Act's protections, could be killed.  That this was the agency's intent cannot seriously be doubted.  When discussing the prospect of wolves dispersing into the Dakotas, the Final Rule's principal author noted that those states would be "very angry" if wolves dispersing from Minnesota received ESA protections there.  AR Doc. 29 at 140.  The ultimate effect of these broad boundaries is to prevent further wolf recovery.

The negative effects of these expansive boundaries are particularly acute because of their interplay with Minnesota's wolf management plan.  *See generally* Minnesota Wolf Management Plan, AR Doc. 215 at 5253 ("Minnesota Plan").  The Minnesota Plan divides the state into two management zones, and effectively corrals wolves into the northeast corner of the state.  Outside that core area, Minnesota landowners have wide authority to kill wolves.  *See id.* at 22-24, AR

Doc. 215 at 5275-77.  When coupled with the removal of federal protection, Minnesota's wolf

control provisions create a virtual "free-fire zone" through which dispersing wolves must cross.[13]

Even if wolves could successfully make it through this zone to reach the borders of neighboring

states, like North and South Dakota, the lack of management plans in those jurisdictions would

thwart any chance at wolf recovery.  *See* 72 Fed. Reg. at 6095.

FWS has tried this scheme before.  When it created three DPSs for the gray wolf in the

2003 Downlisting Rule, the agency drew boundaries that went far beyond the core wolf

populations.  The courts rejected this effort to remove ESA protections from such wide swaths of

the wolf's historic range.  As the District of Vermont put it, "FWS simply cannot downlist or

delist an area that it previously determined warrants an endangered listing because it 'lumps

together' a core population with a low to non-existent population outside of the core area."  *Nat'l*

*Wildlife Fed'n*, 386 F. Supp. 2d at 565.  Although the boundaries of this DPS are somewhat

narrower, this DPS suffers from the same problem.  The DPS's broad boundaries, together with

the lack of protections under state law, will confine the wolf to the core areas where recovery has

already begun.  Because this contravenes the ESA's mandate of species recovery across "a

significant portion of its range," the western Great Lakes DPS is arbitrary and capricious.

## III.    EVEN IF THE DESIGNATION OF THE WESTERN GREAT LAKES DPS WERE OTHERWISE PROPER, THE WOLF COULD NOT BE DELISTED BECAUSE IT REMAINS ENDANGERED WITHIN THE DPS.

Even if FWS could have legitimately restricted the Section 4(a)(1) threats analysis to the

Great Lakes region, delisting would still be improper because the Great Lakes wolf population

---

[13] This zone, dubbed Zone B in the Minnesota Plan, contained approximately 450 wolves at the time of delisting.  72 Fed. Reg. at 6087.  Even though Zone B's wolf population is equal in size to that in Wisconsin and Michigan, *cf. id.* at 6053, this population was deemed expendable by FWS.  The Final Rule contemplates that many, if not all, of these wolves will be killed.  *Id.*

remains threatened or endangered.  In particular, the states within the western Great Lakes DPS

have failed to provide regulatory mechanisms adequate to protect the wolf.  16 U.S.C.

§ 1533(a)(1)(D).  Moreover, the lack of monitoring under state management, when combined

with the ongoing threats from disease and human predation, seriously imperil the wolf's long-

term viability.  *Id.* § 1533(a)(1)(C).

> **A.    The Existing Regulatory Mechanisms Fail To Protect The Gray Wolf.**

Stripped of the ESA's protections, the gray wolf's long-term survival depends upon the

adequacy of state management programs within the western Great Lakes DPS.  Of the nine states

that are wholly or partly within the DPS, only Minnesota, Wisconsin, and Michigan have

adopted wolf management plans.  The Final Rule relies "heavily" on these programs for its

"assessment of the degree of protection and monitoring that will occur after Federal delisting,"

and assumes that these "plans will be funded and implemented largely as written."  72 Fed. Reg.

at 6068.  That assumption, however, "runs counter to the evidence before the agency."  *Motor*

*Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

As a threshold matter, some of the regulatory mechanisms on which the Final Rule relies

do not even exist.  Although Michigan drafted a wolf recovery plan in 1997, that plan was "in the

midst of revision" at the time of delisting.  72 Fed. Reg. at 6068.  Because the revised plan was

expected to be finished soon after the Final Rule, nearly all of FWS's projections about wolf

management in Michigan were premised on this unfinished plan.  Yet even though FWS could

not "evaluate the goals, strategies, or activities" of the revised Michigan plan, the agency

somehow concluded that it would adequately protect the wolf.  *Id.* at 6094.  FWS's reliance on

this *future* plan runs afoul of Section 4(a)(1), which only allows the agency to consider "*existing*

regulatory mechanisms."  16 U.S.C. § 1533(a)(1)(D) (emphasis added); *Southwest Ctr. for*

*Biological Diversity v. Babbitt*, 939 F. Sup. 49, 51 (D.D.C. 1996) (holding that FWS "cannot use

promises of proposed future actions" in a Section 4(a)(1) listing determination); *Biodiversity*

*Legal Found. v. Babbitt*, 943 F. Supp. 23, 26 (D.D.C. 1996) (same); *see also Ctr. for Biological*

*Diversity v. Morgenweck*, 351 F. Supp. 2d 1137, 1141 (D. Colo. 2004) ("The law is clear that

FWS cannot consider future conservation efforts . . . .").

 In an attempt to fill this admitted gap in Michigan's regulatory mechanisms, the Final

Rule points first to a series of non-mandatory "guiding principles" adopted by a citizens'

roundtable, and second to vague assurances from the Michigan Department of Natural Resources

("DNR") that Michigan's wolves will be sufficiently protected.  *See* 72 Fed. Reg. at 6093-94

(describing recommendations of the citizens' roundtable); *id.* at 6092 (describing the DNR's

assurances).  But as courts have repeatedly held, "promises of proposed future actions" are no

substitute for actual regulatory mechanisms.  *Southwest Ctr.*, 939 F. Supp. at 52.  Nor may the

agency rely on voluntary and speculative state measures like the advisory recommendations of

the citizens' roundtable.  *See Oregon Nat. Res. Def. Council v. Daley*, 6 F. Supp. 2d 1139, 1155

(D. Or. 1998) ("[V]oluntary or future conservation efforts by a state should be given no weight in

the listing decision.").

 Even those regulatory mechanisms that do exist fail to protect the wolf.  Collectively, the

Minnesota, Wisconsin, and Michigan plans would permit nearly a 50% decline in the Great

Lakes wolf population.  *Compare* 72 Fed. Reg. at 6053 (estimating a current population of 3919

wolves) *with* AR Doc. 215 at 5255 (Minnesota minimum population of 1600 wolves), AR Doc.

468A at 13386 (Wisconsin target population of 350 wolves), and AR Doc. 215 at 5139

(Michigan minimum population of 200 wolves).  And under these plans, a population decline is

not a mere possibility, but a virtual certainty.  For example, under the Minnesota Plan,

landowners within Zone B – which is approximately 60% of the state – may kill a wolf "to

protect[] livestock, domestic animals, or pets," even when there is no immediate threat.
Minnesota Plan at 22, AR Doc. 215 at 5275. The Minnesota Plan also authorizes the
establishment of "predator control areas" to take wolves near a depredation site. Minnesota Plan
at 23, AR Doc. 215 at 5276. These zones, which can remain open for approximately seven
months, can be established up to five years after the depredation incident. *Id.* Finally, the
Minnesota Plan resurrects the old bounty system by paying state-certified predator controllers
$150 for each wolf killed. *Id.* Likewise, population declines are virtually assured under
Wisconsin's program, which authorizes "[p]roactive control" if the wolf population exceeds 350
wolves. 1999 Wisconsin Wolf Management Plan at 21, AR Doc. 215 at 6001 ("Wisconsin
Plan").

 The future of wolf management in the Great Lakes states is further clouded by a lack of
funding. Until recently, many of the costs of wolf management were borne by the federal
government. Amended Complaint ¶ 82; Answer ¶ 82. Now that the wolf has been delisted, the
states are responsible for wolf management. *Id.* In the Final Rule, FWS "rel[ied] heavily on the
State wolf management plans" in its 4(a)(1) threats analysis, 72 Fed. Reg. at 6068, and the
agency assumed that these "plans will be funded and implemented largely as written."[14] *Id.* But
the evidence indicates that the Minnesota Plan is not being fully implemented. The Minnesota
DNR projected that $695,000 annually would be "needed to accomplish the gray wolf
management plan in Minnesota." Minnesota Plan, Appx. II, AR Doc. 215 at 5292-93. But in
response to a request under the Minnesota Data Practices Act, Minn. Stat. § 13.03, subd. 3, the

---

[14] The need to identify funding sources "[p]rior to completing the delisting of the eastern timber
wolf" was also emphasized in the 1992 Recovery Plan. 1992 Recovery Plan at 26, AR Doc. 215
at 5903.

Minnesota DNR provided documentation that for the foreseeable future only $144,000 annually

has been budgeted for wolf management activities.  *See* Proposed Exhibit E, *attached to*

Declaration of Michael Soules in Support of Plaintiffs' Motion to Supplement (copy of the

Minnesota DNR's Data Practices Act response).[15]

There is also evidence that the Michigan and Wisconsin wolf programs are inadequately

funded.  Even prior to the wolf's delisting, Michigan's wolf management plan was not being

fully implemented.  *See* AR Doc. 142 at 767 (admitting that "full implementation of the

[Michigan plan] did not occur because of competing priorities, changing budgets, and personnel

constraints").  Moreover, Michigan directly petitioned FWS for funding assistance, AR Doc. 228

at 8286, and FWS knew that the Michigan DNR had recently changed its population monitoring

methodology, largely in an effort to cut costs.  AR Doc. 240 at 8523 (author of the new

methodology noting that the switch to "sampling is more budget driven than anythoing [*sic*]

else").  Yet despite these strong indications that Michigan could not cover the costs of wolf

management, FWS simply assumed the opposite.  72 Fed. Reg. at 6068.  The Wisconsin DNR

has also expressed grave concern about funding its program.  *See* AR Doc. 215 at 6786

("Currently a major fiscal crisis is affecting the State of Wisconsin, and will likely reduce state

funding available for wolves in the near future."); AR Doc. 228 at 8233 (noting that "[t]he

Wisconsin DNR . . . will need federal cost sharing on funding these surveys").  FWS's reliance

on its assumption that these state plans would be fully funded, an assumption that "runs counter

---

[15] Plaintiffs' Motion To Supplement The Record is being filed concurrently with this motion for
summary judgment.  If the Court grants the motion to supplement, the Minnesota DNR's
response will become Exhibit E to this motion.

to the evidence before the agency," was arbitrary and capricious.  *Motor Vehicle Mfrs.*, 463 U.S.

29, 43.[16]

### B.      The Great Lakes Wolf Population Is Threatened By Disease And Human Predation.

The inadequacies of state management exacerbate other threats faced by the wolf.  In

particular, the Great Lakes wolf population is at serious risk from both human-caused mortality

and disease.  *See* 16 U.S.C. § 1533(a)(1)(C).

At the time of the wolf's 1978 listing, FWS recognized that "[d]irect killing by man . . .

has been the major direct factor in the decline of wolves in the conterminous United States."  43

Fed. Reg. at 9611.  Through the enforcement of take prohibitions, the ESA has been crucial to

the wolf's nascent recovery.  *See* 72 Fed. Reg. at 6081.  Yet even with the Act's protections,

human-caused mortality – including vehicle accidents and illegal trapping and shooting – has

remained a serious problem, accounting for more than half of all wolf deaths in Wisconsin, with

similar figures reported for Minnesota and Michigan.  *Id.* at 6082.  Despite this persistent threat,

FWS concluded that human predation did not imperil the wolf.  In reaching that conclusion, the

agency relied on regulatory mechanisms that are speculative at best.  For instance, FWS cited the

"increased enforcement" of Minnesota's wolf laws as one of the measures that "will be crucial in

ensuring that illegal mortality does not significantly increase following Federal delisting."  *Id.* at

6086.  But in the very next breath FWS admitted that this "increased enforcement . . . would be

---

[16] Equally troubling are the provisions in the Minnesota Plan that contemplate a public wolf harvest once the five-year post-delisting monitoring period has concluded.  *See* Minnesota Plan at 21, AR Doc. 215 at 5274; *cf.* 16 U.S.C. § 1533(g) (mandating a five-year monitoring period).  By delaying such a harvest until *after* the statutory monitoring period, this plan increases the risk that future reductions in the gray wolf population will go unnoticed.  The Wisconsin Plan also contemplates a possible public wolf harvest.  *See* Wisconsin Plan at 21, AR Doc. 215 at 6001.

dependent on increases in staff and resources," among other contingencies.  *Id.*  Here again,

FWS improperly relied on a regulatory measure that does not yet exist.  *See Southwest Ctr.*, 939

F. Supp. at 51.  And any assumption that Michigan will fully enforce its wolf management

program runs counter to the fact that Michigan failed to fully implement that program even prior

to delisting.  *See* AR Doc. 142 at 767.

The agency's dismissal of human predation as a serious threat relies on two further

assumptions, namely that "other mortality factors do not increase significantly" and that the

states are adequately monitoring their wolf populations.  72 Fed. Reg. at 6083.  As discussed

below, both assumptions are belied by the facts.

Disease has long been a serious threat to the gray wolf.  In recent years sarcoptic mange

has killed as many wolves in Wisconsin as illegal shooting, and disease has affected wolf

recovery in Wisconsin and Michigan.  72 Fed. Reg. at 6079, 6081.  In the Final Rule, FWS

recognized that "to avoid a future decline caused by diseases or parasites, States and their

partners will have to diligently monitor the prevalence of these pathogens in order to effectively

respond to significant outbreaks."  *Id.* at 6077.  But with the possible exception of Wisconsin,

there is little reason to think sufficient monitoring will occur.  The Minnesota DNR has

committed itself to a minimal degree of monitoring, with many components of its monitoring

scheme vague or speculative.  *See* Minnesota Plan at 19-20, AR Doc. 215 at 5272-73 (stating

that radio telemetry will be "encouraged" and population modeling will be "investigate[d]"); *see*

*also* 72 Fed. Reg. at 6081 ("Minnesota has not established minimum goals for the proportion of

its wolves that will be assessed for disease nor does it plan to treat any wolves . . . .").  Because

voluntary and speculative state conservation measures "should be given no weight in the listing

decision" under Section 4(a)(1), *Oregon Nat. Res. Def. Council*, 6 F. Supp. 2d at 1155, FWS's

confidence that Minnesota will adequately monitor its wolves is unwarranted.[17]

FWS's assumptions about monitoring in Michigan are even more unrealistic. As

mentioned above, Michigan's wolf management plan is under revision, and there is evidence that

the existing plan is not being fully implemented. *See* AR Doc. 142 at 767. Moreover, for the

first time this year, the Michigan DNR informed FWS that it would begin using a new

monitoring methodology. 72 Fed. Reg. at 6092. The accuracy and efficacy of this methodology

remains untested, and may not be relied on by FWS. *See Save Our Springs v. Babbitt*, 27 F.

Supp. 2d 739, 748 (W.D. Tex. 1997) (Secretary's consideration of a mechanism "with no proven

track record for effectiveness in protecting the species" was arbitrary and capricious).

Because the states have neither adequate monitoring programs nor sufficient enforcement

capacity, disease and human predation could decimate the Great Lakes wolf population before

FWS has an opportunity to correct the problem. There is thus a serious risk that the gray wolf

could suffer "a significant decline in overall population viability," 72 Fed. Reg. at 6081 – a risk

only aggravated by the state plans' anemic population goals and expanded opportunities for legal

wolf killing. By failing to acknowledge the risks posed by disease and predation, or recognize

the inadequacies of state management and monitoring, FWS's Section 4(a)(1) threats analysis is

arbitrary and capricious.

---

[17] In a draft of the Proposed Rule, FWS implicitly recognized the problem posed by such
voluntary measures. In discussing the threat of disease, the Final Rule mentions that states and
Indian tribes will be encouraged to submit wolf carcasses to federal laboratories for disease
analysis. 72 Fed. Reg. at 6081. But the earlier draft noted that "following delisting, such
cooperation with federal diagnostic laboratories for DPS monitoring will be voluntary, so this
potential threat will remain." AR Doc. 197 at 2842-43 (deleted sentence).

C.      **FWS Lacks Any Measures For Post-Delisting Monitoring.**

The lack of monitoring within the western Great Lakes DPS is compounded by the fact that FWS itself lacks a regulatory mechanism to monitor the wolf's status. Section 4(g) of the Act directs FWS to engage in post-delisting monitoring "for not less than five years" after delisting.[18] 16 U.S.C. § 1533(g)(1). This monitoring period is intended to allow the agency to effectively track populations, assess whether the delisted population remains secure, and ensure that the species is promptly relisted if necessary. *See* 16 U.S.C. § 1533(g)(2); 72 Fed. Reg. at 6101.

FWS made no affirmative commitments to post-delisting monitoring in either the Proposed or Final Rule. Lacking any monitoring program of its own, FWS stated simply that it "anticipate[s] the [post-delisting monitoring] program will be a continuation of State monitoring activities." 72 Fed. Reg. at 6101. This reliance on the state management plans to satisfy FWS's monitoring obligation demonstrates the circular logic of the Final Rule. When Plaintiffs and others warned about the lack of funding for those state plans, FWS responded by simply assuming that the plans would be properly implemented and offering its assurance that "[i]f this assumption turns out to be incorrect, we have the ability to relist the species, including an emergency relisting, if necessary." 72 Fed. Reg. at 6068. Yet by failing to develop any monitoring measures of its own, FWS has effectively outsourced its statutory monitoring obligation to the very state programs whose adequacy Plaintiffs contest. Because FWS's ability to identify a problem depends entirely upon these state programs, FWS has no way of knowing

---

[18] Similarly, the 1992 Recovery Plan specified that "[p]rior to completing the delisting of the eastern timber wolf a detailed monitoring plan must be developed, . . . and funding sources for the monitoring must be identified." 1992 Recovery Plan at 26, AR Doc. 215 at 5903.

the actual state of the wolf and whether emergency relisting is necessary.  By relying entirely on

the states to "implement a system . . . to monitor" the gray wolf, FWS has shirked its statutory

obligations under Section 4(g).  16 U.S.C. § 1533(g)(1).

## CONCLUSION

In the Final Rule, FWS recognized that "[t]he goal of the Act is to recover and delist"

endangered species.  72 Fed. Reg. at 6063.  Unfortunately, in its haste to achieve the latter goal

FWS has sacrificed the former.  Plaintiffs look forward to the day when the gray wolf has

recovered across a significant portion of its range and can safely be delisted.  But that day has

not yet arrived, and this Court should not condone FWS's attempt to circumvent the Act's

protections.  The Final Rule should be struck down.

Dated: November 14, 2007            Respectfully submitted,


/s/  Michael C. Soules & Rebecca G. Judd
Rebecca G. Judd, D.C. Bar No. 486315
rjudd@hsus.org
Jonathan R. Lovvorn, D.C. Bar No. 461163
jlovvorn@hsus.org
The Humane Society of the United States
2100 L Street, NW
Washington, DC  20037
(202) 452-1100
(202) 778-6132 (facsimile)

Brian B. O'Neill, Minn. Bar No. 82521
boneill@faegre.com
Sanne H. Knudsen, Minn. Bar No. 0344552
sknudsen@faegre.com
Michael C. Soules, D.C. Bar No. 477911
msoules@faegre.com
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-3901
(612) 766-7000
(612) 766-1600 (facsimile)

*Attorneys for Plaintiffs*

fb.us.2398948.10

44

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| The Humane Society of the United States;<br>Help Our Wolves Live ("HOWL"); Animal<br>Protection Institute; and Friends of Animals<br>and Their Environment,<br><br>     Plaintiffs,<br><br>  v.<br><br>Dirk Kempthorne, Secretary of the Interior;<br>United States Department of the Interior; and<br>United States Fish and Wildlife Service,<br><br>     Defendants,<br><br>U.S. Sportsmen's Alliance Foundation,<br>Wisconsin Bear Hunters Association, *et al.*,<br><br>     Intervenor-Defendants,<br><br>Safari Club International, National Rifle<br>Association, *et al.*,<br><br>     Intervenor-Defendants. | Civil No. 1:07-cv-00677-PLF |

<u>**PLAINTIFFS' STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE**</u>

   Pursuant to LCvR 7(h), Plaintiffs submit the following statement of material facts as to which there is no genuine dispute:

***The Gray Wolf***

   1.  The gray wolf (*Canis lupus*) is the largest member of the canine family.  Wolves prey primarily on wild ungulates (hoofed animals) such as deer, elk, moose, and bison, as well as smaller mammals like beavers and rabbits.  As habitat generalists, wolves can live almost anywhere with a sufficient ungulate population, so long as they are not being persecuted by humans.  Historically, wolves ranged across nearly all of North America, including the entire

Great Lakes region.  71 Fed. Reg. 15266, 15267, 15277 (Mar. 27, 2006); Administrative Record

Document ("AR Doc.") 215 at 5128; *id.* at 5264; *id.* at 5993; AR Doc. 228 at 8077.

      2.      Wolves are social animals and wolf pups are dependent upon family units, or

packs, for their survival.  Wolf packs in the Great Lakes region generally have between 4 and 6

members, although packs with more than 15 wolves have been recorded.  The territories of these

packs average between 42 and 100 square miles.  AR Doc. 215 at 5125-26; *id.* at 5265.

      3.      Wolf pups generally remain with their parents for at least the first year of life,

while they learn to hunt.  After that, many yearlings leave the pack to find mates and territories

of their own.  This process, which is called dispersal, is essential to the viability of the gray wolf.

By allowing wolves to interbreed over large geographic areas, dispersal helps maintain genetic

diversity.  Dispersal is also crucial to wolf recovery, because dispersing wolves often reoccupy

areas in which wolves were previously extirpated.  AR Doc. 215 at 4765-66; *id.* at 5126, 5130;

*id.* at 5265; *id.* at 5993.

      4.      The gray wolf plays a crucial role in ecosystems throughout North America.  As a

large carnivore, the gray wolf functions as an "umbrella species" because conserving wolf

habitat leads to the protection of many other species within its range.  AR Doc. 468B at 16281.

Wolf conservation thus enhances biodiversity.  *Id.*

      5.      Beyond its strict ecological importance, the gray wolf provides many other

benefits to humans.  For example, the wolf has great significance for many American Indian

tribes in the Great Lakes region.  Plaintiffs' First Amended Complaint for Declaratory and

Injunctive Relief ¶ 49 ("Amended Complaint"); Federal Defendants' Answer ¶ 49 ("Answer").

Wolves also benefit individuals interested in observing and studying wildlife, and many people

appreciate simply knowing that there are wolves in their area.  AR Doc. 215 at 3743; *id.* at 5135,

5136; AR Doc. 418 at 11499-11500.

### Decline Of The Gray Wolf

6.      As agricultural and industrial development began spreading across North

America, wolves became the subject of widespread persecution.  Beginning in the seventeenth

century, federal, state, and local governments authorized bounties intended to eliminate the gray

wolf.  These combined efforts almost entirely eradicated the wolf from the 48 conterminous

United States by the early 1970s.  Amended Complaint ¶ 52; Answer ¶ 52; 71 Fed. Reg. at

15267; AR Doc. 215 at 4758-59.

7.      This trend was reflected in the Midwest.  In the Dakotas, wolves were extirpated

by the 1920s or 1930s, and by 1960, the wolf had been eliminated from Wisconsin and

Michigan.  Despite the wolf's diminishing range in Minnesota, public bounties were paid up

until 1965, and wolves could be legally killed until 1974.  By the early 1970s, the only gray

wolves living within the conterminous United States consisted of a small community in Lake

Superior's Isle Royale National Park and a remnant population, numbering fewer than 1000, in

northeastern Minnesota.  Amended Complaint ¶¶ 53-54; Answer ¶¶ 53-54; AR Doc. 215 at 5267;

*id.* at 5892-93.

### The Wolf's Recovery Begins

8.      The gray wolf was among the first species to be listed under the Endangered

Species Preservation Act of 1966, a forerunner of the Endangered Species Act ("ESA" or "the

Act").  32 Fed. Reg. 4001 (Mar. 11, 1967).  But these legal protections were limited, and it was

the 1973 passage of the ESA that introduced the first serious protection for the wolf.  Soon after

the Act's passage, the United States Fish and Wildlife Service ("FWS" or "the agency") listed

several subspecies of gray wolf, including the eastern timber wolf.  Due to administrative

difficulties created by these various subspecies listings, FWS decided to relist the gray wolf at

the species level.  Accordingly, in 1978 FWS listed the gray wolf as endangered throughout the

conterminous United States and Mexico, except in Minnesota, where wolves were listed as

threatened.  43 Fed. Reg. 9607 (Mar. 9, 1978).

      9.     In its 1978 listing decision, FWS recognized the widespread decrease in the gray

wolf's range.  In the eastern United States, the agency found that the wolf's historic range –

which encompassed "most of the region from Georgia to Maine, and between the Atlantic and

the Great Plains" – had been reduced to northern Minnesota and the adjacent Isle Royale

National Park.  43 Fed. Reg. at 9608, 9610.  In the West, FWS stated that except for the

"occasional wanderer," the wolf had been restricted to remote areas of the Rocky Mountains.  *Id.*

at 9610.  The agency further recognized that some states within the wolf's historic range, such as

Washington and North Dakota, had no protections for the gray wolf.  *Id.* at 9611.  Applying the

threats analysis set forth in Section 4(a)(1) of the ESA, 16 U.S.C. § 1533(a)(1), FWS concluded

that "the entire species *Canis lupus* is Endangered or Threatened to the south of Canada."  43

Fed. Reg. at 9607.

      10.    Once protected by the ESA, the Great Lakes wolf population began reoccupying

portions of its historic range.  Between 1979 and 1998, the occupied wolf range in Minnesota

more than doubled.  Meanwhile, wolves began dispersing from Minnesota into northern

Wisconsin, and from there into the Upper Peninsula of Michigan.  Wisconsin first reported a

wolf pack in 1975, and Michigan recorded a breeding pair in 1991.  Today, there are wolves in

all three states, though the vast majority of the Great Lakes wolf population remains in northern

Minnesota.  *See* 71 Fed. Reg. at 15269-71.

11.    Limited recovery has also begun in the West.  Protected by the ESA, a few wolves dispersing from Canada established a small resident population in Montana.  Meanwhile, in the mid-1990s FWS reintroduced wolves to Yellowstone National Park and public lands in central Idaho.  71 Fed. Reg. 6634, 6635-37 (Feb. 8, 2006).  Those wolves, which are currently managed as an experimental population under Section 10(j) of the Act, 16 U.S.C. § 1539(j), have also contributed to this nascent wolf recovery.  Today, the Great Lakes region and the northern Rocky Mountains contain the only sizeable gray wolf populations within the conterminous United States.

12.    The reemergence of the gray wolf has benefited the broader environment.  For example, the ecological health of Yellowstone National Park and surrounding areas has improved demonstrably since the wolf's reintroduction in the mid-1990s.  The reintroduced wolves have bolstered biodiversity by creating habitat for beavers, songbirds, and trout.  AR Doc. 228 at 7870, 7871; *id.* at 8043, 8045, 8047; *id.* at 8120-23.  Red foxes, which are competitors of the coyote, have likewise benefited from the wolf's return, as shown by their increasing numbers since the reintroduction of wolves to Yellowstone.  AR Doc. 228 at 8045; *id.* at 8122.  Wolves also benefit scavenger species such as grizzly bears, bald eagles, and golden eagles, which are provided a reliable food source on a year-round basis from the "leftovers" of wolf kills.  AR Doc. 215 at 5732-33; AR Doc. 228 at 8122; *id.* at 8196-97, 8201-02.

13.    Despite recent population trends, the gray wolf remains extirpated across the vast majority of its historic range.  At the time of the ESA's passage, the gray wolf had been reduced to 1% of its historic range within the conterminous United States.  *Sierra Club v. Clark*, 577 F. Supp. 783, 785 (D. Minn. 1984), *rev'd in part*, 755 F.2d 608 (8th Cir. 1985) (noting that "[t]he Eastern Timber Wolf . . . now occupies only 1 percent of its original range"); AR Doc. 228 at

7869 (stating that by the 1950s the gray wolf "occup[ied] less than 1% of the species historic

range").  Today, despite its limited progress, the wolf remains extirpated across approximately

95% of its historic range.  AR Doc. 228 at 7869 (noting that the gray wolf "occup[ies] about 5%

of the species' historic range in the conterminous United States").

14.    There are numerous areas within the conterminous United States that contain

suitable gray wolf habitat and yet remain devoid of wolves.  These areas include the Northeast,

parts of Michigan and North Dakota, the Pacific Northwest, and other parts of the West.

*See Defenders of Wildlife v. Sec'y, U.S. Dep't of the Interior*, 354 F. Supp. 2d 1156, 1167 & n.8

(D. Or. 2005) ("*Defenders (wolf)*") (mentioning wolf habitat and dispersing wolves in the

Northeast, Northwest, and the Dakotas); 65 Fed. Reg. 43450, 43462 (July 13, 2000) (identifying

favorable wolf habitat in the Northeast); 71 Fed. Reg. at 15279 (discussing unoccupied wolf

habitat in Michigan and North Dakota); 65 Fed. Reg. at 43474 (noting that "there is certainly

habitat that could support wolves" in western states such as Oregon, Utah, and Colorado); AR

Doc. 468A at 14791, 14792 (concluding that "large areas of habitat exist within North Dakota in

which human population density and road density is low," and that "the state of North Dakota

can support a wolf population").

15.    Since the gray wolf's listing, FWS has undermined ESA protections for the wolf

on several occasions, thereby necessitating judicial intervention.  In the 1970s, FWS authorized a

trapping program in northern Minnesota, which resulted in the take of 151 wolves over a four-

year period before a court stopped the practice.  *See Fund for Animals v. Andrus*, Civ. No. 5-78-

66, 11 Env't Rep. Cas. (BNA) 2189, 2200-01 (D. Minn. 1978).  In the 1980s, FWS authorized

public sport trapping of wolves in Minnesota.  The courts invalidated these regulations, finding

that public hunting of a threatened species violates the ESA.  *Sierra Club v. Clark*, 755 F.2d 608,

615 (8th Cir. 1985); *see also infra* ¶ 19 (describing recent decisions overturning FWS's attempt to downlist the wolf).

### *FWS's Initial Delisting Effort*

16.    In 2000, FWS published a proposed rule that sought to divvy up the wolf's range into four distinct population segments ("DPSs") and to downlist the wolf to threatened status within three of them.  65 Fed. Reg. 43450.

17.    FWS finalized this proposal in 2003.  *See* 68 Fed. Reg. 15804 (April 1, 2003) (the "2003 Downlisting Rule").  The 2003 Downlisting Rule created three large DPSs, including an Eastern DPS that stretched from the Dakotas to New England and a Western DPS that extended from California to the eastern border of Montana and Wyoming.  The Rule reclassified the gray wolf from endangered to threatened within both of these DPSs.

18.    On the same day it released the 2003 Downlisting Rule, FWS announced its intention to delist the gray wolf entirely within the Eastern and Western DPSs.  *See* 68 Fed. Reg. 15876 (April 1, 2003); 68 Fed. Reg. 15879 (April 1, 2003).  The following year, FWS officially proposed to delist the gray wolf in the Eastern DPS.  *See* 69 Fed. Reg. 43664 (July 21, 2004).

19.    A coalition of environmental and animal welfare groups challenged the 2003 Downlisting Rule, and in January 2005 the federal district court in Oregon struck down the rule as a violation of the ESA.  *See Defenders (wolf)*, 354 F. Supp. 2d 1156.  Independently, the federal district court in Vermont reached the same result.  *Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553 (D. Vt. 2005).  These rulings found the 2003 Downlisting Rule to be arbitrary and capricious.  By vacating the rule, these decisions restored the gray wolf to endangered status throughout the conterminous United States except in Minnesota, where the wolf remained threatened.

20.     Shortly after the District of Oregon struck down the 2003 Downlisting Rule, FWS issued a permit allowing the State of Wisconsin to kill 34 endangered wolves in 2005.  The permit was issued pursuant to Section 10(a) of the ESA, which allows the limited take of an endangered species "for scientific purposes or to enhance the propagation or survival of the affected species."  16 U.S.C. § 1539(a)(1)(A).  This Court invalidated that permit because FWS had failed to provide notice and comment before issuing the permit.  *Defenders of Wildlife v. Norton*, Order Granting Permanent Injunction, Civ. No. 05-1573-ESH (D.D.C. Sept. 13, 2005), *attached as* Exhibit A to the Declaration of Michael Soules in Support of Plaintiffs' Motion for Summary Judgment ("Soules Decl.").  The following day, Wisconsin's resubmitted permit application was published in the Federal Register, and FWS issued another permit allowing Wisconsin to take 43 endangered wolves in 2006.  This Court enjoined implementation of the permit, finding that the lethal take of endangered wolves was not authorized by the ESA.  *Humane Soc'y of the United States v. Kempthorne*, 481 F. Supp. 2d 53 (D.D.C. 2006).

### *FWS's Current Delisting Effort*

21.     The day after the District of Oregon's ruling in *Defenders (wolf)*, 354 F. Supp. 1156, FWS began its current effort to delist the gray wolf populations in the western Great Lakes and northern Rocky Mountains.  *See* AR Doc. 4 at 43.  In March 2005, the agency held a "National Gray Wolf Meeting" at Marymount University in pursuit of that effort.

22.     During and after this meeting, FWS considered three general approaches for dealing with the gray wolf.  These alternatives were identified in an "Options paper" that guided the agency's planning process.  The Options paper described these three alternatives and cited "pros" and "cons" of each approach.  *See, e.g.*, AR Doc. 35 at 156-61, Soules Decl., Ex. B.

23.     Under Option 1, the agency would downlist the gray wolf to threatened status throughout the conterminous United States, while possibly retaining an endangered listing for the

Mexican wolf in the Southwest.  AR Doc. 35 at 157.  According to FWS, one of the advantages of this option was that it was "[p]robably fastest overall."  *Id.* at 158.  A disadvantage cited by the agency was that the Section 4(a)(1) threats analysis (which must be done before reclassifying a listed species) would have "to be done over an extremely large area."  *Id.*

24.    Option 2 called for the creation of two DPSs – one in the northern Rocky Mountains and one in the western Great Lakes – that would encompass the existing wolf populations plus a large swath of unoccupied wolf range which would capture most dispersing wolves.  AR Doc. 35 at 158 (DPSs consisting of "core states + large dispersal area").  FWS stated that an advantage of this approach was that it would lead to a quick delisting of the Great Lakes wolf population.  *Id.*  Another cited advantage was that there was "[l]ess risk on the SPR [significant portion of the range] issue because threats analysis conducted on smaller geographic areas."  *Id.*; *see also* AR Doc. 48 at 201, Soules Decl., Ex. C (stating that a "pro" of Option 2 was that the agency would conduct the Section 4(a)(1) "[t]hreats analysis over [a] smaller area"); AR Doc. 23 at 115 (same).  Among the disadvantages of Option 2 was that "[r]emaining areas left unresolved; future wolves there may remain endangered forever."  AR Doc. 35 at 158.

25.    Option 3 was similar to Option 2, except that the boundaries of the two DPSs would be drawn more narrowly.  AR Doc. 35 at 159.  One advantage of this option was that the agency "could delist [Great Lakes] quickly."  *Id.*  But a disadvantage of this approach was that there would be "[f]ewer options for managing dispersing wolves, as dispersal areas within the reclassified DPSs are much smaller than for Option 2."  *Id.*  Yet another disadvantage was that "[r]emaining states not happy because legal status of future wolves there is unresolved – possibly endangered forever or forced to recover them."  *Id.*

26.     The Options paper also confirmed FWS's decision to forgo any federal wolf

recovery efforts in the Northeast, even though that had been a priority for decades.  *See* 1978

Recovery Plan for the Eastern Timber Wolf at 43-44, AR Doc. 215 at 5840-41.  When the timber

wolf recovery plan was revised in 1992, one of its primary objectives was to "[r]e-establish wolf

populations in [the] Adirondack Mountains . . ., northwestern Maine/adjacent New Hampshire,

and/or northeastern Maine."  1992 Recovery Plan for the Eastern Timber Wolf at 35, AR Doc.

215 at 5912 ("1992 Recovery Plan").  By 2004, however, the agency had given up on a federal

recovery effort in the Northeast even though "a substantial amount of the historical range

remains unoccupied."  69 Fed. Reg. at 43672.  Likewise, in the Options paper FWS began

considering whether to "[d]elist the gray due to extinction."  AR Doc. 35 at 156; *see also* AR

Doc. 48 at 195 ("Delist in NE – use best argument").  One of the advantages of this strategy was

that doing so would require no Section 4(a)(1) threats analysis.  AR Doc. 35 at 156.

27.     The Options paper revealed that, once the western Great Lakes and northern

Rocky Mountain DPSs were delisted based on recovery, FWS might delist the unoccupied

portions of the wolf range on the grounds of extinction.  AR Doc. 35 at 159 (stating that a

possible future step for Option 2 is to "[d]elist remaining states as extinct"); AR Doc. 48 at 204

(same).

28.     Although FWS mentioned the possibility of retaining an endangered listing for

the non-DPS remnants, or preparing a recovery plan for these areas, those alternatives were

disfavored by the agency.  *See* AR Doc. 35 at 159 (stating that the option of "leav[ing] remaining

states endangered indefinitely" is "not a preference"); *id.* (establishing recovery plans for the

remaining states "is contrary to FWS' understanding [of] the ESA").

29.    Although FWS had apparently decided on Option 2 as early as July 2005, AR Doc. 66 at 280, the agency did not make the decision public until December, when it announced plans to delist the gray wolf populations in the northern Rocky Mountains and the western Great Lakes.  Amended Complaint ¶ 70; Answer ¶ 70.

30.    In February 2006, FWS issued an Advanced Notice of Proposed Rulemaking stating its plans to designate and delist the Northern Rocky Mountains DPS of the gray wolf.  71 Fed. Reg. 6634.  And in March 2006, FWS formally issued a proposed rule that sought to designate and delist the western Great Lakes DPS of the gray wolf.  71 Fed. Reg. 15266 ("Proposed Rule").  The proposed boundaries of the western Great Lakes DPS were expansive, encompassing the eastern Dakotas, all of Minnesota, Wisconsin, and Michigan, and parts of Iowa, Illinois, Indiana, and Ohio.

31.    After releasing the Proposed Rule, FWS received hundreds of comments from individuals and organizations.  The vast majority of these comments expressed opposition to the agency's delisting proposal.  AR Doc. 230 at 8476 (noting that 57% of comments opposed delisting the Great Lakes wolf population, whereas only 33% supported delisting).  Like other groups, Plaintiffs provided extensive comments on the Proposed Rule, identifying the many factual and legal defects in FWS's proposal.  *See* AR Doc. 228 at 7748-88.

### *The Final Rule*

32.    On February 8, 2007, FWS issued a final rule that simultaneously designated and delisted the western Great Lakes distinct population segment of the gray wolf.  72 Fed. Reg. 6052 ("Final Rule").  That same day, the agency issued a proposed rule seeking to designate and delist the northern Rocky Mountain DPS.  72 Fed. Reg. 6106 (Feb. 8, 2007).  Once both rules are

fully implemented, nearly every gray wolf in the conterminous United States will lose the protections of the ESA.

33.    In designating the western Great Lakes DPS, FWS found that the Great Lakes wolf population was "significant" because, *inter alia*, the loss of these gray wolves would result in a "significant gap in the range of the taxon." 72 Fed. Reg. at 6060. Likewise, FWS found this population to be "discrete" because of its distance from the Northern Rocky Mountain population. *See id.* at 6059.

34.    The broad boundaries of the western Great Lakes DPS extend far beyond the wolf's current distribution. The DPS includes vast swaths of North Dakota, South Dakota, and other states, even though these areas have no viable reproducing wolf populations, and the western boundary of the DPS is approximately 200 miles outside of the wolf's current range. 72 Fed. Reg. at 6059. These boundaries were designed to include "a wolf movement zone around the core wolf populations." *Id.* at 6060; *see also id.* (the DPS "includes the locations of most known dispersers from the core populations").

35.    As FWS described in its Options paper, one of the benefits of these broad boundaries was that they would "allow[] for management of dispersing wolves," AR Doc. 35 at 158, a euphemism for killing dispersers. The wide boundaries were also motivated by FWS's concern that North Dakota and South Dakota would be "very angry" if wolves dispersing from Minnesota received ESA protections in those states. AR Doc. 29 at 140.

### State Management Programs

36.    The Final Rule relies "heavily" on the wolf management programs in Minnesota, Wisconsin, and Michigan for its "assessment of the degree of protection and monitoring that will

occur after Federal delisting." 72 Fed. Reg. at 6068. The Final Rule assumes that these "plans will be funded and implemented largely as written." *Id.*

37.    Although Michigan had drafted a wolf recovery plan in 1997, that plan was "in the midst of revision" at the time of delisting. 72 Fed. Reg. at 6068. But even though FWS could not "evaluate the goals, strategies, or activities" of the revised Michigan plan, the agency concluded that Michigan would adequately protect the wolf. *Id.* at 6094.

38.    In an attempt to fill this gap in Michigan's regulatory mechanisms, FWS pointed first to a series of non-mandatory "guiding principles" adopted by a citizens' roundtable, and second to vague assurances from the Michigan Department of Natural Resources ("DNR") that Michigan's wolves will be sufficiently protected. *See* 72 Fed. Reg. at 6093-94 (describing recommendations of the citizens' roundtable); *id.* at 6092 (describing the DNR's assurances).

39.    Collectively, the Minnesota, Wisconsin, and Michigan wolf management plans would permit nearly a 50% decline in the Great Lakes wolf population. *Compare* 72 Fed. Reg. at 6053 (estimating a current population of 3919 wolves) *with* AR Doc. 215 at 5255 (Minnesota minimum population of 1600 wolves), AR Doc. 468A at 13386 (Wisconsin target population of 350 wolves), and AR Doc. 215 at 5139 (Michigan minimum population of 200 wolves).

40.    The state management programs sharply increase the circumstances in which wolves can be killed. Under the Minnesota Wolf Management Plan ("Minnesota Plan"), landowners within Zone B – which is approximately 60% of the state – may kill a wolf "to protect[] livestock, domestic animals, or pets," even when there is no immediate threat. Minnesota Plan at 22, AR Doc. 215 at 5275. The Minnesota Plan also authorizes the establishment of "predator control areas" to take wolves near a depredation site. *Id.* at 23, AR Doc. 215 at 5276. These zones, which can remain open for approximately seven months, can be

established up to five years after the depredation incident. *Id.* In addition, the Minnesota Plan contemplates a public wolf harvest once the five-year post-delisting monitoring period has concluded. *Id.* at 21, AR Doc. 215 at 5274. The Minnesota Plan also re-establishes a bounty system in Minnesota by paying state-certified predator controllers $150 for each wolf killed. *Id.* at 23, AR Doc. 215 at 5276.

41.     Zone B under the Minnesota Plan contained approximately 450 wolves at the time of delisting. 72 Fed. Reg. at 6087. Even though Zone B's wolf population is equal in size to that in Wisconsin and Michigan, *cf. id.* at 6053, the Final Rule contemplates that many, if not all, of these wolves will be killed. *Id.*

42.     Population declines are also nearly certain under Wisconsin's program, which authorizes "[p]roactive control" if the wolf population exceeds 350 wolves. 1999 Wisconsin Wolf Management Plan at 21, AR Doc. 215 at 6001 ("Wisconsin Plan"). The Wisconsin Plan also contemplates the possibility of a public wolf harvest. *Id.*

43.     Until recently, many of the costs of wolf management were borne by the federal government. Amended Complaint ¶ 82; Answer ¶ 82. Now that the wolf has been delisted, the states are responsible for wolf management. *Id.*

44.     In the Final Rule FWS assumed that the state wolf management "plans will be funded and implemented largely as written." 72 Fed. Reg. at 6068.

45.     The Minnesota Plan is not being fully implemented. The Minnesota DNR projected that $695,000 annually would be "needed to accomplish the gray wolf management plan in Minnesota." Minnesota Plan, Appx. II, AR Doc. 215 at 5292-93. But for the foreseeable future only $144,000 annually has been budgeted for wolf management activities. *See* Proposed

Exhibit E, *attached to* Declaration of Michael Soules in Support of Plaintiffs' Motion to Supplement (copy of the Minnesota DNR's Data Practices Act response).

46.     There is also evidence that the Michigan and Wisconsin wolf programs are not being adequately funded.  Even prior to the wolf's delisting, the Michigan plan was not being fully implemented.  *See* AR Doc. 142 at 767 (admitting that "full implementation of the [Michigan plan] did not occur because of competing priorities, changing budgets, and personnel constraints").  Moreover, Michigan directly petitioned FWS for funding assistance, AR Doc. 228 at 8286, and FWS knew that the Michigan DNR had recently changed its population monitoring methodology, largely in an effort to cut costs.  *See id.* at 8523 (author of the new methodology noting that the switch to "sampling is more budget driven than anythoing [*sic*] else").

47.     The Wisconsin DNR has also expressed grave concern about funding its program.  *See* AR Doc. 215 at 6786 ("Currently a major fiscal crisis is affecting the State of Wisconsin, and will likely reduce state funding available for wolves in the near future."); AR Doc. 228 at 8233 (noting that "[t]he Wisconsin DNR . . . will need federal cost sharing on funding these surveys.").

48.     At the time of the wolf's 1978 listing, FWS recognized that "[d]irect killing by man . . . has been the major direct factor in the decline of wolves in the conterminous United States."  43 Fed. Reg. at 9611.  Through the enforcement of take prohibitions, the ESA has been crucial to the wolf's nascent recovery.  *See* 72 Fed. Reg. at 6081.  Yet even with the Act's protections, human-caused mortality – including vehicle accidents and illegal trapping and shooting – has remained a serious problem, accounting for more than half of all wolf deaths in Wisconsin, with similar figures reported for Minnesota and Michigan.  *Id.* at 6082.

49.     Disease has long been a serious threat to the gray wolf.  In recent years sarcoptic mange has killed as many wolves in Wisconsin as illegal shooting, and disease has affected wolf recovery in Wisconsin and Michigan.  72 Fed. Reg. at 6079, 6081.  In the Final Rule, FWS recognized that "to avoid a future decline caused by diseases or parasites, States and their partners will have to diligently monitor the prevalence of these pathogens in order to effectively respond to significant outbreaks."  *Id.* at 6077.

50.     The Minnesota DNR has committed itself to only a minimal degree of monitoring, with many components of its monitoring scheme vague or speculative.  *See* Minnesota Plan at 19-20, AR Doc. 215 at 5272-73 (stating that radio telemetry will be "encouraged" and population modeling will be "investigate[d]"); *see also* 72 Fed. Reg. at 6081 ("Minnesota has not established minimum goals for the proportion of its wolves that will be assessed for disease nor does it plan to treat any wolves.").

51.     There is also strong evidence that the Michigan DNR will not carry out the monitoring called for by its wolf management program.  Michigan's wolf management plan is under revision, and there is evidence that the existing plan is not being fully implemented.  *See* AR Doc. 142 at 767.  Moreover, for the first time this year, the Michigan DNR informed FWS that it would begin using a new monitoring methodology.  72 Fed. Reg. at 6092.

52.     Plaintiffs and others warned about the lack of funding for the state wolf management plans.  FWS responded by simply assuming that the state plans would be properly implemented and offering its assurance that "[i]f this assumption turns out to be incorrect, we have the ability to relist the species, including an emergency relisting, if necessary."  72 Fed. Reg. at 6068.

53.     FWS made no affirmative commitments to post-delisting monitoring in either the Proposed Rule or Final Rule.  Lacking any monitoring program of its own, FWS stated simply that it "anticipate[s] the PDM program will be a continuation of State monitoring activities."  72 Fed. Reg. at 6101.

### The Eastern Timber Wolf Recovery Plan

54.     FWS relied heavily on the 1992 Recovery Plan in its decision to delist the Great Lakes wolf population.  *See* 72 Fed. Reg. at 6052-53.

55.     The 1992 Recovery Plan focuses on the eastern timber wolf (*Canis lupus lycaon*), a subspecies that lost legal recognition when the FWS listed the gray wolf at the species level in 1978.  *See generally* AR Doc. 215 at 5877.

56.     The 1992 Recovery Plan's primary objective was "to maintain and reestablish viable populations of the eastern timber wolf in as much of its former range as is feasible."  1992 Recovery Plan at 24, AR Doc. 215 at 5901.

57.     The Plan also set forth specific criteria which, when met, would purportedly qualify the wolf for delisting.  These criteria included the retention of a Minnesota population of 1251-1400 wolves and the establishment of a second population consisting of either (a) 100 wolves, if located within 100 miles of the Minnesota population, or (b) 200 wolves, if more than 100 miles from the Minnesota population.  The target population for Minnesota (1251 wolves) is almost identical to the Minnesota wolf population at the time of the wolf's 1978 listing (1235 wolves).  *Compare* 1992 Recovery Plan at 25-26, 28, AR Doc. 215 at 5902-03, 5905 *with* 72 Fed. Reg. at 6052-53.

58.     As explained in a 1998 Addendum, these delisting criteria were intended only to ensure the wolf "is no longer in danger of extinction in the foreseeable future."  AR Doc. 215 at

6860. In other words, the 1992 Recovery Plan was aimed solely at preventing *complete*

extinction of the Great Lakes wolf population.

59.    FWS failed to satisfy all the delisting criteria identified in the 1992 Recovery

Plan. The Plan states that "[p]rior to completing the delisting of the eastern timber wolf a

detailed monitoring plan must be developed, . . . and funding sources for the monitoring must be

identified." 1992 Recovery Plan at 26, AR Doc. 215 at 5903. FWS has satisfied neither of these

requisites.

60.    Irrespective of the delisting criteria, the broader goals of the 1992 Recovery Plan

have not been met. FWS has made no attempt to restore the gray wolf to "as much of its former

range as is feasible." 1992 Recovery Plan at 24, AR Doc. 215 at 5901. Nor has FWS made any

effort to reestablish wolves in the Adirondack Mountains region of New York, New Hampshire,

or Maine – areas that were identified for wolf restoration under the Plan. *Id.* at 35, AR Doc. 215

at 5912.

Dated: November 14, 2007

Respectfully submitted,

/s/  Michael C. Soules & Rebecca G. Judd

Rebecca G. Judd, D.C. Bar No. 486315
rjudd@hsus.org
Jonathan R. Lovvorn, D.C. Bar No. 461163
jlovvorn@hsus.org
The Humane Society of the United States
2100 L Street, NW
Washington, DC  20037
(202) 452-1100
(202) 778-6132 (facsimile)

Brian B. O'Neill, Minn. Bar No. 82521
boneill@faegre.com
Sanne H. Knudsen, Minn. Bar No. 0344552
sknudsen@faegre.com
Michael C. Soules, D.C. Bar No. 477911
msoules@faegre.com
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-3901
(612) 766-7000
(612) 766-1600 (facsimile)

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| The Humane Society of the United States; Help Our Wolves Live ("HOWL"); Animal Protection Institute; and Friends of Animals and Their Environment, | ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) | **Civil No. 1:07-cv-00677-PLF** |
| v. | ) ) |  |
| Dirk Kempthorne, Secretary of the Interior; United States Department of the Interior; and United States Fish and Wildlife Service, | ) ) ) ) |  |
| Defendants, | ) ) |  |
| U.S. Sportsmen's Alliance Foundation; Wisconsin Bear Hunters Association; *et al.*, | ) ) ) |  |
| Intervenor-Defendants, | ) ) |  |
| Safari Club International; National Rifle Association; *et al.*, | ) ) ) |  |
| Intervenor-Defendants. | ) ) |  |

## DECLARATION OF MICHAEL SOULES
## IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

I, Michael C. Soules, declare the following:

1.      I am an attorney at the law firm of Faegre & Benson LLP, and am admitted *pro hac vice* in the above-captioned matter.  I submit this declaration in support of Plaintiffs' Motion For Summary Judgment.

2.      Attached hereto as Exhibit A is a true and correct copy of *Defenders of Wildlife v. Norton*, Order Granting Permanent Injunction, Civ. No. 05-1573-ESH (D.D.C. Sept. 13, 2005).

3.      Attached hereto as Exhibit B is a true and correct copy of Administrative Record Document 35.

4.      Attached hereto as Exhibit C is a true and correct copy of Administrative Record Document 48.

5.      Attached hereto as Exhibit D is a true and correct copy of *Defenders of Wildlife v. Kempthorne*, Civil No. 04-1230, 2006 WL 2844232 (D.D.C. Sept. 29, 2006).


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


November 14, 2007                          *Michael C. Soules*
                                           Michael C. Soules

*The Humane Society of The United States, et. al. v. Kempthorne, et al.,*
Civil No. 1:07-cv-00677-PLF


Plaintiffs' Motion For Summary Judgment


Declaration of Michael C. Soules


# EXHIBIT A

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **DEFENDERS OF WILDLIFE**, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **Civil Action No. 05-1573 (ESH)** |
| | ) | |
| **GALE NORTON, Secretary of the**<br>**Interior**, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Before the Court is plaintiffs' motion for a preliminary injunction [#5]. For the reasons stated in open court at the hearing held this date, the Court grants the motion and will issue a permanent injunction. It is hereby

**ORDERED** that defendants Gale Norton, Matthew J. Hogan, the Department of the Interior, the United States Fish & Wildlife Service and their employees, agents, and any and all others acting in concert or participation with them are permanently enjoined and restrained from permitting any activities authorized under the issuances of Permit No. 05-05 or Permit No. 05-03 A1 to occur. Defendant the United States Fish and Wildlife Service is directed immediately to halt any "takings" of gray wolves for depredation control purposes in Michigan or Wisconsin pursuant to these permits; and it is

**FURTHER ORDERED** that judgment is entered for the plaintiffs and the above-captioned matter is **DISMISSED WITH PREJUDICE.**

Exhibit A-01

_____s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date:   September 13, 2005

-2-

*The Humane Society of The United States, et. al. v. Kempthorne, et al.*,
Civil No. 1:07-cv-00677-PLF

Plaintiffs' Motion For Summary Judgment

Declaration of Michael C. Soules

# EXHIBIT B



**Ron Refsnider**

04/11/2005 07:23 AM

To: Clint Riley/AMBS/R9/FWS/DOI@FWS, Buddy Fazio/R4/FWS/DOI@FWS, Eleanora Babij/ARL/R9/FWS/DOI@FWS, Karen L Anderson/ARL/R9/FWS/DOI@FWS, Gloria Bell/R4/FWS/DOI@FWS, John Fay/ARL/R9/FWS/DOI@FWS, "Kristen.Gustafson@usdoj.gov" <Kristen.Gustafson@usdoj.gov>, Tracy Scheffler/RO/R2/FWS/DOI@FWS, John Morgart/RO/R2/FWS/DOI@FWS, Ed Bangs/R6/FWS/DOI@FWS, Kathy Hollar/RO/R1/FWS/DOI@FWS, Michelle Morgan/ARL/R9/FWS/DOI@FWS, TJ Miller/R3/FWS/DOI@FWS, Jill Parker/R6/FWS/DOI@FWS, Chris Nolin/ARL/R9/FWS/DOI@FWS

cc: Laura Ragan/R3/FWS/DOI@FWS, Wendi Weber/R3/FWS/DOI@FWS, (bcc: Ron Refsnider/R3/FWS/DOI)

Subject: ATTORNEY-CLIENT PRIVILEDED - DRAFT Summary of Marymount Wolf Meeting & Options Paper

Here are the latest drafts of the Marymount documents. I've held off sending these out while awaiting additional input from Margot, but these current drafts need to get to you. Sorry for the delay.

The "Options" paper probably will not change substantially, and so it can be treated as a final; Margot's input is expected to be to the "Notes" document only.

—Ron

          

Marymount 2005 Notes - draft 8.c OPTIONS PAPER - Privileged, Predecisional - draft

Exhibit B-01

**Attorney-Client Privileged/Attorney-Client Work Product**
**DRAFT 8**



# National Gray Wolf Meeting -- March 1-2, 2005
## Marymount University



Exhibit B-02

**Attorney-Client Privileged/Attorney-Client Work Product**
**DRAFT 8**



### B. Control of Depredating and Other Problem Wolves

Various control options were discussed, but most time was spent on the use of 10(a)(1)(A) "recovery" permits, as section 6 take authority doesn't cover lethal control or permanent removal from the wild.

**Region 3** had issued a 10(a)(1)(A) subpermit to Wisconsin DNR (WI DNR) for limited lethal take of endangered wolves prior to the 2003 reclassification final rule. WI DNR has requested reissuance of that subpermit, as well as broader take authorities similar to those allowed by the 2003 4(d) rule. Region 3 has reissued a subpermit to WI DNR authorizing most of the pre-reclassification lethal take authorities, but that authority primarily covers livetrapping and translocation of depredating wolves. Verified second offenders (positive verification of a previous depredation) can be killed, up to 8 in 2005. WI DNR uses USDA-Wildlife Services as their agent. This subpermit gives no take authorization to private citizens.

Region 3 is considering a permit or subpermit to WI and MI DNRs (MI application was just received) covering lethal depredation control, perhaps as broad as that previously in the 4(d) rule.

**Region 6** plans to reissue their permit for lethal control in northwestern Montana and other areas, with similar provisions to what was used pre-reclassification.

**Region 1** received a request from Oregon for a permit or other authorization to remove depredating wolves under their recently completed wolf management plan. Question was raised on whether an over-riding federal recovery plan or control plan is needed; probably not, if state has its own plan which is adequate to conserve the wolf. *[discussion on this final point may have occurred outside of the meeting, during a break.]*



### C. Significant Portion of Range and Distinct Population Segments

[Much of the discussion under this topic appears elsewhere in this summary and is not repeated here.]



Exhibit B-03

**Attorney-Client Privileged/Attorney-Client Work Product**
**DRAFT 8**



3

Exhibit B-04

153

**Attorney-Client Privileged/Attorney-Client Work Product**
**DRAFT 8**

**E. Northeastern Wolves – How should we deal with the scientific uncertainty regarding the identity of the historical wolf in the northeastern states and adjacent Canada?**

Michael Amaral summarized the various theories regarding the identity of the historical wolf in the Northeast: (1) it was a form or subspecies of the gray wolf, possibly of hybrid (with the red wolf) origin; (2) it was the eastern Canadian wolf (*Canis lycaon*), which may include the red wolf as a second subspecies; and (3) there may have been two wolf taxa occupying the Northeast at different times, or simultaneously in different areas, with some overlap and hybridization possibly occurring. Because pre-European settlement wolf specimens are lacking, the controversy is not likely to be resolved in the near future, if ever. Until/unless it is resolved, the FWS cannot determine what, if any, wolf entity should be recovered in the Northeast under the ESA.

Taxonomic uncertainty, combined with the current lack of a wolf population in the Northeast, raises substantial questions regarding the validity of a wolf listing there. If we were considering listing wolves in the Northeast at this time, there may be insufficient information to support a new listing, although several potential entities for listing in the Northeast were discussed.

4

Exhibit B-05

**Attorney-Client Privileged/Attorney-Client Work Product**
**DRAFT 8**

**Participants**

| | |
|---|---|
| Margot Zallen | USDI Office of the Solicitor, Denver, CO |
| Dave Gayer | USDI Office of the Solicitor, DC |
| Clint Riley | FWS Director's Office |
| Bud Fazio | FWS Region 4, Red Wolf Recovery |
| Elena Babij | FWS WO, Recovery |
| Karen Anderson | FWS WO, Candidate Conservation |
| Gloria Bell | FWS R4 RO Endangered Species |
| Laura Ragan | FWS R3 RO Endangered Species |
| John Fay | FWS WO Endangered Species |
| Kristen Gustafson | US Dept. of Justice |
| Tracy Scheffler | FWS R2 RO, Recovery |
| John Morgart | FWS R2, Mexican Wolf Recovery |
| Ed Bangs | FWS R6, Rocky Mtn. Wolf Recovery |
| Kathy Hollar | FWS R1 RO Endangered Species |
| Michelle Morgan | FWS WO, Recovery & Delisting |
| Ron Refsnider | FWS R3 RO Endangered Species |
| TJ Miller | FWS R3 RO Endangered Species |
| Jill Parker | FWS R6 RO Endangered Species |
| Ben Jesup | USDI Office of the Solicitor, DC |
| Mike Young | USDI Office of the Solicitor, DC |
| Chris Nolin | FWS WO, Conservation and Classification |
| Philip Kline (by phone) | USDI Office of the Solicitor, |
| Tony Sullins (by phone) | USDI Office of the Solicitor, Ft. Snelling, MN |

Exhibit B-06

155

DRAFT 4
**Attorney-Client Privileged – Litigation Sensitive – Predecisional**
**Not for Release – FOIA Exempt**



# OPTIONS PAPER from Gray Wolf Meeting – March 1-2, 2005
# Marymount University

**How do we deal with possible wolves in the Northeast?**

## Options for the Northeast:

1. Delist gray wolf due to extinction

    Pros:
- They are extirpated from these states
- No threats analysis needed

    Cons:
- There have been occasional dispersers coming in, likely to continue.
- 
- 
- 
- 

2. Delist gray wolf there and list another wolf entity – *C. lycaon*, or an expanded red wolf listing – or list a gray wolf DPS.

    Pros:
- Keeps options open for recovery in the Northeast, if it is deemed necessary.
- 
- DPS listing may provide additional time to resolve taxonomic issues
- 
- Broad support from peer reviewers of Eastern DPS delisting proposal

    Cons:
- No current wolf population in northeastern U.S.

1

Exhibit B-07

DRAFT 4
**Attorney-Client Privileged – Litigation Sensitive – Predecisional
Not for Release – FOIA Exempt**

- Entity is uncertain, no consensus among wolf experts as to the identity of the historical wolf in the Northeast
- Difficult to describe the taxon to be listed, and there's no precedent for listing a taxon whose identity is uncertain.
- Likely would have to include Canada in the DPS or in a listing of *C. lycaon*, and wolves in Canada are not in trouble.

3. Delist because any NE wolves would be biologically linked to Canadian wolves (regardless of taxonomy), and the U.S. area is not significant to the Canadian wolf population.
  Pros:
  - Don't have to define U.S. entity
  - Consistent with the court ruling on the Arizona population of the cactus ferruginous pygmy owl. 

Cons:
  - Inconsistent with other areas, such as Minnesota and Northern Rockies where wolves are connected with Canadian populations, but we listed a separate U.S. entity.
  - ▮▮▮▮▮▮▮▮▮▮

4. Sever the Northeast at time of Midwest wolf reclass/delisting, and leave NE as a listed remnant under Reclassification/Delisting Options 2 and 3, below (because of unknown taxonomy).

**How do we move forward to change the legal status of the recovered populations?
Reclassification/Delisting Options**
  \* In all of the options, we would retain <u>population viability</u> as the core of our approach through the threats analysis in all suitable habitat in major geographic areas.

**Option 1**: Downlist the gray wolf except for experimental population areas; delist because of error in SE and portions of CA/NV; delist in NE (include discussion of taxonomic issues, extinction, insignificance…).
  Option 1a:  Establish Southwest (SW) DPS/entity and keep endangered.

Pros:
  - Can get 4(d) rules in place for more states relatively quickly in order to deal with problem wolves.
  - Consistent with current reclassification criteria in Eastern and Rockies wolf recovery plans.

2                                                                    Exhibit B-08

DRAFT 4
**Attorney-Client Privileged – Litigation Sensitive – Predecisional
Not for Release – FOIA Exempt**

- More consistent treatment of Canadian wolves because of reasons given in NE Options 1 and 3 in Item E, above.
- Would be able to better manage most dispersing wolves within the U.S. because they would be Threatened and we could promulgate an appropriate 4(d) rule
- Removes taxonomic/subspecies issues as impediments to gray wolf reclassification and delisting
- Probably fastest overall because just one step.

Cons:

- ████████████████████████████
- Will delay (perhaps significantly) delisting the recovered Great Lakes (GL) wolf population because must downlist first and then wait for West and maybe SW to achieve their delisting criteria.
- Questionable support for downlisting if SW is not a separate DPS
- 
- ████████████████████████████
- Threats analysis has to be done over an extremely large area.

**Option 2**: Establish and reclassify or delist 2 DPSs – West and Great Lakes – based on dispersal (core states + large dispersal area); initially keep endangered elsewhere; involves sequenced actions.

Pros:

- Recovery criteria satisfied so could delist in GL quickly, without reclassification step
- Uses biological delineation (dispersal data) for DPS boundaries
- Deals with most dispersers and allows for management of dispersing wolves in growing populations.
- Less risk on SPR issue because threats analysis conducted on smaller geographic areas.
- ████████████████████████████

Cons:

- ████████████████████████████
- ████████████████████████████
- Remaining areas left unresolved; future wolves there may remain endangered forever  
- ████████████████████████████

3                                      Exhibit B-09

DRAFT 4
**Attorney-Client Privileged – Litigation Sensitive – Predecisional
Not for Release – FOIA Exempt**

- Public perception could be negative because wolves in some states may remain "endangered forever."

**Option 3**: Establish and reclassify/delist 3-state Western DPS (ID, MT, and WY); establish and reclassify/delist 3-state Great Lakes DPS (MN, WI, MI); both DPSs use state lines for boundaries, providing small dispersal distances beyond core populations; initially keep endangered elsewhere; involves sequenced actions.

Pros:
- Recovery criteria satisfied so could delist GL quickly, without reclassification step
- ███████████████████████████
- Strong state support from 6 core states
- ████████████████████
- Positive public perception because some states will have their wolves "protected forever."

Cons:
- Fewer options for managing dispersing wolves, as dispersal areas within the reclassified DPSs are much smaller than for Option 2
- Remaining states left unresolved; future wolves there may remain endangered forever, ████████████████████████████
- Remaining states not happy because legal status of future wolves there is unresolved – possibly endangered forever or forced to recover them
- ████████████████████████████
- Negative public perception because wolves in some states may remain "endangered forever."

**Future Steps for Options 2 and 3**:
- Decouple NE (do this somehow in either option) (step)
- Establish SW DPS (step or option)
- Leave remaining states endangered indefinitely (not a preference) (option)
- Delist remaining states as extinct (option)
- Establish recovery plan(s) for remaining states (However, this is contrary to FWS' understanding that the ESA focuses on long-term viability, rather than requiring the filling of all available habitat with the taxon.) (option)
- State management plans for remaining states – delist based on state plans eliminating threats (may need to do this in all states, at least temporarily) (option)
- Section 10 permits for remaining states (option)
- Combination of extinction/state management plans/recovery/section 10 permits (option)

4                                                    Exhibit B-10

DRAFT 4
**Attorney-Client Privileged – Litigation Sensitive – Predecisional
Not for Release – FOIA Exempt**

**Other Issues/Options Discussed over the two days:**
1. Delist Error states (Southeast and parts of CA/NV)
   - Can be part of every option
   - 1st phase for options 2 and 3
   - Hard to draw lines for CA and NV.  May extend into AZ and UT.
   - Of questionable value if we have to do CA/NV separately ▮▮▮▮▮▮▮▮
     ▮▮▮▮▮▮▮▮ It may not be a high priority then.



3. Revise delisting regulations
   - Add other ways to delist other then error, extinction, and recovery.  (e.g., range remnants that are not necessary for recovery).
   - How many species would this apply to?

   Pros:
   - Could clean up old listings

5

Exhibit B-11

DRAFT 4
**Attorney-Client Privileged – Litigation Sensitive – Predecisional
Not for Release – FOIA Exempt**

- May come up with a way to not have to designate DPSs to remove remnants

Cons:
- ▬▬▬▬▬
- Time and feasibility

4. Develop policy on SPR and relation to DPS

A logical approach that would provide a consistent standard for the Service to apply in its recovery programs; however, the Service is not likely to pursue this option at this time.

6

Exhibit B-12

*The Humane Society of The United States, et. al. v. Kempthorne, et al.*,
Civil No. 1:07-cv-00677-PLF

Plaintiffs' Motion For Summary Judgment

Declaration of Michael C. Soules

# EXHIBIT C

 **Michelle Morgan**
05/11/2005 06:51 AM

To: Ron Refsnider/R3/FWS/DOI@FWS
cc: Eleanora Babij/ARL/R9/FWS/DOI@FWS, Martha BalisLarsen/ARL/R9/FWS/DOI
Subject: Re: Oregon District Court Order and Judgement

Ron - can you forward this to the rest of the wolf folks - the meeting was very short with the Asst. Sect. yesterday. He already had knowledge of the issues surrounding the court case and just wanted a brief run through of the options. We did not discuss the pros and cons. We essentially just talked off of the 4 maps. Judge Manson and his office will take a look at it and get back to us. He did say he may want to have another discussion before he makes a decision on how to proceed. The meeting took about 15 minutes.



Gray Wolf Litigation - Manson mtg.

Thanks!!

_____

Michelle Morgan
U.S. Fish and Wildlife Service
Endangered Species Program
Chief, Branch of Recovery and Delisting
Arlington, Virginia
(703) 358-2492 / Fax (703) 358-1735

Ron Refsnider

 **Ron Refsnider**
05/10/2005 11:04 AM

To: Michelle Morgan/ARL/R9/FWS/DOI@FWS
cc:
Subject: Re: Oregon District Court Order and Judgement

I don't recall getting the ppt and Margot says she definitely didn't see it. I'll give Elena a call to see if she can send it to us.

THANKS; enjoy your meeting and good luck with Judge Manson.

---Ron

Michelle Morgan

 **Michelle Morgan**
05/10/2005 09:53 AM

To: Ron Refsnider/R3/FWS/DOI@FWS
cc:
Subject: Re: Oregon District Court Order and Judgement

I am not sure whether Margot got the ppt. I think I sent the original ppt after the direcorate mtg. Unfortunately I am in the Ard mtg so I won't be able to get it to you before the meeting.
-------------------------
Sent from my BlackBerry Wireless Handheld
    Ron Refsnider

        **From:** Ron Refsnider
        **Sent:** 05/10/2005 08:35 AM

Exhibit C-01

**To:** Michelle Morgan
**Subject:** Re: Oregon District Court Order and Judgement

Any chance that Margot could get a copy faxed to her? And I'm interested, too, as I've not seen anything on the Directorate mtg. except some e-mail chatter between Robyn and Wendi.

THANKS.

---Ron

Michelle Morgan



**Michelle Morgan**
05/10/2005 09:08 AM

To: Ron Refsnider/R3/FWS/DOI@FWS
cc:
Subject: Re: Oregon District Court Order and Judgement

We are using a modified version of the powerpoint that I used at the directorate meeting.
-----------------------
Sent from my BlackBerry Wireless Handheld
    Ron Refsnider

    **From:** Ron Refsnider
    **Sent:** 05/10/2005 07:56 AM
    **To:** Michelle Morgan
    **Subject:** Re: Oregon District Court Order and Judgement

Michelle,

Margot asked if she could get a copy of any briefing papers that will be used at today's meeting - other than the Marymount documents, which she already has. Could you fax them to her (303-231-5363) or to me (612-713-5292) and I'll send them to her.

THANKS.

---Ron

Michelle Morgan



**Michelle Morgan**
05/10/2005 08:41 AM

To: Ron Refsnider/R3/FWS/DOI@FWS
cc: TJ Miller/R3/FWS/DOI
Subject: Re: Oregon District Court Order and Judgement

We are talking to Judge Manson today at 1:00 today - the decision will be made at that level.
-----------------------
Sent from my BlackBerry Wireless Handheld
    Ron Refsnider

    **From:** Ron Refsnider
    **Sent:** 05/10/2005 07:11 AM
    **To:** Michelle Morgan
    **Cc:** TJ Miller
    **Subject:** Oregon District Court Order and Judgement

Exhibit C-02

Hi Michelle,

I see that Judge Jones denied our motion and has entered his Final Judgement in the Oregon wolf ruling on 5/6. That starts the 60-day appeal clock, but I think the 150-day clock would have run out at the end of June anyway.

Are we still waiting to see if we get a ruling from the Vermont District Court in the next several weeks, before deciding whether to appeal?

My personal vote is to appeal, although I certainly dislike delaying a revised delisting proposal for the Midwest. But bowing to Judge Jones' ruling seems to be setting major precedents for the entire ESA program -- listing, recovery criteria, delisting/downlisting -- that I really dislike. I think the implications of his ruling put an entirely new spin on the purpose of the ESA and the endpoint for recovery for all listed species.

What's going on in Washington regarding an appeal decision or other options? How will the appeal decision be made?

---Ron

Exhibit C-03



# Gray Wolf Litigation

Exhibit C-04



Map 3 - Final Listing

ct
jment

:t
jment

Distinct
jment
co)

SW DPS
Extends Into
Mexico

Exhibit C-05



Exhibit C-06



Exhibit C-07

# Option 1

- Downlist the lower 48, establish 4(d)
- Remove error States
- Delist in NE – use best argument

Exhibit C-08



Option 1

Map 1 - Previous Listing

Endangered in Mexico

Exhibit C-09

196

# Future Steps - 1

- Establish SW DPS (or list Mexican wolf as a subspecies)

- Delist northern DPS once regulatory assurances criteria have been met

Exhibit C-10

# Option 1

## Pros
- 4(d) rules in place quickly
- Consistent with recovery criteria
- Consistent treatment of Canadian wolves
- Manage dispersing wolves
- Removes taxonomic/subspecies issues
- Removes DPS issues
- Fastest overall – one step

## Cons
- Will delay delisting in Great Lakes
- Would need to describe threats in large area
- Need State Mgmt plans in border states

Exhibit C-11

# Option 2

- Establish and reclassify 2 DPSs – based on dispersal
- Keep endangered outside DPSs
- Involves multiple sequences actions

Exhibit C-12



Option 2

Map 1 - Previous Listing

Endangered in Mexico

Exhibit C-13

# Option 2

Pros
- Could delist GL quickly
- Uses biological delineation
- Captures most dispersers
- Threats analysis over smaller area

Cons
- ████████
- Remaining areas left listed as an endangered DPS
- Might need to plan for recovery
- Left endangered forever

Exhibit C-14

# Option 3

- Option 2- using State boundaries

Exhibit C-15



Exhibit C-16

203

# Future Steps 2 and 3

- Decouple NE – Delist/List
- Establish SW DPS
- Leave remaining States listed indefinitely
- Delist some States as extinct?
- Delist error States
- Establish Recovery Plans for remaining States

Exhibit C-17

# Option 3

Pros

- Could delist GL quickly
- Threats analysis conducted on very small area
- Strong State support from 6 States

Cons

- [redacted]
- Fewer options for managing dispersing wolves
- Remaining states left unresolved
- Wolves may be endangered forever in some States

Exhibit C-18

# Option 4

- Establish and reclassify 1 northern DPS – based on average dispersal distance

- Establish 4(d) rules similar to 10j – with State management

- Separately establish the SW DPS or list as Mexican wolf subspecies

Exhibit C-19



Option 4

Map 1 - Previous Listing

Endangered in Mexico

Exhibit C-20

207

# Option 4

## Pros

- Threats analysis conducted on small area

- Do not have to conduct DPS analysis for two populations

- States could manage species through 4(d)

## Cons

- Will delay delisting in Great Lakes

- Remaining portions of states left unresolved

- Wolves may be endangered forever in some States

Exhibit C-21



Exhibit C-22

*The Humane Society of The United States, et. al. v. Kempthorne, et al.*,
Civil No. 1:07-cv-00677-PLF

Plaintiffs' Motion For Summary Judgment

Declaration of Michael C. Soules

# EXHIBIT D

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2006 WL 2844232 (D.D.C.), 63 ERC 2003
**(Cite as: Not Reported in F.Supp.2d)**

c
Defenders of Wildlife v. Kempthorne
D.D.C.,2006.

United States District Court,District of Columbia.
DEFENDERS OF WILDLIFE, et al., Plaintiffs,
v.
Dirk KEMPTHORNE, et al., Defendants.
**Civil Action No. 04-1230 (GK).**

Sept. 29, 2006.

Eric Robert Glitzenstein, Tanya Sanerib, Meyer
Glitzenstein & Crystal, Washington, DC, for
Plaintiffs.
Kristen Byrnes Floom, U.S. Department of Justice,
Mark Arthur Brown, U.S. Department of Justice,
Wildlife & Marine Resources Section, Washington,
DC, for Defendants.
Thomas R. Lundquist, Crowell & Moring LLP,
Washington, DC, for American Forest & Paper As-
sociation, Intervenor-Defendant.

GLADYS KESSLER, District Judge.

("Lynx IV")

**\*1** Plaintiffs are ten not-for-profit environmental
organizations dedicated to the conservation of en-
dangered species, including the Canada Lynx (*Felis
Lynx Canadensis* ), and one individual who has
been involved with efforts to protect the Lynx since
1989.FN1

> FN1. Plaintiffs are Defenders of Wildlife,
> Northwest Ecosystem Alliance, The Fund
> for Animals, Humane Society of the
> United States, Kettle Range Conservation
> Group, Oregon Natural Resources Council,
> Restore: The North Woods, Superior Wil-
> derness Action Network, American Lands
> Alliance, Center for Biological Diversity,
> and Mark Skatrud.

Defendants, who are sued in their official capacit-
ies, are Dirk Kempthorne, Secretary of the U.S. De-

partment of the Interior (the "Secretary"); Dale
Hall, Director of the U.S. Fish and Wildlife Service
("FWS" or the "Service"); Carlos M. Gutierrez,
Secretary of the U.S. Department of Commerce;
William T. Hogarth, Assistant Administrator for
Fisheries, National Oceanic and Atmospheric Asso-
ciation ("NOAA"); and Mike Johanns, Secretary of
the U.S. Department of Agriculture ("USDA").FN2
In addition, the American Forest and Paper Associ-
ation ("AFPA") has intervened in support of the
Defendants.

> FN2. When Plaintiffs initially brought this
> action, Gale Norton was Secretary of In-
> terior and the case was titled *Defenders of
> Wildlife et al. v. Norton et al.*. In the
> months since this case was filed, there has
> been significant turnover in the executive
> branch. On May 26, 2006, for instance,
> Dirk Kempthorne succeeded Norton. Pur-
> suant to Federal Rule of Civil Procedure
> 25(d)(1), the Court has automatically sub-
> stituted Kempthorne, Hall, Gutierrez, and
> Johanns for their predecessors in office
> who were originally named as Defendants
> in this action.

Plaintiffs bring two distinct claims against Defend-
ants. First, in the latest chapter of an almost decade-
long dispute, they allege that FWS violated a 2002
Order of this Court requiring them to explain their
finding that "collectively, the Northeast, Great
Lakes, and Southern Rockies do not constitute a
significant portion" of the distinct population seg-
ment ("DPS") of the Lynx, and therefore that the
Lynx should not be listed as "endangered" under
the Endangered Species Act ("ESA"), 16 U.S.C. §§
1531 *et seq.*.

Second, Plaintiffs challenge a set of regulations is-
sued in 2003 by several federal agencies including
Interior, Commerce, and FWS, known as the "Joint
Counterpart Endangered Species Act Section 7
Consultation Regulations" ("Counterpart Regula-
tions" or "the Regulations.") *See* 68 Fed.Reg.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit D-01

Not Reported in F.Supp.2d                                                                                          Page 2
Not Reported in F.Supp.2d, 2006 WL 2844232 (D.D.C.), 63 ERC 2003
(Cite as: Not Reported in F.Supp.2d)

68254 (Dec. 8, 2003). According to Plaintiffs, the Regulations are invalid under the ESA, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 1332 et seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq..

This matter is now before the Court on Plaintiffs' Motion for Summary Judgment [Dkt. # 36] and Defendants' Cross Motion for Summary Judgment [Dkt. # 39]. Upon consideration of the Motions, Oppositions, and Replies, and the entire record herein, and for the reasons stated below, Plaintiffs' Motion for Summary Judgment is **granted in part and denied in part** and Defendants' Cross Motion for Summary Judgment is **granted in part and denied in part.**

## I. FACTUAL AND PROCEDURAL BACK-GROUND[FN3]

> FN3. Pursuant to Local Civil Rule 7(h), "[i]n determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."Accordingly, unless otherwise noted, all facts are taken from the parties' Statements of Material Facts Not in Dispute.

### A. Statutory Framework

### 1. The Endangered Species Act ("ESA")

The ESA is the " 'most comprehensive legislation for the preservation of endangered species ever enacted by any nation.' " *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 698 (1995) (quoting *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 180 (1978)). When Congress enacted the statute in 1973, it intended to bring about the "better safeguarding, for the benefit of all citizens, [of] the Nation's heritage in fish, wildlife, and plants." See16 U.S.C. § 1531(a)(5). Having found that a number of species of fish, wildlife, and plants in the United States had become

extinct "as a consequence of economic growth and development untempered by adequate concern and conservation," Congress enacted the ESA in order to "provide a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species." *Id.* § 1531.

**\*2** The Act imposes certain responsibilities on the Secretary of the Interior who has in turn delegated day-to-day authority for its implementation to FWS, an entity within Interior. See16 U.S.C. § 1531(b); 50 C.F.R. § 402.01(b). The ESA's protection of a species and its habitat is triggered only when FWS "lists" a species in danger of becoming extinct as either "endangered" or "threatened." See16 U.S.C. § 1533. The Act defines a "species" as "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature."*Id.* § 1532(16). FWS has issued a "Vertebrate Population Policy" delineating the circumstances under which the Service will list a "distinct population segment" or "DPS" of a species. See 61 Fed.Reg. 4722.

A species is "endangered" when it is in "danger of extinction throughout all or a significant portion of its range."16 U.S.C. § 1532(6). When a species is "likely to become an endangered species within the foreseeable future," the statute defines it as "threatened." *Id.* § 1532(20).

Endangered species are entitled to greater legal protection under the ESA than threatened species. For any species listed as endangered, the ESA makes it unlawful for any person to "import any such species into, or export any such species from, the United States," or to "take any such species within the United States."*Id.* § 1538(a)(1)(A), (B). Under the statute, the term "take" includes "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."*Id.* § 1532(19). For species that are listed as threatened, rather than endangered, the Secretary of the Interior "may," but is not required to, extend

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit D-02

Not Reported in F.Supp.2d                                                                                                    Page 3
Not Reported in F.Supp.2d, 2006 WL 2844232 (D.D.C.), 63 ERC 2003
**(Cite as: Not Reported in F.Supp.2d)**

these prohibitions on taking and export. *Id.*§ 1533(d).

When FWS lists a species, it is also required to "concurrently" designate "critical habitat" for that species, unless it determines that such habitat "is not then determinable." *Id.*§ 1533(a)(6)(C). Critical habitat includes those specific areas which are presently "occupied by the species ... on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection."*Id.*§ 1532(5)(A)(i). Critical habitat may also include habitat that is unoccupied by the species at the time of the listing if FWS determines that such areas are "essential for the conservation of the species."*Id.*

Pursuant to Section 7(a)(2) of the ESA, once a species is listed as endangered or threatened, each federal agency that takes or authorizes an action that may affect that species must "insure," in "consultation" with either FWS or the National Marine Fisheries Service ("NMFS") (collectively the "Services"), that any such action "is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of [the species' designated critical] habitat."*Id.* § 1536(a)(2). As a practical matter, these consultation requirements apply primarily to "Action Agencies" such as the United States Forest Service ("USFS"), the Bureau of Land Management ("BLM"), the Army Corps of Engineers, and the Environmental Protection Agency.

**\*3** FWS promulgated the default Section 7 consultation procedures and Congress later codified them in the 1978 ESA Amendments. See 50 C.F .R. §§ 402.10 et al.; see also 1978 U.S.C.C.A.N. at 9462. Under the 1978 Amendments, an Action Agency bears the responsibility for determining whether its actions "may affect listed species or critical habitat."50 C.F.R. § 402.14(a). If the Agency makes the threshold determination that there is a possibility of such an effect, it must begin informal consultation with one of the Services.*Id.*

The Action Agency may proceed only if, after evaluating the proposed action, the Agency determines that it "is not likely to adversely affect any listed species or critical habitat" and the relevant Service issues a written concurrence with that determination. *Id.* § (b)(1).

If, however, the Action Agency determines that there is a possibility of adverse impact, it must engage in formal consultation with the relevant Service. That process requires the Service to prepare a detailed Biological Opinion describing whether, and if so how, the proposed action "is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat."*Id.* § (g)(4). If the Service finds that the action under review will jeopardize the continued existence of the species or destroy or "adversely modify" its critical habitat, the Service must set forth "reasonable and prudent alternatives" to avoid those results. *Id .* § (h)(3).

### 2. The National Environmental Policy Act ("NEPA")

The NEPA requires officials engaged in "major Federal actions" to complete an environmental assessment ("EA") that evaluates the action's potential environmental impacts and determines whether the statute's mandate for preparation of a more comprehensive environmental impact statement ("EIS") has been triggered. *See*42 U.S.C. § 4332(C)."If a finding of no significant impact is made after analyzing the EA, then preparation of an EIS is unnecessary."*Sierra Club v. U.S. Dep't of Transp.,* 753 F.2d 120, 126 (D.C.Cir.1985) (citing 40 C.F.R. § 1501.4(e)). If such a finding is made, however, the agency must offer an adequate explanation of its conclusion. *See Humane Society of the United States v. Hodel,* 840 F.2d 45, 61-62 (D.C.Cir.1988).

Our circuit employs a four-part test to evaluate the adequacy of agency findings that an action will have no significant environmental impact. That test considers: (1) whether the agency took a "hard look" at the problem; (2) whether the agency identi-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 4
Not Reported in F.Supp.2d, 2006 WL 2844232 (D.D.C.), 63 ERC 2003
**(Cite as: Not Reported in F.Supp.2d)**

fied the relevant areas of environmental concern; (3) as to the problems studied and identified, whether the agency made a convincing case that the impact was insignificant; and (4) if there was an impact of true significance, whether the agency convincingly established that changes in the project sufficiently reduced that impact to a minimum. *See id.* at 62.As our Court of Appeals explained in *Public Citizen v. Nat'l Highway Traffic Safety Admin.,* 848 F.2d 256, 267 (D.C.Cir.1988), a court's role in reviewing "no significant impact" determinations is "to ensure, primarily, that no arguably significant consequences have been ignored ...".

### B. Plaintiffs' Canada Lynx Claim

**\*4** Efforts to secure "endangered" status for the Canada Lynx-and the attendant legal protections for its habitat-have been ongoing for more than twenty years. The history of Lynx-related litigation in this and other federal courts is documented in this Court's last opinion on the matter. *See Defenders of Wildlife et al. v. Norton et al.,* 239 F.Supp.2d 9 (D.D.C.2002) ("Lynx III"). As a result, the Court will limit its discussion here to the immediately-relevant facts.

### 1. The Canada Lynx

The Lynx is a medium-sized cat comparable in size to a bobcat. It is distinguished from other cats of similar size by its long legs and large paws, which make it particularly well-adapted for hunting in deep snow. *See* 65 Fed.Reg. 16052 ("Lynx Final Rule"). In contrast to the bobcat, coyote, and other predators, which consume a variety of animals, the Lynx is a "specialized carnivore" that depends heavily on one particular prey-the snowshoe hare. *See id.*

The North American range of the Lynx currently extends from Alaska, through Canada, and into the northern part of the contiguous United States. *See id.* In Canada and Alaska, Lynx inhabit the boreal forest ecosystem; in the contiguous United States, the distribution of the Lynx is associated with the southern boreal forest, including subalpine coniferous forest in the West and mixed coniferous/decidu-

ous forest in the East. *See id.*

In the lower forty-eight states, Lynx range extends over four different regions: (1) the Northeast, (2) the Great Lakes, (3) the Southern Rocky Mountains, and (4) the Northern Rocky Mountains/Cascades. *See id.* at 16054. There is evidence that the Lynx may currently have been eradicated, or in ESA parlance "extirpated," from New Hampshire, Vermont and New York in the Northeast region, and from Colorado and southeastern Wyoming in the Southern Rockies region. The largest presence of Lynx population in the contiguous United States is in the Northern Rocky Mountains/Cascades region. *Id.* at 16055-59.

### 2. The Lynx's listing history

On July 8, 1998, after this Court had found procedural deficiencies in the Service's earlier consideration of the Lynx's status, FWS published a proposed rule to list as "threatened" the "contiguous U.S. distinct population segment of the Canada [L]ynx." 63 Fed.Reg. 36994 (July 8, 1998). It determined that this population is in jeopardy from "human alteration of forests, low numbers as a result of past overexploitation, expansion of the range of competitors ... and elevated levels of human access into [L]ynx habitat."*Id.*

In finding that the U.S. population should be listed, the Service found that

[b]ased on historic observations, trapping records and other evidence available to the Service at this time, the Service finds that, historically, Canada Lynx were resident in 16 of the contiguous United States. The overall numbers and range of Canada Lynx in the contiguous United States are substantially reduced from historic levels. Currently, resident populations of Lynx likely exist in Maine, Montana, Washington, and possibly Minnesota. States with recent records of individual Lynx sightings, but possibly no longer sustaining self-supporting populations, include Wisconsin, Michigan, Oregon, Idaho, Wyoming, Utah, and Colorado. Lynx may be extirpated from New Hampshire, Vermont, New York, Pennsylvania, and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit D-04

Not Reported in F.Supp.2d                                                                Page 5
Not Reported in F.Supp.2d, 2006 WL 2844232 (D.D.C.), 63 ERC 2003
(Cite as: Not Reported in F.Supp.2d)

Massachusetts.

**\*5** *Id.* at 37007.

On March 24, 2000, FWS published the Lynx Final Rule, listing as "threatened" the contiguous United States DPS of the Lynx. *See* 65 Fed.Reg. 16052 (Mar. 24, 2000). In so doing, the Service declared that "[c]ollectively, the Northeast, Great Lakes, and Southern Rockies do not constitute a significant portion of the range of the DPS," and "do [ ] not contribute substantially to the persistence of the contiguous United States DPS."*Id.* at 16066-67.

Plaintiffs brought suit again in this Court on December 14, 2000, challenging the Rule as arbitrary and capricious and therefore invalid under the APA. Specifically, Plaintiffs attacked FWS's finding that three of the four regions comprising the Lynx's historic range were not a "significant portion" of that range. *See Defenders of Wildlife,* 239 F.Supp.2d at 18.

Because the ESA does not define the term "significant," the Court utilized a dictionary definition that it found to be consistent with the statute's purpose: "a noticeably or measurably large amount."*Id.* at 19.Finding that "[i]t is difficult to discern the logic in the Service's conclusion that three large geographical areas, which comprise three-quarters of the Lynx's historical [habitat in the contiguous United States], are not a 'noticeably or measurably large amount of the species' range,'" the Court held that FWS had indeed violated the APA. *See id.* at 21 (internal citation omitted). This conclusion comported with a persuasive case from the Ninth Circuit in which the court interpreted the ESA to mean that a "species could be 'extinct throughout a significant portion of its range if there are major geographical areas in which it is no longer viable but once was.' " *Id.* at 20 (quoting *Defenders of Wildlife v. Norton,* 258 F.3d 1136, 1145 (9th Cir.2001).

The Court set aside the Lynx Final Rule, remanded the case "for reconsideration and explanation," and ordered the Service, at a minimum, to "explain its conclusion that the area in which the Lynx can no longer live is 'not a significant portion of its range.' " *Id.* (internal citation omitted).

### 3. The instant litigation

Following the Court's remand, FWS published a Notice in the Federal Register on March 17, 2003 indicating that it was "opening a comment period on the contiguous United States [DPS] of the Canada Lynx" pursuant to the Court's Order. 68 Fed.Reg. 12611 (Mar. 17, 2003). The Service indicated that it was "re-evaluating the determination that 'collectively the Northeast, Great Lakes, and Southern Rockies do not constitute a significant portion of the range of the [L]ynx DPS."*Id.*It invited public comments on the quality of [L]ynx habitat," the "quantity of [L]ynx habitat," and "other elements concerning the significant portion of the range of the [L]ynx."*Id.* at 12612. The Service further stated that it would examine "information that had become available since" the Lynx Final Rule was published in 2000, including new research on the historical occurrence of the species, as well as its current status, in the Northeast, Great Lakes, and Southern Rockies. *Id.*

**\*6** The comment period lasted through April 2003, during which time FWS received 118 comments from a variety of sources and covering a "broad spectrum of Lynx-related issues." 68 Fed.Reg. 40080 (July 3, 2003). FWS published a "Notice of Remanded Determination of Status for the Contiguous United States Distinct Population Segment of the Canada Lynx" (the "Remanded Determination") on July 3, 2003. *See id.* at 40076.The twenty-five page Notice concluded with numerous findings including, most notably for purposes of this case, that the contiguous United States DPS of [L]ynx is not in danger of extinction throughout a significant portion of its range within the Northeast, Great Lakes, or Southern Rockies and therefore does not warrant reclassification to 'endangered' status in all or a significant portion of its range within these areas.

*Id.* at 40101.As a result, the Service's 2000 listing of the Lynx as "threatened" remained intact.

As required by the ESA's citizen suit provision, 16

Exhibit D-05

Not Reported in F.Supp.2d                                                                    Page 6
Not Reported in F.Supp.2d, 2006 WL 2844232 (D.D.C.), 63 ERC 2003
**(Cite as: Not Reported in F.Supp.2d)**

U.S.C. § 1540(g), Plaintiffs informed Defendants that they intended to seek judicial review of the Remanded Determination by letter dated March 11, 2004. They noted there, and argue in their instant Motion, that the remanded determination "never squarely answers the specific issue remanded by the Court" and that "even the 'new' evidence discussed in the finding underscores the tenuous status of the Lynx throughout ... its range in the U.S."

Plaintiffs filed the instant Complaint on July 20, 2004. With respect to their Lynx claim, they ask the Court (1) to declare that the Service's July 3, 2003 Remanded Determination violates the ESA and the APA; and (2) to set aside and remand that Determination to FWS for additional consideration. *See* First Am. Compl. at 48.

### C. Plaintiffs' Challenge to the Counterpart Regulations

#### 1. The "Healthy Forests Initiative"

After the severe summer wildfire season of 2000, President William J. Clinton directed Interior and USDA to develop new strategies for reducing the risk of wildfires on national forest and parklands. *See* 68 Fed.Reg. 68255 (Dec. 8, 2003). Accordingly, on September 8, 2000, the Departments issued a report titled "Managing the Impact of Wildfires on Communities and the Environment." According to Defendants, the strategies contained in that report, together with its budget requests and directives, comprise a "National Fire Plan," ("NFP") that is a comprehensive, interagency effort designed to "reduce risk to communities and natural resources from wildland fires." *See* Defs.' Statement of Material Facts § 13.

Following another season of severe wildfires, President George W. Bush announced his "Healthy Forests Initiative" in a speech delivered August 22, 2002. According to a policy document that accompanied the President's speech, the Initiative would "accelerate implementation of the fuels reduction ... goals of the NFP" by substantially increasing the number of acres of national forestland "treated," or thinned, each year. *See* 68 Fed.Reg. 68255 (Dec. 8,

2003). A significant part of that effort would involve "reducing unnecessary regulatory obstacles," to the prompt approval of NFP projects. *See id.*

#### 2. The Counterpart Regulations

*7 On June 5, 2003, Interior, Commerce, FWS, the National Marine Fisheries Service ("NMFS"), and several additional agencies published a Proposed Rule in the Federal Register. *See* 69 Fed.Reg. 33806 (June 5, 2003). It explained that as part of President Bush's Healthy Forests Initiative, the agencies intended to adopt "Counterpart Regulations" that would "provide an optional alternative to the existing [ESA] Section 7 consultation process" for "projects that support the NFP." *Id.* The agencies claimed that the default Section 7 procedures require extensive and time-consuming interagency consultation even on "projects that had only insignificant or beneficial effects on listed species." *Id.* at 3308. The proposed procedures, by contrast, would "reduce delays" on fire management projects by "eliminating the requirement for written concurrences [from FWS or NMFS] for actions within the scope of" the NFP. *Id.*

Under the proposed regulations, a federal Action Agency would be able to enter into an "Alternative Consultation Agreement" ("ACA") with FWS, NMFS, or both. The ACA would include, *inter slia:* (1) a list of the staff members within the Action Agency who would have the authority to make a determination that proposed projects are "not likely to adversely affect" ("NLAA") a listed species and therefore do not require formal consultation under Section 7; (2) a program for training those staff members to make NLAA determinations; and (3) a program by which FWS or NMFS would periodically monitor the Action Agency's actions under the Counterpart Regulations. *See id.* at 33809.

An Action Agency working pursuant to an ACA could make an NLAA determination, and proceed on its proposed action, without undertaking informal consultation with the relevant Service, and without receiving a written NLAA concurrence from that Service. If, however, the Action Agency

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit D-06

Not Reported in F.Supp.2d                                                                                    Page 7
Not Reported in F.Supp.2d, 2006 WL 2844232 (D.D.C.), 63 ERC 2003
**(Cite as: Not Reported in F.Supp.2d)**

makes a determination that the action is likely to have an adverse impact, the default requirement for formal consultation with one of the Services would apply.

On September 30, 2003, the FWS and NMFS issued a six-page Environmental Assessment ("EA") to accompany the proposed Counterpart Regulations. The EA stated that FWS and NMFS believed that Action Agencies working under an ACA would "reach the same NLAA determination that [FWS or NMFS] would reach" if either were consulted on any given project. *See*Counterpart Regulations Admin. R. Vol. 4 at G180. Because FWS and NMFS determined that adoption of the Counterpart Regulations would have no appreciable environmental impact, they concluded that issuance of the EA satisfied their duties under NEPA and that the preparation of a more detailed Environmental Impact Statement was unnecessary. *Id.*

The relevant agencies promulgated a Final Rule adopting the Counterpart Regulations on December 8, 2003 after receiving over 50,000 comments. *See*68 Fed.Reg. 68254 (Dec. 8, 2003). As codified, the Counterpart Regulations are virtually identical to those proposed in June 2003. *See*50 C.F.R. §§ 402.30-.34.

### 3. The instant litigation

*8 As noted *supra,* Plaintiffs filed this case on July 22, 2004. With respect to the Counterpart Regulations,[FN4] Plaintiffs seek a declaratory judgment that the Regulations violate the ESA, APA, and NEPA and an Order setting aside and remanding them to the agencies. *See* First Am. Compl. at 48. Defendants answered on December 13, 2004 and filed the instant Administrative Record for this case on February 11, 2005. The instant Motions-Plaintiffs' Motion for Summary Judgement [Dkt. No. 36] and Defendants' Cross Motion for Summary Judgment [Dkt. No. 39]-were filed on May 3, 2005 and June 3, 2005, respectively.

> FN4. Throughout their briefs, Plaintiffs describe the regulations at issue as the "Self-Consultation Regulations." While

that term has a certain intuitive appeal, the Court will use their official name, the "Joint Counterpart Regulations" or "Counterpart Regulations." *See*50 C.F.R. §§ 402.30-.34.

### II. STANDARD OF REVIEW

Summary judgment will be granted when the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits or declarations, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.Fed.R.Civ.P. 56(c). A fact is "material" if it might affect the outcome of the action under the governing law. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, a "court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."*Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000); *see also Washington Post Co. v. U.S. Dep't of Health and Human Servs.,* 865 F.2d 320, 325 (D.C.Cir.1989). Ultimately, a court must determine "whether the evidence presents a sufficient disagreement ... or whether it is so one-sided that one party must prevail as a matter of law."*Anderson, 477 U.S. at 251-52.* "If material facts are susceptible to divergent inferences, summary judgment is not available."*Coward v. ADT Sec. Sys. Inc.,* 194 F.3d 155, 158 (D.C.Cir.1999).

Plaintiffs bring this case under the ESA's citizen suit provision, 16 U.S.C. § 1540(g), and under the APA, 5 U.S.C. § 706(2)(A). The APA's deferential standard of review authorizes a court to set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law."*See*5 U.S.C. § 706(2)(A). Courts may not substitute their judgment for that of the agency, *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971), and must limit the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit D-07

Not Reported in F.Supp.2d                                                                          Page 8
Not Reported in F.Supp.2d, 2006 WL 2844232 (D.D.C.), 63 ERC 2003
**(Cite as: Not Reported in F.Supp.2d)**

scope of their review to the administrative record. *See Camp v. Pitts,* 411 U.S. 138, 142 (1973). A court's role is to ensure that the agency's decision is based on relevant factors and not a "clear error of judgment." *Id.* If the "agency's reasons and policy choices ... conform to 'certain minimal standards of rationality' ... the rule is reasonable and must be upheld."*Small Refiner Lead Phase-Down Task Force v. E.P.A.,* 705 F.2d 506, 521 (D.C.Cir.1983) (citation omitted).

In exercising its narrowly-defined review, a court must consider whether the agency acted within the scope of its legal authority, based its decision on facts in the record, considered the relevant factors, and adequately explained its decision. *Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 378 (1989); *Citizens to Preserve Overton Park,* 401 U.S. at 415;*Professional Drivers Council v. Bureau of Motor Carrier Safety,* 706 F.2d 1216, 1220 (D.C.Cir.1983).

**\*9** The deference a court must accord is not unlimited, however. For example, the presumption of agency expertise may be rebutted if its decisions are not reasoned. *See ALLTEL Corp. v. F.C.C.,* 838 F.2d 551, 562 (D.C.Cir.1988). Where an agency fails to articulate "a rational connection between the facts found and the choice made,"*Baltimore Gas & Elec. Co. v. Natural Res. Defense Council, et al.,* 462 U.S. 87, 88 (1983), the Court " 'may not supply a reasoned basis for the agency's action that the agency itself has not given.' " *Dithiocarbamate Task Force v. E.P.A.,* 98 F.3d 1394, 1401 (D.C.Cir.1996) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)). If an agency fails to articulate a rational basis for its decision, it is appropriate for a court to remand for reasoned decision-making. *See, e.g., Association of Civilian Technicians v. Federal Labor Relations Auth.,* 370 F.3d 1214 (D.C.Cir.2004); *Carlton v. Babbitt,* 900 F.Supp. 526, 533 (D.D.C.1995).

### III. ANALYSIS

### A. Plaintiffs' Canada Lynx Claim

### 1. Plaintiffs have standing to challenge the Lynx Remanded Determination

As noted above, Lynx-related litigation has been before this Court for nearly a decade and this is the Court's fourth Memorandum Opinion regarding the Lynx listing. With one exception, the Plaintiffs litigating this case have participated in every previous Lynx case the Court has considered.[FN5] For the first time, however, the Government now contends that Plaintiffs do not have standing to bring this suit.[FN6]

> FN5. The American Lands Alliance did not participate in the original Lynx case.
>
> FN6. Because standing is a component of the constitutional requirement of justiciability, Defendants' failure to raise the issue in earlier cases does not preclude them from doing so now. It is notable, however, that despite having three previous opportunities, the Government has never suggested that Plaintiffs do not have standing to challenge its decisions regarding the Lynx's status under the ESA.

Plaintiffs claim that they have "concrete interests in Lynx survival and recovery" and have produced several affidavits demonstrating those interests. *See* Pls.' Mot. for Summ. J. at 7. While Defendants concede that Plaintiffs' "numerous affidavits show that [they] have 'recreational, aesthetic, and professional interests' in the Lynx," they argue that Plaintiffs nevertheless lack standing because they cannot establish any actual or imminent injury. Defs.' Reply at 1-2. In brief, Defendants maintain that because "FWS regulations extend to threatened species virtually all of the protections of **endangered species**," Plaintiffs cannot establish that they suffered any particularized injury arising out of the Service's determination that "the [L]ynx 'does not warrant **reclassification** to endangered in all or a significant portion of its range'" but should instead remain listed as threatened. Defs.' Mot. for Summ. J. at 17.

According to Plaintiffs, there are substantive differ-

Exhibit D-08

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2844232 (D.D.C.), 63 ERC 2003
**(Cite as: Not Reported in F.Supp.2d)**

Page 9

ences in the protections afforded species that are listed as "endangered" rather than "threatened." *See* Pls.' Opp'n and Reply at 7. They claim that a decision by FWS to list the Lynx as "endangered," rather than maintain its "threatened" status, would have several concrete effects, including the preservation of larger areas of critical habitat in order to ensure that the species can "recover." *Id.* at 8. As a result, they claim to have been injured by the Remanded Determination.

**\*10** Article III limits federal jurisdiction to actual cases and controversies, and "[t]hree inter-related judicial doctrines-standing, mootness, and ripeness-ensure that federal courts assert jurisdiction only over" such disputes. *Worth v. Jackson,* 451 F.3d 854, 855 (D.C.Cir.2005). Standing is therefore one of the bedrock requirements any litigant seeking relief in federal court must satisfy. *See Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472 (1982). The "irreducible constitutional minimum" of standing requires plaintiffs to demonstrate that they have suffered an "injury in fact" that is "caused by the challenged conduct and redressable through relief sought from the court."*Shays et al. v. F.E.C.,* 414 F.3d 76, 83 (D.C.Cir.2005).

The first element of standing, "injury-in-fact," requires a plaintiff to allege a concrete, imminent, and particular injury that is neither speculative nor generalized. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992). To meet the second requirement, causation, plaintiffs must establish that there is a "fairly traceable" causal connection between the injury complained of and the Defendant's conduct. *See id.*The third and final element, redressability, requires a showing that it is " 'likely,' as opposed to merely 'speculative,' " that favorable judicial action will redress any harm Plaintiff has suffered. *Id.* at 561 (internal citation omitted); *see also The Wilderness Soc'y v. Norton,* 434 F.3d 584, 590 (D.C.Cir.2006).

The Court concludes that FWS' s decision to maintain the Lynx's status as "threatened," rather than designate it as "endangered," caused concrete and particularized injury to Plaintiffs' interests in the species, therefore giving them standing, in at least three ways. First, the ESA prohibits the taking, importation, or export of an endangered species, but merely permits agencies-in their discretion-to enforce those same prohibitions as to threatened species. *See*16 U.S.C. § 1533(d). The statute makes a facial distinction between the two designations and mandates greater protections for endangered species. Accordingly, FWS's decision to maintain the Lynx's "threatened" status excludes the species from the full range of mandatory ESA protections.

Second, while FWS does currently extend to threatened species the majority of ESA protections normally reserved for endangered ones, not all such protections have been extended. *See*50 C.F.R. § 17.31. To cite one example, state conservation agency officials may take endangered species only under certain limited conditions; by contrast, far fewer limits are placed on the ability of those officials to take threatened species. *See id.* § 17.21(c)(5). In addition, the Service could change course at any time, change its Regulations, and cease extending to threatened species those protections that are not specifically mandated by the ESA.

**\*11** Third, and finally, Defendants concede that there is at least one important distinction between endangered and threatened species: the Services designate, and therefore preserve, larger areas of critical habitat for the former than they do for the latter. *See* Defs.' Reply at 4. As a result, Plaintiffs are correct that the designation of the Lynx as endangered rather than threatened would "have a significant bearing on the amount of 'critical habitat' that must be protected" in order to ensure the survival of the species. Pls.' Opp'n and Reply at 7.

Given these important differences in the status of, and legal protections accorded to, endangered and threatened species, there can be no real question that Plaintiffs, who have cognizable interests in the Lynx and its habitat, have been injured by FWS's determination that the species should remain listed as threatened. They therefore have standing to challenge that determination on the merits.[FN7]

Exhibit D-09

Not Reported in F.Supp.2d                                                                    Page 10
Not Reported in F.Supp.2d, 2006 WL 2844232 (D.D.C.), 63 ERC 2003
**(Cite as: Not Reported in F.Supp.2d)**

FN7. The Court need not address causation or redressability because those elements of standing are not in dispute.

### 2. The Remanded Determination of the Lynx's Status Violates the Court's 2002 Order Because FWS Failed to Squarely Address the Issue Remanded to It

Plaintiffs argue that the Remanded Determination "fail[s] to address the specific issue remanded by the Court," namely whether "[c]ollectively the Northeast, Great Lakes, and Southern Rockies do not constitute a significant portion" of the lynx's range in the contiguous United States. Pls.' Mot. for Summ. J. at 36. Instead, they claim, "defendants took it upon themselves to resolve a different issue entirely-whether the [l]ynx is 'in danger of extinction throughout a significant portion of its range within the Northeast, Great Lakes, and Southern Rockies.'" Pls.' Opp'n and Reply at 25. According to Plaintiffs, it was not within FWS's discretion to consider that issue on remand, and, even if it had been, the Service failed to do so properly.[FN8]

FN8. Specifically, Plaintiffs argue that FWS failed to solicit public comments on whether the Lynx is in danger of extinction throughout a significant portion of its range within the Northeast, Great Lakes, and Southern Rockies. Because the Court holds that Defendants did not squarely address the specific issue that was remanded to it, necessitating yet another remand for further proceedings, it is not necessary to address the adequacy of the notice and comment procedures followed in FWS's consideration of the alternative issue. The Court notes, however, that at least one FWS employee, Randal Bowman, indicated in a March 2003 email that he shared many of Plaintiffs' concerns regarding the sufficiency of the notice and comment process. *See* Lynx Remand Admin. R. at 2659 (Mar. 3, 2003 email from Randal Bowman)("I have serious concerns with ... respect to what we are asking in the way of

public comment ... It is not at all clear to me ... how our considering only quality and quantity of lynx habitat, and requesting comment only on these factors and on data we have posted on the internet, allows us or the public to provide meaningful comment on the question of whether 3 of the 4 regions within the DPS constitute a significant portion of the lynx's range, as required by the court.").

Defendants concede that the Remanded Determination does not "attempt[ ] to defend the determination that the Court had found to be 'counterintuitive and contrary to the plain meaning of the ESA.'" Defs.' Cross Mot. for Summ. J. and Opp'n. Instead, they argue that FWS properly decided to "take an alternative approach" and "go beyond the narrow issue that was specifically raised by the Court."*See id.* at 30-31.Accordingly, FWS "reconsidered the listing rule" in its entirety. *Id.* at 29.The issue is whether FWS's Remanded Determination satisfies the Court's Order.

An administrative agency ordered to reconsider or explain a prior decision retains some discretion to determine how it "may best proceed to develop the needed evidence and how its prior decision should be modified in light of such evidence as develops."*Federal Power Comm'n v. Transcontinental Gas Pipe Line Corp.,* 423 U.S. 326, 333-34 (1976). A court may not dictate to the agency the "methods, procedures, [or] time dimension," for its reconsideration. *SEC v. Chenery Corp.,* 318 U.S. 194, 196 (1947). Nor may a court demand that an agency reach a particular result. *See id.; see also Nat'l Tank Truck Carriers v. E.P.A.,* 907 F.2d 177, 185 (D.C.Cir.1990) ("We will not, indeed we cannot, dictate to the agency what course it must ultimately take.").

**\*12** Nevertheless, an agency faced with a remand order has an affirmative duty to respond to the specific issues remanded. *See, e.g., Tex Tin Corp. v. E.P.A.,* 992 F.2d 353, 355 (D.C.Cir.1993)(holding that the agency violated its remand order by failing to explain the specific issue remanded); *Association*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit D-10

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2844232 (D.D.C.), 63 ERC 2003
**(Cite as: Not Reported in F.Supp.2d)**

Page 11

*of Civilian Technicians v. Federal Labor Relations Auth.*, 370 F.3d 1214, 1223 (D.C.Cir.2004) (ordering a second remand because the agency failed to address adequately the issues remanded in the first instance). A court retains jurisdiction to enforce the terms of its remand order when an agency fails to meet them. *See International Union, United Auto., Aerospace, & Agric. Implement Workers of America, U.A.W. v. O ,S.H.A.*, 976 F.2d 749, 750 (D.C.Cir.1993).

The Court's instructions in its December 2002 Memorandum Opinion and Order were clear and unambiguous. Because it found FWS's determination that "collectively, the Northeast, Great Lakes, and Southern Rockies do not constitute a significant portion of the range of the [United States] DPS" to be arbitrary and capricious, it ordered the agency "[a]t a minimum, [to] *explain* such an interpretation that appears to conflict with the plain meaning of the phrase 'significant portion.' " *Defenders of Wildlife*, 239 F.Supp.2d at 19 (emphasis added). Asking the same question in a slightly different way, the Court further instructed FWS to, "*explain* [its] conclusion that the area in which the [Lynx] can no longer live is not a significant portion of its range."*Id.* at 21 (emphasis added)(internal citation and quotation omitted).

There can be no question that the agency's primary duty on remand was to explain its earlier finding that the Court held to be inconsistent with the ESA: that the Northeast, Great Lakes, and Southern Rockies, three of the four regions that the Lynx has historically populated, do not "collectively" constitute a "significant portion" of the animal's total range within the contiguous United States. Nevertheless, in the course of a twenty-five page Remanded Determination, FWS presents no coherent explanation for that finding. Instead, FWS addresses an issue that is both conceptually and semantically distinct from the one remanded: whether the Lynx is in danger of extinction throughout a significant portion of its range within the Northeast, Great Lakes, and Southern Rockies.

The Court asked FWS to explain how three-fourths

of what it had previously identified as the Lynx's total range in the contiguous United States could not be "significant." [FN9] Instead, FWS chose to address the Lynx's status within those discrete areas, and to present a different rationale for its final justification in the remand of its listing decision.[FN10] While FWS retained the discretion to determine "how its prior decision should be modified in light of such evidence as develops,"*Transcontinental Gas Pipeline Corp.*, 423 U.S. at 333-34, it may not ignore the Court's order for an explanation of an important finding in that prior decision, especially when the explanation (or even the modification or rejection of that explanation) may be relevant to the new rationale it is offering for that decision.

> FN9. The Court notes that FWS did include some discussion of the term "significant" in the Remanded Determination. That discussion, however, is wholly unsatisfactory. The Court previously found that FWS's use of the term was inconsistent with the language and purpose of the ESA and thus was an invalid exercise of statutory interpretation. *See Defenders of Wildlife*, 239 F.Supp.2d at 20. On remand, the Service once again defined " 'significant' to mean 'important' " rather than "noticeably or measurably large," as the Court had defined the term. *See*68 Fed.Reg. at 40076-77 (July 3, 2003). For the reasons it stated in 2002, the Court continues to find the agency's definition unpersuasive. Because this is not a case where deference is due to the Agency's interpretation, moreover, the Court need not and does not accept it. *See International Longshoreman's Ass'n, AFL-CIO v. National Mediation Bd .*, 870 F.2d 733, 736 (D.C.Cir.1989)(holding that no deference is owed to an agency when it "fail[s] to apply an important term of its governing statute").

> FN10. The administrative record makes clear that FWS employees appreciated

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit D-11

Not Reported in F.Supp.2d                                                                        Page 12
Not Reported in F.Supp.2d, 2006 WL 2844232 (D.D.C.), 63 ERC 2003
(Cite as: Not Reported in F.Supp.2d)

their duty to the Court and understood the specific issue that had been remanded. *See, e.g.,*Lynx Remand Admin. R. at 6 (January 21, 2003 email from Ron Refsnider)("We'll need to reexamine the Lynx 'range' and decide if any of the 4 areas-alone or in combination-constitute a significant portion of its range."); *id.* at 166 (April 3, 2003 "Briefing Statement")("In the remand we need to clearly explain how we define the historic and current range of the Lynx ... and dispel the Judge's perception that the range historically was much more extensive."); and *id.* at 870 (May 20, 2003 email from Susan Wilkinson)("The 'significant portion of the range' part is part of the legal definition ... that the Judge in this case specifically wanted us to focus on.").

The record also demonstrates that at least some FWS employees feared that the Remanded Determination was not responsive to the Court's order. *See, e.g., id.* at 870 (May 20, 2003 email from Susan Wilkinson)("I think we are coming to the same conclusion as before but for a different reason."); *id.* at 1618 (June 19, 2003 email from Lori Nordstrom)("I am still concerned that this new direction on the Lynx remand is not what the judge ordered."); and *id.* at 1520 (June 19, 2003 email from Lori Nordstrom) ("I don't have a lot to add to the D[istinct] P[opulation] S[egment] discussion so I'm wondering if maybe we should just bag it for this remand and wait till [sic] the judge tells us to do it again (disappointed sigh).").

**\*13** Where, as here, an agency has utterly failed to abide by the terms of a remand order, a second remand is the only appropriate remedy. Our Court of Appeals addressed a similar factual scenario, and reached the same conclusion, in *Tex Tin Corp. v. E.P.A.. See Tex Tin Corp. v. E.P.A.,* 992 F.2d 353 (D.C.Cir.1993). In that case, the Court criticized the Environmental Protection Agency's ("EPA") analysis underlying its decision to list a hazardous

waste site as a "national priority site" under the federal "Superfund" statute. *See id. at 354.*Specifically, it found fault with EPA's explanation of its conclusion that "arsenic [present at the site] is reasonably likely to be transported via the air route."*Id.* It thus remanded the decision to the agency "for a reasoned explanation of [that] conclusion."*Id.*

On remand EPA again listed the site on the Superfund list, this time offering a new rationale, but did not squarely address the specific issue that was remanded. *See id.* at 355.The Court of Appeals found that the new information provided was "not responsive to [its] remand order," and that "[i]t is too late for the Agency to base its [decision] on a new theory."*Id.* On that basis, the Court remanded the case for a second time, and in fact ordered EPA to take the site off the Superfund list.

While Defendants and Intervenors attempt to draw distinctions between *Tex Tin* and this case, the Court finds their efforts unpersuasive. *See* Defs.' Reply at 16-17; Intervenors' Reply at 20-21. Here, as in *Tex Tin,* the Court ordered an agency to explain on remand a specific technical finding that supported an action taken pursuant to the statute it administers. Likewise, both here and in *Tex Tin,* the agency reached the same substantive determination on remand, presented a new rationale, but neglected to address the specific issue that it had been ordered to explain. Consequently, the Court will order the same remedy the Court of Appeals adopted in *Tex Tin.*

The case will again be remanded to FWS so that it may clearly and specifically address the finding it was ordered to explain three years ago: that "[c]ollectively the Northeast, Great Lakes, and Southern Rockies do not constitute a significant portion of the [Lynx] DPS." Given the lengthy delay in all the proceedings regarding the Lynx listing, the Court expects and hopes that FWS can accomplish its task within 90 days.[FN11]

> FN11. The Court must accept responsibility for part of that delay as the instant Motions have been ripe for well over a year.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit D-12

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2844232 (D.D.C.), 63 ERC 2003
(Cite as: Not Reported in F.Supp.2d)

Page 13

## B. Plaintiffs' Challenge to the Counterpart Regulations

Plaintiffs attack the Counterpart Regulations as invalid under the ESA, APA, and NEPA and seek summary judgment on three grounds. First, they allege that the Regulations violate ESA § 7 by unlawfully enabling Action Agencies such as the BLM or the USFS to bypass their interagency consultation requirements when considering NFP projects. *See* Pls.' Mot. for Summ. J. at 42. Second, Plaintiffs argue that Defendants acted arbitrarily and capriciously, in violation of the APA, by failing to articulate a reasonable explanation of the rationale underlying the Regulations or the evidence supporting them. Third, and finally, they contend that Defendants violated NEPA by promulgating the Regulations after performing an Environmental Assessment when, under the statute, a more comprehensive Environmental Impact Statement should have been developed. *See id.* at 59.

**\*14** In addition to arguing that the Regulations are valid on the merits, Defendants challenge Plaintiffs' standing to bring this claim.[FN12]*See* Defs.' Mot. for Summ. J. at 15. As a threshold matter, therefore, the Court must first consider the standing issue. *See id.* at 16, 25.

> FN12. Defendants also challenge Plaintiffs' claim on ripeness grounds. *See* Defs.' Cross Mot. for Summ. J. and Opp'n at 25-26. Because this argument has so little merit, the Court will address it summarily. The purpose of the ripeness requirement is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."*Abbott Laboratories v. Gardner,* 387 U.S. 136, 148-149 (1967). Specifically, courts look to three factors to determine whether a case is ripe: "(1) whether delayed review

would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented."*Ohio Forestry Ass'n, Inc. v. Sierra Club,* 523 U.S. 726, 733 (1998).

> This case is ripe for three reasons. First, given the ongoing threats to the survival of the Lynx, there is no question that further delay in this already two-year-old case would cause hardship to Plaintiffs. Second, while the Counterpart Regulations are relatively new, FWS published the Final Rule establishing them nearly three years ago. Therefore, judicial intervention at this point would not inappropriately interfere with the formulation of agency policies. Third, and finally, the Counterpart Regulations have been applied at least fourteen times in areas affecting Plaintiffs' interests, and therefore judicial review can be accomplished without further factual development. *See* Pls.' Opp'n and Reply at 21.

### 1. Plaintiffs have standing to challenge the Counterpart Regulations

Defendants offer numerous arguments to support their position that Plaintiffs do not have standing to challenge the Counterpart Regulations. Ultimately, however, it is their characterization of Plaintiffs' claims as "broad, vague, and speculative" that drives Defendants' standing challenge. *See* Defs.' Mot. for Summ. J. at 22. Apart from "pure speculation that the use of the counterpart regulations will increase the risk of some general harm to their interests," Defendants argue, Plaintiffs fail to demonstrate that they have suffered any real injury. *Id.* According to Defendants, it is not enough for Plaintiffs to simply state that they "generally disagree with the counterpart consultation procedures."Defs.' Reply at 6. To establish standing, they must instead demonstrate that the Counterpart Regulations have caused them to suffer a concrete, "personal[,] and particularized injury." *See* Defs.'

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 14
Not Reported in F.Supp.2d, 2006 WL 2844232 (D.D.C.), 63 ERC 2003
**(Cite as: Not Reported in F.Supp.2d)**

Mot. for Summ. J. at 23.

Plaintiffs assert that they have indeed suffered a particularized injury, albeit of a procedural nature. In their view, by allowing Action Agencies to by-pass the Section 7 interagency consultation requirements in certain circumstances, the Counterpart Regulations "represent[ ] a wholesale departure from 'established procedures' ordained by Congress" to protect their "documented interest in [Lynx] habitats." Pls.' Opp'n and Reply at 16. This procedural injury, they contend, is sufficient in itself to confer standing. *See id.* at 17.

The principal elements required to establish standing are outlined above and need not be repeated. Because the injury Plaintiffs claim to have suffered is procedural in nature, a slightly different analysis applies. In procedural injury cases, the plaintiff can establish standing "without meeting all the normal standards for redressibility and immediacy."*Lujan,* 504 at 573 n. 7. Instead, she must merely demonstrate that she is "seeking to enforce a procedural requirement, the disregard of which could impair a separate concrete interest of [hers]."*Id.* at 572.Our Court of Appeals has formulated a two-part test to guide this analysis. The plaintiff must show, first, "that the defendant's acts omitted some procedural requirement," and, second, "that it is substantially probable that the procedural breach will cause [an] essential injury to the plaintiff's own interest."*Florida Audubon Soc'y v. Bentsen,* 94 F.3d 658, 665 (D.C.Cir.1996).

A plaintiff alleging procedural injury, however, "never has to prove that if he had received the procedure the substantive result would be different."*Sugar Cane Growers Coop. v. Veneman,* 289 F.3d 89, 94-95 (D.C.Cir.2002)."All that is necessary is to show that the procedural step was connected to the substantive result."*Id.* In other words, the plaintiff need not "demonstrate that (1) the agency action would have been different but for the procedural violation, [or] (2) that court-ordered compliance with the procedure would alter the final result."*National Parks Conservation Assoc. v. Manson,* 414 F.3d 1, 5 (D.C.Cir.2005).

**\*15** Applying these principles to the facts of this case, the Court concludes that Plaintiffs have demonstrated their standing to challenge the Counterpart Regulations. There is no dispute that Plaintiffs' aesthetic, recreational, and professional interests in the Lynx and its habitat are cognizable. *See Sierra Club v. Morton,* 405 U.S. 727 (1972). There is also no dispute that, pursuant to the Counterpart Regulations, the Action Agencies have already made a number of NLAA determinations on National Fire Plan projects in areas inhabited by the Lynx without engaging in the default Section 7 procedures. What is at issue here is whether there is a causal connection between the omission of such consultation and the injuries Plaintiffs allege.[FN13]

> FN13. The Court notes that for purposes of determining standing, it is the strength of Plaintiffs' allegations of injury that is of primary concern. Whether their substantive legal arguments are ultimately persuasive is not relevant to this analysis.

Without question, Plaintiffs' affiants have demonstrated that they have "concrete interests in Lynx survival and recovery" in areas that have been subject to NLAA determinations under the Counterpart Regulations. *See* Pls.' Mot. for Summ. J. at 7. To take but three examples, affiant Bruce Pendery states that

several areas I regularly use have already been impacted by projects that have gone forward absent the review by the FWS mandated by the ESA. For example, in the Buffalo Ranger District of the Bridger Teton National Forest-an area that I used for recreation, including cross country skiing-the Forest Service "self consulted" under the Counterpart Regulations on the potential impacts on Lynx of the Hathcet-Blackrock Fuels Reduction Project, which will consist of mechanical "thinning" of 300 acres, 231 of which are considered Lynx habitat ... [T]he action agency determined that the projects were "not likely to adversely affect" the Lynx despite potential negative effects ... on the species and its habitat. For example, the thinning and logging operations will harm Lynx by removing suitable habitat....

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 15
Not Reported in F.Supp.2d, 2006 WL 2844232 (D.D.C.), 63 ERC 2003
**(Cite as: Not Reported in F.Supp.2d)**

Pendery Decl. ¶¶ 15-16.

Likewise, affiant Suzanne Stone explains that
several areas I regularly use have already been im-
pacted by projects that have gone forward absent
the review by the FWS mandated by the ESA. For
example, the Whitehawk basin ... is especially im-
portant to me because it is one of my and my fam-
ily's favorite places to visit. The Forest Service,
however, recently approved the Whitehawk White-
bark Pine Restoration Project ... and used the Coun-
terpart Regulations to make a[n NLAA] determina-
tion ... It is my view that [these] large-scale thin-
ning and logging operations will harm Lynx by re-
moving and disturbing suitable habitat, and will im-
pair my interests in this area.

Stone Decl. ¶¶ 11-12.

Finally, affiant Sara Mounsey alleges that
[S]everal areas I regularly use have already been af-
fected by a project called the 57 Bear Paws Fuel
Reduction     Project     that     was     subject     to
"self-consultation" by the Forest Service[ ]. Al-
though projects like this one-which involve logging
and road building-may harm [L]ynx ... the Forest
Service found that the project was "not likely to ad-
versely affect" the[ ] species ... As a consequence
of the FWS being eliminated from the process, op-
portunities to avoid or mitigate impacts on listed
species have been lost....

**\*16** Mounsey Decl. ¶ 10.

Defendants characterize Plaintiffs' injuries as
"premised on speculation and conjecture," Defs.'
Cross Mot. for Summ. J. and Opp'n at 24, and argue
that they have not, as required, "directly alleged
that they have been harmed by any particular
agency actions undertaken pursuant to the ...
[C]ounterpart [R]egulations."Reply at 8. In addition
to being factually inaccurate, this argument mis-
states Plaintiffs' burden at this stage of the proceed-
ings.

To establish standing based on a procedural injury,
Plaintiffs need not demonstrate that any particular
agency action was incorrect or that a different sub-

stantive result would have been reached had the
omitted procedure taken place. *See Sugar Cane
Growers Coop., 289 F.3d at 94-95*. Instead, they
need only show that Defendants "omitted some pro-
cedural requirement" and "that it is substantially
probable" that such omission will "cause [an] es-
sential injury to the plaintiff's ... interest."*Florida
Audubon Soc'y, 94 F.3d at 665*. Plaintiffs have al-
leged, and Defendants have conceded, that the de-
fault procedures for Section 7 consultation were not
applied to certain National Fire Plan Projects in
Lynx habitat. Plaintiffs therefore have standing if it
is "substantially probable" that their interests were
affected by the lack of such consultation.

The Supreme Court has explained that while the
Services "theoretically serve [ ] an advisory func-
tion" when consulting with Action Agencies pursu-
ant to the ESA, they in fact exercise "a powerful
coercive effect." *Bennett v. Spear, 520 U.S. 154,
169 (1997)*. Biological Opinions issued by the Ser-
vices, the Court explained, have a "virtually de-
terminative effect" on the Action Agencies'
policies. *Id. at 170*.Furthermore, our Court of Ap-
peals has likewise noted that "expert agencies (such
as [FWS] ... and [NMFS] ) are far more knowledge-
able than other federal agencies about the precise
conditions that pose a threat to listed species," and
"are in the best position to make discretionary fac-
tual determinations about whether a proposed
agency action will create a problem for a listed spe-
cies and what measures might be appropriate to
protect the species."*City of Tacoma, Washington v.
Federal Energy Regulatory Comm'n, 2006 WL
2411362 at *18 (D.C.Cir.2006)*.

The procedural requirement of Section 7 consulta-
tion was, without question, designed to ensure pro-
tection of listed species and Plaintiffs have estab-
lished their particular interest in Lynx recovery and
survival. Given the well-established expertise of the
Services, and the fact that consulting with them has
a "virtually determinative effect" on the Action
Agencies, it is at least "substantially probable" that
the lack of consultation with the Services on Na-
tional Fire Plan projects injured Plaintiffs' interests
in the Lynx. Plaintiffs are required to show no more

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit D-15

to establish standing. *See Florida Audubon Soc'y, 94 F.3d at 665*. Consequently, the Court must allow their challenge to the Counterpart Regulations to proceed.

## 2. The Counterpart Regulations are valid because they are not an impermissible or unreasonable construction of the ESA, and because FWS considered the relevant data and articulated a satisfactory explanation for them

### a. The Counterpart Regulations are valid under ESA Section 7

**\*17** Plaintiffs argue that ESA Section 7 mandates consultation between the Action Agencies and the Services on each and every federal action that may affect a listed species. *See* Pls.' Mot. for Summ. J. at 42-43. Given the mandatory nature of this duty, they contend, the Counterpart Regulations "flagrantly violate[ ], [and] make[ ] a total mockery of, [S]ection 7(a)(2)'s express requirement for 'consultation' on 'any project' to 'insure' that listed species are not jeopardized or critical habitat is not impaired." *Id.* at 43.

According to the Government, Section 7 does not "define the term 'consultation' nor ... provide any direction or criteria as to how [consultation] is to be carried out. Rather, that gap-filling function is left to the informed discretion of the Services."Defs .' Cross Mot. for Summ. J. and Opp'n at 40. Furthermore, Defendants argue that "nowhere in the ESA did Congress specify that [the] consultation obligation can be fulfilled only by consulting with FWS or NMFS on each and every action as they are taken."*Id.* at 41.Consequently, Defendants contend that the Counterpart Regulations are a reasonable interpretation of the statute that must be upheld.

Because Plaintiffs challenge the Secretary's interpretation of a provision in the ESA, the Court proceeds according to the familiar two-step inquiry of *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984)*. Under the first step of *Chevron,* the reviewing court must ascertain the plain meaning of the statute. To that end, a court "must ... determine whether Congress has

spoken to the precise question at issue."*Natural Res. Def. Council, Inc. v. Browner, 57 F.3d 1122, 1125 (D.C.Cir.1995)* (quoting *Chevron, 467 U.S. at 843 n. 9)*. A court must examine the text of the particular provision under examination, as well as its statutory context and purpose, in making that determination. *See Consumer Electronics Ass'n v. Federal Commc'ns Comm' n, 347 F.3d 291, 297-99 (D.C.Cir.2003); Am. Bankers Ass'n v. Nat'l Credit Union Admin., 271 F.3d 262, 265 (D.C.Cir.2001); County of Los Angeles v. Shalala, 192 F.3d 1005, 1014 (D.C.Cir.1999)*. If this search yields a clear result, then Congress has expressed its intention as to the question at issue, and deference is not appropriate. *See Qi-Zhuo v. Meissner, 70 F .3d 136, 140 (D.C.Cir.1995)* ( "Where ... the plain language of the statute is clear, the court generally will not inquire further into its meaning.").

If, however, "the statute is silent or ambiguous with respect to the specific issue" raised, Congress has not spoken clearly, and the court must proceed to the second step of *Chevron. Chevron, 467 U.S. at 843*. "A statute is considered ambiguous if it can be read more than one way."*AFL-CIO v. Fed. Election Comm'n, 333 F .3d 168, 174 (D.C.Cir.2003)*. In the second-step analysis, an agency interpretation of the statute that is permissible and reasonable merits judicial deference. *Id.* If the statute does not "forbid [ ] the Agency's interpretation," and if that interpretation does not "for other reasons, exceed[ ] the bounds of the permissible," it must be upheld.*Barnhart v. Walton, 535 U .S. 212, 218 (2002)*.

**\*18** While Plaintiffs argue that the first step of *Chevron* should govern the analysis here, there can be no question that this is not a step-one case. In relevant part, Section 7 provides that

[e]ach federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species ...

16 U.S.C. § 1536(a)(2). A definition of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"consultation" is not provided in that Section, nor elsewhere in the ESA. Furthermore, Section 7 is completely silent on both the mechanics and details of the "consultation" it requires. Here, Congress has not "spoken to the precise question at issue,"*Browner, 57 F.3d at 1125,* but has instead "left a gap for the agency to fill."*Chevron, 467 U.S. at 843.* Therefore, the Court must proceed to the second step of the *Chevron* analysis.

Administering a complex regulatory regime like that established in the ESA "necessarily requires the formulation of policy and the making of rules to fill in any gap left, implicitly or explicitly, by Congress."*Id.* Where a statute is subject to conflicting interpretations, *Chevron* step two requires the Court to defer to the Secretary's policy choices so long as they are reasonable and not clearly inconsistent with the statute. *See Troy Corp. v. Browner,* 120 F.3d 277, 283-84 (D.C.Cir.1997).

Plaintiffs argue that the Counterpart Regulations allow Action Agencies to "bypass" the Services entirely on any project within the National Fire Plan. *See* Pls.' Mot. for Summ. J. at 43. This simply is not the case. Pursuant to the Regulations, an Action Agency must develop and implement an Alternative Consultation Agreement ("ACA") together with one or both of the Services before that Agency can be authorized to make NLAA determinations on National Fire Plan projects. *See*50 C.F.R. § 402.33. The Agency and the Services must, *inter alia:* determine and identify who within the Agency will have authority to make such determinations; set forth "the standards the Action Agency will apply in assessing" the potential effects of any proposed National Fireplan Project;" agree upon "a program for monitoring and periodic program evaluation;" and implement a "training program outlined in the ACA to the mutual satisfaction of the Action Agency and the Service."*Id.*

Through the periodic evaluation that the Regulations require, the Services must "determine," on an ongoing basis, that the Action Agency's "implementation" of the ACA is "consistent with ... the ESA and section 7 regulations."*Id.* § 402.33(a).

The Service Director may, as a result of her evaluations, "recommend changes to the Action Agency's implementation of the ACA."0§ 402.33(b). Finally, the Services retain the power to suspend or terminate an ACA if the Action Agency "fails to comply with ... section 7 of the ESA."*Id.* § 402.33(c).

**\*19** The ESA language at issue requires "consultation" on projects that might affect a listed species, but leaves room for the Secretary to determine how, precisely, that consultation should occur.FN14Given the involvement of the Services in the creation of an ACA and the oversight they retain over Action Agencies working pursuant to one, as well as their power to suspend or terminate a poorly-administered ACA, the Services retain an important and ongoing role in evaluating the environmental consequences of National Fire Plan projects. As a result, the Court cannot find that the Counterpart Regulations are inconsistent with the ESA's "consultation" requirement.FN15

> FN14. The statute's legislative history only confirms Congress' intent to give the Secretary discretion in administering the ESA. As Defendants point out, when Congress amended the statute in 1978, the House Report accompanying the bill stated that the amendments were designed, in part, to "introduce some flexibility into the Act."H .R. Rep. No. 95-1625; *see also*124 Cong. Rec. 21,147 (1978) (statement of Senator John Chafee explaining that "[t]he new regulations published by [FWS] for section 7 recognize that consultation procedures must be sufficiently flexible to accommodate the myriad of activities that are authorized, funded, or carried out by the Federal Government").

> FN15. Plaintiffs note that a federal district court in the Western District of Washington recently vacated a different set of counterpart regulations issued by EPA in 2004, finding them inconsistent with the consultation requirement contained in Sec-

Exhibit D-17

Not Reported in F.Supp.2d                                                                 Page 18
Not Reported in F.Supp.2d, 2006 WL 2844232 (D.D.C.), 63 ERC 2003
**(Cite as: Not Reported in F.Supp.2d)**

tion 7. *See Washington Toxics Coalition v. United States Department of Interior,* 2006 WL 2469119 (W.D.Wash.2006). While *Washington Toxics Coalition* and this case present similar issues, the Court finds it distinguishable for at least two reasons. First, the plaintiffs in *Washington Toxics Coalition* challenged a completely different set of counterpart regulations, based on a very different administrative record, than the Regulations and record under review here. Second, and more importantly, the court was compelled to reach its conclusion in *Washington Toxics Coalition* by Ninth Circuit precedent that is substantively different from the case law interpreting *Chevron* in this jurisdiction. *See id.* at *11.The prevailing law in the D.C. Circuit overwhelmingly supports the proposition that the Secretary's construction of ambiguous statutory language must stand so long as it is reasonable and permissible.

Furthermore, Plaintiffs' position, if taken to its logical conclusion, would require the Court not only to overturn the Counterpart Regulations, but also to invalidate the very default Section 7 consultation procedures that have been in effect since 1978 on which Plaintiffs rely. To repeat, Plaintiffs contend that Section 7 requires consultation between the Action Agencies and the Services "on 'any project' to 'insure' that listed species are not jeopardized or critical habitat is not impaired."Pls.' Mot. for Summ. J. at 43. Pursuant to the default consultation regime, which Plaintiffs favor, however, only the Action Agencies are responsible for making an initial determination as to whether a proposed action "may affect listed species or critical habitat."50 C.F.R. § 402.14. The Services play no role whatsoever in that threshold determination; if an Action Agency concludes that a proposed action will have no effect on a listed species, it is under no obligation to consult with the Services.

If Plaintiffs' interpretation of Section 7 is the correct one, this procedure would be invalid because it does not mandate consultation on each and every federal project.[FN16]However, because Congress reviewed the default consultation procedures in 1978, and passed ESA Amendments codifying them, the Court must conclude that Congress intended to allow Action Agencies to initially evaluate the potential environmental consequences of federal actions and to move forward on many of them without first consulting the Services if they concluded that they had "no effect" on listed species and their critical habitat. Plaintiffs' broad interpretation of the term "consultation" does not comport either with the plain meaning of the ESA or the legislative intent underlying it. *See* 1978 U.S.C.C.A.N. at 9462.

> FN16. The Court notes that in response to the Government's argument on this point, Plaintiffs merely state that the validity of the default procedures "are not under review in this case" and that they "have not challenged those longstanding procedures."Pls.' Opp'n and Reply at 35. They offer no substantive rebuttal.

Accordingly, the Court does not find that the Counterpart Regulations involve an unreasonable or impermissible interpretation of the term "consultation" as it is used in ESA Section 7.[FN17]

> FN17. The Court shares many of Plaintiffs' concerns about the wisdom and efficacy of the Counterpart Regulations. However, interpreting terms in the ESA "involves ... complex policy choice[s]." *See Sweet Home,* 515 U.S. at 709. Because Congress has "entrusted the Secretary with broad discretion" to administer the statute, the Court must be "especially reluctant to substitute [its] views of wise policy for his."*Id.* The Counterpart Regulations are reasonable and permissible under the ESA, and it is not the Court's role to second-guess the Secretary's considered judgment.

**b. The Counterpart Regulations satisfy the APA**

Arguing that "[D]efendants have failed to offer even a coherent and consistent explanation, let

Exhibit D-18

Not Reported in F.Supp.2d                                                                 Page 19
Not Reported in F.Supp.2d, 2006 WL 2844232 (D.D.C.), 63 ERC 2003
**(Cite as: Not Reported in F.Supp.2d)**

alone one that is supported by record evidence," Plaintiffs also challenge the Counterpart Regulations as invalid under the APA. Pls.' Mot. for Summ. J. at 50. The Government characterizes this argument as a "straw man" and maintains that in issuing the Counterpart Regulations, the Services and the Secretary built a record and offered a rationale that easily satisfies the APA standard. *See* Defs.' Cross Mot. for Summ. J. and Opp'n at 50.

**\*20** As noted above, the deferential standard of review embodied in the APA limits a court's inquiry to determining whether agency's decision is based on relevant factors and not a "clear error of judgment." *Camp v. Pitts,* 411 U.S. 138, 142 (1973). An agency satisfies this standard if it "examine[s] the relevant data and articulate[s] a satisfactory explanation for its action,"*State Farm Mut. Auto. Ins. Co.,* 463 U.S. at 43, and a court finds that there was "a rational connection between the facts found and the choice made."*Baltimore Gas & Elec. Co.,* 462 U.S. at 88.

The relevant agencies developed the Counterpart Regulations over a period of nearly twelve months and there is no dispute that they complied with the APA's procedural requirements in doing so. They received more than 50,000 comments on the Proposed Rule, including comments from several environmental conservation organizations, and gave detailed responses to many of them in the Final Rule. *See id.* at 68257-60.

Furthermore, a clear rationale, that the Government has consistently articulated, underlies the Counterpart Regulations. That rationale can be summarized roughly as follows. The Services and the Secretary determined that the default Section 7 consultation procedures contain overlapping requirements, and other inefficiencies, that often cause "unnecessary delay" in the approval of National Fire Plan projects. *See*68 Fed.Reg. 68254.Because the number of severe wildfires in national forests has increased dramatically in recent years-in 2002 alone there were 88,000 such fires-time is of the essence in reviewing projects that would "treat" forestland at risk of catching fire.*Id.* The Counterpart Regula-

tions, which streamline the approval process for National Fire Plan Projects, allow Action Agencies to "accelerate the rate at which these types of activities can be implemented so that the likelihood of catastrophic wildland fires is reduced" while also meeting their statutory duties under the ESA. *Id.* at 68255.

In light of this evidence, there is no basis on which the Court could conclude that the agencies failed to "consider the relevant data and articulate a satisfactory explanation for its action."*State Farm Mut. Auto. Ins. Co.,* 463 U.S. at 43. It is not for the Court to decide whether the Counterpart Regulations represent wise "substantive policymaking." *Continental Airlines Inc. v. Department of Transp.,* 843 F.2d 1444, 1451 (D.C.Cir.1988). The Court's only role is to determine whether there is a rational connection between the facts found and the choices made during the rulemaking. There is. As a result, Plaintiffs' APA challenge to the Counterpart Regulations must fail.

### c. Defendants complied with NEPA in promulgating the Counterpart Regulations

The final basis for Plaintiffs' challenge to the Counterpart Regulations is NEPA. According to Plaintiffs, Defendants chose to issue the Regulations with an Environmental Assessment ("EA"), rather than a more comprehensive Environmental Impact Statement ("EIS"), thereby ignoring "the views of FWS's own Regional directors ... who pointed to a multitude of ways in which ... [the Regulations] will undoubtedly have 'environmental effects,' including serious adverse impacts on listed species and their habitats."Pls.' Mot. for Summ. J. at 59. Furthermore, Plaintiffs argue, allowing these Regulations to issue with an EA rather than an EIS, will establish a dangerous precedent for other agencies to follow. *Id.* at 50-60.

**\*21** As discussed above, our Circuit requires courts to consider four factors in evaluating whether an agency has properly concluded that the preparation of an EIS is not necessary: "(1) whether the agency took a 'hard look' at the problem; (2) whether the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 20
Not Reported in F.Supp.2d, 2006 WL 2844232 (D.D.C.), 63 ERC 2003
**(Cite as: Not Reported in F.Supp.2d)**

agency identified the relevant areas of environmental concern; (3) as to the problems studied and identified, whether the agency made a convincing case that the impact was insignificant; and (4) if there was an impact of true significance, whether the agency convincingly established that changes in the project sufficiently reduced that impact to a minimum ."*Hodel,* 840 F.2d at 61-62. This Court's review is limited because, as our Court of Appeals has explained, "NEPA's 'mandate to the agencies is essentially procedural. It is to insure a fully informed and well-considered decision, not necessarily a decision [federal judges] would have reached had they been members of the decisionmaking unit of the agency.' " *National Audubon Soc'y v. Hester,* 801 F.2d 405, 408 (quoting *Vermont Yankee Nuclear Power Co. v. NRDC,* 435 U.S. 519, 558 (1978)).

Applying this deferential test, the Court concludes that Defendants satisfied NEPA. The administrative record demonstrates that Defendants considered comments suggesting that the environmental impact of the Regulations could be grave, including comments from some of FWS' s Regional Directors. *See* Admin. R. Vol. 6. The record also illustrates that Defendants made detailed and reasonable responses to those comments. *Id.* Accordingly, Defendants identified the relevant areas of environmental concern and the Court cannot conclude that they failed to take a "hard look" at those areas. Furthermore, because, as discussed above, the Services retain an ongoing role in evaluating the impact of NLAA determinations by the Action Agencies, it was reasonable for Defendants to find that, as compared to the default Section 7 consultation regime, the overall environmental impact of the Counterpart Regulations will be insignificant. Finally, Defendants correctly point out that the decision to issue an EA, rather than an EIS, creates no binding precedent for other agencies to follow. *Town of Cave Creek, Arizona v. F.A.A.,* 325 F.3d 320, 332 (D.C.Cir.2003).

### IV. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is hereby **granted in part and denied in part** and Defendant's Cross Motion for Summary Judgment is hereby **granted in part and denied in part.**

An Order will issue with this Memorandum Opinion.

D.D.C.,2006.
Defenders of Wildlife v. Kempthorne
Not Reported in F.Supp.2d, 2006 WL 2844232 (D.D.C.), 63 ERC 2003

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit D-20

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| The Humane Society of the United States; ) | |
| Help Our Wolves Live ("HOWL"); Animal ) | |
| Protection Institute; and Friends of Animals ) | |
| and Their Environment, ) | |
| ) | **Civil No. 1:07-cv-00677-PLF** |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| Dirk Kempthorne, Secretary of the Interior; ) | |
| United States Department of the Interior; and ) | |
| United States Fish and Wildlife Service, ) | |
| ) | |
| Defendants, ) | |
| ) | |
| U.S. Sportsmen's Alliance Foundation, ) | |
| Wisconsin Bear Hunters Association, *et al.*, ) | |
| ) | |
| Intervenor-Defendants, ) | |
| ) | |
| Safari Club International, National Rifle ) | |
| Association, *et al.*, ) | |
| ) | |
| Intervenor-Defendants. ) | |
| ) | |

**PROPOSED ORDER**

Upon consideration of Plaintiffs' Motion for Summary Judgment, the oppositions and

replies thereto, and the entire record herein, it is **ORDERED** that the motion is **GRANTED**; and

it is

**FURTHER DECLARED**, **ADJUDGED, and DECREED** that Defendants Secretary of

the Interior Dirk Kempthorne, the United States Department of the Interior, and the United States

Fish and Wildlife Service violated the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*, and

the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), by issuing the final rule designating and

delisting the western Great Lakes distinct population segment of the gray wolf, 72 Fed. Reg.

6062 (Feb. 8, 2007) ("Final Rule"); and it is

      **FURTHER ORDERED** that the Final Rule is vacated; and it is

      **FURTHER ORDERED** that Defendants Secretary of the Interior Dirk Kempthorne, the

United States Department of the Interior, and the United States Fish and Wildlife Service are

permanently enjoined from implementation of any aspect of the Final Rule.

      **SO ORDERED**.


Dated:_____                    _____

                                             The Honorable Paul L. Friedman
                                             United States District Judge

## ATTORNEYS TO BE NOTIFIED

Rebecca G. Judd
rjudd@hsus.org
Jonathan R. Lovvorn
jlovvorn@hsus.org
The Humane Society of the United States
2100 L Street, NW
Washington, DC  20037
(202) 452-1100
(202) 778-6132 (facsimile)

Brian B. O'Neill
boneill@faegre.com
Sanne H. Knudsen
sknudsen@faegre.com
Michael C. Soules
msoules@faegre.com
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-3901
(612) 766-7000
(612) 766-1600 (facsimile)
*Attorneys for Plaintiffs*


Jimmy A. Rodriguez
U.S. DEPARTMENT OF JUSTICE
P.O. Box 7369
Washington, DC 20044
(202) 305-0342
Fax: (202) 305-0275
jimmy.rodriguez@usdoj.gov
 *Attorney for Federal Defendants*


William P. Horn
BIRCH, HORTON, BITTNER AND CHEROT
1155 Connecticut Avenue, NW
Suite 1200
Washington, DC 20036
(202) 659-5800
Fax: (202) 659-1027
whorn@dc.bhb.com

James Hardwick Lister
BIRCH HORTON BITTNER AND CHEROT
1155 Connecticut Avenue
Suite 1200
Washington, DC 20038
(202) 659-5800
jlister@dc.bhb.com
*Attorneys for Intervenor-Defendants U.S. Sportsmen's Alliance Foundation, et al.*


Anna Margo Seidman
SAFARI CLUB INTERNATIONAL
501 2nd Street, NE
Washington, DC 20002
(202) 543-8733
Fax: (202) 543-1205
aseidman@cox.net

Douglas Scott Burdin
Safari Club International
501 2nd Street, NE
Washington, DC 20002
(202) 543-8733
Fax: 202-543-1205
dburdin@sci-dc.org
*Attorneys for Intervenor-Defendants Safari Club International, et al.*