# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HUMANE SOCIETY OF THE UNITED STATES, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| KEMPTHORNE, *et al.*, | ) ) |
| Defendants, | ) ) |
| U.S. SPORTSMEN'S ALLIANCE, FOUNDATION, *et al.*, | ) ) ) |
| Intervenor-Defendants, | ) ) |
| SAFARI CLUB INTERNATIONAL, *et al.*, | ) ) ) |
| Intervenor-Defendants. | ) ) |

**Civ. No. 1:07-cv-00677-PLF**

## BRIEF OF PROPOSED *AMICUS CURIAE* CENTER FOR BIOLOGICAL DIVERSITY

### Introduction

This case presents issues of great importance that go to how federal defendants (Dirk Kempthorne, Secretary of the Department of the Interior ("Secretary"), U.S. Department of the Interior ("Department"), and U.S. Fish and Wildlife Service ("FWS")) may lawfully implement the Endangered Species Act, 16 U.S.C. § 1531, *et seq*. ("ESA") – one of the nation's bedrock environmental laws – to conserve and recover the nation's endangered and threatened wildlife.

In particular, this case concerns the listing of "distinct population segments" ("DPS") under the ESA, which was authorized by Congress as a means to protect and recover certain populations of species *before* large-scale or species-wide decline occurs, and the Secretary's abuse of that authority to accomplish the exact opposite – *i.e.*, to delist a population of wolves in

the Great Lakes, notwithstanding the fact that gray wolf remains threatened with extinction throughout the vast majority of the lower 48 states as the agency determined more than 20 years ago. 72 Fed. Reg. 6052 (Feb. 8, 2007) ("Final Rule").

As explained in greater detail below, the Secretary's piecemeal delisting of the gray wolf is not only patently inconsistent with the procedural and substantive requirements of the ESA, Congressional intent, and agency policy and historical practice, but could effectively end recovery of the endangered gray wolf in the conterminous United States by relegating that species to an uncertain legal status throughout the majority of its range where it plainly remains critically endangered. Moreover, the Secretary's action here signals a dangerous new trend of piecemeal delisting of species which threatens the conservation and recovery of other federally-listed species. Therefore, the Center for Biological Diversity – a national conservation organization that works to protect the nation's biodiversity – is filing this *amicus curiae* brief to assist the Court in understanding what FWS has done in this case, the historical context of its actions, and the dangerous precedent that it will set for potentially dozens, if not hundreds, of vertebrate species if it is allowed to stand.

## BACKGROUND

### I. Statutory and Regulatory Scheme

The purpose of the ESA is to provide "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species . . .." 16 U.S.C. § 1531(b). The Act defines "conserve, conserving, or conservation" to mean "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." 16

U.S.C. § 1532(3). The Supreme Court has described the ESA as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). As Judge Kessler of this court has observed, "[w]hen Congress enacted the [ESA] in 1973, it intended to bring about the 'better safeguarding, for the benefit of all citizens, [of] the Nation's heritage in fish, wildlife, and plants.'" *Defenders of Wildlife v. Norton*, 239 F. Supp. 2d 9, 12 (D.D.C. 2002) (quoting 16 U.S.C. § 1531).

A species receives the protections of the ESA when FWS lists the species as "endangered" or "threatened." A species is "endangered" when it is "in danger of extinction throughout all or a significant portion of its range . . . ." 16 U.S.C. § 1532(6). A "threatened" species is one that is likely to become an endangered species within the foreseeable future . . . ." 16 U.S.C. § 1532(20).[1]

A designation of "endangered" triggers a broad scope of protections in the form of prohibitions, including prohibiting "take" under Section 9 of the ESA. 16 U.S.C. § 1538(a)(1)(B). The term "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). A designation of "threatened" triggers Section 4(d) of the ESA, which provides that "whenever any species is listed as a threatened species . . . Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of threatened species." 16 U.S.C. § 1533(d). In accordance with Section 4(d), FWS long ago promulgated a rule applying full extension of the protective regulations afforded to "endangered" species under Section 9 of the

---

[1]  The Secretary of the Interior has delegated to FWS responsibility for administering these aspects of the ESA with respect to terrestrial species, and the Secretary of Commerce has delegated to the National Marine Fisheries Service ("NMFS") (also known as "NOAA Fisheries") responsibility for administering these aspects of the ESA with respect to marine species. 50 C.F.R. § 402.01(b) (2006).

ESA to "threatened" species, subject to later case-by-case modifications. 50 C.F.R. § 17.31

(2006).

FWS is required to list, delist, or reclassify a species as endangered or threatened due to

any one or a combination of the following factors:

A)    the present or threatened destruction, modification, or curtailment of its
      habitat or range;
B)    overutilization for commercial, recreational, scientific, or educational
      purposes;
C)    disease or predation;
D)    the inadequacy of existing regulatory mechanisms; or
E)    other natural or manmade factors affecting its continued existence.

*Id.* at § 1533(a)(1); 50 C.F.R. § 424.11(c). In addition to analysis under these five factors, FWS

is required to make listing determinations "solely on the basis of the best scientific and

commercial data available," without reference to the possible economic or other impacts of such

a determination. 16 U.S.C. § 1533(b)(1)(A); 50 C.F.R. § 424.11(c).

In 1978, Congress amended the ESA's definition of "species" to mean "any subspecies of

fish or wildlife or plants, and any *distinct population segment* of any species of vertebrate fish or

wildlife." *Id.* § 1532(16) (emphasis added). Congress did not define the term "distinct

population segment," which is not commonly used in scientific discourse, but instructed the

Secretary to exercise his authority with regard to DPSs "sparingly and only when the biological

evidence indicates that such action is warranted." S. Rep. No. 96-151, at 7 (1979). Thus, the

DPS authority was intended by Congress to be a tool for protecting certain imperiled population

segments where listing at the species or subspecies level is not warranted, not a means for the

piecemeal delisting of an endangered or threatened species that remains threatened with

extinction throughout the overwhelming majority of their ranges. *See id.* ("the committee is

aware of the great potential for abuse of this authority [to list DPSs]"); *Defenders of Wildlife v.*

*Norton*, 239 F. Supp. 2d at 12 ("the legislative history of the statute reflects a 'consistent policy decision by Congress that the United States should not wait until an entire species faces global extinction before affording a domestic population segment of a species protected status'") (quoting *Sw. Ctr. for Biological Diversity v. Babbitt*, 926 F. Supp. 920, 924 (D. Ariz. 1996) (citing H.R. Rep. No. 412, 93d Cong., 1st Sess. 10 (1973), *reprinted in* 1978 U.S.C.C.A.N. 2989, 2998).

Following the 1978 Amendments, FWS and NMFS exercised their authority with respect to DPSs "relatively rarely" – between 1978 and 1994, "of nearly 300 native vertebrate species listed under the Act, only about 20 [we]re given separate status as distinct population segments." 59 Fed. Reg. 65884 (Dec. 21, 1994). These included imperiled populations of wood stork, woodland caribou, least tern, roseate tern, silver rice rat, marbled murrelet, snowy plover, and others.[2] It is particularly noteworthy that over this period of time, consistent with Congress' intent, FWS utilized the DPS authority almost exclusively to *list* imperiled population segments where listing at a higher taxonomic level was not warranted, not to designate DPSs for the express purpose of delisting them.

Recognizing the importance of applying the term "distinct population segment" in a "clear and consistent fashion," in 1996 FWS and NMFS developed a "Policy Regarding the

---

[2]   *See* 49 Fed. Reg. 7332 (Feb. 28, 1984) (listing "U.S. breeding population of the wood stork" as endangered species); 49 Fed. Reg. 7390 (Feb. 29, 1984) (listing "population of woodland caribou . . . found in extreme northeastern Washington, northern Idaho, and southern British Columbia" as endangered); 50 Fed. Reg. 21784 (May 28, 1985) (listing "interior population" of the least tern as endangered); 52 Fed. Reg. 42064 (listing population of the roseate tern "that nests in northeastern North America" as endangered and "Caribbean population" that includes "birds that nest in the U.S. Virgin Islands, Puerto Rico, and Florida" as threatened); 56 Fed. Reg. 19809 (Apr. 30, 1991) (listing "Lower Keys population of the rice rat, or silver rice rat" as endangered); 57 Fed. Reg. 45328 (Oct. 1, 1992) (listing "Washington, Oregon, and California population" of marbled murrelet as threatened); 58 Fed. Reg. 12864 (Mar. 5, 1993) (listing "Pacific coast population" of western snowy plover).

Recognition of Distinct Vertebrate Population Segments under the Endangered Species Act." 61 Fed. Reg. 4722 (1996) ("DPS Policy"). The DPS Policy provides that a DPS must be discrete and significant in relation to the species to which it belongs. *Id*. at 4725. In addition to ensuring consistency in DPS designations, *id*. at 4724, the DPS Policy is designed to allow FWS to "protect and conserve species and the ecosystems upon which they depend before large-scale decline occurs that would necessitate listing a species or subspecies throughout its entire range." *Id*. at 4725. In this way, the DPS Policy is designed to increase species protection and further the ESA's overall purpose of conserving imperiled species. *See Defenders of Wildlife v. Sec'y, U.S. Dep't of the Interior*, 354 F. Supp. 2d 1156, 1160 (D. Or. 2005) (the DPS Policy's purpose is to "allow FWS to list a DPS as threatened or endangered, and thereby provide a level of protection that is different from other populations within the same species") (citing 61 Fed. Reg. at 4722).

Since promulgation of the DPS Policy in 1996, FWS has listed 18 DPSs. These include populations of Steller's eider, copperbelly water snake, bog turtle, Peninsular bighorn sheep, California bighorn sheep, mountain yellow-legged frog, pygmy rabbit, and others.[3]

However, despite Congress' concern that the DPS authority would have "great potential for abuse", S. Rep. No. 96-151, at 7 (1979), in recent years FWS has begun to use the DPS Policy increasingly as a tool to *delist* populations of imperiled species, or to downlist their status from "endangered" to "threatened." For example, although the Columbia white-tail deer was

---

[3] *See* 62 Fed. Reg. 31748 (June 11, 1997) (listing Alaska breeding population of Steller's eider as threatened DPS); 62 Fed. Reg. 4183 (Jan. 29, 1997) (listing copperbelly water snake . . . in the northern portion", but not in the southern portion, of its range as threatened); 62 Fed. Reg. 59606 (Nov. 4, 1997) (listing bog turtle DPS); 63 Fed. Reg. 13134 (Mar. 18, 1998) (listing Peninsular bighorn sheep DPS "occupying the Peninsular Ranges of southern California" as endangered); 65 Fed. Reg. 20 (Jan. 3, 2000) (listing Sierra Nevada DPS of California bighorn sheep as endangered); 67 Fed. Reg. 44382 (July 2, 2002) (listing southern California DPS of mountain yellow-legged frog as endangered); 68 Fed. Reg. 10388 (Mar. 5, 2003) (listing Columbia Basin DPS of pygmy rabbit as endangered).

historically distributed throughout the bottomlands and prairie woodlands of western Oregon and southern Washington, in 2003 FWS used the DPS Policy to designate two relatively small, isolated DPSs – one for Douglas County, Oregon, and the other for the Columbia River – and delisted the Douglas County DPS.  68 Fed. Reg. 43647 (July 24, 2003); 32 Fed. Reg. 4001 (Mar. 11, 1967).  Earlier this year, FWS designated and downlisted a DPS of American crocodile that occurs in Florida, thereby splitting the U.S. population from the rest of the species, which had been listed as endangered under the ESA throughout its range since 1979.  72 Fed. Reg. 13027 (Mar. 20, 2007); 40 Fed. Reg. 44149 (Sep. 25, 1975); 44 Fed. Reg. 75074 (Dec. 18, 1979).  Also this year, FWS designated and delisted a grizzly bear population in the area of Yellowstone National Park, although the bear also had been previously listed throughout its range in the conterminous United States since 1975.  72 Fed. Reg. 14866 (Mar. 29, 2007); 40 Fed. Reg. 31734 (July 28, 1975).

Federal courts have rejected FWS's efforts to use the DPS Policy to reduce protections for deserving populations or species.  For example, in remanding FWS's decision to create five DPSs of bull trout but to list only two of them under the ESA, the U.S. District Court for the District of Oregon held that FWS cannot designate DPSs under the ESA unless it first "legitimately concludes, after proper and sustainable analysis, that listing of the entire species or the . . . population in the coterminous United States is either not warranted or warranted but precluded."  *Friends of the Wild Swan v. U.S. Fish and Wildlife Serv.*, 12 F. Supp. 2d 1121, 1134 (D. Or. 1997); *see also id*. ("such a two-tiered approach would promote the ESA's goals of protecting endangered and threatened species and endangered and threatened population segments as quickly as possible").

7

The U.S. District Court for the Northern District of California recently set aside FWS's use of the DPS Policy to subsume two endangered DPSs of California tiger salamander into a species-wide listing as threatened, which had the effect of eliminating the DPSs and decreasing the affected salamanders' protective status from endangered to threatened. In *Ctr. for Biological Diversity v. Kempthorne*, 2005 WL 2000928 (N.D. Cal. Aug. 19, 2005) (W.H.A.), Judge Alsup concluded that FWS's use of the DPS Policy to subsume the DPSs' status violated the ESA, where the scientific team charged with analyzing the species' status was "directed to eliminate the DPS and down-list the species" by Department officials, including former Deputy Assistant Secretary Julie MacDonald. *Id*. at *15.[4]

Indeed, while this case concerns FWS's latest attempt to use the DPS Policy to remove ESA protection – this time, for the newly-configured Western Great Lakes ("WGL") DPS, 72

---

[4]    MacDonald resigned in April of this year following release of a scathing report by the Department's Inspector General, which found that she had been "heavily involved in editing, commenting on, and reshaping the Endangered Species Program's scientific reports from the field." *See Investigative Report on Allegations Against Julie MacDonald, Deputy Assistant Secretary for Fish, Wildlife, and Parks* (Mar. 29, 2007) ("IG Report") (Exhibit ("Ex.") B) at 1. The IG Report explains that according to professional FWS staff (including the former Director of the Endangered Species Program), MacDonald and other DOI political appointees "made changes to [ESA] reports to reflect their political philosophy," and that MacDonald "regularly bypassed managers to speak directly with field staff, often intimidating and bullying them into producing documents that had the desired effect she and the former Assistant Secretary wanted." *Id*. at 4. The "desired effect" was to avoid and/or weaken federal safeguards for imperiled species that had been advocated by the professional staff in FWS. *See id*. at 4-5 ("The former ES Director said that overall, MacDonald did not want to accept petitions to list species as endangered, and did not want to designate critical habitats. He said the overall effect was to minimize the [ESA] as much as possible or ensnare it in court litigation, which happened often."). Indeed, the IG Report sets forth numerous examples of species listings, critical habitat designations, and other ESA regulatory decisions that FWS's staff (including the current Director of the Service) believed had been improperly influenced by nonscientific political considerations during the last several years. *Id*. at 16. The IG Report's conclusions and examples are consistent with a study that found that under the Bush Administration, FWS has had more money for listing species than ever before, yet has listed the fewest number of species since the Act was passed. *See* D. Noah Greenwald *et al*., *The Listing Record, in The Endangered Species Act at Thirty: Renewing the Conservation Promise* (Dale Goble *et al*. eds., 2005).

Fed. Reg. 6052 (Feb. 8, 2007) – two federal courts have set aside FWS's prior attempt to use the DPS Policy to reduce ESA protection for the gray wolf as inconsistent with the ESA. *See Defenders of Wildlife v. Sec'y, U.S. Dep't of the Interior*, 354 F. Supp. 2d at 1172 ("FWS cannot interpret its DPS Policy in such a way as to avoid the clear statutory mandate that 'the Secretary shall . . . determine whether any species is an endangered species or threatened species because of [the listing factors].'") (quoting 16 U.S.C. § 1533(a)(1)); *Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553, 565 (D. Vt. 2005) (FWS's application of DPS Policy to designate and downlist gray wolf DPSs was "'inconsistent with the statute under which the regulations were promulgated'") (quoting *Mines v. Sullivan*, 981 F.2d 1068, 1070 (9th Cir. 1992)).  These decisions restored the gray wolf to endangered status throughout the coterminous United States, except in Minnesota, where the wolf continued to be listed as threatened.

## II.    The Gray Wolf

Gray wolves are the largest wild members of the *Canidae*, or dog family, with adults ranging from 40 to 175 pounds, depending upon sex and subspecies.  71 Fed. Reg. 15266 (Mar. 27, 2006).  Wolves' fur color is frequently a grizzled gray, but it can vary from pure white to coal black.  *Id*.

Wolves are social, mobile animals and often travel 10 to 30 miles per day in packs of two to twelve.  *Id*. at 15267.  Packs are primarily family groups consisting of a breeding pair, their pups from the current year, offspring from one or two previous years, and occasionally an unrelated wolf.  *Id*.

Wolves primarily are predators of medium and large mammals.  *Id*.  Wild prey species in North America include white-tailed deer, mule deer, moose, elk, caribou, bison, muskox, bighorn sheep and Dall sheep, and mountain goat.  *Id*. at 15266-67.  When necessary, wolves also eat

smaller prey like snowshoe hare, beaver, and muskrat, and, at times, small mammals, birds, and large invertebrates. *Id.* at 15267. Wolves are habitat generalists, and when they are not being persecuted by humans, they can live anywhere that contains a sufficient population of large ungulates. First Amended Complaint (Dock. No. 12) at ¶ 41.

Wolves once roamed throughout North America and the conterminous United States and Alaska to southern Mexico (with limited geographic exceptions). 68 Fed. Reg. 15804, 15805 (Apr. 1, 2003). Wolves coexisted with Native American nations, but European settlers persecuted wolves on a "widespread" basis with poisons, trapping, and shooting" that was sanctioned and carried out by Federal, State, and local government through official public policies. *Id.*; *see also* 72 Fed. Reg. at 6125 (an "active eradication program is the sole reason that wolves were extirpated from the NRM").

FWS and its predecessor agency, the Bureau of Biological Survey, conducted a full-fledged gray wolf extermination program that wiped out wolves in the United States, as well as Mexico and large portions of Canada. *See generally* Michael J. Robinson, *Predator Bureaucracy: The Extermination of Wolves and the Transformation of the West* (2005). As a result of this extermination campaign, it is estimated that only several hundred wolves existed in Minnesota and Michigan, and (possibly) Montana by 1973, when the ESA was enacted. 68 Fed. Reg. at 15805. The gray wolf was one of the first species to be listed under the Endangered Species Preservation Act of 1966. 32 Fed. Reg. 4001 (Mar. 11, 1967).

In August 1974, the FWS listed four subspecies of wolves under the newly-enacted ESA, including: the "Mexican wolf" of Mexico and southeastern U.S.; the "Northern Rocky Mountain wolf" of Wyoming, Montana, and Idaho; the "Texas gray wolf" of Texas and Mexico; and the "Eastern timber wolf" of the Great Lakes region. *See* 43 Fed. Reg. 9607 (Mar. 9, 1978). In

10

1978, FWS moved away from protection of these individual wolf subspecies and listed the "entire species" of gray wolf "in Mexico and throughout the 48 conterminous States of the United States" as endangered, except in Minnesota, where it was designated as "threatened." *See* 42 Fed. Reg. 29527 (June 9, 1977) (proposed rule); 43 Fed. Reg. 9607 (final rule recognizing *Canis Lupus* as "Endangered or Threatened to the south of Canada").

Since 1978, due to the substantive protections of the ESA, gray wolf numbers have increased in two small fractions of the species' former range in the Northern Rockies and the Great Lakes. 68 Fed. Reg. at 15805. Between 1979 and 1998, the occupied wolf range in Minnesota doubled in size, and wolves dispersed from Minnesota into northern Wisconsin and into the Upper Peninsula of Michigan. *See* 71 Fed. Reg. at 15269-71. There are now wolves in all three states, but the vast majority of the Great Lakes wolf population is still limited to northern Minnesota. *See id.* The gray wolf remains extirpated across about 95 percent of its historic range. *See* Carroll, C, M.K. Phillips, C.A. Lopez-Gonzalez, and N.H. Schumaker. 2006. Defining recovery goals and strategies for endangered species: the wolf as a case study. Bioscience 56(1): 25-37 (Ex. C) (noting that the gray wolf "occup[ies] about 5% of the species' historic range in the conterminous United States"); *see also* 43 Fed. Reg. at 9610 (the gray wolf "once had a range that included most of Mexico and the 48 conterminous States of the United States" but "now occurs in only a small fraction of this range").[5]

_____

[5] Limited recovery has also begun in the West. Protected by the ESA, a few wolves dispersing from Canada established a small resident population in Montana. In the mid-1990s FWS also reintroduced wolves to Yellowstone National Park and Idaho. 71 Fed. Reg. 6634, 6635-37 (Feb. 8, 2006). In 2006, it is estimated that this population, which is an "experimental population" under Section 10(j) of the Act, 16 U.S.C. § 1539(j), totaled approximately 1,243 wolves. 72 Fed. Reg. at 6108. The Great Lakes region and the northern Rocky Mountains contain the only sizeable gray wolf populations within the conterminous United States; in addition to these populations, in the Southwest there is also a very small, "nonessential

In the Great Lakes region, this limited recovery has tracked the measures set forth in FWS's Recovery Plan for the Eastern Timber Wolf. FWS, Eastern Timber Wolf Recovery Plan (1992). This plan, which was issued in 1978 and revised in 1992, focuses on the "Eastern timber wolf" (*Canis lupus lycaon*), a subspecies that lost legal recognition when the FWS listed the gray wolf at the species level in 1978.

The plan contained modest goals. Its primary objective was "to maintain and reestablish viable populations of the eastern timber wolf in as much of its former range as is feasible." *Id.* at 24. The plan also set forth criteria which, when met, would purportedly qualify the wolf for delisting. These criteria included the retention of a Minnesota population of 1251-1400 wolves and the establishment of a second population consisting of either (a) 100 wolves, if located within 100 miles of the Minnesota population, or (b) 200 wolves, if more than 100 miles from the Minnesota population. *Id.* at 4. The modesty of these goals is underscored by the fact that the target population for Minnesota (1251 wolves), *id.* at 28, was almost identical to the wolf population at the time the plan was drafted (1235 wolves). *See* 72 Fed. Reg. at 6053 ("there were 1,235 wolves in 138 packs in the winter of 1978-79").

By its own terms, however, the recovery plan did not satisfy the delisting requirements of the ESA. As explained in a 1998 addendum, the recovery plan criteria were intended to ensure the wolf "is no longer in danger of extinction in the foreseeable future." *See* Gray Wolf Eastern Population Recovery Team, Addendum to Recovery Plan for the Eastern Timber Wolf (Jan. 10, 1998) (Ex. D) at 1. Thus, the recovery plan's criteria were aimed at preventing complete extinction within the United States, while the ESA prohibits delisting if a species is still

---

experimental population" of the "Mexican gray wolf," 16 U.S.C. § 1539(j), which is a distinct subspecies of gray wolf. 72 Fed. Reg. 44065, 44065-66 (Aug. 7, 2007).

threatened or endangered throughout "all or a significant portion of its range" prior to delisting.

16 U.S.C. § 1532(6).

In light of the limited recovery in the western Great Lakes, FWS has recently attempted

to use the DPS Policy to designate and downlist wolf DPSs, and effectively end recovery efforts

throughout the lower 48 states.  In 2003, FWS issued a final rule that created three DPSs –

Eastern, Western, and Southwestern – and reclassified the Eastern and Western DPSs from

endangered to threatened status, thereby reducing the wolf's status throughout 30 states.  68 Fed.

Reg. 15804 (Apr. 1, 2003).  FWS based the decision to downlist solely on an analysis of threats

to wolf populations in six states – Minnesota, Wisconsin, Michigan, Montana, Idaho, and

Wyoming – *i.e.*, areas of limited recovery that largely comprise the wolf's "current range."  *Id.* at

15810, 15857.  The rule was struck down by two federal courts for violations of the ESA and the

DPS Policy.  *Defenders of Wildlife*, 354 F. Supp. 2d 1156 (overturning as contrary to ESA

FWS's decision to downlist gray wolf DPSs based on purported achievement of gray wolf

recovery plan goals, and in light of FWS's failure to apply ESA listing factors to species outside

of current range); *Nat'l Wildlife Fed'n*, 386 F. Supp. 2d 553 (striking down final rule downlisting

Eastern DPSs as contrary to the DPS Policy and ESA).

Undeterred, FWS has again attempted to use the DPS Policy to reduce gray wolf

protection under the ESA – only this time, by delisting gray wolf populations in the western

Great Lakes and proposing to do the same throughout the northern Rocky Mountains region.  On

February 8, 2007, FWS issued: (1) a proposed rule to designate and delist a Northern Rocky

Mountain DPS, 72 Fed. Reg. 6106 (Feb. 8, 2007); and (2) a final rule designating and delisting a

WGL DPS, *see* Final Rule, 72 Fed. Reg. 6052.  For the WGL DPS, FWS removed ESA

protection completely for the gray wolf in an area that encompasses and extends beyond the

13

species' current range in Minnesota, Wisconsin, and Michigan; the eastern half of North Dakota and South Dakota; the northern half of Iowa; the northern portions of Illinois and Indiana; and the northwestern portion of Ohio.

Without explicitly stating that it was doing so, offering an opportunity to comment, or applying the ESA's five listing factors, in designating and delisting the WGL DPS FWS also simultaneously *revised and reclassified* the geographic scope of the previously-listed entity – *i.e.*, "*Canis Lupus*" as "Endangered or Threatened to the south of Canada." 43 Fed. Reg. at 9607. As a necessary result of FWS's Final Rule, the gray wolf is now protected as endangered in less but still a majority of its historic range in the coterminous United States, and its likelihood of full recovery is now in serious jeopardy.

.    In addition to providing insufficient notice or comment opportunity when it effectively revised and reclassified the previously-listed species and created this "remnant" entity outside of the WGL DPS, FWS also never analyzed the status of this new listing entity as Section 4 of the ESA plainly requires, and never expressly determined whether it is a species, subspecies, or DPS. In addition, FWS never considered whether the species as a whole should remain listed.

As explained below, because FWS did not follow the procedural and substantive requirements of the ESA when it revised and geographically reclassified the wolf's status in the conterminous states, and because the ESA and the FWS's own DPS Policy do not authorize the creation of DPSs for the sole purpose of effecting the piecemeal delisting of a species that unquestionably remains threatened with extinction in the vast majority of its range, the FWS's WGL DPS wolf delisting rule is unlawful and establishes a dangerous precedent for potentially hundreds of other endangered or threatened species that have been long-protected under the Act but achieved limited recovery. Accordingly, the final rule should be set aside.

**ARGUMENT**

I. **FWS HAS UNLAWFULLY REVISED AND GEOGRAPHICALLY RECLASSIFIED THE ESA-LISTED GRAY WOLF IN THE CONTERMINOUS 48 UNITED STATES WITHOUT PROVIDING NOTICE AND AN OPPORTUNITY TO COMMENT ON THE REVISION OR CONDUCTING AN ENDANGERMENT ANALYSIS FOR THE RECLASSIFIED ENTITY.**

In creating and delisting the WGL DPS, FWS also effectively revised and geographically reclassified the previously-listed entity – "*Canis Lupus*" as "Endangered or Threatened to the south of Canada," 43 Fed. Reg. at 9607 – without complying with the procedural and substantive requirements of the ESA. First, the agency failed to adequately notify the public of this change and to provide it with a meaningful opportunity to comment on it. Second, it failed to analyze the status of this remnant entity based upon the ESA's five statutory listing factors and the best scientific data available, and instead focused its evaluations exclusively on the simultaneously created WGL DPS. Finally, the FWS failed to determine whether the revised and reclassified listed entity is a species, subspecies, or DPS. *See*, *e.g.*, 72 Fed. Reg. at 6056-57 (stating that the rule designates and delists WGL DPS, removes designated critical habitat for gray wolf in Minnesota and Michigan, and removes special regulations for gray wolf in Minnesota); *id*. at 6066 ("[w]e have considered only whether the gray wolf is threatened or endangered within this DPS"). This violates clear procedural and substantive requirements of the Act.

Under the ESA, the only way to revise or reclassify a listed species, subspecies, or DPS is by providing notice and an opportunity to comment; determining whether the revised entity is a species, subspecies, or DPS; and conducting an endangerment analysis of it pursuant to the ESA. 16 U.S.C. § 1533(b)(5)(A)-(6)(A) (requiring FWS to provide notice and issue proposed and final rules "[w]ith respect to any regulation proposed by the Secretary to implement a determination, designation, or revision" of a species' status as a threatened or endangered species); 16 U.S.C. §

1533(a)(1) (The Secretary shall by regulation promulgated in accordance with subsection (b) of this section determine whether any species is an endangered species or a threatened species because of any" one of five factors).[6]

There is no question that FWS failed to provide adequate notice and comment opportunity here, where the agency only proposed to designate and delist the WGL DPS, remove designated critical habitat for gray wolf in Minnesota and Michigan, remove special regulations for gray wolf in Minnesota, and never provided notice or solicited public comment with respect to the listed species' status outside of the new WGL DPS.  72 Fed. Reg. at 6056-57.  Courts have held that FWS must provide notice and an opportunity to comment, according to specific statutory deadlines and rulemaking procedures under the APA, on any proposal to eliminate or revise a listed species' status under the ESA.  *See, e.g., Ctr. for Biological Diversity v. U.S. Fish and Wildlife Serv.*, 2005 WL 2000928 at *13 (finding that "FWS did not properly notice a proposal to eliminate . . .  DPS status" for listed population of California tiger salamander); 16 U.S.C. § 1533(b)(4) ("Except as provided in paragraphs (5) and (6) of this subsection, the provisions of section 553 of title 5 (relating to rulemaking procedures), shall apply to any

---

[6]  Again, the ESA's five statutorily prescribed factors are:

(A)      the present or threatened destruction, modification, or curtailment of its habitat or range;
(B)      overutilization for commercial, recreational, scientific, or educational purposes;
(C)      disease or predation;
(D)      the inadequacy of existing regulatory mechanisms; or
(E)      other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1).  These factors are "equally important" and "a finding by the Secretary that a species is negatively affected by just one of the factors warrants a non-discretionary listing as endangered or threatened."  *Nat'l Wildlife Fed'n*, 386 F. Supp. 2d at 558 (citing 50 C.F.R. § 424.11(c)).

16

regulation promulgated to carry out the purposes of this chapter."); *Nat'l Wildlife Fed'n*, 386 F. Supp. 2d at 561 ("APA requires that '[g]eneral notice of a proposed rulemaking . . . shall include . . . either the terms or substance of the proposed rule or a description of the subjects and issues involved'") (quoting 5 U.S.C. § 553(b)(3)).  FWS's failure to provide notice and comment on its concurrent decision to revise and reclassify the geographic scope of the listed gray wolf entity is a patent violation of the clear procedural requirements of the ESA and APA.

FWS similarly could not reclassify the geographic scope of the gray wolf's status in the conterminous states unless it first demonstrated, through application of the listing factors, that such reclassification is appropriate, 16 U.S.C.  1533(a)(1)), but that is not what happened, as FWS simply reclassified the geographic configuration of the listed gray wolf in the conterminous states without applying the listing factors to the new entity at all.  *See* 72 Fed. Reg. at 6066 ("[w]e have considered only whether the gray wolf is threatened or endangered within this DPS").  This too is patently contrary to the ESA.  *See Defenders of Wildlife v. Sec'y, U.S. Dep't of Interior*, 354 F. Supp. 2d at 1170 (emphasis added) (the Act "makes clear that a species shall retain its endangered status unless the Secretary, *by application of the listing factors*, demonstrates that downlisting is appropriate"); *see also id*. at 1172 ("FWS cannot interpret its DPS Policy in such a way as to avoid the clear statutory mandate that 'the Secretary shall . . . determine whether any species is an endangered species or threatened species because of [the listing factors].'") (quoting 16 U.S.C. § 1533(a)).[7]

---

[7]  Where FWS commits such procedural and substantive violations in connection with listing determinations, designations, revisions, or reclassifications, the appropriate remedy is to vacate and remand the final rule – here, the Final Rule to designate and delist the WGL DPS. *See*, *e.g.*, *Nat'l Wildlife Fed'n*, 386 F. Supp. 2d at 568 (vacating and remanding final rule combining the Northeastern and Western Great Lakes DPSs of gray wolf and eliminating protection and recovery efforts in the former Northeastern Gray Wolf DPS area for APA notice

FWS's actions are also not only inconsistent with its own prior practice of using the DPS Policy to list species and not to delist them in piecemeal fashion, *see supra* at 4-5, but are inconsistent with its sister agency's application of the ESA's procedural and substantive requirements. For example, in an analogous situation, NMFS split the northern right whale species, which had been listed as an endangered species in the North Atlantic and North Pacific since 1970, 35 Fed. Reg. 08491 (June 2, 1970), into three separately-listed species, all of which retained their status as endangered. 68 Fed. Reg. 17560 (Apr. 10, 2003). Initially, NMFS believed that the revision was not subject to the listing provisions of the Act because it did not alter the scope of the original listing. Recognizing the error, NMFS later withdrew the revision, stating that the split was "procedurally and substantively flawed" because the agency had failed to "follow the public notice and comment procedural requirements outlined in section 4 for listing a species as endangered or threatened" and "meet the ESA's substantive requirements of conducting a review of the status of the species to determine whether each species is endangered or threatened as a result of any of the five listing factors in that section." 70 Fed. Reg. 01831 (Jan. 11, 2005).[8]

Moreover, FWS's failure to follow the ESA's procedural and substantive requirements with respect to the gray wolf will constrain recovery of that entity, whatever its configuration or

---

and comment opportunity violations); *Ctr. for Biological Diversity v. U.S. Fish and Wildlife Serv.*, 2005 WL 2000928 (remanding procedurally and substantively flawed listing revision to DPS); *Defenders of Wildlife v. Sec'y, U.S. Dep't of Interior*, 354 F. Supp. 2d at 1174 (enjoining and vacating gray wolf DPS rule).

[8] In 2006, NMFS completed a status review of the northern right whale under the ESA in response to a petition by CBD, and found that right whales in the northern hemisphere exist as two species – the North Pacific right whale (*Eubalaena japonica*) and the North Atlantic right whale (*E. glacialis*). NMFS also conducted a five factor threats analysis for both species, and determined that each of these species is in danger of extinction throughout its range. 71 Fed. Reg. 77694 (Dec. 27, 2006).

status. Under the ESA and FWS policies, recovery of a species, subspecies, or DPS is accomplished in significant part through FWS's development and implementation of a "recovery plan" that delineates the conservation measures and management actions that are deemed necessary to support recovery of a species. *See* FWS, Policy and Guidelines for Planning and Coordinating Recovery of Endangered and Threatened Species (May 1990) ("FWS Recovery Guidelines") (excerpted pages attached as Ex. E) at 1; 16 U.S.C. § 1544(f)(1).[9]

FWS's Recovery Guidelines set forth two "priority systems" guide species recovery. FWS Recovery Guidelines (Ex. E) at 4-5. These systems rank the priority of listed species for development and implementation of a recovery plan based on the magnitude of the threats to the entity and other factors. *See generally id.* Of relevance here is the first of these priority systems, the Recovery Priority System, which assigns species a rank of 1 to 18 according to the degree of threat, recovery potential, presence of conflict, and the *taxonomic distinction* of the listed entity. *See Id.*; *id.* at Appendix IV-4; *see also* FWS, Endangered and Threatened Species Listing and Recovery Priority Guidelines, 48 Fed. Reg. 43098 (Sep. 21, 1983). Under this priority system, only designated *genera*, *species*, *subspecies*, or *populations – i.e.*, entities with a clearly defined taxonomic distinction – can effectively be assigned a priority by the relevant FWS Region at the time of listing, and therefore may get "in line" for recovery planning. *See* 48 Fed. Reg. at 43098 ("the loss of a full genus is of greater significance than the loss of a single species or population

---

[9] Recovery is also accomplished through the ESA's prohibitions, including Section 7(a)(2), which prohibits all federal agencies from jeopardizing the continued existence of listed species or adversely modifying their critical habitat, 16 U.S.C. § 1536(a)(2), and Section 9, which prohibits any person from unlawfully taking a protected species. 16 U.S.C. § 1538(a)(1)(B).

of that species").[10]  Thus, as a practical matter, FWS's development and implementation of

recovery measures cannot occur for remnants of a previously-listed entity or leftovers from a

newly-designated and delisted DPS that have received no endangerment analysis pursuant to the

ESA's listing factors.

In designating and delisting the WGL DPS, FWS effectively reclassified the geographic

scope of the listed gray wolf species in the conterminous states without applying the listing

factors to the revised species at all, and therefore did not explicitly determine the entity's

taxonomy or the specific threats to its survival and recovery.  Had this statutorily mandated

analysis been performed, the threats to this geographically reclassified wolf "species" would

have been clearly identified and analyzed and, in turn, that species, subspecies, or DPS would

have received a priority ranking for recovery planning based upon that analysis pursuant to

FWS's Recovery Guidelines.  In the absence of this recovery analysis and ranking, there

effectively can be no recovery planning for the wolf outside the WGL DPS, notwithstanding the

fact the species remains threatened with extinction in the vast majority of its range.  Thus, one

end result of the FWS's action here is that, although the wolf is still listed as endangered outside

of the WGL DPS, it exists in a state of regulatory limbo and its continued recovery has been

effectively truncated.

---

[10]  FWS's Listing and Recovery Priority Guidelines further explain:

The Act includes populations of vertebrate animals in its definition of "species." Because this portion of the definition applies only to vertebrates, it appears inadvisable to incorporate it formally into the priority system.  The Service intends to generally afford vertebrate populations the same consideration as subspecies, but when a candidate subspecies and a candidate population have the same numerical priority, the candidate subspecies will generally have priority.

*Id*.

Furthermore, by leaving the gray wolf in significant portions of its historic range in the U.S. with unclear protection and a lack of recovery goals, the Final Rule fails to further the ESA's goal of conserving and recovering imperiled wildlife at the national level. When Congress enacted the ESA, it sought "to better safeguard[], for the benefit of all citizens, the *Nation's heritage* in fish, wildlife, and plants." 16 U.S.C. § 1531(a)(5) (emphasis added). Yet, by the Final Rule FWS would effectively end recovery of the gray wolf and relegate it to areas of the northern Great Lakes and the northern Rockies, rendering the Act's national conservation interest inconsequential. *See* 16 U.S.C. § 1536(a)(1); *Nat'l Wildlife Fed'n*, 386 F. Supp. 2d 553.

In summary, FWS violated the ESA when it revised the 1978 listing rule for the wolf without affording the public adequate notice and a meaningful opportunity to comment on the full extent of that rule change. Further, FWS based its revision to the 1978 listing rule and resulting change in the legal status of the wolf on a patently defective analysis of the ESA's statutory listing factors which only addressed wolves in the Great Lakes and entirely ignored the remainder and overwhelming majority of the species' historic range in the lower 48 states. FWS's refusal to conduct these analyses violates the clear procedural and substantive requirements of the ESA, is inconsistent with FWS's prior practice and NMFS's application of the DPS Policy, and will effectively relegate recovery of this iconic species to five percent of its historic range in the conterminous states. Carroll, *et al*. (Ex. C) (gray wolf "occup[ies] about 5% of the species' historic range in the conterminous United States"); *see also* 43 Fed. Reg. at 9610 (the gray wolf "once had a range that included most of Mexico and the 48 conterminous States of the United States" but "now occurs in only a small fraction of this range"). For these reasons, FWS's Final Rule must be struck down.

II.  **FWS ALSO ARBITRARILY USED THE DPS POLICY TO SUBDIVIDE THE
     LARGER, LOWER 48 LISTED WOLF IN VIOLATION OF THE ESA, THE
     LEGISLATIVE HISTORY, AND FWS'S DPS POLICY, AND THE FINAL RULE
     MUST BE STRUCK DOWN OR IT COULD SET A DANGEROUS PRECEDENT
     FOR HUNDREDS OF WILDLIFE SPECIES.**

In the Final Rule, FWS designated and delisted the WGL DPS without ever considering

whether the species as a whole should remain listed under the ESA, and focused myopically on

the status of the WGL DPS to the exclusion of any consideration of the status of the species

overall. *See* 72 Fed. Reg. at 6066 ("[w]e have considered only whether the gray wolf is

threatened or endangered within this DPS").  Given the agency's three-decades of protection of

the species, by ignoring the highly pertinent question of how the species is faring or whether it

should remain listed at that level, FWS violated basic principles of administrative law. *See, e.g.,*

*Sierra Club v. Clark*, 755 F.2d 608, 619 (8th Cir. 1985) ("'an agency changing its course by

rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which

may be required when an agency does not act in the first instance'") (quoting *Motor Vehicle*

*Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 42 (1983)); *see also State Farm,*

463 U.S. at 43 (reviewing court must "consider whether the decision was based on a

consideration of the relevant factors").

FWS's failure to consider the species' status also contravenes the fundamental

conservation goals of the ESA, which allow FWS to designate a DPS only if it first evaluates

whether the entire species should be listed. *See, e.g., Friends of the Wild Swan*, 12 F. Supp. 2d at

1134 (emphasis added) (FWS cannot designate DPSs unless it first "legitimately concludes, after

proper and sustainable analysis, that listing of the entire species or the . . . population in the

coterminous United States is either not warranted or warranted but precluded").  Only through

such an approach can FWS "promote the ESA's goals of protecting endangered and threatened

22

species and endangered and threatened population segments as quickly as possible." *Id*.; *cf.*, *Defenders of Wildlife v. Babbitt*, 958 F. Supp. 670, 685 (D.D.C. 1997) ("the fact that an animal population consisted of a mere 'remnant' of a larger historical population argued for, rather than against, protecting the species from further depletion.")

FWS's application of the DPS Policy to delist the gray wolf in piecemeal fashion is contrary to the underlying purpose of the DPS authority and the DPS Policy, which is intended to provide FWS with the flexibility to conserve populations *before* a species becomes threatened or endangered in all of its range.  Congress specifically directed the Secretary to use the DPS authority "*sparingly*" – *i.e.*, not to create arbitrary DPSs, reduce protections by delisting the species in the DPS, and create uncertainty about the species' status or recovery priorities outside of the DPS.  *See Defenders of Wildlife*, 354 F. Supp. 2d at 1169 (the purpose of the DPS Policy is to "allow FWS to list a DPS as threatened or endangered, and thereby provide a level of protection that is different from other populations within the same species"); *see also Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 842 (9th Cir. 2003) ("The FWS does not have to list an entire species as endangered when only one of its populations faces extinction."); *Sw. Ctr. for Biological Diversity v. Babbitt*, 926 F. Supp. 920, 924 (D. Ariz. 1996) (the text and legislative history reflect a "consistent policy decision by Congress that the United States should not wait until an entire species faces global extinction before affording a domestic population segment of a species protected status").

The ESA's legislative history addressing the definition of an "endangered species" also reflects that Congress structured the ESA in order to provide FWS with the authority to protect and recover imperiled species throughout all or a significant portion of their historic ranges – *i.e.*, not in a small fraction of their historic range.  The ESA's two predecessor statutes defined the

23

term "endangered species" to require that the species be facing complete extinction to warrant

listing.  Under the Endangered Species Preservation Act of 1966, an endangered species was one

whose "existence is endangered because its habitat is threatened with destruction, drastic

modification, or severe curtailment, or because of overexploitation, disease, predation, or

because of other factors, and that its survival requires assistance."  Endangered Species

Preservation Act of 1966, Pub. L. No. 89-669 § 1(c), 80 Stat. 926, 926 (1966).  The Endangered

Species Conservation Act of 1969 identified an endangered species as one which is threatened

with "worldwide extinction."  Endangered Species Conservation Act, Pub. L. No. 91-135 § 3(a),

83 Stat. 275 (1969).  The Endangered Species Act of 1973, however, broadened the definition of

an endangered species to one facing "extinction throughout all or a significant portion of its

range."  Endangered Species Act of 1973, Pub. L. No. 93-205, § 3, 87 Stat. 884 (codified at 16

U.S.C. § 1532(6) (2000)).  The House Merchant Marine and Fisheries Committee stated that this

change represented "a significant shift in the definition in existing law, which considers a species

to be endangered only when it is threatened with worldwide extinction."  H.R. Rep. No. 93-412,

at 10 (1973); *see also Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1144 (9th Cir. 2001)

(discussing legislative history).  Thus, this statutory evolution reflects that Congress sought to

require listing well before a species faces worldwide extinction – and, by extension, to require

recovery of a species throughout all or a "significant portion" of its former range, not in a small

fraction thereof, before delisting is appropriate.

When Congress expanded the government's ability to list populations of species and

explicitly authorized the listing of DPSs in the Endangered Species Act Amendments of 1978,

Pub. L. No. 95-632, 92 Stat. 3751 (1978), it recognized "that there may be instances in which

FWS should provide for different levels of protection for populations of the same species.  The

original version of the ESA included within the definition of species "any subspecies of fish or wildlife or plants and any other group of fish or wildlife of the same species or smaller taxa in common spatial arrangement that interbreed when mature."  Pub. L. No. 93-205, § 3(11), 87 Stat. 884 (1973).  The 1978 amendment retained "subspecies" within the definition of species but eliminated the reference to "taxa in common spatial arrangement" and added instead the phrase "any distinct population segment of any species of vertebrate fish or wildlife."  Pub. L. No. 95-632, § 2(5).  Hence, for instance, "the U.S. population of an animal should not necessarily be permitted to become extinct simply because the animal is more abundant elsewhere in the world."  S. Rep. No. 96-151, at 11 (1979) (emphasis added).  Accordingly, many prominent species protected under the ESA, including the gray wolf and bald eagle, were listed as populations in the lower 48 states despite their abundance in Alaska and Canada.

Thus, consistent with these goals, Congress intended that the DPS authority would be used to protect imperiled populations where listing at a higher taxonomic level was unjustified, and there is nothing to suggest that Congress intended the agency to use this authority to do the opposite – *i.e.*, to eliminate protections for populations where the species or subspecies was threatened or endangered and thereby relegate a species' future persistence to those relatively small populations.  The DPS Policy recognizes this, stating that:

> Listing, delisting, or reclassifying distinct vertebrate population segments may allow the Services to protect and conserve species and the ecosystems upon which they depend before large-scale decline occurs that would necessitate listing a species or subspecies throughout its entire range.

61 Fed. Reg. at 4722.  By this language, the DPS Policy codifies Congress' intention that FWS designate DPSs sparingly.  *See id.* ("Congress has instructed the Secretary to exercise this authority with regard to DPS's '. . . sparingly and only when the biological evidence indicates

that such action is warranted.'") (quoting Senate Report 151, 96th Cong., 1st Sess.)).[11]

Nevertheless, disregarding Congressional intent and the DPS Policy, FWS used the DPS

Policy as a tactic for subdividing the gray wolf species – an entity that FWS has already

determined warrants listing "to the south of Canada" since 1978, 43 Fed. Reg. at 9607 – as a

tactic for the express purpose of delisting it.  As such, "FWS's application of the DPS policy is

patently 'inconsistent with the statute under which the regulations were promulgated.'"  *Nat'l

Wildlife Fed'n*, 386 F. Supp. 2d at 565 (quoting *Mines v. Sullivan*, 981 F.2d 1068, 1070 (9th Cir.

1992)); *Friends of the Wild Swan*, 12 F. Supp. 2d at 1133 ("Listing of population segments is a

proactive measure to prevent the need for listing a species over a larger range – not a tactic for

subdividing a larger population the FWS has already determined . . . . warrants listing throughout

a larger range."); *cf.*, *Defenders of Wildlife*, 354 F. Supp. 2d at 1170 ("[l]ike the bull trout DPS,

the wolf DPS appears to be tactic for downlisting areas the FWS has already determined

warrants listing").  Moreover, such misuse of the DPS authority and DPS Policy is precisely the

kind of abuse that Congress was concerned about.  *See* S. Rep. No. 96-151, at 7 (1979) ("the

committee is aware of the great potential for abuse of this authority [to list DPSs]").

Indeed, the Final Rule must be struck down, or it could set a potentially disastrous

precedent for dozens, if not hundreds, of other federally-protected endangered and threatened

species that have managed to recover in a small fraction of their former range.  As explained

above, FWS has increasingly begun to use the DPS Policy to remove protections for such wide-

ranging species as Columbia white-tail deer, crocodile, and grizzly bear.  *See supra* at 6-7.  Yet,

---

[11]  In this connection, it is inconsequential that FWS has retained endangered status for the gray wolf outside of the DPS.  As explained above, FWS ignored the ESA's procedural and substantive requirements in doing so, and as a practical matter has relegated recovery of that listed entity – whatever its configuration – to a bureaucratic never-never land.  *See supra* at 15-21.

these examples and that of the gray wolf may be just a harbinger of what is to come, as FWS is currently undertaking dozens of five-year reviews of listed species, as required by the ESA.  16 U.S.C. § 1533(g) (requiring FWS to "implement a system in cooperation with the States to monitor effectively for not less than five years the status of all species which have recovered to the point at which the measures provided pursuant to this chapter are no longer necessary and which . . . have been removed from either of the lists").[12]

As part of these reviews for wildlife species, FWS is evaluating whether each listed species may be divided up into DPSs.  *See*, *e.g.*, FWS, Black-Capped Vireo *(Vireo atricapilla)*, 5-Year Review: Summary and Evaluation (June 19, 2007) (Ex. F) at 5 (requiring reviewers to specify whether there is "relevant new information that would lead you to consider listing this species as a DPS").  Thus, if FWS's misuse of the DPS Policy in connection with the gray wolf Final Rule is allowed to stand and FWS is permitted to slice up listed species in order to reduce ESA protections for them, the ESA's overall conservation purpose will be placed in jeopardy for dozens and dozens, and possibly hundreds, of listed wildlife species.

Accordingly, the Court should strike down FWS's latest attempt to use the DPS Policy as

---

[12] *See also*, *e.g.*, 72 Fed. Reg. 54057 (Sep. 21, 2007) (announcing initiation of 5-year reviews of 16 Southeastern species); 72 Fed. Reg. 54061 (Sep. 21, 2007) (announcing initiation of 5-year reviews of 18 Caribbean species); 72 Fed. Reg. 42425 (Aug. 2, 2007) (announcing initiation of 5-year reviews of nine Southeastern species); 72 Fed. Reg. 41348 (July 27, 2007) (announcing initiation of 5-year reviews of three wildlife species in the Midwest Region); 72 Fed. Reg. 20134 (Apr. 23, 2007) (announcing 5-year review for 24 Southwestern species); 72 Fed. Reg. 19549 (Apr. 18, 2007) (announcing initiation of 5-year reviews of seven wildlife and two plant species in the Mountain-Prairie Region); 72 Fed. Reg. 10547 (Mar. 8, 2007) (announcing initiation of 5-Year reviews of 71 Species in Oregon, Hawaii, Commonwealth of the Northern Mariana Islands, and Guam); 72 Fed. Reg. 7064 (Feb. 14, 2007) (announcing initiation of 5-year reviews of 58 Species in California and Nevada); 72 Fed. Reg. 4018 (Jan. 29, 2007) (announcing initiation of 5-Year Reviews of 10 Listed Northeastern Species); 71 Fed. Reg. 56545 (Sep. 27, 2006) (announcing initiation of 5-year reviews of 37 Southeastern species); 71 Fed. Reg. 53127 (Sep. 8, 2006) (announcing initiation of 5-year reviews of 14 Southeastern species).

a tactic to subdivide an entity that FWS has already determined warrants listing at the national level – particularly where FWS failed to apply the ESA's procedural and substantive requirements to determine whether it still does.

## **CONCLUSION**

For these reasons as well as those demonstrated in plaintiffs' brief, FWS's designation and delisting of the WGL DPS should be vacated and remanded to the agency, and the status of gray wolves should revert back to endangered throughout the conterminous states and threatened in Minnesota.

DATED: November 14, 2007                    Respectfully submitted,


                                             ___/s/_____
                                             Amy R. Atwood
                                             D.C. Bar No. 470258
                                             Center for Biological Diversity
                                             P.O. Box 11374
                                             Portland, OR 97211
                                             503-283-5474 phone
                                             503-283-5528 fax
                                             atwood@biologicaldiversity.org

                                             Michael P. Senatore
                                             D.C. Bar No. 453116
                                             Center for Biological Diversity
                                             1601 Connecticut Avenue, N.W., Suite 701
                                             Washington, D.C. 20009
                                             202-232-1216 phone
                                             202-232-1217 fax
                                             msenatore@biologicaldiversity.org

                                             Attorneys for *Amicus Curiae*
                                             Center for Biological Diversity

# Exhibit A:

# Letter from Greenwald to Kempthorne (Sep. 25, 2007):
# 60-Day Notice of Intent to Sue Over Violations of Section 4 of the Endangered Species Act In Connection With U.S. Fish and Wildlife Service's Designation of a Western Great Lakes DPS of Gray Wolf (*Canis lupus*)



CENTER for BIOLOGICAL DIVERSITY                    *Because life is good.*

September 25, 2007

**<u>Via Certified Mail – Return Receipt Requested</u>**
Dirk Kempthorne
Secretary
U.S. Department of the Interior
1849 C Street NW
Washington, DC 20240

RE:   60-Day Notice of Intent to Sue Over Violations of Section 4 of the Endangered Species Act In Connection With U.S. Fish and Wildlife Service's Designation of a Western Great Lakes DPS of Gray Wolf (*Canis lupus*)

Dear Secretary Kempthorne:

The Center for Biological Diversity and other interested parties hereby notify you of their intent to sue over your violations of Section 4 of the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*, in connection with the U.S. Fish and Wildlife Service's ("FWS") designation and concurrent delisting of a western Great Lakes distinct population segment (DPS) of the gray wolf (*Canis lupus*).  *See* 16 U.S.C. §§ 1533(b)(1)(A), 1533(b)(3)(A).  This letter is provided pursuant to the 60-day notice requirement of the citizen suit provision of the Endangered Species Act.

On February 8, 2007, FWS delisted the western Great Lakes gray wolf DPS.  72 Fed. Reg. 06052 (Feb. 8, 2007).  FWS issued a related proposed rule on July 6, 2007 to designate a distinct population segment of wolves in the northern Rocky Mountains and to delist this population, but this rule has yet to be finalized.  72 Fed. Reg. 36939 (July 6, 2007).

The gray wolf was originally protected in 1967 under the precursor to the Endangered Species Act as four separate subspecies, including the Mexican wolf, northern Rocky Mountain wolf, eastern timber wolf, and Texas gray wolf.  In 1978, FWS reclassified the wolf based on new information on taxonomy and distribution, and changed the listing to cover the species in the lower 48 states (herein referred to as the "lower 48 states wolf").  43 Fed. Reg. 4310 (March 9, 1978).

Formerly occurring throughout most of the coterminous United States, wolves were extirpated from all of their range in the U.S. except for a small population numbering fewer than 1,000 individuals in northeastern Minnesota and scattered individuals elsewhere by a government sponsored campaign to trap, shoot and poison wolves in the wild.  Following protection, wolves

Exhibit A in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v. Kempthorne, Civ. No. 07-00677
Page 1 of 6

have steadily increased in number and distribution and now total over 3,000 individuals in the Great Lakes, including portions of Minnesota, Wisconsin and Michigan, and over 800 individuals in the northern Rocky Mountains, including portions of Idaho, Montana and Wyoming.  72 Fed. Reg. 6051 (February 8, 2007) and 72 Fed. Reg. 6105 (February 8, 2007). Although wolves in these areas have experienced substantial recovery, wolves remain at low numbers or are absent from most of their range in the lower 48 states wolf.  In subdividing and delisting portions of the lower 48 states wolf, FWS has abandoned protection and recovery of the wolf over large portions of its range, including the entire northeast and significant portions of the Midwest and western U.S.  Because the lower 48 states wolf remains threatened or endangered in all or a significant portion of its range, this decision runs counter to the Endangered Species Act, FWS's policy on recognition of distinct population segments and existing caselaw.

The decision to designate and delist the western Great Lakes wolf population violates the Endangered Species Act by failing to rely on the best available information and arbitrarily and capriciously: 1) delisting the lower 48 states wolf without notice and comment and a five factor analysis determining that the lower 48 states wolf is extinct, recovered, or listed in error; 2) breaking a valid, imperiled DPS into smaller segments for the purpose of limiting conservation of the larger DPS; 3) failing to follow the provisions of Section 4(a) of the Endangered Species Act, 16 U.S.C. § 1533(a) in listing a non-DPS remnant in the remainder of the wolf's range in the lower 48 states; and 4) designating a DPS for a non-listable entity.

I.    **Delisting the Lower 48 states wolf population without notice and comment and a five factor analysis determining that the Lower 48 wolf is extinct, recovered, or listed in error.**

Under the Endangered Species Act, FWS is specifically required to provide notice and issue proposed and final rules "[w]ith respect to any regulation proposed by the Secretary to implement a determination, designation, or revision" of a species status as a threatened or endangered species.  16 U.S.C. 1533(b)(5A-6A).  In designating and delisting the Great Lakes wolf, FWS failed to provide notice, issue a proposed rule, or analyze whether the lower 48 states wolf, which was formerly the listed entity, still qualified for listing as a threatened or endangered species based on a five factor analysis.  This failure is a clear violation of the Endangered Species Act.

In failing to conduct the above analysis, FWS also failed to analyze whether the lower 48 states wolf remains threatened or endangered in a significant portion of its range.  In a case concerning FWS's unlawful finding for the Flat-tailed Horned Lizard, the U.S. Court of Appeals for the Ninth Circuit held that when it is acknowledged that a species is endangered in a portion of its range, as is the case with the wolf, FWS must provide some basis for concluding that this area is not "significant."  The Court stated that:

> The Secretary necessarily has a wide degree of discretion in delineating "a significant portion of its range," since the term is not defined in the statute. But where, as here, it is on the record apparent that the area in which the lizard is

Exhibit A in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v. Kempthorne, Civ. No. 07-00677
Page 2 of 6

expected to survive is much smaller than its historical range, the Secretary must at least explain her conclusion that the area in which the species can no longer live is not a 'significant portion of its range.

*Defenders of Wildlife et al. v. Norton*, 258 F.3d 1136, 1145 (9th Cir. 2001).

FWS's failure to analyze whether the portions of the wolf's range where it is no longer viable constitutes a significant portion of range is thus a clear violation of the Endangered Species Act. 16 U.S.C. §§ 1532(6) (species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range"); 16 U.S.C. § 1533(20) (species is "threatened" if it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range"); 16 U.S.C. § 1533(a)(1) (requiring Secretary to determine whether a species is endangered or threatened due to any one of five statutory factors).

## II.   __Breaking a valid, imperiled DPS into smaller segments for the purpose of limiting conservation of the larger DPS.__

In designating and delisting the western Great Lakes DPS, FWS has subdivided the lower 48 states wolf to limit recovery to where it currently occurs in violation of both the agency's own policy on recognition of DPS and the Endangered Species Act.  FWS's DPS policy clearly specifies that the purpose of the policy is to conserve populations *before* a species becomes endangered in all of its range.  The policy recognizes that:

> Listing, delisting, or reclassifying distinct vertebrate population segments may allow the Services to protect and conserve species and the ecosystems upon which they depend before large-scale decline occurs that would necessitate listing a species or subspecies throughout its entire range.

61 Fed. Reg. 4722 (Feb. 7, 1996)

In designating and delisting the western Great Lakes population, FWS has turned the policy on its head, by delisting a portion of the wolf's range even though it remains threatened or endangered in the entirety of its range.

In a decision concerning FWS's listing of bull trout, the District Court of Oregon ruled that FWS can consider listing of DPS, but only after evaluating whether the species as a whole or a larger DPS requires listing, stating:

> However, nothing in the ESA or USFWS's rules precludes USFWS from proceeding on a population segment basis if it legitimately concludes, after proper and sustainable analysis, that listing of the entire species or the bull trout population in the coterminous United States is either not warranted or warranted but precluded. Indeed, such a two-tiered approach would promote the ESA's

Exhibit A in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v. Kempthorne, Civ. No. 07-00677
Page 3 of 6

> goals of protecting endangered and threatened species and endangered and threatened population segments as quickly as possible.

*Friends of the Wild Swan v. U.S. Fish and Wildlife Service*, 12 F. Supp. 2d 1121, 1134 (D. Or. 1997).

The Court further concluded:

> As USFWS's own population segment policy acknowledges, listing of population segments is a proactive measure to prevent the need for listing a species over a larger range – not a tactic for subdividing a larger population that USFWS has already determined, on the same information, warrants listing throughout a larger range.

*Id.* at 1133.

Rather than subdividing the lower 48 states wolf to list populations before there is a need to list the species as a whole, FWS has created arbitrary boundaries for the purpose of delisting and undermining conservation of the wolf in large areas of its former range.  This runs counter to the DPS policy, which recognized a Congressional mandate to use designation of DPS "sparingly" (see DPS policy: "Congress has instructed the Secretary to exercise this authority with regard to DPS's '...sparingly and only when the biological evidence indicates that such action is warranted.' Senate Report 151, 96th Congress, 1st Session). 61 Fed. Reg. 4722 (Feb. 7, 1996)

The DPS policy clearly explains that creation of such arbitrary boundaries runs counter to the primary purpose of the Endangered Species Act, which is to protect species at a national level and discourages the use of infra-national boundaries, stating:

> Recognition of other political boundaries, such as State lines within the United States, would appear to lead to the recognition of entities that are primarily of conservation interest at the State and local level, and inappropriate as a focus for a national program. The Services recognize, as suggested in some comments, that infra-national political boundaries offer opportunities to provide incentives for the favorable management of species if they were used as a basis for recognizing discrete entities for delisting or for exclusion from a listing. Particularly when applied to the delisting or reclassification of a relatively widespread species for which a recovery program is being successfully carried out in some States, recognition of State boundaries would offer attractive possibilities. Nevertheless, the Act provides no basis for applying different standards for delisting than those adopted for listing. If the Services do not consider entities for listing that are not primarily of conservation interest at a national level, they must also refrain from delisting or reclassifying units at this level.

61 Fed. Reg. 4722 (Feb. 7, 1996).

Tucson  · Phoenix  · San Francisco  · San Diego  · Los Angeles  · Joshua Tree  · Silver City  · Portland  · Washington, DC

www.BiologicalDiversity.org

Exhibit A in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v. Kempthorne, Civ. No. 07-00677
Page 4 of 6

Designation and delisting of the western Great Lakes DPS is being used as an incentive to states to carry out conservation programs, is based on infra-national boundaries, and runs counter to a national conservation interest by leaving wolves in significant portions of their range with unclear protection and a lack of recovery goals. FWS's subdivision of the wolf when it has already determined the lower 48 states wolf warrants protection at the national level clearly runs counter to the DPS policy and is a clear violation of the Endangered Species Act.

**III.    <u>Failing to follow the provisions of Section 4(a) of the Endangered Species Act, 16 U.S.C. § 1533(a) in listing a non-DPS remnant in the remainder of the wolf's range in the lower 48 states.</u>**

In designating the western Great Lakes DPS, FWS states that creation of a WGL DPS "retain[s] the remaining 48-state and Mexico gray wolf listing intact as endangered." *See* 72 Fed. Reg. at 6066. Although we support protection being maintained in these areas, FWS did not follow the procedures for notice and comment, or issuance of proposed and final rules analyzing the five factors for this remnant non-DPS entity. Besides being a clear violation of the Endangered Species Act, this failure reflects the agency's intent to undermine recovery in these areas by leaving their status in a grey area at best. Even were FWS's decision to designate and delist the western Great Lakes DPS without first considering the status of the lower 48 states wolf legal, which we dispute, FWS should have issued a simultaneous rule listing the remaining areas, thereby triggering notice and comment, designation of critical habitat and ultimately formation of a recovery team for development of a recovery plan.

In an analogous situation, the National Marine Fisheries Service (NMFS) split the northern right whale (*Eubalaena sp.)* into three species, all of which retained listing as endangered. Initially, NMFS believed that the revision was not subject to the listing provisions of the Act because it did not alter the scope of the original listing. On January 11, 2005, NMFS withdrew the revision because it recognized, correctly, that the split necessarily entailed the listing of three taxa and hence was subject to all Section 4 listing procedures and analyses, including an endangerment determination. NMFS recognized that the split did not comply with the Endangered Species Act because it did not entail public notice and comment procedural requirements outlined in Section 4 for listing a species as endangered or threatened and did not meet the Endangered Species Act's substantive requirements by ignoring the need to do a status review of the species to determine its status. 70 Fed. Reg. 01831 (Jan. 11, 2005).

Likewise, by effectively creating a newly listed entity in the reminder of the lower 48 states outside the Great Lakes, FWS must follow all of the provisions of section 4 of the Endangered Species Act. 16 U.S.C. § 1533(a)(1) (requiring Secretary to "determine" whether any species is an endangered species or a threatened species because of any one of five statutory factors); 16 U.S.C. § 1533(b) ("Secretary shall make determinations required by subsection (a)(1) of this section solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species"); 16 U.S.C. §§ 1533(b)(5), (6) (setting forth public notice and comment procedures for regulations proposed by the Secretary "to implement a determination, designation, or revision referred to in subsection (a)(1) or (3) of this section").

Exhibit A in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v. Kempthorne, Civ. No. 07-00677
Page 5 of 6

## IV.     Designating a DPS for a non-listable entity.

Both the DPS policy and the Endangered Species Act require recognition and protection of threatened or endangered distinct population segments "of any species of vertebrate fish or wildlife which interbreeds when mature."  61 Fed. Reg. 4722 (Feb. 7, 1996).  In the case of the western Great Lakes wolf population, FWS has designated a DPS for what is arguably a recovered population and thus a population that is not threatened or endangered.  This runs counter to both the DPS policy and the Act.

In light of the violations described above, this letter puts you on statutory notice that the Center for Biological Diversity, and other interested parties intends to file suit in Federal District Court to enforce the ESA, DPS policy (and/or to challenge the policy to the extent it is enforced in a manner that is contrary to the ESA), and the Administrative Procedure Act.  The Center may forego litigation should FWS revoke designation and delisting of the western Great Lakes DPS.  If you have any questions, wish to meet to discuss this matter or feel this notice is in error, please contact me at 503-484-7495.

Sincerely,

D. Noah Greenwald
Conservation Biologist
Center for Biological Diversity
PO Box 11374
Portland, OR 97211

**VIA ELECTRONIC MAIL ONLY**:

| | |
|---|---|
| Amy Atwood | Matt Kenna |
| Staff Attorney | Staff Attorney |
| Center for Biological Diversity | Western Environmental Law Center |
| atwood@biologicaldiversity.org | mattkenna@gmail.com |

Exhibit A in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v. Kempthorne, Civ. No. 07-00677
Page 6 of 6

# Exhibit B:

# Department of the Interior,
# Office of Inspector General,
# *Investigative Report on Allegations Against Julie MacDonald, Deputy Assistant Secretary for Fish, Wildlife, and Parks* (Mar. 29, 2007)



# REPORT OF INVESTIGATION

## Julie MacDonald,
## Deputy Assistant Secretary,
## Fish, Wildlife and Parks

This report contained information that has been redacted pursuant to 5 U.S.C. §§ 552 (b)(2), (b)(5), (b)(6), and (b)(7)(C) of the Freedom of Information Act and 5 U.S.C. § 552a(k)(2) of the Privacy Act. Supporting documentation for this report may be requested by sending a written request to the OIG Freedom of Information Act Office.

# Results in Brief

The Office of Inspector General (OIG) initiated this investigation based on an anonymous complaint alleging that Julie MacDonald, Deputy Assistant Secretary (DAS), Fish, Wildlife and Parks, had been involved in unethical and illegal activities. Specifically, the complainant alleged that MacDonald had bullied, insulted, and harassed the professional staff of the U.S. Fish and Wildlife Service (FWS) to change documents and alter biological reporting regarding the Endangered Species Program. As our investigation progressed, we also developed information that MacDonald had disclosed nonpublic information to private sector sources.

Through interviewing various sources, including FWS employees and senior officials, and reviewing pertinent documents and e-mails, we confirmed that MacDonald has been heavily involved with editing, commenting on, and reshaping the Endangered Species Program's scientific reports from the field. MacDonald admitted that her degree is in civil engineering and that she has no formal educational background in natural sciences, such as biology.

While we discovered no illegal activity on her part, we did determine that MacDonald disclosed nonpublic information to private sector sources, including the California Farm Bureau Federation and the Pacific Legal Foundation. In fact, MacDonald admitted that she has released nonpublic information to public sources on several occasions during her tenure as Deputy Assistant Secretary for FWS.

The OIG Office of General Counsel's review of this investigation indicates that MacDonald's conduct violated the Code of Federal Regulations (C.F.R.) under 5 C.F.R. § 2635.703 Use of Nonpublic Information and 5 C.F.R. § 2635.101 Basic Obligation of Public Service, Appearance of Preferential Treatment.

This case is being referred to the Department of the Interior (DOI) for potential administrative action against MacDonald.

# Background

Julie MacDonald came to the Department of the Interior in July 2002. She served as senior advisor to the former Assistant Secretary until 2004, when she was promoted by then Secretary Gale Norton to Deputy Assistant Secretary for Fish, Wildlife and Parks. MacDonald is a civil engineer with a master's degree in management. She began her federal career as a hydraulic engineer with Interior's Bureau of Reclamation in 1979. In 1987, she commenced a career in public policy. She has been a staff consultant in the California Legislature and served as senior staff to a former California Senate minority leader. A former California Governor later appointed her as Associate Secretary of the State Health and Welfare Agency and then as Deputy Secretary for Legislative Affairs in the California Resources Agency. In the latter position, she was responsible for gaining bipartisan passage of new provisions in the California Endangered Species Act. DAS MacDonald has oversight of FWS operations including the examination of Endangered Species Act (ESA) reviews, and five-year Critical Habitat Designations (CHD) reviews.

Congress enacted the ESA in 1973. The purpose of the ESA is to conserve, or recover, the ecosystems upon which endangered and threatened species depend. Section 4 of the ESA directs the Secretary of the Interior to determine by regulation whether a given species should be listed as endangered or threatened, based upon the "best scientific and commercial data available…after conducting a review of the status of the species."

The Department is required by statute to conduct a review of every listed Endangered Species (ED) at least every five years. This is to determine whether, based on the best available science, each listed species should have its status either lowered from endangered to threatened, raised from threatened to endangered, delisted altogether, or remain unchanged.

The term critical habitat refers to a specific area within the geographical area occupied by the species, at the time it is listed. Critical habitat includes habitat areas that are both occupied and unoccupied by listed species that are essential to the conservation of the species. FWS must designate critical habitat "on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat."

The legal review and clearance procedure for rule-making documents prepared under Section 4 of the ESA, which was modified in 2004, describes the path ED and CHD packages take to be published at the Federal Register.

Usually operating under a court ordered deadline, ED and CHD review timelines for completion vary from 12 to 18 months. After a draft report is completed, the Regional Office, including the Regional Solicitor's Office, review the field's findings; the Regional Solicitor's Office conducts a draft legal analysis of the report, which is sent to FWS headquarters; at headquarters, the Assistant Director for Endangered Species and the Department Solicitor's Office review the report for legal issues and other concerns. Changes and comments can be made to the draft, but then it is sent back to the Regional Office for a formal legal review by the Regional Solicitor's Office. The regional attorney assigned to the review can surname the document if he/she agrees that the report has legal sufficiency (can withstand a potential lawsuit); they can also disagree and not surname the final. Whether the draft is surnamed or not, it goes back to the Department's Solicitor's Office, the FWS Director, and the Assistant Secretary for Fish, Wildlife and Parks, including Deputy Assistant Secretary MacDonald. According to the policy of the Chief of Staff for the Department, Brian Waidmann, the document must be surnamed before leaving DOI, usually by Barry Roth, Deputy Associate Solicitor for Parks and Wildlife. Waidmann also reviews the package before it goes to the Federal Register for publishing.

When FWS suspects that a species is sliding toward extinction, it places a notice in the Federal Register describing the situation and the studies that led to this conclusion. Independent scientists and others, including the public, may comment on the proposed listing. If FWS determines, usually within one year, that the species does deserve listing, it places another notice in the Federal Register. Thirty days later, the listing becomes effective. Unlike other parts of the Endangered Species Act, the listing of a threatened or endangered species is based solely on science, not on economics or other factors.

# Details of Investigation

## Altering/Changing Scientific Documents

On April 11, 2006, the OIG received an anonymous complaint from an employee of FWS alleging unethical and illegal activities by MacDonald. The complainant stated that MacDonald had persistently harassed, bullied, and insulted FWS employees to change documents and "ignore good science" related to the Endangered Species Program. After initiating a preliminary inquiry into these allegations, we opened an investigation.

On October 30, 2006, an article appeared in *The Washington Post* regarding DAS MacDonald and her consistent rejection of FWS staff scientist's recommendations to protect animals and plants under the ESA. Several issues were raised in the article which required further investigation.

When we interviewed the former Director of the FWS Endangered Species Program (ES), he stated that many of the scientific reports his office has issued have been edited extensively by MacDonald, who has no background in biology, and cited the Sage Grouse Risk Analysis as an example. He explained that many other officials in MacDonald's position have made changes to reports to reflect their political philosophy, but MacDonald took it a step further by involving herself at the field level. He explained that MacDonald regularly bypassed managers to speak directly with field staff, often intimidating and bullying them into producing documents that had the desired effect she and the former Assistant Secretary wanted.

The former ES Director discussed one instance in which MacDonald interfered in FWS critical habitat fieldwork. He said that in central California, FWS had been collecting data where *vernal pools* were located to designate them as a critical habitat. He said FWS was conducting the work under a court order with a required date of completion. He explained that several days before this date, FWS sent its report to MacDonald, who then determined that the economic cost of designating the area as a critical habitat was unacceptable. The former ES Director said MacDonald ordered him to revise the report to reflect her position.

*Agent's Note: Vernal pools are miniature ecosystems: natural depressions covered by shallow water for variable periods from winter to spring, they are typically dry for most of summer and fall. A diverse array of plants and animals adapted to a waterlogged spring followed by a parched summer has evolved that thrive under these conditions. Many of these are native species endemic to vernal pools or related wetland habitat. Because of the extreme environment, there are relatively few introduced species that can compete with the natives. In addition to providing habitat for the resident species, vernal pools provide resting sites for migrating birds and foraging grounds for bald and golden eagles.*

The former ES Director said MacDonald reached this conclusion after she had accessed a California Department of Development Web site and researched business development figures from the counties involved with the critical habitat. He stated that she had misread the figures and based her decision on a mistake, although she later acknowledged that she interpreted the figures incorrectly.

The former ES Director said that overall, MacDonald did not want to accept petitions to list species as endangered, and she did not want to designate critical habitats. He said the overall effect

4

was to minimize the Endangered Species Act as much as possible or ensnare it in court litigation, which happened often.

We interviewed the Assistant Director for External Affairs, FWS, who stated that MacDonald would not accept the field's scientific findings and would apply science from alternative outside sources. She said MacDonald would use information from these sources as "the best science" and insist field employees revise their findings to fit what she wanted.

The Assistant Director for External Affairs described MacDonald as "an angry woman" who had been abusive to her and had become a liability to FWS. She stated that MacDonald had demoralized the FWS program with her interference in endangered species studies – often reaching "way down the line" to have reports reflect what she wanted.

When we interviewed the Chief of the Division of Consultation, FWS, he said that while he has not personally experienced or witnessed any inappropriate behavior by MacDonald, many of the field biologists had expressed concerns similar to the OIG complainant. The Chief said he believed that MacDonald's policy regarding endangered species was not to regulate them unless there was scientific proof showing otherwise. He said that unfortunately, in most cases, there is rarely definitive scientific proof, leaving uncertainties. The Chief of the Division of Consultation said MacDonald, when evaluating scientific reports, has leaned more toward the question of: "Does the science fit the policy?"

When we interviewed the Assistant Manager, California/Nevada Operations (CNO), FWS, he explained he has managed or was the lead biologist for the past eight years on numerous studies under the ESA and CHD. FWS would typically not establish CHD for a species until sued by environmental groups to do so. The process involved in CHD would follow the actual listing of an endangered species. [Ex. 5]

The CNO Assistant Manager explained how ESA issues get to court. The DOI and FWS are sued in federal court to review the status of an ED species (list/delist) or CHD. A deadline date is established for the review to be completed. The CNO Assistant Manager's staff would begin compiling scientific and biological data on the issue. Initial draft of the issue would be given to the Regional Solicitor's Office for legal review and sent back for revision. The final draft is reviewed for legal sufficiency by the Regional Solicitor's Office and sent to FWS headquarters in Washington, D.C., for further comments and revisions. The CNO Assistant Manager said many reviews are not surnamed by the regional attorneys because they are legally vulnerable due to administrative procedures ([Ex. 5]).

With respect to the California Tiger Salamander CHD and listing of the Distinct Population Segment (DPS), there was a push by DAS MacDonald to combine a large central area of California with two other smaller DPS for the salamander. According to CNO Assistant Manager, that proposal was eventually rejected by the court, as well as science, when it was determined that there were genetic differences in each population of the salamander that would prevent their combining the DPS.

The Endangered Species Coordinator, CNO, FWS, reiterated the California Tiger Salamander experience during her interview. She was the team coordinator on the FWS determination of threatened status for the Central California DPS of the California Tiger Salamander. The CNO ES Coordinator said DAS MacDonald was not happy that there were two DPSs in the north and south regions of California and wanted to consolidate these into a central California salamander population;

FWS employees disagreed with the consolidation. MacDonald had a number of objections in the final salamander rule to the CNO's findings. This was a controversial issue because consolidating the population segments from the north and south regions into the central population would diminish their status as 'endangered' to the central region's lesser designation of 'threatened.' The ES Coordinator commented that MacDonald was able to get what she wanted on the final salamander ruling; however, the court overruled the Department and kept the north and south DPSs as endangered, while adding the central region as threatened.

The CNO Assistant Manager stated that FWS Ecological Services does not factor in economic issues when reviewing endangered species for a listing. Economics does become an issue though in CHD. The economic issues would be something that senior management at DOI may take into consideration in their decisions in the process. The Secretary of the Interior can overrule FWS' research based on economic considerations as long as it does not lead to the extinction of the species. The CNO Assistant Manager added that FWS research has to be repeated over and over based on the challenges, lawsuits, and pendulum of politics. He also stated that there has been a lot of pressure on his department in CNO over the last three years, "but we have toed the line." He explained, "Everything needs to be consistent with the law and the science."

The CNO Assistant Manager stated that the CNO is at the center for continual lawsuits by the private sector and environmentalists and that the environmental groups particularly like the Ninth Circuit Court of Appeals for ESA issues. He commented that the Regional Solicitor's Office rarely surnames their legal reviews on ED/ CHD issues. The normal path for his office's work (aside from legal review) would be from himself to the CNO Manager, to FWS Deputy Director Marshall Jones, to FWS Director Dale Hall, and then the to the Special Assistant to the Assistant Secretary for Fish, Wildlife and Parks, the Deputy Assistant Secretary and the Assistant Secretary, Fish, Wildlife and Parks would weigh in with the Secretary's Chief of Staff. Deputy Associate Solicitor Barry Roth would surname the FWS packages before sending them to the Federal Register. The CNO Assistant Manager said if DOI management (Assistant Secretary, Chief of Staff) wants something accomplished policy wise, it does not matter whether the Regional Solicitor's Office surnamed the rulemaking package or not; the DOI's Deputy Associate Solicitor can, and frequently does, use his surname authority to move the rule to the Federal Register.

The CNO Assistant Manager commented that working with Julie MacDonald "has been one of the most challenging times in my entire career." He stated that MacDonald intimidated some FWS employees and added that it was very unusual for a person of her position to directly contact field biologists and challenge them on their work. He said MacDonald would relate to the various FWS personnel she contacted that she was calling on behalf of the former Assistant Secretary. The CNO Assistant Manager stated that the CNO Manager would verify that information by calling the former Assistant Secretary himself to ensure that he was the source of the inquiry and not MacDonald. The CNO Assistant Manager related there was a fair amount of "explicit" conversations with MacDonald that the former Assistant Secretary "wanted this and that done" and it caused a lot of stress on his staff.

We interviewed the Chief of the Endangered Species Division, CNO, FWS; he works for the CNO Assistant Manager. The CNO ESD Chief stated that Julie MacDonald "was in your face all the time, but never inappropriate." The CNO ESD Chief described MacDonald as "a pain in the butt."

The CNO ESD Chief stated that he was responsible for much of the research on the Delta Smelt fish as an ESA issue. There was a recovery plan established in 1990 for the Delta Smelt, and

there was also a plan for delisting the Smelt if the population index was exceeded three of the next five years. In 2003, the California Farm Bureau Federation (Farm Bureau) produced a report that the Delta Smelt was no longer threatened. The Farm Bureau report was not referenced, cited, or published with any scientific research. As a result, FWS asked the U.S. Geological Survey (USGS) to conduct a peer review. USGS completed the review and criticized the Farm Bureau's report. There is still an ongoing lawsuit against FWS for not delisting the Smelt based on the recovery plan and whether the population index is accurate. The CNO ESD Chief stated that MacDonald challenged the basic population index that FWS biologists have always used and claimed that the USGS peer review was "no good." In the current lawsuit by the Farm Bureau, there was an e-mail provided to the Farm Bureau that has caused controversy. *Agent's Note: The e-mail was ultimately determined to have been provided by MacDonald.* The presiding judge on the case demanded that FWS explain its position since the e-mail makes the FWS appear confused over its own stance on the Smelt's listing under the ESA. The CNO ESD Chief added that just because an endangered species' recovery plan is met, that does not mandate delisting. He said MacDonald was highly opinionated about what she believed was the right way to evaluate the controversy and she did not support FWS research or the peer review by USGS.

The CNO ESD Chief related a series of phone conversations and meetings with MacDonald, during which she kept pressuring him to make subtle changes to his report or research. Although, according to CNO ESD Chief, in some cases it was just changing words, he had to involve other CNO management so that his report did not begin to just mirror what MacDonald wanted him to say. The CNO ESD Chief opined that the degree of involvement by MacDonald was unprecedented for a DAS.

The CNO Manager FWS, was interviewed and said that most issues on the ESA are court driven. With respect to DAS MacDonald, the CNO Manager related that he has been around a long time with FWS and never took anything MacDonald said or wanted at face value. He would contact the former Assistant Secretary directly or fly to Washington, D.C., to verify MacDonald's requests and present his view on the ED and CHD reviews coming from the CNO.

The CNO Manager stated that his office's confrontations with MacDonald had become much better since Dale Hall had become FWS Director. Thompson opined that political appointees should make changes in policy but not interfere with biologists doing their jobs. There were times MacDonald was helpful in her critical reviews, but the CNO Manager viewed her as ineffective in her overall approach. In the Delta Smelt issue, the CNO Manager stated that he received an enormous amount of pressure from MacDonald. The presiding judge requested a memo for inclusion into the Smelt Administrative Record (a record is kept on all reviews) explaining the circumstances surrounding an e-mail by MacDonald to the CNO Manager and other CNO officials regarding a press release on the Smelt. MacDonald allegedly sent the e-mail to a friend in the Farm Bureau, who brought it to the attention of the judge and prompted the request. In the memo, the CNO Manager identifies MacDonald as being the source of much of the conflicting DOI internal debate over the Smelt. The CNO Manager said he believed that the Farm Bureau dropped its lawsuit on the five-year status review of the Smelt because the science did not support the claims for delisting.

The CNO Manager stated that there are 30 to 50 lawsuits on his desk in any week and that it comes with the territory, the politics, the agency, and the geographical area he supervises. He stated that MacDonald would often put a slant on the rules that would compromise FWS' position and success in court.

7

The CNO Manager was aware of DOI/FWS headquarters personnel who wanted to file a hostile work environment complaint against MacDonald. He said his employees at CNO were definitely stressed, pushed, and yelled at by MacDonald. The CNO Manager stated he would interject at any point when he felt MacDonald had clearly stepped out of her authority and was demeaning to his staff, even to the point of halting conference calls and not calling MacDonald when she had stepped over the line.

The CNO Manager concluded by saying that MacDonald was a prolific writer and made him and his staff do an incredible amount of work, which was often unproductive. He added he felt confident that he and his staff remained professional throughout their contacts with MacDonald despite not feeling MacDonald always shared that basic approach.

The OIG interviewed the Assistant Manager, Region 1 Portland, FWS, who said that she heads up the Endangered Species Review Section for Region 1. The Portland Assistant Manager informed us that the recently retired Region 1 Director was very frustrated in his contacts with MacDonald.

The Portland Assistant Manager commented that Julie MacDonald intimidated FWS personnel within Region 1. She instructed her staff to tell MacDonald that they would need to go through their supervisors when they were badgered with questions by MacDonald. She related that MacDonald would curse and yell at her, but she never felt intimidated or threatened by MacDonald because the Portland Assistant Manager was confident that her 20 years of government service and quality of work could withstand the verbal attacks; however, she sympathized with the less senior FWS employees who might not have felt as secure on the receiving end from a senior manager. She described MacDonald as lacking the basics in managerial style.

The Portland Assistant Manager stressed to her staff to be impartial in their work, be complete, and, above all, remain professional and dedicated to the overall mission of FWS. She commented that MacDonald was very critical and would find mistakes on things that were incomplete, which was a good thing, but her confrontational style tainted any positives related to her review. The Portland Assistant Manager also added that MacDonald would go around managers to get to the lowest level FWS employees. This was considered to be unprofessional and caused additional problems within the region since many of the biologists were not used to that type of direct contact from a senior manager in the Assistant Secretary's corridor.

The Portland Assistant Manager said that MacDonald was very frustrated over CHDs. On the designation of critical habitat for the Bull Trout, for example, there were specific exclusions for federal agencies and not federal lands, as MacDonald had wanted. The exclusion of federal lands meant more miles of critical habitat eliminated.

*Agent's Note: In a number of e-mails and comments on the Bull Trout CHD, MacDonald forced a reduction in critical habitat miles in the Klamath River basin from 296 to 42 miles.*

The Portland Assistant Manager stated Region 1 has produced numerous completed ESA reviews over the past three years and MacDonald has never overturned any of her staff's reviews; however, she said many Region 1 decisions on ESA reviews were revised as a matter of policy by MacDonald or another Fish, Wildlife and Parks senior manager's discretion. The Portland Assistant Manager stated MacDonald has never told her that she could not list or delist an endangered species.

8

The Assistant Manager commented that she has been with the government long enough to know there are a lot of political issues that affect agency decisions.

The Portland Assistant Manager stated that although MacDonald lacked a professional managerial style, she was unaware of any known incidents in which a Region 1 FWS employee felt threatened enough to file a hostile work environment complaint against MacDonald. The Assistant Manager commented that MacDonald would invoke the former Assistant Secretary's name on many occasions to obtain what she wanted from the field. She said that the former regional director ran a lot of interference, while MacDonald put a lot of pressure (using the former Assistant Secretary's name) on the Region.

In closing, the Portland Assistant Manager stated that there was a lack of oversight by DOI senior management to keep MacDonald in check and advise her of her role in the process. The Assistant Manager stated that after FWS Director Dale Hall was appointed in October 2005, he quickly realized that it was unprofessional for MacDonald not to follow a chain of command and it hindered the rulemaking process to have MacDonald involved at the field level.

We interviewed the Chief, Classification and Conservation, FWS, who stated that MacDonald often interjected herself into the scientific process. She cited MacDonald's involvement in an FWS study of Preble's Meadow Jumping Mouse as an example. The mouse was listed in 1998 as a threatened species under the ESA.

On February 2, 2005, FWS issued a finding on a petition to delist the Preble's mouse and proposed to remove the mouse from the federal list of threatened and endangered species. The delisting proposal was primarily based on the genetic research conducted by a zoologist formerly of the Denver Museum of Nature and Science. The zoologist's study claimed that the Preble's mouse was not a species unto itself and was part of a more common species of mouse. The Classification and Conservation Chief said that based on this information, MacDonald wanted to delist the species from the endangered list.

According to the Classification and Conservation Chief, in seeking to use the best science possible in making a final decision, FWS later commissioned a USGS biologist to do an independent genetic analysis of several meadow jumping mouse subspecies. The USGS study results, provided to FWS on January 25, 2006, raised significant questions about the conclusions drawn by zoologist in his study.

Given the apparent inconsistencies between these reports, said the Classification and Conservation Chief, the FWS contracted with Sustainable Ecosystems Institute (SEI) to organize an independent scientific review panel to analyze, assess, and weigh the reasons why the data, findings, and conclusions of the USGS biologist differ from those of the zoologist. The Chief said MacDonald wanted to hire an outside consultant other than SEI. On July 21, 2006, SEI delivered to FWS their report, which stated that based on the "best available science" it appears the Preble's mouse is a distinct species on at least some basis. A final determination by FWS on the status of the Preble's mouse is pending.

The Classification and Conservation Chief opined that MacDonald is more interested in political views than getting it "right." She said that in many instances, FWS establishes a ruling on a critical habitat in the Western United States, has it published in the Federal Register, and then has it

immediately challenged in court by business interests such as water and power companies, cattlemen's associations, commercial and residential housing developers, and farm bureaus. According to the Chief, FWS has been losing many of these challenges, and FWS budget resources are being wasted when a court finds fault with a ruling two or three times on the same habitat review. Further, the Classification and Conservation Chief claimed that several of the Regional Solicitor Offices will not surname, or sign off on, the rule making documents (ED/CHD reviews) or policy decisions because they believe they are not legally sufficient.

During the investigation, we found an example of the legal wrangling involved with a critical habitat ruling described in an article in the *San Francisco Chronicle* on May 17, 2003, regarding the Alameda Whipsnake. According to the article, the Alameda Whipsnake dispute started in 1999 when the Center for Biological Diversity, an environmental group based in Tucson, AZ, sued FWS for failing to designate critical habitat for the whipsnake. The environmental group prevailed in its suit and in 2000; FWS designated more than 400,000 acres of land as critical whipsnake habitat. Following that designation, a coalition including the Home Builders Association, the California Chamber of Commerce, and the California Alliance for Jobs sued FWS alleging it violated the ESA by not adequately defining the habitat area or considering its economic impact. The Pacific Legal Foundation (PLF) represented the coalition in this case and was successful in overturning the original protected habitat of the whipsnake.

The article quoted a spokesperson for FWS in Sacramento, CA, who stated that FWS spent a lot of money on a process that was lawsuit-driven to designate a habitat, after which it was lawsuit-driven to get it dismantled. According to the spokesperson, this illustrates the drain on the FWS budget having to contend with constant lawsuits from either business interests or environmental groups.

***Agent's Note:*** *According to their Web site, the PLF is a conservative law firm representing various business interests. It is a self-proclaimed national leader in the effort to reform the ESA and raise awareness of the Act's impact on people. They have successfully mounted a number of legal challenges to ED/CHD reviews throughout the Western United States on behalf of their clients such as the California Farm Bureau, Washington Farm Bureau, California State Grange, Arizona Cattle Growers' Association, and the California Cattlemen's Association.*

When the OIG questioned her regarding her involvement in the Delta Smelt case, MacDonald related that she has not had to testify in court, but she did have to file a clarifying memorandum, co-signed by CNO Manager, as to the circumstances surrounding her e-mail to CNO officials regarding a controversial press release by CNO on the Smelt.

According to DAS MacDonald, when she attended meetings at Western Regional Offices, it was not beyond the realm of possibility that she swore at field personnel when challenging them on their scientific/biological findings. She said she generally will match the tone of whoever is speaking to her. She recalled that early in her tenure with DOI, the quality of the ED/CHD reviews emanating from the field was bad. She added that the reviews have since improved.

## Regional and Department Solicitors' Comments on the Legal Review Process

We interviewed an attorney from the Department Solicitor's Office in the Main Interior Building (MIB). The attorney has worked on FWS legal issues regarding ED and CHD reviews.

During the past four to five years, he said, federal listings involving ED and CHD reviews have been accomplished under court ordered deadlines.

The attorney from the Solicitor's Office described the process of how a CHD review gets published in the Federal Register. He said if there is a legal dispute between the Regional and Department Solicitor's Offices, the final decision concerning the ED and CHD review packages is made by Deputy Associate Solicitor Roth or Solicitor David Bernhardt, if necessary. According to the attorney, Roth and Bernhardt both have the ability to elevate the surnamed review to the DOI's Chief of Staff despite legal insufficiencies cited by the FWS Regional Solicitor's Office.

We interviewed the Assistant Regional Solicitor, Solicitor's Office, FWS Region 1, Portland, OR, who described his work as involving either litigation, legal review, or rule making as it applies to the ESA.

The Portland Assistant Regional Solicitor stated he has conducted approximately 15 ED/CHD legal reviews and that the administrative record for these reviews generally consists of factual support, scientific data, public comment, and peer review. When asked why he does not generally surname on ED/CHD reviews, the Assistant Regional Solicitor commented he has not surnamed a document in six years due to the legal insufficiency of the documents. He states that he looks at the rule, the rationale within the rule, past judicial decisions, whether it is factually supported, and whether there are any hopes of public support.

The Portland Assistant Regional Solicitor related that he and FWS personnel are always under court ordered deadlines to meet review dates. Normally when he gets a review, there is already a deadline looming and he attempts to turn them around in 24 hours; however, it often takes a week when questions need to be asked of the field biologists.

The Assistant Regional Solicitor commented that often what is being proposed or sent to him for review is a legal stretch. Due to the heavy workload of the field biologists and the ever-present court deadlines, the regional reviews are not particularly good. The initial review package from the field on a CHD or an ED listing/delisting package may be delivered to him lacking elements the field biologists should have included. The Portland Assistant Regional Solicitor often spends time correcting these mistakes and then does the initial review.

The Portland Assistant Regional Solicitor described the review process for a CHD and ED package. He said the completed package would go to the Federal Register, usually the day before it is due, even though from his perspective the package was legally insufficient. The Assistant Regional Solicitor said the former Deputy Associate Solicitor used to rationalize that even though he surnamed a legally insufficient document, it kept the Secretary of the Interior from being held in contempt of court. The Portland Assistant Regional Solicitor commented that the former Counsel to Secretary Norton, believed the former Deputy Associate Solicitor was actually signing ESA issues as being legally sufficient.

The Portland Assistant Regional Solicitor recalled two teleconference calls on CHD for Bull Trout and the Sage Grouse that he had with DAS MacDonald and other Regional and headquarters FWS officials. MacDonald wanted a 90 percent reduction in acreage for the Bull Trout's critical habitat. The Assistant Regional Solicitor remembered distinctly that MacDonald was "quite hostile, raised her voice repeatedly, and cut people short as they were explaining." The Portland Assistant

Regional Solicitor sent the attorney in the Solicitor's Office at MIB an e-mail with the subject, "and the Red Queen was talking backwards," after the conference call. The Portland Assistant Regional Solicitor wrote, "Re: today's call. I'm still reeling from my little taste of it, but its [sic] Alice in Wonderland every day for you, isn't it?" The Assistant Regional Solicitor opined that MacDonald was disrespectful, rude, and unprofessional, and said, "never in over 20 years of government service" had he seen a political appointee behave like she did.

The Portland Assistant Regional Solicitor was assigned the legal review for the designation of Columbia and Klamath populations for the Bull Trout habitat. He cited three reasons for not surnaming the document and a fourth regarding the preamble disclaimer as being inappropriate and in need of deletion from the final rule on the Bull Trout.

Regarding the other conference call on Sage Grouse with MacDonald, the Portland Assistant Regional Solicitor said the interaction with MacDonald was even worse than on Bull Trout. On Sage Grouse, there was a deadline approaching and a major issue involving state regulations for protecting the species. He described the Policy for Evaluating Conservation Efforts (PECE), in which state conservation efforts are screened under defined criteria to validate conservation plans. The Assistant Regional Solicitor said the policy is very well-written, if FWS just followed it. For Sage Grouse, three FWS regions (Regions 1, 2, and 6) reviewed state plans and determined that conservation efforts did not meet the PECE policy. The Portland Assistant Regional Solicitor said once MacDonald was informed, she claimed that FWS came up with the wrong conclusions and instructed them to go back and do the review again. He termed this behavior by MacDonald as "the most brazen case of political meddling" he had seen. [Ex. 5]

In an e-mail to his supervisor, the Portland Assistant Regional Solicitor said that the former DOI Deputy Solicitor, who was in on the conference call, opined that, "...FWS has received inadequate supervision [relating to Sage Grouse and PECE policy] and that it's time for us to start 'meddling' in their work."

When asked about the preamble disclaimer language on their legal review memo (which the Portland Assistant Regional Solicitor believed was initiated by the former Assistant Secretary in 2001 or 2002), he opined that it is a waste of time and makes FWS look reluctant to carry out its duties, casting a negative light on the entire process. The Portland Assistant Regional Solicitor stated he worked with attorney at the MIB a few months ago to change the verbiage in the preamble and that the Assistant Solicitor for Fish & Wildlife, MIB, supposedly has referred it to Assistant Secretary for Fish, Wildlife and Parks David Verhey for further review.

The Assistant Regional Solicitor, Solicitor's Office, CNO, FWS, Sacramento, CA, stated that he has been doing FWS reviews for the past seven years and has done approximately 20 reviews since 2002. These reviews typically consist of listings, 90-day findings, 12-month findings, preliminary CHDs, and final CHDs.

The Assistant Regional Solicitor in Sacramento recalled the Alameda Whipsnake ruling that he had surnamed as being legally sufficient and from which he learned a lesson because the ruling was overturned in court. He commented that he has not surnamed a CHD since 2002. In his legal analysis of the California Tiger Salamander listing, which included the consolidation of the three DPSs that MacDonald wanted and obtained in the final ruling, the Assistant Regional Solicitor in Sacramento

concluded that it was legally insufficient. The final ruling proceeded to the Federal Register, was immediately challenged, and was overturned by a federal district court.

The Assistant Regional Solicitor in Sacramento said that ED and CHD reviews always have looming deadlines and they have to be surnamed by the Department Solicitor's Office before going to the Federal Register. He related that if there are legal concerns, the Assistant Secretary for Fish, Wildlife and Parks would become involved. There are monthly calls back and forth, and legal objections are discussed. The preamble disclaimer language added to the final rules is always debated and "the higher pay grades make the final decision." As to the legal analysis, the Assistant Regional Solicitor in Sacramento said, "MacDonald is not in my chain of command. We work for the Interior Secretary through the Solicitor. MacDonald found that out early in her career." The Assistant Regional Solicitor in Sacramento commented that he had never had a one-on-one discussion with MacDonald. He has raised objections to the rubber stamping of ESA packages at senior levels in the Department despite them being identified as legally insufficient at the regional level; he said, however, "Policy trumps science within the Assistant Secretary's corridor on many occasions."

The Assistant Solicitor for Fish and Wildlife, Solicitor's Office, DOI, Washington, D.C., said the bulk of their work is with the ED, CHD, and litigation issues with the ESA.

He described the typical process for legal analyses of ED and CHD reviews conducted at the regional office level. Sometimes, however, he said that in between the packages going from the Assistant Secretary's Office to the Chief of Staff's Office, they are reviewed by Deputy Associate Solicitor Barry Roth. The Assistant Solicitor for Fish and Wildlife said he provides legal advice (weaknesses in case, potential for legal suit, etc.) to Roth and usually it involves two points of consideration: one, whether to surname the document to avoid being held in contempt of court for failing to provide the Federal Register a rule by the court ordered deadline; and two, whether to surname the document as being defensible in court if challenged or surname the document noting the legal concerns raised by the Regional Solicitor's Office. The main concern is to publish the best decision possible within court deadline requirements.

According to the Assistant Solicitor for Fish and Wildlife , since the Bush Administration came into office in 2001, DOI senior management has conducted a balancing of risk factors involved with sending ED and CHD rules to the Federal Register with the knowledge that there are legal problems with the packages. Obviously, he said, the Assistant Secretary's Office policy agenda involves a certain amount of litigation risks and they are prepared to absorb expected losses.

The Assistant Solicitor for Fish and Wildlife said that in the past four years that Julie MacDonald has been with the Assistant Secretary's Office for Fish, Wildlife and Parks, over 75 percent of the legal reviews his office has received from the FWS western regional offices have not been surnamed.

The Assistant Solicitor for Fish and Wildlife was asked if he had felt any pressure on the ED and CHD issues from DAS MacDonald regarding the number of non-surnamed documents coming from the regions. He said he felt no pressure from MacDonald because she is not in his chain of command; rather, the pressure comes from the court deadlines his office has to meet.

The Assistant Solicitor for Fish and Wildlife related that Brian Waidmann, DOI Chief of Staff, wanted the Solicitor's Office opinion and surname on ED and CHD packages before they go to the Federal Register.

He commented on the preamble disclaimer language for critical habitat that the former Assistant Secretary had inserted into final CH rules. The Assistant Solicitor for Fish and Wildlife said that recently in a California federal court decision on Vernal Pools CH designation, the court said FWS' failure to consider the recovery benefits of a critical habitat designation was a key point in remanding the case.

[Ex. 5]

We interviewed Barry Roth, Deputy Associate Solicitor, Solicitor's Office, DOI, Washington, D.C., he stated that when ED and CHD review packages get to him, he is usually under a court ordered deadline to move them on to the Federal Register; this rarely leaves time to remedy legal problems with the packages. He acknowledged surnaming the packages before they go to the Federal Register to avoid contempt of court charges for missing court deadlines. Roth said meeting the deadlines is his main focus. He does due diligence in reviewing the legal analysis from the Regional Solicitor's Office, notes their legal concerns, and signs them. He understands that he is under no statutory requirement to surname; however, it is DOI Chief of Staff Brian Waidmann's policy that the package be surnamed before the final rule goes to the Federal Register.

Roth said the process for review, commenting, and surnaming has not worked well over the past few years. There has not been a lot of time to work out the legal problems associated with the packages before the court deadline arrives. Within the last year, Roth said the process has improved somewhat as the documents are being delivered with more than one day's notice.

Prior to Roth taking on the surnaming duty, the former Deputy Associate Solicitor, was in the position to last review the ED and CHD packages. Roth said the former Deputy Associate Solicitor more or less rubber stamped the packages with his signature due to the large amount of packages that arrived from the field because of time limits imposed by a court deadline. Roth said he has attempted to give the documents a more critical review before sending them to the Federal Register.

Roth stated that FWS had been instructed to use a boilerplate preamble disclaimer language favored by the former Assistant Secretary regarding critical habitat designations. It was seen as a legal obstacle by several of the Regional Solicitor's attorneys who review CHD packages, and it was recently struck down by a federal district court in California.

Roth related that the FWS work agenda is controlled by the litigation process regarding ED rule listings/delistings and CHDs. Roth used the term, "unfunded mandate on FWS" to describe how their work is affected by lawsuits. They do not have the budget to constantly conduct ED and CHD reviews under court deadlines, in addition to carrying out their normal duties.

Roth advised that he does not always agree with everything DAS MacDonald does; however, he did say she works hard and he has approached their business relationship as her "legal adviser." He normally talks to her on ED and CHD matters when subordinates, an attorney and the Assistant Solicitor for Fish and Wildlife, feel the need to elevate an issue. Roth said MacDonald customarily goes through FWS management with her comments and reservations on particular ED and CHD

14

matters. In matters where Roth and MacDonald have opposing views, he brings the issue to the attention of Solicitor David Bernhardt. Roth related that Bernhardt was focusing more on ESA issues than his predecessors.

Roth was asked if he had knowledge of MacDonald ever releasing deliberative process material outside of DOI, FWS, and the federal government, he recalled the Delta Smelt e-mail she released to the California Farm Bureau in 2004.

The OIG interviewed DOI Solicitor David Bernhardt concerning his role in the ED/CHD legal review process. Bernhardt echoed his subordinate Barry Roth's assertion that ED and CHD packages arrive at the Department usually under a court ordered deadline leaving little time for review before going to the Federal Register. The overriding concern is to avoid contempt of court for the Secretary of the Interior. Bernhardt said he has an obligation to give legal advice to the Secretary as to whether these ED/CHD packages are a bad risk or an assumable risk, given their legal sufficiency, and to provide the Secretary with options.

Recently, Bernhardt sent a memorandum to his office attorneys that included a section on the surnaming of documents. He reminded them that the placing of your surname on a document is an attestation that they have inquired into and analyzed the factual and legal matters presented in the document and are satisfied that the matter is in compliance with applicable law. Bernhardt advised them that it is appropriate to include with their surname comments that describe the scope of the review or articulate reservations to which their surname is subject, consistent with the duty of due diligence.

Bernhardt acknowledged that he has the final decision in differences between Roth and DAS MacDonald regarding legal concerns with ED/CHD packages. He views MacDonald as a legal client to whom he provides advice.

When we interviewed FWS Deputy Director Marshall Jones, he stated several Senior Executive Service employees within the FWS regional offices have contemplated filing hostile work environment complaints. He said none of these individuals, however, have gone forward with their complaints. Jones commented that it seemed like MacDonald had "political heat" on her to change the science behind the endangered species reviews.

According to Jones, MacDonald was the former Assistant Secretary's "attack dog" regarding ED issues. Jones stated that after the new appointment of Hall as FWS Director, MacDonald had moderated her interference. He said Hall had "drawn a line in the sand" with MacDonald and had stated that she has the right to change policy but not the science coming from the field.

Jones also speculated that MacDonald may have been sharing internal FWS ED documents with outside sources. He said he based this suspicion on the sources MacDonald used to challenge FWS field biologist findings. Jones explained that FWS is also being consistently sued in federal court by private sector entities for missing endangered species review deadlines. He cited the PLF as a legal group who regularly sues FWS for missing review dates.

Jones stated that while MacDonald has been correct on several occasions in her challenges of field research, he emphasized that her position is one of political policy – not scientific finding.

15

We interviewed Dale Hall, FWS Director, about the allegations against MacDonald. He stated, "A lot of that is true". He said that since October 2005, when he was sworn in, he has been involved in a "running battle" with MacDonald over the chain of command in FWS and her repeated attempts to circumvent it.

As an example of her interference, Hall cited MacDonald's involvement of a FWS study of the Southwest Willow Flycatcher, a small bird placed on the ED list in 1995 and whose habitat stretches from Arizona through New Mexico and into Southern California. He said the FWS Southwest Region was studying the Flycatcher in order to be in compliance with a September 30, 2003 opinion issued by the Federal District Court of New Mexico (*Center for Biological Diversity v. Norton*). Hall was the Regional Director for that office at the time. He said the biologists were identifying primary constituent elements, which are elements that endangered species need to live. One of these elements was the nesting range of the Flycatcher. Hall explained that birds have flying radiuses around their nests, and the field biologists determined that the Flycatcher's radius or range was 2.1 miles. He said MacDonald decided that 1.8 miles was more accurate, and she then argued with the field personnel about that issue.

Hall said he told the field staff to inform her of the science behind their findings, and if she still said to make the change, to go ahead and do so – but to document everything. He said that in the end, MacDonald had them change the range to 1.8 miles because she was concerned that the 2.1 radius figure would extend into California. Hall stated that MacDonald had a particular interest in all of the ED work in California, where her husband maintained the family ranch, and she had previously served in various California State Legislature positions ranging from staff consultant to a former Republican Senate Minority Leader, to Associate Secretary of Health and Welfare and Deputy Secretary for Legislative Affairs under a former California Governor.

Hall said he had a "face down" with MacDonald over an issue involving the Kootenai River sturgeon, a white sturgeon fish that resides in Montana and Idaho. Hall explained that the sturgeon needed certain levels of river flow in order to spawn, and the goal is to have reasonable river flows for spawning without affecting the operations of the dams[1] more than necessary.

Hall, a wildlife biologist, noted that flow levels are measured in ranges and are not tied into one specific number. He said the field established the range for the Kootenai sturgeon between 2.3 and 5.9 cubic feet per second. He said MacDonald wanted to be specific and asked the field to change the final figure to 5.9. Hall said he challenged MacDonald on her assertion and asked her to put it in writing but that she ultimately relented and they kept the 2.3 to 5.9 range.

Hall stated that MacDonald later circumvented the chain of command and went directly to the field biologists at the river to request documents and to remind them to "be sure" about the science. He noted that the dam operators would have benefited from using the 5.9 figure.

We interviewed the former Assistant Secretary for Fish, Wildlife and Parks, who related that he did not recall anyone in FWS complaining to him regarding the managerial style of MacDonald. A quote from the former Assistant Secretary in a *Time* magazine article from December 13, 2004, regarding MacDonald's critique of the Sage Grouse review stated, "She is highly qualified, an engineer, extremely competent, and reads every single paper cited" by federal biologists in their

---

[1] There are at least five dams along the river's route.

16

reviews. The former Assistant Secretary said he had complete confidence in MacDonald's abilities, first as his Special Assistant and then as Deputy Secretary. She frequently spoke for him in matters regarding ED and CHD with FWS. The former Assistant Secretary said he spoke on a regular basis with FWS Regional Directors regarding ED and CHD final packages and their associated problems. He stated he was personally involved in these issues as they were matters of importance to him.

The OIG interviewed another former Assistant Secretary for Fish, Wildlife and Parks, who subsequently assumed the position and who supervised MacDonald for approximately seven months before accepting a position in the private sector. The other former Assistant Secretary stated that there were several disagreements between FWS Director Hall and MacDonald over chain of command issues and MacDonald's penchant for communicating directly with field employees over scientific reporting. The other former Assistant Secretary said Hall and MacDonald differed over the role the Deputy Assistant Secretary should have in reviewing and editing the scientific reports coming from the field. He described himself as a "referee" between Hall and MacDonald in several meetings.

The other former Assistant Secretary commented that he had heard that several FWS regional directors and office managers were contemplating filing hostile work environment complaints against MacDonald. He said he had heard that MacDonald "got into the face" of FWS personnel and that she had a fundamental suspicion of FWS employees because of her belief that they were close with the environmental groups. He said he has a philosophical difference with MacDonald on how to treat employees, and he did not agree with her approach.

When we interviewed Julie MacDonald, she said she is responsible for reviewing, commenting, and at some times editing critical habitat designation reports and five-year endangered species reviews. MacDonald said she views her involvement in the Endangered Species Program as part of her duties, and she challenges the science produced by FWS field personnel and makes them accountable for the citations and rules they refer to in field reports. She admitted that she is not always right, as in the case of the vernal pools, but added, "The figures were a mistake and very embarrassing, but they didn't make a difference in the outcome of the review."

DAS MacDonald considered the Western Regional Solicitor's Offices to be outside their legal realm in their opinions and analysis regarding ESA and CHD issues." She accused the FWS of being lax in submitting ESA/CHD packages to DOI senior management before court ordered deadlines were imminent.

During her interview, DAS MacDonald was asked why she ignored or discounted the Regional Solicitor's legal opinion concerning ED/CHD packages. MacDonald replied it was a matter of policy, it was what worked best, and it was the result of the risk balancing that takes place between policy and legal insufficiency. MacDonald commented that the former Assistant Secretary was "very" involved regarding ED/CHD issues [Ex. 5].

MacDonald echoed Roth's comment regarding Waidmann wanting everything surnamed before leaving DOI and going to the Federal Register, describing it as his "informal and unwritten" policy. MacDonald agreed with Roth stating that in policy disputes with the DOI Solicitor's Office, she consults with Bernhardt for resolution.

**Misuse of Position**

As our investigation of MacDonald progressed, in addition to the initial allegations, we developed information that MacDonald had misused her position and disclosed nonpublic information to private sector sources.

On April 4, 2006, OIG investigators reviewed MacDonald's government e-mails, using the keyword "Pacific Legal Foundation" as a search item because of the number of times this private sector legal entity appears in newspaper and other media articles related to court decisions involving ED.

The e-mail search revealed that MacDonald had sent an FWS document titled, "Interim Guidance for the Designation of Critical Habitat Under the Endangered Species Act," with an attachment that consisted of 147 pages, to a PLF attorney. MacDonald sent this e-mail on February 4, 2004, following an exchange of e-mails she had with the PLF attorney on the subject of draft CHD policy.

In those e-mails, the PLF attorney requested information from MacDonald, stating, "Any information that you can share regarding the draft policy, and general guidance as to the process/timetable, would be greatly appreciated." MacDonald wrote back, "I will send you a copy of the draft but please do not share it with anyone else. It's still undergoing revision, although the fundamental legal/policy approach will not change. Does that work for you?" The PLF attorney acknowledged, "…yes, that would definitely work. You have my word that it won't go beyond me. Thanks [the PLF attorney's first name]."

Marshall Jones identified the e-mail to the PLF attorney containing the Interim Critical Habitat Guide as being nonpublic information and classified as internal DOI/FWS documents. Jones stated that these documents were for "FWS eyes only" and should not have been disseminated outside of DOI.

*Agent's Note: According to Deputy Director Jones, the Interim Guidance for Critical Habitat Designation has never been publicly released or published for comment. Jones said it remains an FWS internal document and probably will remain so indefinitely. During his interview, Jones speculated that MacDonald may have been sharing internal FWS ED documents with outside sources; however, he had no evidence to substantiate his contention.*

The former Assistant Secretary stated that he did not give MacDonald permission to release the Interim Guidance for Critical Habitat Designation Policy to the attorney for the PLF. He added that he never knowingly gave MacDonald a blanket authorization to release nonpublic information. The former Assistant Secretary stated that he authorized MacDonald to share matters with whomever necessary in the course of consultations on issues.

The other former Assistant Secretary also said he never gave MacDonald permission to release nonpublic information. He admitted that the issue of MacDonald disclosing nonpublic information was a rumor within Fish, Wildlife and Parks; however, he said the subject was not officially brought to his attention in his official capacity as Assistant Secretary.

During our review, we found another e-mail, dated March 30, 2004, which MacDonald sent to a non-governmental address. This e-mail included an attachment titled, "Draft [Delta Smelt] 5-Year Review," which was an FWS review of a Northern California endangered species, the Delta Smelt.[2] During her interview, MacDonald identified the address as her private e-mail account. She said she often transmitted DOI/FWS documents to her home computer for use during off hours.

We found the Draft Delta Smelt five-year review was a highly controversial issue within FWS. In fact, the media heavily reported on MacDonald and her attempts to derail the status review on the Smelt because it did not support removing protections for the Smelt. FWS released its status review on the Delta Smelt on March 31, 2004. Originally, the review had recommended that the threatened listing be continued; however, on April 1, 2004, MacDonald sent an e-mail to FWS CNO Manager, the CNO Assistant Manager, and the Chief of ESD in the Sacramento office, stating that "...the facts represented by the Service [released status review] provide an oversimplified and misleading characterization of what is happening...I have asked the press release be stopped until we have an opportunity to more accurately characterize the finding and its basis".

***Agent's Note:*** *The FWS biologists from the Sacramento office who completed their review of the Delta Smelt five-year draft in March 2004, took the position that there was no justification for delisting the Smelt, while MacDonald opposed the field decision through her comments in the margins of the Smelt draft review dated March 30, 2004. As of this date, the Farm Bureau is no longer a part of the Smelt lawsuit against FWS.*

We discovered several other e-mails sent from MacDonald's government computer to internet subscriber addresses outside of the Department. The title of two such e-mails was the "Delta Smelt letter/report/press release". These e-mails contained MacDonald's critical comments regarding the FWS Sacramento office's release of a Delta Smelt review letter to the Congressional Affairs office in Washington, D.C..

We sent an Inspector General subpoena to AOL for subscriber information for the e-mail accounts to which MacDonald sent the documents. We identified the recipients as an attorney-advisor in the Solicitor's Office at MIB, the father of an individual MacDonald met online, and her child.

Two weeks after MacDonald sent the above-mentioned e-mails, the California Farm Bureau made a formal FOIA request for the e-mail and any responses to it (MacDonald had provided a copy of the e-mail to a Farm Bureau lobbyist and personal friend). An examination of the FOIA file revealed that the e-mail was designated exempt from public disclosure by DOI's FOIA office as "inter-agency or intra-agency memorandums or letters" on July 7, 2004.

A further review of MacDonald's government e-mails showed a large Environmental Protection Agency (EPA) file that was sent to a private AOL account. MacDonald had also sent the same document to another account ending in *chevrontexaco.com*.

Additional reviews of MacDonald's e-mails show that she regularly meets and communicates with officials and lobbyists working for the California Farm Bureau Federation and the Building Industry Association of Southern California. Both of these entities have launched lawsuits against

---

[2] An IG subpoena to MSN/Hotmail did not disclose relevant subscriber information other than the e-mail address was initiated in Los Angeles, CA, in 1999.

FWS to force it to review whether certain species should continue to be listed as endangered. Based on the analysis of several of these e-mails, MacDonald appears to have a close personal and business relationship with a Farm Bureau lobbyist.

Examples include an October 4, 2002 e-mail where the Farm Bureau lobbyist asked MacDonald for information on what FWS has done with the Office of Management and Budget guidelines attached to the e-mail. He also asked about the status of his request for a meeting between the former Assistant Secretary and two Farm Bureau representatives to discuss a court decision concerning FWS land-use restrictions.[3] The Farm Bureau lobbyist requested feedback from MacDonald on these subjects, and MacDonald provided answers in a subsequent e-mail on October 17, 2002.

We found another e-mail, dated September 30, 2003, from the Farm Bureau lobbyist to MacDonald, where he asked her, "with respect to the FY 04 appropriations/budget – any issue regarding the funding for the Fish and Wildlife Service to do the 5 year delta smelt review? where would the money come from?"

*Agent's Note: MacDonald requested through a series of e-mails to subordinate employees, including the FWS Associate Director for Budget, Planning and Human Resources, to gather the above information for her, MacDonald then passed it onto the Farm Bureau lobbyist.*

In another example of MacDonald's close relationship with the California Farm Bureau Federation, she voluntarily provided the previously mentioned Delta Smelt e-mail to an attorney for the California Farm Bureau Federation, who immediately filed the e-mail with the U.S. District Court in Washington, D.C. The court had been reviewing the Delta Smelt case and Farm Bureau's attorney asked the judge to reopen it, citing disarray among the federal defendants as demonstrated by the MacDonald e-mail.

Affidavits filed with the court in the Delta Smelt case indicate that the attorney and the lobbyist testified in District of Columbia Federal District Court that MacDonald provided the objectionable e-mail to the lobbyist at the Farm Bureau attorney's request.

As documented through her government e-mails, DAS MacDonald has met with, lunched with, spoken to, allowed access to high level DOI officials, and provided nonpublic information on FWS internal deliberations to lobbyists like the California Farm Bureau Federation lobbyist and private sector entities such as the California Farm Bureau Federation and PLF over the past four years.

During her interview, MacDonald admitted to sending the Interim Critical Habitat Guide via her government e-mail account to a PLF attorney. She acknowledged that the document would not have been released under a Freedom of Information Act (FOIA) request; however, she said that did not mean she could not release it to a personal friend, the PLF attorney, as long as the attorney would not post the document on the PLF's Web site. Shortly thereafter, MacDonald changed her statement and said she may have received authorization to release the document to the PLF attorney from her supervisor, the former Assistant Secretary.

---

[3] *Arizona Cattle Growers v. U.S. FWS*

According to MacDonald, an attorney in the Solicitor's Office works FWS legal issues for the Department, and in that capacity, she has sent numerous FWS documents to the attorney's home computer for review (when on leave/after hours).

MacDonald confirmed that she also sent the Delta Smelt document to an on-line game friend through his father's e-mail account. MacDonald said she is acquainted with the on-line friend through internet role-playing games. She said she engages in these games to relieve the stress created by her job; however, she said she has not played while at work. When asked why she would e-mail an internal DOI document to a private citizen, MacDonald replied, "I was irritated [with what was happening regarding the subject of the document] and tried to explain my irritation over the phone; however, I sent it to him to read for a better understanding."

*Agent's Note: The on-line game friend is not professionally or personally affiliated with DOI or any of its entities. MacDonald continues to play games on the internet with the on-line friend; however, she has not sent any internal DOI information to him since her first interview last summer.*

MacDonald could offer no explanation as to why she sent her child an e-mail containing an internal DOI/FWS document other than she feels frustrated at times and likes to have third party reviews of these documents. MacDonald opined that she sent FWS documents to the on-line game friend and her child to have another set of eyes give an unfiltered opinion of them, negative comments included.

MacDonald admitted to sending "Watershed proposed draft rule by the EPA: proposal of a new framework for accomplishing the water quality planning and management provisions of the Clean Water Act" via government e-mail to a personal friend, whose e-mail address ended in *chevrontexaco.com*. She said she did not remember why she sent the document as an attachment to the friend but stated, "It probably wasn't releasable." When MacDonald was questioned about the second e-mail, containing a large EPA file, sent to another e-mail address ending in *chevrontexaco.com,* MacDonald could not recall whom this e-mail address belonged to.

MacDonald acknowledged having contact with the Farm Bureau and other lobbying entities, including a professional relationship with the California Farm Bureau Federation lobbyist. She stated that she also has a social relationship with the lobbyist. However, she denied giving preferential treatment to the Farm Bureau lobbyist or his clients. She stated, "I try to respond to everyone/public when asked for information. It's my duty as a public servant." MacDonald stated that the Farm Bureau lobbyist has no more access than any other person seeking information on FWS programs.

Title 5 of the Code of Federal Regulations (C.F.R.) § 2635.101 Basic Obligation of Public Service states:

> Employees shall act impartially and not give preferential treatment to any private organization or individual.

> Employees shall endeavor to avoid any actions creating the appearance that they are violating the law or the ethical standards set forth in this part. Whether particular circumstances create an appearance that the law or these standards have been violated shall be determined from the perspective of a reasonable person with knowledge of the relevant facts.

Title 5 of the Code of Federal Regulations (C.F.R.), Chapter XVI, Subpart G, Standards of Ethical Conduct for Employees of the Executive Branch § 2635.703 Use of Nonpublic Information states:

(a) *Prohibition.*   An employee shall not…allow the improper use of nonpublic information to further his own private interest or that of another, whether through advice or recommendation, or by knowing unauthorized disclosure.

(b) *Definition of nonpublic information.* … Is information that the employee gains by reason of Federal employment and that he knows or reasonably should know has not been made available to the general public.  It includes information that he knows or reasonably should know:

> (1) Is routinely exempt from disclosure under 5 U.S.C. 552 or otherwise protected from disclosure by statute, Executive order or regulation;

> (2) Is designated as confidential by an agency; or

> (3) Has not been actually disseminated to the general public and is not authorized to be made available to the public on request.

An Associate General Counsel of the OIG's Office of General Counsel reviewed the details of our investigation and advised that the C.F.R. had been violated under 5 C.F.R. § 2635.101 Basic Obligation of Public Service because of the appearance of preferential treatment and 5 C.F.R. § 2635.703 Standards of Conduct, Use of Nonpublic Information.

# Subject(s)

Julie MacDonald, Deputy Assistant Secretary, Fish, Wildlife and Parks, Department of the Interior, Washington, D.C.

# Disposition

The results of this investigation will be forwarded to the Assistant Secretary for Fish, Wildlife and Parks for appropriate administrative action as warranted.[Ex.5]

# Exhibit C:

# Carroll, C, M.K. Phillips, C.A. Lopez-Gonzalez, and N.H. Schumaker. 2006. Defining recovery goals and strategies for endangered species: the wolf as a case study. Bioscience 56(1): 25-37

# Defining Recovery Goals and Strategies for Endangered Species: The Wolf as a Case Study

CARLOS CARROLL, MICHAEL K. PHILLIPS, CARLOS A. LOPEZ-GONZALEZ, AND NATHAN H. SCHUMAKER

*We used a spatially explicit population model of wolves (*Canis lupus*) to propose a framework for defining rangewide recovery priorities and finer-scale strategies for regional reintroductions. The model predicts that Yellowstone and central Idaho, where wolves have recently been successfully reintroduced, hold the most secure core areas for wolves in the western United States, implying that future reintroductions will face greater challenges. However, these currently occupied sites, along with dispersal or reintroduction to several unoccupied but suitable core areas, could facilitate recovery of wolves to 49% of the area in the western United States that holds sufficient prey to support wolves. That percentage of the range with recovery potential could drop to 23% over the next few decades owing to landscape change, or increase to 61% owing to habitat restoration efforts such as the removal of some roads on public lands. Comprehensive habitat and viability assessments such as those presented here, by more rigorously defining the Endangered Species Act's concept of "significant portion of range," can clarify debate over goals for recovery of large carnivores that may conflict with human land uses.*

*Keywords: Canis lupus, conservation planning, Endangered Species Act, reintroduction, spatially explicit population model*

**A**s human impacts on the biosphere increase, conservation biology must increasingly focus not only on preserving the current distribution of biodiversity but also on restoring species to areas from which they have been extirpated (figure 1). The success of restoration efforts depends in part on clarification of both the normative and the technical components of recovery goals (Breitenmoser et al. 2001). For example, the level of extinction risk tolerated or the extent of historic range to which recovery is desired are normative decisions guided by laws such as the US Endangered Species Act (ESA; 16 USC 1531–1540 [1988]). Once these normative aspects are resolved, conservation science can help identify which restoration strategy is most likely to ensure the desired level of recovery. Many of the species listed under the ESA are narrowly distributed endemics that can be protected by preserving a limited number of sites (Dobson et al. 1997). It is more difficult to define recovery goals for species such as the gray wolf (*Canis lupus*), which have large area requirements for viable populations, and whose protection may conflict with existing land uses such as livestock production. The scientific methodology used to define recovery goals and strategies for endangered species has not fully integrated recent technical advances in conservation biology, such as spatially explicit population models (SEPMs; Dunning et al. 1995). We present an example of such an analysis applied to the wolf, a high-profile endangered species whose proposed recovery goals (68 Federal Register 15804–15875) have recently been the subject of litigation (*Defenders of Wildlife v. Norton,* Civ. 03-1348-JO [2005]; *National Wildlife Federation v. Norton,* 03-CV-340 [2005]), to demonstrate how these methods can introduce key scientific knowledge into the debate over recovery goals and facilitate the decisionmaking process by illustrating the efficacy of alternate management scenarios.

Although the ESA of 1973 was the third in a series of laws aimed at protecting imperiled species, it was the first to offer protection to any species in danger of extinction throughout all or a significant portion of its range. By including the phrase "significant portion of its range," Congress signaled its intent that listed species should not simply be saved from extinction, but rather recovered so that populations inhabit relatively large areas (i.e., significant portions) of suitable habitat within historic ranges. Case law (*Defenders of Wildlife v. Norton,* 258 F.3d 1136 [2001], 239 F. Supp. 2d 9 [2002], Civ. 03-1348-JO [2005]; *National Wildlife Federation v. Norton,* 03-CV-340 [2005]) and previous delisting actions by the US Fish and Wildlife Service (USFWS) are consistent with this intent, as the 15 taxa that have been declared recovered since passage of the ESA were generally widely distributed at the time of delisting. This expectation was buttressed when Con-

*Carlos Carroll (e-mail: carlos@klamathconservation.org) is with the Klamath Center for Conservation Research, Orleans, CA 95556, and is conservation science advisor for the Wilburforce Foundation in Seattle. Michael K. Phillips is with the Turner Endangered Species Fund, 1123 Research Drive, Bozeman, MT 59718. Carlos A. Lopez-Gonzalez is with the Universidad Autonoma de Querétaro, Querétaro, Mexico 76010. Nathan H. Schumaker is with the US Environmental Protection Agency, Corvallis, OR 97333. © 2006 American Institute of Biological Sciences.*

Exhibit C in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v. Kempthorne, Civ. No. 07-00677
Page 1 of 13



*Figure 1. In 1995, M. K. P. (the second author) and others released the first wolves to inhabit Yellowstone National Park in 70 years. Endangered species recovery efforts often involve reintroduction of animals to unoccupied but potentially suitable habitat. However, the extent of historic range to which reintroduction is needed is a controversial issue for formerly widespread species such as the wolf whose restoration may conflict with human land uses, such as livestock grazing on public lands. Photograph: National Park Service/Jim Peaco.*

gress defined the term "species" to include "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature" (ESA section 3[15]). The policy of recognizing distinct population segments (DPSs) allows for protective measures before the occurrence of large-scale declines that would necessitate listing a species or subspecies throughout its entire range (61 Federal Register 4722).

In the late 1950s, the number of gray wolves inhabiting the conterminous United States reached an all-time low, with fewer than 1000 wolves occupying less than 1% of the species' historic range in northeastern Minnesota and the adjacent Isle Royale National Park (Phillips et al. 2004). Three decades after passage of the ESA, owing to the expansion of populations in Minnesota and Canada and to reintroduction efforts in the northern Rocky Mountains (USFWS 1994) and the southwestern United States (USFWS 1996), about 4500 wolves occupy about 5% of the species' historic range in the conterminous United States (figure 2). In response to this improved conservation status, in April 2003 the USFWS published a reclassification rule that divided the lower 48 states into three DPSs (figure 2), retaining the experimental–nonessential population areas in the northern Rocky Mountains (USFWS 1994) but elsewhere downlisting the eastern and western gray wolf DPSs from endangered to threatened and indicating that recovery objectives for both had been met (68 Federal Register 15804–15875). However, in 2005, two federal court rulings vacated and enjoined the rule on the basis, in part, that it lacked comprehensive consideration of

the phrase "significant portion of range" and misapplied the DPS policy (*Defenders of Wildlife v. Norton*, Civ. 03-1348-JO [2005]; *National Wildlife Federation v. Norton*, 03-CV-340 [2005]). When considered with the two earlier rulings cited above, this indicates that future recovery plans for wolves and other listed species should be guided by a rangewide determination of habitat suitability and relevant principles of conservation planning. The three principles of representation (establishing populations across the full array of potential habitats), resiliency (protecting populations large enough to remain viable), and redundancy (saving enough different populations that some can be lost without a loss of the species) are widely invoked guidelines for ensuring conservation of threatened species, even in the face of geographically widespread threats such as climate change (Shaffer and Stein 2000). By broadening recovery criteria to encompass representation, these principles recognize that a single population may not represent species recovery, even if it is large enough to be significantly resilient to extinction. For wideranging species such as the wolf, the importance of connectivity (protecting linkage areas, especially those that enhance viability by connecting larger with smaller populations) may justify its addition as a fourth principle for defining recovery goals (Soulé and Terborgh 1999).

In the 2003 proposed rule, the USFWS conflated the concepts of population viability and recovery. The claim that the ESA mandates only maintaining a species' viability (preventing extinction) rather than effecting recovery was first made in a 1986 revision to the regulations governing ESA

 Exhibit C in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v. Kempthorne, Civ. No. 07-00677
Page 2 of 13

enforcement (50 CFR 402), but has been repeatedly rejected by the courts (Suckling and Taylor 2005). This distinction is especially important for species such as the wolf or grizzly bear (*Ursus arctos*) that currently occupy a small portion of their historic range, because ESA mechanisms for maintaining viability restrict only "take" of individuals or occupied habitat, whereas ESA mechanisms for effecting recovery may restrict the destruction of unoccupied but suitable habitat and call for proactive measures to promote population reestablishment (Suckling and Taylor 2005). Although the bulk of the ESA's language addresses recovering individual species, Congress also included language that mandates the conservation of ecosystems on which listed species depend. Because of this, some researchers have proposed an additional guideline for recovery planning, the principle of ecological effectiveness (Soulé et al. 2005). An ecologically effective population contains enough individuals with a wide enough geographic distribution to reestablish the species' role in ecosystems. The argument for reestablishing ecologically effective populations is most persuasive in the case of the wolf and other "keystone" species that strongly influence ecosystem function through interspecific interactions such as predation (figure 3). For example, the return of wolves to Yellowstone has triggered a cascade of top-down effects on that ecosystem (Smith et al. 2003). Wolf predation has reduced the ability of elk to concentrate browsing on preferred species such as aspen (*Populus tremuloides*), leading to the recovery of riparian vegetation and associated species (Ripple and Beschta 2004). Because the wolf is a keystone species that was historically widespread throughout the western United States, yet whose recovery may conflict with current land-use practices such as livestock grazing on public lands, it provides an ideal case study of the role of conservation science in clarifying species recovery goals. We first present an example of a rangewide analysis for the wolf in the western contiguous United States, and then describe the use of an SEPM to help define recovery goals and strategies at a finer scale for the southwestern DPS (SWDPS) for the gray wolf (figure 2).

## Rangewide analysis for the western United States
We analyzed potential wolf habitat and population viability across the western contiguous United States, from the western edge of the Great Plains to the Pacific Ocean, an area of about 2,800,000 square kilometers ($km^2$) (figure 2). The structure of the SEPM (PATCH, or program to assist in tracking critical habitat) and input habitat models used in this study are described in detail elsewhere (Schumaker 1998, Carroll et al. 2001a, 2001b, 2003a, 2003b) and summarized here (box 1). We calibrated habitat rankings to specific demographic values based on field studies from areas that showed similar habitat quality to the habitat classes in the SEPM input layers (Ballard et al. 1987, Fuller 1989, Hayes and Harestad 2000, Fuller et al. 2003, Smith et al. 2004). Because the analysis covers a large and ecologically diverse region, the geographic information system, or GIS, models for fecundity and survival



*Figure 2. Map of the analysis area and the approximate location of wolf (*Canis lupus*) populations in the western United States, including the existing Yellowstone, central Idaho, and Blue Range reintroduction sites and the population in northwestern Montana established by dispersal from Canada. Nearly all of the area within the analysis boundary is within the historic geographic range boundary of the gray wolf, although more arid areas typically held few wolves. The extent of habitat defined as "suitable" in this analysis (meeting the productivity threshold that allows breeding in the PATCH model) is shown in gray. The boundaries of the southwestern distinct population segment, or DPS (as proposed by the US Fish and Wildlife Service [68 Federal Register 15804–15875]), are shown. Locations within the southwestern DPS evaluated as potential reintroduction sites in this study are shown in black. Abbreviations: C, Carson; G, Grand Canyon; M, Mogollon; S, San Juan Mountains.*

must use general habitat data that are available in every state. This is a lesser problem for the survival input layer, because roads and human population have a similar negative effect on large carnivore survival in diverse habitats (Thiel 1985, Fuller et al. 2003). A metric combining road density, local human population density, and interpolated human population density (Merrill et al. 1999) predicted survival in the spatially explicit population modeling (figure 4b).

Estimating wolf fecundity (reproductive rates) across the western United States is more difficult. Abundance estimates of ungulate prey are not collected in some areas of the western United States, and where they do exist, they show strong

Exhibit C in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v. Kempthorne, Civ. No. 07-00677
Page 3 of 13

*Articles*



*Figure 3. Wolves in Yellowstone have reduced the ability of elk to concentrate foraging on aspen, cottonwood, and other favored species, thus allowing the recovery of key riparian vegetation and its associated biota. Restoring such top-down ecosystem processes involving wolves and other keystone species may require ecologically effective populations (i.e., populations that are larger and more widespread than would be necessary to ensure viability of the species itself). Photograph: Bob Landis.*

---

**Box 1. Spatially explicit population models.**

Conservation planners assess the distribution of wildlife habitat (including potentially suitable but currently unoccupied areas) with the aid of computer models of varying complexity. Broadly speaking, large carnivores such as the wolf can persist in areas where there is sufficient food and where persecution by humans is low (Fuller et al. 2003). A simple model of recovery potential could therefore highlight large roadless areas with sufficient productivity or extensive forest habitat. More complex spatially explicit population models (SEPMs) might also begin with data on road density and productivity, but would then integrate additional information on species characteristics such as demographic rates and dispersal behavior. For example, social carnivores, such as the wolf, often require larger territories than solitary species of similar size, and may thus be more vulnerable to landscape fragmentation (Carroll et al. 2003a). Unlike the simpler model, an SEPM can provide insights on the effects of population size and connectivity on viability and can help identify the locations of population sources and the degree of threat to those areas from landscape change (figure 4a; Carroll et al. 2003b).

PATCH (program to assist in tracking critical habitat), the SEPM used here, is designed for studying territorial vertebrates. It links the survival and fecundity of individual animals to geographic information system (GIS) data on mortality risk and habitat productivity at the scale of an individual or pack territory (Schumaker 1998). Territories are allocated by intersecting the GIS data with an array of hexagonal cells (figure 4c). The different habitat types in the GIS maps are assigned weights based on the relative levels of fecundity and survival expected in those habitat classes. Base survival and reproductive rates, derived from published field studies, are then supplied to the model as a population projection matrix (box 2; Caswell 2001). The model scales these base matrix values using the mean of the habitat weights within each hexagon, with lower means translating into lower survival rates or reproductive output (figure 4c). Each individual in the population is tracked through a yearly cycle of survival, fecundity, and dispersal events (figure 4a). Environmental stochasticity is incorporated by drawing each year's base population matrix from a randomized set of matrices whose elements were drawn from a beta (survival) or normal (fecundity) distribution (coefficients of variation given in box 2). Adult organisms are classified as either territorial or floaters. The movement of territorial individuals is governed by a parameter for site fidelity, but floaters must always search for available breeding sites. As pack size increases, pack members in the model have a greater tendency to disperse and search for new available breeding sites (Carroll et al. 2003a). Movement decisions use a directed random walk that combines varying proportions of randomness, correlation, and attraction to higher-quality habitat (Schumaker 1998).

Exhibit C in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v. Kempthorne, Civ. No. 07-00677
Page 4 of 13



*Figure 4. Spatially explicit population models (SEPMs) represent population processes by tracking the spatial location of individuals and landscape features. (a) A flowchart of the simulation process in PATCH, the SEPM used in this study. (b) Graphs of the relationship between GIS-based habitat values and demographic values for fecundity (given as females produced per pack) and survival for wolves. (c) Territories are allocated by overlaying an array of hexagonal cells on GIS habitat data. For the wolf, data on roads are used in combination with human population data to calculate the metric of habitat effectiveness used to scale wolf survival rates. Abbreviation: GIS, geographic information system.*

inconsistencies across state boundaries. Therefore, as a surrogate for fecundity, we used tasseled-cap greenness (Crist and Cicone 1984), a metric derived from MODIS (Moderate Resolution Imaging Spectroradiometer) satellite imagery from mid-July 2003 and 2004 (Wharton and Myers 1997). "Pseudohabitat" variables such as greenness that are derived directly from unclassified satellite imagery are correlated to varying degrees with ecological factors such as net primary productivity and green phytomass (Cihlar et al. 1991, Merrill et al. 1993, White et al. 1997), and thus with abundance of ungulate prey species, although this relationship is weakened by phenological variation between years and by spatial variation in the percentages of bare ground and of dry biomass (Merrill et al. 1993). Summer greenness values are strongly correlated with ungulate density in the northern Rocky Mountains and Pacific Northwest (Carroll et al. 2001b, 2003a), and with carnivore habitat in other regions (Mace et al. 1999, Carroll et al. 2001a). However, the link between greenness and prey abundance may be less general across the larger and more ecologically varied region addressed in this study than is the well-established link between prey abundance and wolf density (Fuller et al. 2003). Therefore, to avoid overestimation of prey abundance in nonforest habitats, we used data on vegetation type to rate forest habitat higher than shrubland habitat with similar greenness values. Nonnatural (agricul-

> **Box 2. Parameters used in the PATCH model of wolf population dynamics in the western United States.**
>
> Territory size: 504 square kilometers ($km^2$)
> Maximum dispersal distance: 750–1500 km
> Survival rates (maximum):
>
> - Young, year 0: 0.46
> - Subadult, year 1: 0.86
> - Adult, > 2 years: 0.96
> - At senescence (year 8): 0.69
>
> Fecundity rates (maximum number of female offspring per adult female or pack):
>
> - Subadult, year 1: 0
> - Adult, year 2: 2.29
> - Adult, > 3 years: 3.21
>
> Coefficient of variation in demographic rates:
>
> - Fecundity: 30%
> - Pup (year 0) mortality: 40%
> - Adult mortality: 30%

 Exhibit C in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v. Kempthorne, Civ. No. 07-00677
Page 5 of 13

*Articles*

tural and urban) habitat was given zero habitat value. Because wolves are coursing predators that avoid steep terrain, the wolf fecundity model also incorporated the negative effect of slope on prey vulnerability (Paquet et al. 1996, Carroll et al. 2001b).

The results of the PATCH model are generally more sensitive to the demographic parameters used, and to how these parameters were assigned to habitat classes, than to variation in other parameters, such as dispersal distance (Carroll et al. 2003b). The large body of published research on relationships between wolf demographics and habitat (e.g., as reviewed in Fuller et al. 2003) strengthens the power of conceptual models such as those used here. In previous studies, SEPM predictions of wolf distribution were strongly correlated with wolf distributions as recorded in regional-scale field surveys (Carroll et al. 2003a). This is most likely because large carnivore distribution is strongly limited by human influences, for which easily mapped attributes such as road density are good surrogates (Carroll et al. 2001a). Such "pattern-oriented" calibration of complex spatial models may in some cases reduce uncertainty due to poorly known demographic parameters (Wiegand et al. 2004).

The landscape-change scenarios we used estimated potential change in human-associated impact factors (e.g., roads and human population) by proportionately increasing road density and by increasing human population on the basis of current trends derived from a time series of human census data. Census data were available for the period 1990–2000 (USCB 1991). We predicted human population growth from 2000 to 2025 based on growth rates from 1990 to 2000, but adjusted the predicted 2025 population to match state-level predictions based on more complex socioeconomic models. Human population in the area of our analysis is predicted to grow 42%, from 62 million to 88 million, in the period 2000–2025. Because available road data are of varying dates, it is not possible to assemble a regional chronosequence of road distribution and determine county-level rates of increase in roads. Therefore, the road density parameters incorporate an increase of 1% per year (proportional to the current road density at the 1-km[2] scale) across the study area. We chose to use a rate (1% per year) that is half of that seen in the most rapidly growing portions of our study region (e.g., western Colorado; Theobald et al. 1996). Similarly, we used a simplified habitat restoration scenario that assessed the effects of removing 1% of the roads on public lands per year.

We treated human impacts within strictly protected areas (parks with no hunting or trapping) as less lethal than in other areas, because of the lack of incidental mortality from hunters in those areas. In the landscape-change analysis, we also treated all protected areas (includ-

ing those with hunting) differently from unprotected habitat in that we assumed no increase in road density over time. The simulations began with animals inhabiting all suitable habitat. We define "suitable habitat" as the areas with sufficient food resources to support reproduction (i.e., fecundity values above the threshold value for breeding; figure 2). The threshold determining the extent of suitable habitat was based on the historic distribution and abundance of wolves and their prey, which was low in semiarid, nonforested regions of the Great Basin and Sonoran Desert (Young and Goldman 1944). By the end of the 200-year simulations, animals persisted only in "occupiable" habitat, which we define as the areas with greater than 50% potential for long-term occupation despite the presence of human impacts (figure 5). Thus "current" predictions depict, not the number of animals now inhabiting an area, but the capacity of current habitat conditions to support a resident wolf population over the long term (200 years).

The five landscape scenarios examined (table 1) were as follows:

1. Scenario A: Current conditions (i.e, potential long-term viability given current habitat conditions).
2. Scenario B: Future conditions (with increased road development on private lands only.
3. Scenario C: Future conditions (with human population as of 2025), with increased road development on both private and unprotected public lands.
4. Scenario D: Current conditions (with human population as of 2000), with decreased road development on public lands.
5. Scenario E: Future conditions (with human population as of 2025), with decreased road development on public lands and increased road development on private lands.



*Figure 5. Conceptual diagram of the relationship between the various geographic levels of range occupancy as defined by the application of spatially explicit population models to evaluate recovery thresholds.*

 Exhibit C in support of Brief of Proposed Amicus Curiae Center for Biological Diversity<br>HSUS v. Kempthorne, Civ. No. 07-00677<br>Page 6 of 13 *www.biosciencemag.org*

Table 1. Levels of human impacts used to parameterize wolf survival in alternate scenarios using the PATCH (program to assist in tracking critical habitat) model.

| Scenario | Parameter | | |
|---|---|---|---|
| | Human population | Roads on public land | Roads on private land |
| A | Current level (2000) | Current level (2000) | Current level (2000) |
| B | Predicted level (2025) | Current level (2000) | Predicted level (2025) |
| C | Predicted level (2025) | Predicted level (2025) | Predicted level (2025) |
| D | Current level (2000) | Potential level given road closure/removal on public lands[a] | Current level (2000) |
| E | Predicted level (2025) | Potential level given road closure/removal on public lands[a] | Predicted level (2025) |

Note: Wolf survival was parameterized to vary inversely to levels of human population and road density.
a. Assumes closure or removal on 1% of public lands per year for 25 years.

Although any restoration of public lands would take place over time, we included scenario D to help separate the contrasting effects of this restoration of public lands and the continued degradation of private lands. Scenario E depicts a high-contrast landscape with restored core areas of public lands embedded in a generally unfavorable environment of heavily roaded private lands.

## Analysis at the scale of a distinct population segment

We next evaluated restoration strategies at the scale of a DPS. The SWDPS encompasses the states of Arizona, New Mexico, southern Utah, southern Colorado, and western Texas and Oklahoma, as well as adjacent areas in northern Mexico that were part of the historic range of the Mexican wolf (*C. lupus baileyi*; figure 2). The Mexican wolf has been the focus of conservation concern due to its high level of genetic distinctiveness and the fact that it is extinct in the wild, with the exception of a small population reintroduced to the Blue Range of Arizona and New Mexico in 1998 (Brown and Parsons 2001). We used the SEPM to evaluate the adequacy of a recovery goal similar to that established for the gray wolf in the northern Rocky Mountains: the creation of three wolf populations of at least 100 individuals each (USFWS 1987). We compared the wolf distribution achieved by this goal with the extent of suitable habitat and ecoregions in the DPS. Ecoregions are commonly used as surrogates for biogeographic gradients (Groves 2003). These analyses, as in the earlier rangewide assessment, were based on the long-term potential of an area to support wolf populations, as predicted by the PATCH simulations. Because management actions to remove wolves often arise from livestock depredation, we added a scenario that incorporated data on levels of cattle grazing into the mortality risk metric for wolves. We also modeled specific reintroduction options to assess transient dynamics such as the probability of extinction and the probability of an area being colonized by dispersers from a specific reintroduction site (Carroll et al. 2003a). We evaluated the sensitivity of results to varying assumptions as to maximum dispersal

distance. We performed 1000 simulations of 200 years each for each reintroduction scenario.

We identified eight potential reintroduction sites, four in the United States and four in Mexico, based on the results of initial SEPM simulations. Here we discuss only the results for the US sites: Carson (northern New Mexico), the Grand Canyon (northern Arizona), the Mogollon Rim (central Arizona), and the San Juan Mountains (southwestern Colorado; figure 2). A fifth site in the Blue Range Wolf Recovery Area (BRWRA; Arizona and New Mexico) was also included to provide comparability with current recovery program results. Each of these sites was evaluated in detail by simulating the effects of releasing wolves at that site alone. Each reintroduction site comprised five adjacent potential wolf territories, totaling 2500 km². We approximated the standard reintroduction protocol (Bangs and Fritts 1996) by introducing five breeding-age females in the first year and setting survival for the first 5 years at close to 100% under the assumption that new animals would be released to replace mortality among the initial releases.

## Results of rangewide analysis

The habitat quality threshold used in the SEPM simulations resulted in 44% of the western United States being judged suitable for breeding (i.e., having sufficient prey to support territorial wolves). The proportion of that "suitable" habitat likely (> 50% probability) to be occupied by wolves was 49% under current conditions (scenario A; figure 6a), 32% under future conditions without new roads on public lands (scenario B; a decrease of 35%), 23% under future conditions with development on public lands (scenario C; figure 6b; a decrease of 53%), 61% under current conditions with road closure or removal on some public lands (scenario D; figure 6c; an increase of 25%), and 45% under future conditions with road removal on public lands (scenario E; a decrease of 8%). The potential size of the wolf population in the western United States was predicted to be close to 7000 under current conditions, with a decrease of 29% under scenario B, a decrease of 44% under scenario C, an increase of 24% under scenario D, and a decrease of 6% under scenario E.

Under current conditions, the states of Montana, Colorado, Wyoming, and Idaho have the largest potential wolf populations, followed by Arizona, Utah, and New Mexico (figure 7). Rather than artificially dividing habitat by state lines, one can also identify distinct population centers from the SEPM results (figure 6a). The largest wolf populations could inhabit the Greater Yellowstone ecosystem (GYE) and central Idaho (figure 6), both areas in which wolf reintroduction has already achieved notable success (Phillips et al. 2004). Population centers of the second rank (smaller size) are found in north-

Exhibit C in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v. Kempthorne, Civ. No. 07-00677
Page 7 of 13

*Articles*



*Figure 6. Potential distribution and demography of wolves as predicted by the PATCH model in the western United States under three landscape scenarios: (a) scenario A, current conditions (i.e., potential long-term viability given current habitat conditions); (b) scenario C, future conditions, with human population as of 2025, with increased road development on both private and unprotected public lands; and (c) scenario D, current conditions, with human population as of 2000, with restoration (reduction in roads) on public lands. Those areas with a predicted probability of occupancy of less than 25% are shown as "low occupancy." Some of these areas are infrequently occupied (i.e., between 25% and 50% of the simulations) but are shown to illustrate potential landscape linkages.*

western Montana and western Colorado, of the third rank in the Blue Range and Utah's high plateaus region, and of the fourth rank in Oregon's Cascades. The populations most vulnerable to landscape change (as reflected by percentage decline from scenario A to scenario C) are those in Colorado and Oregon (figure 6). The New Mexico wolf population also declines dramatically under landscape change (figure 6b) but is supported by its connections to Colorado and Arizona populations. The populations that most benefit from road removal on public lands (scenarios D and E) are those in (a) western Oregon and northern California, (b) Colorado and New Mexico, and (c) western Montana (figures 6c, 7).

## Results of analysis at the scale of a distinct population segment

In addition to the current reintroduced population in the Blue Range, the Grand Canyon reintroduction site showed a high probability of success (low extinction rates) and rapid geographic expansion (table 2). Several other reintroduction sites showed higher, but still relatively low, extinction rates. If we assumed that two additional reintroduction projects, in addition to the current Blue Range program, were conducted in the Grand Canyon and Carson sites, then three populations of 100 wolves each would occupy 5.24% of the SWDPS's suitable habitat, and 7.86% of its occupiable habitat (as defined above and in figure 5). Moreover, 5, or 38.5%, of the SWDPS's 13 ecoregions (Bailey 1995) would contain wolves (as a result of two reintroduction sites lying in more than one ecoregion). The probability that a reintroduction at a single site will fail (extinction probability) under scenario A ranges from near zero (0 of 1000 simulations) for the Blue Range and Grand Canyon sites to near 10% for the Mogollon Rim and San Juan Mountains sites (table 2). Under scenario C, the extinction probability for the Mogollon and San Juan Mountains sites increases to 16%–20%. The probability of extinction for the Blue Range, Grand Canyon, and Carson sites increases slightly but remains low (< 3%; table 2). Occupancy of the larger (10,000-km²) restoration zone surrounding each 2500-km² reintroduction site gives a sense of the extent of suitable habitat that might be important in the early stages of population establishment. The Blue Range restoration zone has the highest occupancy, at 72.5%, followed closely by the Carson and Grand Canyon zones (table 2). The Grand Canyon zone is more resilient to landscape change than the





*Figure 7. Potential wolf population size, by state, under one scenario for current conditions (2000a), two habitat degradation scenarios (above; 2025b, 2025c), and two habitat restoration scenarios (below; 2000d, 2025e) of the PATCH model, as shown in table 1.*

Blue Range or Carson; thus, it shows the highest wolf population density among US restoration zones under scenario C (table 2). A scenario that incorporated cattle density as an additional mortality risk factor resulted in a similar ranking of restoration zones, except that the San Juan Mountains zone appeared less vulnerable, and thus only the Mogollon zone showed high relative extinction risk.

*Table 2. Comparative summary of results of analysis of potential wolf restoration zones (areas of 10,000 square kilometers in size surrounding initial reintroduction sites) in the southwestern distinct population segment for the gray wolf.*

| Reintroduction site | Population Scenario A | Scenario C | Occupancy (%), scenario A | Lambda, scenario A | Extinction risk (%) Scenario A | Scenario C | Vulnerability, scenarios A–C/scenario A |
|---|---|---|---|---|---|---|---|
| Blue Range | 92 | 67 | 72.5 | 1.04 | 0 | 1.4 | 27.2 |
| Carson | 84 | 66 | 68.2 | 1.04 | 0.8 | 2.7 | 21.4 |
| Grand Canyon | 91 | 79 | 68.5 | 1.06 | 0 | 0.4 | 13.2 |
| Mogollon Rim | 71 | 45 | 60.3 | 1.00 | 8.6 | 15.8 | 36.6 |
| San Juan Mountains | 79 | 51 | 63.6 | 1.04 | 10.5 | 19.6 | 35.4 |

*Note: See the text for a definition of PATCH (program to assist in tracking critical habitat) scenarios A through C.*

Exhibit C in support of Brief of Proposed Amicus Curiae Center for Biological Diversity *January 2006 / Vol. 56 No. 1 • BioScience* 33
HSUS v. Kempthorne, Civ. No. 07-00677
Page 9 of 13

The regional population size achieved at the end of the SEPM reintroduction simulations (year 200) gives an indication of the ability of a particular reintroduction site to enhance the broader regional population, an ability that is due to factors such as ease of dispersal to other suitable habitat. The Grand Canyon site achieves the highest regional population within the US SWDPS. As a result of sink habitat and other barriers to population spread, the largest regional US population achieved from a single reintroduction is only 59.9% of the maximum population size achieved in the equilibrium scenario (scenario A) that began with all habitat occupied. However, a regional population of 89.3% of the maximum population size is eventually achieved by using three reintroduction sites (Blue Range, Grand Canyon, and Carson). At the end of the 200-year simulations, this reintroduced population occupied 54.3% to 57.5% (depending on assumptions about dispersal distance) of the US SWDPS's suitable habitat under scenario A, 26.3% to 26.6% under scenario C, and 100% of the region's ecoregions under both scenarios. Population predictions in peripheral areas with fragmented habitat were most sensitive to alternate assumptions about maximum dispersal distance (e.g., New Mexico, with 13% relative change), with most other areas showing less than 5% relative change. Extinction probability at individual reintroduction sites was not sensitive to dispersal parameterization, with a doubling of maximum dispersal distance from 750 to 1500 km generally producing changes in extinction risk of less than 0.5% (absolute percentage), with a maximum of 1.6% change.

## Using model results to inform policy

Advances in conservation science since the passage of the ESA have provided scientists and managers with a better understanding of the factors, such as interpopulation connectivity, necessary for successful reintroductions and for the long-term viability of reintroduced populations (Breitenmoser et al. 2001). For example, a key element of the Northwest Forest Plan, designed to facilitate recovery of the northern spotted owl (*Strix occidentalis caurina*), was the recognition that the viability of any particular owl subpopulation was dependent on the successful establishment of territories by dispersing individuals, and hence on the size and connectivity of habitat patches across the landscape (Noon and McKelvey 1996). Such a regional-scale perspective on processes such as loss of connectivity has been difficult to achieve with simpler models of habitat suitability, but is now possible with SEPMs that combine spatial data such as satellite imagery with information from the field on how well animals survive and reproduce in different habitats. Because SEPMs such as the PATCH model (Schumaker 1998) can incorporate changes in landscapes over time, they are also more useful than simpler models in forecasting how species' populations might respond to alternative futures in which current trends either continue or instead are slowed or reversed through habitat protection and restoration.

Complex spatial viability models such as SEPMs may be more biologically realistic than simpler tools, but their realism has a cost: SEPM results may suffer from increased sensitivity to a lack of detailed demographic, habitat, and movement data (Kareiva et al. 1996). We found that population predictions in peripheral areas were most sensitive to alternate assumptions about maximum dispersal distance, and that extinction probability at individual reintroduction sites was not sensitive to dispersal parameterization. Nonetheless, it is important to assess which conservation questions can or cannot be answered with relative confidence in the face of model uncertainty. For example, the minimum threshold of food (prey) availability at which wolves can persist is poorly known (Fuller at al. 2003). Therefore, especially in semiarid areas of the West, the exact population estimates from PATCH, which are strongly affected by where this threshold is set, should be viewed with caution (Carroll et al. 2005). However, because we know more about habitat security thresholds for large carnivores, the proportion of this "suitable" habitat that the model predicts as occupied is more informative (figure 6). In general, population viability analysis tools such as SEPMs are more suitable for comparing alternative management options and suggesting qualitative insights about population structure and threat processes than for providing exact population estimates (McCarthy et al. 2003). As knowledge of wolf–habitat relationships is gathered through long-term field studies in areas such as Yellowstone (Smith et al. 2004), SEPM results can be updated to predict future population distribution more accurately.

For species for which demographic data are too sparse to parameterize SEPMs, simpler, static models of habitat suitability may still be useful for guiding recovery planning. Even for these species, SEPMs may be valuable as heuristic tools to generate hypotheses concerning limiting factors and regional population structure. Emergent characteristics of the regional landscape, such as interpopulation connectivity, are likely to be significant for wide-ranging species and poorly addressed by static models. Connectivity in SEPMs depends on both the strength of the source habitat and the permeability of the intervening landscape (Carroll forthcoming), and thus SEPMs more realistically portray factors fragmenting carnivore populations in the western United States. Wolves in threatened habitat patches, unlike those in the boreal "mainland" of their distribution, cannot expect a large rescue effect (Brown and Kodric-Brown 1977) from surrounding regions. Landscape change in the western United States thus can quickly result in a loss of connectivity. In our SEPM results, semi-isolated (e.g., Oregon) and fragmented (e.g., Colorado) wolf populations show greater threats than they would in a static model of habitat suitability (figure 6). Counterintuitively, landscape change has a greater negative impact on wolves (a 35% to 53% decrease in occupied habitat) than on grizzly bears (a 24% to 40% decrease) in the SEPM simulations. Although currently wolves can occupy a broader spectrum of the landscape than grizzly bears, more of this matrix is threatened by landscape change than are the core areas used

by grizzlies. The loss of such high proportions of potential wolf habitat as a result of landscape change in the western United States over the next quarter-century suggests that absent the protection of important habitat, many western landscapes will become unsuitable for the species, and possibly for other large carnivores as well.

The SEPM results can help planners evaluate the extent of currently "occupiable" and potentially restorable habitat across a species' range. They reveal a potential wolf population structure that combines two highly resilient core areas (the GYE and central Idaho) and several smaller cores, with many peripheral areas that may be dependent on dispersal from core areas for their initial colonization, their continued demographic rescue, or both (Brown and Kodric-Brown 1977). An optimal strategy for establishing representative wolf populations might therefore be based on initial reintroductions to a geographically well-distributed set of core areas (e.g., the current reintroduction areas in the GYE, Idaho, and the Blue Range [figure 2], plus the Grand Canyon and western Colorado). This would seek to maximize the area of peripheral habitat affected by dispersal from the core reintroductions. Secondary targets for reintroductions, to achieve representation and buttress redundancy, would be regions that lack large core areas, but might be unlikely to be rapidly recolonized because of their distance from initial reintroduction sites (e.g., the Oregon Cascades). The high relative vulnerability to future threats and high potential benefit from restoration actions could justify more aggressive habitat protection in Colorado and Oregon, where protected public lands are fragmented and embedded in a rapidly developing matrix of private lands.

Because wolf habitat, as depicted in the SEPM results, is not distributed uniformly across the western United States, it makes sense to break the region into several subareas, each of which might support tightly interacting populations and be linked loosely with the other subareas by infrequent dispersal. Such areas include (a) the northern Rockies, (b) Colorado, (c) the Southwest (Arizona, New Mexico, and portions of Utah), and (d) the Pacific states (figures 2, 6a). These regions could serve as the basis for DPSs or multistate management coordination areas. Ecological barriers, such as expanses of unsuitable habitat, are more appropriate for delineating DPSs than geographic divisions, such as state boundaries (*National Wildlife Federation v. Norton*, 03-CV-340 [2005]). However, management decisions such as delisting proposals that affect a particular DPS should also take into account the broader rangewide context for recovery. For example, even infrequent dispersal between DPSs may be important for initial recolonization and subsequent genetic interchange. The SEPM results suggest that important areas for maintaining population connectivity, both within and among DPSs, include (a) linkages between the three northern Rockies populations (central Idaho, the GYE, and northwestern Montana), (b) linkages along an arc of mountainous habitat extending southward from the GYE to the Blue Range (Arizona and New Mexico) and southward into Mexico, and

(c) a linkage between Colorado and the Uintas of northern Utah (figure 6a). Connectivity between central Idaho and the Oregon Cascades is more tenuous but is strongly enhanced by road removal on public lands (figure 6c). Our results suggest that the potential still exists to recreate a metapopulation of wolves stretching from Canada to Mexico. Similar habitat analyses for adjacent regions of Mexico will allow binational coordination of recovery efforts (Carroll et al. 2005). Expanding analyses beyond the United States is difficult because of inconsistencies in habitat data. However, planners should be aware that truncating analysis at the US border may affect results for areas dependent on dispersal from source habitat outside the United States. For example, inclusion of Mexico and western Canada in the wolf analysis increases predicted occupancy in southern Arizona and northeastern Washington.

SEPM results such as those reported here are also relevant to planners at the DPS scale, in that they make it possible to consider recovery throughout the DPS, rather than constrained within artificially defined recovery areas. For example, current regulations require that wolves dispersing outside of the 17,546 km$^2$ BRWRA (figure 2) be recaptured, a policy that has severely impeded the success of the recovery program (Oakleaf et al. 2004). The inadequacy of the BRWRA alone to support a self-sustaining population, and the likelihood of high dispersal rates, could have been anticipated on the basis of SEPM results showing fragmented source habitat within the BRWRA but sufficient additional habitat northwest of the area (figure 6a). Our results suggest that at least two more reintroduction sites will be necessary to achieve recovery within the SWDPS, because of the more fragmented nature of regional wolf habitat there when compared with the northern Rockies. This fragmentation is due to the natural isolation of forest habitat on mountain ranges in this semiarid region, as well as other anthropogenic barriers to dispersal. Although all four candidate reintroduction sites have low enough extinction risk that they can be included in further planning for wolf recovery, the vulnerability to landscape change of the Mogollon Rim and San Juan Mountains sites, and the relative isolation of the Carson site from the bulk of wolf habitat in the region, may make it advisable to pair any of these three sites with a second site to ensure the establishment of a well-distributed, viable population.

Although it achieves viability (resiliency and redundancy) goals, the potential recovery goal of three populations of 100 wolves each achieves a relatively low level of representation in the short term. However, the eventual wolf distribution achieved from a three-site reintroduction approach appears adequate, at least under the assumption that current habitat conditions do not deteriorate. The central issue then becomes the role of federal versus state management of wildlife during the recovery process, and the appropriate stage for transfer of regulatory authority from the federal to the state level, given the ESA mandate to ensure that a recovered species occupies a significant portion of range. A state plan

Exhibit C in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v. Kempthorne, Civ. No. 07-00677
Page 11 of 13

sufficient to ensure this mandate would most likely be more precautionary than those approved by the USFWS to date.

In their efforts to restore imperiled species and ecosystems, planners must be both ambitious and realistic. Inadequacy and lack of rigor in current ESA recovery plan goals (Gerber and Hatch 2002) are due in part to a shifting-baseline effect (Jackson et al. 2001) that limits the "realistic" range of goals from considering the historic extent of suitable habitat. As Leonard and colleagues (2005) concluded on the basis of genetic analysis, "restoration goals for grey wolves in the western contiguous US include far less area and target vastly lower population sizes than existed historically." The population estimates from the SEPM scenarios reported here are far more ambitious than current recovery goals but at least an order of magnitude lower than historic population estimates (Leonard et al. 2005), and should thus fall within the range of options considered in recovery planning.

To clarify the debate over wolf recovery goals, suitable habitat might be divided into three categories: (1) areas that can be occupied by wolves despite current human impacts and anticipated habitat loss (figure 5, zone 5), (2) areas that are unlikely to support wolves even with substantial habitat restoration or policy change (figure 5, zone 2), and (3) intermediate areas where long-term wolf recovery might require proactive conservation measures (e.g., road removal and restriction of lethal control in response to livestock depredation) (figure 5, zones 3 and 4). While recovery goals must incorporate the ESA mandate concerning significant portion of range, beyond this threshold a normative decision must be made as to what level of biologically suitable habitat should be made occupiable by mitigating human impacts. Our results suggest that more ambitious recovery goals (up to about two-thirds of suitable habitat occupied) may be feasible. Closure or removal of roads on public lands greatly enhances wolf recovery in regions such as Colorado and Oregon that have high ecosystem productivity but currently lack large core areas. Although wolves could inhabit portions of these states without habitat restoration, their distribution might be too restricted to fulfill ESA mandates.

Ecological effectiveness is the most ambitious of the five guiding principles for recovery, as it speaks to abundance as well as distribution (Soulé et al. 2005). Unlike the concept of "significant portion of range," ecological effectiveness is only implicitly mandated by the ESA's charge to conserve the ecosystems on which endangered species depend. Although the role of wolves as keystone species presents a particularly strong argument for restoration of ecologically effective populations, conservation science has increasingly highlighted the high proportion of threatened species that may strongly influence ecosystem function (Soulé et al. 2005), and the high value to humankind of the services arising from functioning ecosystems (Daily 1997). The normative debate over recovery goals for wolves, although tied to the specific legal context of the ESA, thus illuminates a larger debate over the necessity for "rewilding," a reversal of the trend toward increasing human domination of Earth's natural ecosystems (Vitousek et al. 1997, Soulé and Noss 1998).

## Acknowledgments

This study was funded by the Wilburforce Foundation and the Turner Endangered Species Fund. The authors' understanding of the implications of Endangered Species Act language regarding "significant portion of range" benefited greatly from discussions with John Vucetich. Doug Smith, Tracy Scheffler, and three anonymous reviewers also provided helpful comments. The information in this document has been funded in part by the US Environmental Protection Agency. It has been subjected to review by the National Health and Environmental Effects Research Laboratory's Western Ecology Division and approved for publication. Approval does not signify that the contents reflect the views of the agency, nor does mention of trade names or commercial products constitute endorsement or recommendation for use.

## References cited

Bailey R. 1995. Descriptions of the Ecoregions of the United States. 2nd ed. Washington (DC): USDA Forest Service. Miscellaneous Publication 1391.

Ballard WB, Whitman JS, Gardner CL. 1987. Ecology of an exploited wolf population in south-central Alaska. Wildlife Monographs 98: 1–54.

Bangs EE, Fritts SH. 1996. Reintroducing the gray wolf to central Idaho and Yellowstone National Park. Wildlife Society Bulletin 24: 402–413.

Breitenmoser U, Breitenmoser-Würsten C, Carbyn LN, Funk SM. 2001. Assessment of carnivore reintroductions. Pages 241–281 in Gittleman JL, Funk SM, MacDonald DW, Wayne RK, eds. Carnivore Conservation. Cambridge (United Kingdom): Cambridge University Press.

Brown JH, Kodric-Brown A. 1977. Turnover rates in insular biogeography: Effect of immigration on extinction. Ecology 58: 445–449.

Brown WM, Parsons DR. 2001. Restoring the Mexican gray wolf to the desert Southwest. Pages 169–186 in Maehr D, Noss RF, Larkin J, eds. Large Mammal Restoration: Ecological and Sociological Challenges in the 21st Century. Washington (DC): Island Press.

Carroll C. Linking connectivity to viability: Insights from spatially-explicit population models of large carnivores. In Crooks K, Sanjayan MA, eds. Connectivity Conservation. Cambridge (United Kingdom): Cambridge University Press. Forthcoming.

Carroll C, Noss RF, Paquet PC. 2001a. Carnivores as focal species for conservation planning in the Rocky Mountain region. Ecological Applications 11: 961–980.

Carroll C, Noss RF, Schumaker NH, Paquet PC. 2001b. Is the return of the wolf, wolverine, and grizzly bear to Oregon and California biologically feasible? Pages 25–46 in Maehr D, Noss RF, Larkin J, eds. Large Mammal Restoration: Ecological and Sociological Challenges in the 21st Century. Washington (DC): Island Press.

Carroll C, Phillips MK, Schumaker NH, Smith DW. 2003a. Impacts of landscape change on wolf restoration success: Planning a reintroduction program using dynamic spatial models. Conservation Biology 17: 536–548.

Carroll C, Noss RF, Paquet PC, Schumaker NH. 2003b. Use of population viability analysis and reserve selection algorithms in regional conservation plans. Ecological Applications 13: 1773–1789.

Carroll C, Phillips MK, Lopez Gonzalez CA. 2005. Spatial Analysis of Restoration Potential and Population Viability of the Wolf (*Canis lupus*) in the Southwestern United States and Northern Mexico. Orleans (CA): Klamath Center for Conservation Research. (2 December 2005; *www.klamathconservation.org*)

Caswell H. 2001. Matrix Population Models: Construction, Analysis, and Interpretation. Boston: Sinauer.

Cihlar J, St.-Laurent L, Dyer J. 1991. Relation between the normalized difference vegetation index and ecological variables. Remote Sensing of the Environment 35: 279–298.

Crist EP, Cicone RC. 1984. Application of the tasseled cap concept to simulated thematic mapper data. Photogrammetric Engineering and Remote Sensing 50: 343–352.

Daily G, ed. 1997. Nature's Services: Societal Dependence on Natural Ecosystems. Washington (DC): Island Press.

Dobson AP, Rodriguez JP, Roberts WM, Wilcove DS. 1997. Geographic distribution of endangered species in the United States. Science 275: 550–553.

Dunning JB, Stewart DJ, Danielson BJ, Noon BR, Root TL, Lamberson RH, Stevens EE. 1995. Spatially explicit population models: Current forms and future uses. Ecological Applications 5: 3–11.

Fuller TK. 1989. Population dynamics of wolves in north-central Minnesota. Wildlife Monographs 105: 1–41.

Fuller TK, Mech LD, Cochrane JF. 2003. Wolf population dynamics. Pages 161–191 in Mech LD, Boitani L, eds. Wolves: Behavior, Ecology, and Conservation. Chicago: University of Chicago Press.

Gerber LR, Hatch LT. 2002. Are we recovering? An evaluation of recovery criteria under the US Endangered Species Act. Ecological Applications 12: 668–673.

Groves C. 2003. Drafting a Conservation Blueprint: A Practitioner's Guide to Planning for Biodiversity. Washington (DC): Island Press.

Hayes RD, Harestad AS. 2000. Demography of a recovering wolf population in the Yukon. Canadian Journal of Zoology 78: 36–48.

Jackson JBC, et al. 2001. Historical overfishing and the recent collapse of coastal ecosystems. Science 293: 629–63.

Kareiva P, Skelly D, Ruckelshaus M. 1996. Reevaluating the use of models to predict the consequences of habitat loss and fragmentation. Pages 156–166 in Pickett STA, Ostfeld RS, Schachak M, Likens GE, eds. The Ecological Basis of Conservation: Heterogeneity, Ecosystems, and Biodiversity. New York: Chapman and Hall.

Leonard JA, Vilà C, Wayne RK. 2005. Legacy lost: Genetic variability and population size of extirpated US grey wolves (*Canis lupus*). Molecular Ecology 14: 9–17.

Mace RD, Waller JS, Manley TL, Ake K, Wittinger WT. 1999. Landscape evaluation of grizzly bear habitat in western Montana. Conservation Biology 13: 367–377.

McCarthy MA, Andelman SJ, Possingham HP. 2003. Reliability of relative predictions in population viability analysis. Conservation Biology 17: 982–989.

Merrill EH, Bramble-Brodahl MK, Marrs RW, Boyce MS. 1993. Estimation of green herbaceous phytomass from Landsat MSS data in Yellowstone National Park. Journal of Range Management 46: 151–157.

Merrill T, Mattson DJ, Wright RG, Quigley HB. 1999. Defining landscapes suitable for restoration of grizzly bears (*Ursus arctos*) in Idaho. Biological Conservation 87: 231–248.

Noon BR, McKelvey KS. 1996. Management of the spotted owl: A case history in conservation biology. Annual Review of Ecology and Systematics 27: 135–162.

Oakleaf JK, Stark D, Overy P, Smith N. 2004. Mexican wolf recovery: Technical component of the five-year program review and assessment. Albuquerque (NM): US Fish and Wildlife Service.

Paquet PC, Wierzchowski J, Callaghan C. 1996. Effects of human activity on gray wolves in the Bow River Valley, Banff National Park, Alberta. Chapter 7 in Green J, Pacas C, Bayley S, Cornwell L, eds. A Cumulative

Effects Assessment and Futures Outlook for the Banff Bow Valley. Ottawa (Canada): Department of Canadian Heritage.

Phillips MK, Bangs EE, Mech LD, Kelly BT, Fazio BB. 2004. Extermination and recovery of the red wolf and grey wolf in the contiguous United States. Pages 297–309 in MacDonald DW, Sillero-Zubiri C, eds. Biology and Conservation of Wild Canids. New York: Oxford University Press.

Ripple WJ, Beschta RL. 2004. Wolves and the ecology of fear: Can predation risk structure ecosystems? BioScience 54: 755–766.

Schumaker NH. 1998. A User's Guide to the PATCH Model. Corvallis (OR): US Environmental Protection Agency. EPA/600/R-98/135.

Shaffer ML, Stein B. 2000. Safeguarding our precious heritage. Pages 301–322 in Stein BA, Kutner LS, Adams JS, eds. Precious Heritage: The Status of Biodiversity in the United States. Oxford (United Kingdom): Oxford University Press.

Smith DW, Peterson RO, Houston DB. 2003. Yellowstone after wolves. BioScience 53: 330–340.

Smith DW, Stahler DR, Guernsey DS. 2004. Yellowstone Wolf Project: Annual Report, 2003. Yellowstone National Park (WY): National Park Service. YCR-NR-2004-04.

Soulé M, Noss R. 1998. Rewilding and biodiversity: Complementary goals for continental conservation. Wild Earth 8: 18–28.

Soulé ME, Terborgh J. 1999. Continental Conservation: Scientific Foundations of Regional Reserve Networks. Washington (DC): Island Press.

Soulé ME, Estes JA, Miller B, Honnold DL. 2005. Strongly interacting species: Conservation policy, management, and ethics. BioScience 55: 168–176.

Suckling KF, Taylor M. 2005. Critical habitat and recovery. In Goble DD, Scott JM, Davis FW, eds. The Endangered Species Act at Thirty: Renewing the Conservation Commitment. Washington (DC): Island Press.

Theobald DM, Gosnell H, Riebsame WE. 1996. Land use and landscape change in the Colorado mountains, II: A case study of the East River Valley, Colorado. Mountain Research and Development 16: 407–418.

Thiel RP. 1985. Relationship between road densities and wolf habitat suitability in Wisconsin. American Midland Naturalist 113: 404.

[USCB] US Census Bureau. 1991. Census of the United States: 1990. Washington (DC): USCB.

[USFWS] US Fish and Wildlife Service. 1987. Northern Rocky Mountain Wolf Recovery Plan. Denver (CO): USFWS.

———. 1994. The Reintroduction of Gray Wolves to Yellowstone National Park and Central Idaho: Final Environmental Impact Statement. Denver (CO): USFWS.

———. 1996. Reintroduction of the Mexican Wolf within Its Historic Range in the Southwestern United States: Final Environmental Impact Statement. Albuquerque (NM): USFWS.

Vitousek PM, Mooney HA, Lubchenco J, Melillo JM. 1997. Human domination of Earth's ecosystems. Science 277: 494–499.

Wharton SW, Myers MF. 1997. MTPE EOS Data Products Handbook, vol. 1. Greenbelt (MD): NASA Goddard Space Flight Center. Publication 902.

White JD, Running SW, Nemani R, Keane RE, Ryan KC. 1997. Measurement and remote sensing of LAI in Rocky Mountain montane ecosystems. Canadian Journal of Forest Research 27: 1714–1727.

Wiegand T, Revilla E, Knauer F. 2004. Dealing with uncertainty in spatially explicit population models. Biodiversity and Conservation 13: 53–78.

Young SP, Goldman EA. 1944. Wolves of North America, pt. 2: Classification of Wolves. Washington (DC): American Wildlife Institute.

Exhibit C in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v. Kempthorne, Civ. No. 07-00677
Page 13 of 13

# Exhibit D:

# Gray Wolf Eastern Population Recovery Team, Addendum to Recovery Plan for the Eastern Timber Wolf (Jan. 10, 1998)

*Peterson 1998*

RECEIVED

JAN 2 2 1998

FISH & WILDLIFE SERVICE
TE

ΛES



# Michigan Technological University

101 U J Noblet Forestry & Wood Products Bldg
1400 Townsend Drive  Houghton, Michigan 49931 1295

School of Forestry and Wood Products
**906/487-2454**
**1-800-WOODSMI**
**FAX· 906/487-2915**

10 January 1998

William F  Hartwig, Regional Director
U S  Fish and Wildlife Service
1 Federal Drive
Ft  Snelling, MN 55111-4056

Dear Mr  Hartwig,

Enclosed please find the responses of the Recovery Team for the Gray Wolf Eastern Population
to the seven questions posed to the Team in 1996  We have presented these as an addendum to
the 1992 Recovery Plan for the Eastern Timber Wolf

Team members are aware that the Service is reviewing our earlier recommendation regarding use
of the Distinct Population Segment (DPS) designation for wolves in the western Great Lakes
region  We stand ready to make necessary changes to the Recovery Plan itself should the DPS
designation be selected by the Service as the appropriate tool to further the wolf delisting
process

Sincerely,

Rolf O  Peterson, Leader
Recovery Team for the Gray Wolf Eastern Population

Michigan Technological University is an equal opportunity educational institution/equal opportunity employer
Printed on Recycled Paper

014882

# Addendum to

# Recovery Plan
# for the
# Eastern Timber Wolf

Prepared by the
Gray Wolf Eastern Population Recovery Team

10 January 1998

Team Members

| | |
|---|---|
| Rolf O. Peterson | Michigan Technological University (Team leader) |
| Ralph Bailey | Michigan Department of Natural Resources (retired) |
| Joe Dan Rose, Jr. | Bad River Band of Lake Superior Chippewa Indians |
| Michael DonCarlos | Minnesota Department of Natural Resources |
| Ron Hiebert | U. S. National Park Service |
| Robert Jackson | U. S. Bureau of Indian Affairs |
| Neil Kmiecik | Great Lakes Indian Fish and Wildlife Commission |
| L. David Mech | U. S. Geological Survey (Biological Resources Div ) |
| Tony Rinaldi | U. S. Forest Service |
| Adrian Wydeven | Wisconsin Department of Natural Resources |

Exhibit D in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v. Kempthorne, Civ. No. 07-00677
Page 2 of 9

2

Following are Recovery Team responses to questions posed by the U S Fish and Wildlife Service  These are intended to clarify selected portions of the 1992 Recovery Plan for the Eastern Timber Wolf and to provide additional direction that recognizes changes in the status of wolf populations since the Plan was written

1  *Are the 1992 recovery criteria still considered to be sufficient for determining that the eastern timber wolf is recovered, and do they provide reasonable assurances that the taxon will not have to be relisted as threatened or endangered in the foreseeable future?*

The Recovery Team for the Gray Wolf Eastern Population ("the Team") reviewed the criteria for recovery in the Recovery Plan (i e , (1) the survival of the wolf in Minnesota is assured and (2) at least one viable population of gray wolf eastern population outside Minnesota and Isle Royale in the contiguous 48 states of the USA is re-established) and determined that the criteria are still necessary and sufficient  The Team further determined that all numerical population goals for recovery defined in the Recovery Plan were first met in spring 1994, and have been continuously exceeded thereafter  If the goals are similarly maintained for two more years (through spring 1999), the Team would consider the gray wolf eastern population (the Distinct Population Segment in the Western Great Lakes, see Question 7 below) recovered as per the criteria identified in the Recovery Plan  The Team further recommends that the gray wolf eastern population be reclassified as soon as possible from "endangered" to "threatened" in the western Great Lakes region

The Team considers wolf recovery distinct from long-term wolf conservation  Recovery implies that the population segment has reached a population size and distribution that ensures it is no longer in danger of extinction in the foreseeable future  The Recovery Plan provides a framework to prevent extinction and minimum goals for recovery  Long-term wolf conservation is the management regimen through which the population segment will remain out of danger of extinction in the foreseeable future  Thus long-term wolf conservation has as its minimum requirement management provisions that insure that wolves not fall below the recovery level in numbers and distribution  If the Recovery Plan criteria are met and the population segment is delisted, it is the purview of state and tribal governments to determine, collectively and individually, long-term conservation strategies for the Gray Wolf Eastern Population  The Team underscores the importance of cooperative management among states and tribes, to provide a coordinated strategy for wolf conservation, and a strong commitment to providing the public with timely information and comprehensive education regarding wolves and wolf management  In order to avoid even a remote chance of backsliding into a relisting situation, we hereby clarify our recommendations and comment further on the adequacy of the original minimum numerical target of 100 wolves in Michigan and Wisconsin as well as assurance criteria for this second population

In the event of recovery and delisting, in accordance with the Recovery Plan, the Team encourages state and tribal governments to manage wolves such that numbers over and above minimum levels specified in the Recovery Plan are maintained  This is particularly significant in Wisconsin and Michigan, where ample wolf habitat may allow substantial growth in wolf

014884

3

numbers and distribution beyond minimal recovery goals  For example, Upper Michigan has potential to become a second source population, independent of Minnesota, enhancing long-term survival prospects

The Recovery Plan specified as recovery criteria that the survival of the wolf in Minnesota be assured <u>and</u> that a second "population" be established elsewhere  The explicit goal of these criteria was to increase the geographic distribution of the wolf and increase its numbers in an area outside of Minnesota  Geographic distribution could not be specified because of uncertainty in natural wolf recovery, so the specified criteria were primarily numerical, provided some minimal distance from Minnesota was met-- 100 wolves if <100 miles from the source population, 200 wolves if >100 miles from the source population  The Recovery Plan states (page 4)  "A Wisconsin-Michigan population of 100 wolves is considered to be a viable second population, because continued immigration of Minnesota wolves will supplement it demographically and genetically for the foreseeable future " *The intent was clearly to allow full exchange throughout the population (or population segment, as defined by the Vertebrate Policy)*

Consideration of recent literature and ongoing work led to our consensus that the numerical goal of 100 wolves provides reasonable assurance against extinction from demographic, environmental, or catastrophic variation (cf Fritts and Carbyn 1995)  A population of 100 individuals may be several orders of magnitude lower than the theoretical population levels recommended for maintenance of genetic integrity (which remain unconfirmed theory for the gray wolf, specifically), *given an isolated population*  We thereby stress the importance of ensuring adequate population connections (dispersal corridors) throughout this population segment  Wolf management programs in MN, WI, MI and tribal lands must recognize the importance of managing, through education and effective enforcement, human-caused wolf mortality (legal, illegal, and accidental), and maintaining population connectivity (functional dispersal corridors) so that population segments never become isolated  Functional dispersal corridors currently exist through the 3-state range of the population segment, and future management should assure that these corridors continue to function by ensuring a widespread distribution of wolves and suitable habitat in each state

2  *What is meant by "the survival of the wolf in Minnesota is assured" (1992 Plan recovery criteria, page 24, second paragraph)?  What management components (e g , management zones, population monitoring, enforcement, I&E) will the Minnesota and other states wolf management plans have to contain in order for the Service to determine that this criterion has been achieved?*

The Team considers "survival of the wolf in Minnesota to be assured" if the Recovery Plan's numerical population goals for Zones 1-5 (page 29, item 1) continue to be met as minimum population goals for the foreseeable future  The Team recognizes that these population numbers exceed speculative minimum viable population size estimates needed for other wolf populations, but recommends the higher numbers to meet the requirement of "assured" survival of the wolf in Minnesota as well as to preserve a superior source population for genetic interchange with Wisconsin and Michigan

In reviewing the critical factors necessary for long-term survival of the wolf as outlined in

Exhibit D in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v. Kempthorne, Civ. No. 07-00677
Page 4 of 9

014885

4

the Recovery plan (page 16), the Team believes there is reasonable assurance that Minnesota will continue to support a vigorous wolf population. First, large tracts of wild land in the public domain are expected to provide a continuing secure habitat base for the wolf. For example, almost 10,000 mi² lie within Minnesota Zones 1-3 (Recovery Plan) and that area is ecologically saturated with wolves (Fuller et al 1992). Although neither minimum population size nor minimum habitat requirements for the wolf are known with certainty, available information on actual wolf population persistence suggests that 1,500 - 2,000 mi² may provide adequate space for long-term wolf survival (Fritts and Carbyn 1995).

Second, the Team anticipates the development, with adequate public input, of an ecologically sound management program in Minnesota that will include totally protected areas, depredation control, monitoring and education efforts, and provisions for maintaining adequate populations. Third, the Team believes that adequate wild prey populations, especially white-tailed deer, are assured in the foreseeable future. For the next 50 years, projected levels of timber harvest should allow maintenance of deer populations near present levels. Moose and beaver populations are also likely to remain stable or increase. Finally, the Team reiterates the need for a unique management strategy in Minnesota (specifying larger than "minimum" numbers), in order to maintain a large source population of wolves, to provide future security in the face of uncertainties such as disease exposure, and to maintain population connections with wolves in Michigan and Wisconsin.

The Team recommends that the Service require Minnesota, Wisconsin, and Michigan to adopt wolf management programs with minimum population goals equal to or exceeding those contained in the Recovery Plan. The specific management components of each state's wolf management program should be determined by each state and may vary, but must be sufficient to maintain the Recovery Plan minimum population goals, and include population monitoring for verification. The Team wishes to highlight the ongoing need to effectively minimize wolf depredations on livestock and maintain timely information and education efforts. The Team encourages coordination among tribes, states, federal agencies, and other affected parties.

*3. What form and duration of post-delisting monitoring is needed to be able to identify any "significant risk to the well being of any such recovered species" (ESA)?*

The Team recommends that, after delisting, there follow a 5-year period in which monitoring confirms that wolf numbers are consistently maintained above minimum recovery goals. During this period wolves will be managed by tribal and state agencies in accordance with approved management plans developed for wolves in MN, MI, and WI. The Team recommends, at a minimum, that wolves in Michigan and Wisconsin be censused two years and five years after delisting, and that wolf distribution in Minnesota be evaluated annually based on wolves taken by Animal Damage Control personnel involved in depredation management.

*4. There are several studies underway in wolf management zone 5 in Minnesota. What information from these studies is needed for development of management plans for the gray wolf eastern population area?*

Exhibit D in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v. Kempthorne, Civ. No. 07-00677
Page 5 of 9

5

The Team recognizes that wolves are now well-established in MN wolf management zone 5, as identified in the Recovery Plan, an area previously considered unsuitable for wolves because of high potential for conflict with people  The Team believes that, while not required for wolf recovery and delisting, additional information on wolves in zone 5 would be useful for long-term management programs, specifically, wolf density, survival, and movements in relation to habitat factors, dispersal behavior, and food habits (particularly patterns of depredation on domestic animals)

5  *Should the Minnesota management zone boundaries or their definitions/management goals be modified (i e , as recommended by 1992 Plan revisions) prior to the Service's delisting of the wolf?*

The Team no longer believes that, for long-term conservation of the wolf, it is necessary that provisions of the Recovery Plan be "kept in effect" following delisting (page 26)  For example, management zones may be useful in evaluating wolf status to ensure minimum wolf density and distribution in the immediate and foreseeable future, but the Team does not consider the zones specified in the Recovery Plan to be <u>required</u> as the basis for management of wolves or habitat for wolves

Nevertheless, the Team endorses the management concept that a protected source population be established adjacent to areas where wolves may be managed  Establishment of zones or specific areas for management should be the prerogative of the states and tribes

The Team recommends that  areas defined as "critical habitat" in the Recovery Plan be delisted at the same time that the Western Great Lakes Distinct Population Segment of the Gray Wolf Eastern Population is reclassified from "endangered" to "threatened "  The Team believes that further progress in wolf recovery in the western Great Lakes area does not depend on specific "critical habitat" but rather that as long as wolf management programs maintain wolf numbers and distribution above recovery levels defined in the Recovery Plan, a special designation of "critical habitat" is no longer necessary  The Team believes that current land management practices on public wild lands sufficiently protect wolf habitat, and that designation as "critical habitat" does not provide protection that is not otherwise provided through Section 7 consultation and other conservation efforts  The Team reiterates, however, that large areas of wild land or areas with low human densities and minimal accessibility are key to long-term wolf conservation

6  *What role does immigration from Canada play in the stability or growth of the gray wolf eastern population?*

The Team believes, consistent with the ESA, that wolf recovery must be accomplished such that population reservoirs outside the contiguous U S  are not necessary to maintain the species in the U S  The recovery criteria in the Recovery Plan were established accordingly  Wolves in MN are highly connected to wolves in Ontario, across an international border for a distance of >250 mi  At the eastern end of Upper Michigan there is a narrow corridor for movement of wolves between MI and Ontario  The Team views connections between wolves in

014887

6

Great Lakes states and Ontario as non-critical but highly desirable for long-term wolf conservation

*7 Address eastern timber wolf range reoccupation in areas not addressed in the 1992 Plan, and provide recommendations on how the Service should proceed in those areas*

Here we expand on the implications for wolf recovery of recent findings in wolf taxonomy and status, particularly as they affect designations of subspecies in the contiguous 48 States and potential for wolf recovery in the northeastern U S  The Team recognizes that the increase in geographical distribution recommended by the Recovery Plan has now occurred, as gray wolves have become well-established and continue to increase in distribution and abundance in Minnesota, Wisconsin and Upper Michigan  There may also be both biological and societal potential for the gray wolf to become re-established in portions of the northeastern U S , although the political acceptability of this has yet to be established  Two dead wolves have been recovered in Maine, in 1993 and 1996, but Team member Adrian Wydeven learned during a site visit that both animals had minor characteristics suggesting a captive origin  Snow tracking surveys in 1997 by personnel from Maine Department of Inland Fisheries and Wildlife did not provide conclusive evidence of wolf presence (McLaughlin 1997)  Harrison and Chapin (1997) demonstrated that there is substantial habitat in Maine that is probably suitable for wolf colonization, but the St Lawrence River and adjacent land transportation corridor are impediments which have prevented and will probably continue to prevent natural colonization from wolf populations to the north  The same study identified the Adirondack region of New York as possible wolf habitat, but quite disjunct from established wolf populations  If wolves become re-established in the northeastern U S , whether by translocation or by natural movements, it would be in accord with the general goal of the Recovery Plan to recover the wolf "wherever feasible "  Nevertheless, there is significant uncertainty about actual recovery feasibility for the gray wolf in the Northeast (cf Hodgson 1997), and such recovery goes beyond the criteria for recovery specified in the Recovery Plan

The Recovery Team for the Gray Wolf Eastern Population ("the Team") has reviewed (1) the goals of the Recovery Plan, (2) the present status of the taxon within the historic range described in the Recovery Plan, and (3) the 1996 Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act, FR 61(26) 4722-4725 ("the Vertebrate Policy")  It is the consensus of Team members that the criteria for recovery provided by the Recovery Plan are still necessary and sufficient, and that recovery goals for reclassification have now been met  For the Gray Wolf in the western Great Lakes area, the Team recommends designation of a Distinct Population Segment and reclassification from "endangered" to "threatened "

The Team strongly recommends that the U S  Fish and Wildlife Service recognize the gray wolf in the western Great Lakes area as a distinct population segment as described in the Vertebrate Policy, and that the Service proceed with reclassification and delisting in this area as outlined in the Recovery Plan  A Western Great Lakes Distinct Population Segment (DPS)

Exhibit D in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v. Kempthorne, Civ. No. 07-00677
Page 7 of 9

014888

7

should be recognized, which should include three States that now support reproducing gray wolves (MI, WI, and MI) plus contiguous states within a reasonable dispersal distance (ND, SD, IA, IL, OH, IN)  This designation preserves future options for the gray wolf in the northeastern U S  to be fully protected under the Endangered Species Act after wolf recovery in the western Great Lakes area has been achieved

The Vertebrate Policy specifies that the Congressional intent to use DPS designation "sparingly" requires that a DPS meet conditions of *discreteness* and *significance*  Discreteness will be established if at least one of two criteria are met, namely (1) "marked separation" or (2) delimitation by international borders with significant differences in management  The Team believes that both conditions of discreteness are met for the gray wolf in the western Great Lakes area  This population segment is geographically far removed from any other wolf population segment in the contiguous 48 States  Furthermore, U S and Canadian jurisdictions exhibit pronounced differences in management programs (the gray wolf is hunted and trapped in Canada outside national and provincial parks but in the U S  it is protected under the Endangered Species Act)

The Team believes the condition of significance for the gray wolf in the western Great Lakes area is met because (1) here the gray wolf exists as the only viable population segment in the U S  east of the Rocky Mountains, (2) loss of the gray wolf in this area would mean the virtual extinction of the gray wolf in the eastern U S , the geographical region specified by the Recovery Plan, and (3) the gray wolf in the western Great Lakes area is considered morphologically distinct from all other free-ranging gray wolves in the 48 contiguous U S  states (Nowak 1995)

In designating the gray wolf in the Western Great Lakes area a DPS, the Service would be acting in full accordance with the directives of the Vertebrate Policy to proceed with recovery on a reasonable geographic scale, in a timely manner, at minimal cost  The Policy allows different classifications to be assigned to different DPS's, so should gray wolves recolonize areas in the northeastern U S , it would be appropriate to designate a DPS in that area

014889

8

LITERATURE CITED

Fritts, S H and L N Carbyn  1995  Population viability, nature reserves, and the outlook for gray wolf conservation in North America  Restoration Ecology 3 26-38

Harrison, D J and T G Chapin  1997  An assessment of potential habitat for eastern timber wolves in the northeastern United States and connectivity with occupied habitat in southeastern Canada  Working Paper No 7, Wildlife Conservation Society, New York, NY  12 pages

Hodgson, A  1997  Wolf restoration in the Adirondacks?  The questions of local residents  Working Paper No 8, Wildlife Conservation Society, New York, NY  85 pages

McLaughlin, C  1997  Wolf detection -- field efforts, winter 1997  Wildlife Division, Maine Department of Inland Fisheries and Wildlife  3 pages (typewritten)

Nowak, R M  1995  Another look at wolf taxonomy  Pages 375-397 in Carbyn, L N , S H Fritts, and D R Seip (eds )  Ecology and conservation of wolves in a changing world  Canadian Circumpolar Institute, University of Alberta, Edmonton  620 pages

614890

# Exhibit E:

# Excerpted pages from
# FWS, Policy and Guidelines for Planning and Coordinating Recovery of Endangered and Threatened Species (May 1990)

# POLICY AND GUIDELINES FOR PLANNING AND COORDINATING RECOVERY OF

## ENDANGERED AND THREATENED SPECIES

A guide for planning and coordinating the recovery of endangered and threatened species, involving the U.S. Fish and Wildlife Service, State and Federal agencies, and other parties, as required by the Endangered Species Act of 1973, as amended.

## U.S. Department of the Interior

### Fish and Wildlife Service

### May 1990

05/25/90

Exhibit E in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v Kempthorne, Civ. No. 07-00677
Page 1 of 31

POLICY AND GUIDELINES FOR PLANNING AND COORDINATING
RECOVERY OF ENDANGERED AND THREATENED SPECIES:
EXECUTIVE SUMMARY

These "Policy and Guidelines for Planning and Coordinating Recovery of
Endangered and Threatened Species," dated May 1990, revise and supersede
previous guidance on recovery planning.  Changes are in response to:  (1)
the 1988 Amendments to the Endangered Species Act, (2) the General
Accounting Office's December 1988 report, "Endangered Species Management:
Improvements Could Enhance Recovery Program," and (3) the desire of the
Service to make the guidance more useful and consistent with current policy.

Section I discusses major changes in recovery activities required by the
Endangered Species Act Amendments of 1988.  Section II reflects the
Amendments in its discussion of the preparation and processing of Recovery
Plans.  Section III includes a discussion of new reporting systems for
tracking expenditures and species status trends, which will set the stage
for the Service to maintain centralized databases.  Service guidance on
Recovery Plan preparation puts new emphasis on developing: (1) measurable
criteria for recovery goals and (2) recovery tasks for which implementation
can be readily tracked.  Recovery Plans are expected to more specifically
state what the Service is trying to accomplish through recovery, more
precisely describe the on-the-ground work involved in implementing the
Recovery Plan, and provide estimates of the time and costs needed to achieve
recovery.

05/25/90

TABLE OF CONTENTS

Page

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . .   1

     A.  Background and Context . . . . . . . . . . . . . . . .   1

     B.  The Endangered Species Act Amendments of 1988 . . . . .   2

             1.  Public Review of Recovery Plans . . . . . . . . . . .   2
             2.  Recovery Plan Status Report . . . . . . . . . . .   2
             3.  Monitoring of Recovered Species . . . . . . . . .   3
             4.  Section 6 Amendments . . . . . . . . . . . . . .   3
             5.  Annual Reporting of Recovery Expenditures . . . . . .   3
             6.  Recovery Plan Requirements . . . . . . . . . . . .   3

     C.  Recovery Priority System and Policies . . . . . . . . .   4


II.  RECOVERY PLAN PREPARATION AND PROCESSING . . . . . . . . .   5

     A.  Preliminary Steps and Regional Responsibilities . . . . .   6

     B.  Recovery Plan Processing . . . . . . . . . . . . . . .   7

     C.  Summary of Service Responsibilities . . . . . . . . . .   10


III. REPORTING AND TRACKING OF RECOVERY ACCOMPLISHMENTS . . . . .   12

     A.  Species Status Report . . . . . . . . . . . . . . . .   12

     B.  Species Expenditures Report . . . . . . . . . . . . .   13

     C.  Recovered Species Status Report . . . . . . . . . . .   13


IV.  REFERENCES CITED . . . . . . . . . . . . . . . . . . . .   14

05/25/90

Exhibit E in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v Kempthorne, Civ. No. 07-00677
Page 3 of 31

# V.  APPENDICES

Page

APPENDIX I - RECOVERY PLAN FORMAT

- Title/Approval Page . . . . . . . . . . . . . . . . .    I-1
- Disclaimer Page . . . . . . . . . . . . . . . . . . .    I-2
- Literature Citation . . . . . . . . . . . . . . . . .    I-3
- Acknowledgements Page . . . . . . . . . . . . . . . .    I-4
- Executive Summary . . . . . . . . . . . . . . . . . .    I-5
- Recovery Plan Development (Outline) . . . . . . . . .    I-8


APPENDIX II - ORGANIZING THE RECOVERY EFFORT:  ROLES AND OPTIONS

- Organizing the Recovery Effort:  Personnel Considerations    II-1
- Recovery Team Appointment Letter . . . . . . . . . .    II-4
- Recovery Team Responsibilities . . . . . . . . . . .    II-6
- Recovery Outlines - Memo and Format . . . . . . . . .    II-8
- Lead Regions for Endangered Species Activities . . . . .    II-10
- Species Status Report(s) . . . . . . . . . . . . . . .    II-19


APPENDIX III - PUBLIC INVOLVEMENT

- Sample Newspaper Public Notice . . . . . . . . . . . .    III-1
- Sample Press Release . . . . . . . . . . . . . . . . .    III-2
- Model Federal Register Notice of Plan Availability . . .    III-3
- Sample Technical/Agency Review Draft Transmittal Letter    III-6
- Public Meeting Guidance for Recovery Plan Review   . . .    III-7
- Recovery Plan Distribution List . . . . . . . . . . .    III-9


APPENDIX IV - SERVICE POLICIES RELATING TO RECOVERY

- Captive propagation or cultivation   . . . . . . . . .    IV-1
- Habitat protection/land acquisition . . . . . . . . .    IV-1
- Hybrids . . . . . . . . . . . . . . . . . . . . . . .    IV-2
- Relocation of listed species   . . . . . . . . . . . .    IV-2
- Reintroduction vs. Introduction of listed species . . .    IV-3
- Termination of recovery efforts . . . . . . . . . . .    IV-3
- Experimental populations   . . . . . . . . . . . . . .    IV-3
- Listing and Recovery Priority Guidelines   . . . . . . .    IV-4
- National Environmental Policy Act requirements   . . . .    IV-14

05/25/90

Exhibit E in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v Kempthorne, Civ. No. 07-00677
Page 4 of 31

1

## I. INTRODUCTION

### A. Background and Context

Section 4(f) of the Endangered Species Act (Act) of 1973 (16 U.S.C. 1531 et. seq.), as amended, directs the Secretary of the Interior and the Secretary of Commerce to develop and implement recovery plans for species of animals and plants listed as endangered or threatened unless such plans will not promote the conservation of the species. The Fish and Wildlife Service (Service) and the National Marine Fisheries Service have been delegated the responsibility of administering the Act. The National Marine Fisheries Service is generally responsible for most marine species (except birds), and the Service is generally responsible for birds and terrestrial and freshwater species. Exceptions include the West Indian manatee, sea turtles (on land), and sea otters, which are under the Service's jurisdiction.

The Director, Fish and Wildlife Service has delegated the responsibility for preparing and implementing recovery plans to the Regional Directors. Decisions involving species that cross Regional boundaries will be coordinated among appropriate Regional Directors. Although developing recovery plans is usually appropriate, it is not always needed. The Regional Director has a choice to make.

These guidelines describe the procedures established by the Service to implement and coordinate recovery programs for federally listed species occurring in the United States. The objectives of these guidelines are to: (1) provide guidance for implementing the Endangered Species Act Amendments of 1988 and (2) improve the planning process so that substantial effort can be spent on recovery actions. These guidelines are intended to be used by Service managers and by prospective authors and reviewers of recovery plans, whether or not they are employed by the Service or have had previous exposure to recovery plans.

Recovery is the process by which the decline of an endangered or threatened species is arrested or reversed, and threats to its survival are neutralized, so that its long-term survival in nature can be ensured. The goal of this process is the maintenance of secure, self-sustaining wild populations of species with the minimum necessary investment of resources. A recovery plan delineates, justifies, and schedules the research and management actions necessary to support recovery of a species, including those that, if successfully undertaken, are likely to permit reclassification or delisting of the species.

05/25/90

Exhibit E in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v Kempthorne, Civ. No. 07-00677
Page 5 of 31

2

Coordination among Federal, State, and local agencies, academic researchers, conservation organizations, private individuals, and major land users is perhaps the most essential ingredient for the development and implementation of an effective recovery program. In its role as coordinator of the recovery process, the Service must emphasize cooperation and teamwork among all involved parties.

Although recovery plans do not, of themselves, commit manpower or funds, they are used in setting regional and national funding priorities. They also justify Service and other Federal agency recovery appropriations to Congress. Therefore, recovery plans must be as specific as possible in identifying: (1) recovery goals, (2) recovery tasks, (3) the duration and cost of recovery actions, and (4) responsible parties and interests.

B.  **The Endangered Species Act Amendments of 1988**

The 1988 Amendments, and their relation to recovery planning and implementation, are discussed below.

1.  **Public Review of Recovery Plans**

Section 4(f) of the amended Act requires public review of all new or revised recovery plans prior to approval. The intent is to inform the public, promote public involvement in the recovery planning process, and increase the information available to all involved Federal agencies. At a minimum, the Service will publish a notice in the Federal Register notifying the public of the availability of a technical/agency draft or agency draft recovery plan. The notice will open a formal public comment period. Notices or press releases in newspapers within the range of the species will also be considered as appropriate. The Regional Director of the lead Region is responsible for deciding if additional methods, such as public meetings, are warranted. (See guidance in Section II and Appendix III of these guidelines.) Any relevant comments received during the public comment period that require coordination with other agencies in order to address the issue in the final plan should be forwarded to that agency for consideration prior to plan approval. Otherwise, any other comments received may be summarized in the final approved plan.

2.  **Recovery Plan Status Report**

Section 4(f) of the Act was also amended to require the Service to report every 2 years to Congress on the preparation and implementation of recovery plans and on the status of each listed species with a recovery plan. The first report is due in October 1990. The intent is to: (1) measure progress in developing and implementing recovery plans, and (2)

05/25/90

Exhibit E in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v Kempthorne, Civ. No. 07-00677
Page 6 of 31

provide information on the status of each listed species with a recovery plan.  (See guidance in Section II of these guidelines.)

### 3.  Monitoring of Recovered Species

Section 4(g) of the Endangered Species Act was amended to require a system for monitoring (for a period of not less than 5 years) all species that have been recovered and delisted, and to provide for emergency re-listing of any species that may again become in danger.  (See guidance in Section II of these guidelines.)

### 4.  Section 6 Amendments

Congress recognizes that States bear much of the responsibility for managing Federally listed species and that the expertise of State conservation agencies is essential to the endangered species program. Section 6 of the Act was amended to clarify that States may use Section 6 grants to monitor the status of recovered (delisted) species and Notice of Review Category 1 and 2 candidate species.  However, priorities for Section 6 allocations should be:  (1) implementation of recovery actions, (2) candidate monitoring, and (3) monitoring of recovered species.

Although monitoring candidate species is not directly related to recovery, it does provide an opportunity for Federal and State agencies to conduct prelisting habitat protection and management actions, and ensures that species awaiting listing are not lost through inattention to their status.

### 5.  Annual Reporting of Recovery Expenditures

A new section (18) of the Act requires an annual reporting, on a species-by-species basis, of all "reasonably identifiable" Federal or State expenditures made primarily for the conservation of endangered or threatened species pursuant to the Act.  The intent of this amendment is to provide additional cost information to Congress and to examine the distribution of funds.  (Follow guidance in Section II of these guidelines.)

### 6.  Recovery Plan Requirements

In the 1988 amendments, Congress made it clear that a recovery plan is to be an action-oriented document.  There are four issues that must be addressed in every recovery plan.

o   To the maximum extent feasible, a recovery plan must identify site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the

05/25/90

4

species.  Action-oriented tasks designed to achieve specific
recovery goals are appropriate.

o   A recovery plan must estimate the time frame required for
    accomplishing recovery, assuming that sufficient funds are provided
    and in accordance with the schedule in the plan.  Estimates of
    time to recovery must be based on known biological factors and a
    determination of the likelihood that other management programs,
    including regulatory and law enforcement programs, might facilitate
    or detract from task accomplishment.  If they are uncertain, the
    nature of the uncertainty must be discussed in the plan.  If
    unknown, discuss recovery tasks that will make it practical to
    outline tasks and time frames in future plan revisions.

o   A recovery plan must estimate the cost of complete recovery of the
    species.  If the estimate is uncertain, the nature of the
    uncertainty must be discussed in the plan.  In the past, some
    recovery plans have given only the Service's recovery costs.
    However, Congress now requires that all recovery plans estimate
    the total cost for all Federal and State agencies and private
    organizations involved.

o   A recovery plan must set forth precise, measurable criteria
    and/or identify research needs that will allow the Service
    and others to objectively determine when recovery has been
    achieved when it is, in fact, achievable.

With this information in the recovery plans, all interested parties
will have a better idea of the funds necessary for recovery.  These
documents then can be used to support Service budget initiatives.

C.  <u>Recovery Priority System and Policies</u>

     The Service recognizes the necessity to assign priorities to listing,
delisting, and recovery actions in order to most appropriately use the
limited resources available to implement the Act.  The December 1988
General Accounting Office report to Congress criticized the Service for
not following its own priority system and for devoting an inordinate amount
of resources on either high-profile, low priority species or on low priority
tasks for high priority species.

     Two priority systems guide species recovery.  The first is the Species
Recovery Priority System (See Appendix IV.)  This numerical system assigns
species a rank of 1 to 18 according to the degree of threat, recovery
potential, taxonomic distinctness, and presence of an actual or imminent

                                                              05/25/90

5

conflict between the species' conservation and development or other economic activities (the latter factor doubles the number of levels: 1C, 1, 2C, 2, 3C, 3 ...). Each listed species is assigned a priority by the lead Region at the time of listing. In general, the lower the numerical value, the greater the likelihood of extinction and the greater the justification for the Service to expend recovery resources on that species.

The second is the Recovery Task Priority System. In developing a recovery plan, recovery tasks are assigned numerical priorities of 1, 2, or 3 according to the relative contribution they may make to species recovery. (See definitions under Implementation Schedule: Appendix I).

In concept, resources should be allocated first to accomplishing priority-1 recovery tasks for species with a recovery priority number of 1 and last to priority-3 tasks for a species with recovery priority of 18 (lowest priority delineated in the current system). Actual funding allocations, however, may not follow this formula strictly in all cases. Some otherwise low priority species that need only one or two low priority tasks to complete recovery might receive resources to expedite their downlisting or delisting.

In practice, Congress sometimes mandates that funds be spent on species or tasks that would otherwise not yet be funded by a strict application of the two priority systems. Also, a Regional Director must often be flexible enough to take advantage of special opportunities provided by shifting social, political, or economic circumstances. Therefore, the two formal priority systems, used in tandem, serve as a guide rather than a mold to which all actions must conform. When appropriate, Service managers may practice the art of management in deft and imaginative ways to get the greatest conservation benefits for resources expended. Other agencies, groups, and individuals can and should become involved in the coordinated recovery effort.

Service policies with direct application to recovery include those on vertebrate populations, captive propagation or cultivation, land acquisition, hybrids, reintroduction, experimental populations, and termination of recovery. These policies are described in Appendix IV. Plan preparers should be familiar with these policies to ensure consistency of the recovery plan tasks they write.

## II. RECOVERY PLAN PREPARATION AND PROCESSING

The method to be used for plan preparation is based on several factors, including the range (limited vs. extensive), or ecosystem (simple vs. complex), of the species, the complexity of the recovery actions

05/25/90

Exhibit E in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v Kempthorne, Civ. No. 07-00677
Page 9 of 31

6

contemplated, the number of organizations responsible for the implementation of the recovery tasks, the cooperation of private landowners, the availability and expertise of personnel, and the availability of funds. Lead Regions for endangered species activities have been identified to guide coordination of listing and recovery assignments. A discussion of the concept and Regional responsibilities is found in Appendix II. Some recovery plans are prepared by Service biologists. The Service also may use outside expertise in the form of recovery teams, other Federal agencies, State personnel, private conservation organizations, or private contractors in the development and implementation of recovery plans. A detailed discussion of the options available for recovery plan preparation and the roles of prospective participants is found in Appendix II.

The Service need not prepare National Environmental Policy Act (NEPA) documents on the lead Regional Director's decision to prepare a recovery plan. Recovery plan development is categorically excluded from complying with NEPA based on the consultative and technical assistance nature of recovery planning. However, implementation of a specific task in a plan may require NEPA compliance if that task constitutes a major federal action. (See Memo from the Director to the Regional Directors, "NEPA Categorical Exclusion for Recovery Plans," dated 11/5/86, in Appendix IV.)

A.  **Preliminary Steps and Regional Responsibilities**

The recovery planning process begins when or just before a species is listed. Some management actions may have occurred prior to listing a species in an effort to begin reversing its decline or minimizing the threats to its existence. If the species was previously a candidate, some management actions may have already taken place. The Regional Director responsible for preparation of the original listing package is normally designated the lead for preparing and signing the recovery plan, unless the affected Regional Directors agree otherwise. The Director reserves the right to approve recovery plans of national significance.

A lead Regional Director is **required to submit a recovery outline to the Director within 60 days of the final listing rule publication briefly explaining the actions the Region intends to take.** This is a one-page document in which the Regional Director indicates the species recovery priority number, whether or not a recovery plan will be prepared, the estimated date of its completion, whether or not a recovery team will be appointed, and what immediate or major recovery actions are anticipated. (See Memo from the Director and Recovery Outline format in Appendix II.)

For a species found in more than one Region, the designated lead Region will determine the method of plan preparation and coordinate recovery plan

05/25/90

Exhibit E in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v Kempthorne, Civ. No. 07-00677
Page 10 of 31

7

development and implementation in cooperation with other affected Regions. Regions are encouraged to develop multi-species recovery plans for listed species that share the same ecosystem or for taxonomically related species facing similar threats.  In some instances, it may be advantageous to develop separate plans for each major population of a widespread species (e.g., the bald eagle).

B.  **Recovery Plan Processing**

Following regional review, the Regional Director may opt to produce a technical draft for review by the professional community (e.g. academic, law enforcement, other Federal contacts, etc.).  This draft need not include an Implementation Schedule.  Comments received are incorporated into a subsequent agency draft, which is made available for review by all interested agencies and parties (including the general public). Alternatively, the Regional Director may choose to produce a combined technical/agency draft, to be reviewed simultaneously by all interested parties.  The latter approach is recommended because it saves time, effort, and money; however, the decision on whether to have separate drafts or one combined draft belongs to the lead Regional Director.

Once the agency (or technical/agency) draft or a significant revision to a previously approved plan is prepared, the following actions will be taken to comply with the 1988 Amendments:

1)  The lead Region will distribute this draft to the Assistant Director - Fish and Wildlife Enhancement (ADFWE), the Assistant Director - Refuges and Wildlife (ARW), the Assistant Director - Fisheries (AF), the Regional Director for Research and Development, other affected Regions, all affected Service field offices, cooperating agencies, species experts, and other interested and/or affected public or private parties.  Comments will be transmitted to the lead Region within 60 days.

2)  The lead Region will prepare a Notice of Availability for publication in the <u>Federal Register</u> requesting public comments within a specified time.  The lead Region also may develop a public notice and/or press release to be published in, or provided to, local newspapers in each major geographical area where the species is known or believed to occur (See Appendix III for examples of such documents.)  The lead Region will absorb the cost of press releases and other forms of public notification.

3)  The <u>Federal Register</u> notice, press releases, and/or public notices should be published at the same time.  However, the Regional

05/25/90

Exhibit E in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v Kempthorne, Civ. No. 07-00677
Page 11 of 31

8

Director may, as a courtesy, distribute the technical/agency draft or agency draft to cooperating agencies and other affected parties shortly before the general public is invited to review and comment on the draft. This advance distribution is appropriate if the Regional Director wishes to allow cooperating agencies and other affected parties some lead time to deal more effectively with inquiries from the general public.

4)  The Regional Director of the lead Region will decide whether or not to hold public meetings on the draft recovery plan. If a public meeting is to be held in a Region other than the lead Region, that Regional Director is responsible for organizing and holding the meeting but should do so in close cooperation with the lead Region. (See Appendix III for further guidance on public meetings.)

Public comments must be sent to the lead Region for consideration prior to approval of the plan. The lead Region decides whether to address the comments and the Service's response in, or separately from, the recovery plan. The Region has substantial discretion in this area. If only a few comments are received, it may be simple to append them to the approved recovery plan. However, numerous comments could be very unwieldy, and the Region may choose to merely summarize the comments. The Service's administrative record must show that all comments received during the public comment period have been considered and, if not addressed individually, addressed in summary form. Since the 1988 Amendments also require other affected Federal agencies to consider public comments, the lead Region must provide copies of all comments to appropriate agencies for consideration, prior to their address in the approved recovery plan.

Comments can be accepted at any time during recovery plan preparation. Those received outside the designated public comment period need not be addressed in a formal fashion, but the Service and cooperating agencies are free to use any significant information so provided.

A recovery plan is considered "Approved" only after being signed by the lead Regional Director or Director. After approval, the plan is reproduced by the Regional Office and distributed. The distribution list is found in Appendix III. A copy of the signed approval page must be sent to the Director (ATTN: FWE/DES) within 15 days after the approval.

05/25/90

Exhibit E in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v Kempthorne, Civ. No. 07-00677
Page 12 of 31

9

An approved plan should be reviewed periodically to determine if updates or revisions are needed. Changes in an approved plan will be processed in the following manner:

o    **Update** - This involves changes in the Implementation Schedule or other minor revisions (e.g., identification of recovery tasks that have been initiated since the last printing and are either ongoing or have been completed). Tasks that have been completed should be indicated as such in the comments column of the Implementation Schedule, along with actual costs (for example, "complete FY 1989" or "ongoing $20K FY 1989 with Section 6 funds"). The Division of Endangered Species (DES) will be informed of an Update by the Species Recovery Status Report that will be sent to ADFWE on an annual basis (see Section III and Appendix I). Copies of the updated pages should be forwarded to cooperators. No public review and comment is required for updates, but the lead Regional Director may choose to solicit such comment.

o    **Revision** - This involves substantially rewriting some portion(s) of the plan. A revision is necessary when significant changes are needed in Parts I or II, and/or when major conceptual changes are required. Existing approved plans need not be revised merely for reformatting to these guidelines; however, when a revision is undertaken, the opportunity to conform the plan should be taken.

In some cases revisions or updates can be handled by replacing whole pages in the original plan with new versions. Such pages should be dated to indicate the time of revision/update.

Significant revisions of approved plans require a review with public involvement. The Region that prepared the original recovery plan is responsible for preparing the revised recovery plan, unless the affected Regions agree otherwise or the Director provides other instructions.

All updates and revisions should be carefully analyzed to ensure that the task priorities are valid. As in an original plan, the narrative description in Part II for any priority 1 task in a revised plan should include explanation of why the action is necessary to prevent extinction. A revised recovery plan must be identified as such on the title sheet and cover along with the date of the original approved recovery plan and the revision.

05/25/90

10

C.  **Summary of Service Responsibilities**

**The Regional Director has the responsibility to:**

1.  Provide a Recovery Outline (see format in Appendix II) for any listed species for which the Region has lead responsibility to the Director within 60 days subsequent to publication of the final rule listing a species.

2.  Prepare and approve all recovery plans for which the Region prepared the original listing package unless the affected Regions agree otherwise.  These plans will generally be for species that occur solely or largely within the affected Region.  The Director retains the discretion to approve any plan or to delegate approval to the responsible Region.

3.  Take emergency actions, with appropriate permits, necessary for the protection of any listed species regardless of plan status or task priority.

4.  Establish recovery teams, if appropriate, to develop the recovery plan or oversee its implementation.

5.  Modify or terminate recovery teams and their activities.

6.  Appoint, remove, and replace recovery team members as appropriate (Under special circumstances, the Regional Director may wish to have the Director announce these actions.)

7.  Inform the appropriate Public Affairs Office of actions conducted under the above items 4, 5, and 6.

8.  Assist those preparing plans by providing technical, advisory, fiscal, and other assistance as needed.

9.  Complete the Implementation Schedule, Part III. (This may be done instead by the plan preparer, at the discretion of the Regional Director.)

10. Review all drafts of the recovery plan and accept, modify, or return them to the preparer for further modification.  Distribute drafts for review and comment in accordance with Appendix III.

11. Arrange for the publication of a Federal Register notice informing the public of an opportunity to review the recovery plan and provide comments.

05/25/90

11

12. Distribute a press release and/or publish (in a newspaper of local distribution) a public notice of availability of the agency or technical/agency draft of new or revised recovery plans and the opportunity to comment, hold public meetings on recovery plans as the Regional Director finds necessary, and address any significant public comments associated with the recovery plan.  The lead Region is responsible for bearing the costs of publishing Notice(s) outside its region.

13. Print and disseminate approved plans to the appropriate parties listed in Appendix III.  Printing of plans will be accomplished within 90 days after approval; distribution within 120 days, subject to availability of funds (See Appendix III).

14. Immediately upon printing, provide three copies of each new or revised Recovery Plan to the Director through the Assistant Director - Fish and Wildlife Enhancement.

15. Periodically review each recovery plan, and update and revise as required.

16. Notify appropriate Federal agencies, in writing, of the statutory requirement that they consider all information presented during the public comment period and provide copies of such comments to those agencies prior to approval and implementation of new or revised plans.

17. Direct and coordinate recovery plan implementation.

18. Develop budget proposals to implement recovery plans and prepare Annual Work Activity Guidance for current year funding.

19. Review progress of plan implementation and report on accomplishments and progress of species' recovery (including recovered species) as requested by the Director.

20. Terminate recovery efforts once plan objectives have been accomplished.  The Regional Director may continue management actions even after a recovery plan's objectives have been met.

21. Recommend delisting or reclassification of listed species as appropriate.

22. Inform all cooperators of modifications in the plan and other actions, including emergencies, problems, needs, progress, etc.

05/25/90

12

The Region 9 Division of Endangered Species has the responsibility to:

1. Provide guidelines and training on National policy, new legal requirements, and the preparation of plans through written materials and workshops.

2. Review, evaluate, and provide comments on the technical/agency or agency drafts of new or revised plans regarding adherence to the recovery guidelines and other Fish and Wildlife Service policies.

3. Compile Regional reports on recovery implementation progress, species status (including status of recovered species), and status of draft, revised, or approved recovery plans for Director's submission to Congress.


III.    REPORTING AND TRACKING OF RECOVERY ACCOMPLISHMENTS


A recovery plan benefits a species only if it is **implemented**. As a general rule, one person in the lead Region should be assigned the oversight of each recovery plan. This individual should be responsible for coordination with all parties participating in the species recovery efforts and for preparing species-specific input for any required reports.

Three report requirements exist to ensure compliance with the Endangered Species Act. These include: (1) **Species Status Report (biennial)**, (2) **Recovery Expenditures Report (annual)**, and (3) **Recovered Species Status Report (annual)**. **ADFWE will provide specific requirements for each report to the Regions, along with any changes, each time a report is required.** These reports serve as the basis for a system to track recovery progress and expenditures. The following guidance should be followed within each Region.

A. **Species Status Report**

The Service is required, by Congress, to report every two years to the Committee on Environment and Public Works of the Senate and the Committee on Merchant Marine and Fisheries of the House of Representatives on the status of efforts to develop and implement recovery plans for all species listed pursuant to Section 4 of the Act and on the status of all species for which such plans have been developed. The status of each listed species will be tracked using a centralized database (developed by the Region 9 Division of Endangered Species (DES)). Beginning in Fiscal Year 1990, each Region is responsible for sending to the ADFWE, on an biennial basis, a Species Status Report (Parts I, II, and III) on each listed species for which it has lead responsibility (See format, Appendix II). This Status Report will include a tabular report (Parts I and II) and individual species

05/25/90

13

summary status reports (Part III). The species summary status will be no longer than one page. It will include a one-line statement regarding the current status of the species based on information readily available to the staff. A species' status will be categorized as: Improving (Increasing), Stable, Declining, Unknown, or Extinct. The summary should compare the species' current status with its condition at the previous status review. The report should also describe the recovery actions that have been implemented and/or completed during the previous year (including consultations, incidental take authorizations, law enforcement activities, etc). The purpose of this report is to track the status of each species and the implementation of recovery plans, as required by Congress.

B.  **Species Expenditures Report**

On or before January 15, 1990 and each January 15 thereafter, the Service, in accordance with Section 18 of the Act, will submit to Congress an annual report covering the preceding fiscal year which provides an accounting on a species by species basis of all reasonably identifiable Federal and State expenditures made primarily for the conservation of endangered and threatened species pursuant to the Act. DES will develop a list of reasonably identifiable categories (by species or cluster of species), such as listing, recovery, consultation, research and development, acquisition, law enforcement, and Section 6 grants, for the Regions to use in reporting on species expenditures. In addition, DES will develop a simple reporting system for use in identifying expenditures of other Federal agencies and States. The Regions are required to provide ADFWE with an annual expenditure report in advance of the required date for submission to Congress. Coordination through the International Association of Fish and Wildlife Agencies for State expenditures will be accomplished by DES. The Director will then provide Congress with a nationwide Recovery Expenditures Report by January 15th of each year.

C.  **Recovered Species Status Report**

For at least five years after delisting, the Service is required to implement a system in cooperation with the States to monitor the status of all species which have recovered to the point at which the measures provided pursuant to the Act are no longer necessary. The Lead Regions must provide ADFWE with an annual Recovered Species Status Report for each recovered and delisted species, describing the monitoring methods used and the results of the previous fiscal year's monitoring efforts by October 31st of each year.

05/25/90

Exhibit E in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v Kempthorne, Civ. No. 07-00677
Page 17 of 31

14

## IV. REFERENCES:

General Accounting Office. 1979. Endangered Species - A Controversial
    Issue Needing Resolution. Washington, D.C.

General Accounting Office. 1988. Endangered Species - Management
    Improvements Could Enhance Recovery Program. Washington, D.C.

Lande, Russell. 1988. Genetics and Demography in Biological Conservation.
    Science 24(1):1455-1460.

Shaffer, Mark L. 1981. Minimum Population Sizes for Species Conservation,
    Bioscience 43(2):131-134.

U.S. Fish and Wildlife Service. 1973. Tactical Planning in Fish and
    Wildlife Management and Research. Resource Publication 123.
    Washington, D.C.

U.S. Fish and Wildlife Service. 1980. Appendix I. Priority System.
    pp. i-iv. In: Endangered Species Program Management Document.
    Washington, D.C.

U.S. Fish and Wildlife Service. 1981. Service prepares guidelines for
    ranking candidate species. Endangered Species Technical Bulletin
    6(8):1.

U.S. Fish and Wildlife Service. 1983. Endangered and Threatened Species
    Listing and Recovery Priority Guidelines. Federal Register,
    48(184):43098 and 51985.

U.S. Fish and Wildlife Service. 1988. Recovery 2000. Endangered Species
    Division, Federal Building, Fort Snelling, Twin Cities, Minnesota.

05/25/90

# APPENDIX IV

# FISH AND WILDLIFE SERVICE POLICIES RELATING TO RECOVERY

05/25/90

# TABLE OF CONTENTS

                                                                          Page

Captive Propagation or Cultivation . . . . . . . . . . . . . . . . .   IV-1

Habitat Protection/Land Acquisition  . . . . . . . . . . . . . . .   IV-1

Hybrids  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   IV-2

Relocation of Listed Species . . . . . . . . . . . . . . . . . . .   IV-2

Reintroduction vs. Introduction of listed species  . . . . . . . .   IV-3

Termination of Recovery Efforts  . . . . . . . . . . . . . . . . .   IV-3

Experimental Populations . . . . . . . . . . . . . . . . . . . . .   IV-3

Listing and Recovery Priority Guidelines . . . . . . . . . . . . .   IV-4

National Environmental Policy Act Requirements . . . . . . . . . .   IV-14

Exhibit E in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v Kempthorne, Civ. No. 07-00677
Page 20 of 31

IV-1

## SERVICE POLICIES RELATING TO RECOVERY

The following discussion briefly summarizes Service policies relevant to recovery activities. References are provided for people wanting more information, and these reference documents should be available in each Regional Office.

### 1. Captive propagation or cultivation

Captive propagation/cultivation may be a useful tool to facilitate recovery of a species in the wild, but it is not a substitute for reestablishment of viable wild populations. The initiation of significant and costly captive propagation or cultivation programs may be necessary, but should be considered only after all other techniques to maintain or improve a species' status in the wild have failed or are determined as likely to fail. In the case of listed plants, however, seed banking may be relatively simple and inexpensive and need not be delayed.

Emphasis should be on preservation of natural habitats, population management, enforcement of protective regulations, and public education (See Memo from Director to Regional Director, Region 3, Treatment of cultivated material of listed plant species, 1/14/86).

### 2. Habitat protection/land acquisition

Whenever possible, the first step in habitat protection should be education and involvement of the landowners. Proposals to acquire land or interests therein for the benefit of listed species are appropriate when other means (such as cooperation, exchanges, zoning, or other regulation) of achieving recovery objectives are not available or effective. When property must be acquired, the minimum interest necessary to meet species recovery objectives is to be acquired or retained. Long-term (perpetual) restrictive easements and extended use reservations should be considered as alternatives to outright fee purchase, as a way of lessening impacts on the owner and the community and saving the taxpayers money. Donations of desired lands or interests should be encouraged. The Office of Management and Budget has historically imposed restrictions on the use of the Land and Water Conservation Fund for the purchase of lands not identified as essential habitat in recovery plans. Therefore, in cases where land acquisition is deemed necessary, essential habitat should be identified in the recovery plan. Essential habitat should not be confused with critical habitat, which is defined by regulation. Where habitat acquisition is determined to be necessary prior to completion of the recovery plan, the "Preliminary Project Proposal," for that acquisition will require the Director's approval.

05/25/90

Exhibit E in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v Kempthorne, Civ. No. 07-00677
Page 21 of 31

IV-2

If a recovery plan contemplates land acquisition, it must include a thorough discussion of the extent and location (providing it would not increase the risk of "take" of the species) and an estimate of the cost effectiveness and biological effectiveness of alternative strategies for habitat protection.

## 3. Hybrids

Hybrids are not protected by the Endangered Species Act. A hybrid is defined as the offspring of two organisms (animal or plant) of different species (as defined pursuant to the Act).

Protection of hybrids is inconsistent with the Act because it may result in the loss of the last remaining "pure" gene pools or the takeover by hybrids of habitat essential for the genome's survival. (See Memo to Deputy Associate Director for Federal Assistance from Assistant Solicitor, Fish and Wildlife, Whether hybrids are covered by the ESA, 8/2/77; Memo to Regional Solicitor, Northeast Region, from Assistant Solicitor, Fish and Wildlife, Status of the hybrid offspring of two endangered species, 9/21/83.)

## 4. Relocation of listed species

Listed species will not be relocated or transplanted by the Service outside their historic range without specific case-by-case approval from the Director. (Historic range is defined to be those geographic areas which the species was known or believed to occupy in the past. When appropriate, different historic ranges must be defined relative to the life history phase of the species involved in the relocation or transplant.)

The stated purpose of the Endangered Species Act is to conserve the ecosystems upon which Endangered and Threatened species depend [Section 2(b)]. It would therefore be inappropriate to transplant listed species outside their historic range except in special cases. (See Memo from Associate Director to Regional Directors, Reintroduction of endangered and threatened species, 6/25/81; Memo from Director to Associate Solicitor, Conservation and Wildlife, FWS Policy on transplanting listed endangered and threatened species, 7/9/82.)

05/25/90

Exhibit E in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v Kempthorne, Civ. No. 07-00677
Page 22 of 31

IV-3

## 5. Reintroduction vs. Introduction of listed species

The more local an organism, the more critical the distinction between reintroduction and introduction can become. Reintroduction applies to areas (sites), where the species is or was known or believed to occur. All other placements are introductions (always outside of the historic range).

## 6. Termination of recovery efforts

In cases where a species' extinction is imminent and inevitable, Service-sponsored recovery efforts will be terminated. The Director will make such a judgement only after careful study and a recommendation for termination is submitted by the responsible Region. If the Service is to use its limited resources productively, then it cannot afford to expend effort on activities that will not produce any long term benefits. (See Memo from Acting Associate Director to Regional Director, Region 6, Endangered Species Policy Handbook, 7/10/84.)

## 7. Experimental populations

Experimental populations of listed species may be established outside the current range of the species to further species conservation. The "experimental" designation relaxes certain restrictions imposed by Section 9 and, in some cases, Section 7 of the Act. Each member of the experimental population will be treated as a threatened species or as a species proposed for listing, depending on the circumstances. To be considered experimental, a population must be wholly separate geographically from the donor population but within the species' probable historical range (except for unusual situations, which must be approved by the Director).

This treatment of experimental populations allows greater management flexibility under controlled conditions to promote the long-term survival of the species. Flexibility will encourage greater State and local participation in the conservation and recovery of listed species. (See 50 CFR Part 17, Subpart H; Memo from Assistant Solicitor, Fish and Wildlife, to Associate Director for Federal Assistance, Section 10(j) of the ESA and MOU's, 5/23/84; Memo from Assistant Solicitor, Fish and Wildlife, to Associate Director for Federal Assistance, Application of Section 10(j) of the ESA to experimental populations of plants and invertebrates, 3/83.)

05/25/90

Exhibit E in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v Kempthorne, Civ. No. 07-00677
Page 23 of 31

IV-4

The experimental population approach may be used when judged appropriate; however, formal designation is required if reintroductions and/or translocations are to be designated as experimental.  The decision on whether or not to use this approach will be made on a species-by-species basis.

## 8.  <u>Listing and Recovery Priority Guidelines</u>

The Service developed guidelines governing the assignment of priorities to species for listing as endangered or threatened under the Endangered Species Act and the development and implementation of recovery actions for species that are listed under the Act.  The guidelines aid in determining how to make the most appropriate use of resources available to implement the Act.  (See attached guidelines as published in the <u>Federal Register</u> on September 21, 1983).

05/25/90

Exhibit E in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v Kempthorne, Civ. No. 07-00677
Page 24 of 31



# United States Department of the Interior

### FISH AND WILDLIFE SERVICE
### WASHINGTON, D.C. 20240

In Reply Refer To:          NOV 5   1986
FWS/OES

Memorandum

To:        Regional Director, Regions 1, 2, 3, 4, 5, 6, and 7
           (ARD/FA or ARD/AFF)

Through:   Assistant Solicitor · Fish and Wildlife

From:      Director

Subject:   NEPA Categorical Exclusion for Recovery Plans


The question is periodically raised of whether preparation of an
Environmental Assessment (EA) or an Environmental Impact Statement (EIS)
is required for development or approval of recovery plans. For the
following reasons, we have concluded that recovery plans generally are
categorically excluded from analysis under the National Environmental Policy
Act (NEPA).

Recovery plans are broad planning documents that list all tasks the Service
believes may contribute to the recovery of a species. These tasks
involve action by the Service, by other Federal agencies, by State
local governments, by the private sector, or by a combination of t...
Recovery plans typically do not propose specific actions, but instead set
forth general policies for management and treatment of the species. For
these reasons, meaningful analysis of the environmental impacts of a
recovery plan is usually difficult, if not impossible.

In addition, recovery plans impose no obligations on any agency, entity,
or persons to implement the various tasks listed in the plan. In fact,
many of the recommendations in any recovery plan are never implemented
because of limitations on funding, knowledge about the species, or changes
in the species' needs. Finally, any recovery actions set forth in a
recovery plan that are to be carried out by Federal agencies will be
subjected to NEPA analysis at the time they actually are "proposed" within
the meaning of NEPA.

The Departmental Manual (516 DM 2, Appendix 1) (attached) identifies
categorical exclusions from NEPA. In particular, Exclusion 1.10 covers:

Exhibit E in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
Defenders of Wildlife, et al. v. Kempthorne, Civ. No. 07-cv-00677-PLF
Page 23 of 30

"Policies, directives, regulations, and guidelines of an
administrative, financial, legal, technical, or
procedural nature; or the environmental effects of
which are too broad, speculative or conjectural to

2

lend themselves to meaningful analysis and will be
subject later to the NEPA process, either collectively
or case-by-case.

We conclude that recovery plans fit within this exclusion and thus should
normally require no NEPA analysis. However, as provided in 461 DM 2.3 A
and 2.4 B (attached), exceptional or extraordinary circumstances may warrant
the preparation of Environmental Assessment or even Environmental Impact
Statements for particular recovery plans.

Assistant Solicitor -                    Director - Fish and Wildlife Service
Fish and Wildlife

Attachments (deleted)

Exhibit E in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v Kempthorne, Civ. No. 07-00677
Page 26 of 31

U.S. GOVERNMENT PRINTING OFFICE: 1981 O—863-815

Upon disqualification of the apparent high bidder, the next high bid will be honored.

2. The authorized officer may reject the highest qualified bid and release the bidder from his obligation and withdraw the tract for sale, if he determines that consummation of the sale would be inconsistent with the provisions of any existing law or collusive or other activities have hindered or restrained free and open bidding or consummation of the sale would encourage or promote speculation in public lands.

3. All bids will be either returned, accepted, or rejected within 30 days of the sale date.

4. A right-of-way is reserved for ditches and canals constructed by the authority of the United States under the act of August 30, 1890 (26 Stat. 391; 43 U.S.C. 945).

5. The patent will be subject to road right-of-way held by the county and all other valid existing rights.

6. All minerals will be reserved to the United States.

Detailed information concerning the sale, including the environmental. assessment, and the decision document is available for review at the Richfield District Office.

For a period of 45 days from the date of this Notice, interested parties may submit comments to the District Manager, Bureau of Land Management, 150 East 900 North, Richfield, Utah 84701. Any adverse comments will be evaluated by the District Manager, who may vacate or modify this notice. In the absence of any action by the District Manager, this realty action will become the final determination of the Department of the Interior.

Dated: September 12, 1983.

Donald L. Pendleton,

*District Manager.*

[FR Doc. 83–25677 Filed 9–20–81. 8:45 am]

**BILLING CODE 4310–84–M**

---

[W–46102]

**Wyoming; Proposed Reinstatement of Terminated Oil and Gas Leases**

Pursuant to the provisions of Pub. L. 31–245 and Title 43 Code of Federal Regulations, § 3108.2–1(c), and Pub. L. 97–451, a petition for reinstatement of oil and gas lease W–46102 for lands in Natrona County, Wyoming has been timely filed and was accompanied by all the required rentals accruing from their respective dates for termination.

The lessees have agreed to new lease terms for rentals and royalties at rates of $10.00 per acre, and 16⅔ percent, royalty, computed on a sliding scale

based on average production per well per day.

The lessees have paid the required $500 administrative fee and will reimburse the Department of the cost of this Federal Register notice.

The lessees having met all the requirements for reinstatement of the leases as set out in Section 31 (d) and (e) of the Mineral Lands Leasing Act of 1920 (30 U.S.C. 188), the Bureau of Land Management is proposing to reinstate lease W–46102 effective August 31, 1979. subject to the original terms and conditions of the lease and the increased rental and royalty rates cited above.

Harold G. Stinchcomb,

*Chief, Branch of Fluid Minerals.*

[FR Doc. 83–25679 Filed 9–20–83; 8:45 am]

**BILLING CODE 4310–84–M**

---

**Fish and Wildlife Service**

**Endangered and Threatened Species Listing and Recovery Priority Guidelines**

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Notice.

**SUMMARY:** The U.S. Fish and Wildlife Service has developed guidelines governing the assignment of priorities to species for listing as Endangered and Threatened under the Endangered Species Act of 1973, as amended (Act) and development and implementation of recovery plans for species that are listed under the Act. The guidelines aid in determining how to make the most appropriate use of resources available to implement the Act.

**EFFECTIVE DATE:** The guidelines are adopted as of September 21, 1983.

**FOR FURTHER INFORMATION CONTACT:** Mr. John L. Spinks, Jr., Chief, Office of Endangered Species, U.S. Fish and Wildlife Service, Washington, D.C. 20240. (703/235–2771).

**SUPPLEMENTARY INFORMATION:**

**General**

The Service recognizes that it is necessary to assign priorities to listing. delisting. reclassification. and recovery actions in order to make the most appropriate use of the limited resources available to implement the Act. The following priority systems are based on an analysis of such factors as degree and immediacy of threat faced by a species. needs for furhter information. and species' recovery potentials. Inasmuch as such assessments are subjective to some degree, and individual species may not be

comparable in terms of all considerations, the priority systems presented must be viewed as guides and should not be looked upon as inflexible frameworks for determining resource allocations. Draft guidelines were published on April 19, 1983 (49 FR 16756). These final guidelines are based on that draft.

**Summary of Comments and Recommendations**

Comments were received from the following organizations: the Center for Environmental Education (also representing Defenders of Wildlife. Humane Society of the United States. and Natural Resources Defense Council); Chevron U.S.A., Inc.; The Ecological Society of America: Environmental Defense Fund; the law firm of McCarty, Noone and Williams (representing the Colorado River Water Conservation District); Pacific Legal Foundation; Western Timber Association; and Wildlife Legislative Fund of America. Three of the comments expressed general support for the guidelines as proposed, without offering any recommendations for change. Substantive recommendations are addressed below:

*Comments on Listing. Delisting. and Reclassification Priorities*

Because of the detailed and specific nature of comments on the listing portion of the guidelines, they are addressed individually. The Center for Environmental Education *et al.* (CEE) recommended that the Service emphasize listing of qualified species over delisting of species no longer in need of protection, and also stated that delisting should be undertaken only for species with no present need for protection and unlikely to need such protection in the future. The Service agrees in principal with this comment. It should be recognized, however, that the retention of recovered or extinct species on the lists undermines the overall credibility of the lists, and the Service believes that it is justifiable to devote resources to the removal of such species when they are identified.

CEE also expressed concern that consideration of degree and immediacy of threat be tempered by a consideration of benefit from listing and availability of information. They favored subsuming immediacy within degree of threat and adding the other two considerations as "pragmatic" criteria in the system. The Service continues to believe that separate consideration of immediacy is warranted in order to help ensure that the system is most effective in

discretion to assign appropriate priorities to highly distinct and genetically isolated organisms whether or not they constitute monotypic genera.

Finally, ESA requested a clarification of the applicability of the proposed system to unnamed populations. The Act includes populations of vertebrate animals in its definition of "species." Because this portion of the definition applies only to vertebrates, it appears inadvisable to incorporate it formally into the priority system. The Service intends to generally afford vertebrate populations the same consideration as subspecies, but when a candidate subspecies and a candidate population have the same numerical priority, the candidate subspecies will generally have priority.

The Environmental Defense Fund (EDF) expressed concern that too much time might be devoted to setting of species priorities, and that this might detract from actual implementing of listing tasks. The Service agrees that no more time than is necessary should be devoted to the assigning of priorities. Because of this consideration, the Service has deliberately attempted to formulate a system that is simple and that assigns species priorities in a straightforward manner without the need for complex analysis. EDF also expressed concern over the interrelationship of the three systems contained In Tables 1., 2., and 3. As explained below in the summary of comments on the recovery priority system, Tables 1. and 2. are largely independent of Table 3. Further, it is not possible, in the opinion of the Service, to formulate a direct relationship between the systems in Tables 1. and 2. As is explained in the narrative portion of the guidelines, it is anticipated that the need to delist species or reclassify them from Endangered to Threatened will be identified largely through mandated 5-year reviews or through petitions. Once such actions have been identified and assigned priorities, they will be considered for possible action within the Service's annual planning process.

Establishing specific criteria for ranking the priorities of listing proposals versus delisting proposals would take away the flexibility needed by the Service to efficiently apportion its resources. Although the same statutory criteria apply to make the listing and delisting determinations, the factual considerations for setting listing and delisting priorities are quite different. General rules cannot govern this complex mesh of priorities. However, it would generally be found that candidate species facing immediate, critical threats

should have priority for listing over competing delisting proposals under consideration at the time. Likewise, a delisting proposal for a recovered species that would eliminate unwarranted restrictions on significant, identifiable activities may, in appropriate instances, take precedence over listing proposals for species not facing severe, imminent threats. In deciding on which proposals will receive priority, the Service must examine the overall "mix" of potential listings and delisting and assess the relative priorities of the various proposals in light of that "mix." Of course, this assessment process will constantly change as new candidate species are brought to the Service's attention and as listed species attain recovery or become extinct.

EDF also recommended that terms used in the proposed system be more precisely defined and, in particular, recommended that the "degree of threat" criterion be quantified in a way that parallels the standards for finding "jeopardy" under Section 7 of the Act. The Service believes that the circumstances applying to most species are individualistic enough as to be incapable of precise definition or quantification beyond the level proposed. In particular, with regard to determinations of degree of threat, the parallel with considerations under Section 7 of the Act seems faulty. Consultations under Section 7 address known and carefully identified actions that may affect the survival of a species. Degree-of-threat considerations for listing a species may address highly speculative future actions, or more frequently, documented decline of a species for poorly-known or unknown reasons. Such considerations often cannot be quantified, and an attempt to do so might only serve to make priority-setting, rather than listing, the main activity of the program, as feared by EDF (see above). The Service believes that it has access to sufficient biological expertise to permit the admittedly loose definitions of terms to be interpreted appropriately.

EDF also recommended that "degree" be replaced by "magnitude" under "threat." The Service agrees that the latter term is somewhat more precise, and has altered the final guidelines accordingly.

EDF expressed concern that the "immediacy" criterion for threat not be applied so rigidly that Endangered species would always be listed in preference to Threatened species, which might be more recoverable. In general, the Service intends that species judged

Endangered should be listed before those judged Threatened. Once again, it is worth noting that listing is an identification process and, other considerations being equal, should proceed on a "worst-first" basis. Nevertheless, the Service intends that species originally judged to be faced with immediate threats, but which prove not to face such immediate threats when sufficiently complete status information is developed, may be listed nevertheless in order that current status information need not be gathered again later on.

EDF supported the concept of immediacy of threat as a useful addition to the priority system but observed that:

Specifically, we are concerned that the immediacy of threat criterion may ultimately rely on and be distinguished by the availability of scientific information about such threats. Because such threats are not well-known, however, a dearth of information may preclude necessary and expeditious action by the Service. We therefore suggest that the immediacy of threat criterion should be defined and delimited by what are necessarily somewhat subjective best judgments about the expected temporal sequence and realization of a threat; not just the known or unknown occurrence of such threats. We believe the Service recognizes this in its attempt to distinguish two categories ("actual identifiable" versus "potential, intrinsically vulnerable") but falls short in that effort by distinguishing "latent" from "potential" by the presence or absence of information available about such threats (e.g., "known occurrence or lack of * * *."). Hence, to the maximum extent possible, judgments about the immediacy of threat should be guided by how quickly the threat posed by any one of the five statutory factors may affect those populations of a candidate species at risk.

The Service believes that such a recommendation, if adopted, would render the system unworkable. It could make priorities responsive to highly speculative but rapidly-realized threats such as earthquake or volcanic eruption. The Service prefers in setting priorities to rely on known or reasonably predictable threats to a species' survival and known vulnerability to reasonably probable future conditions.

Because they believe that all threats are by definition potential, EDF recommends that "potential" be replaced by "non-imminent" in the system. Insomuch as a threat in this context is one of extinction, and is only realized when a species is extinct, this is a point well taken by the Service. The final system is altered accordingly.

EDF also recommended that an "ecosystem" criterion be incorporated into the system, similar to the "conflict" criterion in Table 3. This would be intended to identify species of ecologic

43102     **Federal Register / Vol. 48, No. 184 / Wednesday, September 21, 1983 / Notices**

potential conflict, has been known to exist, e.g., Northern Rocky Mountain wolf, San Bruno Mountain, San Marcos River Endangered and Threatened species, and the small whorled pogonia. The Service will continue to invite public participation for those species where conflicts or controversies are known to exist.

PLF stated that it is unclear (in Table 3) if there is any differing treatment between Endangered and Threatened species. The distinction between Endangered and Threatened species occurs in the Degree of Threat criterion. It is generally understood that the Degree of Threat is greater for Endangered species than for Threatened species.

PLF also suggested that an additional column be added to Table 3 that would give greater priority in the preparation of recovery plans to those species which are Endangered throughout all their range over those species that are Endangered throughout a portion of their range. Although it is not specifically stated, this concern is reflected in the first criterion (Degree of Threat) of Table 3. A species which is Endangered throughout its range would be listed higher on the degree of threat scale than would be a species Endangered throughout a portion of its range. In reality, most species which are listed are Endangered throughout their ranges. Even though it is legally acceptable to list populations of vertebrates, this practice represents the exception rather than the rule.

FSA recommended that for listing and recovery efforts, populations and named subspecies should have the same priority, since the possession of a name is often based more on tradition than on any meaningful measure of distinctiveness. This issue is addressed in the above Listing Section. In addition, the above reply to a comment from PLF indicates that priority be given to species which are Endangered throughout all their range rather than just to a population. Populations will be addressed when there is sufficient justification, but this is the exception rather than the rule.

EDF expressed the hope that the Service will devote most of its resources to implementing listing and recovery planning efforts and not to prioritizing such tasks. The listing portion of this concern is addressed in the earlier section of this article. The Service is mandated by the Endangered Species Act, as amended, to the preparation of recovery plans giving priority to those species most likely to benefit from such

plans. In doing so, the Service will also focus on those species that are, or may be, in conflict with construction or other development projects or other forms of economic activity. The proposed guidelines are intended to provide a means to identify, and rank, those species most likely to benefit from such plans. It is also necessary that the limited resources for the implementing of recovery actions be allocated in the most judicious fashion possible. This can only be possible by having a sound system for ranking proposed recovery actions.

EDF commented that it remains unclear specifically how the three priority models (Tables 1, 2, and 3) relate to one another. Table 3, Recovery Priority, is independent of Tables 1 and 2. It is to be expected that many species would have a similar ranking when evaluated by Tables 1 and 3. However, differences between species, or recovery potential could reduce these similarities of ranking. This concern is also addressed under listing comments, above.

EDF also found the tasks priority—recovery priority system somewhat confusing. They agreed that the Service's limited resources should be distributed equitably to all listed species, but were not sure specifically how this will be accomplished. They requested clarification of this situation. They commented that, "presumably recovery plans for species facing the highest degree of threat will designate more priority 1 tasks than those plans for species jeopardized by a lower degree of threat."

Generally, plans for species facing the highest degree of threat will designate more Priority 1 tasks than those plans for species jeopardized by a lower degree of threat. However, exceptions may occur. For example, a highly-Threatened isolated desert fish may be in imminent danger from siltation associated with adjacent cattle grazing. Possibly only one task, i.e., fencing, would warrant a Priority 1 designation.

Furthermore, as indicated in the earlier summary of comments on recovery potential and associated costs regardless of the recovery potential, the Service will strive to undertake for every high-threat species those minimum survival efforts which will at least stabilize its status and prevent its extinction. Once such "emergency" measures have been taken, further recovery work designed to eventually lead to delisting of species will be evaluated according to the recovery potential described above. To ensure consistency in the utilization of the

recovery priority system, all draft recovery plans will be reviewed by the same office at the Washington level. Additionally, all funding proposals for implementation of recovery actions will also be reviewed by the same office at the Washington level.

**Priority Guidelines**

*Listing, Delisting, and Reclassification Priorities.* In the past, the Service has informally assigned priorities for listing species as Endangered or Threatened on the basis of several different systems. In 1979, a report to Congress (General Accounting Office, 1979) recommended that the Service officially adopt a listing priority system based primarily on consideration of the degree of threat faced by a species. Following this report, the 1979 Amendments to the Endangered Species Act (Pub. L. 96–159, 93 Stat. 1241) required that guidelines be established and published in the Federal Register, including "* * * a ranking system to assist in the identification of species that should receive priority review for listing * * *." Such a system was adopted (U.S. Fish and Wildlife Service, 1980), but not published in the Federal Register. This system was subsequently revised (U.S. Fish and Wildlife Service, 1981) so that priority for listing would be assigned within a given category of Degree of threat so as to generally favor vertebrate animals ("higher life forms") in the following order: mammals, birds, fishes, reptiles, amphibians, vascular plants, invertebrates.

The 1982 Amendments to the Endangered Species Act (Pub. L. 97–304) retained the requirement that guidelines be published. However, the amendments and the accompanying Conference Report necessitated revision of the 1981 system. Specifically, the amended Act requires that the priority system address delisting as well as listing of species and the Conference Report stated opposition to the adoption of any system that would give consideration to whether species were "higher or lower life forms." The present system is intended to satisfy the requirements of the amended Act.

*1. Listing and reclassification from Threatened to Endangered.* In considering species to be listed or reclassified from Threatened to Endangered, three criteria would be applied to establish 12 priority categories as follows (Table 1):

**43104**    Federal Register / Vol. 48, No. 184 / Wednesday, September 21, 1983 / Notices

which, if applicable, elevates the species in priority for development of a recovery plan and is to be an additional element in determining what actions are to be implemented for the recovery of a species. This fourth factor gives priority within each category in the preparation of recovery plans to those species that are, or may be, in conflict with construction or other development projects or other forms of economic activity. Thus, the species will retain its numerical rank and will acquire the letter designation of "C" indicating conflict, e.g., priority 7 would become 7C. The categories would be assigned as follows:

TABLE 3.—RECOVERY PRIORITY

| Degree of threat and recovery potential | Taxonomy | Priority | Conflict |
|---|---|---|---|
| **High:** | | | |
| High | Monotypic genus | 1 | 1C, 1 |
| High | Species | 2 | 2C, 2 |
| High | Subspecies | 3 | 3C, 3 |
| Low | Monotypic genus | 4 | 4C, 4 |
| Low | Species | 5 | 5C, 5 |
| Low | Subspecies | 6 | 6C, 6 |
| **Moderate:** | | | |
| High | Monotypic genus | 7 | 7C, 7 |
| High | Species | 8 | 8C, 8 |
| High | Subspecies | 9 | 9C, 9 |
| Low | Monotypic genus | 10 | 10C, 10 |
| Low | Species | 11 | 11C, 11 |
| Low | Subspecies | 12 | 12C, 12 |
| **Low:** | | | |
| High | Monotypic genus | 13 | 13C, 13 |
| High | Species | 14 | 14C, 14 |
| High | Subspecies | 15 | 15C, 15 |
| Low | Monotypic genus | 16 | 16C, 16 |
| Low | Species | 17 | 17C, 17 |
| Low | Subspecies | 18 | 18C, 18 |

*Explanation.* The first step for the conservation of any species is to prevent its extinction. Thus the species with the highest degree of threat have the highest priority for preparing and implementing recovery plans. A species can be put in either a high, moderate, or low category, which represents the degree of threat. The high category means extinction is almost certain in the immediate future because of a rapid population decline or habitat destruction. Moderate means the species will not face extinction if recovery is temporarily held off, although there is continual population decline or threat to its habitat. A species in the low category is rare, or is facing a population decline which may be a short-term, self-correcting fluctuation, or the impacts of threats of the species' habitat are not fully known.

Within the above categories, resources should be used in the most cost-effective manner. Priority for preparing and implementing recovery plans would go to species with the greatest potential for success. Recovery potential is based on how well biological and ecological limiting factors and threats to the species' existence are

understood, and how much management is needed.

Priority will be given to those species and projects that offer the greatest potential for success. The recovery potential of a species will be determined by consideration of the following criteria:

| | High recovery potential | Low recovery potential |
|---|---|---|
| Biological and ecological limiting factors. Threats to species' existence | Well understood ...... Well understood easily alleviated. | Poorly understood Poorly understood or pervasive and difficult to alleviate. |
| Management needed [1] | Intensive management not needed, or techniques well documented with high probability of success. | Intensive management with uncertain probability of success, or techniques unknown or still experimental. |

[1] When possible and biologically feasible, data pertinent to the recovery of a particular taxon will be extrapolated from known ecological requirements or management techniques for closely related taxa.

Taxa that are most genetically distinct should receive priority within any given category of degree of threat. Monotypic genera will be given priority over species, subspecies, or populations. This last criterion is in recognition that the loss of the most genetically distinct taxa is of greater significance than the loss of less genetically distinct taxa. That is, for example, the loss of a full genus is of greater significance than the loss of a single species or population of that species.

The second requirement concerning recovery plans mandated by the 1982 Amendments is that priority be given to those species "that are, or may be, in conflict with construction or other development projects or other forms of economic activity." This requirement will be satisfied by having any listed species or subspecies, lacking a recovery plan, and identified as being, or having a recognizable potential for being, in conflict with a construction or development project, automatically qualify for the conflict column of the matrix. This species would then be considered high priority for having a recovery plan developed.

Conflict with construction or other development projects would be identified in large part by consultations conducted with Federal agencies under Section 7 of the Act. Any species identified through Section 7 consultations as having generated a negative biological opinion which concluded that a given proposed project would violate Section 7(a)(2) of the Endangered Species Act or resulted in the recommendation of reasonable and

prudent alternatives to avoid a negative biological opinion, would be assigned to the conflict category and would be given priority over all other candidates for recovery plan preparation and implementation in the same numerical category not involving a conflict. The Service would also contact other Federal agencies for their identification of listed species that are, or may be, in conflict with construction or other development projects or other forms of economic activity. Any species identified by this process would be assigned to the conflict category and would also be given priority over other candidates for recovery plan preparation and implementation within the same numerical category (see Table 3) not involving a conflict.

A task priority (1–3) is used in conjunction with species recovery numbers (1–18 or 1C–18C) in ranking those tasks that need to be accomplished for the recovery of a species. This combination results in a two-tiered priority system (species recovery number-task priority number) which serves to distribute the resources of the program equitably for all listed species. Recovery tasks will be assigned priorities based on the following:

1. *Priority 1.* An action that must be taken to prevent extinction or to prevent the species from declining irreversibly.

2. *Priority 2.* An action that must be taken to prevent a significant decline in species population/habitat quality, or some other significant negative impact short of extinction.

3. *Priority 3.* All other actions necessary to provide for full recovery of the species. (Recognizing that the ultimate success of the Program is species recovery, priority 3 action likely to lead to full recovery and delisting of a species in the foreseeable future will tend to rank higher than other priority 3 actions.)

The highest priority activity (research proposal, permit proposal, etc.) is a 1C–1 priority (species recovery number 1C; task priority number 1).

This is an action necessary to prevent extinction for a monotypic genus, with a high recovery potential, under a high degree of threat and in conflict with a construction or other development project. If resources were channeled into activities based solely on the recovery priority of a species, these resources would be utilized primarily for species with a recovery priority of 1C to 6. However, when the species' priority is viewed in conjunction with the task priority, we are able to identify the most critical activities for all species. This system would insure that resources are

Federal Register / Vol. 48, No. 221 / Tuesday, November 15, 1983 / Notices    51985

**Fish and Wildlife Service**

**Endangered and Threatened Species Listing and Recovery Priority Guidelines**

*Correction*

In FR Doc. 83–25716 beginning on page 43098 of the issue of Wednesday, September 21, 1983, make the following correction: On page 43104, first column, Table 3 should read as set forth below:

Table 3. Recovery Priority

| Degree of Threat | Recovery Potential | Taxonomy | Priority | Conflict |
|---|---|---|---|---|
| High | High | Monotypic genus | 1 | 1C 1 |
| | High | Species | 2 | 2C 2 |
| | High | Subspecies | 3 | 3C 3 |
| | Low | Monotypic genus | 4 | 4C 4 |
| | Low | Species | 5 | 5C 5 |
| | Low | Subspecies | 6 | 6C 6 |
| Moderate | High | Monotypic genus | 7 | 7C 7 |
| | High | Species | 8 | 8C 8 |
| | High | Subspecies | 9 | 9C 9 |
| | Low | Monotypic genus | 10 | 10C 10 |
| | Low | Species | 11 | 11C 11 |
| | Low | Subspecies | 12 | 12C 12 |
| Low | High | Monotypic genus | 13 | 13C 13 |
| | High | Species | 14 | 14C 14 |
| | High | Subspecies | 15 | 15C 15 |
| | Low | Monotypic genus | 16 | 16C 16 |
| | Low | Species | 17 | 17C 17 |
| | Low | Subspecies | 18 | 18C 18 |

BILLING CODE 1505–01–M

Exhibit E in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v Kempthorne, Civ. No. 07-00677
Page 31 of 31

# Exhibit F:

# FWS, Black-Capped Vireo *(Vireo atricapilla),* 5-Year Review: Summary and Evaluation (June 19, 2007)

# Black-capped Vireo
### (*Vireo atricapilla*)

# 5-Year Review:
# Summary and Evaluation

# U.S. Fish and Wildlife Service
# Arlington, Texas

# June 19, 2007

Exhibit F in support of Brief of Proposed Amicus Curiae Center for Biological Diversity
HSUS v. Kempthorne, Civ. No. 07-00677
Page 1 of 26

# .5-YEAR REVIEW

**Species reviewed:  black-capped vireo (*Vireo atricapilla*)**

## TABLE OF CONTENTS

**I.    GENERAL INFORMATION** ....................................................................................... 3
   **A.   Methodology used to complete the review** ..................................................... 3
   **B.   Reviewers** ........................................................................................................ 3
   **C.   Background** ...................................................................................................... 4
**II.   REVIEW ANALYSIS** ............................................................................................... 5
   **A.   Application of the 1996 Distinct Population Segment (DPS) policy** ........... 5
   **B.   Recovery Criteria** ........................................................................................... 5
   **C.   Current Species Status and Updated Information** ....................................... 7
      1.   Biology and Habitat ................................................................................... 7
      2.   Threats ..................................................................................................... 11
      3.   Conservation measures ........................................................................... 19
   **D.   Synthesis** ....................................................................................................... 21
**III.  RESULTS** ................................................................................................................ 24
**IV.   RECOMMENDATIONS FOR FUTURE ACTIONS** ............................................ 24
**V.    REFERENCES** ........................................................................................................ 25

# 5-YEAR REVIEW
## black-capped vireo (*Vireo atricapilla*)

## I.    GENERAL INFORMATION

### A.    Methodology used to complete the review

The U.S. Fish and Wildlife Service (Service) initiated a 5-year review of the black-capped vireo to address new information on the species' distribution, threats, status, and management throughout its range available since its listing.  While some assessments of the species' status involving significant portions of its range have been completed subsequent to its original listing, a 5-year review has not been completed, and therefore, this document serves as the first formal review.  A notice soliciting information pertinent to the review was published in the Federal Register on February 2, 2005 (70 FR 5460-5463).

The Service contracted Texas A&M University to accumulate, summarize, and evaluate the current available information on the species.  The product was a report consolidating the current information on the distribution, population trends, and threats to the species. The method involved a project team, led by Dr. Neal Wilkins, and an eight-member review panel consisting of scientists and stakeholders.  The project team collected, catalogued, and summarized the existing scientific and commercial data related to the status of the species and its known threats.  The eight-member review panel attended two meetings and critically reviewed drafts of the evaluations and conclusions of the report. Meeting notes, deliberations, comments and suggestions were recorded for the administrative record.  The final report includes a bibliography of over 370 articles and was reviewed by three academic professionals whose comments were addressed and/or incorporated.  The completion of this review was based largely on the information within this report, as well as other available information.  The complete report is available from the Southwest Region Electronic Library at http://www.fws.gov/southwest/es/.

Following the receipt of the final draft report on February 13, 2006, the Arlington Field Office assembled an internal review team, which consisted of the Project Leader and three biologists, to evaluate the report and make a preliminary decision on the status of the species.  Comments from the cooperating Field Offices were received through teleconference on May 1, 2006.  The review team of the Arlington Field Office considered comments and recommendations from the cooperating offices, completed the review analysis, and developed a recommendation on the appropriate classification of the species.

### B.    Reviewers

**Lead Region:**          Southwest Region - 2
                          Wendy Brown, Recovery Coordinator (505) 248-6664

| **Lead Field Office:** | Arlington, Texas Field Office |
| | Tom Cloud, Field Supervisor (817) 277-1100 |

| **Cooperating Field Offices:** | Austin, Texas Field Office |
| | Robert Pine, Field Supervisor (512) 490-0057 |
| | |
| | Tulsa, Oklahoma Field Office |
| | Jerry Brabander, Field Supervisor (918) 581-7458 |

## C.    Background

### 1.    FR Notice announcing initiation of this review:

February 2, 2005.  5-year review of lesser long-nosed bat, black-capped vireo, Yuma clapper rail, Pima pineapple cactus, gypsum wild-buckwheat, Mesa Verde cactus, and Zuni fleabane.  70 FR 5460-5463.

### 2.    Species' Recovery Priority Number at start of review:    2C

### 3.    Species status:  Stable (2005 TESS Report)

### 4.    Recovery achieved:  2 (26% - 50% [2005 TESS Report])

### 5.    Listing history

Original Listing: October 6, 1987.  Determination of the black-capped vireo to be an endangered species.  Species listed throughout entire range (USA: Kansas, Oklahoma, Texas; Mexico) without critical habitat, effective November 5, 1987.  52 FR 37420-37423.

No other listing actions have been made regarding the black-capped vireo.

### 6.    Review History

There have been no formal status reviews of the black-capped vireo since it was listed.  However, in 1996, the Service published the "Black-capped Vireo Population and Habitat Viability Assessment Report", that summarized the species' status at that time.  In 2004, the Service completed a programmatic consultation on the 2002 Farm Bill, which included an evaluation of the environmental baseline for the black-capped vireo throughout its range in Texas.  Both of these documents were used in the most recent evaluation of the status of the species by Wilkins et al. (2006), conducted as part of this 5-year review.

### 7.    Recovery Plan or Outline

Black-capped vireo (*Vireo atricapillus*) Recovery Plan, issued September 30, 1991.

## II.    REVIEW ANALYSIS

### A.    Application of the 1996 Distinct Population Segment (DPS) policy

#### 1.    Is the species under review listed as a DPS?

The black-capped vireo was not listed as a DPS.

#### 2.    Is there relevant new information that would lead you to consider listing this species as a DPS in accordance with the 1996 policy?

There is no new information relevant to designation of the black-capped vireo as a DPS.

### B.    Recovery Criteria

#### 1.    Does the species have a final, approved recovery plan containing objective, measurable criteria?

The final recovery plan for the black-capped vireo was approved on September 30, 1991.  The recovery plan contains an interim objective of downlisting to threatened status, pending new information on the feasibility of delisting and development of delisting criteria.  Four criteria are included to meet the downlisting objective.

#### 2.    Adequacy of recovery criteria.

##### a.    Do the recovery criteria reflect the best available and most up-to-date information on the biology of the species and its habitat?

The black-capped vireo recovery plan does not reflect the best currently available information on the biology of the species and its habitat needs. Thus, the recovery criteria are not based upon the most up-to-date information on the species.  The plan acknowledges the uncertainty of the prospect of complete recovery of the species at the time it was written in 1991.  As such, preliminary criteria were developed that would meet the interim objective of downlisting the species to threatened status. Explicitly, the plan is intended to protect and enhance the known populations (at that time), while evaluating the possibility of recovery and developing the necessary delisting criteria if recovery is found to be feasible.   In light of the preliminary nature of the downlisting criteria, the plan notes that revisions would be necessary based on new information. Since the publication of the plan, several of the recovery tasks have been addressed, including research and information tasks.

In 1995, the Service held a black-capped vireo Population and Habitat Viability Assessment workshop, which was attended by 36 biologists representing 26 agencies, organizations, consulting firms, and universities. The stated goal of the workshop was the development of "*recommendations, through consensus-building by participants, that could be used by individuals, or groups of landowners and land managers, to develop and implement conservation strategies for the black-capped vireo*" (USFWS 1996). The workshop culminated in a report that addressed the distribution, status, and threats to the species, as well as made recommendations on management, outreach, future information needs, and recovery plan revisions. The recommendation on recovery plan revisions consisted of the reorganization of recovery regions described in the plan and directly related to recovery criterion number two (see section below).

In 2001, the Service recognized the need to revise the Recovery Plan based on new information and formed a Recovery Team to began the revision process. However, due to budget shortfalls and workload issues, the revision process stalled and the Recovery Team was eventually disbanded in 2005.

**b.      Are all of the 5 listing factors that are relevant to the species addressed in the recovery criteria?**

The recovery plan includes four recovery criteria that, if attained, would be sufficient to consider the black-capped vireo for downlisting to threatened status. The four criteria are 1) all existing populations are protected and maintained, 2) at least one viable breeding population exists in each of the following six locations: Oklahoma, Mexico and four of the six Texas regions, 3) sufficient and sustainable area and habitat on the winter range exists to support the breeding populations outlined in (1) and (2), and 4) all of the above have been maintained for at least 5 consecutive years and available data indicate that they will continue to be maintained. However, the criteria are brief and lack adequate detail to discern a direct application to most of the five listing factors. In a broad sense, it appears all five listing factors are addressed in the first criterion, which requires the protection and maintenance of existing populations. The term "protection" is not further described, thus it could easily be applied to each listing factor, since these factors are threats from which the species may need protection. The only factor that may be considered to be specifically addressed by the criteria is factor A, *present or threatened destruction, modification or curtailment of its habitat or range*. All four recovery criteria at least partially address this threat. Criterion number three is directed toward the vireo's wintering habitat, for which threats were not identified at the time of listing.

For the reasons listed in this section, the Service has determined the Recovery Plan to be out-of-date and in need of revision.  Therefore, the recovery criteria listed in the plan were not used to guide the completion of this 5-year review.

**C.    Current Species Status and Updated Information**

**1.    Biology and Habitat**

The black-capped vireo is a small (10 to 12 cm long), insect-eating, migratory songbird. Mature males are olive green above and white below with faint greenish-yellow flanks. The crown and upper half of the head is black with a partial white eye-ring.  The iris is brownish-red and the bill black.  The plumage of the female is duller than the male.  Females have a dark slate gray head.

Black-capped vireos arrive in Texas from mid-March to mid-April, while those in Oklahoma arrive approximately 10 days later.  They nest from Oklahoma south through central Texas to the Edwards Plateau, then south to the northern portion of Mexico.  Breeding habitat is quite variable across its range, but is generally shrublands with a distinctive patchy structure.  The shrub vegetation is mostly deciduous and generally extends from the ground to about six feet above ground and covers about 30 to 60% of the total area.  Open grassland separates the clumps of shrubs.   In the eastern portion of the vireo's range, the shrub layer is often combined with an open, sparse to moderate tree canopy.   Black-capped vireos may live for more than five years, and usually return year after year to the same territory.  They begin to migrate to the wintering grounds on Mexico's western coast in July and are gone from Texas by mid-September.

Recent efforts to characterize genetic heterozygosity and population structuring in the black-capped vireo found surprising variability, considering the apparent limited dispersal between isolated populations, within four geographically isolated populations in Texas and Oklahoma (Fazio 1994, Fazio et al. 2004).  Within-population heterozygosity was high relative to other species within the family Vireonidae (Johnson et al 1988) and comparable to the mean for birds (Ward et al. 1992).

The specific epithet of the black-capped vireo's scientific name was recently changed from *atricapillus* to *atricapilla*, to conform to rules established for scientific nomenclature (David and Gosselin 2002).  There have been no changes in the taxonomy of the black-capped vireo since it was listed.

The following discussion is taken from the conclusions drawn from Wilkins et al. (2006) relevant to new information about the species and its habitat.  It is important to note that, while a substantial amount of information has been generated since listing, it is not possible to understand the complete population

status of the species.  This is due largely to the paucity of information available from Mexico and to Texas being approximately 97% privately owned or otherwise controlled.  It is also acknowledged that the quality of the available data, from which these conclusions are made, varies with geography and topic. Nevertheless, the data collected in Wilkins et al. (2006) represents the best commercial and scientific information available to date.

<u>Geographic Range</u>

At the time of listing, the historic breeding distribution was thought to include an area stretching from Kansas southward through central Oklahoma and through west-central Texas, with a southern limit in central Coahuila, Mexico. While the overall survey effort has increased since listing, the effort has not been evenly applied across the species' potential breeding range. Even though the resulting data provide incomplete knowledge of the species breeding range, the accumulated results do provide some insight into the conservation status of the species. These results are summarized below.

- When listed in 1987, the black-capped vireo was known to have breeding populations distributed across 21 counties in Texas, four counties in Oklahoma and in Coahuila, Mexico.  Survey efforts since 2000 have confirmed that there are occupied breeding habitats in 38 counties in Texas, three counties in Oklahoma, and three states in Mexico.  Since listing, cumulatively, breeding populations have been documented in 49 Texas counties, five Oklahoma counties and three Mexican states.

- The current black-capped vireo breeding range no longer appears to extend northward past central Oklahoma, and the species has not been documented in Kansas since the 1950s (Figure 1).

- Recent survey results confirm that the black-capped vireo's breeding range extends substantially farther south in Mexico than was known at the time of listing. The recent discovery of the southernmost breeding populations of the species in southern Coahuila, Nuevo Leon, and Tamaulipas significantly expands the known breeding range.

- Given recent observations in the wintering range of the species, black-capped vireos are now known to migrate to wintering habitats located along a narrow range stretching from approximately 16 to 27 degrees North latitude along the mountainous Pacific coast of Mexico (Figure 1). Recent observations suggest that most of the birds winter in the northern two-thirds of this area.



*Figure 1. Currently known breeding and wintering ranges of the black-capped vireo. Ranges are generalized for known locations since 1985.*

Habitat Availability

As identified when the species was listed, the amount and distribution of suitable breeding habitat was a major factor contributing to the species' endangerment. However, at the landscape level, the amounts and distribution of suitable breeding habitat were unknown at the time of listing. Despite some significant progress in refining species-habitat relationships and in estimating the area of potential breeding habitat, there is not yet an inventory that would make it possible to reliably estimate trends in suitable breeding habitat.

- Analysis of extensive roadside surveys conducted in 1996-1998 resulted in an estimate of 1.45 million acres of potential breeding habitat in 53 counties across the species' range in Texas. This amounts to 3.3 percent of the total land area within the counties considered. Due to sampling issues, this estimate lacks reliability and is of limited utility for assessing the species' status.

- The suitability of rangeland as breeding habitat for black-capped vireos largely depends on the composition and structure of woody shrubs and small trees. Habitat alteration by invasive junipers appears to be a major limitation in the maintenance and development of suitable breeding habitats in many portions of the species range.

- The influence of prescribed fire in maintaining habitat suitability in the eastern portion of the species' range appears to be more important than was generally expressed at the time of listing. Although the absence of wildfire "under natural conditions" was acknowledged in the listing decision as a factor in the successional advancement of suitable habitats, the successful application of prescribed fire in managing for black-capped vireos was not well documented or generally acknowledged at the time of listing.

- Fire interacts with a region's physical features and climate to produce different outcomes. Fire appears to contribute to the development of suitable breeding habitats in Oklahoma and the eastern portion of the species' Texas range. However, in the western portion of the species' breeding range in Texas and in Mexico, fire is not as important in maintaining habitat suitability.

Population Status

Population surveys for the black-capped vireo over the years have been inconsistent, making data gathered from such efforts limited for use in determining changes in status over time. The following estimates are from reports of the *known* population over a certain time period. While the comparison of such data does not represent a trend in abundance over time, it is valuable in that it represents the minimum number of known individuals over a certain period.

At the time of listing, the population status of black-capped vireos was largely established from survey efforts that yielded a known population of 191 pairs (Marshall et al. 1985). Extrapolating from their surveys, Marshall et al. (1985) expanded their survey results to estimate that there were more than 20 pairs in Oklahoma, 188 to 374 pairs in Texas, and 48 to 131 pairs in Mexico. By 1996, about 1,803 males were reported in the U.S. (USFWS 1996); by 2005, the known U.S. population was 5,996 males (Wilkins et al 2006). Including the breeding range in Mexico, the current known population is at 6,269. Important points concerning population status are summarized below:

- From available survey data it is clear that the overall breeding population of black-capped vireos is substantially larger than was known at the time of listing. However, it is not clear how much of the difference can be attributed to increased survey effort. Because of unequal survey efforts across the

species' range, we cannot reliably estimate what proportion of the total breeding population is represented by the current known population.

▪ In many local cases, it could be that increased survey efforts alone have resulted in larger known populations of black-capped vireos. In other cases, however, it appears that breeding populations have likely increased since listing. For example, known breeding populations in three of the four areas with the most intensive survey efforts have increased almost 10-fold since surveys were reported in 1996 – these include Fort Hood Military Reservation (Texas), Wichita Mountains Wildlife Refuge (Oklahoma), and Fort Sill Military Reservation (Oklahoma).

▪ To date, about 75 percent of the known population in the breeding range is found on four well-surveyed areas– Fort Hood Military Reservation (Texas), Kerr Wildlife Management Area (Texas), Wichita Mountains Wildlife Refuge (Oklahoma), and Fort Sill Military Reservation (Oklahoma). Together, these facilities cover approximately 400,000 acres (161,877 ha) – an area representing only 1 percent of the total area of rangeland in the Texas/Oklahoma range of the species. The remaining 25 percent of the known population is the product of documented occurrences from at least 52 other properties, many of which are on private lands with only recent survey access.

▪ The current known breeding population in Mexico represents only 4 percent of the total known population. However, suitable breeding habitats in Mexico have been only sparsely surveyed, and most of the known breeding range has not been assessed for black-capped vireo occurrence. Where surveys have been conducted in Mexico, black-capped vireos are often found at densities higher than in the species' U.S. breeding range.

**2.      Threats**

The analysis of the magnitude and imminence of the current threats to the species is largely taken from the conclusions drawn from Wilkins et al. (2006) as they pertain to the five listing factors.

At the time of listing, the identified major threats to the black-capped vireo included habitat loss through land use conversion, grazing and browsing by domestic and wild herbivores, and brood parasitism by brown-headed cowbirds. The threat of vegetational succession, originally considered minor, appears to have been underestimated at the time of listing, although the extent of the effects on the black-capped vireo is not known.  While the relative importance of individual threats appears to have changed since listing, these remain the primary threats to the species.

a.      **Present or threatened destruction, modification or curtailment of its habitat or range:**

Habitat conversion and land use change

When proposed for listing, the largest known concentration of black-capped vireos was in the immediate vicinity of Austin, Texas and the population was under immediate threat from development and road construction. Much of the subsequent development in the Austin area was mitigated through habitat conservation plans and the subsequent set-aside of mitigation lands, including the Balcones Canyonlands National Wildlife Refuge.  Habitat conversion and changes in land use continue to pose a threat throughout parts of the species' range.  There are no data available for directly measuring trends in the amount of suitable habitat for the species, but some overall changes in land ownership and land use do suggest indirect trends that might be important for black-capped vireo conservation. However, these data were available only for the U.S. portion of the bird's breeding range.

- As of 2002, approximately 80 percent of the 68.8 million acres in the species' U.S. breeding range was classified as farm and ranchland. About 70 percent (33.9 million acres) of farm and ranchland in the area was classified as rangeland. This represents the land base on which suitable habitat for black-capped vireos might presently exist or be developed, either through management or natural processes.

- Recent trends in land use, land ownership and land fragmentation in the Texas part of the breeding range are quite different than those in Oklahoma:

  o  Over the period 1992-2002, the total area classified as rangeland declined by 8.6 percent across the breeding range in Texas. This apparent change in land use was partly driven by an overall loss in farm and ranchland, but the reported loss of rangeland was 37 percent more than the overall loss in farm and ranchland. The figures collected for Oklahoma suggest a stable or slightly increasing inventory of rangeland.  All else being equal, a net loss in rangeland area likely represents a loss of potential habitat for the species – but the magnitude of loss as well as compensating factors are unknown.

  o  Over the period 1992-2002, about 2.8 million acres of large farms and ranches (more than 2,000 acres) were broken into smaller ownerships across the species' range in Texas. Oklahoma experienced a slight increase in large ownerships during the same period.

o During this same period, the numbers of smaller farms and ranches increased by about 40 percent across the species' breeding range in both states.

<u>Grazing and browsing</u>

At the time of listing, overbrowsing by domestic goats, sheep, white-tailed deer and exotic herbivores was given as a primary cause of habitat loss, particularly in the Edwards Plateau of Texas (Marshall et al. 1985). Since listing, the numbers and densities of domestic livestock have decreased throughout much of the species' U.S. breeding range, and the specific areas where livestock numbers are decreasing have generally coincided with areas where overbrowsing was most threatening to the species. However, white-tailed deer populations appear to have increased in many of the same areas (i.e., Edwards Plateau).

- Grazing *per se* is neither beneficial nor detrimental to black-capped vireo habitats. The use of grazing and browsing animals, under proper management, for enhancing rangeland habitats, is well supported in the scientific literature. However, high stocking rates combined with poor management can remove the low-growing, shrubby vegetation black-capped vireos require for breeding habitat.

- Evidence continues to suggest that extremely high stocking rates of herbivores–especially goats, white-tailed deer and exotic ungulates– can degrade black-capped vireo breeding habitat. When grazing pressure is reduced, the breeding habitat may recover under some conditions.

- Given the apparent relationship between cattle and brown-headed cowbirds, grazing by cattle may have an indirect impact on black-capped vireos by increasing the risk of brood parasitism. This relationship is highly variable and may be mitigated with livestock management and, possibly, cowbird removal.

<u>Trends in the numbers of grazing and browsing animals.</u>

- Goat numbers have declined throughout a major portion of the black-capped vireo's range in Texas. For example, goat numbers declined by 22.6 percent during the period 1987-2002, including decreases of 58 percent in the Southwest and Trans-Pecos region and almost 35 percent in the Edwards Plateau.

- Since listing, cattle numbers have decreased by 9.6 percent within the Texas range of the species, while increasing by about 12.5 percent in

the Oklahoma portion of the range. In general, cattle densities decreased in the western portion of the species' range in Texas and increased in northeastern Texas and Oklahoma.

- Data for determining trends in grazing animals in the Mexico portion of the species' range were not available.

- Although white-tailed deer populations appear to have decreased throughout Texas since listing, deer population numbers in the Edwards Plateau appear to have increased. The resulting browsing pressure by white-tailed deer may be limiting the development of suitable habitat in many areas of that region.

- Data for estimating trends in the numbers of exotic herbivores are incomplete. However, the most recent estimates, from 1994, suggested that populations of the most numerous species (axis deer, blackbuck antelope, aoudad, fallow deer and sika deer) were increasing in the Edwards Plateau of Texas.

- The densities of domestic livestock, particularly goats, have decreased substantially in recovery regions 2 and 4 (the Edwards Plateau and Southwest and Trans-Pecos regions, respectively). However, across the Edwards Plateau, estimates of white-tailed deer densities now exceed the density estimates for all other classes of domestic livestock.

*Summary of threat factor a.:*  The overall loss and potential fragmentation of native rangeland caused by land use conversion and ownership changes throughout major portions of the species' breeding range, especially in the Edwards Plateau and North-central Texas regions, has likely resulted in an overall decrease in the potential habitat available for the species.

The density and abundance of domestic livestock, particularly goats, have declined substantially in those regions where this threat was of greatest concern at the time of listing, primarily in the Edwards Plateau and Southwest and Trans-Pecos Regions.  Therefore, the potential for livestock overbrowsing to destroy black-capped vireo habitat is probably not as widespread as it was before listing.  At the local level, however, the effects of overbrowsing by domestic livestock can be quite variable and may put local breeding populations of black-capped vireos at risk.

The density and abundance of white-tailed deer and exotic herbivores may have increased in those regions of greatest concern at the time of listing. This is of primary concern in the Edwards Plateau of Texas.  In some locations within that region, exotic ungulates may out-compete white-tailed deer.

The current overall magnitude of threat within factor *a* is considered reduced since the species was originally listed in 1987 for the following reasons: 1) the development threat to the Austin area population was partially mitigated, and currently the area supports a population higher than was known at the time of listing and 2) the abundance of domestic livestock within the Edwards Plateau region of specific concern has decreased since listing. While loss and fragmentation of native rangeland and an increase of exotic and wild herbivores in portions of the black-capped vireo's range is of concern, the extent this threat poses to the species is unknown.

**b.      Overutilization for commercial, recreational, scientific, or educational purposes:**

No new information is available regarding this threat factor. It was recognized in the original listing that excessive recreational activities (i.e., photography) can cause nest abandonment. Likewise, conducting presence/absence surveys for the black-capped vireo often involves recorded playback of the male's song or screech owl vocalizations, which may have induced territory abandonment. While it is impossible to quantify potential harassment from these sources, no substantial reports of adverse effects have ever been documented. Currently, there are more than 60 active permits issued for recovery purposes regarding the black-capped vireo. This threat is considered to be relatively low in magnitude.

**c.      Disease or predation:**

The black-capped vireo does not appear to be significantly threatened by disease. No new information related to disease or ectoparasites has been identified since listing. Black-capped vireo nests are subject to predation from snakes, red imported fire ants, squirrels, foxes, and other birds. Eggs and young are most commonly depredated. The risk of predation from rat snakes and red imported fire ants may limit some populations, at least where parasitism is reduced through cowbird control programs. Because red imported fire ants have increased in distribution and abundance since the black-capped vireo was listed, they likely pose an increasing threat.

**d.      Inadequacy of existing regulatory mechanisms:**

Prior to listing, the black-capped vireo was listed as a threatened species by the State of Texas. Following the Federal listing, the state uplisted the species to endangered to reflect the Federal status. A major concern prior to listing was the lack of habitat protection for the species. While there is still no mechanism of habitat protection (other than the Endangered Species Act protections), the importance of habitat management for the

species has been disseminated through various outreach and other programs (see Conservation Measures below).

**e.      Other natural or manmade factors affecting its continued existence:**

Brood parasitism

At the time of listing, brood parasitism by brown-headed cowbirds was believed to be a primary factor in the low reproductive success of black-capped vireos (Marshall et al. 1985). At that time, it was thought that brown-headed cowbirds were becoming more abundant throughout the mid-continent of the U.S. and that cowbird removal was a necessary step towards black-capped vireo recovery. Important new information concerning brood parasitism and brown-headed cowbirds is summarized below.

Factors influencing abundance and parasitism rates.

- Brood parasitism rates on black-capped vireos appear to be correlated with the densities of other more conspicuous host species; this suggests that female brown-headed cowbirds may parasitize black-capped vireo nests more in areas where populations of more abundant species (e.g., northern cardinals) are denser.

- Brown-headed cowbirds often commute daily between separate feeding and breeding areas. Feeding areas are most often located with cattle; the proximity of feeding areas to breeding areas and the number of feeding sites within commuting distance are often correlated with cowbird abundance.

- At the local scale, the relationship between brown-headed cowbird abundance and rates of brood parasitism appears to be influenced by site factors such as host species assemblage, host abundance, and vegetative cover.

- At the regional scale, the threat of brood parasitism appears correlated with the regional abundance of brown-headed cowbirds.

Cowbird abundance trends.

- Throughout North America (excluding Mexico), the number of brown-headed cowbirds observed along Breeding Bird Survey (BBS) routes has declined by approximately 39 percent in the period 1966-2003.

- Since listing, the relative abundance of brown-headed cowbirds declined in the black-capped vireo's range in Texas, but remained stable in the species' range in Oklahoma. Over the last 10 years (1995-2004), observations of brown-headed cowbirds on BBS routes in the black-capped vireo's range in Texas have declined by 25 percent as compared to the 10-year period prior to listing (1976-1987). There was essentially no change in that comparison for Oklahoma.

Observed variability in parasitism rates.

- Observed brood parasitism rates on black-capped vireos vary across the range, with those in North-central Texas and Oklahoma being relatively higher than in other regions.

- As with other host species, the observed brood parasitism rates on black-capped vireos also can vary from year to year on any one site.

Effect of cowbird parasitism.

- The effect of cowbird parasitism on black-capped vireos is not a simple function of parasitism rates on individual nests. The effect at the population level is best measured as seasonal fecundity, which takes into account the desertion of parasitized nests, renesting attempts, remating efforts, and fledging rates. There is some evidence that high levels of brood parasitism can decrease seasonal fecundity of black-capped vireos.

- The threat posed by cowbird parasitism is proportionately greater when a species' population is declining because of other factors, such as habitat loss. In general, as a host population increases, the relative threat from brood parasitism declines.

Vegetation change

Habitat changes resulting from the encroachment of woody shrubs and small trees (vegetational succession) were identified as a threat to the species at listing. In reviewing the relevant scientific literature, much of the current threat can largely be attributed to the invasion and growth of juniper species. Confounding this threat is the requirement of Ashe juniper for another sympatric endangered species, the golden-cheeked warbler. The golden-cheeked warbler breeds exclusively in Texas and requires mature oak-juniper woodlands for nesting.

- The invasion and growth of native juniper species appears to be one of the most prevalent problems in maintaining existing suitable habitat throughout a major portion of the species' range in Texas and

Oklahoma. Juniper invasion has contributed to an overall afforestation of rangeland habitats throughout much of the species' breeding range in both states.

- Since listing, both Ashe juniper and redberry juniper have increased in dominance throughout the Texas range of the species; in Oklahoma, eastern red cedar has increased substantially.

- Juniper invasion into suitable habitats appears to be a function of the combined influence of fire suppression and overgrazing, and it may be further influenced by drought. At least in the eastern portion of the species' U.S. breeding range, fire appears to exert an overriding influence on the development and maintenance of breeding habitat for the species by controlling invasive juniper.

- Since listing, the increased abundance of five species of woodland birds throughout the U.S. breeding range of the black-capped vireo suggests that woody shrubs and tree cover are increasing, which would have a negative impact on black-capped vireo conservation.

*Summary of threat factor e.:* The threat posed by brood parasitism throughout major portions of the species' range in Texas has likely lessened since the species was listed due to a combination of an apparent decrease in cowbird abundance, an apparent increase in black-capped vireo populations, and circumstantial evidence of a reduction in parasitism rates at some locations due to cowbird removal. This same threat essentially remains unchanged since the time of listing throughout the species' range in Oklahoma. This conclusion is largely based on the fact that the relative abundance of brown-headed cowbirds in Oklahoma appears to be unchanged.

The widespread shift toward juniper-dominated woodlands is an issue of increasing concern for the black-capped vireo. Afforestation affects the species throughout its U.S. breeding range in all but the more western sections of the Edwards Plateau and Southwest and Trans-Pecos Regions. The threat of vegetational succession, particularly by Ashe juniper, is complicated by the requirement of mature oak-juniper woodlands by the endangered golden-cheeked warbler. The concern of vireo habitat loss due to invasive Ashe juniper is equaled by the concern of unchecked juniper removal in suitable habitats of the golden-cheeked warbler.

The overall magnitude of threat originally attributed to threat factor *e* is considered reduced. This is largely due to the data suggesting a decrease in abundance of the brown-headed cowbird over a large portion of the vireo's range and current cowbird control programs (see Conservation Measures) that manage the parasitism threat. It is acknowledged that the

threat of vegetational succession has likely increased since listing, however, there are no available data that allow a quantitative analysis of the level of threat that vegetational succession poses to the vireo.

### 3.     Conservation measures

Since the listing of the black-capped vireo, several conservation actions have been implemented that have reduced the magnitude of the primary threats. These measures are summarized below.

Cowbird removal programs

Cowbird control programs across the black-capped vireo's range resulted in the removal of more than 235,000 cowbirds (mostly female) from 2000 through 2004. To date, most cowbird removal efforts in the range of the black-capped vireo are in those areas where there are relatively large black-capped vireo populations – Fort Hood Military Reservation (Texas), Kerr Wildlife Management Area (Texas), Wichita Mountains Wildlife Refuge (Oklahoma), and Fort Sill Military Reservation (Oklahoma). Cowbird removal can decrease local parasitism rates on black-capped vireo nests resulting in an increase in individual nest success. However, most cowbird control efforts for the black-capped vireo are combined with habitat management and restoration efforts (e.g., coordinated brush control, controlled burning, and grazing management), which confounds most attempts to determine the overall population-level benefit of cowbird removal.

Balcones Canyonlands National Wildlife Refuge

In 1992, Balcones Canyonlands National Wildlife Refuge was established in Burnet, Travis and Williamson Counties, Texas, to protect and manage habitat for the black-capped vireo and golden-cheeked warbler. Within a larger acquisition area of 80,000 acres, the refuge hopes to obtain at least 46,000 acres of habitat for these priority species and other species and habitats of concern. Currently, the refuge consists of about 60 tracts totaling approximately 21,436 acres including lands held in fee simple and conservation easements. Draft habitat management maps currently under development indicate about 360 acres of occupied vireo habitat and at least 1,125 acres of future vireo habitat management on the current tracts. As of 2005, the black-capped vireo population within the refuge boundary was estimated to be 80 to 100 pairs.

Safe Harbor Agreements

Environmental Defense, Inc. is a national non-profit conservation organization that implements diverse programs and activities for the conservation of wildlife. It works with private landowners to promote voluntary, incentive-based conservation efforts for endangered species throughout the country. A Safe Harbor Agreement and associated permit for the black-capped vireo and

endangered golden-cheeked warbler was issued to Environmental Defense in December 2000. The Safe Harbor Agreement originally covered 25 counties in Texas, but was amended in 2005 to include an additional 12 counties in Texas. To date, seven landowners in six counties have enrolled over 6,200 acres for black-capped vireo management. The permit for the Agreement expires in 2030.

<u>Private Lands Incentives</u>

The 2002 Farm Bill, administered by the Natural Resources Conservation Service (NRCS), authorized and funded conservation programs to address natural resource concerns related to soil, air, water, plant, and animals, including wildlife. Conservation practices conducted under Farm Bill programs include brush management, for which Ashe juniper is a target brush species. As of October 1, 2003, approximately 997,256 acres have been treated under brush management in Texas. In April 2004, the NRCS entered into consultation with the Service on the 2002 Farm Bill and potential impacts to the black-capped vireo, as well as other listed species. One outcome of the non-jeopardy biological opinion resulting from the consultation was the establishment of conservation guidelines to allow Farm Bill programs to reduce juniper encroachment in black-capped vireo habitat and reduce potential impacts to the species. Although the biological opinion authorizes incidental take of the black-capped vireo, brush management activities funded through Farm Bill conservation programs are anticipated to have an overall benefit on the black-capped vireo by reducing the threat of vegetational succession primarily resulting from invasive Ashe juniper. The Farm Bill expires in 2007, however, reauthorization is expected.

Initiated in Texas in 1990, the Service's Partners for Fish and Wildlife (PFW) program restores and enhances fish and wildlife habitat on private lands. The PFW program originally targeted wetland habitat for restoration and enhancement work, but has expanded to benefit habitats for all federal trust resources, including waterfowl, other migratory birds, and candidate, threatened, and endangered species. Through 2005, the FWS has entered into 1,194 voluntary partnerships with private landowners, covering approximately 290,000 acres in Texas. Approximately 42,000 acres of habitat for endangered or candidate species have been restored and/or enhanced by the PFW program in Texas. In 2003, the PFW program in Region 2 assumed the administrative responsibility for the Private Stewardship Grants Program, which requires all projects to have a direct benefit to a federally listed or candidate species. To date, approximately 30 private landowners, involving at least 5,000 acres across the range of the species in Texas, have signed Private Lands, Cooperative, or Grant Agreements whereby they agree to work with the Service and our conservation partners to improve the value of the habitat on their property for the black-capped vireo. Habitat improvement practices involve brush management (most often the mechanical control of juniper with skid-steer equipped with tree sheers), prescribed burning, and fencing to control livestock. In the last 3 years approximately $350,000 has been obligated toward projects intended to specifically benefit black-capped

vireos. In Oklahoma, the PFW has included over 400 acres of black-capped vireo restoration in two counties since 1993.

In 1997, the Texas Parks and Wildlife Department (TPWD) initiated their Landowner Incentive Program (LIP) as a pilot project using funds under section 6 of the Endangered Species Act. In subsequent years, this program was supplemented with money appropriated by the Texas legislature. The Texas LIP was developed to encourage private landowners to improve habitat on their property for rare species (including federally listed, candidate, and State listed species) by providing financial incentives. In 2002, the Service initiated the Federal version of LIP as a competitive grant program for States, territories, and Tribes to develop and implement a qualifying program to provide financial and technical assistance to private landowners for projects that would protect and manage habitat for species-at-risk. Since 1998, TPWD has enrolled landowners in eight counties in Texas for restoration or enhancement of over 7,400 acres of black-capped vireo habitat.

<u>Public Outreach</u>

In 1995, the TPWD published the book "Endangered and Threatened Animals of Texas – Their Life History and Management" funded in part by section 6 of the Endangered Species Act. This book provides important information on the listed animals of Texas, including habitat needs, life history, and threats. The information included for the black-capped vireo also provides guidance on avoiding habitat impacts from normal land management activities and techniques for habitat creation and management. These guidelines have been widely distributed and utilized in land management programs as a condition of Federal funding.

**D.     Synthesis**

The black-capped vireo was originally listed in 1987 throughout its entire range in the U.S. and Mexico, largely due to loss of habitat and the effects of brood parasitism by the brown-headed cowbird. The Recovery Plan for the vireo was finalized in 1991, but is in need of revision and not considered the best available information for the purpose of a 5-year review. A complete population assessment is not currently possible due to the lack of available information from Mexico, which may contain a significant population, and the lack of access to private property in Texas, which is approximately 97% privately owned or otherwise controlled. Some threat factors are difficult to quantify for the same reasons. In the future, technology may enhance such analyses through the use of remote sensing, but for the current review equal emphasis is placed on the known population and magnitude of threats.

The known population of the black-capped vireo is currently much larger than at the time of listing, which may be attributed to an increase in the overall population and/or increased survey efforts having identified populations at new locations, including private

lands. Information on private lands in Oklahoma is lacking, but new information indicates the black-capped vireo occurs in portions of Mexico not thought to be part of its range when listed. When the black-capped vireo was listed, the *known* population was 191 pairs and the estimated population was 256 to 525 pairs, occurring in four counties in Oklahoma, 21 counties in Texas, and one Mexican state. An accounting of the *known* population since 2000 shows over 6,200 vireos inhabiting three counties in Oklahoma, 38 counties in Texas, and three states in Mexico.

The black-capped vireo was listed due to major threats identified as habitat loss through land use conversion, grazing and browsing by domestic and wild herbivores, and brood parasitism by brown-headed cowbirds. Other threats include predation and vegetational succession. No new threats to the black-capped vireo have been identified since listing. Based on this review, it appears the original threats to the species still exist, but the magnitude of the threats has changed, resulting in an overall decrease in threat level. A discussion on the magnitude of threats is given in the "conclusion" section below.

Conservation programs and measures implemented to reduce the threats to the species include a 37-county Safe Harbor Agreement, private lands incentives, cowbird removal programs, and public outreach. Most of these measures have occurred within the species' range in Texas and target the major threats to the species – loss of habitat and brood parasitism. Those conservation programs that include on-the-ground actions are coordinated through Service sponsored programs with annual reporting requirements that, at a minimum, include reporting of area and/or habitat enhanced or treated. Such data do not usually provide information useful for detecting trends in vireo populations, distribution and/or overall status, however, some measurable performance can be reported concerning the reduction of threats. For example, a program reporting the number of acres treated for juniper encroachment for black-capped vireo habitat restoration has reduced the threat attributed to vegetational succession in the area(s) treated. It would not be practical nor cost-effective to design detailed monitoring plans for each program, when the purpose of such programs is to utilize measures known to be beneficial to the species. The Service believes the proper implementation of these conservation measures effectively reduce the primary threats to some degree.

Conclusion

Based on the information in this review, the current overall threat level to the black-capped vireo is less in magnitude than it was at the time the species was listed. This is based on some threats decreasing in magnitude, the reconsideration of magnitude to certain threats, and the effects of conservation measures on the major threats to the species.

When the threat of habitat destruction by domestic livestock through overbrowsing was identified during the original listing, no quantitative data were made available, and therefore, the magnitude attributed to the threat was based on anecdotal evidence. The current review shows quantitative data for domestic livestock from 1987 to 2002. The data show this threat has decreased, based upon the decrease in density and abundance of

livestock in those regions of particular concern during the original listing. However, it appears the density of white-tailed deer and exotic ungulates may have increased in the same regions, which may be a concern for habitat availability. This may be the only threat that is not countered by conservation measures, with the possible exception of game management programs.

The threat of brood parasitism by brown-headed cowbirds remains a major, albeit partially managed, threat to the species. At the time of listing, it was believed that the brown-headed cowbird was increasing in abundance; current information suggests that the species may be decreasing in abundance where its range overlaps the black-capped vireo, at least in Texas. Additionally, in the vireo's U.S. range, brood parasitism is effectively managed at the major black-capped vireo populations occurring on public land, and supplemented by cowbird control programs on private lands.

Habitat loss through vegetational succession was considered a minor threat to the species at the time of listing. As revealed in this review, this threat has increased or perhaps was underestimated in the 1987 listing due to a lack of information. While juniper encroachment in black-capped vireo habitat continues to be a concern, the conservation measures outlined in this review reduce the magnitude of the threat.

In the original listing 5-factor analysis, habitat destruction resulting from development activities was considered a major threat to the species. This was based on the existing development threat to 88 percent of the "largest known concentration of black-capped vireos," which consisted of an estimated 33 pairs in the Austin area. While the immediacy of this threat was correctly assigned, the predicted demise of the Austin area black-capped vireo population, as well as the importance placed upon this population to the vireo's overall status, was overvalued in terms of magnitude. That is, the effects of the development in the Austin area have extirpated some populations of black-capped vireo, yet the currently known population is higher now then at the time of listing. This is due in part to effective mitigation and conservation efforts, such as the Balcones Canyonlands National Wildlife Refuge, which currently supports an estimated 80-100 pairs of vireos. Currently, the largest known concentration of black-capped vireos is likely to be the population at Fort Hood, Texas, which is estimated to be more than 13,000 birds. Clearly, the effects of the development threat to the Austin area population of black-capped vireos were substantially less in magnitude than originally anticipated in 1987.

Additionally, more information is known about the distribution of the species, including the discovery of new breeding populations in Texas and Mexico. However, known populations may continue to be extirpated within the species' range. This is the nature of the species' habitat, which is often ephemeral especially in the eastern portion of its range, giving its distribution a patchy appearance across the landscape. The absence of vireo populations in apparently suitable habitat was heavily weighted in the original listing threat analysis, especially in the assignment of the magnitude of identified threats to the species. As such, it was predicted that the occurrence of black-capped vireos on private land would be relatively low, thus making the species in danger of extinction over

the next several decades. This has not been the case, as the discovery of new vireo populations on private lands over the last few years have been a substantial addition to the status of the species. It is expected that such discoveries are likely to continue due to the increase in conservation and other programs that produce survey information. The continued reporting of new populations is not indicative of a species in danger of extinction within all or a significant portion of its range. Nor does the magnitude of threats discussed above indicate the black-capped vireo is endangered. However, the threats to the species still exist and its recovery currently depends largely on management actions to reduce these threats. Therefore, it is recommended that the species be reclassified from endangered to threatened status.

## III.    RESULTS:

### A.    Recommended Classification:

_X__ Downlist to Threatened
____ Uplist to Endangered
____ Delist
____ No change is needed

### B.    New Recovery Priority Number __8__

The black-capped vireo recovery priority is recommended to be changed from 2C to 8. As detailed in this review, the magnitude of threats has decreased since listing, however, the major threats are still imminent.

### C.    If applicable, indicate the Listing and Reclassification Priority Number (FWS only):

Reclassification (from Endangered to Threatened) Priority Number:__6__

The black-capped vireo requires management actions that are unlikely to change if downlisted. A reclassification of the species is not the result of a petition.

## IV.    RECOMMENDATIONS FOR FUTURE ACTIONS

Many information gaps in the biology and threats to the black-capped vireo should be addressed before the next 5-year review. Of particular importance, information regarding the magnitude and trends of brood parasitism by the brown-headed cowbird, as well as differences in parasitism rates across the breeding range is essential to formulating measurable recovery criteria. Additionally, information on the status, threats and distribution of the species across its breeding and wintering range in Mexico is lacking. Surveys and research in Mexico to fill these gaps is a high priority. This additional information should provide a basis for analysis of black-capped vireo populations with

regard to possible reclassification under DPS or significant portion of the range.   The Recovery Plan should be revised to reflect the most current information available, including a thorough threats analysis, and development of objective and measurable delisting criteria.


## V.     REFERENCES

David, N. and M. Gosselin.  2002.  Gender agreement of avian species names.  Bull. Brit. Orn. Club 122:14-49.

Fazio, V.W., III.  1994.  Genetic variation in an endangered passerine, *Vireo atricapillus* Woodhouse.  M.S. Thesis, Ohio University, Athens.

Fazio, V.W., III, D.B. Miles, and M.W. White.  2004.  Genetic differentiation in the endangered black-capped vireo.  Condor 106: 377-385.

Johnson, N.K., R.M. Zink, and J.A. Marten.  1988.  Genetic evidence for relationships in the avian family Vireonidae.  Condor 90: 428-445.

Marshall, J.T., R.B. Clapp, and J.A. Grzybowski.  1985.  Status Report: *Vireo atricapillus* Woodhouse (black-capped vireo).  Prepared for the U.S. Fish and Wildlife Service, Albuquerque, NM, 55 pp.

U.S. Fish and Wildlife Service.  1996.  Black-capped vireo population and habitat viability assessment report. 57 pp.

U.S. Fish and Wildlife Service.  1991.  Black-capped vireo (*Vireo atricapillus*) Recovery Plan.  Austin, Texas.  pp. vi + 74.

Ward, R.D., D.O.F. Skibinski, and M. Woodwark.  1992.  Protein heterozygosity, protein structure, and taxonomic differentiation.  Pages 73-159 in Evolutionary biology.  M.K. Hecht, B. Wallace, and R.J. MacIntyre, editors.  Plenum Press, New York.

Wilkins, N., R.A. Powell, A.A.T. Conkey, and A.G. Snelgrove.  2006.  Population status and threat analysis for the black-capped vireo.  Prepared for the U.S. Fish and Wildlife Service, Region 2. 146 pp.

**U.S. FISH AND WILDLIFE SERVICE**
**5-YEAR REVIEW of the black-capped vireo**

Current Classification:  Endangered

Recommendation resulting from the 5-Year Review

     __X__  Downlist to Threatened
     _____  Uplist to Endangered
     _____  Delist
     _____  No change is needed

Appropriate Listing/Reclassification Priority Number, if applicable _____6_____

Review Conducted By:  Arlington, Texas Ecological Services Field Office

FIELD OFFICE APPROVAL:

Lead Field Supervisor, Fish and Wildlife Service, Region 2

Approve _____Date__6/19/07__
       Thomas J. Cloud, Jr.

REGIONAL OFFICE APPROVAL:

Lead Assistant Regional Director for Ecological Services, Fish and Wildlife Service, Region 2

Approve_____Date__7·26·07__