UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| HUMANE SOCIETY OF THE UNITED STATES, *et al.* | ) ) ) | Case No. 1:07-cv-00677 |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| DIRK KEMPTHORNE, Secretary of the Interior, United States Department of the Interior, *et al.* | ) ) ) | DEFENDANT-INTERVENORS' OPPOSITION TO PLAINTIFFS' |
| Defendants, | ) ) | MOTION TO SUPPLEMENT THE RECORD |
| and | ) ) | |
| SAFARI CLUB INTERNATIONAL, U.S. SPORTSMENS' ALLIANCE FOUNDATION, *et al.* | ) ) ) ) | |
| Defendant-Intervenors. | ) ) | |

## I.    INTRODUCTION

Defendant-Intervenors, Safari Club International, Safari Club International Foundation, National Rifle Association, U.S. Sportsmen's Alliance Foundation, Wisconsin Bear Hunters Association, Scott Meyer and Robert Stafsholt ("Sportsmen Defendant-Intervenors") oppose Plaintiffs', Humane Society of the United States *et al.* ("HSUS *et al.*"), Motion to Supplement the Record.  HSUS *et al.*'s motion should be denied because it is 1) not timely; 2) seeks to introduce records that discuss post-decision events; and 3) offers an incomplete and thereby inaccurate depiction of those post-decision events.  Sportsmen Defendant-Intervenors request that this court deny this motion to make an exception to the rule that judicial review in citizen suits under the Endangered Species Act is an on-the-record review under the Administrative

Procedure Act. HSUS *et al*. included references to the extra-record documents in their Motion for Summary Judgment filed on November 14, 2007, without first obtaining from the Court leave to supplement the record, even though they have had the documents they seek to belatedly introduce in their possession for seven months. Accordingly, the Sportsmen Defendant-Intervenors ask that this Court deny HSUS *et al*.'s Motion for Summary Judgment without prejudice and order HSUS *et al*. to file a new Motion for Summary Judgment that contains no reference to the extra-record documents. In the alternative, if this Court grants HSUS *et al*.'s Motion to Supplement the Record, Sportsmen Defendant-Intervenors request that this Court allow Sportsmen Defendant-Intervenors to similarly supplement the record with a document that provides a full and accurate description of the events and issues described in HSUS *et al*.'s extra-record submission.

## II.    BACKGROUND

### A.    Initiation of the Litigation

On April 16, 2007, HSUS *et al*. filed a Complaint for Declaratory and Injunctive Relief.[1] HSUS *et al*.'s Complaint challenged the U.S. Fish and Wildlife Service et al.'s ("FWS") Final Rule to delist the Western Great Lakes Distinct Population Segment ("WGL-DPS") of gray wolves. 72 Fed. Reg. 6052 (Feb. 8, 2007).

### B.    The FWS's Delisting of Gray Wolves

Prior to the delisting, management and conservation of the wolves of the WGL-DPS came under the authority of the FWS. In delisting the WGL-DPS gray wolves, the FWS

---

[1] HSUS *et al*. filed their First Amended Complaint for Declaratory and Injunctive Relief on May 9, 2007.

transferred that responsibility to the management authorities of the individual states in the WGL-DPS, such as Minnesota's Department of Natural Resources ("DNR").

To determine whether the WGL-DPS wolves required removal from the "endangered" species list, the FWS, in accordance with their statutory obligation under the Endangered Species Act ("ESA"), analyzed five factors that can affect the status of the species. 16 U.S.C. § 1533(a)(1). One of these factors was the adequacy of existing regulatory mechanisms. *Id.* § 1533(a)(1)(D). HSUS *et al.*, in their First Amended Complaint, challenged the FWS's conclusions about the adequacy of existing regulatory mechanisms for wolf management through allegations about the implementation and funding of Minnesota's wolf management plan. First Amended Complaint, ¶ 83.

### C.    HSUS *et al.*s' Minnesota Data Practices Act Request

Six days before filing their Complaint, on April 10, 2007, HSUS *et al.* made a "Minnesota Data Practices Act" request of the Minnesota DNR ("records request"). The records request was narrowly framed. It requested and consequently received limited information that provided an incomplete "snapshot" of the status of Minnesota's management of its wolf populations. Minnesota DNR's April 19, 2007 response to HSUS *et al.*'s records request, are the documents that are the subject of HSUS *et al.*'s Motion to Supplement the Record. ("extra-record documents").

HSUS *et al.*'s records request solicited four specific sets of documents: 1) DNR records regarding the creation of new positions for a wolf specialist, wolf research biologist, and/or three conservation officers; 2) DNR records regarding the hiring of individuals for the five staff positions listed above; 3) DNR records indicating the funds budgeted and/or spent for the wolf

management plan during the fiscal years 2002-2007[2]; and 4) All DNR records regarding the DNR and/or the Governor's budget recommendations or requests for the wolf management program in fiscal years 2008, 2009, or any year thereafter.  (Plaintiff's Exhibit E-01, 02 to Motion to Supplement the Record).  HSUS *et al.*'s request provided Minnesota DNR with a template designed to exclude evidence of wolf management personnel other than five specific individuals mentioned in the records request and of Minnesota wolf management funding from sources other than the state own budgetary sources.  Moreover, the request was aimed to capture information of post-decisional events on a day of HSUS *et al.*'s choosing.  Despite waiting seven months before alerting the FWS and Sportsmen Defendant-Intervenors of their intention to utilize the extra-record documents that were received through their records request, HSUS *et al.* never made any attempt to seek from Minnesota DNR any additional data that would update the information HSUS *et al.* had obtained on April 19, 2007.

D.    **The FWS's Administrative Record**

On September 17, 2007, the FWS lodged the Administrative Record in this case.  Upon receiving the Administrative Record, HSUS *et al.* never challenged the sufficiency of the Administrative Record with respect to documents pertaining to Minnesota's wolf management or asked the FWS to add the extra-record documents to the Administrative Record.[3]  It was not until Friday, November 9, 2007, just five days before filing their Motion to Supplement the Record,

---

[2] As discussed below this request was read to exclude federal funds provided to the DNR for wolf management and state funds used for wolf management but not specifically designated as wolf management funds.

[3] Plaintiffs did correspond with the FWS to challenge the FWS exclusion of certain documents that the FWS classified as "privileged."  That challenge was resolved when on October 15, 2007, the FWS released and lodged the document previously classified as privileged.  The dispute over privileged documents did not include any discussion of the materials that HSUS *et al.* now seek to include in their attempt to supplement the Administrative Record.

that HSUS *et al.* first alerted the FWS and Sportsmen-Defendant-Intervenors that HSUS *et al.* intended to seek leave to supplement the record with the extra-record documents.

  **E.  Declaration of Minnesota Wolf Specialist, Dan Stark**

  Upon receiving HSUS *et al.*'s Motion to Supplement the Record, counsel for Sportsmen Defendant-Intervenors contacted Dan Stark, Wolf Specialist for the Minnesota DNR.  Mr. Stark is employed by the Minnesota DNR in one of the positions that was the subject of HSUS *et al.*'s records request.  However, since Mr. Stark was not in Minnesota DNR's employ on April 19, 2007, nothing about his employment is included in the extra-record documents.  Upon reviewing the extra-record documents, Mr. Stark prepared a Declaration that offers a full explanation of the agency's hiring and distribution of responsibilities for wolf management and enforcement as well as a description of the current status of Minnesota's wolf management funding, from sources both inside and outside the state.  (Daniel Stark's Declaration is attached to this Opposition as Exhibit "A".)  In addition, Mr. Stark's declaration updates the limited data included in the extra-record documents.  For example, in his declaration, Mr. Stark explains how Minnesota's Gray Wolf Management Plan is "funded and implemented largely as written."  Stark Declaration, ¶ 4.

  In his declaration, Mr. Stark explains that, due to continued federal funding for depredation control, the state's required funding for implementation of its Wolf Management Plan is much less than Minnesota expected prior to the delisting.  His declaration states:

> 11.  At the time that Minnesota's Wolf Management Plan was prepared, the Minnesota DNR assumed that upon delisting, the state would be required to assume all financial responsibility for Minnesota depredation control activities.
> 12.  Prior to delisting and since 1986, the federally funded Wildlife Services branch of the U.S. Department of Agriculture has been the agency that has conducted Minnesota's gray wolf depredation control activities.
> 13.  Since delisting, Wildlife Services has continued to maintain their depredation control activities, using federal funding, under a cooperative agreement with Minnesota DNR.  This cooperative agreement and federal funding for this effort will continue into the foreseeable future.

14.   Since depredation control activities are being funded with federal dollars, the Minnesota DNR will not and has no need to make a request to the Minnesota Legislature to fund a program or activity that is already being funded by another source.

15.   The approximate cost of the depredation control activities being carried out by Wildlife Services with federal funds is $400,000.

Stark Declaration, Exhibit "A," ¶¶ 11-15.

In his declaration, Mr. Stark also explains that Minnesota has acquired staff and has made staff assignments that exceed the expectations of the state's wolf management plan.   The declaration details how the Minnesota DNR not only hired "three Conservation Officers as lead officers in wolf range to serve as primary internal and external contacts regarding wolf issues" Stark Declaration, Exhibit "A," ¶ 7, but also filled 20 additional Conservation Officer vacancies. According to the declaration, "there are now 71 DNR Conservation Officers stationed in or adjacent to Minnesota wolf range" and "[e]ach of these officers respond to gray wolf management issues and each is involved, at least in part, in wolf management and wolf-related enforcement activities."  Stark Declaration, Exhibit "A," ¶ 9.

Mr. Stark's declaration also dispels any confusion as to Minnesota's funding and implementation of the state's wolf management plan.  Although HSUS *et al*. suggest that the plan called for $695,000 annual funding for wolf management, the state is now devoting in more than that figure on its wolf efforts:

5.   A careful review of Minnesota's wolf management strategies demonstrates that Minnesota, through its own efforts and those of its' agents, is actually expending in excess of $695,000 annually on wolf management.

6.   The $144,000 specifically identified from the "Heritage Enhancement Fund" on the form identified as "Funds Allocated and Expended for Wolf Management (sic) Activity FY 2002-2009" in the documents provided by the Minnesota DNR in response to the Plaintiffs' Minnesota Data Practices Act request, accounts for only a portion of the funds that the Minnesota DNR, and its agents are expending on wolf management.

7. Minnesota DNR has designated three Conservation Officers as lead officers in wolf range to serve as primary internal and external contacts regarding

wolf issues. Wolf management issues are a priority for these three officers. The salaries for these three officers, of approximately $70,000 per officer, or approximately $210,000 annually, are paid from portions of the DNR budget other than the $144,000 specifically identified for wolf management.

15. The approximate cost of the depredation control activities being carried out by Wildlife Services with federal funds is $400,000.

Stark Declaration, ¶¶ 5-7, 15. Mr. Stark's declaration brings into context the limited data represented in the extra-record documents and provides a more current picture of the state's wolf management efforts, not the least of which is his own employment as the state's wolf specialist.

### F.    HSUS *et al.*'s Inclusion of Extra Record Documents in Their Summary Judgment Motion

HSUS *et al.* filed their Motion to Supplement the Record on the same day that they filed their Motion for Summary Judgment. In that Motion for Summary Judgment and in their Statement of Material Facts, HSUS *et al.* referenced and based arguments on the extra-record documents. Consequently, HSUS *et al.*'s Motion for Summary Judgment relies on documents that are not part of the Administrative Record lodged by the FWS and for which HSUS *et al.* have not been granted leave to include as extra-record materials. Defendants and Sportsmen Defendant-Intervenors' Motions for Summary Judgment and Oppositions to Plaintiffs' Motion for Summary Judgment are currently due to be filed on January 11, 2007. If this matter is not resolved before that date, Sportsmen Defendant-Intervenors and presumably Defendants will have no choice but to include in their own motions and oppositions, arguments that respond to documents that should not be part of this Court's consideration. If the Court does not deny Plaintiffs' Motions for Summary Judgment and direct Plaintiffs to refile their Motions without reference to the extra-record documents, Defendants and Sportsmen Defendant-Intervenors will be forced to brief on these issues. As a result, the briefing of all of the parties will be tainted by references to matters outside the proper and complete Administrative Record. To resolve this

matter, Sportsmen Defendant-Intervenors not only ask that the Court deny HSUS *et al*.'s Motion

to Supplement the Record, but also ask that this Court deny HSUS *et al*.'s Motion for Summary

Judgment, filed on November 14, 2007, without prejudice and order HSUS *et al*. to file a Motion

for Summary Judgment that includes no reference to the extra-record documents.

## III.    ARGUMENT

### A.    HSUS *et al*.'s Extra-Record Documents Do Not Qualify for An Exception to the Rule Confining Courts to a Review of the Administrative Record

HSUS *et al*. seek to supplement the Administrative Record with documents that post-date

the FWS's February 8, 2007 decision to delist the gray wolves of the WGL-DPS.  They contend

that the documents demonstrate that the FWS made an incorrect decision about the status of

Minnesota's wolf management efforts.  "Ordinarily, judicial review of informal agency rule-

making is confined to the administrative record; neither party is entitled to supplement that

record with litigation affidavits or other evidentiary material that was not before the agency."

*Edison Electric Institute v. OSHA,* 849 F.2d 611, 617-18 (D.C.Cir.1988), *citing Camp v. Pitts,*

411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973).  This rule fully applies to ESA

citizen suit cases such as this one.  *Cabinet Mountain Wilderness/Scotchman's Peak Grizzly

Bears v. Peterson*, 685 F2.d 678, 685 (D.C. Cir. (1982) (on-the-record review under the

Administrative Procedure Act applies).  HSUS *et al*. do not wish to abide by this rule.

In support of their motion to supplement the record, HSUS *et al*. rely heavily on the case

of *Esch v. Yeutter*, 876 F.2d 976 (D.C. Cir. 1989).   That case involved a procedural challenge to

the U.S. Department of Agriculture's decision to suspend farm subsidy benefits.  The plaintiffs

in *Esch* asserted that the agency had not complied with mandatory hearing requirements and had

failed to inform them of the nature of alleged inadequacies in their applications, thereby

prejudicing their right and ability to adduce relevant evidence during the administrative process.

876 F.2d at 992-993. The District Court allowed supplementation of the Administrative Record in order to respond to this procedural error. The Court of Appeals found the supplementation to be proper and offered, in dicta, a summarized version of eight circumstances in which courts from various jurisdictions had allowed the introduction of extra-record documents as an exception to the general rule that judicial review of agency conduct is confined to the administrative record of that agency's decision. 876 F.2d at 991. The *Esch* court noted that the general principal to exclude extra-record evidence "exerts its maximum force when the substantive soundness of the agency's decision is under scrutiny." *Id*. However, since the challenge in *Esch* was a procedural one, the D.C. Court of Appeals found it appropriate to allow supplementation of the record.

> [I]n the present case, the procedural validity of the department's action also remains in serious question. Particularly in the latter context, it may sometimes be appropriate to resort to extra-record information to enable judicial review to become effective.

*Id*. In dicta, the *Esch* court listed the following eight potential exceptions to the general principle that confines courts to a review of the Administrative Record:

> (1)When agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency actions shows whether the decision was correct or not; (6) in cases where agencies are sued for a failure to take action; (7) in cases arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage.

*Id*.

In this case, HSUS *et al*. seek to introduce extra-record documents under Exception (5) identified in the *Esch* case, contending that they are entitled to rely on post-decisional documents to show that the FWS's decision to delist was an incorrect one. However, HSUS *et al*.'s claims

against the FWS are substantive (attacking the merits of delisting) and not procedural. Consequently, the *Esch* exception does not apply to this case, and the Court should decline the invitation to make Exception (5) swallow the rule that judicial review is on the record. The record is the record before the agency at the time it made its decision. See Federal Defendants' Opposition to Plaintiffs' Motion at 5-6 (briefing this point) (Docket 33).

In their motion, Plaintiffs rely on *Esch* Exception (5) but neglect to explain the genesis or rationale behind what appears to be a very broad exception to the general rule. Although the *Esch* court did admit extra-record documents for its review of agency action, it did not rely on Exception (5) to do so. The D.C. Court of Appeals in *Esch* did nothing other than list in dicta an exception related to post-decisional evidence as one that had been formulated and used by other courts.[4]

District Courts in this Circuit have applied one or more of the eight *Esch* exceptions, but in doing so have been careful to restrict the application to limited circumstances. For example, this particular Court has chosen to apply the *Esch* exceptions to procedural rather than substantive challenges to agency conduct. In the recent case of *Hammond v. Norton*, 370 F. Supp.2d 226 (D.D.C. 2005), this Court refused to apply *Esch* Exception (5) in a case that challenged a Bureau of Land Management ("BLM") decision.[5] In that case the Plaintiffs challenged BLM's refusal to prepare a Supplemental Environmental Impact Statement pertaining to a petroleum pipeline project. The Plaintiffs asserted that changes in the financial situation of one the key players involved in the project altered the potential environmental impact of the

---

[4] The *Esch* court cited the case of *American Mining Congress v. Thomas*, 772 F.2d 617, 626-627 (10th Cir. 1985) *cert. denied* 476 U.S. 1158, 106 S.Ct. 2275, 90 L.Ed. 2d 718 (1986).

[5] In the case of *Lake Pilots Association v. U.S. Coast Guard*, 257 F. Supp. 2d 148, 164 (D.D.C. 2003), another District Court refused to apply the *Esch* exceptions in a case that included no procedural challenges to the Coast Guard's decision on piloting rates.

effort.  Plaintiffs sought leave to supplement the record with a declaration that offered the court an estimate of the potential financial obligation that Plaintiffs asserted that the key player might not be able to meet due to his altered financial status.

Noting the general principle that judicial review of agency action should be restricted to the contents of the Administrative Record, and citing *Esch v. Yuetter*, this Court found that because the Hammond Plaintiffs had asserted no procedural defect against the Bureau of Land Management decision under review or other reason for supplementing the record, the extra-record submission could not be admitted.[6]

Without more, an exception that allows an aggrieved party the right to use hindsight to "second guess" an agency would basically impose upon decision-making agencies the obligation to be prescient.  An agency would be required to refrain from taking any action, unless the agency could *absolutely guarantee* that nothing could interfere with the success of that action.  Moreover, such a broad exception to the general rule against extra-record evidence could allow a disgruntled party to pick evidence from any moment in time following an agency's decision to introduce as a basis for questioning the agency's determination.  To undermine agency decision-making, a litigant could introduce post-decisional documents from any particular point in time,

---

[6] Contrary to HSUS *et al.*'s representations, the case of *American Rivers v. United States Army Corps of Engineers*, 271 F. Supp.2d 230 (D.D.C. 2003) does not support HSUS *et al.'s* request to introduce post-decisional extra-record evidence for the purposes of summary judgment.  In that case, the District Court considered the introduction of extra-record evidence to aid the court in the determination of a preliminary injunction motion.  Referencing the eight exceptions of *Esch v. Yeutter*, 876 F.2d 976, 991 & n. 166 (D.C. Cir. 1989) the District Court admitted extra-record materials under a different *Esch* exception; Exception (8) applicable to preliminary injunction determinations.   In determinations that rely, at least in part, upon the current harm being experienced by the aggrieved party, evidence of post-decisional events can help the court determine the nature of the harm.  That is not relevant to this Court's review of the parties' motions for summary judgment in the instant matter.

despite the evidence being totally unrepresentative of the normal status of the situation impacted by the agency's decision or rule.

      **B.**    **To Make a Denial of the Motion to Supplement the Administrative Record Effective, the Court Should Require HSUS to Refile Its Motion for Summary Judgment Without Reference to the Extra-Record Materials.**

Without first obtaining this Court's leave to supplement the Administrative Record, HSUS *et al*. moved forward and referenced the extra-record documents in their Motion for Summary Judgment and in their Statement of Facts (¶ 45) filed November 14, 2007. By doing so, HSUS *et al*. has potentially tainted the summary judgment briefing and the court's review of this matter. If this Court denies HSUS *et al*.'s Motion to Supplement the Administrative Record, Defendants and Sportsmen Defendant-Intervenors will be prejudiced by the presence of the references and argument based on the extra-record documents. If Plaintiffs' Motion to Supplement the Record is not resolved before January 11, 2007, which is the date upon which Defendant and Sportsmen Defendant-Intervenor's Summary Judgment Motions and Oppositions to Plaintiffs' Motion for Summary Judgment are due to be filed, Defendants and Sportsmen Defendant Intervenors will be forced to include in their filings responses to arguments based on these or other extra-record documents. This will exacerbate the departure from the principle that judicial review is on the record.

To avoid the morass introduced by HSUS *et al*.'s premature and likely improper use of the extra-record documents, Sportsmen Defendant-Intervenors ask that this Court deny HSUS *et al*.'s Motion for Summary Judgment without prejudice to HSUS *et al*. to file a new Motion for Summary Judgment after their Motion to Supplement the Administrative Record is resolved. This remedy was recently utilized by Judge Kennedy of this Court. In the case of *Friends of Animals et al. v. Kempthorne*, Civil Action 04-01660(HHK), Plaintiffs filed motions for

summary judgment prior to the resolution of an administrative record dispute. On March 5, 2007, Judge Kennedy denied the plaintiffs' motions for summary judgment without prejudice to plaintiffs to renew those motions or to refile them after resolution of the parties' administrative record dispute. (A copy of Judge Kennedy's March 5, 2007 Order is attached as Exhibit "B.")

> **C.     If HSUS *et al.*'s Extra Record Documents Are Admitted, then the Declaration of Daniel Stark Should Be Admitted As Well**

Finally, if this Court chooses to grant HSUS *et al.*'s Motion to Supplement, Defendant-Intervenors ask this Court to further supplement the record with the Declaration of Minnesota DNR Wolf Specialist, Daniel Stark (Exhibit "A"). Mr. Stark's declaration updates the dated and limited information that is contained in the HSUS *et al.*'s extra-record submission and dispels misrepresentations suggested by the materials selectively requested by HSUS *et al.*, back in April of 2007. If this Court determines that *Esch* Exception (5) allows the introduction of post-decisional evidence that reflects on the correctness of the FWS's decision to delist wolves, then this Court should admit Daniel Stark's declaration as post-decisional evidence that establishes that the FWS's decision to delist the wolves of the WGL-DPS was indeed correct.

WHEREFORE, Sportsmen Defendant-Intervenors respectfully request that this Court deny HSUS *et al.*'s' Motion to Supplement the Administrative Record and that this Court deny HSUS *et al.*'s Motion for Summary Judgment without prejudice to refile. Alternatively, Sportsmen Defendant-Intervenors request that this Court admit the declaration of Daniel Stark to respond to the extra-record materials submitted by HSUS *et al*.

A Proposed Order is attached.

/s/ James H. Lister

William P. Horn (D.C. Bar No. 375666)
James H. Lister (D.C. Bar. No. 447878)
Birch Horton, Bittner & Cherot
1155 Connecticut Avenue N.W., Suite 1200
Washington, D.C.  20036
(202) 659-5800
Fax:  (202)659-1027
whorn@dc.bhb.com
jlister@dc.bhb.com

*Counsel for U.S. Sportsmen's Alliance
Foundation, Wisconsin Bear Hunters'
Association, Scott Meyer and Robert Stafsholt*

/s/ Anna M. Seidman

Anna M. Seidman (D.C. Bar No. 417091)
Douglas S. Burdin (D.C. Bar No. 434107)
Safari Club International
501 2nd Street NE
Washington, D.C.  20002
(202) 543-8733
Fax:  (202) 543-1205
aseidman@sci-dc.org
dburdin@sci-dc.org

*Counsel for Safari Club International,  Safari
Club International Foundation, and National
Rifle Association*

Case No. 1:07-cv-00677

DEFENDANT-INTERVENORS'
OPPOSITION TO PLAINTIFFS'
MOTION TO SUPPLEMENT
THE RECORD

**EXHIBIT A**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| HUMANE SOCIETY OF THE UNITED STATES, *et al.* Plaintiffs, | ) ) ) | Case No. 1:07-cv-00677 |
| vs. | ) ) ) | |
| DIRK KEMPTHORNE, Secretary of the Interior, United States Department of the Interior, *et al.* | ) ) ) | DECLARATION OF Daniel Stark |
| Defendants, | ) ) | |
| and | ) ) ) | |
| SAFARI CLUB INTERNATIONAL, and SAFARI CLUB INTERNATIONAL FOUNDATION *et al.* | ) ) ) ) ) ) ) | |

Defendant-Intervenors-)

1. My name is Daniel Stark and I am the Wolf Management Specialist for the Minnesota Department of Natural Resources.

2. I have reviewed the set of documents that the Minnesota Department of Natural Resources (DNR) supplied on April 19, 2007 to Michael C. Soules of Faegre and Benson LLP, Attorneys for Plaintiffs in this litigation, in response to the request made under the Minnesota Data Practices Act for information regarding funding and personnel aspects of the States' gray wolf management program.

3. The information contained in the documents supplied by the Minnesota DNR on April 19, 2007 does not, without context, fully explain the nature of Minnesota's implementation of its Gray Wolf Management Plan.

Page 1

4.  Minnesota's Gray Wolf Management Plan, as indicated by the Final Rule to Delist the Gray Wolves of the Western Great Lakes Distinct Population Segment is, in fact, "funded and implemented largely as written."

5.  A careful review of Minnesota's wolf management strategies demonstrates that Minnesota, through its own efforts and those of its' agents, is actually expending in excess of $695,000 annually on wolf management.

6.  The $144,000 specifically identified from the "Heritage Enhancement Fund" on the form identified as "Fund Allocated and Expended for Wolf Management (sic) Activity FY2002-2009" in the documents provided by the Minnesota DNR in response to the Plaintiffs' Minnesota Data Practices Act request, accounts for only a portion of the funds that the Minnesota DNR and its agents are expending on wolf management.

7.  Minnesota DNR has designated three Conservation Officers as lead officers in wolf range to serve as primary internal and external contacts regarding wolf issues. Wolf management issues are a priority for these three officers. The salaries for these three officers, of approximately $70,000 per officer, or approximately $210,000 annually, are paid from portions of the DNR budget other than the $144,000 specifically identified for wolf management.

8.  At the time that the Minnesota Wolf Management Plan was drafted, there were many vacancies in the Enforcement Division of the Minnesota DNR.

9.  Instead of simply establishing three new officer positions, Minnesota DNR filled 20 vacant Conservation Officer positions in wolf range since the wolf plan was drafted. Although the three lead officers serve as the primary internal and external contacts for wolf issues, there are now 71 DNR Conservation Officers stationed in or adjacent to Minnesota wolf range. Each of these officers respond to gray wolf management issues and each is involved, at least in part, in wolf management and wolf-related enforcement activities.

10. Minnesota Conservation Officers have a greater presence in wolf range than the U.S. Fish and Wildlife Service law enforcement personnel ever did during the time that gray wolves were listed as a "threatened" species in Minnesota. In fact, even while gray wolves were federally listed, many if not all of the gray wolf enforcement matters addressed in Minnesota involved Minnesota Conservation Officers who brought information, evidence, or the case to federal officers.

11. At the time that Minnesota's Wolf Management Plan was prepared, the Minnesota DNR assumed that upon delisting, the state would be required to assume all financial responsibility for Minnesota depredation control activities.

12. Prior to delisting and since 1986, the federally funded Wildlife Services branch of the

U. S. Department of Agriculture has been the agency that has conducted Minnesota's gray wolf depredation control activities.

13. Since delisting, Wildlife Services has continued to maintain their depredation control activities, using federal funding, under a cooperative agreement with Minnesota DNR. This cooperative agreement and federal funding for this effort will continue into the foreseeable future.

14. Since depredation control activities are being funded with federal dollars, the Minnesota DNR will not and has no need to make a request to the Minnesota Legislature to fund a program or activity that is already being funded by another source.

15. The approximate annual cost of the depredation control activities being carried out by Wildlife Services with federal funds is $400,000.

16. The $210,000 for the conservation officer salaries and the $400,000 for wolf depredation activities, both of which are paid from sources other than the DNR Heritage Enhancement Fund, combined with the $144,000 specifically allocated for wolf management positions and activities, amount to more than the $695,000 that was expected to be necessary to implement the wolf management plan.

17. Minnesota's DNR is fulfilling its statutory and management plan obligations to manage wolves and to ensure their long-term survival. This winter the DNR is utilizing some of the Heritage Enhancement Funding to conduct a population survey as part of our research and monitoring plan. This survey costs about $50,000, including costs of radio collaring wolves and locating them by aircraft.

18. Minnesota has conducted systematic wolf population surveys at ten year intervals starting in 1978. In 2003 the interval was decreased to every five years. In order to conduct these population surveys the DNR relies on a certain number of packs being radio-collared. By encouraging others to research and study wolves it reduces the total number of wolves that need to be specifically radio-collared for a systematic survey of Minnesota's wolf range. The DNR is committed to collaring the necessary number of wolves to conduct an accurate estimate of Minnesota's wolf population. The current method for conducting the wolf population survey is scientifically valid and has been published in a peer-reviewed scientific journal (Fuller et al. 1992). A priority for research will be evaluating and updating current methods to count wolves as needed to ensure an accurate estimate of Minnesota's wolf population. Techniques and methods may be developed and evaluated in the future that enhance the current methodology to count wolves.

19. Additional management comes from area wildlife managers that work to enhance populations and habitats for ungulates in Minnesota. This funding is tied to the Minnesota DNR wildlife section annual operating budget of $27,000,000.

20. Under Minnesota DNR's enforcement operations as budgeted, the conservation of wolf populations in the state is not at risk from takings by humans. The Minnesota DNR division of enforcement has been a presence in wolf range throughout federal protection and supported and conducted investigations of illegal wolf mortality while wolves were federally protected. The state presence far exceeds that which was ever present by federal officers. There are more conservation officers present in wolf range than the wolf plan called for and than there were prior to delisting. The state has been doing wolf enforcement all along and will continue to enforce Minnesota's gray wolf laws.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 4ᵗʰ day of __December__, 2007, at __St. Paul__, Minnesota.

Daniel Stark

Case No. 1:07-cv-00677

DEFENDANT-INTERVENORS'
OPPOSITION TO PLAINTIFFS'
MOTION TO SUPPLEMENT
THE RECORD

**EXHIBIT B**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FRIENDS OF ANIMALS,

    Plaintiff,

  v.

DIRK KEMPTHORNE, Secretary of the
Interior,

    Defendant.

REBECCA ANN CARY, et. al.,

    Plaintiffs,

  v.

DALE HALL, Director, Fish and Wildlife
Service, et. al.,

    Defendants,

  and

SAFARI CLUB INTERNATIONAL, et. al.,

    Defendant-Intervenors

Civil Action 04-01660 (HHK)
Civil Action 06-02120
(Consolidated Cases)

## ORDER

It is this 5th day of March, 2007, hereby

**ORDERED** that plaintiffs' motions for summary judgment [#42, #45] are **DENIED**

without prejudice to renewal or refiling after resolution of the Cary plaintiffs' motion to compel;

and it is further

**ORDERED** that defendants' motion to stay summary judgment briefing (#47) is

therefore **DENIED** as moot.

Henry H. Kennedy, Jr.
United States District Judge

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

HUMANE SOCIETY OF THE UNITED          )
STATES, *et al.*                      )
                                      )    Case No. 1:07-cv-00677
              Plaintiffs,             )
                                      )
       vs.                            )
                                      )
DIRK KEMPTHORNE, Secretary of the Interior,  )
United States Department of the Interior, *et al.*  )
                                      )
              Defendants,             )
                                      )
       and                            )
                                      )
SAFARI CLUB INTERNATIONAL,            )
U.S. SPORTSMENS' ALLIANCE             )
FOUNDATION, *et al.*                  )
                                      )
              Defendant-Intervenors.  )

**(PROPOSED) ORDER**

Having reviewed Plaintiffs' November 14, 2007 Motion to Supplement the

Administrative Record, and the responses thereto, it is this _____ day of December, 2007,

hereby Ordered that:

CHOOSE A OR B:    (A)    The Motion to Supplement is Denied and Plaintiffs are directed to

refile their Motion for Summary Judgment without reference to the

extra-record material attached to the Motion.

            (B)    The Motion to Supplement is Granted, and Defendant-Intervenors

shall be permitted to include Exhibit A to their Opposition to

Motion to Supplement in the Administrative Record.

_____
Paul Friedman
United States District Judge