UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

HUMANE SOCIETY OF THE )
UNITED STATES, *et al*, )
)
        Plaintiffs, )
)
v )
)
KEMPTHORNE, *et al*, )
)
        Defendants, )
)
U.S. SPORTSMEN'S ALLIANCE, )
FOUNDATION, *et al*, )
)
        Intervenor-Defendants, )
)
SAFARI CLUB INTERNATIONAL, *et al*, )
)
        Intervenor-Defendants. )
_____ )

Civil No. 1:07-cv-00677-PLF

MOTION OF THE **MICHIGAN** DEPARTMENT OF NATURAL RESOURCES; THE
STATE OF **KANSAS**; THE **KENTUCKY** DEPARTMENT OF FISH AND WILDLIFE
RESOURCES; THE **MINNESOTA** DEPARTMENT OF NATURAL RESOURCES;
THE **MISSOURI** DEPARTMENT OF CONSERVATION; THE STATE OF **NORTH
DAKOTA**; THE **OHIO** DEPARTMENT OF NATURAL RESOURCES; THE STATE
OF **WISCONSIN**; THE ASSOCIATION OF FISH AND WILDLIFE AGENCIES;
THE MIDWEST ASSOCIATION OF FISH AND WILDLIFE AGENCIES AND
ITS MEMBER AGENCIES THE **IOWA** DEPARTMENT OF NATURAL
RESOURCES; THE **NEBRASKA** GAME AND PARKS DIVISION; AND THE
**SOUTH DAKOTA** GAME, FISH AND PARKS DEPARTMENT AS *AMICI CURIAE*
IN SUPPORT OF DEFENDANTS **FOR LEAVE TO FILE *AMICI CURIAE* BRIEF**

The the Michigan Department of Natural Resources; the State of Kansas; the

Kentucky Department of Fish and Wildlife Resources; the Minnesota Department of

Natural Resources; the Missouri Department of Conservation; the State of North Dakota;

the Ohio Department of Natural Resources; the State of Wisconsin**;** the Association of

1

Fish and Wildlife Agencies; the Midwest Association of Fish and Wildlife Agencies; and its member agencies the Iowa Department of Natural Resources, the Nebraska Game & Parks Commission and the South Dakota Game, Fish and Parks Department; respectfully move the Court for leave to file an *amici curiae* brief in support of the position of the FWS concerning delisting the wolf as an endangered species that was issued by the United States Fish and Wildlife Service (FWS). The Michigan Department of Natural Resources is the agency primarily responsible for wolf management in Michigan which is one of the states included in the Western Great Lakes Distinct Population Segment addressed in the Final Rule effective March 12, 2007.[1]

This case presents issues of great importance to the ability of the FWS to interpret and administer the Endangered Species Act[2] (ESA) in a manner that is consistent with the best interests of the species protected under the act as well as the interests of the states responsible for protecting and managing a particular species, in this case, the gray wolf. The State of Michigan's gray wolf population has gone from virtual extirpation to approximately 500 animals in the last two decades.[3] This level of recovery is two and a half times the numeric abundance goal set forth in the 1997 Michigan Gray Wolf Recovery and Management Plan.[4] The *amici curiae* are well-positioned to assist the Court in understanding what the FWS has done in this case, and as an illustrative example, the State of Michigan's commitment to maintaining a viable wolf population above a level that would warrant classification as threatened or endangered, and that the

---

[1] 72 Fed Reg 6052 (Feb. 8, 2007).
[2] 16 USC § 1531, *et seq*
[3] 72 Fed Reg 6053-6055.
[4] 72 Fed Reg 6053.

FWS action being challenged in this case does not present a threat to protecting endangered species under the ESA.

In accordance with Local Rule 7.1(m), counsel for counsel for *amici curiae* contacted counsel for the parties in this case. Counsel for defendants and intervenor-defendants Safari Club, International, *et al.* stated that they do not oppose this motion. Counsel for plaintiffs said they do not oppose this motion.

Respectfully submitted,

Michael A. Cox
Attorney General

/s/ Marie Shamraj
Marie Shamraj (P44481)
Robert P. Reichel (P31878)
Assistant Attorney General
Environment, Natural Resources,
and Agriculture Division
on behalf of the Michigan Department of
Natural Resources
525 W. Ottawa, 6th Fl, Williams Bldg.
P.O. Box 30755
Lansing, MI  48909
shamrajm@michigan.gov
(517) 373-7540

Date:  January 18, 2008

S: NR/AC/cases/20073001321-B-:L/wolf delisting/motion to file amicus

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| HUMANE SOCIETY OF THE UNITED STATES, *et al*, | ) ) ) | |
| Plaintiffs, | ) ) ) | Civil No. 1:07-cv-00677-PLF |
| v | ) ) | |
| KEMPTHORNE, *et al*, | ) ) | |
| Defendants, | ) ) | |
| U.S. SPORTSMEN'S ALLIANCE, FOUNDATION, *et al*, | ) ) ) | |
| Intervenor-Defendants, | ) ) | |
| SAFARI CLUB INTERNATIONAL, *et al*, | ) ) | |
| Intervenor-Defendants. | ) ) ) | |

BRIEF OF THE **MICHIGAN** DEPARTMENT OF NATURAL RESOURCES; THE
STATE OF **KANSAS**; THE **KENTUCKY** DEPARTMENT OF FISH AND WILDLIFE
RESOURCES; THE **MINNESOTA** DEPARTMENT OF NATURAL RESOURCES;
THE **MISSOURI** DEPARTMENT OF CONSERVATION; THE STATE OF **NORTH
DAKOTA**; THE **OHIO** DEPARTMENT OF NATURAL RESOURCES; THE STATE
OF **WISCONSIN**; THE ASSOCIATION OF FISH AND WILDLIFE AGENCIES;
THE MIDWEST ASSOCIATION OF FISH AND WILDLIFE AGENCIES AND
ITS MEMBER AGENCIES THE **IOWA** DEPARTMENT OF NATURAL RESOURCES;
THE **NEBRASKA** GAME AND PARKS DIVISION; AND THE **SOUTH DAKOTA** GAME,
FISH AND PARKS DEPARTMENT AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS

**INTRODUCTION**

This case concerns the United States Fish and Wildlife Service's (FWS) recent removal of

the gray wolf in the Western Great Lakes states from the endangered species list pursuant to the

Endangered Species Act (ESA).[1] Based upon the documented recovery of the wolf population in

---

[1] 16 USC §1531 *et seq.*

the western Great Lakes States, the FWS, in accordance with the provisions of the ESA and the

Administrative Procedures Act (APA),[2] determined that the gray wolf in the western Great Lakes

States no longer met the definitions of threatened or endangered under the ESA  The FWS found

that the wolf populations in the states of Michigan, Wisconsin, and Minnesota met or exceeded

the delisting criteria specified in the 1978 Recovery Plan for the Eastern Timber Wolf and the

1992 revised Recovery Plan.[3]

The undersigned *amici curiae*, the Michigan Department of Natural Resources; the State

of Kansas; the Kentucky Department of Fish and Wildlife Resources; the Minnesota Department

of Natural Resources; the Missouri Department of Conservation; the State of North Dakota; the

Ohio Department of Natural Resources; the State of Wisconsin; the Association of Fish and

Wildlife Agencies; the Midwest Association of Fish and Wildlife Agencies; and its member

agencies the Iowa Department of Natural Resources, the Nebraska Game & Parks Commission

and the South Dakota Game, Fish and Parks Department; are and represent State agencies that

have primary responsibility for the conservation and management of resident wildlife, including

gray wolves, within their respective boundaries.  As such, they have direct and substantial

interest in the subject of this case.

These *amici curiae* respectfully submit that the FWS's action is consistent with applicable

law, the protection of the gray wolf, and an appropriate allocation of wildlife management

---

[2] 5 USC § 706.

[3] 72 Fed Reg 6052, Feb. 8, 2007.

2

responsibility between the federal and State governments. Because the FWS's decision correctly interprets and applies the ESA, and is supported by the record it should be upheld.[4]

I.    **The FWS Final Rule Removing the Western Great Lakes Distinct Population Segment of the Gray Wolf From the List of Endangered and Threatened Wildlife Complies with the Requirements of the Endangered Species Act and the Administrative Procedures Act**

A.    Standard of Review

Compliance with the ESA is reviewed under the Administrative Procedures Act.[5] Under the APA, the reviewing court may set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or if the action failed to meet statutory, procedural, or constitutional requirements.[6] The Court may not substitute its judgment for that of the agency.[7]

The District Court for the District of Columbia found[8]:

> The court's limited role is to ensure that the agency's decision is based on relevant factors and not a "clear error of judgment." If the "agency's reasons and policy choices . . . conform to 'certain minimal standards of rationality' . . . the rule is reasonable and must be upheld." This standard presumes the validity of agency action. Deference to an agency's scientific and technical expertise dictates that agency action must be upheld as long as the agency has "considered the relevant factors and articulated a rational connection between the facts found and the choice made." In exercising its narrowly defined duty under the APA, a court must consider whether the agency acted within the scope of its legal authority, whether the agency adequately explained its decision, whether the agency based

---

[4] Section I of this Brief outlines the common position of all these *amici curiae* as to why the Final Rule at issue here should be upheld. Section II further illustrates and supports those arguments using the statute and management of the gray wolf in Michigan by the Michigan Department of Natural Resources as a specific example.

[5] 5 USC §706 (APA). *See also Colorado River Cutthroat Trout, et al v Kempthorne, et al,* 448 F Supp 2d 170, 174 (DC Cir 2006); *City of Las Vegas v Lujan,* 282 US App DC 57; 891 F2d 927, 932 (DC Cir 1989).

[6] 5 USC § 706; *Citizens to Preserve Overton Park, Inc v Volpe,* 401 US 402, 413-14; 91 S Ct 814; 28 L Ed 2d 136 (1971), overruled on other grounds by *Califano v Sanders,* 430 US 99, 105; 97 S Ct 980; 51 L Ed 2d 192 (1977).

[7] *Citizens to Preserve Overton Park,* 401 US at 416.

[8] *Defenders of Wildlife v Babbitt,* 958 F Supp 670, 678-79 (DDC 1997)(internal citations omitted).

3

its decision on facts in the record, and whether the agency considered the relevant factors. The court must defer to the agency's expertise, particularly with respect to decision-making which involves "a high level of technical expertise."

Under this standard of review, the Court's view of whether or not the delisting in question was an appropriate policy choice is of no consequence. Due to its expertise, the FWS has been authorized by Congress to make delisting determinations so long as it meets the requirements of the applicable statutes. The Court may set aside an agency decision as arbitrary and capricious only if the agency 1) relied on factors that Congress did not intend it to consider, (2) failed entirely to consider an important aspect of the problem, (3) offered an explanation for its decision that runs counter to the evidence before the agency, or (4) [action] is so implausible that it cannot be ascribed to difference in view or the product of agency expertise.[9]

The FWS has the discretion and authority to identify which species need to be listed as endangered as well as the discretion and authority to determine when to remove or reclassify a species. The ESA provides, in pertinent part[10]:

> "The Secretary shall by regulation promulgated in accordance with subsection (b) determine whether a species is an endangered species or a threatened species . . . " 16 U.S.C. § 1533(a)(1). "The Secretary shall develop and implement plans (hereinafter in this subsection referred to as "recovery plans") for the conservation and survival of endangered species and threatened species . . . [shall] incorporate in each plan-- . . .objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list; . . ."

A species receives the protections of the ESA when the FWS lists the species as "endangered" or "threatened" when it is "in danger of extinction *throughout all or a significant*

---

[9] *Sierra Club v Bosworth*, 352 F Supp 2d 909, 917 (D Minn 2005), citing *Motor Vehicle Mfrs Ass'n v State Farm Mut Auto Ins Co*, 463 US 29, 43; 103 S Ct 2856, 77 L Ed 443 (1983).
[10] 16 USC § 1533(f)(1)(B)(ii).

*portion of its range*" or "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."[11]

The FWS listed the gray wolf (*Canis lupus*) as endangered in 1974 and adopted a recovery plan in 1978 which was revised in 1992.[12] In the final delisting rule, the FWS determined that the goals of the recovery plans had been met, in fact exceeded. According to the recovery plans, there were two delisting criteria. First, it was vital that the Minnesota wolf population be maintained and the goal was to reach a population of 1,250 - 1,400 animals.[13] The second delisting criterion of the Recovery Plan was to establish at least one viable wolf population outside of Minnesota and the Michigan Isle Royale populations.[14] The goal for this second wolf population was that it would consist of at least 200 wolves for five years or, if, the second wolf population was within 100 miles of the Minnesota wolf population, it would be considered viable if it maintained a minimum of 100 wolves for at least five years.[15] In 2003-04 (the period of the most recent survey), the estimated Minnesota wolf population size was 3,020.[16] In 2005-06, the Wisconsin[17] wolf population numbered 465 wolves and the Michigan wolf population numbered 434 wolves.[18]

---

[11] 16 USC § 1532(6) & (20), respectively. (Emphasis added.)

[12] 71 Fed Reg 15,267 (March 27, 2006); 72 Fed Reg 6,052 (Feb 8, 2007).

[13] 72 Fed Reg 6,052 (Feb. 8, 2007).

[14] 72 Fed Reg 6,052 (Feb. 8, 2007).

[15] 72 Fed Reg 6,052 (Feb. 8, 2007).

[16] 72 Fed Reg 6,053 (Feb. 8, 2007).

[17] Wisconsin wolf population estimates for 1985 through 2006 increased from 15 to 465-502 wolves and from 4 to 115 packs. These estimates are conservative in two respects, as they undercount lone wolves and they are made in late winter, at the annual low point of the population. 72 Fed Reg 6054-6055 (Feb 8 2007).

[18] 72 Fed Reg 6,053 (Feb. 8, 2007).

B.    The FWS properly designated and delisted the gray wolf in the Western Great
Lakes Distinct Population Segment.

1.    Distinct Population Segment

In 1978, Congress amended the ESA's definition of "species" to read "[t]he term

"species" includes any subspecies of fish or wildlife or plants, and any distinct population

segment of any species of vertebrate fish or wildlife which interbreeds when mature."[19]  The

ESA does not include a definition of the phrase "distinct population segment".

In 1996, the FWS issued a policy clarifying its interpretation of the phrase "distinct population

segment."[20]  The original definition of "species" was ". . . any subspecies of fish or wildlife or

plants and any other group of fish or wildlife of the same species or smaller taxa in common

spatial arrangement that interbreed when mature."[21]  The inclusion of the phrase "distinct

population segment" in the definition of "species" authorized the FWS to list a "species" as

threatened or endangered taking into consideration  subspecies and for vertebrate taxa to also

consider the "distinct population segments."[22]

> "It is important in light of the Act's requirement to use the best available scientific
> information in determining the status of species that this interpretation follows
> sound biological principles. . . . Available scientific information provides little
> specific enlightenment in interpreting the phrase 'distinct population segment.'
> This term is not commonly used in scientific discourse, although 'population' is an
> important term in a variety of contexts.  For instance, a population may be
> circumscribed by a set of experimental conditions, or it may approximate an ideal
> natural group of organisms with approximately equal breeding opportunities
> among its members or it may refer to a loosely bounded, regionally distributed
> collection of organisms."

Accordingly, the FWS adopted a "DPS" policy as follows:

> "Three elements are considered in a decision regarding the status of a possible
> DPS as endangered or threatened under the Act.  These are applied similarly for

---

[19] 16 USC § 1532(16).
[20] 61 Fed Reg 4,722 (Feb 7, 1996).
[21] Endangered Species Act of 1973 §3(16).
[22] 61 Fed Reg 4722 (Feb 7, 1996).

addition to the lists of endangered and threatened wildlife and plants, reclassification, and **removal from the lists**: (Emphasis added)

1. Discreteness of the population segment in relation to the remainder of the species to which it belongs;

2. The significance of the population segment to the species to which it belongs; and

3. The population segment's conservation status in relation to the Act's standards for listing (i e , is the population segment, when treated as if it were a species, endangered or threatened?)

*Discreteness:* A population segment of a vertebrate species may be considered discrete if it satisfies either one of the following conditions:

1. It is markedly separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors. Quantitative measures of genetic or morphological discontinuity may provide evidence of this separation.

2. It is delimited by international government boundaries within which differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist that are significant in light of section 4(a)(1)(D) of the Act

*Significance* If a population segment is considered discrete under one or more of the above conditions, its biological or ecological significance will then be considered in light of Congressional guidance (see Senate Report 151, 96th Congress, 1st Session) that the authority to list DPS's be used " . . . sparingly" while encouraging the conservation of genetic diversity. In carrying out this examination, the Services will consider available scientific evidence of the discrete population segment's importance to the taxon to which it belongs. This consideration may include, but is not limited to, the following:

1. Persistence of the discrete population segment in an ecological setting unusual or unique for the taxon,

2. Evidence that loss of the discrete population segment would result in a significant gap in the range of the taxon,

3. Evidence that the discrete population segment represents the only surviving natural occurrence of a taxon that may be more abundant elsewhere as an introduced population outside its historic range, or

4. Evidence that the discrete population segment differs markedly from other populations of the species in its genetic characteristics.

Because precise circumstances are likely to vary considerably from case to case, it is not possible to describe prospectively all the classes of information that might bear on the biological and ecological importance of a discrete population segment.

*Status:* If a population segment is discrete and significant (i.e., it is a distinct population segment) its evaluation for endangered or threatened status will be based on the Act's definitions of those terms and a review of the factors enumerated in section 4(a). It may be appropriate to assign different classifications to different DPS's of the same vertebrate taxon.

* * *

Listing, delisting, or reclassifying distinct vertebrate population segments may allow the Services to protect and conserve species and the ecosystems upon which they depend before large-scale decline occurs that would necessitate listing a species or subspecies throughout its entire range. This may allow protection and recovery of declining organisms in a more timely and less costly manner, and on a smaller scale than the more costly and extensive efforts that might be needed to recover an entire species or subspecies. The Service's ability to address local issues (without the need to list, recover, and consult rangewide) will result in a more effective program. *Id.*

The FWS analyzed the Western Great Lakes (WGL) DPS applying the factors outlined in

the DPS policy and concluded that a WGL DPS was consistent with the requirements of the Act

and the policy.[23]

"The WGL DPS boundary includes all of Minnesota, Wisconsin, and Michigan; the part of North Dakota that is north and east of the Missouri River upstream as far as Lake Sakakawea and east of Highway 83 from Lake Sakakawea to the Canadian border; the part of South Dakota that is north and east of the Missouri River; the parts of Iowa, Illinois, and Indiana that are north of Interstate Highway 80; and the part of Ohio north of Interstate Highway 80 and west of the Maumee River (at Toledo)."

The FWS concluded that based on its review of the best available scientific data, the

WGL DPS is *discrete* from other wolf populations as a result of physical separation and the

---

[23] Vol 71, No 58 Fed Reg 15,274 (March 27, 2006).

international border with Canada.[24]  In delineating the boundary of the WGL DPS, the FWS

considered the current distribution of wolves in the Midwest and the characteristic movements of

gray wolves elsewhere.[25]  The WGL DPS includes the core recovered wolf population plus a

wolf movement zone.[26]  After studying movement data, the FWS found that "affiliation with the

Midwestern wolf population has diminished and is essentially lost when dispersal takes a

Midwest wolf a distance of 250-300 miles beyond the outer edge of the areas that are largely

continuously occupied by wolf packs."[27]  Even though some wolves may travel further, these

long range dispersers are unlikely to return and therefore, lose their functional connection with

and potential conservation value to the WGL population.[28]

        The FWS further concluded that "[t]he DPS is *significant* to the taxon to which it belongs

because it contains the only populations of the species in the Laurentian Mixed Forest Biotic

Province in the United States, it contains a wolf metapopulation that fills a large gap in the

historical range of the taxon; and it contains the majority of gray wolves in the conterminous

States."[29]

2   Significant Portion of the Range

a)    Statutory Text

        The ESA defines "endangered" as **"in danger of extinction throughout** all or **a**

**significant portion of its range** . ."[30]  "Threatened" is defined as "likely to become an

endangered species within the foreseeable future throughout all or a **significant portion of its**

---

[24] 72 Fed Reg 6060 (Feb 8, 2007).
[25] 72 Fed Reg 6060 (Feb 8, 2007).
[26] 72 Fed Reg 6060 (Feb 8, 2007).
[27] 72 Fed Reg 6061 (Feb 8, 2007).
[28] 72 Fed Reg 6061 (Feb 8, 2007).
[29] 72 Fed Reg 6061 (Feb 8, 2007).
[30] 16 USC §1532(6).

9

range."[31]  The word "range" in the phrase "significant portion of its range" (SPR), refers to the range in which the species currently exists, not to the historical range of the species where it once existed.

The Supreme Court has stated, "the starting point in every case involving construction of a statute is the language [of the statute] itself."[32]  If the meaning of the statutory language is plain, the inquiry normally ends.[33]  To determine the plain meaning, the words in a statutory provision that are not defined by the statute itself are customarily given their ordinary meaning.[34]  However, in determining the plain meaning[35]:

> a reviewing court should not confine itself to examining a particular statutory provision in isolation. The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context ... It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."

The meaning of "range" in the SPR phrase is not disputed. The dictionary definition of "range" as used in the statute at issue is "the region throughout which a kind of organism or ecological community naturally lives or occurs."[36]  The American Heritage Dictionary defines "range" in this context as "[t]he geographical region in which a kind of plant or animal normally lives or grows."[37] This definition is clear and has not been addressed by any court. Instead, the

---

[31] 16 USC §1532(20)(Emphasis added).

[32] *Landreth Timber Co v Landreth,* 471 US 681, 685 (1982); *See also Duncan v Walker,* 533 US 167, 172 (2001).

[33] *Lamie v United States Trustee,* 540 US 526, 534 (2004); *United States v Ron Pair Enters,* 489 US 235, 241 (1989).

[34] *BP Am Prod Co v Burton,* 127 S Ct 638, 643 (2006) (citing *Perrin v United States,* 444 US 37, 42 (1979)); *Williams v Taylor,* 529 US 420, 431 (2000).

[35] *Food & Drug Admin v Brown & Williams Tobacco Co,* 529 US 120, 132-33 (2000) (quoting *Davis v Michigan Dep't of Treasury,* 489 US 803, 809 (1989)).

[36] MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 964 (10th ed. 2000). The 1971 definition of "range" is identical. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1880 (16th ed 1971).

[37] AMERICAN HERITAGE DICTIONARY 1025 (2nd college ed 1985).

debate involves the question of whether the word "range" as used in the definition of "endangered species" is the historical or the current range of the species.

Context is the key to elucidating this issue. Under the definition, a species is "endangered" only if it "is in danger of extinction" in the relevant portion of its range. The phrase "is in danger" denotes a present-tense condition of being at risk of a future, undesired event.[38] Thus, it makes no sense to say that a species "is in danger" in an area where the species no longer exists, i.e., in its historical range. Such a construction would be inconsistent with common usage. "Range" as used in the ESA must mean "current range" rather than "historical range". When the Secretary determines whether a species is an endangered species, she must consider the "present" or "threatened" (i.e. future), rather than the past, "destruction, modification, or curtailment" of a specie's habitat or range.[39]

The statute requires the Secretary to consider whether a species "is in danger of extinction throughout . . . a significant portion of its range" not whether it is "extinct throughout . . . a significant portion of its range." This is an important distinction because the Ninth Circuit in a case upon which Plaintiffs rely heavily, opined that the Secretary must consider "the extinction throughout . . . a significant portion of its range" and therefore concluded that the Secretary's interpretation of the statute was due no deference.[40] However, if one looks at the actual statutory language that the Secretary must consider, i.e., whether a species is "in danger of extinction throughout . . . a significant portion of its range", it becomes clear that it is the **current** range rather than the historical range that is contemplated by the statute. A species cannot presently be

---

[38] "Danger" is defined as (among other things) "the state of being exposed to serious loss or injury," meaning that the loss has not yet happened. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 573 (2002). If a species has already become extinct in a particular area, it is not in "danger" there as the loss has already occurred.

[39] ESA § 4(a)(1)(A).

[40] *Defenders of Wildlife v Norton,* 258 F3d 1136, 1145 CA 9 2001).

"in danger of extinction" in that portion of its range where it "was once viable but no longer is"—if by the latter phrase the court meant lost historical habitat.[41]  In that portion of the range, the species is already extinct rather than "in danger of extinction".

In determining whether the gray wolf species is presently "in danger of extinction throughout . . . a significant portion of its range," the FWS properly focused on the range where the gray wolf currently exists, the WGL DPS, and found that it is not "in danger of extinction throughout . . . a significant portion of its range."  The fact that the gray wolf has ceased to exist in some portions of its historical range does not mean that it is in danger of extinction throughout a significant portion of its range.

In analyzing the "significant portion of the range" phrase, it is also necessary to review the meaning of the word "significant."  The statute does not provide a definition of "significant."  Thus, as with the word "range" it is appropriate to look at the ordinary meaning as provided by the dictionary.  The American Heritage Dictionary defines "significant" as "1.  Having or expressing a meaning; meaningful.  2.  Having or expressing a covert meaning; suggestive: *a significant glance.*  3.  Notable; valuable."[42]  Another dictionary includes "important, " "meaningful," "a noticeably or measurably large amount," or "suggestive."[43]  Given these different meanings, it is impossible to determine what Congress intended when using the term "significant" in the SPR phrase.  Since the statute does not define "significant" and since there is more than one ordinary meaning of "significant", it would seem that the Secretary has the discretion to interpret the term in a manner that is consistent with the purpose and intent of the

---

[41] *Defenders of Wildlife,* 258 F3d at 1145.

[42] AMERICAN HERITAGE DICTIONARY 1139 (2nd college ed 1985).

[43] MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1088 (10th ed 2000).  The 1971 definition of "significant" is "having or likely to have influence or effect" or "deserving of consideration."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2116 (16th ed 1971).  This edition does not include a meaning referring to a "large amount."

statute. The question becomes which meaning, "important" "meaningful", or "large amount" is the most appropriate interpretation in construing the SPR phrase? If one determines that the term "significant" should be construed as meaning "large amount", there are other questions that must be answered. What percentage of the range is "significant?" Is it 50%, 75%, or 80%, etc ? Of course, there is nothing in the statutory language to support a specific percentage to be equated to the term "significant". In addition, would the same size relationship be appropriately applied to every case and every species? It is possible that a very small portion of a range is "significant" in the case of a particular species because that particular portion is needed for continued reproduction of that species. In such a case, size would not be the "significant" portion of the range, rather importance to the survival of the species would be the most relevant factor.

In another case, this court adopted the "large amount" meaning without explanation or discussion of other possible meanings such as "important" or "meaningful."[44]

As the Supreme Court has stated, when there is ambiguity in the statute, as there is with the term "significant" in the case before this court, the Secretary has broad discretion to resolve the ambiguity[45]:

> In *Chevron*, this Court held that ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion. Filling these gaps, the Court explained, involves difficult policy choices that agencies are better equipped to make than courts. If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation.

The agency's discretion is circumscribed by considerations such as achieving the purposes of the statute, an interpretation that is consistent with the rest of the act without

---

[44] *Defenders of Wildlife v Norton,* 239 F Supp 2d 9, 19 (DDC 2002).

[45] *Nat'l Cable & Telecomms Ass'n v Brand X Internet Servs,* 545 US 967, 980 (2002) (internal citations omitted).

rendering other portions of the statute superfluous, legislative history, and judicial

interpretations.

The purposes of the ESA are[46]:

" . . . to provide a means whereby ecosystems upon which endangered species and
threatened species depend may be conserved, to provide a program for the
conservation of such endangered species and threatened species, and to take such
steps as may be appropriate to achieve the purposes of the treaties and
conventions set forth in subsection (a) of this Section.

Thus, the Secretary may lawfully define "significant" in terms of factors other than

simply size, or the "large amount" meaning that is found in some, but not all, dictionaries.

Conservation of the species may depend upon protecting biologically important portions of the

range rather than merely listing the species as endangered in the entire historic range.

As for legislative history, which is rather limited with respect to this particular term,

Senator Tunney's remarks on the Senate version of the ESA suggest that the range of a species

may be divided along political boundaries.[47]

[T]he Secretary may list an animal as "endangered" through all or a portion of its
range. An animal might be "endangered" in most States but overpopulated in
some. In a State in which a species is overpopulated, the Secretary would have
the discretion to list that animal as merely threatened or to remove it from the
endangered species list entirely while still providing protection in areas where it
was threatened with extinction. In that portion of its range where it was not
threatened with extinction, the States would have full authority to use their
management skills to insure the proper conservation of the species.

A well-known example may serve to illustrate how S 1983 provides for maximum
management and conservation discretion, while insuring absolute protection for
species imminently in danger of extinction . . . It is likely that in certain portions
of Louisiana, the American alligator may be relisted under this bill as a threatened
species [in response to the State of Louisiana allowing the harvest of alligators in
one parish to limit habitat destruction caused by overpopulation of alligators]. S.
1983 would permit continued State action to enhance the existence of this species.

---

[46] 16 USC § 1531(b).
[47] 119 Cong Rec 25,669 (July 24, 1973).

> In other areas the alligator would remain listed as an endangered species and
> would be entitled to absolute Federal or State protection . . .

Judicial interpretations of the term "significant" have not been consistent. There is only one district court opinion that based its ruling on the "large amount" meaning of "significant." The court provided no discussion or analysis to support its conclusion and relied upon one dictionary definition, that being the Webster's Ninth Collegiate Dictionary at 1096 (Merriam-Webster Inc. 1990).[48]

The Ninth Circuit rejected a completely quantitative approach to defining "significant," where a "bright line" or "predetermined" percentage of historical range loss is considered "significant" in all cases.[49] The Ninth Circuit seems to have concluded that "significance" in terms of range loss must be decided on a case by case basis taking into account not only the size of the range but also considering the biological importance of the range for a particular species.[50] The Ninth Circuit also rejected the notion that portion of a species' range is "significant" only if the threats present there are so severe that the species is in jeopardy of worldwide extinction.[51] Thus, it is fair to conclude that even the Ninth Circuit has recognized that the Secretary has wide discretion to interpret the term "significant" within the two limits described above.

In the case of the gray wolf, the Secretary properly considered the current range and concluded that the gray wolf population in the Western Great Lakes Distinct Population Segment is no longer endangered in a significant portion of the range.

---

[48] *Defenders of Wildlife v Norton,* 239 F Supp 2d 9, 19, (D D C 2002).
[49] *Defenders of Wildlife v Norton,* 258 F3d 1136, 1143 (CA 9, 2001).
[50] *Defenders of Wildlife v Norton,* 258 F3d 1136, 1143 (CA 9, 2001).
[51] *Id* at 1143, 1146.

b)    The legislative history of the ESA shows Congress intended
that the agency have the discretion to focus on threats within a
particular area

The legislative history of the ESA shows that Congress intended the secretary to have the
discretion to divide the range of a species along political boundaries and declare it endangered
only in States where the State authorities are not providing adequate protection of the species.

FWS may look at a portion of the entire range in evaluating the endangered status of a
particular species. The following excerpts from the Congressional Record reflect statements
made in the context of the enactment of the Endangered Species Act of 1973. With respect to
looking at a portion of the entire range rather than the entire range, Senator Spong posed the
following question[52]:

"As I understand it, a species could be declared endangered over part of its range
and not endangered in other parts. Is that correct? If so, how do you plan to
enforce it? Specifically, how would you deal with a commercial species which is
endangered in part of its range and abundant elsewhere?"

In response, Curtis Bohlen, the Deputy Assistant Secretary for Fish and Wildlife Parks, wrote:

"That is correct.

Although man's present ability to rapidly and drastically alter the environment
makes it possible for a species or subspecies to be forced from a secure status to a
hazardous one almost overnight, such happenings are the exception rather than the
rule. Usually it becomes apparent to scientists that a species is heading for
trouble long before it reaches the point at which it is threatened with extinction. It
is when such indicators - - unregulated commercial, or other overexploitation;
significant reductions in population; significant loss or threatened loss of habitat,
etc. - - are detected that an animal would become a candidate for the Endangered
Species List.

Quite commonly an animal's status does not deteriorate at the same rate
throughout its range. This is especially true for those whose range extends into
two or more nations, States, or other political subdivisions. This is so since the
well-being of most wildlife now is dependent upon the management and other

---

[52] 92nd Cong 109 (1972) (question from Senator Spong).

considerations it receives—or just as importantly, <u>fails</u> to receive—from the people and governments who control the land upon which it lives.

To more directly answer your question, let's assume a hypothetical situation involving a commercially valuable animal which occurs in three countries.[53] Let's assume, after the appropriate reviews, consultations, etc., that it is determined that

-in country "A" – a good management program exists; adequate unthreatened habitat is present; the population is healthy and produces a surplus which is harvested under a carefully regulated system,

-in country "B" – the animal is largely ignored and neither receives special management or protective attention nor is overexploited,

-in country "C" – no management program exists and the animal is being heavily overexploited.

Thus, this animal would be considered to be in good shape over part of its range (country "A"), holding its own in a second portion (country "B"), and in trouble in a third.

Under our present authority, no assistance could be given to this animal, since it is not "threatened with extinction." However, it is obvious that unless something acts on behalf of the animal, its extirpation in country "C" is imminent. Once that occurs, the same forces likely would shift their attention to the animal in country "B," thus making the species' continued existence dependent on the welfare of the remnant population in country "A."

* * *

It is our hope that this ability to apply selective protections would provide protection to those animals needing it, encourage the agencies which have management and protective authority to exercise that authority and allow the recognition of such efforts.[54]

---

[53]   The predecessor statute to the ESA, the Endangered Species Conservation Act of 1969, had defined "endangered species" as follows: "A species or subspecies of fish or wildlife shall be deemed to be threatened with **worldwide extinction** whenever the Secretary determines, based on the best scientific and commercial data available to him . . . that the continued existence of such species or subspecies of fish or wildlife is . . . endangered . . . The Endangered Species Conservation Act of 1969 § 3(a), 83 Stat 275, 275 (1969) (Emphasis added.)

[54]   92d Cong 109(1972)(statement of Curtis Bohlen, Deputy Assistant Secretary for Fish and Wildlife and Parks, Department of the Interior).

Dr. Earl Baysinger, Assistant Chief, Office of Endangered Species and International

Activities and Douglas Wheeler, Deputy Assistant Secretary for Fish and Wildlife and Parks

testified at hearings on S. 1592 introduced by Sens. Magnuson and Hatfied. S. 1592 did not, at

that time, contain any definitions of endangered or threatened species. However, administration

witnesses stated:

> Mr. Wheeler: [F]or the first time, under the authority of this bill, we would be
> able to fine-tune to the extent that we could prohibit the taking in that area where
> the condition of endangerment exists, and not in others.
>
> The law presently requires that we find a species to be endangered throughout all
> its range. We are not able to say that in Florida it exists but in Alaska it does not.
>
> Dr. Baysinger: If we were to find that the whistling swan was threatened within
> the territory of the United States, under the present law we would have to apply
> that endangered category to the swan throughout its range wherever it occurs,
> whether it be Alaska, Utah, or Maryland.
>
> Under the legislation we are talking about today, we would be able to fine tune
> that and take a look at the swan . . . [I]f this were an animal about which we were
> concerned, that was obviously getting in trouble in part of its range, for whatever
> reason, we would be able to sit down, look at the animal, determine with the other
> agencies with whom we are dealing what actions are needed to prevent that
> animal from deteriorating to the point where it would become endangered, make
> the finding that this animal is likely to become threatened over a portion of its
> range, and then apply such techniques as would be needed to prevent it from
> deteriorating further within that portion of its range.
>
> We don't have that authority under the existing act.
>
> Senator Cook: In other words, S. 1592 gives you a degree of selectivity that you
> never had before.
>
> Dr. Baysinger: Yes, it gives us a scalpel rather than a broad sword.[55]

In another hearing before the House Subcommittee on Fisheries and Wildlife

Conservation, Assistant Secretary Reed stated:

---

[55] 93rd Cong 60-62 (1973); See also Senator Tunney's remarks discussed in Section I.B.2b.
above.

[W]e find ourselves in a bind. We must [under the 1969 Act] put an animal on the endangered species list to give it protection over all of its range when it could be surplus in part of its range. The alligator, which for instance, in Florida and Louisiana are numerous and coming back may be able to stand a harvest. But, the alligator is in real trouble throughout the rest of its range.

The administration's bill gives the Secretary the power to allow harvest in areas where the animal is not presently threatened with extinction and protect [it] in areas where [it] is in trouble, that is, where [it] is likely to become threatened with extinction.[56]

Thus, the Secretary's decision to define and delist the WGL DPS is consistent with both

the text of the statute and the legislative history of the ESA.

C.    The FWS properly analyzed the Five Factors under Section 4 of the ESA.

When the FWS decides to list, delist, or reclassify a species under the ESA, the FWS

must analyze the five categories of threats set forth in Section 4(a)(1).[57] The five factors are:

(A) the present or threatened destruction, modification, or curtailment of its habitat or range;
(B) overutilization for commercial, recreational, scientific, or educational purposes;
(C) disease or predation;
(D) the inadequacy of existing regulatory mechanisms; or
(E) other natural or manmade factors affecting its continued existence

The Final Rule that removes the gray wolf in the Western Great Lakes Distind Population

Segment (WGL DPS), which includes Michigan, from the Federal list of threatened and

endangered species is, in part, based upon the five-factor analysis required by the statute.

---

[56] 93d Cong 207 (1973); *Endangered Species · Hearings on HR 37 and 4758 Before the Subcomm on Fisheries and Wildlife Conservation of the House Comm on Merchant Marine and Fisheries* (statement of Nathaniel Reed, Assistant Secretary for Fish and Wildlife and Parks, Department of Interior).
[57] 16 USC § 1533(a)(1).

1.      The Present or Threatened Destruction, Modification, or Curtailment of Its Habitat or Range

The FWS summarized its analysis of this factor as follows[58]:

The wolf population in the WGL DPS currently occupies all the suitable habitat area identified for recovery in the Midwest in the 1978 and 1992 Recovery Plans, which are the [significant portion of the range] SPR within the DPS, and most of the potentially suitable habitat in the WGL DPS. Unsuitable habitat, and the small fragmented areas of suitable habitat away from these core areas, are areas where viable wolf populations are unlikely to develop and persist. Although they may have been a historical habitat, many of these areas are no longer suitable for wolves, and none of them are important to meet the biological needs of the species. They therefore are not a SPR of the WGL DPS.

The WGL DPS wolf population exceeds its numerical, temporal, and distributional goals for recovery. A delisted wolf population would be safely maintained above recovery levels for the foreseeable future within the SPR of the DPS. Because much important wolf habitat in the SPR is in public ownership, the States will continue to manage for high ungulate populations, and the States, Tribes, and Federal land management agencies will adequately regulate human-cased mortality of wolves and wolf prey. This will allow these three States to easily support a recovered and viable wolf metapopulation into the foreseeable future. We conclude that gray wolves within the SPR in this DPS are not in danger of extinction now, or likely to be in danger of extinction in the foreseeable future, as a result of destruction, modification, or curtailment of the species' habitat or range.

2.      Overutilization for Commercial, Recreational, Scientific, or Educational Purposes

With respect to this factor, the FWS concluded that there is little likelihood that this factor poses a significant threat to the wolf population in the WGL DPS. Since wolves have been listed as endangered or threatened under the ESA, "no gray wolves have been legally killed or removed from the wild in any of the nine States included in the WGL DPS for either commercial or recreational purposes."[59] Although some wolves may have been illegally killed for commercial use of the pelts or parts, these incidents are rare.[60] The FWS concluded that the

---

[58] 72 Fed Reg 6,077 (Feb 8, 2007).

[59] 72 Fed Reg 6,077 (Feb 8, 2007).

[60] 72 Fed Reg 6,077 (Feb 8, 2007).

State wolf management plans for Minnesota, Wisconsin, and Michigan will adequately deter the illegal killing of wolves for these purposes for many years to come."[61]

The FWS summarized its analysis of this factor as follows[62]:

> Taking wolves for scientific or educational purposes in the other WGL DPS States may not be regulated or closely monitored in the future, but the threat to wolves in those States will not be significant to the long-term viability of the wolf population in the WGL DPS. The potential limited commercial and recreational harvest that occur in the DPS will be regulated by State and/or Tribal conservation agencies and is discussed under Factor D. Therefore, we conclude that overutilization for commercial, recreational, scientific, or educational purposes will not be a threat sufficient to cause the WGL DPS gray wolves to be in danger of extinction in the foreseeable future in all or a significant portion of the range within the WGL DPS.

### 3. Disease or Predation

The FWS reviewed and analyzed a number of diseases that have been reported for the gray wolf. Specifically, the diseases addressed in the Final Rule are canine parvovirus (CPV), sarcoptic mange, lyme disease, dog louse, canine distemper virus (CDV), rabies, canine heartworm, blastomycosis, bacterial myocarditis, granulomatous pneumonia, brucellosis, leptospirosis, bovine tuberculosis, hookworm, coccidiosis, and canine hepatitis.[63] Even though there has been documented mortality for individual wolves, reduced longevity and fecundity of individuals or entire packs, and potentially attenuated wolf population growth from some of these diseases, "the overall trend for wolf populations in the WGL DPS continues to be upward."[64] The FWS concluded that "diseases and parasites will not prevent the continuation of wolf recovery or the maintenance of viable wolf populations in the DPS.[65] The FWS further concluded that delisting wolves in the WGL DPS should not significantly change the incidence

---

[61] 72 Fed Reg 6,077 (Feb 8, 2007).

[62] 72 Fed Reg 6,077 (Feb 8, 2007).

[63] 72 Fed Reg 6,080 (Feb 8, 2007).

[64] 72 Fed Reg 6,081 (Feb 8, 2007).

[65] 72 Fed Reg 6,081 (Feb 8, 2007).

or impacts of disease and that diseases and parasites "will not be threats sufficient to cause the WGL DPS gray wolves to be in danger of extinction in the foreseeable future in all or a significant portion of the range within the WGL DPS."[66]

### 4.    Inadequacy of Existing Regulatory Mechanisms

The FWS analyzed this factor and concluded that "over a significant portion of the WGL DPS range, there are adequate regulatory mechanisms to ensure that this population of gray wolves is neither threatened nor endangered."[67] This conclusion is based on a review of applicable state laws and wolf management plans. Of particular importance is that the three states (Michigan, Wisconsin, and Minnesota) in which the core wolf populations occur, have plans in place to maintain viable wolf populations. Importantly, these three states have applicable laws and programs to: deter illegal killing of wolves; manage problem wolves without harm to their populations; and monitor trends in population size. Individually, the three states take a conservative approach to wolf management because they treat wolves within their jurisdictions as an isolated population that receives no genetic or demographic benefits from immigrating wolves. This approach provides strong assurances that the gray wolf will remain viable in each state for the foreseeable future. In addition, Michigan, Wisconsin, and Minnesota have been leaders in wolf recovery efforts and have repeatedly demonstrated their commitment to the maintenance of viable wolf populations.

### 5.    Other Natural or Manmade Factors Affecting Its Continued Existence

In evaluating this factor, the FWS concluded that there may be some Tribal taking of wolves after the delisting.[68] The Tribal interest in taking wolves is largely based upon traditional

---

[66] 72 Fed Reg 6,081 (Feb 8, 2007).
[67] 72 Fed Reg 6,083 (Feb 8, 2007).
[68] 72 Fed Reg 6099 (Feb 8, 2007).

ceremonial purposes.[69]  However, the FWS found that the small "number of wolves that may be taken by Native Americans will not be a threat sufficient to cause the WGL DPS gray wolves to be in danger of extinction in the foreseeable future in all or a significant portion of the range within the WGL DPS."[70]  In addition, even though the wolf may be removed from the federal list of endangered species, it is still a protected species under Michigan law.  See Attachment 1, Hogrefe Declaration, ¶ 19.

In order to insure long-term survival of the gray wolf population, it is important to properly manage the conflicts between human activities and wolves.[71]  If the populace does not have any recourse when there are incidents such as wolves taking livestock or pets, public support for wolf recovery programs will likely diminish.[72]  The delisting of the gray wolf gives the State and the Tribes more flexibility in minimizing wolf conflicts with human activities.[73]

Based upon the foregoing discussion, it is evident that the FWS manner of delisting of the gray wolf in the WGL DPS was within the discretion of the Secretary and consistent with the applicable statutes.  Therefore, the *amici curiae* urge this court to uphold the FWS's delisting rule.

## II.    The Michigan gray wolf population is no longer endangered and was properly delisted by the FWS.

In determining that the gray wolf in the WGL DPS was no longer endangered within the meaning of the ESA, the FWS found that gray wolf population in Michigan was no longer endangered based upon the following analysis:

---

[69] 72 Fed Reg 6099 (Feb 8, 2007).

[70] 72 Fed Reg 6099 (Feb 8, 2007).

[71] 72 Fed Reg 6099 (Feb 8, 2007).

[72] 72 Fed Reg 6099 (Feb 8, 2007).

[73] 72 Fed Reg 6100 (Feb 8, 2007).

Prior to 1991, and excluding Isle Royale,[74] the last known breeding population of wild Michigan wolves occurred in the mid-1950s. However, as wolves began to reoccupy northern Wisconsin, the Michigan Department of Natural Resources (MI DNR) began noting single wolves at various locations in the UP [Upper Peninsula] of Michigan. In 1989, a wolf pair was verified in the central UP, and it produced pups in 1991. Since that time, wolf packs have spread throughout the UP, with immigration occurring from Wisconsin on the West and possibly from Ontario on the east. They now are found in very county of the UP, with the possible exception of Keweenaw County (Huntzinger et al 2005).[75]

\* \* \*

During the winter of 2004-05, at least 87 wolf packs were resident in the UP (Huntzinger et al 2005).

\* \* \*

Annual surveys have documented minimum late-winter estimates of wolves occurring in the UP as increasing from 57 wolves in 1994 to 434 in 91 packs in 2006.[76]

[T]he number of wolves in the Michigan UP wolf population by itself has surpassed the recovery criterion for a second population in the eastern US (i.e., 100 wolves for a minimum of 5 consecutive years, based on 6 late-winter estimates), as specified in the Federal Recovery Plan, since 2001. In addition, the UP numbers have now surpassed the Federal criterion for an isolated wolf population of 200 animals for 6 successive late-winter surveys (USFWS 1992, pp 24-26).[77]

---

[74] The wolf population of Isle Royale National Park, Michigan, is not considered to be an important factor in the recovery or long-term survival of wolves in the WGL DPS. This is a small and isolated wolf population that probably has not had any contact with mainland wolf populations since its founding pair crossed the Lake Superior ice in the late 1940s (Peterson et al 1998, p 828). This wolf population lacks sufficient genetic uniqueness (Wayne et al. 1991, pp 47-49), and due to the island's small size, cannot satisfy the discreteness criterion for a separate DPS. For these same reasons it will not make a significant numerical contribution to gray wolf recovery, although long-term research on this wolf population has added a great deal to our knowledge of the species. 416 AR, pp 11262-63.
[75] 416 AR, p 11260; 72 Fed Reg 6055 (Feb 8, 2007).
[76] 416 AR, pp 11260-11263;
[77] 416 AR, p 11262; 72 Fed Reg 6055 (Feb 8, 2007)

The FWS concluded that "(n)either the 1978 nor the 1992 recovery criteria suggest that the restoration of the gray wolf throughout all or most of its historical range in the eastern US, or to all of these potential re-establishment areas, is necessary to achieve recovery under the Act.[78]

It should be noted that delisting the gray wolf in the WGL DPS does not change the status of the gray wolf in other areas of the other states.[79]

In their Statement of Material Facts not in Genuine Dispute, Plaintiffs have made a number of allegations specifically pertaining to the State of Michigan's wolf management activities:  1) that Michigan's wolf management plan will not be fully implemented; 2) that there is a lack of funding for state plans; 3) that human caused mortality is a serious problem; 4) that most costs of wolf management were borne by the federal government; and 5) that Michigan has asked for federal funds as evidence that the Michigan wolf management plan is not adequately funded.  (See Plaintiffs' Statement of Material Facts not in Genuine Dispute, ¶¶ 37, 38, 43, 46, 48, and 51)

Contrary to Plaintiffs' assertions, the Michigan DNR has taken the lead in protecting the Michigan gray wolf population and that federal delisting in the WGL DPS which includes Michigan does not abrogate Michigan's responsibility for managing its gray wolf population. (Attachment 1, Hogrefe Declaration, ¶ 4).  The Michigan DNR is committed to maintaining a viable Michigan wolf population above the level that would warrant its classification as threatened or endangered at either the State of federal level.  (Attachment 1, Hogrefe Declaration, ¶ 11).  This commitment has been memorialized in the rule-making process. (Attachment 1, Hogrefe Declaration, ¶ 12).  In addition, Michigan laws and regulations

---

[78] 416 AR, p 11249; 72 Fed Reg 6053 (Feb 8, 2007).
[79] 467 AR , pp 12786-96, 12833; 72 Fed Reg 6064-6065, 6101 (Feb 8, 2007).

protecting wolves remain in effect and continue to be enforced.[80]  (Attachment 1, Hogrefe

Declaration, ¶ 19)

For example, the FWS's delisting decision does not affect the amount of funding that the

State will allocate to wolf management as the federal government has provided very little ESA

funding to help Michigan manage its wolves for the past 10 years  (Attachment 1, Hogrefe

Declaration, ¶ 5)  Specifically, in Fiscal Year 2005, Michigan DNR expenditures for wolf

management are very conservatively estimated as being approximately $476,000.  (Attachment

1, Hogrefe Declaration, ¶ 7)  These costs were associated with population monitoring, research,

field staff training, responding to nuisance-animal and depredation complaints, depredation

control activities, and reimbursement for wolf depredation of livestock.  (Attachment 1, Hogrefe

Declaration, ¶ 7)  During this time, United States Fish and Wildlife Service contributed virtually

no money to these activities in Michigan.  (Attachment 1, Hogrefe Declaration, ¶ 7)  Moreover,

this expenditure estimate does not include costs expended on education and outreach efforts,

interaction with other agencies, wolf planning activities, and law enforcement activities

(Attachment 1, Hogrefe Declaration, ¶ 7)

Law enforcement activities have been primarily paid for with State rather than federal

funds.  (Attachment 1, Hogrefe Declaration, ¶ 8)  State law enforcement officials have conducted

most investigations and enforcement related to illegal wolf killings in Michigan.  (Attachment 1,

Hogrefe Declaration, ¶ 8)  For 2005, 2006, and the beginning of 2007, Michigan DNR law

enforcement officials investigated or pursued prosecution of 22 wolf-related violations at

considerable expense.  (Attachment 1, Hogrefe Declaration, ¶ 8)  During this same time frame,

---

[80] Mich Comp Laws 324.36501 *et seq*; Mich Comp Laws 287.1001 *et seq*; and the Michigan
Wildlife Conservation Order which can be found on the Michigan DNR website at
www.Michigan.gov/dnr .

federal law enforcement officials investigated or pursued prosecution of only one wolf-related violation. (Attachment 1, Hogrefe Declaration, ¶ 8)  The very few federal agents stationed within the wolf range in Michigan precludes their involvement in most cases and the burden to enforce wolf-related violations will continue to rest with the State (Attachment 1, Hogrefe Declaration, ¶ 8)  Furthermore, the Michigan DNR is not aware of any wolf-related violations that have been prosecuted under the ESA; rather, law enforcement actions have been conducted under State law and regulations. (Attachment 1, Hogrefe Declaration, ¶ 9)

The Michigan DNR acknowledges that the United States Department of Agriculture (USDA) Animal and Plant Health Inspection Wildlife Service (APHIS) has provided an important federal contribution to wolf management in Michigan  Continuation of that contribution is not expected to change as a result of the delisting rule. (Attachment 1, Hogrefe Declaration, ¶ 10)

Although Michigan's wolf management plan was undergoing revision during the time the delisting rule-making process was underway, the 1997 wolf management plan has remained in effect at all times. (Attachment 1, Hogrefe Declaration, ¶ 13.)  At no time has there been a gap in the wolf management activities or legal protection. (Attachment 1, Hogrefe Declaration, ¶ 18)  Wolf management plan revisions are necessary to allow the State to respond to changes in local wolf populations, changes in environmental conditions, improved understanding of wolf biology, changes in public attitudes, and improvements in technology. (Attachment 1, Hogrefe Declaration, ¶ 17)  This is necessary to comply with ESA's requirement of basing decisions on the best available scientific and commercial data.[81]

_____

[81] 16 USC § 1533(b)(1)(A).

Plaintiffs also assert that Michigan's implementation of a new methodology for population monitoring is suspect and was implemented primarily to cut costs. (See Plaintiffs' Statement of Material Facts not in Genuine Dispute ¶¶ 46 and 51). The Michigan DNR has developed and implemented a new wolf population monitoring methodology in order to be able to monitor the now larger wolf population more effectively and efficiently. (Attachment 1, Hogrefe Declaration, ¶ 24) The new methodology is expected to provide more reliable and accurate population estimates of a wolf population that has increased considerably since the initial methodology was developed. (Attachment 1, Hogrefe Declaration, ¶ 24) The methodology has been evaluated by respected scientists and has been tested in the field. (Attachment 1, Hogrefe Declaration, ¶ 24)

The Plaintiffs assert that "[c]ollectively, the Minnesota, Wisconsin, and Michigan wolf management plans would permit nearly a 50% decline in the Great Lakes wolf population . . ." (See Plaintiffs' Statement of Material Facts not in Genuine Dispute ¶ 39) The Michigan DNR has indicated the winter Michigan wolf population must consistently include no fewer than 200 wolves to preclude the need for its classification as threatened or endangered. (Attachment 1, Hogrefe Declaration, ¶ 30). The identified minimum level of 200 wolves should not be interpreted as a maximum abundance goal. The Michigan DNR has not established a goal for the maximum number of wolves in Michigan and has no plans to reduce or limit the number of wolves in Michigan to a certain level. (Attachment 1, Hogrefe Declaration, ¶ 30)

Plaintiffs' Statement of Material Facts not in Genuine Dispute alleges that human-caused mortality, including vehicle accidents and illegal trapping and shooting as well as disease are serious threats to the gray wolf. (See Plaintiffs' Statement of Material Facts not in Genuine Dispute, ¶¶ 48 and 49) Simply because a particular factor is a leading cause of mortality does

28

not mean that the factor in question is a threat to the viability of a population. The viability of any population depends on the rate of mortality in relation to birth, immigration, and emigration rates. If birth and immigration rates equal or exceed mortality and emigration rates, the viability of the wolf population will not be threatened regardless of whether the leading cause of death is starvation, intraspecific aggression, disease, vehicle collision, illegal killing, or some other factor. (Attachment 1, Hogrefe Declaration, ¶ 25) Trends in Michigan over the past two decades show that rates of mortality have not been a problem for sustaining a viable wolf population. If mortality rates, birth rates, and dispersal rates remain in relative proportion to current levels, the wolf population in Michigan will continue to grow. (Attachment 1, Hogrefe Declaration, ¶ 27)

In sum, Plaintiffs claims with respect to the alleged inadequacy of the State of Michigan DNR's wolf management plan and the implementation thereof are without merit. The data in the record relied upon by the FWS show that wolf population in Michigan is thriving and all indications are that Michigan will continue to maintain a viable wolf population into the foreseeable future.

## CONCLUSION

Since the FWS Final Rule delisting of the gray wolf in the WGL DPS was lawful, it

should be upheld.

> Respectfully submitted,
>
> Michael A. Cox
> Attorney General
>
>   /s/ Marie Shamraj
> Marie Shamraj (P44481)
> Robert P. Reichel (P31878)
> Assistant Attorneys General
> Environment, Natural Resources,
> and Agriculture Division
> on behalf of the Michigan
> Department of Natural Resources
> 525 W. Ottawa, 6th Fl, Williams Bldg.
> P.O. Box 30755
> Lansing, MI   48909
> shamrajm@michigan.gov
> (517) 373-7540
>
>   /s/ Paul Morrison
> Paul Morrison, KS 10427
> Attorney General for the State of Kansas
> Memorial Hall, 2nd Floor
> 120 SW 10th Street
> Topeka, KS 66612
> (785) 296-2215
> 1-888-428-8436
> (785) 296-6296 fax
>
>   /s/ Morgain M. Sprague
> Morgain M. Sprague (ky89528)
> General Counsel
> Kentucky Department of Fish
>    and Wildlife Resources
> #1 Sportsman's Lane
> Frankfort, KY 40601
> Morgain.Sprague@ky.gov
> (859) 564-3400

Lori Swanson
Attorney General, State of Minnesota

 /s/ David W. Merchant
David W. Merchant (D.C. Bar No. 375864)
David P. Iverson (Minn. Bar No. 180944)
Assistant Attorneys General
Attorneys for Minnesota Department of
Natural Resources
445 Minnesota Street, Suite 1100
St. Paul, Minnesota 55101-2128
(651) 297-4217 (Voice)

 /s/ Tracy E. McGinnis
Tracy E. McGinnis
Missouri Bar No. 40551
General Counsel
Missouri Department of Conservation
P.O Box 180
Jefferson City, Missouri 65102-0180
Tracy.McGinnis@mdc.mo.gov
Phone: 573-522-4115 x 3210

 /s/ Wayne Stenehjem
Wayne Stenehjem (Bar No. 03442)
Attorney General of North Dakota
600 E. Boulevard Avenue
Bismarck, ND 58505-0040
wstenehjem@nd.gov
Phone (701) 328-2210
Facsimile (701) 328-4300

 /s/ J. Anthony Logan
J. Anthony Logan, OH 007257
Chief Legal Counsel
Ohio Department of Natural Resources,
Division of Wildlife
2045 Morse Road, D-3
Columbus, OH 43229
Tony.Logan@dnr.state.oh.us
(614) 265-6819

  /s/ J. B. VanHollen
J. B. Van Hollen (Bar No. 1007743)
Attorney General of Wisconsin
Wisconsin Department of Justice
17 W. Main Street
Madison, WI  53703
DawsonTJ@doj.state.wi.us
(608) 266-1221

  /s/ M. Carol Bambery
M. Carol Bambery, (P37591) Counsel
On behalf of the Association of Fish &
Wildlife Agencies
444 N. Capitol Street, N.W. Suite 725
Washington, D.C. 20001
CBambery@fishwildlife.org
(202) 624-3687

and also on behalf of the Midwest
Association of Fish and Wildlife Agencies
and its member agencies:

Iowa Department of Natural Resources
502 E. 9th St., Wallace Bldg
Des Moines, IA 50319
(515) 281-5145

Nebraska Game & Parks Commission
P. O. Box 30370
Lincoln, NE 68503
(402) 471-0641

South Dakota Game, Fish
 and Parks Department
523 East Capitol
Pierre SD  57501-3182
(605) 773-3387/fax (605) 773-6245

Date:  January 18, 2008

S: NR/AC/cases/20073001321-B-:L/wolf delisting dnr brief 6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| HUMANE SOCIETY OF THE UNITED STATES, *et al*, | ) ) | |
| | ) | Civil No. 1:07-cv-00677-PLF |
| Plaintiffs, | ) ) | |
| v | ) ) | |
| KEMPTHORNE, *et al*, | ) ) | |
| Defendants, | ) ) | |
| U.S. SPORTSMEN'S ALLIANCE, FOUNDATION, *et al*, | ) ) ) | |
| Intervenor-Defendants, | ) ) | |
| SAFARI CLUB INTERNATIONAL, *et al*, | ) ) | |
| Intervenor-Defendants. | ) ) ) | |

## DECLARATION OF TODD HOGREFE

1.     I have personal knowledge of the facts asserted in this declaration, and if called as a witness, I am competent to testify to these facts under oath.

2     I am the Endangered Species Coordinator for the Michigan Department of Natural Resources (DNR). In this position, I coordinate the statewide Michigan threatened and endangered species program, prepare and review wildlife-focused plans and technical reports, administer State natural-resource regulations (including the Michigan Endangered Species Protection Law), and facilitate compliance with federal natural-resource regulations (including the federal Endangered Species Act). I have held my current position since May 2004.

3.    I have direct personal knowledge of the biology and status of wolves in Michigan, wolf management in Michigan, State and federal regulations pertaining to wolves in Michigan, and attitudes held by Michigan residents regarding wolves. I took a lead role in the preparation of the 384-page *Review of Social and Biological Science Relevant to Wolf Management in Michigan* (Beyer et al. 2006), and I am the primary author of the draft updated *Michigan Wolf Management Plan* (Michigan DNR 2007).

4.    The Michigan DNR has the primary responsibility and statutory authority for the management of resident Michigan wildlife, including wolves. The federal status of wildlife as threatened or endangered does not abrogate this responsibility or authority. Accordingly, the State of Michigan has always borne the majority of costs and responsibilities of wolf management in Michigan and will continue to do so, regardless of the federal status of wolves.

5.    The federal status of wolves in the western Great Lakes region does not affect the amount of funding available to the State of Michigan for wolf management. The federal government has not provided the State of Michigan with any substantive Endangered Species Act (ESA) funding to help it manage wolves in more than 10 years; when ESA funding was provided, its amount was small in relation to the total cost of the wolf-management program. The federal government has not provided the State of Michigan with any other funding specifically for the management of wolves. The federal status of wolves does not affect the availability of other, non-federal sources of funding the State of Michigan uses to manage wolves.

6.    Relatively few costs and responsibilities of on-the-ground wolf management in Michigan were borne by the federal government while wolves were federally classified as threatened or endangered.

7.    As an example, Fiscal Year 2005 was typical in terms of recent annual agency expenditures on wolf management. Michigan DNR expenditures that can be directly attributed to the wolf-management program during that period have been estimated at approximately $476,000. This figure is an underestimate of the actual Michigan DNR expenditures during that period because it does not reflect charges to multi-use cost codes that prevent determination of costs incurred for a particular species or project. Costs not reflected in the figure are substantial, and include those for education and outreach efforts, interaction with other agencies, certain wolf-planning expenses, and wolf-related expenses of the Michigan DNR Law Enforcement Division. The costs reflected in the $476,000 figure were associated with population monitoring, research, training of field staff, responses to nuisance-animal and depredation complaints, depredation control activities, and reimbursement for wolf depredation of livestock. During the same time period, the U.S. Fish and Wildlife Service expended virtually no money or staff time on those activities in Michigan.

8.    Contributions toward wolf-related law enforcement in Michigan have also been predominantly State rather than federal. State law enforcement officials have conducted most investigations and enforcement related to illegal wolf killings in Michigan. For example, from the beginning of 2005 to the date of the final delisting rule, Michigan DNR law enforcement officials investigated or pursued prosecution of 22 wolf-related violations, at considerable expense. By contrast, federal law enforcement officials investigated or pursued prosecution of one wolf-related violation during that time period (Agent James Fuller, U.S. Fish and Wildlife Service, personal communication). The extremely small number of federal agents stationed within wolf range in the region precludes their involvement in most cases. State of Michigan

3

law enforcement officials will continue to take the lead on most wolf-related violations, as they have in the past, regardless of the federal status of wolves.

9.    To my knowledge, no violations involving the illegal killing of a wolf in Michigan have been prosecuted under the federal Endangered Species Act. Instead, prosecutions have been made under State regulations, which remain in effect and continue to be enforced. In this sense, compared to the federal Endangered Species Act, Michigan regulations have been more of a practical deterrent to the illegal killing of wolves.

10.    An important federal contribution to wolf management in Michigan has been the work conducted by the United States Department of Agriculture (USDA) Animal and Plant Health Inspection Service (APHIS) Wildlife Services. USDA APHIS Wildlife Services personnel have been involved with the wolf program in Michigan since 2000 and have played a key role in population monitoring, research, training of field staff, and program planning. The continuing participation of USDA APHIS Wildlife Services in the Michigan wolf-management program does not depend on the federal status of wolves.

11    The Michigan DNR is committed to maintaining a viable Michigan wolf population above a level that would warrant its classification as threatened or endangered at either the State or federal level. In the context of the Michigan DNR's mission and its public trust responsibilities for the State's natural resources, the maintenance of a viable wolf population is an appropriate and necessary goal.

12    The Michigan DNR has communicated this commitment to the U.S. Fish and Wildlife Service in multiple letters, documents, meetings and conversations. AR Doc. 228 at 8286; AR Doc. 418 at 11491; AR Doc. 418 at 11496; also Michigan DNR 1997, 2007.

13.    The *Michigan Gray Wolf Recovery and Management Plan* (Michigan DNR 1997) has been and continues to be the plan that guides State wolf management in Michigan. The U.S. Fish and Wildlife Service has indicated its support for the wolf-management approach outlined in the plan. AR Doc. 467 at 12824.

14.    The Michigan DNR will continue to conduct wolf management in Michigan under the guidance of a wolf management plan that is designed to maintain a viable wolf population above a level that would warrant its classification as threatened or endangered (Michigan DNR 1997, 2007).

15.    The Michigan DNR is currently revising its wolf management plan through a process that includes review of the best available scientific information and substantial public involvement. The process involves the following phases, presented in general sequence: 1) intra- and inter-agency scoping; 2) public meetings and comment period; 3) focus-group meetings; 4) public-attitude surveys; 5) review of biological and social science relevant to wolf management in Michigan; 6) development of guiding principles by a 20-member citizen advisory group; 7) plan writing; and 8) public review and comment. This process began in 2004 and is expected to conclude in winter or spring 2008. The most-recent draft of the revised wolf management plan is available on the Michigan DNR website at www.michigan.gov/dnr (Click on the link for 'Wildlife & Habitat' and then the link for 'Draft Wolf Management Plan').

16.    The Michigan DNR has undertaken revision of its wolf management plan with the understanding that the U.S. Fish and Wildlife Service may re-classify wolves as federally threatened or endangered if it finds that implementation of the revised plan would not adequately conserve the species.

5

17.    Wolf-plan revisions allow State agencies to address and respond to changes in local wolf populations, environmental conditions, understanding of wolf biology, public attitudes, and technology. Only through periodic plan revisions will wolves be managed based on the best available scientific information.

18.    The Michigan wolf-plan revision process has in no way caused a gap in Michigan's regulatory mechanisms regarding wolves. The *Michigan Gray Wolf Recovery and Management Plan* (Michigan DNR 1997) has been and continues to be the plan that guides State wolf management in Michigan. It will remain effective until a new, revised plan is finalized.

19.    The Michigan laws and regulations that protect wolves have remained in effect and continue to be enforced. These laws and regulations include the Michigan Endangered Species Protection Law (Michigan Public Act 451 of 1994, Part 365), Mich. Comp. Laws 324.36501 *et seq.*; the Michigan Wolf–Dog Cross Act (Public Act 246 of 2000), Mich. Comp. Laws 287.1001 *et seq.*; and the Michigan Wildlife Conservation Order. The Michigan Wildlife Conservation Order can be viewed on the Michigan DNR website at www.michigan.gov/dnr (Click on the link for 'Inside DNR,' then the link for 'Laws & Legislation,' and then the link for 'Wildlife Conservation Orders').

20.    Funding and implementation of the Michigan wolf management plan has been and continues to be adequate to maintain a viable Michigan wolf population above a level that would warrant its classification as threatened or endangered. The Michigan wolf population exceeded the plan's population abundance goal within 4 years of plan finalization. Moreover, the level of funding and implementation of the Michigan plan facilitated a 450% increase in the wolf population between 1997 and 2007. Recent data indicate a continuing upward population

trend. The combined Michigan–Wisconsin wolf population currently exceeds federal recovery criteria by more than ten times.

21.    As part of the comments on the draft delisting rule, the Michigan DNR made a petition to the U.S. Fish and Wildlife Service for funding assistance. The petition was presented in the following context:

> 'Following delisting, we will conduct management to ensure the persistence of a viable wolf population in Michigan and thus preclude the need for its reclassification as threatened or endangered under State or Federal law. We will also continue to monitor the population. This action will help the U.S. Fish and Wildlife Service comply with the Federal Endangered Species Act, which requires post-delisting monitoring for a minimum of five years. Monitoring during this period will require substantial commitment of agency resources, and in the spirit of continuing partnership, we request Federal funding assistance to implement a post-delisting monitoring plan. We look forward to opening a dialogue with you to discuss the funding required for this purpose.' AR Doc. 228 at 8286

That text in no way suggests the Michigan DNR lacks the funding necessary to conduct post-delisting monitoring. Rather, the text asks the U.S. Fish and Wildlife Service to share the costs of a program which it is required to implement. This is an example of a request made on principle rather than need. Since those comments were submitted, the Michigan DNR and USDA APHIS Wildlife Services have continued to conduct wolf population monitoring in Michigan without funding assistance from the U.S. Fish and Wildlife Service.

22.    The Michigan DNR, with the cooperation of USDA APHIS Wildlife Services, has implemented and will continue to implement an effective wolf population monitoring program. Despite suggestions by the Plaintiffs, the September 2004 draft 5-year evaluation of the Michigan wolf plan does not conclude that population monitoring or disease monitoring was inadequate. Rather, it indicates 'the majority of plan direction on research and monitoring was implemented and accomplished.' AR Doc. 142 at 767.

23.    The aspects of monitoring that were not implemented and accomplished at the time of the 5-year evaluation pertained primarily to social-attitude research rather than assessment of the biological status of the wolf population. The evaluation states that '[a]lthough some work on public attitudes towards wolves was completed during the last five years, the work was limited in scope and the effort needs to be expanded. Additional research on public attitudes towards wolves and wolf management options is needed.' AR Doc. 142 at 767. To address this need, the Michigan DNR funded an extensive study of attitudes held by Michigan residents regarding wolves. This multi-year study was completed by Michigan State University in 2006 (Beyer et al. 2006).

24.    The Michigan DNR recently developed and implemented a new wolf population monitoring methodology (Potvin et al. 2005, Drummer 2006). The original methodology became less efficient and reliable as the Michigan wolf population grew, because it was designed to track a relatively small number of wolves. The new methodology is expected to save time and money while providing reliable and accurate population estimates. The new methodology has been described in a peer-reviewed journal, has been evaluated by respected scientists, has been tested in the field, and is widely considered to be an effective, reliable technique for estimating wolf population size.

25.    The viability of any population depends on the rate of mortality in relation to birth, immigration and emigration rates. If birth and immigration rates equal or exceed mortality and emigration rates, viability of the wolf population will not be threatened, regardless of whether the leading cause of death is starvation, intraspecific aggression, disease, vehicle collision, illegal killing, or another factor.

8

26     The viability of a population does not depend on the relative contributions of different mortality factors toward overall mortality rate. In other words, simply because a particular factor is a leading cause of mortality does not mean that factor is a threat to the viability of a population. Harvest by hunters is the largest source of mortality in white-tailed deer in Michigan (Rodney Clute, Michigan DNR, personal communication), but no informed person would argue that hunting under current Michigan regulations threatens the viability of the Michigan deer population. Cardiovascular disease may be a leading killer of humans worldwide, but no informed person would argue that its current prevalence threatens us with extinction. Similarly, certain human activities may be the leading cause of wolf mortality in the western Great Lakes region, but the current prevalence of those activities does not threaten the wolf population.

27.    Trends in Minnesota, Wisconsin and Michigan over the past two decades show that rates of human-caused mortality (or mortality in general) have not been a problem for sustaining viable wolf populations. The population in Minnesota has increased and remained stable at a level that is double the federal recovery criterion for abundance. From 1994 to 2007, the Michigan population grew at an average annual rate of 19%. Similar growth has been observed in Wisconsin. Combined, the Michigan–Wisconsin wolf population exceeds the federal recovery criterion for abundance by more than ten times. If human-caused mortality rates (or overall mortality rates), birth rates, and dispersal rates remain in relative proportion to current levels, the wolf population in Michigan will continue to grow.

28.    Disease may be a leading cause of wolf mortality in the western Great Lakes region, but its current prevalence does not threaten the wolf population, for the same reason that human-caused mortality does not threaten the wolf population.

29.    The Michigan DNR will continue to monitor wolf health through necropsies of dead wolves and analysis of biological samples from captured live wolves (Michigan DNR 1997, 2007).

30.    The Michigan DNR has indicated the winter Michigan wolf population must consistently include no fewer than 200 wolves to preclude the need for its classification as threatened or endangered (Michigan DNR 1997, 2007). The identified minimum level of 200 wolves should not be interpreted as a maximum abundance goal. The Michigan DNR has not and does not intend to establish a goal for the maximum number of wolves in Michigan. Therefore, the Michigan DNR has no plans to reduce or limit the number of wolves in the State to a certain level.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

January 14, 2008

_____
Todd C. Hogrefe

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

HUMANE SOCIETY OF THE )
UNITED STATES, *et al,* )
                      )
       Plaintiffs, )
                      )
v )
                      )
KEMPTHORNE, *et al,* )
                      )
       Defendants, )
                      )
U.S. SPORTSMEN'S ALLIANCE, )
FOUNDATION, *et al,* )
                      )
       Intervenor-Defendants, )
                      )
SAFARI CLUB INTERNATIONAL, *et al,* )
                      )
       Intervenor-Defendants. )

Civil No. 1:07-cv-00677-PLF

**ORDER ON MOTION OF THE *AMICI CURIAE*, THE MICHIGAN**
DEPARTMENT OF NATURAL RESOURCES; THE STATE OF **KANSAS**; THE
**KENTUCKY** DEPARTMENT OF FISH AND WILDLIFE RESOURCES; THE
**MINNESOTA** DEPARTMENT OF NATURAL RESOURCES; THE **MISSOURI**
DEPARTMENT OF CONSERVATION; THE STATE OF **NORTH DAKOTA**; THE
**OHIO** DEPARTMENT OF NATURAL RESOURCES; THE STATE OF
**WISCONSIN**; THE ASSOCIATION OF FISH AND WILDLIFE AGENCIES; THE
MIDWEST ASSOCIATION OF FISH AND WILDLIFE AGENCIES AND ITS
MEMBER AGENCIES THE **IOWA** DEPARTMENT OF NATURAL RESOURCES;
THE **NEBRASKA** GAME AND PARKS DIVISION; AND THE **SOUTH DAKOTA**
<u>GAME, FISH AND PARKS DEPARTMENT **TO FILE *AMICUS CURIAE* BRIEF**</u>

Having reviewed the Motion of the *Amici Curiae,* Michigan Department of

Natural Resources; the State of Kansas; the Kentucky Department of Fish and Wildlife

Resources; the Minnesota Department of Natural Resources; the Missouri Department of

Conservation; the State of North Dakota; the Ohio Department of Natural Resources; the

1

State of Wisconsin; the Association of Fish and Wildlife Agencies; the Midwest

Association of Fish and Wildlife Agencies; and its member agencies the Iowa

Department of Natural Resources, the Nebraska Game & Parks Commission and the

South Dakota Game, Fish and Parks Department for Leave to File *Amicus Curiae* Brief,

and supporting document, Attachment 1, it is hereby

ORDERED that *Amici Curiae*, the Michigan Department of Natural Resources,

[other states], Association of Fish and Wildlife Agencies, and Midwest Association of

Fish and Wildlife Agencies' Motion is GRANTED, and it is hereby further

ORDERED, that *Amici Curiae,* the Michigan Department of Natural Resources,

[other states], Association of Fish and Wildlife Agencies, and Midwest Association of

Fish and Wildlife Agencies shall be permitted to participate in these proceedings as *amici*

*curiae,* including filing a brief with this Court.

Dated this _____ day of _____, 2008

_____
HONORABLE PAUL L. FRIEDMAN

S: NR/AC/cases/20073001321-B-:L/wolf delisting/ amicus Order

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| HUMANE SOCIETY OF THE<br>UNITED STATES, *et al*, | ) <br> ) <br> ) | |
| Plaintiffs, | ) <br> ) <br> ) | Civil No. 1:07-cv-00677-PLF |
| v | ) <br> ) | |
| KEMPTHORNE, *et al*, | ) <br> ) | |
| Defendants, | ) <br> ) | |
| U.S. SPORTSMEN'S ALLIANCE,<br>FOUNDATION, *et al*, | ) <br> ) <br> ) | |
| Intervenor-Defendants, | ) <br> ) | |
| SAFARI CLUB INTERNATIONAL, *et al*, | ) <br> ) | |
| Intervenor-Defendants. | ) <br> ) | |

MOTION OF *AMICI CURIAE* THE **MICHIGAN** DEPARTMENT OF NATURAL
RESOURCES; THE STATE OF **KANSAS**; THE **KENTUCKY** DEPARTMENT OF
FISH AND WILDLIFE RESOURCES; THE **MINNESOTA** DEPARTMENT OF NATURAL
RESOURCES; THE **MISSOURI** DEPARTMENT OF CONSERVATION; THE STATE
OF **NORTH DAKOTA**; THE **OHIO** DEPARTMENT OF NATURAL RESOURCES;
THE STATE OF **WISCONSIN**; THE ASSOCIATION OF FISH AND WILDLIFE
AGENCIES; THE MIDWEST ASSOCIATION OF FISH AND WILDLIFE AGENCIES
AND ITS MEMBER AGENCIES THE **IOWA** DEPARTMENT OF NATURAL
RESOURCES; THE **NEBRASKA** GAME AND PARKS DIVISION; AND THE **SOUTH
DAKOTA** GAME, FISH AND PARKS DEPARTMENT TO SUPPLEMENT THE RECORD

The Michigan Department of Natural Resources; the State of Kansas; the Kentucky

Department of Fish and Wildlife Resources; the Minnesota Department of Natural Resources;

the Missouri Department of Conservation; the State of North Dakota; the Ohio Department of

Natural Resources; the State of Wisconsin; the Association of Fish and Wildlife Agencies; the

Midwest Association of Fish and Wildlife Agencies; and its member agencies the Iowa

Department of Natural Resources, the Nebraska Game & Parks Commission and the South Dakota Game, Fish and Parks Department; (collectively, "amici curiae"), who have concurrently moved for leave to file an *amici curiae* brief, respectfully move this Court to supplement the record with the following document, which is designated as Attachment 1 to the brief of *Amici Curiae*: **Declaration of Todd Hogrefe, Michigan Department of Natural Resources Wildlife Biologist.**

The reasons supporting this motion are set forth in the accompanying Memorandum. Counsel for *amici curiae* has conferred with counsel for the Plaintiffs, Federal Defendants, and Intervenor-Defendants regarding this issue in accordance with LCvR 7(m). Both Federal Defendants and Intervenor-Defendants take no position on this motion. Plaintiffs refuse to state their position without previous disclosure of the proposed supplemental material.

Respectfully submitted,

Michael A. Cox
Attorney General

/s/ Marie Shamraj
Marie Shamraj (P44481)
Robert P. Reichel (P31878)
Assistant Attorney General
Environment, Natural Resources,
and Agriculture Division
on behalf of the Michigan Department of
Natural Resources
525 W. Ottawa, 6th Fl, Williams Bldg.
P.O. Box 30755
Lansing, MI   48909
shamrajm@michigan.gov
(517) 373-7540

Date: January 18, 2008

S: NR/AC/cases/20073001321-B-:L/wolf delisting/motion to supplement record

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| HUMANE SOCIETY OF THE UNITED STATES, *et al*, | ) ) ) | Civil No. 1:07-cv-00677-PLF |
| Plaintiffs, | ) ) | |
| v | ) ) | |
| KEMPTHORNE, *et al*, | ) ) | |
| Defendants, | ) ) | |
| U.S. SPORTSMEN'S ALLIANCE, FOUNDATION, *et al*, | ) ) ) | |
| Intervenor-Defendants, | ) ) | |
| SAFARI CLUB INTERNATIONAL, *et al*, | ) ) | |
| Intervenor-Defendants. | ) ) ) | |

**MEMORANDUM OF *AMICI CURIAE* THE MICHIGAN** DEPARTMENT OF NATURAL RESOURCES; THE STATE OF **KANSAS**; THE **KENTUCKY** DEPARTMENT OF FISH AND WILDLIFE RESOURCES; THE **MINNESOTA** DEPARTMENT OF NATURAL RESOURCES; THE **MISSOURI** DEPARTMENT OF CONSERVATION; THE STATE OF **NORTH DAKOTA**; THE **OHIO** DEPARTMENT OF NATURAL RESOURCES; THE STATE OF **WISCONSIN**; THE ASSOCIATION OF FISH AND WILDLIFE AGENCIES; THE MIDWEST ASSOCIATION OF FISH AND WILDLIFE AGENCIES AND ITS MEMBER AGENCIES THE **IOWA** DEPARTMENT OF NATURAL RESOURCES; THE **NEBRASKA** GAME AND PARKS DIVISION; AND THE **SOUTH DAKOTA** GAME, FISH AND PARKS DEPARTMENT **IN SUPPORT OF THEIR MOTION TO SUPPLEMENT THE RECORD**

The Michigan Department of Natural Resources; the State of Kansas; the Kentucky

Department of Fish and Wildlife Resources; the Minnesota Department of Natural Resources;

the Missouri Department of Conservation; the State of North Dakota; the Ohio Department of

Natural Resources; the State of Wisconsin; the Association of Fish and Wildlife Agencies; the

Midwest Association of Fish and Wildlife Agencies; and its member agencies the Iowa Department of Natural Resources, the Nebraska Game & Parks Commission and the South Dakota Game, Fish and Parks Department who have concurrently moved for leave to file an *amici curiae* brief, respectfully move this Court to supplement the record with the following document, which is designated as Attachment 1 to the brief of *Amici Curiae* **Declaration of Todd Hogrefe, Michigan Department of Natural Resources Wildlife Biologist.**

Plaintiffs' Complaint and Statement of Material Facts not in Genuine Dispute have made a number of assertions about the MDNR's wolf management activities and wolf management plans that distort or are unsupported by the existing agency record. In addition, the Plaintiffs have made similar assertions with respect to the wolf management plans and activities of the States of Wisconsin and Minnesota. These assertions are found in paragraphs 36 to 53 of the Plaintiffs' Statement of Material Facts not in Genuine Dispute. In order to effectively refute these assertions, it is necessary to supplement the record with factual material that is not part of the administrative record that was created in the rule making process.

## I. BACKGROUND

In this action, Plaintiffs, Humane Society of the United States, *et al.* are challenging the federal government's decision to remove the "western Great Lakes (WGL) Distinct Population Segment (DPS)" of the gray wolf from the list of threatened and endangered species.[1] The MDNR along with its *amici curiae* which include two fish and wildlife associations and other states, has filed a Motion for leave to file an *amicus* brief supporting the delisting decision of the United States Fish and Wildlife Service. As part of their challenge, Plaintiffs assert, among other

---

[1] 72 Fed Reg 6052 (Feb 8, 2007)

things, that the State of Michigan DNR's wolf management plan and the implementation of that plan are inadequate.

The Plaintiffs make similar assertions of inadequacy against the wolf management plans and wolf management activities of the States of Wisconsin and Minnesota. In their Opposition to Plaintiff's Motion to Supplement the Record, Intervenor-Defendants Safari Club International Foundation, U.S. Sportsmen's Alliance Foundation, *et al.*, have argued that if the Plaintiffs' Motion to Supplement the Record is granted, then the Court should supplement the record with the Declaration of Minnesota Wolf Specialist, Daniel Stark. (See Defendant-Intervenors Safari Club International Foundation, U.S. Sportsmen's Alliance Foundation, *et al*'s. Opposition to Plaintiffs' Motion to Supplement the Record, p 13.) It appears that Plaintiffs are not objecting to the factual statements contained in the Declaration of Daniel Stark. (See Plaintiffs' Reply Memorandum in Support of Plaintiffs' Motion to Supplement the Record, p 4.)

In the case of the State of Michigan, Plaintiffs did not request to supplement the record with materials specific to the State of Michigan's wolf management plans and activities. Rather, in order to support their argument that the State of Michigan's wolf management plan and wolf management activities are and shall be inadequate and that therefore, FWS's delisting of the gray wolf in the WGL DPS is arbitrary and capricious, Plaintiffs have made conclusions which are purported to be facts based upon the record when, in fact, these conclusions severely distort the administrative record.

*Amici curiae* cannot effectively refute these allegations if they are constrained to rely on the administrative record.

3

## II. ARGUMENT

*Amici curiae* recognize that generally, judicial review of agency action is limited to the administrative record before the agency at the time that the agency made its decision.[2] However, there are a number of exceptions to this rule that have been recognized by the D C Circuit. These exceptions are:[3]

> (1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued for a failure to take action; (7) in cases arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage.

It appears that these exceptions are intended for situations where the agency action is being challenged and the challenger is proposing to introduce extra-record evidence because of some type of short-coming in the administrative record because of some action or inaction by the agency. In the present case, *amici curiae* are supporting rather than challenging the action of the United States Fish and Wildlife Service (FWS) and are not finding fault with the administrative record as such. It is the Plaintiffs mischaracterizations of the administrative record that are the basis for the *amici curiae's* Motion to Supplement the Record with the Declaration of Todd Hogrefe, MDNR Wildlife Biologist.

If the Court is going to consider the assertions that Plaintiffs have made in their Statement of Material Facts not in Genuine Dispute with respect to the MDNR's wolf management plan and activities, the MDNR should have the opportunity to adequately address these assertions. *Amici curiae* submit that it is within the discretion of the Court to permit the

---

[2] *Humane Soc'y of the United States v Dep't of Commerce,* 432 F Supp 2d 4, 14 (D D C 2006)
[3] *Esch v Yeutter,* 278 U S App D C 98; 876 F2d 976, 991 (1989).

MDNR to file the Declaration of Todd Hogrefe in order to address the conclusions proffered by

Plaintiffs which are at best misleading and at worst completely erroneous.

## **CONCLUSION**

For the foregoing reasons, the administrative record should be supplemented by the

Declaration of Todd Hogrefe, Attachment 1 of the *Amicus* Brief of *Amici Curiae,* Michigan

Department of Natural Resources, *et al.*

A Proposed Order is attached.

Respectfully submitted,

Michael A. Cox
Attorney General

  /s/ Marie Shamraj
Marie Shamraj (P44481)
Robert P. Reichel (P31878)
Assistant Attorney General
Environment, Natural Resources,
and Agriculture Division
on behalf of the Michigan Department of
Natural Resources
525 W. Ottawa, 6th Fl, Williams Bldg.
P.O. Box 30755
Lansing, MI   48909
shamrajm@michigan.gov
(517) 373-7540

Date:  January 18, 2008

S: NR/AC/cases/20073001321-B-:L/wolf delisting/memorandum to supplement record

5

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

HUMANE SOCIETY OF THE          )
UNITED STATES, *et al*,        )
                               )          Civil No. 1:07-cv-00677-PLF
      Plaintiffs,            )
                               )
v                              )
                               )
KEMPTHORNE, *et al*,           )
                               )
      Defendants,            )
                               )
U.S. SPORTSMEN'S ALLIANCE,     )
FOUNDATION, *et al*,           )
                               )
      Intervenor-Defendants, )
                               )
SAFARI CLUB INTERNATIONAL, *et al*,  )
                               )
      Intervenor-Defendants. )
_____)

**(PROPOSED) ORDER**

Having reviewed the January 18, 2008 *amici curiae* Michigan Department of Natural

Resources (MDNR), *et al's* Motion to Supplement the Administrative Record and the responses

thereto and otherwise being fully advised in the premises, on this _____day of January, 2008:

IT IS HEREBY ORDERED *amici curiae* MDNR, *et al's* Motion to Supplement the

Administrative Record is granted.


Dated this _____day of_____, 2008


                        _____
                        HONORABLE PAUL L. FRIEDMAN