## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE HUMANE SOCIETY OF THE
UNITED STATES, HELP OUR WOLVES LIVE,
ANIMAL PROTECTION INSTITUTE, and
FRIENDS OF ANIMALS AND THEIR
ENVIRONMENT,

        Plaintiffs,

        vs.                                            Civil Action No. 1:07-cv-00677(PLF)

DIRK KEMPTHORNE,
Secretary of the Interior,
U.S. DEPARTMENT OF THE INTERIOR, and
U.S. FISH AND WILDLIFE SERVICE,

        Defendants,

and

SAFARI CLUB INTERNATIONAL, SAFARI
CLUB INTERNATIONAL
FOUNDATION, and
NATIONAL RIFLE ASSOCIATION,

        Defendant-Intervenors,

and

U.S. SPORTSMENS' ALLIANCE
FOUNDATION, WISCONSIN BEAR HUNTERS'
ASSOCIATION, SCOTT MEYER, and ROBERT
STAFSHOLT,

        Defendant-Intervenors.

## DEFEMDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT

Defendant-Intervenors U.S. Sportsmens' Alliance Foundation, Wisconsin Bear Hunting

Association, Scott Meyer, and Rob Stafholt and Defendant-Intervenors Safari Club International,

Safari Club International Foundation, and National Rifle Association (collectively, "Defendant-

Intervenors") move for summary judgment in this judicial review case for the reasons stated in

the accompanying Consolidated Memorandum, and the accompanying Statement of

Uncontroverted Facts, both of which are incorporated herein.  Among other points stated in the

Consolidated Memorandum, Plaintiffs have failed to establish their standing to sue under the

Administrative Procedure Act ("APA"), 5 U.S.C. § 702, and Article III of the Constitution.

Further, the action of the Federal Agency Defendants in removing the Western Great Lakes

Distinct Population Segment of the gray wolf from the list of endangered and threatened species

under the Endangered Species Act (ESA) complied with the ESA in all respects and was not

arbitrary an capricious or otherwise violative of law, and so must be affirmed.  5 U.S.C. § 706;

16 U.S.C. §§ 1532, 1533.


Dated: January 18, 2007                          Respectfully submitted,

s/ James H. Lister                               s/Anna M. Seidman
William P. Horn (D.C. Bar No. 375666)            Anna M. Seidman (D.C. Bar No. 417091)
James H. Lister (D.C. Bar. No. 447878)           Douglas S. Burdin (D.C. Bar No. 434107)
Birch Horton, Bittner & Cherot                   Safari Club International
1155 Connecticut Avenue N.W.                      501 2nd Street NE
Suite 1200                                       Washington, D.C.  20002
Washington, D.C.  20036                          (202) 543-8733
(202) 659-5800                                   Fax:  (202) 543-1205
Fax:  (202)659-1027                              aseidman@sci-dc.org
whorn@dc.bhb.com                                 dburdin@sci-dc.org
jlister@dc.bhb.com

*Counsel for U.S. Sportsmen's Alliance*          *Counsel for Safari Club International, Safari Club*
*Foundation, Wisconsin Bear Hunters'*            *International Foundation, and National Rifle*
*Association, Scott Meyer and Robert*            *Association*
*Stafsholt*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, HELP OUR WOLVES LIVE, ANIMAL PROTECTION INSTITUTE, and FRIENDS OF ANIMALS AND THEIR ENVIRONMENT, | |
| Plaintiffs, | |
| vs. | Civil Action No. 1:07-cv-00677(PLF) |
| DIRK KEMPTHORNE, Secretary of the Interior, U.S. DEPARTMENT OF THE INTERIOR, and U.S. FISH AND WILDLIFE SERVICE, | |
| Defendants, | |
| and | |
| SAFARI CLUB INTERNATIONAL, SAFARI CLUB INTERNATIONAL FOUNDATION, and NATIONAL RIFLE ASSOCIATION, | |
| Defendant-Intervenors, | |
| and | |
| U.S. SPORTSMENS' ALLIANCE FOUNDATION, WISCONSIN BEAR HUNTERS' ASSOCIATION, SCOTT MEYER, and ROBERT STAFSHOLT, | |
| Defendant-Intervenors. | |

**DEFENDANT-INTERVENORS' CONSOLIDATED MEMORANDUM**
**IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**
**AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page No.**

INTRODUCTION ....................................................................................................................1

STATEMENT OF FACTS .......................................................................................................1

STANDARD OF REVIEW ......................................................................................................2

ARGUMENT ...........................................................................................................................2

I.      PLAINTIFFS HAVE NOT ESTABLISHED THEIR STANDING TO SUE ......................2

II.     THE EVIDENCE OVERWHELMINGLY SUPPORTS THE
FWS' FINDING THAT WOLVES HAVE RECOVERED, AND
THE DISTINCT POPULATION SEGMENT PROVISION OF THE
ESA APPLIES EQUALLY TO LISTING AND DELISTING ...........................................3

     A.     The Gray Wolves of the Western Great Lakes Distinct Population
Segment Are a Recovered Species ...........................................................................3

     B.     The FWS Properly Conducted a Threats Analysis and Properly
Determined, Based on the Best Available Scientific Evidence, That
Delisting Was Appropriate ......................................................................................5

     C.     The FWS Properly Determined Existing Regulatory Mechanisms Are
Adequate ...............................................................................................................6

     D.     The FWS Properly Concluded That The Existence of Disease and Human
Predation Do Not Require the FWS To Continue the "Endangered"
Classification for the WGL DPS.............................................................................12

     E.     The FWS Properly Developed and Applied the DPS Policy....................................14

     F.     The FWS Properly Used Distinct Population Segments As A Tool For
the Purpose of Delisting..........................................................................................16

     G.     The FWS Established the WGL DPS In A Manner Consistent With Its
Historical Approach to the Eastern Timber Wolf .....................................................18

     H.     The FWS Correctly Established the Boundaries of the WGL DPS...........................19

III.    THE FWS REASONABLY DETERMINED THAT THE GENERALLY
UNSUITABLE HABITAT WITHIN THE WGL DPS BUT OUTSIDE THE
CORE RECOVERY AREAS IS NOT A SIGNIFICANT PORTION OF THE
GRAY WOLVES' RANGE ...........................................................................................21

## TABLE OF CONTENTS (CONT.)

                                                                                    Page No.

    A.    The ESA's "Significant Portion of Range" (SPR) Inquiry .......................................21

    B.    The Successful Recovery in the Core Recovery Areas  ............................................22

    C.    The FWS Has Properly Completed the Analysis of Whether the Non-Core Areas Constitutes SPR  ..............................................................................23

        1.    The Northern Lower Peninsula of Michigan ..................................24

        2.    The Turtle Mountains of North Dakota .........................................27

        3.    There Were No Other Potential SPRs in the DPS .........................28

    D.    The FWS Was Not Required to Treat Presently Unsuitable Habitat as a SPR Just Because the Unsuitable Area is Large and Was Once Part of the Wolves' Range .........................................................................................28

        1.    Unsuitable Habitat is Not Part of the Wolves' "Range"................................29

        2.    Even with the FWS's Evaluation of All the Range within the WGL DPS, Currently Unsuitable Habitat That Was Once Occupied by Wolves Is No Longer a Significant Portion of the Range ........................................................................................32

IV.    SHOULD ANY OF PLAINTIFFS' UNFOUNDED PREDICTIONS OF FUTURE JEOPARDY TO THE WOLF COME TO PASS, THE FWS WILL BE UNDER A NON-DISCRETIONARY DUTY TO RELIST THE WESTERN GREAT LAKES WOLVES ON AN EMERGENCY BASIS .........................37

V.    ANY REMEDY THAT THIS COURT ORDERS SHOULD AVOID HARMFUL AND NEEDLESS DISRUPTIONS TO RECOVERED WOLF MANAGEMENT IN THE CORE RECOVERY AREAS ....................................................38

CONCLUSION......................................................................................................................41

# TABLE OF AUTHORITIES

<u>Page No.</u>

## FEDERAL CASES

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*,
    988 F.2d 146 (D.C. Cir. 1993)......................................................................................39

*American Wildlands v. Kempthorne*,
    478 F.Supp. 2d 92 (D.D.C.March 26, 2007),.......................................................6, 13

*Baltimore Gas & Elec. Co. v. Natural Res. Defense Council*,
    462 U.S. 87 (1983)........................................................................................................2

*Barscz v. Director, Office of Workers' Compensation Programs*,
    486 F.3d 744 (2nd Cir. 2007)....................................................................................29

*Biodiversity Legal Foundation v. Babbitt*,
    943 F. Supp. 23 (D.D.C. 1996)....................................................................................7

*Carlton v. Babbitt*,
    900 F. Supp. 526 (D.D.C. 1995)..................................................................................2

*Center for Biological Center for Biological Diversity v. FWS*,
    2007 WL 716108 (D. Colo. March 7, 2007)...............................................................8

*Center for Biological Diversity v. Norton (Rio Grand Cutthroat Trout)*,
    411 F.Supp.2d 1271 (D.N.M. 2005),
    *vacated by consent due to mootness and on other grounds*,
    Case No. 06-2049, (10th Cir. May 21, 2007) .....................................................31, 36

*Center for Biological Diversity v. U.S. Fish and Wildlife Service (Rio Grand Cutthroat Trout)*,
    2007 WL 716108 No. 05-305-RPM (D. Colo., Mar. 7, 2007),
    *vacated by consent due to mootness and on other grounds*,
    Case No. 07-1206, (10th Cir. Oct. 22, 2007).........................................................31

*Center for Biological Diversity v. U.S. Fish and Wildlife Service*,
    402 F. Supp.2d 1198 (D. Or. 2005) .............................................................................7

*Chevron, U.S.A., Inc. v. Natural Res. Defense Council*,
    467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).................................2, 22, 36

*Colorado River Cutthroat Trout v. Kempthorne*,
    448 F. Supp. 2d 170 (D.D.C. 2006) ...........................................................................2

*Davis v. Latschar*,
    83 F.Supp.2d 1 (D.D.C.1998), *aff'd.* 202 F.3d 359 (D.C.Cir.2000)......................2

## TABLE OF AUTHORITIES (CONT.)

<u>Page No.</u>

*Defenders of Wildlife v. Norton (Florida Black Bear case)*
Civil Action No. 99-02072-HHK, slip op. at 8-11 (D.D.C. Dec. 13, 2001)........................*passim*

*Defenders of Wildlife v. Norton*,
239 F.Supp.2d 9 (D.D.C. 2002) (Kessler, J.),
*vacated in part on separate point*,
2004 WL 438599, 89 Fed.Appx. 273 (D.C. Cir. 2004) ........................................................34

*Defenders of Wildlife v. Norton (Lizard case)*,
258 F.3d 1136 (9th Cir. 2001) ...................................................................................*passim*

*Defenders of Wildlife v. Secretary, U.S. Dep't of the Interior (Wolves)*,
354 F.Supp.2d 1156 (D.Or. 2005) ....................................................................19, 23, 24

*Endangered Species Comm. of the Building Ind. Assoc. of South. Cal. v. Babbitt*,
852 F. Supp. 32 (D.D.C. 1994) ........................................................................................39

*Everett v. United States*,
158 F.3d 1364 (D.C.Cir.1998) ..........................................................................................2

*Federation of Fly Fishers v. Daley*,
131 F. Supp.2d 1158(N.D. Cal. 2000) ...............................................................................8

*Fla. Audubon Soc'y v. Bentsen*,
94 F.3d 658 (D.C.Cir.1996) (*en banc*)..............................................................................3

*Fox Television Stations v. FCC*,
280 F.3d 1027 (D.C. Cir. 2002) ......................................................................................39

*Fund for Animals v. Babbit (Grizzly Bear)*,
903 F.Supp. 96 (D.D.C. 1995).............................................................................26-27, 39-41

*Maine v. Norton*,
257 F.Supp.2d 357 (D. Me. 2003) ..................................................................................15

*Marsh v. Oregon Natural Res. Council*,
490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)......................................................2

*National Assoc. of Home Builders v. Norton*,
451 F.3d 8 (D.C.C. 2005) ...........................................................................................2, 39

# TABLE OF AUTHORITIES (CONT.)

<u>Page No.</u>

*National Wildlife Federation v. Norton (Wolves)*,
    386 F.Supp.2d 553, 560 (D. Vt. 2005)...............................................................24, 40

*Northwest Ecosystem Alliance v. U.S. Fish and Wildlife Service*,
    475 F.3d 1136 (9th Cir. 2007) ........................................................................15-16

*Nuclear Energy Inst., Inc. v. EPA*,
    373 F.3d 1251(D.C.Cir.2004) ................................................................................3

*OSG Bulk Ships v. United States*,
    132 F.3d 808 (D.C.Cir.1998) ................................................................................2

*Southwest Center for Biological Diversity v. Norton (Queen Charlotte Goshawk)*,
    2002 WL 1733618, No. 98-0934 (D.D.C. Jul. 29, 2002) .....................................*passim*

*Stinson v. United States*,
    508 U.S. 36, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993).........................................2

*Thomas Jefferson Univ. v. Shalala*,
    512 U.S. 504, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994)......................................2

*United Mine Workers v. Federal Mine Safety and Health Administration*,
    924 F.2d 340 (D.C. Cir. 1991) ..........................................................................39

*U.S. ex rel Totten v. Bombardier Corp.*,
    380 F.3d 488 (D.C. Cir. 2004) ..........................................................................29

*U.S. v. Wilson*,
    503 U.S. 329 (1992).........................................................................................29

*Wyoming Outdoor Council v. United States Forest Serv.*,
    165 F.3d 43 (D.C.Cir.1999) ................................................................................2

# FEDERAL STATUTES

5 U.S.C. § 706................................................................................................2, 26, 31, 38
16 U.S.C. § 1531.............................................................................................17
16 U.S.C. § 1532.............................................................................................*passim*
16 U.S.C. §1533...............................................................................................*passim*

## TABLE OF AUTHORITIES (CONT.)

### FEDERAL REGISTER

Page No.

32 Fed. Reg. 4001 (March 11, 1967)..........................................................................18
39 Fed. Reg. 1175 (January 4, 1974)..........................................................................18
43 Fed. Reg. 9607 (March 9, 1978)............................................................................19
61 Fed. Reg. 4722, 4725 (February 7, 1996)..........................................................14, 17
68 Fed. Reg. 15804, 15810 (April 1, 2003)..............................................19, 23, 28, 38-39
71 Fed. Reg. 15266 (March 27, 2006).........................................................................39
71 Fed. Reg. 15287-95 (March 27, 2006)....................................................................41
72 Fed. Reg. 6052 (February 8, 2007).................................................................*passim*
72 Fed. Reg. 6059-60 (February 8, 2007)........................................................15, 20, 22
72 Fed. Reg. at 6065 (February 8, 2007)....................................................................36
72 Fed. Reg. at 6066 (February 8, 2007)....................................................................31
72 Fed. Reg. 6068 (February 8, 2007).............................................................9, 10, 38
72 Fed. Reg. at 6071-76 (February 8, 2007)........................................................*passim*
72 Fed. Reg. 6083 (February 8, 2007)........................................................................9
72 Fed. Reg. 6084-85 (February 8, 2007)..............................................................8, 10
72 Fed. Reg. 6092 (February 8, 2007)........................................................................9
72 Fed. Reg. 30819 (June 4, 2007)......................................................................12, 37
72 Fed. Reg. at 30820 (June 4, 2007)........................................................................37

### OTHER AUTHORITIES

1978 Recovery Plan for the Eastern Timber Wolf, revised in 1992 (Recovery Plan)......................4

American Heritage Dictionary of the English Language at 1497 (1992)..........................................30

Department of the Interior Solicitor's Memorandum dated March 16, 2007....................................30

H.R. Rep. No. 412, 93rd Cong., 1 Sess.; Cong. Rec. 25,669 (July 24, 1973)..................................18, 40

Endangered Species Preservation Act of October 15, 1966 (80 Stat. 926; 16 U.S.C. § 668aa(c)), ..18

Merriam-Webster Collegiate Dictionary at 964 (10th ed. 2000) .......................................30

Sutherland Stat. Const., § 21.10 (2002)............................................................................29, 30

Defendant-Intervenors U.S. Sportsmen's Alliance Foundation, Wisconsin Bear Hunting Association, Scott Meyer and Rob Stafholt and Defendant-Intervenors Safari Club International, Safari Club International Foundation, and National Rifle Association (collectively, "Defendant-Intervenors") respectfully submit this Consolidated Memorandum in Support of Their Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment.

## INTRODUCTION

Defendant-Intervenors move for summary judgment and oppose the summary judgment requested by the Plaintiffs, Humane Society of the United States *et al.* ("HSUS *et al.*").  HSUS *et al.* have challenged a Final Rule, promulgated the U.S. Fish and Wildlife Service ("FWS") that designated the Western Great Lakes Distinct Population Segment (WGL DPS) of wolves and that removed the wolves of that DPS from the lists of "endangered" and "threatened" species.  16 U.S.C. §1533.  Defendant-Intervenors submit that the FWS appropriately designated the WGL DPS, including its geographic boundaries, determined the significant portions of the WGL DPS wolves' range, and conducted the mandatory threats analysis to determine that ESA listing for the DPS was no longer required

Defendant-Intervenors request that this court deny HSUS *et al.*'s Motion for Summary Judgment and grant the FWS's and Defendant-Intervenors' Motions.  If for any reason, this court deems some other remedy necessary, Defendant-Intervenors ask that the court avoid vacating the Final Rule to Delist in order to maintain consistency in the management of the recovered populations of WGL DPS wolves by the Minnesota, Wisconsin, and Michigan Departments of Natural Resources.

## STATEMENT OF FACTS

In lieu of a separate Statement of Facts, Defendant-Intervenors incorporate their accompanying Statement of Uncontroverted Material Facts filed pursuant to Local Rule 56.1.

Pertinent facts are also stated with citation during the course of the legal arguments made below.

## STANDARD OF REVIEW

In light of the FWS's vast expertise in the area of wildlife conservation and management, courts apply a deferential standard of review together with a strong presumption in favor of upholding the FWS on such decisions.  *Carlton v. Babbitt,* 900 F. Supp. 526, 530 (D.D.C. 1995); *see Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 375-78, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).  Judicial review of ESA decisions is under 5 U.S.C. § 706; *National Assoc. of Home Builders v. Norton,* 451 F.3d 8, 13 (D.C.C. 2005).  A court must uphold the FWS's decision if it finds that the Service "considered the relevant factors and articulated a rational connection between the facts found and the choice made."  *Baltimore Gas & Elec. Co. v. Natural Res. Defense Council,* 462 U.S. 87, 105 (1983).  As this Court stated in another ESA case:

> For challenges to an agency's construction of the statutes that it administers, the Court's review must be particularly deferential. The Court must defer to the agency's interpretation of a statute that it implements "so long as it is reasonable, consistent with the statutory purpose, and not in conflict with the statute's plain language." *OSG Bulk Ships v. United States,* 132 F.3d 808, 814 (D.C.Cir.1998) (quoting *Coal Employment Project v. Dole,* 889 F.2d 1127, 1131 (D.C.Cir.1989)); *see Chevron, U.S.A., Inc. v. Natural Res. Defense Council,* 467 U.S. 837, 845, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), *Davis v. Latschar,* 83 F.Supp.2d 1, 5 (D.D.C.1998), *aff'd.* 202 F.3d 359 (D.C.Cir.2000). An agency's interpretation of its own regulations also is entitled to substantial deference by the courts unless it is "plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994); *see also Stinson v. United States,* 508 U.S. 36, 45, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993); *Wyoming Outdoor Council v. United States Forest Serv.,* 165 F.3d 43, 52 (D.C.Cir.1999); *Everett v. United States,* 158 F.3d 1364, 1367 (D.C.Cir.1998).

*Colorado River Cutthroat Trout v. Kempthorne*, 448 F. Supp. 2d 170, 174-75 (D.D.C. 2006).

## ARGUMENT

## I.    PLAINTIFFS HAVE NOT ESTABLISHED THEIR STANDING TO SUE

To establish Constitutional standing, Plaintiffs must demonstrate that they have suffered a "concrete and particularized" injury that is "actual or imminent"; that was "caused by, or fairly

traceable to, an act that the litigant challenges in the instant litigation"; and that can be redressed by the court. *Fla. Audubon Soc'y v. Bentsen,* 94 F.3d 658, 663 (D.C.Cir.1996) (*en banc*). (*internal quotation marks omitted*). An organization must additionally demonstrate its <u>Article III</u> standing by providing evidence that at least one of its members would have standing to sue in his or her own right. *Nuclear Energy Inst., Inc. v. EPA,* 373 F.3d 1251, 1265 (D.C.Cir.2004). Defendant- Intervenors disputed HSUS *et al.'s* standing in Affirmative Defense 4 of Defendant-Intervenors' Answer to Plaintiffs' Amended Complaint for Declaratory and Injunctive Relief, p. 33. In Plaintiffs' Motion for Summary Judgment and Statement of Material Facts, HSUS *et al*. offer no declarations or affidavits to support their standing to sue. HSUS *et al*. have provided no information whatsoever to describe HSUS *et al.* and/or their members' contact with wolves within the WGL DPS and/or any concrete or imminent harm caused by the delisting. HSUS *et al*. have failed in their burden to demonstrate their standing with admissible evidence.

II.    **THE EVIDENCE OVERWHELMINGLY SUPPORTS THE FWS' FINDING THAT WOLVES HAVE RECOVERED, AND THE DISTINCT POPULATION SEGMENT PROVISION OF THE ESA APPLIES EQUALLY TO LISTING AND DELISTING**

    A.    **The Gray Wolves of the Western Great Lakes Distinct Population Segment Are a Recovered Species**

The gray wolves of the WGL DPS are a "recovered" species. "Recovered" status is often determined by the "recovery plan" that the Secretary of the Interior, and by delegation of authority the FWS, is generally required to develop for the conservation and survival of listed species. 16 U.S.C. §1533(f)(1). The ESA directs the agency, to the maximum extent practicable, to incorporate into the recovery plan:

> objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list.

*Id*. § 1533(f)(1)(B)(ii). The FWS established such objective, measurable criteria for the gray

wolves of the WGL DPS when it drafted the 1978 Recovery Plan for the Eastern Timber Wolf.

The Recovery Plan, which was revised in 1992 (Recovery Plan), identified the following

recovery criteria:

> At least two viable populations within the 48 United States satisfying the
> following conditions must exist: (1) the Minnesota population [estimated at 1550
> to 1750 wolves] must be stable or growing, and its continued survival be assured,
> and (2) a second population outside of Minnesota and Isle Royale must be re-
> established, having at least 100 wolves in late winter if located within 100 miles
> of the Minnesota wolf population, or having at least 200 wolves if located beyond
> that distance.  These population levels must be maintained for five consecutive
> years before delisting can occur.  A Wisconsin-Michigan population of 100
> wolves is considered to be a viable second population, because continued
> immigration of Minnesota wolves will supplement it demographically and
> genetically for the foreseeable future.

AR Doc. 468A, p. 13770, 13773.  Although the Recovery Plan deemed the persistence of the

Minnesota population mandatory, it offered flexibility with respect to the location of the second

population and included, for possible re-establishment alternatives, populations in northern

Wisconsin, the upper peninsula (UP) of Michigan, the Adirondack Forest Preserve of New York,

a small area in eastern Maine, and a larger area of northwestern Maine and adjacent northern

New Hampshire.  AR Doc. 468 A, p. 13825-6.  The Recovery Plan's recovery criteria were

specific and can in no way be interpreted to require the return of the gray wolf to all or most of

its historic range.  *Id.*

All the recovery criteria of the Recovery Plan have long been met and exceeded.  A

stable, if not growing wolf population in excess of 1,750 wolves has lived in Wisconsin for more

than a decade.  In a 1997-1998 survey, Wisconsin estimated a population of approximately 2,445

wolves.  In a study conducted in 2003-2004, Minnesota estimated that its wolf population was

between 2,301 and 3,708 wolves.  According to annual winter track surveys, the Minnesota wolf

population showed a stable or slowly increasing wolf population during the 11 year period

between 1994 and 2005.  72 Fed. Reg. 6052, 6054 (February 8, 2007).

A second wolf population, established in Wisconsin and Michigan has also long

exceeded the recovery criteria.

> In 2002, wolf numbers in Wisconsin alone surpassed the Federal criterion for a
> second population, as identified in the 1992 Recovery Plan (i.e., 100 wolves for a
> minimum of 5 consecutive years, as measured by 6 consecutive late- winter
> counts).  Furthermore, in 2004 Wisconsin wolf numbers exceeded the Recovery
> Plan criterion of 200 animals for 6 successive late-winter surveys for an isolated
> wolf population.

72 Fed. Reg. 6055.  Wisconsin's wolf population has continued to grow, although at a somewhat

slower rate than was documented previously.  Since 2001, Michigan's wolves have also

independently exceeded the Recovery Plan's recovery criterion for a second population in the

eastern United States (*i.e.*, 100 wolves for a minimum of five consecutive years, based on six

late-winter estimates) and have for six successive late-winter surveys, surpassed the Federal

criterion for an isolated wolf population of 200 animals.  *Id*.

A supplementary component of the Recovery Plan's recovery criteria, at least for the

Wisconsin wolf population, is assurance of continued survival.  The WGL DPS's assured

"continued survival" is demonstrated by the FWS's analysis of the impact of the five statutory

factors for listing, 16 U.S.C. § 1533(a)(1)(A)-(E) and of "those efforts, if any, being made by any

State or foreign nation, or any political subdivision of a State or foreign nation, to protect such

species, whether by predator control, protection of habitat and food supply, or other conservation

practices. . .."  *Id.* § 1533(b)(1)(A).

> **B.      The FWS Properly Conducted a Threats Analysis and Properly Determined,
> Based on the Best Available Scientific Evidence, That Delisting Was
> Appropriate**

To determine the appropriate listing status of a species, the ESA requires that the FWS

examine five statutory factors identified in 16 U.S.C. § 1533(a)(1)(A)-(E) , including **(A)** the

present or threatened destruction, modification, or curtailment of its habitat or range; **(B)**

overutilization for commercial, recreational, scientific, or educational purposes; **(C)** disease or

predation; **(D)** the inadequacy of existing regulatory mechanisms; or **(E)** other natural or manmade factors affecting its continued existence.  The mere fact that one or more of these factors are present, and/or even that one or more of these factors have an impact on the numbers or health of the species being considered, does not require the FWS to list the species as "endangered" or "threatened."  The FWS is only obligated to place (or keep) a species on one of these lists if, based on the best available science, the agency determines that one or more of these factors is jeopardizing the continued existence of the species.  *American Wildlands v. Kempthorne*, 478 F.Supp. 2d 92, 98 (D.D.C. 2007) (Court upheld FWS decision not to list trout species where threats were present and had impact on species, but not to the extent that the species required classification as "threatened."  "Although the WCT subspecies has been reduced from historic levels and its extant populations face threats in several areas of the historic range, we find that the magnitude and imminence of those threats do not jeopardize the continued existence of the subspecies within the foreseeable future."  478 F. Supp. 2d at 98, *quoting from* 68 Fed. Reg. at 47,006.)

In its determination on the listing status of the WGL DPS, the FWS assessed the impact of the five factors ("threats analysis") with the knowledge that wolves are an incredibly resilient species.  Numerous scientific studies analyzed by the FWS for the purpose of deciding on the listing status demonstrated that wolf populations can continue to thrive despite significant population reduction.  A.R. Doc. 215, p. 5893.  (Citing studies showing wolves rebounded from annual loss of 20 to 30%, and even 50%).[1]

### C.     The FWS Properly Determined Existing Regulatory Mechanisms Are Adequate

---

[1]     In this Motion and Opposition, Defendant-Intervenors do not offer a discussion of the FWS's analysis of all five factors, but respond simply to the arguments HSUS *et al*. presented in Plaintiffs' Motion for Summary Judgment.

6

One of the five factors that the ESA directs the FWS to analyze for listing decisions is the adequacy of existing regulatory mechanisms.  Here, the FWS correctly determined that existing regulatory mechanisms, as that requirement is interpreted, exist to justify delisting the WGL DPS.  The standard for these measures is "adequacy," not perfection.

> The ESA does not guarantee the best of all possible worlds for the species at issue.  Instead, the agency is charged with determining whether one or more of the factors caused the species to be endangered or threatened.  There can be a large gap between the best regulatory mechanisms and a situation in which the regulatory mechanisms contribute to the threat or endangerment of a species.

*Center for Biological Diversity v. U.S. Fish and Wildlife Service*, 402 F. Supp.2d 1198, 1209 (D. Or. 2005)(court upheld FWS decision to withdraw proposed rule to list coastal cutthroat trout subspecies despite FWS's finding of flaws in existing regulatory mechanisms).  Moreover, the FWS is not obligated to seek guarantees as to the regulatory mechanisms' future success.  The FWS decision to delist (or to choose not to list) a species is not in error simply because of the existence of any uncertainty about whether the pertinent regulatory mechanisms will be effective.  *Southwest Center for Biological Diversity v. Norton*, 2002 WL 17733618 (D.D.C. July 29, 2002) (Magistrate's recommendation agreeing with FWS decision as to regulatory mechanisms to protect Queen Charlotte goshawk, but recommending remand on other grounds was accepted in part and rejected in part by the District Court by an Order dated May 24, 2004, Case No. 98-0934).

Although the mechanisms assessed by the FWS must be in existence at the time of the delisting decision, *Biodiversity Legal Foundation v. Babbitt*, 943 F. Supp. 23, 26 (D.D.C. 1996), the FWS is permitted to take into account the presence of voluntary mechanisms that contribute to the species' conservation.

> Although voluntary actions are not certain in the same way that regulatory schemes are, they are nonetheless concrete proposals.  It is appropriate that NMFS consider voluntary actions to the extent that they are an "effort being made" to protect a threatened species.

*Federation of Fly Fishers v. Daley*, 131 F. Supp.2d 1158, 1168 (N.D. Cal. 2000) (court

determined that NMFS could consider voluntary measures, so long as the agency did not rely too

heavily on them.).  *See also Center for Biological Center for Biological Diversity v. FWS*, 2007

WL 716108 (D. Colo. March 7, 2007) *vacated per joint agreement of the parties on other*

*grounds* (court ruled that FWS could consider the joint voluntary conservation efforts of federal

agencies other than the FWS, states and non-governmental entities, in assessing the impact of

risk factors on a species for the purpose of a listing determination).  At least one reason why the

FWS may consider voluntary state efforts, in addition to regulatory mechanisms, is the fact that

the ESA requires the FWS to do so.  Even before the agency is supposed to conducts its analysis

of the existing regulatory mechanisms, the ESA requires the FWS to evaluate the states' efforts

to protect the species:

> The Secretary shall make determinations required by subsection (a) (1) of this
> section solely on the basis of the best scientific and commercial data available to
> him after conducting a review of the status of the species and *after taking into*
> *account those efforts, if any, being made by any State or foreign nation, or any*
> *political subdivision of a State or foreign nation, to protect such species,*
> *whether by predator control, protection of habitat and food supply, or other*
> *conservation practices, within any area under its jurisdiction*, or on the high
> seas.

16 U.S.C. § 1533(b)(1)(A) (*emphasis added*).

The FWS's analysis of the proper listing status of the WGL DPS of gray wolves revealed

that Minnesota, Wisconsin and Michigan each had developed and finalized gray wolf

management plans.  Minnesota's plan was completed in early 2001, Wisconsin's was adopted in

1999 and updated in 2006, and Michigan's was completed and approved in 1997.  72 Fed. Reg.

6084-85.

Each of the plans includes a minimum population level, (1,600 in Minnesota, 350 in

Wisconsin and 200 in Michigan) which if reached, triggers the pertinent state's enhanced wolf

protections.  *Id.* at 6083.  These minimum population standards each exceed the minimum

population numbers established by the Eastern Timber Wolf Recovery Plan for the species'

recovery and removal from the "endangered" and "threatened" species lists (1550 for Minnesota,

100 for Wisconsin and Michigan collectively).  AR Doc. 468A, p. 13770, 13773. Consequently,

even if one or more of the state's wolf populations did, for some reason, drop to these minimum

levels, the population reduction(s) would not qualify the WGL DPS for "endangered" or

"threatened" listing status.  The wolves in the WGL DPS have greatly exceeded any objective

criteria established for recovery and therefore, a hypothetical population decline to state

minimum population standards would simply not jeopardize the survival of the species.

    Michigan's wolf management plan has been in effect for over 10 years and remains in

effect while the state develops a revised plan.  *Id.* at 6068.  In delisting wolves, the FWS relied

on the adequacy of the existing plan, and not on the forthcoming revised version.  The FWS

observed that "[n]ecessary wolf management actions detailed in the Michigan Plan include

public education and outreach activities, annual wolf population and health monitoring, research,

depredation control, and habitat management."  *Id.* at 6092.  In accordance with the requirements

of Section 1533(b)(1)(A) of the ESA, the FWS also took into consideration state efforts for the

protection of wolves in addition to the mandatory regulatory mechanisms, such as its *Guidelines

for Management and Lethal Control of Wolves Following Confirmed Depredation Events.*  *Id.* at

6068.  Based on the existing methods in place, the FWS determined that Michigan's wolf

protections are adequate to prevent wolves from returning to a point at which they will be "in

danger of extinction throughout all or a significant portion of its range" (endangered) or "likely

to become an endangered species within the foreseeable future throughout all or a significant

portion of its range" (threatened).  16 U.S.C. §§ 1532 (6) and (20).

Minnesota's wolf management plan's goal is "to ensure the long-term survival of wolves in Minnesota while addressing wolf-human conflicts that inevitably result when wolves and people live in the same vicinity", and focuses on population monitoring and management, management of wolf depredation of domestic animals, management of wolf prey, enforcement of laws regulating take of wolves, public education, and increased staffing to accomplish these actions. *Id*. at 6084. The plan divides the state into two zones, with wolves in Zone A receiving stronger protection than wolves in Zone B. Even in Zone B, significant restrictions apply to the take of wolves. For example, only depredating wolves may be killed and only on lands owned, leased or managed by the owner of a domestic animal attacked or threatened by a wolf on the land or within a one mile radius of that land. According to Minnesota's Wolf Management Plan, "[a]lthough these depredation procedures will likely result in a larger number of wolves killed, as compared to previous ESA management, ***they will not result in the elimination of wolves from Zone B***." AR Doc. 215 at 5276 (*emphasis added*).

The FWS properly assumed that Minnesota's wolf management efforts would be "funded and implemented largely as written." 72 Fed. Reg. at 6068. As demonstrated by the Declaration of Daniel Stark, Wolf Management Specialist for the Minnesota Department of Natural Resources, the state's collective financial resources for wolf management, including in-kind depredation control assistance from the Wildlife Services Division of the U.S. Department of Agriculture and state funding from multiple budgets, as well as the 20 new Conservation Officers each tasked, at least in part, with wolf management responsibilities, far exceeds the management expectations identified in the state's wolf management plan. Declaration of Daniel Stark, attached as Exhibit 2 to this brief.[2]

---

[2] Defendant-Intervenors have already attached Daniel Stark's declaration as an Exhibit to their Opposition to Plaintiffs' Motion to Supplement the Administrative Record. In that Opposition, Defendant-Intervenors' argued that Plaintiffs should be prohibited from adding post-decisional documents

Contrary to representations made by HSUS *et al.* in their Motion for Summary Judgment, there is no significant question as to Michigan and/or Wisconsin's funding of their management plans.  It is true that the Executive Summary of Michigan's Five Year Evaluation Report of its Gray Wolf Recovery and Management Plan noted less than *full* implementation of its management plan.  However, that indication of less than "perfect" implementation is countered by the state's acknowledgement that "many objectives of the plan were met during the first five years of plan implementation."  AR Doc. 215, p. 767.

HSUS *et al.*'s ability to extract from the vast Administrative Record a limited number of references suggesting that states have expressed concerns about funding and/or have requested financial support from the federal government do little to shed any true light on the states' ability to adequately fund their wolf management efforts.  In the first place, Plaintiffs fail to demonstrate how funding situations have changed from the time when wolves were listed as "endangered" to post-delisting.  Plaintiffs offer no evidence to show to what extent, prior to delisting, the federal government provided the states with funding that assisted Michigan, Minnesota or Wisconsin with conducting their conservation, management, research and monitoring effort for wolves and/or that this funding has been removed post delisting.  The only evidence of federal funding comes from the declaration of Daniel Stark, Minnesota Wolf Management Specialist.  *See* Declaration of Daniel Stark, Exhibit 2.  In that declaration, Stark discusses the fact that since 1986, the federally funded Wildlife Services branch of the U. S. Department of Agriculture has been the agency that has conducted Minnesota's gray wolf

---

to the AR and from referencing those documents in their Motion for Summary Judgment.  Defendant-Intervenors argued, in the alternative that if the Court permitted the Plaintiffs to supplement the record, that the Court also accept Daniel Stark's declaration, which provided a more complete and accurate description of the information referenced in Plaintiffs' supplemental documents.   Since the Court has not yet ruled on Plaintiffs' Motion to Supplement the Record, Defendant-Intervenors submit Daniel Stark's declaration as an Exhibit to this Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment, to counter the inaccurate inferences drawn by Plaintiffs allegedly based on the Exhibits to Plaintiffs' Motion to Supplement the Administrative Record.

depredation control activities.  He also explains how Wildlife Services has *continued* to provide

and fund the state's depredation control activities.  In their Motion for Summary Judgment and

Statement of Material Facts, HSUS *et al*. offers nothing to suggest that the same situation is not

occurring in the other states of the WGL DPS as well.

Michigan's decision to change its population monitoring strategies is similarly irrelevant.

As explained by Thomas Drummer, Ph.D of Michigan Technological University, who helped

design the new monitoring strategy:  "The results of the simulations indicate the proposed

monitoring program based on geographic stratification will produce unbiased, precise estimates

of total wolf abundance."  AR Doc 241, p. 8527.

Whether or not the states aspire to obtain enhanced funding to supplement their current

wolf management resources, the FWS's duty is not to seek perfection or certainty.  Based on the

information available, the FWS properly found that the states' regulatory and other mechanisms

will prevent the wolves of the WGL DPS from reaching a status where listing is required.  The

FWS's decision on this issue was sound, reasonable and neither arbitrary nor capricious.

**D.**  **The FWS Properly Concluded That The Existence of Disease and Human**
         **Predation Do Not Require the FWS To Continue the "Endangered"**
         **Classification for the WGL DPS**

Like most wildlife species, wolves are subject to certain diseases.  These diseases do not

pose a risk that jeopardizes the DPS's continued existence.  The prevalence of disease and its

impact on population numbers and species health will be monitored by both federal and state

authorities. *Draft Post-Delisting Monitoring Plan for the Western Great Lakes Distinct*

*Population Segment of the Gray Wolf*, 72 Fed. Reg. 30819 (June 4, 2007) (describes combined

federal/state plans for monitoring disease and predation during five year post-delisting period).

For example, the 1997 Michigan Wolf Recovery and Management Plan states that wolf health

and disease monitoring will receive a high priority for a minimum of five years post delisting.

*Id.* at 6080.  Wisconsin's post-delisting approach is to test for disease and parasite loads through periodic necropsy and scat analyses.  In addition, the 2006 update to Wisconsin's 1999 plan recommends that all wolves live-trapped for other purposes should have their health monitored and reported to the state wildlife health specialists.  *Id.*  Contrary to HSUS *et al.*'s mischaracterizations of the state's efforts, nothing about Minnesota's disease monitoring qualifies as "voluntary or speculative."  Instead, the strategies are quite concrete, stating that DNR personnel "will collaborate with other investigators and continue monitoring disease incidence, where necessary, by examination of wolf carcasses obtained through depredation control programs, and also through blood/tissue physiology work conducted by DNR and the U.S. Geological Survey."  AR Doc. 215, p. 5285.  In addition, Minnesota's DNR personnel will engage in the "regular collection of pertinent tissues of live captured or dead wolves" and periodically assess wolf health "when circumstances indicate that diseases or parasites may be adversely affecting portions of the wolf population."  AR Doc. 215, p. 5273.

Similarly, post-delisting human-caused wolf mortality will not result in reduction of the WGL DPS wolf population sufficient to require the FWS to relist the species.  As indicated above, wolf populations can continue to thrive despite an up to 50% reduction in numbers.  A.R. Doc. 215, p. 5893.  The simple fact that the removal of federal protections could result in a higher take of wolves, does not require the FWS to consider the WGL DPS at risk of becoming "threatened" or "endangered."  *American Wildlands v. Kempthorne*, 478 F.Supp.2d 92 (D.D.C. Mar 26, 2007) (although trout population sustained impact from threats, court agreed with FWS that "magnitude and imminence" of those threats did not jeopardize the continued existence of the species.)

Michigan, Minnesota and Wisconsin continue to place restrictions on the take of wolves and enforce penalties for the illegal removal of members of the species.  Minnesota, for example,

has increased by 20 the number of Conservation Officers available to enforce Minnesota's take restrictions.  Declaration of Daniel Stark, Exhibit 2.  Each state has established population minimums that, if reached, would trigger even greater protections for the species.

Although disease and human-caused mortality are factors that may have an impact on wolf populations, they are not risks that jeopardize the continued survival of the WGL DPS.

### E.    The FWS Properly Developed and Applied the DPS Policy

The ESA mandates that the FWS must, at least every five years, review all the "species" on the "endangered" and "threatened" species lists and determine, based on an analysis of the five statutory factors listed discussed above, 16 U.S.C. § 1533(a)(1) and the considerations identified in 1533(b), which species should be removed from the lists.  16 U.S.C. § 1533(c)(2).  That duty applies to "species" and that term is defined by the ESA to include "any subspecies of fish or wildlife or plants, and any *distinct population segment* of any species of vertebrate fish or wildlife which interbreeds when mature."  16 U.S.C. § 1532(16) (*emphasis added*).  Because the phrase "distinct population segment" is not defined anywhere in the ESA, the FWS, in a joint action with the National Marine Fisheries Service ("NMFS"), developed a policy to interpret and apply the phrase.  *Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act*, 61 Fed. Reg. 4722 (Feb. 7, 1996) ("DPS Policy").  A population qualifies as a Distinct Population Segment ("DPS") if it is both discrete and significant.  *Id.* at 4725.  A population is *discrete* if it is "separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors," or if a population's boundaries are marked by international borders.  *Id.*  A population's *significance* is analyzed under four non-exclusive factors: (1) whether the population persists in a unique or unusual ecological setting; (2) whether the loss of the population would cause a "significant gap" in the taxon's range; (3) whether the population is the only surviving natural occurrence of a

14

taxon; and (4) whether the population's genetic characteristics are "markedly" different from the rest of the taxon.  *Id.*

Courts have carefully scrutinized the DPS policy and have determined that it is entitled to highly deferential review and have upheld the policy as a reasonable agency construction of the ESA.  *Northwest Ecosystem Alliance v. U.S. Fish and Wildlife Service,* 475 F.3d 1136, 1145 (9th Cir. 2007) (court applied deference per *Chevron, U.S.A., Inc. v. Natural Res. Defense Council,* 467 U.S. 837, 845, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and upheld the FWS's decision to reject petition to designate DPS for western gray squirrel population); *Maine v. Norton*, 257 F.Supp.2d 357, 385 (D. Me. 2003) (court upheld DPS designation and listing of Gulf of Maine Atlantic salmon population).

Utilizing the DPS Policy, the FWS analyzed the Western Great Lakes population of gray wolves and found it to be both significant and discrete.  72 Fed. Reg. 6052, 6059-60.  First, based on the following findings, the FWS concluded the population segment to be "significant":  the WGL wolves represent the only U.S. wolf population to reside in the Laurentian Mixed Forest Province or to use any form of eastern coniferous or eastern mixed coniferous-broadleaf forest in the United States; the recovered Western Great Lakes wolf metapopulation is the only gray wolf population in the conterminous United States east of the Rocky Mountains and currently constitutes about 80 percent of North American gray wolves that occur south of Canada.

Next, the FWS found the WGL wolf population to be discrete because it is markedly separated from other gray wolf populations, due to its distance from these other populations and due to the unsuitable habitat that separates the WGL DPS from the other populations.  "The area between Minnesota packs and Northern Rocky Mountain packs largely consists of unsuitable habitat, with only scattered islands of possibly suitable habitat, such as the Black Hills of eastern Wyoming and western South Dakota."  *Id.* at 6059.  The FWS also concluded that the WGL DPS

wolves were unlikely to "cross the eastern boundary into the Laurentian Mixed Habitat Province of New York, Pennsylvania, and New England due to inhospitable conditions." *Id.*

HSUS *et al*. purports to challenge the FWS's designation of the WGL DPS by trying to undermine the Service's "significance" and "discreteness" determinations. These DPS challenges are a subterfuge for HSUS *et al*.'s pervading dissatisfaction with the delisting. For example, HSUS *et al*. attack the FWS's "significance" determination, not because the FWS determined the WGL DPS to be "significant," but instead because the Service used the "significance" determination to classify the Western Great Lakes population as a DPS. *See* Plaintiffs' Motion for Summary Judgment at 29-30. HSUS *et al*.'s "significance" challenge is not directed at the WGL DPS designation, but is instead an attack on the DPS policy itself, which establishes "significance" as a criterion for DPS classification. Since the DPS policy has previously been upheld as a reasonable agency interpretation of the ESA, HSUS *et al*.'s challenge can easily be rejected. *Northwest Ecosystem Alliance,* 475 F.3d at 1145.

HSUS *et al*. also attacks the FWS's "discreteness" analysis. HSUS *et al*. take issue with the Service's findings on discreteness, claiming that the absence of wolves from the areas between existing wolf populations cannot be the foundation for discreteness. *See* Plaintiffs' Motion for Summary Judgment at 30. However, this challenge too is not focused on the FWS's finding of a discrete DPS, it is a challenge to the FWS's decision to delist the DPS. The attack is premised on a very simplistic and unrealistic approach to conservation status and species recovery. The fact is that roads, cities, and human populations generally make it impossible to attempt to recreate what HSUS *et al*. assumes to have been the historic distribution of wolves. Such recovery efforts are not required of the FWS. *See* cases cited in Point III.D. below.

    **F.**    **The FWS Properly Used Distinct Population Segments As A Tool For the Purpose of Delisting**

The FWS evaluated and designated the WGL DPS in order to respond to the species' recovered status. From the outset, the FWS made it clear when drafting the DPS policy that the agency intended to use DPSs as a tool not simply for listing species, but for delisting them as well.[3]

> The Fish and Wildlife Service and the National Marine Fisheries Service (Services) have adopted a policy to clarify their interpretation of the phrase "distinct population segment of any species of vertebrate fish or wildlife" for the purposes of listing, *delisting*, and reclassifying species under the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 et. seq.) (Act).

61 Fed. Reg. 4722 (February 7, 1996), *Policy Regarding the Recognition of Distinct Vertebrate Population Segments under the Endangered Species Act* (*emphasis added*).

> This document adopts an interpretation of the term "distinct population segment" for the purposes of listing, *delisting*, and reclassifying vertebrates by the U.S. Fish and Wildlife Service (FWS) and NMFS.

*Id.* (*emphasis added*).

> This guides the evaluation of distinct vertebrate population segments for the purposes of listing, *delisting*, and reclassifying under the Act.

*Id.* at 4725 (*emphasis added*). The FWS also made a point in the DPS policy of noting that it interpreted the ESA "to provide[ ] no basis for applying different standards for delisting than those adopted for listing." *Id.* at 4724.

The Ninth Circuit, in the case of *Defenders of Wildlife v. Norton*, 258 F.3d 1141 (9th Cir. 2001) discussed how Congress had specifically intended to give the Secretary "more flexibility in her approach to wildlife management," *id.* at 1144, and offered legislative history to show the Secretary's ability to divide a species into populations in order to list some populations and delist others:

---

[3]     Contrary to the arguments of Amicus, Center for Biological Diversity, the FWS followed proper rulemaking procedures in designating the WGL DPS. The FWS published its proposal to designate the DPS on March 27, 2006 in the same rulemaking document, but as an independent action, offering the public the opportunity to comment on either the DPS designation, the delisting proposal or both. 71 Fed. Reg. 6052 (March 27, 2006).

Senator Tunney explained:  An animal might be 'endangered' in most States but overpopulated in some.  In a State in which a species is overpopulated, the Secretary would have the discretion to list that animal as merely threatened *or to remove it from the endangered species listing entirely while still providing protection in areas where it was threatened with extinction.*  In that portion of its range where it was not threatened with extinction, the States would have full authority to use their management skills to insure the proper conservation of the species.

*Id.*, *quoting* H.R. Rep. No. 412, 93rd Cong., 1 Sess. (1973) (*emphasis added*).  *See* 16 U.S.C. § 1532(6), (16), (20).

### G.     The FWS Established the WGL DPS In A Manner Consistent With Its Historical Approach to the Eastern Timber Wolf

In designating the WGL DPS, the FWS responded to the recovery of a population of wolves that has historically been dealt with in a manner distinct from other gray wolf populations within the United States.  Contrary to HSUS *et al*.'s allegations, the FWS did not "carve up" a gray wolf species in order to sidestep listing obstacles.  The gray wolf population of the Western Great Lakes has long and consistently been dealt with as distinct from other wolf populations of the conterminous United States.  For example, on March 11, 1967, the FWS listed as "threatened" the "timber wolf – canis lupus lycaon"[4] under the Endangered Species Preservation Act of October 15, 1966 (80 Stat. 926; 16 U.S.C. § 668aa(c)), 32 Fed. Reg. 4001, (March 11, 1967).  Then on January 4, 1974, the FWS listed as "endangered" both the Eastern Timber wolf (canis lupus lycaon) and the Northern Rocky Mountain wolf (canis lupus irremotus).  39 Fed. Reg. 1175, (January 4, 1974).  In 1978, the FWS converted these two individual subspecies' listings into a single listing, for the sake of "convenience."

In any case, the Service wishes to recognize that the entire species Canis lupus in Endangered or Threatened to the south of Canada, and considers that this matter can be handled most conveniently by listing only the species name.

---

[4]     Canis lupus lycaon is the scientific name for the Eastern Timber Wolf that resides in the WGL DPS.

43 Fed. Reg. 9607 (March 9, 1978).  Despite the joint listing, the FWS continued to deal with the

Eastern Timber wolf as an entity separate and distinct from other U.S. populations of wolves.  In

1978, the FWS published the Eastern Timber Wolf Recovery Plan, which was revised in 1992.

AR Doc. 468A, p. 13770.  The Eastern Timber Wolf Recovery Plan was separate and distinct

from the recovery plan developed and published for the Northern Rocky Mountain population of

wolves.  68 Fed. Reg. 15804, 15810 (April 1, 2003).  The recovery goals of the Eastern Timber

Wolf Recovery Plan established objective recovery goals different from the recovery goals

identified by the Northern Rocky Mountain Recovery Plan.  Each wolf population achieved their

recovery objectives independently of the other.

> **H.    The FWS Correctly Established the Boundaries of the WGL DPS**

Upon designating the WGL DPS, the FWS determined the geographical boundaries for

this population segment.  Congress offered no statutory language to assist in the determination of

these geographical boundaries, constructively endowing the FWS with full discretion to

designate these parameters.   Few courts, if any, have considered the question of DPS

boundaries.  The Oregon District Court, in the case of *Defenders of Wildlife v. Secretary*, 354 F.

Supp. 2d 1156 (D. Or. 2005) rejected the FWS's decision to broadly draw DPS boundaries for

the reclassification of wolves and offered simple alternative guidance:  "The DPS Policy is

designed to draw a line around a population whose conservation status differs from other

populations within that species."  354 F. Supp. 2d at 1170.  Applying the best scientific evidence

available, the FWS did exactly what the Oregon court recommended.  Taking into account the

status of the recovered population of gray wolves in Wisconsin, Minnesota and Michigan, the

average dispersal distances of wolves from these core populations, the likelihood of these

dispersing wolves returning to the core population areas and/or settling within the dispersal area,

and the habitat conditions of the dispersal area, the FWS crafted boundaries that properly

accounted for the behaviors and habitat needs of the wolf population constituting the WGL DPS.

The FWS explained:

> To delineate the boundary of the WGL DPS, we considered the current distribution of wolves in the Midwest and the characteristic movements of those wolves and of gray wolves elsewhere. We examined the available scientific data on long-distance movements, including long-distance movements followed by return movements to the vicinity of the natal pack. We concluded that wolf behavior and the nature of wolf populations require that we include within the area of the DPS some subset of known long-distance movement locations. However, as described below, wolf biology and common sense argue against the inclusion within the DPS boundary of all known or potential long-distance movements. . . .
> [T]his DPS has been delineated to include the core recovered wolf population plus a wolf movement zone around the core wolf populations. This geographic delineation is not intended to include all areas to which wolves have moved from the Great Lakes population. Rather, it includes the area currently occupied by wolf packs in Minnesota, Wisconsin, and Michigan; the nearby areas in these States, including the Northern Lower Peninsula of Michigan, in which wolf packs may become established in the foreseeable future; and a surrounding area into which Minnesota, Wisconsin, and Michigan wolves occasionally move but where persistent packs are not expected to be established because suitable habitat is rare and exists only as small patches. The area surrounding the core wolf populations includes the locations of most known dispersers from the core populations, especially the shorter and medium-distance movements from which wolves are most likely to return to the core areas and contribute to the recovered wolf population.

72 Fed. Reg. at 6060. In essence, the FWS drew a line around the core population, but not such a tightly drawn line that it would result in dispersing wolves constantly passing between "endangered" and delisted status. The FWS strategy can be demonstrated with an anthill analogy. If the FWS decided to delist a DPS constituting an anthill and drew the boundary of the DPS at the base of the anthill, the ants that regularly traveled from the anthill and back would constantly cross the boundary line and would move back and forth from one listing status to another. At one moment an ant could be delisted, "endangered" the next and then delisted again minutes later. At one moment, the ant would be managed by the state government and when it crossed the boundary, it would be the responsibility of the federal government, only to return to state management when

it made its return trip.  By drawing the DPS boundary out a reasonable ant dispersal

distance beyond the edge of the anthill, the FWS could accommodate normal ant travel

behavior, and would thereby reduce the confusion and potential management conflicts

caused by the ants' propensity to travel to and from their home.  The FWS would also be

correctly identifying the "population" of ants.

In the Final Rule, the FWS delisted only the WGL DPS, leaving all wolves outside the

boundaries of the DPS as "endangered."  Therefore, if a WGL DPS wolf disperses more than the

average distance from the core population to an area from which the wolf is unlikely to make the

trip back to the core area, that wolf becomes classified as "endangered" and will receive the

federal protections that accompany that listing status.

### III.  THE FWS REASONABLY DETERMINED THAT THE GENERALLY UNSUITABLE HABITAT WITHIN THE WGL DPS BUT OUTSIDE THE CORE RECOVERY AREAS IS NOT A SIGNIFICANT PORTION OF THE GRAY WOLVES' RANGE

Substantial evidence in the Administrative Record supports the FWS' determinations that

wolves have occupied substantially all suitable habitat within the WGL DPS, and that the wolves

in that suitable habitat are no longer "endangered" or threatened with extinction.  A.R. 3828-29.

The FWS was therefore not arbitrary or capricious in determining that the remaining generally

unsuitable habitat in the WGL DPS was not a "significant portion" of the "range" of the wolves

in the DPS, and so properly delisted wolves throughout the DPS.

#### A.     The ESA's "Significant Portion of Range" (SPR) Inquiry

The definition of "endangered species" (coupled with the accompanying definition of

"species") asks whether a species, sub-species, or distinct population segment (DPS) of a

vertebrate species "is in danger of extinction throughout all or a <u>significant portion of its range</u>"

("SPR") 16 U.S.C. § 1532(6), (16) (*emphasis added*).  The definition of "threatened species"

similarly asks whether the species, sub-species, or DPS "is likely to become an endangered

species in the foreseeable future throughout all or a significant portion of its range."  16 U.S.C. §

1532(20).  Thus, a danger of extinction in a <u>non-significant</u> portion of the range does not result in

listing as endangered or threatened unless the species, sub-species, or DPS is also in danger of

extinction "throughout all" of its range.  *Id*.  The ESA does not define what "significant portion"

or "range" means.  The SPR phrasing is "inherently ambiguous."  *Defenders of Wildlife v.*

*Norton (Lizard case),* 258 F.3d 1136, 1141 (9th Cir. 2001); *see Defenders of Wildlife v. Norton*

*(Florida Black Bear case)*, No. 99-02072, slip op. at 8-10 (D.D.C. Dec. 13, 2001) (FWS'

application of SPR standard in that case was "reasonable" under *Chevron v. Natural Resources*

*Defense Council*, 467 U.S. 837, 843 (1984)) (copy supplied as Exhibit 1).

     **B.**     **The Successful Recovery in the Core Recovery Areas**

As discussed in more detail in Point II above, the evidence overwhelmingly supports

FWS' finding that wolves have recovered in the Core Recovery Areas of Minnesota, Wisconsin

and the Upper Peninsula of Michigan ("Core Recovery Areas").  72 Fed. Reg. at 6054-55, A.R.

12786-7.  Since the original listing of the wolf in 1974, the then-remaining several hundred

wolves in Minnesota have grown into a healthy group of approximately 3,000 wolves, and there

are also now 460-500 wolves in neighboring Wisconsin and approximately 430 more in the

Upper Peninsula of Michigan.  72 Fed. Reg. at 6054-55.  As discussed above, the criteria set in

the 1992 wolf recovery plan for delisting have been satisfied.  72 Fed. Reg. at 6052-55; 16

U.S.C. § 1533 (f)(1)(B)(ii) (recovery plans set objective measurable criteria for delisting).

As noted in Point II above, the FWS has determined that any wolf that disperses further

than 200-300 miles from the Core Recovery Areas has left the WGL DPS population, and so any

such wolf would be outside the DPS and now listed as "endangered" under the ESA.  72 Fed.

Reg. at 6059, A.R. 12791.  The FWS thus drew the WGL DPS boundaries to follow rivers and

interstate highways that occurred approximately 200 to 300 miles from the Core Recovery Areas.

*Id.* (noting that rivers and interstate highways also served as partial barriers to wolf dispersal and so reinforced the finding that the wolves in the WGL DPS were distinct from other wolves). The DPS boundaries encompass all of Minnesota, Wisconsin, and Michigan, the eastern halves of South Dakota and North Dakota, the northern 3/5 of Iowa, the northern 1/4 to 1/5 of Illinois, and the fragments of extreme northern Ohio and Indiana located north of Interstate 80. 72 Fed. Reg. at 6052 (map at Figure 1); A.R. 127900.

C.    **The FWS Has Properly Completed the Analysis of Whether the Non-Core Areas Constitutes SPR**

The FWS reasonably determined that the generally unsuitable habitat within the WGL DPS but outside the Core Recovery Areas ("Non-Core Areas") does not constitute a significant portion of the range ("SPR") of the WGL-DPS wolves. Consequently, the agency properly concluded that the difficulties faced by the very few wolves who attempt to disperse out of the Core Recovery Areas do not require continued listing of those wolves.

In its prior 2003 rule establishing the large "Eastern United States DPS" stretching from the Dakotas all the way to Maine, and downlisting wolves in that DPS from "endangered" to "threatened," the FWS determined that the wolves in Minnesota, Wisconsin, and the Upper Peninsula of Michigan had met the criteria for delisting set in the Recovery Plan. 68 Fed. Reg. 15804, 15810 (April 1, 2003) ("2003 Reclassification Rule"). The District Court for the District of Oregon accepted this finding on judicial review of the 2003 Reclassification Rule. "[T]he Western Great Lakes wolf population exceeded the numerical criteria for <u>downlisting</u> [downgrading from endangered to threatened status] <u>and delisting</u> [removing completely from the list of endangered or threatened species]." *Defenders of Wildlife v. Secretary, U.S. Dep't of the Interior (Wolves)*, 354 F.Supp.2d 1156, 1162 (D.Or. 2005) (*emphasis added*). Nonetheless, the Oregon Court vacated that 2003 Reclassification Rule because the court determined that the FWS had reclassified an entire DPS without adequately examining whether there were SPRs

23

outside the Core Recovery Areas (but within the DPS) and without conducting a threats analysis in any such Non-Core-Area that qualified as a SPR.  354 F.Supp.2d at 1171-72.[5]

In the Final Rule to delist the WGL DPS, the FWS has conducted a SPR/threats analysis of the Non-Core Areas included within the boundaries of the WGL DPS.  The boundaries of the WGL DPS are much less expansive than the DPS boundaries that the FWS designated for the 2003 Reclassification Rule.  The Final Rule to Delist the gray wolves of the WGL DPS established DPS boundaries that encompassed only wolves in the Core Recovery Areas and wolves within reasonable dispersal distances from the Core Recovery Areas.  72 Fed. Reg. at 6052; A.R. 12784.  For its delisting of the WGL DPS wolves, the FWS examined every part of the Non-Core Areas within the new narrower DPS boundaries to see if any part qualified as a SPR.  72 Fed. Reg. at 6071-74; A.R. 12803.  FWS properly evaluated and determined that the Non-Core Areas did not contain suitable wolf habitat that might support a significant wolf population.  *Id.*

Based on the scientific literature establishing that wolves require substantial contiguous areas of low road density (generally road densities of 0.9 to 1.1 miles of road per square mile or less), the FWS used road-density as its primary tool to evaluate habitat suitability.  72 Fed. Reg. at 6071; A.R. 12803 (*cites to literature*).  The FWS also evaluated availability of prey (wolf feed primarily on deer and other wild ungulates) and terrain type (forested areas providing cover for denning and escape are best).  *Id.* at 6074.

1.      The Northern Lower Peninsula of Michigan

The most serious candidate for SPR outside the Core Recovery Areas was the Northern Lower Peninsula ("NLP") of Michigan.  This area is separated from the Upper Peninsula of

---

[5]      A District Court in the District of Vermont reached a similar conclusion and vacated the 2003 Reclassification Rule on consideration of a rulemaking procedural issue not involved here.  *National Wildlife Federation v. Norton (Wolves)*, 386 F.Supp.2d 553, 560 (D. Vt. 2005).

Michigan, a Core Recovery Area where many wolves are present, by the four-mile-wide Straits

of Mackinac (which connect Lake Michigan and Lake Huron), which in some years freezes

during winter.   A few isolated wolves have been seen crossing to the NLP during freezes.  The

death of one such wolf was recorded in 2004.  72 Fed. Reg. at 6072; A.R. 12804.  No wolf

reproduction is known to have occurred in the NLP and follow-up surveys in the NLP by the

Michigan DNR in winter 2005 and in the winter and spring 2006 failed to find any wolf tracks.

*Id.*

Reviewing two road-density studies (Gerhing/Potter and Potvin), the FWS found that

there was some suitable wolf habitat in the NLP.  However, the habitat was highly fragmented.

72 Fed. Reg. at 6072; A.R. 105, p.459; A.R. 12804.  Gehring/Potter discounted fragmented

habitat and found 850 square miles of suitable habitat in the NLP.  *Id.*  Potvin used a separate

analysis that gave more weight to fragmented habitat and prey availability and found 3,090

square miles of suitable habitat.  72 Fed. Reg. at 6073; AR Doc. 105, p. 459.  Both estimates fell

far below the 5,000 square miles of contiguous suitable habitat that the FWS in the 1992 Wolf

Recovery Plan had determined was the minimum necessary to support a permanent wolf

population.  72 Fed. Reg. at 6072; AR Doc. 105, p. 459.  This analysis expressly took into

account the possibility that wolves from the nearby Upper Peninsula of Michigan could

periodically replenish a future NLP population.  Absent replenishment from a nearby source

population, the Recovery Plan criteria set 10,000 square miles as the minimum contiguous

habitat for a self-sustaining wolf population.  *Id.*

The evidence on whether the NLP could in the future support a permanent wolf

population of any size was thus conflicting.  Per the Recovery Plan's contiguous-suitable-area

criteria, no permanent wolf population was likely to establish itself.  In contrast, Potvin estimated

the limited NLP habitat might support a modest number of wolves in the future (110 to 480

wolves), roughly the same number of wolves supported by the far larger amounts of suitable habitat in Wisconsin and the Upper Peninsula of Michigan.  72 Fed. Reg. at 6072; A.R. 12804. However, hewing far more closely to the Recovery Plan criteria, Gehring/Potter concluded the limited NLP habitat could only support 46 to 89 wolves, which would be less than 3% of the number of wolves found in the Core Recovery Areas (*See* populations counts for the Core Recovery Areas above).  *Id.*  Further, Gehring/Potter also emphasized that the NLP might never support any permanent wolf population.  "Given current land-use patterns and road patterns, the NLP may never support a significant, large wolf population given the likely reduced dispersal rate from a source population."  *See* AR Doc. 468B at p. 16823 (Gehring/Potter study).

The FWS was not arbitrary and capricious in resolving this conflicting evidence by finding that the small, marginally suitable, and fragmented habitat in the NLP was not a SPR.  5 U.S.C. § 706(a)(2) (APA standard of review); *Defenders of Wildlife v. Norton (Florida Black Bear)*, Civil Action No. 99-02072-HHK at 10-11 (D.D.C. Dec. 13, 2001) (finding that FWS reasonably determined that an area containing 40% of the habitat of the Florida Black Bear, but which supported only 5% of the bear's population due to the habitat being of lesser quality than other habitat, was not a SPR) (copy supplied as Exhibit 1 to this brief).

"In reviewing the action of the FWS, the Court must be thorough and probing, but if the Court finds support for the agency action, it must step back and refrain from assessing the wisdom of the decision unless there has been a 'clear error of judgment.'"  *Fund for Animals v. Babbit (Grizzly Bear)*, 903 F.Supp. 96, 105 (D.D.C. 1995) (*citing Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378 (D.Or. 1989).  The FWS was not required to accept the opinion of one researcher (Potvin) that 110 to 480 wolves could live in the NLP in the face of other evidence (the Recovery Plan criteria as applied to the road-density findings by Gerhing/Potter and also Potvin) that either no wolves (Recovery Plan) or a very small number

(Gehring/Potter) could live there in the future.  *Id*., 903 F.Supp. at 110 (the presence of

"disagreement between scientists … is not sufficient to demonstrate arbitrariness by the

government").[6]

2.        The Turtle Mountains of North Dakota

A second potential SPR candidate was the Turtle Mountains of North Dakota.  The FWS

found that this was an "island" of forested area that straddles the border with Manitoba and is

surrounded by unsuitable crop and grazing land.  72 Fed. Reg. at 6074; A.R. 12806.  It consists

of just 579 square miles of suitable habitat, 394 of which are in North Dakota and 185 of which

are across the border in Manitoba.  *Id.;* AR Doc. 105, p. 459.  Again this was well below the

5,000 square mile contiguous suitable habitat minimum set in the Recovery Plan even for

populations that could be supported by immigration from elsewhere (here wolves from

Minnesota or Canada that might cross unsuitable terrain to reach the Turtle Mountains).  *Id*.

Further, the FWS found the Turtle Mountains were isolated, meaning the higher 10,000 square

mile minimum applied.  *Id.* at 6072-74.  FWS concluded that "[w]hile this area may provide a

small marginal wolf habitat and may support limited and sporadic wolf reproduction, the Turtle

Mountain area within the U.S. is not a significant portion of the range of the gray wolves within

the DPS, because of its very small areas and its setting as an island of forest surrounded by a

landscape largely modified for agriculture and grazing."  *Id.* at 6074*; citing* Licht & Huffman

1996 (article available at AR Doc. 468A, p. 2652).  Thus FWS' finding that the Turtle Mountains

is not a SPR is supported by evidence and so not arbitrary and capricious.

---

[6]        The separate issue of whether "range" as used in the ESA refers to "current range" rather than "future potential range" is addressed below.  *See* 16 U.S.C. § 1532(6), (20).  If range means current range, then the NLP was not even a serious candidate for SPR status because the NLP is clearly not a significant part of the current range.  As discussed above, there has never been any documented wolf reproduction in the NLP and recent surveys after a few isolated sightings failed to find any wolf tracks.

3.    There Were No Other Potential SPRs in the DPS

Reviewing road density information, the FWS found no other areas within the WGL DPS that contained suitable wolf habitat.  72 Fed. Reg. at 6074-75.[7]  Thus Plaintiffs have failed to show that there is any suitable habitat within the narrowed DPS that the FWS either did not evaluate as a candidate for SPR status or evaluated in an arbitrary and capricious manner.  Consequently, FWS has complied with the requirements of the statute as applied in the Oregon and Vermont decisions striking down the 2003 Reclassification Rule.  Notably, the National Wildlife Federation, the lead party that successfully challenged the 2003 Delisting Rule in Vermont, 386 F.Supp.2d at 560, has moved for leave to file an amicus curiae brief here supporting the 2007 delisting rule.

**D.    The FWS Was Not Required to Treat Presently Unsuitable Habitat as a SPR Just Because the Unsuitable Area is Large and Was Once Part of the Wolves' Range**

Because the FWS' fact-findings regarding lack of suitable habitat in the Non-Core Recovery Areas have support in the Administrative Record, and so are binding on judicial review, the "boundary-drawing" question boils down to whether the FWS, in making its delisting decision, was required as a matter of law to treat as SPR(s) the portions of the DPS that once were suitable for and occupied by wolves but no longer are.

Undoubtedly, portions of the WGL DPS outside the Core Recovery Areas were once suitable for and occupied by wolves.  The "entire Midwest" was historically wolf range.  72 Fed. Reg. at 6071.  However, most of those areas are now cities, suburbs, cleared farm land, railroads, highways, or other areas not suitable for and therefore not occupied by wolves.  *See* 72 Fed. Reg.

---

[7]    The FWS reviewed speculation that there might be some "very marginal" suitable habitat in Southern Illinois and Western/Central Pennsylvania.  However, the FWS protected any wolves that may be present in those far-away areas by placing them outside the WGL DPS boundaries, so any such wolves continue to be listed as endangered.  72 Fed. Reg. 6052, Figure 1 (WGL DPS map).  Being outside the WGL DPS, those areas by definition are not a SPR within the WGL DPS.  16 U.S.C. § 1532(6), (16), (20).

at 6074-75. To use an extreme example, the skyscrapers, suburbs, and exurbs of Chicago constitute a very large area in terms of acreage and are located within the WGL DPS. However, there can be no realistic expectation that wolves will ever again live there. If delisting of the wolves must await wolf recovery in such areas, delisting will never occur.

The FWS did not err by declining to treat as SPRs large areas of presently unsuitable wolf habitat. Two separate reasons support the FWS' decision.

          1.     <u>Unsuitable Habitat is Not Part of the Wolves' "Range"</u>

First, the ESA defines endangered species <u>in the present tense</u> as being a species, sub-species, or DPS which "<u>is</u> in danger" of becoming extinct "throughout all or a significant portion of its range." Range thus refers to the areas in which a species <u>presently</u> might inhabit but is in "danger" of BECOMING extinct, not to some past range in which the species is ALREADY extinct. Wolves are not in danger of becoming extinct in the skyscraper canyons, suburbs, and exurbs of Chicago – they are already extinct there. The use in 16 U.S.C. § 1532 of the present tense ("<u>is </u>in danger of extinction throughout … range") signifies intent to exclude past tense, i.e. what "was … the range." *U.S. ex rel Totten v. Bombardier Corp.,* 380 F.3d 488, 493 (D.C. Cir. 2004) ("provide" cannot be read to include "has provided" without violating the "Supreme Court's admonition 'that Congress's use of a verb tense is significant in construing statutes'") (*quoting U.S. v. Wilson,* 503 U.S. 329, 333 (1992)); *Barscz v. Director, Office of Workers' Compensation Programs,* 486 F.3d 744, 749-50 (2nd Cir. 2007). This result is also directed by the federal statute setting forth the rules of statutory construction (1 U.S.C. § 1); it allows the present tense to be read to include the future tense, but has no provision allowing the present tense to be read to include the past tense: unless context requires otherwise, "words used in the present tense include the future as well as the present". *Id.* Further, statutes drafted in the present tense "are applied … as of the date of enforcement." Sutherland Stat. Const., § 21.10

29

(2002).  The plain meaning of the term "range" is present range.  "Range" is "the geographic region in which a plant or animal normally lives or grows."  American Heritage Dictionary of the English Language at 1497 (1992) (*emphasis added*).  "Range" is "the region throughout which a kind of organism or ecological community naturally lives or occurs."  Merriam-Webster Collegiate Dictionary at 964 (10th ed. 2000) (*emphasis added*).

Among the many problems with defining range as "historical range" is the difficulty of determining the specific date in the past to which the historical range definition would be applied, and as of which species ranges should somehow be measured.  European settlement occurred gradually and at various dates long in the past; Native American settlement occurred earlier; and the date of the enactment of the ESA (1973) is another possibility.  The ESA offers no guidance for choosing such a historical time frame, which is a sign Congress intended a present-tense construction, as is the obvious difficulty in gathering evidence as to what animal roamed where hundreds of years ago.[8]

Judge Kennedy's decision in the Florida Black Bear case noted above treats "range" as "current" range.  *Defenders of Wildlife v. Norton (Florida Black Bear)*, Civil Action No. 99-02072-HHK at 10-11 (D.D.C. Dec. 13, 2001).  The opinion opens by noting that "because of human development and other factors, the black bear's habitat has been reduced to less than thirty percent of its historical range."  *Id.* at 3 (*emphasis added*).  However, in analyzing which portions of the bear's range qualified as a SPR, the Court looked solely to the "current range," and based its determination on the current suitability of habitat.  *Id*. at 10-11.  Two other district

---

[8]     The "current" range versus "historical" range issue is further reviewed from a statutory construction perspective in the Department of the Interior Solicitor's Memorandum dated March 16, 2007 and supplied as Exhibit 3 to this brief.  The Solicitor concludes "range" means current range.  *Id.* at 7-9.  Defendant-Intervenors understand that the Memorandum (or a slightly earlier) draft is included in a supplemental portion of the Administrative Record, but did not have the A.R. cite.  In any event, a solicitor's opinion, like any agency or court opinion, can be directly cited whether or not in the Administrative Record.

courts in Colorado and New Mexico have determined that range is current range; albeit in opinions since vacated by consent as moot due to a change in how FWS interprets the term "significant" in the SPR definition.[9]  Judge Kennedy's opinion in the Florida Black Bear case did not apply the version of the significance test that FWS has since rejected, and so is not affected by that issue.[10]

Because "range" means "current range", currently-unsuitable habitat in which the species does not now live cannot be part of its range.   In reaching its determination of the listing status of the WGL DPS, the FWS was thus overly-cautious in electing to treat "range" in its SPR analysis as encompassing all areas within the DPS boundaries (even Chicago) rather than just areas where the wolf presently exists.   The FWS explained its theoretical agreement with the view that range meant "current range."  72 Fed. Reg. at 6070; A.R. 12802.  However, taking a very cautious approach, FWS also explained that, for purposes of this rule, it was going to examine the entire geographical area within the DPS and evaluate each part of it for significance. 72 Fed. Reg. at 6066 ("Issue 16"); A.R. 12798.[11]

---

[9]    *Center for Biological Diversity v. U.S. Fish and Wildlife Service (Rio Grand Cutthroat Trout)*, 2007 WL 716108, *2, No. 05-305-RPM (D. Colo., Mar. 7, 2007), *vacated by consent due to mootness and on other grounds*, Case No. 07-1203, (10th Cir. Oct 22, 2007); *see also, Center for Biological Diversity v. Norton (Rio Grand Cutthroat Trout)*, 411 F.Supp.2d 1271, 1278 (D.N.M. 2005), *vacated by consent due to mootness and on other grounds*,  Case No. 06-2049 (10th Cir. May 21, 2007).

[10]    Judge Kennedy's opinion follows the Ninth Circuit's rejection of the FWS' now-discarded Marymount interpretation under which an area is a SPR only if future localized extinction within it would threaten total extinction.  *Defenders of Wildlife (Florida Black Bear)*, slip op. at 9 (discussing *Defenders of Wildlife v. Norton (Lizard)*, 258 F.3d 1136, 1141, 1143 (9th Circ. 2001)). Consequently, Judge Kennedy's opinion is not affected by the FWS subsequent decision to discard the Marymount interpretation.

[11]    Because no wolf population is presently established in the NLP or Turtle Mountains (*see* Point II.C. above), neither is within the current range of the species, and so the "significance" inquiry that FWS actually conducted for those areas was unnecessary.  Consequently, any error in how FWS conducted that inquiry (there was no error) was harmless error that cannot be the basis for reversal, 5 U.S.C. § 706 (in APA judicial review, "due account shall be taken of the rule of prejudicial error").

2.      Even with the FWS's Evaluation of All the Range within the WGL DPS,
        Currently Unsuitable Habitat That Was Once Occupied by Wolves Is No
        Longer a Significant Portion of the Range

Second, even if all the range within the DPS boundaries are evaluated, the "significance" test must be surmounted before any areas of historic range could qualify as a SPR.

The only Court of Appeals decision to address the SPR question leaves unclear whether range means current or historical range.  *Defenders of Wildlife v. Norton (Lizard)*, 258 F.3d 1136, 1141, 1143 (9th Circ. 2001).  However, even if the Ninth Circuit's opinion could be interpreted to mean that "range" for SPR purposes includes historical range, that opinion unambiguously holds that the geographical size of an area does not control whether it is "significant" for SPR purposes:

> First, it simply does not make sense to assume that the loss of a predetermined percentage of habitat or range would necessarily qualify a species for listing.   A species with an exceptionally large historical range may continue to enjoy healthy population levels despite the loss of a substantial amount of suitable habitat. Similarly, a species with an exceptionally small historical range may quickly become endangered after the loss of even a very small percentage of suitable habitat.  As the examples cited by [Plaintiffs] and noted above demonstrate, the percentage of habitat loss that will render a species in danger of extinction or threatened with extinction will necessarily be determined on a case by case basis. Furthermore, were a bright line percentage appropriate for determining when listing was necessary, Congress could simply have included that percentage in the text of the ESA.

*Defenders of Wildlife (Lizard)*, 258 F.3d at 1143 (*emphasis added*).

With the possible exception of Judge Kessler's lynx opinion, discussed below, the subsequent opinions in this area all follow the Ninth Circuit's analysis that size does not equate to significance for SPR's purposes.  Judge Kennedy's Florida Black Bear case fully analyzes the Ninth Circuit's *Defenders of Wildlife* opinion and, in a discussion highly pertinent to the instant case, upholds the FWS's decision to use suitability of habitat, population distribution, and fragmentation of habitat, and other factors to determining significance:

32

> Following the Ninth Circuit's cogent analysis …, this court holds that the Wildlife Service's interpretation of what constitutes a significant portion of the black bear's range and its determination that the species is not likely to become endangered over that range [the range of the smaller of the two bear groups] is reasonable.  <u>First, the areas likely to be lost only support five percent of the black bear's population.   Although these areas may constitute forty percent of the bear's present habitat, it is habitat that relatively few bears use.  Second the habitats likely to disappear … are of low quality and are geographically isolated from each other and from bear habitats likely to survive in the foreseeable future.</u>  Because none of the threatened habitats are particularly large, and because they are spread out from one another and from most of the remaining viable bear habitats, they may not exert a significant impact on the bear population as a whole.  <u>Thus, these pockets of habitat are not "major geographical areas" of the bear's range</u>.  Finally, the bears living in those habitats will remain isolated and unlikely to contribute genetically to the continuation of the species."

*Defenders of Wildlife (Florida Black Bear)* at 10-11 (*emphasis added*) (copy is attached as

Exhibit 1 to this brief).  Here there is no evidence that the few dispersing wolves outside the

Core Recovery Areas, but within the WGL DPS, are anything but a tiny fraction of the total wolf

population in the DPS, 72 Fed. Reg. at 6054-55; A.R. 12786-7, and the limited suitable habitat

outside the Core Recovery Areas are fragmented and of lower quality than that in the Core

Recovery Areas, 72 Fed. Reg. at 6071-75.

In *Southwest Center for Biological Diversity v. Norton (Queen Charlotte Goshawk),* 2002

WL 1733618, *16, No. 98-0934 (D.D.C. Jul. 29, 2002), Magistrate Judge Facciola issued a

recommended decision that similarly agreed that population distribution is more important than

acreage size in determining whether an area is "significant" for SPR purposes:

> "[A] flat percentage of geographic area is not the sole determinant of significance. As a general rule, species are not evenly distributed across their ranges, but rather tend to concentrate in certain areas where habitat is particularly suitable.  Thus, the percentage of geographic area would not literally correlate to the percentage of the species' population.  One third of a species' geographic range may be found to contain a disproportionably greater or lesser percentage of the total number of individuals.  It does not seem fair or sensible, than, to point to some arbitrary geographic percentage as constituting a 'significant' portion of a species' range."

2002 WL 1733618, *16, slip op. at 28.  Magistrate Judge Facciola then noted that the SPR

candidate area (Vancouver Island) contained 19 of the 43 known nesting sites of the rare Queen

Charlotte goshawk, as well as most of the habitat, and recommended that FWS be ordered to

treat the area as a SPR.  *Id.* at 29.  Notably, Judge Urbina, on review of Magistrate Judge

Facciola's recommended decision, declined to find that an area containing 19 of the 43 nesting

site was "significant" as a matter of law, and instead directed FWS to reconsider the matter and

supply a more reasoned analysis.  Order, Case No. 98-0934 (D.D.C. May 24, 2004).  Thus the

Goshawk case follows the same analytical path as Judge Kennedy's Florida Black Bear opinion,

and reaches a different result based on the presence of far more of the population in the SPR

candidate area.

Judge Kessler's lynx opinion does not rebut the analysis that population distribution is

more important than acreage.  *Defenders of Wildlife v. Norton*, 239 F.Supp.2d 9 (D.D.C. 2002)

(Kessler, J.), *vacated in part on separate point*, 2004 WL 438599, 89 Fed.Appx. 273 (D.C. Cir.

2004).  The lynx opinion begins by explaining that the "lynx range extends into four different

regions that are separated from each other by ecological barriers consisting of <u>unsuitable</u> lynx

habitat:  (1) the Northeast, (2) the Great Lakes, (3) the Southern Rocky Mountains, and (4) the

Northern Rocky Mountains/Cascades."  *Id*., 239 F.Supp.2d at 14 (*emphasis added*).  Judge

Kessler did not require that the barrier areas of unsuitable habitat be considered as potential

SPRs, although they were in the contiguous United States DPS established by the FWS, and it

was unclear whether they were once lynx range.  *Id.*  Instead, Judge Kessler rejected FWS's

argument that three of those regions which contained at least some suitable habitat (the

Northeast, the Great Lakes, and the Southern Rocky Mountains) could not be SPRs merely

because lynx were "naturally rare" in them.  *Id.* at 19.  Perhaps because FWS had not done the

necessarily detailed habitat suitability analysis, the opinion does not analyze which parts the

Northeast, Great Lakes or Southern Rocky Mountains (a) contained significant suitable habitat in which the naturally rare lynx could survive if protected, or (b) contained largely unsuitable habitat that could not be significant. *Id.* at 20-21. As a result, the FWS had little factual basis to support its conclusion that the three areas were not SPRs.

Further, in the lynx case the remnant population at issue was not a recovered DPS that had exceeded recovery plan criteria, grown dramatically in both numbers and range, been on the "endangered" species list for thirty years subject to federal and state conservation and management strategies. The gray wolves of the WGL DPS are not a "remnant" population, but instead are a healthy, hearty, self sustaining population of a now recovered species and should be dealt with accordingly.

By contrast, here the FWS has done the detailed suitability analysis and determined that there is no suitable habitat within the Non-Core-Areas of sufficient size to support a viable wolf population. 72 Fed. Reg. at 6071-76. FWS is not just making the circular argument that wolves in the Non-Core Areas should be removed from the list of endangered and threatened species in the Non-Core Areas merely because they are rare; rather it has shown that the Non-Core Areas do not contain suitable wolf habitat and therefore are not a significant portion of the range of the wolves within the WGL DPS. 72 Fed. Reg. at 6071-75. As explained above, the ESA precludes listing of non-significant range portions in which the species is in danger, unless the species is also in danger "throughout all" of its range. 16 U.S.C. § 1532(6), (20).

If the Court finds a direct conflict between the Ninth Circuit ruling in Defenders of Wildlife, and the D.C. District Court opinions in the Florida Black Bear and goshawk cases, and Judge Kessler's ruling on the lynx listing opinion, Defendant-Intervenors respectfully submit that the former authorities are more persuasive. At least one court has chosen to reject Judge Kessler's analysis. A New Mexico District Court explained:

> The Lynx case is not persuasive. The court in that case considered the word "significant" to refer to an "amount" of geographical area. But the Court and, as noted above, both parties in this case, have rejected that use of "significant" in the context of the ESA, focusing instead on the biological significance of the lost range, not its raw size. If raw size of the range were the only determinative factor, virtually every non-domestic species of wildlife in North America would be listed. Historical accounts in the Lewis and Clark journals, for example, describe abundant wildlife across the depth and breadth of the country they explored, and that historical range no longer exists in its pristine state.

*Center for Biological Diversity (Rio Grand Cutthroat Trout),* 411 F. Supp. 2d at 1281.[12]

In short, once it is established that an area is presently unsuitable for a species, requiring the FWS to treat it as SPR just because it contains many acres that once were suitable and significant would be an exercise in futility, and rob the FWS of the discretion it is due under *Chevron* in construing the "inherently ambiguous" SPR language. *Defenders of Wildlife (Lizard)*, 258 F.3d at 1141. Asphalt cannot be unpoured, skyscrapers will not be leveled, suburbs do not disappear, and cleared farmland is unlikely to become large swaths of forest. The present tense wording of the definitions of "endangered" and "threatened" species fully justify (and in fact require) FWS's reading that significance is determined based on the present state of habitat, not the state of the habitat at some point of time in the past. Defendant-Intervenors fully recognize the equitable argument that human activity over the last 200 to 300 years is largely responsible for rendering so much habitat unsuitable, but Congress knew this when it passed the ESA in 1973, and chose not to include any provision in the SPR language that made application of the SPR test turn on <u>why</u> habitat is now unsuitable and thus insignificant. Plaintiffs cannot be allowed to end run this Congressional decision to limit the ESA's scope in cases such as this one

---

[12]    As described in **note 10** above, the FWS on appeal consented to the vacating of the District of New Mexico's opinion as moot due both to the FWS' decision to restart the listing process for trout and a change in how FWS interprets the term "significant." However, the FWS has not changed its position that geographic size does not determine significance, 72 Fed. Reg. 6065, so the New Mexico court's reasoning on that specific point is not undermined by FWS' subsequent change-of-interpretation.

where the species (or here, a DPS of a species) is doing well in all significant portions of its

range.

## IV.    SHOULD ANY OF PLAINTIFFS' UNFOUNDED PREDICTIONS OF FUTURE JEOPARDY TO THE WOLF COME TO PASS, THE FWS WILL BE UNDER A NON-DISCRETIONARY DUTY TO RELIST THE WESTERN GREAT LAKES WOLVES ON AN EMERGENCY BASIS

The text of the ESA itself rebuts HSUS *et al.'s* argument that alleged potential future

threats to the recovered wolf population (*e.g.*, the alleged potential for increase in diseases) made

it arbitrary and capricious to delist the WGL-DPS.  Plaintiffs' Memorandum of Law in Support

of Plaintiff's Motion for Summary Judgment at 39-41.  Congress was aware that that no listing

decision can be based  on *absolute* certainty that a recovered species will continue to do well

after delisting and therefore included in Section 4(g) of the ESA a requirement that the FWS

monitor the delisted population for five years.  16 U.S.C. § 1533(g)(1).  The FWS has complied

with those requirements by developing a post-delisting monitoring plan for the WGL DPS.  72

Fed. Reg. 30819 (June 4, 2007).[13]

If the FWS's post-delisting monitoring reveals that some threat has risen to the level of

being "a significant risk to the well being of any such recovered species," then the FWS is

directed to relist the species, on an emergency basis, as an endangered or threatened species:

"The Secretary shall make prompt use of the authority under paragraph 7 of subsection (b) of this

section [emergency relisting] to prevent a significant risk to the well being of such recovered

species."  16 U.S.C. § 1533(g)(2) (*emphasis and bracketed material added*).  The emergency

relisting is effective immediately – the notice-and-comment process is completed later.  16

---

[13]     Although the FWS has thus far published a Draft plan, the Federal Register Notice for the plan indicates that it is already being implemented.  72 Fed. Reg. at 30820.

U.S.C. § 1533(b)(7).[14]  In the Final Rule, FWS acknowledged this authority and duty to "relist

midwestern gray wolves if necessary."  72 Fed. Reg. 6052, 6068 (Feb. 8, 2007).

## V.    ANY REMEDY THAT THIS COURT ORDERS SHOULD AVOID HARMFUL AND NEEDLESS DISRUPTIONS TO RECOVERED WOLF MANAGEMENT IN THE CORE  RECOVERY AREAS

The appropriate "remedy" in this matter is the dismissal of HSUS *et al*.'s Motion for

Summary Judgment and grant of Defendants' Motion for Summary Judgment.  However, if this

Court finds that it must issue some alternative remedy that remedy should avoid unnecessary and

harmful disruptions to ongoing state management of recovered gray wolf populations.

Defendant-Intervenors' primary interest is in defending the delisting in the Core Recovery Areas

(Minnesota, Wisconsin, and the Upper Peninsula of Michigan).  The Core Recovery Areas are

where Defendant-Intervenors' members, while hunting other species or participating in other

outdoor activities, actually encounter wolves.  These individuals need the flexibility to protect

their dogs or other property from depredation by wolves.  State wolf management plans provide

hunters and outdoor enthusiasts far more flexibility in their ability to respond to wolf

depredation.  Thus, in addition to defending the 2007 delisting Rule, Defendant-Intervenors' key

objective is to impress upon this court the need to avoid a another outcome like that in the

Oregon and Vermont cases, where,  without disputing the recovery of gray wolves in the Core

Recovery Areas, the two courts rejected the 2003 Reclassification Rule in its entirety.  *See* Point

III.C above.

D.C. Circuit precedent governing remedies in APA judicial review cases provides the

Court with ample flexibility to fashion a remedy that will not result in the Core Recovery Area

populations returning to "endangered" or "threatened" status.  Actions taken by the FWS,

pursuant to the ESA, are reviewed under the Administrative Procedure Act, 5 U.S.C. § 706

---

[14]    After an emergency relisting takes effect, the FWS has 240 days to conduct the notice-and-comment process necessary to affirm and complete the relisting.  16 U.S.C. § 1533(b)(7).

("APA").  *National Association of Home Builders v. Norton*, 451 F.3d 8, 13 (D.C. Cir. 2005);

*Fund for Animals v. Babbitt (Grizzly Bears)*, 903 F.Supp. 96, 105 (D.D.C. 1995).  Under the

APA, a court that disagrees with agency action considers a flexible two-factor standard in

deciding whether to: (a) vacate that action, or (b) leave it in place on remand while the agency

completes further proceedings to reconsider and further explain its action.  *Allied-Signal, Inc. v.*

*U.S. Nuclear Regulatory Commission*, 988 F.2d 146, 150-151 (D.C. Cir. 1993); *see also United*

*Mine Workers v. Federal Mine Safety and Health Administration*, 924 F.2d 340 (D.C. Cir. 1991)

(remand without vacatur of final rule lifting restrictions on mine ventilation techniques).  Those

two factors are: (1) the seriousness of the violation and the prospect that the agency will be able

to cure it on remand; and (2) the disruption that could occur if the court vacates the agency action

and then the agency later cures the deficiencies and reinstates the vacated action.  *Id*. at 150-51;

*Fox Television Stations v. FCC,* 280 F.3d 1027, 1049 (D.C. Cir. 2002) (this is a balancing test,

strong showing on one factor can be enough).  It applies to ESA cases like other APA cases.

*Endangered Species Comm. of the Building Ind. Assoc. of South.  Cal. v. Babbitt*, 852 F.Supp.

32, 42 (D.D.C.  1994).[15]

The curability factor strongly weighs against vacatur here.  If this court, like the Oregon

and Vermont courts that reviewed the 2003 Reclassification Rule, accents FWS' finding that the

wolves of the Core Recovery Areas are indeed recovered, then this court can allow those wolf

populations to retain their delisted status.    As described above, the wolf population in the Core

Recovery Areas "greatly exceeds the numerical recovery criteria" established by FWS.  71 Fed.

Reg. 15266.

---

[15]     *Endangered Species Committee* reviewed an order listing the gnatcatcher as threatened.  A group
opposed to listing persuaded the Court that FWS erred.  The Court ordered that the gnatcatcher retain its
threatened status on remand due to concerns about rapid destruction of habitat if it were temporarily
delisted during remand.  852 F.Supp. at 41.  There is no evidence in this case of an increase in wolf
killings or declines in wolf populations since the delisting nine months ago, so the reasoning of the
gnatcatcher case that led to remand without vacatur in that case would not require vacatur here.

While allowing the recovered wolves to retain their delisted status, the Court could, for example, remand and direct the FWS to draw a smaller line around the recovered populations or to draw a line between recovered and non-recovered significant portions of the population in order to relist only the non-recovered portions.  *Defenders of Wildlife (Lizard)*, 258 F.3d at 1144; *National Wildlife Federation (Wolves/Vermont),* 386 F.Supp.2d at 564 ("The ESA allows defendants to provide varying levels of protection based upon the biological evidence ….  The FWS does not have to list an entire species as endangered when only one of its populations faces extinction ….  Nowhere in the ESA is the Secretary prohibited from creating a 'non-DPS remnant'" to protect any wolves found outside the core recovery areas) (*internal citations and quotations omitted*).  The Ninth Circuit agreed with this analysis, utilizing legislative history, after it found the statute itself to be "inherently ambiguous":

> An animal might be "endangered" in most States but overpopulated in some. In a State in which a species is overpopulated, the Secretary would have the discretion to list that animal as merely threatened or to remove it from the endangered species listing entirely while still providing protection in areas where it was threatened with extinction. *In that portion of its range where it was not threatened with extinction, the States would have full authority to use their management skills to insure the proper conservation of the species.*

*Defenders of Wildlife (Lizard),* 258 F.3d at 1141, 1144 (quoting statement from ESA sponsor Senator John Tunney (CA) found at H.R. Rep. No. 412, 93rd Cong., 1 Sess.; Cong. Rec. 25,669 (July 24, 1973)).

The disruption factor also weighs heavily in favor of a remand without vacatur if the court deems it necessary The Final Rule to delist the WGL DPS transferred wolf management and conservation from FWS to the States.  Anticipating delisting, the Minnesota, Wisconsin, and Michigan Departments of Natural Resources developed extensive state wolf management programs which went into effect upon delisting.  These States have been successfully operating their plans for the last nine months with no evidence of adverse consequences to the wolf

populations. Each of these Core Recovery Areas State plans establishes long term minimum wolf populations that are greater than the goals set by the Eastern Timber Wolf Recovery Plan. A.R. p. 5134 (MI), A.R. p. 5255 (MN), A.R. p. 5983 (WI).[16] Each of the plans bars the take of wolves, with limited-regulated exceptions for depredation control (prevention of property damage). If vacatur returns wolf conservation and management to the FWS, the toll will be felt by those living and recreating in these Core Recovery Areas, who are losing pets, livestock and recreational opportunities to this recovered predator species. The resulting back and forth in management authority between the federal and state jurisdictions would cause needless disruption, frustration and loss to all concerned.

Alternatively, if the court finds reason to request additional explanation or other rulemaking, the court could remand the Final Rule, and stay its ruling for a short-term such as 90 to 120 days, sufficient for FWS to prepare, publish for comment, and, if it so chose, adopt a ruling to conform to this Court's direction, such as potentially a ruling delisting wolves only in the Core Recovery Areas. [17] That would at least avoid disruption of the ongoing implementation of the Minnesota, Wisconsin, and Michigan wolf management plans.

## <u>CONCLUSION</u>

The Court should affirm the 2007 delisting order in its entirety because wolves have now recovered and are thriving in substantially all of the suitable habitat in the WGL DPS. The FWS made a proper determination with respect to the SPR of the WGL DPS. Its determination that no area of the WGL DPS outside the Core Recovery Areas constituted a SPR is supported

---

[16]     71 Fed. Reg. 15287-95 (*citing* Michigan Department of Natural Resources, Michigan Gray Wolf Recovery and Management Plan (1997) (#58); Minnesota Department of Natural Resources, Minnesota Wolf Management Plan (2001) (#68); Wisconsin Department of Natural Resources, Wisconsin Wolf Management Plan (1999) (#103)).

[17]     The Court can also place time limits for completing remand. *Fund for Animals (Grizzly Bears),* 903 F.Supp. at 118 (giving FWS 90 days to complete reconsideration of portions of a recovery plan).

by the factual evidence that the Non-Core Areas lack suitable wolf habitat.  The agency also

properly designated the WGL DPS, determined its boundaries and properly determined, based on

the best available science that wolves no longer qualify for "endangered" or even "threatened"

status.  In reaching this conclusion, it conducted the requisite threats analysis.

Defendant-Intervenors request that this court deny HSUS *et al*.'s Motion for Summary

Judgment and grant the FWS's and Defendant-Intervenors' Motion.  If for some reason, this

court deems some other remedy necessary, Defendant-Intervenors ask that this court avoid

vacating the Final Rule to Delist in order to maintain consistency in the management of the

recovered populations of WGL DPS wolves by the Minnesota, Wisconsin, and Michigan

Departments of Natural Resources.

Dated: January 18, 2007                    Respectfully submitted,


_____

William P. Horn (D.C. Bar No. 375666)
James H. Lister (D.C. Bar. No. 447878)
Birch Horton, Bittner & Cherot
1155 Connecticut Avenue N.W.,
Suite 1200
Washington, D.C.  20036
(202) 659-5800
Fax:  (202)659-1027
whorn@dc.bhb.com
jlister@dc.bhb.com

*Counsel for U.S. Sportsmen's Alliance
Foundation, Wisconsin Bear Hunters'
Association, Scott Meyer and Robert
Stafsholt*


_____

Anna M. Seidman (D.C. Bar No. 417091)
Douglas S. Burdin (D.C. Bar No. 434107)
Safari Club International
501 2nd Street NE
Washington, D.C.  20002
(202) 543-8733
Fax:  (202) 543-1205
aseidman@sci-dc.org
dburdin@sci-dc.org

*Counsel for Safari Club International,  Safari Club
International Foundation, and National Rifle
Association*

**EXHIBIT 1 TO DEFENDANT-INTERVENORS'
CONSOLIDATED MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**(CASE NO. 1:07-CV00677-PLF)**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEFENDERS OF WILDLIFE, et al.,

Plaintiffs,

v.

GALE NORTON, et al.,

Defendants.

Civil Action 99-02072 (HHK)

**FILED**

DEC 1 3 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## MEMORANDUM

In this suit, plaintiffs, Defenders of Wildlife and others ("Defenders"), claim that the

decision of the United States Fish & Wildlife Service ("Wildlife Service" or "Agency") not to list

the Florida black bear as a threatened species pursuant to the Endangered Species Act ("ESA"),

16 U.S.C. § 1531 *et seq.*, violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et*

*seq.* Defenders contend that the decision was arbitrary, capricious, and an abuse of discretion.

Presently before the court are the parties' cross motions for summary judgment. Upon

consideration of the motions, the oppositions thereto, and the administrative record, the court

concludes that each motion should be granted in part and that this case should be remanded to the

Wildlife Service for further proceedings.

## I. BACKGROUND

A.    **Statutory Framework**

The ESA was enacted in order "to provide a means whereby the ecosystems upon which

39

endangered species and threatened species depend may be conserved, [and] to provide a program

for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

The statute defines the term "threatened species" as "any species which is likely to become an

endangered species within the foreseeable future throughout all or a significant portion of its

range." 16 U.S.C. § 1532(20). An "endangered species" is defined as "any species which is in

danger of extinction throughout all or a significant portion of its range . . . ." 16 U.S.C. §

1532(6). The Act does not provide protection to a species unless the Secretary of Interior lists it

as endangered or threatened. *See* 16 U.S.C. § 1533. Once a species is listed as threatened or

endangered, it receives substantial federal protection. For example, it is illegal for anyone to kill,

take, hunt or capture an endangered or threatened species. *See* 16 U.S.C. § 1538(a)(1); 50 C.F.R.

§§ 17.21, 17.31.

The ESA allows citizens to file petitions seeking to list a species as threatened or

endangered. *See* 16 U.S.C. § 1440(g)(1). Once a citizen petitions for listing of a species, the

Wildlife Service must decide within ninety days if the petition presents enough information

indicating that a listing may be warranted. *See* 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. §

424.14(b). If the Wildlife Service determines that the petition provides sufficient information, it

then conducts a study of the current state of the species, known as a status review, to determine

whether to list the species. *See* 16 U.S.C. § 1533(b)(3)(B). If the agency decides that a listing is

warranted, it must publish a proposed rule listing the species. *See* 16 U.S.C. § 1533(b)(5). The

agency must issue a final rule either listing the species or explaining its decision not to list within

twelve months of issuance of the proposed rule. *See* 16 U.S.C. § 1533(b)(5).

In order to determine whether a species warrants listing pursuant to the ESA, the Wildlife

Service must consider five specific factors:

> (A) the present or threatened destruction, modification, or curtailment of its
> habitat or range;
> (B) overutilization for commercial, recreational, scientific, or educational
> purposes;
> (C) disease or predation;
> (D) the inadequacy of existing regulatory mechanisms; or
> (E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1).  Because the Act states that "[t]he Secretary shall . . . determine whether

any species is an endangered species or a threatened species because of any of the [five factors

set forth in the ESA]," *id.*; *see also* 50 C.F.R. § 424.11, the agency must list a species as long as

any one factor demonstrates that it is threatened or endangered.  *See, e.g., Carlton v. Babbitt*, 900

F. Supp. 526, 530 (D.D.C. 1995).  The agency must base its decision whether or not to list

"solely on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b).


**B.    The Effort To Have the Florida Black Bear Listed**

The Florida black bear ("black bear" or "bear") (*Ursus americanus floridanus*) is a

subspecies of the North American black bear (*Ursus americanus*).  The current population of the

black bear occurs primarily in Florida, although small populations are also found in Alabama and

Georgia.  *See* 56 Fed. Reg. 596 (Jan. 7, 1992).  The animal lives in a variety of forest habitats,

including pine flatwoods, hardwood swamp, cabbage palm forest and sand pine scrub forest.  Its

diet is diverse, but consists mainly of hard and soft mast as well as fruits, insects, and small

animals.  Because of human development and other factors, the black bear's habitat has been

reduced to less than thirty percent of its historical range.

In 1990 Inge Hutchinson petitioned the Wildlife Service to list the black bear as a

threatened species. Hutchinson argued in her petition that the combined effect of legal and illegal

hunting, loss and fragmentation of habitat, and road mortality posed a threat to the animal's

continued existence. *See* 56 Fed. Reg. at 596. The Wildlife Service determined that the petition

presented substantial information indicating that listing might be warranted. *See* 55 Fed. Reg.

42,223 (Oct. 18, 1990). The Wildlife Service then conducted a status review of the black bear,

and on January 7, 1992, determined that the effects of habitat destruction, legal and illegal

hunting, and human induced mortality warranted listing the black bear as threatened. *See* 56 Fed.

Reg. at 599. The Wildlife Service concluded, however that while the threat to the black bear was

imminent, the magnitude of the threat was "moderate to low." *Id.* At the time, the Wildlife

Service ranked species on a scale of one to twelve based on their priority for listing. The black

bear was assigned to category nine in the listing hierarchy. *Id.* As a result, even though the

Agency concluded that the black bear should be listed, it found that listing was precluded until it

was able to list species with a higher priority. *See id.*

By 1997, the black bear remained unlisted. On January 21, 1997, the Wildlife Service

entered into a settlement agreement in *Fund for Animals, Inc. v. Babbitt*, Civ. No. 92-0800 (SS)

(D.D.C.), a case brought to challenge the Agency's failure to list a number of different species

within the statutory twelve-month time frame. As part of the settlement agreement, the Wildlife

Service agreed either to issue a proposed rule listing the black bear or to issue a final rule finding

that it did not warrant listing by December 31, 1998. The Wildlife Service then conducted

another study of the black bear. The ensuing report identified nine distinct populations of the

Florida black bear. It concluded that four of the nine populations – Southern Alabama,

Chassahowitzka, St. Johns, and Highlands – and possibly a fifth – Eglin AFB – were unlikely to

survive into the foreseeable future. The report indicated that the four remaining populations –

Okefenokee National Wildlife Refuge (NWR), Ocala National Forest (NF), Big Cypress National

Preserve, and Apalachicola NF – which house the vast majority of the black bear population,

were likely to survive into the foreseeable future. All four of those habitats are estimated to have

populations of at least 300 bears, and all contain at least 2,200 km$^2$ of publicly owned land.

On December 8, 1998, the Wildlife Service concluded, in contrast to its 1992 finding,

that the black bear did not warrant listing as a threatened species. *See* 63 Fed. Reg. 67,613,

67,618 (Dec. 8, 1998). This suit followed.

## II. STANDARD OF REVIEW

Under the APA, a reviewing court shall set aside agency action it finds to be "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. §

706(2)(A). An agency rule is arbitrary and capricious if

> the agency has relied on factors which Congress has not intended it to consider,
> entirely failed to consider an important aspect of the problem, offered an
> explanation for its decision that runs counter to the evidence before the agency, or
> is so implausible that it could not be ascribed to a difference in view or the
> product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). While the

court's scope of review is narrow, as it "is not empowered to substitute its judgment for that of

the agency," the court must still conduct "a thorough, probing, in-depth review" of the agency's

decision. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415-16 (1971).

Agency actions are presumed to be valid. *See Ethyl Corp. v. EPA*, 541 F.2d 1, 31 (D.C. Cir.

1976) (*en banc*). As long as an agency considers relevant factors and can articulate a rational

connection between the facts found and the choices made, then its decision will be upheld. *See State Farm*, 463 U.S. at 43; *Marsh v. Oregon Natural Res. Council*, 460 U.S. 360, 378 (1989) (holding that agency action will not be reversed absent a clear error of judgment). Moreover, when an agency's action relies on scientific and technical information touching upon the agency's area of expertise, a court is particularly deferential. *See Marsh*, 460 U.S. at 377.

Because this case involves a challenge to final agency action, review is limited to the administrative record and the grounds for decision invoked by the agency. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973); *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). "Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record, even though the Court does not employ the standard of review set forth in Rule 56, Fed. R. Civ. P." *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995) (internal citation omitted).

### III. ANALYSIS

Defenders attack the decision of the Wildlife Service not to list the black bear on three grounds. First, Defenders argue that the Agency's decision is inconsistent with the ESA's express requirement that a species be listed if the species is threatened over "all or a significant portion of its range." *See* 16 U.S.C. § 1532(20). Second, Defenders contend that the Wildlife Service's 1998 decision not to list the black bear is arbitrary and capricious in light of the Agency's 1992 decision that a listing of the species was warranted. Specifically, Defenders maintain that the Wildlife Service erroneously concluded in its 1998 decision that the combined effects of habitat destruction, habitat isolation, roadkill, and hunting did not warrant listing.

Finally, Defenders assert that the Wildlife Service improperly relied on uncertain future

regulatory activity in determining that existing regulatory mechanisms are adequate to protect the

black bear's existence. Each argument is addressed in turn below.

**A.    The Agency's Interpretation of "Significant Portion of its Range"**

The ESA requires the Secretary of the Interior to list any species that it finds to be

endangered or threatened. *See* 16 U.S.C. § 1533(a). Under the ESA, a species must be listed as

threatened if it is likely to become endangered over "all or *a significant portion* of its range."  16

U.S.C. § 1532(20) (emphasis added).  Similarly, a species is endangered if it "is in danger of

extinction throughout all or a significant portion of its range . . . ."  16 U.S.C. § 1532(6).  In its

decision not to list the Florida black bear, the Wildlife Service acknowledged that several areas

of current black bear habitat, comprising 17,821 km$^2$, or forty percent of the bear's current

geographical habitat, are unlikely to survive into the foreseeable future. *See* 63 Fed. Reg. at

67,614-16 (1998).

Defenders argue that the Wildlife Service's decision not to list the black bear even though

forty percent of the animal's current habitat likely will be lost results from an erroneous

interpretation of what is meant by the phrase "all or a significant portion of its range."  16 U.S.C.

§ 1532(20). The likely loss of forty percent of the bears' current range warrants listing, according

to Defenders, because that much of the species habitat is "significant" as a matter of law.  In

support of its position,  Defenders cite several instances in which the Wildlife Service found that

the loss of a particular percentage of a species' habitat warranted a listing of the species as

threatened or endangered, including one where as little as one-third of a species' habitat was in

7

danger of disappearing. *See, e.g.*, 65 Fed. Reg. 26,762 (May 9, 2000) (listing the Koala where

the geographic range declined by fifty to ninety percent); 65 Fed. Reg. 19,686 (Apr. 12, 2000)

(listing the Santa Ana sucker where the species lost approximately seventy-five percent of its

range); 57 Fed. Reg. 45,328 (Oct. 1, 1992) (listing the Marbled Murrelet where one third of its

range was at risk of being lost).

The Wildlife Service disagrees with Defenders' reasoning. The Agency points out that the

portion of habitat likely to be lost supports only five percent of the black bear's population. The

Wildlife Service argues that under the circumstances, this loss does not constitute a significant

portion of the bear's range.

In determining whether the Wildlife Service misinterpreted the ESA, the job of the court

is not to impose its own construction of the statute, but merely to decide if the Agency's

interpretation is reasonable. When reviewing an agency's construction of a statute, the court

must first look to see if Congress has addressed the question at issue. *See Chevron, Inc. v.

Natural Res. Def. Council*, 467 U.S. 837, 843 (1984). If it has, then the court must give effect to

the meaning of the statute as determined by Congress. *See id.* But if Congress has not spoken

directly to the matter at hand, then the court must defer to any reasonable interpretation of the

statute by the agency, even if that interpretation is different from the court's preferred reading.

*See id.* at 843-44 & n.11.

Neither the ESA nor any of its implementing regulations defines the phrase "significant

portion of its range." The only court that has addressed the meaning of the phrase has found it to

be ambiguous. *See Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1141 (9th Cir. 2001). In

*Defenders of Wildlife v. Norton*, the Ninth Circuit reasoned that "significance" depends on the

overall nature of the range that will be lost. That case involved a challenge to the Wildlife

Service's refusal to list the flat-tailed horned lizard as a threatened species. The Wildlife Service

had determined that although the lizard might not survive on private land, listing was not

warranted because of the likelihood that the lizard would continue to survive on its public land

habitat. *See id.* at 1140. In order to resolve the dispute, the court had to decide whether or not

the lizard's private land habitat constituted a significant portion of its range. *See id.* at 1141.

The Ninth Circuit rejected the Wildlife Service's argument that a species warrants

protection only if it would lose a portion of its range that would put the entire species in danger

of extinction. *See id.* The court found that this interpretation turned the phrase "significant

portion" into mere surplusage by equating the danger of extinction over a significant portion of

the range with extinction over the entire range. *See id.* at 1141-42. The court emphasized that

the Wildlife Service will commonly list only particular populations of species as threatened or

endangered precisely because they may be threatened over a significant portion of their range, but

not over their entire range. *See id.* at 1145 (citing examples where certain populations of species

were listed as threatened but other populations of the species were not).

The court also rejected the plaintiff's interpretation, which is substantially similar to the

argument advanced by Defenders in the present case, that significance is determined by the

percentage of habitat lost. *See id.* at 1143. The court observed that because different species

may have habitat ranges of varying sizes, and may have different migration and travel patterns

affecting the size of the habitat they require to survive, "it simply does not make sense to assume

that the loss of predetermined percentage of habitat or range would necessarily qualify a species

for listing." *Id.* Since the amount of habitat loss that will put a species in danger of extinction is

fact-specific, the court held that "the percentage of habitat loss that will render a species in

danger of extinction or threatened with extinction will necessarily be determined on a case-by-

case basis." *Id.*

　　Finding that neither percentage of habitat loss nor the danger of extinction over the entire

range provided a proper definition, the court examined the Act's legislative history and

determined that the phrase "significant portion" was included in the statute as a way of allowing

for increased federal-state cooperation to protect species in areas where they are threatened, even

if the species is not threatened as a whole. *See id.* at 1144-45.  In other words, if a species is

endangered in Florida, but not in other parts of the country, the statutory language allows the

Wildlife Service to list the species as threatened in Florida if it finds that the Florida habitat

constitutes a significant portion of the species' range.  The court ultimately concluded "that a

species can be extinct 'throughout . . . a significant portion of its range' if there are major

geographical areas in which it is no longer viable but once was.  Those areas need not coincide

with political boundaries, but they can." *Id.* at 1145.

　　Following the Ninth Circuit's cogent analysis in *Defenders of Wildlife*, this court holds

that the Wildlife Service's interpretation of what constitutes a significant portion of the black

bear's range and its determination that the species is not likely to become endangered over that

range is reasonable.  First, the areas likely to be lost only support five percent of the black bear's

population.  Although these areas may constitute forty percent of the bear's present habitat, it is

habitat that relatively few bears use.  Second, the habitats likely to disappear – Southern

Alabama, Chassahowitzka, Highlands, St. Johns, and Eglin's Air Force Base – are of low quality,

and are geographically isolated from each other and from bear habitats likely to survive in the

foreseeable future.[1] Because none of the threatened habitats are particularly large, and because

they are spread out from one another and from most of the remaining viable bear habitats, they

may not exert a significant impact on the bear population as a whole.  Thus, these pockets of

habitat are not "major geographical areas" of the bear's range.  Finally, the bears living in those

habitats will remain isolated and unlikely to contribute genetically to the continuation of the

species.[2]

  The court's conclusion regarding the reasonableness of the Wildlife's Service's

determination that the black bear is not threatened over a significant portion of its range is not

altered by a consideration of Defenders' recitation of the instances in which the Wildlife Service

found that the loss of a particular percentage of a species' habitat warranted the listing of a

species as threatened or endangered.  Simply comparing the percentages of lost habitat of

different species is not illuminating.  The black bear may have a different population size and

may not face the same biological and environmental pressures that were faced by the species

covered by the rulings in the cited instances.  Indeed, there is no evidence demonstrating any

similarity between the black bear and the other species that the Wildlife Service decided to list.

To imbue the Wildlife Service's determinations regarding these species with significance would

---

[1] Currently, linkages do exist between St. John's and the Ocala National Forest habitat. The Wildlife Service found that there is a significant likelihood that those linkages will disappear absent a listing of the species.

[2] The court does not take the Wildlife Service to mean that the loss of forty percent of the black bear's habitat would never be significant.  It could be the case that the loss of forty percent of the bear's habitat, where the habitat is of higher quality, supports a greater population, or provides increased genetic exchange and interaction, such as the loss of habitat in Okefenokee, Big Cypress, Ocala, or Apalachicola, would constitute a significant portion of the bear's range.

11

be to ignore the Ninth Circuit's admonition that species' evaluations must be made on a case-by-case basis. *See Defenders of Wildlife*, 258 F.3d at 1143.

## B.     The Combined Effects of Habitat Destruction, Hunting, and Roadkill

Defenders argue that the Wildlife Service's 1998 decision not to list the black bear, after finding in 1992 that listing was warranted, is arbitrary, capricious and an abuse of discretion. In particular, Defenders assert that the best available scientific evidence does not provide a rational basis for the Agency's conclusion that, based on its examination of the required statutory factors, the combined effects of habitat destruction, habitat isolation, hunting, and roadkill do not create a reasonable likelihood that the black bear will become endangered in the foreseeable future.

### 1.     *The Wildlife Service's 1992 Decision that the Black Bear Should Be Listed*

In 1992, the Wildlife Service concluded that the black bear warranted listing as a threatened species because continued habitat destruction, increased isolation between habitats, and deaths from hunting and roadkill made it likely that the species would become endangered in the foreseeable future. Specifically, the Agency determined that future development of private land in existing black bear habitats would likely turn those areas into isolated "islands" with no linkages between individual habitats. *See* 57 Fed. Reg. 596, 598 (Jan. 7, 1992). The Wildlife Service found that the loss of habitat and the loss of habitat linkages warranted listing because habitat isolation would decrease genetic exchange between bear populations and threaten the black bear's survival. *See id.* The Agency also found that the loss of habitat reduced the amount of space available to the black bear, thereby leaving it increasingly vulnerable to human-caused

12

mortality such as hunting and roadkill. *See id.* Thus, the ultimate basis for the Agency's

conclusion that listing was appropriate was that the combined effects of habitat destruction, legal

and illegal hunting, and roadkill threatened the black bear's continued existence. *See id.* at 599.

Although the Wildlife Service determined that the black bear should be listed as

threatened, the 1992 proposed rule indicated that the threat facing the black bear was not

overwhelming and characterized the threat to the black bear as "moderate to low." *See id.* at 599.

The Agency noted that the black bear occurs mainly on public land and that bears living on

public land, primarily in the habitats of Okefenokee NWR, Ocala NF, Apalachicola NF, and Big

Cypress National Preserve "enjoy a reasonable degree of habitat security." *Id.* at 598. The

Wildlife Service also emphasized that future public land acquisitions could play a critical role in

increasing habitat security. *See id.* Thus, while the Wildlife Service determined that habitat loss,

in combination with threats from hunting and roadkill, warranted listing, the threat faced by the

black bear was small enough that it would not be unreasonable for new information or positive

developments regarding black bear populations to cause the Wildlife Service to determine that

the black bear was no longer likely to become endangered in the foreseeable future.

2.     *The 1998 Decision that Listing is not Warranted*

In 1997, as part of the settlement of *Fund for Animals, Inc. v. Babbitt*, Civ. No. 92-0800

(SS) (D.D.C.), the Wildlife Service agreed to decide whether or not to list the black bear as

threatened by December 31, 1998. After the settlement, the Wildlife Service assembled a status

report on the current state of the species. The report combined older data with new data and

studies compiled after the Wildlife Service's 1992 decision, and concluded that the black bear

was not likely to become threatened in the foreseeable future. In its 1998 rule, the Wildlife

Service found that none of the five statutory factors warranted listing for the black bear. *See* 63

Fed. Reg. at 67,618.

In its 1998 decision not to list, the Wildlife Service identified four habitats where the

black bear was not likely to become endangered in the foreseeable future: (1) Apalachicola NF,

(2) Ocala NF, (3) Okefenokee NWR, and (4) Big Cypress National Preserve. *See* 63 Fed. Reg. at

67,615-16. The Agency realized that for two of the habitats, Ocala and Big Cypress, continued

development was likely to restrict future black bear habitat to public land only. *See id.* at 67,615-

16. Based on its conclusion that those four habitats were likely to survive, the Wildlife Service

concluded that habitat destruction did not create a reasonable likelihood that the black bear

would become endangered in the foreseeable future. *See id.* at 67,618.

Defenders advance several arguments in support of its position that the Wildlife Service's

decision was unwarranted. First, Defenders argue that continued development will limit the black

bear to public land, which is not sufficient to support the black bear population. Second,

Defenders argue that continued habitat isolation will limit genetic exchange between populations,

making it difficult for the species to maintain its numbers. Third, Defenders argue that roadkill

deaths will continue to threaten black bear populations. Fourth, Defenders claim that hunting by

humans will also threaten the viability of the black bear.

Defenders' position cannot be sustained because evidence in the administrative record

supports the Agency's conclusions regarding the combined effects of habitat destruction, habit

isolation, hunting and roadkill. First, new information caused the Wildlife Service to

significantly revise its population estimates for the black bear, which changed the Agency's

14

outlook on the bear's likelihood of long-term survival.  Whereas in 1992 the Agency estimated

the entire black bear population at 550-1,050, in 1998, based on new studies of population

density, the Agency increased its estimate threefold, approximating the population at 1,600-

3,000.  New studies caused the Wildlife Service to revise its population estimates in Ocala from

125 bears to at least 600 bears.  *See* 63 Fed. Reg. at 67,615.  The population at Big Cypress was

previously estimated at 145 bears, but new information led the Wildlife Service to increase that

estimate to 350-450 bears.  The Agency also concluded that the Apalachicola population exceeds

400 bears and that the Okefenokee habitat contains at least 600 bears.  *See* 63 Fed. Reg. at

67,615-16.  The Wildlife Service concluded that the higher estimates significantly increased the

black bear's chances of survival.  Specifically, according to the status report, the increased

population enabled the black bear to overcome deaths from hunting and roadkill much more

easily than it could at its estimated 1992 population.

The Wildlife Service reasonably concluded that the increased population estimates will

enable the black bear to withstand projected losses of current habitat.  According to a 1994 study

prepared for the Florida Game and Fresh Water Fish Commission (FGFWFC), black bear

habitats with an area of 2,000-4,000 km$^2$ and with populations of 200 bears had a ninety-five

percent chance of survival for 200 years.[3]  *See* Pls.' Notice of Filing Excerpts of the

---

[3] The author of that study, however, also wrote a letter encouraging the Wildlife Service
to list the black bear as threatened.  *See* AR 214 (letter from James Cox).  Plaintiffs cite several
letters from scientists to the Wildlife Service arguing that the black bear should be listed.  *See*
AR 213 (letter from David S. Maehr), 214 (letter from James Cox), 218 (letter from Laurie
Macdonald).  Mere disagreement between scientists, however, does not invalidate the Agency's
conclusion.  It is not the court's role to investigate and decide upon which expert the Wildlife
Service should have relied.  When there is disagreement among expert opinions, the agency is
entitled to rely on the expert of its choice, including its own experts.  *See, e.g., Central Arizona*

Administrative R., Ex. 9, at 31 [hereinafter Cox]; 67 Fed. Reg. at 67,617. All four surviving

habitats meet those two criteria.[4] Thus, even with projected losses of current habitat, the black

bear will continue to live on habitats of sufficient size such that it is unlikely to become

endangered in the foreseeable future.

With respect to Defenders' argument that black bear habitats in the future may be limited

to public land, while the Wildlife Service acknowledged in its final rule that the Ocala and Big

Cypress habitats would likely be restricted to public land, it concluded that because the public

land habitat in those areas exceeds 2,000 km², the amount of public land for each habitat was

sufficient to prevent the black bear from becoming endangered in those areas. See 63 Fed. Reg.

at 67,615-16. Also, the status report relied upon by the Wildlife Service contained evidence

supporting the conclusion that the slow pace of development in the Okefenokee and Apalachicola

habitats will enable black bears to continue to live on private land in those areas for the

---

Water Dist. v. EPA, 990 F.2d 1531, 1539 (9th Cir. 1993); Fund for Animals v. Babbitt, 903 F.
Supp. 96, 109-10 (D.D.C. 1995). As long as the experts relied upon provide some justification
for their conclusions, the court will not disregard them. See, e.g., Northern Spotted Owl v.
Hodel, 716 F. Supp. 479, 483 (W.D. Wash. 1988) (holding that the position of agency experts
must be conclusory and contrary to unrebutted expert opinion to be overturned). Even though
Defenders provide evidence that some experts opposed the Agency experts' conclusions about
the importance of linkage zones and habitat size, "disagreement between scientists about the
necessity of establishing linkage zones is not sufficient to demonstrate arbitrariness by the
government." Fund for Animals, 903 F. Supp. at 110. Because the Agency's experts articulated
reasonable opinions based on the facts at their disposal, the Agency was entitled to rely on those
opinions, even if they conflicted with those of other experts.

[4] As of December 8, 1998, the Apalachicola NF habitat included 4,100 km² of secure land
and over 10,000 km² of potential habitat; Ocala NF contained 2,223 km² of public land habitat
and 8,935 km² of overall habitat; Okefenokee NWR contained 2,532 km² of occupied public land
habitat, 5,872 km² of overall occupied habitat, and 4,395 km² of potentially occupied habitat; and
Big Cypress National Preserve contained 2,700 km² of public land habitat (both occupied and
potential) and 2,700 km² of overall occupied habitat. See 63 Fed. Reg. at 67,615-16.

foreseeable future. While development is encroaching on private land habitat in Apalachicola, the rate of development is so slow that the amount of public land acquisition occurring since 1992 is greater than the amount of habitat lost to private development. According to the status report, acquisition projects in the last decade have increased public land holdings by 725 km[2] and existing projects are expected to add another 500 km[2]. Between 1992 and 1998, land acquisitions by state and federal authorities increased the amount of overall public land habitat in Florida by more than 1,500 km[2]. Because a great deal of this acquisition occurred in Apalachicola, Ocala, Okefenokee and Big Cypress, the Agency determined that these habitats were secure and contained sufficient buffer zones to protect against the threat to the black bear from private development. *See* AR 203, at 11. Moreover, this finding is consistent with the Agency's original 1992 proposed rule which indicated that increased public land acquisition could provide sufficient habitat to alleviate the threat to the black bear. *See* 56 Fed. Reg. at 598.

As for the issue of habitat isolation, the Wildlife Service reasonably concluded that this phenomenon does not pose as serious a threat to the black bear as it did in 1992. In its final ruling, the Wildlife Service cited evidence that bear populations exceeding 200 can maintain a level of genetic variation that does not threaten the population's likelihood of survival. *See* 63 Fed. Reg. at 67,617; AR 203 at 11-12. Thus, because of higher population estimates, the linkages between habitats that the Wildlife Service determined were important for the bear's survival in 1992 may not be as necessary for survival in 1998.

With respect to the danger to the black bear posed by hunting, the Wildlife Service pointed out that in 1994, Florida eliminated all open hunting seasons of the black bear. *See* 63 Fed. Reg. at 67,616. The Agency concluded that the elimination of the open hunting season

yielded a positive effect on black bear populations in Apalachicola, where there was formerly a

nine day hunting season, and in Baker and Columbia counties near Okefenokee NWR, where

there was formerly a fifty-eight day hunting season on private land. While Georgia still allows a

six day hunt near Okefenokee NWR, studies of bear takes indicated that the hunt was unlikely to

adversely affect black bear populations in the area. The status report indicated that the

Okefenokee hunt also provided an added benefit to the black bear by discouraging development

of private land habitat in the area because local landowners profit from the hunt and have an

interest in making their land hospitable to black bears. Additionally, new evidence in the

Wildlife Service's status report indicated that the impact of illegal poaching is minimal.

Finally, the Agency was justified in concluding that the effects of roadkill do not threaten

the black bear. According to data cited in the status report, roadkill levels for the black bear do

not differ significantly from those of other bear populations. *See* 63 Fed. Reg. at 67,617. Also,

the report explained that the rise in black bear populations from 1992 to 1998 increased the

bear's ability to overcome the effects of roadkill. Furthermore, the status report suggested that

roadkill rates in Okefenokee and Apalachicola were low due to limited private development, and

that roadkill rates in Ocala and Big Cypress would probably not increase significantly because

those habitats are composed primarily of public land, which has comparatively limited

automobile traffic. *See id.* The Wildlife Service also concluded that the construction of wildlife

underpasses in Ocala that allow for black bears to travel safely beneath state highways may also

reduce the amount of roadkill in that area. *See id.*

In sum, based upon the new data it gathered concerning the effects of habitat destruction,

hunting, and roadkill, the Wildlife Service reasonably concluded that these phenomena would not

likely result in the  black bear becoming endangered in the foreseeable future.


C.    **Inadequacy of Existing Regulatory Mechanisms**

. Defenders contend that the Wildlife Service's decision was arbitrary and capricious

because the Agency incorrectly determined that existing regulatory mechanisms are adequate to

protect the black bear.  According to Defenders, the Wildlife Service erroneously relied on

possible future regulations to justify its decision, rather than relying solely on existing regulatory

mechanisms.  Defenders list several regulations cited by the Agency in its final rule that they

allege are not "existing."  For example, Defenders note that the Wildlife Service relied on the

possibility of future land management activities that the Agency "expect[s] to be compatible with

the continued existence of bears at current levels," 63 Fed. Reg. at 67,618, as well as on state and

federal "authority and responsibility for management of the Florida black bear." *Id.* at 67,617.

Defenders argue that because there is no guarantee that such regulations will be enacted, or that

any future government action will take place, it was impermissible for the Wildlife Service to

rely on the possibility of such future action in deciding not to list the black bear.  The Wildlife

Service responds that the regulations it cites qualify as existing regulatory mechanisms and that it

was entitled to rely on them.  The Wildlife Service's position on this issue cannot be sustained.

Several courts have examined the meaning of the phrase "existing regulatory

mechanisms" in the Endangered Species Act and have determined that the plain language of the

statute forbids the Wildlife Service from relying on speculative future regulations in making

determinations regarding listing. *See, e.g.*, *Biodiversity Legal Found. v. Babbitt*, 943 F. Supp.

23, 26 (D.D.C. 1996); *Oregon Nat. Res. Council v. Daley*, 6 F. Supp. 2d 1139, 1154 (D. Or.

1998) ("[A]ccording to the plain language of the ESA, the Secretary may not rely on plans for

future actions to reduce threats and protect a species as a basis for deciding that listing is not

currently warranted."). Accordingly, the Wildlife Service cannot rely on speculative future

actions to justify its decisions because there is no assurance that those actions will in fact be

carried out. *See, e.g., Biodiversity Legal Found.*, 943 F. Supp. at 26 ("[The agency] cannot use

promises of proposed future actions as an excuse for not making a determination based on the

existing record."); *see also Save Our Springs v. Babbitt*, 27 F. Supp. 2d 739, 744 (W.D. Tex.

1997).[5] The present tense of the statute and the uncertain nature of future regulations indicate

that an agency's determination of whether to list a species must be based on the present status of

the species and not on the assumption that future actions will suffice to protect a species'

population. Thus, "existing regulatory mechanisms" are those that are being currently

implemented and enforced, as opposed to regulations which might be enacted in the future, or

current regulations authorizing future government action but which do not require that such

action will take place.

   To be sure the Wildlife Service's 1998 decision does mention several regulations that

qualify as "existing regulatory mechanisms." The Agency cites new restrictions on hunting as a

_____

   [5] Some disagreement exists about whether agencies may rely on existing but voluntary
measures being taken to protect a species. In *Oregon Natural Resources Council v. Daley*, the
court held that voluntary actions cannot be considered existing regulatory mechanisms because
without some method of enforcing compliance, "[v]oluntary actions, like those proposed in the
future, are necessarily speculative." *Oregon Nat. Res. Council v. Daley*, 6 F. Supp. 2d 1139,
1155 (D. Or. 1998). The court in *Federation of Fly Fishers v. Daley*, however, disagreed with
the reasoning in *Oregon Natural Resources Council*, and found that existing, concrete voluntary
programs could be considered as part of an agency's decision-making process. *See Federation of
Fly Fishers v. Daley*, 131 F. Supp. 2d 1158, 1168 n.4 (N.D. Cal. 2000).

reason why hunting poses a lesser threat to the black bear than it did in 1992. *See* 63 Fed. Reg. at

67,616. The Agency's final rule also discusses ongoing land management programs, such as

prescribed timber burning and replacement of certain forest stands, which the Agency believes

would have the effect of maintaining the black bear's habitat. *See id.* at 67,616-17.

It is unclear from the record, however, whether other regulations relied upon by the

Wildlife Service are currently being implemented. In its discussion of the adequacy of existing

regulatory mechanisms, the Wildlife Service mentions that the states of Florida, Georgia and

Alabama have authority and responsibility for the management of the black bear, but does not

indicate that the states are actually taking any regulatory action to protect it. While those states

may be authorized to take certain actions, those actions cannot be considered existing regulatory

mechanisms unless the states currently are carrying them out. The Agency also cites the USDA

Forest Service Land and Resource Management Plan for National Forests in Florida, which it

"expect[s] to be compatible with the continued maintenance of bears at current levels." *Id.* at

67,618. The rule, however, does not indicate whether the plan is being implemented, whether the

plan requires government action, or whether the plan merely authorizes future government

action. The Land and Resource Management Plan also allows for prescribed burning and timber

management, but the Agency again fails to identify if those particular regulatory actions actually

are being undertaken as a result of the plan.

It may be that federal and state agencies are carrying out regulatory actions pursuant to

land management plans and their regulatory authority, but it is impossible for this court to

determine, based on the existing record, what those regulatory activities are, and in what manner

they are being implemented. The Wildlife Service must judge the viability of the black bear

based on threats to its existing status and therefore can rely only on regulatory actions currently in effect when making its decision. The Agency cannot rely on the possibility of action in the future to justify a determination that the black bear is not currently threatened.

The record also fails to clarify the extent to which the Agency relied on the possibility of future action, and examination of the 1998 final rule does not indicate whether the Agency would have found that the black bear was threatened if it had not considered the possibility of future regulatory actions. As a result, this case must be remanded to the Agency so that the Wildlife Service can examine only regulatory mechanisms which are currently being undertaken and enforced. Additionally, the Agency must indicate on the record the regulations upon which it bases its decision.


## IV. CONCLUSION

For the reasons set forth in this memorandum, each motion for summary judgment before the court is granted in part and denied in part. This case is remanded to the Wildlife Service to determine, in a manner consistent with this memorandum, whether the inadequacy of existing regulatory mechanisms warrants listing the black bear as a threatened species.

An appropriate order accompanies this memorandum.

Henry H. Kennedy, Jr.
United States District Judge

Dated: 12/13/01

22

**EXHIBIT 2 TO DEFENDANT-INTERVENORS'
CONSOLIDATED MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**(CASE NO. 1:07-CV00677-PLF)**

12/04/2007  17:40    6512974961              MN DNR FAW                    PAGE  01/04

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| HUMANE SOCIETY OF THE UNITED STATES, *et al.* | ) ) | Case No. 1:07-cv-00677 |
| Plaintiffs, | ) | |
| | ) ) | |
| vs. | ) ) | |
| DIRK KEMPTHORNE, Secretary of the Interior, United States Department of the Interior, *et al.* | ) ) ) | DECLARATION OF Daniel Stark |
| Defendants, | ) ) | |
| and | ) ) | |
| | ) | |
| SAFARI CLUB INTERNATIONAL, and SAFARI CLUB INTERNATIONAL FOUNDATION *et al.* | ) ) ) ) ) ) | |
| Defendant-Intervenors- | ) | |

1. My name is Daniel Stark and I am the Wolf Management Specialist for the Minnesota Department of Natural Resources.

2. I have reviewed the set of documents that the Minnesota Department of Natural Resources (DNR) supplied on April 19, 2007 to Michael C. Soules of Faegre and Benson LLP, Attorneys for Plaintiffs in this litigation, in response to the request made under the Minnesota Data Practices Act for information regarding funding and personnel aspects of the States' gray wolf management program.

3. The information contained in the documents supplied by the Minnesota DNR on April 19, 2007 does not, without context, fully explain the nature of Minnesota's implementation of its Gray Wolf Management Plan.

Page 1

4.  Minnesota's Gray Wolf Management Plan, as indicated by the Final Rule to Delist the Gray Wolves of the Western Great Lakes Distinct Population Segment is, in fact, "funded and implemented largely as written."

5.  A careful review of Minnesota's wolf management strategies demonstrates that Minnesota, through its own efforts and those of its' agents, is actually expending in excess of $695,000 annually on wolf management.

6.  The $144,000 specifically identified from the "Heritage Enhancement Fund" on the form identified as "Fund Allocated and Expended for Wolf Management (sic) Activity FY2002-2009" in the documents provided by the Minnesota DNR in response to the Plaintiffs' Minnesota Data Practices Act request, accounts for only a portion of the funds that the Minnesota DNR and its agents are expending on wolf management.

7.  Minnesota DNR has designated three Conservation Officers as lead officers in wolf range to serve as primary internal and external contacts regarding wolf issues. Wolf management issues are a priority for these three officers. The salaries for these three officers, of approximately $70,000 per officer, or approximately $210,000 annually, are paid from portions of the DNR budget other than the $144,000 specifically identified for wolf management.

8.  At the time that the Minnesota Wolf Management Plan was drafted, there were many vacancies in the Enforcement Division of the Minnesota DNR.

9.  Instead of simply establishing three new officer positions, Minnesota DNR filled 20 vacant Conservation Officer positions in wolf range since the wolf plan was drafted. Although the three lead officers serve as the primary internal and external contacts for wolf issues, there are now 71 DNR Conservation Officers stationed in or adjacent to Minnesota wolf range. Each of these officers respond to gray wolf management issues and each is involved, at least in part, in wolf management and wolf-related enforcement activities.

10. Minnesota Conservation Officers have a greater presence in wolf range than the U.S. Fish and Wildlife Service law enforcement personnel ever did during the time that gray wolves were listed as a "threatened" species in Minnesota. In fact, even while gray wolves were federally listed, many if not all of the gray wolf enforcement matters addressed in Minnesota involved Minnesota Conservation Officers who brought information, evidence, or the case to federal officers.

11. At the time that Minnesota's Wolf Management Plan was prepared, the Minnesota DNR assumed that upon delisting, the state would be required to assume all financial responsibility for Minnesota depredation control activities.

12. Prior to delisting and since 1986, the federally funded Wildlife Services branch of the

U. S. Department of Agriculture has been the agency that has conducted Minnesota's gray wolf depredation control activities.

13. Since delisting, Wildlife Services has continued to maintain their depredation control activities, using federal funding, under a cooperative agreement with Minnesota DNR. This cooperative agreement and federal funding for this effort will continue into the foreseeable future.

14. Since depredation control activities are being funded with federal dollars, the Minnesota DNR will not and has no need to make a request to the Minnesota Legislature to fund a program or activity that is already being funded by another source.

15. The approximate annual cost of the depredation control activities being carried out by Wildlife Services with federal funds is $400,000.

16. The $210,000 for the conservation officer salaries and the $400,000 for wolf depredation activities, both of which are paid from sources other than the DNR Heritage Enhancement Fund, combined with the $144,000 specifically allocated for wolf management positions and activities, amount to more than the $695,000 that was expected to be necessary to implement the wolf management plan.

17. Minnesota's DNR is fulfilling its statutory and management plan obligations to manage wolves and to ensure their long-term survival. This winter the DNR is utilizing some of the Heritage Enhancement Funding to conduct a population survey as part of our research and monitoring plan. This survey costs about $50,000, including costs of radio collaring wolves and locating them by aircraft.

18. Minnesota has conducted systematic wolf population surveys at ten year intervals starting in 1978. In 2003 the interval was decreased to every five years. In order to conduct these population surveys the DNR relies on a certain number of packs being radio-collared. By encouraging others to research and study wolves it reduces the total number of wolves that need to be specifically radio-collared for a systematic survey of Minnesota's wolf range. The DNR is committed to collaring the necessary number of wolves to conduct an accurate estimate of Minnesota's wolf population. The current method for conducting the wolf population survey is scientifically valid and has been published in a peer-reviewed scientific journal (Fuller et al. 1992). A priority for research will be evaluating and updating current methods to count wolves as needed to ensure an accurate estimate of Minnesota's wolf population. Techniques and methods may be developed and evaluated in the future that enhance the current methodology to count wolves.

19. Additional management comes from area wildlife managers that work to enhance populations and habitats for ungulates in Minnesota. This funding is tied to the Minnesota DNR wildlife section annual operating budget of $27,000,000.

12/04/2007  17:40    6512974961             MN DNR FAW                        PAGE  04/04

20. Under Minnesota DNR's enforcement operations as budgeted, the conservation of wolf populations in the state is not at risk from takings by humans. The Minnesota DNR division of enforcement has been a presence in wolf range throughout federal protection and supported and conducted investigations of illegal wolf mortality while wolves were federally protected. The state presence far exceeds that which was ever present by federal officers. There are more conservation officers present in wolf range than the wolf plan called for and than there were prior to delisting. The state has been doing wolf enforcement all along and will continue to enforce Minnesota's gray wolf laws.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 4ᵗʰ day of _Decem ber_ , 2007, at _St. Pau l_ , Minnesota.

Daniel Stark

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, HELP OUR WOLVES LIVE, ANIMAL PROTECTION INSTITUTE, and FRIENDS OF ANIMALS AND THEIR ENVIRONMENT,<br><br>    Plaintiffs,<br><br>    vs.<br><br>DIRK KEMPTHORNE, Secretary of the Interior, U.S. DEPARTMENT OF THE INTERIOR, and U.S. FISH AND WILDLIFE SERVICE,<br><br>    Defendants,<br><br>and<br><br>SAFARI CLUB INTERNATIONAL, SAFARI CLUB INTERNATIONAL FOUNDATION, and NATIONAL RIFLE ASSOCIATION,<br><br>    Defendant-Intervenors,<br><br>and<br><br>U.S. SPORTSMENS' ALLIANCE FOUNDATION, WISCONSIN BEAR HUNTERS' ASSOCIATION, SCOTT MEYER, and ROBERT STAFSHOLT,<br><br>    Defendant-Intervenors. | Civil Action No. 1:07-cv-00677(PLF) |

## DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFFS' RULE 56.1 STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE

Defendant-Intervenors U.S. Sportsmen's Alliance Foundation, Wisconsin Bear Hunting

Association, Scott Meyer and Rob Stafholt and Defendant-Intervenors Safari Club International,

Safari Club International Foundation, and National Rifle Association (collectively, "Defendant-Intervenors") respectfully submit this Response to Plaintiffs' Statement of Material Facts not in dispute ("Plaintiffs' Rule 56.1 Statement") (Docket 27-3).[1]

1.      Admitted in part and denied in part.  It is admitted that the gray wolf is the largest member of the canine family.  Defendant-Intervenors ("Defendant-Intervenors") also admit that wolves prey primarily on wild ungulates such as deer, elk, moose and bison, as well as smaller mammals like beavers and rabbits.  Defendant-Intervenors deny the accuracy of Statement 1 in that it is an incomplete depiction of the materials referenced by Plaintiffs.  More specifically, Plaintiffs fail to explain that wolves do not simply prey on wild ungulates, but "most often kill very young ungulates."  AR. Doc 215, p. 5264.  In addition, Defendant-Intervenors note that wolves do not restrict their killing of ungulates for the purposes of obtaining food.  "Under unusual circumstances, such as when there is extremely deep snow late in the winter, wolves may kill many more ungulates than they can eat."  AR. Doc 215, p. 5265.  It is also necessary to recognize that in the Western Great Lakes Distinct Population Segment ("WGL-DPS"), during the last 25 years, wolves have not only preyed upon wild animals but have also killed domestic animals including horses, cattle, sheep, goats, llamas, pigs, geese, ducks, turkeys, chickens, guinea fowl, pheasants, dogs, cats and captive deer.  71 Fed. Reg. 15266-67.

Defendant-Intervenors deny that wolves can live "almost anywhere."  Wolves generally require areas with a road-density of 0.9 to 1.1 miles of road per square mile or less to live.  72 Fed. Reg at 6071 (citing multiple studies: published and major unpublished literature relied upon by FWS are in the A.R. starting at A.R. 12836).  Forested areas are best, because they produce cover for denning and nesting.  72 Fed. Reg. at 6074.  Less than 0.9 to 1.1 miles per square mile

---

[1]      Any "admit" responses are solely for purposes of the pending Summary Judgment Motions with respect to which this Response is filed.

may be necessary for wolves to live in non-forested areas. *Id.* Under the Wolf Recovery Plan,

51000 square miles of contiguous suitable habitat is reconsidered necessary to support a

permanent wolf population that is replenished by another nearby population, and 10,000 square

miles is necessary if there is no nearly supporting wolf population. 72 Fed. Reg. at 6072.

Defendant-Intervenors deny that regulated take by humans in reasonable amounts

threaten wolf populations. In fact, wolves can most certainly survive in the presence of

significant take by man. AR. Doc. 215, p. 5893 (it has been demonstrated that annual mortality

of 28 percent (Fuller 1989, Keith 1983, Peterson et al. 1984) to 50 percent (Mech. 1970, 64,

Ballard and Stephenson 1982, Ballard et al. 1987) can be sustained by healthy productive wolf

populations.) In addition, if wolf populations become too dense in a particular area and/or

allowed to prey too aggressively on the existing ungulate, *etc.* population, wolves themselves

will prey on other wolves.

> The most common natural causes of mortality to both pups and adults are
> starvation and intraspecific strife (i.e. wolves killing other wolves). This happens
> when food is scarce and when wolves must 'trespass' into adjacent wolves'
> territories to hunt. Resident wolves defend their territory and food supply and
> often the result is the death of one or more members of both packs.

AR. Doc. 215, p. 5266.

Defendant-Intervenors admit that wolves historically ranged across much of North America,

excluding the Southeast, California and Nevada, and possibly the northeastern states. A great

deal of question exists over whether it was the gray wolf or the red wolf that historically

inhabited the northeastern United States. 69 Fed. Reg. 43665 (July 21, 2004).

2.      Admitted in part and denied in part. Defendant-Intervenors admit the first

sentence of paragraph 2. Defendant-Intervenors deny the second sentence due to the fact that

Plaintiffs have referenced it out of context. The statement from the Administrative Record

referenced by Plaintiffs applies only to the average pack territories for wolves of Wisconsin and Minnesota.  A.R. Doc. 215 at 5125-26.

3.     Admitted in part and denied in part.  Defendant-Intervenors admit the first and second sentences but deny the third sentence, as written.  The Administrative Record citation referenced by Plaintiffs indicates that dispersal is "important" to the gray wolf as opposed to "essential."  Defendant-Intervenors admit the fourth sentence, but deny the fifth sentence as Defendant-Intervenors can find no Administrative Record reference for this statement.  Further dispersal will not result in wolves occupying unsuitable habitat, as wolves cannot occupy unsuitable habitat on a long term basis.  *See* 72 Fed. Reg. at 6071-75.

4.     Admitted in part and denied in part.  Defendant-Intervenors admit that wolves can potentially play the role of an "umbrella species"  However, Plaintiffs cite the statements relating to the wolf's role in biodiversity out of context, by neglecting to mention that wolves' ability to enhance biodiversity is contingent on the need to prevent carnivore-human conflict.  Plaintiffs fail to add that "[f]ailure to effectively reduce or prevent carnivore-human conflict (*e.g.* wolf-human conflict) can lead to an erosion of social tolerance for carnivores and possible the management agencies involved."  AR. Doc. 468B at p. 16281.

5.     Admitted in part and denied in part.  Defendant-Intervenors admit the first two sentences of Statement 5.  Defendant-Intervenors deny the third sentence to the extent that it is made out of context.  In the third sentence, Plaintiffs reference the Michigan Gray Wolf Recovery and Management Plan which explains the fact that the majority of individuals polled do not wish to coexist with wolves that pose threats to livestock and pets.  AR Doc. 215 at p. 5135.

6.      Denied as immaterial.  Defendant-Intervenors deny the materiality of Statement 6 in that the level of "persecution" described is now prohibited by both federal and state laws. Limited take of wolves by no means constitutes "persecution" and can be sustained by healthy wolf populations.  Please see Defendant-Intervenors' response to Statement 1 for citations.

7.      Denied as immaterial.  Defendant-Intervenors deny the materiality of Statement 7 in that the level of "persecution" described is now prohibited by both federal and state laws. Limited take of wolves, even take of up to 50% percent of wolf populations, by no means constitutes "persecution" and can be sustained by healthy wolf populations.  Please see Defendant-Intervenors' response to Statement 1.

8.      Admitted in part and denied in part.  Defendant-Intervenors admit that individual subspecies of gray wolves were listed under the Endangered Species Preservation Act and that individual subspecies were later listed under the Endangered Species Act.  Defendant-Intervenors admit that the FWS initially listed four subspecies of the gray wolf as "endangered," including the Mexican wolf (canis lupus baileyi), of Mexico and the southwestern United States, the northern Rocky Mountain wolf (c.l. irremotus), of Wyoming, Montana and Idaho; the eastern timber wolf (c.l. lycaon) of northern Great Lakes Region, and the Texas gray wolf (c.l. monstrabilis) formerly of Texas and Mexico that the FWS believed to probably be extinct. Defendant-Intervenors further note that in the March 9, 1978 Federal Register Notice, the FWS specifically identified the gray wolves of Minnesota as "another 'species.'"  43 Fed. Reg. 9610. Finally, Defendant-Intervenors admit that on March 9, 1978, the FWS listed the entire species canis lupus as "endangered," with the exception of the gray wolves of Minnesota that were listed as "threatened." Defendant-Intervenors deny the materiality of the collective listing since the FWS's action was based on convenience."  ("So that this matter can be handled most

5

"conveniently" by listing only the species name.")  Defendant-Intervenors deny any remaining components of this statement as inaccurate paraphrases of the Administrative Record references. In addition, Defendant-Intervenors wish to add that, since the March 9, 1978 Federal Register listing notice, the FWS has obtained significant information indicating that it was the red wolf, and not the gray wolf that inhabited the northeastern part of the United States, which would substantially diminish what the FWS, in 1978, believed to be the wolves' original range.  69 Fed. Reg. 43665 (July 21, 2004).

9.     Admitted in part and denied in part.  Defendant-Intervenors deny the first sentence of Statement 9 as inaccurate.  Instead Defendant-Intervenors wish the Court to understand that in the 1978 listing decision, the FWS stated that "as delineated by recent systematic sources, the original range of the subspecies C.l. lycaon included most of the region from Georgia to Maine, and between the Atlantic and Great Plains."  43 Fed. Reg. 9608. Defendant-Intervenors further admit that the FWS, in the 1978 listing decision explained that C.l. lycaon remained in the upper Great Lakes region, including a group on Isle Royale and possibly a few in northern Michigan and Wisconsin.  The FWS went on to describe a "major population of the gray wolf" in northern Minnesota that had "not itself undergone a significant decline since about 1900."  43 Fed. Reg. 9610.  The FWS further noted that during the last decade, the Minnesota population "appears to have [experienced] a numerical increase in some areas, and an overall range increase."  *Id.*  Defendant-Intervenors admit the second sentence of Statement 9. Defendant-Intervenors deny the third sentence of Statement 9 as inaccurate, and instead admit that the FWS noted that there were still some places in the lower 48 States such as Washington and North Dakota, where wolves may have occurred and where they were not under Federal protection.  43 Fed. Reg. 9611.  Finally, Defendant-Intervenors admit the fourth sentence of this

statement.  In addition, Defendant-Intervenors wish to add that, since the March 9, 1978 Federal

Register listing notice, the FWS has obtained significant information indicating that it was the

red wolf, and not the gray wolf that inhabited the northeastern part of the United States, which

would substantially diminish what the FWS, in 1978, believed to be the wolves original range.

69 Fed. Reg. 43665 (July 21, 2004).

10.    Admitted in part and denied in part. The first sentence of statement 10 is admitted.

The second sentence is denied as incomplete.  Although Defendant-Intervenors admit that

between 1979 and 1998 the wolf range in Minnesota was estimated to have more than doubled, it

is also important to note that between 1998 and 2004 the range in Minnesota was found to have

stabilized.  71 Fed. Reg. at 15270.  Defendant-Intervenors admit sentence three of Statement 10.

Sentence four is denied as incorrect. Defendant-Intervenors can find no reference in the

Administrative Records document cited by Plaintiff for Statement 10 that includes the

information found in the fourth sentence.  Defendant-Intervenors admit that a pair of wolves was

verified in Michigan in 1989 and produced pups in 1991.  Defendant-Intervenors deny sentence

five of the statement as vague. Minnesota's wolf population was estimated to be between 2301

and 3708, in 2004, greater than Wisconsin and Michigan.  *Id.* at 15269.  However, the Michigan

and Wisconsin population were estimated at 405 and 425 respectively, in 2005 which would

constitute over 20 percent of the GLDPS.  *Id.*  Additionally, the Wisconsin and Michigan

population were found to be increasing rapidly while the Minnesota population has stabilized or

slowly increased.  *Id.* at 15270.

11.    Defendant-Intervenors admit the first and second sentences of Statement 11, but

deny the third sentence as inaccurate, noting that the wolves reintroduced to the Northern Rocky

Mountain area are managed as a "nonessential" experimental population.  Finally, Defendant-

Intervenors deny the fourth sentence as vague, but admit that the wolves of the Western Great Lakes Distinct Population Segment and the Northern Rocky Mountain Distinct Population Segment are large, recovered species of gray wolves.

12.    Defendant-Intervenors deny this statement as immaterial.  It constitutes a discussion about the Northern Rocky Mountain Distinct Population Segment of wolves that, at this time remain "endangered" and are not the subject of the delisting that Plaintiffs have challenged in this litigation.  Defendant-Intervenors wish to note however, that Plaintiffs' Statement 12 mentions only select portions of the Administrative Record that Plaintiffs reference for this Statement and neglects to mention the fact that wolves may be having a detrimental if not irreversible impact on the elk population upon which wolves are dependent for survival. Plaintiffs fail to mention that "the elk population which had swollen to 20,000 by the 1990's is now less than 10,000."  AR Doc. 228 at 8120.  This phenomenon may be occurring, at least in part, because of the fact that, in summer, wolves feed on newborn ungulates.  AR doc. 215 at 5733.  If wolf populations continue to prey on ungulate populations, the wolves may decimate the very animals they need to survive.  Defendant-Intervenors wish to point out that not all species benefit from the presence of wolves.  Songbirds in the Northern Rockies may actually suffer from the presence of wolves.

> With fewer coyotes, their prey – voles, mice and other rodents – have exploded in number.  That has benefitted red fox and raptors.  But red fox prey on songbirds as well, and more foxes could mean a great toll on birds."

AR Doc. 228, p. 8122.  Defendant-Intervenors also wish to note that not all biologists agree that wolves have a beneficial impact on the broader environment.

> Some researchers, however, are agnostic about the effects of the wolf.  Crabtree, for example, says that yes, willows are rebounding and imaging data show the regrowth dramatically.  But a strong correlation between the nature of wolves and

the new growth is far from demonstrated. 'Claiming wolves are responsible
verges on bad science' he states. 'The ecosystem in Yellowstone is a multicausal
interactive system, and there's never a single cause. Even a predominant cause is
rare. At the same time the wolf numbers were coming back, there was flooding
along the river, and the climate is a lot warmer. Wolves probably have a role, but
it is confounded by those factors. It will take 20 years or more before we know
definitely. Duncan Patten is a research ecologist who served on a National
Academy of Sciences study of Yellowstone published in 2002. Yellowstone has
not had a hard winter since wolves reached high levels, he observes, and elk may
not have needed to resort to trees for food. "When winters are hard, elk take a lot
of chances to put something in their belly. Give me two hard winters in a row and
I'll buy the argument."

AR  Doc. 228, p. 8122-23.

13.     Defendant-Intervenors deny this statement as immaterial. The delisting rule that

Plaintiffs have challenged in this litigation focuses on the Western Great Lakes Distinct

Population Segment of wolves. The status of wolves in most of the "range" that Plaintiffs

discussed in Statement 13 remains "endangered."

14.     Defendant-Intervenors deny this statement as immaterial. The delisting rule that

Plaintiffs have challenged in this litigation focuses on the Western Great Lakes Distinct

Population Segment of wolves. The status of wolves outside the boundaries of the WGL-DPS is

immaterial to Plaintiffs' challenge. Currently, wolves in the Northeast, more than half of North

Dakota, the Pacific Northwest and the entire west, including Oregon, Utah, and Colorado,

continue to be listed as "endangered."   In addition, the FWS has obtained significant

information indicating that it was the red wolf, and not the gray wolf that inhabited the

northeastern part of the United States, which could make it inappropriate for the FWS to attempt

to reintroduce gray wolves to that area. 69 Fed. Reg. 43665 (July 21, 2004). Finally, FWS

found that unoccupied potential habitat in North Dakota (the Turtle Mountains) and the Northern

Lower Peninsula of Michigan is too small, fragmented, and marginal to support a viable wolf

population. 72 Fed. Reg. at 6072-74.

15.    Defendant-Intervenors deny this statement as immaterial.  The population status of wolves in the 1970's and 1980's is not the same as it is at present and consequently any court's reaction to wolf related decisions 20 and 30 years ago has no bearing on the current delisting of wolves.

16.    Admitted (except that the Downlisting Rule did not downlist wolves in Minnesota from endangered to threatened status because wolves in Minnesota had long been listed as threatened rather than endangered).

17.    Admitted (except that the Downlisting Rule did not downlist wolves in Minnesota from endangered to threatened status because wolves in Minnesota had long been listed as threatened rather than endangered).

18.    Admitted in part and denied in part.  Defendant-Intervenors deny the first sentence of Statement 18 as inaccurate because, on April 1, 2003, the FWS announced its intention to "conduct rulemaking" "to propose to delist" wolves.  68 Fed. Reg. 15876. Defendant-Intervenors admit the second sentence of Statement 18.

19.    Admitted.

20.    Admitted in part and denied in part.  Defendant-Intervenors admit the first through fourth sentences of this statement, but deny the fifth sentence as incomplete.  Defendant-Intervenors can admit the fifth sentence if it is supplemented to state that the FWS and Defendant-Intervenors Safari Club International *et al*. appealed the ruling to the Court of Appeals for the D.C. Circuit.  Once the WGL-DPS wolves were delisting, the FWS and SCI *et al.* moved to vacate the opinion as moot.  The motion is currently pending before the Court of Appeals for the District of Columbia Circuit.

21.     Admitted in part and denied in part.  With regard to the first sentence of Statement 21, Defendant-Intervenors deny that the FWS began an effort to delist gray wolf populations in the WGL-DPS and Northern Rocky Mountain DPS on February 1, 2005.  On that date, there was simply an e-mail exchange that discussed how the FWS should respond to the Oregon court's ruling on wolf reclassification.  AR Doc. 4 at 43.  Defendant-Intervenors admit the second sentence of Statement 21.

22.     Denied.  Defendant-Intervenors deny this statement as incomplete.  The Options paper described by Plaintiffs in statement 22 included more than three options.  Other options were described in AR Doc. 35, p. 160-161 and Option 4 was described on p. 296.  The Options paper included separate options for Northeast wolves.

23.     Admitted in part and denied in part.  Defendant-Intervenors deny the first sentence of Statement 23, as immaterial since the FWS did not select Option 1 and it is not Option 1 that Plaintiffs are challenging in this litigation.  In addition, Defendant-Intervenors deny the first sentence because it is an inaccurate oversimplification of the FWS's discussion of Option 1.  Plaintiffs neglect to discuss the elements of Option 1 that address the nonessential experimental populations, the potential for delisting because of the fact that wolves did not historically range in the southeastern United States and parts of Nevada and California, or the fact that taxonomic questions exist as to whether the wolves of the northeastern United States were gray wolves or red wolves.  Defendant-Intervenors admit the second sentence of Statement 23.

24.     Admitted.

25.     Admitted in part and denied in part.  Defendant-Intervenors admit that Option 3 was similar to Option 2, but note that the in Option 3 the DPSs would use state lines for boundaries.  Defendant-Intervenors admit the second, third and fourth sentences.

26.     Defendant-Intervenors deny the materiality of Statement 26.  The wolves of the northeastern United States are not material in that they remain "endangered" and are not part of the delisting rule that Plaintiffs challenge in this litigation.  In addition, in Statement 26, Plaintiffs inaccurately describe the 1992 Recovery Plan for the Eastern Timber Wolf with respect to wolves in the northeastern United States. The 1992 Recovery Plan did not require the reestablishment of a wolf population in the northeast.  The 1992 Recovery Plan stated:

> Although the 1978 Recovery Plan specifies the need for two viable populations (including the Minnesota population) it did not specify the characteristics of the second population.  In 1981 (letter from Ralph E. Bailey, Eastern Timber Wolf Recovery Team Leader, to Harvey K Nelson, Regional Director, U.S. Fish and Wildlife Service, Twin Cities, Minnesota, dated Sept. 15, 1981; memorandum from Assistant Regional Director (SE) to holders of the Eastern Timber Wolf Recovery Plan, dated October 19, 1981) the Eastern Timber Wolf Recovery Team clarified this.  It recommended adopting either of the latter two approaches listed above by characterizing "viable population" in two different ways: (1) a population of at least 200 wolves established at a distance greater than 200 miles from the Minnesota population (e.g. northern New York or northern Maine) is believed to be large enough to be viable, as well as to have sufficient genetic diversity, to exist indefinitely in total isolation from any other wolf population. (2) A smaller population (greater that (sic) 100 wolves) in Wisconsin/Michigan, closely tied to the Minnesota population will be able to remain viable, and by occasional immigration of Minnesota wolves will retain sufficient genetic diversity to cope with environmental fluctuations.

AR Doc. 215, p. 5902.  Defendant-Intervenors also deny Statement 26 because it ignores the fact that the FWS's efforts have no impact on nonfederal restoration or recovery efforts for wolves in the northeast.  "Although we believe that additional wolf restoration is not necessary within the eastern United States before delisting the EDPS, delisting will not preclude states and tribes from undertaking additional wolf restoration programs."  69 Fed. Reg. 43672.

27.    Denied and immaterial and incomplete.  Defendant-Intervenors deny the materiality of Statement 27 in that all wolves other than those of the WGL-DPS remain endangered and are therefore not the subject of delisting rule that Plaintiffs challenge in this litigation.  Plaintiffs do not have the ability to challenge "possible future" steps since they are not ripe for review.  Moreover, Defendant-Intervenors deny Statement 27 as incomplete because Plaintiffs fail to include in the statement a discussion of the other option discussed in AR Docs 35 and 46, which is to leave the wolves of the remaining states endangered indefinitely.  AR Doc 35 at p. 159 and AR Doc 48 at p. 204.

28.    Denied as immaterial and incomplete.  Defendant-Intervenors deny the materiality of Statement 28 in that all wolves other than those of the WGL-DPS remain endangered and are therefore not the subject of delisting rule that Plaintiffs challenge in this litigation.  Plaintiffs do not have the ability to challenge "possible future" steps since they are not ripe for review.  Defendant-Intervenors also deny the statement as incomplete because it fails to completely and accurately provide an accounting of the Administrative Record document that Plaintiffs reference for the statement.  Plaintiffs fail to fully account that the FWS determined that establishing recovery plans for the remaining states "is contrary to FWS's understanding that the ESA focuses on long-term viability, rather than requiring the filling of all available habitat with the taxon."  AR Doc. 35 at p. 159.

29.    Admitted in part and denied in part.  It is denied that the FWS decided on Option 2 as early as July 2005.  AR Doc. 66 at 280 merely indicates that Ron Refsnider was asked to work up a "new approach for a wolf DPS in the Midwest."  Defendant-Intervenors admit the remainder of Statement 29.

30.    Admitted in part and denied in part.  Defendant-Intervenors deny the first sentence as inaccurate, but admit that in February 2006, the FWS issued an Advanced Notice of Proposed Rulemaking, stating its plans to conduct rulemaking.  71 Fed. Reg. 6634.  Defendant-Intervenors admit the second sentence of Statement 30.  Defendant-Intervenors deny that the proposed boundaries of the WGL-DPS were "expansive" in that they encompassed Minnesota, Wisconsin, Michigan, only a tiny piece of Ohio and Indiana, approximately 1/4 of Illinois, 2/3 of Iowa and less than half of the Dakotas.

31.    Denied as immaterial.  While it may be true that the FWS received hundreds of comments, the distribution of those in support and opposition is immaterial because the FWS's decision to delist wolves was not based on a popularity contest, but instead on the best available science.  While it may also be true that Plaintiffs provided comments on the Proposed Rule, their comments merely addressed their subjective impression and not the conclusive facts or law pertaining to the delisting of wolves in the WGL-DPS.

32.    Admitted in part and denied in part.  Defendant-Intervenors admit the first and second sentences of Statement 32.  Defendant-Intervenors deny the third sentence as inaccurate since it ignores the five year federal monitoring period required by the ESA for species delisting.

33.    Denied.  Defendant-Intervenors deny Statement 33 as incomplete and inaccurate. The first sentence of Statement 33 fails to mention that the FWS found that the Great Lakes wolf population was "significant" because WGL-DPS wolves occupy the unusual or unique ecological setting of the Laurentin Mixed Forests.  "WGL wolves represent the only use by gray wolf packs of any form of eastern coniferous or eastern mixed coniferous-broadleaf forest in the United States."  72 Fed. Reg. 6060.  Defendant-Intervenors also deny the second sentence of Statement 33 as incomplete because it fails to note that the WGL-DPS is discrete from the

Northern Rocky Mountain population because of the unsuitable habitat/inhospitable conditions between the two populations.  72 Fed. Reg. at 6059.

34.    Admitted in part and denied in part.  Defendant-Intervenors deny the first sentence of Statement 34 in its characterization of the boundaries of the DPS extending "far" beyond the wolf's distribution.  The boundaries are not set "far" but are appropriately designed to account for normal wolf dispersal distances.  Defendant-Intervenors also deny the second sentence of Statement 34 that mischaracterizes the boundaries of the WGL-DPS as including "vast" portions of several states.  The WGL-DPS includes Minnesota, Wisconsin, Michigan, only a tiny piece of Ohio and Indiana, approximately 1/4 of Illinois, 2/3 of Iowa and less than half of the Dakotas.  Defendant-Intervenors also deny the third sentence of Statement 34 as incomplete.  The complete reference states:

> As discussed below, this DPS has been delineated to include the core recovered wolf population plus a wolf movement zone around the core wolf populations. This geographic delineation is not intended to include all areas to which wolves have moved from the Great Lakes population.  Rather, it includes the area currently occupied by wolf packs I Minnesota, Wisconsin, and Michigan; the nearby areas in these States, including the northern Lower Peninsula of Michigan, in which wolf packs may become established in the foreseeable future; and a surrounding area into which Minnesota, Wisconsin and Michigan wolves occasionally move but where persistent packs are not expected to be established because suitable habitat is rare and exists only as small patches.  The area surrounding the core wolf populations includes the locations of most known dispersers from the core populations, especially the shorter and medium-distance movements from which wolves are most likely to return to the core areas and contribute to the recovered wolf population.

72 Fed. Reg. at 6060.

35.    Denied.  Defendant-Intervenors deny the first sentence of Statement 35 as there is nothing in the document referenced by Plaintiffs for this statement that defines "management of dispersing wolves" as "killing dispersers."  The management strategies for dealing with dispersing wolves are determined by the individual states.  Defendant-Intervenors deny the

second sentence of Statement 35 as immaterial.  The fact that the FWS may have acknowledged that North and South Dakota would be very angry if wolves dispersing from Minnesota "being fully endangered when they cross the state line even after delisting in MN" does not mean that the FWS failed to make its decision to delist based on the best scientific evidence available.  *See* 72 Fed. Reg. 6052-6070 (explaining rationale for DPS).

36.    Denied.  Defendant-Intervenors deny the first sentence of Statement 36 as an incomplete representation of the AR documents referenced.  In Statement 36, Plaintiffs fail to mention that the FWS relied on the state management plans "because these plan have received the necessary approvals with the state governments."  72 Fed. Reg. at 6068.  Defendant-Intervenors also deny the second sentence as incomplete, because Plaintiffs fail to accurately describe the AR Doc upon which they rely for the statement.  Plaintiffs fail to mention that the FWS stated that they "believe[d] it is reasonable to assume that the plans [would] be funded and implemented largely as written."  *Id.*

37.    Denied as immaterial and inaccurate.  Defendant-Intervenors deny Statement 37 as immaterial because whether or not Michigan's plan was in the midst of revision at the time of delisting, Michigan's 1997 wolf recovery plan was in effect at the time of delisting and wolves were classified by the state of Michigan as a state "endangered" species.  MI ADC R. 299.1027. Defendant-Intervenors also deny Statement 37 as inaccurate because it fails to relate the fact that the FWS noted that "the current Michigan plan . . . will provide adequate regulatory mechanisms for Michigan wolves.  72 Fed. Reg. at 6094.

38.    Denied as immaterial and inaccurate.  Defendant-Intervenors deny Statement 38 as immaterial because whether or the FWS pointed to a series of "guiding principles" at the  time of delisting, Michigan's 1997 wolf recovery plan was in effect at the time of delisting and

wolves were classified by the state of Michigan as a state "endangered" species.  MI ADC R.

299.1027.  Defendant-Intervenors also deny Statement 38 as inaccurate because it fails to relate

the fact that the FWS noted that "the current Michigan plan . . . will provide adequate regulatory

mechanisms for Michigan wolves.  72 Fed. Reg. at 6094.

       39.     Denied as inaccurate.  While Statement 39 accurately identifies the minimum

wolf population targets for Michigan, Minnesota and Wisconsin, there is no indication from the

AR Docs referenced for this statement that any or all of the states would take measures to reduce

their current populations to these minimum target numbers.  To the contrary, for example,

Minnesota's Wolf Management Plan states that:  "wolf populations in Minnesota will be allowed

to continue to expand with a minimum population goal of 1,600" and that "no general public

taking of wolves will be proposed for the first 5 years following federal delisting."  72 Fed Reg.

at 5255.

       40.     Admitted in part and denied in part.  Defendant-Intervenors deny that state

management programs "sharply" increase the circumstances in which wolves can be killed.

Defendant-Intervenors admit that the Minnesota Wolf Management Plan authorizes Zones,

including Zone B.  Defendant-Intervenors deny the veracity of Statement 40 because Plaintiffs

grossly misrepresent the nature of wolf management available in Zone B.  In Zone B, only

depredating wolves may be killed and only on lands owned, leased or managed by the owner of a

domestic animal attacked or threatened by a wolf on the land or within a one mile radius of that

land.  Defendant-Intervenors also deny the accuracy and completeness of Statement 40 because

Plaintiffs fail to make reference to the following statement from the Minnesota Wolf

Management Plan that specifically states: Although these depredation procedures will likely

result in a larger number of wolves killed, as compared to previous ESA management, they will

not result in the elimination of wolves from Zone B." AR Doc. 215 at 5276. Plaintiffs

misrepresent the description of "predator control areas" by failing to specify that in Zone A,

predator control areas can only be opened for up to 60 days. *Id.* Plaintiffs also incorrectly

characterize Minnesota's Wolf Management Plan's approach to wolf harvest, by failing to note

that public harvests will simply be "considered" by the Minnesota DNR not sooner than 5 years

after federal delisting. *Id.* at 5274. Defendant-Intervenors admit the final sentence of

Statement 40.

      41.    Denied as immaterial. Defendant-Intervenors deny Statement 41 because the

presence of wolves in Zone B has never been deemed necessary for the recovery or sustainability

of wolves in the WGL-DPS. Defendant-Intervenors deny statement 41 as incomplete and

misleading because it fails to offer the following information from the AR documents upon

which it relies:

> The limitation of this broad take authority to Zone B is fully consistent with the
> Federal Recovery Plan's advice that wolves should be restored to the rest of
> Minnesota but not to Zone B (Federal Zone 5) because that area "is not suitable
> for wolves" (USFWS 1992, p. 20). The Federal Recovery Plan envisioned that the
> Minnesota numerical recovery goal would be achieved solely in Zone A (Federal
> Zones 1-4) (USFWS 1992, p. 28), and that has occurred. Wolves outside of Zone
> A are not necessary to the establishment and long-term viability of a self-
> sustaining wolf population in the State, and therefore there is no need to establish
> or maintain a wolf population in Zone B. Therefore, there is no need to maintain
> significant protection for wolves in Zone B in order to maintain a Minnesota wolf
> population that continues to satisfy the Federal recovery goals after Federal
> delisting.

72 Fed. Reg. at 6087.

      42.    Admitted in part and denied in part. Defendant-Intervenors admit that

Wisconsin's wolf management program includes "proactive control" if the wolf population

exceeds 350 wolves. Defendant-Intervenors deny that population declines are also nearly certain

under this program. Instead, these strategies would do little more than slow the growth or

stabilize the population numbers.  In making this inaccurate statement, Plaintiffs fail to provide a

complete depiction of the proactive control strategy described in Wisconsin's wolf management

program:

> Proactive control by government trappers would be used by Wisconsin DNR to
> control the wolf population once the management goal of 350 is achieved.  This
> would consist of lethal controls in areas with a history of depredation problems, or
> in areas with a high probability of wolf-human conflicts.  Such control would
> have the effect of slowing or perhaps stabilizing the growth of the wolf
> population.

AR Doc. 215 at 6001.  Plaintiffs also misrepresent the role of public harvests.   The

Wisconsin wolf management plan states that harvests can be considered only if other

control activities do not adequately maintain the population near the 350 goal and only

after all other control activities are first attempted.  Moreover, "[t]he Wisconsin state

legislature would have to approve authority for a controlled public harvest of wolves."

*Id.*

43.    Admitted in part and denied in part.  Defendant-Intervenors admit that prior to

delisting, many of the costs of wolf management were borne by the federal government.

However, many of these costs were also borne by the states.  Although Defendant-Intervenors

admit that since delisting, the states are responsible for wolf management, Defendant-Intervenors

deny the implication that the states have assumed all financial responsibility for this

management.  For example, according to the Declaration of Dan Stark, Wolf Specialist for the

state if Minnesota, the federal government continues to assume much of the financial

responsibility for depredation control.

44.    Admitted in part and denied in part.  Defendant-Intervenors admit the statement

generally, but deny that Plaintiffs accurately referenced the Administrative Record.  Plaintiffs

fail to mention that the FWS stated that they "believe[d] it is reasonable to assume that the plans [would] be funded and implemented largely as written." 72 Fed. Reg. at 6068.

45.     Denied.  Please see the Declaration of Minnesota Wolf Specialist Dan Stark.

46.     Admitted in part and denied in part.  Defendant-Intervenors deny as immaterial the vague unspecified allegations included in the first sentence of Statement 46 because it offers little information about Michigan's wolf management efforts or funding.  Defendant-Intervenors admit that the Executive Summary of the Five Year Evaluation of Michigan's Wolf Management Plan does include the quoted statement, but Defendant-Intervenors deny that there is any evidence of Michigan's failure to manage its wolves in a way that would preclude delisting. Although Defendant-Intervenors admit that Michigan may have written a letter to the FWS for funding assistance, Defendant-Intervenors deny the materiality of the fact, since Plaintiffs offer no evidence of whether or not Michigan received the requested funding.  Considering that Minnesota continues to receive federal funding assistance for wolf depredation efforts, it is not unreasonable to assume that Michigan receives similar assistance.  See Declaration of Daniel Stark, Minnesota Wolf Management Specialist.  Finally, Defendant-Intervenors deny the fourth sentence as misleading and incomplete.  While Thomas Drummer of Michigan Technological University may have conjectured that a switch to statistical sampling to estimate the size of the Michigan wolf population may have been cost driven, he also offered a detailed discussion about how the new sampling method would be designed to provide the same level of data as was available through the previous system.  AR Doc. 241 at 8527.

47.     Admitted in part and denied in part.  Defendant-Intervenors admit that the documents Plaintiffs quote in Statement 47 contain references to the funding of Wisconsin's wolf management strategies.  Defendant-Intervenors deny the materiality of Statement 47 in that

Plaintiffs offer no information as to whether Wisconsin received additional federal funding and/or whether funding has had an impact on Wisconsin's ability to carry out its wolf management strategies. Finally, as there is evidence that Minnesota continues to receive federal funding for its wolf depredation efforts, it is reasonable to assume that Wisconsin also continues to receive this federal assistance. Declaration of Dan Stark.

48. Denied as immaterial and inaccurate. Although unregulated, unmonitored killing may have played a role in the decline of the gray wolf prior to 1978, the delisting of wolves has not and will not result in unregulated or unmonitored killing of the species. It is denied that human-caused mortality constitutes a serious problem. Numerous scientific studies have shown that wolf populations can continue to thrive despite significant population reduction.

> Despite an annual kill of perhaps 20 to 30 percent of the estimated number of wolves in Minnesota in earlier years, there was no noticeable decline in the statewide population. This should not be surprising because it has been demonstrated that annual mortality of 28 percent (Fuller 1989, Keith 1983, Peterson et al. 1984) to 50 percent (Mech 1970, 64, Ballard and Stephenson 1982, Ballard et al. 1987) can be sustained by healthy productive wolf populations.

A.R. Doc. 215, p. 5893.

49. Admitted in part and denied in part. Defendant-Intervenors admit that disease is a factor that the FWS was obligated to consider in its determination as to whether the WGL-DPS should be delisted. Defendant-Intervenors also admit that, in the Final Rule to delist the WGL-DPS of wolves, the FWS acknowledged the need for continued monitoring of diseases and parasites. Defendant-Intervenors deny that diseases or parasites constitute a threat that would make it necessary for wolves to be listed as "threatened" or "endangered." According to the FWS, despite the presence of certain diseases and parasites, the number of wolves in the WGL-DPS has continued to grow.

21

Despite these and other diseases and parasites, the overall trend for wolf populations in the WGL DPS continues to be upward. Wolf management plans for Minnesota, Michigan, and Wisconsin include disease monitoring components that we expect will identify future disease and parasite problems in time to allow corrective action to avoid a significant decline in overall population viability. We conclude that diseases and parasites will not prevent the continuation of wolf recovery or the maintenance of viable wolf populations in the DPS. Delisting wolves in the WGL DPS will not significantly change the incidence or impacts of disease and parasites on these wolves. Furthermore, we conclude that diseases and parasites will not be threats sufficient to cause the WGL DPS gray wolves to be in danger of extinction in the foreseeable future in all or a significant portion of the range within the WGL DPS.

71 Fed. Reg. 6081.

50.     Denied as inaccurate, incomplete and immaterial.  Defendant-Intervenors deny

Plaintiffs' characterization of Minnesota's monitoring efforts as inaccurate and incomplete, in

that Plaintiffs failed to include a discussion of all the strategies that Minnesota uses to monitor

wolves.  The Minnesota Wolf Management Plan states:

Annual changes in wolf distribution and abundance will be monitored by means of currently used indicators such as wolf depredation complaints, autumn scent station surveys, winter furbearer track surveys, and other observations of field personnel from all natural resources agencies.

AR Doc. 215 at 5272

In addition, the Minnesota Wolf Management Plan states:

Monitoring the health of wolves necessarily includes consideration of the effects of infectious diseases and parasites.  Examples of health monitoring include collection and analysis of biological samples from live-captured wolves, analysis of wolf scats, and necropsies of dead wolves.  Regular collection of pertinent tissues of live-captured or dead wolves will be initiated, and periodic assessments of wolf health will be carried out under authorization of DNR, when circumstances indicate that diseases or parasites may be adversely affecting portions of the wolf population.

AR Doc. 215 at 5273.  Minnesota's Wolf Management Plan further explains that the Minnesota

DNR "will collaborate with other investigators and continue monitoring disease incidence, where

necessary, by examination of wolf carcasses obtained through depredation control programs, and

also through blood/tissue physiology work conducted by DNR and the U.S. Geological Survey. DNR will also keep records of documented and suspected incidence of sarcoptic mange." AR Doc. 215, p. 5285.

Defendant-Intervenors deny as immaterial Plaintiffs' statement as to minimum goals for disease assessment. As noted by the FWS, Minnesota's approach to disease monitoring is appropriate "in light of its much greater abundance of wolves than in the other two states.' 72 Fed. Reg. 6081.

51.    Denied. Defendant-Intervenors deny that there is any evidence that the Michigan DNR will not carry out the monitoring plan called for by its wolf management program. Although it is true that Michigan is in the process of revising their wolf management plan, there is no evidence that the existing plan is not being fully implemented. In fact, in the five year evaluation Report dated September 2004, Michigan acknowledged carrying out many of the objectives of Michigan's Wolf Recovery and Management Plan during its first five years of implementation. AR Doc. 142 at 767. Defendant-Intervenors deny as immaterial Michigan's use of a new monitoring strategy. As explained by Thomas Drummer, PhD of Michigan Technological University, who helped design the new monitoring strategy:

"The results of the simulations indicate the proposed monitoring program based on geographic stratification will produce unbiased, precise estimates of total wolf abundance." A.R. p. 8527.

52.    Denied as immaterial. Plaintiffs' assumptions of insufficient funding for wolf management are baseless and unfounded. As indicated by the Declaration of Daniel Stark, Wolf Management Specialist for Minnesota DNR, Plaintiff falsely represented Minnesota's funding and implementation of their wolf management efforts. Also as indicated by the Declaration of

Daniel Stark, federal funding for wolf depredation control continues to be made available to Minnesota post-delisting and presumably continues for Wisconsin and Michigan.  Moreover, Plaintiffs offer no evidence to indicate that wolf recovery and management efforts under federally listed status would be better funded than currently under state management.

53.    Denied as inaccurate.  In the Final Rule, the FWS explained that they "are developing a [Post Delisting Monitoring] plan for the gray wolves in the WGL DPS with the assistance of the Eastern Gray Wolf Recovery Team."  72 Fed. Reg. 6101.  The FWS published a draft version of that plan on June 4, 2007.  72 Fed. Reg. 30819 (June 4, 2007) and have stated that the plan is currently being implemented.  *Id*. at 30820.

54.    Admitted.

55.    Denied.  The 1992 Eastern Timber Wolf Recovery Plan focused on the eastern timber wolf species.  The ESA defines the term "species" to include "subspecies."  16 U.S.C. Section 1532 (16).  That species did not lose recognition, but was instead merged with the other species of wolves for the sake of "convenience."  43 Fed. Reg. 9610.  March 9, 1978.

56.    Admitted in part and denied in part.  Defendant-Intervenors admit that the 1992 Eastern Timber Wolf Recovery Plan does include the statement quoted by Plaintiffs.  However, the statement is immaterial in that wolves existing or dispersing into much of the area encompassed by the Eastern Timber Wolf Recovery Plan are still classified as "endangered." Moreover, it is unclear that the historically ranging species for the northeastern United States, which is a significant portion of the area that was the focus of the 1992 Eastern Timber Wolf Recovery Plan, was the gray wolf.  See Defendant-Intervenors' Response to Statement 27.

57.    Defendant-Intervenors admit the first and second sentences of Statement 57. Defendant-Intervenors deny the third sentence as immaterial.

58.    Denied.  As evidenced by the January 10, 1998 Addendum to the Recovery Plan for the Eastern Timber Wolf, numerical recovery was not aimed solely at preventing complete extinction:

> If the Recovery Plan criteria are met and the population segment is delisted, it is the purview of state and tribal governments to determine, collectively and individually, long-term conservation strategies for the Gray Wolf Eastern Population.  The Team underscores the importance of cooperative management among states and tribes, to provide a coordinated strategy for wolf conservation, and a strong commitment to providing the public with timely information and comprehensive education regarding wolves and wolf management.  In order to avoid even a remote chance of backsliding into a relisting situation, we hereby clarify our recommendations and comment further on the adequacy of the original minimum numerical target of 100 wolves in Michigan and Wisconsin as well as assurance criteria for this second population.

AR Doc.  14884.

59.    Denied.  Please see Defendant-Intervenors' response to Statement 53.

60.    Denied as Immaterial.  Plaintiffs have filed suit to challenge the delisting of wolves in the Western Great Lakes Distinct Population Segment.  Wolves in much of the area that was the subject of the 1992 Recovery Plan continue to be classified as "endangered."  Please see Defendant-Intervenors' response to Statement 56.

Dated: January 18, 2007                    Respectfully submitted,

s/ James H. Lister                          s/Anna M. Seidman
William P. Horn (D.C. Bar No. 375666)       Anna M. Seidman (D.C. Bar No. 417091)
James H. Lister (D.C. Bar. No. 447878)      Douglas S. Burdin (D.C. Bar No. 434107)
Birch Horton, Bittner & Cherot             Safari Club International
1155 Connecticut Avenue N.W.                501 2nd Street NE
Suite 1200                                  Washington, D.C.  20002
Washington, D.C.  20036                     (202) 543-8733
(202) 659-5800                              Fax:  (202) 543-1205
Fax:  (202)659-1027                         aseidman@sci-dc.org
whorn@dc.bhb.com                            dburdin@sci-dc.org
jlister@dc.bhb.com

*Counsel for U.S. Sportsmen's Alliance*     *Counsel for Safari Club International, Safari Club*
*Foundation, Wisconsin Bear Hunters'*       *International Foundation, and National Rifle*
*Association, Scott Meyer and Robert*       *Association*
*Stafsholt*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

THE HUMANE SOCIETY OF THE
UNITED STATES, HELP OUR WOLVES LIVE,
ANIMAL PROTECTION INSTITUTE, and
FRIENDS OF ANIMALS AND THEIR
ENVIRONMENT,

        Plaintiffs,

      vs.

DIRK KEMPTHORNE,
Secretary of the Interior,
U.S. DEPARTMENT OF THE INTERIOR, and
U.S. FISH AND WILDLIFE SERVICE,

        Defendants,

and

SAFARI CLUB INTERNATIONAL, SAFARI
CLUB INTERNATIONAL
FOUNDATION, and
NATIONAL RIFLE ASSOCIATION,

        Defendant-Intervenors,

and

U.S. SPORTSMENS' ALLIANCE
FOUNDATION, WISCONSIN BEAR HUNTERS'
ASSOCIATION, SCOTT MEYER, and ROBERT
STAFSHOLT,

        Defendant-Intervenors.

Civil Action No. 1:07-cv-00677(PLF)

**ORDER**

Upon consideration of the Motion for Summary Judgment, filed by Defendant-

Intervenors on January 18, 2008 ("Motion"), and the supporting and opposing memoranda filed

by the parties, and for the reasons stated in the accompanying Memorandum Opinion, it is

hereby Ordered this _____ day of _____, 2008 that the Motion is GRANTED

and a complete Summary Judgment is entered in favor of all Defendants and against Plaintiffs.

      The Clerk is directed to enter Judgment for all Defendants.

_____
Paul Friedman
United States District Judge

**ATTORNEYS TO BE NOTIFIED**

Rebecca G. Judd
rjudd@hsus.org
Jonathan R. Lovvorn
jlovvorn@hsus.org
The Humane Society of the United States
2100 L Street, NW
Washington, DC 20037
(202) 452-1100
(202) 778-6132 (facsimile)

Brian B. O'Neill
boneill@faegre.com
Sanne H. Knudsen
sknudsen@faegre.com
Michael C. Soules
msoules@faegre.com
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
(612) 766-7000
(612) 766-1600 (facsimile)

*Attorneys for Plaintiffs*

Jimmy A. Rodriguez
U.S. DEPARTMENT OF JUSTICE
P.O. Box 7369
Washington, DC 20044
(202) 305-0342
Fax: (202) 305-0275
jimmy.rodriguez@usdoj.gov

*Attorney for Federal Defendants*

William P. Horn
BIRCH, HORTON, BITTNER AND CHEROT
1155 Connecticut Avenue, NW
Suite 1200
Washington, DC 20036
(202) 659-5800
Fax: (202) 659-1027
whorn@dc.bhb.com

James Hardwick Lister
BIRCH HORTON BITTNER AND CHEROT
1155 Connecticut Avenue
Suite 1200
Washington, DC 20038
(202) 659-5800
jlister@dc.bhb.com

*Attorneys for Defendant-Intervenors U.S. Sportsmen's Alliance Foundation, et al.*

Anna Margo Seidman
SAFARI CLUB INTERNATIONAL
501 2nd Street, NE
Washington, DC 20002
(202) 543-8733
Fax: (202) 543-1205
aseidman@cox.net

Douglas Scott Burdin
SAFARI CLUB INTERNATIONAL
501 2nd Street, NE
Washington, DC 20002
(202) 543-8733
Fax: 202-543-1205
dburdin@sci-dc.org

*Attorneys for Defendant-Intervenors Safari Club International, et al.*