**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HUMANE SOCIETY OF THE UNITED STATES, HELP OUR WOLVES LIVE, ANIMAL PROTECTION INSTITUTE, AND FRIENDS OF ANIMALS AND THEIR ENVIRONMENT, )))))) | |
| Plaintiffs, )) | Case No. 1:07-cv00677 |
| vs. )) | |
| DIRK KEMPTHORNE, Secretary of the Interior, U.S. DEPARTMENT OF THE INTERIOR, AND U.S. FISH AND WILDLIFE SERVICE ))))) | |
| Defendants, )) | |
| SAFARI CLUB INTERNATIONAL, SAFARI CLUB INTERNATIONAL FOUNDATION, AND NATIONAL RIFLE ASSOCIATION, ))))) | |
| Defendant-Intervenors, )) | |
| and ))) | |
| U.S. SPORTSMEN'S ALLIANCE FOUNDATION, WISCONSIN BEAR HUNTING ASSOCIATION, SCOTT MEYER, AND ROB STAFHOLT, ))))) | |
| Defendant-Intervenors. ) | |

**NOTICE OF FILING OF SUPPLEMENTAL EXHIBIT 3 TO**
**DEFENDANT-INTERVENORS' CONSOLIDATED MEMORANDUM**
**IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND**
**IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Defendant-Intervenors U.S. Sportsmen's Alliance Foundation, Wisconsin Bear Hunting

Association, Scott Meyer and Rob Stafholt and Defendant Intervenors Safari Club International,

Safari Club International Foundation, and National Rifle Association (all, collectively,

"Defendant-Intervenors") respectfully submit the attached Supplement Exhibit 3 to their

Consolidated Memorandum in Support of Their Motion for Summary Judgment and in

Opposition to Plaintiffs' Motion for Summary Judgment (Docket 43).  This Exhibit was

inadvertently left out at the time of the original filing on Friday, January 18, 2008, and was

referenced in, but not attached to that filing.  It is an Opinion of the Solicitor of the Department

of Interior dated March 16, 2007.  *See, U.S. v. Lara,* 541 U.S. 193, 206 (2004)*(Solicitor's*

Opinions constitute legal authority that may be considered by a Court).


Dated:   January 23, 2008

Respectfully submitted,


/s/ James H. Lister
William P. Horn (D.C. Bar No. 375666)
James H. Lister (D.C. Bar. No. 447878)
Birch Horton, Bittner & Cherot
1155 Connecticut Avenue N.W., Suite 1200
Washington, D.C.  20036
(202) 659-5800
Fax:  (202)659-1027
whorn@dc.bhb.com
jlister@dc.bhb.com

*Counsel for U.S. Sportsmen's Alliance*
*Foundation, Wisconsin Bear Hunters'*
*Association, Scott Meyer and Robert Stafsholt*

Anna M. Seidman (D.C. Bar No. 417091)
Douglas S. Burdin (D.C. Bar No. 434107)
Safari Club International
501 2nd Street NE
Washington, D.C.  20002
(202) 543-8733
Fax:  (202) 543-1205
aseidman@sci-dc.org
dburdin@sci-dc.org

*Counsel for Safari Club International,  Safari*
*Club International Foundation, and National*
*Rifle Association*

**SUPPLEMENTAL EXHIBIT 3 TO DEFENDANT-INTERVENORS'
CONSOLIDATED MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**


**(CASE NO. 1:07-CV00677-PLF)**



# United States Department of the Interior

OFFICE OF THE SOLICITOR

March 16, 2007

M-37013

Memorandum

To:         Director, U.S. Fish and Wildlife Service

From:       Solicitor

Subject:    The Meaning of "In Danger of Extinction Throughout All or a Significant Portion
            of its Range"


## I.    INTRODUCTION

Since 1973, the Endangered Species Act (ESA) has defined "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range." Endangered Species Act of 1973 § 3(6), 16 U.S.C. § 1532(6) (2006) (ESA/Act). Thirty-three years later, questions continue to be raised about the meaning of the phrase "in danger of extinction throughout … a significant portion of its range" (SPR phrase/SPR language).

As a result of these continued questions, the Fish and Wildlife Service (Service) is working to develop a policy on how to apply the SPR phrase when determining whether a species is an endangered species under the Act.[1]  To facilitate the development of this policy, you have requested this Office's view of the meaning of the SPR phrase. Our office has reviewed the statutory language, the legislative history, relevant court rulings, and Departmental practices. I provide you our most informed view of the general meaning of the SPR phrase and the specific meaning of its component terms, particularly "significant" and "range."

Your effort to develop a policy is prompted, in part, by the 2001 decision of the Ninth Circuit Court of Appeals that rejected the interpretation of the SPR phrase favored by the Department. *Defenders of Wildlife v. Norton*, 258 F.3d 1136 (9th Cir. 2001) (flat-tailed horned lizard).[2]

---

[1] Because the definition of "threatened species" under the ESA includes the SPR phrase—i.e., a threatened species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range"—the opinion given in this memorandum about the meaning of the SPR phrase also applies when the Service is determining whether a species is a threatened species.

[2] Seven district courts have essentially adopted or followed the Ninth Circuit's interpretation. *See Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553 (D. Vt. 2005) (gray wolf); *Defenders of Wildlife v. Secretary, U.S. Dept. of the Interior*, 354 F. Supp. 2d 1156 (D. Or. 2005) (gray wolf); *Defenders of Wildlife v. Norton*, 239 F. Supp. 2d 9 (D.D.C. 2002) (Canada lynx); *see also Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 402 F. Supp. 2d 1198 (D. Or. 2005) (coastal cutthroat trout) (following flat-tailed horned lizard case in general, without directly addressing other possible interpretations); *Envtl. Protection Info. Ctr. v. Nat'l Marine Fisheries Serv.*, No. C-02-5401 EDL (N.D. Cal. Mar. 1, 2004) (green sturgeon) (same); *Southwest Ctr. for Biological Diversity v. Norton*, CA

There, the Ninth Circuit interprets the SPR phrase as a "substantive standard" for determining whether a species is an endangered species. Under the court's interpretation, there are two situations in which the Secretary must determine a species to be an endangered species: 1) where the Secretary finds that the species is in danger of extinction throughout all of its range; or 2) where the Secretary finds that the species is in danger of extinction throughout a significant portion of its range.

Since approximately 2000, the Department, on the other hand, has interpreted the SPR phrase to mean that a species is an endangered species only when it is in danger of extinction throughout a portion of its current range that is "so important to the continued existence of a species that threats to the species in that area can have the effect of threatening the viability of the species as a whole." *Ctr. for Biological Diversity v. Norton*, 411 F. Supp. 2d 1271, 1278 (D.N.M. 2005), *appeal pending* (Rio Grande cutthroat trout). Under the Department's interpretation, there is only one situation in which the Secretary must find a species to be an endangered species—when the Secretary finds that it is in danger of extinction throughout all of its range. Under this interpretation, the Secretary need not demonstrate that there are threats so severe throughout the range that the species is in danger of extinction in every portion of its range. Instead, if the Secretary can demonstrate that the species faces threats in only a portion of its range so severe as to threaten the viability of the species throughout its range, a determination that a species is an endangered species would be justified. In other words, since approximately 2000, the Department has viewed the SPR phrase not as providing another "substantive standard" for determining whether a species is an endangered species, but rather as "clarifying" the evidentiary burden the Secretary must satisfy when making that determination.[3] For this reason, the Department's interpretation of the SPR phrase is sometimes referred to as the "clarification interpretation." The Department's interpretation of the SPR phrase was recently upheld by the District Court of New Mexico. *Id.* Only two district courts have upheld the Department's interpretation, to date.[4]

---

No. 98-934 (RMU/JMF), 2002 U.S. Dist. LEXIS 13661 (D.D.C. July 29, 2002) (magistrate's recommendation) (Queen Charlotte goshawk) (same), *adopted in rel. part*, slip op. (D.D.C. May 24, 2004); *Defenders of Wildlife v. Norton*, CA 99-02072 (HHK) (D.D.C. Dec. 13, 2001) (Florida black bear) (same).

[3] Prior to the 1978 Amendments, some listings specified that species were endangered in only part of their range within the United States. Boundaries for these partial range listings varied from the U.S.-Canadian border defining the contiguous United States for such species as the grizzly bear, 40 Fed. Reg. 31,376 (July 28, 1975), and gray wolf, 41 Fed. Reg. 17,742 (Apr. 28, 1976), to a mere three parishes in Louisiana comprising the listed range of the American alligator, 40 Fed. Reg. 44,412 (Sept. 26, 1975). Species were also listed as endangered in some states and threatened in others, such as the gray wolf, 41 Fed. Reg. 24,062 (June 14, 1976), and the bald eagle, 43 Fed. Reg. 6230, 6233 (Feb. 14, 1978). However, the determinations therein of endangered species and threatened species do not explain the bases for listing them in only portions of their ranges.

[4] The District Court of Colorado, citing the District Court of New Mexico's decision with no additional analysis, also upheld the Department's interpretation of the SPR phrase. *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, CA No. 05-cv-00305-RPM, 2007 U.S. Dist. LEXIS 16175, at *8 (D. Colo. Mar. 7, 2007) (Bonneville cutthroat trout).

For the reasons given below, I conclude that:

1. The SPR phrase is a substantive standard for determining whether a species is an endangered species—whenever the Secretary concludes because of the statutory five-factor analysis that a species is "in danger of extinction throughout ... a significant portion of its range," it is to be listed and the protections of the ESA applied to the species in that portion of its range where it is specified as an "endangered species";

2. the word "range" in the SPR phrase refers to the range in which a species currently exists, not to the historical range of the species where it once existed;

3. the Secretary has broad discretion in defining what portion of a range is "significant," and may consider factors other than simply the size of the range portion in defining what is "significant"; and

4. the Secretary's discretion in defining "significant" is not unlimited; he may not, for example, define "significant" to require that a species is endangered only if the threats faced by a species in a portion of its range are so severe as to threaten the viability of the species as a whole.


II.    ANALYSIS

A.    The Language of the SPR Phrase

As the Supreme Court has recently affirmed, "the starting point in every case involving construction of a statute is the language [of the statute] itself." *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 685 (1982); *see Duncan v. Walker*, 533 U.S. 167, 172 (2001). Where the meaning of the language in a statute is plain, that is normally the end of the inquiry. *Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004); *United States v. Ron Pair Enters.*, 489 U.S. 235, 241 (1989). To determine the plain meaning, the words in a statutory provision that are not defined by the statute itself are customarily given their ordinary meaning. *BP Am. Prod. Co. v. Burton*, 127 S. Ct. 638, 643 (2006) (citing *Perrin v. United States*, 444 U.S. 37, 42 (1979)); *Williams v. Taylor*, 529 U.S. 420, 431 (2000). However, in determining the plain meaning:

> a reviewing court should not confine itself to examining a particular statutory provision in isolation. The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context .... It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."

*Food & Drug Admin. v. Brown & Williams Tobacco Co.*, 529 U.S. 120, 132–33 (2000) (quoting *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989)).

3

The SPR phrase has no biologically or scientifically accepted ordinary or technical meaning. Therefore, courts have focused on four words in the SPR phrase as key to interpreting its meaning. Those words are "extinction," "or," "range," and "significant." The meaning of each is addressed below.

      1.    "Extinction"

"Extinction" is defined by the dictionary as "the condition or fact of being extinct." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 411 (10th ed. 2000).[5] The word "extinct," as used in reference to a plant or animal species, is defined as "no longer in existence," "having died out or come to an end," or "having no living members." Id.[6] A fair, but not necessary, implication from this definition is that to be extinct, a species must have no living members anywhere. In other words, using the dictionary definition, a species that once inhabited the United States, but no longer has any living representatives there, arguably cannot be said to be extinct if there are living representatives elsewhere in the world.

Based on the dictionary definition, the Ninth Circuit concluded that "'extinction' suggests total rather than partial disappearance," and that the phrase "in danger of extinction throughout … a significant portion of its range" is therefore "inherently ambiguous, as it appears to use language in a manner in some tension with ordinary usage." *Defenders of Wildlife*, 258 F.3d at 1141. In spite of this conclusion by the Ninth Circuit, it should be noted that "ordinary usage" does not necessarily equate to the dictionary definition. *See Third Nat'l Bank v. Impac, Ltd.*, 432 U.S. 312, 376 (1977) ("As always, the meaning of particular phrases must be determined in context [and] read in context."). Experience suggests that in ordinary usage, people often refer to an animal or plant as being extinct in one place, even though it may not be extinct in all places. For example, a species such as the California condor may be considered extinct in some States although it persists in others.[7]

Moreover, just because the language in a statutory provision may be in "some tension with ordinary usage" does not mean that it lacks a plain meaning. As noted above, plain meaning can also be supplied from the context in which the words are used. *See id.*; *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir. 1945) (statutory context should be favored over a contrary dictionary definition).[8] In the context of the SPR phrase as a whole the meaning of "extinction" is clear.

---

[5] The dictionary definition of "extinction" from a dictionary contemporary with the enactment of the ESA is similar: "the condition or fact of being extinct or extinguished" or "the process of becoming extinct or extinguished." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 806 (16th ed. 1971).

[6] The 1971 definition is again similar: "no longer in existence," "lacking living representatives," or "lacking survivors." *Id.*

[7] Further, no alternative or more specific general or biological term defines the disappearance of a species in only a portion of its range. The term "extirpation" is sometimes used in this manner, but dictionaries generally define "extirpation" in a similar manner to "extinction," as implying total destruction or disappearance. *See, e.g.*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 411 (10th ed. 2000). Similarly, the 1971 definition of "extirpate" is "to destroy totally," "wipe out," "kill off," or "make extinct," and "extirpation" is defined as "the act of extirpating or state of being extirpated." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 806 (16th ed. 1971).

[8] Judge Learned Hand, in this case, stated that "it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose

4

The word is used as part of a phrase—"in danger of extinction"—that is modified by the phrase "throughout ... a significant portion of its range." Thus, for purposes of the ESA, a species can be "endangered" even if it is facing extinction only in a significant portion of its range. In other words, a species does not need to be in danger of extinction everywhere—i.e., be in danger of total disappearance—to merit the protection of the ESA. As long as it is in danger of extinction "throughout ... a significant portion of its range"—i.e., is in danger of disappearing in that significant portion of the range—it must be protected in that portion of its range where, in fact, it is an "endangered species."

This understanding of Congressional intent in using the word "extinction" is supported by the way in which the word is used elsewhere in the ESA. In section 2, Congress found that "various species of fish, wildlife, and plants in the United States" that are of considerable "value to the Nation and its people" "have been rendered extinct," or "are threatened with extinction." ESA § 2(a)(1)–(3). These findings suggest that Congress viewed the disappearance of a species within the part of its range occurring in the United States as constituting "extinction" in that geographic area, even though the species might be prospering elsewhere. Similarly, section 4(c) of the ESA requires the Secretary, when publishing the list of endangered species, to "specify with respect to each such species over what portion of its range it is endangered," the clear implication being that the species can be endangered—i.e., in danger of extinction—in one portion of its range without being in danger of extinction throughout its range. ESA § 4(c)(1). Indeed, to read the SPR phrase instead as requiring that a species be in danger of extinction throughout its entire range before it could be considered "endangered" for purposes of the ESA would severely diminish the Secretary's ability to achieve one of the primary objectives of the ESA, which is to "[safeguard], for the benefit of all citizens, the Nation's heritage in fish, wildlife, and plants." ESA § 2(a)(5).

The legislative history of the ESA is consistent with this reading of the word "extinction," as modified by the SPR phrase. The predecessor statute to the ESA, the Endangered Species Conservation Act of 1969, had defined "endangered species" as follows:

> A species or subspecies of fish or wildlife shall be deemed to be threatened with worldwide extinction whenever the Secretary determines, based on the best scientific and commercial data available to him ... that the continued existence of such species or subspecies of fish or wildlife is ... endangered ....

The Endangered Species Conservation Act of 1969 § 3(a), 83 Stat. 275, 275 (1969). This provision had been interpreted as requiring that a species be threatened with worldwide extinction before it could be protected.[9] To give the Secretary greater flexibility in his listing decisions, and thus provide greater protection for species, Congress included a new definition of "endangered species" in the ESA of 1973. The House Report on the ESA noted that the new definition of "endangered species" represented "a significant shift in the definition of existing

---

or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." *Cabell*, 148 F.2d at 739.

[9] *See* Appendix at A-4.

5

law which considers a species to be endangered only when it is threatened with worldwide extinction." H.R. REP. NO. 93-412, at 10 (1973). This legislative history, coupled with the manner in which "extinction" is used elsewhere in the Act, supports a reading of the term "extinction" to include the disappearance of species in only part of its range.

2.      "Or"

"Or" is defined in the dictionary as "a function word to indicate an alternative" or "used in logic as a sentential connective that forms a complex sentence which is true when at least one of its constituent sentences is true."[10] MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 815 (10th ed. 2000). In its analysis, the Ninth Circuit focused on the fact that the definition of "endangered species" includes the disjunctive term "or." *Defenders of Wildlife*, 258 F.3d at 1141–42. That definition states that a species is endangered if it is "in danger of extinction throughout all or a significant portion of its range." ESA § 3(6). The Ninth Circuit noted that, where the word "or" is used in a statute, courts must seek to give an independent and separate meaning to the clauses that appear on either side of the word "or"; otherwise, one or the other of the clauses would be surplusage. *Defenders of Wildlife*, 258 F.3d at 1142. This is consistent with "a basic canon of statutory construction" that "a statute ought, upon the whole, be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void or insignificant." *Dodd v. United States*, 545 U.S. 353, 371 (2005).

The Ninth Circuit rejected the Department's interpretation of the definition of "endangered species" because it failed to respect this canon of construction. The court reasoned as follows:

> The Secretary's explanation of this odd phraseology is of no assistance in puzzling out the meaning of the phrase, since her interpretation simply cannot be squared with the statute's language and structure. The Secretary … interprets the enigmatic phrase to mean that a species is eligible for protection under the ESA if it "faces threats in enough key portions of its range that the entire species is in danger of extinction …." [The Secretary] therefore assumes that a species is in danger of extinction in "a significant portion of its range" only if it is in danger of extinction everywhere.

> If, however, the effect of extinction throughout "a significant portion of its range" is the threat of extinction everywhere, then the threat of extinction throughout "a significant portion of its range" is equivalent to the threat of extinction throughout all its range. Because the statute already defines "endangered species" as those that are "in danger of extinction throughout all … of [their] range," the Secretary's interpretation of "a significant portion of its range" has the effect of rendering the phrase superfluous.

---

[10] A 1971 dictionary defines "or" in similar terms, as "a function word to indicate an alternative between different or unlike things, states, or actions" or a "choice between alternative things, states, or courses." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1585 (16th ed. 1971).

6

> Such a redundant reading of a significant statutory phrase is unacceptable. When interpreting a statute, we must follow a "natural reading ..., which would give effect to all of the statute's provisions." By reading "all" and "a significant portion of its range" as functional equivalents, the Secretary's construction violates that rule.

*Defenders of Wildlife*, 258 F.3d at 1141–42 (footnote and citation omitted). Because the Ninth Circuit keyed on the presence of the disjunctive "or" in the definition, its interpretation is sometimes referred to as the "disjunctive interpretation."

On the other hand, the New Mexico court, while agreeing with the Ninth Circuit that the SPR phrase is ambiguous, disagreed with the Ninth Circuit's conclusion that the Department's interpretation was arbitrary, instead adopting the Department's interpretation as the "most appropriate and logical way to view this puzzling phrase." *Ctr. for Biological Diversity*, 411 F. Supp. 2d at 1280. The court accepted the Department's interpretation and did not independently analyze the meaning of the term "extinction," standing alone or in context, and did not attempt to give separate and independent meaning to the phrases on either side of the disjunctive word "or."

Consistent with the Ninth Circuit's interpretation of "or" and for the reasons discussed below, I conclude that if the Secretary determines that a species is in danger of extinction in a significant portion of its range, he must specify the portion of its range where it is an endangered species and then apply the protections in the Act to the members of the species in that portion of its range.

      3.    "Range"

The meaning of "range" in the SPR phrase is not disputed. The general dictionary definition of "range" as "the region throughout which a kind of organism or ecological community naturally lives or occurs," MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 964 (10th ed. 2000),[11] is clear and has not been questioned or debated by any court. Instead, the debate centers on whether the "range" referred to in the definition of "endangered species" is the historical or the current range of the species.

In addressing this issue, context again is key. Under the definition, a species is "endangered" only if it "is in danger of extinction" in the relevant portion of its range. The phrase "is in danger" denotes a present-tense condition of being at risk of a future, undesired event.[12] Hence, to say a species "is in danger" in an area where it no longer exists—i.e., in its historical range—

---

[11] The 1971 definition of "range" is identical. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1880 (16th ed. 1971).

[12] "Danger" is defined as (among other things) "the state of being exposed to serious loss or injury," meaning that the loss has not happened yet. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 573 (2002); *cf.* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 292 (10th ed. 2000) (defining "danger" as "exposure or liability to injury, pain, harm, or loss." If a species has already been extirpated from an area, it is not in "danger" there; the loss has already occurred. The 1971 definition of "danger" is similar: "the state of being threatened with serious loss or injury." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 573 (16th ed. 1971).

would be inconsistent with common usage. Thus, "range" must mean "current range," not "historical range." This interpretation of "range" is further supported by the fact that when determining whether a species is an endangered species, the Secretary must consider the "present" or "threatened" (i.e., future), rather than the past, "destruction, modification, or curtailment" of a species's habitat or range. ESA § 4(a)(1)(A).

The Ninth Circuit appears to conclude, however, without any analysis or explanation that the "range" referred to in the SPR phrase includes the historical range of the species. The Ninth Circuit concludes its opinion by stating that a species "can be *extinct* 'throughout ... a significant portion of its range' if there are major geographical areas in which it is no longer viable but once was," and then faults the Secretary for not "at least explain[ing] her conclusion that the area in which the species can no longer live is not a significant portion of its range." *Defenders of Wildlife*, 258 F.3d at 1145 (emphasis added); *see Northwest Ecosystem Alliance v. United States Fish and Wildlife Service*, 475 F.3d 1136, 2007 U.S. App. LEXIS 2296, at *35-36 (9th Cir. Feb. 2, 2007) ("[w]e have recognized that a species can be considered extinct throughout a significant portion of its range 'if there are major geographical areas in which it is no longer viable but once was."). This suggests that, in the view of the Ninth Circuit, the range the Service must analyze in assessing endangerment includes the historical range—i.e., the places where the species was once viable but is no longer.[13]

This interpretation is not supported by the statute. Indeed, it appears to be based on an inadvertent misquote of the relevant statutory language. In addressing this issue, the Ninth Circuit states that the Secretary must determine whether a species is "extinct throughout ... a significant portion of its range." *Id.* If that were true, the Secretary would necessarily have to study the historical range. But that is not what the statute says, and the Ninth Circuit quotes the statute correctly elsewhere in its opinion. Under the ESA, the Secretary is to determine not if a species is "extinct throughout ... a significant portion of its range," but if it "is in danger of extinction throughout ... a significant portion of its range." A species cannot presently be "in danger of extinction" in that portion of its range where it "was once viable but no longer is"—if by the latter phrase the court meant lost historical habitat. In that portion of its range, the species has by definition ceased to exist. There it is not "in danger of extinction"; it is extinct.

To determine whether a species is presently "in danger of extinction throughout ... a significant portion of its range," the Service must (and currently does) focus on the range in which the species currently exists. Data about the historical range and how the species came to be extinct in that location may be relevant in understanding or predicting whether a species is "in danger of extinction" in its current range.[14] But the fact that it has ceased to exist in what may have been

---

[13] It is possible that the court was referring to areas within the current range within which the Service expected the species to become extirpated. However, in a subsequent challenge to the Service's decision on remand, the district court held that the Ninth Circuit had required the Service to determine "whether the lizard's lost historical habitat was a significant portion of the range." *Tucson Herpetological Soc'y v. Norton*, No. CV-04-0075-PHX-NVW, slip op. at 9 (D. Ariz. Aug. 30, 2005).

[14] The New Mexico district court agreed with this construction for the most part, noting that "FWS must take into account the species' historical range and reductions thereto[, b]ut even with a reduction in range ..., if the remaining core populations ensure the species' survival throughout its range or a significant portion thereof, then the species is

portions of its historical range does not necessarily mean that it is "in danger of extinction" in a significant portion of the range where it currently exists.

    4.   "Significant"

As explained above, a species can be determined to be an endangered species for purposes of the ESA even if it is in danger of extinction only in a significant portion of its range. However, the question remains, what portion of its range should be considered "significant."

Most, if not all, dictionaries list several definitions of "significant." For example, one standard dictionary defines "significant" as "important," "meaningful," "a noticeably or measurably large amount," or "suggestive." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1088 (10th ed. 2000).[15] If it means a "noticeably or measurably large amount," then the Secretary, in determining endangerment, would have to focus on the size of the range portion in question, either in relation to the rest of the range or perhaps even in absolute terms. If it means "important," then the Secretary would have to consider additional factors, other than size, to determine whether the portion of the range in which a species is "in danger of extinction" is "significant." For example, would the portion of the range be "significant" if it were a key breeding ground of the species, even though the area in question was only a small part of the entire range?

One district court interpreted the term to mean "a noticeably or measurably large amount" without analysis or any reference to other alternate meanings, including "important" or "meaningful." *Defenders of Wildlife v. Norton*, 239 F. Supp. 2d 9, 19 (D.D.C. 2002) (Canada lynx).[16] The court did not explain why the Service could not employ another, equally plausible definition of "significant." Therefore, I find the court's interpretation unpersuasive.[17] It is impossible to determine from the word itself, even when read in the context of the entire statute,

---

not endangered." *Ctr. for Biological Diversity*, 411 F. Supp. 2d at 1282. Similarly, the court also stated that a species's "lost habitat may be numerically or geographically large … but not biologically significant because the species' survival is not threatened by the shrinkage in habitat." *Id.* at 1283. The Colorado District Court agreed, finding "persuasive" the New Mexico District Court's interpretation "that the current range is the relevant context." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, CA No. 05-cv-00305-RPM, 2007 U.S. Dist. LEXIS 16175, at *7 (D. Colo. Mar. 7, 2007).

[15] The 1971 definition of "significant" is "having or likely to have influence or effect" or "deserving of consideration." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2116 (16th ed. 1971). Note that this edition did not include a definition similar to "a noticeably or measurably large amount."

[16] Citing MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (9th ed. 1990). In a subsequent ruling the court rejected the Service's finding on remand that equated "significant" with "important," which the court viewed as contrary to its previous ruling. *Defenders of Wildlife v. Kempthorne*, CA No. 04-1230 (GK), 2006 U.S. Dist. LEXIS 71137, at *36–37 (D.D.C. Sept. 29, 2006) (remanding the listing determination on other grounds).

[17] The Ninth Circuit implicitly agreed, finding that "it is not inconsistent with common usage, nor is it unreasonable, for the Service to construe … 'significant,' in the sense of being notable." *Northwest Ecosystem Alliance*, 2007 U.S. App. LEXIS 2296, at *20. Analyzing the meaning of "significant," as it is used in the Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act, the court later stated that "the term 'significant' has 'its commonly understood meaning, which is important.'" *Id.* at *30-31 (quoting *Nat'l Ass'n of Homebuilders v. Norton*, 340 F.3d 835, 846 (9th Cir. 2003) (citations and internal quotation marks omitted)).

9

which meaning of "significant" Congress intended.  Even if it were clear which meaning was intended, "significant" would still require interpretation.  For example, if it were meant to refer to size, what size would be "significant": 30%, 60%, or 90% of current range?  Additionally, would, or should, the size be the same percentage in every case or for each species?  Moreover, what factors, if any, would be appropriate to consider in making a size determination?  Is size all by itself "significant," or does size only become "significant" when considered in combination with other factors?  On the other hand, if "significant" were meant to refer to importance, what factors would need to be considered in deciding that a particular portion of a species's range is "important" enough to trigger the protections of the ESA?

Where there is ambiguity in a statute, as with the meaning of "significant," the official charged with administering the statute, which in this case is the Secretary, has broad discretion to resolve the ambiguity and give meaning to the term.  As the Supreme Court has stated:

> In *Chevron*, this Court held that ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion.  Filling these gaps, the Court explained, involves difficult policy choices that agencies are better equipped to make than courts.  If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation.

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005) (internal citations omitted).

In resolving the ambiguity, however, the Secretary does not have unlimited discretion.  A court may overturn the Secretary's interpretation if it is "arbitrary, capricious, ... or otherwise not in accordance with law."  Administrative Procedure Act, 5 U.S.C. § 706(2)(A).  In exercising his discretion, the Secretary must be guided, at a minimum, by the following considerations.  First, in defining the term, he should do so in a way that is consistent with achieving the purposes of the statute.  As a corollary, he may not define the term in a way that would make any other portion of the statute superfluous, and he should strive to define the term in a way that makes sense in the context of the statute as a whole.  Second, he should take into account whatever legislative history might be relevant for purposes of determining the intent of Congress.  Third, he should take into account any judicial interpretations of the term.  Indeed, in those jurisdictions where the ambiguous term has been judicially interpreted, he may be bound by that interpretation, unless he has subsequently issued an authoritative interpretation of the term that differs from what the court found.  *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. at 983–85.  Each of these considerations is discussed below with reference to the meaning of the word "significant" in the SPR phrase.

10

a.    Purpose of the Act

The primary stated purposes of the ESA include "to provide a means whereby the ecosystems upon which endangered and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered and threatened species." ESA § 2(b). According to the Act's findings, such species of fish, wildlife, and plants are worthy of conservation because they are of "esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people." ESA § 2(a)(3). Thus, in defining what portion of a range will be considered "significant," it is appropriate for the Secretary to consider factors other than just the size of the portion in relation to the current range as a whole. He may define "significant" in such a way as to insure conservation of the species protected by the Act. For example, the Secretary could consider, among other things, the portion of the range in terms of the biological importance of that portion of the range to the species and in terms of the various values listed in the Act that would be impaired or lost if the species were to become extinct in either that portion of the current range or in the current range as a whole.

b.    Legislative History

The legislative history addressing the meaning of the word "significant" is sparse. Some of the floor debate and hearing testimony strongly suggest the Secretary has the discretion to divide the range of a species along political boundaries and declare it endangered only in states where the state authorities are not providing adequate protection of the species. Given the language of the final bill, such a division would have to be consistent with his definition of what makes a portion of a species's range "significant." For example, in a floor debate on the Senate version of the ESA, Senator Tunney made the following remarks:

> [T]he Secretary may list an animal as "endangered" through all or a portion of its range. An animal might be "endangered" in most States but overpopulated in some. In a State in which a species is overpopulated, the Secretary would have the discretion to list that animal as merely threatened or to remove it from the endangered species listing entirely while still providing protection in areas where it was threatened with extinction. In that portion of its range where it was not threatened with extinction, the States would have full authority to use their management skills to insure the proper conservation of the species.

> A well-known example may serve to illustrate how S. 1983 provides for maximum management and conservation discretion, while insuring absolute protection for species imminently in danger of extinction. ... It is likely that in certain portions of Louisiana, the American alligator may be relisted under this bill as a threatened species [in response to the State of Louisiana allowing the harvest of alligators in one parish to limit habitat destruction caused by overpopulation of alligators]. S. 1983 would permit continued State action to enhance the existence of this species. In other areas the alligator would remain

11

listed as an endangered species and would be entitled to absolute Federal or State
protection ....

119 CONG. REC. 25,669 (July 24, 1973). The attached appendix contains relevant portions of the
legislative history from 1972 and 1973.[18]

c.     Judicial Interpretations

Many of the courts that have addressed the meaning of the word "significant" have explicitly or
by implication acknowledged that its ultimate meaning is ambiguous.[19] In that circumstance,
even though a court may have adopted one interpretation or another for purposes of resolving the
case before it, the Secretary is not necessarily bound by the court's interpretation, even in the
area of that court's jurisdiction. As the Supreme Court has explained:

> A court's prior judicial construction of a statute trumps an agency construction
> otherwise entitled to *Chevron* deference only if the prior court decision holds that
> its construction follows from the unambiguous terms of the statute and thus leaves
> no room for agency discretion.

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. at 982. I have found no
appellate cases that conclude that there is only one possible meaning of "significant."[20] Within
certain limits, therefore, the Secretary has the authority to define a reasonable meaning of the
word "significant" in the SPR phrase through a listing rule or by amending the rules that govern
listing decisions.[21]

The Ninth Circuit, for example, while acknowledging that the Secretary has "a wide degree of
discretion in delineating" what portion of a range is "significant," nonetheless appeared to set

---

[18] *See The Endangered Species Conservation Act of 1972: Hearings on S. 3199 and S. 3818 Before the Subcomm. on
the Environment of the Senate Comm. on Commerce*, 92nd Cong. 109 (1972) (statement of Curtis Bohlen, Deputy
Assistant Secretary for Fish and Wildlife and Parks, Department of the Interior); *The Endangered Species
Conservation Act of 1973: Hearings on S. 1592 and S. 1983 Before the Subcomm. on the Environment of the Senate
Comm. on Commerce*, 93d Cong. 60-62 (1973) (statements of Dr. Earl Baysinger, Assistant Chief, Office of
Endangered Species and International Activities, and Douglas Wheeler, Deputy Assistant Secretary for Fish and
Wildlife and Parks); *see* Appendix at A-2–13.

[19] *See, e.g., Defenders of Wildlife v. Norton*, 258 F.3d at 1142–43 (flat-tailed horned lizard) (finding the SPR phrase
ambiguous and rejecting both a quantitative approach and the Secretary's approach based on the clarification
interpretation of significance); *Ctr. for Biological Diversity v. Norton*, 411 F. Supp. 2d at 1277 (Rio Grande
cutthroat trout) (finding the language of the SPR phrase "puzzling and enigmatic" and questioning whether
"significant" may refer to size or biological significance). *But cf., Defenders of Wildlife v. Norton*, 239 F. Supp. 2d
at 19 (Canada lynx) (finding that "significant" means a "noticeably or measurably large amount" according to a
dictionary definition).

[20] One district court has found that there is only one possible meaning of "significant." *Defenders of Wildlife v.
Norton*, 239 F. Supp. 2d at 19 (Canada lynx).

[21] *See* Joint Regulations; Endangered Species Committee Regulations, 50 C.F.R. pt. 424. Note that these are joint
regulations with the National Marine Fisheries Service, the National Oceanic and Atmospheric Administration, and
the Department of Commerce. Consequently, any amendment of these regulations will require coordination with the
National Marine Fisheries Service and approval by the Secretary of Commerce.

some outer limits of that discretion—i.e., the point at which an interpretation would be unreasonable or arbitrary. *See Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1145 (9th Cir. 2001). On the one hand, it rejected what it called a quantitative approach to defining "significant," where a "bright line" or "predetermined" percentage of historical range loss is considered "significant" in all cases. *Id.* at 1143. According to the court, there are two problems with such an approach:

> First, it simply does not make sense to assume that the loss of a predetermined percentage of habitat or range would necessarily qualify a species for listing. A species with an exceptionally large historical range may continue to enjoy healthy population levels despite the loss of a substantial amount of suitable habitat. Similarly, a species with an exceptionally small historical range may quickly become endangered after the loss of even a very small percentage of habitat.

*Id.* The Ninth Circuit concluded, at least with respect to range loss, that what is "significant" must "necessarily be determined on a case by case basis," and must take into account not just the size of the range but also the biological importance of the range to the species. *Id.* At the other end of the spectrum, the Ninth Circuit rejected what it called "the faulty definition offered by the Secretary," a definition "flatly inconsistent with the statute" that holds that a portion of a species's range is "significant" only if the threats present there are severe enough to put the species in jeopardy of worldwide extinction. *Id.* at 1143, 1146. The Ninth Circuit found, in effect, that because such an interpretation would make surplusage out of other words in the definition of endangered species, the interpretation would be unreasonable. It thus appears that within the two outer boundaries set by the Ninth Circuit, the Secretary still has wide discretion, even in the Ninth Circuit, to give the definitive interpretation of the word "significant" in the SPR phrase.

B.      Reading the SPR Phrase in Harmony with other ESA Provisions

In interpreting the SPR phrase, the Secretary must do so "with a view to [its] place in the overall statutory scheme." *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989). I address here questions that have been raised about whether reading the SPR phrase as a substantive standard can be done in harmony with sections 3(16), 4(a)(1), and 4(c)(1) and sections 7 and 9.

1.      Determining Whether a Species is an Endangered Species and Specifying Over What Portion of it its Range it is Endangered

Section 4 establishes the process the Secretary is to use to determine whether any species is an endangered species because of any of five statutory factors. Section 4(b) establishes the informational basis and the procedure the Secretary is to use to make his determinations. Section 4(c) requires the Secretary to publish a list of all species determined to be endangered species, referring to the species by name, specifying over what portion of its range it is endangered (and hence, an endangered species), and specifying any critical habitat within such range.

13

The Department has previously argued that reading the SPR phrase as a substantive standard for determining whether a species is an endangered species would lead to a violation of the listing provisions in section 4 of the Act, and that therefore such a reading of the SPR phrase must be in error. According to the argument, such a reading would be inconsistent with the listing provisions in two ways. First, it would improperly allow the Secretary under section 4(a)(1) to determine that something less than a species as a whole is endangered, and, second, it would improperly allow the Secretary under section 4(c)(1) to list as endangered something less than a species as a whole. For example, a recent brief filed on behalf of the Department argued that "[l]isting a species in only the significant portion [of its range] where it is found to be endangered ... would allow FWS to list a lesser entity than those specified in the 'species' definition, which would appear to violate section 4(a)(1)." Defendant's Supplemental Brief in Response to Court's June 8, 2005 Memorandum Opinion and Order at 10, *Ctr. for Biological Diversity v. Norton*, 411 F. Supp. 2d 1271 (D.N.M. 2005) (No. CIV 03-252 LFG/LAM).

The problem with the argument, both with respect to section 4(a)(1) and section 4(c)(1), is that it is a classic case of allowing the tail to wag the dog. Moreover, as discussed in the following section, the argument is inconsistent with the legislative history of the ESA.

With respect to section 4(a)(1), the argument simply assumes a meaning for that section and then uses that meaning to interpret the definition of "endangered species," instead of settling on a meaning for the definition of "endangered species" and then using that definition when applying section 4(a)(1). The argument assumes that because section 4(a)(1) requires (authorizes) the Secretary to determine whether "any species is an endangered species," only a species as a whole can be endangered. In other words, it is all or nothing; a species is either endangered in its entirety or it is not endangered. This reading of section 4(a)(1), however, simply begs the question of what it means to be an "endangered species." Because "endangered species" is a defined term in the Act, one must start with that definition to determine the meaning of section 4(a)(1), rather than vice versa. When the construction of the Act is approached in that manner, section 4(a)(1) can be read in full harmony with a reading of the SPR phrase as a substantive standard.

Section 4(a)(1) requires the Secretary to "determine whether any species is an endangered species." There are two defined terms in that phrase—"species" and "endangered species." Section 3(16) defines "species" as including "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." In other words, under the definition, three different groups of organisms expressly qualify as a "species":

1. a group of organisms comprising all of the organisms in a species;
2. a group of organisms comprising all of the organisms in "any subspecies of fish or wildlife or plants"; or
3. a group of organisms comprising "any distinct population segment of vertebrate fish or wildlife which interbreeds when mature."

14

Section 3(6) defines "endangered species" as any species which is in danger of extinction either throughout all of its range or throughout a significant portion of its range. Thus, under section 4(a)(1), the Secretary must examine whether:

1. the members of any group of organisms constituting a "species" are in danger of extinction throughout all of the species's range; or
2. the members of any group of organisms constituting a "species" that inhabit a significant portion of the species's range are in danger of extinction.

The Secretary is required to make his determinations in section 4(a)(1)

> solely on the basis of the best scientific and commercial data available to him *after* conducting a review of the status of the species *and after* taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction, or on the high seas.

ESA § 4(b)(1)(A) (emphases added).

The Secretary is thus asked to determine under section 4(a)(1) which members of the species are endangered, either all of the members or only those members that inhabit a significant portion of the species's range. For example, the Secretary might examine the American alligator as a species, determine that Florida is a significant portion of the American alligator's range, and conclude that American alligators in Florida are in danger of extinction, even though alligators elsewhere are not.

Having made his determination, the Secretary would then be required to comply with the listing requirements in section 4(c)(1). That section requires him to "publish in the Federal Register a list of all species determined by him ... to be endangered species." Some have argued that this language means that only a species as a whole can be listed. However, the balance of the language in the section proves otherwise. The section requires, in full, that the list "refer to the species ... by scientific and common name or names, specify with respect to each such species over what portion of its range it is endangered ..., and specify any critical habitat within such range."[22]

---

[22] It has also been questioned whether interpreting the SPR phrase as a "substantive standard" for listing is consistent with the "distinct population segment of any species of vertebrate fish or wildlife." ESA § 3(16). The argument is that Congress intended that the protections of the Act below the taxonomic category of subspecies be limited to DPSs, thus the protection of a subset of a DPS (in this case a SPR of a DPS) would be inconsistent with this intent. There is, however, no support in the language of the Act or its legislative history for the assertion that Congress included the DPS language to alter or limit the meaning of the SPR phrase. The DPS language was added to the definition of "species" five years after the SPR phrase and replaced earlier language that Congress evidently concluded was too broad. *See* H.R. CONF. REP. NO. 95-1804, at 17 (1978). Moreover, Congress refused twice in 1978 to specifically alter the language of the SPR phrase. *See* Appendix at A-16–17. Instead, the DPS language and the SPR phrase give the Secretary two different tools "to provide a program for the conservation of ... endangered species"—the overarching goal of the Act. ESA § 2(b). In some cases, the results achieved with those tools will

15

Applying the requirements of section 4(c)(1) to my example of the American alligator, the Secretary would refer to it by its scientific or common name, specify that portion of its range in which it is endangered as Florida, and specify any critical habitat within its range. In so doing, he would not be listing a "lesser entity than those specified in the 'species' definition"; rather, he would be doing exactly what section 4(c)(1) requires—identifying the members of the species that are "endangered species" by specifying the portion of the range in which they are in danger of extinction. As a result of such a listing, the public might commonly refer to the American alligator as "endangered," or as having been "listed"; however, for purposes of the Act, it would only be the alligators in Florida that would be "endangered." The Ninth Circuit appeared to adopt this approach in the flat-tailed horned lizard case, implying that different portions of a species's range may require enhanced or different degrees of protection. *Defenders of Wildlife*, 258 F.3d at 1146.[23] Accordingly, section 4 can be read in harmony with a reading of the SPR phrase as a substantive standard.

2.     Protecting Listed Species

Similarly, the protections afforded in sections 7 and 9 to endangered species can also be applied in full harmony with a reading of the SPR phrase as a substantive standard.

Section 7 requires federal agencies to insure, in consultation with the Secretary, that their actions are "not likely to jeopardize the continued existence of any endangered species." It bears highlighting that section 7(a)(2) requirements apply to "endangered species," not species as a whole. In other words, the section does require consultation on any species that is listed as threatened or endangered. Under our reading of the SPR phrase, an "endangered species" can consist either of all of the members of a species, regardless of where they live, or of all the members of a species that inhabit a significant portion of a species's range. Thus, when a species is listed pursuant to section 4(c)(1) as endangered throughout all of its range, federal agencies are required to consult about their actions that may affect the species regardless of where they might occur throughout the entire range of the species. By the same token, where a species is listed pursuant to section 4(c)(1) as endangered in only a portion of its range, federal agencies are required to consult about their actions only if they may affect the members of the species inhabiting that portion of its range. In short, if a proposed federal agency action may affect a species within a significant portion of its range where it is classified as an endangered species or a threatened species, the agency must consult with the Service on that action.

---

overlap—e.g., a DPS might, by definition, inhabit a significant portion of a species's range, depending on how the Secretary defines "significant." But this potential for overlap does not mean that the DPS language alters or limits the meaning of the SPR phrase.

[23] The court also extensively quoted the legislative history supporting the view that the protections of the Act are limited to the portion of the species's range in which it is endangered. *Defenders of Wildlife*, 258 F.3d at 1144–45; *see also Roosevelt Campobello Intl. Park Comm'n v. U.S. Envtl Protection Agency*, 684 F.2d 1041, 1050 n.5 (1st Cir. 1982) (bald eagle) ("[T]he Secretary of the Interior is given the exclusive duty and power to publish a list specifying 'with respect to each ... species over what portion of its range it is endangered.' ... We see no reason why the Secretary should not have ... authority to ascertain the appropriate range in which the species is endangered .... In any case, the legislative history appears to authorize the Secretary to deem a species endangered in the United States, or a portion thereof, even if it is abundant elsewhere").

16

Section 9 prohibits any person from taking certain actions "with respect to any endangered species of fish or wildlife." Once again, it bears repeating that Congress used the term "endangered species," and not "species" as a whole. For example, it is unlawful to "take" any member of an endangered species of fish or wildlife within the United States. As noted above, under our reading of the SPR phrase, an "endangered species" can consist either of all of the members of a species, regardless of where they live, or of all the members of a species that inhabit a significant portion of a species's range. Thus, where a species is listed pursuant to section 4(c)(1) as endangered throughout all of its range, it would be unlawful to "take" any member of that species subject to the jurisdictional limitations of section 9. By the same token, where a species is listed pursuant to section 4(c)(1) as endangered in only a portion of its range, it would only be unlawful to "take" a member of the species that inhabits that portion of its range. In the first instance, the Secretary would have specified that the species is endangered in all of its range, while in the second instance the Secretary would have specified the portion of its range where it is endangered. In summary, it would be a violation of section 9(a)(1)(B) of the ESA if a person, while in the United States, "takes" an individual of a fish and wildlife species from a significant portion of its range that has been classified as an endangered species. It is the act of taking a member of an endangered species that establishes the violation—not the taking of a member of the species itself.

Reading the Act to require protection for a species only where it is endangered, as specified in section 4(c)(1), provides precisely the flexibility that the Nixon Administration sought in 1972 and the Congress provided in 1973. In 1972, when responding to a written question from then Senator Spong, who had expressed his understanding that "a species could be declared endangered over part of its range and not declared endangered in other parts," a Deputy Assistant Secretary responded for the Department in the affirmative. He stated, "[i]t is our hope that this ability to provide selective protections would provide protections to those animals needing it, encourage the agencies which have management and protective authority to exercise that authority and allow the recognition of such efforts." Appendix at A-6. Embracing such an approach, the Senate Commerce Committee noted, "[b]y providing for the listing of a species endangered throughout a significant portion of its range, the Committee recognized the need for maintaining a viable population of species or subspecies where possible in more than just one portion of the world." Appendix at A-8. These concepts derived from the legislative history of the Act are subsumed within the provisions of section 4(b)(1), which specifically requires the Secretary to consider the presence of conservation practices and management measures that are in place in various nations or States when making determinations under section 4. By "taking into account ... those efforts being made by any State ... or any political subdivision of a State ... to protect ... species, whether by predator control, protection of habitat and food supply or other conservation practices," when making his determination of endangerment and then "specify[ing] over what portion of its range" a species is endangered, the Secretary is able to recognize the conservation practices and protection efforts of States and local jurisdictions, while also ensuring the Act's protections are properly provided.

In 1973, during committee hearings, then Representative John Breaux stated he understood the legislation to allow the Secretary "to designate areas in which the species is endangered and

17

areas where it is not endangered." Appendix at A-10. Then Assistant Secretary Reed testified that "[t]he administration's bill gives the Secretary the power to allow harvest in areas where the animal is not presently threatened with extinction and protect [it] in areas where [it] is in trouble, that is where [it] is likely to become threatened with extinction." Appendix at A-9. Similarly, the floor debates for the Endangered Species Act of 1973 in both the House of Representatives and the Senate support the ability of the Secretary to provide protections of the Act to a species where it is in danger of extinction, and not doing so for those areas where it is not in danger. Appendix at A-12–13.

An alternative reading—that a species must be protected throughout its entire range even if it is found to be endangered in only a significant portion—would render section 4(c)(1) meaningless, or at least relegate its application to delineating the range of distinct population segments and experimental populations, although neither of these terms existed when Congress prescribed the requirements for listing in section 4(c)(1).[24] Moreover, this reading would conflict with the Congressional desire that "the Federal government should protect [endangered or threatened] species where States have failed to meet minimum Federal standards, it should not pre-empt efficient programs." S. REP. No. 93-307, at 3 (1973). Finally, the alternative reading would frustrate the import of requiring that the conservation practices within a State, or its political subdivisions, be taken into account when making a determination under section 4(a)(1). A statutory term should not be construed to lead to absurd results. *Nixon v. Mo. Mun. League*, 541 U.S. 125, 138 (2004).

The protections afforded in sections 7 and 9 to endangered species can also be applied in full harmony with a reading of the SPR phrase as a substantive standard.

III.    CONCLUSION

I trust this memorandum and its conclusions will be helpful to you in developing your SPR policy. The Service, acting for the Secretary, has considerable discretion to consider a number of factors when determining whether a species is endangered in any significant portion of its range. Therefore, my office stands ready to assist you as you seek to explain how that discretion should

---

[24] In 1982, several operative provisions contained in section 4(c) were moved to section 4(b). However, the legislative history does not indicate that Congress intended the amendments to diminish the operative effect of the remaining provisions in section 4(c). In fact, plaintiffs have successfully enforced another provision of section 4(c), the requirement that the Secretary conduct reviews of listed species at least every five years. *See, e.g., California State Grange v. Norton*, No. CIV-S-05-00560 MCE/PAN, slip op. (E.D. Cal. Sept. 20, 2005) (approving settlement agreement in case in which plaintiffs alleged failure to conduct reviews under section 4(c)(2) of 194 listed species; in settlement, dated Sept. 12, 2005, the United States agreed to deadlines for completing reviews of all 194 species). Moreover, this reading is consistent with the definitions of "conserve," "conserving," and "conservation" relating to bringing "any endangered species or threatened species to the point where the measures provided pursuant to this Act are no longer necessary." ESA § 3(3). It is doubtful that Congress would have required the Secretary to specify which portion of a species range is endangered or threatened, if in all instances the entire range was to be specified. Given the context of the Congressional discussion leading to the passage of the ESA in 1973, it is doubtful that Congress would require the measures of protection provided in the Act to apply in those portions of the range where the species is neither endangered or threatened. *See* Appendix at A-4–6 & A-8–13.

18

be exercised in the Service's listing and delisting decisions. This opinion applies to all instances where the Service is attempting to determine whether a species is an endangered species or a threatened species.

This opinion was prepared with the substantial assistance and contribution of Deputy Solicitor Lawrence J. Jensen and the Division of Parks and Wildlife of the Office of the Solicitor, Deputy Associate Solicitor Barry N. Roth and Assistant Solicitor for Fish and Wildlife W. Michael Young, Philip G. Kline, Benjamin C. Jesup, and John D. Rudolph of the Branch of Fish and Wildlife, Eric W. Nagle of the Pacific Northwest Regional Solicitor's Office, Cheryll F. Dobson of the Pacific Southwest Regional Solicitor's Office, and Margot Zallen of the Rocky Mountain Regional Solicitor's Office.

David Longly Bernhardt

Attachment

19

APPENDIX:  LEGISLATIVE HISTORY

A.    Endangered Species Act Precursors and Relevant Legislative History

    1.    Endangered Species Preservation Act of 1966

The Endangered Species Preservation Act of 1966 (ESPA) represented the first comprehensive federal effort to protect endangered species.  The ESPA defined endangered species narrowly:

> A species of native fish and wildlife shall be regarded as threatened with extinction whenever the Secretary of the Interior finds, after consultation with the affected States, that its existence is endangered because its habitat is threatened with destruction, drastic modification, or severe curtailment, or because of overexploitation, disease, predation, or because of other factors, and that its survival requires assistance.[1]

The Conference Report, as well as the statute state that Congress intended to achieve two goals. First, Congress intended the ESPA to represent "a program for the conservation, protection, restoration, and propagation of selected species of native fish and wildlife, including migratory birds, that are threatened with extinction . . .."[2]  To further this purpose, Congress authorized the Secretary of the Interior to "utilize the land acquisition and other authorities of the Migratory Bird Conservation Act . . . the Fish and Wildlife Act of 1956 . . . and the Fish and Wildlife Coordination Act to carry out a program in the United States of conserving, protecting, restoring, and propagating" threatened species.[3]

Second, Congress declared its policy to be the following:

> [the Secretaries of Interior, Agriculture, and Defense,] including the various bureaus, agencies, and services within the Departments, shall seek to protect species of native fish and wildlife threatened with extinction and, where practicable and consistent with their program purposes . . . shall preserve the habitats of such threatened species on lands under their jurisdiction.[4]

Thus, the ESPA operated to protect only 'native' fish and wildlife that were directly threatened or whose habitats were faced with the threat of destruction.  The narrow focus of the bill led to

---

[1]   The Endangered Species Preservation Act of 1966, Pub. L. No. 89-669, § 1(c), 80 Stat. 926, 926 (1966).

[2]   ESPA § 1(a); H.R. CONF. REP. NO. 89-2205, at 3 (1966); 112 CONG. REC. 26,638 (1966).

[3]   ESPA § 2(a).

[4]   *Id.* § 1(b).

subsequent legislation three years later.[5]

    2.    <u>Endangered Species Conservation Act of 1969</u>

When Congress enacted the Endangered Species Conservation Act of 1969 (ESC),[6] it broadened the definition of 'endangered species' to provide that: "*A species or subspecies* of fish or wildlife shall be deemed to be threatened with *worldwide extinction* whenever the Secretary determines, based on the best scientific and commercial data available to him, . . . that the continued existence of such species or subspecies of fish or wildlife is . . . endangered . . . ."[7]  Additionally, consistent with the ESC's expansion of protection to foreign species, Congress prohibited the importation into the United States of any threatened species of fish or wildlife.[8]

Further, to strengthen the enforcement of endangered species legislation and to assist the States in stopping "illegal traffic in certain protected species of fish and wildlife, such as the alligator, [the ESC made] it unlawful for anyone to knowingly put into interstate commerce or foreign commerce, any such species taken contrary to a Federal, State, or foreign law."[9]

    3.    <u>Legislative History Pertaining to the Endangered Species Conservation Act of 1972 and Related Bills</u>

The process of developing and enacting what was to eventually become the Endangered Species Act of 1973[10] began on February 8, 1972, when President Nixon issued an environmental message to the Nation.  Both the Senate and the House of Representatives drafted bills responding to the President's proposal.  All of these bills contained SPR language either identical or similar to the language found in the Administration's proposal, as it related to SPR.[11]  Thus, the committee hearings and testimony surrounding the Endangered Species Conservation Act of 1972 during the 92nd Congress are relevant.

---

[5]    The ESPA contained weak enforcement mechanisms.  It did not apply to foreign wildlife and the Secretary's land acquisition authority represented the ESPA's only means of habitat protection.

[6]    The Endangered Species Conservation Act of 1969, Pub. L. No. 91-135, 83 Stat. 275 (1969).

[7]    *Id.* § 3(a) (emphasis added).

[8]    *Id.* § 2; *see also* S. REP. NO. 91-526, at 1 (1969); 115 CONG. REC. 33,568 (1969).

[9]    115 CONG. REC. 20,166 (1969) (referring to H.R. 11363, 89th Cong. (1969)); *see also* ESC §7(a)-(b).

[10]    The Endangered Species Act of 1973, Pub. L. No. 93-205, 87 Stat. 884 (1973) (amended 1978, 1982, 1986, and 1988).

[11]    H.R. 1311 § (2)(c)(1) (1972); H.R. 13081, 92d Cong. § (2)(c)(1) (1972); S. 3199, 92d Cong. § (2)(c)(1) (1972); *see also* S. 3818, 92d Cong. § (4)(a) (1972) (including flora in the definition of endangered species and including "habitat" in "significant portion of its habitat or range.").

In his message, President Nixon stated that "we have found that even the most recent act to protect endangered species, which dates only from 1969, simply does not provide the kind of management tools needed to act early enough to save a vanishing species."[12] As a result, the Nixon Administration proposed the Endangered Species Conservation Act of 1972, which sought "to provide a program for the conservation, protection, restoration, and propagation of selected species and subspecies of fish and wildlife, including migratory birds, that are threatened with extinction, or are likely within the foreseeable future to become threatened with extinction."[13]

To facilitate this approach, the Nixon Administration proposed a definition for "endangered species," which introduced the SPR phrase that is currently in force today:

> A species or subspecies of fish or wildlife shall be regarded as an endangered species whenever, in his discretion, the Secretary determines, based on the best scientific and commercial data available to him and after consultation, as appropriate, with the affected States, and, in cooperation with the Secretary of State, the country or countries in which such fish and wildlife are normally found or whose citizens harvest the same on the high seas, and, to the extent practicable, with interested persons and organizations, and other Federal agencies, that the continued existence of such species or subspecies of fish or wildlife, in the judgment of the Secretary, is *either presently threatened with extinction or will likely become threatened with extinction, throughout all or a significant portion of its range*, due to any of the following factors . . ..[14]

The authorizing committees, individual Members of Congress, and representatives from the Department of the Interior and the Department of Commerce invested considerable effort during the 92nd Congress considering the proposed endangered species legislation. Although the legislation was not enacted, the Committee hearings contain interesting discussion of many of the key concepts and terms that would ultimately find their way into the Endangered Species Act of 1973.

In a hearing before the Senate Commerce Committee, a National Oceanic and Atmospheric Administration (NOAA) official, David Wallace, summarized the need for the proposed 1972 legislation. In that testimony, he highlighted the Administration's view that a central problem with both the 1966 and 1969 Acts was that the Secretary's ability to list endangered species was too limited:

---

[12] *See* President's Message to Congress Outlining the 1972 Environmental Program, 8 WEEKLY COMP. PRES. DOC. 223-224 (November 8, 1972).

[13] Endangered Species Conservation Act of 1972, H.R. 1311, 92d Cong. § 2(a) (1972).

[14] *Id.* at § (2)(c)(1) (emphasis added).

A-3

The existing Endangered Species Act divides fish and wildlife into "native fish and wildlife" and "other fish and wildlife." For the present law to have any effect on native species of fish and wildlife, they must be found to be actually "threatened with extinction."

In the case of "other fish and wildlife," one must find that a species is "threatened with worldwide extinction." Once these determinations are made, the Secretary of Interior is given various powers to acquire lands and use funds to conserve, protect, and restore the species. However, his powers to place restrictions on the taking of such species or any trafficking therein are minimal.

As to other species of fish and wildlife, the Secretary's power is limited to forbidding imports. Clearly this authority is far too limited.

S. 3199 is in sharp contrast with existing law. First, it wipes out the artificial distinction between "native" and "other" fish and wildlife so that maximum protection measures can be applied to both to the extent that the United States can exercise jurisdiction. This clarifies the status of large numbers of species that move in and out of the waters along our coasts. Secondly, while retaining the existing category of animals which are presently "threatened with extinction," the bill adds a new category of animals which "will likely within the foreseeable future become threatened with extinction."

Moreover, it provides that action may be taken if either condition exists within a significant portion of the animal's range and does not require a finding of worldwide endangerment.[15]

Additionally, Associate Administrator Wallace explained that listing a species as endangered or threatened under the proposed legislation:

[D]oes not require a finding of worldwide endangerment. *This last modification recognizes the fact that a species or subspecies may be threatened because of events taking place in a very small but significant part of its range.* Thus, if a species' breeding area is being threatened, with the result that its future is in doubt, the species could be placed upon the endangered list, *regardless of the fact that the breeding ground is geographically small* relative to the whole range of

---

[15] *The Endangered Species Conservation Act of 1972: Hearings on S. 3199 and S. 3818 Before the Subcomm. on the Environment of the Senate Comm. on Commerce*, 92d Cong. 132 (1972) (statement of David Wallace, Associate Administrator for Marine Resource, National Oceanic and Atmospheric Administration); *see Predatory Mammals and Endangered Species: Hearings on H.R. 1311 and 13081 Before the Subcomm. on Fisheries and Wildlife Conservation of the House Comm. on Merchant Marine and Fisheries*, 92d Cong. 190 (statement of Robert White, Administrator, National Oceanic and Atmospheric Administration).

the species.[16]

Similarly, Curtis Bohlen, the Deputy Assistant Secretary for Fish and Wildlife and Parks, in a written response to questions from Senator Spong wrote:

> Senator SPONG: As I understand it, a species could be declared endangered over part of its range and not endangered in other parts. Is this correct? If so, how do you plan to enforce it? Specifically, how would you deal with a commercial species which is endangered in part of its range and abundant elsewhere?

> Mr. BOHLEN: That is correct.

> Although man's present ability to rapidly and drastically alter the environment makes it possible for a species or subspecies to be forced from a secure status to a hazardous one almost overnight, such happenings are the exception rather than the rule. Usually it becomes apparent to scientists that a species is heading for trouble long before it reaches the point at which it is threatened with extinction. It is when such indicators - - unregulated commercial, or other overexploitation; significant reductions in population; significant loss or threatened loss of habitat, etc. - - are detected that an animal would become a candidate for the Endangered Species List.

> Quite commonly an animal's status does not deteriorate at the same rate throughout its range. This is especially true for those whose range extends into two or more nations, States, or other political subdivisions. This is so since the well-being of most wildlife now is dependent upon the management and other considerations it receives–or, just as importantly, _fails_ to receive–from the people and governments who control the land upon which it lives.

> To more directly answer your question, let's assume a hypothetical situation involving a commercially valuable animal which occurs in three countries. Let's assume, after the appropriate reviews, consultations, etc., that it is determined that

> –in country "A" - a good management program exists; adequate unthreatened habitat is present; the population is healthy and produces a surplus which is harvested under a carefully regulated system,
> –in country "B" - the animal largely is ignored and neither receives special management or protective attention nor is overexploited,
> –in country "C" - no management program exists and the animal is being heavily

---

[16] _The Endangered Species Conservation Act of 1972: Hearings on S. 3199 and S. 3818 Before the Subcomm. on the Environment of the Senate Comm. on Commerce_, 92d Cong. 132 (1972) (statement of David Wallace, Associate Administrator for Marine Resources, National Oceanic and Atmospheric Administration)(emphasis added).

overexploited.

Thus, this animal would be considered to be in good shape over part of its range (country "A"), holding its own in a second portion (country "B"), and in trouble in a third.

Under our present authority, no assistance could be given this animal, since it is not "threatened with extinction." However, it is obvious that unless something acts on behalf of the animal, its extirpation in country "C" is imminent. Once that occurs, the same forces likely would shift their attention to the animal in country "B," thus making the species' continued existence dependent on the welfare of the remnant population in country "A."

This is a "textbook example" of our concept of a candidate for the "likely to become threatened with extinction" category.

If that same animal were so classified, regulations could be issued that would:

a. Permit the importation into the United States of lawfully taken specimens from country "A."
b. Prohibit or restrict the importation of specimens which originated in countries "B" or "C." As programs to manage and protect the animal are implemented in country "B" or "C" and as the animal responds, such prohibitions or restrictions could be relaxed accordingly.

It is our hope that this ability to apply selective protections would provide protection to those animals needing it, encourage the agencies which have management and protective authority to exercise that authority and allow the recognition of such efforts.[17]

Senator Spong posed the identical question to Associate Administrator Wallace who responded as follows:

Where a species is presently threatened with extinction over a significant part of its range, the Secretary will enact measures which, for example, would control the

---

[17] *The Endangered Species Conservation Act of 1972: Hearings on S. 3199 and S. 3818 Before the Subcomm. on the Environment of the Senate Comm. on Commerce*, 92d Cong. 109 (1972) (statement of Curtis Bohlen, Deputy Assistant Secretary for Fish and Wildlife and Parks, Department of the Interior).

A-6

time of taking, the manner of taking, catch limitations, or areas where taking would be prohibited.[18]

In Committee hearings in the House of Representatives, Representative Potter questioned Deputy Assistant Secretary Bohlen about whether a discrete population could qualify as a subspecies:

> Mr. POTTER: I talked with Mr. Baysinger on the identity of subspecies, as differentiated from population stocks. My question, is this bill, which relates to "species and subspecies," sufficiently fine-tuned to let you reach the situation where somebody goes in, say, and wipes out one entire population, even though it may not be a subspecies?

> Mr BOHLEN: There is an added clause in the definition of endangerment, which refers to the status of the species or subspecies throughout all, or a portion of its range.

> Mr. POTTER: You feel this gives you the necessary tools to handle discrete populations?

> Mr. BOHLEN: Yes, I think it does.[19]

Additionally, in a hearing before the Senate, Nathaniel Reed, Assistant Secretary for Wildlife and Fish and Parks, testified that the SPR language authorized the Secretary to regulate a species in one part of its range without regulating the species where it is abundant in other parts of its range.[20]

The Administration's original 1972 bill limited protection to species and subspecies.

---

[18] *Id.* at 141 (statement of David Wallace, Associate Administrator for Marine Resource, National Oceanic and Atmospheric Administration). Ralph McMullen, Director of the Michigan Dept. of Natural Resources and President of the International Association of Game, Fish, and Conservation Commissioners, testified that the SPR language should allow the Secretary to designate a species as threatened or endangered in a significant portion of its range without designating that species as threatened or endangered rangewide. Interestingly, Mr. McMullen also interpreted the term "range" to mean the present range of a species, rather than historical range. *See Predatory Mammals and Endangered Species: Hearings on H.R. 13081 and 1311 Before the Subcomm. on Fisheries and Wildlife Conservation of the House Comm. on Merchant Marine and Fisheries*, 92d Cong. 321 (1972).

[19] *Predatory Mammals and Endangered Species: Hearings on H.R. 1311 and 13081 Before the Subcomm. on Fisheries and Wildlife Conservation of the House Comm. on Merchant Marine and Fisheries,* 92d Cong. 136 (1972) (statement of Curtis Bohlen, Deputy Assistant Secretary for Fish and Wildlife and Parks, Department of the Interior).

[20] Letter from Nathaniel Reed, Assistant Secretary of Fish and Wildlife and Parks, to Senator Ted Stevens (Sept. 25, 1972) (on file with the Solicitor's Office of the Dept. of the Interior) (commenting on S. 3818 § 4(a)).

In 1972, a Senate Report by the Committee on Commerce contained language identical to the Administration's bill. The Senate Report explained the SPR language as follows:

> Where the Secretary determines that a species or subspecies of fish and wildlife throughout all or a significant portion of its habitat or range is presently threatened with extinction or is likely within the foreseeable future to become threatened with extinction, he may list such species as an endangered species. By providing for the listing of species endangered throughout a significant portion of its range, the Committee recognized the need for maintaining a viable population of species or subspecies where possible in more than just one portion of the world.[21]

### 4.    The Endangered Species Act of 1973

The enactment of the Endangered Species Act on December 29, 1973[22] stemmed directly from two bills introduced in the House and the Senate during the 93rd Congress: S. 1983 and H.R. 37. These two bills incorporated the SPR language and other new provisions introduced in the Administration's 1972 proposal and extended protections to populations of species in addition to species and subspecies. The bills reiterated the focus of the 1972 bills to rectify a perceived shortcoming of the 1969 Act, which required a species to be threatened with worldwide extinction before it could be listed and thereby protected under the 1969 Act.[23]

Much of the 1973 Congressional debate centered on amending ESC in two principal respects. First, Congress supported the addition of language that provided the Secretary with the authority to protect species that are likely to become threatened with extinction before that threat is realized. Second, Congress sought to provide the Secretary with the flexibility to protect species that are threatened or endangered in only a portion of their range, rather than requiring worldwide endangerment.

The Senate bill, S. 1983, included the current version of the SPR phrase and the Senate Report noted that "flexibility in regulation is enhanced by a provision which allows for listing if the

---

[21]  S. REP. NO. 92-1136, at 6 (Sept. 15, 1972).

[22]  The Endangered Species Act of 1973, Pub. L. No. 93-205, 87 Stat. 884 (1973) (amended 1978, 1982, 1986, and 1988).

[23]  However, the interaction between the federal and state government in the administration of the Act, particularly any perceived preemption of state laws, was the primary point of debate and perhaps the most important and contentious issue that Congress dealt with in passage of the 1973 Act. *See, e.g.*, H.R. REP. NO. 93-412, at 7 (July 27, 1973).

A-8

animal is endangered over a 'substantial portion of its range.'"[24]

House committee report language regarding H.R. 37 referenced an early incarnation of the SPR language, which modified the "endangered species" definition from the 1969 Act to include any species in danger of extinction "throughout its entire range, or any portion of its range."[25] The House Committee Report noted that the new "endangered species" definition represented

> a significant shift in the definition in existing law which considers a species to be endangered only when it is threatened with worldwide extinction. It includes the possibility of declaring a species endangered within the United States where its principal range is in another country, such as Canada or Mexico, and members of that species are only found in this country insofar as [it exists] only on the periphery of [its] range.[26]

The House Committee Report also lists the principal changes to be effected by the new legislation, including that "[i]t permits protection of animals which are in trouble in any significant portion of their range, rather than threatened with worldwide extinction."[27]

During Committee hearings before the House Subcommittee on Fisheries and Wildlife Conservation, Assistant Secretary Reed, stated:

> [W]e find ourselves in a bind. We must [under the 1969 Act] put an animal on the endangered species list to give it protection over all of its range when it could be surplus in part of its range. The alligator, which for instance, in Florida and Louisiana are numerous and coming back may be able to stand a harvest. But, the alligator is in real trouble throughout the rest of its range.
>
> The administration's bill gives the Secretary the power to allow harvest in areas where the animal is not presently threatened with extinction and protect [it] in areas where [it] is in trouble, that is, where [it] is likely to become threatened with

---

[24] S. Rep. No. 93-307 (July 1, 1973). Note that the Report references the language "*substantial* portion of its range" (emphasis added). However, this is the only reference in the Report to the word "substantial" rather than "significant." The bill referenced in the same Senate report includes the term "significant" rather than "substantial" as does every other House and Senate report referencing S. 1983.

[25] H.R. Rep. No. 93-412, at 10 (July 27, 1973).

[26] *Id.* Later Congressional testimony by Representative Price reiterated this reasoning. He stated that "H.R. 37, would protect species threatened in any significant portion of their range, rather than only those threatened with worldwide extinction." 119 Cong. Rec. 30,165 (Sept. 18, 1973).

[27] H.R. Rep. No. 93-412, at 2 (note that the introductory remarks inexplicably refer to "significant portion of its range," whereas the actual definition in the Bill at that time did not include the word "significant"); *see also* 119 Cong. Rec. 30,165 (Sept. 18, 1973) (stating identical language in relation to an updated version of H.R. 37 containing the SPR phrase in the current Act).

A-9

extinction.[28]

Later, Assistant Secretary Reed responded to a question from Representative Breaux:

> Mr. BREAUX: As I understand this bill, the Department is allowed to designate areas in which the species is endangered and areas where it is not endangered.
>
> How could this effect county lines–where some counties within a State have an endangered species while others do not?
>
> Mr. REED: Both the State and Federal officers would have an awfully hard time dealing with areas as small as some counties. It is possible, but I can hear [the Bureau's law enforcement officer] sitting behind me, shaking right now.[29]

Howard Pollock, Deputy Administrator of NOAA, responded to the same question in the following manner:

> [T]hat action may be taken if either condition [of endangered or threatened status] exists throughout a significant portion of the animal's range and does not require a finding of worldwide endangerment. This last modification recognizes the fact that a species or subspecies may be threatened because of events taking place in a small but significant part of its range.[30]

In addition, Dr. Earl Baysinger, Assistant Chief, Office of Endangered Species and International Activities and Douglas Wheeler, Deputy Assistant Secretary for Fish and Wildlife and Parks, testified at hearings on S. 1592 introduced by Sens. Magnuson and Hatfield. S. 1592 did not, at that time, contain any definitions of endangered or threatened species. However, administration witnesses stated:

> Mr. WHEELER: [F]or the first time, under the authority of this bill, we would be able to fine-tune to the extent that we could prohibit the taking in that area where the condition of endangerment exists, and not in others.
>
> The law presently requires that we find a species to be endangered throughout all its range. We are not able to say that in Florida it exists but in Alaska it does not.

---

[28]  *Endangered Species: Hearings on H.R. 37 and 4758 Before the Subcomm. on Fisheries and Wildlife Conservation of the House Comm. on Merchant Marine and Fisheries*, 93d Cong. 207 (1973) (statement of Nathaniel Reed, Assistant Secretary for Fish and Wildlife and Parks, Department of Interior).

[29]  *Id.* at 210.

[30]  *Id.* at 227 (statement of Howard Pollock, Deputy Administrator of NOAA, U.S. Dept. of Commerce).

Dr. BAYSINGER: If we were to find that the whistling swan was threatened within the territory of the United States, under the present law we would have to apply that endangered category to the swan throughout its range wherever it occurs, whether it be Alaska, Utah, or Maryland.

Under the legislation we are talking about today, we would be able to fine tune that and take a look at the swan . . . [I]f this were an animal about which we were concerned, that was obviously getting in trouble in part of its range, for whatever reason, we would be able to sit down, look at the animal, determine with the other agencies with whom we are dealing what actions are needed to prevent that animal from deteriorating to the point where it would become endangered, make the finding that this animal is likely to become threatened over a portion of its range, and then apply such techniques as would be needed to prevent it from deteriorating further within that portion of its range.

We don't have that authority under the existing act.

Senator COOK: In other words, S. 1592 gives you a degree of selectivity that you never had before?

Dr. BAYSINGER: Yes, it gives us a scalpel rather than a broad sword.[31]

The Senate bill, S. 1983, included the current version of the SPR phrase. The Senate Report noted:

The bill provides a broadened concept of "endangered species" by affording the Secretary the additional power to list animals which he determines are likely within the foreseeable future to become threatened with extinction. This give effect to the Secretary's ability to forecast population trends by permitting him to regulate these animals before the danger becomes imminent while long-range action is begun. By creating two levels of protection, regulatory mechanisms may more easily be tailored to the needs of the endangered animals. Flexibility in regulation is enhanced by a provision which allows for listing if the animal is endangered over a "substantial portion of its range."[32]

---

[31]  *The Endangered Species Conservation Act of 1973: Hearings on S. 1592 and S. 1983 Before the Subcomm. on the Environment of the Senate Comm. on Commerce*, 93d Cong. 60-62 (1973) (statements of Dr. Earl Baysinger, Assistant Chief, Office of Endangered Species and International Activities and Douglas Wheeler, Deputy Assistant Secretary for Fish and Wildlife and Parks).

[32]  S. REP. NO. 93-307 at 3; *But see* id. at 7 ("Section 3(2) defines an endangered species" as one "which is in danger of extinction throughout all or a significant portion of its range."). Note that the Report references the language "*substantial* portion of its range" (emphasis added). However, this is the only reference in the Report to the word "substantial" rather than "significant" and, therefore, appears to be a mistake or misquote. The bill referenced in the same Senate report uses the term "significant" rather than "substantial" as does every other House and Senate

A-11

In floor debate in the House of Representatives, Representative Goodling stated:

> [U]nder existing laws, the Federal Government was unable to adequately provide
> conservation and protection measures to those species which had not yet met the
> legal and technical definition of "extinct," but due to a variety of other factors
> were closely approaching that population level.  H.R. 37 broadens the concept of
> "endangered species" by vesting authority  in the Secretary to list those species
> which are "likely within the foreseeable future to become threatened with
> extinction." . . . Greater flexibility is provided while at the same time additional
> means of protection, conservation, and management is permitted and required.[33]

Later, during House consideration of the Bill, Representative Young stated:

> By drawing upon and expanding existing areas of authority and competency in
> the Departments of Interior, Commerce, and Agriculture, the committee has
> been able to expand greatly our important efforts to protect species threatened
> with extinction to include those species which may become endangered,
> whether on a large scale or within a part of their habitat only.[34]

Senator Tunney, in floor debate, stated:

> [U]nder existing law, a species must be declared 'endangered' even if in a
> certain
> portion of its range, the species has experienced a population boom, or is
> otherwise threatening to destroy the life support capacity of its habitat.  Such a
> broad listing prevents local authorities from taking steps to insure healthy
> population levels.[35]

Senator Tunney went on to explain that

> [T]he Secretary may list an animal as 'endangered' through all or a portion of its
> range. An animal might be 'endangered' in most States but overpopulated in
> some.  In a State in which a species is overpopulated, the Secretary would have
> the discretion to list that animal as merely threatened or to remove it from the
> endangered species listing entirely while still providing protection in areas where

---

report referencing S. 1983.

[33]   119 Cong. Rec. 30,164 (Sept. 18, 1973); *see also id.* at 30,157.

[34]   119 Cong. Rec. 30,167 (Sept. 18, 1973).

[35]   119 Cong. Rec. 25,669 (July 24, 1973).

A-12

it was threatened with extinction. In that portion of its range where it was not threatened with extinction, the States would have full authority to use their management skills to insure the proper conservation of the species.

A well-known example may serve to illustrate how S. 1983 provides for maximum management and conservation discretion, while insuring absolute protection for species imminently in danger of extinction. . . . [I]t is likely that in certain portions of Louisiana, the American alligator may be relisted under this bill as a threatened species [in response to the State of Louisiana allowing the harvest of alligators in one parish to limit habitat destruction caused by overpopulation of alligators]. S. 1983 would permit continued State action to enhance the existence of this species. In other areas the alligator would remain listed as an endangered species and would be entitled to absolute Federal or State protection until a State plan was approved by the Secretary under the provisions of this act.[36]

B.    Congressional Activity After the Enactment of the Endangered Species Act of 1973

Congress has not amended the SPR language since the 1973 Act, therefore the subsequent amendments to the Endangered Species Act of 1973 provide little probative insight into what Congress intended in 1973. However, subsequent actions in Congress, especially in 1979, indicate that Congress was fully aware of the ability of the Secretary to list a species as a threatened species or endangered species in only a portion of its range., not merely a significant portion of its range.

    1. Legislative History Pertaining to the 1978 Amendments

Congress did not amend the SPR language when it passed the 1978 amendments to the ESA. However, it did alter the definition of "species" to specifically include "any distinct population segment." This language remains in the current Act.

During Senate debate of the bill that became the 1978 amendments to the ESA S. 2899, Senator Bartlett introduced a proposal to amend the SPR language in the endangered and threatened definitions by replacing the phrase "a significant portion" with the phrase "the essential portion."[37] Senator Bartlett submitted this amendment in response to the delay of a dam project that purportedly would have reduced the range of a listed fish species by 12%.[38] The following colloquy between Senators Bartlett and Wallop discussed the amendment:

---

[36]   *Id.*

[37]   124 CONG. REC. 21,582-3 (July 19, 1978).

[38]   124 CONG. REC. 21,583.

A-13

MR BARTLETT: . . . I believe that this amendment will resolve the confusing application of the Endangered Species Act, and retain sufficient protection to insure that we do not decimate various species.

. . . I feel that this amendment provides the opportunity in the definition for consideration to be given to varying percentages which might be more pertinent and accurate to the situation than would be evident with the language that is now in the two definitions.

MR. WALLOP: The Senator has come across a flaw in the original Act which is minor but, through interpretation, as is sometimes the case, has become major. I ask the Senator if he would basically agree that his definition of "essential" would be that portion of its range that does not necessarily imply that the species must be endangered over the vast majority of its range, or even the most crucial part of its range; in other words, if "essential" means that portion of the range necessary for the continued survival and recovery of the species.

MR. BARTLETT: Yes, I agree with that definition of the word "essential" and I think it is important that that be understood.[39]

Senator Bartlett's amendment, was not included in the October 15, 1978 Conference Report that accompanied S. 2899.[40]

Another amendment introduced on the same day by Senator Garn would have amended the SPR phrase by removing the term "significant."[41] Senator Garn explained: "I would also permit the designation of a species as endangered even in some portion of its range that is less than "significant." . . . [T]o permit the protection of a major species, such as the alligator, which may be threatened in a restricted geographic locale, but is not over its entire range, or even over a significant part of its range."[42] The Senator withdrew the amendment before the Senate acted on the amendment.[43]

In addition to including the DPS language, Congress also amended section 4(c)(1) to require

---

[39] *Id.*

[40] An additional amendment to the term "endangered species" was also proposed, but rejected in the Senate. Senator Scott introduced an amendment that would have added the phrase "and which the Secretary has determined is of a substantial benefit to mankind," thereby instituting an additional limitation on whether a species qualifies as endangered. 124 CONG. REC. 21,358 (July 18, 1978).

[41] 124 CONG. REC. 21,564 (July 19, 1978).

[42] *Id.* at 21,572.

[43] *Id.*

A-14

inclusion of critical habitat designations in the lists of endangered and threatened species.

   2. Legislative History Pertaining to ESA Reauthorization in 1979

After addition of the current DPS language in the 1978 amendments, the Senate, while deliberating reauthorization and appropriations for the Endangered Species Act in 1979, responded to a General Accounting Office (GAO) Report proposing amendments to the Act.[44]

The Report found that the DPS language "permits the Fish and Wildlife Service to list geographically limited populations of vertebrate species as endangered or threatened even though they may not be endangered or threatened throughout all or a significant portion of their existing ranges or their overall statuses are not known."[45]  The Report concluded that redefining the "species" definition to limit listings to entire species would require FWS to review the status of species listed in parts of their ranges and to then determine which of these species are threatened or endangered throughout all or a significant part of their ranges.[46]  These species would then be listed throughout their entire ranges.[47]

The GAO Report proposed, among other things, amending the Act so "the term 'species' includes any subspecies of fish, wildlife or plans." As an alternative to this approach, the GAO proposed to modify the term "species" by adding the following sentence: "Distinct population listings must constitute significant portions of the species' range in terms of total numbers, biological importance, or the need to maintain the species within the United States."[48]  The GAO Report concluded that the redefined "species" definition from the 1978 amendments only partially corrected the problem by limiting populations to vertebrates.[49]

The GAO Report concludes by proposing an alternative legislative amendment that was "acceptable to FWS officials" and consistent with then contemporary draft FWS guidelines by defining what constitutes a "significant portion" of the range of endangered and threatened species.[50]  According to the Report, those draft FWS guidelines defined "significant portion" as:

---

[44] ENDANGERED SPECIES - A CONTROVERSIAL ISSUE NEEDING RESOLUTION, U.S. General Accounting Office, CED 79-65 (July 2, 1979) (GAO Report).

[45] Id.

[46] Id. at 55.

[47] Id.

[48] Id. at 106.

[49] Id. at 51.

[50] Id. at 59.  The Report noted that the draft guidelines were "under review within the Office of Endangered Species" at the time. Id.

A-15

(1) More than half of a species' range, which may include historical as well as recent and anticipated future losses or (2) losses of habitat totaling less than 50 percent of relatively small range, or in other circumstances where the loss may have an inordinately large negative impact on the species' survival.[51]

The GAO Report also discussed the Department of the Interior's response to the GAO's similar draft recommendations. The Department was critical of the GAO's first legislative proposal to redefine the "species" definition for two reasons. First, because the draft recommendations concluded that the entire range of a species endangered or threatened in a significant portion of its range must be listed, needless allocation of resources for section 7 consultations and other ESA activities would be required for biologically non-endangered populations of certain species.[52] Second, the proposed revision may prevent FWS from listing widespread species that are listed solely to protect populations in the coterminous United States.[53]

In response to the alternative recommendation, Larry Meierotto, the Assistant Secretary of the Interior for Policy, Budget and Administration, stated that "allowing only the listing of 'significant' populations is, however, acceptable and, we would contend simply gives legislative sanction to the reasonable interpretation that we have made of the existing definition."[54]

A Senate Committee did not adopt either of GAO's legislative recommendations as they related to the term "species," stating:

> The Committee agrees that there may be instances in which FWS should provide for different levels of protection for populations of the same species. For instance, the U.S. population of an animal should not necessarily be permitted to become extinct simply because the animal is more abundant elsewhere in the world. Similarly, listing of populations may be necessary when the preponderance of evidence indicates that a species faces a widespread threat, but conclusive data is available with regard to only certain populations.[55]

------

[51] *Id.*

[52] *Id.* at 58.

[53] *Id.*

[54] Letter from Larry E. Meierotto, Assistant Secretary for Policy, Budget, and Administration, Department of the Interior, to Henry Eschwege, Director of the Community and Economic Development Division, General Accounting Office (June 15, 1979).

[55] S. REP. NO. 96-151, at 6-7 (May 15, 1979). The Senate Report did not address the GAO Report's alternate proposal reciting the draft FWS guidelines for determining "significant portion."

However, the Senate Report cautioned FWS to use the ability to list populations "sparingly."[56]

    3.    Legislative History Pertaining to the 1982 Amendments

The 1982 amendments do not directly address the SPR phrase or amend the "species," "endangered species," or "threatened species" definitions. However, a Senate Committee Report discussed the Secretary's failure to recognize differing status of populations of a species in response to testimony regarding game species listed in foreign countries:

> The Committee also received testimony stating that "the Secretary has listed some foreign species as endangered throughout their entire range without considering whether their population status varies from country to country." There may be nations where a combination of a healthy population and effective management programs permit the sport hunting of such species without adversely affecting its status. The failure to recognize this may result in the foreign nations being denied much-needed revenues derived from license fees that are used to fund their wildlife conservation and management programs.
>
> If the Secretary is in receipt of biological information from a foreign nation with respect to a resident game species listed as "endangered," he should evaluate the status of such species within the country in question.[57]

The 1982 amendments significantly narrowed the discretion available to the Secretaries in the listing process by removing the petition requirements from section 4(c), placing them in section 4(b), and adding several additional requirements and deadlines. The 1982 amendments also allowed direct judicial review of all non-discretionary actions under section 4 by amending the citizen-suit provisions of section 11.[58]

In describing the Conference Report, Representative Breaux, who was a manager of the bill, stated: "This law is not designed to strengthen or weaken the Endangered Species Act, but simply to make it work better."[59]

---

[56] *Id.* at 7. The House and Senate also rejected proposals to further amend the definition of "species" in response to the GAO Report. In the House, Representative Young proposed to amend the "species" definition to exclude invertebrates altogether. 125 CONG. REC. 29,066 (Oct. 25, 1979). In the Senate, Senator Bellmon proposed to amend the "species" definition so that a species could only be listed upon a determination by the Secretary that the species has an aesthetic or economic value. 125 CONG. REC. 14,577 (June 13, 1979).

[57] S. REP. NO 97-418, at 16 (May 24, 1982).

[58] Endangered Species Act of 1973, Pub. L. No. 95-632, *amended by* Pub. L. No. 97-304, 96 Stat. 1411 (Oct. 13, 1982).

[59] 128 Cong. Reg. 26,188 (Sept. 30, 1982).