IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| The Humane Society of the United States et al. ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> Dirk Kempthorne, Secretary of the Interior, et al. ) <br> ) <br> Defendants, ) <br> ) <br> U.S. Sportsmen's Alliance Foundation, et al., ) <br> ) <br> and ) <br> ) <br> Safari Club International, National Rifle ) <br> Association, et al., ) <br> ) <br> Intervenor-Defendants. ) | Case No. 07-CV-00677 <br><br> **AMICUS NATIONAL WILDLIFE FEDERATION ET AL. MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

## TABLE OF CONTENTS

Page No.

I. SUMMARY .................................................................................................................. 1

II. ARGUMENT ............................................................................................................... 3

    A. NWF and its Affiliates Have Long Sought to Achieve Effective Wolf Recovery Throughout the Wolf Range ...................................................... 3

        1. NWF Was Lead Plaintiff Opposing A Misguided FWS Delisting Attempt, But Now Supports The Current Delisting Because FWS Corrected Its Errors ............................................................. 5

        2. Contrary to Plaintiffs' Arguments, Neither the Prior NWF Ruling Nor Other Case Precedents Prohibit the Use of DPSs for Downlisting or Delisting ............................................................... 6

    B. Plaintiffs' Position Would Undercut The Core Goal Of The ESA, To Achieve Species Recovery And Then Return Management To State Wildlife Administrators ................................................................................. 7

    C. The FWS Properly and Lawfully Delisted the Western Great Lakes Wolf DPS ................................................................................................................ 11

        1. The WGL Wolf DPS Is No Longer Endangered, And Will Remain Protected Under Adequate State Programs ........................... 11

        2. DPSs Lawfully Can Be Used For Delisting ............................................ 13

            a. Plaintiffs' Significant Portion of Range Argument is Irrelevant ........................................................................................... 13

            b. The Plain Language of the Statute Permits Delisting DPSs.... 14

            c. Delisting a DPS Comports With Congressional Intent and ESA Policy .................................................................................. 14

III. CONCLUSION ........................................................................................................ 16

# TABLE OF AUTHORITIES

## FEDERAL CASES

Page No.

*Defenders of Wildlife v. Sec'y, U.S. Department of the Interior*,
  345 F.Supp. 2d 1156 (D. Or. 2005) .................................................................1, 2

*Friends of the Wild Swan v. U.S. Fish & Wildlife Services*, 12 F.Supp. 2d 1121
  (D. Or. 1997) ...................................................................................................2

*National Wildlife Federation v. Norton*, 386 F.Supp. 2d 553 (D. Vt. 2005) ...................1, 3

*Tenn. Valley Authority v. Hill*, 437 U.S. 153 (1978) ...........................................................2

*Wyo. v. U.S. Department of Interior*, 442 F.3d 1262 (10th Cir. 2006) ...............................6

*Wyo. Farm Bureau Federation v. Babbitt*, 199 F.3d 1224 (10th Cir. 2000) ......................6

## FEDERAL STATUTES & REGULATIONS

Endangered Species Act, 16 U.S.C. §1531 et seq. ..................................................... *passim*

50 C.F.R. §§ 17.11(h), 17.12(h) ..............................................................................................5

## FEDERAL REGISTER

32 Fed. Reg. 4001 ...................................................................................................................6

43 Fed. Reg. 9607 ...................................................................................................................6

61 Fed. Reg. 4722 ...................................................................................................................9

65 Fed. Reg. 43,450 ............................................................................................................1, 5

68 Fed. Reg. 15,804 ................................................................................................................1

71 Fed. Reg. 15,266 ................................................................................................................4

72 Fed. Reg. 6052 ..........................................................................................................3, 7, 8

## STATE STATUTES

Minn. Stat. §3.737..................................................................................................................10

I. **SUMMARY**

The National Wildlife Federation ("NWF") together with its affiliated state organizations, Wisconsin Wildlife Federation ("WWF"), Minnesota Conservation Federation ("MCF"), and Michigan United Conservation Clubs ("MUCC") are filing this brief in support of the federal Defendants because the wolf population has fully recovered in the Western Great Lakes ("WGL") area and because the states will effectively manage wolves to sustain a viable population for the foreseeable future. All four organizations also believe that the goals of the Endangered Species Act, 16 U.S.C. §1531 et seq. ("ESA") are best served by recognizing species recovery when it occurs, delisting the listed species, and refocusing limited federal resources on other species that are listed under the ESA. The United States Fish and Wildlife Service ("FWS") Final Rule, 72 Fed. Reg. 6052 (Feb. 8, 2007) should be upheld by the Court.

As discussed in greater detail below, Amici NWF et al. now support the FWS action on the very same issue over which NWF previously brought suit against FWS (in *Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553 (D. Vt. 2005)) for the critical reason that this time the FWS complied with law and applied good science with good public policy. Given the NWF Amici's extensive and longstanding involvement in wolf conservation efforts, and because *NWF v. Norton* is a key ruling cited by the parties in this proceeding, Amici believe that they can offer special insight into why that ruling and related wolf management facts support rather than undercut the new FWS rulemaking at issue here.

The story of wolf recovery in the western Great Lakes is one of remarkable success for wildlife conservation. From a small, imperiled population located along the Minnesota-Ontario border in the 1960s, wolves have now occupied all of northern Minnesota, Wisconsin, and Michigan, and the population has exceeded the recovery goals set out in the 1992 wolf recovery

1

plan by a factor of more than two. Proposed Rule Designating WGL DPS, 71 Fed. Reg. 15,266, 15,268 col. 1 (Mar. 27, 2006). The scope and relative speed of this achievement was hardly imagined by wildlife researchers and managers when the first recovery efforts began. This success story occurred because of the combined efforts of the FWS and the natural resource agencies in Michigan, Wisconsin, and Minnesota, and because large segments of the public understand that a healthy wolf population is essential to the fabric of the north woods and a legacy that must be protected. Overwhelmingly, the public and most conservation organizations recognize that wolf recovery is a cause for celebration, not litigation.

The NWF, the WWF, the MCF, and the MUCC have all been advocates for wolf conservation and recovery for many years. This advocacy has taken many guises as the wolf issue evolved. In the late 1990s, for example, the NWF supported the Clinton administration's initiation of the wolf delisting process. Accordingly, in 1998, the then President of the National Wildlife Federation, Mark Van Putten, was invited by former Secretary of the Interior under President Clinton, Bruce Babbitt, to the ceremony in Minnesota where Secretary Babbitt announced that wolves had recovered in the Western Great Lakes and that a delisting process would begin. Four years later, however, when this process veered badly off the tracks with a misguided proposal that in effect stripped protections from the still endangered Northeastern wolf range, NWF was the lead plaintiff in the *NWF v. Norton* case challenging the FWS rulemaking delisting wolves. Now, with a rule that delists wolves where recovery has actually occurred, and leaves ESA protections in place where it has not, NWF and its affiliated state organizations strongly support FWS and its decision to return management to the states.

The overarching goal of the Endangered Species Act is to restore endangered species "to the point at which the measures provided pursuant to this [statute] are no longer necessary." 16

U.S.C §1532(3). At that point, Congress intended that state wildlife management programs take over the lead in protecting such recovered species. This permits limited federal resources to be devoted to more pressing needs and permits local state expertise to focus on the tailored minutiae of managing the recovered species. The federally led wolf recovery programs have far exceeded the target criteria that define recovery. Wildlife agencies for eleven states in and clustered about the WGL Distinct Population Segment ("DPS") area have also filed an amicus brief (Mich. Dep't of Nat'l Resources, et al.) supporting the delisting. Plaintiffs' insistence that the thriving WGL wolf population remain subject to the ESA is not only counter to the law but counter to good social policy reflected in the ESA and recognized by the states and many other principal stakeholders.

## II. ARGUMENT

### A. NWF and its Affiliates Have Long Sought to Achieve Effective Wolf Recovery Throughout the Wolf Range

The National Wildlife Federation, along with its state affiliates, are among the oldest wildlife conservation organizations in the nation. NWF was established in 1936 when President Roosevelt convened a national conference to address the plight of the nation's fish and wildlife at the height of the dustbowl and depression. The conference identified the need to create a national organization to unite the many state and local conservation clubs that had been established around the nation. Since its founding, and as a federation of state organizations including Amici Wisconsin Wildlife Federation, Minnesota Conservation Federation, and Michigan United Conservation Clubs, the NWF has sought to build strong, broadly supported programs for wildlife conservation at the local, state and national levels.

NWF and its state affiliates have long been involved in wolf management in the Western Great Lakes and the Northern Rockies, which are the two geographic regions where wolf

recovery has succeeded. For years, NWF and its affiliates have attended meetings, commented on management proposals, and carefully evaluated the direction of both state and federal recovery efforts. As a consistent, strong advocate for restoring wolf populations, NWF has both challenged and supported FWS wolf management proposals in federal court. *Compare Wyo. v. U.S. Dep't of Interior*, 442 F.3d 1262 (10th Cir. 2006) (NWF as Defendants-Intervenors-Appellees) *with Wyo. Farm Bureau Fed'n v. Babbitt*, 199 F.3d 1224 (10th Cir. 2000) (NWF and WWF as Intervenors-Appellants); *see also NWF v. Norton*.

NWF and its affiliates have been involved in wolf delisting and management since their inception, and have a strong interest in seeing the federal, states', and organizations' efforts succeed. As an organization founded to protect and conserve wildlife, NWF also has an interest in preserving the integrity of the ESA and its ability to protect endangered and threatened wildlife. NWF staff participated in stakeholder roundtable discussions in developing the Michigan wolf management plan, and encouraged its members to attend the formative Great Lakes Wolf Recovery symposium in Wisconsin.[1] NWF also submitted comments on the Michigan and Wisconsin wolf management plans.[2] NWF also submitted comments to FWS

---

[1] 25 Nat'l Wildlife Fed'n E-Wolf News 2 (Aug.-Sept. 2005), www.nwf.org (link "About," link "Newsroom," search "gray wolf").

[2] Ltr. from Margaret L. Strechsacker, Program Manager, N.E. Nat. Resource Ctr., to Pete Fasbender, Regl. Dir., U.S. Fish & Wildlife Serv., *Comment on Permit Application to Take Gray Wolves*, 1 (Oct. 13, 2005); Mich. United Conservation Clubs, *Final Wolf Management Plan*, http://www.mucc.org/policy/wolfplan.php (accessed Jan. 16, 2008).

regarding the rulemaking presently at issue in this case.[3] NWF's emphasis has always been to educate the public on wolf management and recovery.[4]

1. **NWF Was Lead Plaintiff Opposing A Misguided FWS Delisting Attempt, But Now Supports The Current Delisting Because FWS Corrected Its Errors**

For the Western Great Lakes area, NWF and its affiliates supported the initial proposal made by FWS in 2000 to establish a DPS made up of wolves in Minnesota, Wisconsin, Michigan, and parts of the bordering states. This rulemaking would also have established DPSs for the Northern Rockies, the Northeast, and the Southwest. *See* Proposed Rule to Establish Wolf DPSs, 65 Fed. Reg. 43,450 (July 13, 2000). Between 2000 and 2003, however, the FWS dramatically changed the proposed DPS boundaries. The DPS in the Northeast was merged into a WGL DPS, and a recovery program was designed to focus on the core WGL area, thus leaving the Northeast abandoned. Additionally, the DPS in the Northern Rockies was enlarged dramatically. *See* Final Rule to Reclassify Gray Wolf, 68 Fed. Reg. 15,804 (Apr. 1, 2003). The practical result of these changes would have ended wolf recovery efforts in the Northeast and much of the West.

That proposal was unacceptable to NWF. While NWF supported delisting wolf populations that had actually recovered, NWF would not endorse a proposal to abandon wolf

---

[3] Ltr. from Andy Buchsbaum, Dir., Great Lakes Nat. Resource Ctr., to WGL Wolf Delisting, U.S.F.W.S, *Comment on U.S. Fish & Wildlife Service's Proposed Delisting of Gray Wolves in the Western Great Lakes Region* (June 14, 2006).

[4] *See* Mich. United Conservation Clubs, *Youth Education*, http://www.mucc.org/youth/index.php (accessed Jan. 16, 2008); Minn. Conservation Fed'n., *Our Mission: Education & Legislation*, www.nwf.org (link "About," link "Our Affiliates," select Minnesota, link MCF, link "About Us" link "Our Mission: Education and Legislation); Wis. Wildlife Fed'n., *Education Programs*, www.nwf.org (link "About," link "Our Affiliates," link Wisconsin, link WWF, link "Education Programs").

Memorandum in Support of Defendants' Motion for Summary Judgment

recovery in areas of the nation that could but did not yet support viable wolf populations. As a result, NWF became the lead plaintiff in *NWF v. Norton*, suing FWS for abandoning wolf recovery efforts in the Northeast. That action, in combination with another case filed by Defenders of Wildlife, halted and reversed the FWS' misguided decision to walk away from wolf conservation across the nation based on the success of wolf recovery efforts in the Western Great Lakes and the Northern Rockies. *See Defenders of Wildlife v. Sec'y, U.S. Dep't of the Interior*, 345 F. Supp. 2d 1156 (D. Or. 2005). As the federal Defendants correctly note, the courts in both cases instructed FWS to establish DPSs based on biology, not geography, and acknowledged that smaller DPSs with viable wolf populations and rational boundaries were consistent with the DPS policy. *Defenders*, 345 F. Supp. 2d at 1170-73; *Nat'l Wildlife Fed'n*, 386 F. Supp. 2d at 563-68.

    2.    **Contrary to Plaintiffs' Arguments, Neither the Prior NWF Ruling Nor Other Case Precedents Prohibit the Use of DPSs for Downlisting or Delisting**

Plaintiffs and Amicus Center for Biological Diversity claim that *NWF v. Norton* and the other principal DPS court rulings are on all fours with the present case, but have it backwards. Prior courts struck down attempts to list DPSs in lieu of listing broader geographic ranges, and struck down attempts to combine geographically remote, endangered areas with recovered DPSs in order to dilute the protections of the former. The NWF agrees completely with those courts' rulings. However, Plaintiffs' attempt to fashion a converse principle does not lead to a valid conclusion. In the current case FWS simply is delisting a thriving wolf DPS from the rigid (and appropriate) federal protections that remain across the rest of the historic wolf range across the United States. Not only does the ESA continue to apply to the rest of the historic national range, but the DPS would be relisted should for some unforeseen reason wolf populations decline.

6

Memorandum in Support of Defendants' Motion for Summary Judgment

As noted, the court in the prior NWF case acknowledged that nothing in the creation of a DPS would prevent the FWS from protecting the non-DPS portion of the wolf range. *Nat'l Wildlife Fed'n*, 386 F. Supp. 2d at 565. The *NWF v. Norton* ruling does not support Plaintiffs' argument that a DPS cannot be used for downlisting or delisting -- only that such use must be properly exercised.

Likewise inapt, *Friends of the Wild Swan v. U.S. Fish & Wildlife Servs.*, 12 F. Supp. 2d 1121 (D. Or. 1997) concerned plaintiffs' petition to list the entire range of bull trout. Since FWS had previously identified the entire range as being at risk, the *Swan* court ruled that FWS could not then list only cherry-picked DPSs and ignore the rest of the range. It was in this context that the *Swan* court made its statement that DPSs are "not a tactic for subdividing a larger population." *Id.* at 1133 (emphasis omitted). In direct contradiction to Plaintiffs' position, *Defenders of Wildlife* states: "FWS can downlist a DPS if that discrete and significant population is no longer endangered." 354 F. Supp. 2d at 1169.

### B. Plaintiffs' Position Would Undercut The Core Goal Of The ESA, To Achieve Species Recovery And Then Return Management To State Wildlife Administrators

Plaintiffs correctly note that the Endangered Species Act is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." Pl. Br. 2 (quoting *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978)). But while Plaintiffs thoroughly describe the protections that the ESA affords listed species and the care with which the Secretary must consider proposals to both list and delist species, they are largely silent on the ESA's most important driver for ensuring that species recover.

Until Congress passed the ESA in 1973, it had been a fundamental principle of wildlife law that the states were responsible for the fish and wildlife resources within their borders. Dale

7

Memorandum in Support of Defendants' Motion for Summary Judgment

D. Goble & Eric T. Freyfogle, *Wildlife Law: Cases & Materials* 387 (2002). With the exception of migratory birds, which were managed by the federal government through an international treaty with Canada and Mexico, *id.* at 853-57, the states managed fish and wildlife through hunting and fishing regulations and habitat acquisition programs. As wildlife law evolved, it was increasingly understood that the states held their fish and wildlife populations as a public trust, with all the responsibilities that a trustee has for protecting the trust for future generations. *Id.* at 438-39 (citing Deborah G. Musiker, Tom France & Lisa A. Hallenbeck, *The Public Trust and Parens Patriae Doctrines: Protecting Wildlife in Uncertain Political Times*, 16 Pub. Land L. Rev. 87 (1995)).

In passing the ESA, Congress found that in many cases states had failed in their duties as trustee and that state laws and regulations had failed to keep pace with the many and diverse threats to a myriad species of fish and wildlife. *See* S. Rpt. No. 93-307, at 2991-92 (July 6, 1973). Congress, however, recognized that state leadership was essential for effective fish and wildlife management and wrote the ESA to foster federal cooperation with the states, shore up state legal authorities, and ultimately affirm and encourage the primacy of state management of fish and wildlife. *Id.*

Under the ESA, the federal government, acting through the FWS, takes jurisdiction once a species is listed under the law, but only for so long as the species needs such protection. The most comprehensive duty set forth in the ESA is the duty to "conserve," which extends to all federal agencies and which requires each agency to:

> use . . . all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this [statute] are no longer necessary.

8

16 U.S.C. §1532(3). Thus, recovery plans focus on restoring endangered species populations to the point where federal protection is no longer needed and where the states can again assume jurisdiction and management. The ESA specifically provides that a "species be removed from the list" when recovery plan criteria are met. *Id.* § 1533(f)(1)(B)(ii). This important conservation duty serves as a catalyst for federal agency action toward a well understood, broadly accepted goal. Simply preventing extinction or preserving the status quo is never the goal; instead recovery is all about taking the actions necessary to conserve a species to that point where the protective measures provided by the ESA "are no longer necessary." For thirty years, stakeholders have agreed on goals for wolf recovery and worked to achieve it. Now, with success achieved, Plaintiffs seek to push back the goal posts to some ill-defined but far distant place and in so doing fundamentally undermine the ESA's conservation goal.

The Wolf Recovery Plan has provided a consensus framework for management actions that federal and state agencies and the public have relied upon for three decades. 71 Fed. Reg. at 15, 267–68. No legal challenge has ever been brought challenging the delisting criteria specified in the Recovery Plan.[5] The FWS and states developed a sensible, cooperative program that recognized the strengths and limitations of both the federal and state agencies. For example, whereas the ESA has no provision for providing incentives for farmers not to kill wolves, each of the core wolf states for the WGL DPS has enacted programs to pay compensation for livestock and other farm animals. *See infra* pages 15-16.

For the WGL DPS wolves, recovery by any and all measures has been met. A Recovery Plan for the Eastern Gray Wolf was written in 1978 and revised in 1992. AR Doc. 468A, 13,769-842. This plan established population goals for recovery that have been long understood

---

[5] Amicus NWF has not found any reported cases involving a challenge to the Recovery Plan delisting criteria, and found no references to such in any of the other briefs submitted in the present proceeding.

9

Memorandum in Support of Defendants' Motion for Summary Judgment

and well accepted by the agencies and the people of Minnesota, Michigan, and Wisconsin. 71 Fed. Reg. at 15,267-68. Through the recovery effort, the wolf population has grown and the range has expanded steadily. Recovery objectives were met a decade ago when Interior Secretary Babbitt announced the initiation of the wolf delisting process in the summer of 1998. *See* 65 Fed. Reg. at 43,454-56.

Overturning the decision to delist, which was properly reached by the FWS, would do more than simply frustrate the ESA's most central goal. Agencies, non-governmental organizations, and other stakeholders including scientists and committed individuals are working to recover the 1,351 species of listed plants and animals across the nation. *See* 50 C.F.R. § § 17.11(h), 17.12(h). Some of these efforts are energetic and effective, others proceed falteringly with difficulty and frustration, and recovery for some species has barely started. All of this work, however, is sustained by the premise that successful work will be rewarded, although the measure of the reward differs on each side of the federal-state divide. On the federal side, FWS can shift resources and personnel away from species that no longer need ESA protections and toward species that continue to struggle. On the state side, natural resource agencies can once again assume primary authority for species management with programs tailored to local circumstances.

Wolf recovery in the Western Great Lakes provides an important illumination of how the Endangered Species Act should work and many managers, biologists, and interested citizens are watching this process to see if it is ultimately sustained. As a result of a great deal of work, a tremendous success has occurred on the ground and a species exterminated from vast portions of its former range has been recovered across millions of acres of suitable habitat. FWS's prior efforts to make more of this success than warranted by were rejected by the courts. *See NWF v.*

*Norton*; *Defenders of Wildlife v. Sec'y*. Now, with a delisting rule that accurately reflects the ESA's requirement that species are protected where they are endangered and delisted where they are not, FWS's decision to remove wolves from the list of endangered species and return management to the states should be sustained. This decision should be held out as a model of how recovery efforts can work as the law intended.

### C. The FWS Properly and Lawfully Delisted the Western Great Lakes Wolf DPS

#### 1. The WGL Wolf DPS Is No Longer Endangered, And Will Remain Protected Under Adequate State Programs

Wolves were federally listed as endangered under the original Endangered Species Preservation Act of 1966, and listed again in 1978 under the Endangered Species Act of 1973. *See* Notice of Endangered Species Finding, 32 Fed. Reg. 4001 (Mar. 11, 1967); Final Rule, 43 Fed. Reg. 9607 (March 9, 1978). In 1978, wolves were classified as endangered throughout the United States range except for Minnesota, where they were listed as threatened. Under the ESA, FWS is required to "develop and implement plans . . . for the conservation and survival of endangered species and threatened species." 16 U.S.C §1533(f)(1). Driven by this command to develop a plan to conserve wolves so that so that federal protections would be "no longer necessary," *id.* § 1532(3), the FWS prepared a Recovery Plan for the Eastern Gray Wolf in 1978 and revised it in 1992. AR Doc. 468A, 13,769-842.

The Recovery Plan established delisting criteria for wolves in the eastern United States: (1) survival of wolves in Minnesota must be assured by maintaining a population of at least 1,250 to 1,400 wolves; and (2) a second viable population outside of Minnesota must be established, with a population of at least 100 wolves if the population is within 100 miles of Minnesota and at least 200 wolves if beyond that range. These criteria were developed with

11

Memorandum in Support of Defendants' Motion for Summary Judgment

wide public participation, review and comment, and have been understood and accepted by the agencies and public for decades.

As federal Defendants describe in detail, wolf populations have "far exceeded" the recovery criteria. Def. Br. 12. Intervenors Safari et al. also describe in detail how all of the criteria "have long been met and exceeded." Int. Safari Br. 4-5. The eleven affected Amici state wildlife management agencies concur and provide additional statistics. Michigan DNR et al. Br. 5. The eleven state wildlife agencies re-examined the FWS's ESA Section 4(a)(1) analysis and concluded that the wolf population within the WGL DPS is no longer endangered and specifically no longer requires ESA program protection against the five statutory threat categories. Michigan DNR et al. Br. 19–25; *see also* Def. Br. 32–42; Int. Safari Br. 5–14.

Of great importance, the affected states within the WGL DPS have in place adequate regulatory mechanisms, including state laws and state wolf management plans, to ensure that the delisted wolf population does not backslide into threatened or endangered status. NWF and its local affiliates have worked closely for decades with the states to develop and implement these programs. The eleven state wildlife agencies re-analyzed these programs and affirmed their adequacy. Michigan DNR et al Br. 22; *see also* Def. Br. 37-41; Int. Safari Br. 8–14. Minnesota is the most significant core wolf population center, with over three thousand wolves counted in the last census. 72 Fed. Reg. at 6053 tbl.1. The Minnesota DNR's Wolf Management Specialist has provided a detailed account of the adequate staffing, funding, and activities of the state's wolf management plan. Int. Safari Br. Exh. 2, Stark Decl.

2.  **DPSs Lawfully Can Be Used For Delisting**

   a.  **Plaintiffs' Significant Portion of Range Argument is Irrelevant**

Plaintiffs' argument that the FWS failed to analyze wolf status over a significant portion of the historic range is a meaningless distraction, since the entire historic range remains protected. The new DPS is not an "excuse to avoid any consideration of the gray wolf's status elsewhere." Pl. Br. 15. The FWS acknowledged in the final rulemaking that the entire rest of the wolf range remains listed for ESA protected status. 72 Fed. Reg. 6052, 6101 col. 2 at Effects of the Rule (Feb. 8, 2007); *see also* 6065 col. 1 at Issue 11, 6066 col. 2 at Issue 19. For similar reasons the new DPS does not reclassify the gray wolf status in the coterminous 48 states. Residual areas outside of the DPS remain listed as endangered. Not only does the historic range remain protected, but the ESA would require FWS to relist the DPS should for some unforeseen reason wolf populations decline to unacceptable levels. Moreover, the FWS has authority to take emergency measures even prior to completion of a formal relisting process. *See* 16 U.S.C. §§ 1533(b)(7), 1533(g).

Instead of acknowledging that the Recovery Plan has provided a legally required and scientifically supported road map for achieving the ESA's conservation goal, Plaintiffs seek to twist the statutory language and the FWS DPS policy so as to ignore decades of planning and work by all of the involved federal and state agencies. According to Plaintiffs, "[i]f FWS adopts an unreasonably narrow definition of 'range,' the agency might wrongly focus on a small area within which the species is surviving, while ignoring serious threats to the species across the rest of its range." Pl. Br. 19-20. Plaintiffs are wrong both in suggesting that FWS has attempted to "unreasonably narrow" the WGL DPS or that FWS is ignoring serious threats to wolves across the rest of the species' range. The FWS rulemaking indicated that the Agency designated a DPS

based on a recovery program that has been working for three decades to rebuild both the wolf population and the wolf range across all of northern Minnesota, Wisconsin, and Michigan. *See* 72 Fed. Reg. at 6052-53. There is nothing narrow about this designation; it reflects a broadly accepted recovery effort that has resulted in a population that is both discrete and significant, and with a conservation status that dramatically exceeds every recovery target. The designation of the WGL DPS and the delisting of wolves within it comply fully with FWS DPS policy, the Recovery Plan, and the conservation objectives of the ESA. *See* Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act, 61 Fed Reg. 4722 (Feb 7. 1996); AR Doc. 468A, 13,769-842.

### b. The Plain Language of the Statute Permits Delisting DPSs

Defendants, Intervenor Safari, and other Amici have exhaustively refuted Plaintiffs' mischaracterization of the statutory language, legislative intent, and FWS Policy provisions for the uses of DPSs. The ESA unequivocally defines "species" to include "any distinct population segment . . . ." 16 U.S.C. § 1532(16). Simply put, Congress amended the ESA to permit the FWS to treat a DPS in every way in which the statute permits it to treat a species. Just as a species as a whole can be downlisted or delisted, so can a DPS, and by the same procedure.

### c. Delisting a DPS Comports With Congressional Intent and ESA Policy

Moving the thriving WGL DPS wolf population from the federal ESA program into the state protection programs implements, and vindicates, the overarching scheme of the ESA. As discussed above at pages 8 to 9, the federal government, acting through the FWS, takes jurisdiction once a species is listed, but only for so long as the species remains endangered or threatened. The statute requires delisting upon recovery. 16 U.S.C. § 1533(f)(1)(B)(ii).

14

Memorandum in Support of Defendants' Motion for Summary Judgment

Recovery plans function to restore a species population to the point where management can revert to state programs.

States, not the federal government, are best suited to tailor wildlife protection programs to their individual circumstances with both carrot and stick approaches. For example, the three core wolf states fund and enforce state programs to compensate livestock owners for any animals killed by wolves, thus greatly reducing incentives for illegally killing wolves to protect livestock and other farm animals. As the following statistics indicate, these compensation programs can be vastly more effective in dissuading the local populace from wolf poisoning or other killing than the abstract prohibition against wolf taking provided by the federal ESA. Minnesota law provides compensation to livestock owners whose animals are killed or crippled by gray wolves, Minn. Stat. §3.737(1)(a), and the commissioner of agriculture for livestock is directed to identify management practices that will reduce gray wolf depredation on farms, *id.* at §3.737(5). Under this statute, compensation payments made by the Minnesota Department of Agriculture have ranged from $31,000 to $67,000 annually. *Minn. Wolf Mgmt. Plan* 57 (Minn. Dep't of Nat. Resources Feb. 2001). Wisconsin wolf management plans also provide for compensation to be paid to livestock owners. From 1985 to 2005, the Wisconsin Department of Natural Resources paid almost $470,000 in wolf damage compensation claims for 275 calves, 17 cows, 74 sheep, 6 horses, 44 farmed deer, 148 turkeys, 114 chickens, and 127 dogs that were killed or injured. *Wis. Wolf Mgmt. Plan: Addendum 2006 & 2007*, 18 (Wis. Dep't of Nat. Resources Aug. 15, 2007). Michigan also requires compensation for livestock owners that suffer wolf depredation of their herds. *See* Mich. Dep't of Nat. Resources, *Draft Mich. Wolf Mgmt. Plan* 57 (Aug. 16, 2007). As the state only compensates for the value of the livestock at the time of loss, the difference between the loss and the full fall market values is made up by contributions from

Defenders of Wildlife and a private donor. *Id.* Through this program, Michigan has paid livestock owners $18,024 and Defenders of Wildlife has paid $3,733 in wolf-kill compensation through the end of 2006. *Id.*

These types of state wildlife management programs have no parallel in the federal ESA, nor could they, since they are intimately tied to local circumstances and concerns. The federal program of restoring the WGL wolf population having been completed with resounding success, it is time for management of this population to be returned to the states.

### III.   CONCLUSION

For the foregoing reasons, Amici National Wildlife Federation et al. respectfully submit that the Court should grant Defendants' cross motion for summary judgment, deny Plaintiffs' motion for summary judgment, and uphold the FWS Final Rule.

RESPECTFULLY SUBMITTED this 25th day of January, 2008.

        National Wildlife Federation, Wisconsin Wildlife Federation, Minnesota Conservation Federation, and Michigan United Conservation Clubs

        By their Attorneys,

        /s/ Thomas M. France
        Thomas M. France, Montana Bar No. 2028
        france@nwf.org
        National Wildlife Federation
        240 N. Higgins, Suite 2
        Missoula, MT 59802
        Telephone: 406-721-6705
        Facsimile: 406-721-6714

        /s/ David F. Williams & Jonathan R. Stone
        David F. Williams, D.C. Bar No. 298380
        david.williams@cwt.com
        Jonathan R. Stone, D.C. Bar No. 425021
        jstone@cwt.com
        Cadwalader, Wickersham & Taft LLP
        1201 F Street N.W., Suite 1100
        Washington, DC 20004
        Telephone: 202-862-2200
        Facsimile: 202-862-2400