## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| The Humane Society of the United States; Help Our Wolves Live ("HOWL"); Animal Protection Institute; and Friends of Animals and Their Environment, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | **Civil No. 1:07-cv-00677-PLF** |
| v. | ) ) | |
| Dirk Kempthorne, Secretary of the Interior; United States Department of the Interior; and United States Fish and Wildlife Service, | ) ) ) ) | |
| Defendants, | ) ) | |
| U.S. Sportsmen's Alliance Foundation; Wisconsin Bear Hunters Association; *et al.*, | ) ) ) | |
| Intervenor-Defendants, | ) ) | |
| Safari Club International; National Rifle Association; *et al.*, | ) ) ) | |
| Intervenor-Defendants. | ) ) | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION
## TO DEFENDANTS' CROSS-MOTIONS FOR SUMMARY
## JUDGMENT AND REPLY MEMORANDUM IN SUPPORT
## OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................i

INTRODUCTION ...........................................................................................................1

I.     FWS CANNOT PIECEMEAL DELIST THE GRAY WOLF. ..........................2

       A.     FWS's Failure To Consider Threats Across The Wolf's Historic
              Range Violated The ESA. ......................................................................2

              1.     The Phrase "Significant Portion Of Its Range" In The ESA
                     Refers To A Species' Historic Range. .........................................5

              2.     FWS Cannot Circumvent The Significant Portion Of The
                     Range Requirement By Carving Up The Wolf's Range Into
                     DPSs. ..........................................................................................11

       B.     FWS Cannot Use The DPS As A Delisting Tool. ..................................16

II.    THE EXPANSIVE BOUNDARIES OF THE WESTERN GREAT
       LAKES DPS ARE ARBITRARY AND CAPRICIOUS BECAUSE THEY
       THWART FURTHER WOLF RECOVERY. ...................................................21

III.   EVEN IF THE CREATION OF THE WESTERN GREAT LAKES DPS
       WERE OTHERWISE LAWFUL, THE WOLF COULD NOT BE
       DELISTED........................................................................................................23

       A.     The Great Lakes Wolf Population Cannot Be Delisted Based On
              The Eastern Timber Wolf Recovery Plan. ............................................24

       B.     The Great Lakes Wolf Population Remains Threatened By
              Inadequate Regulatory Mechanisms, Disease, And Human
              Predation................................................................................................25

       C.     FWS Lacks Any Measures For Post-Delisting Monitoring. ..................32

       D.     Vacatur Is The Only Appropriate Remedy.............................................32

IV.    PLAINTIFFS HAVE STANDING TO BRING THIS ACTION. ....................33

CONCLUSION..............................................................................................................36

## TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*Ad Hoc Metals Coalition v. Whitman,*
   227 F. Supp. 2d 134 (D.D.C. 2002) ................................................................... 11

*Alabama Educ. Ass'n v. Chao,*
   455 F.3d 386 (D.C. Cir. 2006) ........................................................................... 9

*Am. Soc'y for the Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus,*
   317 F.3d 334 (D.C. Cir. 2003) ......................................................................... 34

*Baltimore Gas & Elec. Co. v. NRDC,*
   462 U.S. 87 (1983) ......................................................................................... 20

*Barnhart v. Sigmon Coal Co.,*
   534 U.S. 438 (2002) ......................................................................................... 7

*Bennett v. Spear,*
   520 U.S. 154 (1997) ........................................................................... 34, 35, 36

*Biodiversity Legal Found. v. Babbitt,*
   943 F. Supp. 23 (D.D.C. 1996) ....................................................................... 26

*Brown v. Thompson,*
   374 F.3d 253 (4th Cir. 2004) ............................................................................ 8

*Cape Hatteras Access Pres. Alliance v. U.S. Dep't of the Interior,*
   344 F. Supp. 2d 108 (D.D.C. 2004) ................................................................. 30

*Chemical Mfrs. Ass'n v. EPA,*
   217 F.3d 861 (D.C. Cir. 2000) ......................................................................... 10

*Christensen v. Harris County,*
   529 U.S. 576 (2000) ......................................................................................... 11

*Defenders of Wildlife v. Babbitt,*
   130 F. Supp. 2d 121 (D.D.C. 2001) ................................................................. 24

*Defenders of Wildlife v. Kempthorne,*
   Civ. No. 04-1230 (GK), 2006 WL 2844232 (D.D.C. Sept. 29, 2006) ............... 15, 35

*Defenders of Wildlife v. Norton*,
   239 F. Supp. 2d 9 (D.D.C. 2002) ............................................................... passim

*Defenders of Wildlife v. Norton*,
   257 F. Supp. 2d 53 (D.D.C. 2003) ...................................................... 34, 35, 36

*Defenders of Wildlife v. Norton*,
   258 F.3d 1136 (9th Cir. 2001) ................................................................... passim

*Defenders of Wildlife v. Norton*,
   Civ. No. 99-02072-HHK (D.D.C. Dec. 13, 2001) ................................................6

*Defenders of Wildlife v. Sec'y, U.S. Dep't of the Interior*,
   354 F. Supp. 2d 1156 (D. Or. 2005)........................................................... passim

*Endangered Species Committee of the Bldg. Indus. Ass'n v. Babbitt*,
   852 F. Supp. 32 (D.D.C. 1994) .......................................................................33

*Fed'n of Fly Fishers v. Daley*,
   131 F. Supp. 2d 1158 (N.D. Cal. 2000)............................................................26

*Friends of the Wild Swan v. U.S. Fish & Wildlife Serv.*,
   12 F. Supp. 2d 1121 (D. Or. 1997).......................................................... passim

*Fund for Animals v. Babbitt*,
   903 F. Supp. 96 (D.D.C. 1995) .................................................................24, 26

*Garcia v. United States*,
   469 U.S. 70 (1984) ........................................................................................13

*Household Credit Servs. v. Pfennig*,
   541 U.S. 232 (2004) .........................................................................................8

*Humane Soc'y of the United States v. Kempthorne*,
   481 F. Supp. 2d 53 (D.D.C. 2006) ...............................................................31, 33

*IBEW v. NLRB*,
   814 F.2d 697 (D.C. Cir. 1987) ........................................................................8

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
   478 U.S. 221 (1986) ........................................................................................34

*Kaseman v. District of Columbia*,
   444 F.3d 637 (D.C. Cir. 2006) ......................................................................10

*Loving v. United States*,
   517 U.S. 748 (1996) .........................................................................................8

iii

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*,
547 U.S. 71 (2006) ............................................................................................7

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .............................................................................. 2, 30, 31

*Nat'l Ass'n of Home Builders v. Norton*,
340 F.3d 835 (9th Cir. 2003) ...........................................................................19

*Nat'l Wildlife Fed'n v. Norton*,
386 F. Supp. 2d 553 (D. Vt. 2005) .............................................................1, 32

*NRDC v. U.S. Dep't of the Interior*,
275 F. Supp. 2d 1136 (C.D. Cal. 2002) ...........................................................33

*Oregon Natural Resources Defense Council v. Daley*,
6 F. Supp. 2d 1139 (D. Or. 1998) ....................................................................26

*S.A. Storer & Sons Co. v. Sec'y of Labor*,
360 F.3d 1363 (D.C. Cir. 2004) .......................................................................20

*Shays v. FEC*,
414 F.3d 76 (D.C. Cir. 2005) .............................................................................9

*Southwest Ctr. for Biological Diversity v. Babbitt*,
939 F. Supp. 49 (D.D.C. 1996) .............................................................26, 27, 30

*State of New York v. EPA*,
413 F.3d 3 (D.C. Cir. 2005) ...............................................................................7

*The Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*,
353 F.3d 1051 (9th Cir. 2003) .........................................................................11

*TVA v. Hill*,
437 U.S. 153 (1978) ...................................................................................passim

*Western Res., Inc. v. FERC*,
9 F.3d 1568 (D.C. Cir. 1993) ...........................................................................11

## FEDERAL STATUTES

1 U.S.C. § 1 ..............................................................................................................10

16 U.S.C. § 1531(c)(1) .............................................................................................23

16 U.S.C. § 1532(3) ..................................................................................................23

16 U.S.C. § 1532(6) ..................................................................................... passim

16 U.S.C. § 1532(16) ............................................................................... 12, 16, 17

16 U.S.C. § 1532(20) ...........................................................................................7

16 U.S.C. § 1533(a)(1) ............................................................................ 2, 21, 24

16 U.S.C. § 1533(a)(1)(D) .................................................................................23, 26

16 U.S.C. § 1533(c)(1) .................................................................................7, 13

16 U.S.C. § 1533(g)(1) .........................................................................................32

16 U.S.C. § 1536(a)(1) .........................................................................................23

16 U.S.C. § 1539(j) ...............................................................................................6

Pub. L. 97-304, § 6(6) (Oct. 13, 1982) .................................................................6

## FEDERAL REGISTER

43 Fed. Reg. 9607 (Mar. 9, 1978) ................................................... 13, 31, 36

51 Fed. Reg. 19926 (June 3, 1986) ...........................................................25

61 Fed. Reg. 4722 (Feb. 7, 1996) ....................................................... passim

65 Fed. Reg. 16052 (Mar. 24, 2000) ................................................... 14, 22

68 Fed. Reg. 15804 (April 1, 2003) ..............................................................1

68 Fed. Reg. 40076 (July 3, 2003) .............................................................15

71 Fed. Reg. 15266 (Mar. 27, 2006) ......................................................9, 21

72 Fed. Reg. 6052 (Feb. 8, 2007) ....................................................... passim

72 Fed. Reg. 6106 (Feb. 8, 2007) .......................................................1, 3, 15

## OTHER AUTHORITIES

Black's Law Dictionary (8th ed. 2004) ...................................................28

H.R. Rep. 95-1625 (Nov. 25, 1978) ...........................................................8

H.R. Rep. No. 93-412 (1973) ...................................................................................13

H.R. Rep. No. 97-567 (May 17, 1982), *reprinted in* 1982 U.S.C.C.A.N. 2807............................6

Hausrath, Katherine M., *The Designation of "Distinct Population Segments" Under the Endangered Species Act in Light of National Association of Homebuilders v. Norton*, 80 Chi.-Kent L. Rev. 449 (2005) ...................................................................................17

Webster's Third New International Dictionary (1981) ................................................................28

**INTRODUCTION**

The delisting of the Great Lakes wolf population is, at bottom, old wine in new bottles. Although the gray wolf remains endangered in the conterminous United States, for nearly a decade the U.S. Fish and Wildlife Service ("FWS" or "the agency") has aggressively sought to remove the protections of the Endangered Species Act ("ESA" or "the Act") from this species. FWS's first try involved divvying up the gray wolf's range into distinct population segments ("DPSs") and downlisting the wolf to threatened status within them. *See* 68 Fed. Reg. 15804 (April 1, 2003) ("2003 Downlisting Rule"). The practical effect of these actions was to reduce ESA protections for nearly every gray wolf in the conterminous United States.[1] Courts struck down the 2003 Downlisting Rule as a clear violation of the ESA. *Defenders of Wildlife v. Sec'y, U.S. Dep't of the Interior*, 354 F. Supp. 2d 1156 (D. Or. 2005) ("*Defenders (wolf)*"); *Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553 (D. Vt. 2005).

Undeterred, the agency has now embarked an even more audacious effort. Circling up the only two gray wolf populations in the conterminous United States, FWS seeks to delist both populations on the grounds of "recovery." Pursuant to this strategy, in February 2007 FWS removed the western Great Lakes DPS of the gray wolf from the endangered species list. 72 Fed. Reg. 6052 (Feb. 8, 2007) (the "Final Rule"). That same day, the agency issued a proposal to delist the gray wolf population in the northern Rocky Mountains. 72 Fed. Reg. 6106 (Feb. 8, 2007). Once both rules are finalized, their effect will be even greater than that of the 2003 Downlisting Rule: virtually every gray wolf in the conterminous United States will be delisted.

---

[1] The only wolf population that has been spared from the agency's delisting campaign is an experimental population of Mexican gray wolves in the Southwest. *See* Memorandum Of Law In Support Of Plaintiffs' Motion For Summary Judgment ("Plaintiffs' Br.") at 10 n.2.

This piecemeal delisting of the wolf contravenes the ESA and its implementing policies. *See generally* Plaintiffs' Br. at 18-43.

In an effort to disguise these violations of law, Federal Defendants try to recast the Final Rule as a series of factual determinations entitled to "a high degree of deference." Fed. Br. at 1-2. But although administrative agencies enjoy considerable latitude in their decisionmaking, an agency may not flout statutory directives, nor may it issue a decision that is contrary to the evidence. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Because the Final Rule does both, this Court should grant Plaintiffs' motion for summary judgment.

## I.    FWS CANNOT PIECEMEAL DELIST THE GRAY WOLF.

### A.    FWS's Failure To Consider Threats Across The Wolf's Historic Range Violated The ESA.

In their opening brief, Plaintiffs discussed how the gray wolf remains extirpated across 95% of its historic range within the conterminous United States, and established that "there are major geographical areas in which [the wolf] is no longer viable but once was." *Defenders of Wildlife v. Norton*, 239 F. Supp. 2d 9, 20 (D.D.C. 2002) ("*Defenders (lynx)*") (quoting *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1145 (9th Cir. 2001) ("*Defenders (lizard)*")). Many of these areas contain large swaths of suitable habitat, including the Northeast, Pacific Northwest, and other parts of the West. *See, e.g., Defenders (wolf)*, 354 F. Supp. 2d at 1167 & n.8 (discussing wolf habitat and dispersing wolves in the Northeast, Pacific Northwest, and Dakotas). Plaintiffs also explained that if FWS sought to downlist or delist the gray wolf, the agency would first have to analyze the five categories of threats set forth in Section 4(a)(1) of the ESA. *See* 16 U.S.C. § 1533(a)(1) (the "Section 4(a)(1) threats"). In addition, before changing the wolf's status, the agency must, "at a minimum," explain why these unoccupied parts of the

2

wolf's range do not constitute a "significant portion of its range." *Defenders (lynx)*, 239 F. Supp. 2d at 21. FWS would have difficulty meeting this requirement because, with the vast majority of the wolf's range unoccupied, any such explanation would "appear[] to conflict with the plain meaning of the phrase 'significant portion.'" *Id.* at 19.

In the Final Rule, FWS neither performed the range-wide 4(a)(1) threats analysis nor provided the explanation called for by *Defenders (lynx)*. Instead, the agency circled up one of the only two gray wolf populations in the conterminous United States by declaring it to be a DPS. The agency has followed a similar path with respect to the northern Rocky Mountains wolf population. By carving up the wolf's range in this fashion, FWS hopes to delist the wolf without ever assessing threats to the wolf range-wide, or explaining why the vast swaths of unoccupied habitat are not significant portions of that range. *See* AR Doc. 35 at 158 (FWS sought to create "[l]ess risk on the [significant portion of the range] issue because threats analysis conducted on smaller geographic areas"); AR Doc. 23 at 115. The ultimate effect of FWS's delisting strategy is shown in the figure below. *See Delisting of Wolf DPSs* (outlining the western Great Lakes DPS and the proposed Northern Rocky Mountain DPS).[2]

---

[2] This figure is a composite that was developed from two FWS maps. *See* 72 Fed. Reg. at 6112; *Gray Wolf Status Under the Endangered Species Act*, *available at* http://www.fws.gov/midwest/wolf/esa_status/grwoesastatus12march07.pdf (Mar. 12, 2007).

## DELISTING OF WOLF DPSS



LEGEND:
- DPS
- Species-level Listing
- Wolf Populations
- Mexican Wolf Experimental Population

By delisting the wolf without ever conducting the Section 4(a)(1) threats analysis at a meaningful geographic scale, FWS's strategy contravenes the ESA's mandate that a species be protected throughout a "significant portion of its range." 16 U.S.C. § 1532(6). Indeed, though the Final Rule involves the delisting of a species rather than its initial listing, the Final Rule suffers from the same flaw identified in *Defenders (lynx)*, where this Court held that "FWS's exclusive focus on one region where the Lynx is more prevalent, despite its historic presence in three additional regions, is contrary to the expansive protection intended by the ESA." 239 F. Supp. 2d at 19. The sole difference between these cases is that here FWS sought to circumvent the significant portion of the range requirement by carving up the range into DPS. But this effort to sidestep the statute should fare no better, because if FWS could avoid consideration of the species as a whole simply by declaring portions of its range to be DPSs, the agency could

justify delisting *any* endangered species whose remaining populations are clustered in isolated

pockets. *See Friends of the Wild Swan v. U.S. Fish & Wildlife Serv.*, 12 F. Supp. 2d 1121, 1124

(D. Or. 1997) (rejecting FWS's attempt to divvy up a species' range into five DPSs).

Defendants and their *amici* nevertheless contend that FWS satisfied the significant

portion of the range requirement. First, they argue that FWS applied an acceptable definition of

"significant portion of its range" because the "range" referred to is a species' current range. Fed.

Br. at 27-30; Intervenors' Br. at 22, 29-33; *see also* Brief of *Amicus Curiae* Michigan

Department of Natural Resources *et al.* ("Michigan DNR Br.") at 11. Second, they claim that,

irrespective of the "range" to which the statute refers, the Final Rule is lawful because FWS

designated this portion of the range as a DPS before conducting the Section 4(a)(1) threats

analysis. Neither contention has merit.

### 1. The Phrase "Significant Portion Of Its Range" In The ESA Refers To A Species' Historic Range.

Federal Defendants argue that the "word 'range' . . . refers to a population's current range

and not the historical range where it once existed." Fed. Br. at 28. Their position is contrary to

the great weight of judicial authority. This Court and others have repeatedly confirmed that the

phrase "significant portion of its range" refers to a species' *historic* range. *See Defenders (lynx)*,

239 F. Supp. 2d at 20 n.7 (rejecting FWS's "crabbed interpretation of the phrase 'significant

portion of its range,' which would mean that a species that had once survived in a region, but no

longer did, was not entitled to the protections of the ESA"); *Defenders (lizard)*, 258 F.3d at 1145

(concluding that a species' range includes "major geographical areas in which it is no longer

viable but once was"); *Defenders (wolf)*, 354 F. Supp. 2d at 1167 (rejecting interpretation of "range" that only included "the current range of the wolf").[3]

These holdings are well supported by the ESA's text, structure, and legislative history. Although the ESA does not expressly define the term "range" as historical range, 16 U.S.C. § 1532(6), two other provisions of the Act demonstrate that this was Congress's intent. First, Section 10(j) authorizes FWS to introduce experimental populations of a species "outside the current range" if doing so would further the species' conservation.[4] 16 U.S.C. § 1539(j). Second, in designating the critical habitat of a species, the ESA directs the agency to limit critical habitat to "areas within the geographical area occupied by the species," unless it is essential that critical habitat be designated in "areas outside the geographical area occupied by the species." *Id.* § 1532(5)(A). Congress's direct reference to a species' "current range," and its careful parsing between areas inside and outside "the geographical area occupied by the species," demonstrate that when Congress intended to refer to species' current range, it did so explicitly.

---

[3] Intervenors wrongly assert that *Defenders (lizard)* left "unclear whether range means current or historical range." Intervenors' Br. at 32. Not only did the Ninth Circuit find that "a species can be extinct 'throughout . . . a significant portion of its range' if there are major geographical areas in which it is no longer viable but once was," but it also held that when "the area in which the lizard is expected to survive is much smaller than its *historical range*, the Secretary must at least explain her conclusion that the area in which the species can no longer live is not a 'significant portion of its range.'" 258 F.3d at 1145 (emphasis added). Intervenors also incorrectly argue that an unpublished decision of this Court which preceded *Defenders (lynx)* "treats 'range' as 'current' range." Intervenors' Br. at 30 (citing *Defenders of Wildlife v. Norton*, Civ. No. 99-02072-HHK (D.D.C. Dec. 13, 2001)). This decision, which largely followed the direction of *Defenders (lizard)*, did not expressly address the current-versus-historic range issue.

[4] Subsection 10(j) was added to the ESA in 1982. Pub. L. 97-304, § 6(6) (Oct. 13, 1982). The House Report explained that this provision was added to correct the ESA's "tendency to discourage voluntary introduction of species in areas of their *historical range*." H.R. Rep. No. 97-567 at 17 (May 17, 1982), *reprinted in* 1982 U.S.C.C.A.N. 2807, 2817 (emphasis added).

By contrast, in the phrase "significant portion of its range" Congress used the broader term "range."  16 U.S.C. § 1532(6), (20).  If the word "range" were construed to mean "current range," that would render Congress's use of the word "current" in Section 10(j) superfluous, thereby violating the rule that statutes be interpreted so that "no clause, sentence, or *word* shall be superfluous, void, or insignificant."  *State of New York v. EPA*, 413 F.3d 3, 39 (D.C. Cir. 2005) (citation omitted) (emphasis added); *see also Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) (When "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (citations omitted).[5]

Moreover, by authorizing the introduction of experimental populations and designation of critical habitat outside a species' current range, Congress signaled its intent to extend ESA protections throughout a species' historic range.[6]  Interpreting the significant portion of the range

---

[5] Section 4(c)(1) of the Act further demonstrates that Congress's use of the term "range," without more, means historical range.  Section 4(c)(1) instructs FWS, when publishing the list of threatened and endangered species, to specify for each species "over what portion of its range it is endangered or threatened, and specify *any critical habitat within such range*."  16 U.S.C. § 1533(c)(1) (emphasis added).  Because critical habitat can be designated outside a species' current range, *id.* § 1532(5)(A), and because Section 4(c)(1) implies that *all* critical habitat must fall "within [a species'] range," the only logical construction of "range" is that it means historic range.  *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 86 (2006) ("Generally, 'identical words used in different parts of the same statute are . . . presumed to have the same meaning.'") (citation omitted).

[6] This does not mean that a species must be restored to *every portion* of its historic range prior to delisting.  Intervenors set up a straw man by suggesting that Plaintiffs seek wolf recovery in "the skyscrapers, suburbs, and exurbs of Chicago."  Intervenors' Br. at 29.  Far from it.  Plaintiffs merely contend that, should FWS seek to downlist or delist the gray wolf, the agency must conduct a Section 4(a)(1) threats analysis across the wolf's historic range and, "at a minimum," demonstrate why the broad swaths of suitable habitat in the Northeast, Pacific Northwest, and elsewhere are not significant portions of its range.  *Defenders (lynx)*, 239 F. Supp. 2d at 19; *Defenders (lizard)*, 258 F.3d at 1145.  Intervenors also argue at length that the "geographical size of an area does not control whether it is 'significant' for SPR purposes."  Intervenors' Br. at 32-

(continued on next page)

requirement to mean historic range is therefore consistent with the "design of the statute as a whole." *Household Credit Servs. v. Pfennig*, 541 U.S. 232, 239 (2004) (citations omitted).  And because this interpretation bolsters protections for endangered and threatened species, it is also consistent with the ESA's mandate that endangered species "be afforded the highest of priorities." *TVA v. Hill*, 437 U.S. 153, 174 (1978).

Finally, were there any ambiguity in the language of the statute, it was eliminated by Congress's unequivocal declaration that "[t]he term 'range' . . . refers to the historical range of the species."  H.R. Rep. 95-1625 (Nov. 25, 1978), *reprinted in* ESA Legislative History at 742 (1982); *see also IBEW v. NLRB*, 814 F.2d 697, 712 (D.C. Cir. 1987) (observing that "a committee report may ordinarily be used to interpret unclear language contained in a statute").[7] FWS has adhered to this understanding of "significant portion of its range" throughout most of the ESA's history.  *See* Plaintiffs' Br. at 20 (citing rulemakings).

Federal Defendants nevertheless argue that FWS's interpretation of "range" as limited to current range "is a reasonable interpretation of an ambiguous statutory phrase and it is therefore entitled to a high degree of deference."  Fed. Br. at 29.  But the interpretation of "range" announced in the Final Rule is not entitled to deference because, as the foregoing discussion

---

(continued from previous page)

36; *see also* Michigan DNR Br. at 12-13.  Plaintiffs merely urge the Court to follow the reasoning in *Defenders (lynx)*, where the Court required FWS to explain its "conclusion that three large geographical areas, which comprise three-quarters of the Lynx's historical regions, are not a 'noticeably or measurably large amount' of the species' range."  239 F. Supp. 2d at 19.

[7] The 1978 Amendments, which added another reference to "range" in Section 4(c)(1) of the Act, are relevant because "subsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction."  *Loving v. United States*, 517 U.S. 748, 770 (1996); *see also Brown v. Thompson*, 374 F.3d 253, 259 (4th Cir. 2004) ("In determining whether an amendment clarifies or changes an existing law, a court, of course, looks to statements of intent made by the legislature that enacted the amendment.").

establishes, Congress plainly intended "range" to mean historic range. *See Shays v. FEC*, 414 F.3d 76, 105 (D.C. Cir. 2005) ("In undertaking our *Chevron* step one inquiry into 'whether Congress has directly spoken to the precise question at issue,' we employ 'the traditional tools of statutory construction,' including 'examination of the statute's text, legislative history, and structure, as well as its purpose.'") (alterations and citation omitted); *see also Defenders (lynx)*, 239 F. Supp. 2d at 20 & n.7 (adopting definition of range to include areas in which a species once survived, but no longer did).

But even assuming, for the sake of argument, that this statutory term were ambiguous, the interpretation advanced in the Final Rule would not be entitled to deference because FWS adopted it without a reasoned explanation. The agency applied two separate – and contradictory – definitions in the proposed and final delisting rules. In the Proposed Rule, the agency announced that the significant portion of a species' range is that portion which is "so important to the continued existence of the species that threats to the species in that area can threaten the viability of the species, subspecies, or DPS as a whole." 71 Fed. Reg. 15266, 15277 (Mar. 27, 2006). In other words, according to the agency the "significant portion" of the wolf's range includes only those areas necessary to prevent the wolf's total extinction. This contention has been thoroughly repudiated by the courts. *See, e.g.*, *Defenders (lizard)*, 258 F.3d at 1142; *Defenders (lynx)*, 239 F. Supp. 2d at 20 n.7. Apparently realizing the deficiencies of this definition, FWS shifted gears in the Final Rule. There, the agency announced an entirely new interpretation. *See* 72 Fed. Reg. at 6069-71. But in doing so, FWS failed to acknowledge that it had abandoned the definition used in the Proposed Rule. And "[w]hen an agency adopts a materially changed interpretation of a statute, it must . . . provide a 'reasoned analysis' supporting its decision to revise its interpretation." *Alabama Educ. Ass'n v. Chao*, 455 F.3d 386,

392 (D.C. Cir. 2006) (citation omitted). Because the Final Rule is devoid of any "reasoned

analysis" explaining why the FWS adopted a different definition, the Court should reject this

new interpretation.

Even on its own terms, FWS's discussion of "range" is unpersuasive. The Final Rule

argues that range must mean current range because the verb associated with it is in the present,

rather than the past, tense. 72 Fed. Reg. at 6069. But the definition of an "endangered species" –

a species that "is in danger of extinction throughout all or a significant portion of its range," 16

U.S.C. § 1532(6) – makes sense regardless of whether "historic" or "current" is placed before the

word "range." More importantly, though verb tense can be important in some circumstances, an

interpretation based solely on verb tense should be disregarded if "the context indicates

otherwise." 1 U.S.C. § 1. And here, where the ESA's text, structure, purpose, and legislative

history demonstrate that Congress intended FWS to consider a species' historic range, this verb

tense argument must be rejected. *See Chemical Mfrs. Ass'n v. EPA*, 217 F.3d 861, 867 (D.C.

Cir. 2000) ("[I]n expounding a statute, we must not be guided by a single sentence or member of

a sentence, but look to the provisions of the whole law, and to its object and policy.") (quotation

marks, alterations, and citation omitted).[8]

Finally, Defendants' interpretation of "range" should be rejected because it produces

absurd results. *See Kaseman v. District of Columbia*, 444 F.3d 637, 643 (D.C. Cir. 2006). If

"range" were limited to a species' current range, that would create an incentive for landowners

and resource users to eliminate vulnerable species (or destroy their habitat) before ESA

---

[8] Even the Final Rule's principal author once stated that "I am using 'range' to mean historical
range.' I dislike the approach of interpreting it as 'Significant Portion of Current Range.'" AR
Doc. 162 at 1124.

protections are extended to those species.  With hundreds of species currently waiting to be added to the endangered species list, Defendants' interpretation could seriously imperil candidate species.  Congress could not have intended to create such a perverse incentive.[9]

### 2.    FWS Cannot Circumvent The Significant Portion Of The Range Requirement By Carving Up The Wolf's Range Into DPSs.

As Plaintiffs explained above, the ESA precludes FWS from piecemeal delisting a species by divvying up the species' range into small portions and restricting the Section 4(a)(1) threats analysis to those areas.  *See Defenders (lynx)*, 239 F. Supp. 2d at 19; *Friends of the Wild Swan*, 12 F. Supp. 2d at 1133.  Federal Defendants nevertheless argue that FWS's actions were lawful because the agency designated the Great Lakes wolf population as a DPS *before* conducting the threats analysis.  *See* Fed. Br. at 27; *see also* Brief of *Amicus Curiae* Pacific Legal Foundation *et al.* at 1, 3.  In other words, they contend that FWS need not conduct a Section 4(a)(1) threats analysis across a species' entire range if the agency first divides that range into DPSs.

---

[9] Federal Defendants baldly assert that a memorandum prepared by the Interior Department Solicitor after the Final Rule was issued can be considered by this Court. Fed. Br. at 29 n.7; Intervenors' Br. at 30 n.8; *see also* Michigan DNR Br. at 9-19 (summarizing, without attribution, the Solicitor's opinion).  Regardless of whether the Court takes judicial notice of this document, a later-issued opinion cannot be used to justify the Final Rule because it is a "time-honored rule that a reviewing court 'must judge the propriety of agency action solely by the grounds invoked by the agency'" at the time the decision under review is made.  *Western Res., Inc. v. FERC*, 9 F.3d 1568, 1576 (D.C. Cir. 1993) (alterations and citation omitted); *see also Ad Hoc Metals Coalition v. Whitman*, 227 F. Supp. 2d 134, 137 (D.D.C. 2002) (noting that a court "may not entertain *post hoc* rationalizations where no rationale was set forth before").  Even if the Solicitor's opinion had preceded the Final Rule, this document would still not be entitled to particular deference.  First, Solicitor opinions are not entitled to *Chevron* deference.  *The Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1068 n.16 (9th Cir. 2003); *see generally Christensen v. Harris County*, 529 U.S. 576, 587 (2000).  Second, as the opinion itself makes clear, this document is merely preliminary guidance meant to assist an ongoing agency process.  *See* Intervenors' Br., Ex. 3 at 1, 18 ("I trust this memorandum and its conclusions will be helpful to you in developing your SPR policy.").

The purported textual basis for this argument is that the definition of species "includes . . . any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16). This definition authorizes FWS to list a locally vulnerable population of a vertebrate species as a DPS even though the species as a whole is neither threatened nor endangered. *See* Plaintiffs' Br. at 5-6; 61 Fed. Reg. 4722, 4725 (Feb. 7, 1996) (the "DPS Policy") (DPSs can "protect and conserve species and the ecosystems upon which they depend before large-scale decline occurs that would necessitate listing a species or subspecies throughout its entire range."). As the District of Oregon observed, if FWS "legitimately concludes, after proper and sustainable analysis, that listing of the entire species" is unnecessary, the agency can "proceed[] on a population segment basis." *Friends of the Wild Swan*, 12 F. Supp. 2d at 1134. This "two-tiered approach," *id.*, is consistent with the Act's policy of "institutionalized caution." *TVA*, 437 U.S. at 194.

Defendants, however, claim that by extending protection to distinct population segments, this definition permits FWS to skip the first analytical step (a Section 4(a)(1) threats analysis across a species' range) and proceed directly to the second. Indeed, they suggest that this definition requires FWS to do so. Fed. Br. at 27-28. But nothing in the Act directs the agency to restrict its scale of analysis to the DPS level before conducting a 4(a)(1) threats assessment for the species as a whole. And allowing FWS to skip that step would gut the definition of an "endangered species" – one of the central provisions of the ESA – by eliminating the need to consider the species' status across a "significant portion of its range." 16 U.S.C. § 1532(6), (20).[10] If, as Federal Defendants contend, FWS could restrict its threats analysis to a small

_____

[10] At the time of the Act's passage, Congress emphasized the importance of this definition, because extending protection to those species at risk "throughout a significant portion of [their]

(continued on next page)

portion of a species' range through the creation of DPSs, it could avoid listing species whose

remaining populations are clustered in isolated pockets. The agency could simply draw DPSs

around the areas where the species is doing well and restrict its Section 4(a)(1) threats analysis to

those areas. The agency would never be called upon to consider the unoccupied portions of the

range, or whether the species as a whole is endangered or threatened.

     The same holds true in the delisting context. By divvying up a species-level listing into

DPSs, and then delisting those DPSs without considering the species as a whole (or the rest of

the historic range), FWS would never have to explain why the unoccupied portions of the range

are not significant to the recovery of the species. *Cf. Defenders (lynx)*, 239 F. Supp. 2d at 21

(holding that FWS must, "at a minimum, explain its conclusion that the area in which the lynx

can no longer live is not a significant portion of its range") (quoting *Defenders (lizard)*, 258 F.3d

at 1145) (quotation marks and alterations omitted). This strategy – of eschewing a range-wide

threats analysis and avoiding any consideration of the unoccupied portions of the range – is

precisely what FWS has done in the Final Rule.[11] Because its ultimate effect is to render the

_____

(continued from previous page)

range" represented "a significant shift . . . in existing law." H.R. Rep. No. 93-412 (1973),
*reprinted in* ESA Legislative History at 149.

[11] Intervenors and the Michigan DNR point to some legislative history in arguing that FWS can
piecemeal delist the gray wolf. *See* Intervenors' Br. at 17-18; Michigan DNR Br. at 16-19.
None of this legislative history, which consists of floor debates and committee testimony, is
probative. *See generally Garcia v. United States*, 469 U.S. 70, 76 & n.3 (1984). But to the
extent it is, these excerpts merely stand for the unremarkable proposition that an endangered
species need not be listed across its entire range. That notion is apparent from the Act itself,
which requires FWS "to specify with respect to each such species over what portion of its range
it is endangered or threatened." 16 U.S.C. § 1533(c)(1). Indeed, that is precisely what FWS did
with respect to the gray wolf, where the agency listed the species in the conterminous United
States but not in Alaska. *See* 43 Fed. Reg. 9607 (Mar. 9, 1978).

"significant portion of its range" requirement meaningless, Federal Defendants' theory

contravenes the plain meaning of the ESA.[12]

     Federal Defendants attempt to distinguish *Defenders (lynx)* by arguing that this case only

involved the "Canada lynx's historical range and habitat *within the DPS*." Fed. Br. at 31. But a

closer examination of that decision undermines their position. For although the lynx was

technically classified as a DPS, that DPS encompassed the *entire historic range* of the lynx

within the conterminous United States. *See* 65 Fed. Reg. 16052, 16061 (Mar. 24, 2000)

(describing the "contiguous United States DPS of the [Canada] lynx"). FWS therefore saw no

need to delineate the southern boundary of this DPS, and simply listed the lynx as threatened in

every state within which it historically occurred. 65 Fed. Reg. at 16085. Because the geographic

reach of the DPS extended to the species' entire historic range, this "DPS" listing was effectively

a species-level listing. And just as FWS's focus on one region "to the exclusion of the remaining

three-quarters of the Lynx's historical regions[] is antithetical to the ESA's broad purpose to

---

[12] Nor can Federal Defendants rely on the DPS Policy to buttress its argument that "a determination regarding whether an entity is a species, subspecies, or a distinct population segment comes *before* the significant portion of the range analysis." Fed. Br. at 27. For one thing, Defendants' position is contrary to the text of the statute, and *Chevron* deference cannot save it. More importantly, the DPS Policy does not address whether FWS must conduct a Section 4(a)(1) threats analysis for the species as a whole before considering DPSs. Rather, the Policy describes the process to be followed once FWS concludes, "after proper and sustainable analysis, that listing of the entire species" is unnecessary. *Friends of the Wild Swan*, 12 F. Supp. 2d at 1134. To the extent it provides any guidance at all on this issue, the DPS Policy suggests that FWS should not use the DPS tool except in circumstances where a species-level listing is unnecessary. *See* 61 Fed. Reg. at 4725 (DPSs were intended "to protect and conserve species and the ecosystems upon which they depend before large-scale decline occurs that would necessitate listing a species or subspecies throughout its entire range.").

protect endangered and threatened species," 239 F. Supp. 2d at 19, so too is the agency's focus

on the gray wolf's only existing populations to the exclusion of 95% of its historic range.[13]

Finally, Federal Defendants try to downplay the significance of the Final Rule by arguing

that wolves outside the western Great Lakes DPS retain their endangered status.  Fed. Br. at 28;

*see also* Intervenors' Br. at 28 n.7; Brief of *Amicus Curiae* National Wildlife Federation *et al.*

("NWF Br.") at 13.  But this argument merely underscores the insidious nature of FWS's

piecemeal delisting strategy.  FWS is currently finalizing plans to delist the "northern Rocky

Mountains DPS" of the gray wolf.  *See* 72 Fed. Reg. at 6106.  Once completed, though the

"endangered" listing will persist outside these two DPSs, virtually no gray wolf in the country

will be protected by the ESA.  Nor will there be any realistic chance of wolf recovery elsewhere,

because the broad boundaries of the delisted DPSs hinder, rather than promote, further wolf

recovery.  *See infra* at Part II.  In short, the agency's strategy results in the only gray wolf

populations in the conterminous United States being delisted while leaving a meaningless

remnant listing throughout the depopulated parts of the range.

More troubling still, there is evidence that, once the Great Lakes and northern Rocky

Mountain wolf populations are delisted, FWS will try to delist the unoccupied portions of the

range on the grounds of extinction.  *See, e.g.*, AR Doc. 35 at 159 (stating that a possible future

step for Option 2 – the option implemented in the Final Rule – is to "[d]elist remaining states as

extinct"); AR Doc. 48 at 204 (same); *see also* AR Doc. 35 at 159 (stating that the option of

---

[13] Curiously, Federal Defendants make much of the fact that, on remand, FWS "did not alter its
listing determination but, instead, provided a more detailed explanation of why certain portions
of the lynx's range were not significant."  Fed. Br. at 31 (citing 68 Fed. Reg. 40076, 40100 (July
3, 2003)).  That rulemaking was subsequently overturned by this Court.  *Defenders of Wildlife v.
Kempthorne*, Civ. No. 04-1230 (GK), 2006 WL 2844232, at *13 (D.D.C. Sept. 29, 2006)
(concluding that FWS had "utterly failed to abide by the terms of a remand order").

"leav[ing] remaining states endangered indefinitely" is "not a preference"). FWS's apparent aim – declaring the existing populations to be "recovered," while delisting the rest of the species' range based on extinction – "flies in the face of the plain language of the ESA and its purpose." *Defenders (lynx)*, 239 F. Supp. 2d at 19-20.

        **B.**        **FWS Cannot Use The DPS As A Delisting Tool.**

Plaintiffs' opening brief demonstrated that the ESA does not permit DPSs to be used a delisting tool, and that FWS's use of that tool to delist the gray wolf was arbitrary and capricious. *See* Plaintiffs' Br. at 28-31. In their response, Federal Defendants do not contest that, had the Great Lakes wolf population *not* been found "significant" to the species as a whole, it could not have been delisted as a DPS. *Id.* at 29-30. Nor do they dispute that the very reason this wolf population is "discrete" is because the wolf has been extirpated from much of its historic range. *Id.* at 30. Instead, Federal Defendants try to justify FWS's actions by pointing to language in the statute, DPS Policy, and *Defenders (wolf)* which, they claim, permit FWS to designate DPSs for delisting purposes. But none of these sources support the proposition for which they are cited.

Federal Defendants first argue that "a plain reading" of the ESA demonstrates that FWS can carve a DPS out of a species-level listing for purposes of delisting. Fed. Br. at 14-15. They point to the definition of "species," which "includes any subspecies . . ., and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16).

As explained above, through this definition Congress extended the protections of the ESA to locally-vulnerable populations of vertebrate fish or wildlife in circumstances where the species as a whole is not endangered or threatened. *See* 61 Fed. Reg. at 4725 (noting that the use of the DPS tool "may allow the Services to protect and conserve species and the ecosystems

upon which they depend before large scale decline occurs that would necessitate listing a species or subspecies throughout its entire range"); *see also Friends of the Wild Swan*, 12 F. Supp. 2d at 1133 ("[L]isting of population segments is a proactive measure to prevent the need for listing a species over a larger range . . . ."). Once a DPS has been listed, of course, it can be delisted when it is no longer threatened or endangered. But the plain language of the statute does not sanction FWS's tactic of carving a DPS out of a species-level listing for the purpose of *reducing* the protections of the Act.

This understanding of DPSs, as a tool designed to *increase* species protection, is demonstrated by Congress's restriction of DPS listings to "vertebrate fish or wildlife." 16 U.S.C. § 1532(16). Congress consciously decided not to extend this tool to locally-vulnerable populations of insects and plants; those invertebrate species can only be protected under the ESA if they are at risk throughout all or a significant portion of their range. *See* Katherine M. Hausrath, *The Designation of "Distinct Population Segments" Under the Endangered Species Act in Light of National Association of Homebuilders v. Norton*, 80 Chi.-Kent L. Rev. 449, 455-56 (2005). Only those species that Congress deemed most valuable, such as mammals, birds, and fish, could be listed as a DPS. *Id.* The definition of "species" makes no sense if the DPS tool could be used, as Federal Defendants assert, for delisting purposes. Why would Congress make it possible for the DPS tool to remove protections from core populations of vertebrates, while forbidding this "flexibility" for invertebrates? FWS's use of the DPS as a delisting tool is unreasonable in light of the only statutory language that Congress has provided. For this reason alone, the agency's interpretation should be rejected.

The DPS Policy likewise confirms that DPSs are "a proactive measure to *prevent* the need for listing a species over a larger range – *not* a tactic for subdividing a larger population that

17

USFWS has already determined . . . warrants listing throughout a larger range." *Friends of the Wild Swan*, 12 F. Supp. 2d at 1133 (citing DPS Policy, 61 Fed. Reg. at 4725). The DPS Policy provides that a vertebrate population must be both "significant" and "discrete" to be designated as a DPS. 61 Fed. Reg. at 4725. The requirement that a population segment be "significant" reflects how the DPS tool is to be properly used. Simply stated, the DPS Policy instructs that a DPS be designated only if the population segment is important enough to warrant protection.[14] Like the ESA's restriction of the DPS tool to vertebrates, the Policy's restriction of DPSs to "significant" populations makes no sense if this tool could be used, as Federal Defendants suggest, to remove protections from a population already protected by a species-level listing. Under Defendants' theory, the DPS Policy would allow the removal of federal protections from a "significant" population of an endangered species, while forbidding this option for non-significant populations.[15]

 The DPS Policy further clarifies that DPSs are intended to protect a locally-vulnerable population where the species as a whole is neither threatened nor endangered:

> Listing, delisting, or reclassifying distinct vertebrate population segments may allow the Services to protect and conserve species and the ecosystems upon which

---

[14] The DPS Policy outlines several factors to consider in determining whether a vertebrate population is significant enough to warrant listing: the population segment exists in a unique ecological setting; loss of the population segment would result in a gap in the taxon's range; the population segment represents the only natural occurrence of a taxon that is abundant elsewhere as an introduced population; and the population segment differs from other populations in its genetic characteristics. 61 Fed. Reg. at 4725.

[15] Intervenors point to a floor debate in arguing that DPSs can be carved out of a species-level listing. Intervenors' Br. at 18 (quoting *Defenders (lizard)*, 258 F.3d at 1144). This statement, which was made in *1973*, provides little insight into Congress's intent in creating the DPS tool in *1978*. By amending the definition of "species," and instructing FWS to list DPSs "sparingly," 61 Fed. Reg. at 4724, Congress significantly narrowed the agency's discretion to list – or delist – smaller populations of a species. Intervenors' reliance on *Defenders (lizard)* is particularly misplaced since that case did not involve DPSs at all.

they depend before large scale decline occurs that would necessitate listing a species or subspecies throughout its entire range. This may allow protection and recovery of declining organisms in a more timely and less costly manner, and on a smaller scale than the more costly and extensive efforts that might be needed to recover an entire species or subspecies.

61 Fed. Reg. at 4725. In short, the entire thrust of the DPS Policy demonstrates that this tool can be used to protect a population segment without having to list the entire species. Nowhere does the Policy state or even imply that DPSs can be used to strip federal protections from a core population of a listed species.

The courts have also concluded that DPSs should be used when listing at the species or subspecies level is not warranted, but a local population of the species is facing additional threats. *See Defenders (wolf)*, 354 F. Supp. 2d at 1169 ("[I]f a distinct and significant population of an unlisted species is struggling while other populations are faring well, FWS may designate the struggling population as a DPS and list it as endangered."); *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 842 (9th Cir. 2003) (noting that under the DPS Policy "[t]he FWS does not have to list an entire species as endangered when only one of its populations faces extinction"); *Friends of the Wild Swan*, 12 F. Supp. 2d at 1133.

In arguing that DPSs can be created for delisting purposes, Federal Defendants point to statements from the DPS Policy and *Defenders (wolf)* which, they claim, indicate that DPSs can be delisted. Fed. Br. at 16-17. But these statements are more naturally read to mean that an *already listed* DPS can be delisted once it has recovered. *See, e.g.*, *Defenders (wolf)*, 354 F. Supp. 2d at 1169 ("FWS can downlist a DPS if that discrete and significant population is no longer endangered").[16] As the District of Oregon stated, "[t]he purpose of the DPS Policy is to

---

[16] Federal Defendants describe the Final Rule as a product of the agency's "dutiful" efforts to comply with prior court decisions. *See* Fed. Br. at 16; *see also* AR Doc. 77 at 311 (discussing

(continued on next page)

allow FWS to *list* a DPS as threatened or endangered . . . ." *Id.* at 1160 (emphasis added).  This interpretation is further supported by the DPS Policy's admonition that "[a]ny interpretation [of the term 'distinct population segment'] should also be aimed at carrying out the purposes of the Act."  61 Fed. Reg. at 4722.  Since Congress, in drafting the ESA, made "it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities," *TVA*, 437 U.S. at 194, this Court should resist any interpretation of the Policy that has the opposite effect.  The congressional mandate to give species "the highest of priorities" cannot be reconciled with FWS's use of the DPS as a delisting tool.

Trying to insulate the agency's actions from careful judicial scrutiny, Federal Defendants characterize the Final Rule as a straightforward application of the DPS Policy entitled to substantial deference from this Court.  Fed. Br. at 19-20.  But Plaintiffs are not challenging factual determinations for which deference may be appropriate.  *Cf. Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983).  Rather, Plaintiffs challenge the agency's use of the DPS in a manner contrary to law.  The Court should not defer to an agency interpretation that is inconsistent with both an agency policy and the statute under which that policy was promulgated. *See, e.g.*, *S.A. Storer & Sons Co. v. Sec'y of Labor*, 360 F.3d 1363, 1369 (D.C. Cir. 2004) (rejecting agency interpretation that "does not sensibly conform to the purpose and wording of the regulation") (quotation marks, alterations, and citation omitted).  Because nothing in the Act,

---

(continued from previous page)

*Defenders (wolf)*).  But the District of Oregon did not approve the use of DPSs as a delisting tool for the wolf.  Indeed, the court stated that it "does not decide whether FWS could downlist the Western Great Lakes and Northern Rockies core populations at this time."  354 F. Supp. 2d at 1173.

DPS Policy, or relevant judicial precedents authorizes the use of DPSs as a delisting tool, the

Final Rule should be set aside.[17]

## II.    THE EXPANSIVE BOUNDARIES OF THE WESTERN GREAT LAKES DPS ARE ARBITRARY AND CAPRICIOUS BECAUSE THEY THWART FURTHER WOLF RECOVERY.

In their opening brief, Plaintiffs explained how the broad boundaries of the western Great

Lakes DPS are inconsistent with the ESA's mandate of prioritizing species recovery.  These

capacious boundaries, especially when coupled with Minnesota's wolf management plan, hinder,

rather than promote, further wolf recovery.  *See* Plaintiffs' Br. at 31-34.

Federal Defendants do not seriously dispute this consequence of the DPS's expansive

boundaries.  Instead, like the agency itself, they emphasize FWS's "wide degree of discretion" in

drawing those boundaries.  Fed. Br. at 24; *cf.* AR Doc. 58 at 232 ("The boundary can be placed

anywhere between the population that is the subject of the DPS and any other populations of the

same taxon – Period!").  But where, as here, FWS has established boundaries that are

inconsistent with the congressional intent to encourage species recovery, the agency's exercise of

discretion is unreasonable.

Federal Defendants also assert that these boundaries were created at the direction of prior

judicial decisions.  Fed. Br. at 25; *see also* Intervenors' Br. at 19.  But the Oregon and Vermont

decisions did not instruct FWS to draw such lines.  For one thing, the District of Oregon

---

[17] Intervenors try to further justify the Final Rule by claiming that the Great Lakes wolf population has been treated separately from other wolf populations.  Intervenors' Br. at 18-19. FWS's historical treatment of this population is inconsequential.  First, even assuming there were scientific consensus on which subspecies are affected by the Final Rule, *cf.* 71 Fed. Reg. at 15267, FWS expressly disavowed any consideration of wolf subspecies in delisting the Great Lakes population.  72 Fed. Reg. at 6065.  Moreover, for the reasons explained *infra* in Part III.A, satisfying the numerical goals of the 1992 Recovery Plan cannot be used as a substitute for a Section 4(a)(1) threats analysis.  16 U.S.C. § 1533(a)(1).

expressed no view on the propriety of a Western Great Lakes DPS. *Defenders (wolf)*, 354 F. Supp. 2d at 1173. Moreover, one of the problems with the 2003 Downlisting Rule was that "the conservation status of populations within each DPS varies dramatically." *Defenders (wolf)*, 354 F. Supp. 2d at 1171. By extending the boundaries far beyond the existing wolf populations, FWS has repeated the error identified by the Oregon court. To the extent these decisions provide any guidance at all, they would support at most a tight line around the existing wolf populations in northern Minnesota, northern Wisconsin, and Michigan's Upper Peninsula – not an expansive DPS stretching across nine states that removes federal protection from nearly all dispersing wolves.

Though FWS has previously acknowledged the importance of dispersing wolves to wolf recovery, *e.g.*, 68 Fed. Reg. at 15817, FWS drew the boundaries of the western Great Lakes DPS so as to virtually ensure that dispersing wolves cannot contribute to wolf recovery outside the DPS. To reach a protected area, wolves must travel hundreds of miles across a "wolf movement zone." 72 Fed. Reg. at 6060. And within that zone, states and individuals will have broad authority to "manage," i.e., to kill, dispersing wolves. *See* AR Doc. 35 at 158 (stating that an advantage of Option 2 – the option implemented in the Final Rule – was that it "allows for management of dispersing wolves"); *cf. id.* at 159 (warning that a disadvantage of Option 3, which had narrower DPS boundaries, was that it provided "[f]ewer options for managing dispersing wolves"). Wolves dispersing through Minnesota will face a particularly hazardous journey because they must pass through a "free-fire zone" that covers 60% of the state. *See* Minnesota Wolf Management Plan at 22-24, AR Doc. 215 at 5275-77.

Federal Defendants and Intervenors argue that these boundaries will not inhibit wolf recovery because wolves remain endangered outside the DPS. Fed. Br. at 25-26; Intervenors'

Br. at 21.  But the fact that an endangered listing remains *beyond* typical wolf dispersal distances means little, especially when dispersing wolves are likely to be killed before they ever reach the DPS boundaries.  And because the boundaries were drawn to include most known dispersing wolves, 72 Fed. Reg. at 6060, the agency has created a landscape where gray wolves are not known to exist outside of this DPS and the one proposed for the northern Rocky Mountains.  *See Delisting of Wolf DPSs*, *supra* at 4.  By drawing the DPS boundaries so widely, then, the agency sets itself up for a third phase in this delisting campaign – to delist the remaining, non-DPS area as extinct and get out of the wolf recovery business entirely.  *See* AR Doc. 35 at 159 (stating that a possible future step for Option 2 is to "[d]elist remaining states as extinct").

The "plain language of the Act, buttressed by its legislative history, shows clearly that Congress viewed the value of endangered species as 'incalculable.'"  *TVA*, 437 U.S. at 187.  In furtherance of that purpose, the Act directs FWS to use "all methods and procedures" which are necessary to conserve the wolf.  16 U.S.C. § 1532(3); 16 U.S.C. § 1531(c)(1); 16 U.S.C. § 1536(a)(1).  By thwarting further recovery of the gray wolf, the far-reaching boundaries of the western Great Lakes DPS fundamentally undermine the ESA.

## III.     EVEN IF THE CREATION OF THE WESTERN GREAT LAKES DPS WERE OTHERWISE LAWFUL, THE WOLF COULD NOT BE DELISTED.

Plaintiffs have previously explained that the Great Lakes wolf population remains threatened or endangered because the states within this DPS do not have regulatory mechanisms that adequately protect the wolf.  16 U.S.C. § 1533(a)(1)(D).  Plaintiffs have also described how the lack of monitoring under state management, together with the ongoing threats of disease and human predation, imperil the wolf's long-term viability.  *Id.* § 1533(a)(1)(C); *see generally* Plaintiffs' Br. at 34-43.

In their briefing, Federal Defendants and Intervenors do not seriously contest most of these points. Instead, they try to distract the Court by setting up a series of straw men and proceeding to knock them down. *See* Fed. Br. at 32-43; Intervenors' Br. at 3-14. But none of those arguments refute the fact that FWS, by relying on unrealistic assumptions, unlawfully delisted the Great Lakes wolf population in the face of threats from disease, human predation, and inadequate regulatory mechanisms.

### A.     The Great Lakes Wolf Population Cannot Be Delisted Based On The Eastern Timber Wolf Recovery Plan.

Before addressing threats to the Great Lakes wolf population, it is necessary to clear up a misimpression left by Federal Defendants and Intervenors. In their briefs, they repeatedly cite the 1992 Recovery Plan for the Eastern Timber Wolf ("Recovery Plan") in trying to justify the Final Rule.[18] *See* Intervenors' Br. at 3-5; Fed. Br. at 12, 39; *see also* NWF Br. at 9. But their reliance is mistaken, because a delisting decision must be guided by an analysis of the Section 4(a)(1) threats, not by the mere satisfaction of a recovery plan's numerical goals. *See* 16 U.S.C. § 1533(a)(1); *Defenders of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 133 (D.D.C. 2001) ("[T]he same five statutory factors must be considered in delisting as in listing.") (quoting *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 111 (D.D.C. 1995)).

At times, Federal Defendants and Intervenors imply that satisfying the Recovery Plan's population goals can serve as a substitute for a proper Section 4(a)(1) analysis. But, unlike the

---

[18] The Recovery Plan established two population goals for the eastern timber wolf, which were (1) the retention of a Minnesota population of 1251-1400 wolves and (2) the establishment of a second population consisting of either 100 wolves, if located within 100 miles of the Minnesota population, or 200 wolves, if more than 100 miles from the Minnesota population. The target population for Minnesota (1251 wolves) was almost identical to the Minnesota wolf population at the time of the wolf's 1978 listing (1235 wolves). *Compare* 1992 Recovery Plan at 25-26, 28, AR Doc. 215 at 5902-03, 5905 *with* 72 Fed. Reg. at 6052-53.

statutorily required Section 4(a)(1) threats analysis, a recovery plan is just that – a plan. A species cannot be delisted "until the threats to the species as analyzed under section 4(a)(1) of the Act have been removed." 51 Fed. Reg. 19926, 19935 (June 3, 1986); *see also* 72 Fed. Reg. at 6066 (acknowledging that "achieving these criteria alone cannot result in a delisting").

Even *if* the Recovery Plan were relevant, FWS failed to meet all of its requirements. For example, the Recovery Plan states that "[p]rior to completing the delisting of the eastern timber wolf a detailed monitoring plan must be developed, . . . and funding sources for the monitoring must be identified." 1992 Recovery Plan at 26, AR Doc. 215 at 5903. FWS satisfied neither requirement before issuing the Final Rule.

### B. The Great Lakes Wolf Population Remains Threatened By Inadequate Regulatory Mechanisms, Disease, And Human Predation.

As explained in Plaintiffs' opening brief, FWS wrongly concluded that existing regulatory mechanisms are adequate to protect the wolf. The regulatory mechanisms are inadequate because, *inter alia*, (1) FWS improperly relied on a regulatory mechanism that did not yet exist, namely Michigan's *future* wolf management plan; (2) Michigan's remaining regulatory mechanisms were vague and non-mandatory; (3) the state management plans would permit nearly a 50% decline in the Great Lakes wolf population; and (4) despite FWS's assumption that the state plans would be "funded and implemented largely as written," the evidence indicates that these plans are underfunded. *See* Plaintiffs' Br. at 35-39. Though they devote many pages to these issues, Federal Defendants cannot refute these inconvenient facts.

First, Federal Defendants argue that the agency can consider future regulatory mechanisms because, by definition, any non-federal regulations would not "take effect until the delisting rule is finalized." Fed. Br. at 37 n.9. This glib argument, for which no support is offered, cannot be seriously credited. Courts have repeatedly held that only *existing* regulatory

mechanisms can be considered in listing decisions.  16 U.S.C. § 1533(a)(1)(D); *see, e.g.*, *Southwest Ctr. for Biological Diversity v. Babbitt*, 939 F. Supp. 49, 51 (D.D.C. 1996); *Biodiversity Legal Found. v. Babbitt*, 943 F. Supp. 23, 26 (D.D.C. 1996); *Fund for Animals*, 903 F. Supp at 111.[19]

Rather than acknowledge the Final Rule's dependence on future regulatory mechanisms, Federal Defendants alternatively argue that FWS "was relying on the 1997 [Michigan] Plan and not the pending revision."  Fed. Br. at 38; *see also* Intervenors' Br. at 9.  But Defendants are wrong: the Final Rule states that "both the current Michigan Plan, and *the revised plan . . .*, will provide adequate regulatory mechanisms for Michigan wolves."  72 Fed. Reg. at 6094 (emphasis added).  FWS therefore relied on this future plan even though it could not "evaluate the goals, strategies, or activities" of that plan.  *Id.*  And to the extent FWS relied on the current Michigan plan in delisting the wolf, its reliance merely underscores the arbitrariness of the Final Rule.  FWS predicted that the Michigan plan would be replaced within a year, yet the agency based its delisting decision on projections over the next 30 years.  72 Fed. Reg. at 6068, 6069, 6092.  Thus, the only plan whose "goals, strategies, or activities" FWS could assess would be defunct

---

[19] Intervenors concede that "the mechanisms assessed by the FWS must be in existence at the time of the delisting decision."  Intervenors' Br. at 7.  As to their argument that FWS can rely on voluntary measures, Plaintiffs direct this Court to *Oregon Natural Resources Defense Council v. Daley*, which noted that "[v]oluntary actions, like those planned in the future, are necessarily speculative," and held that "voluntary . . . conservation efforts by a state should be given no weight in the listing decision."  6 F. Supp. 2d 1139, 1155 (D. Or. 1998).  Even those courts that have considered voluntary measures warn against "excessive reliance on primarily voluntary plans."  *Fed'n of Fly Fishers v. Daley*, 131 F. Supp. 2d 1158, 1169 n.4 (N.D. Cal. 2000).  In any event, there is a wide gulf between a well-designed system of voluntary measures and the Michigan DNR's vague and conclusory assurances.

for almost all of the relevant time period.  The inescapable conclusion is that FWS was, in fact, relying on the future Michigan plan – a regulatory mechanism that does not exist.[20]

As for those regulatory mechanisms in actual existence, it remains undisputed that the state management plans would permit nearly a 50% decline in the Great Lakes wolf population. *Compare* 72 Fed. Reg. at 6053 *with* AR Doc. 215 at 5139, 5255; AR Doc. 468A at 13386.  Nor is there any question that Wisconsin authorizes "[p]roactive control" if the wolf population exceeds 350 wolves – a target population nearly a quarter smaller than the 2006 estimate.  1999 Wisconsin Wolf Management Plan at 21, AR Doc. 215 at 6001 ("Wisconsin Plan"); *cf.* 72 Fed. Reg. at 6053 (estimating 465 wolves in Wisconsin); *see also* AR Doc. 468A at 12840 (noting the likelihood of "more liberal controls to keep the population near 350 once federal delisting is completed").[21]  Federal Defendants suggest that any population decline would not be problematic because the population would remain above "recovered levels," i.e., the population goals of the 1992 Recovery Plan.  Fed. Br. at 39; Intervenors' Br. at 8-9.  But, as explained above in Part III.A, the satisfaction of these numerical goals cannot justify the wolf's delisting.

Federal Defendants also accuse Plaintiffs of "attempt[ing] to distort the facts" with respect to the Minnesota Plan's $150 bounty provided to state-certified predator controllers.

---

[20] Plaintiffs explained in their opening brief that FWS tried to plug this gap in Michigan's regulatory mechanisms by relying on bare assurances from the Michigan DNR and a non-mandatory set of "guiding principles" adopted by a citizens' roundtable.  Plaintiffs' Br. at 36 (citing 72 Fed. Reg. at 6092, 6093-94).  Though trying to magnify the importance of the document, Federal Defendants implicitly concede that these "guiding principles" are advisory only.  *See* Fed. Br. at 38.  As for the Michigan DNR's assurances, it is well settled that FWS may not rely on "promises of proposed future actions" in listing decisions.  *Southwest Ctr.*, 939 F. Supp. at 52.

[21] In their brief, Intervenors wrongly assert that a "wolf population in excess of 1,750 wolves has lived in Wisconsin for more than a decade," and that the Wisconsin population was estimated at

(continued on next page)

Fed. Br. at 40. But although Federal Defendants may dislike Plaintiffs' nomenclature,[22] it is undisputed that the Minnesota Plan creates a financial incentive to kill wolves. *See* Minnesota Plan at 23; AR Doc. 215 at 5276.

Federal Defendants similarly fail to establish that the state management plans are adequately funded. *Cf.* Plaintiffs' Br. at 37-39. Relying principally on the Declaration of Daniel Stark, they argue that the Minnesota Plan is being sufficiently funded. *See* Fed. Br. at 40; *see also* Intervenors' Br. at 10, 11-12. This *post hoc* declaration, which was prepared specifically for this litigation, is not part of the administrative record. *See* Docket No. 34, Ex. 1 (attached to Intervenors' opposition to Plaintiffs' Motion to Supplement). But should the Court consider the Stark Declaration, that document simply confirms that Minnesota's wolf plan is being underfunded. The Minnesota DNR projected that $695,000 annually would be necessary to implement the Minnesota Plan, including $495,000 for professional staff, population research and monitoring, enforcement, and education. *See* Minnesota Plan, Appx. II, AR Doc. 215 at 5292-93. But even when federal sources are considered, the Stark Declaration demonstrates that these activities are receiving only $354,000 annually – an annual shortfall of $141,000. *See* Stark Decl. ¶ 16. To be sure, the *total* amount of funding is greater than $695,000, but that is

---

(continued from previous page)

2445 wolves in 1998. Intervenors' Br. at 4. These references were apparently to the Minnesota wolf population.

[22] Federal Defendants claim that "Plaintiffs [*sic*] use of the word 'bounty' is crude." Fed. Br. at 40. Nothing could be further from the truth. A "bounty" is defined as "a reward, premium, or subsidy esp. when offered or given by a government," such as "a payment to encourage the destruction of noxious animals." Webster's Third New International Dictionary 260 (1981); *see also* Black's Law Dictionary 198 (8th ed. 2004) (defining bounty as a "premium or benefit offered or given, esp. by a government, to induce someone to take action or perform a service <a bounty for the killing of dangerous animals>"). Though the Minnesota Plan's bounty is more

(continued on next page)

because depredation control programs are receiving twice the amount deemed necessary by the

Minnesota Plan. *Id.* ¶ 15; *cf.* AR Doc. 215 at 5293. So although there seems to be plenty of

money for wolf *control*, there is not enough for wolf protection and monitoring.[23]

      Plaintiffs' opening brief also cited evidence indicating that the Michigan and Wisconsin

wolf programs are inadequately funded and implemented. *See* Plaintiffs' Br. at 38-39. Neither

Federal Defendants nor Intervenors have offered any contrary evidence. The only "evidence"

Federal Defendants muster is a discussion of funding in the Wisconsin Plan Addendum. Fed. Br.

at 41. But that document does not contain any firm commitments for funding, and Federal

Defendants have identified no evidence that Michigan's wolf program is adequately funded.[24]

      Intervenors criticize Plaintiffs for "offer[ing] no evidence" about the funding shortfall in

these states. Intervenors' Br. at 11-12. But Plaintiffs cannot provide more funding-related

evidence because there is none in the administrative record. Indeed, though Plaintiffs

specifically raised this issue in their comments on the Proposed Rule, *see* AR Doc. 228 at 7785-

87, FWS chose not to confront it, instead blithely assuming that the state wolf management

"plans will be funded and implemented largely as written." 72 Fed. Reg. at 6068. Here, where

there is no evidence that the plans are adequately funded, and where the only available evidence

---

(continued from previous page)

closely regulated than those predating the gray wolf's 1978 listing, the Plan unquestionably
subsidizes the killing of depredating wolves, and therefore falls squarely within these definitions.

[23] Federal Defendants point to several pages of the Minnesota Plan in an effort to bolster their
claim that this plan is being adequately funded. *See* Fed. Br. at 41. But the fact that the
Minnesota DNR is cooperating with federal agencies does not address the issue of funding.

[24] The Michigan DNR, an *amicus curiae* to this action, recently filed a motion to supplement the
administrative record. *See* Docket No. 48 (Jan. 24, 2008). Plaintiffs oppose this motion and
urge the Court to disregard all references to the proffered document included in the DNR's
*amicus* brief. *See* Docket No. 51 (Feb. 1, 2008). It is worth briefly noting, however, that

(continued on next page)

suggests the contrary, FWS's heavy reliance on the state plans for its "assessment of the degree

of protection and monitoring that will occur after Federal delisting" was arbitrary and capricious.

*Id.*; *see Motor Vehicle Mfrs.*, 463 U.S. at 43 (an agency may not "offer[] an explanation for its

decision that runs counter to the evidence before the agency"); *Cape Hatteras Access Pres.

Alliance v. U.S. Dep't of the Interior*, 344 F. Supp. 2d 108, 133 (D.D.C. 2004) (overturning

agency's conclusion where it "has no connection to the facts found").

   In addition to the inadequacy of existing regulatory mechanisms, Plaintiffs' opening brief

explained how the Great Lakes wolf population is threatened by human-caused mortality and

disease. *See* Plaintiffs' Br. at 39-41. For example, Plaintiffs pointed to FWS's belief that the

"increased enforcement" of Minnesota's wolf laws "will be crucial in ensuring that illegal

mortality does not significantly increase following Federal delisting," and contrasted that with

the agency's concession that this "increased enforcement . . . would be dependent on increases in

staff and resources," among other contingencies. 72 Fed. Reg. at 6086. By moving forward with

delisting before these contingencies had been resolved, FWS improperly relied on a regulatory

measure that did not yet exist. *See Southwest Ctr.*, 939 F. Supp. at 51.

   Federal Defendants fail to address FWS's reliance on such future, speculative measures.

Instead, they accuse Plaintiffs of "assuming that there will be rampant violations of law," and

argue that FWS "was surely rational in assuming that the citizens of the Great Lakes States will

generally abide by the law." Fed. Br. at 36. Defendants' sarcasm aside, the mere existence of

state wildlife laws, and the fact that a handful of violations have been prosecuted, *id.* at 36-37,

---

(continued from previous page)

although this document is replete with *post hoc* justifications, none of them demonstrate that
Michigan's regulatory mechanisms are adequate.

does not negate the fact that FWS delisted the wolf before this "increased enforcement" of Minnesota's laws had been assured.  72 Fed. Reg. at 6086.  Moreover, as the history of the gray wolf attests, simply having a law on the books provides no guarantee that it will be followed. The agency recognized the seriousness of illegal killings when it listed the gray wolf in 1978.  43 Fed. Reg. at 9611 ("Illegal killing is a problem in Minnesota and other areas where the wolf still occurs.").  And even as it moved to delist the wolf last year, FWS acknowledged that this threat remains.  *See* 72 Fed. Reg. at 6081-82 (noting that "illegal killing of wolves has continued," and that "[i]t is likely that most illegal killings . . . are intentional").[25]

Finally, despite Federal Defendants' protests, the Great Lakes wolf population is still imperiled by the lack of adequate disease monitoring.  Not only are many provisions in the Minnesota Plan overly vague, *see* Minnesota Plan at 19-20, AR Doc. 215 at 5272-73, but FWS's assumption that the monitoring components of the state management programs would be fully implemented "runs counter to the evidence before the agency."  *Motor Vehicle Mfrs.*, 463 U.S. at 43.  There is thus a serious risk that the gray wolf could suffer "a significant decline in overall population viability" before it is ever detected by the states.  72 Fed. Reg. at 6081.  By failing to acknowledge the risks posed by disease and predation, and neglecting to recognize the inadequacies of state management and monitoring, the Final Rule's Section 4(a)(1) threats analysis is arbitrary and capricious.

---

[25] Citing a USDA official's comments, Federal Defendants further suggest that "state wolf control activities will likely increase public tolerance for wolves."  Fed. Br. at 37.  This Court rejected a similar unsupported "public tolerance" argument in overturning FWS's issuance of permits that allowed the Wisconsin DNR to take endangered wolves.  *Humane Soc'y of the United States v. Kempthorne*, 481 F. Supp. 2d 53, 71-72 (D.D.C. 2006) (noting that "[t]here is no support for the idea that Congress intended the FWS to cater to criminal behavior and cotton to social intolerance as a strategy for endangered species recovery") (citation omitted).

### C.    FWS Lacks Any Measures For Post-Delisting Monitoring.

Section 4(g)(1) of the ESA requires FWS to "monitor effectively" newly delisted species

for a minimum of five years.  16 U.S.C. § 1533(g)(1).  In their opening brief, Plaintiffs discussed

how FWS had improperly outsourced this statutory obligation to the very state wolf management

programs whose adequacy Plaintiffs contest.  Plaintiffs' Br. at 42-43.  Though disputing

Plaintiffs' characterization, Federal Defendants acknowledge that FWS is developing a system

"that primarily utilizes state-collected data."  Fed. Br. at 43.  Given the serious concerns

disclosed in the record about funding and implementation of the state wolf management plans,

FWS's dependence upon the states to "implement a system" of effective monitoring was

unreasonable.  *Cf.* 16 U.S.C. § 1533(g)(1).

Federal Defendants suggest that the agency's failure to issue a post-delisting monitoring

plan contemporaneously with the Final Rule is of no consequence because such a plan is in effect

now.  But the "clear, affirmative commitment" on which Defendants rely is a *draft* plan; no final

plan has been published.  And even the Recovery Plan, on which Federal Defendants so heavily

rely, called for a post-delisting monitoring plan to be in place before delisting.  *See* Recovery

Plan at 26, AR Doc. 215 at 5903 ("Prior to completing the delisting of the eastern timber wolf a

detailed monitoring plan must be developed . . . .").  One year after delisting the wolf, FWS

remains in violation of Section 4(g)(1) because it still has not implemented an effective post-

delisting monitoring program.

### D.    Vacatur Is The Only Appropriate Remedy.

If this Court finds the Final Rule unlawful, the Rule should be vacated.  *Cf.* Intervenors'

Br. at 38-41 (requesting a remand without vacatur).  As Intervenors implicitly recognize, the

presumptive remedy for ESA violations is to set aside the flawed regulation.  *See Defenders*

*(wolf)*, 354 F. Supp. 2d at 1174 (enjoining and vacating the 2003 Downlisting Rule); *Nat'l*

32

*Wildlife Fed'n*, 386 F. Supp. 2d at 568 (vacating 2003 Downlisting Rule). Issuing a remedy that maximizes species protection is crucial in the ESA context because of the Act's "strong policy preference for protecting endangered species even when such protection may result in adverse economic consequences." *Endangered Species Committee of the Bldg. Indus. Ass'n v. Babbitt*, 852 F. Supp. 32, 42 (D.D.C. 1994) (retaining ESA protections during remand to avoid harm to a sensitive species); *see also NRDC v. U.S. Dep't of the Interior*, 275 F. Supp. 2d 1136, 1145 (C.D. Cal. 2002) (explaining that the inquiry into whether a flawed rule should be vacated "turns on the foreseeable risk of harm" to the species).

Intervenors argue that vacatur is unnecessary because the Final Rule can easily be cured. But, as Plaintiffs detailed above, the Final Rule violates the ESA on numerous grounds, and correcting those violations will require a fundamentally different approach. There is no reason to think that the deficiencies of the Final Rule can be easily cured. Moreover, Intervenors' "disruption" argument underscores the need for vacatur. They urge the Court not to vacate the Final Rule because "hunters and outdoor enthusiasts" need "flexibility to protect their dogs or other property from depredation by wolves." Intervenors' Br. at 38, 41. In other words, Intervenors wish to retain the right to kill wolves. And that consequence – the continued killing of an endangered species – causes irreparable harm, which is precisely why vacatur is necessary here. *See Defenders (wolf)*, 354 F. Supp. 2d at 1174 (issuing an injunction against the 2003 Downlisting Rule because the "death or injury of endangered wolves . . . is irreparable injury"); *Humane Soc'y of the United States*, 481 F. Supp. 2d at 69-70.

## IV.    PLAINTIFFS HAVE STANDING TO BRING THIS ACTION.

Though not seriously contesting the issue, Federal Defendants and Intervenors question Plaintiffs' standing. *See* Fed. Br. at 13 n.3; Intervenors' Br. at 2-3. Their concerns are unwarranted.

To establish standing under the ESA, a plaintiff need only demonstrate that it satisfies the requirements of Article III standing. *See Am. Soc'y for the Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus*, 317 F.3d 334, 336 (D.C. Cir. 2003) (noting that the ESA's citizen suit provision "eliminates any prudential standing requirement"). Plaintiffs easily meet those standards. First, each of the Plaintiffs has suffered an "injury in fact." *See Bennett v. Spear*, 520 U.S. 154, 167 (1997). As demonstrated by the declarations filed concurrently with this brief, at least one member of each of the Plaintiff groups has been injured by FWS's delisting of the Great Lakes wolf population. *See* Declaration of Karlyn Berg; Declaration of Linda Hatfield; Declaration of Tom Herschelman; Declaration of Jodi Louth; Declaration of Robert Waligora.

These declarants have aesthetic, recreational, scientific, and educational interests in the Great Lakes wolf population and a strong interest in maintaining ESA protections for the wolf. Such interests suffice for Article III standing. *See, e.g.*, *Ringling Bros.*, 317 F.3d at 336 (noting that "harm to one's aesthetic interests in viewing animals may be a sufficient injury in fact"); *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 n.4 (1986) (finding that the plaintiffs had "undoubtedly … alleged a sufficient 'injury in fact' in that the whale watching and studying of their members will be adversely affected by continued whale harvesting"). Each of the declarants has also visited areas of Minnesota, Wisconsin, or Michigan within the wolf's current range and plans to continue doing so in the near future. *See Defenders of Wildlife v. Norton*, 257 F. Supp. 2d 53, 63 (D.D.C. 2003) ("*Defenders (Colorado River)*") (finding injury in fact where members of plaintiff groups "state that they have visited the region repeatedly and aver that they will be returning there within a period of months or a few years").

FWS's decision to remove ESA protections, thereby allowing wolves to be lethally taken in Michigan and Wisconsin and expanding the circumstances under which Minnesota wolves can be killed, 72 Fed. Reg. at 6087, creates a legal injury that is both "concrete and particularized" and "actual or imminent." *Bennett*, 520 U.S. at 167; *see also Defenders (wolf)*, 354 F. Supp. 2d at 1162-63 (finding that Plaintiffs had standing to challenge the 2003 Downlisting Rule); *Defenders of Wildlife v. Kempthorne*, Civ. No. 04-1230 (GK), 2006 WL 2844232, at *10-11 (D.D.C. Sept. 29, 2006) (holding that FWS's classification of the Canada lynx as threatened rather than endangered established standing because the decision "excludes the species from the full range of mandatory ESA protections" and expands circumstances in which lynx can be taken).

In addition to the harm caused by the increased killing of, and reduced protection for, individual wolves, the declarants are injured by the imminent decline in the Great Lakes wolf population. Even accepting (for the sake of argument) FWS's overly optimistic assumptions about the future of the Great Lakes wolves, the Final Rule contemplates that wolf populations will decline in parts of the western Great Lakes DPS. *See, e.g.*, 72 Fed. Reg. at 6087 (noting that the 450 wolves in Minnesota's Zone B "could be subject to substantial reduction in numbers"); 1999 Wisconsin Wolf Management Plan at 21, AR Doc. 215 at 6001 (authorizing proactive control where the wolf population exceeds 350 animals). The reduced opportunities for gray wolf observation and study that will result from these population declines is a legally cognizable injury. *Defenders (Colorado River)*, 257 F. Supp. 2d at 63. Finally, because at least one

member of each Plaintiff group has been injured, Plaintiffs themselves satisfy the injury in fact

requirement. *Id.* at 62.[26]

Plaintiffs similarly satisfy the causation and redressability prongs of Article III standing.

Because Plaintiffs' injuries stem from the consequences of delisting the Great Lakes wolf, their

injuries are "fairly traceable" to the Final Rule. *Bennett*, 520 U.S. at 167. And because a

favorable decision from this Court, vacating the Final Rule, would restore the ESA's protections

to the Great Lakes wolf population, Plaintiffs likewise satisfy the redressability prong. *Id.*

Plaintiffs therefore have standing to bring this action.

## CONCLUSION

In 1978, recognizing the extirpation of the wolf across its historic range, FWS listed the

gray wolf in the conterminous United States. 43 Fed. Reg. 9607. Since that time, progress

towards recovery has been made, but the wolf remains extirpated throughout a vast majority of

its range, and existing wolf populations face continuing threats. FWS cannot legally remove the

Act's protections from the wolf without first conducting a Section 4(a)(1) threats analysis across

the species' range and then explaining why the unoccupied portions of the range are not

"significant." If not forced to go through this process, the agency will effectively delist the gray

wolf without ever explaining why 95% of the wolf's historic range, including large swaths of

---

[26] The Plaintiff groups likewise meet the remaining requirements for organizational standing. *See Defenders (Colorado River)*, 257 F. Supp. 2d at 62. First, each of the four groups is suing to protect the gray wolf, which is a goal that is vital to each of these organizations' purposes. *See* Berg Decl. ¶¶ 3, 5 (describing goals and activities of The Humane Society of the United States and Animal Protection Institute); Hatfield Decl. ¶¶ 3-5 (describing purposes and activities of Help Our Wolves Live); Waligora Decl. ¶ 2 (describing goals and activities of Friends of Animals and Their Environment). Second, Plaintiffs' claims, and the remedies they seek, do not require the involvement of individual members. *See* Plaintiffs' First Amended Complaint at 30-34 (describing claim and request for relief).

prime wolf habitat in the Northeast, Pacific Northwest, and elsewhere, are not a significant portion of its range.

Rather than spend its energy on creative – but unlawful – schemes to prematurely delist the wolf, FWS should focus its efforts on recovering wolves in the unoccupied portions of their range, and ensuring that existing wolf populations are adequately protected. Until the gray wolf has recovered across a significant portion of its range, and the Section 4(a)(1) threats ameliorated, the wolf should remain protected. By affording species "the highest of priorities," *TVA*, 437 U.S. at 174, the ESA requires no less. Because FWS has prematurely delisted the wolf, the Final Rule should be set aside.

Dated: February 15, 2008                    Respectfully submitted,


                                            /s/  Michael C. Soules & Rebecca G. Judd
                                            Rebecca G. Judd, D.C. Bar No. 486315
                                            rjudd@hsus.org
                                            Jonathan R. Lovvorn, D.C. Bar No. 461163
                                            jlovvorn@hsus.org
                                            The Humane Society of the United States
                                            2100 L Street, NW
                                            Washington, DC  20037
                                            (202) 452-1100
                                            (202) 778-6132 (facsimile)

                                            Brian B. O'Neill, Minn. Bar No. 82521
                                            boneill@faegre.com
                                            Sanne H. Knudsen, Minn. Bar No. 0344552
                                            sknudsen@faegre.com
                                            Michael C. Soules, D.C. Bar No. 477911
                                            msoules@faegre.com
                                            FAEGRE & BENSON LLP
                                            2200 Wells Fargo Center
                                            90 South Seventh Street
                                            Minneapolis, MN  55402-3901
                                            (612) 766-7000
                                            (612) 766-1600 (facsimile)

                                            *Attorneys for Plaintiffs*

fb.us.2562392.11

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| The Humane Society of the United States; | ) |
| Help Our Wolves Live ("HOWL"); Animal | ) |
| Protection Institute; and Friends of Animals | ) |
| and Their Environment, | ) |
| | ) |
|                Plaintiffs, | ) |
| | ) |
|     v. | ) |
| | ) |
| Dirk Kempthorne, Secretary of the Interior; | ) |
| United States Department of the Interior; and | ) |
| United States Fish and Wildlife Service, | ) |
| | ) |
|               Defendants, | ) |
| | ) |
| U.S. Sportsmen's Alliance Foundation, | ) |
| Wisconsin Bear Hunters Association, *et al.*, | ) |
| | ) |
|               Intervenor- | ) |
| Defendants, | ) |
| | ) |
| Safari Club International, National Rifle | ) |
| Association, *et al.*, | ) |
| | ) |
|               Intervenor- | ) |
| Defendants. | ) |

Civil No. 1:07-cv-00677-PLF

<u>**CERTIFICATE OF SERVICE**</u>

       I hereby certify that on this 15th day of February, 2008, I caused to be served by first class mail (1) Plaintiffs' Memorandum in Opposition to Defendants' Cross-Motions for Summary Judgment and Reply Memorandum in Support of Plaintiffs' Motion for Summary Judgment; (2) accompanying declarations; (3) Plaintiffs' Response to Defendants' Statements of Facts, and (4) a proposed order, on the following:

M. Carol Bambery
ASSOCIATION OF FISH & WILDLIFE
AGENCIES
444 North Capitol Street, NW
Suite 725
Washington, DC 20001

J. Anthony Logan
OHIO DEPARTMENT OF
  NATURAL RESOURCES
2045 Morse Road, D-3
Columbus, OH 43229

Tracy E. McGinnis
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 180
Jefferson, MO 65102-0180

David W. Merchant
OFFICE OF THE ATTORNEY GENERAL
FOR THE STATE OF MINNESOTA
445 Minnesota Street
100 Bremer Tower
Saint Paul, MN 55101

Paul Morrison
OFFICE OF THE ATTORNEY GENERAL
120 SW 10th Street
Memorial Hall, Second Floor
Topeka, KS 66612

Morgain M. Sprague
KENTUCKY DEPARTMENT OF FISH &
WILDLIFE RESOURCES
#1 Sportsman's Lane
Frankfurt, KY 40601

Wayne K. Stenehjem
OFFICE OF THE ATTORNEY
GENERAL
600 East Boulevard Avenue
Department 25
Bismarck, ND  58505-0040

J. B. VanHollen
OFFICE OF THE ATTORNEY GENERAL
17 West Main Street
Madison, WI 53703

/s/ Michael C. Soules
Michael C. Soules
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-3901
(612) 766-7000

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| The Humane Society of the United States; Help Our Wolves Live ("HOWL"); Animal Protection Institute; and Friends of Animals and Their Environment, | ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) | Civil No. 1:07-cv-00677-PLF |
| v. | ) ) |  |
| Dirk Kempthorne, Secretary of the Interior; United States Department of the Interior; and United States Fish and Wildlife Service, | ) ) ) ) |  |
| Defendants, | ) ) |  |
| U.S. Sportsmen's Alliance Foundation, Wisconsin Bear Hunters Association, *et al.*, | ) ) ) |  |
| Intervenor-Defendants, | ) ) |  |
| Safari Club International, National Rifle Association, *et al.*, | ) ) ) |  |
| Intervenor-Defendants. | ) ) |  |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENTS OF MATERIAL FACTS

Pursuant to LCvR 7(h) and 56.1, Plaintiffs submit the following responses to the

statements of material facts submitted by Federal Defendants and Intervenors.  For ease of

reference, Plaintiffs' responses correspond to the paragraph numbers of each Defendants'

statement.

## I.    PLAINTIFFS' RESPONSE TO FEDERAL DEFENDANTS' STATEMENT OF FACTS

1.    Statement not disputed.

2.     Statement not disputed.  Plaintiffs do not dispute that the gray wolf was extirpated from the "vast majority" of its range in the conterminous United States, but clarify that at the time of the Endangered Species Act's ("ESA") passage, the gray wolf had been reduced to 1% of its historic range.  *Sierra Club v. Clark*, 577 F. Supp. 783, 785 (D. Minn. 1984), *rev'd in part*, 755 F.2d 608 (8th Cir. 1985) (noting that "[t]he Eastern Timber Wolf . . . now occupies only 1 percent of its original range"); AR Doc. 228 at 7869 (stating that by the 1950s the gray wolf "occup[ied] less than 1% of the species historic range").

3.     Statement partially disputed.  Though precise figures are unavailable, the number of gray wolves in Minnesota likely exceeded "several hundred" at the time of the ESA's passage. The Minnesota wolf population was fewer than 1000 in the early 1970s, and in 1973 was estimated to be between 500 and 1000.  Plaintiffs' First Amended Complaint for Declaratory and Injunctive Relief ¶ 54 ("Amended Complaint"); Federal Defendants' Answer ¶ 54 ("Answer"); 72 Fed. Reg. at 6053.

4.     Statement not disputed.

5.     Statement not disputed.

6.     Statement not disputed.

7.     Statement not disputed.

8.     Statement not disputed.

9.     Statement not disputed.

10.     Statement disputed.  The 1992 Recovery Plan for the Eastern Timber Wolf ("1992 Recovery Plan") speaks for itself and provides the best evidence of its contents, and any allegations contrary to its plain language and meaning are disputed.  Plaintiffs dispute that the 1992 Recovery Plan pertains to the gray wolf species.  The 1992 Recovery Plan focuses on the

eastern timber wolf (*Canis lupus lycaon*), a subspecies that lost legal recognition when the FWS

listed the gray wolf at the species level in 1978. *See generally* AR Doc. 215 at 5877. Plaintiffs

also dispute the notion that the "wolves at issue in this case" are limited to those within the Great

Lakes region or the eastern United States. As Plaintiffs have described in their briefs, the U.S.

Fish and Wildlife Service's ("FWS") piecemeal delisting strategy has implications for the gray

wolf throughout the conterminous United States.

11.    Statement disputed. The 1992 Recovery Plan speaks for itself and provides the

best evidence of its contents, and any allegations contrary to its plain language and meaning are

disputed. Plaintiffs also aver that in addition to setting forth various numerical goals, AR Doc.

215 at 5905, the 1992 Recovery Plan contains other requirements, including a mandate that

"[p]rior to completing the delisting of the eastern timber wolf a detailed monitoring plan must be

developed, . . . and funding sources for the monitoring must be identified." 1992 Recovery Plan

at 26, AR Doc. 215 at 5903. Plaintiffs further aver that the "primary objective of the Recovery

Plan is to maintain and reestablish viable populations of the eastern timber wolf in an much of its

former range as is feasible." 1992 Recovery Plan at 24, AR Doc. 215 at 5901. Consistent with

that primary objective, the 1992 Recovery Plan calls for the reestablishment of wolf populations

in the Adirondack Mountains, northwestern Maine/adjacent New Hampshire, and/or northeastern

Maine. *Id.* at 35, AR Doc. 215 at 5912.

12.    Statement disputed. The 1998 document referenced by Federal Defendants

speaks for itself and provides the best evidence of its contents, and any allegations contrary to its

plain language and meaning are disputed.

13.    Statement partially disputed. Plaintiffs do not dispute that, at the time the Final

Rule was issued, the Great Lakes wolf population was larger than the population goals set forth

on page 28 of the 1992 Recovery Plan. 1992 Recovery Plan at 28, AR Doc. 215 at 5905.

Plaintiffs dispute that this population "far exceed[s]" those goals. Plaintiffs dispute Federal

Defendants' characterization of Administrative Record Documents ("AR Doc.") 77, 251, and

318, which speak for themselves and provide the best evidence of their contents, and any

allegations contrary to their plain language and meaning are disputed. Plaintiffs also dispute

Federal Defendants' characterization of a judicial decision, which speaks for itself and provides

the best evidence of its contents, and any allegations contrary to its plain language and meaning

are disputed.

14.    Statement partially disputed. Plaintiffs dispute the allegation that the number of

gray wolves in Minnesota in 1974 numbered "a few hundred." In 1974, the Minnesota wolf

population was likely close to 1000. 72 Fed. Reg. at 6053. Plaintiffs do not dispute that the

2003-2004 estimated wolf population in Minnesota was approximately 3000 wolves, *id.* at 6054,

but lack sufficient knowledge to respond to Federal Defendants' characterization of the current

wolf population and therefore dispute it. Plaintiffs do not dispute that the occupied wolf range in

Minnesota has increased from an estimated 14,769 square miles in 1970 to 33,971 square miles

in 1997-98.

15.    Statement not disputed.

16.    Statement not disputed.

17.    Statement not disputed.

18.    Statement partially disputed. Plaintiffs dispute Federal Defendants' assertion that

the Final Rule left "the remainder of the wolf's range listed as endangered." Plaintiffs aver that

FWS's piecemeal delisting strategy removes ESA protections from nearly every gray wolf in the

conterminous United States, and that the non-DPS remnant listing is meaningless. Plaintiffs

further aver that FWS has proposed delisting the depopulated portions of the gray wolf's range on the grounds of extinction.  AR Doc. 35 at 156, 159; AR Doc. 48 at 195, 204.

19.     Statement disputed.  Plaintiffs dispute Federal Defendants' characterization of various comments on the Proposed Rule, which speak for themselves and provide the best evidence of their contents, and any allegations contrary to their plain language and meaning are disputed.  Plaintiffs lack sufficient knowledge to respond to Federal Defendants' characterization of the peer reviewers' depth of experience and therefore dispute it.

20.     Statement disputed.  Plaintiffs dispute Federal Defendants' characterization of various comments on the Proposed Rule, which speak for themselves and provide the best evidence of their contents, and any allegations contrary to their plain language and meaning are disputed.

21.     Statement not disputed.

22.     Statement disputed.  Although the Final Rule contains *some* of FWS's "reasons and [] rationale" for delisting the Great Lakes wolf population, there are other reasons for the Final Rule that were not disclosed in the Final Rule.  A more complete understanding of the rationale behind the Final Rule can be found in various documents in the administrative record, such as AR Doc. 35.  There are likely additional reasons motivating FWS's actions that cannot be discerned because they were not put down on paper, or because they are contained in decisional documents that were withheld based on privilege.  *See* Docket No. 23, Ex. 1 (Federal Defendants' amended privilege log).

## II.    PLAINTIFFS' RESPONSE TO INTERVENORS' STATEMENT OF FACTS

1.      Statement disputed.  The 1978 Recovery Plan for the Eastern Timber Wolf ("1978 Recovery Plan") and the 1992 Recovery Plan speak for themselves and provide the best evidence of their contents, and any allegations contrary to their plain language and meaning are disputed. Plaintiffs dispute that either the 1978 or 1992 Recovery Plan identified only two requirements that must be met in order to delist wolves.

2.      Statement disputed.  The 1978 Recovery Plan and the 1992 Recovery Plan speak for themselves and provide the best evidence of their contents, and any allegations contrary to their plain language and meaning are disputed.

3.      Statement disputed.  The 1978 Recovery Plan and the 1992 Recovery Plan speak for themselves and provide the best evidence of their contents, and any allegations contrary to their plain language and meaning are disputed.  Plaintiffs aver that the 1992 Recovery Plan established a population goal of 1251-1400 wolves for Minnesota.  1992 Recovery Plan at 28, AR Doc. 215 at 5905.

4.      Statement disputed.  The 1978 Recovery Plan and the 1992 Recovery Plan speak for themselves and provide the best evidence of their contents, and any allegations contrary to their plain language and meaning are disputed.

5.      Statement disputed.  The 1978 Recovery Plan and the 1992 Recovery Plan speak for themselves and provide the best evidence of their contents, and any allegations contrary to their plain language and meaning are disputed.

6.      Statement disputed.  The 1978 Recovery Plan and the 1992 Recovery Plan speak for themselves and provide the best evidence of their contents, and any allegations contrary to their plain language and meaning are disputed.

7.    Statement disputed.  The 1978 Recovery Plan and the 1992 Recovery Plan speak for themselves and provide the best evidence of their contents, and any allegations contrary to their plain language and meaning are disputed.

8.    Statement disputed.  The 1998 document referenced by Intervenors speaks for itself and provides the best evidence of its contents, and any allegations contrary to its plain language and meaning are disputed.

9.    Statement disputed.  The 1978 Recovery Plan and the 1992 Recovery Plan speak for themselves and provide the best evidence of their contents, and any allegations contrary to their plain language and meaning are disputed.

10.    Statement disputed.  The 1978 Recovery Plan and the 1992 Recovery Plan speak for themselves and provide the best evidence of their contents, and any allegations contrary to their plain language and meaning are disputed.  Plaintiffs aver that the 1978 Recovery Plan and 1992 Recovery Plan pertain to the eastern timber wolf, not the gray wolf.  Plaintiffs further aver that the "primary objective of the Recovery Plan is to maintain and reestablish viable populations of the eastern timber wolf in an much of its former range as is feasible."  1992 Recovery Plan at 24, AR Doc. 215 at 5901.  Consistent with that primary objective, the 1992 Recovery Plan calls for the reestablishment of wolf populations in the Adirondack Mountains, northwestern Maine/adjacent New Hampshire, and/or northeastern Maine.  *Id.* at 35, AR Doc. 215 at 5912.

11.    Statement not disputed.

12.    Statement not disputed.

13.    Statement not disputed.

14.    Statement not disputed.

15.     Statement not disputed, though Plaintiffs note that the Minnesota Department of Natural Resources ("DNR") concluded that there was no statistically significant change in the state's wolf population between 1997-98 and 2003-04.  72 Fed. Reg. at 6054.

16.     Statement disputed.  The 1978 Recovery Plan and the 1992 Recovery Plan speak for themselves and provide the best evidence of their contents, and any allegations contrary to their plain language and meaning are disputed.  Plaintiffs aver that the 1992 Recovery Plan established a population goal of 1251-1400 wolves for Minnesota.  1992 Recovery Plan at 28, AR Doc. 215 at 5905.

17.     Statement disputed.  A 1970 questionnaire estimated that the occupied wolf range in Minnesota was approximately 14,769 square miles.  72 Fed. Reg. at 6054.

18.     Statement not disputed.

19.     Statement not disputed.

20.     Statement disputed.  Plaintiffs dispute that the survival of the gray wolf in Minnesota is assured merely because the wolf population and occupied wolf range have increased since the 1970s.  Plaintiffs also dispute Intervenors' characterization of a criterion in the 1978 Recovery Plan and the 1992 Recovery Plan, which speak for themselves and provide the best evidence of their contents, and any allegations contrary to their plain language and meaning are disputed.

21.     Statement not disputed.

22.     Statement not disputed.

23.     Statement partially disputed.  Plaintiffs do not dispute that by 2002 the Wisconsin DNR had estimated a population in excess of 100 of wolves for six consecutive years.  Plaintiffs dispute Intervenors' characterization of a criterion in the 1978 Recovery Plan and the 1992

Recovery Plan, which speak for themselves and provide the best evidence of their contents, and any allegations contrary to their plain language and meaning are disputed. Plaintiffs lack sufficient knowledge to respond to Intervenors' characterization of the current wolf population in Wisconsin and therefore dispute it.

24.      Statement disputed. The source cited by Intervenors does not state that the Wisconsin wolf population is less than 100 miles from the Minnesota wolf population.

25.      Statement partially disputed. Plaintiffs do not dispute that by 2004 the Wisconsin DNR had estimated a population in excess of 200 of wolves for six consecutive years. Plaintiffs dispute Intervenors' characterization of a criterion in the 1978 Recovery Plan and the 1992 Recovery Plan, which speak for themselves and provide the best evidence of their contents, and any allegations contrary to their plain language and meaning are disputed. Plaintiffs also dispute any characterization of Wisconsin wolf numbers since 2005-06.

26.      Statement disputed. Plaintiffs dispute Intervenors' characterization of a criterion in the 1978 Recovery Plan and the 1992 Recovery Plan, which speak for themselves and provide the best evidence of their contents, and any allegations contrary to their plain language and meaning are disputed.

27.      Statement not disputed.

28.      Statement not disputed.

29.      Statement disputed. Plaintiffs dispute Intervenors' characterization of a criterion in the 1978 Recovery Plan and the 1992 Recovery Plan, which speak for themselves and provide the best evidence of their contents, and any allegations contrary to their plain language and meaning are disputed.

30.     Statement disputed.  The 1978 Recovery Plan, 1992 Recovery Plan, and AR Doc. 105 speak for themselves and provide the best evidence of their contents, and any allegations contrary to their plain language and meaning are disputed.  Plaintiffs aver that the description in the 1992 Recovery Plan was not attempting to establish a uniform standard for the amount of habitat necessary to support a viable isolated wolf population.  1992 Recovery Plan at 25-26, AR Doc. 215 at 5902-03.

31.     Statement partially disputed.  Although Plaintiffs do not dispute that a wolf population is "isolated" if it has no interactions with other wolves, Plaintiffs dispute the implication that a wolf population must be near another wolf population for it not to be isolated. Wolves frequently disperse long distances, and these dispersal patterns help gray wolves maintain genetic diversity and reoccupy portions of their historic range from which they were previously eradicated.  71 Fed. Reg. 15266, 15267 (Mar. 27, 2006).

32.     Statement disputed.  The 1978 Recovery Plan, 1992 Recovery Plan, and AR Doc. 105 speak for themselves and provide the best evidence of their contents, and any allegations contrary to their plain language and meaning are disputed.  Plaintiffs aver that the 1992 Recovery Plan was not attempting to establish a uniform standard for the amount of habitat necessary to support a viable wolf population that is replenished by immigration.  1992 Recovery Plan at 26, AR Doc. 215 at 5903.

33.     Statement disputed.  There is no scientific consensus on the road density necessary for suitable wolf habitat, and there is some evidence that wolves can survive at higher road densities.  *See* AR Doc. 228 at 7724-29.

34.     Statement disputed.  Wolves are habitat generalists, and can live almost anywhere with a sufficient ungulate population, so long as they are not being persecuted by humans.  *See*

Plaintiffs' Statement of Material Facts Not in Dispute ("Plaintiffs' Statement") ¶ 1; Federal

Defendants' Response to Plaintiffs' Statement of Material Facts ("Federal Defendants'

Response") ¶ 1.

35.    Statement disputed.  Intervenors extrapolate this statement from a speculative

comment in the Final Rule.  Neither the comment in the Final Rule, nor Intervenors' overbroad

extrapolation from it, are supported by any evidence.

36.    Statement not disputed.

37.    Statement disputed.  The Gehring/Potter analysis cited by Intervenors speaks for

itself and provides the best evidence of its contents, and any allegations contrary to its plain

language and meaning is disputed.

38.    Statement disputed.  The Gehring/Potter analysis cited by Intervenors speaks for

itself and provides the best evidence of its contents, and any allegations contrary to its plain

language and meaning is disputed.

39.    Statement disputed.  The Potvin analysis cited by Intervenors speaks for itself and

provides the best evidence of its contents, and any allegations contrary to its plain language and

meaning is disputed.

40.    Statement disputed.  The Gehring/Potter analysis, Potvin analysis, 1978 Recovery

Plan, and 1992 Recovery Plan speak for themselves and provide the best evidence of their

contents, and any allegations contrary to their plain language and meaning are disputed.

Plaintiffs aver that the 1992 Recovery Plan was not attempting to establish a "threshold" for the

amount of habitat necessary to support a viable wolf population that is replenished by

immigration.  *See* 1992 Recovery Plan at 26, AR Doc. 215 at 5903.

41.     Statement disputed.  The Gehring/Potter and Potvin analyses speak for themselves and provide the best evidence of their contents, and any allegations contrary to their plain language and meaning are disputed.  Plaintiffs further note that Dr. Gehring has questioned the population estimate in his study, stating that "[t]hese estimates are likely very low considering that wolves in Wisconsin have already grown above the estimates provided by the same model." AR Doc. 228 at 7427.

42.     Statement disputed.  The Gehring/Potter analysis cited by Intervenors speaks for itself and provides the best evidence of its contents, and any allegations contrary to its plain language and meaning is disputed.  Plaintiffs further note that Dr. Gehring suggested that the Northern Lower Peninsula would be a good candidate for establishing a wolf population.  *See* AR Doc. 228 at 7427.

43.     Statement partially disputed.  Plaintiffs do not dispute that, *at the time the Final Rule was issued*, there was no known, permanent wolf population in the Northern Lower Peninsula.  Plaintiffs lack sufficient knowledge to respond to Intervenors' broader assertion and therefore dispute it.

44.     Statement disputed.  Plaintiffs do not dispute that, at the time the Final Rule was issued, there was no known, reproducing wolf population in the Northern Lower Peninsula. With respect to the situation in recent years, Plaintiffs lack sufficient knowledge to respond to Intervenors' broader assertion and therefore dispute it.  Plaintiffs further aver that historically there were wolf populations throughout most of North America, including the entire Great Lakes region.  Plaintiffs' Statement ¶ 1; Federal Defendants' Response ¶ 1; *see also* 72 Fed. Reg. at 15267.

45.     Statement not disputed.

46.     Statement partially disputed.  Plaintiffs do not dispute that, at the time the Final Rule was issued, there was no known, permanent wolf population in the Northern Lower Peninsula.  Plaintiffs lack sufficient knowledge to respond to Intervenors' broader allegation and therefore dispute it.

47.     Statement disputed.  Plaintiffs aver that the Final Rule does not precisely identify which parts of Michigan FWS considered to be the "Northern Lower Peninsula," and there may be some suitable habitat outside the area that FWS considered.

48.     Statement partially disputed.  This statement appears to contain a typographical error and is therefore more difficult to respond to.  Plaintiffs do not dispute that FWS concluded that the Turtle Mountain region is the only area outside northern Minnesota, northern Wisconsin, the Upper Peninsula of Michigan, and the Northern Lower Peninsula within this DPS that might hold wolves on a frequent or constant basis.  72 Fed. Reg. at 6073.  Any allegations in Paragraph 48 that are contrary to the foregoing are disputed.

49.     Statement partially disputed.  Plaintiffs do not dispute that the areas surrounding Turtle Mountain region in the United States are largely agricultural.  Plaintiffs dispute that the surrounding landscape is unsuitable for wolves because it provides negligible cover.  Wolves are habitat generalists.  *See* Plaintiffs' Statement ¶ 1; Federal Defendants' Response ¶ 1.

50.     Statement partially disputed.  Plaintiffs do not dispute that FWS concluded that the Turtle Mountains area "may provide a small area of marginal wolf habitat . . . ."  72 Fed. Reg. at 6073.  Any allegations in Paragraph 50 that are contrary to the foregoing are disputed.

51.     Statement partially disputed.  Plaintiffs do not dispute that FWS concluded that the Turtle Mountains area is approximately 579 square miles.  *See* 72 Fed. Reg. at 6073.  Any allegations in Paragraph 51 that are contrary to the foregoing are disputed.

52.    Statement disputed.  Plaintiffs dispute Intervenors' characterization of criteria in the 1978 Recovery Plan and the 1992 Recovery Plan, which speak for themselves and provide the best evidence of their contents, and any allegations contrary to their plain language and meaning are disputed.

53.    Statement disputed.  Intervenors' statement is vague and must therefore be denied.  Plaintiffs further note that the Final Rule does not specifically state that a wolf population in the Turtle Mountains, should one become established, would be isolated from all other wolf populations.

54.    Statement not disputed.

55.    Statement not disputed.

56.    Statement partially disputed.  Plaintiffs do not dispute that, *at the time the Final Rule was issued*, there was no known, permanent wolf population in the Turtle Mountains area. Plaintiffs lack sufficient knowledge to respond to Intervenors' broader allegation and therefore dispute it.

57.    Statement disputed.  The Final Rule speaks for itself and provides the best evidence of its contents, and any allegations contrary to its plain language and meaning is disputed.

58.    Statement disputed.  The allegations in Paragraph 58 state a legal conclusion to which no response is required.  To the extent a response is required, Plaintiffs aver that Intervenors misunderstand the "significant portion of [the] range" requirement.  *See* 16 U.S.C. § 1532(6).

59.    Statement disputed.  Plaintiffs dispute Intervenors' characterization of various studies and the 1992 Recovery Plan, which speak for themselves and provide the best evidence

of their contents, and any allegations contrary to their plain language and meaning are disputed. Plaintiffs further aver that wolf populations cannot "continue to thrive" if they are suffering population reductions. Instead, as documented by the loss of the wolf from 99% of its range within the conterminous United States, high mortality rates and population reduction lead to the extirpation of the wolf. *Sierra Club v. Clark*, 577 F. Supp. 783, 785 (D. Minn. 1984), *rev'd in part*, 755 F.2d 608 (8th Cir. 1985) (noting that "[t]he Eastern Timber Wolf . . . now occupies only 1 percent of its original range"); AR Doc. 228 at 7869 (stating that by the 1950s the gray wolf "occup[ied] less than 1% of the species historic range").

60.     Statement not disputed.

61.     Statement disputed. The state management plans, the 1978 Recovery Plan, and the 1992 Recovery Plan speak themselves and provide the best evidence of their contents, and any allegations contrary to their plain language and meaning are disputed. Plaintiffs aver that 350 wolves is Wisconsin's target population goal, not its minimum population goal. 1999 Wisconsin Wolf Management Plan at 21, AR Doc. 215 at 6001. The allegations in the third sentence state a legal conclusion for which no response is required. To the extent a response is deemed necessary, Plaintiffs state that the numerical population goals provided by the 1992 Recovery Plan are irrelevant to whether the Great Lakes wolf population should be listed under the ESA. Plaintiffs further aver that the Great Lakes wolf population should not have been delisted and therefore already "qualif[ies] . . . for 'endangered' or 'threatened' listing status."

62.     Statement disputed. The first sentence is disputed because the 1997 Michigan wolf management plan has not been fully implemented. AR Doc. 142 at 767. The second and third sentences are disputed because the Final Rule speaks for itself and is the best evidence of its contents, and any allegations contrary to its plain language and meaning are disputed.

Plaintiffs further aver that the Final Rule relies on a future wolf management plan for Michigan whose "goals, strategies, or activities" could not be evaluated.  72 Fed. Reg. at 6094.

63.    Statement disputed.  The Final Rule speaks for itself and is the best evidence of its contents, and any allegations contrary to its plain language and meaning are disputed.

64.    Statement disputed.  The Final Rule speaks for itself and is the best evidence of its contents, and any allegations contrary to its plain language and meaning are disputed.  Plaintiffs further aver that neither the citation offered by Intervenors nor the rest of the Final Rule indicates that Michigan depredation control guidelines were relied on as a basis for delisting the Great Lakes wolf population.

65.    Statement disputed.  The Minnesota wolf management plan speaks for itself and is the best evidence of its contents, and any allegations contrary to its plain language and meaning are disputed.  Plaintiffs further aver that, far from imposing "significant restrictions" on the killing of wolves in Zone B, the Minnesota plan sharply increases the circumstances in which wolves can be killed.  Minnesota Plan at 22-23; AR Doc. 215 at 5275-76.

66.    Statement disputed.  The Final Rule speaks for itself and is the best evidence of its contents, and any allegations contrary to its plain language and meaning are disputed.  Plaintiffs aver that FWS's assumption was contrary to the facts and unreasonable, because the Minnesota Plan is not being fully implemented.  Amended Complaint ¶ 82; Answer ¶ 82; Minnesota Plan, Appx. II, AR Doc. 215 at 5292-93; Proposed Exhibit E, *attached to* Declaration of Michael Soules in Support of Plaintiffs' Motion to Supplement (copy of the Minnesota DNR's Data Practices Act response).  Plaintiffs aver that the Stark Declaration is not part of the administrative record.  Plaintiffs also aver that even if the factual portions of the Stark Declaration are considered, they demonstrate that the Minnesota Plan is not being fully

implemented. *See* Stark Decl. ¶ 16. Plaintiffs further aver that the Stark Declaration speaks for itself and is the best evidence of its contents, and any allegations contrary to its plain language and meaning are disputed.

67.    Statement disputed. The Stark Declaration speaks for itself and is the best evidence of its contents, and any allegations contrary to its plain language and meaning are disputed.

68.    Statement disputed. This statement appears to contain a typographical error and is therefore more difficult to respond to. Plaintiffs dispute that the Michigan DNR's new methodology, which was adopted due to budgetary concerns, will adequately monitor the Michigan wolf population. AR Doc. 240 at 8523; 72 Fed. Reg. at 6092. Plaintiffs further aver that AR Doc. 241 speaks for itself and is the best evidence of its contents, and any allegations contrary to its plain language and meaning are disputed.

69.    Statement disputed. The state management plans and the Final Rule speak themselves and provide the best evidence of their contents, and any allegations contrary to their plain language and meaning are disputed. Plaintiffs further aver that the state wolf management programs will not adequately monitor for disease. The Minnesota DNR has committed itself to only a minimal degree of monitoring, with many components of its monitoring scheme vague or speculative. *See* Minnesota Plan at 19-20, AR Doc. 215 at 5272-73 (stating that radio telemetry will be "encouraged" and population modeling will be "investigate[d]"); *see also* 72 Fed. Reg. at 6081 ("Minnesota has not established minimum goals for the proportion of its wolves that will be assessed for disease nor does it plan to treat any wolves."). There is also strong evidence that the Michigan DNR will not carry out the monitoring called for by its wolf management program. Michigan's wolf management plan is under revision, and there is evidence that the existing plan

is not being fully implemented. *See* AR Doc. 142 at 767. Moreover, for the first time last year, the Michigan DNR informed FWS that it would begin using a new monitoring methodology. 72 Fed. Reg. at 6092.

70.     Statement partially disputed. Plaintiffs dispute any suggestion that the western Great Lakes wolf population is "recovered" or should not be currently protected under the ESA.

71.     Statement not specifically disputed, although Plaintiffs aver that the Final Rule speaks for itself and is the best evidence of its contents, and any allegations contrary to its plain language and meaning are disputed.

72.     Statement partially disputed. The first sentence is disputed because it fails to identify whom Intervenors are referring to, and is thus vague and must be denied. The first sentence is further disputed because in 1978 FWS listed the gray wolf at the species level throughout the conterminous United States and Mexico. 43 Fed. Reg. 9607 (Mar. 9, 1978). The second and third sentences are not disputed. Plaintiffs dispute the allegations in footnote 2, which fails to recognize that the gray wolf, not the eastern timber wolf, is the taxon that was protected under the ESA until FWS issued the Final Rule. Plaintiffs further aver that there is no scientific consensus on which subspecies of gray wolf are located in the Great Lakes region. *See, e.g.*, 71 Fed. Reg. at 15267; AR Doc. 228 at 7427. Plaintiffs dispute Intervenors' characterization of the 1978 listing rule, which speaks for itself and is the best evidence of its contents, and any allegations contrary to its plain language and meaning are disputed.

73.     Statement partially disputed. The first sentence is disputed because FWS ceased classifying wolves in the Great Lakes region at the subspecies level after the 1978 listing rule. 43 Fed. Reg. 9607. Plaintiffs further aver that FWS expressly disavowed any consideration of wolf subspecies in delisting the Great Lakes population. 72 Fed. Reg. at 6065. The second

sentence is not disputed.  In response to the allegations in the third sentence, Plaintiffs do not dispute that FWS has created more than one recovery plan for the gray wolf, and that those plans focus on different geographic areas.  Any allegations in the third sentence that are contrary to the foregoing are disputed.  With respect to the allegations in the fourth sentence, Plaintiffs do not dispute that the 1992 Recovery Plan set different goals than the Northern Rocky Mountains recovery plan.  Any allegations in the fourth sentence contrary to the foregoing are disputed.  Plaintiffs dispute the fifth sentence, and aver that neither the Great Lakes wolf population nor the northern Rocky Mountains wolf population have "recovered."  Plaintiffs further aver that to the extent either population has achieved any population goals outlined in a recovery plan, the achievement of those goals is irrelevant to whether the gray wolf can be downlisted or delisted.  16 U.S.C. § 1533(a)(1).

74.    Statement disputed.  The Final Rule speaks for itself and is the best evidence of its contents, and any allegations contrary to its plain language and meaning are disputed.

75.    Statement disputed.  Plaintiffs aver that FWS published a *draft* post-delisting monitoring plan on June 4, 2007.  Plaintiffs further aver that the referenced Federal Register notice speaks for itself and is the best evidence of its contents, and any allegations contrary to its plain language and meaning are disputed.

Dated: February 15, 2008                    Respectfully submitted,


                                            /s/  Michael C. Soules & Rebecca G. Judd
                                            Rebecca G. Judd, D.C. Bar No. 486315
                                            rjudd@hsus.org
                                            Jonathan R. Lovvorn, D.C. Bar No. 461163
                                            jlovvorn@hsus.org
                                            The Humane Society of the United States
                                            2100 L Street, NW
                                            Washington, DC  20037
                                            (202) 452-1100
                                            (202) 778-6132 (facsimile)

                                            Brian B. O'Neill, Minn. Bar No. 82521
                                            boneill@faegre.com
                                            Sanne H. Knudsen, Minn. Bar No. 0344552
                                            sknudsen@faegre.com
                                            Michael C. Soules, D.C. Bar No. 477911
                                            msoules@faegre.com
                                            FAEGRE & BENSON LLP
                                            2200 Wells Fargo Center
                                            90 South Seventh Street
                                            Minneapolis, MN  55402-3901
                                            (612) 766-7000
                                            (612) 766-1600 (facsimile)

                                            *Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| The Humane Society of the United States; Help Our Wolves Live ("HOWL"); Animal Protection Institute; and Friends of Animals and Their Environment,     Plaintiffs, v. Dirk Kempthorne, Secretary of the Interior; United States Department of the Interior; | )) )) )) )) )) )) )) )) )) )) )) )) | Civil No. 1:07-cv-00677-PLF |
| and United States Fish and Wildlife Service, Defendants, U.S. Sportsmen's Alliance Foundation; Wisconsin Bear Hunters Association; et al.,     Intervenor-Defendants, Safari Club International; National Rifle Association; et al.,     Intervenor-Defe | | |
| ndants. | | |

**Declaration of Karlyn Berg**

I, Karlyn I. Berg, declare the following:

1. I reside in Bovey, Minnesota (Balsam Township), and have lived in Minnesota for 35 years.

2. I am a member of The Humane Society of the United States (HSUS) and have been a consultant for HSUS on wolf-related issues since 1998.

3. HSUS is a non-profit charitable organization incorporated in 1954. HSUS is the largest animal protection organization in the world, with over 10.5 million members and constituents. HSUS's mission is to promote the humane treatment of animals and to foster respect, understanding, and compassion for all creatures. HSUS has shown particular interest in endangered and threatened species, and supports efforts aimed at the protection and recovery of such species and their habitats. HSUS regularly submits comments to government agencies concerning proposed actions that would affect animals. HSUS publishes a magazine and maintains a website for its members and the general public, and it regularly disseminates information concerning the treatment of wild animals, including government decisions that affect wildlife. HSUS has been an active advocate for wolf protection and recovery for decades.

4. I am also a member of the Animal Protection Institute (API), and have been a member of that organization since 2006.

5. API, which was founded in 1968, is a national non-profit organization dedicated to advocating for the protection of animals from cruelty and exploitation. API has tens of thousands of members and supporters living throughout the country. API's work includes monitoring and studying the impacts of agency actions on animals, including wolves and other carnivores. One of API's principal campaigns focuses on wildlife protection, and API uses education and other methods to protect wild animals and their habitat. API regularly submits

2

comments to government agencies concerning proposed actions that would affect animals. API publishes a magazine and maintains a website for its members and the general public, and it regularly disseminates information concerning the treatment of wild animals, including government decisions that affect animals. In recent years API has been actively involved in efforts aimed at wolf protection and recovery. (On December 12, 2007, API officially changed its name to "Born Free USA united with Animal Protection Institute.")

6. My interest in and appreciation of wolves and their conservation began as early as 1968, and I have been working on behalf of wolves for nearly 40 years. From 1969 to 1972 I was involved with a national educational tour bringing live wolves to schools, organizations, and museums. Our goal was to bring awareness to the plight of wolves and to encourage the conservation of wolves. As part of that tour I traveled to Minnesota in 1971 to visit the last population of wild wolves in the lower 48 states and advocate their protection. Upon the encouragement of a prominent wolf biologist I moved to Minnesota specifically to work on wolf protection issues. In 1973 I established residence in Minnesota and then I was able to observe wolf research and had an opportunity to encounter wolves in the wild. While my original intention was to live in Minnesota for a brief time, instead I remained to found an educational organization, the Wildlife Education Program and Design (WEPD), dedicated to conservation of the wolf. I continue as director of WEPD, and I am active in wolf conservation efforts, wolf education, and wolf studies involving research of wolves, or their role in maintaining the stability of ecosystems as well as human attitudes toward wolves.

7. As an educator, I have given numerous presentations throughout the United States for nature centers, schools, various universities and private organizations like The Wisconsin Timber Wolf Alliance. I have participated in wolf workshops that include tracking, howling, and hearing wolves howl as well as observing wolf tracks and scats, and searching for other evidence of their

3

presence.

8. The Minnesota Non-Game Department hired me to design and create wolf educational boxes. The prototype and first boxes were completed in 1987 and I went on to make over 85 more boxes for most of the National Forests in the Great Lakes region, as well as numerous schools and nature centers.

9. In addition to these educational efforts, I have shared my familiarity with wild wolves with others by guiding wolf tracking trips, wolf hikes, snowshoe trips and night wolf howling events. I have led these events for local residents, youth groups, news media, and visitors from all over the world interested in the gray wolf. I also led a wolf trip on Isle Royale for the Science Museum of Minnesota.

10. My programs are in demand throughout the United States in great part because my knowledge of the wolf is based upon my actual encounters with wild wolves in Minnesota wolf habitat. I served as a consultant on the Science Museum of Minnesota's "Wolves and Humans" exhibit (1981 to 1983), and have consulted with the Bell Museum, zoos, and on numerous wolf films, television documentaries and exhibits over the last 39 years. I wrote the educational materials package for the Wolves and Humans exhibit. I also traveled as the keynote speaker and presenter with the Wolves and Humans exhibit on its national tour from 1983 to 1985. When the exhibit tour ended in 1987 I helped create the International Wolf Center in Ely, Minnesota, by serving as the Executive Director for the Committee to create the Center, where the Wolves and Humans exhibit now resides.

11. I have been involved with wolf-related litigation, conferences, and political activities over the past 39 years. I have testified before the Minnesota Legislature and the United States Congress on wolf issues.

12. As wolves expanded their range to Wisconsin and Michigan my work, field experience,

4

and educational efforts expanded to those states as well.

13. My many encounters with wolves in the wild continues to inspire to work for their protection. I have lived in wolf country since 1973 and have witnessed wolves in the vicinity, where I have observed their tracks, have howled to them and even visited their deer kills around my home. Wolves are not only my work focus, but they are my welcome neighbors.

14. I have also visited on many occasions, and intend to continue to visit, forests, parks, and other areas in Minnesota, Michigan, Wisconsin and other regions that provide habitat for the gray wolf. These areas include the Superior, Chequamegon-Nicolet, Ottawata, and Hiawatha National Forests, as well as western wolf regions such as Wyoming, Montana, and Alaska. While visiting these areas, I enjoy wildlife viewing, hiking, photography, camping, and other pursuits.

15. I have been fortunate to join other wolf researchers and naturalists to track wolves in Minnesota and Wisconsin. In Minnesota I participated in wolf howl surveys for the Minnesota Department of Natural Resources (DNR).

16. I served as a roundtable member on the State of Minnesota's wolf round table in 1998. I am a member of the Wolf Stakeholders group in Wisconsin, which keeps me as an active participant in the recovery of the wolf in Wisconsin. And I am also a member of the Great Lakes Wolf Stewards group. I continue to monitor the wolf-related activities of the United States Fish and Wildlife Service (FWS), USDA Wildlife Services, Minnesota, Michigan, and Wisconsin DNRs. I attend meetings and hearings that involve wolf management in all the Great Lakes states as well.

17. My concern for wolves is not just for the population as a whole. When I first moved to northern Minnesota I routinely howled to a pack at Sherry Lake. This was one of the packs that survived the intensive killing of the late 1960s and early 70s. I visited that pack frequently. In 1974, during the nine-month period that the Federal law was being violated by the State, those

5

wolves were all trapped and killed. I met the trapper who killed them and he was never held responsible because the State did not enforce the law at that time. He told me he regretted the act though trapping was his hobby. To this day I treasure the plaster track cast that I made of two of those wolves; the female wolf and her puppy. With federal protection that wolf area recovered.

18. I have witnessed and suffered watching the loss of individual wolves on other occasions since that time. For example, five wolves were illegally snared on our Christmas tree farm. These were wolves whose tracks I would see or howls I would hear. The criminals were never caught. It is more than disheartening to know that even under the protection of federal law the State of Minnesota provided little enforcement to make that protection meaningful. I am deeply concerned that without any federal protection the kind of wolf killing I witnessed in the early years will not only resume but escalate. Recently, I have seen the tracks of a lone wolf when I am dog sledding on our lake. That animal is rarely seen, which is probably why it has managed to survive the killing that I believe has gradually increased in this area.

19. I believe that individual wolves have inherent value, and I am deeply disturbed by the knowledge that FWS has removed the Great Lakes wolf population from the endangered species list. In Minnesota, FWS's decision will result in expanded opportunities for landowners, state predator controllers, and others to lethally take wolves. And by returning the gray wolf to state management in Wisconsin and Michigan, FWS is now allowing the lethal control of these intelligent, beautiful, and social animals. I have experienced the wolf's recovery years in Minnesota so it is especially distressing to me that although history has shown that wolves are critically impacted by antiquated and excessive lethal control actions, the state DNRs are advocating and permitting these very unnecessary lethal control activities. All three states have plans that are highly deficient and will return the wolf to the very dangers that caused them to be

6

endangered in the first place. Since I began this work before wolves were protected, arrived in Minnesota just as they received protection and have followed closely them for the last 35 years I am deeply disturbed to see this species now facing the very perils I witnessed in 1973.

20. The benefits that I derive from the wolf, and would derive, but for FWS's failure to adequately protect the wolf, have been, are being, and will continue to be harmed, adversely affected and irreparably injured by FWS's failure to comply with its statutory obligations to ensure the survival and recovery of the wolf. The FWS's decision to delist the gray wolf, and the return of wolves to state management, will lead to the deaths of individual animals, disturb and stress intra-pack relationships, and cause a decline in the area wolf population. The FWS's violation of the Endangered Species Act will therefore continue to deprive me, HSUS, API, and these organizations' other members of the recreational, scientific, educational, and aesthetic benefits derived from this species.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


February _11_, 2008

Karlyn I. Atkinson Berg

7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

The Humane Society of the United States;  )
Help Our Wolves Live ("HOWL"); Animal      )
Protection Institute; and Friends of Animals )
and Their Environment,                     )
                                           )
                    Plaintiffs,            )
                                           )            Civil No. 1:07-cv-00677-PLF
          v.                               )
                                           )
Dirk Kempthorne, Secretary of the Interior; )
United States Department of the Interior; and )
United States Fish and Wildlife Service,   )
                                           )
                    Defendants,            )
                                           )
U.S. Sportsmen's Alliance Foundation;      )
Wisconsin Bear Hunters Association; *et al.*, )
                                           )
           Intervenor-Defendants,          )
                                           )
Safari Club International; National Rifle   )
Association; *et al.*,                      )
                                           )
           Intervenor-Defendants.          )
                                           )
                                           )
                                           )
                                           )
_____  )

## DECLARATION OF LINDA HATFIELD

I, Linda Hatfield, declare the following:

1.      I reside in Minneapolis, Minnesota, and have lived in Minnesota all my life.

2.      I am a long time member of HOWL, Help Our Wolves Live.  I served on the

HOWL board since the mid 1980s.  Harriet Lykken was the long standing Executive Director.  In

2001 Harriet Lykken retired; I then succeeded her as HOWL's director.

3.      HOWL was formed in 1969 as an informal group seeking to influence the

Minnesota legislature to oppose the wolf bounty.  Although the bounty fund had been cut off in

1965 by a governor's veto, there was constant pressure from northern Minnesota farmers, politicians, hunters, and trappers to reinstate the bounty. At that time wolves were totally unprotected and could be shot or trapped as "varmints" without restriction. In 1971 HOWL was incorporated as a non-profit charitable organization in the State of Minnesota with its principal place of business in Minneapolis. HOWL consists entirely of volunteer members and has remained a strong voice for wolves and other wild species, such as the lynx and wolverine, since its incorporation.

4.     HOWL's mission is to be am advocate for the protection and preservation of the gray wolf, lynx, wolverine, and other endangered or threatened species of a predatory nature. HOWL uses education and science to discourage cruelty to wild species caused by human ignorance.

5.     As HOWL's director, I regularly submit comments to government agencies concerning proposed actions that would affect the gray wolf, lynx, wolverine, and other wild species and their habitats.

6.     I am also a member of the Humane Society of the United States (HSUS) and Animal Protection Institute (API). I have worked as a volunteer with both of these organizations for many years on wolf, lynx, and other wildlife issues for many years.

7.     HSUS is a non-profit charitable organization incorporated in 1954. HSUS is the largest animal protection organization in the world, with over 10.5 million members and constituents. HSUS's mission is to promote the humane treatment of animals and to foster respect, understanding, and compassion for all creatures. HSUS has shown particular interest in endangered and threatened species, and supports efforts aimed at the protection and recovery of such species and their habitats. HSUS regularly submits comments to government agencies

concerning proposed actions that would affect animals. HSUS publishes a magazine and maintains a website for its members and the general public, and it regularly disseminates information concerning the treatment of wild animals, including government decisions that affect wildlife. HSUS has been an active advocate for wolf protection and recovery for decades.

8.    API was founded in 1968 as a national non-profit organization dedicated to advocating for the protection of animals from cruelty and exploitation. API has tens of thousands of members and supporters living throughout the country. API's work includes monitoring and studying the impacts of agency actions on animals, including wolves and other carnivores. One of API's principal campaigns focuses on wildlife protection, and API uses education and other methods to protect wild animals and their habitat. API regularly submits comments to government agencies concerning proposed actions that would affect animals. API publishes a magazine and maintains a website for its members and the general public, and it regularly disseminates information concerning the treatment of wild animals, including government decisions that affect animals. In recent years API has been actively involved in efforts aimed at wolf and lynx protection and recovery. (On December 12, 2007, API officially changed its name to "Born Free USA united with Animal Protection Institute.")

9.    I have a personal commitment to ensuring the recovery and maintaining protection of the gray wolf and its habitat. Even though I live in the Twin Cities, I spend much of my vacation time hiking in northern Minnesota. I like to hike in remote areas on and off the Superior Hiking trail. I mostly hike within the Superior National Forest and the State Parks in the northern part of the state. While hiking and visiting those areas I sometimes stop and take time to do a pencil illustration. I also like to take photographs. Viewing wildlife is my main

reason to hike trails in the northern part of the state.  On a couple of occasions I've seen wolves while hiking.

10.    Other members of HOWL also enjoy hiking and camping and they too hope to see wildlife and, most importantly, wolves.

11.    I frequently attend wolf conferences and wolf workshops.  Learning about wolves is very important to me.

12.    As long as I can remember, I've had a deep compassion and appreciation for all animals.  However, those animals that live in the wild hold a deeper place within my inner core.  The wolf, being a top predator and knowing and understanding its importance to the ecosystem, has been a strong focus of mine for most of my adult life.  But the world hasn't always been kind to the wolf and the wolf remains a villain in the view of many people.  I couldn't sit back and do nothing so I started to work on wolf protection issues.  I continue to be an advocate for the wolf through HOWL, by presenting information and talking to the public, writing comments, and learning more about the wolf and its importance to the balance of the ecosystem so I can continue to educate others.

13.    I was a member of the Minnesota Wolf Round Table in the summer of 1998.  I did not represent HOWL, because Harriet Lykken and Karlyn Berg were the HOWL reps, but served as a representative for FATE, Friends of Animals and Their Environment.  The MN Wolf Round Table met the summer of 1998.  Unfortunately, the MN Wolf Round Table had more representatives interested in killing the wolf than it did interested in the welfare of this animal.

14.    I believe that all wolves have value – inherent value – not just the species as a whole, but as individuals.  I am deeply upset by the actions the Fish and Wildlife Service (FWS) has done in removing Endangered Species Act (ESA) protection of the Great Lakes wolves.  In

my view, FWS is pandering to those who have an interest in killing this animal rather than keeping or maintaining protection of the wolf. FWS's decision will result in expanded lethal opportunities for landowners, state predator controllers, hunters, trappers, and others who just want to kill a wolf. This decision now gives control to the states. Briefly, Minnesota's state plan/law allows predator controllers to be paid a $150 bounty for each wolf killed. The bounty on wolves was one of the main reasons that caused the demise of the wolf. FWS should not allow history to repeat itself. And to see history repeat itself is most distressing because this decision to delist and turn over management to the states will lead to the death of many individual animals. It will disturb and cause stress to wolf family members (pack members). This will cause a decline to the population.

15.     There are many benefits that HOWL members and I receive from the wolf – its beauty, its predatory value, its importance to the ecological framework, and to the wolf itself. Other HOWL members and I are harmed by FWS's decision to remove the ESA protection of wolves. FWS is failing to adequately protect the wolf. Under the delisting decision wolves are being harmed and will continue to be harmed. HOWL members and I do not want harm to come to wolves for it will harm all of us. Moreover, the views of wolf supporters were not considered when this decision was made. The decision to remove ESA protection benefits those who have an interest in hunting this animal as a trophy or trapping this animal for its fur, or just killing it because it's there. And in time this will happen.

5

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

February 10, 2008

Linda Hatfield

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| The Humane Society of the United States;<br>Help Our Wolves Live ("HOWL"); Animal<br>Protection Institute; and Friends of Animals<br>and Their Environment, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil No. 1:07-cv-00677-PLF |
| v. | ) ) | |
| Dirk Kempthorne, Secretary of the Interior;<br>United States Department of the Interior; and<br>United States Fish and Wildlife Service, | ) ) ) ) | |
| Defendants, | ) ) | |
| U.S. Sportsmen's Alliance Foundation;<br>Wisconsin Bear Hunters Association; *et al.*, | ) ) ) | |
| Intervenor-Defendants, | ) ) | |
| Safari Club International; National Rifle<br>Association; *et al.*, | ) ) ) | |
| Intervenor-Defendants. | ) ) | |

## DECLARATION OF TOM HERSCHELMAN

I, Tom Herschelman, declare as follows:

1.    I reside in Sheboygan Falls, Wisconsin, and have lived in Wisconsin for over 28 years.

2.    I am a member of The Humane Society of the United States ("HSUS") and have been since 2005.

3.    HSUS is a non-profit charitable organization incorporated in 1954. HSUS is the largest animal protection organization in the world, with over 10.5 million members and constituents. HSUS's mission is to promote the humane treatment of animals and to foster respect, understanding, and compassion for all creatures. HSUS has shown particular interest in endangered and threatened species, and supports efforts aimed at the protection and recovery of such species and their habitats. HSUS regularly submits comments to government agencies concerning proposed actions that would affect animals. HSUS publishes a magazine and maintains a website for its members and the general public, and it regularly disseminates information concerning the treatment of wild animals, including government decisions that affect wildlife.

4.    Since its inception in 1954, HSUS has been dedicated to protecting imperiled species and the habitats on which they depend. HSUS's Wildlife and Habitat Protection and Threatened and Endangered Species Program sections work to ensure the survival of all wild animals from cruelty, exploitation, hunting and trapping, and habitat loss. HSUS accomplishes these objectives through public education, litigation, legislation, and research and investigations. HSUS publishes information and citizen alerts regarding the plight of the gray wolf to inform its members and constituents of its activities and to request assistance in protecting such an imperiled species. HSUS has been an active advocate for wolf protection and recovery throughout its history. For instance, HSUS was involved in litigation successfully challenging the U.S. Fish and Wildlife Service's 2005 decision to issue a permit that allowed the Wisconsin Department of Natural Resources (DNR) to lethally take wolves. HSUS was also the lead plaintiff in similar litigation when FWS issued a permit in 2006 that allowed the Wisconsin DNR to take endangered wolves.

5.    I have a personal commitment to ensuring the recovery, fruitfulness and multiplication of the gray wolf and the protection of its habitat. I have on several occasions visited, and intend to continue to visit forests, parks, and other wilderness areas where gray wolf populations live. For example, I travel yearly and will continue to travel to the Boundary Waters Canoe Area Wilderness (BWCAW) in Minnesota and the surrounding Superior National Forest. I enjoy many outdoor activities, including hiking, wilderness canoeing, and fishing. I have heard of and experienced wolf sightings in the BWCAW, and I observed a juvenile wolf on the Gunflint Trail. On another occasion, my family heard wolves howling around us at night while canoeing in the BWCAW. We have listened in awe to wolves howling at night while around campfires in the BWCAW. I have seen wolf tracks to my great delight in north central Minnesota. My dream is to one-day videotape the life histories of gray wolves living in the BWCAW.

6.    One of my greatest memories in the Boundary Waters was the circumstance of my paddling across the lake from the campsite that my wife and I were sharing and coming upon a prior winter moose kill, with the remainders of the moose both on the shore and in the water at the edge. I felt like I was trespassing on spiritual ground to be in the place where this great predator-prey relationship was relived as it has been for ages and should be forever, in all areas where suitable habitat exists.

7.    I also have visited and will continue to visit wilderness areas in the Upper Peninsula of Michigan and northern Wisconsin, including Porcupine Mountains Wilderness State Park, Pictured Rocks National Lakeshore, Chequamegon-Nicolet National Forest, as well as Flambeau River, Black River, and American Legion State Forests and some Wisconsin County Forests. While visiting these areas, I enjoy wildlife viewing, hiking, photography, camping, and

other pursuits. The knowledge that gray wolves are a mere 100 miles north of Madison, Wisconsin, is reassuring to me, and proof that humans and wolves can live in harmony if humans so choose. The possibility that I might observe the presence of wolves is always an important motivating factor in my decision to venture out into these national and state forests.

8.    I have a particular awareness and understanding of the gray wolf species. I attended the School of Natural Resources at the University of Michigan from 1961 to 1963. I studied landscape ecology and biodiversity from approximately 1991 to 2000. I was also the Forestry-Biodiversity Chair of the John Muir Chapter of the Sierra Club from 1991 to 2000. As the Forestry-Biodiversity Chair, I was involved in discussions over the potential delisting of the gray wolf, which I adamantly opposed. During that time, I met with officials from Wisconsin DNR and the Chequamegon-Nicolet National Forest regarding the Wisconsin gray wolf population. I submitted comments to the Fish and Wildlife Service and Wisconsin DNR regarding reclassification or taking of the gray wolf under the Endangered Species Act. I have also written opinion letters and given oral presentations on gray wolf management and on the gray wolf population in Wisconsin. I received the Religious Campaign for Forest Conservation's 2007 Steward of the Forest Award "presented in acknowledgement of Exemplary Love, Care, Sacrifice and Service on behalf of the Lord's Good Forests." I continue to work on my Masters Degree in Theology from Lakeland College in Sheboygan, Wisconsin.

9.    I see wolves as an inheritance from both a sacred and secular perspective, and, therefore, they are to be nurtured, esteemed, respected and studied. They are not objects or property to be manipulated and destroyed, or hunted by the public. They must be allowed to expand and exist by fruitfulness and multiplication into suitable habitat in the Great Lakes, Oregon, the Northern Rockies, the greater Yellowstone Area, and all suitable areas of the USA.

We are to act as their stewards. I believe especially from a sacred and Christian viewpoint that wolf killing is contrary to sound theology. I have a deep and heartfelt interest and love of wolves, as they are part of God's creation, and because they exemplify to me wilderness and harmony according to the great plan of God. As wolves are a keystone species in the created order, to kill them is a blatant interference with God's created order.

10.    I believe that individual wolves have inherent value, from both a secular and sacred viewpoint, and I am deeply disturbed by the knowledge that the Fish and Wildlife Service has removed the Great Lakes wolf population from the list of endangered and threatened species in the Great Lakes. By delisting the gray wolf, the Fish and Wildlife Service is allowing the lethal control of these intelligent, beautiful, and social animals in several parts of their historical range, including the Michigan and Wisconsin. And by removing any or all federal protections for the wolf in Minnesota, Wisconsin, Michigan, and elsewhere the Fish and Wildlife Service has increased the circumstances under which individual wolves can be legally killed.

11.    The benefits that I derive from the wolf, and would derive, but for the Fish and Wildlife Service's failure to adequately protect the wolf, have been, are being, and will continue to be harmed, adversely affected and irreparably injured by the Fish and Wildlife Service's failure to comply with its statutory obligations to ensure the survival and recovery of the wolf. The delisting of the Great Lakes wolf population will lead to the deaths of individual animals, disturb and stress intra-pack relationships, and cause a decline in the area wolf population. Accordingly, the Fish and Wildlife Service's violation of the Endangered Species Act will continue to deprive HSUS, myself and other HSUS members of the recreational, scientific, religious, and aesthetic benefits of this species.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

February __, 2008

Tom Herschelman

2-8-2008

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

The Humane Society of the United States;    )
Help Our Wolves Live ("HOWL"); Animal       )
Protection Institute; and Friends of Animals )
and Their Environment,                       )
                                             )
        Plaintiffs,                    )      **Civil No. 1:07-cv-00677-PLF**
                                             )
     v.                                      )
                                             )
Dirk Kempthorne, Secretary of the Interior;  )
United States Department of the Interior; and )
United States Fish and Wildlife Service,     )
                                             )
        Defendants,                    )
                                             )
U.S. Sportsmen's Alliance Foundation;        )
Wisconsin Bear Hunters Association; *et al.*, )
                                             )
        Intervenor-Defendants,         )
                                             )
Safari Club International; National Rifle     )
Association; *et al.*,                        )
                                             )
        Intervenor-Defendants.         )
                                             )

### DECLARATION OF JODI LOUTH

I, Jodi Louth, declare as follows:

    1.    I am a member of The Humane Society of the United States (HSUS) and have

been since the year 2000.

    2.    HSUS is the nation's largest animal protection organization in the world, with

over 10.5 million members and constituents, including over 341,000 members and constituents

in the State of Michigan. Since its inception in 1954, HSUS has worked to promote the humane

treatment of all animals, including wildlife, and has been actively involved in the preservation of

endangered and threatened species and their habitats. In particular, HSUS has been a long-time advocate for gray wolf protection and recovery.

3.     I am a sixteen-year resident of the State of Michigan and have lived in Saline, Michigan for over eleven years.

4.     I am a lifelong animal advocate. I have been campaigning against deer and dove hunting and pigeon shooting in the State of Michigan for nearly fifteen years. In addition, I formed the advocacy group Michiganders Against Sport Hunting. I am also a Volunteer Wildlife Rehabilitator for Washtenaw County, Michigan.

5.     In particular, I am an avid gray wolf supporter. I have on several occasions visited, and intend to continue to visit, forests, parks, and other wilderness areas in the State of Michigan where gray wolf populations live. I enjoy many outdoor activities in these areas, including hiking, wildlife photography, wildlife viewing, and nature observation. For example, in the summer of 2006, I visited Isle Royale National Park to photograph and view moose and gray wolves. Last summer, I visited Tahquamenon Falls State Park in the Upper Peninsula area of Michigan where I hiked and continued my search for gray wolves and other wildlife.

6.     While in Isle Royale National Park, I took a tour into gray wolf habitat, which required boating to a remote area and a long hike, and then attended a presentation by a scientist from the Michigan Technological University who has been conducting a 50-year study on wolf-moose interactions. During my visit, I heard a wolf call and witnessed wolf tracks.

7.     I intend to continue to visit these wolf habitat areas and others in the State of Michigan and to increase the frequency of my visits with the hope of experiencing the sight or sound of wolves. The possibility that I might observe or photograph the presence of wolves and

other wildlife is always an important motivating factor in my decision to venture out into these national and state parks.

8.    I believe that the gray wolf is a majestic species and that each individual wolf deserves to remain protected on the endangered species list. I was appalled to learn of the federal government's decision to delist the Great Lakes population of gray wolves, which allows my state of Michigan to lethally control and kill wolves. I am concerned that individual wolf killing will harm wolf packs and will lead to a population decline throughout Michigan.

9.    Because of the U.S. Fish and Wildlife Service's delisting rule, which has resulted in state-sanctioned killing of wolves, my opportunities to experience the sight or sounds of wolves have been reduced. As a result, my recreational and aesthetic interests in viewing and photographing wolves and their habitat have been harmed.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

February 8, 2008

Jodi Louth

3

0UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

The Humane Society of the United States;  )
Help Our Wolves Live ("HOWL"); Animal    )
Protection Institute; and Friends of Animals )
and Their Environment,                    )
                                          )
                    Plaintiffs,           )          **Civil No. 1:07-cv-00677-PLF**
                                          )
        v.                                )
                                          )
Dirk Kempthorne, Secretary of the Interior; )
United States Department of the Interior; and )
United States Fish and Wildlife Service,   )
                                          )
                    Defendants,           )
                                          )
U.S. Sportsmen's Alliance Foundation;     )
Wisconsin Bear Hunters Association; et al., )
                                          )
            Intervenor-Defendants,        )
                                          )
Safari Club International; National Rifle  )
Association; et al.,                      )
                                          )
            Intervenor-Defendants.        )
                                          )

## DECLARATION OF ROBERT WALIGORA

I, Robert Waligora, declare the following:

1.      I reside in St. Louis Park, Minnesota, and have lived in Minnesota for 34 years.

2.      I am a founding member of Friends of Animals and Their Environment (FATE).

FATE, a Minnesota non-profit organization established in 1976, is committed to the

protection and preservation of Minnesota wildlife.  FATE, which has approximately 200

members and supporters, regularly advocates on behalf of animals, and in particular wolves,

through public education and political lobbying.  Members of FATE enjoy monitoring and

observing animals in the wild, including wolves.

3.      I have a personal commitment to ensuring the recovery of the gray wolf and the protection of its habitat.  I have heard wolves while camping alone in the Boundary Waters of northern Minnesota more than once.  The first time, I was forced by twilight to push a canoe through a nearly-dry remote creek, walk over sphagnum moss, and camp on a rocky outcrop of a small lake.  Wolves began calling very close to me.  It was an experience that I will never forget. I have seen wolf scat and seen wolf prints while portaging.  More than any other species, wolves are the animals I hope to experience when I camp and hike.

4.      I have also visited on many occasions, and intend to continue to visit, forests, parks, and other areas in Minnesota, northern Wisconsin and northern Michigan that provide habitat for the gray wolf.  Some of the areas that I have visited and intend to continue to visit include the Boundary Waters, Itasca State Park, the Bemidji lake area, Porcupine Mountain Wilderness Area (UP), and Nicollet National Forest (Wisc.).  I have also visited areas in the West that contain wolf habitat or potential wolf habitat, including Rocky Mountain National Park, Yellowstone National Park, Grand Teton National Park, and Theodore Roosevelt National Monument.  While visiting these areas, I enjoy wildlife viewing, hiking, photography, camping, and other pursuits.

5.      My interest in and appreciation of wolves and their conservation began as early as 1974.  I have been involved in efforts to protect wolves since then.  My work with FATE on behalf on wolves has included work on two lawsuits against the Department of Interior, one in 1978 to stop a large-scale wolf-killing program in the name of livestock control and the other in 1983 to stop a wolf season.  Both were successful.  I have attended public hearings on wolves and lobbied in the Minnesota legislature.  I have written many letters-to-the editor and editorials on behalf of wolves.  I have lobbied in the Minnesota Legislature to prevent the adoption of a

management plan that would have been harmful to wolves. I have made public presentations on behalf of the wolf and appeared on radio and television shows discussing wolf protection.

6.    I believe that individual wolves have intrinsic value, and I am deeply disturbed by the knowledge that the Fish and Wildlife Service (FWS) has removed the Great Lakes wolf population from the endangered species list. In Minnesota, FWS's decision will result in expanded opportunities for landowners, state predator controllers, and others to lethally take wolves. And by returning the gray wolf to state management in Wisconsin, FWS is now allowing the lethal control of these intelligent, beautiful, and social animals. It is especially distressing to me that although history has shown that wolves are critically impacted by antiquated and excessive lethal control actions, Minnesota and Wisconsin are allowing these unnecessary lethal control activities. Wolf experts at the 1978 trial demonstrated that it does no good to kill wolves that are not killing livestock.

7.    The benefits that I derive from the wolf, and would derive, but for FWS's failure to adequately protect the wolf, have been, are being, and will continue to be harmed by FWS's failure to comply with its statutory duty to ensure the survival and recovery of the wolf. The FWS's decision to delist the gray wolf, and the return of wolves to state management, will lead to the deaths of individual animals, disturb and stress intra-pack relationships, and cause a decline in the area wolf population. Accordingly, the FWS's violation of the Endangered Species Act offends me and will continue to deprive myself and other FATE members of the recreational, scientific, and aesthetic benefits derived from this species.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

February 11,  2008

_Robert Waligora_
Robert Waligora

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| The Humane Society of the United States; Help Our Wolves Live ("HOWL"); Animal Protection Institute; and Friends of Animals and Their Environment, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | **Civil No. 1:07-cv-00677-PLF** |
| v. | ) ) | |
| Dirk Kempthorne, Secretary of the Interior; United States Department of the Interior; and United States Fish and Wildlife Service, | ) ) ) ) | |
| Defendants, | ) ) | |
| U.S. Sportsmen's Alliance Foundation, Wisconsin Bear Hunters Association, *et al.*, | ) ) ) | |
| Intervenor-Defendants, | ) ) | |
| Safari Club International, National Rifle Association, *et al.*, | ) ) ) ) | |
| Intervenor-Defendants. | ) ) | |

## PROPOSED ORDER

Upon consideration of Plaintiffs' Motion for Summary Judgment, Defendants' Cross-Motions for Summary Judgment, the oppositions and replies thereto, and the entire record herein, it is **ORDERED** that Plaintiffs' motion is **GRANTED** and Defendants' motions are **DENIED**; and it is

**FURTHER DECLARED**, **ADJUDGED, and DECREED** that Defendants Secretary of the Interior Dirk Kempthorne, the United States Department of the Interior, and the United States Fish and Wildlife Service violated the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*, and

the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), by issuing the final rule designating and

delisting the western Great Lakes distinct population segment of the gray wolf, 72 Fed. Reg.

6062 (Feb. 8, 2007) ("Final Rule"); and it is

      **FURTHER ORDERED** that the Final Rule is vacated; and it is

      **FURTHER ORDERED** that Defendants Secretary of the Interior Dirk Kempthorne, the

United States Department of the Interior, and the United States Fish and Wildlife Service are

permanently enjoined from implementation of any aspect of the Final Rule.

      **SO ORDERED**.


Dated:_____          _____
                                The Honorable Paul L. Friedman
                                United States District Judge

## <u>ATTORNEYS TO BE NOTIFIED</u>

**Attorneys To Be Notified Electronically:**

Rebecca G. Judd
rjudd@hsus.org
Jonathan R. Lovvorn
jlovvorn@hsus.org
THE HUMANE SOCIETY OF THE UNITED STATES
2100 L Street, NW
Washington, DC  20037
(202) 452-1100
(202) 778-6132 (facsimile)

Brian B. O'Neill
boneill@faegre.com
Sanne H. Knudsen
sknudsen@faegre.com
Michael C. Soules
msoules@faegre.com
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-3901
(612) 766-7000
(612) 766-1600 (facsimile)
*Attorneys for Plaintiffs*

Jimmy A. Rodriguez
U.S. DEPARTMENT OF JUSTICE
P.O. Box 7369
Washington, DC 20044
(202) 305-0342
Fax: (202) 305-0275
jimmy.rodriguez@usdoj.gov
*Attorney for Federal Defendants*

William P. Horn
whorn@dc.bhb.com
James Hardwick Lister
jlister@dc.bhb.com
BIRCH, HORTON, BITTNER AND CHEROT
1155 Connecticut Avenue, NW
Suite 1200
Washington, DC 20036
(202) 659-5800
Fax: (202) 659-1027
*Attorneys for Intervenor-Defendants U.S. Sportsmen's Alliance Foundation, et al.*

Anna Margo Seidman
aseidman@cox.net
Douglas Scott Burdin
dburdin@sci-dc.org
SAFARI CLUB INTERNATIONAL
501 2nd Street, NE
Washington, DC 20002
(202) 543-8733
Fax: (202) 543-1205
*Attorneys for Intervenor-Defendants Safari Club International et al.*

Amy R. Atwood
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR  97211
(503) 283-5474
(503) 283-5528 (fax)
atwood@biologicaldiversity.org
*Attorney for Amicus Curiae Center for Biological Diversity*

Thomas G. Echikson
SIDLEY AUSTIN BROWN & WOOD
1501 K Street, NW
Washington, DC  20005
(202) 736-8000
(202) 736-8711 (fax)
techikson@sidley.com
*Attorney for Amicus Curiae Pacific Legal Foundation et al.*

Marie Shamraj
MICHIGAN DEPARTMENT OF ATTORNEY GENERAL
525 West Ottawa
Sixth Floor, Williams Building
Lansing, MI 48909
(517) 373-7540
shamrajm@michigan.gov
*Attorney for Amicus Curiae Michigan Department of Natural Resources et al.*

Jonathan R. Stone
CADWALADER WICKERSHAM & TAFT LLP
1201 F Street, NW
Washington, DC 20004
(202) 862-2270
(202) 862-2400 (fax)
jstone@cwt.com
*Attorney for Amicus Curiae National Wildlife Federation et al.*

**Attorneys To Be Notified By Other Means:**

M. Carol Bambery
ASSOCIATION OF FISH & WILDLIFE AGENCIES
444 North Capitol Street, NW
Suite 725
Washington, DC 20001

J. Anthony Logan
OHIO DEPARTMENT OF NATURAL RESOURCES
2045 Morse Road, D-3
Columbus, OH 43229

Tracy E. McGinnis
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 180
Jefferson, MO 65102-0180

David W. Merchant
OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF MINNESOTA
445 Minnesota Street
100 Bremer Tower
Saint Paul, MN 55101

Paul Morrison
OFFICE OF THE ATTORNEY GENERAL
120 SW 10th Street
Memorial Hall, Second Floor
Topeka, KS 66612

Morgain M. Sprague
KENTUCKY DEPARTMENT OF FISH & WILDLIFE RESOURCES
#1 Sportsman's Lane
Frankfurt, KY 40601

Wayne K. Stenehjem
600 East Boulevard Avenue
Department 25
Bismarck, ND 58505-0040

J. B. VanHollen
OFFICE OF THE ATTORNEY GENERAL
17 West Main Street
Madison, WI 53703
*Attorneys For Amicus Curiae Michigan Department of Natural Resources, et al.*