## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil No. 1:07-cv-677-PLF |
| DIRK KEMPTHORNE, Secretary of the Department of the Interior, the UNITED STATES DEPARTMENT OF THE INTERIOR, and the UNITED STATES FISH and WILDLIFE SERVICE. | ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| U.S. SPORTSMEN'S ALLIANCE FOUNDATION, WISCONSIN BEAR HUNTING ASSOCIATION, *et al.*, | ) ) ) ) | |
| Intervenor-Defendants, | ) ) | |
| SAFARI CLUB INTERNATIONAL and the NATIONAL RIFLE ASSOCIATION, *et al.*, | ) ) ) ) | |
| Intervenor-Defendants. | ) | |

## REPLY IN SUPPORT OF FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

PAGE

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    The Service properly established and delisted the Western Great Lakes DPS.
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.    The Service correctly utilized the DPS tool in the Final Rule. . . . . . . 3

      B.    The Service Has Not "Circumvented the Significant Portion of the
            Range Analysis." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.   The Western Great Lakes DPS boundaries are reasonable, based upon sound
      science, and entitled to a high degree of deference. . . . . . . . . . . . . . . . . . . . 10

      A.    The DPS boundary lines are entitled to deference. . . . . . . . . . . . . . . . 11

      B.    The Final Rule marks the consummation of the ESA's conservation
            mandate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      C.    The DPS boundaries were specifically drawn to comply with the case
            law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      D.    The Final Rule does not prevent additional recovery efforts. . . . . 15

III.  The Western Great Lakes Wolf Population is No Longer Under a Threat of
      Extinction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      A.    The achievement of the goals set forth in the Eastern Timber Wolf
            Recovery Plan cannot be dismissed. . . . . . . . . . . . . . . . . . . . . . . . . 16

      B.    The state management plans are adequate and the effects of disease
            and human predation do not pose a threat of extinction now or the
            foreseeable future. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

            1.    The Service reasonably relied upon the 1997 Michigan State
                  Management Plan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

            2.    Plaintiffs' worst-case scenarios are not supported by the
                  available data. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

            3.    The Service was reasonable in concluding that the state
                  management plans would be adequately funded. . . . . . . . . 20

i

**4.**     **Disease and human predation do not threaten the long-term survival of wolves in the region.** . . . . . . . . . . . . . . . . . . . . . . . . 21

**C.**     **The Service has complied with the ESA's post-delisting monitoring requirement.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**IV.**     **If the Court finds a violation of law, it retains the discretion to leave the Final Rule in place.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## TABLE OF AUTHORITIES

PAGE

**CASES**

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*American Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1086 (D.C. Cir. 2001) . . . . . . . . . . . 23

*Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Camp v. Pitts*, 411 U.S. 138, 142 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Center for Biological Diversity v. Kempthorne*, 498 F.Supp.2d 293, 294 (D.D.C. 2007) . . 15, 16

*Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 842-43 (1984) . . . . . . . 11

*Defenders of Wildlife v. Norton*, 239 F. Supp. 2d 9 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . 6, 7

*Defenders of Wildlife v. Secretary, U.S. Dep't of the Interior*, 354 F. Supp. 2d 1156, 1169 (D. Or. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 14, 15

*Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 745 (1985) . . . . . . . . . . . . . . . . . . . . . . . 23

*Friends of the Wild Swan v. U.S. Fish & Wildlife Serv.*, 12 F. Supp. 2d 1121 (D. Or. 1997) . . 6,8

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 166, 2 L.Ed. 60 (1803) . . . . . . . . . . . . . . . . . . . . . 4

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. Ruckelshaus*, 719 F.2d 1159, 1167 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 66 (2004) . . . . . . . . . . . . . . . . . . . 4

*Roosevelt Campobello v. EPA*, 684 F.2d 1041, 1050 n.5 (1st Cir. 1982) . . . . . . . . . . . . . . . . . 10

*Sugar Cane Growers Co-op. of Florida v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002) . . . . . . 23

*Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1994) . . . . . . . . . . . . . . . . . . . . . . 12

*Vermont Yankee Nuclear Power v. Natural Resources Defense Council*, 435 U.S. 519, 523-24, 548, 555 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Wyoming Farm Bureau Federation v. Babbitt*, 199 F.3d 1224 (10th Cir. 2000) . . . . . . . . . . . . 15

**STATUTES**

16 U.S.C. § 1532 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5

16 U.S.C. § 1532(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 13

16 U.S.C. § 1533 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 16, 18, 21

16 U.S.C. § 1533(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

16 U.S.C. § 1533(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

16 U.S.C. § 1533(g)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**REGULATIONS**

50 C.F.R. § 424.11(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

50 C.F.R. § 424.11(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**INTRODUCTION**

After reading Plaintiffs' reply brief, it becomes abundantly clear that they have lost sight of the overarching purpose of the Endangered Species Act ("ESA"), which is not to keep species on the list of endangered species in perpetuity but is, instead, to achieve recovery so that species can be removed from the endangered list. The ESA is a recovery, not a restoration, statute. Federal Defendants understand that Plaintiffs wish to "foster respect, understanding, and compassion for all creatures," and those are laudable goals, but they are not the ESA's goals. *Compare* Amended Complaint at ¶ 11 *with* 50 C.F.R. § 424.11(d)(1). Similarly, this case is not about evaluating whether returning management responsibilities of the recovered Western Great Lakes wolf population to the state wildlife agencies, or the Service's utilization of the distinct population segment ("DPS") tool, is good public policy. Instead, the Court is charged with determining whether the Final Rule[1]/ represents a valid exercise of the Service's lawful discretion. Because the decision to update the gray wolf's listing status – by establishing the Western Great Lakes DPS of gray wolf and then delisting that DPS – is rational, based upon the best available scientific data, and in full compliance with the ESA, it must be upheld by the Court.

In their briefing, Plaintiffs have consistently conflated the legal issues and unnecessarily complicated the facts in an attempt to distract the Court from the following: first, the Western

---

[1]/ *Final Rule Designating the Western Great Lakes Populations of Gray Wolves as a Distinct Population Segment; Removing the Western Great Lakes Distinct Population Segment of the Gray Wolf From the List of Endangered and Threatened Wildlife*, 72 Fed. Reg. 6052 (Feb. 8, 2007), which can be found at Administrative Record ("AR") Document ("Doc.") 467. For the Court's convenience, a copy of the Final Rule was included as an exhibit to Federal Defendants' opening memorandum ("Defs' SJ Mem."), Docket No. 41 and 42.

Great Lakes wolf population has greatly exceeded the recovery goals set forth in the Eastern

Timber Wolf Recovery Plan, a plan which establishes the baseline for determining whether the

population has "recovered"; second, the Western Great Lakes wolf population is both "discrete"

and "significant" and was therefore properly deemed a DPS; third, any action that the ESA

authorizes for a "species" – including delisting – is also authorized and/or required for a DPS;

fourth, the Service considered the Western Great Lakes wolf population's entire range in its

significant portion of the range analysis, which – for the purposes of this case – renders

irrelevant the debate over whether a significant portion of a species' range includes both current

and historical ranges; and finally, the States of Michigan, Wisconsin, and Minnesota have been

active and responsible partners in achieving wolf recovery and there is no indication that their

continued management efforts will be any less successful.  For these reasons, and all the reasons

discussed in briefs filed in support of the Final Rule, Federal Defendants respectfully request that

the Court grant its cross-motion for summary judgment and deny Plaintiffs' motion for summary

judgment.

## I.      The Service properly established and delisted the Western Great Lakes DPS.

In their opening brief, Defendants explained that the ESA defines the term "species" to

include "any subspecies of fish or wildlife or plants, and any *distinct population segment* of any

species of vertebrate fish or wildlife which interbreeds when mature."  16 U.S.C. § 1532 (16)

(emphasis added); Defs' SJ Mem. at 14.  Defendants also explained that any action, including

delisting, that the ESA or its implementing regulations authorize or require for a "species" is also

authorized or required for a DPS.  *Id.*  For instance, the ESA requires the Service to review the

status of listed species every five years to determine whether any "species" (including subspecies

or DPS) should be removed from the list.  16 U.S.C. § 1533 (c)(2)(B).  Similarly, the ESA's

implementing regulations provide that a "species" (including subspecies or DPS) "shall be listed

or reclassified" based upon the five listing factors set forth in 16 U.S.C. § 1533(a) and "may be

delisted on the basis of recovery" if the "best scientific and commercial data indicate that it is no

longer endangered or threatened."  50 C.F.R. § 424.11(c), (d)(2).  Moreover, the Service's DPS

Policy expressly states that it is intended for "the purposes of listing, *delisting*, and reclassifying

species under the Endangered Species Act . . . ."  DPS Policy, 61 Fed. Reg. at 4722 (Feb. 7,

1996) (emphasis added).  Thus, Defendants demonstrated that the statute, the implementing

regulations, and the Service's DPS Policy all contradict Plaintiffs' position that the ESA does not

permit a DPS to be used for delisting.  Defs' SJ Mem. at 14-16.

> **A.    The Service correctly utilized the DPS tool in the Final Rule.**

Plaintiffs continue to claim that while the ESA allows the Service to "list a locally

vulnerable population of a vertebrate species as a DPS even though the species as a whole is

neither threatened or endangered," it does not allow the Service to *delist* a locally recovered

population of a vertebrate species as a DPS, while retaining a listed status for the remainder of

the species.  Plaintiffs Reply Memorandum ("Pls' Reply"), Docket No. 53, at 12.  Their

conclusion is premised on the faulty argument that by delisting just the Western Great Lakes

DPS, when the gray wolf was originally listed throughout the lower 48 states and Mexico, the

Service has circumvented the significant portion of the range analysis required under the ESA.

Pls' Reply at 11.  Once again, Plaintiffs are wrong.  Nothing in the statute, regulations, or DPS

Policy prohibit the Service from delisting a validly drawn, recovered DPS simply because other

members of the species as a whole remain listed.  As long as the population at issue meets the

discreteness and significance requirements of the DPS Policy, it is a valid DPS and can be listed,

reclassified, or delisted just like a species or a subspecies.  *See* DPS Policy, 61 Fed. Reg. at 4725.

Indeed, the DPS Policy – which Plaintiffs do not challenge – instructs the Service to consider the

conservation status of the population segment in relation to the ESA's standards for listing only

after it has determined that the population segment meets the discreteness and significance

criteria that qualify it as a DPS.  *Id.*  Defendants demonstrated in their opening brief that the

Western Great Lakes gray wolf population is a valid DPS that easily satisfies the delisting

criteria set forth in the Recovery Plan for the Eastern Timber Wolf.  Defs' SJ Mem. at 11-12, 19-

22.  Furthermore, Defendants fully explained that the ESA's plain language, the DPS Policy

itself, and the applicable case law, all make clear that DPSs may be utilized for both listing and

delisting species.  Defs' SJ Mem. 14-19.  Although – as a matter of policy – Plaintiffs may not

have chosen to utilize the DPS policy to delist a population, the Final Rule was based upon a

valid construction of the ESA and therefore represents the Service's lawful policy choice, which

should not be disturbed by the Court.  *See Norton v. Southern Utah Wilderness Alliance,* 542

U.S. 55, 66 (2004) (holding that "[t]he principal purpose of the APA limitations . . . is to protect

agencies from undue judicial interference with their lawful discretion, and to avoid judicial

entanglement in abstract policy disagreements which courts lack both expertise and information

to resolve"); *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 166, 2 L.Ed. 60 (1803) (Marshall,

C.J.) (asserting that the courts' reviewing power is triggered "where a specific duty is assigned

by law...."; and that discretionary acts by the executive "are only politically examinable").

     **B.**     **The Service Has Not "Circumvented the Significant Portion of the Range Analysis."**

     Plaintiffs' rationale – that by delisting the Western Great Lakes DPS the Service has

somehow circumvented the significant portion of the range analysis – relies on an incorrect reading of the ESA. Pls' Reply at 11-15. The term "significant portion of its range" appears in the definitions of "endangered species" and "threatened species."[2]/ 16 U.S.C. § 1532 (6),(20). As Defendants' opening brief explained, these definitions and the ESA's definition of "species" must be read together. Defs' SJ Mem. at 27. To determine whether a species, subspecies, or DPS is an endangered species or a threatened species the Service must analyze the five factors, set out in ESA Section 4(a)(1). 16 U.S.C. § 1533(a)(1). The geographic scope of the five-factor analysis depends on the "range" of the specific entity being considered for listing, reclassification, or delisting. In this case, the Service determined whether the Western Great Lakes DPS met the ESA's definition of endangered species or threatened species, so the scope of the five-factor analysis was properly tailored to the range of that DPS. The Service correctly examined whether the Western Great Lakes DPS remained in danger of extinction throughout all or a significant portion of the DPS's range or was likely to become endangered within the foreseeable future throughout all or a significant portion of the DPS's range, due to any of the five factors individually or in combination. Based on the best scientific and commercial data available, the Service concluded that the Western Great Lakes DPS did not meet the ESA's definition of an endangered species or a threatened species, and warranted delisting. Final Rule, 72 Fed. Reg. at 6069-6101. The Final Rule has no effect on the listing status of gray wolves outside the Western Great Lakes DPS.

---

[2]/An "endangered species" means "any species which is in danger of extinction throughout all or a significant portion of its range," and a "threatened species" means "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532 (6),(20).

Because the Final Rule does not affect the conservation status of wolves outside the Western Great Lakes DPS, the parade of horribles that Plaintiffs conjure up, *see* Pls' Reply at 13-14, will not come to pass. The Service has analyzed the significant portion of the range for the Western Great Lakes DPS and explained why any unoccupied portions of that range are not significant. Any subsequent final agency action to delist or reclassify gray wolf populations outside the Western Great Lakes DPS will have to comply with the ESA and will be subject to judicial review when it is ripe.

If the Final Rule had downlisted or delisted the gray wolf throughout the lower 48 states, the geographic scope of the five-factor analysis would have been broader, but that is not the agency action before the Court. The only action properly before the Court is the Final Rule delisting the Western Great Lakes DPS, and the geographic scope of the five-factor analysis for that action is lawful. Because the Final Rule complies with the ESA, its implementing regulations, and the DPS Policy, it should be upheld.

Finding no support for their position in the statute, the regulations, or the DPS Policy, Plaintiffs rely on two cases, *Defenders of Wildlife v. Norton*, 239 F. Supp. 2d 9 (D.D.C. 2002) ("*Defenders (lynx)*") and *Friends of the Wild Swan v. U.S. Fish & Wildlife Serv.*, 12 F. Supp. 2d 1121 (D. Or. 1997) ("*Friends of the Wild Swan*"), to argue that a DPS cannot be delisted if other members of the species as a whole remain listed. Pls' Reply at 11. These two cases are not binding on this Court and, in any event, fail to make Plaintiffs' point.

*Defenders (lynx)* involved a challenge by environmental groups to the Service's decision to list the Canada lynx as a threatened, rather than an endangered, DPS within the contiguous United States. 239 F. Supp. 2d at 11. The plaintiffs charged that the Service should have listed

the lynx population in the contiguous United States as four separate DPSs in the Northeast, Great
Lakes, Southern Rocky Mountains, and Northern Rocky Mountains/ Cascades, not as a single
DPS. *Defenders (lynx)*, 239 F. Supp. 2d at 18, n.5. Plaintiffs also charged that the Service
arbitrarily focused on the relatively robust lynx population and habitat in the Northern Rockies/
Cascades Region, while ignoring the other three regions *within the DPS* where the lynx was rare
or possibly extirpated, in order to avoid listing the entire DPS as endangered. The Court held
that the Service did not adequately explain its determination that the Northeast, Great Lakes, and
Southern Rocky Mountains regions were not a significant portion of the lynx's range within the
DPS, and it remanded the decision for further consideration and explanation. *Id.* at 21.

Defenders (lynx) stands only for the unremarkable proposition that *if* the Service creates a
DPS that encompasses the entire historical range of the species, it must identify the significant
portions of that range and explain its decision. The case does not preclude the Service from
creating a DPS that does *not* encompass the entire historical range of the species. Nor does it
require the Service to conduct the ESA Section 4(a)(1) analysis across the species' entire
historical range before it can delist such a DPS. To the contrary, *Defenders (lynx)* supports the
Service's decision to limit its "significant portion of the range" analysis to the gray wolf's range
within the boundaries of the Western Great Lakes DPS. In addition, unlike the lynx rule – where
three-fourths of the historical range was deemed insignificant without sufficient analysis or
explanation – , here the Service painstakingly considered the entire historical range within the
DPS and found that the vast majority of suitable gray wolf habitat within the Western Great
Lakes DPS was a "significant portion of its range." *See* Defs' SJ Mem. at 29-30; Final Rule, 72
Fed. Reg. at 6071-74.

*Friends of the Wild Swan* is similarly unhelpful to Plaintiffs' argument. *See* Pls' Reply at 12. In that case, environmental groups challenged the Service's decision to list only two of five bull trout populations as DPSs. 12 F. Supp. 2d at 1121. The Court held that the Service's determination was arbitrary and capricious because it was not adequately explained by the administrative record and because it failed to address the complete scope of the plaintiffs' listing petition, which asked the agency to list the bull trout throughout its entire range. *Friends of the Wild Swan*, 12 F. Supp. 2d at 1133-34. The Court noted that the Service had to determine whether the entire bull trout species qualified for listing before it could proceed by population segment, not because the ESA required it, but because the Service's findings had to be "at least comprehensive enough to address the [plaintiffs'] petition to list." *Id.* at 1134. Thus, *Friends of the Wild Swan* does not stand for the proposition that every listing or delisting determination must address the entire species before it addresses a distinct population segment. Instead, it stands for the proposition that a determination on a listing petition must address the complete scope of that petition. Whether the rulemaking adequately addressed the scope of a listing petition is not at issue here, and the Service fully explained its decision to create and delist the Western Great Lakes DPS.

Furthermore, to the extent that *Friends of the Wild Swan* advocates a policy of "institutionalized caution," as Plaintiffs contend, the Final Rule's approach is conservative. Plaintiffs argue that the Service must begin a listing inquiry at the whole species level and work its way down, listing at the DPS level only after determining that a species or subspecies listing is inappropriate. Pls' Reply at 12. Applying the conservative approach that Plaintiffs advocate to the *delisting* process would require the Service to begin its analysis at the DPS level and work

its way up to the subspecies or species level only if a broader delisting were appropriate. Without accepting this reasoning as correct, even by Plaintiffs' own logic the Service has followed a conservative approach in its delisting of the Western Great Lakes DPS.

Plaintiffs' arguments find no support in the caselaw, but the Service's approach to the Final Rule does. As Defendants explained in their opening brief, the Final Rule is the product of the Service's efforts to comply with prior court decisions from the District of Oregon and the District of Vermont regarding the agency's prior effort to reclassify certain gray wolf populations. Defs' SJ Mem. at 16-17. In particular, the same Oregon Court that issued *Friends of the Wild Swan* held that "[t]he DPS Policy provides FWS the flexibility to list, downlist, or delist discrete and significant populations, even though the conservation status of the species may differ elsewhere." *Defenders of Wildlife v. Secretary, U.S. Dep't of the Interior*, 354 F. Supp. 2d 1156, 1169 (D. Or. 2005). Similarly, the Vermont Court held that the ESA "allows defendants to provide varying levels of protection based on biological evidence." *National Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553, 564 (D.Vt. 2005). The Court agreed with the plaintiffs that the ESA and DPS Policy allow the Service to "maintain[] a nationwide species listing, [while] establishing DPSs in areas where [the Service] needs the kind of flexibility the DPS designation provides." *Id.* "Nowhere in the ESA is the Secretary prevented from creating a 'non-DPS remnant' designation, especially when the remnant area was already listed as endangered." *Id.* at 565.

At bottom, Plaintiffs' significant portion of the range argument is a red herring. It takes Plaintiffs six pages of briefing to explain their rationale for why the ESA's use of the term "range" unambiguously refers to a species' "historical range" instead of its "current range." Pls'

Reply at 5-11.  However, no lengthy response is required because this argument is irrelevant here.  As explained above, the appropriate scope for the "significant portion of the range" analysis is the range of the Western Great Lakes DPS, not the range of the entire species.  The Service addressed both the current and historical range of the gray wolf within the boundaries of the Western Great Lakes DPS.  *See* Defs' SJ Mem. at 30-31.  Accordingly, because the Final Rule is in full compliance with the ESA (including the ESA's "significant portion of the range" language), its implementing regulations, the DPS Policy, and the relevant case law, it should be upheld by the Court.[3]/

## II.    The Western Great Lakes DPS boundaries are reasonable, based upon sound science, and entitled to a high degree of deference.

As explained in Federal Defendants' opening brief, Plaintiffs have failed to demonstrate

---

[3]/ Although the Court need not go beyond the plain language of the statute in order to reject Plaintiffs' claims, the ESA's legislative history also supports the Service's decision to delist the Western Great Lakes DPS by revealing Congress's intent to give the Secretary of the Interior greater flexibility to tailor listings geographically, to allow the location and degree of the listing to match the location and degree of the threat.  For example, Senator Tunney explained that the addition of the phrase "significant portion of its range" to the definition of "endangered species" provided the Secretary of the Interior the following added flexibility:

[T]he Secretary may list an animal as 'endangered' through all or a portion of its range.  An animal might be 'endangered' in most States but overpopulated in some.  In a State in which a species is overpopulated, the Secretary would have the discretion to list that animal as merely threatened or to remove it from the endangered species listing entirely while still providing protection in areas where it was threatened with extinction.  In that portion of its range where it was not threatened with extinction, the States would have full authority to use their management skills to insure the proper conservation of the species.

119 Cong. Rec. 25,669 (July 24, 2973).  *Accord, Roosevelt Campobello v. EPA*, 684 F.2d 1041, 1050 n.5 (1st Cir. 1982).  Thus, the legislative history reinforces the Service's conclusion that the conservation status of a species may vary between regions of the United States, and it demonstrates that the Final Rule is a valid exercise of the discretion that Congress intended to vest in the Secretary of the Interior through the ESA.

that the Western Great Lakes DPS boundaries were drawn in an arbitrary and capricious manner.

Defs' SJ Mem. at 23-26.  The evidence in the Administrative Record refutes Plaintiffs'

assertions by demonstrating that the Service considered the best available scientific data on wolf

distributions and movements when it delineated the boundaries of the Western Great Lakes DPS.

*Id.*; *see also infra* at 12.  Because the Service was exercising its expertise as the agency charged

with implementing the ESA, its conclusions regarding the boundary lines are entitled to a high

degree of deference.  Ultimately, because the Service reached a reasonable conclusion based

upon the available data, the DPS lines should be upheld.

In their reply brief, Plaintiffs rehash several arguments that were made in their opening

memorandum.  First, Plaintiffs conclusorily dismiss the fact that the Service's DPS boundary

determination is entitled to a high degree of deference, with no citation to authority, and they

state that the DPS boundaries are "inconsistent with congressional intent to encourage species

conservation . . . ."  Pls' Reply at 21.  Second, Plaintiffs allege that the Oregon court did not

instruct the DPS boundaries to be drawn as they were in the Final Rule and go so far as to assert

that "FWS has repeated the error identified by the Oregon court."  Pls' Reply at 21-22.  Finally,

Plaintiffs argue that the DPS boundary lines frustrate future wolf recovery.  Pls' Reply at 22.   As

explained in Defendants' opening brief, and discussed below, none of these contentions have

merit.

> **A.     The DPS boundary lines are entitled to deference.**

As an initial matter, because there is little statutory guidance on drawing the boundaries

of a DPS and the determination required a weighing of the biological information, it is

indisputable that the Service exercised a wide degree of discretion when it defined the

boundaries of the Western Great Lakes DPS.[4]/ Plaintiffs erroneously allege that the Service's

"exercise of discretion is unreasonable." Pls' Reply at 21. This allegation is not borne out by

the evidence in the Administrative Record. Here, the Service was faced with several options,

among them were drawing a tight line around the core Great Lakes wolf population or drawing a

very large circle around the core population plus all known dispersers. Final Rule at 6060-62;

AR Doc. 64. In the end, however, the Service chose a reasonable middle ground – drawing the

boundary line to include the core recovered wolf population in the Great Lakes Region plus a

wolf movement zone around the core population, which includes dispersers known to contribute

to the core population. Final Rule at 6061-62. This reasonable choice was the culmination of an

exhaustive review of biological scientific data and the regulatory guidance; indeed, the

Administrative Record demonstrates that the Service brought its substantial expertise on wolves

and wolf recovery directly to bear on the issue of where to draw the DPS boundary lines and

thoroughly analyzed the issue. AR Doc. 64 (memorandum authored by FWS wolf expert

---

[4]/ The deference owed to the boundary lines can be viewed in two ways. First, from a factual perspective, the Service's determinations were based on its expert scientific evaluation of wolf biology and the Court must be at its most deferential in determining whether the agency's actions were arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. Ruckelshaus*, 719 F.2d 1159, 1167 (D.C. Cir. 1983) (citing *Baltimore Gas & Elec. Co. v. NRDC,* 462 U.S. 87, 103 (1983)). Second, from a statutory perspective, the ESA and DPS policy provide little guidance on the issue of where DPS boundary lines should be drawn, so in filling this gap – in the context of a rule that has gone through formal notice and comment – the Service's legal conclusions are also entitled to deference. *See Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 842-43 (1984) (holding that if Congress has spoken to the question at issue, then that is the end of the matter but if Congress has left a gap in the statute or the text of the statute is ambiguous, then the court must determine if the agency's interpretation is permissible, and if so, the court must defer to it); *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1994) (holding that "the agency's interpretation [of its own regulations] must be given controlling weight unless it is plainly erroneous . . .") (citations and quotations omitted). Plaintiffs have failed to refute either of these two points. Pls' Reply at 21 (challenging the degree of deference owed to the Service but citing no caselaw).

analyzing the delineation of the DPS boundaries); AR Doc. 57 (same); AR Doc. 58 (same); AR Doc. 77 (same). In addition to the Service's own experts, the delineation of the DPS boundary lines was supported by the peer-reviewers' analysis. AR Doc. 318 at 9029 (summary of peer review comments). Finally, the Service's underlying rationale with regard to the DPS boundaries was thoroughly explained in the Final Rule. Final Rule, 72 Fed. Reg. at 6060-62. Consequently, the decisions made with regard to the DPS boundary lines were not arbitrary and capricious and should therefore be upheld by the Court.

> **B.    The Final Rule marks the consummation of the ESA's conservation mandate.**

The creation and delisting of the Western Great Lakes DPS in no way discourages species conservation as Plaintiffs suggest. Pls' Reply at 27. Instead, the Final Rule marks the fulfillment of the ESA's conservation requirement. The ESA defines "conservation" as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species *to the point at which the measures provided pursuant to this chapter are no longer necessary*." 16 U.S.C. § 1532(3) (emphasis added). Here, the States, tribes, and conservation groups have all played a key role in the recovery of the Western Great Lakes wolf population and now, because the wolf population is recovered and healthy, continued conservation efforts under the ESA are no longer necessary. Plaintiffs' assertion that the delisting of the Great Lakes wolf population is inconsistent with the ESA's conservation requirement is based upon their apparent confusion of the term "conservation" with "restoration." The ESA mandates that conservation efforts should end when they are no longer necessary. 16 U.S.C. § 1532(3). However, the ESA does not require the range-wide restoration of the gray wolf to all areas that it historically inhabited before it may be delisted in the Western Great Lakes Region – an area that

13

is inhabited by a healthy, recovered wolf population.

**C.    The DPS boundaries were specifically drawn to comply with the case law.**

Plaintiffs continue to erroneously assert that the DPS boundaries are somehow

inconsistent with the Oregon court decision. Pls' Reply at 21-22 (claiming that "the District of

Oregon expressed no view on the propriety of a Western Great Lakes DPS"). Nothing could be

further from the truth. The Western Great Lakes DPS was specifically created, and the

boundaries drawn, to comply with previous court decisions, including the Oregon court ruling.

*See, e.g.,* AR Doc. 57 at 228 (memorandum entitled: "Thoughts on Delineating a Gray Wolf DPS

for Recovered Wolves in the Midwest Following the Ruling by the Oregon District Court"); AR

58; AR 64; AR 77. The Oregon court correctly did not endorse specific DPS boundaries (any

such opinion would have been advisory and impermissibly encroached upon the expert agency's

discretion) but the Oregon court made clear that the Service had erred in 2003 by not "drawing a

line around the distinct populations in the Western Great Lakes and the Northern Rockies . . . ."

354 F.Supp.2d at 1171. Further, the Oregon court noted that "the conservation status of

populations within each [2003] DPS vari[ed] dramatically, ranging from recovered populations

in parts of Montana, to precarious populations in Washington, to extirpated populations in

Nevada, for example." *Id.* Here, by contrast, the Service did in fact draw a line around the

Western Great Lakes wolf population – a healthy, recovered population. Final Rule, 72 Fed.

Reg. at 6062-63.[5/] Hence, the Final Rule is in full compliance with the ESA and the case law,

---

[5/] It should also be noted that, with regard to the boundaries (*i.e.*, the overall size of the DPS) the
Oregon court did not invalidate the Service's previous DPSs strictly because of their size, but
instead found that the Service had failed to properly analyze the threats within each large DPS.
*Defenders*, 354 F.Supp.2d at 1171-72. Here, no such error was made because the Service
thoroughly analyzed the threats within the entire range of the population within Western Great

including the Oregon court decision.

**D.    The Final Rule does not prevent additional recovery efforts.**

Finally, Plaintiffs mistakenly argue that the DPS boundary lines frustrate future wolf recovery.  Pls' Reply at 22-23.  Because the Final Rule does not alter the ESA listing status of wolves outside of the DPS, it does not hinder the Service's or States' ability to implement reintroduction and recovery programs in other areas of the country.  Final Rule, 72 Fed. Reg. at 6065 (issue 11 and Response, explaining that the option of restoring wolves to the northeastern United States is preserved because wolves in the northeast would retain their endangered classification); *see also* AR at 204 (in discussing possible options, noting that recovery plans could be established for the remaining states).  Moreover, Plaintiffs' focus on the alleged inability of wolves within the DPS to disperse to other areas is misdirected because it takes an overly narrow view of wolf recovery possibilities.  For example, Plaintiffs overlook the fact that the Final Rule does not foreclose further wolf recovery in other areas of suitable habitat (*e.g.*, in the Northeast) via reintroduction programs.  *Id.*  Indeed, gray wolf populations in Wyoming, central Idaho, and the southwestern United States did not develop from dispersers, but from wolf reintroductions that were planned and carried out by the Service and partner agencies and organizations.  *See generally Wyoming Farm Bureau Federation v. Babbitt*, 199 F.3d 1224 (10th Cir. 2000) (discussing the Service's Rocky Mountain reintroduction efforts); *Center for Biological Diversity v. Kempthorne*, 498 F.Supp.2d 293, 294 (D.D.C. 2007) (noting that the first gray wolves were reintroduced into the southwestern United States in 1998).  Consequently, continued wolf recovery in areas outside of the Western Great Lakes DPS is not prevented by the

Lakes DPS.  Final Rule at 6069-71.

creation of the Western Great Lakes DPS.

III.    **The Western Great Lakes Wolf Population is No Longer Under a Threat of Extinction.**

    A.    **The achievement of the goals set forth in the Eastern Timber Wolf Recovery Plan cannot be dismissed.**

Plaintiffs incorrectly attempt to diminish and dismiss the remarkable success of achieving the goals established in the Eastern Timber Wolf Recovery Plan. Pls' Reply at 24-25. Specifically, Plaintiffs allege that Federal Defendants are implying that the satisfaction of the recovery goals supplants the need to perform an ESA five-factor threats analysis. *Id.* This is flatly inaccurate. Even a cursory reading of the Final Rule and its extensive 30-page discussion of the five listing factors shows that the Service *did not* use the achievement of the recovery goals as a surrogate for a Section 4(a)(1) threats analysis. *See* Final Rule at 6066 ("The population goals in the 1992 Recovery Plan are not the sole determinants of whether delisting is appropriate.").

Here, the Recovery Plan established the criteria for determining what constitutes a "recovered" wolf population in the region, which is its intended purpose. In particular, the ESA makes clear that recovery plans are to establish "objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list." 16 U.S.C. § 1533 (f)(1)(B)(ii). Thus, the fact that the "objective, measurable criteria" for determining when this wolf population should be delisted have been met, was rightly emphasized in Federal Defendants' opening brief and the Final Rule and is

incorrectly discounted by Plaintiffs.[6]  In contrast to recovery plans, the five-factor threats

analysis determines whether, if the protections of the ESA are removed, the recovered

population (as defined by a recovery plan) will be under a threat of extinction in the foreseeable

future.  Here, the Service acknowledged the undisputed fact that the Great Lakes wolf population

has satisfied the recovery goals set forth in the Eastern Timber Wolf Recovery Plan, Final Rule

at 6053-56, and then performed a robust threats analysis under Section 4(a)(1) in order to

determine whether the wolves would remain at or above recovered levels for the foreseeable

future, Final Rule at 6099-6101.  This is exactly how recovery plans should be utilized under the

ESA.

    **B.    The state management plans are adequate and the effects of disease and human predation do not pose a threat of extinction now or in the foreseeable future.**

As explained in Federal Defendants' opening brief, the Service found that none of the

five categories of threats – (1) habitat destruction or degradation or a reduction in the range of

the gray wolf; (2) utilization by humans; (3) disease, parasites, or predatory actions by other

animals or humans; (4) regulatory measures by State, Tribal, and Federal agencies; or (5) other

threats – would individually, or in combination, place the Western Great Lakes wolf population

in danger of extinction in the foreseeable future in all or a significant portion of the population's

range.  Defs' SJ Mem at 32-34; *see also* Final Rule, 72 Fed. Reg. at 6100-01 (summary of five-

factor analysis of potential threats); *see also* AR Doc. 318 at 9029 (summary of peer review

comments); AR Doc. 228 at 7440.  In their reply brief, Plaintiffs focus their attacks on the

---

[6] Remarkably, Plaintiffs only begrudgingly concede that the Recovery Plan is even relevant to this case.  Pls' Reply at 25 (stating that "Even *if* the Recovery Plan were relevant . . .") (emphasis in original).

adequacy of the regulatory mechanisms (*i.e.*, the state management plans) and the effects of

disease and human predation; they fail to challenge the Service's findings with regard to the

availability of suitable habitat or any of the other potential threats.  At the end of the day, none of

the five listing factors, including the adequacy of existing regulatory mechanisms along with

disease and human predation, threaten the wolves' long-term survival in the Western Great

Lakes region.

> **1.    The Service reasonably relied upon the 1997 Michigan State Management Plan**.

With regard to the state management plans, Plaintiffs misinterpret the Final Rule when

they claim that it relies on revisions to the Michigan wolf management plan.[7]/  Pls' Reply at 26.

Plaintiffs utilize a partial quote to make their point.  *Id*.  Here, Federal Defendants provide the

entire passage:

> MI DNR's history of leadership in wolf recovery, its repeated written
> commitments to ensure the continued viability of a Michigan wolf population
> above a level that would trigger State or Federal listing as threatened or
> endangered, along with the protective "Guiding Principles" from the Michigan
> Wolf Management Roundtable, lead us to conclude that both the current
> Michigan Plan, and the revised plan to be developed using the guidance of the
> Roundtable, will provide adequate regulatory mechanisms for Michigan wolves.

Final Rule at 6094.  A fair reading of the Service's analysis of Michigan's regulatory

mechanisms, Final Rule 6092-94, shows that the Service first analyzed the 1997 Michigan Plan

and concluded that it was an adequate regulatory mechanism and then discussed Michigan's

ongoing efforts to bolster that plan, which it expected to be adequate as well.  The fact that the

Service was relying on the 1997 Michigan Plan, and not the revisions, was highlighted in the

---

[7]/ Plaintiffs' challenges to the adequacy of the Michigan plan are also fully addressed in the State
of Michigan's Amicus Brief.  Docket No. 40.

Comments section of the Final Rule. *See* Final Rule at 6068 (Issues 32 and 33). In concluding

its analysis of Michigan's efforts, the Service properly stated that the current Michigan plan was

adequate and, that based on its review of Michigan's ongoing revisions and the States' past

history as a responsible steward of the wolves, the revised plan was also expected to provide an

adequate regulatory mechanism. Final Rule at 6094; AR Doc. 418 at 11491 (letter from

Michigan DNR, emphasizing that "the new revised Plan will underscore commitments to wolf

management already made in the 1997 plan"). This conclusion was rational and in no way

untoward or in violation of the ESA; indeed, had the Service only discussed the existing

Michigan plan, Plaintiffs would no doubt have claimed the agency erred in not acknowledging

the ongoing revision – regardless of whether it could or could not have relied upon those

revisions.

### 2.    Plaintiffs' worst-case scenarios are not supported by the available data.

Plaintiffs also return to an argument raised in their opening brief regarding an alleged

potential for a 50 percent decline in the Western Great Lakes wolf population. Pls' Reply at 27.

Plaintiffs fail to support their assertion with any data or explain how this worst-case scenario

would actually endanger the long-term survival of the wolf population. Instead, Plaintiffs

circularly dismiss the point that wolves would remain at recovered levels – even assuming

*arguendo* a 50 percent reduction – by claiming that the recovery goals established in the 1992

Recovery Plan are irrelevant. Pls' Reply at 27. However, as explained above, the recovery goals

are highly relevant, not for supplanting the threats analysis, but for setting the baseline of what

constitutes a recovered population level. Although Plaintiffs may be opposed to the death of a

single wolf, *see* Complaint at ¶ 11, the fact that some wolves will be taken as a result of

delisting, but not to a point that would threaten the population, does not call into question the validity of the Final Rule.

> **3.    The Service was reasonable in concluding that the state management plans would be adequately funded.**

Plaintiffs incorrectly assert that the state management plans will not be adequately funded.  Pls' Reply at 25.  This issue was fully addressed in Federal Defendants' opening brief.  Defs' SJ Mem. at 40-42.  The issue of state funding presented the Service with a difficult issue.  Appropriations are generally limited to the current fiscal year, so the Service was in the position of making assumptions in order to determine whether the state management plans would be adequately funded for the foreseeable future.  Final Rule at 6068; *see also generally* General Accounting Office, Principles of Federal Appropriations Law, 4-4 (1982).  There is nothing unlawful about this, however.  As long as the Service's assumptions were rational, then they must be upheld.  The Service explained in the Final Rule that it was reasonable to assume the plans will be adequately funded because of a suite of factors, including:  the fact that the States are the entities that "led the efforts to restore wolves" to the region and the state management plans "received the necessary approvals within the State governments", "the high public visibility of wolf management", "the extent of public interest and involvement in the development" of the state plans, and the Service's own monitoring "for the next five years."  Final Rule at 6068.  Plaintiffs in this case are attempting to set a bar so high that a species will never be eligible for delisting, no matter how well recovered its population or how dramatically reduced the threats, until a trust fund is established to ensure its management.  This is not required by the ESA nor should it be endorsed by this Court.

4.    **Disease and human predation do not threaten the long-term survival of wolves in the region.**

Plaintiffs attack the Service's conclusions regarding disease and human-caused mortality by relying on outdated assumptions and unsupported allegations. There is no doubt that, in the past, governmental entities and many private persons sought to eradicate wolves. Final Rule at 6068, 6081. However, as the Service explained, public sentiment and agency mandates have changed dramatically since that time. Final Rule at 6068. Specifically, "[w]hile wolf eradication might still be the wish of a small number of individuals, we believe there is broad support among the public and within governmental agencies to allow wolves to occupy our landscape, with some degree of management imposed to maintain control of the level of wolf-human conflicts." Final Rule at 6068. Furthermore, Plaintiffs ignore the role of compensatory mortality in analyzing human predation. That is, human-caused mortality "is not simply added to 'natural' mortality, but rather replaces a portion of it." Final Rule at 6083. In other words, many wolves taken by humans would have otherwise died from disease, intraspecies strife, or starvation. In fact, scientific studies have concluded "that human-caused mortality can replace about 70 percent of other forms of mortality." *Id.* Accordingly – based upon the general change in attitudes toward wolves, compensatory mortality, and other factors discussed in the Final Rule but ignored by Plaintiffs – the Service rationally concluded that all forms of human-caused mortality will not cause the Western Great Lakes wolf population to be in danger of extinction in the foreseeable future. Final Rule at 6083.[8]

---

[8] Despite Plaintiffs' arguments to the contrary, Federal Defendants were not being sarcastic in pointing out that Plaintiffs were assuming that persons would violate the law when they argued that illegal human-caused mortality would threaten the wolf population. *See* Defs' SJ Mem. at 36. Indeed, Plaintiffs are correct in pointing out that Defendants have been rebuked for

Finally, in a desperate attempt to refute the overwhelming evidence demonstrating that disease does not threaten the long-term viability of the wolf population, Plaintiffs make several unsupported assertions. For example, they claim that the wolf population in the Western Great Lakes region is still threatened by disease with no citation to scientific information or data. Pls' Reply at 31. This contention is belied by the opinions of the experts (both from within and outside of the Service) who reviewed this issue. *See* Final Rule, 72 Fed. Reg. at 6080-81; AR Doc. 469 at 17239*;* AR Doc. 469 at 17242; Defs' SJ Mem. at 34-37. With regard to an alleged lack of adequate monitoring, Federal Defendants explained in their opening brief that State monitoring has been more than adequate during the recovery process and that there is no indication that the States' monitoring efforts going forward will not be successful as well. *See* Defs' SJ Mem. at 34-37. Moreover, the Service's own post-delisting monitoring efforts will ensure that the States are properly monitoring the impacts of disease on the wolf population. *See* § C below. At bottom, Plaintiffs' strained attempts to keep wolves perpetually on the list of endangered species cannot be sustained because neither disease nor human-caused mortality threaten the long-term survival of wolves in the Western Great Lakes region.

**C.    The Service has complied with the ESA's post-delisting monitoring requirement.**

Because the Service has released a final, post-delisting monitoring plan in accordance with Section 4(g)(1) of the Act, Plaintiffs' claims regarding a lack of such a plan are moot. *See*

---

assuming that persons will violate the law. Pls' Reply at 31 n. 25. Plaintiffs cannot have it both ways; that is, attack the Service for assuming persons will take matters into their own hands in one case and then argue that illegal wolf kills will threaten the Western Great Lakes wolf population in the present action. State laws in the region prevent the illegal taking of wolves and there is no indication that these laws will not be enforced. Defs' SJ Mem. at 36-37.

http://www.fws.gov/midwest/wolf/ (Final Post-Monitoring Delisting Plan).  As explained in

Federal Defendants' opening brief, the Service made a clear, affirmative commitment to post-

delisting monitoring.  *See* http://www.fws.gov/midwest/wolf/ (Draft Post-Monitoring Delisting

Plan); 72 Fed. Reg. 30819 (notice of availability).  The ESA does not require the Service to have

a written post-delisting monitoring plan completed at the time of delisting as Plaintiffs suggest.

*See* Final Rule at 6069 ("There is no requirement that a PDM plan be completed before

delisting.").  Furthermore, the ESA does not require that the Service prepare a monitoring "plan"

or any other document.  16 U.S.C. § 1533(g)(1).  The statute merely requires that the agency

develop a "system" to effectively monitor the species' progress.  *Id*.  Here, the Service has been

monitoring wolves since the Final Rule was issued.  *See* 72 Fed. Reg. at 30820 ("Now that we

have made the delisting determination for the WGL DPS, we are implementing the PDM as

described in the Draft PDM Plan").  Hence, Plaintiffs' claims have always lacked merit.

However, since the Service has finalized its post-monitoring delisting plan, any arguments

attacking the lack of a written post-delisting monitoring plan have been rendered moot.[9]/

**IV.     If the Court finds a violation of law, it retains the discretion to leave the Final Rule
         in place.**

The Supreme Court has consistently held that, where the administrative record of an

agency action does not support that action, the proper course is to remand the decision to the

agency for additional investigation or explanation.  *Camp v. Pitts*, 411 U.S. 138, 142 (1973);

*Vermont Yankee Nuclear Power v. Natural Resources Defense Council*, 435 U.S. 519, 523-24,

---

[9]/ Plaintiffs appear to challenge the substance of the Draft-Post Delisting Monitoring Plan in
their briefing.  Pls' Reply at 32.  However, any such challenge was not ripe for review prior to
the finalization of the plan and is not presently before the Court.

548, 555 (1978); *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 745 (1985). Typically, in addition to remanding the decision, the court vacates the challenged action. *See, e.g., Sugar Cane Growers Co-op. of Florida v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002). However, Administrative Procedure Act violations do not always require vacatur. *Id.*; *see also, e.g., American Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1086 (D.C. Cir. 2001) (noting the court's practice "of remanding without vacating when we are unsure of the grounds the agency asserts to defend its action (and, perhaps, where we perceive that a ground poorly articulated might be sufficient to sustain the action)"); *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) ("An inadequately supported rule, however, need not necessarily be vacated."). "The decision whether to vacate depends on 'the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.'" *Allied-Signal*, 988 F.2d at 150-51 (quoting *International Union, UMW v. FMSHA*, 920 F.2d 960, 967 (D.C. Cir. 1990)). Federal Defendants request that, if the Court finds that the Final Rule violates the law, it be allowed to fully brief the issue of remedy, including whether the Final Rule should be vacated.

## CONCLUSION

For all the reasons discussed above and in other briefing filed in support of the Final Rule, Federal Defendants respectfully request that the Court deny Plaintiffs' motion for summary judgment and enter judgment for Defendants.

Respectfully Submitted this 7th day of March, 2008

> RONALD J. TENPAS
> Assistant Attorney General
> Environment & Natural Resources Division
> United States Department of Justice
> LISA L. RUSSELL
> Assistant Section Chief
> KRISTEN L. GUSTAFSON
> Senior Trial Attorney
> Wildlife & Marine Resources Section
>
> */s Jimmy A. Rodriguez*
> JIMMY A. RODRIGUEZ (Tx Bar. No. 24037378)
> Trial Attorney
> United States Department of Justice
> Ben Franklin Sta., P.O. Box 7369
> Washington, D.C., 20044-7369
> TELEPHONE:(202) 305-0342
> FAX: (202) 305-0275
> jimmy.rodriguez@usdoj.gov
> Attorneys for Defendants

Of Counsel:

Sharon Pudwill
United States Department of the Interior
Office of the Solicitor
Bishop Henry Whipple Fed. Bldg.
1 Federal Drive
Fort Snelling, MN 55111-4030

25