# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| HUMANE SOCIETY OF THE UNITED STATES, HELP OUR WOLVES LIVE, ANIMAL PROTECTION INSTITUTE, AND FRIENDS OF ANIMALS AND THEIR ENVIRONMENT, | ) ) ) ) ) | |
| | ) | Case No. 1:07-cv00677-PLF |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| DIRK KEMPTHORNE, Secretary of the Interior, U.S. DEPARTMENT OF THE INTERIOR, AND U.S. FISH AND WILDLIFE SERVICE | ) ) ) ) | |
| Defendants, | ) ) | |
| SAFARI CLUB INTERNATIONAL, SAFARI CLUB INTERNATIONAL FOUNDATION, AND NATIONAL RIFLE ASSOCIATION, | ) ) ) ) | |
| Defendant-Intervenors, | ) ) ) | |
| and | ) ) | |
| U.S. SPORTSMEN'S ALLIANCE FOUNDATION, WISCONSIN BEAR HUNTING ASSOCIATION, SCOTT MEYER, AND ROB STAFHOLT, | ) ) ) ) ) | |
| Defendant-Intervenors. | ) ) | |

## DEFENDANT-INTERVENORS' REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

**Page No.**

INTRODUCTION ..................................................................................................1

ARGUMENT .......................................................................................................5

    A.    Recovery in All Significant Portions of WGL-DPS Range.....................5

        1.    Irrelevance of Current v. Historic Range Debate..........................5

        2.    Unsuitable Habitat is not a Significant Range Portion .................6

    B.    Irrelevance of Areas Outside DPS ........................................................9

    C.    Recognition of DPS at Time of Delisting..............................................11

    D.    Collateral Attacks on Wolf Recovery Plan...........................................13

    E.    Section 1533(a)(1) Risk/Threats Analysis Factors ...............................13

        1.    Adequacy of Regulatory Mechanisms/State Wolf Management Plans .....14

        2.    Disease and Predation.................................................................17

        3.    Depredation Control in Dispersal Areas .....................................18

    F.    Post-Delisting Monitoring and Emergency Relisting............................21

    G.    Harmless Error Standard and Remedy if Error is Found.......................23

CONCLUSION.....................................................................................................24

# TABLE OF AUTHORITIES

## FEDERAL CASES

Page No.

*Center For Biological Diversity v. Hamilton*, 453 F.3d 1331,
1334 (11th Cir. 2006)................................................................13

*Defenders of Wildlife v. Babbitt* (lynx) 958 F. Supp. 670,
684 (D.D.C. 1997) ....................................................................10

*Defenders of Wildlife v. Norton (Florida Black Bear)*, Civil Action
No. 99-02072-HHk at 10-11 (D.D.C. Dec. 13, 2001) ..5*Defenders of Wildlife v. Norton (Lizard)*,
258 F.3d 1141, 1143 (9th Cir. 2001) ...........................................5

*Defenders of Wildlife v. Norton (Lynx)*, 258 F.3d 1141, 1142 (9th Cir. 2001)......................5, 6, 9

*Defenders of Wildlife v. Norton (Lynx)*, 239 F.Supp.2d 9 (D.D.C. 2002) (Kessler, J.),
*vacated in part on separate point*, 2004 WL 438599, 89 Fed.Appx. 273
(D.C. Cir. 2004) .......................................................................9

*Defenders of Wildlife v. Secretary, U.S. Dep't of the Interior (Wolves)*,
354 F.Supp.2d 1156 (D.Or. 2005) ...........................................11

*Firestone Tire & Rubber Co. v. Burch*, 489 U.S. 101,
114, 109 S.Ct. 948, 956 (1989)..................................................7

*Friends of Wild Swan, Inc. v. U.S. Fish & Wildlife Serv.*,
12 F.Supp.2d 1121, 1132-34 (D.Or. 1997)................................11

*National Wildlife Federation v. Norton (Wolves)*, 386 F.Supp.2d 553,
560 (D. Vt. 2005)....................................................................13

*O'Gilvie v. United States*, 519 U.S. 79, 90, 117 S.Ct. 452, 458, (1996)....................................7

*Strahan v. Linnon*, 1998 WL 1085817 *4(1st Cir. 1998) ..........................................13

*Strahan v. Linnon*, 967 F.Supp. 581, 607 (D.Mass.1997) ..........................................13

*Southwest Center for Biological Diversity v. Norton (Queen Charlotte Goshawk)*, 2002 WL
1733618, *16, No. 98-0934 (D.D.C. Jul. 29, 2002) ........................................5

*U. S. v. Atlantic Research Corp.*,127 S.Ct. 2331 (2007) ..........................................7

*U. S. v. City of St. Paul*, 258 F.23d 750, 752 (8th Cir. 2001) ..........................................22

*U.S. v. Lara*, 541 U.S. 3 206 (2004) ................................................................23

**Page No.**

**FEDERAL STATUTES**

5 U.S.C. § 706 ................................................................................................................15

16 U.S.C. § 1532 ....................................................................................................... passim

16 U.S.C. §1533 ........................................................................................................ passim

28 U.S.C. § 2401 .............................................................................................................13

**FEDERAL REGISTER**

43 Fed. Reg. 9607 (March 9, 1978) ............................................................................ 11-12

61 Fed. Reg. 4722, 4725 (February 7, 1996) ................................................................. 9-11

72 Fed. Reg. 6092 (February 8, 2007) ...................................................................... passim

72 Fed. Reg. 30819 (June 4, 2007) .................................................................................21

**OTHER AUTHORITIES**

House Report 97-567 (May 17, 1982) .............................................................................8

FWS Post Delisting Monitoring Plan for the Western Great Lakes Distinct
Population Segment of the Gray Wolf("PDM") ....................................................... passim

N.D. Cent. Code 20.1-07 (2007) ....................................................................................20

S.D. Codified Laws § 41-8-20 (2007) ..............................................................................20

Illinois Endangered Species Act, 520 ILCS 10 ................................................................20

Iowa Code § 491A (2007 Merged) ..................................................................................20

Wis. Stat. § 29.604 ..........................................................................................................15

Wis Stat § 29.057 ............................................................................................................15

Wis. Sta. 71.40 ................................................................................................................15

Minn. Stat. 97B.645 .........................................................................................................19

Minn. Stat. 97B.646 .........................................................................................................19

Defendant-Intervenors U.S. Sportsmen's Alliance Foundation, Wisconsin Bear Hunting Association, Scott Meyer, Rob Stafholt, Safari Club International, Safari Club International Foundation, and National Rifle Association ("Defendant-Intervenors") hereby reply to Plaintiffs' Opposition to Defendants' Cross-Motions for Summary Judgment ("Pl. Opp.", Docket 53).

## **INTRODUCTION**

A careful examination of Plaintiffs' Opposition reveals that Plaintiffs, in challenging the delisting of the Western Great Lakes Distinct Population Segment of wolves ("WGL-DPS"), misconstrue the statutory delisting criteria in 16 U.S.C. § 1533 and try to impose their own totally subjective set of delisting criteria not found in the statute. Try as they might, Plaintiffs cannot overcome the fact that the FWS complied with all ESA requirements and lawfully delisted the WGL-DPS wolves.

Plaintiffs' Opposition muddles the ESA delisting criteria. Section 4 of the ESA includes three interrelated obligations for the removal of a species from the "endangered" species list. The FWS must 1) consider the extent to which the objective criteria established for recovery in the species' recovery plan have been satisfied, 16 U.S.C. § 1533(f)(1)(B)(ii); 2) conduct a review of the status of the species and take into account any conservation efforts of the pertinent state or local authority, *id.* at (b)(1)(A); and 3) based on the best scientific and commercial data available, conduct an analysis of five statutorily identified factors to make certain that none of them pose a risk so great that it (they) place the species in danger of extinction throughout all of a significant portion of its range, *id.* at (a)(1)(A)-(E), 16 U.S.C. § 1532(6), (16) (20).

Where the FWS chooses to recognize a distinct population segment ("DPS") of a species, the "species" that is considered for listing or delisting is the DPS. 16 U.S.C. § 1532(16) (defining a DPS as a species). Consequently, contrary to the subjective aspirations of the

Plaintiffs, delisting of the WGL-DPS could not be conditioned upon the return of wolves to all suitable habitats within the conterminous United States, or upon the day when wolves face no risks or threats from any source. The ESA is not the Endangered Species *Forever* Act. Instead the ESA obligates the FWS to recognize when a DPS has recovered and to remove it from the "endangered" species list, subject to the obligation to relist if a "significant risk" to the recovered DPS later emerges. *Id.* § 1533(f), (g)(1), g(2).

Recovery plans, where applicable, establish the blueprint that instructs the FWS to determine when to examine a species for the purpose of delisting. The ESA directs the Secretary of the Interior (the FWS) to "develop and implement" recovery plans that include:

> objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the [endangered or threatened species] list

*Id.* § 1533(f)(1)(B)(ii). The FWS complied with that requirement by formulating and implementing the Eastern Timber Wolf Recovery Plan in 1978 and revising it in 1992 ("Recovery Plan") which established very objective and very measurable criteria for wolves living in the WGL-DPS. A.R. Doc 468A, p. 13769.

Plaintiffs, in their Opposition, do not contest the FWS's finding that the wolves of the WGL-DPS met and substantially exceeded the numerical recovery goals set forth in the Recovery Plan. As Defendant-Intervenors discussed in their Opening Brief ("DI. Opn. Br.", Docket 43-2), the Recovery Plan, as it was revised in 1992, defined recovery to require, for at least five consecutive years, at least two viable populations within the 48 contiguous states including a growing or stable population in Minnesota of 1550 to 1750 wolves and a second population outside of Minnesota and Isle Royale having at least 100 wolves in late winter if located within 100 miles of the Minnesota population. AR Doc. 468A, p. 13769, 13773, DI Opn.

Br. at 4. The wolves of the WGL-DPS long ago met and then surpassed those criteria. In 2003-2004, the FWS estimated a growing and/or stable population in Minnesota of approximately 3,020 wolves, and in 2005-06, the FWS estimated the Wisconsin population to be 465, and the Michigan population to be 434. *Final Rule Designating the Western Great Lakes Population of Gray Wolves as a Distinct Population Segment, Removing the Western Great Lakes Distinct Population Segment of the Gray Wolf from the List of Endangered and Threatened Wildlife,* 72 Fed. Reg. 6052, 6053-56 (Feb. 8, 2007) ("Final Rule").

The second step in the delisting process requires that the FWS take into account the status of the DPS as well as *any* efforts being made by any state or subdivision of a state to protect or conserve the species. *Id.* 1533(b)(1)(A). In accordance with these requirements, the FWS analyzed the current status of state statutes, regulations, and state management plans to conserve the WGL-DPS wolves. The FWS noted that Michigan's Wolf Management Plan received state approval in late 1997, Wisconsin's plan was approved in 1999 and Minnesota completed its management plan in early 2001. 72 Fed. Reg. at 6083-84.[1]

Finally, Section 1533(a)(1) of the ESA directs the FWS to conduct a "threats" analysis, based solely on the "best scientific and commercial data available," of five factors: **(A)** the present or threatened destruction, modification, or curtailment of its habitat or range; **(B)** overutilization for commercial, recreational, scientific, or educational purposes; **(C)** disease or predation; **(D)** the inadequacy of existing regulatory mechanisms; or **(E)** other natural or

---

[1]    Because Michigan was in the process of revising its wolf management plans, the FWS appropriately relied on the current Michigan plan, but also appropriately examined but did not exclusively rely on the Recommended Guiding Principles for Wolf Management in Michigan drafted by Michigan's stakeholder roundtable, which will be used to revise Michigan's wolf management plan. 72 Fed. Reg. at 6084.

manmade factors affecting its continued existence.[2] Although Plaintiffs appear to argue that absolute elimination of risk is an essential prerequisite to delisting, that is not the law. The ESA does not require the Secretary to retain a species on the "endangered" or "threatened" species lists simply because one or more of those risk factors are present, or even because the population size of the DPS may be negatively impacted by any or all of the risk factors. The law simply states that the Secretary must retain (or place) a species on those lists, if one or more of the factors has such a profound impact so to cause the species to be in danger of extinction throughout all or a significant portion of its range. 16 U.S.C. §§ 1532(6)(20), 1533(a).

In its delisting rule, the FWS analyzed in detail and at length all five factors, 72 Fed. Reg. 6072-6101, and based on the evidence before it, reasonably concluded that the five factors "will not individually or in combination be likely to cause the WGL-DPS of the gray wolf to be in danger of extinction in the foreseeable future in all or a significant portion of the species' range." 72 Fed. Reg. 6101. This analysis was supported by the record. Nothing more was required.

The number of wolves in the WGL-DPS now far exceeds the recovery plan goals, and these numbers provide an ample margin of safety that FWS can take into account in analyzing the significance and magnitude of future risks to the WGL-DPS. Nevertheless the FWS has demonstrated extreme caution with respect to its analysis of the five risk factors. As demonstrated by its post-delisting monitoring plan ("PDM Plan"), the FWS committed itself to consider relisting if the number of wolves falls below specific trigger levels that actually *exceed* the numerical thresholds established in the Recovery Plan for delisting.[3]

---

[2]    Plaintiffs address only two (adequacy of existing regulatory mechanisms and disease/predation) in their Opposition.

[3]    See Point F to this Reply for a discussion of the Post-Delisting Monitoring Plan.

## ARGUMENT

In the following arguments, Defendant-Intervenors more specifically demonstrate the legality of the delisting as well as the particular inaccuracies of Plaintiffs' challenge.

**A. Recovery in All Significant Portions of WGL-DPS Range.** Plaintiffs make no attempt to dispute two key FWS findings described in Defendant-Intervenors' Opening Brief:

(1) unsuitable habitat is not "significant" in deciding whether the WGL-DPS of the wolf is "endangered" or "threatened" throughout "all or a *significant* portion of its range," 16 U.S.C. § 1532(6), (20), 72 Fed.Reg. at 6071, and

(2) there is no significant area of *suitable* wolf habitat within the WGL- DPS except for the core recovery areas of Minnesota, Wisconsin, and the Upper Peninsula of Michigan (the "Core Recovery Areas"). 72 Fed.Reg.at 6072-75.

*See* Pl. Opp. at 7, n. 6; DI Opn. Br. at 23-37. Coupled with the overwhelming evidence that wolves have recovered within the Core Recovery Areas,[4] these two FWS findings lead inexorably to the conclusion that the WGL-DPS wolves have recovered in all "significant portions of [their] range" ("SPR") and so are no longer statutorily defined as "endangered" or "threatened". *Id.* § 1532(6), (16), (20). Plaintiffs make no attempt to distinguish the holdings in the Lizard, Florida Black Bear, and Goshawk cases that unsuitable habitat is properly discounted by the FWS in the SPR analysis.[5] *See* DI Opn. Br. at 32-34 (reviewing these cases).

1.    Irrelevance of Current v. Historic Range Debate. Rather than attempt to identify some significant area of suitable habitat within the WGL-DPS in which wolves have not yet recovered, Plaintiffs argue at length that the term "range" in the phrase "significant portion of its range" ("SPR") means "historical range" rather than "current range." Pl. Opp. at 5-10.

---

[4]    See DI Opn. Br. at 2 to 4, 22, and pages 2-3 above.

[5]    *Defenders of Wildlife v. Norton (Lizard),* 258 F.3d 1141, 1143 (9th Cir. 2001); *Defenders of Wildlife v. Norton (Florida Black Bear),* Civil Action No. 99-02072-HHK at 10-11 (D.D.C. Dec. 13, 2001) (copy supplied as Ex. 1 to DI Opn. Br., Docket 43-4); *Southwest Center for Biological Diversity v. Norton (Goshawk),* 2002 WL 1733618, *16, No. 98-0934 (D.D.C. Jul. 29, 2002), *remedy modified on review of Magistrate's Recommendations* (D.D.C. May 24, 2004).

This debate over what "range" means is in fact entirely academic to the outcome of this case. First, although the FWS expressed its view that the statutory term "range" refers to "current range," the FWS in its delisting rule nevertheless elected to play it safe and clearly and succinctly stated that "[f]or the purposes of this notice, we consider the range of the gray wolf to be the *entire geographical area delineated by the boundaries of the WGL DPS*." 72 Fed. Reg. at 6070 (emphasis added). Thus for the purpose of delisting the gray wolf, the FWS analyzed all the area within the DPS, including both current and historical range.

In addition, the case law confirms that unsuitable habitat is not "significant" (and thus is not a SPR) even if it was once part of historic range, see DI Opn. Br. at 32-36 (collecting cases) and note 5 above, and there is no significant suitable habitat in the DPS, except for the Core Recovery Areas where recovery has already occurred. 72 Fed.Reg. at 6072-75. Thus, there is no merit to Plaintiffs' historical range argument under any factual or legal analysis.

On a related issue, Plaintiffs' discussion of the FWS's revision of its interpretation of the term "significance" in the SPR phrase has no bearing on the outcome of this case, as the FWS, in doing so, did nothing more than respond to and implement the direction of the 9th Circuit. Not only did the FWS provide a reasonable explanation for the modified approach, citing *Defenders of Wildlife v. Norton* (lizard) 258 F.3d 1141, 1143 (9th Cir. 2001), but the revised interpretation accommodates Plaintiffs' criticism of the earlier interpretation and so is not prejudicial to Plaintiffs. 72 Fed.Reg. at 6071.

Should the Court still find it necessary to address the current range versus historic range debate, Defendant-Intervenors have demonstrated the term "range" means "current range." *See* DI Opn. Br. at 29-32. Plaintiffs' attempt to use a reference in a 1978 House Committee Report to define the meaning of a term "range" as it was drafted into the 1973 original ESA is not

6

persuasive and does not overcome the presumption that the present tense wording of the relevant statute is controlling.  16 U.S.C. § 1532(6)(20); *see* DI Opn. Br. at 28-31.  The view of a subsequent legislative committee discussing how the term range would be used in a separate component of the ESA should not be the basis for judging the intent of an earlier Congress. *O'Gilvie v. United States*, 519 U.S. 79, 90 (1996) ("the view of a later Congress cannot control the interpretation of an earlier enacted statute.").  Some courts have gone so far as to refer to views of a subsequent Congress as a "hazardous basis for inferring the intent of an earlier one." *Firestone Tire & Rubber Co. v. Burch*, 489 U.S. 101, 114, 109 S.Ct. 948, 956 (1989) (internal quotations omitted).  The fact that a subsequent House Committee would discuss its interpretation of the term "range" when enacting a relatively unrelated provision pertaining to the designation of "critical habitat," offers little to clarify the meaning of the term "range" as it refers to the definition of "endangered" and "threatened" species.  The subsequent legislative history upon which Plaintiffs rely does not show any effort by that House Committee to associate their discussion of the term "range" with the previous Congress' use of the phrase "significant portion of its range.

Similarly, the fact that in 1982, another subsequent Congress used the term "current" to modify the term "range" in an amendment regarding the introduction of experimental populations does not automatically render the term "current" superfluous, or force this Court to assume that the earlier-enacted term "range" in the phrase "significant portion of its range" refers only to "historical range."  Even aside from the obvious point that two different Congresses were doing the drafting nine years apart, an ostensibly superfluous term can function to clarify the meaning of other portions of the statute.  In the case of *U.S. v. Atlantic Research Corp.*, the Supreme Court acknowledged "our hesitancy to construe statutes to render language superfluous

does not require us to avoid surplusage at all costs." 127 S.Ct. 2331, 2337 (2007) (Court refused to ignore phrase "any other person" in statute pertaining to environmental clean-up.) The legislative history of the 1982 amendment regarding experimental populations demonstrates Congress' intent to make certain that experimental populations would be introduced outside their current range. "It may be helpful to clarify in legislative history that although these populations will be established outside of their current range, the intent is to remain within historical range." H.R. Rep. No. 97-567 at 46 (1982). There is nothing in the committee's discussion that evinces their opinion as to the definition of the term "range" standing alone.

    2.    <u>Unsuitable Habitat is not a Significant Range Portion.</u>  Plaintiffs virtually concede that unsuitable habitat cannot be a SPR when they respond to Defendant-Intervenors' point that metropolitan Chicago (which is within the DPS) is unsuitable wolf habitat and thus cannot be a SPR, even if wolves may once have roamed there. Disclaiming any intent to demand wolf recovery in Chicago, Plaintiffs assert that the FWS must adequately explain delisting *if* the delisted areas include "broad swaths of suitable habitat" in which recovery has not occurred:

> Intervenors set up a straw man by suggesting that Plaintiffs seek wolf recovery in "the skyscrapers, suburbs, and exurbs of Chicago." Far from it. Plaintiffs merely contend that, should FWS seek to downlist or delist the gray wolf, **the agency must** conduct a Section 4(a)(1) threats analysis across the wolf's historic range and, at a minimum, **demonstrate why broad swaths of *suitable* habitat in the *Northeast, Pacific Northwest,* and elsewhere are not significant portions of its range.**

Pl. Opp. at 7, n. 6 (emphasis added, internal quotations omitted).[6] However, the only allegedly "suitable habitat" that Plaintiffs identify and claim the FWS should have considered classifying as a SPR is *outside the DPS boundaries:* the "Northeast" and the "Pacific Northwest." *Id.*

---

[6]    So long as the WGL-DPS wolves have recovered in the areas of its range that are SPRs, here the Core Recovery Areas of Minnesota, Wisconsin, and the Upper Peninsula of Michigan, whether any stray animal that enters a non-significant range portion (e.g. Chicago) is in jeopardy from one or more of the (Footnote Continued)

**B.   Irrelevance of Areas Outside DPS.**   The FWS was not required to consider the potential significance of allegedly suitable habitat outside the WGL-DPS (e.g., in the Northeast and Pacific Northwest) in deciding whether to delist the wolves within the WGL-DPS.

A DPS constitutes a species.   The ESA defines the term "species" to include "any subspecies of fish or wildlife or plants, and ***any distinct population segment*** of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16)(emphasis added).   According to the *Policy Regarding the Recognition of Distinct Vertebrate Population Segments under the Endangered Species Act*, ("DPS Policy") a DPS is "discrete" or markedly separated from other populations of the broader species or subspecies.  61 Fed.Reg. 4722, 4725 (Feb. 7, 1996).  The health and survival of the species is independent of the health and survival of other DPSs or other subspecies.  *Id.*  Thus, when the FWS must determine the listing status of a DPS, it looks to the population of the DPS itself to determine that status, and not to the status of other DPSs or other species.  Accordingly, when looking at whether the "species" is "endangered" or "threatened" "throughout all or a significant portion of its range," the "species" the FWS must look at is the DPS, not the species as a whole.  The "range" that is examined is the range within the DPS, not worldwide or nationwide range.  16 U.S.C. § 1532(6), (16), (20).[7]

As noted by the court in the case of *Defenders of Wildlife v. Norton* (lynx), 239 F.Supp.2d 9, 15 (D.D.C. 2002), the FWS is not permitted to determine the listing status of a population of wildlife based on the health or status of another species or distinct population.

---

Section 4(a)(1) listing factors, 16 U.S.C. § 1533(a)(1), is immaterial.  By the terms of the ESA, a species that is in danger of localized extinction in a non-significant portion of its range is not "endangered" or "threatened."  16 U.S.C. § 1532(6), (16), (20).

[7]        The DPS Policy gives the FWS the same flexibility to delist a recovered DPS even though the species elsewhere remains "endangered" or "threatened" as it gives the FWS authority to list a DPS as "endangered" or "threatened" despite the presence of healthy populations in other places.  DPS Policy, 61 Fed.Reg. at 4725; *Defenders of Wildlife v. Norton (lizard),* 258 F.3d at 1144.

Citing its earlier decision in *Defenders of Wildlife v. Babbitt* (lynx) 958 F. Supp. 670, 684 (D.D.C. 1997), the District Court explained how the FWS was prohibited from determining the status of the lynx population of the conterminous United States based on the health of Alaska and Canada populations of the species. Contrary to Plaintiffs' interpretation, *Norton (lynx)* does not stand for the proposition that the FWS must make listing decisions by considering portions of a species' range outside the designated DPS. In that case, the FWS had designated the entire conterminous U.S. as a lynx DPS, and the court rejected the Service's conclusions regarding habitat *within that DPS. Norton (lynx),* 239 F.Supp.2d at 16, 21.

Although Plaintiffs insinuate nefarious motives for the FWS's designation of the WGL-DPS, Plaintiffs do not challenge the FWS's technical finding that the wolves of the WGL-DPS are markedly distinct from other wolf U.S. populations, and thereby qualify as a DPS in accordance with the DPS policy. *See* Pl. Opp. at 21-23 (complaining about the location of DPS boundaries, not the finding that WGL-DPS wolves were distinct from other wolf populations).[8]

**C.  Recognition of DPS at Time of Delisting**.  In crafting the policy for defining DPSs, the FWS explicitly identified DPSs as a tool for the purpose of delisting as well as listing:

> The Fish and Wildlife Service and the National Marine Fisheries Service (Services) have adopted a policy to clarify their interpretation of the phrase "distinct population segment of any species of vertebrate fish or wildlife" for the purposes of listing, *delisting*, and reclassifying species under the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 et. seq.) (Act).

---

[8]     The scientific evidence supports the FWS's conclusion that the wide areas of unsuitable habitat and formidable physical barriers between the Core Recovery Areas in Minnesota, Wisconsin, and the Upper Peninsula of Michigan on the one hand and the far away Pacific Northwest and Northeast on the other hand prevent all but the rarest intermingling between wolves in the DPS and wolves elsewhere in the Nation. 72 Fed.Reg. at 6059. As the FWS demonstrated, a wolf would have to travel 400 miles across unsuitable habitat to reach the Northern Rocky Mountains population, the nearest U.S. population outside the WGL DPS. *Id.* Further, the WGL-DPS wolves are the only wolves inhabiting a Mixed-Laurentian Forest in the United States. 72 Fed.Reg. at 7060. Thus the WGL DPS wolves are "distinct" from other wolves and the FWS properly recognized the DPS.

DPS Policy, 61 Fed. Reg. 4722 (February 7, 1996) (emphasis added).

The delisting of the WGL-DPS population of wolves is not the first occasion on which the FWS has designated DPSs for the purpose of removing a species from the "endangered" species list. The FWS designated three DPSs for wolves in 2003 when it promulgated a rule to reclassify the Eastern and Northern Rocky Mountain wolf DPSs. And although the Oregon federal district court disagreed with the boundaries that the FWS chose for the DPSs, the Court found nothing wrong with the FWS's decision to create DPSs for the purpose of the reclassification. Observing no distinction between using DPSs for listing, reclassification and delisting, the Oregon Court simply explained that:

> The DPS Policy is designed to draw a line around a population whose conservation status differs from other populations within that species.

*Defenders of Wildlife v. Secretary (wolves)*, 354 F. Supp. 2d 1156, 1170 (D. Or. 2005).

Plaintiffs offer no case that holds that a DPS cannot be recognized at the same time as a decision to delist. Plaintiffs chiefly rely on *Friends of Wild Swan, Inc. v. U.S. Fish & Wildlife Serv. (bull trout)*, 12 F.Supp.2d 1121, 1132-34 (D.Or. 1997), which in fact supports the FWS's action in this case. That opinion upheld the general legal authority of the FWS to separately evaluate on a DPS-by-DPS basis whether and where it should originally list the bull trout. 12 F.Supp.2d at 1133-34 (emphasis added). The case remands for additional explanation because the FWS did not adequately respond to a citizen petition filed under 16 U.S.C. § 1533(b)(3) asking the FWS to list the bull trout nationally, and because the FWS had determined **just two years earlier** using the "***same information***" that a national level listing would be warranted by the evidence, and did not adequately explain its shift to a DPS-by-DPS approach. 12 F.Supp.2d at 1132 (emphasis added). By contrast, **thirty years have passed** since the 1978 decision to list the wolf at the National level. 43 Fed.Reg. 9607 (Mar. 9, 1978). During this 30 year period

11

there has been a night-to-day recovery by the wolves in the area encompassed by the WGL-DPS.

Moreover, Congress gave the FWS a new tool when the legislature added a provision to the

ESA, authorizing creation of DPSs. P.L. 95-632 (Oct. 1978). The information and

opportunities before the FWS in 2007 were obviously not the "same information" and

opportunities that were before the FWS at the time of the original 1970s listing.[9]

      The FWS has never uniformly listed or protected all wolves of the conterminous United

States. In 1966 and 1967, the FWS individually listed subspecies of wolves as the agency

determined each subspecies' need for the protection. [10] Then, in 1978, the FWS, for the sake of

convenience, listed almost the entire species, as "endangered" throughout the conterminous

United States when it became apparent that the entire species required federal protection. 43

Fed.Reg. 9607(1978). Even then the FWS drew geographical distinctions, by designating

Minnesota wolves "threatened" and wolves in other states "endangered." *Id.* Just as it was then

necessary to distinguish the more populous wolves of Minnesota from those of the remainder of

the conterminous United States, so is it now necessary to respond to the excellent recovery that

some DPSs have demonstrated, and to distinguish their protections from other populations that

have shown limited or no recovery. Recovery and delisting is the ESA's goal. 16 U.S.C §

1533(f).

---

[9]    Further, in the *Friends of the Wild Swan* case, the Court directed the FWS to conduct a two tiered analysis, by which it first considered the listing status of the species throughout its range, and then considered the appropriate listing status for individual DPSs. In the instant matter the FWS has already followed the two tiered approach, initially providing protection for the individual populations of wolves under a single umbrella and then later, removing federal protections from only those DPSs that no longer qualify as "endangered."

[10]    On March 11, 1967, the FWS listed as "threatened" the "timber wolf – canis lupus lycaon"[10] under the Endangered Species Preservation Act of October 15, 1966 (80 Stat. 926; 16 U.S.C. § 668aa(c)), 32 Fed. Reg. 4001, (March 11, 1967). And on January 4, 1974, the FWS listed as "endangered" both the Eastern Timber wolf (canis lupus lycaon) and the Northern Rocky Mountain wolf (canis lupus irremotus). 39 Fed. Reg. 1175 (January 4, 1974).

**D.  Collateral Attack on Wolf Recovery Plan.**  While Plaintiffs appear to agree that the numerical criteria for delisting set forth in the Recovery Plan have been met, Pl. Opp. at 24, Plaintiffs collaterally attack the Recovery Plan by seeking to establish a different set of objective recovery criteria – more specifically criteria for nationwide recovery. However, the FWS bears no obligation to develop a nationwide wolf recovery plan.  The Vermont federal district court that reviewed the 2003 rule that reclassified gray wolves from "endangered" to "threatened" held that "the Secretary's decision to proceed with three recovery plans for the gray wolf rather than one comprehensive national plan must be afforded *Chevron* deference." *National Wildlife Federation v. Norton*, 386 F. Supp.2d 553, 568. (D.Vt. 2005)

Plaintiffs' attack on the Recovery Plan must also fail because Plaintiffs waited too long to wage their challenge.  The Recovery Plan was a final and reviewable agency action.  *Strahan v. Linnon*, 1998 WL 1085817 *4 (1st Cir. 1998); *Fund for Animals v. Babbitt (Grizzly Bear),* 903 F.Supp. 96, 105 (D.D.C. 1995); *see* 16 U.S.C. § 1533(f) (1)(B)(ii).  Any attacks to that plan are barred by the statute of limitations.  Although the ESA itself contains no express limitation of action period, ESA actions are governed by 28 U.S.C. § 2401(a), the general six-year statute of limitations for civil actions against the federal government. *Center For Biological Diversity v. Hamilton,* 453 F.3d 1331, 1334 (11th Cir. 2006). The Plaintiffs have never sued to overturn the Recovery Plan.  The six-year statute-of-limitation to challenge the 1992 Wolf Recovery Plan expired in 1998.

**E.  Section 1533(a)(1) Risk/Threats Analysis Factors.**  Plaintiffs also argue that the FWS paid too much attention to the objective recovery criteria set forth in the Recovery Plan pursuant to 16 U.S.C. § 1533(f) and not enough attention to the five listing factors set forth in 16 U.SC. § 1533(a)(1).  Subsection (f) injects a quantifiable element into the delisting decision,

providing that satisfaction of the "objective, measurable criteria" set forth in a recovery plan "*would result* in a determination, in accordance with the provisions of this section, that the species be removed from the list" of endangered or threatened species. 1533(f)(1)(B)(ii) (emphasis added). Plaintiffs' argument has no merit since the FWS discussed at length each of the five (5) listing factors set forth in sub-section (a) and appropriately concluded that none of those listing factors either individually or collectively placed the WGL-DPS in danger of extinction throughout all or a significant portion of its range. 72 Fed.Reg. at 6071-6101. Plaintiffs offer no basis for overturning FWS's findings.

      1.    Adequacy of Regulatory Mechanisms / State Wolf Management Plans.

Plaintiffs focus on factor (iv), "Inadequacy of Existing Regulatory Mechanisms," alleging that the Michigan Wolf Management Plan ("Michigan Plan") is a draft and that the Michigan Plan and Minnesota Wolf Management Plan ("Minnesota Plan") are underfunded. Contrary to Plaintiffs' contentions, Michigan currently has an ongoing effective state wolf management plan that was adopted in 1997. A.R. Doc 468A at 15209. Michigan's existing plan is not a draft. 72 Fed.Reg. at 6092-94. The fact that the Michigan Plan is currently undergoing a periodic update and that the FWS properly made note of this fact, does not undermine the adequacy of the operative Michigan Plan as an *existing* regulatory mechanism. The FWS carefully examined and found that the existing Michigan Plan was adequate. 72 Fed.Reg. at 6094. In addition, the FWS found that the draft plan, when finalized, would *also* be adequate. *Id.* Because the existing Michigan Plan was itself adequate and in place, Plaintiffs have no grounds for claiming that the FWS was relying on "future" regulatory mechanisms in order to approve delisting for wolves.

      There is no evidence in the Administrative Record ("AR") of inadequate funding. Even if there were, Plaintiffs have not demonstrated anything to indicate that any hypothesized

insufficiencies in funding are significant enough to reverse the remarkable recovery of wolves in the WGL-DPS. It is not enough for Plaintiffs to show the existence of a risk factor. They must show that the risk is so serious as to cause the DPS to be in danger of extinction. §§1533(a)(1), 1532(6)(20).

Plaintiffs do not provide any factually based comparison of the funding of state wolf management plans before and after delisting. Each state's long record of willingness to engage in wolf population monitoring is just one example of each state's established track record in wolf management. *See* 72 Fed.Reg. at 6053-6056. For example, the record shows that Wisconsin has long found ways to fund wolf management and in recent years has been funding a greater share of those costs through state funds.[11] That state also adequately funds its wolf management program through a variety of stable statutory mechanisms not contingent upon continued ESA listing.[12] Minnesota, the state with the largest wolf population, also confirmed to FWS in 2006 that it would continue its 2001 wolf management plan, which includes wolf monitoring and many other management tasks, post delisting.[13] Michigan, whose management plan is discussed above, similarly agreed in 2006 to conduct post-delisting monitoring. A.R. Doc 228 at 8266. It

---

[11]    2006 Wolf Management Plan Addendum to 1999 Wolf Management Plan, AR Doc 468A at 13407 (total annual expenditures on State wolf management ranged from $217,885 to $349,972 between 1999/2000 and 2004/2005 fiscal years and State share of that funding increased to $172,861 in 2003/2004 and then to $195,747 in 2004/2005). In its 2006 comments on the proposed delisting, Wisconsin agreed to engage in post-delisting monitoring on behalf of FWS, requesting "cost-sharing" to help it conduct this federal monitoring duty, and FWS responded by explaining the availability of federal funding sources.ee A.R. Doc  468A at 8233; Final Post-Delisting Monitoring Plan Appendix at 3-4 (Ex. B. to this Reply).

[12]    Funding sources include the State Endangered Resources Tax Check-Off, Wis. Stat. § 71.30(10) (2006), License Plate Revenue, Wis. Stat. § 341.14 (2006), Wis. Stats., and voluntary donations, Wis. Stat. § 71.10(5)(b).  State endangered resources funds pay for depredation programs in accordance with Wis. Stat. § 71.10(5)(am).

[13]    A.R. Doc 228 at 8222 (comments); A.R. Doc 468A at 14933 (State Wolf Management Plan); see *also*, Minn.Stat.97B.646 (confirming state objective of ensuring wolf survival).  The Minnesota comments did not condition continued state management on federal funding.

requested federal funding assistance for post-delisting monitoring but did not condition its

commitment on that funding, which the FWS in any event has indicated is available. *Id., see*

Post-Delisting Monitoring Plan App. at 3-4 (Ex. B. to this Reply, also discussed in Point F to this

Reply). In short, Plaintiffs have made no showing that the FWS acted arbitrarily and

capriciously in concluding that each state would, in some way, adequately carry out each state's

management responsibilities. 5 U.S.C. § 706(2).

In addition, Defendant-Intervenors and the State Government Amici have also submitted

documents to supplement the Administrative Record that refute Plaintiffs' post-decisional

evidence concerning the adequacy of state wolf management funding. Plaintiffs have already

admitted that the Stark Declaration, regarding Minnesota's funding (Docket 43-5), should

become part of the AR if Plaintiffs' own extra-record evidence regarding Minnesota funding

becomes part of the AR. [14] Read correctly, the Stark Declaration confirms that Minnesota

spends more on personnel who work on wolf management than the $695,000 figure that framers

of the Minnesota plan originally budgeted. Plaintiffs misconstrue the Stark Declaration by

incorrectly contending that the $354,000 being spent by Minnesota Department of Natural

Resources annually for professional staff dedicated to wolf management, population research and

monitoring, enforcement and education represents a shortfall of $141,000 from the wolf related

costs anticipated by the drafters of the state's wolf management plan. However, in making this

assessment, Plaintiffs assume that all professional staff with wolf responsibilities and all wolf

enforcement activities are paid for from the $695,000 allocated by Minnesota for wolf

management. That might have been the case, had Minnesota chosen to merely establish and fill

three new Conservation officer positions related to wolves. However, Minnesota DNR did not

---

[14]    Plaintiffs' Reply Supporting Plaintiffs' Motion to Supplement A.R. at 12 (Docket 35).

simply establish those three positions but also filled 20 *additional* positions with individuals

whose responsibilities include regularly engaging in wolf protection and monitoring activities.

Although these individuals have responsibilities for wolf management, their salaries are paid

from other, non-wolf portions of the Minnesota DNR budget. As Mr. Stark explained:

> "Instead of simply establishing three new officer positions, Minnesota DNR filled
> 20 vacant Conservation Officer positions in wolf range since the wolf plan was
> drafted. Although the three lead officers serve as the primary internal and
> external contacts for wolf issues, there are now 71 DNR Conservation Officers
> stationed in or adjacent to Minnesota wolf range. Each of these officers respond
> to grey wolf management issues and each is involved, at least in part, in wolf
> management and wolf-related enforcement activities."

Declaration of Daniel Stark at page 3 (Exh. 2 to Defendant-Intervenors' Motion for Summary

Judgment, Docket 43-5). As a result, contrary to Plaintiffs' allegations, not only is there

"enough" money for wolf protection and monitoring, there is in fact more funding being devoted

to these areas than was deemed necessary by the drafters of the Minnesota plan.

      With regard to Michigan, State Government Amici have filed a motion requesting that

the AR be supplemented by the Hogrefe Declaration and Defendant-Intervenors expect to shortly

file their own motion joining in that request. If admitted, the Hogrefe Declaration provides

supplementary information about the funding and implementation of Michigan's Wolf

Management Plan. *See* Hogrefe Declaration (Docket 40-2); A.R. Doc 228 at 8286; Doc. 418 at

11491 and 11496 (various Michigan commitments clarified by Mr. Hogrefe).

      2.    <u>Disease and Predation</u>. In their Opposition, Plaintiffs devote three sentences to

their argument that there is inadequate monitoring by Minnesota, Michigan and Wisconsin of

wolf numbers and therefore potential for diseases or human predators to kill large numbers of

wolves without being detected by state managers. Pl. Opp. at 31. Contrary to this argument, all

three states have numerous game wardens in the field who are poised to detect any surge in the

number of wolf carcasses spotted. The FWS Post Delisting Monitoring Plan explains that

Minnesota, which has the largest and thus most difficult to count wolf population, will conduct formal wolf censuses in the first and fifth years following delisting. PDM Plan at 3-4 (copy supplied as Exhibit "B" to this Reply). Further, in these years and intervening years DNR personnel "will continue their collection and analysis of scent post data, winter track surveys, and verified wolf depredations," which activity "will furnish independent annual indices of wolf population trends and changes in occupied range ...." *Id.* Wisconsin and Michigan conduct annual wolf population counts, with Michigan now using a sampling method as wolf populations have increased greatly. *Id.* at 4-5.

Inexplicably, Plaintiffs misrepresent the Final Rule to suggest that the gray wolf populations in those States could decline significantly before such decline is detected. Pl. Opp. at 31. The actual statement in the Final Rule is that "Wolf management plans for Minnesota, Michigan, and Wisconsin include disease monitoring components that we expect will identify future disease and parasite problems in time to allow corrective action *to avoid a significant decline in overall population viability*." 72 Fed.Reg. at 6081 (emphasis added).

3.    Depredation Control in Dispersal Areas. Plaintiffs erroneously suggest that the FWS has drawn unnecessarily broad boundaries around the core populations of wolves in the WGL-DPS, and that by doing so, the Service has created a rule that "virtually ensure[s] that dispersing wolves cannot contribute to wolf recovery" by dispersing to the areas of the United States where the classification status of wolves remains "endangered." Pl. Opp. at 22. Plaintiffs go so far as to suggest that post-delisting, the States of the WGL-DPS plan to simply eradicate all wolves in these dispersal areas. Nothing could be farther from the truth. Although several of the States have authorized depredation control measures for problem wolves, none of the states has approved regulated seasons for wolves and not one has authorized unlimited removal of wolves.

Plaintiffs make a point of singling out wolves that disperse through Minnesota, inaccurately identifying Zone B in Minnesota as a "free-fire zone." Although it is true that Minnesota has divided the state into two zones and has designated stronger wolf protections within Zone A, there is no truth to Plaintiffs' allegations that the less stringent wolf protections in Zone B will result in the eradication of all wolves traveling through the area. According to the Minnesota Plan, only the following types of wolf removal are being allowed in Zone B:

> • state administered wolf control by certified predator controllers will be limited to cases of verified losses within the previous five years, and conducted within a one-mile radius of the depredation site
>
> • owners of livestock, domestic animals, or pets may shoot wolves to protect their animals, on land owned or leased by the owner, under certain conditions. Additionally, owners of livestock, domestic animals, or pets may employ a State certified predator controller to trap wolves to protect their animals on and within one mile of land owned or leased by the owner

Minnesota Plan, p. 3, AR 215, p. 5255. Minnesota DNR plans to monitor the wolf removal in Zone B since the taking of a wolf within that zone must be reported within 48 hours to the Minnesota DNR. *Id.* at. 24, AR 215, p. 5277. The Minnesota Plan specifically notes that, within Zone B, wolves will continue to be fully protected on federal land, with the exception of certain areas of public land immediately adjacent to private land. *Id.* at. 20, AR Doc. 215, p. 5273. Minnesota's Plan also specifically refutes any suggestion that the less restrictive protections will remove the Zone's entire wolf population.

> Although these depredation procedures will likely result in a larger number of wolves killed, as compared to previous ESA management, they will not result in the elimination of wolves from Zone B.

*Id.* p. 23, AR Doc. 215, p. 5276; see also Minn. Stat. 97B.645 (codifying wolf protections). Plaintiffs simply have no basis for challenging the breadth of the area within the boundaries of the WGL-DPS. The DPS appropriate incorporates the normal dispersal distances of the core population of wolves. However, wolves that range within those normal distances will not be at

19

risk of eradication even in areas with less restrictive wolf protections, and wolves that range

beyond the normal distances will have the opportunity to inhabit areas of the U.S., beyond the

boundaries of the WGL-DPS, where wolves continue to be under federal protections.

With respect to depredation control, Minnesota, Wisconsin, and Michigan have all

committed to the FWS to track each depredation control action they authorize and report the

number of wolves so taken to FWS under the PDM Plan. Post-Delisting Monitoring Plan at 6

(Ex. B to this Reply). They will also report to the FWS other forms of wolf death. *Id.*

Moreover, the resiliency of the wolves and their ability to quickly regain population even after

substantial levels of regulated authorize take demonstrates that depredation control is unlikely to

pose any risk of major population decreases that will cause the WGL-DPS to become in danger

of extinction throughout all or a portion of its range. A.R. Doc. 215, p. 5893 (citing studies

showing wolves rebounded from annual loss of 20% to 30%, and even 50%).

Also contrary to Plaintiffs' dispersal argument are the state-law protections that wolves

enjoy in the surrounding States of North Dakota, South Dakota, Iowa and Illinois, the only other

States that have substantial territory in the DPS. Hunting and trapping of wolves is not allowed

in these States.[15] So the dispersal zones within these States do not constitute "free-fire zones"

for any wolf that attempts to cross through.

---

[15]    North Dakota classifies gray wolves, to the extent they exist at all in the State, as furbearers with
a closed season, so they cannot be hunted or trapped. N.D. Cent. Code § 20.1-07 (2007); North Dakota
2007 Furbearer Guide, *available at* www.gf.nd.gov/regulations/furbearer/pdf/furbearer-guide.pdf. South
Dakota only permits hunting or trapping of species for which an open season is established, and it has
established no open season for wolves, and there is no indication it has plans to do so. S.D. Codified
Laws § 41-8-20 (2007); S.D. Furbearer Regs., www.sdgfp.info/Wildlife/Trapping/SDfurbearerregs.pdf.
Iowa (most of which is in the DPS) similarly lists gray wolves as furbearers with a closed season. Iowa
Code § 481A (2007); Iowa Hunting Regs. (www.iowa.dnr.com/law/files/07huntingregs.pdf).
Illinois (the northern fifth of which is in the DPS) protects wolves under the Illinois Endangered Species
Act, 520 ILCS 10. Ohio and Indiana have only tiny fragments of territory in the DPS (which includes
(Footnote Continued)

**F.  Post-Delisting Monitoring and Emergency Relisting.**  Contrary to Plaintiffs'

argument, the FWS had a PDM Plan in place as required by 16 U.S.C. § 1533(g) at the time of

delisting.  *See* Pl. Opp. at 32.  The FWS labeled the original PDM Plan a "draft" because it was

in the process of refinement at the time of delisting, but the draft PDM Plan itself explained that

it was put into effect on an interim basis to avoid a gap in monitoring:

> "We began developing the PDM Plan in advance of making a final decision on
> the delisting proposal in order to be able to implement the PDM activities in a
> timely manner in the event that we determined that delisting the WGL DPS is
> appropriate.  We are implementing the PDM [Post-Delisting Monitoring] as
> described in the Draft PDM Plan, although we recognize that the PDM Plan may
> be modified as a result of this review."

72 Fed.Reg. 30819, 30820 (June 4, 2007).  The draft PDM Plan is attached as Exhibit "A" to this

Reply.  The Final PDM plan was recently completed following opportunity for public comment

and is attached as Exhibit "B."

Plaintiffs also complain that the PDM relies on data from the states; however, this

cooperation with the states is what the ESA requires.  "The Secretary shall implement a system *in

cooperation with the States* to monitor" delisted species. § 1533(g)(1) (emphasis added).

Plaintiffs complain that the FWS could not be assured that the states would fund the

monitoring program, but absolute assurance is not required.  The FWS, in the Final Rule, noted

that the states had been conducting wolf monitoring "for several decades with significant

assistance from numerous partners, including the U.S. Forest Service, National Park Services,

USDA-APHIS Wildlife Services, Tribal natural resource agencies, and the Service.  ... All three

state DNRs have committed to continue their previous wolf population monitoring

methodology." 72 Fed.Reg. at 6101; *see also* Point E.1 above.  There was no reason to believe

---

them only so the DPS boundary follows Interstate-80), and no wolves are known to have been seen there,
so there States have not had occasion to address wolf conservation matters.

that work the states had carried on for decades and committed to continue would suddenly stop. The Final PDM Plan lists multiple sources of federal funding that are available to help states conducting post-delisting monitoring on behalf of FWS. *See* PDM Plan – Appendix at 3-4 (Ex. B).[16] Finally, the FWS emphasized that it retained "responsibility" for conducting monitoring, and so would step in directly if the states did not fulfill their commitments. 72 Fed. Reg. at 6101. In satisfying the monitoring requirement of 16 U.S.C. § 1533(f), FWS also satisfied the Recovery Plan criteria that called for an adequately funded monitoring plan to be in place.

 The draft PDM Plan (and the final PDM Plan which supersedes it) provides that FWS will consider relisting in the event of:

 (a) either the Wisconsin or Michigan wolf population fell below 100 wolves, or

 (b) the lower-end confidence level for the estimated Minnesota Wolf population (i.e. worst-case scenario estimate) falls below 1,500 wolves.

Additionally, FWS will investigate further in the event of the following:

 (c) a substantial and widespread increase in mortality from known or unknown cases occurs, or

 (d) evidence of a new wolf disease or substantial increase in virulence of a previously known wolf disease, even in the absence of demographic, impact on wolf population, or

 (e) any one of several other warning signal events occur.

See Ex. A at 9-10 and Ex. B. at 10-11. The PDM Plan's relisting criteria exceed those established by the Recovery Plan. For example the PDM Plan insists on the existence of populations of 100+ wolves in both Wisconsin and Michigan, while the Recovery Plan required

---

[16] The Court may take judicial notice of the PDM Plans. Fed.R.Evid. 201. The PDM Plans implement a mandatory ESA process and so have independent stature as agency action. 16 U.S.C. § 1533(g) (statutory monitoring process). They may also be considered by the court like other agency policy pronouncements. See *U.S. v. City of St. Paul*, 258 F.3d 750, 752 (8th Cir. 2001) (taking judicial notice of agency handbook)

in some scenarios only one such population for both states.  The PDM Plan also includes a

disease trigger which was not found in the Recovery Plan.  *Id.*; A.R. Doc 468A, p. 13795-95.

**H.    Harmless Error Standard and Remedy if Error is Found**.  Should the Court

find some error in some aspect of the FWS's hundred page delisting decision, the Court will

need to consider whether the error is prejudicial or harmless under the Administrative Procedure

Act's ("APA") harmless error standard.  5 U.S.C. § 706 ("due account shall be taken of the rule

of prejudicial error").  Given the large margin by which the number of wolves now exceeds the

Recovery Plan targets and the narrow nature of many of Plaintiffs' objections, it is difficult to

see how any error could be prejudicial.  Should the Court find prejudicial error, it must consider

remedy under the APA remedy standards.  See DI Opn. at 38-39 (reviewing caselaw).

Plaintiffs explain that "to the extent that the [Oregon and Vermont decisions regarding

the 2003 downlisting rule] provide any guidance at all, they would support at most a tight

[delisting] line around the existing wolf populations in northern Minnesota, northern Wisconsin,

and Michigan's Upper Peninsula," i.e. the Core Recovery Areas.  Pl.Opp. at 22.  As Plaintiffs'

statement suggests, Plaintiffs offer little response to Defendant-Intervenors' point that temporary

relisting in the Core Recovery Areas during a remand to address curable issues would be

needlessly disruptive to state wolf management.  *See* Pl. Opp. at 32-33 (addressing disruption to

Defendant-Intervenors but not disruption to states);  DI. Opn. at 40-41 (addressing both types of

disruption).  Those state management plans have been in operation for almost a year since

delisting, and have required the investment of considerable resources.  *E.g.* State Governments

Amici Brief at 25-28 (Docket 40) (describing Michigan's plan).

Plaintiffs do not deny that remand without vacatur for further explanation or a temporary

stay of remedy to give the FWS a chance to act before disruption occurs are available remedies

in appropriate ESA cases, as in any other case reviewed under the APA. Pl. Opp. at 33; DI Opn. at 39-41. Plaintiffs do not appear to contend that the FWS will inevitably have to redesignate the wolves of the Core Recovery Area as "endangered" or "threatened." *See* Pl. Opp. at 22. 16 U.S.C. § 1533(c) in fact precludes listing in "portions of [the species or DPS] range" in which the species (or DPS) is no longer endangered or threatened, e.g. the Core Recovery Areas.[17]

Plaintiffs' argument that allegedly "endangered" wolves in the Core Recovery Areas are of irreplaceable value (Pl. Opp. at 33) presumes that the wolves in the Core Recovery Areas are in fact "endangered" or "threatened" (and also ignores the broader interests of the state governments implementing wolf management plans). However, as discussed above, all the evidence available to the FWS establishes that wolves in the Core Recovery Areas have recovered and are no longer "endangered" or "threatened." Consequently, a remedy that would impose the listing of a recovered species would defy the purpose of the ESA.

## CONCLUSION

For the foregoing reasons and those stated in Defendant-Intervenors' Opening Brief and the briefs of the Federal Defendants and Amici State Governments, National Wildlife Federation, and Pacific Legal Foundation, the Court should affirm the FWS's decision to delist the WGL-DPS wolves and grant Defendant-Intervenors' Motion for Summary Judgment.

---

[17]    16 U.S.C. § 1533(c)(1) provides flexibility for listing in any more limited areas where threats are found to exist, as it directs that FWS when listing a species (a DPS is a "species") shall "specify .. what portions of its range it is endangered or threatened ...." *See also Defenders of Wildlife (Lizard)*, 258 F.3d at 1141, 1144 (FWS has flexibility to list only where threats exist); 43 Fed.Reg. 9607 (Mar. 9, 1978) (classifying wolves in Minnesota as "threatened" and wolves elsewhere in conterminous 48 states as "endangered");  DOI Solicitor's Memorandum on the Meaning of "in Danger of Extinction Throughout All or a Significant Portion of its Range" at 16-19 (Mar. 16, 2007) (Exh. 3 to DI Op. Br.); see *U.S. v. Lara*, 541 U.S. 193, 206 (2004) (Court may consider Solicitor's opinion like other precedent).

Dated:　March 7, 2007　　　　　　　　Respectfully submitted,

/s/ William P. Horn　　　　　　　　　　/s/ Anna M. Seidman
William P. Horn (D.C. Bar No. 375666)　Anna M. Seidman (D.C. Bar No. 417091)
James H. Lister (D.C. Bar. No. 447878)　Douglas S. Burdin (D.C. Bar No. 434107)
Birch Horton, Bittner & Cherot　　　　Safari Club International
1155 Connecticut Avenue N.W., Suite 1200　501 2nd Street NE
Washington, D.C.　20036　　　　　　　Washington, D.C.　20002
(202) 659-5800　　　　　　　　　　　(202) 543-8733
Fax:　(202)659-1027　　　　　　　　Fax:　(202) 543-1205
whorn@dc.bhb.com　　　　　　　　　aseidman@sci-dc.org
jlister@dc.bhb.com　　　　　　　　　dburdin@sci-dc.org

*Counsel for U.S. Sportsmen's Alliance*　*Counsel for Safari Club International, Safari*
*Foundation, Wisconsin Bear Hunters'*　*Club International Foundation, and National*
*Association, Scott Meyer and Robert Stafholt*　*Rifle Association*

25

EXHIBIT A TO DEFENDANT-INTERVENORS' REPLY TO
PLAINTIFFS' OPPOSITION TO DEFENDANT-INTERVENORS'
MOTION FOR SUMMARY JUDGMENT

(CASE NO. 1:07-CV00677-PLF)

**DRAFT**
04/23/07

# Post-Delisting Monitoring Plan
# Gray Wolf Western Great Lakes Distinct Population Segment

**Overview of Purpose and Focus**

Section 4(g) of the Endangered Species Act (Act) requires post-delisting monitoring (PDM) for a minimum of five years after a species is delisted due to its recovery. The post-delisting monitoring shall be used to indicate whether the species should be relisted, or relisted under the emergency listing authority of the Act, to prevent a significant risk to its well being. In order to do this, PDM should focus on reviewing and evaluating (1) population characteristics of the species, (2) threats to the species, and (3) implementation of legal and/or management commitments that have been identified as important in reducing threats to the species or maintaining threats at sufficiently low levels.

For the proposed Gray Wolf Western Great Lakes Distinct Population Segment (WGL DPS) (71 FR 15266; March 27, 2006; Figure 1), focusing PDM on these three aspects is necessary and sufficient to ensure that the DPS does not decrease to the point of again meeting the definitions of threatened or endangered. Demographic data – specifically, winter and late-winter estimates of wolf populations in the northern portions of Minnesota, Wisconsin, and Michigan – are the basis for our determination that wolves in this DPS have surpassed their numerical recovery criteria for a sufficient period. A reduction in threats to the species is the primary cause of the dramatic wolf population increase over the last 25 years and attainment of the numerical recovery criteria. The post-delisting protection of wolves via state and tribal laws and regulations, as well as protections by federal land management agencies, will be critical to maintaining a recovered population of gray wolves in the WGL DPS, because those laws and regulations will become the primary mechanism to protect wolves from their primary former threat – excessive human-caused mortality.

PDM for the WGL DPS will be focused within the borders of Minnesota, Wisconsin, and the Upper Peninsula (UP) of Michigan. These areas constitute the core wolf recovery areas within the DPS, and the numerical recovery criteria specified in the Recovery Plan for the Eastern Timber Wolf (USFWS 1992) have been attained by the wolf populations within this area. Because the delisting of the gray wolf WGL DPS is based on wolf recovery in these states, it is not necessary for the Service to conduct PDM in other parts of the DPS. However, the Service remains interested in receiving additional biological evidence regarding the existence of individual wolves or wolf populations in the other states within the DPS, and especially in the Northern Lower Peninsula (NLP) of Michigan. Additionally, the Service is interested in obtaining disease/parasite data from wolves found in other portions of the DPS that may provide evidence regarding a new or increasing threat that may impact wolves in the core recovery areas of the DPS.

1

**DRAFT**
04/23/07



Figure 1. Western Great Lakes Distinct Population Segment

Population Characteristics

The monitoring of wolf populations in Minnesota, Wisconsin, and Michigan has been carried out for several decades primarily by the three State DNRs, with significant assistance from numerous partners, including the U.S. Forest Service, National Park Service, USDA/APHIS-Wildlife Services, tribal natural resource agencies, and the Service. The methods used in this monitoring are summarized below, and are described in detail by Erb and Benson (2004), Wydeven *et al.* (2006), and Potvin *et al.* (2005).

In order to maximize comparability of PDM data with data obtained prior to delisting (Table 1), all three states intend to continue their previous wolf population monitoring methodology with only minor changes. As specified in the Recovery Plan for the Eastern Timber Wolf (USFWS 1992), population monitoring will be conducted during the late winter months when wolf populations are at the low point of their annual cycle, and when snow cover and lack of foliage

2

**DRAFT**
04/23/07

on deciduous trees facilitates tracking and aerial counting.

**Table 1. Gray wolf winter populations in Minnesota, Wisconsin, and Michigan (excluding Isle Royale) from 1976 through 2006.**

| YEAR | Minnesota | Wisconsin | Michigan | WI & MI Total |
|------|-----------|-----------|----------|---------------|
| 1976 | 1,000–1,200 | ? | | |
| 1978–79 | 1,235 | ? | | |
| 1988–89 | 1,500 & 1,750 | 31 | 3 | 34 |
| 1989-90 | | 34 | 10 | 44 |
| 1990-91 | | 40 | 17 | 57 |
| 1991-92 | | 45 | 21 | 66 |
| 1992-93 | | 40 | 30 | 70 |
| 1993–94 | | 57 | 57 | 114 |
| 1994–95 | | 83 | 80 | 163 |
| 1995–96 | | 99 | 116 | 215 |
| 1996–97 | | 148 | 113 | 261 |
| 1997–98 | 2,445 | 180 | 139 | 319 |
| 1998–99 | | 205 | 169 | 374 |
| 1999–2000 | | 248 | 216 | 464 |
| 2000–01 | | 257 | 249 | 506 |
| 2001–02 | | 327 | 278 | 604 |
| 2002–03 | | 335 | 321 | 656 |
| 2003–04 | 3,020 | 373 | 360 | 733 |
| 2004–05 | | 435 | 405 | 840 |
| 2005-06 | | 465 | 434 | 899 |

Minnesota DNR will continue to use a rangewide survey/local intensive study approach, which is suitable for a wolf population of thousands of animals ranging across more than 34,100 sq. mi. (88,325 sq. km). The most recent survey was conducted during the winter of 2003-2004 to provide a population estimate used in making the Service's delisting decision. However, the Minnesota Wolf Management Plan (MN DNR 2001) specifies that the survey frequency will be increased from the previous 9 or 10-year interval. Statewide wolf population and distribution estimates will be conducted during the first and fifth years following delisting and subsequently at 5-year intervals. In the intervening years the DNR will continue their collection and analysis of scent post data, winter track surveys, and verified wolf depredations on domestic animals. Each of these will furnish independent annual indices of wolf population trends and changes in occupied range, but they will not provide population estimates.

The Minnesota method uses estimates of winter pack territory and pack size that are based on several localized radio-tracking studies in different portions of Minnesota wolf range. The extent of occupied wolf range is separately delineated from extensive surveying of hundreds of natural resource managers, wildlife biologists, conservation officers, and other knowledgeable

**DRAFT**
04/23/07

field personnel, and also by using human density and road density data. Wolf density data from the localized radio-tracking studies are applied to the wolf range delineated from the surveys to derive an estimate of pack wolf numbers across the occupied range. This number is adjusted upward to account for a Minnesota wolf population believed to include 15 percent non-pack wolves (based on Fuller *et al.* 1992). This method provides a population point estimate, and the DNR has computed a 90 percent confidence interval for the point estimate (Erb and Benson 2004).

Wisconsin DNR will continue its intensive radio-tracking and annual winter track and sign surveys to provide data directly comparable to those available for recent years. This method is based on weekly aerial radio-tracking of approximately 40 percent of Wisconsin wolf packs from mid- through late winter, supplemented by multiple winter track and sign surveys in all areas suspected of having wolf packs. These complementary methods identify the locations and approximate territorial boundaries of nearly all packs, and they have a high likelihood of detecting most or all members of each pack. Because detection is less than 100 percent, the method is understood to provide something of an underestimate of the late winter pack wolf population in the State.

Due to the intensity of the Wisconsin surveys, very few packs are missed. There have been several years in which packs subsequently have been documented in a location where no packs were identified during the previous late winter survey. When this occurs, WI DNR retroactively adjusts the previous year's population estimate to account for the missed wolves. Although there currently are no data available to derive confidence limits, the DNR's survey method probably underestimates packs and pack wolf numbers by less than 10 percent. Because some of the underestimate is removed by adjustment in the subsequent year, the ultimate underestimate probably averages 5 to 10 percent or less for pack wolves. Winters with less snow cover produce poorer conditions for track surveys and reduced contrast for aerial sightings, likely resulting in larger underestimates in such years.

A second cause of underestimation is the lone wolves that are missed in the survey. Lone wolves are generally believed to constitute about 10-15 percent of a wolf population in winter (Fuller et al. 1992, 2003). The WI DNR recorded 2 to 13 percent of the wolf population as loners from 1991-2000, but among radio-collared wolves an average of 8 percent spent the whole winter as loners (range 0 to 15 percent) (Wydeven *et al.* 2000). Wolf reports were received from numerous Wisconsin counties beyond the area surveyed by the DNR. Although many of these are likely misidentifications by the public, some of these reports likely are of dispersing lone wolves not included in the survey tally. Thus, missing lone wolves may lead to an underestimate on the order of 5 to 10 percent of the statewide wolf population in Wisconsin.

Combining the estimated error for missed packs and missed individual pack wolves with the estimated error from missed loners results in an overall underestimate on the order of 10 to 20 percent. At the other extreme, the survey design minimizes the likelihood of double-counting wolves or packs; we do not believe overestimating the statewide wolf population will occur via this survey methodology.

4

**DRAFT**
04/23/07

Wisconsin DNR might test other methods during the PDM period, but the State does not plan to replace its traditional radio tracking/snow tracking surveys during the PDM period (Wydeven in litt. 2006).

Michigan DNR also plans to continue its intensive ground tracking, aerial observation, and radio telemetry-based methods during the PDM period. Michigan's methods are very similar to those used by Wisconsin, including weekly monitoring of radio-collared wolves in about 40 percent of the packs. However, Michigan does not use volunteers to assist with ground tracking. Annually, Michigan DNR, assisted by USDA-Wildlife Services, spends over 2,000 person hours conducting the ground tracking portion of the survey. This effort involves searching over 8,000 miles of roads and trails at least once for wolf sign, with many miles searched multiple times.

Given the increases in wolf numbers and the effort required to count wolves, the Michigan DNR is planning to implement a sampling approach to reduce the cost and increase the efficiency of the survey based on an analysis by Potvin *et al.* (2005). Michigan DNR is planning to stratify the UP into three sampling areas and intensively survey roughly 40 to 50 percent of the wolf habitat area annually. Computer simulations have shown that such a geographically stratified monitoring program will produce unbiased and precise estimates of the total wolf population which can be statistically compared to estimates derived from the previous method to detect changes in the UP wolf population (Beyer in litt. 2006, Lederle in litt. 2006).

The late winter surveys by the Wisconsin and Michigan DNRs produce estimates of their wolf populations at the low points in their annual cycle. By late winter, mortality factors such as starvation and hypothermia exacerbated by mange and other diseases have largely exerted their effect and the annual production of pups has not yet begun. In early spring after pups are born it is likely that the wolf population jumps to approximately double the late-winter population. Therefore, the late-winter population estimates must always be accompanied with this understanding when used to evaluate recovery progress and post-delisting viability – they are minimum estimates of the wolf population made at its annual low point.

Post-Delisting Threats

Post-delisting threats are all the threats that may affect the species after the protections of the Act are removed. These include ongoing threats whose magnitude has been reduced by recovery actions for the species, continuing threats that have not been mitigated by recovery actions over the years since listing, or new threats that are first recognized subsequent to delisting. For gray wolf WGL PDM purposes, we believe the most important threats to monitor are those that have been sufficiently reduced and contained, but not permanently eliminated, during the recovery process. For gray wolves in the WGL DPS, those threats are primarily the various forms of human-caused mortality that have been reduced by the provisions of the Act. Additionally, a variety of known wolf diseases and parasites are of concern. Furthermore, the possibility of new diseases represents a threat that requires vigilance. All these anticipated post-delisting threats are described in detail in **Summary of Factors Affecting the Species** in the preamble of the 2006 proposed delisting rule (75 FR 15277-15302).

5

**DRAFT**
04/23/07

Minnesota, Wisconsin, and Michigan DNRs will continue to compile summaries of incidents of human-caused and natural mortality and to provide this information to us annually. This reporting will include information on: **wolves killed legally and intentionally** for depredation control, threat reduction, research, or other reasons; **known accidental mortalities** (for example, vehicle collisions and incidental trapping mortalities); **natural mortality** (e.g., disease and intraspecific conflict); **illegally killed wolves**, and **mortalities from unknown factors**.

The wolf management plans for Minnesota and Wisconsin commit the respective DNRs to conduct necropsies on dead wolves, carry out disease screening on livetrapped wolves, and analyze wolf scat for disease-causing microorganisms and parasites. The Michigan DNR states that wolf health disease monitoring will receive a high priority for a minimum of five years following Federal delisting. This information will be provided annually for our review.

Generally, American Indian reservation natural resource agencies are not bound to the wolf reporting mechanisms that are contained in state wolf management plans. Thus, there may be reservations within wolf range in Minnesota, Wisconsin, and Michigan which will not annually report their wolf population, mortality, and disease data to the state DNRs. Annually we will contact each of the large reservations within the DPS's known wolf range to directly obtain their population and mortality/disease data, as well as any new information regarding tribal management and protection of wolves in order to have the most comprehensive data available for our annual review.

Similarly, we will annually contact the federal land management agencies with significant wolf populations on their units in Minnesota, Wisconsin, and Michigan to obtain any additional data they may have regarding wolf management/protection, numbers, mortalities, injuries, or disease occurrences.

<u>Implementation of Legal and Management Commitments</u>

The recovered WGL DPS is dependent upon wolves receiving sufficient protection in Minnesota, Wisconsin, and Michigan so as to ensure that a viable wolf population will remain in Minnesota and a second viable population will exist in Wisconsin-Michigan for the foreseeable future. As the Act's protection ended at the time of delisting, the necessary post-delisting protection must come from state, tribal, and local governments, and from several federal land management agencies. Among these, state protections are the most important, because they apply directly to the largest number of WGL DPS wolves.

By delisting the Gray Wolf WGL DPS we have concluded that the wolf management plans of the Minnesota, Wisconsin, and Michigan DNRs and future gray wolf protections by the various tribes and federal land management agencies are sufficient to preserve viable wolf populations in the Midwest. Therefore, post-delisting monitoring will also annually evaluate the implementation and outcomes of these wolf management plans, protections, and related guidelines and procedures.

**Monitoring Duration and Methods**

6

**DRAFT**
04/23/07

<u>Duration.</u>  Unless such situations arise as are described below, the Service and the wolf management agencies will carry out PDM for five years following the delisting of the Gray Wolf WGL DPS.  This will allow for five complete Wisconsin-Michigan population estimates after delisting has occurred and non-federal wolf management plans and protections become operational.  It will also include population estimates for Minnesota wolves at or near the beginning and end of the five-year period.  Given that the Gray Wolf WGL DPS population currently is estimated to be several times greater than the numerical delisting criteria stated in the 1992 Recovery Plan (USFWS 1992), and because at this time we envision no reasonably likely threat or combination of threats sufficient to drive that population rapidly downward, we believe 5 years of PDM is sufficient.  Under the circumstances described below we will consider extending the PDM and/or taking action to restore federal protections under the Act.

<u>Data Gathering.</u>  We will annually gather available data from Minnesota, Wisconsin, and Michigan DNR's, and from the Native American natural resource agencies and federal land management agencies with large land bases within occupied wolf range in these three states.  We will also contact the wildlife management agencies of the other states in the DPS to obtain relevant data that they may have acquired during the previous year.

The Service will contact state and tribal wildlife resource conservation agencies and federal land management and research agencies to establish points of contact to obtain the relevant data annually.  Within the Service, the Endangered Species Coordinator at the Service's Twin Cities, Minnesota, Ecological Services Field Office will be the focal point for the data gathering, evaluation, and coordination with the Eastern Gray Wolf Recovery Team and other experts, as appropriate.

Our data gathering will include the following, with the primary data shown in bold type:
- Wolf **population estimates, pack numbers, and estimated occupied area** from Minnesota, Wisconsin, and Michigan DNRs and from larger reservations within the wolf-occupied portions of these three states
- Wolf **mortality data** from the three states and the larger reservations within occupied range in the WGL DPS
- Data on the **occurrence of diseases and parasites** in wolves throughout the WGL DPS
- Information on changes made within the previous year, or changes likely within the next year, to state **regulatory mechanisms that change the previously-provided protections** for gray wolves, gray wolf prey, or gray wolf habitat within the DPS
- Summary data for all **law enforcement investigations** relating to wolves by the three states.
- Summary reports of **wolf depredation incidents** and the resolution of those incidents
- Reports or publications on public attitudes toward WGL DPS wolves
- Reports of wild gray wolves in other states within the WGL DPS
- Wolf research reports or publications dealing with WGL DPS wolves or factors adversely affecting them
- Educational materials, press releases, and other wolf-related public information/education documents distributed by the state, tribal, and federal agencies within the WGL DPS, and

7

**DRAFT**
04/23/07

similar materials distributed within the WGL DPS by non-governmental agencies.

<u>Summary of Annual Data Collection.</u>  Letters will be sent annually to the following four categories of agencies, requesting a standard list of data types from all agencies in the category.

Minnesota, Wisconsin, and Michigan Departments of Natural Resources:
- population estimates, pack numbers, occupied area
- mortality data
- disease/parasite occurrence in wolves
- verified or probable depredation incidents and follow-up actions
- changes to regulatory mechanisms affecting the protection or management of the species, its prey, and its habitat
- law enforcement investigations of wolf mortality
- other relevant information

Natural Resource Management Agencies of the large reservations in occupied wolf area – Red Lake, Leech Lake, Fond du Lac, Bois Forte, Grande Portage, Bad River, Lac Courte Oreilles, Menominee, and Lac du Flambeau:
- population estimates and pack numbers
- mortality data

Other States within the WGL DPS – North Dakota, South Dakota, Iowa, Illinois, Indiana, and Ohio:
- verified or probable wolf reports & disposition of any verified or probable wolves
- disease/parasite occurrence in documented wolves

Federal Land Management Agencies with large land bases within occupied wolf range – Chippewa National Forest (NF), Superior NF, Chequamegon-Nicolet NF, Hiawatha NF, Ottawa NF, Voyageurs National Park; and national wildlife refuges with sufficient land base or known wolf presence:
- population estimates and pack numbers
- mortality data
- law enforcement investigations of wolf mortality
- regulatory mechanism changes

Wisconsin and Michigan DNRs currently finalize their annual population estimates in April through June, so we expect to annually gather this information during April through June, for subsequent evaluation in June or July.  If state and tribal population estimates are available earlier, the evaluation similarly will occur earlier in the year.

<u>Evaluation.</u>  These data will be reviewed and evaluated internally by the Service and provided in entirety or in summary form to the Eastern Gray Wolf Recovery Team for their independent review.  The Service may request additional reviews from other wolf experts and independent specialists, as appropriate.  These annual reviews will look for indications of increasing or new

8

**DRAFT**
04/23/07

threats to wolf population viability, a decline in wolf population or decrease in occupied range, a change in state/tribal/federal management/protection that might cause a decline, or other factors that might indicate or cause a decline in wolf population viability in the WGL DPS. While the reviews will focus on population trends, mortality data, and protection/enforcement activities, other data will be reviewed when appropriate.

We will post the results of these reviews in summary form on our Web site in a timely manner in order for all interested parties to annually review our PDM and our evaluation of the data.

**Events & Factors Indicating a Potential Need for Action:**

While it may seem desirable to specify in advance a list of strict quantitative triggers that would automatically result in specified actions by the Service (e.g., PDM expansion or extension, initiating a formal status review, or publication of a relisting proposal), such decisions are rarely clear-cut and often require the consideration of multiple qualitative factors and evaluating interactions of varying complexity. Thus, we are instead identifying five quantitative events and describing several examples of qualitative factors that would lead to our *consideration* of the actions (a) through (f) described below, but *would not necessarily trigger* these actions. Consultation with the Recovery Team, other wolf experts, and/or endangered species biologists within the Service will precede our determination of the appropriate response.

Events that might cause Consideration of Relisting or Emergency Relisting:
Either of these events might be evidence of a serious problem, but by itself would not necessarily trigger Federal regulatory action. The occurrence of any of the following could cause the Service to investigate the cause, the likelihood of continuation, other indications of Midwest wolf population viability, and other relevant factors, to decide if a proposal to relist, an emergency relisting, or other action is warranted.
1. A decline that reduces the combined Wisconsin-Michigan (excluding Isle Royale and the Lower Peninsula) late winter wolf population estimate to 200 or fewer wolves.
2. A decline that brings either the Wisconsin or the Michigan (excluding Isle Royale and the Lower Peninsula) wolf estimate to 100 or fewer wolves.
3. A decline that brings the Minnesota winter wolf population point estimate to 1500 or fewer wolves.

Others factors indicating a potential cause for concern include, but are not limited to, the following:
The occurrence of any of the following factors can direct the Service's attention to an evaluation of its seriousness, but will not necessarily lead to any other follow-up action.
1. A rapid and large decline (for example, 25 percent or more from the previous year) in the late winter wolf population estimate for Wisconsin and/or Michigan.
2. Any wolf population decline in Wisconsin Zones 1 and 2 or the Upper Peninsula of Michigan of three years or more in duration.
3. A substantial and widespread increase in mortality from known or unknown causes.
4. Evidence of a new wolf disease or substantial increase in virulence of a previously known wolf disease, even in the absence of noticeable demographic impacts on the wolf population.

9

**DRAFT**
04/23/07

5. A substantial decline in the wolf prey base across a large portion of the occupied wolf range in the DPS.
6. A significant adverse change in wolf, wolf prey, or wolf habitat, management practices or protection across a substantial portion of the occupied wolf range in the WGL DPS.

In the event that WGL DPS declines are evident following an annual PDM review, the Service may take any or all of the following actions:
(a) extend the PDM period,
(b) add new components to the PDM,
(c) initiate a comprehensive status review of the species within the DPS, and/or
(d) investigate and/or remedy the cause(s) of the decline.

As part of each annual evaluation the Service will also consider changes to the PDM methodology and data review process. If such changes are found to be necessary to meet the Service's responsibilities under Section 4(g) of the Act they will be promptly implemented, subject to available funding needed for their implementation.

At the end of the PDM period the Service will conduct a final internal review, and may request reviews by the Recovery Team and other independent specialists, as appropriate. The results of these reviews will be posted on the Service's Web site.

**Literature Cited**

Beyer, Dean. 2006. E-mail from Beyer, MI DNR Wildlife Research, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 08/10/06. Subject: Potential for "MN-style" wolf monitoring in WI and MI? 2 pp. with 6-page attachment by Drummer.

Erb, J. and S. Benson. 2004. Distribution and abundance of wolves in Minnesota, 2003-04. Unpublished report by Minnesota Department of Natural Resources, Grand Rapids, MN 13 pp.

Fuller, T.K., W.E. Berg, G.L. Radde, M.S. Lenarz, and G.B. Joselyn. 1992. A history and current estimate of wolf distribution and numbers in Minnesota. Wildlife Society Bulletin 20:42-54.

Fuller, T.K., L.D. Mech, and J.F. Cochrane. 2003. Wolf population dynamics. Pp. 161-191 In Wolves: Behavior, Ecology, and Conservation. eds. L.D. Mech and L. Boitani. Univ. of Chicago Press, Chicago. 448 pp.

Lederle, P. 2006. E-mail from Lederle, MI DNR Wildlife Research Section Supervisor, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 09/05/06. Subject: Support for the sampling protocols. 1 p.

Michigan Department of Natural Resources. 1997. Michigan gray wolf recovery and management plan. Lansing, MI 58 pp.

Minnesota Department of Natural Resources. 2001. Minnesota wolf management plan. Prepared by the Section of Wildlife, dated February 2001. 36 pp. plus 9 appendices.

Potvin, M.J., T.D. Drummer, J.A. Vucetich, D.E. Beyer, R.O. Peterson, and J.H. Hammill. 2005. Monitoring and habitat analysis for wolves in Upper Michigan. J. Wildl. Mgmt. 69:1660-1669.

**DRAFT**
04/23/07

U.S. Fish and Wildlife Service. 1992. Recovery plan for the eastern timber wolf. Twin Cities, MN 73 pp.

Wiedenhoeft, J.E. 2005 . Summary Report - "Minnesota-type" wolf survey for Wisconsin - GIS analysis. Unpublished report to State Wildlife Grants Program - CWCP. Wisconsin DNR, Park Falls, WI. 14 pp.

Wydeven, Adrian. 2006. E-mail from Wydeven, WI DNR Mammalian Ecologist, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 08/09/06. Subject: Potential for "MN-style" wolf monitoring in WI and MI. 2 pp. with 14-page attachment [Wiedenhoeft 2005, listed separately above].

Wydeven, A.P., J.E. Wiedenhoeft, B.E. Kohn, R.P. Thiel, R.N. Schultz, and S.R. Boles. 2000. Progress report of wolf population monitoring in Wisconsin for the period October 1999 - March 2000. Unpublished report by Wisc. Dept. Natural Resources, Park Falls, WI. 31 pp.

Wydeven, A.P., J.E. Wiedenhoeft, R.N. Schultz, R.P. Thiel, S.R. Boles, and E. Heilhecker. 2006. Progress report of wolf population monitoring for the period October 2005 – March 2006. Unpublished report by WI DNR, Park Falls, WI. 39 pp.

Draft prepared by the Region 3 Division of Endangered Species, U.S. Fish and Wildlife Service, Whipple Federal Building, 1 Federal Drive, Ft. Snelling, Minnesota 55111.

**EXHIBIT B TO DEFENDANT-INTERVENORS' REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT**

**(CASE NO. 1:07-CV00677-PLF)**

**U.S. Fish & Wildlife Service**

# Post-delisting Monitoring Plan for the Western Great Lakes Distinct Population Segment of the Gray Wolf



**U.S. Fish & Wildlife Service**

# Post-delisting Monitoring Plan for the Western Great Lakes Distinct Population Segment of the Gray Wolf

## February 2008

Recommended Citation

U.S. Fish and Wildlife Service.  2008. Post-delisting monitoring plan for the Western Great Lakes Distinct Population Segment of the Gray Wolf.  U.S. Fish and Wildlife Service, Twin Cities Field Office and Midwest Region.  Bloomington, MN and Ft. Snelling, MN. 13pp.

## Table of Contents

Acknowledgements ............................................................................................................. 1

Background ....................................................................................................................... 1

Public Review and Comment ............................................................................................ 2

Monitoring by the States .................................................................................................. 2

    Minnesota ..................................................................................................................... 3

    Wisconsin ..................................................................................................................... 4

    Michigan ....................................................................................................................... 5

    Summary of Monitoring in Wisconsin and Michigan ................................................. 6

Monitoring of Threats ....................................................................................................... 6

Implementation of Legal and Management Commitments ............................................ 7

Monitoring Duration and Methods ................................................................................... 7

Events & Factors Indicating a Potential Need for Action by the Service ..................... 10

Events that Might Cause Consideration of Relisting or Emergency Relisting ............... 10

Others Factors Indicating a Potential Cause for Concern .............................................. 11

Literature Cited ............................................................................................................... 13

**Acknowledgements**

This plan was originally drafted by Ron Refsnider, U.S. Fish and Wildlife Service (Service), Midwest Region, with input from members of the Service's recovery team.  It was then finalized after the completion of the public comment period by Phil Delphey, with assistance from Joel Trick and Christie Deloria-Sheffield all of U.S. Fish and Wildlife Service.

**Background**

Section 4(g) of the Endangered Species Act (Act) requires the Service to monitor, for a minimum of five years, any species that is delisted due to its recovery.  The intent of this monitoring is to determine whether the species should be proposed for relisting under the normal listing procedures, relisted under the emergency listing authority of the Act, or kept off of the list because it remains neither threatened nor endangered.  For the Western Great Lakes Distinct Population Segment of the Gray Wolf [WGLDPS, 71 Federal Register 15266; (March 27, 2006); Figure 1], the post-delisting monitoring (PDM) plan should focus on reviewing and evaluating (1) population characteristics of the distinct population segment (DPS), (2) threats to the DPS, and (3) implementation of legal and management commitments that are important in reducing threats to the DPS or maintaining threats at sufficiently low levels as these have a bearing on the five factors set forth in the Act.

For the delisted WGLDPS, focusing PDM on these three aspects is necessary and sufficient to ensure that the DPS does not decrease to the point of again meeting the definition of threatened or endangered without an appropriate and timely response from the Service.  Winter and late-winter estimates of wolf populations in Minnesota, Wisconsin, and Michigan have demonstrated that wolves in the WGLDPS have surpassed their numerical recovery criteria for a sufficient period due to a reduction in threats over the last 25 years [U.S. Fish and Wildlife Service (USFWS) 1992].  The protection and management of wolves by states will be critical in conserving the WGLDPS.  In addition, management of wolf habitat by tribes and federal land management agencies will continue to be important in conserving the WGLDPS.  Since delisting, state and tribal laws and regulations have become the primary mechanism to protect wolves from their primary former threat – excessive human-caused mortality.

PDM for the WGLDPS will be focused within the borders of Minnesota, Wisconsin, and the Upper Peninsula (UP) of Michigan, where wolf populations have attained the numerical recovery criteria specified in the Recovery Plan for the Eastern Timber Wolf (USFWS 1992).  The delisting of the WGLDPS of the Gray Wolf is based on wolf recovery in those three states.  Therefore, it is not necessary to conduct intensive monitoring in other parts of the DPS.  The Service is interested, however, in reviewing any data regarding the existence of individual wolves or wolf populations outside of the core recovery areas (Fig. 1), especially in the Northern Lower Peninsula (NLP) of Michigan.  Additionally, the Service is interested in obtaining disease and parasite data from wolves found in other portions of the DPS that may suggest a new or increasing threat that may impact wolves in the core recovery areas.

1



Figure 1.  Western Great Lakes Distinct Population Segment

**Public Review and Comment**

On June 4, 2007, the Service announced the availability of its draft plan to monitor the WGLDPS of the Gray Wolf for public review and comment.  After the comment period closed on July 5, 2007, the Service reviewed each comment received and prepared comments in response to any substantive comments (see Appendix).

**Monitoring by the States**

The States of Minnesota, Wisconsin, and Michigan have carried out wolf monitoring for several decades, with significant assistance from numerous partners, including the U.S. Forest Service, National Park Service, U.S. Department of Agriculture (USDA)-Wildlife Services, tribal natural

resource agencies, and the Service. In Minnesota, for example, these agencies provide data directly to the Minnesota Department of Natural Resources to support its development of statewide population estimates (Erb and Benson 2004). The methods used in this monitoring are summarized below, and are described in detail by Erb and Benson (2004), Wydeven *et al.* (2006), and Potvin *et al.* (2005).

All three states intend to implement monitoring methodologies that would allow for comparison to data obtained before delisting. As specified in the Recovery Plan for the Eastern Timber Wolf (USFWS 1992), population monitoring will be conducted during the late winter months when wolf populations are at the low point of their annual cycle and when snow cover and lack of foliage on deciduous trees facilitates tracking and aerial counting.

**Table 1. Gray wolf winter populations in Minnesota, Wisconsin, and Michigan (excluding Isle Royale) from 1976 through 2006.**

| Year | Minnesota | Wisconsin (WI) | Michigan (MI) | WI & MI Total |
|------|-----------|----------------|---------------|---------------|
| 1976 | 1,000–1,200 | ? | | |
| 1978–79 | 1,235 | ? | | |
| 1988–89 | 1,500 & 1,750 | 31 | 3 | 34 |
| 1989-90 | | 34 | 10 | 44 |
| 1990-91 | | 39 | 17 | 57 |
| 1991-92 | | 45 | 21 | 66 |
| 1992-93 | | 40 | 30 | 70 |
| 1993–94 | | 54 | 57 | 114 |
| 1994–95 | | 83 | 80 | 163 |
| 1995–96 | | 99 | 116 | 215 |
| 1996–97 | | 148 | 113 | 261 |
| 1997–98 | 2,445 | 178 | 139 | 319 |
| 1998–99 | | 204 | 169 | 374 |
| 1999–2000 | | 248 | 216 | 464 |
| 2000–01 | | 257 | 249 | 506 |
| 2001–02 | | 327 | 278 | 604 |
| 2002–03 | | 335 | 321 | 656 |
| 2003–04 | 3,020 | 373 | 360 | 733 |
| 2004–05 | | 435 | 405 | 840 |
| 2005-06 | | 467 | 434 | 899 |
| 2006-07 | | 540 | 509 | 1,049 |

Minnesota

Minnesota Department of Natural Resources (DNR) will continue to use a rangewide survey/local intensive study approach, which is suitable for a wolf population of thousands of animals ranging across more than 34,100 square miles (88,325 square kilometer). The most

recent survey was conducted during the winter of 2003-2004 and provided a population estimate used in making the Service's delisting decision. The Minnesota Wolf Management Plan (Minnesota DNR 2001) specifies that the survey frequency will be increased from the previous 9-10-year interval. Statewide wolf population and distribution estimates will be conducted during the first and fifth years after delisting and subsequently at 5-year intervals.

During the years between statewide population estimates, the DNR will collect and analyze data from its predator scent post survey, furbearer winter track survey, and recorded wolf depredations of domestic animals. Each of these will furnish independent annual indices of wolf population trends and occupied rangebut will not provide population estimates. In the "Forest Zone", which comprises the main portion of the wolf range in Minnesota, there were 173 scent station routes completed in 2006 (Erb 2006). Each route is 2.7 miles long and contains ten scent stations. Data from these indices must be interpreted with caution and may not by themselves be reliable indicators of population declines. Since 1994, however, trends in these indices point to a stable or slowing growing wolf population in Minnesota, consistent with the results of the statewide population estimates [72 Federal Register 6054 (8 February 2007)].

To estimate statewide wolf abundance, Minnesota uses estimates of winter pack territory and pack size that are based on radio telemetry studies in different portions of Minnesota wolf range. The extent of occupied wolf range is determined based on an extensive survey of hundreds of tribal, federal, state and other natural resource managers, wildlife biologists, conservation officers, and other knowledgeable field personnel, and also by using human density and road density criteria (Erb and Benson 2004). Wolf density data from the localized radio telemetry studies are applied to the estimated wolf range to derive an estimate of the numbers of wolves in packs in Minnesota. This number is adjusted upward to account for non-pack wolves and a 90 percent confidence interval for the resulting point estimate is calculated (Erb and Benson 2004). Using those methods for the winter of 2003/2004, Minnesota DNR estimated 3,020 wolves in the state with a 90 percent confidence interval ranging from 2,301-3,708 (Erb and Benson 2004).

In addition to reviewing each statewide wolf population estimate and wolf population indices, the Service will request from Minnesota DNR an annual summary of recorded wolf mortality incidents. In the years between statewide population estimates, these mortality data will provide an additional index to the wolf population in the state and may help to assess the relative importance of various mortality factors.

Wisconsin

Wisconsin DNR will continue its intensive radio-tracking and annual winter track and sign surveys to provide data directly comparable to those available for recent years. Wisconsin's methods are based on weekly aerial radio-tracking of about 40 percent of Wisconsin wolf packs from mid- through late-winter, supplemented by multiple winter track and sign surveys conducted in all areas suspected of containing wolf packs. Those complementary methods identify the locations and approximate territories of nearly all packs and have a high likelihood of detecting most or all members of each pack. Detection probability is less than 100 percent. Therefore, the method probably underestimates the number of wolves in packs.

4

In several years, packs have subsequently been documented where no packs were suspected. When this occurs, WI DNR retroactively adjusts the previous year's population estimate to account for the missed wolves. Although there currently are no data available to derive confidence limits, the DNR's survey methods probably underestimate packs and pack wolf numbers by less than 10 percent. Because some of the underestimate is removed by adjustment in the subsequent year, the ultimate underestimate probably averages 5 to 10 percent or less for pack wolves. Winters with less snow cover produce poorer conditions for track surveys and reduced contrast for aerial sightings, likely resulting in larger underestimates in those years.

A second cause of underestimation is the number of lone wolves that are not included in the final estimate. Lone wolves are generally believed to constitute about 10-15 percent of a wolf population in winter (Fuller et al. 1992, 2003). WI DNR recorded 2 to 13 percent of the wolf population as loners from 1991-2000, but among radio-collared wolves an average of 8 percent spent the whole winter as loners (range 0 to 15 percent, Wydeven *et al.* 2000). The 2006-2007 population estimate included 17 (3%) lone wolves. Wolf reports were received from numerous Wisconsin counties beyond the area surveyed by the DNR. Although many of these are likely misidentifications by the public, some of these reports likely are of dispersing lone wolves not included in the annual count. Thus, missing lone wolves may further underestimate the statewide wolf population in Wisconsin.

Due to the minimal likelihood of double-counting pack wolves and the conservative approach used to estimate numbers of lone wolves, Wisconsin's methods are unlikely to overestimate the number of late-winter wolves in the state. During the PDM period Wisconsin DNR might test other methods, but does not plan to replace its traditional radio tracking/snow tracking surveys (Wydeven in litt. 2006).

Michigan

Michigan DNR also plans to continue its intensive ground tracking, aerial observation, and radio telemetry-based methods during the PDM period. Michigan's methods are very similar to those used by Wisconsin, including weekly monitoring of radio-collared wolves in about 40 percent of the packs, although Michigan does not use volunteers to assist with ground tracking. With the assistance of USDA-Wildlife Services, Michigan DNR annually spends over 2,000 person hours conducting the ground tracking portion of the survey. This effort involves searching over 8,000 miles of roads and trails at least once for wolf sign, with many miles searched multiple times.

Due to the increases in wolf numbers and the corresponding increase in effort required to count wolves, Michigan DNR is planning to implement a sampling approach to more efficiently determine wolf abundance (Potvin *et al.* 2005). Under this approach, Michigan DNR would stratify the UP into three sampling areas and intensively survey about 40-50 percent of the wolf habitat area annually. This stratified sampling approach would produce unbiased and precise estimates of the total wolf population that may be compared statistically to estimates derived before delisting (Beyer in litt. 2006, Lederle in litt. 2006).

Summary of Monitoring in Wisconsin and Michigan

The late winter surveys by the Wisconsin and Michigan DNRs produce estimates of their wolf populations at the low points in their annual cycle. By late winter, mortality factors such as starvation and hypothermia, perhaps exacerbated by mange and other diseases, have largely exerted their effects and the annual production of pups has not yet begun. In early spring after pups are born it is likely that the wolf population approximately doubles the late-winter population. Therefore, the late-winter population estimates must always be accompanied with this understanding when used to evaluate recovery progress and post-delisting viability – they are minimum estimates of the wolf population made at its annual low point.

**Monitoring of Threats**

The most important part of this monitoring plan is to determine, with sufficient confidence, that population levels exceed the objectives described in the recovery plan, as summarized above. Where feasible, however, the Service should also review mortality records, diseases, prey abundance, and other information to determine whether or not significant problems for wolf populations may be developing during the post-delisting monitoring period. Post-delisting threats are all the threats that may affect the species after the protections of the Act are removed. These include ongoing threats whose magnitude has been reduced by conservation actions, continuing threats that have not been mitigated since listing, or new threats that are first recognized subsequent to delisting. For purposes of this monitoring plan, we believe the most important threats to monitor are those that have been sufficiently reduced and contained, but not permanently eliminated, during the recovery process. For gray wolves in the WGLDPS, those threats are primarily the various forms of human-caused mortality that were reduced by conservation actions before the DPS was delisted. Additionally, a variety of known wolf diseases and parasites are of concern and new diseases represent a threat that requires vigilance. All of these anticipated post-delisting threats are described in detail in **Summary of Factors Affecting the Species** in the preamble of the 2006 proposed delisting rule [75 Federal Register 15277-15302 (8 February 2007)].

Minnesota, Wisconsin, and Michigan DNRs will continue to compile summaries of human-caused and natural mortality and to provide this information to us annually. This reporting will include information on: wolves killed legally and intentionally for depredation control, conservation actions taken to reduce threats, conduct research, or for other reasons, accidental mortality (e.g., vehicle collisions and incidental trapping mortalities), natural mortality (e.g., disease and intraspecific conflict), illegally killed wolves, and mortalities from unknown factors. Although starvation may be the major cause of pup mortality, disease may also be important during some years and may also infrequently play a significant role in adult mortality. Significant levels of mortality due to disease would be reflected in population surveys conducted by each state. Nevertheless, each state plans to also implement some level of disease monitoring.

The wolf management plans for Minnesota and Wisconsin commit the respective DNRs to conduct necropsies on dead wolves, carry out disease screening on live-trapped wolves, and

analyze wolf scat for pathogenic microorganisms and parasites. The Michigan DNR states that wolf health and disease monitoring will receive a high priority for a minimum of five years after Federal delisting. The Service will request this information annually for review (see below).

Native American Indian tribes are responsible for wolf management within their reservations. In addition, many tribes have rights and interests in wolves in a number of treaty ceded territories. Consistent with our responsibilities to tribes and our goal to have the most comprehensive data available for our annual review, we will annually contact tribes and their designated intertribal natural resource agencies within the DPS to obtain any information they wish to share regarding wolf populations, the health of those populations, or changes in their management and protection. Reservations within the WGLDPS that may have significant wolf data to provide during the post-delisting period include Bois Forte, Bad River, Fond du Lac, Grand Portage, Lac Courte Oreilles, Lac du Flambeau, Leech Lake, Menominee, Oneida, Red Lake, and White Earth. The Service will annually contact the natural resource agencies of each of these reservations and that of the 1854 Treaty Authority and Great Lakes Indian Fish and Wildlife Commission to request wolf data as described below.

We will also annually contact the federal land management agencies with significant wolf populations on their units in Minnesota, Wisconsin, and Michigan to obtain any additional data they may have regarding wolf management/protection, numbers, mortality, injuries, or disease.

## Implementation of Legal and Management Commitments

The recovered WGLDPS is dependent upon wolves receiving sufficient protection in Minnesota, Wisconsin, and Michigan to ensure that a viable wolf population will remain in Minnesota and a second viable population will exist in Wisconsin-Michigan for the foreseeable future. When the Act's protection ended at the time of delisting, the focus of wolf protection shifted to state and tribal governments and to federal land management agencies. Protections by the states as identified more fully in the Final Rule [72 Federal Register 6052 (8 February 2007)], may be most important because they affect the greatest number of wolves in the DPS.

The Service has concluded that the wolf management plans of Minnesota, Wisconsin, and Michigan and the protection of gray wolves by the tribes and federal land management agencies are sufficient to conserve viable wolf populations within the DPS. Therefore, the Service will annually evaluate the implementation and outcomes of these wolf management plans, protections, and related guidelines and procedures.

## Monitoring Duration and Methods

The Service will implement this PDM plan for five years after the delisting of the Gray Wolf WGLDPS. Therefore, we plan to complete this monitoring in 2012 – for example, population data obtained during the winter of 2011-2012 will represent the final year of monitoring. This will allow for five complete Wisconsin-Michigan population estimates after delisting has occurred and non-federal wolf management plans and protections become operational. Minnesota DNR will develop statewide estimates for the winters of 2007-2008 and 2011-2012.

The WGLDPS population currently is estimated to be several times greater than the numerical delisting criteria stated in the 1992 Recovery Plan (USFWS 1992 and Table 1) and we currently envision no threat or combination of threats that are reasonably likely to drive wolf numbers rapidly downward.  Therefore, we believe 5 years of PDM is sufficient.  Under the circumstances described below we will consider extending the PDM period and/or taking action to restore federal protections under the Act.

We will gather available data annually from Minnesota, Wisconsin, and Michigan DNR's and from the Native American natural resource agencies and federal land management agencies with large land bases within occupied wolf range in these three states.  We will also contact the wildlife management agencies of the other states in the DPS to obtain any relevant data acquired during the previous year.

The Service will contact state and tribal wildlife resource conservation agencies and federal land management and research agencies to establish points of contact to obtain the relevant data annually.  Within the Service, the Endangered Species Coordinator at the Service's Twin Cities, Minnesota, Ecological Services Field Office will be the focal point for the data gathering, evaluation, and coordination with former members of the Eastern Gray Wolf Recovery Team and other experts, as appropriate.

Our data gathering will include the following, with the primary data shown in bold type:

- Wolf **population estimates, pack numbers, and estimated occupied area** from Minnesota, Wisconsin, and Michigan DNRs and from reservations within the wolf-occupied portions of these three states;
- Wolf **mortality data** from the three states and the reservations within occupied range in the WGLDPS;
- Data on the **occurrence of diseases and parasites** in wolves throughout the WGLDPS;
- Information on changes made within the previous year, or changes likely within the next year, to state **regulatory mechanisms that change the previously-provided protections** for gray wolves, gray wolf prey, or gray wolf habitat within the DPS;
- Summary data for all **law enforcement investigations** relating to wolves by the three states;
- Summary reports of **wolf depredation incidents** and the resolution of those incidents in the WGLDPS;
- Reports or publications on public attitudes toward WGLDPS wolves;
- Reports of wild gray wolves in other states within the WGLDPS;
- Wolf research reports or publications dealing with WGLDPS wolves or factors adversely affecting them;
- Educational materials, press releases, and other wolf-related public information/education documents distributed by the state, tribal, and federal agencies within the WGLDPS, and similar materials distributed within the WGLDPS by non-governmental agencies.

The Service will annually contact the following four categories of agencies, requesting the listed types of data.

8

1) Minnesota, Wisconsin, and Michigan Departments of Natural Resources:

- population estimates, pack numbers, occupied area
- mortality data
- disease/parasite occurrence in wolves
- verified or probable depredation incidents and follow-up actions
- changes to regulatory mechanisms affecting the protection or management of the species, its prey, and its habitat
- law enforcement investigations of wolf mortality
- other relevant information including any recent population estimates or indices for primary wolf prey, white-tailed deer (*Odocoileus virginianus*) and moose (*Alces alces*).

2) Tribal Natural Resource Agencies in the DPS:

- population estimates and pack numbers
- mortality data
- changes to management
- other relevant information including any recent population estimates or indices for primary wolf prey, white-tailed deer (*Odocoileus virginianus*) and moose (*Alces alces*).

3) Other States within the WGLDPS – North Dakota, South Dakota, Iowa, Illinois, Indiana, and Ohio:

- verified or probable wolf reports & disposition of any verified or probable wolves
- disease/parasite occurrence in documented wolves
- other relevant information

4) Federal Land Management Agencies with large land bases within occupied wolf range – Chippewa National Forest (NF), Superior NF, Chequamegon-Nicolet NF, Hiawatha NF, Ottawa NF, Voyageurs National Park; and national wildlife refuges with sufficient land base or known wolf presence:

- population estimates and pack numbers
- mortality data
- law enforcement investigations of wolf mortality
- regulatory mechanism changes
- other relevant information including any recent population estimates or indices for primary wolf prey, white-tailed deer (*Odocoileus virginianus*) and moose (*Alces alces*).

Wisconsin and Michigan DNRs currently finalize their annual population between April and June. Therefore, we expect to gather this information annually during that timeframe and to complete our evaluation of the information later in the year. The data and the Service's evaluations thereof may be provided in entirety or in summary form to the former members of the Eastern Gray Wolf Recovery Team for their independent review. The Service may request additional reviews from other wolf experts and independent specialists, as appropriate. We will attempt to focus these annual reviews on any indications of (1) increasing or new threats to wolf population viability, (2) a decline in wolf population or decrease in occupied range, (3) a change in state, tribal, or federal management and protection that might have adverse effects on wolf conservation. We will also evaluate other factors that might indicate or cause a decline in wolf population viability in the WGLDPS and how these might affect the status of the species in terms of the Act's five listing factors. Although the Service's review will focus on population trends, mortality data, and protection and enforcement activities, other data will be reviewed as appropriate. We will post the results of these reviews in summary form on our Web site in a timely manner to allow interested parties to annually review our PDM and our evaluation of the data.

### Events & Factors Indicating a Potential Need for Action by the Service

Although it may seem desirable to specify in advance a list of explicit quantitative triggers that would require specific actions by the Service (e.g., extension of the PDM period, initiating a formal status review, or publication of a relisting proposal), such actions should only be taken based on a more comprehensive review. Thus, we are instead identifying three quantitative events and describing several examples of qualitative factors that would lead to our *consideration* of the actions (a) through (d) described below, but which *would not necessarily trigger* these actions. Consultation with the former members of the Eastern Gray Wolf Recovery Team, other wolf experts, and endangered species biologists within the Service will help to identify the appropriate response.

### Events that Might Cause Consideration of Relisting or Emergency Relisting

Any of the events described below might be evidence of a serious problem, but by themselves may not trigger Federal regulatory action. The occurrence of any of the following could cause the Service to investigate the underlying cause, the likely duration of the decline, and other data relevant to wolf population viability in the WGLDPS to decide if a proposal to relist, an emergency relisting, or other action is warranted.

- A decline that reduces the combined Wisconsin-Michigan (excluding Isle Royale and the Lower Peninsula) late winter wolf population estimate to 200 or fewer wolves.[1]

---

[1] To calculate the total number of wolves in Michigan and Wisconsin, the Service will assume that the number of wolves in either state is equal to the lower end of the 90% confidence interval or, in the absence of any confidence intervals, the minimum value of the reported range. As of this plan's completion, Michigan plans to annually compute confidence intervals for its statewide population estimate, whereas Wisconsin provides a range with minimum and maximum values.

- A decline that brings <u>either</u> the Wisconsin <u>or</u> the Michigan (excluding Isle Royale and the Lower Peninsula) wolf estimate to 100 or fewer wolves.

- A decline that brings the Minnesota winter wolf population point estimate or lower end of the 90% confidence interval to 1500 or fewer wolves.

The numeric recovery goals were 1251-1400 for Minnesota (USFWS 1992:28) and 100 for the Wisconsin-Michigan population (USFWS 1992:25).

**Others Factors Indicating a Potential Cause for Concern**

The Service may evaluate the potential impact of any of the following events on the conservation of the WGLDPS, but would not necessarily take additional actions.

- A rapid and large decline (for example, 25 percent or more from the previous year) in the late winter wolf population estimate for Wisconsin or Michigan.
- Any wolf population decline in Wisconsin Zones 1 and 2 or the Upper Peninsula of Michigan of three years or more in duration.
- A substantial and widespread increase in mortality from known or unknown causes.
- Evidence of a new wolf disease or substantial increase in virulence of a previously known wolf disease, even in the absence of noticeable demographic impacts on the wolf population.
- A substantial decline in the wolf prey base across a large portion of the occupied wolf range in the DPS.
- A significant adverse change in wolf, wolf prey, or wolf habitat management practices or protection across a substantial portion of the occupied wolf range in the WGLDPS.

If declines in wolf abundance in the WGLDPS (as described above under 'Events' and 'Other factors') are evident following an annual PDM review, the Service may take any or all of the following actions:

a) extend the PDM period;
b) add new components to the PDM;
c) initiate a comprehensive status review of the species within the DPS;
d) investigate or remedy the cause(s) of the decline.

In addition, the Service may determine that none of these four actions is appropriate. For example, no action may be necessary if the decline is relatively minor, is likely to be temporary or readily resolved, or is not statistically significant.

As part of each annual evaluation the Service will also consider changes to the PDM

11

methodology and data review process.  If such changes are necessary to meet the Service's responsibilities under Section 4(g) of the Act, they will be promptly implemented, subject to available funding needed for their implementation.

During the monitoring period, if the Service detects a change in wolf populations or a significant increase in threats, it can evaluate and change monitoring methods or consider relisting.  At the end of the PDM period the Service will conduct a final internal review and may request reviews by the former members of the Eastern Gray Wolf Recovery Team and other independent specialists, as appropriate.  Based on those reviews, which will be posted on the Service's Internet site, the Service will decide whether to relist, continue monitoring, or end monitoring.

## Literature Cited

Beyer, Dean.  2006.  E-mail from Beyer, MI DNR Wildlife Research, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 08/10/06.  Subject:  Potential for "MN-style" wolf monitoring in WI and MI?  2 pp. with 6-page attachment by Drummer.

Erb, J. and S. Benson.  2004.  Distribution and abundance of wolves in Minnesota, 2003-04.  Unpublished report by Minnesota Department of Natural Resources, Grand Rapids, MN 13 pp.

Fuller, T.K., W.E. Berg, G.L. Radde, M.S. Lenarz, and G.B. Joselyn.  1992.  A history and current estimate of wolf distribution and numbers in Minnesota.  Wildlife Society Bulletin 20:42-54.

Fuller, T.K., L.D. Mech, and J.F. Cochrane.  2003.  Wolf population dynamics.  Pp. 161-191 In Wolves:  Behavior, Ecology, and Conservation.  eds. L.D. Mech and L. Boitani.  Univ. of Chicago Press, Chicago.  448 pp.

Lederle, P.  2006.  E-mail from Lederle, MI DNR Wildlife Research Section Supervisor, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 09/05/06.  Subject:  Support for the sampling protocols.  1 p.

Michigan Department of Natural Resources.  1997.  Michigan gray wolf recovery and management plan.  Lansing, MI  58 pp.

Minnesota Department of Natural Resources.  2001.  Minnesota wolf management plan.  Prepared by the Section of Wildlife, dated February 2001.  36 pp. plus 9 appendices.

Potvin, M.J., T.D. Drummer, J.A. Vucetich, D.E. Beyer, R.O. Peterson, and J.H. Hammill.  2005.  Monitoring and habitat analysis for wolves in Upper Michigan.  J. Wildl. Mgmt.  69:1660-1669.

U.S. Fish and Wildlife Service.  1992.  Recovery plan for the eastern timber wolf.  Twin Cities, MN  73 pp.

Wiedenhoeft, J.E.  2005 . Summary Report - "Minnesota-type" wolf survey for Wisconsin - GIS analysis. Unpublished report to State Wildlife Grants Program - CWCP. Wisconsin DNR, Park Falls, WI. 14 pp.

Wydeven, Adrian.  2006.  E-mail from Wydeven, WI DNR Mammalian Ecologist, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 08/09/06.  Subject:  Potential for "MN-style" wolf monitoring in WI and MI.  2 pp. with 14-page attachment [Wiedenhoeft 2005, listed separately above].

Wydeven, A.P., J.E. Wiedenhoeft, B.E. Kohn, R.P. Thiel, R.N. Schultz, and S.R. Boles.  2000.  Progress report of wolf population monitoring in Wisconsin for the period October 1999 - March 2000.  Unpublished report by Wisc. Dept.  Natural Resources, Park Falls, WI.  31 pp.

Wydeven, A.P., J.E. Wiedenhoeft, R.N. Schultz, R.P. Thiel, S.R. Boles, and E. Heilhecker.  2006.  Progress report of wolf population monitoring for the period October 2005 – March 2006.  Unpublished report by WI DNR, Park Falls, WI.  39 pp.

**U.S. Fish and Wildlife Service**

# Appendix: Responses to Public Comments

## on the

# Post-Delisting Monitoring Plan for the Western Great Lakes Distinct Population Segment of the Gray Wolf

November 2007

Appendix – Responses to Public Comments

# __Table of Contents__

Introduction ........................................................................................................... 1

Accuracy, Precision, and Sensitivity of the Proposed Monitoring Plan ......................... 1

Funding ................................................................................................................. 3

Disease Monitoring ................................................................................................. 4

Cooperation with Native American Tribal Governments ............................................... 5

Recommended Actions at End of Five-Year Monitoring Period .................................... 5

Status of Wolves in Lower Michigan ......................................................................... 6

Other Comments Specific to Monitoring in Minnesota .................................................. 6

Scope of Plan ........................................................................................................ 7

Monitoring Effort .................................................................................................... 7

Typographical, Clarification, and other Minor Errors in Draft ..................................... 8

Potential Response of the Service to Monitoring Results ............................................ 8

## Introduction

On June 4, 2007, U.S. Fish and Wildlife Service (Service) announced the availability of its draft plan to monitor the Western Great Lakes Distinct Population Segment (WGL DPS) of the Gray Wolf for public review and comment.  The comment period closed on July 5, 2007.  The plan is intended to fulfill the Service's responsibility under the Endangered Species Act of 1973, as amended, to monitor the status of the WGL DPS for five years after its removal from the Federal List of Threatened and Endangered Wildlife and Plants.  The Service announced the delisting of the WGL DPS on February 8, 2007 and the delisting became effective on March 12, 2007.

After the comment period closed, the Service reviewed each comment received and prepared comments in response to any substantive comments.  Those comments and the Service's responses are grouped and summarized below.

## Accuracy, Precision, and Sensitivity of the Proposed Monitoring Plan

Comment – The precision of the 'rangewide survey/local intensive study approach' to monitoring that is used by Minnesota Department of Natural Resources (MN DNR) may not be sufficient to readily detect rapid population declines, which may result from increased lethal control of wolves.

Response: The Service will review mortality data annually for each state and will also evaluate 'annual index' data collected by MN DNR (e.g., autumn scent station surveys; MN DNR 2001:19).  Although MN DNR plans to conduct statewide population estimates during only the first and fifth years after delisting, our review of mortality data and other indices of wolf population abundance would likely result in the detection of any sharp population decline between years.

Comment – The Service should consider the relative precision of each state's population estimate, especially for Minnesota.

Response – The 2003/2004 survey and subsequent analysis by MN DNR resulted in an estimate of 3020 wolves in Minnesota with a 90% confidence interval ranging from 2301 to 3708.  In other words, MN DNR may be 90% confident that the actual number of wolves in Minnesota during the winter of 2003/2004 was between 2301 and 3708.  On the other hand, there may only be a 10% chance that the number of wolves in Minnesota was less than 2301 or greater than 3708.  The Service agrees that it should consider the precision of statewide population estimates.  Therefore, under the heading, "Events that might cause Consideration of Relisting or Emergency Relisting", the Service will evaluate a decline that brings the Minnesota winter wolf population point estimate or 90% confidence interval to 1500 or fewer wolves.

Wisconsin DNR's (WI DNR) methods do not allow it to quantitatively describe the precision of its population estimate, although its methods likely produce a highly accurate and precise estimate.  Wisconsin typically reports its population estimate as a range and the Service will use the low end of the range when evaluating the state's wolf population estimate against the review triggers.

As stated in the draft post-delisting monitoring plan, Michigan DNR (MI DNR) has recently modified its monitoring plans to allow for the calculation of confidence intervals.  Thus, to calculate the total number of wolves in Michigan and Wisconsin, the Service will assume that the number of wolves in either state is equal to the lower end of the 90% confidence interval or the minimum of the reported range.

Comment – The population levels that would cause the Service to consider relisting gray wolves in the Western Great Lakes Distinct Population Segment are too low for Minnesota.

Response – In the draft post-delisting monitoring (PDM) plan, a decline that brought the Minnesota winter wolf population estimate to 1500 or fewer wolves would trigger the Service to consider relisting the gray wolf in the Western Great Lakes Distinct Population Segment.  As stated above, the Service will modify this 'trigger' to state that the Service will consider relisting if the lower end of the 90% confidence interval

is less than 1500. The Service's recovery plan established a planning goal of 1,250–1,400 animals for the Minnesota wolf population (USFWS 1992:28), concluding that a population of this size would be necessary to ensure resilience against potentially harmful demographic and environmental events. In 1997, when wolf numbers in the Midwest appeared to be approaching the recovery criteria specified in the 1992 Plan, the Service reconvened its Recovery Team to reevaluate these criteria, which stated that the recovery criteria were ''sufficient'' (Peterson in litt. 1997, in litt. 1998). Furthermore, a separate group of peer reviewers supported the Service's conclusion that the Western Great Lakes Distinct Population Segment of the Gray Wolf (WGL DPS) was recovered. No one among this group expressed concern with the 1992 recovery criteria. Therefore, we think that the plan to consider relisting if and when the 90% confidence interval falls below 1500 would be sufficiently sensitive to ensure a timely response to a situation in which the Minnesota population was at or approaching minimum recovery levels.

Comment – The monitoring methods used in the three states are inconsistent with one another. For example, they vary in accuracy and precision and the methods used in Minnesota would have overestimated the number of wolves in Wisconsin in 2004.

Response – There is no clear reason for the monitoring methods to be entirely consistent among the three states as long as each is sufficient to describe the status of wolves in its respective state. Thus far, each state has developed methods that have been sufficient for describing the numbers and distribution of gray wolves within its boundaries. The cost and delay that would result from each state attempting to modify its monitoring methods to align with a single methodology would be significant and may hinder comparisons to pre-delisting abundance and distribution within the WGL DPS. Nevertheless, each state may improve its monitoring methods as biologists find ways to improve the accuracy, precision, and efficiency of their methods.

Based on an analysis conducted by Wisconsin DNR (Wiedenhoeft 2005), the methods used in Minnesota to estimate wolf abundance and distribution there would not have been well suited for use in Wisconsin in 2004. This may be due, in part, to the fact that the wolf population in Wisconsin is still expanding and the Minnesota methods assume that all suitable habitat is occupied by wolves. That assumption may be valid for Minnesota, where all suitable habitat may already be occupied (Erb & Benson 2004), but would have overestimated wolf abundance in Wisconsin in 2004 where wolves were yet to inhabit all suitable habitat and where wolf habitat is more patchy (Wiedenhoeft 2005:12).

The Minnesota methods were also found to overestimate the area occupied by wolves in Michigan (D. Beyer, Michigan DNR, pers. comm. 8/10/06). In the Upper Peninsula, deer are sparse in some areas during winter. The habitat suitability model used in Minnesota is based on road and human density and does not consider winter deer density. Therefore, some areas where human and road densities are sufficiently low in Michigan have insufficient prey densities to support resident packs. The assumption that these areas were occupied by wolves resulted in an overestimate of wolf numbers in Michigan (D. Beyer, pers. comm. 7/27/07). These underlying ecological differences among the states provide further support for not attempting to force a uniform monitoring methodology.

Comment – The Minnesota monitoring methods may make it difficult to measure rapid population declines.

Response – This comment focused on the methods used to calculate statewide population estimates in Minnesota. The Service will not rely entirely on these statewide population estimates to assess trends in wolf abundance in Minnesota, but would also review wolf mortality data, law enforcement investigations of wolf mortality, verified or probable depredation incidents and associated follow-up actions, and wolf pack numbers on national forests, national parks, and national wildlife refuges. These additional sources of information, in conjunction with review of the periodic statewide population estimates, are likely to allow for timely detection of any significant population declines in Minnesota.

Appendix – Responses to Public Comments

Comment – The Service should require the states to annually present confidence limits on these estimates.

Response – Wisconsin intensively monitors its wolf population using aerial radio tracking, intense snow track surveys, and collection of public reports of wolf observations  and will continue to do so during the five-year federal monitoring period (Wydeven et al. 2007:13).  Therefore, it likely provides a highly precise and conservative estimate of the statewide population.  It is conservative because it is taken in late winter before pups are born and it underestimates lone wolves.  Moreover, the Service would use the minimum value in the range to represent the size of the state population.  Confidence intervals are more important when only a subset of the population is intensively monitored, as in Minnesota and Michigan.

Comment - The "Events that might cause Consideration of Relisting or Emergency Relisting" should be made more stringent.  The scenarios presented appear to be based solely on baseline recovery population levels and do not consider the rate of decline or other factors.  Steep rates of decline should also be considered a quantitative event which might cause consideration of relisting.  This concept is considered under item 1 of the "Other factors indicated a potential cause for concern" section, but this should be elevated and incorporated into the "event" conditions.

Response – We will keep this concern where it was in the draft plan, but may take the following actions in response to a steep decline:

  a)  extend the PDM period;
  b)  add new components to the PDM plan;
  c)  initiate a comprehensive status review of the species within the DPS;
  d)  investigate and/or remedy any causes of the decline.

Comment – An "event" condition should also be developed based upon marked declines in the population indices that the MN DNR uses to monitor wolf population trends between state-wide surveys.

Response – The annual indices that MN DNR proposes to use to monitor wolf populations between statewide surveys include wolf depredation complaints, autumn scent station surveys, winter furbearer track surveys, and other observations of field personnel from all natural resources agencies (Minnesota Department of Natural Resources 2001:19).  In general, these indices must be interpreted with caution and may not by themselves be reliable indicators of significant population declines.  Nevertheless, the Service will review these data sources annually and may take the types of actions described in the immediately preceding comment, if appropriate.

Comment – The draft PDM plan stated that MN DNR's statewide population estimate "can only provide trend information and is not a population count."

Response – This comment in the draft PDM plan referred to the annual indices of wolf numbers and distribution (number of depredation complaints, scent post surveys, etc.) and did not refer to the five-year statewide population estimate.

## Funding

Comment - Funding sources that will support the population monitoring activities proposed by the states are not identified.  The Service must guarantee adequate funds are in place to support these plans.  The Service's plan must identify the resources that each state will use to support population monitoring activities.

Response – In 2000, MN DNR sent its recommendations for appropriations to implement its wolf management plan to the state legislature.  These described funds necessary for population monitoring and to hire a wolf specialist, which it hired in 2007.  The Service cannot guarantee that adequate funds are in place for the next five years of monitoring in each state.  Nevertheless, each state has acted in good faith thus far in monitoring its wolf populations and has also demonstrated that it can acquire funds necessary to fully

implement the monitoring components of its state plan. The states have a variety of sources from which to fund wolf population monitoring, including Endangered Species Act Section 6 Conservation Grants. The Service does not anticipate any of the states being unable or unwilling to implement the monitoring committed to in their state management plans. Nevertheless, if any of the three states substantially reduce the robustness of their monitoring program (e.g., relative to the description of its monitoring in the Service's plan) the Service will consider revising the post-delisting monitoring plan.

Comment - Section 4(g) of the Endangered Species Act (ESA) mandates postdelisting monitoring (PDM) for a minimum of five years after a species is delisted. Because PDM is a federal requirement, federal funding should be provided to the states of Minnesota, Wisconsin, and Michigan to fulfill it. Furthermore, the level of federal funding provided should be commensurate with the standards and monitoring intensity required by the final PDM plan.

Response – The states are obviously critical in implementing the post-delisting monitoring described in the PDM plan. Nevertheless, there is a variety of federal assistance funds that could be used by states to support their efforts. These include Federal Aid in Wildlife Restoration, the State Wildlife Grant Program, and the Cooperative Endangered Species Conservation Fund.

## Disease Monitoring

Comment - The sampling protocol for necropsies and disease screening should be specifically stated to ensure that sampling is adequate to provide statistically significant results.

Response – Although starvation may be the major cause of pup mortality, disease may also be important during some years and may also infrequently play a significant role in adult mortality. Significant levels of mortality due to disease would be reflected in population surveys conducted by each state. Nevertheless, each state plans to implement some level of disease monitoring. Although we understand the commenter's interest in a statistically robust disease monitoring program and the potential need for such monitoring in some cases, the continued population monitoring to be conducted by each state and the level of disease monitoring proposed by each state is sufficient for post-delisting monitoring of the Western Great Lakes DPS.

Below we summarize the disease monitoring proposed in each state's wolf management plan (Michigan Department of Natural Resources 2007; Minnesota Department of Natural Resources 2001; Wisconsin Department Natural Resources 2006):

Michigan

In its draft revised wolf management plan, MI DNR proposes to take the following actions to ensure diseases and parasites do not threaten the viability of wolves in Michigan:

- As necessary, update and refine protocols for collecting, submitting, and storing information on carcasses and biological samples.
- Train field staff on collection and submission protocols.
- Conduct necropsies and analyses of dead wolves and biological samples, respectively.
- Work with management partners to develop and conduct studies of wolf diseases and parasites.
- Continue to evaluate the feasibility and need for vaccinations of captured and free-ranging wolves.

Minnesota

- Will collaborate with other investigators and continue monitoring disease incidence, where necessary, by examination of wolf carcasses obtained through depredation control programs and through blood/tissue physiology work conducted by MN DNR and the U.S. Geological Survey.
- Will keep records of documented and suspected incidence of sarcoptic mange.

Appendix – Responses to Public Comments

- May initiate regular collection of tissue and conduct "periodic assessments of wolf health" "when circumstances indicate that diseases or parasites may be adversely affecting portions of the wolf population."

Wisconsin

- Will test live-captured wolves for diseases, physiological condition and parasites. Ideally about 10% of a population of 100 wolves should be examined, but as the population continues to increase, the percentage of the population live-captured will decline. In recent years 20 to 40 wolves were captured annually.
- Will collect wolf scats to monitor for infectious diseases and parasites.
- Will necropsy dead wolves to determine cause of death, physical condition and disease status.
- Will archive tissues for future disease and genetic investigations.
- May occasionally conduct special studies on wolves – these should include health monitoring.
- Should continue wolf health monitoring as part of the capture protocol of studies of wild wolves in Wisconsin and should coordinate this monitoring with WDNR Wildlife Health Team.

## Cooperation with Native American Tribal Governments

Comment – The paragraph on page 6 which discusses tribal management has a generally negative tone.

Response – The commenter also provided replacement language for this paragraph, which we have largely adopted in the final version of the plan.

Comment – Expand the list of information that the Service will request from tribal natural resource agencies (i.e., include "changes to management" and "other relevant information") and request this information from tribal natural resource agencies within the range of wolf within the DPS, in general.

Response – The final version of the plan includes this slightly expanded list of information to be requested from tribal natural resource agencies and does not explicitly limit the information request to specific tribes.

## Recommended Actions at End of Five-Year Monitoring Period

Comment – The Service indicates at the end of the 5 year period, it "may" request reviews by the Recovery Team; this should be a required action.

Response – The Service, in developing and implementing recovery plans, may procure the services of appropriate public and private agencies and institutions and other qualified persons in the form of recovery teams. Now that the gray wolf within the WGL DPS is delisted, the Service plans to disband the Eastern Gray Wolf Recovery Team. Therefore, we will change any reference to the recovery team to "former members of the recovery team" in the final plan. Nevertheless, the Service recognizes the substantial technical expertise of these persons and will likely seek their individual reviews of our findings, at least at the end of the five-year monitoring period.

Comment – The Service indicates that, except under fairly extreme circumstances, it believes a 5 year monitoring period will be adequate; the Service should retain an oversight role and program even after the five-year post-delisting period has ended.

Response – Now that the WGL DPS of gray wolves is no longer on the list of endangered and threatened species, the Service has no authority under the Endangered Species Act for formal oversight of wolf management. If data are sufficient to indicate that the gray wolf in the DPS will be effectively conserved without protection of the Endangered Species Act, then the Service should focus its limited resources on species that remain on the list of endangered and threatened species or that may warrant addition to the list (i.e., "candidate" and 'at risk' species).

Comment - A public attitude survey should be conducted near the end of the monitoring period to gain insight into the trends in public acceptance of wolves. Public attitudes may be the most significant factor in determining the long-term fate of the species in this DPS and it would be difficult to adequately determine if additional monitoring is necessary without an understanding of public attitudes and how they may be trending.

Response – The Service will annually review any reports or publications on public attitudes toward WGL DPS wolves and any educational materials, press releases, and other wolf-related public information/education materials produced by the states, tribes, or others. In addition, we will directly evaluate the impacts of the public on wolves in the DPS by reviewing wolf population estimates and trends, the numbers of wolves killed legally and illegally, summary data for all law enforcement investigations, and reports of wolf depredation incidents. Although the Service does not plan to commission any survey of public attitudes, it plans to review the results of any studies conducted by others (e.g., universities).

## Status of Wolves in Lower Michigan

Comment – A population survey should be conducted in the northern lower portion of Michigan in the final year of the 5-year post-delisting monitoring period.

Response –There is no clear need for wolves to occur in this area to ensure that the species no longer meets the definition of endangered or threatened under the Endangered Species Act. Therefore, the Service's PDM plan will not refer specifically to wolves in this particular area.

## Other Comments Specific to Monitoring in Minnesota

Comment – MN DNR should conduct aerial wolf surveys and should not just gather "opinions" and data incidental to studies on other species. We would like to see a list of participants and break down of their field positions in order to assess their qualifications for making these wolf observations.

Response – The statewide survey is based on much more robust methods than that suggested by the commenter. MN DNR collects data from a variety of sources to prepare its five-year statewide population estimate. It relies, in part, on data collected from regular monitoring that is not focused solely on gray wolf, including scent post surveys and winter furbearer track surveys. There is nothing inherently wrong in using these types of data to ensure that all data revealing of wolf abundance and distribution contribute to the MN DNR's understanding of wolf trends in the state. MN DNR also uses the best available information regarding the relationships between wolf densities and human population and road densities to describe occupied wolf range in the state. In addition, ongoing radio telemetry studies help DNR to refine estimates of pack territory sizes. We expect MN DNR to continue to investigate the most efficient methods to estimate its statewide wolf population as accurately and precisely as is feasible. In its 2003-2004 report on its most recent statewide estimate, for example, MN DNR stated that aerial sampling methods show promise, but "may be logistically challenging when applied to broad expanses of dense forest" (Erb and Benson 2004). Due to the logistical and other factors that each state must consider when designing its methods to monitor the widespread and dynamic wolf populations, it would not be appropriate for the Service to prescribe specific methodologies.

Comment – A significant portion of Minnesota's wolf range does not have any scent post sites and two of the largest counties in prime wolf range (Itasca and Koochiching) have only one station each.

Response – MN DNR actually conducts annual surveys along 24 2.7-mile routes (ten scent stations each - 240 scent stations total) in Itasca County and an additional ten routes (100 scent stations total) in Koochiching County (J. Erb, Minnesota Department of Natural Resources, Grand Rapids, MN, pers. comm. 8/24/07). In the "Forest Zone", which comprises the main portion of the wolf range in Minnesota, there were 173 scent station routes completed in 2006 (Erb 2006).

Comment – The draft monitoring plan mentioned that MN DNR would furnish independent annual indices

and changes in occupied range of wolf in the state but they will not provide population estimates annually. Delisting and monitoring depend on population data.  Using limited trend data is an arbitrary way to "monitor" a species just removed from the list of threatened species.

Response – It is uncommon for populations of any species to be counted in their entirety.  Therefore, conservation agencies commonly use indices and population sampling to monitor population trends.  Of the three states inhabited by gray wolf packs in the WGL DPS, only Wisconsin may continue to conduct what may approach a complete count or census of its late winter wolf population.  Minnesota, however, may contain approximately six times the number of wolves as Wisconsin, distributed over a larger geographic area.  The combined use of annual population indices and a five-year statewide population estimate is adequate for monitoring the post-delisting status of gray wolves in the state.

## Scope of Plan

Comment – The post-delisting threats remain significant.  The draft plan does not adequately acknowledge those threats nor does it provide an adequate process for addressing those threats.

Response – The Service determined that the current threats to the species no longer warranted its listing as endangered or threatened under the ESA.  A reduction in threats to the species is the primary cause of the dramatic wolf population increase over the last 25 years and attainment of the numerical recovery criteria.  The intent of the post-delisting monitoring plan is to determine whether or not threats to gray wolves in the WGL DPS are adequately addressed by states, tribes, and others (e.g., federal land management agencies) to preclude the need to list the species under the ESA during the five years following its delisting.  For gray wolf WGL PDM purposes, we believe the most important threats to monitor are those that have been sufficiently reduced and contained, but not permanently eliminated, during the recovery process.  For gray wolves in the WGL DPS, those threats are primarily the various forms of human-caused mortality that have been reduced by the provisions of the Act.  Additionally, a variety of known wolf diseases and parasites are of concern.  Furthermore, the possibility of new diseases represents a threat that requires vigilance.  All these anticipated post-delisting threats are described in detail in "Summary of Factors Affecting the Species" in the preamble of the 2006 proposed delisting rule (75 FR 15277-15302) and are addressed by each state in their respective state management plans.

## Monitoring Effort

Comment – The same monitoring techniques should not be required both pre-and post delisting, particularly for populations that significantly exceed numerical delisting criteria outlined in recovery plans.  In reality, states should only be required, through the PDM plan, to reliably demonstrate that there is at least the minimum number required by recovery plans for delisting purposes.

Response – The Service agrees that the most important purpose of population monitoring per the ESA's PDM requirement is to determine, with sufficient confidence, that population levels exceed the objectives described in the recovery plan.  Where feasible, however, the Service should also review trends in population estimates, indices of abundance (e.g., scent post surveys), mortality records, diseases, and prey abundance to determine whether or not significant problems for wolf populations may be developing during the PDM period.

Comment - The final PDM plan should include language that allows the states to investigate and adopt alternative methods and protocols so as long as the data are scientifically comparable to data obtained prior to delisting.  States should have flexibility to refine and change monitoring protocols through time as new techniques are investigated and validated.  This flexibility is especially important given the potential for limited and declining availability of funding as wolf distribution expands.

Response – In the final PDM plan the Service will attempt to accurately describe each state's monitoring plans for the five years following delisting.  There is nothing in the Service's plan that would preclude changes by the states.  The Service would review any changes, however, to ensure that the revised methods

are likely to provide sufficiently accurate and precise information to effectively monitor the status of the species. In fact, Michigan has been in the process of revising its methods and the nature of those revisions is briefly described in the PDM plan.

## Typographical, Clarification, and other Minor Errors in Draft

Comment - The PDM draft indicates actions (a) through (f) as potential actions USFWS might take after an annual review, but actions (e) and (f) are missing from the list on page 10 of the 04/23/07 draft.

Response – The draft plan should have said that the Service may take actions "(a) through (d)" listed below. There were no potential response actions that were missing from the draft plan.

Comment - The difference and the nature of the relationships between "quantitative events" with "qualitative factors" are not clear.

Response – The response to the 'quantitative' triggers would be a focus on the potential need to relist the species, whereas the response to the 'qualitative' factors would not necessarily focus on the potential need to relist the species. Situations that trigger one of the "qualitative events" will prompt the Service to evaluate the situation in detail and its underlying causes, but will not necessarily prompt an assessment of the potential need to relist the species. We will attempt to make that more clear in the final PDM plan.

## Potential Response of the Service to Monitoring Results

Comment - We agree with the general USFWS approach, to consider a variety of data sets, events, and factors that influence wolf population trajectory, in addition to their interactions. We agree that USFWS should not specify a set of strict triggers and automatic agency actions a priori. Instead, USFWS should consider the collective body of information and data, consult with independent experts if appropriate, and proceed accordingly.

Response – We agree that it would not be appropriate to state in the PDM plan that the Service would relist the species, for example, if certain events transpired. It is more appropriate to state, as clearly as is appropriate, what situations will prompt an evaluation by the Service to determine its appropriate response.

Comment – The PDM draft plan states that "in the event that WGL DPS declines are evident following an annual review, the Service may take any or all of the following actions." Previous paragraphs suggest that this is the list (a) through (f) of potential USFWS actions. But the list (a) through (d) published in the draft does not include the option of taking no action for a year. The final PDM plan should not absolutely require the USFWS to take any action after only a single year's decline. Wildlife populations are inherently variable and there is also variance associated with monitoring protocols, sampling, and population estimation procedures. For example, monitoring protocols in the Great Lakes states rely heavily on snow tracking surveys, but low snow pack and poor tracking conditions can result in poor quality data and an apparent population decline when the population may have actually increased.

Response – We agree that evidence of a population decline in some years may not warrant that the Service implement one of the four actions described in the draft plan. We will modify the plan to include 'no action' as a potential response, as appropriate.

Comment – As written, the Service could be required to take action after any single's year data shows "a decline", but the draft is not clear with respect to whether the decline was in one of the quantitative measures or the qualitative measures. This should be clarified in the final DPM plan.

Response – We will attempt to clarify this in the final plan to indicate that the Service may act in response to annual declines in any of the 'quantitative' or 'qualitative' events or factors.

Comment – We encourage the Service to consider a combination of metrics (e.g., moving averages) and not

Appendix – Responses to Public Comments

a single metric of total number of wolves.  Furthermore, more than a single year's decline (or whatever combination of metrics is in the final PDM) in a state's wolf population should be required before extending the PDM period, initiating a status review, or an emergency relisting.

Response – The Service is likely to maintain a focus on total number of wolves or estimates thereof as described in the draft plan.  We agree that such a focus will result in a high degree of sensitivity to population fluctuations, but we will strive to ensure that our response to any declines is appropriate and based on factors such as the magnitude of the decline and our ability to identify the cause and duration of the decline.

Appendix – Responses to Public Comments

## **Literature Cited**

Erb, J. 2006. Carnivore Scent Station Survey Summary, 2006. Pages 67-74. Status of Wildlife Populations, 2007. Minnesota Department of Natural Resources, St. Paul, MN.

Erb, J. and S. Benson. 2004.  Distribution and abundance of wolves in Minnesota, 2003-2004. in. Minnesota Department of Natural Resources.  5 p.

Michigan Department of Natural Resources. 2007. Draft Michigan wolf management plan. Lansing, MI. 76 p.

Minnesota Department of Natural Resources. 2001. Minnesota wolf management plan. St. Paul, MN. 36 p. [http://files.dnr.state.mn.us/natural_resources/animals/mammals/wolves/wolfplan2000.pdf]

Wiedenhoeft, J. E. 2005. Summary Report: "Minnesota-type" wolf survey for Wisconsin – GIS analysis. Wisconsin Department of Natural Resources, Madison, WI. 14 p.

Wisconsin Department Natural Resources. 2006. Wisconsin Wolf Management Plan, Addendum 2006. Madison, WI. 60 p. [http://dnr.wi.gov/org/land/er/publications/wolfplan/pdfs/WIWolfManagementPlanAdd2006.pdf]

Wydeven, A. P., J. E. Wiedenhoeft, R. P. Thiel, R. N. Schultz, and S. R. Boles. 2007. Progress report of wolf population monitoring in Wisconsin for the period, October 2006 - March 2007. Wisconsin Department of Natural Resources, Park Falls, WI. 25 p.