UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HUMANE SOCIETY OF THE UNITED STATES, HELP OUR WOLVES LIVE, ANIMAL PROTECTION INSTITUTE, AND FRIENDS OF ANIMALS AND THEIR ENVIRONMENT,<br><br>Plaintiffs,<br><br>vs.<br><br>DIRK KEMPTHORNE, Secretary of the Interior, U.S. DEPARTMENT OF THE INTERIOR, AND U.S. FISH AND WILDLIFE SERVICE<br><br>Defendants,<br><br>SAFARI CLUB INTERNATIONAL, SAFARI CLUB INTERNATIONAL FOUNDATION, AND NATIONAL RIFLE ASSOCIATION,<br><br>Defendant-Intervenors,<br><br>and<br><br>U.S. SPORTSMEN'S ALLIANCE FOUNDATION, WISCONSIN BEAR HUNTING ASSOCIATION, SCOTT MEYER, AND ROB STAFHOLT,<br><br>Defendant-Intervenors. | Case No. 1:07-cv00677-PLF |

**DEFENDANT-INTERVENORS' MOTION TO SUPPLEMENT THE RECORD WITH THE HOGREFE DECLARATION SUPPLIED BY STATE GOVERNMENT AMICI AND <u>MEMORANDUM IN SUPPORT OF MOTION</u>**

The above-captioned Defendant-Intervenors respectfully move this Court to supplement the Administrative Record with the Declaration of Todd Hogrefe of the Michigan Department of Natural Resources ("Hogrefe Declaration," supplied as Ex. 1 hereto). The Hogrefe Declaration should be admitted to supplement the Administrative Record if the Court, in determining whether the FWS erred in delisting, admits other proposed supplements to the Administrative Record consisting of evidence post-dating the delisting decision under review. The proposed

1

supplements, including the Hogrefe Declaration, all regard the funding and implementation of state wolf management plans ("post-decisional wolf management evidence").

### The Motion Moots the Amicus Curiae Standing Issued Raised by Plaintiffs

On January 18, 2008, Amici Curiae State Governments independently moved to supplement the Administrative Record with the Hogrefe Declaration ("States' Motion," Docket 48).  Plaintiffs' opposed the State's Motion, based, in part, on the contention that Amici Curiae lack standing to file motions (Docket 51 at page 3).  This Court has not yet ruled on the States' Motion.  Whether or not the Amici have standing to supplement the record, Defendant-Intervenors have been admitted as parties to this litigation and have the requisite standing to file motions and to seek supplementation of the Administrative Record.  Because the States' Motion has merit, Defendant-Intervenors file this Motion to alleviate the technical *amici* standing issue and to explain the relationship between the three items of post-decisional wolf management evidence that various parties have submitted to supplement the Administrative Record:  (1) Minnesota records submitted by Plaintiff, (2) the Declaration of Minnesota Wolf Specialist, Daniel Stark ("Stark Declaration"), previously submitted by Defendant-Intervenors, and (3) the Hogrefe Declaration that is the subject of this Motion.

### If Plaintiffs' Post-Decisional Evidence is Considered, So Too Should Defendants'

The briefing on Plaintiffs' own Motion to Supplement the Record (Docket 28) with post-decisional wolf management evidence and the State's Motion addresses the issue of whether post-decisional wolf management evidence qualifies for admission to the Administrative Record under one of the exceptions to the general rule that judicial review should be restricted to  the

administrative record. *Esch v. Yeutter,* 876 F.2d 976, 991 (D.C. Cir. 1989).[1] To avoid repetition, Defendant-Intervenors incorporate by reference: (1) their Response (Docket 34) to the Plaintiffs' Motion to Supplement and (2) the States' Motion to Supplement (Docket 48), which describes the Hogrefe Declaration in more detail.

Without waiting for a ruling from this court on their Motion to Supplement, Plaintiffs in their Summary Judgment Motion referenced post-decisional materials regarding Minnesota's implementation and funding of the state's wolf management plan. To counter the inaccuracies of Plaintiffs' submissions, Defendant-Intervenors obtained a Declaration from Minnesota Wolf Specialist, Daniel Stark (Docket 34-2), and asked that the Stark Declaration be considered if the Court took into consideration the extra-record evidence already proffered by the Plaintiffs. (Docket 34 at 13). In their reply, Plaintiffs said they did not object to admission of the "non-argumentative portions" of the Stark Declaration. (Docket 35 at 12).

Just as the Stark Declaration provides post-decisional wolf management evidence regarding Minnesota to refute inaccurate allegations made by the Plaintiffs, the Hogrefe Declaration provides post-decisional wolf management evidence that refutes Plaintiffs' inaccurate allegations regarding Michigan's funding and implementation of their wolf management plan. The Hogrefe Declaration especially paragraphs 4-8, 10, 20-22, directly evidence the Michigan Department of Natural Resource's funding to carry out wolf management. *Compare* Plaintiffs' Motion to Supplement at 3 (Docket 28) (seeking to introduce documents regarding funding of Minnesota Department of Natural Resources); Stark Declaration (Docket 34-2) (rebutting Plaintiffs' evidence regarding Minnesota funding). The remaining paragraphs of the Hogrefe declaration provide context for the portions discussing funding.

---

[1] Briefs on Plaintiffs' Motion to Supplement were filed at Dockets 28 (Plaintiffs' Opening Brief), 33 (Federal Defendants), 34 (Defendant-Intervenors), and 35 (Plaintiffs Reply). Briefs on the States' Motion to Supplement were filed at Dockets 48 (States) and 51 (Plaintiffs).

Accordingly, if the Court decides to admit post-decisional wolf management evidence, it should admit the Hogrefe Declaration regarding Michigan, as well as the Stark Declaration regarding Minnesota, so that the Court may take into account the relevant evidence on State wolf plan implementation and funding.[2] Prior to filing this Motion, Defendant-Intervenors determined that Plaintiffs object to the relief requested and Federal Defendants do not object to that relief.

## Conclusion

Should the Court choose to consider post-decisional evidence regarding implementation and funding of state management plans, it should include the Hogrefe Declaration in its review in order to obtain a full and accurate account of matters regarding the funding of State wolf management plans. A proposed order for the Court's consideration is attached.

Dated March 11, 2008                    Respectfully submitted,

| | |
|---|---|
| */s/ James H. Lister* | */s/ Anna M. Seidman* |
| William P. Horn (D.C. Bar No. 375666) | Anna M. Seidman (D.C. Bar No. 417091) |
| James H. Lister (D.C. Bar. No. 447878) | Douglas S. Burdin (D.C. Bar No. 434107) |
| Birch Horton, Bittner & Cherot | Safari Club International |
| 1155 Connecticut Avenue N.W., Suite 1200 | 501 2nd Street NE |
| Washington, D.C. 20036 | Washington, D.C. 20002 |
| (202) 659-5800 | (202) 543-8733 |
| Fax: (202)659-1027 | Fax: (202) 543-1205 |
| whorn@dc.bhb.com | aseidman@sci-dc.org |
| jlister@dc.bhb.com | dburdin@sci-dc.org |
| | |
| *Counsel for U.S. Sportsmen's Alliance Foundation, Wisconsin Bear Hunters' Association, Scott Meyer and Robert Stafsholt* | *Counsel for Safari Club International, Safari Club International Foundation, and National Rifle Association* |

---

[2] If the court find reason to determine questions related to remedy, the Hogrefe Declaration would be separately admissible for this determination. In such circumstance, the Hogrefe Declaration would help the Court determine the present status of wolf management funding and implementation in Michigan, which is in turn relevant to whether any error (Intervenors believe there is none) is harmless and whether any particular remedy need be imposed. *See Esch v. Yeutter,* 876 F.2d 976, 991 (D.C. Cir. 1989) (discussing supplementation for purposes of considering remedy). This separate basis for supplementation of the Administrative Record is now premature, as for the reasons stated in the briefs on the merits, the FWS did not err in delisting.

4

**DEFENDANT-INTERVENORS'
MOTION TO SUPPLEMENT THE RECORD WITH THE
HOGREFE DECLARATION SUPPLIED BY STATE GOVERNMENT
AMICI AND MEMORANDUM IN SUPPORT OF MOTION**

**(EXHIBIT 1 – HOGREFE DECLARATION)**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| HUMANE SOCIETY OF THE UNITED STATES, *et al*, | ) ) ) | |
| Plaintiffs, | ) ) ) | Civil No. 1:07-cv-00677-PLF |
| v | ) ) | |
| KEMPTHORNE, *et al*, | ) ) | |
| Defendants, | ) ) | |
| U.S. SPORTSMEN'S ALLIANCE, FOUNDATION, *et al*, | ) ) ) | |
| Intervenor-Defendants, | ) ) | |
| SAFARI CLUB INTERNATIONAL, *et al*, | ) ) | |
| Intervenor-Defendants. | ) ) | |

## DECLARATION OF TODD HOGREFE

1. I have personal knowledge of the facts asserted in this declaration, and if called as a witness, I am competent to testify to these facts under oath.

2. I am the Endangered Species Coordinator for the Michigan Department of Natural Resources (DNR). In this position, I coordinate the statewide Michigan threatened and endangered species program, prepare and review wildlife-focused plans and technical reports, administer State natural-resource regulations (including the Michigan Endangered Species Protection Law), and facilitate compliance with federal natural-resource regulations (including the federal Endangered Species Act). I have held my current position since May 2004.

3. I have direct personal knowledge of the biology and status of wolves in Michigan, wolf management in Michigan, State and federal regulations pertaining to wolves in Michigan, and attitudes held by Michigan residents regarding wolves. I took a lead role in the preparation of the 384-page *Review of Social and Biological Science Relevant to Wolf Management in Michigan* (Beyer et al. 2006), and I am the primary author of the draft updated *Michigan Wolf Management Plan* (Michigan DNR 2007).

4. The Michigan DNR has the primary responsibility and statutory authority for the management of resident Michigan wildlife, including wolves. The federal status of wildlife as threatened or endangered does not abrogate this responsibility or authority. Accordingly, the State of Michigan has always borne the majority of costs and responsibilities of wolf management in Michigan and will continue to do so, regardless of the federal status of wolves.

5. The federal status of wolves in the western Great Lakes region does not affect the amount of funding available to the State of Michigan for wolf management. The federal government has not provided the State of Michigan with any substantive Endangered Species Act (ESA) funding to help it manage wolves in more than 10 years; when ESA funding was provided, its amount was small in relation to the total cost of the wolf-management program. The federal government has not provided the State of Michigan with any other funding specifically for the management of wolves. The federal status of wolves does not affect the availability of other, non-federal sources of funding the State of Michigan uses to manage wolves.

6. Relatively few costs and responsibilities of on-the-ground wolf management in Michigan were borne by the federal government while wolves were federally classified as threatened or endangered.

7.      As an example, Fiscal Year 2005 was typical in terms of recent annual agency expenditures on wolf management. Michigan DNR expenditures that can be directly attributed to the wolf-management program during that period have been estimated at approximately $476,000. This figure is an underestimate of the actual Michigan DNR expenditures during that period because it does not reflect charges to multi-use cost codes that prevent determination of costs incurred for a particular species or project. Costs not reflected in the figure are substantial, and include those for education and outreach efforts, interaction with other agencies, certain wolf-planning expenses, and wolf-related expenses of the Michigan DNR Law Enforcement Division. The costs reflected in the $476,000 figure were associated with population monitoring, research, training of field staff, responses to nuisance-animal and depredation complaints, depredation control activities, and reimbursement for wolf depredation of livestock. During the same time period, the U.S. Fish and Wildlife Service expended virtually no money or staff time on those activities in Michigan.

8.      Contributions toward wolf-related law enforcement in Michigan have also been predominantly State rather than federal. State law enforcement officials have conducted most investigations and enforcement related to illegal wolf killings in Michigan. For example, from the beginning of 2005 to the date of the final delisting rule, Michigan DNR law enforcement officials investigated or pursued prosecution of 22 wolf-related violations, at considerable expense. By contrast, federal law enforcement officials investigated or pursued prosecution of one wolf-related violation during that time period (Agent James Fuller, U.S. Fish and Wildlife Service, personal communication). The extremely small number of federal agents stationed within wolf range in the region precludes their involvement in most cases. State of Michigan

law enforcement officials will continue to take the lead on most wolf-related violations, as they have in the past, regardless of the federal status of wolves.

9. To my knowledge, no violations involving the illegal killing of a wolf in Michigan have been prosecuted under the federal Endangered Species Act. Instead, prosecutions have been made under State regulations, which remain in effect and continue to be enforced. In this sense, compared to the federal Endangered Species Act, Michigan regulations have been more of a practical deterrent to the illegal killing of wolves.

10. An important federal contribution to wolf management in Michigan has been the work conducted by the United States Department of Agriculture (USDA) Animal and Plant Health Inspection Service (APHIS) Wildlife Services. USDA APHIS Wildlife Services personnel have been involved with the wolf program in Michigan since 2000 and have played a key role in population monitoring, research, training of field staff, and program planning. The continuing participation of USDA APHIS Wildlife Services in the Michigan wolf-management program does not depend on the federal status of wolves.

11. The Michigan DNR is committed to maintaining a viable Michigan wolf population above a level that would warrant its classification as threatened or endangered at either the State or federal level. In the context of the Michigan DNR's mission and its public trust responsibilities for the State's natural resources, the maintenance of a viable wolf population is an appropriate and necessary goal.

12. The Michigan DNR has communicated this commitment to the U.S. Fish and Wildlife Service in multiple letters, documents, meetings and conversations. AR Doc. 228 at 8286; AR Doc. 418 at 11491; AR Doc. 418 at 11496; also Michigan DNR 1997, 2007.

13. The *Michigan Gray Wolf Recovery and Management Plan* (Michigan DNR 1997) has been and continues to be the plan that guides State wolf management in Michigan. The U.S. Fish and Wildlife Service has indicated its support for the wolf-management approach outlined in the plan. AR Doc. 467 at 12824.

14. The Michigan DNR will continue to conduct wolf management in Michigan under the guidance of a wolf management plan that is designed to maintain a viable wolf population above a level that would warrant its classification as threatened or endangered (Michigan DNR 1997, 2007).

15. The Michigan DNR is currently revising its wolf management plan through a process that includes review of the best available scientific information and substantial public involvement. The process involves the following phases, presented in general sequence: 1) intra- and inter-agency scoping; 2) public meetings and comment period; 3) focus-group meetings; 4) public-attitude surveys; 5) review of biological and social science relevant to wolf management in Michigan; 6) development of guiding principles by a 20-member citizen advisory group; 7) plan writing; and 8) public review and comment. This process began in 2004 and is expected to conclude in winter or spring 2008. The most-recent draft of the revised wolf management plan is available on the Michigan DNR website at www.michigan.gov/dnr (Click on the link for 'Wildlife & Habitat' and then the link for 'Draft Wolf Management Plan').

16. The Michigan DNR has undertaken revision of its wolf management plan with the understanding that the U.S. Fish and Wildlife Service may re-classify wolves as federally threatened or endangered if it finds that implementation of the revised plan would not adequately conserve the species.

17. Wolf-plan revisions allow State agencies to address and respond to changes in local wolf populations, environmental conditions, understanding of wolf biology, public attitudes, and technology. Only through periodic plan revisions will wolves be managed based on the best available scientific information.

18. The Michigan wolf-plan revision process has in no way caused a gap in Michigan's regulatory mechanisms regarding wolves. The *Michigan Gray Wolf Recovery and Management Plan* (Michigan DNR 1997) has been and continues to be the plan that guides State wolf management in Michigan. It will remain effective until a new, revised plan is finalized.

19. The Michigan laws and regulations that protect wolves have remained in effect and continue to be enforced. These laws and regulations include the Michigan Endangered Species Protection Law (Michigan Public Act 451 of 1994, Part 365), Mich. Comp. Laws 324.36501 *et seq.*; the Michigan Wolf–Dog Cross Act (Public Act 246 of 2000), Mich. Comp. Laws 287.1001 *et seq.*; and the Michigan Wildlife Conservation Order. The Michigan Wildlife Conservation Order can be viewed on the Michigan DNR website at www.michigan.gov/dnr (Click on the link for 'Inside DNR,' then the link for 'Laws & Legislation,' and then the link for 'Wildlife Conservation Orders').

20. Funding and implementation of the Michigan wolf management plan has been and continues to be adequate to maintain a viable Michigan wolf population above a level that would warrant its classification as threatened or endangered. The Michigan wolf population exceeded the plan's population abundance goal within 4 years of plan finalization. Moreover, the level of funding and implementation of the Michigan plan facilitated a 450% increase in the wolf population between 1997 and 2007. Recent data indicate a continuing upward population

6

trend. The combined Michigan–Wisconsin wolf population currently exceeds federal recovery criteria by more than ten times.

21.    As part of the comments on the draft delisting rule, the Michigan DNR made a petition to the U.S. Fish and Wildlife Service for funding assistance. The petition was presented in the following context:

> 'Following delisting, we will conduct management to ensure the persistence of a viable wolf population in Michigan and thus preclude the need for its reclassification as threatened or endangered under State or Federal law. We will also continue to monitor the population. This action will help the U.S. Fish and Wildlife Service comply with the Federal Endangered Species Act, which requires post-delisting monitoring for a minimum of five years. Monitoring during this period will require substantial commitment of agency resources, and in the spirit of continuing partnership, we request Federal funding assistance to implement a post-delisting monitoring plan. We look forward to opening a dialogue with you to discuss the funding required for this purpose.' AR Doc. 228 at 8286

That text in no way suggests the Michigan DNR lacks the funding necessary to conduct post-delisting monitoring. Rather, the text asks the U.S. Fish and Wildlife Service to share the costs of a program which it is required to implement. This is an example of a request made on principle rather than need. Since those comments were submitted, the Michigan DNR and USDA APHIS Wildlife Services have continued to conduct wolf population monitoring in Michigan without funding assistance from the U.S. Fish and Wildlife Service.

22.    The Michigan DNR, with the cooperation of USDA APHIS Wildlife Services, has implemented and will continue to implement an effective wolf population monitoring program. Despite suggestions by the Plaintiffs, the September 2004 draft 5-year evaluation of the Michigan wolf plan does not conclude that population monitoring or disease monitoring was inadequate. Rather, it indicates 'the majority of plan direction on research and monitoring was implemented and accomplished.' AR Doc. 142 at 767.

23.     The aspects of monitoring that were not implemented and accomplished at the time of the 5-year evaluation pertained primarily to social-attitude research rather than assessment of the biological status of the wolf population. The evaluation states that '[a]lthough some work on public attitudes towards wolves was completed during the last five years, the work was limited in scope and the effort needs to be expanded. Additional research on public attitudes towards wolves and wolf management options is needed.' AR Doc. 142 at 767. To address this need, the Michigan DNR funded an extensive study of attitudes held by Michigan residents regarding wolves. This multi-year study was completed by Michigan State University in 2006 (Beyer et al. 2006).

24.     The Michigan DNR recently developed and implemented a new wolf population monitoring methodology (Potvin et al. 2005, Drummer 2006). The original methodology became less efficient and reliable as the Michigan wolf population grew, because it was designed to track a relatively small number of wolves. The new methodology is expected to save time and money while providing reliable and accurate population estimates. The new methodology has been described in a peer-reviewed journal, has been evaluated by respected scientists, has been tested in the field, and is widely considered to be an effective, reliable technique for estimating wolf population size.

25.     The viability of any population depends on the rate of mortality in relation to birth, immigration and emigration rates. If birth and immigration rates equal or exceed mortality and emigration rates, viability of the wolf population will not be threatened, regardless of whether the leading cause of death is starvation, intraspecific aggression, disease, vehicle collision, illegal killing, or another factor.

26.     The viability of a population does not depend on the relative contributions of different mortality factors toward overall mortality rate. In other words, simply because a particular factor is a leading cause of mortality does not mean that factor is a threat to the viability of a population. Harvest by hunters is the largest source of mortality in white-tailed deer in Michigan (Rodney Clute, Michigan DNR, personal communication), but no informed person would argue that hunting under current Michigan regulations threatens the viability of the Michigan deer population. Cardiovascular disease may be a leading killer of humans worldwide, but no informed person would argue that its current prevalence threatens us with extinction. Similarly, certain human activities may be the leading cause of wolf mortality in the western Great Lakes region, but the current prevalence of those activities does not threaten the wolf population.

27.     Trends in Minnesota, Wisconsin and Michigan over the past two decades show that rates of human-caused mortality (or mortality in general) have not been a problem for sustaining viable wolf populations. The population in Minnesota has increased and remained stable at a level that is double the federal recovery criterion for abundance. From 1994 to 2007, the Michigan population grew at an average annual rate of 19%. Similar growth has been observed in Wisconsin. Combined, the Michigan-Wisconsin wolf population exceeds the federal recovery criterion for abundance by more than ten times. If human-caused mortality rates (or overall mortality rates), birth rates, and dispersal rates remain in relative proportion to current levels, the wolf population in Michigan will continue to grow.

28.     Disease may be a leading cause of wolf mortality in the western Great Lakes region, but its current prevalence does not threaten the wolf population, for the same reason that human-caused mortality does not threaten the wolf population.

29. The Michigan DNR will continue to monitor wolf health through necropsies of dead wolves and analysis of biological samples from captured live wolves (Michigan DNR 1997, 2007).

30. The Michigan DNR has indicated the winter Michigan wolf population must consistently include no fewer than 200 wolves to preclude the need for its classification as threatened or endangered (Michigan DNR 1997, 2007). The identified minimum level of 200 wolves should not be interpreted as a maximum abundance goal. The Michigan DNR has not and does not intend to establish a goal for the maximum number of wolves in Michigan. Therefore, the Michigan DNR has no plans to reduce or limit the number of wolves in the State to a certain level.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

January 14, 2008

*[signature: Todd C. Hogrefe]*

Todd C. Hogrefe

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HUMANE SOCIETY OF THE UNITED STATES, HELP OUR WOLVES LIVE, ANIMAL PROTECTION INSTITUTE, AND FRIENDS OF ANIMALS AND THEIR ENVIRONMENT,<br><br>        Plaintiffs,<br><br>   vs.<br><br>DIRK KEMPTHORNE, Secretary of the Interior, U.S. DEPARTMENT OF THE INTERIOR, AND U.S. FISH AND WILDLIFE SERVICE<br><br>        Defendants,<br><br>SAFARI CLUB INTERNATIONAL, SAFARI CLUB INTERNATIONAL FOUNDATION, AND NATIONAL RIFLE ASSOCIATION,<br><br>        Defendant-Intervenors,<br><br>and<br><br>U.S. SPORTSMEN'S ALLIANCE FOUNDATION, WISCONSIN BEAR HUNTING ASSOCIATION, SCOTT MEYER, AND ROB STAFHOLT,<br><br>        Defendant-Intervenors. | ) ) ) ) ) Case No. 1:07-cv00677-PLF ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**[PROPOSED] ORDER**

Upon consideration of the Motion to Supplement the Record filed by Defendant-Intervenors U.S. Sportsmen's Alliance Foundation *et al.*, and Safari Club International, *et al.*, and the responses and replies thereto, it is

**ORDERED** that the motion to supplement is **GRANTED**; and it is

**FURTHER ORDERED** that the administrative record shall be supplemented by the following document:

Declaration of Todd Hogrefe, Michigan Department of Natural Resources, dated January 14, 2008.

**SO ORDERED**.

_____
Honorable Paul L. Friedman
U.S. District Court, District of
 Columbia