UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HUMANE SOCIETY OF THE UNITED STATES, HELP OUR WOLVES LIVE, ANIMAL PROTECTION INSTITUTE, AND FRIENDS OF ANIMALS AND THEIR ENVIRONMENT,<br><br>Plaintiffs,<br><br>vs.<br><br>DIRK KEMPTHORNE, Secretary of the Interior, U.S. DEPARTMENT OF THE INTERIOR, AND U.S. FISH AND WILDLIFE SERVICE<br><br>Defendants,<br><br>SAFARI CLUB INTERNATIONAL, SAFARI CLUB INTERNATIONAL FOUNDATION, AND NATIONAL RIFLE ASSOCIATION,<br><br>Defendant-Intervenors,<br><br>and<br><br>U.S. SPORTSMEN'S ALLIANCE FOUNDATION, WISCONSIN BEAR HUNTING ASSOCIATION, SCOTT MEYER, AND ROB STAFHOLT,<br><br>Defendant-Intervenors. | Case No. 1:07-cv00677-PLF<br><br><br><br><br><br><br><br><br><br><br><br><br><br>**Defendant-Intervenors' Reply to Plaintiffs' Opposition to Motion to Supplement the Record With the Declaration of Todd Hogrefe** |

Defendant-Intervenors submit this reply to Plaintiffs' Opposition ("Opp.") (Doc. 61) to Defendant-Intervenors' Motion to Supplement the Record with the Declaration of Todd Hogrefe ("Hogrefe Declaration") of the Michigan Department of Natural Resources (Docs. 59 and 59-2).

1. **All Parties Have an Equal Opportunity to Invoke the *Esch* Exceptions**

Plaintiffs have taken an inconsistent approach to the extra-record evidence that has been submitted to this court by the parties. Relying upon one of the *Esch v. Yeutter*[1] exceptions to the

---

[1]   *Esch v. Yeutter,* 876 F.2d 976, 991 (D.C. Cir. 1991)

1

rule restricting the Court's review to the Administrative Record, Plaintiffs previously moved the court to supplement the Administrative Record with post-decisional extra-record evidence regarding funding of the Minnesota Wolf Management Plan.   Nevertheless, Plaintiffs ask the court to apply a different standard to the evidence submitted by Defendant-Intervenors. Plaintiffs now oppose Defendant-Intervenors' request to supplement the record with the Hogrefe Declaration because it affirmatively introduces evidence that supports Michigan's wolf management plan funding.

Earlier in this litigation Plaintiffs acknowledged the admissibility of the Declaration of Daniel Stark ("Stark Declaration") (Doc 34-2) regarding Minnesota wolf management plan funding.  Plaintiffs deemed the Stark Declaration acceptable because it responded to Plaintiffs' proffered evidence regarding Minnesota wolf plan funding.  Opp. at 4-5; Plaintiffs' Reply to Opposition to Plaintiffs' Motion to Supplement (Doc 35 at 12).  Plaintiffs' inconsistent approach to extra-record evidence suggests that Plaintiffs believe that only they are permitted to affirmatively introduce extra-record evidence, and Defendants are limited to rebuttal.

Contrary to Plaintiffs' assertions, the *Esch* exceptions do not so discriminate among parties to the case.  The *Esch* court relied on *American Petroleum Institute v. EPA*, 540 F.2d 1023, 1034 (10th Cir. 1976) *cert. denied,* 430 U.S. 922 (1977) which itself relied on *Amoco Oil Co. v. EPA*, 501 F.2d 722, 729 n. 10 (D.C. Cir. 1974).[2]  Both *American Petroleum* and *Amoco Oil* permitted  *defendants* to introduce post-decisional extra-record documents in order to verify the correctness of their actions and/or the plausibility of their predictions.  Thus Defendants and Plaintiffs have the same standing to request supplementation.

---

[2]    The *Esch* court cited *American Mining Congress v. Thomas*, 772 F.2d 617, 626-627 (10th Cir. 1985) *cert. denied* 476 U.S. 1158 (1986) which is the source of these two cases in which the 10th Circuit and D.C. Circuit courts utilized and explained the *Esch* case Exception (5) .

## 2. Admissibility of Factual Statements of Hogrefe Declaration

Plaintiffs claim that the Hogrefe Declaration must be excluded as argumentative. Opp. at 2. However, Plaintiffs have previously acceded to the admission of the factual statements of the Stark Declaration. Opp. at 4-5. Accordingly, Defendant-Intervenors offer the following non-argumentative factual statements in the Hogrefe Declaration:

> "The federal status of wolves in the western Great Lakes region does not affect the amount of funding available to the State of Michigan for wolf management. The federal government has not provided the State of Michigan with any substantive Endangered Species Act (ESA) funding to help it manage wolves in more than 10 years; when ESA funding was provided, its amount was small in relation to the total cost of the wolf management program. The federal government has not provided the State of Michigan with any other funding specifically for the management of wolves. The federal status of wolves does not affect the availability of other, non-federal sources of funding the State of Michigan uses to manage wolves." Hogrefe Dec. ¶ 5.

> "As an example, Fiscal Year 2005 was typical in terms of recent annual agency expenditures on wolf management. Michigan DNR expenditures that can be directly attributed to the wolf-management program during that period have been estimated at approximately $476,000. This figure is an underestimate of the actual Michigan DNR expenditures during that period because it does not reflect charges to multi-use cost codes that prevent determination of costs incurred for a particular species or project. Costs not reflected in the figure are substantial, and include those for education and outreach efforts, interaction with other agencies, certain wolf-planning expenses, and wolf-related expenses of the Michigan DNR Law Enforcement Division. The costs reflected in the $476,000 figure were associated with population monitoring, research, training of field staff, responses to nuisance-animal and depredation complaints, depredation control activities, and reimbursement for wolf depredation of livestock. During the same time period, the U.S. Fish and Wildlife Service expended virtually no money or staff time on those activities in Michigan." Hogrefe Dec. ¶ 7.

> "State law enforcement officials have conducted most investigations and enforcement related to illegal wolf killings in Michigan. For example, from the beginning of 2005 to the date of the final delisting rule, Michigan DNR law enforcement officials investigated or pursued prosecution of 22 wolf-related violations, at considerable expense. By contrast, federal law enforcement officials investigated or pursued prosecution of one wolf-related violation during that time period (Agent James Fuller, U.S. Fish and Wildlife Service, personal communication). " Hogrefe Dec. ¶ 8.

> "[T]he State of Michigan has always borne the majority of costs and responsibilities of wolf management in Michigan and will continue to do so, regardless of the federal status of wolves …." Hogrefe Dec.,¶ 4
>
> "An important federal contribution of wolf management in Michigan has been the work conducted by the United States Department of Agriculture (USDA) Animal and Plant Health Inspection Service (APHIS) Wildlife Services. USDA APHIS Wildlife Services personnel have been involved with the wolf program in Michigan since 2000 and have played a key role in population monitoring, research, training of field staff, and program planning. The continuing participation of USDA APHIS Wildlife Services in the Michigan wolf-management program does not depend on the federal status of wolves." Hogrefe Dec., ¶ 10.
>
> "The Michigan DNR has communicated this commitment to the U.S. Fish and Wildlife Service in multiple letters, documents, meetings and conversations. AR Doc. 228 at 8286; AR Doc. 418 at 11491; AR Doc. 418 at 11496; also Michigan DNR 1997, 2007." Hogrefe Dec., ¶ 12.
>
> Since [the Michigan DNR's comments on the proposed delisting rule] were submitted, the Michigan DNR and USDA APHIS Wildlife Services have continued to conduct wolf population monitoring in Michigan without funding assistance from the U.S. Fish and Wildlife Service." Hogrefe Declaration, ¶ 21 (also clarifying a point in those comments misinterpreted by Plaintiffs, and explaining that the DNR's request for federal funding was "made on principle rather than need").

At the very least, the Court should admit the foregoing as these excerpts relate specific facts and cannot be excluded as argument. While other paragraphs of the Hogrefe Declaration are also non-argumentative and factual, the above paragraphs contain key points pertaining to Michigan's wolf management implementation and funding.

### 3. There is No Post-Hoc Rationalization Involved

Plaintiffs erroneously claim that the Hogrefe Declaration represents a "post-hoc rationalization." Plaintiffs cite "post-decisional" cases in which courts have rejected attempts by federal agencies whose actions are being reviewed to justify their decisions with after-the-fact explanations. Opp. at 6. However, the Hogrefe Declaration does not constitute a "post-hoc rationalization" by the FWS or anyone else, because the FWS fully expressed in its rulemaking decision its rationale for finding Michigan willing and able to assume wolf management

4

responsibilities in its decision. *Final Rule*, 72 Fed.Reg. 6052, 6092-95 (Feb. 7, 2007). The very cases cited by Plaintiffs recognize that supplementation of the administrative record with background information and explanatory evidence is appropriate to support the federal agency's rationale where that rationale is expressed in the decision under review:

> [General Services Administration] urges consideration of [a GSA official's] declaration was proper under a limited exception allowing agencies to supplement the administrative record to provide such additional explanations of the reasons for the agency decision as may prove necessary. But this exception may not be employed to offer post-hoc rationalizations ***where no rationalization exists***. ***Although the record may be supplemented to provide, for example, background information or evidence of whether all relevant factors were examined by an agency,*** we have made clear that the new material should be merely explanatory of the original record and should contain no new rationalizations. Here, GSA provided no rationalization at the agency level for its refusal to withhold the price data and is therefore precluded from initially offering one on judicial review.

*AT&T Inf. Sys., Inc. v. GSA*, 810 F.2d 1233, 1236 (D.C. Cir. 1987) (internal citations and quotations omitted, emphasis added) (cited at Plaintiffs' Opposition at 6).

Subsequent decisions have applied the reasoning of *AT&T Inf. Sys*. by allowing supplementation of the record with declarations prepared for the purposes of litigation. In those cases, the courts admitted declarations that provided the court with background information or an explanation of what was in or was "implicit in" the existing administrative record. *Clifford v. Pena*, 77 F.3d 1414, 1439 (D.C. Cir. 1996) ("We agree with the district court that there is nothing improper in receiving declarations that merely illuminate reasons obscured but implicit in the administrative record"); *American Forest & Paper Ass'n, Inc. v. U.S. E.P.A*; 1996 WL 509601. *3, No. 93-cv-0694 (D.D.C. 1996); *Lykes Bros. Steamship Co., Inc. v. Pena,* 1993 WL 786964, * 7, No. 92-cv-2780 (D.D.C. 1993); *see also, Appeal of Bolden*, 848 F.2d 201, 207 (D.C. Cir. 1998).

Here, in its Final Rule to delist the WGL-DPS, the FWS, after analyzing Michigan's wolf regulatory program in detail, fully stated its rationale for finding that Michigan was willing and able to successfully assume management of the wolf after federal delisting, and that the "adequacy of existing regulatory mechanisms" factor therefore favored delisting:

> "MI-DNR's history of leadership in wolf recovery, ***its repeated written commitments*** to ensure the continued viability of the Michigan wolf population above a level that would trigger State or Federal listing as threatened or endangered, along with the protective 'Guiding Principles' from the Michigan Wolf Management Roundtable, lead us to conclude that both the current Michigan plan, and the revised plan to be developed using the guidance of the Roundtable, will provide adequate regulatory mechanisms for Michigan wolves."

72 Fed.Reg. 6052, 6094 (Feb. 8, 2007) (emphasis added). The FWS's statement fulfilled the agency's APA obligation. 5 U.S.C. § 553(c) ("the agency shall incorporate in the rules adopted a *concise general statement* of their basis and purpose") (emphasis added).

Supplementation with background information and explanatory evidence regarding the details of Michigan DNR funding thus helps explain and supports the rationale fully stated by FWS in the delisting decision and so is appropriate. *AT&T Inf. Sys., Inc.*, 810 F.3d at 1236; *see also, Esch,* 876 F.2d at 991(supplementation allowed "in cases where evidence arising after the agency action shows whether the decision was correct or not")[3]; *Amoco Oil Co. v. EPA*, 501 F.2d 722, 729 n. 10 (D.C. Cir. 1974); *American Petroleum Institute v. EPA*, 540 F.2d 1023, 1034 (10th Cir. 1976).

In attempting to portray the funding details of Michigan wolf plan funding as being post-hoc rationalization rather than background information, Plaintiffs lose sight of the fact that their

---

[3] The *AT&T Inf. Sys., Inc.* case cited by Plaintiffs also makes it clear that information assembled after the date of decision relating to events occurring before the effective date of the decision may still supplement the record if it qualifies as background or explanatory material. 810 F.2d at 1236.

challenge to Michigan's funding relates to one small facet of a much broader multi-issue case.[4]
In addition to providing background information, the declaration helps explain the FWS's finding that Michigan made "repeated written commitments" to implement Michigan's wolf management plan. 72 Fed.Reg. at 6095.

Thus, in response to Plaintiffs' contentions and its citation to *AT&T Inf. Sys.*, the key analysis this Court should conduct in determining whether to allow the Hogrefe Declaration to supplement the Administrative Record is whether the document constitutes background information or evidence of whether all relevant factors were examined by the agency, *AT&T Inf. Sys.,* 810 F.2d at 1236, or information arising after the date of the decision that assists the court in evaluating the correctness of the agency's predictions and assumptions. *Esch*, 876 F.3d at 991. The Hogrefe Declaration does both, and for those reasons, should be admitted to supplement the Administrative Record.[5]

## Conclusion

The Court should supplement the record with evidence regarding the funding and implementation of state wolf management plans on an equal basis and admit the Hogrefe Declaration or at least those portions of the Hogrefe Declaration that demonstrate the funding and implementation of the Michigan Wolf Management Plan.

---

[4] State wolf management plan funding is subsumed within the larger issue of the State's ability to manage wolves post-delisting, which in turn is subsumed into the even larger issue of the adequacy of existing regulatory mechanisms. 16 U.S.C. § 1533(a)(1)(D). Adequacy of existing regulatory mechanisms is itself just one of five factors in a balancing test used to determine whether the growing wolf population is in danger of extinction, with no single factor being dispositive. 16 U.S.C. §§ 1532(6), (16), (20), 1532(6)(20). That balancing test, in turn, was just one of several issues before FWS -- other included applying the wolf recovery plan, drawing DPS boundaries, and evaluating significant portion of range. Plaintiffs' decision to focus on "one tree in the forest" (the Michigan wolf management plan) does not make background information relating to that "tree" post-hoc rationalization.

[5] In addition, Plaintiffs in their Opposition did not challenge an alternative basis for supplementation, that should the Court find liability for any reason, it may supplement the record with the Hogrefe Declaration for purposes of deciding remedy. *Esch*, 876 F.2d at 991; Intervenors' Motion at 4.

Dated April 3, 2008                           Respectfully submitted,

*/s/ James H. Lister*  
William P. Horn (D.C. Bar No. 375666)  
James H. Lister (D.C. Bar. No. 447878)  
Birch Horton, Bittner & Cherot  
1155 Connecticut Avenue N.W., Suite 1200  
Washington, D.C.  20036  
(202) 659-5800  
Fax:  (202)659-1027  
whorn@dc.bhb.com  
jlister@dc.bhb.com  

*Counsel for U.S. Sportsmen's Alliance Foundation, Wisconsin Bear Hunters' Association, Scott Meyer and Robert Stafsholt*

*/s/ Anna M. Seidman*  
Anna M. Seidman (D.C. Bar No. 417091)  
Douglas S. Burdin (D.C. Bar No. 434107)  
Safari Club International  
501 2nd Street NE  
Washington, D.C.  20002  
(202) 543-8733  
Fax:  (202) 543-1205  
aseidman@sci-dc.org  
dburdin@sci-dc.org  

*Counsel for Safari Club International,  Safari Club International Foundation, and National Rifle Association*