## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| HUMANE SOCIETY OF THE UNITED STATES, HELP OUR WOLVES LIVE, ANIMAL PROTECTION INSTITUTE, AND FRIENDS OF ANIMALS AND THEIR ENVIRONMENT, | ) ) ) ) ) | Case No. 1:07-cv00677-PLF |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| DIRK KEMPTHORNE, Secretary of the Interior, U.S. DEPARTMENT OF THE INTERIOR, AND U.S. FISH AND WILDLIFE SERVICE | ) ) ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| SAFARI CLUB INTERNATIONAL, SAFARI CLUB INTERNATIONAL FOUNDATION, AND NATIONAL RIFLE ASSOCIATION, | ) ) ) ) | |
| | ) | |
| Defendant-Intervenors, | ) | |
| and | ) | |
| | ) | |
| U.S. SPORTSMEN'S ALLIANCE FOUNDATION, WISCONSIN BEAR HUNTING ASSOCIATION, SCOTT MEYER, AND ROB STAFHOLT, | ) ) ) ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

### DEFENDANT-INTERVENORS' CONSOLIDATED ERRATA TO ADMINISTRATIVE RECORD CITATIONS IN THEIR PLEADINGS ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Defendant-Intervenors have completed a post-filing review of the pleadings filed in connection with the cross-motions for summary judgment and have discovered that a number of the Administrative Record citations in the pleadings that they filed contain incorrect document number or page number citations.

Accordingly, Defendant-Intervenors submit this Consolidated Errata to 1)Defendant-Intervenors' Consolidated Memorandum In Support of their Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment, (Docket 43-2, also filed at Docket 44-2), 2) Defendant-Intervenors' Reply to Plaintiffs' Opposition to Defendant-Intervenors' Motion for Summary Judgment, (Docket 57), 3) Defendant-Intervenors' Statement of Material Facts Not in Genuine Dispute (Docket 43-3), and 4) Defendant-Intervenors' Response to Plaintiffs' Rule 56.1 Statement of Material Facts not in Genuine Dispute (Docket 44-5).  Together with this Consolidated Errata, Defendant-Intervenors simultaneously submit corrected conformed copies of each of these pleadings:

**Errata to Defendant-Intervenors' Consolidated Memorandum
In Support of their Motion for Summary Judgment and in Opposition to
Plaintiffs' Motion for Summary Judgment (Dockets 43-2, 44-2)**

| | | | |
|---|---|---|---|
| p. 11 | AR Doc. 215, p. 767 | should be corrected to | AR Doc. 142, p. 767 |
| p. 21 | A.R. 3828-3829 | should be corrected to | AR Doc. 213, p. 3828-3829 |
| p. 23 | A.R. 127900 | should be corrected to | AR Doc. 467, p. 12790 |
| p. 24 | A.R 12803 | should be corrected to | AR Doc .468A at 14345<br>AR Doc. 468A at 15702<br>AR Doc. 468A at 15468<br>AR Doc. 468B at 16319 |
| p. 26 | A.R. Doc. 468B at p. 16823 | should be corrected to | AR Doc. 468B at 16283 |
| p. 27 | AR Doc. 468A, p.2652 | should be corrected to | AR Doc. 468A at 15487, 15491 |
| p. 41 | AR p. 5134 (MI) | should be corrected to | AR Doc. 215 at 5139 (MI) |

**Errata to Defendant-Intervenors' Reply Memorandum (Docket 57)**

| | | | |
|---|---|---|---|
| p. 15 | AR Doc. 228 at 8266 | should be corrected to | AR Doc. 228 at 8286 |
| p. 15 | AR Doc. 468A at 8233 | should be corrected to | AR Doc. 228 at 8233 |
| p. 19 | AR 215, p. 5255 | should be corrected to | AR Doc. 215 at 5256 |

**Errata to Defendant-Intervenors' Statement of Uncontroverted Material Facts in Support of**
**Motion for Summary Judgment**
**(Dockets 43-3)**

Statement of Fact No. 42:
      A.R. 16823                 should be corrected to       AR Doc. 468B at 16283

Statement of Fact No. 69:
      AR Doc 15, p. 767         should be corrected to       AR Doc. 142 at 767

**Errata to Defendant-Intervenors' Response to Plaintiffs' Rule 56.1**
**Statement of Material Facts Not in Genuine Dispute (Docket 44-5)**

Reply to Statement of Fact No. 22:
      AR Doc 35, p. 296        should be corrected to       AR Doc. 48, p. 208

Reply Statement of Fact No. 58:
      AR 14844                should be corrected to       AR Doc. 215, p. 6860

Dated April 8, 2008                    Respectfully submitted,

/s/ James H. Lister                 /s/ Anna M. Seidman

William P. Horn (D.C. Bar. No. 375666)     Anna M. Seidman (D.C. Bar No. 417091)
James H. Lister (D.C. Bar. No. 447878)      Douglas S. Burdin (D.C. Bar. No. 434107)
Birch Horton, Bittner & Cherot          Safari Club International
1155 Connecticut Avenue N.W., Suite 1200    501 2nd Street NE
Washington, D.C.  20036             Washington, D.C.  20002
(202) 659-5800                      (202) 543-8733
Fax:  (202)659-1027                Fax:  (202) 543-1205
whorn@dc.bhb.com                 aseidman@sci-dc.org
jlister@dc.bhb.com                  dburdin@sci-dc.org

*Counsel for U.S. Sportsmen's Alliance*     *Counsel for Safari Club International,  Safari*
*Foundation, Wisconsin Bear Hunters'*      *Club International Foundation, and National*
*Association, Scott Meyer and Robert Stafsholt*  *Rifle Association*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, HELP OUR WOLVES LIVE, ANIMAL PROTECTION INSTITUTE, and FRIENDS OF ANIMALS AND THEIR ENVIRONMENT,<br><br>        Plaintiffs,<br><br>     vs.<br><br>DIRK KEMPTHORNE, Secretary of the Interior, U.S. DEPARTMENT OF THE INTERIOR, and U.S. FISH AND WILDLIFE SERVICE,<br><br>        Defendants,<br><br>and<br><br>SAFARI CLUB INTERNATIONAL, SAFARI CLUB INTERNATIONAL FOUNDATION, and NATIONAL RIFLE ASSOCIATION,<br><br>        Defendant-Intervenors,<br><br>and<br><br>U.S. SPORTSMENS' ALLIANCE FOUNDATION, WISCONSIN BEAR HUNTERS' ASSOCIATION, SCOTT MEYER, and ROBERT STAFSHOLT,<br><br>        Defendant-Intervenors. | Civil Action No. 1:07-cv-00677(PLF) |

DEFENDANT-INTERVENORS' CONSOLIDATED MEMORANDUM
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page No.**

INTRODUCTION .................................................................................................................1

STATEMENT OF FACTS .....................................................................................................1

STANDARD OF REVIEW ....................................................................................................2

ARGUMENT ..........................................................................................................................2

I.    PLAINTIFFS HAVE NOT ESTABLISHED THEIR STANDING TO SUE ......................2

II.   THE EVIDENCE OVERWHELMINGLY SUPPORTS THE
      FWS' FINDING THAT WOLVES HAVE RECOVERED, AND
      THE DISTINCT POPULATION SEGMENT PROVISION OF THE
      ESA APPLIES EQUALLY TO LISTING AND DELISTING ...........................................3

      A.    The Gray Wolves of the Western Great Lakes Distinct Population
            Segment Are a Recovered Species ...........................................................................3

      B.    The FWS Properly Conducted a Threats Analysis and Properly
            Determined, Based on the Best Available Scientific Evidence, That
            Delisting Was Appropriate .......................................................................................5

      C.    The FWS Properly Determined Existing Regulatory Mechanisms Are
            Adequate ..................................................................................................................6

      D.    The FWS Properly Concluded That The Existence of Disease and Human
            Predation Do Not Require the FWS To Continue the "Endangered"
            Classification for the WGL DPS..............................................................................12

      E.    The FWS Properly Developed and Applied the DPS Policy.....................................14

      F.    The FWS Properly Used Distinct Population Segments As A Tool For
            the Purpose of Delisting...........................................................................................16

      G.    The FWS Established the WGL DPS In A Manner Consistent With Its
            Historical Approach to the Eastern Timber Wolf .....................................................18

      H.    The FWS Correctly Established the Boundaries of the WGL DPS............................19

III.  THE FWS REASONABLY DETERMINED THAT THE GENERALLY
      UNSUITABLE HABITAT WITHIN THE WGL DPS BUT OUTSIDE THE
      CORE RECOVERY AREAS IS NOT A SIGNIFICANT PORTION OF THE
      GRAY WOLVES' RANGE ...........................................................................................21

## TABLE OF CONTENTS (CONT.)

<u>Page No.</u>

    A.    The ESA's "Significant Portion of Range" (SPR) Inquiry ........................................21

    B.    The Successful Recovery in the Core Recovery Areas  ...........................................22

    C.    The FWS Has Properly Completed the Analysis of Whether the
           Non-Core Areas Constitutes SPR ..............................................................................23

           1.    The Northern Lower Peninsula of Michigan ..................................24

           2.    The Turtle Mountains of North Dakota ..........................................27

           3.    There Were No Other Potential SPRs in the DPS ..........................28

    D.    The FWS Was Not Required to Treat Presently Unsuitable Habitat
           as a SPR Just Because the Unsuitable Area is Large and Was Once
           Part of the Wolves' Range ........................................................................................28

           1.    Unsuitable Habitat is Not Part of the Wolves' "Range"................29

           2.    Even with the FWS's Evaluation of All the Range within the
                 WGL DPS, Currently Unsuitable Habitat That Was Once
                 Occupied by Wolves Is No Longer a Significant Portion of
                 the Range ........................................................................................32

IV.    SHOULD ANY OF PLAINTIFFS' UNFOUNDED PREDICTIONS OF
        FUTURE JEOPARDY TO THE WOLF COME TO PASS, THE FWS
        WILL BE UNDER A NON-DISCRETIONARY DUTY TO RELIST THE
        WESTERN GREAT LAKES WOLVES ON AN EMERGENCY BASIS .........................37

V.    ANY REMEDY THAT THIS COURT ORDERS SHOULD AVOID
       HARMFUL AND NEEDLESS DISRUPTIONS TO RECOVERED WOLF
       MANAGEMENT IN THE CORE RECOVERY AREAS ....................................................38

CONCLUSION...................................................................................................................41

# TABLE OF AUTHORITIES

<u>Page No.</u>

## FEDERAL CASES

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*,
    988 F.2d 146 (D.C. Cir. 1993) ................................................................................39

*American Wildlands v. Kempthorne*,
    478 F.Supp. 2d 92 (D.D.C.March 26, 2007), ......................................................6, 13

*Baltimore Gas & Elec. Co. v. Natural Res. Defense Council*,
    462 U.S. 87 (1983) ................................................................................................2

*Barscz v. Director, Office of Workers' Compensation Programs*,
    486 F.3d 744 (2nd Cir. 2007) ...............................................................................29

*Biodiversity Legal Foundation v. Babbitt*,
    943 F. Supp. 23 (D.D.C. 1996) ..............................................................................7

*Carlton v. Babbitt*,
    900 F. Supp. 526 (D.D.C. 1995) .............................................................................2

*Center for Biological Center for Biological Diversity v. FWS*,
    2007 WL 716108 (D. Colo. March 7, 2007)........................................................8

*Center for Biological Diversity v. Norton (Rio Grand Cutthroat Trout)*,
    411 F.Supp.2d 1271 (D.N.M. 2005),
    *vacated by consent due to mootness and on other grounds*,
    Case No. 06-2049, (10th Cir. May 21, 2007) .......................................................31, 36

*Center for Biological Diversity v. U.S. Fish and Wildlife Service (Rio Grand Cutthroat Trout)*,
    2007 WL 716108 No. 05-305-RPM (D. Colo., Mar. 7, 2007),
    *vacated by consent due to mootness and on other grounds*,
    Case No. 07-1206, (10th Cir. Oct. 22, 2007) ......................................................31

*Center for Biological Diversity v. U.S. Fish and Wildlife Service*,
    402 F. Supp.2d 1198 (D. Or. 2005) ......................................................................7

*Chevron, U.S.A., Inc. v. Natural Res. Defense Council*,
    467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ................................2, 22, 36

*Colorado River Cutthroat Trout v. Kempthorne*,
    448 F. Supp. 2d 170 (D.D.C. 2006) .......................................................................2

*Davis v. Latschar*,
    83 F.Supp.2d 1 (D.D.C.1998), *aff'd*. 202 F.3d 359 (D.C.Cir.2000) .....................2

**TABLE OF AUTHORITIES (CONT.)**

<u>Page No.</u>

*Defenders of Wildlife v. Norton (Florida Black Bear case)*
    Civil Action No. 99-02072-HHK, slip op. at 8-11 (D.D.C. Dec. 13, 2001).........................*passim*

*Defenders of Wildlife v. Norton,*
    239 F.Supp.2d 9 (D.D.C. 2002) (Kessler, J.),
    *vacated in part on separate point,*
    2004 WL 438599, 89 Fed.Appx. 273 (D.C. Cir. 2004) .......................................................34

*Defenders of Wildlife v. Norton (Lizard case),*
    258 F.3d 1136 (9th Cir. 2001) .......................................................................................*passim*

*Defenders of Wildlife v. Secretary, U.S. Dep't of the Interior (Wolves),*
    354 F.Supp.2d 1156 (D.Or. 2005) ...........................................................................19, 23, 24

*Endangered Species Comm. of the Building Ind. Assoc. of South. Cal. v. Babbitt,*
    852 F. Supp. 32 (D.D.C. 1994) ...............................................................................................39

*Everett v. United States,*
    158 F.3d 1364 (D.C.Cir.1998) .................................................................................................2

*Federation of Fly Fishers v. Daley,*
    131 F. Supp.2d 1158(N.D. Cal. 2000) ....................................................................................8

*Fla. Audubon Soc'y v. Bentsen,*
    94 F.3d 658 (D.C.Cir.1996) (*en banc*)....................................................................................3

*Fox Television Stations v. FCC,*
    280 F.3d 1027 (D.C. Cir. 2002) ............................................................................................39

*Fund for Animals v. Babbit (Grizzly Bear),*
    903 F.Supp. 96 (D.D.C. 1995)...................................................................................26-27, 39-41

*Maine v. Norton,*
    257 F.Supp.2d 357 (D. Me. 2003) ........................................................................................15

*Marsh v. Oregon Natural Res. Council,*
    490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).........................................................2

*National Assoc. of Home Builders v. Norton,*
    451 F.3d 8 (D.C.C. 2005) ...................................................................................................2, 39

iv

## TABLE OF AUTHORITIES (CONT.)

<u>Page No.</u>

*National Wildlife Federation v. Norton (Wolves)*,
    386 F.Supp.2d 553, 560 (D. Vt. 2005)..............................................................24, 40

*Northwest Ecosystem Alliance v. U.S. Fish and Wildlife Service*,
    475 F.3d 1136 (9th Cir. 2007) ........................................................................15-16

*Nuclear Energy Inst., Inc. v. EPA*,
    373 F.3d 1251(D.C.Cir.2004) ..............................................................................3

*OSG Bulk Ships v. United States*,
    132 F.3d 808 (D.C.Cir.1998) ................................................................................2

*Southwest Center for Biological Diversity v. Norton (Queen Charlotte Goshawk)*,
    2002 WL 1733618, No. 98-0934 (D.D.C. Jul. 29, 2002) .....................................*passim*

*Stinson v. United States*,
    508 U.S. 36, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993).........................................2

*Thomas Jefferson Univ. v. Shalala*,
    512 U.S. 504, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994)......................................2

*United Mine Workers v. Federal Mine Safety and Health Administration*,
    924 F.2d 340 (D.C. Cir. 1991) .............................................................................39

*U.S. ex rel Totten v. Bombardier Corp.*,
    380 F.3d 488 (D.C. Cir. 2004) ............................................................................29

*U.S. v. Wilson*,
    503 U.S. 329 (1992).............................................................................................29

*Wyoming Outdoor Council v. United States Forest Serv.*,
    165 F.3d 43 (D.C.Cir.1999) .................................................................................2

## FEDERAL STATUTES

5 U.S.C. § 706.................................................................................................2, 26, 31, 38
16 U.S.C. § 1531.............................................................................................................17
16 U.S.C. § 1532.....................................................................................................*passim*
16 U.S.C. §1533......................................................................................................*passim*

## TABLE OF AUTHORITIES (CONT.)

### FEDERAL REGISTER

                                                                                    Page No.

32 Fed. Reg. 4001 (March 11, 1967)......................................................................18
39 Fed. Reg. 1175 (January 4, 1974)....................................................................18
43 Fed. Reg. 9607 (March 9, 1978)......................................................................19
61 Fed. Reg. 4722, 4725 (February 7, 1996).................................................14, 17
68 Fed. Reg. 15804, 15810 (April 1, 2003)..............................19, 23, 28, 38-39
71 Fed. Reg. 15266 (March 27, 2006)..................................................................39
71 Fed. Reg. 15287-95 (March 27, 2006)............................................................41
72 Fed. Reg. 6052 (February 8, 2007)..........................................................*passim*
72 Fed. Reg. 6059-60 (February 8, 2007)...................................................15, 20, 22
72 Fed. Reg. at 6065 (February 8, 2007)..............................................................36
72 Fed. Reg. at 6066 (February 8, 2007)..............................................................31
72 Fed. Reg. 6068 (February 8, 2007)...................................................9, 10, 38
72 Fed. Reg. at 6071-76 (February 8, 2007)..................................................*passim*
72 Fed. Reg. 6083 (February 8, 2007)..................................................................9
72 Fed. Reg. 6084-85 (February 8, 2007)........................................................8, 10
72 Fed. Reg. 6092 (February 8, 2007)..................................................................9
72 Fed. Reg. 30819 (June 4, 2007)...............................................................12, 37
72 Fed. Reg. at 30820 (June 4, 2007).................................................................37

### OTHER AUTHORITIES

1978 Recovery Plan for the Eastern Timber Wolf, revised in 1992 (Recovery Plan)......................4

American Heritage Dictionary of the English Language at 1497 (1992) ..........................................30

Department of the Interior Solicitor's Memorandum dated March 16, 2007 ....................................30

H.R. Rep. No. 412, 93rd Cong., 1 Sess.; Cong. Rec. 25,669 (July 24, 1973) ...................................18, 40

Endangered Species Preservation Act of October 15, 1966 (80 Stat. 926; 16 U.S.C. § 668aa(c)), ..18

Merriam-Webster Collegiate Dictionary at 964 (10th ed. 2000) ......................................................30

Sutherland Stat. Const., § 21.10 (2002) ............................................................................29, 30

Defendant-Intervenors U.S. Sportsmen's Alliance Foundation, Wisconsin Bear Hunting Association, Scott Meyer and Rob Stafholt and Defendant-Intervenors Safari Club International, Safari Club International Foundation, and National Rifle Association (collectively, "Defendant-Intervenors") respectfully submit this Consolidated Memorandum in Support of Their Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment.

## INTRODUCTION

Defendant-Intervenors move for summary judgment and oppose the summary judgment requested by the Plaintiffs, Humane Society of the United States *et al.* ("HSUS *et al.*").  HSUS *et al.* have challenged a Final Rule, promulgated the U.S. Fish and Wildlife Service ("FWS") that designated the Western Great Lakes Distinct Population Segment (WGL DPS) of wolves and that removed the wolves of that DPS from the lists of "endangered" and "threatened" species.  16 U.S.C. §1533.  Defendant-Intervenors submit that the FWS appropriately designated the WGL DPS, including its geographic boundaries, determined the significant portions of the WGL DPS wolves' range, and conducted the mandatory threats analysis to determine that ESA listing for the DPS was no longer required

Defendant-Intervenors request that this court deny HSUS *et al.*'s Motion for Summary Judgment and grant the FWS's and Defendant-Intervenors' Motions.  If for any reason, this court deems some other remedy necessary, Defendant-Intervenors ask that the court avoid vacating the Final Rule to Delist in order to maintain consistency in the management of the recovered populations of WGL DPS wolves by the Minnesota, Wisconsin, and Michigan Departments of Natural Resources.

## STATEMENT OF FACTS

In lieu of a separate Statement of Facts, Defendant-Intervenors incorporate their accompanying Statement of Uncontroverted Material Facts filed pursuant to Local Rule 56.1.

Pertinent facts are also stated with citation during the course of the legal arguments made below.

## STANDARD OF REVIEW

In light of the FWS's vast expertise in the area of wildlife conservation and management, courts apply a deferential standard of review together with a strong presumption in favor of upholding the FWS on such decisions. *Carlton v. Babbitt,* 900 F. Supp. 526, 530 (D.D.C. 1995); *see Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 375-78, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Judicial review of ESA decisions is under 5 U.S.C. § 706; *National Assoc. of Home Builders v. Norton,* 451 F.3d 8, 13 (D.C.C. 2005). A court must uphold the FWS's decision if it finds that the Service "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Natural Res. Defense Council,* 462 U.S. 87, 105 (1983). As this Court stated in another ESA case:

> For challenges to an agency's construction of the statutes that it administers, the Court's review must be particularly deferential. The Court must defer to the agency's interpretation of a statute that it implements "so long as it is reasonable, consistent with the statutory purpose, and not in conflict with the statute's plain language." *OSG Bulk Ships v. United States,* 132 F.3d 808, 814 (D.C.Cir.1998) (quoting *Coal Employment Project v. Dole,* 889 F.2d 1127, 1131 (D.C.Cir.1989)); *see Chevron, U.S.A., Inc. v. Natural Res. Defense Council,* 467 U.S. 837, 845, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), *Davis v. Latschar,* 83 F.Supp.2d 1, 5 (D.D.C.1998), *aff'd.* 202 F.3d 359 (D.C.Cir.2000). An agency's interpretation of its own regulations also is entitled to substantial deference by the courts unless it is "plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994); *see also Stinson v. United States,* 508 U.S. 36, 45, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993); *Wyoming Outdoor Council v. United States Forest Serv.,* 165 F.3d 43, 52 (D.C.Cir.1999); *Everett v. United States,* 158 F.3d 1364, 1367 (D.C.Cir.1998).

*Colorado River Cutthroat Trout v. Kempthorne*, 448 F. Supp. 2d 170, 174-75 (D.D.C. 2006).

## ARGUMENT

## I.    PLAINTIFFS HAVE NOT ESTABLISHED THEIR STANDING TO SUE

To establish Constitutional standing, Plaintiffs must demonstrate that they have suffered a "concrete and particularized" injury that is "actual or imminent"; that was "caused by, or fairly

traceable to, an act that the litigant challenges in the instant litigation"; and that can be redressed

by the court.  *Fla. Audubon Soc'y v. Bentsen,* 94 F.3d 658, 663 (D.C.Cir.1996) (*en banc*).

(*internal quotation marks omitted*).  An organization must additionally demonstrate its <u>Article III</u>

standing by providing evidence that at least one of its members would have standing to sue in his

or her own right.  *Nuclear Energy Inst., Inc. v. EPA,* 373 F.3d 1251, 1265 (D.C.Cir.2004).

Defendant- Intervenors disputed HSUS *et al.'s* standing in Affirmative Defense 4 of Defendant-

Intervenors' Answer to Plaintiffs' Amended Complaint for Declaratory and Injunctive Relief, p.

33.  In Plaintiffs' Motion for Summary Judgment and Statement of Material Facts, HSUS *et al*.

offer no declarations or affidavits to support their standing to sue.  HSUS *et al*. have provided no

information whatsoever to describe HSUS *et al.* and/or their members' contact with wolves

within the WGL DPS and/or any concrete or imminent harm caused by the delisting.  HSUS *et*

*al*. have failed in their burden to demonstrate their standing with admissible evidence.

II.    **THE EVIDENCE OVERWHELMINGLY SUPPORTS THE FWS' FINDING
        THAT WOLVES HAVE RECOVERED, AND THE DISTINCT POPULATION
        SEGMENT PROVISION OF THE ESA APPLIES EQUALLY TO LISTING AND
        DELISTING**

   A.    **The Gray Wolves of the Western Great Lakes Distinct Population Segment
            Are a Recovered Species**

        The gray wolves of the WGL DPS are a "recovered" species.  "Recovered" status is often

determined by the "recovery plan" that the Secretary of the Interior, and by delegation of

authority the FWS, is generally required to develop for the conservation and survival of listed

species.  16 U.S.C. §1533(f)(1).  The ESA directs the agency, to the maximum extent

practicable, to incorporate into the recovery plan:

> objective, measurable criteria which, when met, would result in a determination,
> in accordance with the provisions of this section, that the species be removed
> from the list.

*Id*. § 1533(f)(1)(B)(ii).  The FWS established such objective, measurable criteria for the gray

wolves of the WGL DPS when it drafted the 1978 Recovery Plan for the Eastern Timber Wolf.

The Recovery Plan, which was revised in 1992 (Recovery Plan), identified the following

recovery criteria:

> At least two viable populations within the 48 United States satisfying the
> following conditions must exist: (1) the Minnesota population [estimated at 1550
> to 1750 wolves] must be stable or growing, and its continued survival be assured,
> and (2) a second population outside of Minnesota and Isle Royale must be re-
> established, having at least 100 wolves in late winter if located within 100 miles
> of the Minnesota wolf population, or having at least 200 wolves if located beyond
> that distance.  These population levels must be maintained for five consecutive
> years before delisting can occur.  A Wisconsin-Michigan population of 100
> wolves is considered to be a viable second population, because continued
> immigration of Minnesota wolves will supplement it demographically and
> genetically for the foreseeable future.

AR Doc. 468A, p. 13770, 13773.  Although the Recovery Plan deemed the persistence of the

Minnesota population mandatory, it offered flexibility with respect to the location of the second

population and included, for possible re-establishment alternatives, populations in northern

Wisconsin, the upper peninsula (UP) of Michigan, the Adirondack Forest Preserve of New York,

a small area in eastern Maine, and a larger area of northwestern Maine and adjacent northern

New Hampshire.  AR Doc. 468 A, p. 13825-6.  The Recovery Plan's recovery criteria were

specific and can in no way be interpreted to require the return of the gray wolf to all or most of

its historic range.  *Id.*

All the recovery criteria of the Recovery Plan have long been met and exceeded.  A

stable, if not growing wolf population in excess of 1,750 wolves has lived in Wisconsin for more

than a decade.  In a 1997-1998 survey, Wisconsin estimated a population of approximately 2,445

wolves.  In a study conducted in 2003-2004, Minnesota estimated that its wolf population was

between 2,301 and 3,708 wolves.  According to annual winter track surveys, the Minnesota wolf

population showed a stable or slowly increasing wolf population during the 11 year period

between 1994 and 2005.  72 Fed. Reg. 6052, 6054 (February 8, 2007).

A second wolf population, established in Wisconsin and Michigan has also long exceeded the recovery criteria.

> In 2002, wolf numbers in Wisconsin alone surpassed the Federal criterion for a second population, as identified in the 1992 Recovery Plan (i.e., 100 wolves for a minimum of 5 consecutive years, as measured by 6 consecutive late- winter counts). Furthermore, in 2004 Wisconsin wolf numbers exceeded the Recovery Plan criterion of 200 animals for 6 successive late-winter surveys for an isolated wolf population.

72 Fed. Reg. 6055. Wisconsin's wolf population has continued to grow, although at a somewhat slower rate than was documented previously. Since 2001, Michigan's wolves have also independently exceeded the Recovery Plan's recovery criterion for a second population in the eastern United States (*i.e.*, 100 wolves for a minimum of five consecutive years, based on six late-winter estimates) and have for six successive late-winter surveys, surpassed the Federal criterion for an isolated wolf population of 200 animals. *Id*.

A supplementary component of the Recovery Plan's recovery criteria, at least for the Wisconsin wolf population, is assurance of continued survival. The WGL DPS's assured "continued survival" is demonstrated by the FWS's analysis of the impact of the five statutory factors for listing, 16 U.S.C. § 1533(a)(1)(A)-(E) and of "those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices. . .." *Id.* § 1533(b)(1)(A).

**B.     The FWS Properly Conducted a Threats Analysis and Properly Determined, Based on the Best Available Scientific Evidence, That Delisting Was Appropriate**

To determine the appropriate listing status of a species, the ESA requires that the FWS examine five statutory factors identified in 16 U.S.C. § 1533(a)(1)(A)-(E) , including **(A)** the present or threatened destruction, modification, or curtailment of its habitat or range; **(B)** overutilization for commercial, recreational, scientific, or educational purposes; **(C)** disease or

predation; **(D)** the inadequacy of existing regulatory mechanisms; or **(E)** other natural or manmade factors affecting its continued existence.  The mere fact that one or more of these factors are present, and/or even that one or more of these factors have an impact on the numbers or health of the species being considered, does not require the FWS to list the species as "endangered" or "threatened."  The FWS is only obligated to place (or keep) a species on one of these lists if, based on the best available science, the agency determines that one or more of these factors is jeopardizing the continued existence of the species.  *American Wildlands v. Kempthorne*, 478 F.Supp. 2d 92, 98 (D.D.C. 2007) (Court upheld FWS decision not to list trout species where threats were present and had impact on species, but not to the extent that the species required classification as "threatened."  "Although the WCT subspecies has been reduced from historic levels and its extant populations face threats in several areas of the historic range, we find that the magnitude and imminence of those threats do not jeopardize the continued existence of the subspecies within the foreseeable future."  478 F. Supp. 2d at 98, *quoting from* 68 Fed. Reg. at 47,006.)

        In its determination on the listing status of the WGL DPS, the FWS assessed the impact of the five factors ("threats analysis") with the knowledge that wolves are an incredibly resilient species.  Numerous scientific studies analyzed by the FWS for the purpose of deciding on the listing status demonstrated that wolf populations can continue to thrive despite significant population reduction.  A.R. Doc. 215, p. 5893.  (Citing studies showing wolves rebounded from annual loss of 20 to 30%, and even 50%).[1]

        **C.    The FWS Properly Determined Existing Regulatory Mechanisms Are Adequate**

---

[1]        In this Motion and Opposition, Defendant-Intervenors do not offer a discussion of the FWS's analysis of all five factors, but respond simply to the arguments HSUS *et al*. presented in Plaintiffs' Motion for Summary Judgment.

6

One of the five factors that the ESA directs the FWS to analyze for listing decisions is the adequacy of existing regulatory mechanisms.  Here, the FWS correctly determined that existing regulatory mechanisms, as that requirement is interpreted, exist to justify delisting the WGL DPS.  The standard for these measures is "adequacy," not perfection.

> The ESA does not guarantee the best of all possible worlds for the species at issue.  Instead, the agency is charged with determining whether one or more of the factors caused the species to be endangered or threatened.  There can be a large gap between the best regulatory mechanisms and a situation in which the regulatory mechanisms contribute to the threat or endangerment of a species.

*Center for Biological Diversity v. U.S. Fish and Wildlife Service*, 402 F. Supp.2d 1198, 1209 (D. Or. 2005)(court upheld FWS decision to withdraw proposed rule to list coastal cutthroat trout subspecies despite FWS's finding of flaws in existing regulatory mechanisms).  Moreover, the FWS is not obligated to seek guarantees as to the regulatory mechanisms' future success.  The FWS decision to delist (or to choose not to list) a species is not in error simply because of the existence of any uncertainty about whether the pertinent regulatory mechanisms will be effective.  *Southwest Center for Biological Diversity v. Norton*, 2002 WL 17733618 (D.D.C. July 29, 2002) (Magistrate's recommendation agreeing with FWS decision as to regulatory mechanisms to protect Queen Charlotte goshawk, but recommending remand on other grounds was accepted in part and rejected in part by the District Court by an Order dated May 24, 2004, Case No. 98-0934).

Although the mechanisms assessed by the FWS must be in existence at the time of the delisting decision, *Biodiversity Legal Foundation v. Babbitt*, 943 F. Supp. 23, 26 (D.D.C. 1996), the FWS is permitted to take into account the presence of voluntary mechanisms that contribute to the species' conservation.

> Although voluntary actions are not certain in the same way that regulatory schemes are, they are nonetheless concrete proposals.  It is appropriate that NMFS consider voluntary actions to the extent that they are an "effort being made" to protect a threatened species.

*Federation of Fly Fishers v. Daley*, 131 F. Supp.2d 1158, 1168 (N.D. Cal. 2000) (court

determined that NMFS could consider voluntary measures, so long as the agency did not rely too

heavily on them.).  *See also Center for Biological Center for Biological Diversity v. FWS*, 2007

WL 716108 (D. Colo. March 7, 2007) *vacated per joint agreement of the parties on other*

*grounds* (court ruled that FWS could consider the joint voluntary conservation efforts of federal

agencies other than the FWS, states and non-governmental entities, in assessing the impact of

risk factors on a species for the purpose of a listing determination).  At least one reason why the

FWS may consider voluntary state efforts, in addition to regulatory mechanisms, is the fact that

the ESA requires the FWS to do so.  Even before the agency is supposed to conducts its analysis

of the existing regulatory mechanisms, the ESA requires the FWS to evaluate the states' efforts

to protect the species:

> The Secretary shall make determinations required by subsection (a) (1) of this
> section solely on the basis of the best scientific and commercial data available to
> him after conducting a review of the status of the species and *after taking into*
> *account those efforts, if any, being made by any State or foreign nation, or any*
> *political subdivision of a State or foreign nation, to protect such species,*
> *whether by predator control, protection of habitat and food supply, or other*
> *conservation practices, within any area under its jurisdiction*, or on the high
> seas.

16 U.S.C. § 1533(b)(1)(A) (*emphasis added*).

The FWS's analysis of the proper listing status of the WGL DPS of gray wolves revealed

that Minnesota, Wisconsin and Michigan each had developed and finalized gray wolf

management plans.  Minnesota's plan was completed in early 2001, Wisconsin's was adopted in

1999 and updated in 2006, and Michigan's was completed and approved in 1997.  72 Fed. Reg.

6084-85.

Each of the plans includes a minimum population level, (1,600 in Minnesota, 350 in

Wisconsin and 200 in Michigan) which if reached, triggers the pertinent state's enhanced wolf

protections. *Id*. at 6083.  These minimum population standards each exceed the minimum

population numbers established by the Eastern Timber Wolf Recovery Plan for the species'

recovery and removal from the "endangered" and "threatened" species lists (1550 for Minnesota,

100 for Wisconsin and Michigan collectively).  AR Doc. 468A, p. 13770, 13773. Consequently,

even if one or more of the state's wolf populations did, for some reason, drop to these minimum

levels, the population reduction(s) would not qualify the WGL DPS for "endangered" or

"threatened" listing status.  The wolves in the WGL DPS have greatly exceeded any objective

criteria established for recovery and therefore, a hypothetical population decline to state

minimum population standards would simply not jeopardize the survival of the species.

Michigan's wolf management plan has been in effect for over 10 years and remains in

effect while the state develops a revised plan.  *Id*. at 6068.  In delisting wolves, the FWS relied

on the adequacy of the existing plan, and not on the forthcoming revised version.  The FWS

observed that "[n]ecessary wolf management actions detailed in the Michigan Plan include

public education and outreach activities, annual wolf population and health monitoring, research,

depredation control, and habitat management." *Id*. at 6092.  In accordance with the requirements

of Section 1533(b)(1)(A) of the ESA, the FWS also took into consideration state efforts for the

protection of wolves in addition to the mandatory regulatory mechanisms, such as its *Guidelines*

*for Management and Lethal Control of Wolves Following Confirmed Depredation Events*.  *Id*. at

6068.  Based on the existing methods in place, the FWS determined that Michigan's wolf

protections are adequate to prevent wolves from returning to a point at which they will be "in

danger of extinction throughout all or a significant portion of its range" (endangered) or "likely

to become an endangered species within the foreseeable future throughout all or a significant

portion of its range" (threatened).  16 U.S.C. §§ 1532 (6) and (20).

Minnesota's wolf management plan's goal is "to ensure the long-term survival of wolves in Minnesota while addressing wolf-human conflicts that inevitably result when wolves and people live in the same vicinity", and focuses on population monitoring and management, management of wolf depredation of domestic animals, management of wolf prey, enforcement of laws regulating take of wolves, public education, and increased staffing to accomplish these actions.  *Id*. at 6084.  The plan divides the state into two zones, with wolves in Zone A receiving stronger protection than wolves in Zone B.  Even in Zone B, significant restrictions apply to the take of wolves.  For example, only depredating wolves may be killed and only on lands owned, leased or managed by the owner of a domestic animal attacked or threatened by a wolf on the land or within a one mile radius of that land.  According to Minnesota's Wolf Management Plan, "[a]lthough these depredation procedures will likely result in a larger number of wolves killed, as compared to previous ESA management, ***they will not result in the elimination of wolves from Zone B***."  AR Doc. 215 at 5276 (*emphasis added*).

The FWS properly assumed that Minnesota's wolf management efforts would be "funded and implemented largely as written."  72 Fed. Reg. at 6068.  As demonstrated by the Declaration of Daniel Stark, Wolf Management Specialist for the Minnesota Department of Natural Resources, the state's collective financial resources for wolf management, including in-kind depredation control assistance from the Wildlife Services Division of the U.S. Department of Agriculture and state funding from multiple budgets, as well as the 20 new Conservation Officers each tasked, at least in part, with wolf management responsibilities, far exceeds the management expectations identified in the state's wolf management plan.  Declaration of Daniel Stark, attached as Exhibit 2 to this brief.[2]

---

[2]     Defendant-Intervenors have already attached Daniel Stark's declaration as an Exhibit to their Opposition to Plaintiffs' Motion to Supplement the Administrative Record.  In that Opposition, Defendant-Intervenors' argued that Plaintiffs should be prohibited from adding post-decisional documents

Contrary to representations made by HSUS *et al.* in their Motion for Summary Judgment, there is no significant question as to Michigan and/or Wisconsin's funding of their management plans. It is true that the Executive Summary of Michigan's Five Year Evaluation Report of its Gray Wolf Recovery and Management Plan noted less than *full* implementation of its management plan. However, that indication of less than "perfect" implementation is countered by the state's acknowledgement that "many objectives of the plan were met during the first five years of plan implementation." AR Doc. 142, p. 767.

HSUS *et al.*'s ability to extract from the vast Administrative Record a limited number of references suggesting that states have expressed concerns about funding and/or have requested financial support from the federal government do little to shed any true light on the states' ability to adequately fund their wolf management efforts. In the first place, Plaintiffs fail to demonstrate how funding situations have changed from the time when wolves were listed as "endangered" to post-delisting. Plaintiffs offer no evidence to show to what extent, prior to delisting, the federal government provided the states with funding that assisted Michigan, Minnesota or Wisconsin with conducting their conservation, management, research and monitoring effort for wolves and/or that this funding has been removed post delisting. The only evidence of federal funding comes from the declaration of Daniel Stark, Minnesota Wolf Management Specialist. *See* Declaration of Daniel Stark, Exhibit 2. In that declaration, Stark discusses the fact that since 1986, the federally funded Wildlife Services branch of the U. S. Department of Agriculture has been the agency that has conducted Minnesota's gray wolf

---

to the AR and from referencing those documents in their Motion for Summary Judgment. Defendant-Intervenors argued, in the alternative that if the Court permitted the Plaintiffs to supplement the record, that the Court also accept Daniel Stark's declaration, which provided a more complete and accurate description of the information referenced in Plaintiffs' supplemental documents. Since the Court has not yet ruled on Plaintiffs' Motion to Supplement the Record, Defendant-Intervenors submit Daniel Stark's declaration as an Exhibit to this Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment, to counter the inaccurate inferences drawn by Plaintiffs allegedly based on the Exhibits to Plaintiffs' Motion to Supplement the Administrative Record.

depredation control activities.  He also explains how Wildlife Services has *continued* to provide

and fund the state's depredation control activities.  In their Motion for Summary Judgment and

Statement of Material Facts, HSUS *et al.* offers nothing to suggest that the same situation is not

occurring in the other states of the WGL DPS as well.

      Michigan's decision to change its population monitoring strategies is similarly irrelevant.

As explained by Thomas Drummer, Ph.D of Michigan Technological University, who helped

design the new monitoring strategy:  "The results of the simulations indicate the proposed

monitoring program based on geographic stratification will produce unbiased, precise estimates

of total wolf abundance."  AR Doc. 241, p. 8527.

      Whether or not the states aspire to obtain enhanced funding to supplement their current

wolf management resources, the FWS's duty is not to seek perfection or certainty.  Based on the

information available, the FWS properly found that the states' regulatory and other mechanisms

will prevent the wolves of the WGL DPS from reaching a status where listing is required.  The

FWS's decision on this issue was sound, reasonable and neither arbitrary nor capricious.

      **D.**    **The FWS Properly Concluded That The Existence of Disease and Human Predation Do Not Require the FWS To Continue the "Endangered" Classification for the WGL DPS**

      Like most wildlife species, wolves are subject to certain diseases.  These diseases do not

pose a risk that jeopardizes the DPS's continued existence.  The prevalence of disease and its

impact on population numbers and species health will be monitored by both federal and state

authorities.  *Draft Post-Delisting Monitoring Plan for the Western Great Lakes Distinct*

*Population Segment of the Gray Wolf*, 72 Fed. Reg. 30819 (June 4, 2007) (describes combined

federal/state plans for monitoring disease and predation during five year post-delisting period).

For example, the 1997 Michigan Wolf Recovery and Management Plan states that wolf health

and disease monitoring will receive a high priority for a minimum of five years post delisting.

Id. at 6080.  Wisconsin's post-delisting approach is to test for disease and parasite loads through periodic necropsy and scat analyses.  In addition, the 2006 update to Wisconsin's 1999 plan recommends that all wolves live-trapped for other purposes should have their health monitored and reported to the state wildlife health specialists.  *Id*.  Contrary to HSUS *et al*.'s mischaracterizations of the state's efforts, nothing about Minnesota's disease monitoring qualifies as "voluntary or speculative."  Instead, the strategies are quite concrete, stating that DNR personnel "will collaborate with other investigators and continue monitoring disease incidence, where necessary, by examination of wolf carcasses obtained through depredation control programs, and also through blood/tissue physiology work conducted by DNR and the U.S. Geological Survey."  AR Doc. 215, p. 5285.  In addition, Minnesota's DNR personnel will engage in the "regular collection of pertinent tissues of live captured or dead wolves" and periodically assess wolf health "when circumstances indicate that diseases or parasites may be adversely affecting portions of the wolf population."  AR Doc. 215, p. 5273.

Similarly, post-delisting human-caused wolf mortality will not result in reduction of the WGL DPS wolf population sufficient to require the FWS to relist the species.  As indicated above, wolf populations can continue to thrive despite an up to 50% reduction in numbers.  AR Doc. 215, p. 5893.  The simple fact that the removal of federal protections could result in a higher take of wolves, does not require the FWS to consider the WGL DPS at risk of becoming "threatened" or "endangered."  *American Wildlands v. Kempthorne*, 478 F.Supp.2d 92 (D.D.C. Mar 26, 2007) (although trout population sustained impact from threats, court agreed with FWS that "magnitude and imminence" of those threats did not jeopardize the continued existence of the species.)

Michigan, Minnesota and Wisconsin continue to place restrictions on the take of wolves and enforce penalties for the illegal removal of members of the species.  Minnesota, for example,

has increased by 20 the number of Conservation Officers available to enforce Minnesota's take restrictions.  Declaration of Daniel Stark, Exhibit 2.  Each state has established population minimums that, if reached, would trigger even greater protections for the species.

Although disease and human-caused mortality are factors that may have an impact on wolf populations, they are not risks that jeopardize the continued survival of the WGL DPS.

### E.    The FWS Properly Developed and Applied the DPS Policy

The ESA mandates that the FWS must, at least every five years, review all the "species" on the "endangered" and "threatened" species lists and determine, based on an analysis of the five statutory factors listed discussed above, 16 U.S.C. § 1533(a)(1) and the considerations identified in 1533(b), which species should be removed from the lists.  16 U.S.C. § 1533(c)(2). That duty applies to "species" and that term is defined by the ESA to include "any subspecies of fish or wildlife or plants, and any *distinct population segment* of any species of vertebrate fish or wildlife which interbreeds when mature."  16 U.S.C. § 1532(16) (*emphasis added*).  Because the phrase "distinct population segment" is not defined anywhere in the ESA, the FWS, in a joint action with the National Marine Fisheries Service ("NMFS"), developed a policy to interpret and apply the phrase.  *Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act*, 61 Fed. Reg. 4722 (Feb. 7, 1996) ("DPS Policy").  A population qualifies as a Distinct Population Segment ("DPS") if it is both discrete and significant.  *Id.* at 4725.  A population is *discrete* if it is "separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors," or if a population's boundaries are marked by international borders.  *Id.*  A population's *significance* is analyzed under four non-exclusive factors: (1) whether the population persists in a unique or unusual ecological setting; (2) whether the loss of the population would cause a "significant gap" in the taxon's range; (3) whether the population is the only surviving natural occurrence of a

taxon; and (4) whether the population's genetic characteristics are "markedly" different from the rest of the taxon. *Id.*

Courts have carefully scrutinized the DPS policy and have determined that it is entitled to highly deferential review and have upheld the policy as a reasonable agency construction of the ESA. *Northwest Ecosystem Alliance v. U.S. Fish and Wildlife Service,* 475 F.3d 1136, 1145 (9th Cir. 2007) (court applied deference per *Chevron, U.S.A., Inc. v. Natural Res. Defense Council,* 467 U.S. 837, 845, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and upheld the FWS's decision to reject petition to designate DPS for western gray squirrel population); *Maine v. Norton*, 257 F.Supp.2d 357, 385 (D. Me. 2003) (court upheld DPS designation and listing of Gulf of Maine Atlantic salmon population).

Utilizing the DPS Policy, the FWS analyzed the Western Great Lakes population of gray wolves and found it to be both significant and discrete. 72 Fed. Reg. 6052, 6059-60. First, based on the following findings, the FWS concluded the population segment to be "significant": the WGL wolves represent the only U.S. wolf population to reside in the Laurentian Mixed Forest Province or to use any form of eastern coniferous or eastern mixed coniferous-broadleaf forest in the United States; the recovered Western Great Lakes wolf metapopulation is the only gray wolf population in the conterminous United States east of the Rocky Mountains and currently constitutes about 80 percent of North American gray wolves that occur south of Canada.

Next, the FWS found the WGL wolf population to be discrete because it is markedly separated from other gray wolf populations, due to its distance from these other populations and due to the unsuitable habitat that separates the WGL DPS from the other populations. "The area between Minnesota packs and Northern Rocky Mountain packs largely consists of unsuitable habitat, with only scattered islands of possibly suitable habitat, such as the Black Hills of eastern Wyoming and western South Dakota." *Id.* at 6059. The FWS also concluded that the WGL DPS

wolves were unlikely to "cross the eastern boundary into the Laurentian Mixed Habitat Province of New York, Pennsylvania, and New England due to inhospitable conditions." *Id.*

HSUS *et al*. purports to challenge the FWS's designation of the WGL DPS by trying to undermine the Service's "significance" and "discreteness" determinations.  These DPS challenges are a subterfuge for HSUS *et al*.'s pervading dissatisfaction with the delisting.  For example, HSUS *et al*. attack the FWS's "significance" determination, not because the FWS determined the WGL DPS to be "significant," but instead because the Service used the "significance" determination to classify the Western Great Lakes population as a DPS.  *See* Plaintiffs' Motion for Summary Judgment at 29-30.  HSUS *et al*.'s "significance" challenge is not directed at the WGL DPS designation, but is instead an attack on the DPS policy itself, which establishes "significance" as a criterion for DPS classification.  Since the DPS policy has previously been upheld as a reasonable agency interpretation of the ESA, HSUS *et al*.'s challenge can easily be rejected.  *Northwest Ecosystem Alliance,* 475 F.3d at 1145.

HSUS *et al*. also attacks the FWS's "discreteness" analysis.  HSUS *et al*. take issue with the Service's findings on discreteness, claiming that the absence of wolves from the areas between existing wolf populations cannot be the foundation for discreteness.  *See* Plaintiffs' Motion for Summary Judgment at 30.  However, this challenge too is not focused on the FWS's finding of a discrete DPS, it is a challenge to the FWS's decision to delist the DPS.  The attack is premised on a very simplistic and unrealistic approach to conservation status and species recovery.  The fact is that roads, cities, and human populations generally make it impossible to attempt to recreate what HSUS *et al*. assumes to have been the historic distribution of wolves.  Such recovery efforts are not required of the FWS.  *See* cases cited in Point III.D. below.

**F.     The FWS Properly Used Distinct Population Segments As A Tool For the Purpose of Delisting**

The FWS evaluated and designated the WGL DPS in order to respond to the species' recovered status. From the outset, the FWS made it clear when drafting the DPS policy that the agency intended to use DPSs as a tool not simply for listing species, but for delisting them as well.[3]

> The Fish and Wildlife Service and the National Marine Fisheries Service (Services) have adopted a policy to clarify their interpretation of the phrase "distinct population segment of any species of vertebrate fish or wildlife" for the purposes of listing, *delisting*, and reclassifying species under the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 et. seq.) (Act).

61 Fed. Reg. 4722 (February 7, 1996), *Policy Regarding the Recognition of Distinct Vertebrate Population Segments under the Endangered Species Act* (*emphasis added*).

> This document adopts an interpretation of the term "distinct population segment" for the purposes of listing, *delisting*, and reclassifying vertebrates by the U.S. Fish and Wildlife Service (FWS) and NMFS.

*Id.* (*emphasis added*).

> This guides the evaluation of distinct vertebrate population segments for the purposes of listing, *delisting*, and reclassifying under the Act.

*Id.* at 4725 (*emphasis added*). The FWS also made a point in the DPS policy of noting that it interpreted the ESA "to provide[ ] no basis for applying different standards for delisting than those adopted for listing." *Id.* at 4724.

The Ninth Circuit, in the case of *Defenders of Wildlife v. Norton*, 258 F.3d 1141 (9th Cir. 2001) discussed how Congress had specifically intended to give the Secretary "more flexibility in her approach to wildlife management," *id.* at 1144, and offered legislative history to show the Secretary's ability to divide a species into populations in order to list some populations and delist others:

---

[3]    Contrary to the arguments of Amicus, Center for Biological Diversity, the FWS followed proper rulemaking procedures in designating the WGL DPS. The FWS published its proposal to designate the DPS on March 27, 2006 in the same rulemaking document, but as an independent action, offering the public the opportunity to comment on either the DPS designation, the delisting proposal or both. 71 Fed. Reg. 6052 (March 27, 2006).

> Senator Tunney explained:  An animal might be 'endangered' in most States but
> overpopulated in some.  In a State in which a species is overpopulated, the
> Secretary would have the discretion to list that animal as merely threatened *or to
> remove it from the endangered species listing entirely while still providing
> protection in areas where it was threatened with extinction.*  In that portion of its
> range where it was not threatened with extinction, the States would have full
> authority to use their management skills to insure the proper conservation of the
> species.

*Id.*, *quoting* H.R. Rep. No. 412, 93rd Cong., 1 Sess. (1973) (*emphasis added*).  *See* 16 U.S.C. §

1532(6), (16), (20).

### G.    The FWS Established the WGL DPS In A Manner Consistent With Its Historical Approach to the Eastern Timber Wolf

In designating the WGL DPS, the FWS responded to the recovery of a population of

wolves that has historically been dealt with in a manner distinct from other gray wolf populations

within the United States.  Contrary to HSUS *et al.*'s allegations, the FWS did not "carve up" a

gray wolf species in order to sidestep listing obstacles.  The gray wolf population of the Western

Great Lakes has long and consistently been dealt with as distinct from other wolf populations of

the conterminous United States.  For example, on March 11, 1967, the FWS listed as

"threatened" the "timber wolf – canis lupus lycaon"[4] under the Endangered Species Preservation

Act of October 15, 1966 (80 Stat. 926; 16 U.S.C. § 668aa(c)), 32 Fed. Reg. 4001, (March 11,

1967).  Then on January 4, 1974, the FWS listed as "endangered" both the Eastern Timber wolf

(canis lupus lycaon) and the Northern Rocky Mountain wolf (canis lupus irremotus).  39 Fed.

Reg. 1175, (January 4, 1974).  In 1978, the FWS converted these two individual subspecies'

listings into a single listing, for the sake of "convenience."

> In any case, the Service wishes to recognize that the entire species Canis lupus in
> Endangered or Threatened to the south of Canada, and considers that this matter
> can be handled most conveniently by listing only the species name.

---

[4]    Canis lupus lycaon is the scientific name for the Eastern Timber Wolf that resides in the WGL
DPS.

43 Fed. Reg. 9607 (March 9, 1978).  Despite the joint listing, the FWS continued to deal with the

Eastern Timber wolf as an entity separate and distinct from other U.S. populations of wolves.  In

1978, the FWS published the Eastern Timber Wolf Recovery Plan, which was revised in 1992.

AR Doc. 468A, p. 13770.  The Eastern Timber Wolf Recovery Plan was separate and distinct

from the recovery plan developed and published for the Northern Rocky Mountain population of

wolves.  68 Fed. Reg. 15804, 15810 (April 1, 2003).  The recovery goals of the Eastern Timber

Wolf Recovery Plan established objective recovery goals different from the recovery goals

identified by the Northern Rocky Mountain Recovery Plan.  Each wolf population achieved their

recovery objectives independently of the other.

      **H.**      **The FWS Correctly Established the Boundaries of the WGL DPS**

      Upon designating the WGL DPS, the FWS determined the geographical boundaries for

this population segment.  Congress offered no statutory language to assist in the determination of

these geographical boundaries, constructively endowing the FWS with full discretion to

designate these parameters.   Few courts, if any, have considered the question of DPS

boundaries.  The Oregon District Court, in the case of *Defenders of Wildlife v. Secretary*, 354 F.

Supp. 2d 1156 (D. Or. 2005) rejected the FWS's decision to broadly draw DPS boundaries for

the reclassification of wolves and offered simple alternative guidance:  "The DPS Policy is

designed to draw a line around a population whose conservation status differs from other

populations within that species."  354 F. Supp. 2d at 1170.  Applying the best scientific evidence

available, the FWS did exactly what the Oregon court recommended.  Taking into account the

status of the recovered population of gray wolves in Wisconsin, Minnesota and Michigan, the

average dispersal distances of wolves from these core populations, the likelihood of these

dispersing wolves returning to the core population areas and/or settling within the dispersal area,

and the habitat conditions of the dispersal area, the FWS crafted boundaries that properly

accounted for the behaviors and habitat needs of the wolf population constituting the WGL DPS.

The FWS explained:

> To delineate the boundary of the WGL DPS, we considered the current distribution of wolves in the Midwest and the characteristic movements of those wolves and of gray wolves elsewhere. We examined the available scientific data on long-distance movements, including long-distance movements followed by return movements to the vicinity of the natal pack. We concluded that wolf behavior and the nature of wolf populations require that we include within the area of the DPS some subset of known long-distance movement locations. However, as described below, wolf biology and common sense argue against the inclusion within the DPS boundary of all known or potential long-distance movements. . . .
> [T]his DPS has been delineated to include the core recovered wolf population plus a wolf movement zone around the core wolf populations. This geographic delineation is not intended to include all areas to which wolves have moved from the Great Lakes population. Rather, it includes the area currently occupied by wolf packs in Minnesota, Wisconsin, and Michigan; the nearby areas in these States, including the Northern Lower Peninsula of Michigan, in which wolf packs may become established in the foreseeable future; and a surrounding area into which Minnesota, Wisconsin, and Michigan wolves occasionally move but where persistent packs are not expected to be established because suitable habitat is rare and exists only as small patches. The area surrounding the core wolf populations includes the locations of most known dispersers from the core populations, especially the shorter and medium-distance movements from which wolves are most likely to return to the core areas and contribute to the recovered wolf population.

72 Fed. Reg. at 6060.  In essence, the FWS drew a line around the core population, but not such a tightly drawn line that it would result in dispersing wolves constantly passing between "endangered" and delisted status.  The FWS strategy can be demonstrated with an anthill analogy.  If the FWS decided to delist a DPS constituting an anthill and drew the boundary of the DPS at the base of the anthill, the ants that regularly traveled from the anthill and back would constantly cross the boundary line and would move back and forth from one listing status to another.  At one moment an ant could be delisted, "endangered" the next and then delisted again minutes later.  At one moment, the ant would be managed by the state government and when it crossed the boundary, it would be the responsibility of the federal government, only to return to state management when

it made its return trip.  By drawing the DPS boundary out a reasonable ant dispersal

distance beyond the edge of the anthill, the FWS could accommodate normal ant travel

behavior, and would thereby reduce the confusion and potential management conflicts

caused by the ants' propensity to travel to and from their home.  The FWS would also be

correctly identifying the "population" of ants.

In the Final Rule, the FWS delisted only the WGL DPS, leaving all wolves outside the

boundaries of the DPS as "endangered."  Therefore, if a WGL DPS wolf disperses more than the

average distance from the core population to an area from which the wolf is unlikely to make the

trip back to the core area, that wolf becomes classified as "endangered" and will receive the

federal protections that accompany that listing status.

III.    **THE FWS REASONABLY DETERMINED THAT THE GENERALLY
        UNSUITABLE HABITAT WITHIN THE WGL DPS BUT OUTSIDE THE CORE
        RECOVERY AREAS IS NOT A SIGNIFICANT PORTION OF THE GRAY
        WOLVES' RANGE**

Substantial evidence in the Administrative Record supports the FWS' determinations that

wolves have occupied substantially all suitable habitat within the WGL DPS, and that the wolves

in that suitable habitat are no longer "endangered" or threatened with extinction.  AR Doc. 213,

p. 3828-29.  The FWS was therefore not arbitrary or capricious in determining that the remaining

generally unsuitable habitat in the WGL DPS was not a "significant portion" of the "range" of

the wolves in the DPS, and so properly delisted wolves throughout the DPS.

A.    **The ESA's "Significant Portion of Range" (SPR) Inquiry**

The definition of "endangered species" (coupled with the accompanying definition of

"species") asks whether a species, sub-species, or distinct population segment (DPS) of a

vertebrate species "is in danger of extinction throughout all or a <u>significant portion of its range</u>"

("SPR") 16 U.S.C. § 1532(6), (16) (*emphasis added*).  The definition of "threatened species"

similarly asks whether the species, sub-species, or DPS "is likely to become an endangered

species in the foreseeable future throughout all or a significant portion of its range."  16 U.S.C. §

1532(20).  Thus, a danger of extinction in a <u>non-significant</u> portion of the range does not result in

listing as endangered or threatened unless the species, sub-species, or DPS is also in danger of

extinction "throughout all" of its range.   *Id*.  The ESA does not define what "significant portion"

or "range" means.  The SPR phrasing is "inherently ambiguous."  *Defenders of Wildlife v.*

*Norton (Lizard case),* 258 F.3d 1136, 1141 (9th Cir. 2001); *see Defenders of Wildlife v. Norton*

*(Florida Black Bear case)*, No. 99-02072, slip op. at 8-10 (D.D.C. Dec. 13, 2001) (FWS'

application of SPR standard in that case was "reasonable" under *Chevron v. Natural Resources*

*Defense Council*, 467 U.S. 837, 843 (1984)) (copy supplied as Exhibit 1).

### B.    The Successful Recovery in the Core Recovery Areas

As discussed in more detail in Point II above, the evidence overwhelmingly supports

FWS' finding that wolves have recovered in the Core Recovery Areas of Minnesota, Wisconsin

and the Upper Peninsula of Michigan ("Core Recovery Areas").  72 Fed. Reg. at 6054-55, AR

12786-7.  Since the original listing of the wolf in 1974, the then-remaining several hundred

wolves in Minnesota have grown into a healthy group of approximately 3,000 wolves, and there

are also now 460-500 wolves in neighboring Wisconsin and approximately 430 more in the

Upper Peninsula of Michigan.  72 Fed. Reg. at 6054-55.  As discussed above, the criteria set in

the 1992 wolf recovery plan for delisting have been satisfied.  72 Fed. Reg. at 6052-55; 16

U.S.C. § 1533 (f)(1)(B)(ii) (recovery plans set objective measurable criteria for delisting).

As noted in Point II above, the FWS has determined that any wolf that disperses further

than 200-300 miles from the Core Recovery Areas has left the WGL DPS population, and so any

such wolf would be outside the DPS and now listed as "endangered" under the ESA.  72 Fed.

Reg. at 6059, AR 12791.  The FWS thus drew the WGL DPS boundaries to follow rivers and

interstate highways that occurred approximately 200 to 300 miles from the Core Recovery Areas.

*Id.* (noting that rivers and interstate highways also served as partial barriers to wolf dispersal and so reinforced the finding that the wolves in the WGL DPS were distinct from other wolves). The DPS boundaries encompass all of Minnesota, Wisconsin, and Michigan, the eastern halves of South Dakota and North Dakota, the northern 3/5 of Iowa, the northern 1/4 to 1/5 of Illinois, and the fragments of extreme northern Ohio and Indiana located north of Interstate 80. 72 Fed. Reg. at 6052 (map at Figure 1); AR Doc. 467, p. 12790.

C.    **The FWS Has Properly Completed the Analysis of Whether the Non-Core Areas Constitutes SPR**

The FWS reasonably determined that the generally unsuitable habitat within the WGL DPS but outside the Core Recovery Areas ("Non-Core Areas") does not constitute a significant portion of the range ("SPR") of the WGL-DPS wolves. Consequently, the agency properly concluded that the difficulties faced by the very few wolves who attempt to disperse out of the Core Recovery Areas do not require continued listing of those wolves.

In its prior 2003 rule establishing the large "Eastern United States DPS" stretching from the Dakotas all the way to Maine, and downlisting wolves in that DPS from "endangered" to "threatened," the FWS determined that the wolves in Minnesota, Wisconsin, and the Upper Peninsula of Michigan had met the criteria for delisting set in the Recovery Plan. 68 Fed. Reg. 15804, 15810 (April 1, 2003) ("2003 Reclassification Rule"). The District Court for the District of Oregon accepted this finding on judicial review of the 2003 Reclassification Rule. "[T]he Western Great Lakes wolf population exceeded the numerical criteria for <u>downlisting</u> [downgrading from endangered to threatened status] <u>and delisting</u> [removing completely from the list of endangered or threatened species]." *Defenders of Wildlife v. Secretary, U.S. Dep't of the Interior (Wolves)*, 354 F.Supp.2d 1156, 1162 (D.Or. 2005) (*emphasis added*). Nonetheless, the Oregon Court vacated that 2003 Reclassification Rule because the court determined that the FWS had reclassified an entire DPS without adequately examining whether there were SPRs

23

outside the Core Recovery Areas (but within the DPS) and without conducting a threats analysis in any such Non-Core-Area that qualified as a SPR.  354 F.Supp.2d at 1171-72.[5]

In the Final Rule to delist the WGL DPS, the FWS has conducted a SPR/threats analysis of the Non-Core Areas included within the boundaries of the WGL DPS.  The boundaries of the WGL DPS are much less expansive than the DPS boundaries that the FWS designated for the 2003 Reclassification Rule.  The Final Rule to Delist the gray wolves of the WGL DPS established DPS boundaries that encompassed only wolves in the Core Recovery Areas and wolves within reasonable dispersal distances from the Core Recovery Areas.  72 Fed. Reg. at 6052; AR 12784.  For its delisting of the WGL DPS wolves, the FWS examined every part of the Non-Core Areas within the new narrower DPS boundaries to see if any part qualified as a SPR.  72 Fed. Reg. at 6071-74; AR 12803.  FWS properly evaluated and determined that the Non-Core Areas did not contain suitable wolf habitat that might support a significant wolf population.  *Id.*

Based on the scientific literature establishing that wolves require substantial contiguous areas of low road density (generally road densities of 0.9 to 1.1 miles of road per square mile or less), the FWS used road-density as its primary tool to evaluate habitat suitability.  72 Fed. Reg. at 6071(*citing AR Doc 468A at 14345, 15468, 15702 and 468B at 16319*) The FWS also evaluated availability of prey (wolf feed primarily on deer and other wild ungulates) and terrain type (forested areas providing cover for denning and escape are best).  *Id*. at 6074.

### 1.     The Northern Lower Peninsula of Michigan

The most serious candidate for SPR outside the Core Recovery Areas was the Northern Lower Peninsula ("NLP") of Michigan.  This area is separated from the Upper Peninsula of Michigan, a Core Recovery Area where many wolves are present, by the four-mile-wide Straits

---

[5]     A District Court in the District of Vermont reached a similar conclusion and vacated the 2003 Reclassification Rule on consideration of a rulemaking procedural issue not involved here.  *National Wildlife Federation v. Norton (Wolves)*, 386 F.Supp.2d 553, 560 (D. Vt. 2005).

of Mackinac (which connect Lake Michigan and Lake Huron), which in some years freezes
during winter.   A few isolated wolves have been seen crossing to the NLP during freezes.  The
death of one such wolf was recorded in 2004.  72 Fed. Reg. at 6072; A.R. 12804.  No wolf
reproduction is known to have occurred in the NLP and follow-up surveys in the NLP by the
Michigan DNR in winter 2005 and in the winter and spring 2006 failed to find any wolf tracks.
*Id.*

Reviewing two road-density studies (Gerhing/Potter and Potvin), the FWS found that
there was some suitable wolf habitat in the NLP.  However, the habitat was highly fragmented.
72 Fed. Reg. at 6072; A.R. 105, p.459; A.R. 12804.  Gehring/Potter discounted fragmented
habitat and found 850 square miles of suitable habitat in the NLP.  *Id.*  Potvin used a separate
analysis that gave more weight to fragmented habitat and prey availability and found 3,090
square miles of suitable habitat.  72 Fed. Reg. at 6073; AR Doc. 105, p. 459.  Both estimates fell
far below the 5,000 square miles of contiguous suitable habitat that the FWS in the 1992 Wolf
Recovery Plan had determined was the minimum necessary to support a permanent wolf
population.  72 Fed. Reg. at 6072; AR Doc. 105, p. 459.  This analysis expressly took into
account the possibility that wolves from the nearby Upper Peninsula of Michigan could
periodically replenish a future NLP population.  Absent replenishment from a nearby source
population, the Recovery Plan criteria set 10,000 square miles as the minimum contiguous
habitat for a self-sustaining wolf population.  *Id.*

The evidence on whether the NLP could in the future support a permanent wolf
population of any size was thus conflicting.  Per the Recovery Plan's contiguous-suitable-area
criteria, no permanent wolf population was likely to establish itself.  In contrast, Potvin estimated
the limited NLP habitat might support a modest number of wolves in the future (110 to 480
wolves), roughly the same number of wolves supported by the far larger amounts of suitable

habitat in Wisconsin and the Upper Peninsula of Michigan.  72 Fed. Reg. at 6072; AR 12804.

However, hewing far more closely to the Recovery Plan criteria, Gehring/Potter concluded the

limited NLP habitat could only support 46 to 89 wolves, which would be less than 3% of the

number of wolves found in the Core Recovery Areas (*See* populations counts for the Core

Recovery Areas above).  *Id.*  Further, Gehring/Potter also emphasized that the NLP might never

support any permanent wolf population.  "Given current land-use patterns and road patterns, the

NLP may never support a significant, large wolf population given the likely reduced dispersal

rate from a source population."  *See* AR Doc. 468B at 16283 (Gehring/Potter study).

The FWS was not arbitrary and capricious in resolving this conflicting evidence by

finding that the small, marginally suitable, and fragmented habitat in the NLP was not a SPR.  5

U.S.C. § 706(a)(2) (APA standard of review); *Defenders of Wildlife v. Norton (Florida Black*

*Bear)*, Civil Action No. 99-02072-HHK at 10-11 (D.D.C. Dec. 13, 2001) (finding that FWS

reasonably determined that an area containing 40% of the habitat of the Florida Black Bear, but

which supported only 5% of the bear's population due to the habitat being of lesser quality than

other habitat, was not a SPR) (copy supplied as Exhibit 1 to this brief).

"In reviewing the action of the FWS, the Court must be thorough and probing, but if the

Court finds support for the agency action, it must step back and refrain from assessing the

wisdom of the decision unless there has been a 'clear error of judgment.'"  *Fund for Animals v.*

*Babbit (Grizzly Bear)*, 903 F.Supp. 96, 105 (D.D.C. 1995) (*citing Marsh v. Oregon Natural*

*Resources Council,* 490 U.S. 360, 378 (D.Or. 1989).  The FWS was not required to accept the

opinion of one researcher (Potvin) that 110 to 480 wolves could live in the NLP in the face of

other evidence (the Recovery Plan criteria as applied to the road-density findings by

Gerhing/Potter and also Potvin) that either no wolves (Recovery Plan) or a very small number

(Gehring/Potter) could live there in the future.  *Id*., 903 F.Supp. at 110 (the presence of

"disagreement between scientists … is not sufficient to demonstrate arbitrariness by the government").[6]

### 2.     The Turtle Mountains of North Dakota

A second potential SPR candidate was the Turtle Mountains of North Dakota.  The FWS found that this was an "island" of forested area that straddles the border with Manitoba and is surrounded by unsuitable crop and grazing land.  72 Fed. Reg. at 6074; AR 12806.  It consists of just 579 square miles of suitable habitat, 394 of which are in North Dakota and 185 of which are across the border in Manitoba.  *Id.;* AR Doc. 105, p. 459.  Again this was well below the 5,000 square mile contiguous suitable habitat minimum set in the Recovery Plan even for populations that could be supported by immigration from elsewhere (here wolves from Minnesota or Canada that might cross unsuitable terrain to reach the Turtle Mountains).  *Id.*  Further, the FWS found the Turtle Mountains were isolated, meaning the higher 10,000 square mile minimum applied. *Id.* at 6072-74.  FWS concluded that "[w]hile this area may provide a small marginal wolf habitat and may support limited and sporadic wolf reproduction, the Turtle Mountain area within the U.S. is not a significant portion of the range of the gray wolves within the DPS, because of its very small areas and its setting as an island of forest surrounded by a landscape largely modified for agriculture and grazing."  *Id.* at 6074*; citing* Licht & Huffman 1996 (article available at AR Doc. 468A at 15487, 15491).  Thus FWS' finding that the Turtle Mountains is not a SPR is supported by evidence and so not arbitrary and capricious.

### 3.     There Were No Other Potential SPRs in the DPS

---

[6]     The separate issue of whether "range" as used in the ESA refers to "current range" rather than "future potential range" is addressed below.  *See* 16 U.S.C. § 1532(6), (20).  If range means current range, then the NLP was not even a serious candidate for SPR status because the NLP is clearly not a significant part of the current range.  As discussed above, there has never been any documented wolf reproduction in the NLP and recent surveys after a few isolated sightings failed to find any wolf tracks.

Reviewing road density information, the FWS found no other areas within the WGL DPS that contained suitable wolf habitat.  72 Fed. Reg. at 6074-75.[7]  Thus Plaintiffs have failed to show that there is any suitable habitat within the narrowed DPS that the FWS either did not evaluate as a candidate for SPR status or evaluated in an arbitrary and capricious manner.  Consequently, FWS has complied with the requirements of the statute as applied in the Oregon and Vermont decisions striking down the 2003 Reclassification Rule.  Notably, the National Wildlife Federation, the lead party that successfully challenged the 2003 Delisting Rule in Vermont, 386 F.Supp.2d at 560, has moved for leave to file an amicus curiae brief here supporting the 2007 delisting rule.

**D.     The FWS Was Not Required to Treat Presently Unsuitable Habitat as a SPR Just Because the Unsuitable Area is Large and Was Once Part of the Wolves' Range**

Because the FWS' fact-findings regarding lack of suitable habitat in the Non-Core Recovery Areas have support in the Administrative Record, and so are binding on judicial review, the "boundary-drawing" question boils down to whether the FWS, in making its delisting decision, was required as a matter of law to treat as SPR(s) the portions of the DPS that once were suitable for and occupied by wolves but no longer are.

Undoubtedly, portions of the WGL DPS outside the Core Recovery Areas were once suitable for and occupied by wolves.  The "entire Midwest" was historically wolf range.  72 Fed. Reg. at 6071.  However, most of those areas are now cities, suburbs, cleared farm land, railroads, highways, or other areas not suitable for and therefore not occupied by wolves.  *See* 72 Fed. Reg. at 6074-75.  To use an extreme example, the skyscrapers, suburbs, and exurbs of Chicago

---

[7]     The FWS reviewed speculation that there might be some "very marginal" suitable habitat in Southern Illinois and Western/Central Pennsylvania.  However, the FWS protected any wolves that may be present in those far-away areas by placing them outside the WGL DPS boundaries, so any such wolves continue to be listed as endangered.  72 Fed. Reg. 6052, Figure 1 (WGL DPS map).  Being outside the WGL DPS, those areas by definition are not a SPR within the WGL DPS.  16 U.S.C. § 1532(6), (16), (20).

constitute a very large area in terms of acreage and are located within the WGL DPS.  However, there can be no realistic expectation that wolves will ever again live there.  If delisting of the wolves must await wolf recovery in such areas, delisting will never occur.

The FWS did not err by declining to treat as SPRs large areas of presently unsuitable wolf habitat.  Two separate reasons support the FWS' decision.

### 1.    Unsuitable Habitat is Not Part of the Wolves' "Range"

First, the ESA defines endangered species in the present tense as being a species, sub-species, or DPS which "is in danger" of becoming extinct "throughout all or a significant portion of its range."  Range thus refers to the areas in which a species presently might inhabit but is in "danger" of BECOMING extinct, not to some past range in which the species is ALREADY extinct.  Wolves are not in danger of becoming extinct in the skyscraper canyons, suburbs, and exurbs of Chicago – they are already extinct there.  The use in 16 U.S.C. § 1532 of the present tense ("is in danger of extinction throughout … range") signifies intent to exclude past tense, i.e. what "was … the range."  *U.S. ex rel Totten v. Bombardier Corp.,* 380 F.3d 488, 493 (D.C. Cir. 2004) ("provide" cannot be read to include "has provided" without violating the "Supreme Court's admonition 'that Congress's use of a verb tense is significant in construing statutes'") (*quoting U.S. v. Wilson,* 503 U.S. 329, 333 (1992)); *Barscz v. Director, Office of Workers' Compensation Programs,* 486 F.3d 744, 749-50 (2nd Cir. 2007).  This result is also directed by the federal statute setting forth the rules of statutory construction (1 U.S.C. § 1); it allows the present tense to be read to include the future tense, but has no provision allowing the present tense to be read to include the past tense:  unless context requires otherwise, "words used in the present tense include the future as well as the present".  *Id.*  Further, statutes drafted in the present tense "are applied … as of the date of enforcement."  Sutherland Stat. Const., § 21.10 (2002).  The plain meaning of the term "range" is present range.  "Range" is "the geographic

region in which a plant or animal normally lives or grows." American Heritage Dictionary of the

English Language at 1497 (1992) (*emphasis added*).  "Range" is "the region throughout which a

kind of organism or ecological community naturally lives or occurs." Merriam-Webster

Collegiate Dictionary at 964 (10th ed. 2000) (*emphasis added*).

Among the many problems with defining range as "historical range" is the difficulty of

determining the specific date in the past to which the historical range definition would be

applied, and as of which species ranges should somehow be measured.  European settlement

occurred gradually and at various dates long in the past; Native American settlement occurred

earlier; and the date of the enactment of the ESA (1973) is another possibility.  The ESA offers

no guidance for choosing such a historical time frame, which is a sign Congress intended a

present-tense construction, as is the obvious difficulty in gathering evidence as to what animal

roamed where hundreds of years ago.[8]

Judge Kennedy's decision in the Florida Black Bear case noted above treats "range" as

"current" range.  *Defenders of Wildlife v. Norton (Florida Black Bear)*, Civil Action No. 99-

02072-HHK at 10-11 (D.D.C. Dec. 13, 2001).  The opinion opens by noting that "because of

human development and other factors, the black bear's habitat has been reduced to less than

thirty percent of its historical range."  *Id.* at 3 (*emphasis added*).  However, in analyzing which

portions of the bear's range qualified as a SPR, the Court looked solely to the "current range,"

and based its determination on the current suitability of habitat.  *Id*. at 10-11.  Two other district

courts in Colorado and New Mexico have determined that range is current range; albeit in

---

[8]        The "current" range versus "historical" range issue is further reviewed from a statutory
construction perspective in the Department of the Interior Solicitor's Memorandum dated March 16, 2007
and supplied as Exhibit 3 to this brief.  The Solicitor concludes "range" means current range.  *Id.* at 7-9.
Defendant-Intervenors understand that the Memorandum (or a slightly earlier) draft is included in a
supplemental portion of the Administrative Record, but did not have the A.R. cite.  In any event, a
solicitor's opinion, like any agency or court opinion, can be directly cited whether or not in the
Administrative Record.

opinions since vacated by consent as moot due to a change in how FWS interprets the term "significant" in the SPR definition.[9]  Judge Kennedy's opinion in the Florida Black Bear case did not apply the version of the significance test that FWS has since rejected, and so is not affected by that issue.[10]

Because "range" means "current range", currently-unsuitable habitat in which the species does not now live cannot be part of its range.  In reaching its determination of the listing status of the WGL DPS, the FWS was thus overly-cautious in electing to treat "range" in its SPR analysis as encompassing all areas within the DPS boundaries (even Chicago) rather than just areas where the wolf presently exists.  The FWS explained its theoretical agreement with the view that range meant "current range."  72 Fed. Reg. at 6070; A.R. 12802.  However, taking a very cautious approach, FWS also explained that, for purposes of this rule, it was going to examine the entire geographical area within the DPS and evaluate each part of it for significance.  72 Fed. Reg. at 6066 ("Issue 16"); A.R. 12798.[11]

     2.     <u>Even with the FWS's Evaluation of All the Range within the WGL DPS, Currently Unsuitable Habitat That Was Once Occupied by Wolves Is No</u>

---

[9]      *Center for Biological Diversity v. U.S. Fish and Wildlife Service (Rio Grand Cutthroat Trout)*, 2007 WL 716108, \*2, No. 05-305-RPM (D. Colo., Mar. 7, 2007), *vacated by consent due to mootness and on other grounds*, Case No. 07-1203, (10th Cir. Oct 22, 2007); *see also, Center for Biological Diversity v. Norton (Rio Grand Cutthroat Trout)*, 411 F.Supp.2d 1271, 1278 (D.N.M. 2005), *vacated by consent due to mootness and on other grounds*,  Case No. 06-2049 (10th Cir. May 21, 2007).

[10]      Judge Kennedy's opinion follows the Ninth Circuit's rejection of the FWS' now-discarded Marymount interpretation under which an area is a SPR only if future localized extinction within it would threaten total extinction.  *Defenders of Wildlife (Florida Black Bear)*, slip op. at 9 (discussing *Defenders of Wildlife v. Norton (Lizard)*, 258 F.3d 1136, 1141, 1143 (9th Circ. 2001)). Consequently, Judge Kennedy's opinion is not affected by the FWS subsequent decision to discard the Marymount interpretation.

[11]      Because no wolf population is presently established in the NLP or Turtle Mountains (*see* Point II.C. above), neither is within the current range of the species, and so the "significance" inquiry that FWS actually conducted for those areas was unnecessary.  Consequently, any error in how FWS conducted that inquiry (there was no error) was harmless error that cannot be the basis for reversal, 5 U.S.C. § 706 (in APA judicial review, "due account shall be taken of the rule of prejudicial error").

Longer a Significant Portion of the Range

Second, even if all the range within the DPS boundaries are evaluated, the "significance" test must be surmounted before any areas of historic range could qualify as a SPR.

The only Court of Appeals decision to address the SPR question leaves unclear whether range means current or historical range. *Defenders of Wildlife v. Norton (Lizard)*, 258 F.3d 1136, 1141, 1143 (9th Circ. 2001). However, even if the Ninth Circuit's opinion could be interpreted to mean that "range" for SPR purposes includes historical range, that opinion unambiguously holds that the geographical size of an area does not control whether it is "significant" for SPR purposes:

> First, it simply does not make sense to assume that the loss of a predetermined percentage of habitat or range would necessarily qualify a species for listing. A species with an exceptionally large historical range may continue to enjoy healthy population levels despite the loss of a substantial amount of suitable habitat. Similarly, a species with an exceptionally small historical range may quickly become endangered after the loss of even a very small percentage of suitable habitat. As the examples cited by [Plaintiffs] and noted above demonstrate, the percentage of habitat loss that will render a species in danger of extinction or threatened with extinction will necessarily be determined on a case by case basis. Furthermore, were a bright line percentage appropriate for determining when listing was necessary, Congress could simply have included that percentage in the text of the ESA.

*Defenders of Wildlife (Lizard)*, 258 F.3d at 1143 (*emphasis added*).

With the possible exception of Judge Kessler's lynx opinion, discussed below, the subsequent opinions in this area all follow the Ninth Circuit's analysis that size does not equate to significance for SPR's purposes. Judge Kennedy's Florida Black Bear case fully analyzes the Ninth Circuit's *Defenders of Wildlife* opinion and, in a discussion highly pertinent to the instant case, upholds the FWS's decision to use suitability of habitat, population distribution, and fragmentation of habitat, and other factors to determining significance:

Following the Ninth Circuit's cogent analysis …, this court holds that the Wildlife

Service's interpretation of what constitutes a significant portion of the black bear's range and its determination that the species is not likely to become endangered over that range [the range of the smaller of the two bear groups] is reasonable.  <u>First, the areas likely to be lost only support five percent of the black bear's population.  Although these areas may constitute forty percent of the bear's present habitat, it is habitat that relatively few bears use.  Second the habitats likely to disappear … are of low quality and are geographically isolated from each other and from bear habitats likely to survive in the foreseeable future.</u>  Because none of the threatened habitats are particularly large, and because they are spread out from one another and from most of the remaining viable bear habitats, they may not exert a significant impact on the bear population as a whole.  <u>Thus, these pockets of habitat are not "major geographical areas" of the bear's range</u>.  Finally, the bears living in those habitats will remain isolated and unlikely to contribute genetically to the continuation of the species."

*Defenders of Wildlife (Florida Black Bear)* at 10-11 (*emphasis added*) (copy is attached as

Exhibit 1 to this brief).  Here there is no evidence that the few dispersing wolves outside the

Core Recovery Areas, but within the WGL DPS, are anything but a tiny fraction of the total wolf

population in the DPS, 72 Fed. Reg. at 6054-55; AR 12786-7, and the limited suitable habitat

outside the Core Recovery Areas are fragmented and of lower quality than that in the Core

Recovery Areas, 72 Fed. Reg. at 6071-75.

In *Southwest Center for Biological Diversity v. Norton (Queen Charlotte Goshawk),* 2002

WL 1733618, *16, No. 98-0934 (D.D.C. Jul. 29, 2002), Magistrate Judge Facciola issued a

recommended decision that similarly agreed that population distribution is more important than

acreage size in determining whether an area is "significant" for SPR purposes:

"[A] flat percentage of geographic area is not the sole determinant of significance.  As a general rule, species are not evenly distributed across their ranges, but rather tend to concentrate in certain areas where habitat is particularly suitable.  Thus, the percentage of geographic area would not literally correlate to the percentage of the species' population.  One third of a species' geographic range may be found to contain a disproportionally greater or lesser percentage of the total number of individuals.  It does not seem fair or sensible, than, to point to some arbitrary geographic percentage as constituting a 'significant' portion of a species' range."

2002 WL 1733618, *16, slip op. at 28.  Magistrate Judge Facciola then noted that the SPR

candidate area (Vancouver Island) contained 19 of the 43 known nesting sites of the rare Queen

Charlotte goshawk, as well as most of the habitat, and recommended that FWS be ordered to

treat the area as a SPR.  *Id.* at 29.  Notably, Judge Urbina, on review of Magistrate Judge

Facciola's recommended decision, declined to find that an area containing 19 of the 43 nesting

site was "significant" as a matter of law, and instead directed FWS to reconsider the matter and

supply a more reasoned analysis.  Order, Case No. 98-0934 (D.D.C. May 24, 2004).  Thus the

Goshawk case follows the same analytical path as Judge Kennedy's Florida Black Bear opinion,

and reaches a different result based on the presence of far more of the population in the SPR

candidate area.

Judge Kessler's lynx opinion does not rebut the analysis that population distribution is

more important than acreage.  *Defenders of Wildlife v. Norton*, 239 F.Supp.2d 9 (D.D.C. 2002)

(Kessler, J.), *vacated in part on separate point*, 2004 WL 438599, 89 Fed.Appx. 273 (D.C. Cir.

2004).  The lynx opinion begins by explaining that the "lynx range extends into four different

regions that are separated from each other by ecological barriers consisting of <u>unsuitable</u> lynx

habitat:  (1) the Northeast, (2) the Great Lakes, (3) the Southern Rocky Mountains, and (4) the

Northern Rocky Mountains/Cascades."  *Id.*, 239 F.Supp.2d at 14 (*emphasis added*).  Judge

Kessler did not require that the barrier areas of unsuitable habitat be considered as potential

SPRs, although they were in the contiguous United States DPS established by the FWS, and it

was unclear whether they were once lynx range.  *Id.*  Instead, Judge Kessler rejected FWS's

argument that three of those regions which contained at least some suitable habitat (the

Northeast, the Great Lakes, and the Southern Rocky Mountains) could not be SPRs merely

because lynx were "naturally rare" in them.  *Id.* at 19.  Perhaps because FWS had not done the

necessarily detailed habitat suitability analysis, the opinion does not analyze which parts the

Northeast, Great Lakes or Southern Rocky Mountains (a) contained significant suitable habitat in

which the naturally rare lynx could survive if protected, or (b) contained largely unsuitable habitat that could not be significant. *Id.* at 20-21. As a result, the FWS had little factual basis to support its conclusion that the three areas were not SPRs.

Further, in the lynx case the remnant population at issue was not a recovered DPS that had exceeded recovery plan criteria, grown dramatically in both numbers and range, been on the "endangered" species list for thirty years subject to federal and state conservation and management strategies. The gray wolves of the WGL DPS are not a "remnant" population, but instead are a healthy, hearty, self sustaining population of a now recovered species and should be dealt with accordingly.

By contrast, here the FWS has done the detailed suitability analysis and determined that there is no suitable habitat within the Non-Core-Areas of sufficient size to support a viable wolf population. 72 Fed. Reg. at 6071-76. FWS is not just making the circular argument that wolves in the Non-Core Areas should be removed from the list of endangered and threatened species in the Non-Core Areas merely because they are rare; rather it has shown that the Non-Core Areas do not contain suitable wolf habitat and therefore are not a significant portion of the range of the wolves within the WGL DPS. 72 Fed. Reg. at 6071-75. As explained above, the ESA precludes listing of non-significant range portions in which the species is in danger, unless the species is also in danger "throughout all" of its range. 16 U.S.C. § 1532(6), (20).

If the Court finds a direct conflict between the Ninth Circuit ruling in Defenders of Wildlife, and the D.C. District Court opinions in the Florida Black Bear and goshawk cases, and Judge Kessler's ruling on the lynx listing opinion, Defendant-Intervenors respectfully submit that the former authorities are more persuasive. At least one court has chosen to reject Judge Kessler's analysis. A New Mexico District Court explained:

> The Lynx case is not persuasive. The court in that case considered the word "significant" to refer to an "amount" of geographical area. But the Court and, as

noted above, both parties in this case, have rejected that use of "significant" in the context of the ESA, focusing instead on the biological significance of the lost range, not its raw size.  If raw size of the range were the only determinative factor, virtually every non-domestic species of wildlife in North America would be listed. Historical accounts in the Lewis and Clark journals, for example, describe abundant wildlife across the depth and breadth of the country they explored, and that historical range no longer exists in its pristine state.

*Center for Biological Diversity (Rio Grand Cutthroat Trout),* 411 F. Supp. 2d at 1281.[12]

In short, once it is established that an area is presently unsuitable for a species, requiring the FWS to treat it as SPR just because it contains many acres that once were suitable and significant would be an exercise in futility, and rob the FWS of the discretion it is due under *Chevron* in construing the "inherently ambiguous" SPR language.  *Defenders of Wildlife (Lizard)*, 258 F.3d at 1141.  Asphalt cannot be unpoured, skyscrapers will not be leveled, suburbs do not disappear, and cleared farmland is unlikely to become large swaths of forest.  The present tense wording of the definitions of "endangered" and "threatened" species fully justify (and in fact require) FWS's reading that significance is determined based on the present state of habitat, not the state of the habitat at some point of time in the past.  Defendant-Intervenors fully recognize the equitable argument that human activity over the last 200 to 300 years is largely responsible for rendering so much habitat unsuitable, but Congress knew this when it passed the ESA in 1973, and chose not to include any provision in the SPR language that made application of the SPR test turn on <u>why</u> habitat is now unsuitable and thus insignificant.  Plaintiffs cannot be allowed to end run this Congressional decision to limit the ESA's scope in cases such as this one

where the species (or here, a DPS of a species) is doing well in all significant portions of its

---

[12]     As described in **note 10** above, the FWS on appeal consented to the vacating of the District of New Mexico's opinion as moot due both to the FWS' decision to restart the listing process for trout and a change in how FWS interprets the term "significant."  However, the FWS has not changed its position that geographic size does not determine significance, 72 Fed. Reg. 6065, so the New Mexico court's reasoning on that specific point is not undermined by FWS' subsequent change-of-interpretation.

range.

## IV. SHOULD ANY OF PLAINTIFFS' UNFOUNDED PREDICTIONS OF FUTURE JEOPARDY TO THE WOLF COME TO PASS, THE FWS WILL BE UNDER A NON-DISCRETIONARY DUTY TO RELIST THE WESTERN GREAT LAKES WOLVES ON AN EMERGENCY BASIS

The text of the ESA itself rebuts HSUS *et al.'s* argument that alleged potential future threats to the recovered wolf population (*e.g.*, the alleged potential for increase in diseases) made it arbitrary and capricious to delist the WGL-DPS. Plaintiffs' Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment at 39-41. Congress was aware that that no listing decision can be based on *absolute* certainty that a recovered species will continue to do well after delisting and therefore included in Section 4(g) of the ESA a requirement that the FWS monitor the delisted population for five years. 16 U.S.C. § 1533(g)(1). The FWS has complied with those requirements by developing a post-delisting monitoring plan for the WGL DPS. 72 Fed. Reg. 30819 (June 4, 2007).[13]

If the FWS's post-delisting monitoring reveals that some threat has risen to the level of being "a significant risk to the well being of any such recovered species," then the FWS is directed to relist the species, on an emergency basis, as an endangered or threatened species: "The Secretary shall make prompt use of the authority under paragraph 7 of subsection (b) of this section [emergency relisting] to prevent a significant risk to the well being of such recovered species." 16 U.S.C. § 1533(g)(2) (*emphasis and bracketed material added*). The emergency relisting is effective immediately – the notice-and-comment process is completed later. 16 U.S.C. § 1533(b)(7).[14] In the Final Rule, FWS acknowledged this authority and duty to "relist midwestern gray wolves if necessary." 72 Fed. Reg. 6052, 6068 (Feb. 8, 2007).

---

[13] Although the FWS has thus far published a Draft plan, the Federal Register Notice for the plan indicates that it is already being implemented. 72 Fed. Reg. at 30820.

[14] After an emergency relisting takes effect, the FWS has 240 days to conduct the notice-and-comment process necessary to affirm and complete the relisting. 16 U.S.C. § 1533(b)(7).

V.    **ANY REMEDY THAT THIS COURT ORDERS SHOULD AVOID HARMFUL AND NEEDLESS DISRUPTIONS TO RECOVERED WOLF MANAGEMENT IN THE CORE RECOVERY AREAS**

The appropriate "remedy" in this matter is the dismissal of HSUS *et al.*'s Motion for Summary Judgment and grant of Defendants' Motion for Summary Judgment.  However, if this Court finds that it must issue some alternative remedy that remedy should avoid unnecessary and harmful disruptions to ongoing state management of recovered gray wolf populations. Defendant-Intervenors' primary interest is in defending the delisting in the Core Recovery Areas (Minnesota, Wisconsin, and the Upper Peninsula of Michigan).  The Core Recovery Areas are where Defendant-Intervenors' members, while hunting other species or participating in other outdoor activities, actually encounter wolves.  These individuals need the flexibility to protect their dogs or other property from depredation by wolves.  State wolf management plans provide hunters and outdoor enthusiasts far more flexibility in their ability to respond to wolf depredation.  Thus, in addition to defending the 2007 delisting Rule, Defendant-Intervenors' key objective is to impress upon this court the need to avoid a another outcome like that in the Oregon and Vermont cases, where, without disputing the recovery of gray wolves in the Core Recovery Areas, the two courts rejected the 2003 Reclassification Rule in its entirety.  *See* Point III.C above.

D.C. Circuit precedent governing remedies in APA judicial review cases provides the Court with ample flexibility to fashion a remedy that will not result in the Core Recovery Area populations returning to "endangered" or "threatened" status.  Actions taken by the FWS, pursuant to the ESA, are reviewed under the Administrative Procedure Act, 5 U.S.C. § 706 ("APA").  *National Association of Home Builders v. Norton*, 451 F.3d 8, 13 (D.C. Cir. 2005); *Fund for Animals v. Babbitt (Grizzly Bears)*, 903 F.Supp. 96, 105 (D.D.C. 1995).  Under the APA, a court that disagrees with agency action considers a flexible two-factor standard in

deciding whether to: (a) vacate that action, or (b) leave it in place on remand while the agency completes further proceedings to reconsider and further explain its action. *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146, 150-151 (D.C. Cir. 1993); *see also United Mine Workers v. Federal Mine Safety and Health Administration*, 924 F.2d 340 (D.C. Cir. 1991) (remand without vacatur of final rule lifting restrictions on mine ventilation techniques). Those two factors are: (1) the seriousness of the violation and the prospect that the agency will be able to cure it on remand; and (2) the disruption that could occur if the court vacates the agency action and then the agency later cures the deficiencies and reinstates the vacated action. *Id.* at 150-51; *Fox Television Stations v. FCC,* 280 F.3d 1027, 1049 (D.C. Cir. 2002) (this is a balancing test, strong showing on one factor can be enough). It applies to ESA cases like other APA cases. *Endangered Species Comm. of the Building Ind. Assoc. of South. Cal. v. Babbitt*, 852 F.Supp. 32, 42 (D.D.C. 1994).[15]

The curability factor strongly weighs against vacatur here. If this court, like the Oregon and Vermont courts that reviewed the 2003 Reclassification Rule, accents FWS' finding that the wolves of the Core Recovery Areas are indeed recovered, then this court can allow those wolf populations to retain their delisted status. As described above, the wolf population in the Core Recovery Areas "greatly exceeds the numerical recovery criteria" established by FWS. 71 Fed. Reg. 15266.

While allowing the recovered wolves to retain their delisted status, the Court could, for example, remand and direct the FWS to draw a smaller line around the recovered populations or to draw a line between recovered and non-recovered significant portions of the population in

---

[15]     *Endangered Species Committee* reviewed an order listing the gnatcatcher as threatened. A group opposed to listing persuaded the Court that FWS erred. The Court ordered that the gnatcatcher retain its threatened status on remand due to concerns about rapid destruction of habitat if it were temporarily delisted during remand. 852 F.Supp. at 41. There is no evidence in this case of an increase in wolf killings or declines in wolf populations since the delisting nine months ago, so the reasoning of the gnatcatcher case that led to remand without vacatur in that case would not require vacatur here.

order to relist only the non-recovered portions. *Defenders of Wildlife (Lizard)*, 258 F.3d at 1144;

*National Wildlife Federation (Wolves/Vermont),* 386 F.Supp.2d at 564 ("The ESA allows

defendants to provide varying levels of protection based upon the biological evidence …. The

FWS does not have to list an entire species as endangered when only one of its populations faces

extinction …. Nowhere in the ESA is the Secretary prohibited from creating a 'non-DPS

remnant'" to protect any wolves found outside the core recovery areas) (*internal citations and

quotations omitted*). The Ninth Circuit agreed with this analysis, utilizing legislative history,

after it found the statute itself to be "inherently ambiguous":

> An animal might be "endangered" in most States but overpopulated in some. In a
> State in which a species is overpopulated, the Secretary would have the discretion
> to list that animal as merely threatened or to remove it from the endangered
> species listing entirely while still providing protection in areas where it was
> threatened with extinction. *In that portion of its range where it was not threatened
> with extinction, the States would have full authority to use their management
> skills to insure the proper conservation of the species*.

*Defenders of Wildlife (Lizard),* 258 F.3d at 1141, 1144 (quoting statement from ESA sponsor

Senator John Tunney (CA) found at H.R. Rep. No. 412, 93rd Cong., 1 Sess.; Cong. Rec. 25,669

(July 24, 1973)).

The disruption factor also weighs heavily in favor of a remand without vacatur if the

court deems it necessary The Final Rule to delist the WGL DPS transferred wolf management

and conservation from FWS to the States. Anticipating delisting, the Minnesota, Wisconsin, and

Michigan Departments of Natural Resources developed extensive state wolf management

programs which went into effect upon delisting. These States have been successfully operating

their plans for the last nine months with no evidence of adverse consequences to the wolf

populations. Each of these Core Recovery Areas State plans establishes long term minimum

wolf populations that are greater than the goals set by the Eastern Timber Wolf Recovery Plan.

AR Doc. 215 at 5139 (MI), AR Doc. 215 at 5255 (MN), AR Doc. 215 at 5983 (WI).[16]  Each of

the plans bars the take of wolves, with limited-regulated exceptions for depredation control

(prevention of property damage).  If vacatur returns wolf conservation and management to the

FWS, the toll will be felt by those living and recreating in these Core Recovery Areas, who are

losing pets, livestock and recreational opportunities to this recovered predator species.  The

resulting back and forth in management authority between the federal and state jurisdictions

would cause needless disruption, frustration and loss to all concerned.

Alternatively, if the court finds reason to request additional explanation or other

rulemaking, the court could remand the Final Rule, and stay its ruling for a short-term such as 90

to 120 days, sufficient for FWS to prepare, publish for comment, and, if it so chose, adopt a

ruling to conform to this Court's direction, such as potentially a ruling delisting wolves only in

the Core Recovery Areas. [17]  That would at least avoid disruption of the ongoing implementation

of the Minnesota, Wisconsin, and Michigan wolf management plans.

## CONCLUSION

The Court should affirm the 2007 delisting order in its entirety because wolves have now

recovered and are thriving in substantially all of the suitable habitat in the WGL DPS.   The

FWS made a proper determination with respect to the SPR of the WGL DPS.  Its determination

that no area of the WGL DPS outside the Core Recovery Areas constituted a SPR is supported

by the factual evidence that the Non-Core Areas lack suitable wolf habitat.  The agency also

properly designated the WGL DPS, determined its boundaries and properly determined, based on

---

[16]     71 Fed. Reg. 15287-95 (*citing* Michigan Department of Natural Resources, Michigan Gray Wolf Recovery and Management Plan (1997) (#58); Minnesota Department of Natural Resources, Minnesota Wolf Management Plan (2001) (#68); Wisconsin Department of Natural Resources, Wisconsin Wolf Management Plan (1999) (#103)).

[17]     The Court can also place time limits for completing remand.  *Fund for Animals (Grizzly Bears),* 903 F.Supp. at 118 (giving FWS 90 days to complete reconsideration of portions of a recovery plan).

the best available science that wolves no longer qualify for "endangered" or even "threatened" status.  In reaching this conclusion, it conducted the requisite threats analysis.

Defendant-Intervenors request that this court deny HSUS *et al*.'s Motion for Summary Judgment and grant the FWS's and Defendant-Intervenors' Motion.  If for some reason, this court deems some other remedy necessary, Defendant-Intervenors ask that this court avoid vacating the Final Rule to Delist in order to maintain consistency in the management of the recovered populations of WGL DPS wolves by the Minnesota, Wisconsin, and Michigan Departments of Natural Resources.

Corrected Per Errata: April 7, 2008

Dated: January 18, 2007                          Respectfully submitted,


_____                    _____
William P. Horn (D.C. Bar No. 375666)       Anna M. Seidman (D.C. Bar No. 417091)
James H. Lister (D.C. Bar. No. 447878)      Douglas S. Burdin (D.C. Bar No. 434107)
Birch Horton, Bittner & Cherot             Safari Club International
1155 Connecticut Avenue N.W.,              501 2nd Street NE
Suite 1200                                 Washington, D.C.  20002
Washington, D.C.  20036                    (202) 543-8733
(202) 659-5800                             Fax:  (202) 543-1205
Fax:  (202)659-1027                        aseidman@sci-dc.org
whorn@dc.bhb.com                           dburdin@sci-dc.org
jlister@dc.bhb.com

*Counsel for U.S. Sportsmen's Alliance*     *Counsel for Safari Club International,  Safari Club*
*Foundation, Wisconsin Bear Hunters'*       *International Foundation, and National Rifle*
*Association, Scott Meyer and Robert*       *Association*
*Stafsholt*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| HUMANE SOCIETY OF THE UNITED | ) | |
| STATES, HELP OUR WOLVES LIVE, | ) | |
| ANIMAL PROTECTION INSTITUTE, | ) | |
| AND FRIENDS OF ANIMALS AND | ) | |
| THEIR ENVIRONMENT, | ) | Case No. 1:07-cv00677-PLF |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| DIRK KEMPTHORNE, Secretary of the Interior, | ) | |
| U.S. DEPARTMENT OF THE INTERIOR, AND | ) | |
| U.S. FISH AND WILDLIFE SERVICE | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| SAFARI CLUB INTERNATIONAL, | ) | |
| SAFARI CLUB INTERNATIONAL | ) | |
| FOUNDATION, AND NATIONAL RIFLE | ) | |
| ASSOCIATION, | ) | |
| | ) | |
| Defendant-Intervenors, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| U.S. SPORTSMEN'S ALLIANCE | ) | |
| FOUNDATION, WISCONSIN BEAR HUNTING | ) | |
| ASSOCIATION, SCOTT MEYER, AND | ) | |
| ROB STAFHOLT, | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

**DEFENDANT-INTERVENORS' REPLY TO PLAINTIFFS' OPPOSITION TO
DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page No.**

INTRODUCTION ...................................................................................................1

ARGUMENT ........................................................................................................5

    A.    Recovery in All Significant Portions of WGL-DPS Range...................................5

        1.    Irrelevance of Current v. Historic Range Debate.........................................5

        2.    Unsuitable Habitat is not a Significant Range Portion ...............................6

    B.    Irrelevance of Areas Outside DPS .................................................................9

    C.    Recognition of DPS at Time of Delisting............................................................11

    D.    Collateral Attacks on Wolf Recovery Plan.........................................................13

    E.    Section 1533(a)(1) Risk/Threats Analysis Factors .............................................13

        1.    Adequacy of Regulatory Mechanisms/State Wolf Management Plans .....14

        2.    Disease and Predation ................................................................................17

        3.    Depredation Control in Dispersal Areas .....................................................18

    F.    Post-Delisting Monitoring and Emergency Relisting ...........................................21

    G.    Harmless Error Standard and Remedy if Error is Found......................................23

CONCLUSION......................................................................................................24

# TABLE OF AUTHORITIES

## **FEDERAL CASES**

**Page No.**

*Center For Biological Diversity v. Hamilton*, 453 F.3d 1331,
1334 (11th Cir. 2006)............................................................................................13

*Defenders of Wildlife v. Babbitt* (lynx) 958 F. Supp. 670,
684 (D.D.C. 1997) ................................................................................................10

*Defenders of Wildlife v. Norton (Florida Black Bear)*, Civil Action
No. 99-02072-HHk at 10-11 (D.D.C. Dec. 13, 2001) ..5*Defenders of Wildlife v. Norton (Lizard)*,
258 F.3d 1141, 1143 (9th Cir. 2001) ...................................................................5

*Defenders of Wildlife v. Norton (Lynx)*, 258 F.3d 1141, 1142 (9th Cir. 2001)......................5, 6, 9

*Defenders of Wildlife v. Norton (Lynx)*, 239 F.Supp.2d 9 (D.D.C. 2002) (Kessler, J.),
*vacated in part on separate point*, 2004 WL 438599, 89 Fed.Appx. 273
(D.C. Cir. 2004) ......................................................................................................9

*Defenders of Wildlife v. Secretary, U.S. Dep't of the Interior (Wolves)*,
354 F.Supp.2d 1156 (D.Or. 2005) .......................................................................11

*Firestone Tire & Rubber Co. v. Burch*, 489 U.S. 101,
114, 109 S.Ct. 948, 956 (1989).............................................................................7

*Friends of Wild Swan, Inc. v. U.S. Fish & Wildlife Serv.*,
*12 F.Supp.2d 1121, 1132-34 (D.Or. 1997)*...........................................................11

*National Wildlife Federation v. Norton (Wolves)*, 386 F.Supp.2d 553,
560 (D. Vt. 2005)..................................................................................................13

*O'Gilvie v. United States*, 519 U.S. 79, 90, 117 S.Ct. .452, 458, (1996).......................................7

*Strahan v. Linnon*, 1998 WL 1085817 *4(1st Cir. 1998)  .........................................................13

*Strahan v. Linnon*, 967 F.Supp. 581, 607 (D.Mass.1997) ..........................................................13

*Southwest Center for Biological Diversity v. Norton (Queen Charlotte Goshawk)*, 2002 WL
1733618, *16, No. 98-0934 (D.D.C. Jul. 29, 2002)...........................................................5

*U. S. v. Atlantic Research Corp.*,127 S.Ct. 2331 (2007) .............................................................7

*U. S. v. City of St. Paul*, 258 F.23d 750, 752 (8th Cir. 2001) ....................................................22

*U.S. v. Lara*, 541 U.S. 3 206 (2004) ………………………………………………………….23

**Page No.**

**FEDERAL STATUTES**

5 U.S.C. § 706 ........................................................................................15

16 U.S.C. § 1532 ............................................................................... passim

16 U.S.C. §1533 ................................................................................ passim

28 U.S.C. § 2401 ....................................................................................13

**FEDERAL REGISTER**

43 Fed. Reg. 9607 (March 9, 1978) ................................................... 11-12

61 Fed. Reg. 4722, 4725 (February 7, 1996) ......................................... 9-11

72 Fed. Reg. 6092 (February 8, 2007) ................................................ passim

72 Fed. Reg. 30819 (June 4, 2007) .........................................................21

**OTHER AUTHORITIES**

House Report 97-567 (May 17, 1982) ........................................................8

FWS Post Delisting Monitoring Plan for the Western Great Lakes Distinct
Population Segment of the Gray Wolf("PDM") .................................. passim

N.D. Cent. Code 20.1-07 (2007) ............................................................20

S.D. Codified Laws § 41-8-20 (2007) .....................................................20

Illinois Endangered Species Act, 520 ILCS 10 ........................................20

Iowa Code § 491A (2007 Merged) .........................................................20

Wis. Stat. § 29.604 ...............................................................................15

Wis Stat § 29.057 .................................................................................15

Wis. Sta. 71.40 ....................................................................................15

Minn. Stat. 97B.645 .............................................................................19

Minn. Stat. 97B.646 .............................................................................19

Defendant-Intervenors U.S. Sportsmen's Alliance Foundation, Wisconsin Bear Hunting Association, Scott Meyer, Rob Stafholt, Safari Club International, Safari Club International Foundation, and National Rifle Association ("Defendant-Intervenors") hereby reply to Plaintiffs' Opposition to Defendants' Cross-Motions for Summary Judgment ("Pl. Opp.", Docket 53).

## INTRODUCTION

A careful examination of Plaintiffs' Opposition reveals that Plaintiffs, in challenging the delisting of the Western Great Lakes Distinct Population Segment of wolves ("WGL-DPS"), misconstrue the statutory delisting criteria in 16 U.S.C. § 1533 and try to impose their own totally subjective set of delisting criteria not found in the statute. Try as they might, Plaintiffs cannot overcome the fact that the FWS complied with all ESA requirements and lawfully delisted the WGL-DPS wolves.

Plaintiffs' Opposition muddles the ESA delisting criteria. Section 4 of the ESA includes three interrelated obligations for the removal of a species from the "endangered" species list. The FWS must 1) consider the extent to which the objective criteria established for recovery in the species' recovery plan have been satisfied, 16 U.S.C. § 1533(f)(1)(B)(ii); 2) conduct a review of the status of the species and take into account any conservation efforts of the pertinent state or local authority, *id*. at (b)(1)(A); and 3) based on the best scientific and commercial data available, conduct an analysis of five statutorily identified factors to make certain that none of them pose a risk so great that it (they) place the species in danger of extinction throughout all of a significant portion of its range, *id.* at (a)(1)(A)-(E), 16 U.S.C. § 1532(6), (16) (20).

Where the FWS chooses to recognize a distinct population segment ("DPS") of a species, the "species" that is considered for listing or delisting is the DPS. 16 U.S.C. § 1532(16) (defining a DPS as a species). Consequently, contrary to the subjective aspirations of the

Plaintiffs, delisting of the WGL-DPS could not be conditioned upon the return of wolves to all

suitable habitats within the conterminous United States, or upon the day when wolves face no

risks or threats from any source. The ESA is not the Endangered Species *Forever* Act. Instead

the ESA obligates the FWS to recognize when a DPS has recovered and to remove it from the

"endangered" species list, subject to the obligation to relist if a "significant risk" to the recovered

DPS later emerges. *Id*. § 1533(f), (g)(1), g(2).

Recovery plans, where applicable, establish the blueprint that instructs the FWS to

determine when to examine a species for the purpose of delisting. The ESA directs the Secretary

of the Interior (the FWS) to "develop and implement" recovery plans that include:

> objective, measurable criteria which, when met, would result in a determination,
> in accordance with the provisions of this section, that the species be removed
> from the [endangered or threatened species] list

*Id*. § 1533(f)(1)(B)(ii). The FWS complied with that requirement by formulating and

implementing the Eastern Timber Wolf Recovery Plan in 1978 and revising it in 1992

("Recovery Plan") which established very objective and very measurable criteria for wolves

living in the WGL-DPS. AR Doc. 468A, p. 13769.

Plaintiffs, in their Opposition, do not contest the FWS's finding that the wolves of the

WGL-DPS met and substantially exceeded the numerical recovery goals set forth in the

Recovery Plan. As Defendant-Intervenors discussed in their Opening Brief ("DI. Opn. Br.",

Docket 43-2), the Recovery Plan, as it was revised in 1992, defined recovery to require, for at

least five consecutive years, at least two viable populations within the 48 contiguous states

including a growing or stable population in Minnesota of 1550 to 1750 wolves and a second

population outside of Minnesota and Isle Royale having at least 100 wolves in late winter if

located within 100 miles of the Minnesota population. AR Doc. 468A, p. 13769, 13773, DI Opn.

Br. at 4. The wolves of the WGL-DPS long ago met and then surpassed those criteria. In 2003-2004, the FWS estimated a growing and/or stable population in Minnesota of approximately 3,020 wolves, and in 2005-06, the FWS estimated the Wisconsin population to be 465, and the Michigan population to be 434. *Final Rule Designating the Western Great Lakes Population of Gray Wolves as a Distinct Population Segment, Removing the Western Great Lakes Distinct Population Segment of the Gray Wolf from the List of Endangered and Threatened Wildlife,* 72 Fed. Reg. 6052, 6053-56 (Feb. 8, 2007) ("Final Rule").

The second step in the delisting process requires that the FWS take into account the status of the DPS as well as ***any*** efforts being made by any state or subdivision of a state to protect or conserve the species. *Id.* 1533(b)(1)(A). In accordance with these requirements, the FWS analyzed the current status of state statutes, regulations, and state management plans to conserve the WGL-DPS wolves. The FWS noted that Michigan's Wolf Management Plan received state approval in late 1997, Wisconsin's plan was approved in 1999 and Minnesota completed its management plan in early 2001. 72 Fed. Reg. at 6083-84.[1]

Finally, Section 1533(a)(1) of the ESA directs the FWS to conduct a "threats" analysis, based solely on the "best scientific and commercial data available," of five factors: **(A)** the present or threatened destruction, modification, or curtailment of its habitat or range; **(B)** overutilization for commercial, recreational, scientific, or educational purposes; **(C)** disease or predation; **(D)** the inadequacy of existing regulatory mechanisms; or **(E)** other natural or

---

[1]    Because Michigan was in the process of revising its wolf management plans, the FWS appropriately relied on the current Michigan plan, but also appropriately examined but did not exclusively rely on the Recommended Guiding Principles for Wolf Management in Michigan drafted by Michigan's stakeholder roundtable, which will be used to revise Michigan's wolf management plan. 72 Fed. Reg. at 6084.

manmade factors affecting its continued existence.[2]  Although Plaintiffs appear to argue that absolute elimination of risk is an essential prerequisite to delisting, that is not the law.  The ESA does not require the Secretary to retain a species on the "endangered" or "threatened" species lists simply because one or more of those risk factors are present, or even because the population size of the DPS may be negatively impacted by any or all of the risk factors.  The law simply states that the Secretary must retain (or place) a species on those lists, if one or more of the factors has such a profound impact so to cause the species to be in danger of extinction throughout all or a significant portion of its range.  16 U.S.C. §§ 1532(6)(20), 1533(a).

In its delisting rule, the FWS analyzed in detail and at length all five factors, 72 Fed. Reg. 6072-6101, and based on the evidence before it, reasonably concluded that the five factors "will not individually or in combination be likely to cause the WGL-DPS of the gray wolf to be in danger of extinction in the foreseeable future in all or a significant portion of the species' range." 72 Fed. Reg. 6101.  This analysis was supported by the record.  Nothing more was required.

The number of wolves in the WGL-DPS now far exceeds the recovery plan goals, and these numbers provide an ample margin of safety that FWS can take into account in analyzing the significance and magnitude of future risks to the WGL-DPS.  Nevertheless the FWS has demonstrated extreme caution with respect to its analysis of the five risk factors.  As demonstrated by its post-delisting monitoring plan ("PDM Plan"), the FWS committed itself to consider relisting if the number of wolves falls below specific trigger levels that actually *exceed* the numerical thresholds established in the Recovery Plan for delisting.[3]

---

[2]      Plaintiffs address only two (adequacy of existing regulatory mechanisms and disease/predation) in their Opposition.

[3]      See Point F to this Reply for a discussion of the Post-Delisting Monitoring Plan.

## **ARGUMENT**

In the following arguments, Defendant-Intervenors more specifically demonstrate the legality of the delisting as well as the particular inaccuracies of Plaintiffs' challenge.

**A**. **Recovery in All Significant Portions of WGL-DPS Range.**  Plaintiffs make no attempt to dispute two key FWS findings described in Defendant-Intervenors' Opening Brief:

> (1) unsuitable habitat is not "significant" in deciding whether the WGL-DPS of the wolf is "endangered" or "threatened" throughout "all or a ***significant*** portion of its range," 16 U.S.C. § 1532(6), (20), 72 Fed.Reg. at 6071, and
>
> (2) there is no significant area of ***suitable*** wolf habitat within the WGL-DPS except for the core recovery areas of Minnesota, Wisconsin, and the Upper Peninsula of Michigan (the "Core Recovery Areas").  72 Fed.Reg.at 6072-75.

*See* Pl. Opp. at 7, n. 6; DI Opn. Br. at 23-37.  Coupled with the overwhelming evidence that wolves have recovered within the Core Recovery Areas,[4] these two FWS findings lead inexorably to the conclusion that the WGL-DPS wolves have recovered in all "significant portions of [their] range" ("SPR") and so are no longer statutorily defined as "endangered" or "threatened".  *Id.* § 1532(6), (16), (20).  Plaintiffs make no attempt to distinguish the holdings in the Lizard, Florida Black Bear, and Goshawk cases that unsuitable habitat is properly discounted by the FWS in the SPR analysis.[5]  *See* DI Opn. Br. at 32-34 (reviewing these cases).

1.    Irrelevance of Current v. Historic Range Debate.  Rather than attempt to identify some significant area of suitable habitat within the WGL-DPS in which wolves have not yet recovered, Plaintiffs argue at length that the term "range" in the phrase "significant portion of its range" ("SPR") means "historical range" rather than "current range."  Pl. Opp. at 5-10.

---

[4]      See DI Opn. Br. at 2 to 4, 22, and pages 2-3 above.

[5]      *Defenders of Wildlife v. Norton (Lizard)*, 258 F.3d 1141, 1143 (9th Cir. 2001); *Defenders of Wildlife v. Norton (Florida Black Bear)*, Civil Action No. 99-02072-HHK at 10-11 (D.D.C. Dec. 13, 2001) (copy supplied as Ex. 1 to DI Opn. Br., Docket 43-4); *Southwest Center for Biological Diversity v. Norton (Goshawk)*, 2002 WL 1733618, *16, No. 98-0934 (D.D.C. Jul. 29, 2002), *remedy modified on review of Magistrate's Recommendations* (D.D.C. May 24, 2004).

This debate over what "range" means is in fact entirely academic to the outcome of this case. First, although the FWS expressed its view that the statutory term "range" refers to "current range," the FWS in its delisting rule nevertheless elected to play it safe and clearly and succinctly stated that "[f]or the purposes of this notice, we consider the range of the gray wolf to be the ***entire geographical area delineated by the boundaries of the WGL DPS***." 72 Fed. Reg. at 6070 (emphasis added). Thus for the purpose of delisting the gray wolf, the FWS analyzed all the area within the DPS, including both current and historical range.

In addition, the case law confirms that unsuitable habitat is not "significant" (and thus is not a SPR) even if it was once part of historic range, see DI Opn. Br. at 32-36 (collecting cases) and note 5 above, and there is no significant suitable habitat in the DPS, except for the Core Recovery Areas where recovery has already occurred. 72 Fed.Reg. at 6072-75. Thus, there is no merit to Plaintiffs' historical range argument under any factual or legal analysis.

On a related issue, Plaintiffs' discussion of the FWS's revision of its interpretation of the term "significance" in the SPR phrase has no bearing on the outcome of this case, as the FWS, in doing so, did nothing more than respond to and implement the direction of the 9th Circuit. Not only did the FWS provide a reasonable explanation for the modified approach, citing *Defenders of Wildlife v. Norton* (lizard) 258 F.3d 1141, 1143 (9th Cir. 2001), but the revised interpretation accommodates Plaintiffs' criticism of the earlier interpretation and so is not prejudicial to Plaintiffs. 72 Fed.Reg. at 6071.

Should the Court still find it necessary to address the current range versus historic range debate, Defendant-Intervenors have demonstrated the term "range" means "current range." *See* DI Opn. Br. at 29-32. Plaintiffs' attempt to use a reference in a 1978 House Committee Report to define the meaning of a term "range" as it was drafted into the 1973 original ESA is not

persuasive and does not overcome the presumption that the present tense wording of the relevant statute is controlling.  16 U.S.C. § 1532(6)(20); *see* DI Opn. Br. at 28-31.  The view of a subsequent legislative committee discussing how the term range would be used in a separate component of the ESA should not be the basis for judging the intent of an earlier Congress. *O'Gilvie v. United States*, 519 U.S. 79, 90 (1996) ("the view of a later Congress cannot control the interpretation of an earlier enacted statute.").  Some courts have gone so far as to refer to views of a subsequent Congress as a "hazardous basis for inferring the intent of an earlier one." *Firestone Tire & Rubber Co. v. Burch*, 489 U.S. 101, 114, 109 S.Ct. 948, 956 (1989) (internal quotations omitted).  The fact that a subsequent House Committee would discuss its interpretation of the term "range" when enacting a relatively unrelated provision pertaining to the designation of "critical habitat," offers little to clarify the meaning of the term "range" as it refers to the definition of "endangered" and "threatened" species.  The subsequent legislative history upon which Plaintiffs rely does not show any effort by that House Committee to associate their discussion of the term "range"with the previous Congress' use of the phrase "significant portion of its range.

Similarly, the fact that in 1982, another subsequent Congress used the term "current" to modify the term "range" in an amendment  regarding the introduction of experimental populations does not automatically render the term "current" superfluous, or force this Court to assume that the earlier-enacted term "range" in the phrase "significant portion of its range" refers only to "historical range."  Even aside from the obvious point that two different Congresses were doing the drafting nine years apart, an ostensibly superfluous term can function to clarify the meaning of other portions of the statute.  In the case of *U.S. v. Atlantic Research Corp*., the Supreme Court acknowledged "our hesitancy to construe statutes to render language superfluous

does not require us to avoid surplusage at all costs." 127 S.Ct. 2331, 2337 (2007) (Court refused

to ignore phrase "any other person" in statute pertaining to environmental clean-up.) The

legislative history of the 1982 amendment regarding experimental populations demonstrates

Congress' intent to make certain that experimental populations would be introduced outside their

current range.  "It may be helpful to clarify in legislative history that although these populations

will be established outside of their current range, the intent is to remain within historical range."

H.R. Rep. No. 97-567 at 46 (1982).  There is nothing in the committee's discussion that evinces

their opinion as to the definition of the term "range" standing alone.

        2.    <u>Unsuitable Habitat is not a Significant Range Portion.</u>  Plaintiffs virtually

concede that unsuitable habitat cannot be a SPR when they respond to Defendant-Intervenors'

point that metropolitan Chicago (which is within the DPS) is unsuitable wolf habitat and thus

cannot be a SPR, even if wolves may once have roamed there.  Disclaiming any intent to demand

wolf recovery in Chicago, Plaintiffs assert that the FWS must adequately explain delisting *if* the

delisted areas include "broad swaths of suitable habitat" in which recovery has not occurred:

> Intervenors set up a straw man by suggesting that Plaintiffs seek wolf recovery in
> "the skyscrapers, suburbs, and exurbs of Chicago."  Far from it.  Plaintiffs merely
> contend that, should FWS seek to downlist or delist the gray wolf, **the agency
> must** conduct a Section 4(a)(1) threats analysis across the wolf's historic range
> and, at a minimum, **demonstrate why broad swaths of *suitable* habitat in the
> *Northeast, Pacific Northwest*, and elsewhere are not significant portions of its
> range.**

Pl. Opp. at 7, n. 6 (emphasis added, internal quotations omitted).[6]  However, the only allegedly

"suitable habitat" that Plaintiffs identify and claim the FWS should have considered classifying

as a SPR is ***outside the DPS boundaries:***  the "Northeast" and the "Pacific Northwest."  *Id.*

_____

[6]     So long as the WGL-DPS wolves have recovered in the areas of its range that are SPRs, here the
Core Recovery Areas of Minnesota, Wisconsin, and the Upper Peninsula of Michigan, whether any stray
animal that enters a non-significant range portion (e.g. Chicago) is in jeopardy from one or more of the
(Footnote Continued)

**B. Irrelevance of Areas Outside DPS.** The FWS was not required to consider the potential significance of allegedly suitable habitat outside the WGL-DPS (e.g., in the Northeast and Pacific Northwest) in deciding whether to delist the wolves within the WGL-DPS.

A DPS constitutes a species. The ESA defines the term "species" to include "any subspecies of fish or wildlife or plants, and ***any distinct population segment*** of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16)(emphasis added). According to the *Policy Regarding the Recognition of Distinct Vertebrate Population Segments under the Endangered Species Act*, ("DPS Policy") a DPS is "discrete" or markedly separated from other populations of the broader species or subspecies. 61 Fed.Reg. 4722, 4725 (Feb. 7, 1996). The health and survival of the species is independent of the health and survival of other DPSs or other subspecies. *Id.* Thus, when the FWS must determine the listing status of a DPS, it looks to the population of the DPS itself to determine that status, and not to the status of other DPSs or other species. Accordingly, when looking at whether the "species" is "endangered" or "threatened" "throughout all or a significant portion of its range," the "species" the FWS must look at is the DPS, not the species as a whole. The "range" that is examined is the range within the DPS, not worldwide or nationwide range. 16 U.S.C. § 1532(6), (16), (20).[7]

As noted by the court in the case of *Defenders of Wildlife v. Norton* (lynx), 239 F.Supp.2d 9, 15 (D.D.C. 2002), the FWS is not permitted to determine the listing status of a population of wildlife based on the health or status of another species or distinct population.

---

Section 4(a)(1) listing factors, 16 U.S.C. § 1533(a)(1), is immaterial. By the terms of the ESA, a species that is in danger of localized extinction in a non-significant portion of its range is not "endangered" or "threatened." 16 U.S.C. § 1532(6), (16), (20).

[7]        The DPS Policy gives the FWS the same flexibility to delist a recovered DPS even though the species elsewhere remains "endangered" or "threatened" as it gives the FWS authority to list a DPS as "endangered" or "threatened" despite the presence of healthy populations in other places**.** DPS Policy, 61 Fed.Reg. at 4725; *Defenders of Wildlife v. Norton (lizard),* 258 F.3d at 1144.

Citing its earlier decision in *Defenders of Wildlife v. Babbitt* (lynx) 958 F. Supp. 670, 684 (D.D.C. 1997), the District Court explained how the FWS was prohibited from determining the status of the lynx population of the conterminous United States based on the health of Alaska and Canada populations of the species.  Contrary to Plaintiffs' interpretation, *Norton (lynx)* does not stand for the proposition that the FWS must make listing decisions by considering portions of a species' range outside the designated DPS.  In that case, the FWS had designated the entire conterminous U.S. as a lynx DPS, and the court rejected the Service's conclusions regarding habitat *within that DPS.  Norton (lynx),* 239 F.Supp.2d  at 16, 21.

Although Plaintiffs insinuate nefarious motives for the FWS's designation of the WGL-DPS, Plaintiffs do not challenge the FWS's technical finding that the wolves of the WGL-DPS are markedly distinct from other wolf U.S. populations, and thereby qualify as a DPS in accordance with the DPS policy.  *See* Pl. Opp. at 21-23 (complaining about the location of DPS boundaries, not the finding that WGL-DPS wolves were distinct from other wolf populations).[8]

C.  **Recognition of DPS at Time of Delisting**.  In crafting the policy for defining DPSs, the FWS explicitly identified DPSs as a tool for the purpose of delisting as well as listing:

> The Fish and Wildlife Service and the National Marine Fisheries Service (Services) have adopted a policy to clarify their interpretation of the phrase "distinct population segment of any species of vertebrate fish or wildlife" for the purposes of listing, ***delisting***, and reclassifying species under the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 et. seq.) (Act).

---

[8]    The scientific evidence supports the FWS's conclusion that the wide areas of unsuitable habitat and formidable physical barriers between the Core Recovery Areas in Minnesota, Wisconsin, and the Upper Peninsula of Michigan on the one hand and the far away Pacific Northwest and Northeast on the other hand prevent all but the rarest intermingling between wolves in the DPS and wolves elsewhere in the Nation.  72 Fed.Reg. at 6059.  As the FWS demonstrated, a wolf would have to travel 400 miles across unsuitable habitat to reach the  Northern Rocky Mountains population, the nearest U.S. population outside the WGL DPS.  *Id.*  Further, the WGL-DPS wolves are the only ones inhabiting a Mixed-Laurentian Forest in the United States.  72 Fed.Reg. at 7060.  Thus the WGL DPS wolves are "distinct" from other wolves and the FWS properly recognized the DPS.

DPS Policy, 61 Fed. Reg. 4722 (February 7, 1996) (emphasis added).

The delisting of the WGL-DPS population of wolves is not the first occasion on which the FWS has designated DPSs for the purpose of removing a species from the "endangered" species list.  The FWS designated three DPSs for wolves in 2003 when it promulgated a rule to reclassify the Eastern and Northern Rocky Mountain wolf DPSs.  And although the Oregon federal district court disagreed with the boundaries that the FWS chose for the DPSs, the Court found nothing wrong with the FWS's decision to create DPSs for the purpose of the reclassification.  Observing no distinction between using DPSs for listing, reclassification and delisting, the Oregon Court simply explained that:

> The DPS Policy is designed to draw a line around a population whose
> conservation status differs from other populations within that species.

*Defenders of Wildlife v. Secretary (wolves)*, 354 F. Supp. 2d 1156, 1170 (D. Or. 2005).

Plaintiffs offer no case that holds that a DPS cannot be recognized at the same time as a decision to delist.  Plaintiffs chiefly rely on *Friends of Wild Swan, Inc. v. U.S. Fish & Wildlife Serv. (bull trout),* 12 F.Supp.2d 1121, 1132-34 (D.Or. 1997), which in fact supports the FWS's action in this case.  That opinion upheld the general legal authority of the FWS to separately evaluate on a DPS-by-DPS basis whether and where it should originally list the bull trout.  12 F.Supp.2d at 1133-34 (emphasis added).  The case remands for additional explanation because the FWS did not adequately respond to a citizen petition filed under 16 U.S.C. § 1533(b)(3) asking the FWS to list the bull trout nationally,  and because the FWS had determined **just two years earlier**  using the "*same information*" that a national level listing would be warranted by the evidence, and did not adequately explain its shift to a DPS-by-DPS approach.  12 F.Supp.2d at 1132 (emphasis added).   By contrast, **thirty years have passed** since the 1978 decision to list the wolf at the National level.  43 Fed.Reg. 9607 (Mar. 9, 1978).  During this 30 year period

there has been a night-to-day recovery by the wolves in the area encompassed by the WGL-DPS.

Moreover, Congress gave the FWS a new tool when the legislature added a provision to the

ESA, authorizing creation of DPSs.  P.L. 95-632 (Oct. 1978).   The information and

opportunities before the FWS in 2007 were obviously not the "same information" and

opportunities that were before the FWS at the time of the original 1970s listing.[9]

The FWS has never uniformly listed or protected all wolves of the conterminous United

States.   In 1966 and 1967, the FWS individually listed subspecies of wolves as the agency

determined each subspecies' need for the protection. [10]  Then, in 1978, the FWS, for the sake of

convenience, listed almost the entire species, as "endangered" throughout the conterminous

United States when it became apparent that the entire species required federal protection. 43

Fed.Reg. 9607(1978).   Even then the FWS drew geographical distinctions, by designating

Minnesota wolves "threatened" and wolves in other states "endangered."  *Id*. Just as it was then

necessary to distinguish the more populous wolves of Minnesota from those of the remainder of

the conterminous United States, so is it now necessary to respond to the excellent recovery that

some DPSs have demonstrated, and to distinguish their protections from other populations that

have shown limited or no recovery.  Recovery and delisting is the ESA's goal.  16 U.S.C §

1533(f).

---

[9]      Further, in the *Friends of the Wild S*wan case, the Court directed the FWS to conduct a two tiered analysis, by which it first considered the listing status of the species throughout its range, and then considered the appropriate listing status for individual DPSs.  In the instant matter the FWS has already followed the two tiered approach, initially providing protection for the individual populations of wolves under a single umbrella and then later, removing federal protections from only those DPSs that no longer qualify as "endangered."

[10]      On March 11, 1967, the FWS listed as "threatened" the "timber wolf – canis lupus lycaon"[10] under the Endangered Species Preservation Act of October 15, 1966 (80 Stat. 926; 16 U.S.C. § 668aa(c)), 32 Fed. Reg. 4001, (March 11, 1967).  And on January 4, 1974, the FWS listed as "endangered" both the Eastern Timber wolf (canis lupus lycaon) and the Northern Rocky Mountain wolf (canis lupus irremotus). 39 Fed. Reg. 1175 (January 4, 1974).

**D.   Collateral Attack on Wolf Recovery Plan.**   While Plaintiffs appear to agree that the numerical criteria for delisting set forth in the Recovery Plan have been met, Pl. Opp. at 24, Plaintiffs collaterally attack the Recovery Plan by seeking to establish a different set of objective recovery criteria – more specifically criteria for nationwide recovery. However, the FWS bears no obligation to develop a nationwide wolf recovery plan.  The Vermont federal district court that reviewed the 2003 rule that reclassified gray wolves from "endangered" to "threatened" held that "the Secretary's decision to proceed with three recovery plans for the gray wolf rather than one comprehensive national plan must be afforded *Chevron* deference."  *National Wildlife Federation v. Norton*, 386 F. Supp.2d 553, 568. (D.Vt. 2005)

Plaintiffs' attack on the Recovery Plan must also fail because Plaintiffs waited too long to wage their challenge.  The Recovery Plan was a final and reviewable agency action.  *Strahan v. Linnon*, 1998 WL 1085817 *4 (1st Cir. 1998); *Fund for Animals v. Babbitt (Grizzly Bear),* 903 F.Supp. 96, 105 (D.D.C. 1995); *see* 16 U.S.C. § 1533(f) (1)(B)(ii).  Any attacks to that plan are barred by the statute of limitations.  Although the ESA itself contains no express limitation of action period, ESA actions are governed by 28 U.S.C. § 2401(a), the general six-year statute of limitations for civil actions against the federal government. *Center For Biological Diversity v. Hamilton,* 453 F.3d 1331, 1334 (11th Cir. 2006). The Plaintiffs have never sued to overturn the Recovery Plan.  The six-year statute-of-limitation to challenge the 1992 Wolf Recovery Plan expired in 1998.

**E**.   **Section 1533(a)(1) Risk/Threats Analysis Factors.**   Plaintiffs also argue that the FWS paid too much attention to the objective recovery criteria set forth in the Recovery Plan pursuant to 16 U.S.C. § 1533(f) and not enough attention to the five listing factors set forth in 16 U.SC. § 1533(a)(1).  Subsection (f) injects a quantifiable element into the delisting decision,

providing that satisfaction of the "objective, measurable criteria" set forth in a recovery plan

"***would result*** in a determination, in accordance with the provisions of this section, that the

species be removed from the list" of endangered or threatened species.  1533(f)(1)(B)(ii)

(emphasis added).  Plaintiffs' argument has no merit since the FWS discussed at length each of

the five (5) listing factors set forth in sub-section (a) and appropriately concluded that none of

those listing factors either individually or collectively placed the WGL-DPS in danger of

extinction throughout all or a significant portion of its range. 72 Fed.Reg. at 6071-6101.

Plaintiffs offer no basis for overturning FWS's findings.

       1.      Adequacy of Regulatory Mechanisms / State Wolf Management Plans.

Plaintiffs focus on factor (iv), "Inadequacy of Existing Regulatory Mechanisms," alleging that

the Michigan Wolf Management Plan ("Michigan Plan") is a draft and that the Michigan Plan

and Minnesota Wolf Management Plan ("Minnesota Plan") are underfunded.  Contrary to

Plaintiffs' contentions, Michigan currently has an ongoing effective state wolf management plan

that was adopted in 1997.  AR Doc. 468A at 15209. Michigan's existing plan is not a draft.  72

Fed.Reg. at 6092-94.  The fact that the Michigan Plan is currently undergoing a periodic update

and that the FWS properly made note of this fact, does not undermine the adequacy of the

operative Michigan Plan as an ***existing*** regulatory mechanism.  The FWS carefully examined and

found that the existing Michigan Plan was adequate.  72 Fed.Reg. at 6094. In addition, the FWS

found that the draft plan, when finalized, would ***also*** be adequate.  *Id.*  Because the existing

Michigan Plan was itself adequate and in place, Plaintiffs have no grounds for claiming that the

FWS was relying on "future" regulatory mechanisms in order to approve delisting for wolves.

       There is no evidence in the Administrative Record ("AR") of inadequate funding.  Even

if there were, Plaintiffs have not demonstrated anything to indicate that any hypothesized

insufficiencies in funding are significant enough to reverse the remarkable recovery of wolves in

the WGL-DPS. It is not enough for Plaintiffs to show the existence of a risk factor. They must

show that the risk is so serious as to cause the DPS to be in danger of extinction. §§1533(a)(1),

1532(6)(20).

Plaintiffs do not provide any factually based comparison of the funding of state wolf

management plans before and after delisting. Each state's long record of willingness to engage

in wolf population monitoring is just one example of each state's established track record in wolf

management. *See* 72 Fed.Reg. at 6053-6056. For example, the record shows that Wisconsin has

long found ways to fund wolf management and in recent years has been funding a greater share

of those costs through state funds.[11] That state also adequately funds its wolf management

program through a variety of stable statutory mechanisms not contingent upon continued ESA

listing.[12] Minnesota, the state with the largest wolf population, also confirmed to FWS in 2006

that it would continue its 2001 wolf management plan, which includes wolf monitoring and

many other management tasks, post delisting.[13] Michigan, whose management plan is discussed

above, similarly agreed in 2006 to conduct post-delisting monitoring. AR Doc. 228 at 8286. It

---

[11]    2006 Wolf Management Plan Addendum to 1999 Wolf Management Plan, AR Doc. 468A at 13407 (total annual expenditures on State wolf management ranged from $217,885 to $349,972 between 1999/2000 and 2004/2005 fiscal years and State share of that funding increased to $172,861 in 2003/2004 and then to $195,747 in 2004/2005). In its 2006 comments on the proposed delisting, Wisconsin agreed to engage in post-delisting monitoring on behalf of FWS, requesting "cost-sharing" to help it conduct this federal monitoring duty, and FWS responded by explaining the availability of federal funding sources.ee AR Doc. 228 at 8233; Final Post-Delisting Monitoring Plan Appendix at 3-4 (Ex. B. to this Reply).

[12]    Funding sources include the State Endangered Resources Tax Check-Off, Wis. Stat. § 71.30(10) (2006), License Plate Revenue, Wis. Stat. § 341.14 (2006), Wis. Stats., and voluntary donations, Wis. Stat. § 71.10(5)(b). State endangered resources funds pay for depredation programs in accordance with Wis. Stat. § 71.10(5)(am).

[13]    AR Doc. 228 at 8222 (comments); A.R. Doc 468A at 14933 (State Wolf Management Plan); *see also*, Minn.Stat.97B.646 (confirming state objective of ensuring wolf survival). The Minnesota comments did not condition continued state management on federal funding.

requested federal funding assistance for post-delisting monitoring but did not condition its commitment on that funding, which the FWS in any event has indicated is available.  *Id*., *see* Post-Delisting Monitoring Plan App. at 3-4 (Ex. B. to this Reply, also discussed in Point F to this Reply).  In short, Plaintiffs have made no showing that the FWS acted arbitrarily and capriciously in concluding that each state would, in some way, adequately carry out each state's management responsibilities.  5 U.S.C. § 706(2).

In addition, Defendant-Intervenors and the State Government Amici have also submitted documents to supplement the Administrative Record that refute Plaintiffs' post-decisional evidence concerning the adequacy of state wolf management funding.  Plaintiffs have already admitted that the Stark Declaration, regarding Minnesota's funding (Docket 43-5), should become part of the AR if Plaintiffs' own extra-record evidence regarding Minnesota funding becomes part of the AR. [14]  Read correctly, the Stark Declaration confirms that Minnesota spends more on personnel who work on wolf management than the $695,000 figure that framers of the Minnesota plan originally budgeted.  Plaintiffs misconstrue the Stark Declaration by incorrectly contending that the $354,000 being spent by Minnesota Department of Natural Resources annually for professional staff dedicated to wolf management, population research and monitoring, enforcement and education represents a shortfall of $141,000 from the wolf related costs anticipated by the drafters of the state's wolf management plan.  However, in making this assessment, Plaintiffs assume that all professional staff with wolf responsibilities and all wolf enforcement activities are paid for from the $695,000 allocated by Minnesota for wolf management.  That might have been the case, had Minnesota chosen to merely establish and fill three new Conservation officer positions related to wolves.  However, Minnesota DNR did not

---

[14]     Plaintiffs' Reply Supporting Plaintiffs' Motion to Supplement A.R. at 12 (Docket 35).

simply establish those three positions but also filled 20 *additional* positions with individuals

whose responsibilities include regularly engaging in wolf protection and monitoring activities.

Although these individuals have responsibilities for wolf management, their salaries are paid

from other, non-wolf portions of the Minnesota DNR budget.  As Mr. Stark explained:

> "Instead of simply establishing three new officer positions, Minnesota DNR filled
> 20 vacant Conservation Officer positions in wolf range since the wolf plan was
> drafted.  Although the three lead officers serve as the primary internal and
> external contacts for wolf issues, there are now 71 DNR Conservation Officers
> stationed in or adjacent to Minnesota wolf range.  Each of these officers respond
> to grey wolf management issues and each is involved, at least in part, in wolf
> management and wolf-related enforcement activities."

Declaration of Daniel Stark at page 3 (Exh. 2 to Defendant-Intervenors' Motion for Summary

Judgment, Docket 43-5).  As a result, contrary to Plaintiffs' allegations, not only is there

"enough" money for wolf protection and monitoring, there is in fact more funding being devoted

to these areas than was deemed necessary by the drafters of the Minnesota plan.

     With regard to Michigan, State Government Amici have filed a motion requesting that

the AR be supplemented by the Hogrefe Declaration and Defendant-Intervenors expect to shortly

file their own motion joining in that request.  If admitted, the Hogrefe Declaration provides

supplementary information about the funding and implementation of Michigan's Wolf

Management Plan.  *See* Hogrefe Declaration (Docket 40-2); AR Doc. 228 at 8286; Doc. 418 at

11491 and 11496 (various Michigan commitments clarified by Mr. Hogrefe).

     2.   <u>Disease and Predation</u>.  In their Opposition, Plaintiffs devote three sentences to

their argument that there is inadequate monitoring by Minnesota, Michigan and Wisconsin of

wolf numbers and therefore potential for diseases or human predators to kill large numbers of

wolves without being detected by state managers.  Pl. Opp. at 31.  Contrary to this argument, all

three states have numerous game wardens in the field who are poised to detect any surge in the

number of wolf carcasses spotted.  The FWS Post Delisting Monitoring Plan explains that

17

Minnesota, which has the largest and thus most difficult to count wolf population, will conduct formal wolf censuses in the first and fifth years following delisting.  PDM Plan at 3-4 (copy supplied as Exhibit "B" to this Reply).  Further, in these years and intervening years DNR personnel "will continue their collection and analysis of scent post data, winter track surveys, and verified wolf depredations," which activity "will furnish independent annual indices of wolf population trends and changes in occupied range …."  *Id*.  Wisconsin and Michigan conduct annual wolf population counts, with Michigan now using a sampling method as wolf populations have increased greatly.  *Id*.  at 4-5.

Inexplicably, Plaintiffs misrepresent the Final Rule to suggest that the gray wolf populations in those States could decline significantly before such decline is detected.  Pl. Opp. at 31.  The actual statement in the Final Rule is that "Wolf management plans for Minnesota, Michigan, and Wisconsin include disease monitoring components that we expect will identify future disease and parasite problems in time to allow corrective action ***to avoid a significant decline in overall population viability***."  72 Fed.Reg. at 6081 (emphasis added).

3.     <u>Depredation Control in Dispersal Areas</u>.  Plaintiffs erroneously suggest that the FWS has drawn unnecessarily broad boundaries around the core populations of wolves in the WGL-DPS, and that by doing so, the Service has created a rule that "virtually ensure[s] that dispersing wolves cannot contribute to wolf recovery" by dispersing to the areas of the United States where the classification status of wolves remains "endangered."  Pl. Opp. at. 22.  Plaintiffs go so far as to suggest that post-delisting, the States of the WGL-DPS plan to simply eradicate all wolves in these dispersal areas.  Nothing could be farther from the truth.  Although several of the States have authorized depredation control measures for problem wolves, none of the states has approved regulated seasons for wolves and not one has authorized unlimited removal of wolves.

Plaintiffs make a point of singling out wolves that disperse through Minnesota, inaccurately identifying Zone B in Minnesota as a "free-fire zone." Although it is true that Minnesota has divided the state into two zones and has designated stronger wolf protections within Zone A, there is no truth to Plaintiffs' allegations that the less stringent wolf protections in Zone B will result in the eradication of all wolves traveling through the area. According to the Minnesota Plan, only the following types of wolf removal are being allowed in Zone B:

> • state administered wolf control by certified predator controllers will be limited to cases of verified losses within the previous five years, and conducted within a one-mile radius of the depredation site
>
> • owners of livestock, domestic animals, or pets may shoot wolves to protect their animals, on land owned or leased by the owner, under certain conditions. Additionally, owners of livestock, domestic animals, or pets may employ a State certified predator controller to trap wolves to protect their animals on and within one mile of land owned or leased by the owner

Minnesota Plan, p. 3, AR Doc. 215, p. 5256. Minnesota DNR plans to monitor the wolf removal in Zone B since the taking of a wolf within that zone must be reported within 48 hours to the Minnesota DNR. *Id*. at 24, AR Doc. 215, p. 5277. The Minnesota Plan specifically notes that, within Zone B, wolves will continue to be fully protected on federal land, with the exception of certain areas of public land immediately adjacent to private land. *Id*. at 20, AR Doc. 215, p. 5273. Minnesota's Plan also specifically refutes any suggestion that the less restrictive protections will remove the Zone's entire wolf population.

> Although these depredation procedures will likely result in a larger number of wolves killed, as compared to previous ESA management, they will not result in the elimination of wolves from Zone B.

*Id*. p. 23, AR Doc. 215, p. 5276; see also Minn. Stat. 97B.645 (codifying wolf protections). Plaintiffs simply have no basis for challenging the breadth of the area within the boundaries of the WGL-DPS. The DPS appropriate incorporates the normal dispersal distances of the core population of wolves. However, wolves that range within those normal distances will not be at

risk of eradication even in areas with less restrictive wolf protections, and wolves that range

beyond the normal distances will have the opportunity to inhabit areas of the U.S., beyond the

boundaries of the WGL-DPS, where wolves continue to be under federal protections.

With respect to depredation control, Minnesota, Wisconsin, and Michigan have all

committed to the FWS to track each depredation control action they authorize and report the

number of wolves so taken to FWS under the PDM Plan.  Post-Delisting Monitoring Plan at 6

(Ex. B to this Reply).  They will also report to the FWS other forms of wolf death.  *Id.*

Moreover, the resiliency of the wolves and their ability to quickly regain population even after

substantial levels of regulated authorize take demonstrates that depredation control is unlikely to

pose any risk of major population decreases that will cause the WGL-DPS to become in danger

of extinction throughout all or a portion of its range.  AR Doc. 215, p. 5893 (citing studies

showing wolves rebounded from annual loss of 20% to 30%, and even 50%).

Also contrary to Plaintiffs' dispersal argument are the state-law protections that wolves

enjoy in the surrounding States of North Dakota, South Dakota, Iowa and Illinois, the only other

States that have substantial territory in the DPS.  Hunting and trapping of wolves is not allowed

in these States.[15]  So the dispersal zones within these States do not constitute "free-fire zones"

for any wolf that attempts to cross through.

---

[15]     North Dakota classifies gray wolves, to the extent they exist at all in the State, as furbearers with
a closed season, so they cannot be hunted or trapped. N.D. Cent. Code § 20.1-07 (2007); North Dakota
2007 Furbearer Guide, *available at* www.gf.nd.gov/regulations/furbearer/pdf/furbearer-guide.pdf.  South
Dakota only permits hunting or trapping of species for which an open season is established, and it has
established no open season for wolves, and there is no indication it has plans to do so.  S.D. Codified
Laws § 41-8-20 (2007); S.D. Furbearer Regs., www.sdgfp.info/Wildlife/Trapping/SDfurbearerregs.pdf.
Iowa (most of which is in the DPS) similarly lists gray wolves as furbearers with a closed season.  Iowa
Code § 481A (2007 merged); Iowa Hunting Regs. (www.iowa.dnr.com/law/files/07huntingregs.pdf).
Illinois (the northern fifth of which is in the DPS) protects wolves under the Illinois Endangered Species
Act, 520 ILCS 10.  Ohio and Indiana have only tiny fragments of  territory in the DPS (which includes
(Footnote Continued)

F. **Post-Delisting Monitoring and Emergency Relisting**.  Contrary to Plaintiffs'

argument, the FWS had a PDM Plan in place as required by 16 U.S.C. § 1533(g) at the time of

delisting.  *See* Pl. Opp. at 32.  The FWS labeled the original PDM Plan a "draft" because it was

in the process of refinement at the time of delisting, but the draft PDM Plan itself explained that

it was put into effect on an interim basis to avoid a gap in monitoring:

> "We began developing the PDM Plan in advance of making a final decision on
> the delisting proposal in order to be able to implement the PDM activities in a
> timely manner in the event that we determined that delisting the WGL DPS is
> appropriate. We are implementing the PDM [Post-Delisting Monitoring] as
> described in the Draft PDM Plan, although we recognize that the PDM Plan may
> be modified as a result of this review."

72 Fed.Reg. 30819, 30820 (June 4, 2007).  The draft PDM Plan is attached as Exhibit "A" to this

Reply. The Final PDM plan was recently completed following opportunity for public comment

and is attached as Exhibit "B."

Plaintiffs also complain that the PDM relies on data from the states; however, this

cooperation with the states is what the ESA requires. "The Secretary shall implement a system ***in***

***cooperation with the States*** to monitor" delisted species. § 1533(g)(1) (emphasis added).

Plaintiffs complain that the FWS could not be assured that the states would fund the

monitoring program, but absolute assurance is not required.  The FWS, in the Final Rule, noted

that the states had been conducting wolf monitoring "for several decades with significant

assistance from numerous partners, including the U.S. Forest Service, National Park Services,

USDA-APHIS Wildlife Services, Tribal natural resource agencies, and the Service.  … All three

state DNRs have committed to continue their previous wolf population monitoring

methodology."  72 Fed.Reg. at 6101; *see also* Point E.1 above.  There was no reason to believe

them only so the DPS boundary follows Interstate-80), and no wolves are known to have been seen there,
so there States have not had occasion to address wolf conservation matters.

that work the states had carried on for decades and committed to continue would suddenly stop.

The Final PDM Plan lists multiple sources of federal funding that are available to help states

conducting post-delisting monitoring on behalf of FWS. *See* PDM Plan – Appendix at 3-4 (Ex.

B).[16] Finally, the FWS emphasized that it retained "responsibility" for conducting monitoring,

and so would step in directly if the states did not fulfill their commitments. 72 Fed. Reg. at

6101. In satisfying the monitoring requirement of 16 U.S.C. § 1533(f), FWS also satisfied the

Recovery Plan criteria that called for an adequately funded monitoring plan to be in place.

The draft PDM Plan (and the final PDM Plan which supersedes it) provides that FWS

will consider relisting in the event of:

(a)    either the Wisconsin or Michigan wolf population fell below 100 wolves, or

(b)    the lower-end confidence level for the estimated Minnesota Wolf population (i.e. worst-case scenario estimate) falls below 1,500 wolves.

Additionally, FWS will investigate further in the event of the following:

(c)    a substantial and widespread increase in mortality from known or unknown cases occurs, or

(d)    evidence of a new wolf disease or substantial increase in virulence of a previously known wolf disease, even in the absence of demographic, impact on wolf population, or

(e)    any one of several other warning signal events occur.

See Ex. A at 9-10 and Ex. B. at 10-11. The PDM Plan's relisting criteria exceed those

established by the Recovery Plan. For example the PDM Plan insists on the existence of

populations of 100+ wolves in both Wisconsin and Michigan, while the Recovery Plan required

---

[16]    The Court may take judicial notice of the PDM Plans. Fed.R.Evid. 201. The PDM Plans implement a mandatory ESA process and so have independent stature as agency action. 16 U.S.C. § 1533(g) (statutory monitoring process). They may also be considered by the court like other agency policy pronouncements. *See U.S. v.City of St. Paul*, 258 F.3d 750, 752 (8th Cir. 2001) (taking judicial notice of agency handbook)

in some scenarios only one such population for both states.  The PDM Plan also includes a

disease trigger which was not found in the Recovery Plan.  *Id*.; AR Doc. 468A, p. 13795-95.

      **H.**    <u>**Harmless Error Standard and Remedy if Error is Found**</u>.  Should the Court

find some error in some aspect of the FWS's hundred page delisting decision, the Court will

need to consider whether the error is prejudicial or harmless under the Administrative Procedure

Act's ("APA") harmless error standard.  5 U.S.C. § 706 ("due account shall be taken of the rule

of prejudicial error").  Given the large margin by which the number of wolves now exceeds the

Recovery Plan targets and the narrow nature of many of Plaintiffs' objections, it is difficult to

see how any error could be prejudicial.  Should the Court find prejudicial error, it must consider

remedy under the APA remedy standards.  *See* DI Opn. at 38-39 (reviewing caselaw).

      Plaintiffs explain that "to the extent that the [Oregon and Vermont decisions regarding

the 2003 downlisting rule] provide any guidance at all, they would support at most a tight

[delisting] line around the existing wolf populations in northern Minnesota, northern Wisconsin,

and Michigan's Upper Peninsula,**"** i.e. the Core Recovery Areas.  Pl.Opp. at 22.  As Plaintiffs'

statement suggests, Plaintiffs offer little response to Defendant-Intervenors' point that temporary

relisting in the Core Recovery Areas during a remand to address curable issues would be

needlessly disruptive to state wolf management.  *See* Pl. Opp. at 32-33 (addressing disruption to

Defendant-Intervenors but not disruption to states);  DI. Opn. at 40-41 (addressing both types of

disruption).  Those state management plans have been in operation for almost a year since

delisting, and have required the investment of considerable resources.  *E.g*. State Governments

Amici Brief at 25-28 (Docket 40) (describing Michigan's plan).

      Plaintiffs do not deny that remand without vacatur for further explanation or a temporary

stay of remedy to give the FWS a chance to act before disruption occurs are available remedies

in appropriate ESA cases, as in any other case reviewed under the APA.  Pl. Opp. at 33; DI Opn.

at 39-41.  Plaintiffs do not appear to contend that the FWS will inevitably have to redesignate the

wolves of the Core Recovery Area as "endangered" or "threatened."  *See* Pl. Opp. at 22.  16

U.S.C. § 1533(c) in fact precludes listing in "portions of [the species or DPS] range" in which

the species (or DPS) is no longer endangered or threatened, e.g. the Core Recovery Areas.[17]

Plaintiffs' argument that allegedly "endangered" wolves in the Core Recovery Areas are

of irreplaceable value (Pl. Opp. at 33) presumes that the wolves in the Core Recovery Areas are

in fact "endangered" or "threatened" (and also ignores the broader interests of the state

governments implementing wolf management plans).  However, as discussed above, all the

evidence available to the FWS establishes that wolves in the Core Recovery Areas have

recovered and are no longer "endangered" or "threatened."  Consequently, a remedy that would

impose the listing of a recovered species would defy the purpose of the ESA.

## CONCLUSION

For the foregoing reasons and those stated in Defendant-Intervenors' Opening Brief and

the briefs of the Federal Defendants and Amici State Governments, National Wildlife Federation,

and Pacific Legal Foundation, the Court should affirm the FWS's decision to delist the WGL-

DPS wolves and grant Defendant-Intervenors' Motion for Summary Judgment.

---

[17]    16 U.S.C. § 1533(c)(1) provides flexibility for listing in any more limited areas where threats are found to exist, as it directs that FWS when listing a species (a DPS is a "species") shall "specify .. what portions of its range it is endangered or threatened …."  *See also Defenders of Wildlife (Lizard)*, 258 F.3d at 1141, 1144 (FWS has flexibility to list only where threats exist); 43 Fed.Reg. 9607 (Mar. 9, 1978) (classifying wolves in Minnesota as "threatened" and wolves elsewhere in conterminous 48 states as "endangered");  DOI Solicitor's Memorandum on the Meaning of "in Danger of Extinction Throughout All or a Significant Portion of its Range" at 16-19 (Mar. 16, 2007) (Exh. 3 to DI Op. Br.); see *U.S. v. Lara*, 541 U.S. 193, 206 (2004) (Court may consider Solicitor's opinion like other precedent).

Corrected Per Errata: April 7, 2008

Dated:  March 7, 2008                                    Respectfully submitted,

/s/ William P. Horn                                      /s/ Anna M. Seidman
William P. Horn (D.C. Bar No. 375666)                    Anna M. Seidman (D.C. Bar No. 417091)
James H. Lister (D.C. Bar. No. 447878)                   Douglas S. Burdin (D.C. Bar No. 434107)
Birch Horton, Bittner & Cherot                           Safari Club International
1155 Connecticut Avenue N.W., Suite 1200                 501 2nd Street NE
Washington, D.C.  20036                                  Washington, D.C.  20002
(202) 659-5800                                           (202) 543-8733
Fax:  (202)659-1027                                      Fax:  (202) 543-1205
whorn@dc.bhb.com                                         aseidman@sci-dc.org
jlister@dc.bhb.com                                       dburdin@sci-dc.org

*Counsel for U.S. Sportsmen's Alliance*                  *Counsel for Safari Club International,  Safari*
*Foundation, Wisconsin Bear Hunters'*                    *Club International Foundation, and National*
*Association, Scott Meyer and Robert Stafholt*           *Rifle Association*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, HELP OUR WOLVES LIVE, ANIMAL PROTECTION INSTITUTE, and FRIENDS OF ANIMALS AND THEIR ENVIRONMENT, | |
| Plaintiffs, | |
| vs. | Civil Action No. 1:07-cv-00677(PLF) |
| DIRK KEMPTHORNE, Secretary of the Interior, U.S. DEPARTMENT OF THE INTERIOR, and U.S. FISH AND WILDLIFE SERVICE, | |
| Defendants, | |
| and | |
| SAFARI CLUB INTERNATIONAL, SAFARI CLUB INTERNATIONAL FOUNDATION, and NATIONAL RIFLE ASSOCIATION, | |
| Defendant-Intervenors, | |
| and | |
| U.S. SPORTSMENS' ALLIANCE FOUNDATION, WISCONSIN BEAR HUNTERS' ASSOCIATION, SCOTT MEYER, and ROBERT STAFSHOLT, | |
| Defendant-Intervenors. | |

**DEFENDANT-INTERVENORS' STATEMENT OF**
**UNCONTROVERTED MATERIAL FACTS IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

Pursuant of Local Civil Rule 56.1, Defendant-Intervenors U.S. Sportsmen's Alliance

Foundation, Wisconsin Bear Hunting Association, Scott Meyer and Rob Stafholt and Defendant-

Intervenors Safari Club International, Safari Club International Foundation, and National Rifle Association (collectively, "Defendant-Intervenors") submit this Statement of Uncontroverted Material Facts in Support of their Motion for Summary Judgment.

### Delisting Criteria in Wolf Recovery Plan

1.    The 1978 Recovery Plan for the Eastern Timber Wolf and the 1992 revised Recovery Plan (collectively, the "Recovery Plan") contain the same two criteria for delisting wolves.  72 Fed. Reg. at 6052 (February 8, 2007).

2.    The first delisting criterion of the Recovery Plan provides that the survival of the wolf in Minnesota must be assured, which means the population must be stable or increasing. 72 Fed. Reg. at 6052, 6053-55.

3.    The Recovery Plan established a planning goal of 1,250-1,400 animals for the Minnesota wolf population (USFWS 1992, p. 28), which would increase the likelihood of maintaining its genetic diversity over the long term. 7 2 Fed. Reg. at 6052.

4.    The second delisting criterion in the Recovery Plan provides that at least one viable wolf population should be reestablished within the historical range of the Eastern Timber wolf outside of Minnesota and the isolated population on the island of Isle Royale, Michigan.  72 Fed. Reg. at 6052

5.    The second population (the one not in Minnesota or Isle Royale) was required in order to enhance both the resiliency and redundancy of the recovery program.  72 Fed. Reg. at 6052.

6.    If the second population was an isolated population, that is, located more than 100 miles (160 km) from the Minnesota wolf population, the second population had to consist of at

least 200 wolves for at least 5 years (based upon late-winter population estimates) to be considered viable.  72 Fed. Reg. at 6072.

7.    Alternatively, if the second population was located within 100 miles (160 km) of a self-sustaining wolf population (for example, the Minnesota wolf population), it was considered viable if it maintained a minimum of 100 wolves for at least 5 years.  72 Fed. Reg. at 6053.

8.    In 1998, FWS clarified the application of the delisting criterion for the second population by stating that the criterion would be satisfied by Michigan or Wisconsin populations if six consecutive late-winter surveys yielding a full five years of population data (the five years between the first and sixth survey) all showed a population above the threshold number.  72 Fed. Reg. at 6053.

9.    The Recovery Plan did not specify where in the eastern United States the second population should be reestablished.  *Id.*

10.    Neither the 1978 nor the 1992 recovery criteria suggested that the restoration of the gray wolf throughout all or most of its historical range in the eastern United States, or to all of these potential re-establishment areas, was necessary to achieve recovery under the Act.  *Id.*

<u>**Fulfillment of the Recovery Plan Criteria**</u>

<u>Minnesota</u>

11.    There were fewer than a 1000 wolves in Minnesota when wolves were listed under the ESA in 1974.  72 Fed. Reg at 6053.

12.    In 1976, the estimated Minnesota wolf population was 1,000 to 1,200 wolves.  72 Fed. Reg. at 6053 (citing USFW 1978, pp. 4, 50-52).

13.    In 1988-89, the Minnesota Department of Natural Resources ("DNR") estimated the Minnesota wolf population as being 1500 to 1750 wolves.  72 Fed. Reg. at 6053.

14.    In 1997-98, the Minnesota DNR estimated the Minnesota wolf population as being approximately 2,445 wolves, with a 90 percent confidence interval that the population was between 1995 to 2,905 wolves.  72 Fed. Reg. at 6054 (*citing* Berg and Benson 1999, p. 4).

15.    In 2003-04, the Minnesota DNR estimated the Minnesota wolf population as being approximately 3,020 wolves.  72 Fed. Reg. at 6054.

16.    This 2003-04 population estimate was more than double the target number of Minnesota wolves (1,250 to 1,400) set in the Recovery Plan.  72 Fed. Reg. at 6052-54.

17.    The estimated wolf range in Minnesota in 1970 was 11,954 square miles.  72 Fed. Reg. at 6054.

18.    The estimated wolf range in Minnesota in 1997-98 was 33,971 square miles.  72 Fed. Reg. at 6054.

19.    The estimated wolf range in Minnesota in 2003-04 was not substantially different than that in 1997-98.  72 Fed. Reg. at 6054.

20.    Based on the increase in the number of wolves in Minnesota and their range, the survival of the wolves in Minnesota is assured, satisfying the first Recovery Plan criterion.  72 Fed. Reg. at 6052 (Minnesota population is stable and increasing), 6060 (Minnesota wolves have occupied substantially all suitable habitat in the State).

Wisconsin

21.    In 1979-80, the Wisconsin DNR estimated the Wisconsin wolf population as being approximately 25 wolves.  72 Fed. Reg. at 6054.

4

22.    In 2005-06, the Wisconsin DNR estimated the Wisconsin wolf population as being approximately 465 to 502 wolves.  72 Fed. Reg. at 6055.

23.    Since 2002, Wisconsin wolf numbers exceeded the Recovery Plan criterion for a second wolf population where the second population was less than 100 miles from the first wolf population.  By 2002 Wisconsin had had a minimum of 100 wolves for a minimum of five consecutive years as measured by six annual late-winter counts.  72 Fed. Reg. at 6055.

24.    The Wisconsin wolf population is less than 100 miles from the Minnesota wolf population.  72 Fed. Reg. at 6053.

25.    Moreover, since 2004, Wisconsin wolf numbers exceeded the Recovery Plan criterion for a second wolf population that was more than 100 miles from a first wolf population.  By 2004 Wisconsin had had a minimum of 200 wolves for a minimum of five consecutive years as measured by six annual late-winter counts.  72 Fed. Reg. at 6055.

26.    Accordingly, Wisconsin has met the Recovery Plan criterion for a second wolf population regardless of whether that population is less than or more than 100 miles from the Minnesota population.  72 Fed. Reg. at 6055.

Upper Peninsula of Michigan

27.    In 1994, the Michigan DNR estimated there to be 57 wolves in the Upper Peninsula of Michigan.  72 Fed. Reg. at 6055.

28.    In 2006, the Michigan DNR estimated there to be 434 wolves in the Upper Peninsula of Michigan.  72 Fed. Reg. at 6055.

29.    By the date of the issuance of the 2007 Final Rule to Delist the WGL DPS (Feb. 8, 2007), the Upper Peninsula Michigan wolf population had satisfied the Recovery Plan criterion for a second wolf population that was more than 100 miles from a first wolf

population.  By February 8, 2007, there were more than 200 wolves in the Upper Peninsula for

five consecutive years as measured by six annual late-winter surveys.  72 Fed.Reg. at 6055.

### Suitability of Habitat Outside Minnesota, Wisconsin, and the Upper Peninsula of Michigan

Criteria for Habitat Suitability

30.    The Recovery Plan concluded that 10,000 square miles of contiguous suitable

wolf habitat is necessary to support a viable permanent isolated gray wolf population.  AR 459.

72 Fed. Reg. at 6074.

31.    An isolated wolf population is one not periodically refreshed by immigration from

another nearby wolf population.  72 Fed. Reg. at 6072, 6074.

32.    The Recovery Plan concluded that 5,000 square miles of contiguous suitable wolf

habitat is necessary to support a viable permanent wolf population that is replenished by

immigration from another nearby wolf population.  72 Fed. Reg. at 6072.

33.    For habitat to be suitable for wolves, the road density must generally be equal to

or less than 0.9 to 1.1 miles of road per square mile.  72 Fed. Reg. at 6071 (*citing* Thiel, 1985,

pages 404-06; Jensen *et al*., 1986, pages 364-66 ; Mech *et al*., 1988, pages 85-87; Fuller *et al*.,

1992, pages 48-51; and Mladneoff, 1985, page 289).

34.    Forests provide more suitable habitat than open terrain for wolves, as forests

provide better cover for escape and denning.  72 Fed. Reg. at 6074.

35.    For non-forested habitat to be potentially suitable for wolves, the road density

may need to be substantially less than the 0.9 to 1.1 miles per square mile figure applicable to

forested habitat.  72 Fed. Reg. at 6074.

36.    For any habitat to be suitable for wolves, there must also be a sufficient number of

deer or other ungulates to serve as prey for the wolves.  72 Fed. Reg. at 6076.

The Northern Lower Peninsula of Michigan

37.   Analyzing road-density data, Gehring/Potter concludes that there are about 850 square miles of suitable wolf habitat in the Northern Lower Peninsula ("NLP") of Michigan. 72 Fed. Reg. at 6072; AR 459.

38.   Gehring/Potter reached that conclusion after determining that areas in the NLP with satisfactory road-density are highly fragmented, and excluding from the count fragments of habitat with suitable road-density that were less than 19 square miles in size.  72 Fed. Reg. at 6072; AR 459.

39.   Potvin concludes that there are about 3090 square miles of suitable wolf habitat in the NLP; however, Potvin includes small habitat fragments of suitable road-density in that count, even if fragments are less than 19 square miles in size.  72 Fed. Reg. at 6072; AR 459.

40.   Despite their differences in methodology, both the Gehring/Potter suitable habitat figure for the NLP and the Potvin suitable habitat figure for the NLP fall below the 5,000 square mile threshold judged necessary by the Recovery Plan for establishing a permanent wolf population that is periodically replenished by another wolf population.  72 Fed. Reg. at 6072.

41.   While Potvin concludes the NLP might support more wolves, Gehring/Potter conclude that the NLP might support a population of only 46 to 90 wolves.  72 Fed. Reg. at 6072.

42.   Gehring/Potter also conclude that "Given current land-use and road patterns, the NLP may never support a significant, large wolf population given the likely reduced dispersal rate from a source population."  72 Fed. Reg. at 6074; AR 468B at 16283.

43.   The NLP has no present permanent wolf population, i.e. wolves other that occasional wolves dispersing from elsewhere. 72 Fed. Reg. at 6072.

44.   Wolf reproduction in the NLP has never been documented.  72 Fed. Reg. at 6072.

45.   Several wolves have been seen crossing the Straits of Mackinac from the Upper Peninsula to the NLP.  72 Fed. Reg. at 6072.  However, follow-up surveys by the Michigan DNR in the winter of 2005 and 2006 revealed no wolf tracks in the NLP.  72 Fed. Reg. at 6072.

46.   Thus there is no established wolf population in the NLP even though any wolves there were federally protected there for thirty-four years (1974 through 2007) by the Endangered Species Act ("ESA").

47.   No other area in the Lower Peninsula of Michigan has any suitable wolf habitat. 72 Fed. Reg. at 6072.

<u>The Turtle Mountains of North Dakota</u>

48.   Based on the road-density criteria, the only area outside Minnesota these three states and within the WGL DPS that potentially might hold wolves on a frequent or possibly constant basis is the Turtle Mountain region that straddles the international border in north central North Dakota in the northwestern corner of the DPS.  72 F.R. at 6074.

49.   The Turtle Mountains area is an island of forest surrounded by a landscape largely modified for agriculture and grazing.   The surrounding landscape is unsuitable for wolves because it provides negligible cover for denning and escape.  72 Fed. Reg. at 6074.

50.   The Turtle Mountains habitat is marginal for wolves.  72 Fed. Reg. at 6074.

51.   The Turtle Mountains area contains 579 miles of potentially suitable low-road-density habitat, 384 of which are in North Dakota, and so within the Western Great Lakes Distinct Population Segment ("WGL DPS"), and 185 of which are across the border in

Manitoba, Canada, and so outside the WGL DPS.  72 Fed. Reg. at 6074 (*citing* Licht and

Huffman 1996, p. 172).

52.    The 579 square miles of potentially suitable habitat in the Turtle Mountains falls

below both (a) the 5,000 square mile minimum contiguous suitable habitat criterion that the

Recovery Plan sets for a wolf population that is periodically replenished by immigration from a

nearby population, and (b) the 10,000 square mile criterion that the Recovery Plan set for an

isolated population.  72 Fed. Reg. at 6072, 6074.

53.     The Turtle Mountains are isolated, so the higher 10,000 mile minimum applies.

72 Fed. Reg. at 6074.

54.    There is no evidence in the record that wolves have reproduced in the Turtle

Mountains.

55.    There is no evidence in the record that wolves have been seen in the Turtle

Mountains.

56.    Thus there is no established wolf population in the Turtle Mounts even though

any wolves there were protected there for thirty-four years (1974 through 2007) by the ESA.

Other Areas within the WGL DPS

57.    In addition to evaluating the NLP of Michigan and the Turtle Mountains of North

Dakota, the FWS concluded that the remaining portions of  the WGL DPS outside the Core

Recovery Areas (Minnesota, Wisconsin, and the Upper Peninsula of Michigan) do not contain

sufficient contiguous suitable wolf habitat to support a permanent wolf population.  72 Fed.

Reg. at 6074.

Significant Portion of Range Conclusion

58.    Accordingly, no areas within the WGL DPS but outside the Core Recovery Areas constitute a significant portion of the range of the wolves in the WGL DPS.  72 Fed. Reg. at 6073-74.

### Wolves are a Resilient Species

59.    Numerous scientific studies analyzed by the FWS for the purpose of deciding on the listing status, demonstrated that wolf populations can continue to thrive despite significant population reduction.  AR Doc. 215, p. 5893 (listing studies finding wolves rebound from 20-30% and even 50% annual population losses).

### Wolf Management Plans

60.    Minnesota, Michigan and Wisconsin each developed and adopted wolf management plans.  Minnesota's plan was completed in early 2001, Wisconsin's was adopted in 1999 and updated in 2006, and Michigan's was completed and approved in 1997.  72 Fed. Reg. 6084-85.

61.    Each of the plans includes a minimum population level, (1600 in Minnesota, 350 in Wisconsin and 200 in Michigan) which if reached, triggers the pertinent state's enhanced wolf protections.  *Id*. at 6083.  These minimum population standards each exceed the minimum population numbers established by the Eastern Timber Wolf Recovery Plan for the species' recovery and removal from the "endangered" and "threatened" species lists.  (1550 for Minnesota, 100 for Wisconsin and Michigan collectively) AR Doc. 468A, p. 13770, 13773.  Consequently, even if one or more of the state's wolf populations did, for some reason, drop to these minimum levels, the population reduction(s) would not qualify the WGL DPS for "endangered" or "threatened" listing status.

62.    Michigan's wolf management plan has been in effect for over 10 years and remains in effect while the state develops a revised plan. *Id*. at 6068.  In delisting wolves, the FWS relied on the adequacy of the existing plan, and not on the forthcoming revised version. In the Final Rule to delist the WGL DPS, the FWS explained that "the current Michigan plan . . . will provide adequate regulatory mechanisms for Michigan wolves.  72 Fed. Reg. at 6094.

63.    The FWS observed that "[n]ecessary wolf management actions detailed in the Michigan Plan include public education and outreach activities, annual wolf population and health monitoring, research, depredation control, and habitat management."  72 Fed. Reg. at 6092.

64.    In making its decision to delist the wolves of the WGL DPS, the FWS also took into consideration state efforts for the protection of wolves in addition to the mandatory regulatory mechanisms, such as its *Guidelines for Management and Lethal Control of Wolves Following Confirmed Depredation Events*. *Id*. at 6068.

65.    Minnesota's wolf management plan's goal is "to ensure the long-term survival of wolves in Minnesota while addressing wolf-human conflicts that inevitably result when wolves and people live in the same vicinity", and focuses on population monitoring and management, management of wolf depredation of domestic animals, management of wolf prey, enforcement of laws regulating take of wolves, public education, and increased staffing to accomplish these actions. *Id*. at 6084.  The plan divides the state into two zones, with wolves in Zone A receiving stronger protection than wolves in Zone B.  Even in Zone B, significant restrictions apply to the take of wolves.  For example, only depredating wolves may be killed and only on lands owned, leased or managed by the owner of a domestic animal attacked or threatened by a wolf on the land or within a one mile radius of that land.  According to Minnesota's Wolf

Management Plan, "[a]lthough these depredation procedures will likely result in a larger number of wolves killed, as compared to previous ESA management, ***they will not result in the elimination of wolves from Zone B***."  AR Doc. 215 at 5276 (*emphasis added*).  *See* A.R. Doc. 215, p. 5893 (wolves are resilient and a healthy population that can rebound from substantial losses.

66.    The FWS properly assumed that Minnesota's wolf management efforts would be "funded and implemented largely as written."  72 Fed. Reg. at 6068.  As demonstrated by the Declaration of Daniel Stark, Wolf Management Specialist for the Minnesota Department of Natural Resources, the state's collective financial resources for wolf management, including in-kind depredation control assistance from the Wildlife Services Division of the U.S. Department of Agriculture and state funding from multiple budgets, as well as the 20 new Conservation Officers each tasked, at least in part, with wolf management responsibilities, far exceeds the management expectations identified in the state's wolf management plan. Declaration of Daniel Stark, attached as Exhibit "2" to Defendant-Intervenors' Memorandum in Support of Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment.[1]

67.    In his Declaration, Daniel Stark discusses the fact that since 1986, the federally funded Wildlife Services branch of the U. S. Department of Agriculture has been the agency that has conducted Minnesota's gray wolf depredation control activities.  Daniel Stark also explains how Wildlife Services has *continued* to provide and fund the State's depredation control activities.  Declaration of Daniel Stark, attached as Exhibit 2 to Defendant-Intervenors'

---

[1]    Defendant-Intervenors requested this document be included in the Administrative Record in their response to Plaintiffs' Motion to Supplement the Administrative Record, as an alternative to denial of Plaintiffs' Motion to Supplement the Administrative Record.

Memorandum in Support of Motion for Summary Judgment and Opposition to Plaintiffs'
Motion for Summary Judgment.

68.    Although Michigan has Michigan's decision to change its population monitoring
strategies, the new strategies will continue to enable the state to adequately monitor its wolf
population.  As explained by Thomas Drummer, PhD of Michigan Technological University,
who helped design the new monitoring strategy:  "The results of the simulations indicate the
proposed monitoring program based on geographic stratification will produce unbiased, precise
estimates of total wolf abundance."  AR Doc 241, p.  8527.

69.    According to the Executive Summary of Michigan's Five Year Evaluation Report
of its Gray Wolf Recovery and Management Plan "many objectives of the plan were met
during the first five years of plan implementation."  AR Doc. 142 at 767.  Michigan, Minnesota
and Wisconsin each have plans to monitor and assess the impact of disease on their wolf
populations.  The 1997 Michigan Wolf Recovery and Management Plan states that wolf health
and disease monitoring will receive a high priority for a minimum of five years post delisting.
*Id.* at 6080.  Wisconsin's post-delisting approach is to test for disease and parasite loads
through periodic necropsy and scat analyses.  In addition, the 2006 update to Wisconsin's 1999
plan recommends that all wolves live-trapped for other purposes should have their health
monitored and reported to the state wildlife health specialists.  *Id.*  Minnesota's disease
monitoring strategies involve DNR personnel who "will collaborate with other investigators
and continue monitoring disease incidence, where necessary, by examination of wolf carcasses
obtained through depredation control programs, and also through blood/tissue physiology work
conducted by DNR and the U.S. Geological Survey."  AR Doc. 215, p. 5285.  In addition,
Minnesota's DNR personnel will engage in the "regular collection of pertinent tissues of live

captured or dead wolves" and periodically assess wolf health "when circumstances indicate that diseases or parasites may be adversely affecting portions of the wolf population."  AR Doc. 215, p. 5273.

<u>The Western Great Lakes Distinct Population Segment</u>

70.    The WGL wolves represent the only U.S. wolf population to reside in the Laurentian Mixed Forest Province or to use any form of eastern coniferous or eastern mixed coniferous-broadleaf forest in the United States.  The recovered Western Great Lakes wolf metapopulation is the only gray wolf population in the conterminous United States east of the Rocky Mountains and currently constitutes about 80 percent of North American gray wolves that occur south of Canada.  72 Fed. Reg. 6051, 6059-6060.

71.    The boundaries of the WGL-DPS encompass Minnesota, Wisconsin, Michigan, small segments of Ohio and Indiana, approximately 1/4 of Illinois, 2/3 of Iowa and less than half of the Dakotas.  72 Fed. Reg. at 6052.

72.    The gray wolf population of the Western Great Lakes has long and consistently been dealt with as distinct from other wolf populations of the conterminous United States.  On March 11, 1967, the FWS listed as "threatened" the "timber wolf – canis lupus lycaon"[2] under the Endangered Species Preservation Act of October 15, 1966 (80 Stat. 926; 16 U.S.C. 668aa(c)), 32 Fed. Reg. 4001, (March 11, 1967).  Then on January 4, 1974, the FWS listed as "endangered" both the Eastern Timber wolf (canis lupus lycaon) and the Northern Rocky Mountain wolf (canis lupus irremotus).  39 Fed. Reg. 1175, (January 4, 1974).  In 1978, the FWS converted these two individual subspecies' listings into a single listing, for the sake of "convenience,"

---

[2]    Canis lupus lycaon is the scientific name for the Eastern Timber Wolf that resides in the WGL-DPS.

explaining that "[i]n any case, the Service wishes to recognize that the entire species

Canis lupus is Endangered or Threatened to the south of Canada, and considers that this

matter can be handled most conveniently by listing only the species name."  43 Fed.

Reg. 9607 (March 9, 1978).

73.    Despite the joint listing, the FWS continued to deal with the Eastern

Timber wolf as an entity separate and distinct from other U.S. populations of wolves.

In 1978, the FWS published the Eastern Timber Wolf Recovery Plan, which was

revised in 1992.  AR Doc. 468A, p. 13770.  The Eastern Timber Wolf Recovery Plan

was separate and distinct from the recovery plan developed and published for the

Northern Rocky Mountain population of wolves.  68 Fed. Reg. 15804, 15810 (April 1,

2003).  The recovery goals of the Eastern Timber Wolf Recovery Plan established

objective recovery different from the recovery goals identified by the Northern Rocky

Mountain Recovery Plan.  Each wolf population achieved their recovery objectives

independently of the other.

74.    To delineate the boundary of the WGL DPS, the FWS "considered the

current distribution of wolves in the Midwest and the characteristic movements of those

wolves and of gray wolves elsewhere" and "examined the available scientific data on

long-distance movements, including long-distance movements followed by return

movements to the vicinity of the natal pack" 72 Fed. Reg. at 6060.  The FWS

"concluded that wolf behavior and the nature of wolf populations require that we

include within the area of the DPS some subset of known long-distance movement

locations."  *Id*.  The FWS determined that "wolf biology and common sense argue

against the inclusion within the DPS boundary of all known or potential long-distance

movements. . . ." *Id*.  The FWS drew the boundaries of the DPS "to include the core

recovered wolf population plus a wolf movement zone around the core wolf

populations." *Id*.  The DPS boundaries were "not intended to include all areas to which

wolves have moved from the Great Lakes population" but instead to "include[] the area

currently occupied by wolf packs in Minnesota, Wisconsin, and Michigan; the nearby

areas in these States, including the Northern Lower Peninsula of Michigan, in which

wolf packs may become established in the foreseeable future; and a surrounding area

into which Minnesota, Wisconsin, and Michigan wolves occasionally move but where

persistent packs are not expected to be established because suitable habitat is rare and

exists only as small patches." *Id*.  The FWS designated boundaries so that "[t]he area

surrounding the core wolf populations includes the locations of most known dispersers

from the core populations, especially the shorter and medium-distance movements from

which wolves are most likely to return to the core areas and contribute to the recovered

wolf population." *Id*.

72.    The FWS has developed and published a post-delisting monitoring plan

for the WGL DPS. 72 Fed. Reg. 30819 (June 4, 2007).  The Federal Register Notice

announcing the plan states that it is already being implemented. *Id*. at 30820.

Corrected Per Errata: April 7, 2008

Dated: January 18, 2007                    Respectfully submitted,


s/ James H. Lister                         s/ Anna M. Seidman
William P. Horn (D.C. Bar No. 375666)      Anna M. Seidman (D.C. Bar No. 417091)
James H. Lister (D.C. Bar. No. 447878)     Douglas S. Burdin (D.C. Bar No. 434107)
Birch Horton, Bittner & Cherot            Safari Club International
1155 Connecticut Avenue N.W.,              501 2nd Street NE
Suite 1200                                 Washington, D.C.  20002
Washington, D.C.  20036                    (202) 543-8733
(202) 659-5800                             Fax:  (202) 543-1205
Fax:  (202)659-1027                        aseidman@sci-dc.org
whorn@dc.bhb.com                           dburdin@sci-dc.org
jlister@dc.bhb.com

*Counsel for U.S. Sportsmen's Alliance*    *Counsel for Safari Club International,  Safari Club*
*Foundation, Wisconsin Bear Hunters'*      *International Foundation, and National Rifle*
*Association, Scott Meyer and Robert*      *Association*
*Stafsholt*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, HELP OUR WOLVES LIVE, ANIMAL PROTECTION INSTITUTE, and FRIENDS OF ANIMALS AND THEIR ENVIRONMENT,<br><br>        Plaintiffs,<br><br>    vs.<br><br>DIRK KEMPTHORNE,<br>Secretary of the Interior,<br>U.S. DEPARTMENT OF THE INTERIOR, and<br>U.S. FISH AND WILDLIFE SERVICE,<br><br>        Defendants,<br><br>and<br><br>SAFARI CLUB INTERNATIONAL, SAFARI CLUB INTERNATIONAL FOUNDATION, and NATIONAL RIFLE ASSOCIATION,<br><br>        Defendant-Intervenors,<br><br>and<br><br>U.S. SPORTSMENS' ALLIANCE FOUNDATION, WISCONSIN BEAR HUNTERS' ASSOCIATION, SCOTT MEYER, and ROBERT STAFSHOLT,<br><br>        Defendant-Intervenors. | Civil Action No. 1:07-cv-00677(PLF) |

## DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFFS' RULE 56.1 STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE

Defendant-Intervenors U.S. Sportsmen's Alliance Foundation, Wisconsin Bear Hunting

Association, Scott Meyer and Rob Stafholt and Defendant-Intervenors Safari Club International,

Safari Club International Foundation, and National Rifle Association (collectively, "Defendant-Intervenors") respectfully submit this Response to Plaintiffs' Statement of Material Facts not in dispute ("Plaintiffs' Rule 56.1 Statement") (Docket 27-3).[1]

1.      Admitted in part and denied in part.  It is admitted that the gray wolf is the largest member of the canine family.  Defendant-Intervenors ("Defendant-Intervenors") also admit that wolves prey primarily on wild ungulates such as deer, elk, moose and bison, as well as smaller mammals like beavers and rabbits.  Defendant-Intervenors deny the accuracy of Statement 1 in that it is an incomplete depiction of the materials referenced by Plaintiffs.  More specifically, Plaintiffs fail to explain that wolves do not simply prey on wild ungulates, but "most often kill very young ungulates."  AR Doc. 215, p. 5264.  In addition, Defendant-Intervenors note that wolves do not restrict their killing of ungulates for the purposes of obtaining food.  "Under unusual circumstances, such as when there is extremely deep snow late in the winter, wolves may kill many more ungulates than they can eat."  AR Doc. 215, p. 5265.  It is also necessary to recognize that in the Western Great Lakes Distinct Population Segment ("WGL-DPS"), during the last 25 years, wolves have not only preyed upon wild animals but have also killed domestic animals including horses, cattle, sheep, goats, llamas, pigs, geese, ducks, turkeys, chickens, guinea fowl, pheasants, dogs, cats and captive deer.  71 Fed. Reg. 15266-67.

Defendant-Intervenors deny that wolves can live "almost anywhere."  Wolves generally require areas with a road-density of 0.9 to 1.1 miles of road per square mile or less to live.  72 Fed. Reg at 6071 (citing multiple studies: published and major unpublished literature relied upon by FWS are in the A.R. starting at AR 12836).  Forested areas are best, because they produce cover for denning and nesting.  72 Fed. Reg. at 6074.  Less than 0.9 to 1.1 miles per square mile

---

[1]      Any "admit" responses are solely for purposes of the pending Summary Judgment Motions with respect to which this Response is filed.

may be necessary for wolves to live in non-forested areas. *Id.* Under the Wolf Recovery Plan, 51000 square miles of contiguous suitable habitat is reconsidered necessary to support a permanent wolf population that is replenished by another nearby population, and 10,000 square miles is necessary if there is no nearly supporting wolf population. 72 Fed. Reg. at 6072.

Defendant-Intervenors deny that regulated take by humans in reasonable amounts threaten wolf populations. In fact, wolves can most certainly survive in the presence of significant take by man. AR Doc. 215, p. 5893 (it has been demonstrated that annual mortality of 28 percent (Fuller 1989, Keith 1983, Peterson et al. 1984) to 50 percent (Mech. 1970, 64, Ballard and Stephenson 1982, Ballard et al. 1987) can be sustained by healthy productive wolf populations.) In addition, if wolf populations become too dense in a particular area and/or allowed to prey too aggressively on the existing ungulate, *etc.* population, wolves themselves will prey on other wolves.

> The most common natural causes of mortality to both pups and adults are starvation and intraspecific strife (i.e. wolves killing other wolves). This happens when food is scarce and when wolves must 'trespass' into adjacent wolves' territories to hunt. Resident wolves defend their territory and food supply and often the result is the death of one or more members of both packs.

AR Doc. 215, p. 5266.

Defendant-Intervenors admit that wolves historically ranged across much of North America, excluding the Southeast, California and Nevada, and possibly the northeastern states. A great deal of question exists over whether it was the gray wolf or the red wolf that historically inhabited the northeastern United States. 69 Fed. Reg. 43665 (July 21, 2004).

2.    Admitted in part and denied in part. Defendant-Intervenors admit the first sentence of paragraph 2. Defendant-Intervenors deny the second sentence due to the fact that Plaintiffs have referenced it out of context. The statement from the Administrative Record

referenced by Plaintiffs applies only to the average pack territories for wolves of Wisconsin and Minnesota.  AR Doc. 215 at 5125-26.

3.     Admitted in part and denied in part.  Defendant-Intervenors admit the first and second sentences but deny the third sentence, as written.  The Administrative Record citation referenced by Plaintiffs indicates that dispersal is "important" to the gray wolf as opposed to "essential."  Defendant-Intervenors admit the fourth sentence, but deny the fifth sentence as Defendant-Intervenors can find no Administrative Record reference for this statement.  Further dispersal will not result in wolves occupying unsuitable habitat, as wolves cannot occupy unsuitable habitat on a long term basis.  *See* 72 Fed. Reg. at 6071-75.

4.     Admitted in part and denied in part.  Defendant-Intervenors admit that wolves can potentially play the role of an "umbrella species"  However, Plaintiffs cite the statements relating to the wolf's role in biodiversity out of context, by neglecting to mention that wolves' ability to enhance biodiversity is contingent on the need to prevent carnivore-human conflict.  Plaintiffs fail to add that "[f]ailure to effectively reduce or prevent carnivore-human conflict (*e.g.* wolf-human conflict) can lead to an erosion of social tolerance for carnivores and possible the management agencies involved."  AR Doc. 468B at 16281.

5.     Admitted in part and denied in part.  Defendant-Intervenors admit the first two sentences of Statement 5.  Defendant-Intervenors deny the third sentence to the extent that it is made out of context.  In the third sentence, Plaintiffs reference the Michigan Gray Wolf Recovery and Management Plan which explains the fact that the majority of individuals polled do not wish to coexist with wolves that pose threats to livestock and pets.  AR Doc. 215 at 5135.

6.     Denied as immaterial.  Defendant-Intervenors deny the materiality of Statement 6 in that the level of "persecution" described is now prohibited by both federal and state laws.

4

Limited take of wolves by no means constitutes "persecution" and can be sustained by healthy wolf populations. Please see Defendant-Intervenors' response to Statement 1 for citations.

7.     Denied as immaterial. Defendant-Intervenors deny the materiality of Statement 7 in that the level of "persecution" described is now prohibited by both federal and state laws. Limited take of wolves, even take of up to 50% percent of wolf populations, by no means constitutes "persecution" and can be sustained by healthy wolf populations. Please see Defendant-Intervenors' response to Statement 1.

8.     Admitted in part and denied in part. Defendant-Intervenors admit that individual subspecies of gray wolves were listed under the Endangered Species Preservation Act and that individual subspecies were later listed under the Endangered Species Act. Defendant-Intervenors admit that the FWS initially listed four subspecies of the gray wolf as "endangered," including the Mexican wolf (canis lupus baileyi), of Mexico and the southwestern United States, the northern Rocky Mountain wolf (c.l. irremotus), of Wyoming, Montana and Idaho; the eastern timber wolf (c.l. lycaon) of northern Great Lakes Region, and the Texas gray wolf (c.l. monstrabilis) formerly of Texas and Mexico that the FWS believed to probably be extinct. Defendant-Intervenors further note that in the March 9, 1978 Federal Register Notice, the FWS specifically identified the gray wolves of Minnesota as "another 'species.'" 43 Fed. Reg. 9610. Finally, Defendant-Intervenors admit that on March 9, 1978, the FWS listed the entire species canis lupus as "endangered," with the exception of the gray wolves of Minnesota that were listed as "threatened." Defendant-Intervenors deny the materiality of the collective listing since the FWS's action was based on convenience." ("So that this matter can be handled most "conveniently" by listing only the species name.") Defendant-Intervenors deny any remaining components of this statement as inaccurate paraphrases of the Administrative Record references.

5

In addition, Defendant-Intervenors wish to add that, since the March 9, 1978 Federal Register

listing notice, the FWS has obtained significant information indicating that it was the red wolf,

and not the gray wolf that inhabited the northeastern part of the United States, which would

substantially diminish what the FWS, in 1978, believed to be the wolves' original range.  69 Fed.

Reg. 43665 (July 21, 2004).

       9.      Admitted in part and denied in part.  Defendant-Intervenors deny the first

sentence of Statement 9 as inaccurate.  Instead Defendant-Intervenors wish the Court to

understand that in the 1978 listing decision, the FWS stated that "as delineated by recent

systematic sources, the original range of the subspecies C.l. lycaon included most of the region

from Georgia to Maine, and between the Atlantic and Great Plains."  43 Fed. Reg. 9608.

Defendant-Intervenors further admit that the FWS, in the 1978 listing decision explained that C.l.

lycaon remained in the upper Great Lakes region, including a group on Isle Royale and possibly

a few in northern Michigan and Wisconsin.  The FWS went on to describe a "major population

of the gray wolf" in northern Minnesota that had "not itself undergone a significant decline since

about 1900."  43 Fed. Reg. 9610.  The FWS further noted that during the last decade, the

Minnesota population "appears to have [experienced] a numerical increase in some areas, and an

overall range increase."  *Id.*  Defendant-Intervenors admit the second sentence of Statement 9.

Defendant-Intervenors deny the third sentence of Statement 9 as inaccurate, and instead admit

that the FWS noted that there were still some places in the lower 48 States such as Washington

and North Dakota, where wolves may have occurred and where they were not under Federal

protection.  43 Fed. Reg. 9611.  Finally, Defendant-Intervenors admit the fourth sentence of this

statement.  In addition, Defendant-Intervenors wish to add that, since the March 9, 1978 Federal

Register listing notice, the FWS has obtained significant information indicating that it was the

red wolf, and not the gray wolf that inhabited the northeastern part of the United States, which would substantially diminish what the FWS, in 1978, believed to be the wolves original range. 69 Fed. Reg. 43665 (July 21, 2004).

10. Admitted in part and denied in part. The first sentence of statement 10 is admitted. The second sentence is denied as incomplete. Although Defendant-Intervenors admit that between 1979 and 1998 the wolf range in Minnesota was estimated to have more than doubled, it is also important to note that between 1998 and 2004 the range in Minnesota was found to have stabilized. 71 Fed. Reg. at 15270. Defendant-Intervenors admit sentence three of Statement 10. Sentence four is denied as incorrect. Defendant-Intervenors can find no reference in the Administrative Records document cited by Plaintiff for Statement 10 that includes the information found in the fourth sentence. Defendant-Intervenors admit that a pair of wolves was verified in Michigan in 1989 and produced pups in 1991. Defendant-Intervenors deny sentence five of the statement as vague. Minnesota's wolf population was estimated to be between 2301 and 3708, in 2004, greater than Wisconsin and Michigan. *Id.* at 15269. However, the Michigan and Wisconsin population were estimated at 405 and 425 respectively, in 2005 which would constitute over 20 percent of the GLDPS. *Id.* Additionally, the Wisconsin and Michigan population were found to be increasing rapidly while the Minnesota population has stabilized or slowly increased. *Id.* at 15270.

11. Defendant-Intervenors admit the first and second sentences of Statement 11, but deny the third sentence as inaccurate, noting that the wolves reintroduced to the Northern Rocky Mountain area are managed as a "nonessential" experimental population. Finally, Defendant-Intervenors deny the fourth sentence as vague, but admit that the wolves of the Western Great

Lakes Distinct Population Segment and the Northern Rocky Mountain Distinct Population

Segment are large, recovered species of gray wolves.

      12.     Defendant-Intervenors deny this statement as immaterial.  It constitutes a

discussion about the Northern Rocky Mountain Distinct Population Segment of wolves that, at

this time remain "endangered" and are not the subject of the delisting that Plaintiffs have

challenged in this litigation.  Defendant-Intervenors wish to note however, that Plaintiffs'

Statement 12 mentions only select portions of the Administrative Record that Plaintiffs reference

for this Statement and neglects to mention the fact that wolves may be having a detrimental if not

irreversible impact on the elk population upon which wolves are dependent for survival.

Plaintiffs fail to mention that "the elk population which had swollen to 20,000 by the 1990's is

now less than 10,000."  AR Doc. 228 at 8120.  This phenomenon may be occurring, at least in

part, because of the fact that, in summer, wolves feed on newborn ungulates.  AR Doc. 215 at

5733.  If wolf populations continue to prey on ungulate populations, the wolves may decimate

the very animals they need to survive.  Defendant-Intervenors wish to point out that not all

species benefit from the presence of wolves.  Songbirds in the Northern Rockies may actually

suffer from the presence of wolves.

> With fewer coyotes, their prey – voles, mice and other rodents – have exploded in
> number.  That has benefitted red fox and raptors.  But red fox prey on songbirds
> as well, and more foxes could mean a great toll on birds."

AR Doc. 228, p. 8122.  Defendant-Intervenors also wish to note that not all biologists agree that

wolves have a beneficial impact on the broader environment.

> Some researchers, however, are agnostic about the effects of the wolf.  Crabtree,
> for example, says that yes, willows are rebounding and imaging data show the
> regrowth dramatically.  But a strong correlation between the nature of wolves and
> the new growth is far from demonstrated.  'Claiming wolves are responsible
> verges on bad science' he states.  'The ecosystem in Yellowstone is a multicausal

interactive system, and there's never a single cause. Even a predominant cause is rare. At the same time the wolf numbers were coming back, there was flooding along the river, and the climate is a lot warmer. Wolves probably have a role, but it is confounded by those factors. It will take 20 years or more before we know definitely. Duncan Patten is a research ecologist who served on a National Academy of Sciences study of Yellowstone published in 2002. Yellowstone has not had a hard winter since wolves reached high levels, he observes, and elk may not have needed to resort to trees for food. "When winters are hard, elk take a lot of chances to put something in their belly. Give me two hard winters in a row and I'll buy the argument."

AR Doc. 228, p. 8122-23.

13.     Defendant-Intervenors deny this statement as immaterial. The delisting rule that Plaintiffs have challenged in this litigation focuses on the Western Great Lakes Distinct Population Segment of wolves. The status of wolves in most of the "range" that Plaintiffs discussed in Statement 13 remains "endangered."

14.     Defendant-Intervenors deny this statement as immaterial. The delisting rule that Plaintiffs have challenged in this litigation focuses on the Western Great Lakes Distinct Population Segment of wolves. The status of wolves outside the boundaries of the WGL-DPS is immaterial to Plaintiffs' challenge. Currently, wolves in the Northeast, more than half of North Dakota, the Pacific Northwest and the entire west, including Oregon, Utah, and Colorado, continue to be listed as "endangered." In addition, the FWS has obtained significant information indicating that it was the red wolf, and not the gray wolf that inhabited the northeastern part of the United States, which could make it inappropriate for the FWS to attempt to reintroduce gray wolves to that area. 69 Fed. Reg. 43665 (July 21, 2004). Finally, FWS found that unoccupied potential habitat in North Dakota (the Turtle Mountains) and the Northern Lower Peninsula of Michigan is too small, fragmented, and marginal to support a viable wolf population. 72 Fed. Reg. at 6072-74.

15.    Defendant-Intervenors deny this statement as immaterial.  The population status of wolves in the 1970's and 1980's is not the same as it is at present and consequently any court's reaction to wolf related decisions 20 and 30 years ago has no bearing on the current delisting of wolves.

16.    Admitted (except that the Downlisting Rule did not downlist wolves in Minnesota from endangered to threatened status because wolves in Minnesota had long been listed as threatened rather than endangered).

17.    Admitted (except that the Downlisting Rule did not downlist wolves in Minnesota from endangered to threatened status because wolves in Minnesota had long been listed as threatened rather than endangered).

18.    Admitted in part and denied in part.  Defendant-Intervenors deny the first sentence of Statement 18 as inaccurate because, on April 1, 2003, the FWS announced its intention to "conduct rulemaking" "to propose to delist" wolves.  68 Fed. Reg. 15876. Defendant-Intervenors admit the second sentence of Statement 18.

19.    Admitted.

20.    Admitted in part and denied in part.  Defendant-Intervenors admit the first through fourth sentences of this statement, but deny the fifth sentence as incomplete.  Defendant-Intervenors can admit the fifth sentence if it is supplemented to state that the FWS and Defendant-Intervenors Safari Club International *et al*. appealed the ruling to the Court of Appeals for the D.C. Circuit.  Once the WGL-DPS wolves were delisting, the FWS and SCI *et al.* moved to vacate the opinion as moot.  The motion is currently pending before the Court of Appeals for the District of Columbia Circuit.

21.     Admitted in part and denied in part.  With regard to the first sentence of Statement 21, Defendant-Intervenors deny that the FWS began an effort to delist gray wolf populations in the WGL-DPS and Northern Rocky Mountain DPS on February 1, 2005.  On that date, there was simply an e-mail exchange that discussed how the FWS should respond to the Oregon court's ruling on wolf reclassification.  AR Doc. 4 at 43.  Defendant-Intervenors admit the second sentence of Statement 21.

22.     Denied.  Defendant-Intervenors deny this statement as incomplete.  The Options paper described by Plaintiffs in statement 22 included more than three options.  Other options were described in AR Doc. 48, p. 160-161 and Option 4 was described on p. 208.  The Options paper included separate options for Northeast wolves.

23.     Admitted in part and denied in part.  Defendant-Intervenors deny the first sentence of Statement 23, as immaterial since the FWS did not select Option 1 and it is not Option 1 that Plaintiffs are challenging in this litigation.  In addition, Defendant-Intervenors deny the first sentence because it is an inaccurate oversimplification of the FWS's discussion of Option 1.  Plaintiffs neglect to discuss the elements of Option 1 that address the nonessential experimental populations, the potential for delisting because of the fact that wolves did not historically range in the southeastern United States and parts of Nevada and California, or the fact that taxonomic questions exist as to whether the wolves of the northeastern United States were gray wolves or red wolves.  Defendant-Intervenors admit the second sentence of Statement 23.

24.     Admitted.

25.    Admitted in part and denied in part.  Defendant-Intervenors admit that Option 3 was similar to Option 2, but note that the in Option 3 the DPSs would use state lines for boundaries.  Defendant-Intervenors admit the second, third and fourth sentences.

26.    Defendant-Intervenors deny the materiality of Statement 26.  The wolves of the northeastern United States are not material in that they remain "endangered" and are not part of the delisting rule that Plaintiffs challenge in this litigation.  In addition, in Statement 26, Plaintiffs inaccurately describe the 1992 Recovery Plan for the Eastern Timber Wolf with respect to wolves in the northeastern United States. The 1992 Recovery Plan did not require the reestablishment of a wolf population in the northeast.  The 1992 Recovery Plan stated:

> Although the 1978 Recovery Plan specifies the need for two viable populations (including the Minnesota population) it did not specify the characteristics of the second population.  In 1981 (letter from Ralph E. Bailey, Eastern Timber Wolf Recovery Team Leader, to Harvey K Nelson, Regional Director, U.S. Fish and Wildlife Service, Twin Cities, Minnesota, dated Sept. 15, 1981; memorandum from Assistant Regional Director (SE) to holders of the Eastern Timber Wolf Recovery Plan, dated October 19, 1981) the Eastern Timber Wolf Recovery Team clarified this.  It recommended adopting either of the latter two approaches listed above by characterizing "viable population" in two different ways: (1) a population of at least 200 wolves established at a distance greater than 200 miles from the Minnesota population (e.g. northern New York or northern Maine) is believed to be large enough to be viable, as well as to have sufficient genetic diversity, to exist indefinitely in total isolation from any other wolf population. (2) A smaller population (greater that (sic) 100 wolves) in Wisconsin/Michigan, closely tied to the Minnesota population will be able to remain viable, and by occasional immigration of Minnesota wolves will retain sufficient genetic diversity to cope with environmental fluctuations.

AR Doc. 215, p. 5902.  Defendant-Intervenors also deny Statement 26 because it ignores the fact that the FWS's efforts have no impact on nonfederal restoration or recovery efforts for wolves in the northeast.  "Although we believe that additional wolf restoration is not necessary within the eastern United States before delisting the EDPS, delisting will not preclude states and tribes from undertaking additional wolf restoration programs."  69 Fed. Reg. 43672.

27.    Denied and immaterial and incomplete.  Defendant-Intervenors deny the materiality of Statement 27 in that all wolves other than those of the WGL-DPS remain endangered and are therefore not the subject of delisting rule that Plaintiffs challenge in this litigation.  Plaintiffs do not have the ability to challenge "possible future" steps since they are not ripe for review.  Moreover, Defendant-Intervenors deny Statement 27 as incomplete because Plaintiffs fail to include in the statement a discussion of the other option discussed in AR Docs. 35 and 46, which is to leave the wolves of the remaining states endangered indefinitely.  AR Doc. 35 at 159 and AR Doc. 48 at 204.

28.    Denied as immaterial and incomplete.  Defendant-Intervenors deny the materiality of Statement 28 in that all wolves other than those of the WGL-DPS remain endangered and are therefore not the subject of delisting rule that Plaintiffs challenge in this litigation.  Plaintiffs do not have the ability to challenge "possible future" steps since they are not ripe for review.  Defendant-Intervenors also deny the statement as incomplete because it fails to completely and accurately provide an accounting of the Administrative Record document that Plaintiffs reference for the statement.  Plaintiffs fail to fully account that the FWS determined that establishing recovery plans for the remaining states "is contrary to FWS's understanding that the ESA focuses on long-term viability, rather than requiring the filling of all available habitat with the taxon."  AR Doc. 35 at 159.

29.    Admitted in part and denied in part.  It is denied that the FWS decided on Option 2 as early as July 2005.  AR Doc. 66 at 280 merely indicates that Ron Refsnider was asked to work up a "new approach for a wolf DPS in the Midwest."  Defendant-Intervenors admit the remainder of Statement 29.

30.     Admitted in part and denied in part.  Defendant-Intervenors deny the first sentence as inaccurate, but admit that in February 2006, the FWS issued an Advanced Notice of Proposed Rulemaking, stating its plans to conduct rulemaking.  71 Fed. Reg. 6634.  Defendant-Intervenors admit the second sentence of Statement 30.  Defendant-Intervenors deny that the proposed boundaries of the WGL-DPS were "expansive" in that they encompassed Minnesota, Wisconsin, Michigan, only a tiny piece of Ohio and Indiana, approximately 1/4 of Illinois, 2/3 of Iowa and less than half of the Dakotas.

31.     Denied as immaterial.  While it may be true that the FWS received hundreds of comments, the distribution of those in support and opposition is immaterial because the FWS's decision to delist wolves was not based on a popularity contest, but instead on the best available science.  While it may also be true that Plaintiffs provided comments on the Proposed Rule, their comments merely addressed their subjective impression and not the conclusive facts or law pertaining to the delisting of wolves in the WGL-DPS.

32.     Admitted in part and denied in part.  Defendant-Intervenors admit the first and second sentences of Statement 32.  Defendant-Intervenors deny the third sentence as inaccurate since it ignores the five year federal monitoring period required by the ESA for species delisting.

33.     Denied.  Defendant-Intervenors deny Statement 33 as incomplete and inaccurate. The first sentence of Statement 33 fails to mention that the FWS found that the Great Lakes wolf population was "significant" because WGL-DPS wolves occupy the unusual or unique ecological setting of the Laurentin Mixed Forests.  "WGL wolves represent the only use by gray wolf packs of any form of eastern coniferous or eastern mixed coniferous-broadleaf forest in the United States."  72 Fed. Reg. 6060.  Defendant-Intervenors also deny the second sentence of Statement 33 as incomplete because it fails to note that the WGL-DPS is discrete from the

14

Northern Rocky Mountain population because of the unsuitable habitat/inhospitable conditions between the two populations.  72 Fed. Reg. at 6059.

34.     Admitted in part and denied in part.  Defendant-Intervenors deny the first sentence of Statement 34 in its characterization of the boundaries of the DPS extending "far" beyond the wolf's distribution.  The boundaries are not set "far" but are appropriately designed to account for normal wolf dispersal distances.  Defendant-Intervenors also deny the second sentence of Statement 34 that mischaracterizes the boundaries of the WGL-DPS as including "vast" portions of several states.  The WGL-DPS includes Minnesota, Wisconsin, Michigan, only a tiny piece of Ohio and Indiana, approximately 1/4 of Illinois, 2/3 of Iowa and less than half of the Dakotas.  Defendant-Intervenors also deny the third sentence of Statement 34 as incomplete.  The complete reference states:

> As discussed below, this DPS has been delineated to include the core recovered wolf population plus a wolf movement zone around the core wolf populations. This geographic delineation is not intended to include all areas to which wolves have moved from the Great Lakes population.  Rather, it includes the area currently occupied by wolf packs I Minnesota, Wisconsin, and Michigan; the nearby areas in these States, including the northern Lower Peninsula of Michigan, in which wolf packs may become established in the foreseeable future; and a surrounding area into which Minnesota, Wisconsin and Michigan wolves occasionally move but where persistent packs are not expected to be established because suitable habitat is rare and exists only as small patches.  The area surrounding the core wolf populations includes the locations of most known dispersers from the core populations, especially the shorter and medium-distance movements from which wolves are most likely to return to the core areas and contribute to the recovered wolf population.

72 Fed. Reg. at 6060.

35.     Denied.  Defendant-Intervenors deny the first sentence of Statement 35 as there is nothing in the document referenced by Plaintiffs for this statement that defines "management of dispersing wolves" as "killing dispersers."  The management strategies for dealing with dispersing wolves are determined by the individual states.  Defendant-Intervenors deny the

second sentence of Statement 35 as immaterial.  The fact that the FWS may have acknowledged

that North and South Dakota would be very angry if wolves dispersing from Minnesota "being

fully endangered when they cross the state line even after delisting in MN" does not mean that

the FWS failed to make its decision to delist based on the best scientific evidence available.  *See*

72 Fed. Reg. 6052-6070 (explaining rationale for DPS).

36.     Denied.  Defendant-Intervenors deny the first sentence of Statement 36 as an

incomplete representation of the AR documents referenced.  In Statement 36, Plaintiffs fail to

mention that the FWS relied on the state management plans "because these plan have received

the necessary approvals with the state governments."  72 Fed. Reg. at 6068.  Defendant-

Intervenors also deny the second sentence as incomplete, because Plaintiffs fail to accurately

describe the AR Doc upon which they rely for the statement.  Plaintiffs fail to mention that the

FWS stated that they "believe[d] it is reasonable to assume that the plans [would] be funded and

implemented largely as written."  *Id.*

37.     Denied as immaterial and inaccurate.  Defendant-Intervenors deny Statement 37

as immaterial because whether or not Michigan's plan was in the midst of revision at the time of

delisting, Michigan's 1997 wolf recovery plan was in effect at the time of delisting and wolves

were classified by the state of Michigan as a state "endangered" species.  MI ADC R. 299.1027.

Defendant-Intervenors also deny Statement 37 as inaccurate because it fails to relate the fact that

the FWS noted that "the current Michigan plan . . . will provide adequate regulatory mechanisms

for Michigan wolves.  72 Fed. Reg. at 6094.

38.     Denied as immaterial and inaccurate.  Defendant-Intervenors deny Statement 38

as immaterial because whether or the FWS pointed to a series of "guiding principles" at the  time

of delisting, Michigan's 1997 wolf recovery plan was in effect at the time of delisting and

wolves were classified by the state of Michigan as a state "endangered" species.  MI ADC R.

299.1027.  Defendant-Intervenors also deny Statement 38 as inaccurate because it fails to relate

the fact that the FWS noted that "the current Michigan plan . . . will provide adequate regulatory

mechanisms for Michigan wolves.  72 Fed. Reg. at 6094.

       39.     Denied as inaccurate.  While Statement 39 accurately identifies the minimum

wolf population targets for Michigan, Minnesota and Wisconsin, there is no indication from the

AR Docs referenced for this statement that any or all of the states would take measures to reduce

their current populations to these minimum target numbers.  To the contrary, for example,

Minnesota's Wolf Management Plan states that:  "wolf populations in Minnesota will be allowed

to continue to expand with a minimum population goal of 1,600" and that "no general public

taking of wolves will be proposed for the first 5 years following federal delisting."  72 Fed Reg.

at 5255.

       40.     Admitted in part and denied in part.  Defendant-Intervenors deny that state

management programs "sharply" increase the circumstances in which wolves can be killed.

Defendant-Intervenors admit that the Minnesota Wolf Management Plan authorizes Zones,

including Zone B.  Defendant-Intervenors deny the veracity of Statement 40 because Plaintiffs

grossly misrepresent the nature of wolf management available in Zone B.  In Zone B, only

depredating wolves may be killed and only on lands owned, leased or managed by the owner of a

domestic animal attacked or threatened by a wolf on the land or within a one mile radius of that

land.  Defendant-Intervenors also deny the accuracy and completeness of Statement 40 because

Plaintiffs fail to make reference to the following statement from the Minnesota Wolf

Management Plan that specifically states: Although these depredation procedures will likely

result in a larger number of wolves killed, as compared to previous ESA management, they will

17

not result in the elimination of wolves from Zone B." AR Doc. 215 at 5276. Plaintiffs

misrepresent the description of "predator control areas" by failing to specify that in Zone A,

predator control areas can only be opened for up to 60 days. *Id.* Plaintiffs also incorrectly

characterize Minnesota's Wolf Management Plan's approach to wolf harvest, by failing to note

that public harvests will simply be "considered" by the Minnesota DNR not sooner than 5 years

after federal delisting. *Id.* at 5274. Defendant-Intervenors admit the final sentence of

Statement 40.

      41.    Denied as immaterial. Defendant-Intervenors deny Statement 41 because the

presence of wolves in Zone B has never been deemed necessary for the recovery or sustainability

of wolves in the WGL-DPS. Defendant-Intervenors deny statement 41 as incomplete and

misleading because it fails to offer the following information from the AR documents upon

which it relies:

> The limitation of this broad take authority to Zone B is fully consistent with the
> Federal Recovery Plan's advice that wolves should be restored to the rest of
> Minnesota but not to Zone B (Federal Zone 5) because that area "is not suitable
> for wolves" (USFWS 1992, p. 20). The Federal Recovery Plan envisioned that the
> Minnesota numerical recovery goal would be achieved solely in Zone A (Federal
> Zones 1-4) (USFWS 1992, p. 28), and that has occurred. Wolves outside of Zone
> A are not necessary to the establishment and long-term viability of a self-
> sustaining wolf population in the State, and therefore there is no need to establish
> or maintain a wolf population in Zone B. Therefore, there is no need to maintain
> significant protection for wolves in Zone B in order to maintain a Minnesota wolf
> population that continues to satisfy the Federal recovery goals after Federal
> delisting.

72 Fed. Reg. at 6087.

      42.    Admitted in part and denied in part. Defendant-Intervenors admit that

Wisconsin's wolf management program includes "proactive control" if the wolf population

exceeds 350 wolves. Defendant-Intervenors deny that population declines are also nearly certain

under this program. Instead, these strategies would do little more than slow the growth or

stabilize the population numbers.  In making this inaccurate statement, Plaintiffs fail to provide a

complete depiction of the proactive control strategy described in Wisconsin's wolf management

program:

> Proactive control by government trappers would be used by Wisconsin DNR to
> control the wolf population once the management goal of 350 is achieved.  This
> would consist of lethal controls in areas with a history of depredation problems, or
> in areas with a high probability of wolf-human conflicts.  Such control would
> have the effect of slowing or perhaps stabilizing the growth of the wolf
> population.

AR Doc. 215 at 6001.  Plaintiffs also misrepresent the role of public harvests.   The

Wisconsin wolf management plan states that harvests can be considered only if other

control activities do not adequately maintain the population near the 350 goal and only

after all other control activities are first attempted.  Moreover, "[t]he Wisconsin state

legislature would have to approve authority for a controlled public harvest of wolves."

*Id.*

     43.    Admitted in part and denied in part.  Defendant-Intervenors admit that prior to

delisting, many of the costs of wolf management were borne by the federal government.

However, many of these costs were also borne by the states.  Although Defendant-Intervenors

admit that since delisting, the states are responsible for wolf management, Defendant-Intervenors

deny the implication that the states have assumed all financial responsibility for this

management.  For example, according to the Declaration of Dan Stark, Wolf Specialist for the

state if Minnesota, the federal government continues to assume much of the financial

responsibility for depredation control.

     44.    Admitted in part and denied in part.  Defendant-Intervenors admit the statement

generally, but deny that Plaintiffs accurately referenced the Administrative Record.  Plaintiffs

45.     Denied.  Please see the Declaration of Minnesota Wolf Specialist Dan Stark.

46.     Admitted in part and denied in part.  Defendant-Intervenors deny as immaterial the vague unspecified allegations included in the first sentence of Statement 46 because it offers little information about Michigan's wolf management efforts or funding.  Defendant-Intervenors admit that the Executive Summary of the Five Year Evaluation of Michigan's Wolf Management Plan does include the quoted statement, but Defendant-Intervenors deny that there is any evidence of Michigan's failure to manage its wolves in a way that would preclude delisting. Although Defendant-Intervenors admit that Michigan may have written a letter to the FWS for funding assistance, Defendant-Intervenors deny the materiality of the fact, since Plaintiffs offer no evidence of whether or not Michigan received the requested funding.  Considering that Minnesota continues to receive federal funding assistance for wolf depredation efforts, it is not unreasonable to assume that Michigan receives similar assistance.  See Declaration of Daniel Stark, Minnesota Wolf Management Specialist.  Finally, Defendant-Intervenors deny the fourth sentence as misleading and incomplete.  While Thomas Drummer of Michigan Technological University may have conjectured that a switch to statistical sampling to estimate the size of the Michigan wolf population may have been cost driven, he also offered a detailed discussion about how the new sampling method would be designed to provide the same level of data as was available through the previous system.  AR Doc. 241 at 8527.

47.     Admitted in part and denied in part.  Defendant-Intervenors admit that the documents Plaintiffs quote in Statement 47 contain references to the funding of Wisconsin's wolf management strategies.  Defendant-Intervenors deny the materiality of Statement 47 in that

Plaintiffs offer no information as to whether Wisconsin received additional federal funding and/or whether funding has had an impact on Wisconsin's ability to carry out its wolf management strategies.  Finally, as there is evidence that Minnesota continues to receive federal funding for its wolf depredation efforts, it is reasonable to assume that Wisconsin also continues to receive this federal assistance.  Declaration of Dan Stark.

48.     Denied as immaterial and inaccurate.  Although unregulated, unmonitored killing may have played a role in the decline of the gray wolf prior to 1978, the delisting of wolves has not and will not result in unregulated or unmonitored killing of the species.   It is denied that human-caused mortality constitutes a serious problem.  Numerous scientific studies have shown that wolf populations can continue to thrive despite significant population reduction.

> Despite an annual kill of perhaps 20 to 30 percent of the estimated number of wolves in Minnesota in earlier years, there was no noticeable decline in the statewide population.  This should not be surprising because it has been demonstrated that annual mortality of 28 percent (Fuller 1989, Keith 1983, Peterson et al. 1984) to 50 percent (Mech 1970, 64, Ballard and Stephenson 1982, Ballard et al. 1987) can be sustained by healthy productive wolf populations.

AR Doc. 215, p. 5893.

49.     Admitted in part and denied in part.  Defendant-Intervenors admit that disease is a factor that the FWS was obligated to consider in its determination as to whether the WGL-DPS should be delisted.  Defendant-Intervenors also admit that, in the Final Rule to delist the WGL-DPS of wolves, the FWS acknowledged the need for continued monitoring of diseases and parasites.  Defendant-Intervenors deny that diseases or parasites constitute a threat that would make it necessary for wolves to be listed as "threatened" or "endangered." According to the FWS, despite the presence of certain diseases and parasites, the number of wolves in the WGL-DPS has continued to grow.

21

Despite these and other diseases and parasites, the overall trend for wolf
populations in the WGL DPS continues to be upward. Wolf management plans
for Minnesota, Michigan, and Wisconsin include disease monitoring components
that we expect will identify future disease and parasite problems in time to allow
corrective action to avoid a significant decline in overall population viability. We
conclude that diseases and parasites will not prevent the continuation of wolf
recovery or the maintenance of viable wolf populations in the DPS. Delisting
wolves in the WGL DPS will not significantly change the incidence or impacts of
disease and parasites on these wolves. Furthermore, we conclude that diseases and
parasites will not be threats sufficient to cause the WGL DPS gray wolves to be in
danger of extinction in the foreseeable future in all or a significant portion of the
range within the WGL DPS.

71 Fed. Reg. 6081.

50.    Denied as inaccurate, incomplete and immaterial.  Defendant-Intervenors deny

Plaintiffs' characterization of Minnesota's monitoring efforts as inaccurate and incomplete, in

that Plaintiffs failed to include a discussion of all the strategies that Minnesota uses to monitor

wolves.  The Minnesota Wolf Management Plan states:

Annual changes in wolf distribution and abundance will be monitored by means
of currently used indicators such as wolf depredation complaints, autumn scent
station surveys, winter furbearer track surveys, and other observations of field
personnel from all natural resources agencies.

AR Doc. 215 at 5272.

In addition, the Minnesota Wolf Management Plan states:

Monitoring the health of wolves necessarily includes consideration of the effects
of infectious diseases and parasites.  Examples of health monitoring include
collection and analysis of biological samples from live-captured wolves, analysis
of wolf scats, and necropsies of dead wolves.  Regular collection of pertinent
tissues of live-captured or dead wolves will be initiated, and periodic assessments
of wolf health will be carried out under authorization of DNR, when
circumstances indicate that diseases or parasites may be adversely affecting
portions of the wolf population.

AR Doc. 215 at 5273.  Minnesota's Wolf Management Plan further explains that the Minnesota

DNR "will collaborate with other investigators and continue monitoring disease incidence, where

necessary, by examination of wolf carcasses obtained through depredation control programs, and

also through blood/tissue physiology work conducted by DNR and the U.S. Geological Survey.
DNR will also keep records of documented and suspected incidence of sarcoptic mange." AR
Doc. 215, p. 5285.

Defendant-Intervenors deny as immaterial Plaintiffs' statement as to minimum goals for
disease assessment. As noted by the FWS, Minnesota's approach to disease monitoring is
appropriate "in light of its much greater abundance of wolves than in the other two states.' 72
Fed. Reg. 6081.

51.    Denied. Defendant-Intervenors deny that there is any evidence that the Michigan
DNR will not carry out the monitoring plan called for by its wolf management program.
Although it is true that Michigan is in the process of revising their wolf management plan, there
is no evidence that the existing plan is not being fully implemented. In fact, in the five year
evaluation Report dated September 2004, Michigan acknowledged carrying out many of the
objectives of Michigan's Wolf Recovery and Management Plan during its first five years of
implementation. AR Doc. 142 at 767. Defendant-Intervenors deny as immaterial Michigan's
use of a new monitoring strategy. As explained by Thomas Drummer, PhD of Michigan
Technological University, who helped design the new monitoring strategy:

"The results of the simulations indicate the proposed monitoring program based on
geographic stratification will produce unbiased, precise estimates of total wolf abundance." AR
p. 8527.

52.    Denied as immaterial. Plaintiffs' assumptions of insufficient funding for wolf
management are baseless and unfounded. As indicated by the Declaration of Daniel Stark, Wolf
Management Specialist for Minnesota DNR, Plaintiff falsely represented Minnesota's funding
and implementation of their wolf management efforts. Also as indicated by the Declaration of

23

Daniel Stark, federal funding for wolf depredation control continues to be made available to Minnesota post-delisting and presumably continues for Wisconsin and Michigan. Moreover, Plaintiffs offer no evidence to indicate that wolf recovery and management efforts under federally listed status would be better funded than currently under state management.

53.     Denied as inaccurate. In the Final Rule, the FWS explained that they "are developing a [Post Delisting Monitoring] plan for the gray wolves in the WGL DPS with the assistance of the Eastern Gray Wolf Recovery Team." 72 Fed. Reg. 6101. The FWS published a draft version of that plan on June 4, 2007. 72 Fed. Reg. 30819 (June 4, 2007) and have stated that the plan is currently being implemented. *Id*. at 30820.

54.     Admitted.

55.     Denied. The 1992 Eastern Timber Wolf Recovery Plan focused on the eastern timber wolf species. The ESA defines the term "species" to include "subspecies." 16 U.S.C. Section 1532 (16). That species did not lose recognition, but was instead merged with the other species of wolves for the sake of "convenience." 43 Fed. Reg. 9610. March 9, 1978.

56.     Admitted in part and denied in part. Defendant-Intervenors admit that the 1992 Eastern Timber Wolf Recovery Plan does include the statement quoted by Plaintiffs. However, the statement is immaterial in that wolves existing or dispersing into much of the area encompassed by the Eastern Timber Wolf Recovery Plan are still classified as "endangered." Moreover, it is unclear that the historically ranging species for the northeastern United States, which is a significant portion of the area that was the focus of the 1992 Eastern Timber Wolf Recovery Plan, was the gray wolf. *See* Defendant-Intervenors' Response to Statement 27.

57.     Defendant-Intervenors admit the first and second sentences of Statement 57. Defendant-Intervenors deny the third sentence as immaterial.

58.    Denied.  As evidenced by the January 10, 1998 Addendum to the Recovery Plan for the Eastern Timber Wolf, numerical recovery was not aimed solely at preventing complete extinction:

> If the Recovery Plan criteria are met and the population segment is delisted, it is the purview of state and tribal governments to determine, collectively and individually, long-term conservation strategies for the Gray Wolf Eastern Population.  The Team underscores the importance of cooperative management among states and tribes, to provide a coordinated strategy for wolf conservation, and a strong commitment to providing the public with timely information and comprehensive education regarding wolves and wolf management.  In order to avoid even a remote chance of backsliding into a relisting situation, we hereby clarify our recommendations and comment further on the adequacy of the original minimum numerical target of 100 wolves in Michigan and Wisconsin as well as assurance criteria for this second population.

AR Doc. 215, p. 6860.

59.    Denied.  Please see Defendant-Intervenors' response to Statement 53.

60.    Denied as Immaterial.  Plaintiffs have filed suit to challenge the delisting of wolves in the Western Great Lakes Distinct Population Segment.  Wolves in much of the area that was the subject of the 1992 Recovery Plan continue to be classified as "endangered."  Please see Defendant-Intervenors' response to Statement 56.

Corrected Per Errata: April 7, 2008

Dated: January 18, 2007                    Respectfully submitted,


s/ James H. Lister                          s/Anna M. Seidman
William P. Horn (D.C. Bar No. 375666)      Anna M. Seidman (D.C. Bar No. 417091)
James H. Lister (D.C. Bar. No. 447878)     Douglas S. Burdin (D.C. Bar No. 434107)
Birch Horton, Bittner & Cherot            Safari Club International
1155 Connecticut Avenue N.W.               501 2nd Street NE
Suite 1200                                 Washington, D.C.  20002
Washington, D.C.  20036                    (202) 543-8733
(202) 659-5800                             Fax:  (202) 543-1205
Fax:  (202)659-1027                        aseidman@sci-dc.org
whorn@dc.bhb.com                           dburdin@sci-dc.org
jlister@dc.bhb.com

*Counsel for U.S. Sportsmen's Alliance*    *Counsel for Safari Club International, Safari Club*
*Foundation, Wisconsin Bear Hunters'*      *International Foundation, and National Rifle*
*Association, Scott Meyer and Robert*      *Association*
*Stafsholt*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

THE HUMANE SOCIETY OF THE
UNITED STATES, HELP OUR WOLVES LIVE,
ANIMAL PROTECTION INSTITUTE, and
FRIENDS OF ANIMALS AND THEIR
ENVIRONMENT,

          Plaintiffs,

          vs.                    Civil Action No. 1:07-cv-00677(PLF)

DIRK KEMPTHORNE,
Secretary of the Interior,
U.S. DEPARTMENT OF THE INTERIOR, and
U.S. FISH AND WILDLIFE SERVICE,

          Defendants,

and

SAFARI CLUB INTERNATIONAL, SAFARI
CLUB INTERNATIONAL
FOUNDATION, and
NATIONAL RIFLE ASSOCIATION,

          Defendant-Intervenors,

and

U.S. SPORTSMENS' ALLIANCE
FOUNDATION, WISCONSIN BEAR HUNTERS'
ASSOCIATION, SCOTT MEYER, and ROBERT
STAFSHOLT,

          Defendant-Intervenors.

**DEFENDANT-INTERVENORS' CONSOLIDATED MEMORANDUM**
**IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**
**AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Page No.

INTRODUCTION .................................................................................................1

STATEMENT OF FACTS ......................................................................................1

STANDARD OF REVIEW .....................................................................................2

ARGUMENT...........................................................................................................2

I.      PLAINTIFFS HAVE NOT ESTABLISHED THEIR STANDING TO SUE .....................2

II.     THE EVIDENCE OVERWHELMINGLY SUPPORTS THE
        FWS' FINDING THAT WOLVES HAVE RECOVERED, AND
        THE DISTINCT POPULATION SEGMENT PROVISION OF THE
        ESA APPLIES EQUALLY TO LISTING AND DELISTING .............................................3

        A.      The Gray Wolves of the Western Great Lakes Distinct Population
                Segment Are a Recovered Species ......................................................................3

        B.      The FWS Properly Conducted a Threats Analysis and Properly
                Determined, Based on the Best Available Scientific Evidence, That
                Delisting Was Appropriate ..................................................................................5

        C.      The FWS Properly Determined Existing Regulatory Mechanisms Are
                Adequate ..............................................................................................................6

        D.      The FWS Properly Concluded That The Existence of Disease and Human
                Predation Do Not Require the FWS To Continue the "Endangered"
                Classification for the WGL DPS.........................................................................12

        E.      The FWS Properly Developed and Applied the DPS Policy.....................................14

        F.      The FWS Properly Used Distinct Population Segments As A Tool For
                the Purpose of Delisting.....................................................................................16

        G.      The FWS Established the WGL DPS In A Manner Consistent With Its
                Historical Approach to the Eastern Timber Wolf ...................................................18

        H.      The FWS Correctly Established the Boundaries of the WGL DPS.........................19

III.    THE FWS REASONABLY DETERMINED THAT THE GENERALLY
        UNSUITABLE HABITAT WITHIN THE WGL DPS BUT OUTSIDE THE
        CORE RECOVERY AREAS IS NOT A SIGNIFICANT PORTION OF THE
        GRAY WOLVES' RANGE ............................................................................................21

i

**TABLE OF CONTENTS (CONT.)**

<u>Page No.</u>

A. The ESA's "Significant Portion of Range" (SPR) Inquiry ..................................21

B. The Successful Recovery in the Core Recovery Areas  ...........................22

C. The FWS Has Properly Completed the Analysis of Whether the
Non-Core Areas Constitutes SPR .........................................................23

    1. The Northern Lower Peninsula of Michigan .................................24

    2. The Turtle Mountains of North Dakota ........................................27

    3. There Were No Other Potential SPRs in the DPS ..........................28

D. The FWS Was Not Required to Treat Presently Unsuitable Habitat
as a SPR Just Because the Unsuitable Area is Large and Was Once
Part of the Wolves' Range .........................................................................28

    1. Unsuitable Habitat is Not Part of the Wolves' "Range"...............29

    2. Even with the FWS's Evaluation of All the Range within the
WGL DPS, Currently Unsuitable Habitat That Was Once
Occupied by Wolves Is No Longer a Significant Portion of
the Range ........................................................................................32

IV. SHOULD ANY OF PLAINTIFFS' UNFOUNDED PREDICTIONS OF
FUTURE JEOPARDY TO THE WOLF COME TO PASS, THE FWS
WILL BE UNDER A NON-DISCRETIONARY DUTY TO RELIST THE
WESTERN GREAT LAKES WOLVES ON AN EMERGENCY BASIS ..........................37

V. ANY REMEDY THAT THIS COURT ORDERS SHOULD AVOID
HARMFUL AND NEEDLESS DISRUPTIONS TO RECOVERED WOLF
MANAGEMENT IN THE CORE RECOVERY AREAS ....................................38

CONCLUSION...............................................................................................................41

ii

TABLE OF AUTHORITIES

Page No.

**FEDERAL CASES**

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission,*
   988 F.2d 146 (D.C. Cir. 1993) ........................................................................39

*American Wildlands v. Kempthorne,*
   478 F.Supp. 2d 92 (D.D.C.March 26, 2007),......................................................6, 13

*Baltimore Gas & Elec. Co. v. Natural Res. Defense Council,*
   462 U.S. 87 (1983) ........................................................................................2

*Barscz v. Director, Office of Workers' Compensation Programs,*
   486 F.3d 744 (2nd Cir. 2007)..........................................................................29

*Biodiversity Legal Foundation v. Babbitt,*
   943 F. Supp. 23 (D.D.C. 1996) .........................................................................7

*Carlton v. Babbitt,*
   900 F. Supp. 526 (D.D.C. 1995) .......................................................................2

*Center for Biological Center for Biological Diversity v. FWS,*
   2007 WL 716108 (D. Colo. March 7, 2007)........................................................8

*Center for Biological Diversity v. Norton (Rio Grand Cutthroat Trout),*
   411 F.Supp.2d 1271 (D.N.M. 2005),
   *vacated by consent due to mootness and on other grounds,*
   Case No. 06-2049, (10th Cir. May 21, 2007) ..................................................31, 36

*Center for Biological Diversity v. U.S. Fish and Wildlife Service (Rio Grand Cutthroat Trout),*
   2007 WL 716108 No. 05-305-RPM (D. Colo., Mar. 7, 2007),
   *vacated by consent due to mootness and on other grounds,*
   Case No. 07-1206, (10th Cir. Oct. 22, 2007) ......................................................31

*Center for Biological Diversity v. U.S. Fish and Wildlife Service,*
   402 F. Supp.2d 1198 (D. Or. 2005) ...................................................................7

*Chevron, U.S.A., Inc. v. Natural Res. Defense Council,*
   467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)...............................2, 22, 36

*Colorado River Cutthroat Trout v. Kempthorne,*
   448 F. Supp. 2d 170 (D.D.C. 2006) ....................................................................2

*Davis v. Latschar,*
   83 F.Supp.2d 1 (D.D.C.1998), *aff'd.* 202 F.3d 359 (D.C.Cir.2000)......................2

iii

**TABLE OF AUTHORITIES (CONT.)**

**Page No.**

*Defenders of Wildlife v. Norton (Florida Black Bear case)*
    Civil Action No. 99-02072-HHK, slip op. at 8-11 (D.D.C. Dec. 13, 2001)..........................*passim*

*Defenders of Wildlife v. Norton*,
    239 F.Supp.2d 9 (D.D.C. 2002) (Kessler, J.),
    *vacated in part on separate point*,
    2004 WL 438599, 89 Fed.Appx. 273 (D.C. Cir. 2004) ........................................34

*Defenders of Wildlife v. Norton (Lizard case)*,
    258 F.3d 1136 (9th Cir. 2001) ...............................................................*passim*

*Defenders of Wildlife v. Secretary, U.S. Dep't of the Interior (Wolves)*,
    354 F.Supp.2d 1156 (D.Or. 2005) ...............................................19, 23, 24

*Endangered Species Comm. of the Building Ind. Assoc. of South. Cal. v. Babbitt*,
    852 F. Supp. 32 (D.D.C. 1994).........................................................39

*Everett v. United States*,
    158 F.3d 1364 (D.C.Cir.1998).........................................................2

*Federation of Fly Fishers v. Daley*,
    131 F. Supp.2d 1158(N.D. Cal. 2000) ...............................................8

*Fla. Audubon Soc'y v. Bentsen*,
    94 F.3d 658 (D.C.Cir.1996) (*en banc*)................................................3

*Fox Television Stations v. FCC*,
    280 F.3d 1027 (D.C. Cir. 2002) ......................................................39

*Fund for Animals v. Babbit (Grizzly Bear)*,
    903 F.Supp. 96 (D.D.C. 1995)..............................................26-27, 39-41

*Maine v. Norton*,
    257 F.Supp.2d 357 (D. Me. 2003) ....................................................15

*Marsh v. Oregon Natural Res. Council*,
    490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).............................2

*National Assoc. of Home Builders v. Norton*,
    451 F.3d 8 (D.C.C. 2005) .........................................................2, 39

iv

## TABLE OF AUTHORITIES (CONT.)

**Page No.**

*National Wildlife Federation v. Norton (Wolves)*,
    386 F.Supp.2d 553, 560 (D. Vt. 2005)..............................................................24, 40

*Northwest Ecosystem Alliance v. U.S. Fish and Wildlife Service*,
    475 F.3d 1136 (9th Cir. 2007) ..........................................................................15-16

*Nuclear Energy Inst., Inc. v. EPA*,
    373 F.3d 1251(D.C.Cir.2004) ...................................................................................3

*OSG Bulk Ships v. United States*,
    132 F.3d 808 (D.C.Cir.1998) ...................................................................................2

*Southwest Center for Biological Diversity v. Norton (Queen Charlotte Goshawk)*,
    2002 WL 1733618, No. 98-0934 (D.D.C. Jul. 29, 2002) ..............................*passim*

*Stinson v. United States*,
    508 U.S. 36, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993).............................................2

*Thomas Jefferson Univ. v. Shalala*,
    512 U.S. 504, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994)...........................................2

*United Mine Workers v. Federal Mine Safety and Health Administration*,
    924 F.2d 340 (D.C. Cir. 1991) .............................................................................39

*U.S. ex rel Totten v. Bombardier Corp.*,
    380 F.3d 488 (D.C. Cir. 2004)..............................................................................29

*U.S. v. Wilson*,
    503 U.S. 329 (1992)..............................................................................................29

*Wyoming Outdoor Council v. United States Forest Serv.*,
    165 F.3d 43 (D.C.Cir.1999) ...................................................................................2

## FEDERAL STATUTES

5 U.S.C. § 706.........................................................................................2, 26, 31, 38
16 U.S.C. § 1531.................................................................................................17
16 U.S.C. § 1532............................................................................................*passim*
16 U.S.C. §1533.............................................................................................*passim*

**TABLE OF AUTHORITIES (CONT.)**

**FEDERAL REGISTER**

**Page No.**

32 Fed. Reg. 4001 (March 11, 1967) ...................................................................18
39 Fed. Reg. 1175 (January 4, 1974) .................................................................18
43 Fed. Reg. 9607 (March 9, 1978) ...................................................................19
61 Fed. Reg. 4722, 4725 (February 7, 1996) ...............................................14, 17
68 Fed. Reg. 15804, 15810 (April 1, 2003) .............................19, 23, 28, 38-39
71 Fed. Reg. 15266 (March 27, 2006) ...............................................................39
71 Fed. Reg. 15287-95 (March 27, 2006) ..........................................................41
72 Fed. Reg. 6052 (February 8, 2007) .........................................................passim
72 Fed. Reg. 6059-60 (February 8, 2007) ...............................................15, 20, 22
72 Fed. Reg. at 6065 (February 8, 2007) ............................................................36
72 Fed. Reg. at 6066 (February 8, 2007) ............................................................31
72 Fed. Reg. 6068 (February 8, 2007) ......................................................9, 10, 38
72 Fed. Reg. at 6071-76 (February 8, 2007) ................................................passim
72 Fed. Reg. 6083 (February 8, 2007) .................................................................9
72 Fed. Reg. 6084-85 (February 8, 2007) ......................................................8, 10
72 Fed. Reg. 6092 (February 8, 2007) .................................................................9
72 Fed. Reg. 30819 (June 4, 2007) ..............................................................12, 37
72 Fed. Reg. at 30820 (June 4, 2007) .................................................................37

**OTHER AUTHORITIES**

1978 Recovery Plan for the Eastern Timber Wolf, revised in 1992 (Recovery Plan).......................4

American Heritage Dictionary of the English Language at 1497 (1992) ..........................................30

Department of the Interior Solicitor's Memorandum dated March 16, 2007 ...................................30

H.R. Rep. No. 412, 93rd Cong., 1 Sess.; Cong. Rec. 25,669 (July 24, 1973) ...................................18, 40

Endangered Species Preservation Act of October 15, 1966 (80 Stat. 926; 16 U.S.C. § 668aa(c)), ..18

Merriam-Webster Collegiate Dictionary at 964 (10th ed. 2000) ...........................................30

Sutherland Stat. Const., § 21.10 (2002) .........................................................................................29, 30

Defendant-Intervenors U.S. Sportsmen's Alliance Foundation, Wisconsin Bear Hunting Association, Scott Meyer and Rob Stafholt and Defendant-Intervenors Safari Club International, Safari Club International Foundation, and National Rifle Association (collectively, "Defendant-Intervenors") respectfully submit this Consolidated Memorandum in Support of Their Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment.

## INTRODUCTION

Defendant-Intervenors move for summary judgment and oppose the summary judgment requested by the Plaintiffs, Humane Society of the United States *et al.* ("HSUS *et al.*").  HSUS *et al.* have challenged a Final Rule, promulgated the U.S. Fish and Wildlife Service ("FWS") that designated the Western Great Lakes Distinct Population Segment (WGL DPS) of wolves and that removed the wolves of that DPS from the lists of "endangered" and "threatened" species.  16 U.S.C. §1533.  Defendant-Intervenors submit that the FWS appropriately designated the WGL DPS, including its geographic boundaries, determined the significant portions of the WGL DPS wolves' range, and conducted the mandatory threats analysis to determine that ESA listing for the DPS was no longer required

Defendant-Intervenors request that this court deny HSUS *et al.*'s Motion for Summary Judgment and grant the FWS's and Defendant-Intervenors' Motions.  If for any reason, this court deems some other remedy necessary, Defendant-Intervenors ask that the court avoid vacating the Final Rule to Delist in order to maintain consistency in the management of the recovered populations of WGL DPS wolves by the Minnesota, Wisconsin, and Michigan Departments of Natural Resources.

## STATEMENT OF FACTS

In lieu of a separate Statement of Facts, Defendant-Intervenors incorporate their accompanying Statement of Uncontroverted Material Facts filed pursuant to Local Rule 56.1.

1

Pertinent facts are also stated with citation during the course of the legal arguments made below.

## STANDARD OF REVIEW

In light of the FWS's vast expertise in the area of wildlife conservation and management, courts apply a deferential standard of review together with a strong presumption in favor of upholding the FWS on such decisions. *Carlton v. Babbitt,* 900 F. Supp. 526, 530 (D.D.C. 1995); *see Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 375-78, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Judicial review of ESA decisions is under 5 U.S.C. § 706; *National Assoc. of Home Builders v. Norton,* 451 F.3d 8, 13 (D.C.C. 2005). A court must uphold the FWS's decision if it finds that the Service "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Natural Res. Defense Council,* 462 U.S. 87, 105 (1983). As this Court stated in another ESA case:

> For challenges to an agency's construction of the statutes that it administers, the Court's review must be particularly deferential. The Court must defer to the agency's interpretation of a statute that it implements "so long as it is reasonable, consistent with the statutory purpose, and not in conflict with the statute's plain language." *OSG Bulk Ships v. United States,* 132 F.3d 808, 814 (D.C.Cir.1998) (quoting *Coal Employment Project v. Dole,* 889 F.2d 1127, 1131 (D.C.Cir.1989)); *see Chevron, U.S.A., Inc. v. Natural Res. Defense Council,* 467 U.S. 837, 845, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), *Davis v. Latschar,* 83 F.Supp.2d 1, 5 (D.D.C.1998), *aff'd.* 202 F.3d 359 (D.C.Cir.2000). An agency's interpretation of its own regulations also is entitled to substantial deference by the courts unless it is "plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994); *see also Stinson v. United States,* 508 U.S. 36, 45, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993); *Wyoming Outdoor Council v. United States Forest Serv.,* 165 F.3d 43, 52 (D.C.Cir.1999); *Everett v. United States,* 158 F.3d 1364, 1367 (D.C.Cir.1998).

*Colorado River Cutthroat Trout v. Kempthorne*, 448 F. Supp. 2d 170, 174-75 (D.D.C. 2006).

## ARGUMENT

**I.     PLAINTIFFS HAVE NOT ESTABLISHED THEIR STANDING TO SUE**

To establish Constitutional standing, Plaintiffs must demonstrate that they have suffered a "concrete and particularized" injury that is "actual or imminent"; that was "caused by, or fairly

traceable to, an act that the litigant challenges in the instant litigation"; and that can be redressed by the court. *Fla. Audubon Soc'y v. Bentsen,* 94 F.3d 658, 663 (D.C.Cir.1996) (*en banc*). (*internal quotation marks omitted*). An organization must additionally demonstrate its <u>Article III</u> standing by providing evidence that at least one of its members would have standing to sue in his or her own right. *Nuclear Energy Inst., Inc. v. EPA,* 373 F.3d 1251, 1265 (D.C.Cir.2004). Defendant- Intervenors disputed HSUS *et al.'s* standing in Affirmative Defense 4 of Defendant-Intervenors' Answer to Plaintiffs' Amended Complaint for Declaratory and Injunctive Relief, p. 33. In Plaintiffs' Motion for Summary Judgment and Statement of Material Facts, HSUS *et al.* offer no declarations or affidavits to support their standing to sue. HSUS *et al.* have provided no information whatsoever to describe HSUS *et al.* and/or their members' contact with wolves within the WGL DPS and/or any concrete or imminent harm caused by the delisting. HSUS *et al.* have failed in their burden to demonstrate their standing with admissible evidence.

II.    **THE EVIDENCE OVERWHELMINGLY SUPPORTS THE FWS' FINDING THAT WOLVES HAVE RECOVERED, AND THE DISTINCT POPULATION SEGMENT PROVISION OF THE ESA APPLIES EQUALLY TO LISTING AND DELISTING**

   A.    **The Gray Wolves of the Western Great Lakes Distinct Population Segment Are a Recovered Species**

   The gray wolves of the WGL DPS are a "recovered" species. "Recovered" status is often determined by the "recovery plan" that the Secretary of the Interior, and by delegation of authority the FWS, is generally required to develop for the conservation and survival of listed species. 16 U.S.C. §1533(f)(1). The ESA directs the agency, to the maximum extent practicable, to incorporate into the recovery plan:

   objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list.

*Id.* § 1533(f)(1)(B)(ii). The FWS established such objective, measurable criteria for the gray

3

wolves of the WGL DPS when it drafted the 1978 Recovery Plan for the Eastern Timber Wolf. The Recovery Plan, which was revised in 1992 (Recovery Plan), identified the following recovery criteria:

> At least two viable populations within the 48 United States satisfying the following conditions must exist: (1) the Minnesota population [estimated at 1550 to 1750 wolves] must be stable or growing, and its continued survival be assured, and (2) a second population outside of Minnesota and Isle Royale must be re-established, having at least 100 wolves in late winter if located within 100 miles of the Minnesota wolf population, or having at least 200 wolves if located beyond that distance. These population levels must be maintained for five consecutive years before delisting can occur. A Wisconsin-Michigan population of 100 wolves is considered to be a viable second population, because continued immigration of Minnesota wolves will supplement it demographically and genetically for the foreseeable future.

AR Doc. 468A, p. 13770, 13773. Although the Recovery Plan deemed the persistence of the Minnesota population mandatory, it offered flexibility with respect to the location of the second population and included, for possible re-establishment alternatives, populations in northern Wisconsin, the upper peninsula (UP) of Michigan, the Adirondack Forest Preserve of New York, a small area in eastern Maine, and a larger area of northwestern Maine and adjacent northern New Hampshire. AR Doc. 468 A, p. 13825-6. The Recovery Plan's recovery criteria were specific and can in no way be interpreted to require the return of the gray wolf to all or most of its historic range. *Id.*

All the recovery criteria of the Recovery Plan have long been met and exceeded. A stable, if not growing wolf population in excess of 1,750 wolves has lived in Wisconsin for more than a decade. In a 1997-1998 survey, Wisconsin estimated a population of approximately 2,445 wolves. In a study conducted in 2003-2004, Minnesota estimated that its wolf population was between 2,301 and 3,708 wolves. According to annual winter track surveys, the Minnesota wolf population showed a stable or slowly increasing wolf population during the 11 year period between 1994 and 2005. 72 Fed. Reg. 6052, 6054 (February 8, 2007).

A second wolf population, established in Wisconsin and Michigan has also long exceeded the recovery criteria.

> In 2002, wolf numbers in Wisconsin alone surpassed the Federal criterion for a second population, as identified in the 1992 Recovery Plan (i.e., 100 wolves for a minimum of 5 consecutive years, as measured by 6 consecutive late- winter counts). Furthermore, in 2004 Wisconsin wolf numbers exceeded the Recovery Plan criterion of 200 animals for 6 successive late-winter surveys for an isolated wolf population.

72 Fed. Reg. 6055. Wisconsin's wolf population has continued to grow, although at a somewhat slower rate than was documented previously. Since 2001, Michigan's wolves have also independently exceeded the Recovery Plan's recovery criterion for a second population in the eastern United States (*i.e.*, 100 wolves for a minimum of five consecutive years, based on six late-winter estimates) and have for six successive late-winter surveys, surpassed the Federal criterion for an isolated wolf population of 200 animals. *Id.*

A supplementary component of the Recovery Plan's recovery criteria, at least for the Wisconsin wolf population, is assurance of continued survival. The WGL DPS's assured "continued survival" is demonstrated by the FWS's analysis of the impact of the five statutory factors for listing, 16 U.S.C. § 1533(a)(1)(A)-(E) and of "those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices. . .." *Id.* § 1533(b)(1)(A).

**B.    The FWS Properly Conducted a Threats Analysis and Properly Determined, Based on the Best Available Scientific Evidence, That Delisting Was Appropriate**

To determine the appropriate listing status of a species, the ESA requires that the FWS examine five statutory factors identified in 16 U.S.C. § 1533(a)(1)(A)-(E) , including **(A)** the present or threatened destruction, modification, or curtailment of its habitat or range; **(B)** overutilization for commercial, recreational, scientific, or educational purposes; **(C)** disease or

predation; **(D)** the inadequacy of existing regulatory mechanisms; or **(E)** other natural or manmade factors affecting its continued existence. The mere fact that one or more of these factors are present, and/or even that one or more of these factors have an impact on the numbers or health of the species being considered, does not require the FWS to list the species as "endangered" or "threatened." The FWS is only obligated to place (or keep) a species on one of these lists if, based on the best available science, the agency determines that one or more of these factors is jeopardizing the continued existence of the species. *American Wildlands v. Kempthorne*, 478 F.Supp. 2d 92, 98 (D.D.C. 2007) (Court upheld FWS decision not to list trout species where threats were present and had impact on species, but not to the extent that the species required classification as "threatened." "Although the WCT subspecies has been reduced from historic levels and its extant populations face threats in several areas of the historic range, we find that the magnitude and imminence of those threats do not jeopardize the continued existence of the subspecies within the foreseeable future." 478 F. Supp. 2d at 98, *quoting from* 68 Fed. Reg. at 47,006.)

In its determination on the listing status of the WGL DPS, the FWS assessed the impact of the five factors ("threats analysis") with the knowledge that wolves are an incredibly resilient species. Numerous scientific studies analyzed by the FWS for the purpose of deciding on the listing status demonstrated that wolf populations can continue to thrive despite significant population reduction. A.R. Doc. 215, p. 5893. (Citing studies showing wolves rebounded from annual loss of 20 to 30%, and even 50%).[1]

      **C.**      **The FWS Properly Determined Existing Regulatory Mechanisms Are Adequate**

---

[1]    In this Motion and Opposition, Defendant-Intervenors do not offer a discussion of the FWS's analysis of all five factors, but respond simply to the arguments HSUS *et al.* presented in Plaintiffs' Motion for Summary Judgment.

One of the five factors that the ESA directs the FWS to analyze for listing decisions is the adequacy of existing regulatory mechanisms.  Here, the FWS correctly determined that existing regulatory mechanisms, as that requirement is interpreted, exist to justify delisting the WGL DPS.  The standard for these measures is "adequacy," not perfection.

> The ESA does not guarantee the best of all possible worlds for the species at issue.  Instead, the agency is charged with determining whether one or more of the factors caused the species to be endangered or threatened.  There can be a large gap between the best regulatory mechanisms and a situation in which the regulatory mechanisms contribute to the threat or endangerment of a species.

*Center for Biological Diversity v. U.S. Fish and Wildlife Service*, 402 F. Supp.2d 1198, 1209 (D. Or. 2005)(court upheld FWS decision to withdraw proposed rule to list coastal cutthroat trout subspecies despite FWS's finding of flaws in existing regulatory mechanisms).  Moreover, the FWS is not obligated to seek guarantees as to the regulatory mechanisms' future success.  The FWS decision to delist (or to choose not to list) a species is not in error simply because of the existence of any uncertainty about whether the pertinent regulatory mechanisms will be effective.  *Southwest Center for Biological Diversity v. Norton*, 2002 WL 17733618 (D.D.C. July 29, 2002) (Magistrate's recommendation agreeing with FWS decision as to regulatory mechanisms to protect Queen Charlotte goshawk, but recommending remand on other grounds was accepted in part and rejected in part by the District Court by an Order dated May 24, 2004, Case No. 98-0934).

Although the mechanisms assessed by the FWS must be in existence at the time of the delisting decision, *Biodiversity Legal Foundation v. Babbitt*, 943 F. Supp. 23, 26 (D.D.C. 1996), the FWS is permitted to take into account the presence of voluntary mechanisms that contribute to the species' conservation.

> Although voluntary actions are not certain in the same way that regulatory schemes are, they are nonetheless concrete proposals.  It is appropriate that NMFS consider voluntary actions to the extent that they are an "effort being made" to protect a threatened species.

7

*Federation of Fly Fishers v. Daley*, 131 F. Supp.2d 1158, 1168 (N.D. Cal. 2000) (court

determined that NMFS could consider voluntary measures, so long as the agency did not rely too

heavily on them.). *See also Center for Biological Center for Biological Diversity v. FWS*, 2007

WL 716108 (D. Colo. March 7, 2007) *vacated per joint agreement of the parties on other*

*grounds* (court ruled that FWS could consider the joint voluntary conservation efforts of federal

agencies other than the FWS, states and non-governmental entities, in assessing the impact of

risk factors on a species for the purpose of a listing determination).  At least one reason why the

FWS may consider voluntary state efforts, in addition to regulatory mechanisms, is the fact that

the ESA requires the FWS to do so.  Even before the agency is supposed to conducts its analysis

of the existing regulatory mechanisms, the ESA requires the FWS to evaluate the states' efforts

to protect the species:

> The Secretary shall make determinations required by subsection (a) (1) of this
> section solely on the basis of the best scientific and commercial data available to
> him after conducting a review of the status of the species and ***after taking into***
> ***account those efforts, if any, being made by any State or foreign nation, or any***
> ***political subdivision of a State or foreign nation, to protect such species,***
> ***whether by predator control, protection of habitat and food supply, or other***
> ***conservation practices, within any area under its jurisdiction***, or on the high
> seas.

16 U.S.C. § 1533(b)(1)(A) (*emphasis added*).

   The FWS's analysis of the proper listing status of the WGL DPS of gray wolves revealed

that Minnesota, Wisconsin and Michigan each had developed and finalized gray wolf

management plans.  Minnesota's plan was completed in early 2001, Wisconsin's was adopted in

1999 and updated in 2006, and Michigan's was completed and approved in 1997.  72 Fed. Reg.

6084-85.

   Each of the plans includes a minimum population level, (1,600 in Minnesota, 350 in

Wisconsin and 200 in Michigan) which if reached, triggers the pertinent state's enhanced wolf

8

protections. *Id*. at 6083. These minimum population standards each exceed the minimum population numbers established by the Eastern Timber Wolf Recovery Plan for the species' recovery and removal from the "endangered" and "threatened" species lists (1550 for Minnesota, 100 for Wisconsin and Michigan collectively). AR Doc. 468A, p. 13770, 13773. Consequently, even if one or more of the state's wolf populations did, for some reason, drop to these minimum levels, the population reduction(s) would not qualify the WGL DPS for "endangered" or "threatened" listing status. The wolves in the WGL DPS have greatly exceeded any objective criteria established for recovery and therefore, a hypothetical population decline to state minimum population standards would simply not jeopardize the survival of the species.

Michigan's wolf management plan has been in effect for over 10 years and remains in effect while the state develops a revised plan. *Id*. at 6068. In delisting wolves, the FWS relied on the adequacy of the existing plan, and not on the forthcoming revised version. The FWS observed that "[n]ecessary wolf management actions detailed in the Michigan Plan include public education and outreach activities, annual wolf population and health monitoring, research, depredation control, and habitat management." *Id*. at 6092. In accordance with the requirements of Section 1533(b)(1)(A) of the ESA, the FWS also took into consideration state efforts for the protection of wolves in addition to the mandatory regulatory mechanisms, such as its *Guidelines for Management and Lethal Control of Wolves Following Confirmed Depredation Events*. *Id*. at 6068. Based on the existing methods in place, the FWS determined that Michigan's wolf protections are adequate to prevent wolves from returning to a point at which they will be "in danger of extinction throughout all or a significant portion of its range" (endangered) or "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range" (threatened). 16 U.S.C. §§ 1532 (6) and (20).

9

Minnesota's wolf management plan's goal is "to ensure the long-term survival of wolves in Minnesota while addressing wolf-human conflicts that inevitably result when wolves and people live in the same vicinity", and focuses on population monitoring and management, management of wolf depredation of domestic animals, management of wolf prey, enforcement of laws regulating take of wolves, public education, and increased staffing to accomplish these actions. *Id.* at 6084. The plan divides the state into two zones, with wolves in Zone A receiving stronger protection than wolves in Zone B. Even in Zone B, significant restrictions apply to the take of wolves. For example, only depredating wolves may be killed and only on lands owned, leased or managed by the owner of a domestic animal attacked or threatened by a wolf on the land or within a one mile radius of that land. According to Minnesota's Wolf Management Plan, "[a]lthough these depredation procedures will likely result in a larger number of wolves killed, as compared to previous ESA management, ***they will not result in the elimination of wolves from Zone B***." AR Doc. 215 at 5276 (*emphasis added*).

The FWS properly assumed that Minnesota's wolf management efforts would be "funded and implemented largely as written." 72 Fed. Reg. at 6068. As demonstrated by the Declaration of Daniel Stark, Wolf Management Specialist for the Minnesota Department of Natural Resources, the state's collective financial resources for wolf management, including in-kind depredation control assistance from the Wildlife Services Division of the U.S. Department of Agriculture and state funding from multiple budgets, as well as the 20 new Conservation Officers each tasked, at least in part, with wolf management responsibilities, far exceeds the management expectations identified in the state's wolf management plan. Declaration of Daniel Stark, attached as Exhibit 2 to this brief.[2]

---

[2] Defendant-Intervenors have already attached Daniel Stark's declaration as an Exhibit to their Opposition to Plaintiffs' Motion to Supplement the Administrative Record. In that Opposition, Defendant-Intervenors' argued that Plaintiffs should be prohibited from adding post-decisional documents

Contrary to representations made by HSUS *et al.* in their Motion for Summary Judgment, there is no significant question as to Michigan and/or Wisconsin's funding of their management plans. It is true that the Executive Summary of Michigan's Five Year Evaluation Report of its Gray Wolf Recovery and Management Plan noted less than *full* implementation of its management plan. However, that indication of less than "perfect" implementation is countered by the state's acknowledgement that "many objectives of the plan were met during the first five years of plan implementation." AR Doc. ~~215~~142, p. 767.

HSUS *et al.*'s ability to extract from the vast Administrative Record a limited number of references suggesting that states have expressed concerns about funding and/or have requested financial support from the federal government do little to shed any true light on the states' ability to adequately fund their wolf management efforts. In the first place, Plaintiffs fail to demonstrate how funding situations have changed from the time when wolves were listed as "endangered" to post-delisting. Plaintiffs offer no evidence to show to what extent, prior to delisting, the federal government provided the states with funding that assisted Michigan, Minnesota or Wisconsin with conducting their conservation, management, research and monitoring effort for wolves and/or that this funding has been removed post delisting. The only evidence of federal funding comes from the declaration of Daniel Stark, Minnesota Wolf Management Specialist. *See* Declaration of Daniel Stark, Exhibit 2. In that declaration, Stark discusses the fact that since 1986, the federally funded Wildlife Services branch of the U. S. Department of Agriculture has been the agency that has conducted Minnesota's gray wolf

---

to the AR and from referencing those documents in their Motion for Summary Judgment. Defendant-Intervenors argued, in the alternative that if the Court permitted the Plaintiffs to supplement the record, that the Court also accept Daniel Stark's declaration, which provided a more complete and accurate description of the information referenced in Plaintiffs' supplemental documents. Since the Court has not yet ruled on Plaintiffs' Motion to Supplement the Record, Defendant-Intervenors submit Daniel Stark's declaration as an Exhibit to this Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment, to counter the inaccurate inferences drawn by Plaintiffs allegedly based on the Exhibits to Plaintiffs' Motion to Supplement the Administrative Record.

depredation control activities.  He also explains how Wildlife Services has *continued* to provide and fund the state's depredation control activities.  In their Motion for Summary Judgment and Statement of Material Facts, HSUS *et al*. offers nothing to suggest that the same situation is not occurring in the other states of the WGL DPS as well.

Michigan's decision to change its population monitoring strategies is similarly irrelevant. As explained by Thomas Drummer, Ph.D of Michigan Technological University, who helped design the new monitoring strategy:  "The results of the simulations indicate the proposed monitoring program based on geographic stratification will produce unbiased, precise estimates of total wolf abundance."  AR Doc. 241, p. 8527.

Whether or not the states aspire to obtain enhanced funding to supplement their current wolf management resources, the FWS's duty is not to seek perfection or certainty.  Based on the information available, the FWS properly found that the states' regulatory and other mechanisms will prevent the wolves of the WGL DPS from reaching a status where listing is required.  The FWS's decision on this issue was sound, reasonable and neither arbitrary nor capricious.

   **D.    The FWS Properly Concluded That The Existence of Disease and Human Predation Do Not Require the FWS To Continue the "Endangered" Classification for the WGL DPS**

Like most wildlife species, wolves are subject to certain diseases.  These diseases do not pose a risk that jeopardizes the DPS's continued existence.  The prevalence of disease and its impact on population numbers and species health will be monitored by both federal and state authorities.  *Draft Post-Delisting Monitoring Plan for the Western Great Lakes Distinct Population Segment of the Gray Wolf*, 72 Fed. Reg. 30819 (June 4, 2007) (describes combined federal/state plans for monitoring disease and predation during five year post-delisting period). For example, the 1997 Michigan Wolf Recovery and Management Plan states that wolf health and disease monitoring will receive a high priority for a minimum of five years post delisting.

Id. at 6080.  Wisconsin's post-delisting approach is to test for disease and parasite loads through

periodic necropsy and scat analyses.  In addition, the 2006 update to Wisconsin's 1999 plan

recommends that all wolves live-trapped for other purposes should have their health monitored

and reported to the state wildlife health specialists.  *Id*.  Contrary to HSUS *et al*.'s

mischaracterizations of the state's efforts, nothing about Minnesota's disease monitoring

qualifies as "voluntary or speculative."  Instead, the strategies are quite concrete, stating that

DNR personnel "will collaborate with other investigators and continue monitoring disease

incidence, where necessary, by examination of wolf carcasses obtained through depredation

control programs, and also through blood/tissue physiology work conducted by DNR and the

U.S. Geological Survey."  AR Doc. 215, p. 5285.  In addition, Minnesota's DNR personnel will

engage in the "regular collection of pertinent tissues of live captured or dead wolves" and

periodically assess wolf health "when circumstances indicate that diseases or parasites may be

adversely affecting portions of the wolf population."  AR Doc. 215, p. 5273.

Similarly, post-delisting human-caused wolf mortality will not result in reduction of the

WGL DPS wolf population sufficient to require the FWS to relist the species.  As indicated

above, wolf populations can continue to thrive despite an up to 50% reduction in numbers.  A R

Doc. 215, p. 5893.  The simple fact that the removal of federal protections could result in a

higher take of wolves, does not require the FWS to consider the WGL DPS at risk of becoming

"threatened" or "endangered."  *American Wildlands v. Kempthorne*, 478 F.Supp.2d 92 (D.D.C.

Mar 26, 2007) (although trout population sustained impact from threats, court agreed with FWS

that "magnitude and imminence" of those threats did not jeopardize the continued existence of

the species.)

Michigan, Minnesota and Wisconsin continue to place restrictions on the take of wolves

and enforce penalties for the illegal removal of members of the species.  Minnesota, for example,

13

has increased by 20 the number of Conservation Officers available to enforce Minnesota's take restrictions. Declaration of Daniel Stark, Exhibit 2. Each state has established population minimums that, if reached, would trigger even greater protections for the species.

Although disease and human-caused mortality are factors that may have an impact on wolf populations, they are not risks that jeopardize the continued survival of the WGL DPS.

      **E.**      **The FWS Properly Developed and Applied the DPS Policy**

The ESA mandates that the FWS must, at least every five years, review all the "species" on the "endangered" and "threatened" species lists and determine, based on an analysis of the five statutory factors listed discussed above, 16 U.S.C. § 1533(a)(1) and the considerations identified in 1533(b), which species should be removed from the lists. 16 U.S.C. § 1533(c)(2). That duty applies to "species" and that term is defined by the ESA to include "any subspecies of fish or wildlife or plants, and any *distinct population segment* of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16) (*emphasis added*). Because the phrase "distinct population segment" is not defined anywhere in the ESA, the FWS, in a joint action with the National Marine Fisheries Service ("NMFS"), developed a policy to interpret and apply the phrase. *Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act*, 61 Fed. Reg. 4722 (Feb. 7, 1996) ("DPS Policy"). A population qualifies as a Distinct Population Segment ("DPS") if it is both discrete and significant. *Id.* at 4725. A population is *discrete* if it is "separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors," or if a population's boundaries are marked by international borders. *Id.* A population's *significance* is analyzed under four non-exclusive factors: (1) whether the population persists in a unique or unusual ecological setting; (2) whether the loss of the population would cause a "significant gap" in the taxon's range; (3) whether the population is the only surviving natural occurrence of a

14

taxon; and (4) whether the population's genetic characteristics are "markedly" different from the rest of the taxon.  *Id.*

Courts have carefully scrutinized the DPS policy and have determined that it is entitled to highly deferential review and have upheld the policy as a reasonable agency construction of the ESA.  *Northwest Ecosystem Alliance v. U.S. Fish and Wildlife Service,* 475 F.3d 1136, 1145 (9th Cir. 2007) (court applied deference per *Chevron, U.S.A., Inc. v. Natural Res. Defense Council,* 467 U.S. 837, 845, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and upheld the FWS's decision to reject petition to designate DPS for western gray squirrel population); *Maine v. Norton*, 257 F.Supp.2d 357, 385 (D. Me. 2003) (court upheld DPS designation and listing of Gulf of Maine Atlantic salmon population).

Utilizing the DPS Policy, the FWS analyzed the Western Great Lakes population of gray wolves and found it to be both significant and discrete.  72 Fed. Reg. 6052, 6059-60.  First, based on the following findings, the FWS concluded the population segment to be "significant":  the WGL wolves represent the only U.S. wolf population to reside in the Laurentian Mixed Forest Province or to use any form of eastern coniferous or eastern mixed coniferous-broadleaf forest in the United States; the recovered Western Great Lakes wolf metapopulation is the only gray wolf population in the conterminous United States east of the Rocky Mountains and currently constitutes about 80 percent of North American gray wolves that occur south of Canada.

Next, the FWS found the WGL wolf population to be discrete because it is markedly separated from other gray wolf populations, due to its distance from these other populations and due to the unsuitable habitat that separates the WGL DPS from the other populations.  "The area between Minnesota packs and Northern Rocky Mountain packs largely consists of unsuitable habitat, with only scattered islands of possibly suitable habitat, such as the Black Hills of eastern Wyoming and western South Dakota."  *Id.* at 6059.  The FWS also concluded that the WGL DPS

15

wolves were unlikely to "cross the eastern boundary into the Laurentian Mixed Habitat Province of New York, Pennsylvania, and New England due to inhospitable conditions." *Id.*

HSUS *et al.* purports to challenge the FWS's designation of the WGL DPS by trying to undermine the Service's "significance" and "discreteness" determinations. These DPS challenges are a subterfuge for HSUS *et al.*'s pervading dissatisfaction with the delisting. For example, HSUS *et al.* attack the FWS's "significance" determination, not because the FWS determined the WGL DPS to be "significant," but instead because the Service used the "significance" determination to classify the Western Great Lakes population as a DPS. *See* Plaintiffs' Motion for Summary Judgment at 29-30. HSUS *et al.*'s "significance" challenge is not directed at the WGL DPS designation, but is instead an attack on the DPS policy itself, which establishes "significance" as a criterion for DPS classification. Since the DPS policy has previously been upheld as a reasonable agency interpretation of the ESA, HSUS *et al.*'s challenge can easily be rejected. *Northwest Ecosystem Alliance,* 475 F.3d at 1145.

HSUS *et al.* also attacks the FWS's "discreteness" analysis. HSUS *et al.* take issue with the Service's findings on discreteness, claiming that the absence of wolves from the areas between existing wolf populations cannot be the foundation for discreteness. *See* Plaintiffs' Motion for Summary Judgment at 30. However, this challenge too is not focused on the FWS's finding of a discrete DPS, it is a challenge to the FWS's decision to delist the DPS. The attack is premised on a very simplistic and unrealistic approach to conservation status and species recovery. The fact is that roads, cities, and human populations generally make it impossible to attempt to recreate what HSUS *et al.* assumes to have been the historic distribution of wolves. Such recovery efforts are not required of the FWS. *See* cases cited in Point III.D. below.

**F.     The FWS Properly Used Distinct Population Segments As A Tool For the Purpose of Delisting**

16

The FWS evaluated and designated the WGL DPS in order to respond to the species'
recovered status.  From the outset, the FWS made it clear when drafting the DPS policy that the
agency intended to use DPSs as a tool not simply for listing species, but for delisting them as
well.[3]

> The Fish and Wildlife Service and the National Marine Fisheries Service
> (Services) have adopted a policy to clarify their interpretation of the phrase
> "distinct population segment of any species of vertebrate fish or wildlife" for the
> purposes of listing, *delisting*, and reclassifying species under the Endangered
> Species Act of 1973, as amended (<u>16 U.S.C. 1531 et. seq.) (Act)</u>.

61 Fed. Reg. 4722 (February 7, 1996), *Policy Regarding the Recognition of Distinct Vertebrate
Population Segments under the Endangered Species Act* (*emphasis added*).

> This document adopts an interpretation of the term "distinct population segment"
> for the purposes of listing, *delisting*, and reclassifying vertebrates by the U.S. Fish
> and Wildlife Service (FWS) and NMFS.

*Id*. (*emphasis added*).

> This guides the evaluation of distinct vertebrate population segments for the
> purposes of listing, *delisting*, and reclassifying under the Act.

*Id*. at 4725 (*emphasis added*).  The FWS also made a point in the DPS policy of noting that it
interpreted the ESA "to provide[ ] no basis for applying different standards for delisting than
those adopted for listing."  *Id*. at 4724.

The Ninth Circuit, in the case of *Defenders of Wildlife v. Norton*, 258 F.3d 1141 (9th Cir.
2001) discussed how Congress had specifically intended to give the Secretary "more flexibility
in her approach to wildlife management," *id.* at 1144, and offered legislative history to show the
Secretary's ability to divide a species into populations in order to list some populations and delist
others:

---

[3]    Contrary to the arguments of Amicus, Center for Biological Diversity, the FWS followed proper
rulemaking procedures in designating the WGL DPS.  The FWS published its proposal to designate the
DPS on March 27, 2006 in the same rulemaking document, but as an independent action, offering the
public the opportunity to comment on either the DPS designation, the delisting proposal or both.  71 Fed.
Reg. 6052 (March 27, 2006).

Senator Tunney explained:  An animal might be 'endangered' in most States but overpopulated in some.  In a State in which a species is overpopulated, the Secretary would have the discretion to list that animal as merely threatened *or to remove it from the endangered species listing entirely while still providing protection in areas where it was threatened with extinction.*  In that portion of its range where it was not threatened with extinction, the States would have full authority to use their management skills to insure the proper conservation of the species.

*Id.*, *quoting* H.R. Rep. No. 412, 93rd Cong., 1 Sess. (1973) (*emphasis added*).  *See* 16 U.S.C. § 1532(6), (16), (20).

### G.  The FWS Established the WGL DPS In A Manner Consistent With Its Historical Approach to the Eastern Timber Wolf

In designating the WGL DPS, the FWS responded to the recovery of a population of wolves that has historically been dealt with in a manner distinct from other gray wolf populations within the United States.  Contrary to HSUS *et al*.'s allegations, the FWS did not "carve up" a gray wolf species in order to sidestep listing obstacles.  The gray wolf population of the Western Great Lakes has long and consistently been dealt with as distinct from other wolf populations of the conterminous United States.  For example, on March 11, 1967, the FWS listed as "threatened" the "timber wolf – canis lupus lycaon"[4] under the Endangered Species Preservation Act of October 15, 1966 (80 Stat. 926; 16 U.S.C. § 668aa(c)), 32 Fed. Reg. 4001, (March 11, 1967).  Then on January 4, 1974, the FWS listed as "endangered" both the Eastern Timber wolf (canis lupus lycaon) and the Northern Rocky Mountain wolf (canis lupus irremotus).  39 Fed. Reg. 1175, (January 4, 1974).  In 1978, the FWS converted these two individual subspecies' listings into a single listing, for the sake of "convenience."

In any case, the Service wishes to recognize that the entire species Canis lupus in Endangered or Threatened to the south of Canada, and considers that this matter can be handled most conveniently by listing only the species name.

---

[4]     Canis lupus lycaon is the scientific name for the Eastern Timber Wolf that resides in the WGL DPS.

18

43 Fed. Reg. 9607 (March 9, 1978). Despite the joint listing, the FWS continued to deal with the Eastern Timber wolf as an entity separate and distinct from other U.S. populations of wolves. In 1978, the FWS published the Eastern Timber Wolf Recovery Plan, which was revised in 1992. AR Doc. 468A, p. 13770. The Eastern Timber Wolf Recovery Plan was separate and distinct from the recovery plan developed and published for the Northern Rocky Mountain population of wolves. 68 Fed. Reg. 15804, 15810 (April 1, 2003). The recovery goals of the Eastern Timber Wolf Recovery Plan established objective recovery goals different from the recovery goals identified by the Northern Rocky Mountain Recovery Plan. Each wolf population achieved their recovery objectives independently of the other.

**H.     The FWS Correctly Established the Boundaries of the WGL DPS**

Upon designating the WGL DPS, the FWS determined the geographical boundaries for this population segment. Congress offered no statutory language to assist in the determination of these geographical boundaries, constructively endowing the FWS with full discretion to designate these parameters. Few courts, if any, have considered the question of DPS boundaries. The Oregon District Court, in the case of *Defenders of Wildlife v. Secretary*, 354 F. Supp. 2d 1156 (D. Or. 2005) rejected the FWS's decision to broadly draw DPS boundaries for the reclassification of wolves and offered simple alternative guidance: "The DPS Policy is designed to draw a line around a population whose conservation status differs from other populations within that species." 354 F. Supp. 2d at 1170. Applying the best scientific evidence available, the FWS did exactly what the Oregon court recommended. Taking into account the status of the recovered population of gray wolves in Wisconsin, Minnesota and Michigan, the average dispersal distances of wolves from these core populations, the likelihood of these dispersing wolves returning to the core population areas and/or settling within the dispersal area, and the habitat conditions of the dispersal area, the FWS crafted boundaries that properly

19

accounted for the behaviors and habitat needs of the wolf population constituting the WGL DPS.

The FWS explained:

> To delineate the boundary of the WGL DPS, we considered the current
> distribution of wolves in the Midwest and the characteristic movements of those
> wolves and of gray wolves elsewhere. We examined the available scientific data
> on long-distance movements, including long-distance movements followed by
> return movements to the vicinity of the natal pack. We concluded that wolf
> behavior and the nature of wolf populations require that we include within the
> area of the DPS some subset of known long-distance movement locations.
> However, as described below, wolf biology and common sense argue against the
> inclusion within the DPS boundary of all known or potential long-distance
> movements. . . .
> [T]his DPS has been delineated to include the core recovered wolf population plus
> a wolf movement zone around the core wolf populations. This geographic
> delineation is not intended to include all areas to which wolves have moved from
> the Great Lakes population. Rather, it includes the area currently occupied by
> wolf packs in Minnesota, Wisconsin, and Michigan; the nearby areas in these
> States, including the Northern Lower Peninsula of Michigan, in which wolf packs
> may become established in the foreseeable future; and a surrounding area into
> which Minnesota, Wisconsin, and Michigan wolves occasionally move but where
> persistent packs are not expected to be established because suitable habitat is rare
> and exists only as small patches. The area surrounding the core wolf populations
> includes the locations of most known dispersers from the core populations,
> especially the shorter and medium-distance movements from which wolves are
> most likely to return to the core areas and contribute to the recovered wolf
> population.

72 Fed. Reg. at 6060.  In essence, the FWS drew a line around the core population, but

not such a tightly drawn line that it would result in dispersing wolves constantly passing

between "endangered" and delisted status.  The FWS strategy can be demonstrated with

an anthill analogy.  If the FWS decided to delist a DPS constituting an anthill and drew

the boundary of the DPS at the base of the anthill, the ants that regularly traveled from

the anthill and back would constantly cross the boundary line and would move back and

forth from one listing status to another.  At one moment an ant could be delisted,

"endangered" the next and then delisted again minutes later.  At one moment, the ant

would be managed by the state government and when it crossed the boundary, it would

be the responsibility of the federal government, only to return to state management when

20

it made its return trip.  By drawing the DPS boundary out a reasonable ant dispersal

distance beyond the edge of the anthill, the FWS could accommodate normal ant travel

behavior, and would thereby reduce the confusion and potential management conflicts

caused by the ants' propensity to travel to and from their home.  The FWS would also be

correctly identifying the "population" of ants.

In the Final Rule, the FWS delisted only the WGL DPS, leaving all wolves outside the

boundaries of the DPS as "endangered."  Therefore, if a WGL DPS wolf disperses more than the

average distance from the core population to an area from which the wolf is unlikely to make the

trip back to the core area, that wolf becomes classified as "endangered" and will receive the

federal protections that accompany that listing status.

III.    **THE FWS REASONABLY DETERMINED THAT THE GENERALLY
        UNSUITABLE HABITAT WITHIN THE WGL DPS BUT OUTSIDE THE CORE
        RECOVERY AREAS IS NOT A SIGNIFICANT PORTION OF THE GRAY
        WOLVES' RANGE**

Substantial evidence in the Administrative Record supports the FWS' determinations that

wolves have occupied substantially all suitable habitat within the WGL DPS, and that the wolves

in that suitable habitat are no longer "endangered" or threatened with extinction.  A.R. Doc. 213,

p. 3828-29.  The FWS was therefore not arbitrary or capricious in determining that the remaining

generally unsuitable habitat in the WGL DPS was not a "significant portion" of the "range" of

the wolves in the DPS, and so properly delisted wolves throughout the DPS.

A.    **The ESA's "Significant Portion of Range" (SPR) Inquiry**

The definition of "endangered species" (coupled with the accompanying definition of

"species") asks whether a species, sub-species, or distinct population segment (DPS) of a

vertebrate species "is in danger of extinction throughout all or a significant portion of its range"

("SPR") 16 U.S.C. § 1532(6), (16) (*emphasis added*).  The definition of "threatened species"

similarly asks whether the species, sub-species, or DPS "is likely to become an endangered

21

species in the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. §

1532(20). Thus, a danger of extinction in a <u>non-significant</u> portion of the range does not result in

listing as endangered or threatened unless the species, sub-species, or DPS is also in danger of

extinction "throughout all" of its range. *Id.* The ESA does not define what "significant portion"

or "range" means. The SPR phrasing is "inherently ambiguous." *Defenders of Wildlife v.*

*Norton (Lizard case),* 258 F.3d 1136, 1141 (9th Cir. 2001); *see Defenders of Wildlife v. Norton*

*(Florida Black Bear case)*, No. 99-02072, slip op. at 8-10 (D.D.C. Dec. 13, 2001) (FWS'

application of SPR standard in that case was "reasonable" under *Chevron v. Natural Resources*

*Defense Council*, 467 U.S. 837, 843 (1984)) (copy supplied as Exhibit 1).

    **B.**     **The Successful Recovery in the Core Recovery Areas**

    As discussed in more detail in Point II above, the evidence overwhelmingly supports

FWS' finding that wolves have recovered in the Core Recovery Areas of Minnesota, Wisconsin

and the Upper Peninsula of Michigan ("Core Recovery Areas"). 72 Fed. Reg. at 6054-55, A.R.

12786-7. Since the original listing of the wolf in 1974, the then-remaining several hundred

wolves in Minnesota have grown into a healthy group of approximately 3,000 wolves, and there

are also now 460-500 wolves in neighboring Wisconsin and approximately 430 more in the

Upper Peninsula of Michigan. 72 Fed. Reg. at 6054-55. As discussed above, the criteria set in

the 1992 wolf recovery plan for delisting have been satisfied. 72 Fed. Reg. at 6052-55; 16

U.S.C. § 1533 (f)(1)(B)(ii) (recovery plans set objective measurable criteria for delisting).

    As noted in Point II above, the FWS has determined that any wolf that disperses further

than 200-300 miles from the Core Recovery Areas has left the WGL DPS population, and so any

such wolf would be outside the DPS and now listed as "endangered" under the ESA. 72 Fed.

Reg. at 6059, A.R. 12791. The FWS thus drew the WGL DPS boundaries to follow rivers and

interstate highways that occurred approximately 200 to 300 miles from the Core Recovery Areas.

*Id.* (noting that rivers and interstate highways also served as partial barriers to wolf dispersal and so reinforced the finding that the wolves in the WGL DPS were distinct from other wolves). The DPS boundaries encompass all of Minnesota, Wisconsin, and Michigan, the eastern halves of South Dakota and North Dakota, the northern 3/5 of Iowa, the northern 1/4 to 1/5 of Illinois, and the fragments of extreme northern Ohio and Indiana located north of Interstate 80. 72 Fed. Reg. at 6052 (map at Figure 1); A. R. Doc. 467, p. 12790o.

C.    **The FWS Has Properly Completed the Analysis of Whether the Non-Core Areas Constitutes SPR**

The FWS reasonably determined that the generally unsuitable habitat within the WGL DPS but outside the Core Recovery Areas ("Non-Core Areas") does not constitute a significant portion of the range ("SPR") of the WGL-DPS wolves. Consequently, the agency properly concluded that the difficulties faced by the very few wolves who attempt to disperse out of the Core Recovery Areas do not require continued listing of those wolves.

In its prior 2003 rule establishing the large "Eastern United States DPS" stretching from the Dakotas all the way to Maine, and downlisting wolves in that DPS from "endangered" to "threatened,"  the FWS determined that the wolves in Minnesota, Wisconsin, and the Upper Peninsula of Michigan had met the criteria for delisting set in the Recovery Plan. 68 Fed. Reg. 15804, 15810 (April 1, 2003) ("2003 Reclassification Rule"). The District Court for the District of Oregon accepted this finding on judicial review of the 2003 Reclassification Rule.  "[T]he Western Great Lakes wolf population exceeded the numerical criteria for <u>downlisting</u> [downgrading from endangered to threatened status] <u>and delisting</u> [removing completely from the list of endangered or threatened species]." *Defenders of Wildlife v. Secretary, U.S. Dep't of the Interior (Wolves)*, 354 F.Supp.2d 1156, 1162 (D.Or. 2005) (*emphasis added*).  Nonetheless, the Oregon Court vacated that 2003 Reclassification Rule because the court determined that the FWS had reclassified an entire DPS without adequately examining whether there were SPRs

23

outside the Core Recovery Areas (but within the DPS) and without conducting a threats analysis in any such Non-Core-Area that qualified as a SPR.  354 F.Supp.2d at 1171-72.[5]

In the Final Rule to delist the WGL DPS, the FWS has conducted a SPR/threats analysis of the Non-Core Areas included within the boundaries of the WGL DPS.  The boundaries of the WGL DPS are much less expansive than the DPS boundaries that the FWS designated for the 2003 Reclassification Rule.  The Final Rule to Delist the gray wolves of the WGL DPS established DPS boundaries that encompassed only wolves in the Core Recovery Areas and wolves within reasonable dispersal distances from the Core Recovery Areas.  72 Fed. Reg. at 6052; A.R. 12784.  For its delisting of the WGL DPS wolves, the FWS examined every part of the Non-Core Areas within the new narrower DPS boundaries to see if any part qualified as a SPR.  72 Fed. Reg. at 6071-74; A.R. 12803.  FWS properly evaluated and determined that the Non-Core Areas did not contain suitable wolf habitat that might support a significant wolf population.  *Id.*

Based on the scientific literature establishing that wolves require substantial contiguous areas of low road density (generally road densities of 0.9 to 1.1 miles of road per square mile or less), the FWS used road-density as its primary tool to evaluate habitat suitability.  72 Fed. Reg. at 6071, A.R. 12803 (*citing AR Doc 468A at 14345, 15468, 15702 and 468B at 16319) to literature)*.  The FWS also evaluated availability of prey (wolf feed primarily on deer and other wild ungulates) and terrain type (forested areas providing cover for denning and escape are best).  *Id.* at 6074.

Formatted: Font: 10 pt

1.     The Northern Lower Peninsula of Michigan

The most serious candidate for SPR outside the Core Recovery Areas was the Northern Lower Peninsula ("NLP") of Michigan.  This area is separated from the Upper Peninsula of

---

[5]     A District Court in the District of Vermont reached a similar conclusion and vacated the 2003 Reclassification Rule on consideration of a rulemaking procedural issue not involved here.  *National Wildlife Federation v. Norton (Wolves)*, 386 F.Supp.2d 553, 560 (D. Vt. 2005).

Michigan, a Core Recovery Area where many wolves are present, by the four-mile-wide Straits

of Mackinac (which connect Lake Michigan and Lake Huron), which in some years freezes

during winter.   A few isolated wolves have been seen crossing to the NLP during freezes.  The

death of one such wolf was recorded in 2004.  72 Fed. Reg. at 6072; A.R. 12804.  No wolf

reproduction is known to have occurred in the NLP and follow-up surveys in the NLP by the

Michigan DNR in winter 2005 and in the winter and spring 2006 failed to find any wolf tracks.

*Id.*

      Reviewing two road-density studies (Gerhing/Potter and Potvin), the FWS found that

there was some suitable wolf habitat in the NLP.  However, the habitat was highly fragmented.

72 Fed. Reg. at 6072; A.R. 105, p.459; A.R. 12804.  Gehring/Potter discounted fragmented

habitat and found 850 square miles of suitable habitat in the NLP.  *Id.*  Potvin used a separate

analysis that gave more weight to fragmented habitat and prey availability and found 3,090

square miles of suitable habitat.  72 Fed. Reg. at 6073; AR Doc. 105, p. 459.  Both estimates fell

far below the 5,000 square miles of contiguous suitable habitat that the FWS in the 1992 Wolf

Recovery Plan had determined was the minimum necessary to support a permanent wolf

population.  72 Fed. Reg. at 6072; AR Doc. 105, p. 459.  This analysis expressly took into

account the possibility that wolves from the nearby Upper Peninsula of Michigan could

periodically replenish a future NLP population.  Absent replenishment from a nearby source

population, the Recovery Plan criteria set 10,000 square miles as the minimum contiguous

habitat for a self-sustaining wolf population.  *Id.*

      The evidence on whether the NLP could in the future support a permanent wolf

population of any size was thus conflicting.  Per the Recovery Plan's contiguous-suitable-area

criteria, no permanent wolf population was likely to establish itself.  In contrast, Potvin estimated

the limited NLP habitat might support a modest number of wolves in the future (110 to 480

wolves), roughly the same number of wolves supported by the far larger amounts of suitable habitat in Wisconsin and the Upper Peninsula of Michigan. 72 Fed. Reg. at 6072; A.R. 12804. However, hewing far more closely to the Recovery Plan criteria, Gehring/Potter concluded the limited NLP habitat could only support 46 to 89 wolves, which would be less than 3% of the number of wolves found in the Core Recovery Areas (*See* populations counts for the Core Recovery Areas above). *Id.* Further, Gehring/Potter also emphasized that the NLP might never support any permanent wolf population. "Given current land-use patterns and road patterns, the NLP may never support a significant, large wolf population given the likely reduced dispersal rate from a source population." *See* AR Doc. 468B at p. 162823 (Gehring/Potter study).

The FWS was not arbitrary and capricious in resolving this conflicting evidence by finding that the small, marginally suitable, and fragmented habitat in the NLP was not a SPR. 5 U.S.C. § 706(a)(2) (APA standard of review); *Defenders of Wildlife v. Norton (Florida Black Bear)*, Civil Action No. 99-02072-HHK at 10-11 (D.D.C. Dec. 13, 2001) (finding that FWS reasonably determined that an area containing 40% of the habitat of the Florida Black Bear, but which supported only 5% of the bear's population due to the habitat being of lesser quality than other habitat, was not a SPR) (copy supplied as Exhibit 1 to this brief).

"In reviewing the action of the FWS, the Court must be thorough and probing, but if the Court finds support for the agency action, it must step back and refrain from assessing the wisdom of the decision unless there has been a 'clear error of judgment.'" *Fund for Animals v. Babbit (Grizzly Bear)*, 903 F.Supp. 96, 105 (D.D.C. 1995) (*citing Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378 (D.Or. 1989). The FWS was not required to accept the opinion of one researcher (Potvin) that 110 to 480 wolves could live in the NLP in the face of other evidence (the Recovery Plan criteria as applied to the road-density findings by Gerhing/Potter and also Potvin) that either no wolves (Recovery Plan) or a very small number

26

(Gehring/Potter) could live there in the future.  *Id.*, 903 F.Supp. at 110 (the presence of "disagreement between scientists … is not sufficient to demonstrate arbitrariness by the government").[6]

      2.    <u>The Turtle Mountains of North Dakota</u>

A second potential SPR candidate was the Turtle Mountains of North Dakota.  The FWS found that this was an "island" of forested area that straddles the border with Manitoba and is surrounded by unsuitable crop and grazing land.  72 Fed. Reg. at 6074; A.R. 12806.  It consists of just 579 square miles of suitable habitat, 394 of which are in North Dakota and 185 of which are across the border in Manitoba.  *Id.;* AR Doc. 105, p. 459.  Again this was well below the 5,000 square mile contiguous suitable habitat minimum set in the Recovery Plan even for populations that could be supported by immigration from elsewhere (here wolves from Minnesota or Canada that might cross unsuitable terrain to reach the Turtle Mountains).  *Id.* Further, the FWS found the Turtle Mountains were isolated, meaning the higher 10,000 square mile minimum applied.  *Id.* at 6072-74.  FWS concluded that "[w]hile this area may provide a small marginal wolf habitat and may support limited and sporadic wolf reproduction, the Turtle Mountain area within the U.S. is not a significant portion of the range of the gray wolves within the DPS, because of its very small areas and its setting as an island of forest surrounded by a landscape largely modified for agriculture and grazing."  *Id.* at 6074*; citing* Licht & Huffman 1996 (article available at AR Doc. 468A, p. at 15487, 15491 2652).  Thus FWS' finding that the Turtle Mountains is not a SPR is supported by evidence and so not arbitrary and capricious.

_____

[6]     The separate issue of whether "range" as used in the ESA refers to "current range" rather than "future potential range" is addressed below.  *See* 16 U.S.C. § 1532(6), (20).  If range means current range, then the NLP was not even a serious candidate for SPR status because the NLP is clearly not a significant part of the current range.  As discussed above, there has never been any documented wolf reproduction in the NLP and recent surveys after a few isolated sightings failed to find any wolf tracks.

      3.    <u>There Were No Other Potential SPRs in the DPS</u>

Reviewing road density information, the FWS found no other areas within the WGL DPS that contained suitable wolf habitat.  72 Fed. Reg. at 6074-75.[7]  Thus Plaintiffs have failed to show that there is any suitable habitat within the narrowed DPS that the FWS either did not evaluate as a candidate for SPR status or evaluated in an arbitrary and capricious manner.  Consequently, FWS has complied with the requirements of the statute as applied in the Oregon and Vermont decisions striking down the 2003 Reclassification Rule.  Notably, the National Wildlife Federation, the lead party that successfully challenged the 2003 Delisting Rule in Vermont, 386 F.Supp.2d at 560, has moved for leave to file an amicus curiae brief here supporting the 2007 delisting rule.

      **D.**      **The FWS Was Not Required to Treat Presently Unsuitable Habitat as a SPR Just Because the Unsuitable Area is Large and Was Once Part of the Wolves' Range**

Because the FWS' fact-findings regarding lack of suitable habitat in the Non-Core Recovery Areas have support in the Administrative Record, and so are binding on judicial review, the "boundary-drawing" question boils down to whether the FWS, in making its delisting decision, was required as a matter of law to treat as SPR(s) the portions of the DPS that once were suitable for and occupied by wolves but no longer are.

Undoubtedly, portions of the WGL DPS outside the Core Recovery Areas were once suitable for and occupied by wolves.  The "entire Midwest" was historically wolf range.  72 Fed. Reg. at 6071.  However, most of those areas are now cities, suburbs, cleared farm land, railroads, highways, or other areas not suitable for and therefore not occupied by wolves.  *See* 72 Fed. Reg.

---

[7]      The FWS reviewed speculation that there might be some "very marginal" suitable habitat in Southern Illinois and Western/Central Pennsylvania.  However, the FWS protected any wolves that may be present in those far-away areas by placing them outside the WGL DPS boundaries, so any such wolves continue to be listed as endangered.  72 Fed. Reg. 6052, Figure 1 (WGL DPS map).  Being outside the WGL DPS, those areas by definition are not a SPR within the WGL DPS.  16 U.S.C. § 1532(6), (16), (20).

at 6074-75.  To use an extreme example, the skyscrapers, suburbs, and exurbs of Chicago constitute a very large area in terms of acreage and are located within the WGL DPS.  However, there can be no realistic expectation that wolves will ever again live there.  If delisting of the wolves must await wolf recovery in such areas, delisting will never occur.

The FWS did not err by declining to treat as SPRs large areas of presently unsuitable wolf habitat.  Two separate reasons support the FWS' decision.

        1.    <u>Unsuitable Habitat is Not Part of the Wolves' "Range"</u>

First, the ESA defines endangered species <u>in the present tense</u> as being a species, sub-species, or DPS which "<u>is</u> in danger" of becoming extinct "throughout all or a significant portion of its range."  Range thus refers to the areas in which a species <u>presently</u> might inhabit but is in "danger" of BECOMING extinct, not to some past range in which the species is ALREADY extinct.  Wolves are not in danger of becoming extinct in the skyscraper canyons, suburbs, and exurbs of Chicago – they are already extinct there.  The use in 16 U.S.C. § 1532 of the present tense ("<u>is </u>in danger of extinction throughout … range") signifies intent to exclude past tense, i.e. what "was  … the range."  *U.S. ex rel Totten v. Bombardier Corp.,* 380 F.3d 488, 493 (D.C. Cir. 2004) ("provide" cannot be read to include "has provided" without violating the "Supreme Court's admonition 'that Congress's use of a verb tense is significant in construing statutes'") (*quoting U.S. v. Wilson,* 503 U.S. 329, 333 (1992)); *Barscz v. Director, Office of Workers' Compensation Programs,* 486 F.3d 744, 749-50 (2nd Cir. 2007).  This result is also directed by the federal statute setting forth the rules of statutory construction (1 U.S.C. § 1); it allows the present tense to be read to include the future tense, but has no provision allowing the present tense to be read to include the past tense:  unless context requires otherwise, "words used in the present tense include the future as well as the present".  *Id.*  Further, statutes drafted in the present tense "are applied … as of the date of enforcement."  Sutherland Stat. Const., § 21.10

29

(2002).  The plain meaning of the term "range" is present range.  "Range" is "the geographic region in which a plant or animal normally live_s_ or grow_s_."  <u>American Heritage Dictionary of the English Language</u> at 1497 (1992) (*emphasis added*).  "Range" is "the region throughout which a kind of organism or ecological community naturally live_s_ or occur_s_."  <u>Merriam-Webster Collegiate Dictionary</u> at 964 (10th ed. 2000) (*emphasis added*).

Among the many problems with defining range as "historical range" is the difficulty of determining the specific date in the past to which the historical range definition would be applied, and as of which species ranges should somehow be measured.  European settlement occurred gradually and at various dates long in the past; Native American settlement occurred earlier; and the date of the enactment of the ESA (1973) is another possibility.  The ESA offers no guidance for choosing such a historical time frame, which is a sign Congress intended a present-tense construction, as is the obvious difficulty in gathering evidence as to what animal roamed where hundreds of years ago.[8]

Judge Kennedy's decision in the Florida Black Bear case noted above treats "range" as "current" range.  *Defenders of Wildlife v. Norton (Florida Black Bear)*, Civil Action No. 99-02072-HHK at 10-11 (D.D.C. Dec. 13, 2001).  The opinion opens by noting that "because of human development and other factors, the black bear's habitat has been reduced to less than thirty percent of its <u>historical</u> range."  *Id.* at 3 (*emphasis added*).  However, in analyzing which portions of the bear's range qualified as a SPR, the Court looked solely to the "<u>current</u> range," and based its determination on the current suitability of habitat.  *Id.* at 10-11.  Two other district

_____

[8]        The "current" range versus "historical" range issue is further reviewed from a statutory construction perspective in the Department of the Interior Solicitor's Memorandum dated March 16, 2007 and supplied as Exhibit 3 to this brief.  The Solicitor concludes "range" means current range.  *Id.* at 7-9.  Defendant-Intervenors understand that the Memorandum (or a slightly earlier) draft is included in a supplemental portion of the Administrative Record, but did not have the A.R. cite.  In any event, a solicitor's opinion, like any agency or court opinion, can be directly cited whether or not in the Administrative Record.

courts in Colorado and New Mexico have determined that range is current range; albeit in opinions since vacated by consent as moot due to a change in how FWS interprets the term "significant" in the SPR definition.[9] Judge Kennedy's opinion in the Florida Black Bear case did not apply the version of the significance test that FWS has since rejected, and so is not affected by that issue.[10]

Because "range" means "current range", currently-unsuitable habitat in which the species does not now live cannot be part of its range. ¬In reaching its determination of the listing status of the WGL DPS, the FWS was thus overly-cautious in electing to treat "range" in its SPR analysis as encompassing all areas within the DPS boundaries (even Chicago) rather than just areas where the wolf presently exists. ˗The FWS explained its theoretical agreement with the view that range meant "current range." 72 Fed. Reg. at 6070; A.R. 12802. However, taking a very cautious approach, FWS also explained that, for purposes of this rule, it was going to examine the entire geographical area within the DPS and evaluate each part of it for significance. 72 Fed. Reg. at 6066 ("Issue 16"); A.R. 12798.[11]

---

[9]    *Center for Biological Diversity v. U.S. Fish and Wildlife Service (Rio Grand Cutthroat Trout)*, 2007 WL 716108, *2, No. 05-305-RPM (D. Colo., Mar. 7, 2007), *vacated by consent due to mootness and on other grounds*, Case No. 07-1203, (10th Cir. Oct 22, 2007); *see also, Center for Biological Diversity v. Norton (Rio Grand Cutthroat Trout)*, 411 F.Supp.2d 1271, 1278 (D.N.M. 2005), *vacated by consent due to mootness and on other grounds*, Case No. 06-2049 (10th Cir. May 21, 2007).

[10]    Judge Kennedy's opinion follows the Ninth Circuit's rejection of the FWS' now-discarded Marymount interpretation under which an area is a SPR only if future localized extinction within it would threaten total extinction. *Defenders of Wildlife (Florida Black Bear)*, slip op. at 9 (discussing *Defenders of Wildlife v. Norton (Lizard)*, 258 F.3d 1136, 1141, 1143 (9th Circ. 2001)). Consequently, Judge Kennedy's opinion is not affected by the FWS subsequent decision to discard the Marymount interpretation.

[11]    Because no wolf population is presently established in the NLP or Turtle Mountains (*see* Point II.C. above), neither is within the current range of the species, and so the "significance" inquiry that FWS actually conducted for those areas was unnecessary. Consequently, any error in how FWS conducted that inquiry (there was no error) was harmless error that cannot be the basis for reversal, 5 U.S.C. § 706 (in APA judicial review, "due account shall be taken of the rule of prejudicial error").

31

    2.    <u>Even with the FWS's Evaluation of All the Range within the WGL DPS,</u>
<u>Currently Unsuitable Habitat That Was Once Occupied by Wolves Is No</u>
<u>Longer a Significant Portion of the Range</u>

Second, even if all the range within the DPS boundaries are evaluated, the "significance"

test must be surmounted before any areas of historic range could qualify as a SPR.

The only Court of Appeals decision to address the SPR question leaves unclear whether

range means current or historical range. *Defenders of Wildlife v. Norton (Lizard)*, 258 F.3d

1136, 1141, 1143 (9th Circ. 2001). However, even if the Ninth Circuit's opinion could be

interpreted to mean that "range" for SPR purposes includes historical range, that opinion

unambiguously holds that the geographical size of an area does not control whether it is

"significant" for SPR purposes:

> First, it simply does not make sense to assume that the loss of a predetermined
> percentage of habitat or range would necessarily qualify a species for listing. A
> species with an exceptionally large historical range may <u>continue to enjoy healthy</u>
> <u>population levels</u> despite the loss of a substantial amount of suitable habitat.
> Similarly, a species with an exceptionally small historical range may quickly
> become endangered after the loss of even a very small percentage of suitable
> habitat. As the examples cited by [Plaintiffs] and noted above demonstrate, the
> percentage of habitat loss that will render a species in danger of extinction or
> threatened with extinction will necessarily be determined on a case by case basis.
> Furthermore, were a bright line percentage appropriate for determining when
> listing was necessary, Congress could simply have included that percentage in the
> text of the ESA.

*Defenders of Wildlife (Lizard)*, 258 F.3d at 1143 (*emphasis added*).

With the possible exception of Judge Kessler's lynx opinion, discussed below, the

subsequent opinions in this area all follow the Ninth Circuit's analysis that size does not equate

to significance for SPR's purposes. Judge Kennedy's Florida Black Bear case fully analyzes the

Ninth Circuit's *Defenders of Wildlife* opinion and, in a discussion highly pertinent to the instant

case, upholds the FWS's decision to use suitability of habitat, population distribution, and

fragmentation of habitat, and other factors to determining significance:

Following the Ninth Circuit's cogent analysis …, this court holds that the Wildlife Service's interpretation of what constitutes a significant portion of the black bear's range and its determination that the species is not likely to become endangered over that range [the range of the smaller of the two bear groups] is reasonable.  First, the areas likely to be lost only support five percent of the black bear's population.   Although these areas may constitute forty percent of the bear's present habitat, it is habitat that relatively few bears use.  Second the habitats likely to disappear … are of low quality and are geographically isolated from each other and from bear habitats likely to survive in the foreseeable future. Because none of the threatened habitats are particularly large, and because they are spread out from one another and from most of the remaining viable bear habitats, they may not exert a significant impact on the bear population as a whole.  Thus, these pockets of habitat are not "major geographical areas" of the bear's range.  Finally, the bears living in those habitats will remain isolated and unlikely to contribute genetically to the continuation of the species."

*Defenders of Wildlife (Florida Black Bear)* at 10-11 (*emphasis added*) (copy is attached as

Exhibit 1 to this brief).  Here there is no evidence that the few dispersing wolves outside the

Core Recovery Areas, but within the WGL DPS, are anything but a tiny fraction of the total wolf

population in the DPS, 72 Fed. Reg. at 6054-55; A.R. 12786-7, and the limited suitable habitat

outside the Core Recovery Areas are fragmented and of lower quality than that in the Core

Recovery Areas, 72 Fed. Reg. at 6071-75.

In *Southwest Center for Biological Diversity v. Norton (Queen Charlotte Goshawk),* 2002

WL 1733618, *16, No. 98-0934 (D.D.C. Jul. 29, 2002), Magistrate Judge Facciola issued a

recommended decision that similarly agreed that population distribution is more important than

acreage size in determining whether an area is "significant" for SPR purposes:

"[A] flat percentage of geographic area is not the sole determinant of significance. As a general rule, species are not evenly distributed across their ranges, but rather tend to concentrate in certain areas where habitat is particularly suitable.  Thus, the percentage of geographic area would not literally correlate to the percentage of the species' population.  One third of a species' geographic range may be found to contain a disproportionately greater or lesser percentage of the total number of individuals.  It does not seem fair or sensible, than, to point to some arbitrary geographic percentage as constituting a 'significant' portion of a species' range."

33

2002 WL 1733618, *16, slip op. at 28.  Magistrate Judge Facciola then noted that the SPR candidate area (Vancouver Island) contained 19 of the 43 known nesting sites of the rare Queen Charlotte goshawk, as well as most of the habitat, and recommended that FWS be ordered to treat the area as a SPR.  *Id.* at 29.  Notably, Judge Urbina, on review of Magistrate Judge Facciola's recommended decision, declined to find that an area containing 19 of the 43 nesting site was "significant" as a matter of law, and instead directed FWS to reconsider the matter and supply a more reasoned analysis.  Order, Case No. 98-0934 (D.D.C. May 24, 2004).  Thus the Goshawk case follows the same analytical path as Judge Kennedy's Florida Black Bear opinion, and reaches a different result based on the presence of far more of the population in the SPR candidate area.

Judge Kessler's lynx opinion does not rebut the analysis that population distribution is more important than acreage.  *Defenders of Wildlife v. Norton*, 239 F.Supp.2d 9 (D.D.C. 2002) (Kessler, J.), *vacated in part on separate point*, 2004 WL 438599, 89 Fed.Appx. 273 (D.C. Cir. 2004).  The lynx opinion begins by explaining that the "lynx range extends into four different regions that are separated from each other by ecological barriers consisting of <u>unsuitable</u> lynx habitat:  (1) the Northeast, (2) the Great Lakes, (3) the Southern Rocky Mountains, and (4) the Northern Rocky Mountains/Cascades."  *Id.*, 239 F.Supp.2d at 14 (*emphasis added*).  Judge Kessler did not require that the barrier areas of unsuitable habitat be considered as potential SPRs, although they were in the contiguous United States DPS established by the FWS, and it was unclear whether they were once lynx range.  *Id.*  Instead, Judge Kessler rejected FWS's argument that three of those regions which contained at least some suitable habitat (the Northeast, the Great Lakes, and the Southern Rocky Mountains) could not be SPRs merely because lynx were "naturally rare" in them.  *Id.* at 19.  Perhaps because FWS had not done the necessarily detailed habitat suitability analysis, the opinion does not analyze which parts the

34

Northeast, Great Lakes or Southern Rocky Mountains (a) contained significant suitable habitat in which the naturally rare lynx could survive if protected, or (b) contained largely unsuitable habitat that could not be significant. *Id.* at 20-21. As a result, the FWS had little factual basis to support its conclusion that the three areas were not SPRs.

Further, in the lynx case the remnant population at issue was not a recovered DPS that had exceeded recovery plan criteria, grown dramatically in both numbers and range, been on the "endangered" species list for thirty years subject to federal and state conservation and management strategies. The gray wolves of the WGL DPS are not a "remnant" population, but instead are a healthy, hearty, self sustaining population of a now recovered species and should be dealt with accordingly.

By contrast, here the FWS has done the detailed suitability analysis and determined that there is no suitable habitat within the Non-Core-Areas of sufficient size to support a viable wolf population. 72 Fed. Reg. at 6071-76. FWS is not just making the circular argument that wolves in the Non-Core Areas should be removed from the list of endangered and threatened species in the Non-Core Areas merely because they are rare; rather it has shown that the Non-Core Areas do not contain suitable wolf habitat and therefore are not a significant portion of the range of the wolves within the WGL DPS. 72 Fed. Reg. at 6071-75. As explained above, the ESA precludes listing of non-significant range portions in which the species is in danger, unless the species is also in danger "throughout all" of its range. 16 U.S.C. § 1532(6), (20).

If the Court finds a direct conflict between the Ninth Circuit ruling in Defenders of Wildlife, and the D.C. District Court opinions in the Florida Black Bear and goshawk cases, and Judge Kessler's ruling on the lynx listing opinion, Defendant-Intervenors respectfully submit that the former authorities are more persuasive. At least one court has chosen to reject Judge Kessler's analysis. A New Mexico District Court explained:

35

The Lynx case is not persuasive. The court in that case considered the word "significant" to refer to an "amount" of geographical area. But the Court and, as noted above, both parties in this case, have rejected that use of "significant" in the context of the ESA, focusing instead on the biological significance of the lost range, not its raw size. If raw size of the range were the only determinative factor, virtually every non-domestic species of wildlife in North America would be listed. Historical accounts in the Lewis and Clark journals, for example, describe abundant wildlife across the depth and breadth of the country they explored, and that historical range no longer exists in its pristine state.

*Center for Biological Diversity (Rio Grand Cutthroat Trout),* 411 F. Supp. 2d at 1281.[12]

In short, once it is established that an area is presently unsuitable for a species, requiring the FWS to treat it as SPR just because it contains many acres that once were suitable and significant would be an exercise in futility, and rob the FWS of the discretion it is due under *Chevron* in construing the "inherently ambiguous" SPR language. *Defenders of Wildlife (Lizard),* 258 F.3d at 1141. Asphalt cannot be unpoured, skyscrapers will not be leveled, suburbs do not disappear, and cleared farmland is unlikely to become large swaths of forest. The present tense wording of the definitions of "endangered" and "threatened" species fully justify (and in fact require) FWS's reading that significance is determined based on the present state of habitat, not the state of the habitat at some point of time in the past. Defendant-Intervenors fully recognize the equitable argument that human activity over the last 200 to 300 years is largely responsible for rendering so much habitat unsuitable, but Congress knew this when it passed the ESA in 1973, and chose not to include any provision in the SPR language that made application of the SPR test turn on <u>why</u> habitat is now unsuitable and thus insignificant. Plaintiffs cannot be allowed to end run this Congressional decision to limit the ESA's scope in cases such as this one

---

[12]    As described in **note 10** above, the FWS on appeal consented to the vacating of the District of New Mexico's opinion as moot due both to the FWS' decision to restart the listing process for trout and a change in how FWS interprets the term "significant." However, the FWS has not changed its position that geographic size does not determine significance, 72 Fed. Reg. 6065, so the New Mexico court's reasoning on that specific point is not undermined by FWS' subsequent change-of-interpretation.

where the species (or here, a DPS of a species) is doing well in all significant portions of its

range.

IV.    **SHOULD ANY OF PLAINTIFFS' UNFOUNDED PREDICTIONS OF FUTURE JEOPARDY TO THE WOLF COME TO PASS, THE FWS WILL BE UNDER A NON-DISCRETIONARY DUTY TO RELIST THE WESTERN GREAT LAKES WOLVES ON AN EMERGENCY BASIS**

The text of the ESA itself rebuts HSUS *et al.'s* argument that alleged potential future

threats to the recovered wolf population (*e.g.*, the alleged potential for increase in diseases) made

it arbitrary and capricious to delist the WGL-DPS.  Plaintiffs' Memorandum of Law in Support

of Plaintiff's Motion for Summary Judgment at 39-41.  Congress was aware that that no listing

decision can be based  on *absolute* certainty that a recovered species will continue to do well

after delisting and therefore included in Section 4(g) of the ESA a requirement that the FWS

monitor the delisted population for five years.  16 U.S.C. § 1533(g)(1).  The FWS has complied

with those requirements by developing a post-delisting monitoring plan for the WGL DPS.  72

Fed. Reg. 30819 (June 4, 2007).[13]

If the FWS's post-delisting monitoring reveals that some threat has risen to the level of

being "a significant risk to the well being of any such recovered species," then the FWS is

directed to relist the species, on an emergency basis, as an endangered or threatened species:

"The Secretary shall make prompt use of the authority under paragraph 7 of subsection (b) of this

section [emergency relisting] to prevent a significant risk to the well being of such recovered

species."  16 U.S.C. § 1533(g)(2) (*emphasis and bracketed material added*).  The emergency

relisting is effective immediately – the notice-and-comment process is completed later.  16

---

[13]       Although the FWS has thus far published a Draft plan, the Federal Register Notice for the plan indicates that it is already being implemented.  72 Fed. Reg. at 30820.

U.S.C. § 1533(b)(7).[14]  In the Final Rule, FWS acknowledged this authority and duty to "relist

midwestern gray wolves if necessary."  72 Fed. Reg. 6052, 6068 (Feb. 8, 2007).

## V.     ANY REMEDY THAT THIS COURT ORDERS SHOULD AVOID HARMFUL AND NEEDLESS DISRUPTIONS TO RECOVERED WOLF MANAGEMENT IN THE CORE  RECOVERY AREAS

The appropriate "remedy" in this matter is the dismissal of HSUS *et al*.'s Motion for

Summary Judgment and grant of Defendants' Motion for Summary Judgment.  However, if this

Court finds that it must issue some alternative remedy that remedy should avoid unnecessary and

harmful disruptions to ongoing state management of recovered gray wolf populations.

Defendant-Intervenors' primary interest is in defending the delisting in the Core Recovery Areas

(Minnesota, Wisconsin, and the Upper Peninsula of Michigan).  The Core Recovery Areas are

where Defendant-Intervenors' members, while hunting other species or participating in other

outdoor activities, actually encounter wolves.  These individuals need the flexibility to protect

their dogs or other property from depredation by wolves.  State wolf management plans provide

hunters and outdoor enthusiasts far more flexibility in their ability to respond to wolf

depredation.  Thus, in addition to defending the 2007 delisting Rule, Defendant-Intervenors' key

objective is to impress upon this court the need to avoid a another outcome like that in the

Oregon and Vermont cases, where,  without disputing the recovery of gray wolves in the Core

Recovery Areas, the two courts rejected the 2003 Reclassification Rule in its entirety.  *See* Point

III.C above.

D.C. Circuit precedent governing remedies in APA judicial review cases provides the

Court with ample flexibility to fashion a remedy that will not result in the Core Recovery Area

populations returning to "endangered" or "threatened" status.  Actions taken by the FWS,

pursuant to the ESA, are reviewed under the Administrative Procedure Act, 5 U.S.C. § 706

---

[14]      After an emergency relisting takes effect, the FWS has 240 days to conduct the notice-and-comment process necessary to affirm and complete the relisting.  16 U.S.C. § 1533(b)(7).

("APA").  *National Association of Home Builders v. Norton*, 451 F.3d 8, 13 (D.C. Cir. 2005);

*Fund for Animals v. Babbitt (Grizzly Bears)*, 903 F.Supp. 96, 105 (D.D.C. 1995).  Under the

APA, a court that disagrees with agency action considers a flexible two-factor standard in

deciding whether to: (a) vacate that action, or (b) leave it in place on remand while the agency

completes further proceedings to reconsider and further explain its action.  *Allied-Signal, Inc. v.*

*U.S. Nuclear Regulatory Commission*, 988 F.2d 146, 150-151 (D.C. Cir. 1993); *see also United*

*Mine Workers v. Federal Mine Safety and Health Administration*, 924 F.2d 340 (D.C. Cir. 1991)

(remand without vacatur of final rule lifting restrictions on mine ventilation techniques).  Those

two factors are: (1) the seriousness of the violation and the prospect that the agency will be able

to cure it on remand; and (2) the disruption that could occur if the court vacates the agency action

and then the agency later cures the deficiencies and reinstates the vacated action.  *Id*. at 150-51;

*Fox Television Stations v. FCC*, 280 F.3d 1027, 1049 (D.C. Cir. 2002) (this is a balancing test,

strong showing on one factor can be enough).  It applies to ESA cases like other APA cases.

*Endangered Species Comm. of the Building Ind. Assoc. of South.  Cal. v. Babbitt*, 852 F.Supp.

32, 42 (D.D.C.  1994).[15]

     The curability factor strongly weighs against vacatur here.  If this court, like the Oregon

and Vermont courts that reviewed the 2003 Reclassification Rule, accents FWS' finding that the

wolves of the Core Recovery Areas are indeed recovered, then this court can allow those wolf

populations to retain their delisted status.     As described above, the wolf population in the Core

Recovery Areas "greatly exceeds the numerical recovery criteria" established by FWS.  71 Fed.

Reg. 15266.

---

[15]     *Endangered Species Committee* reviewed an order listing the gnatcatcher as threatened.  A group
opposed to listing persuaded the Court that FWS erred.  The Court ordered that the gnatcatcher retain its
threatened status on remand due to concerns about rapid destruction of habitat if it were temporarily
delisted during remand.  852 F.Supp. at 41.  There is no evidence in this case of an increase in wolf
killings or declines in wolf populations since the delisting nine months ago, so the reasoning of the
gnatcatcher case that led to remand without vacatur in that case would not require vacatur here.

While allowing the recovered wolves to retain their delisted status, the Court could, for example, remand and direct the FWS to draw a smaller line around the recovered populations or to draw a line between recovered and non-recovered significant portions of the population in order to relist only the non-recovered portions.  *Defenders of Wildlife (Lizard)*, 258 F.3d at 1144; *National Wildlife Federation (Wolves/Vermont),* 386 F.Supp.2d at 564 ("The ESA allows defendants to provide varying levels of protection based upon the biological evidence ....  The FWS does not have to list an entire species as endangered when only one of its populations faces extinction ....  Nowhere in the ESA is the Secretary prohibited from creating a 'non-DPS remnant'" to protect any wolves found outside the core recovery areas) (*internal citations and quotations omitted*).  The Ninth Circuit agreed with this analysis, utilizing legislative history, after it found the statute itself to be "inherently ambiguous":

> An animal might be "endangered" in most States but overpopulated in some. In a State in which a species is overpopulated, the Secretary would have the discretion to list that animal as merely threatened or to remove it from the endangered species listing entirely while still providing protection in areas where it was threatened with extinction. *In that portion of its range where it was not threatened with extinction, the States would have full authority to use their management skills to insure the proper conservation of the species.*

*Defenders of Wildlife (Lizard),* 258 F.3d at 1141, 1144 (quoting statement from ESA sponsor Senator John Tunney (CA) found at H.R. Rep. No. 412, 93rd Cong., 1 Sess.; Cong. Rec. 25,669 (July 24, 1973)).

The disruption factor also weighs heavily in favor of a remand without vacatur if the court deems it necessary The Final Rule to delist the WGL DPS transferred wolf management and conservation from FWS to the States.  Anticipating delisting, the Minnesota, Wisconsin, and Michigan Departments of Natural Resources developed extensive state wolf management programs which went into effect upon delisting.  These States have been successfully operating their plans for the last nine months with no evidence of adverse consequences to the wolf

40

populations.  Each of these Core Recovery Areas State plans establishes long term minimum

wolf populations that are greater than the goals set by the Eastern Timber Wolf Recovery Plan.

A.R. Doc. 215 at  p. 51394 (MI), A.R. Doc. 215 at p. 5255 (MN), A.R. Doc. 215 at p. 5983

(WI).[16]  Each of the plans bars the take of wolves, with limited-regulated exceptions for

depredation control (prevention of property damage).  If vacatur returns wolf conservation and

management to the FWS, the toll will be felt by those living and recreating in these Core

Recovery Areas, who are losing pets, livestock and recreational opportunities to this recovered

predator species.  The resulting back and forth in management authority between the federal and

state jurisdictions would cause needless disruption, frustration and loss to all concerned.

     Alternatively, if the court finds reason to request additional explanation or other

rulemaking, the court could remand the Final Rule, and stay its ruling for a short-term such as 90

to 120 days, sufficient for FWS to prepare, publish for comment, and, if it so chose, adopt a

ruling to conform to this Court's direction, such as potentially a ruling delisting wolves only in

the Core Recovery Areas. [17]  That would at least avoid disruption of the ongoing implementation

of  the Minnesota, Wisconsin, and Michigan wolf management plans.

## CONCLUSION

     The Court should affirm the 2007 delisting order in its entirety because wolves have now

recovered and are thriving in substantially all of the suitable habitat in the WGL DPS.   The

FWS made a proper determination with respect to the SPR of the WGL DPS.  Its determination

that no area of the WGL DPS outside the Core Recovery Areas constituted a SPR is supported

---

[16]     71 Fed. Reg. 15287-95 (*citing* Michigan Department of Natural Resources, Michigan Gray Wolf Recovery and Management Plan (1997) (#58); Minnesota Department of Natural Resources, Minnesota Wolf Management Plan (2001) (#68); Wisconsin Department of Natural Resources, Wisconsin Wolf Management Plan (1999) (#103)).

[17]     The Court can also place time limits for completing remand.  *Fund for Animals (Grizzly Bears),* 903 F.Supp. at 118 (giving FWS 90 days to complete reconsideration of portions of a recovery plan).

by the factual evidence that the Non-Core Areas lack suitable wolf habitat. The agency also properly designated the WGL DPS, determined its boundaries and properly determined, based on the best available science that wolves no longer qualify for "endangered" or even "threatened" status. In reaching this conclusion, it conducted the requisite threats analysis.

Defendant-Intervenors request that this court deny HSUS *et al.*'s Motion for Summary Judgment and grant the FWS's and Defendant-Intervenors' Motion. If for some reason, this court deems some other remedy necessary, Defendant-Intervenors ask that this court avoid vacating the Final Rule to Delist in order to maintain consistency in the management of the recovered populations of WGL DPS wolves by the Minnesota, Wisconsin, and Michigan Departments of Natural Resources.

Corrected Per Errata: April 7, 2008

Dated:  January 18, 2007              Respectfully submitted,


_____            _____
William P. Horn (D.C. Bar No. 375666)    Anna M. Seidman (D.C. Bar No. 417091)
James H. Lister (D.C. Bar. No. 447878)   Douglas S. Burdin (D.C. Bar No. 434107)
Birch Horton, Bittner & Cherot          Safari Club International
1155 Connecticut Avenue N.W.,            501 2nd Street NE
Suite 1200                               Washington, D.C. 20002
Washington, D.C. 20036                   (202) 543-8733
(202) 659-5800                           Fax:  (202) 543-1205
Fax:  (202)659-1027                      aseidman@sci-dc.org
whorn@dc.bhb.com                         dburdin@sci-dc.org
jlister@dc.bhb.com

*Counsel for U.S. Sportsmen's Alliance*    *Counsel for Safari Club International,  Safari Club*
*Foundation, Wisconsin Bear Hunters'*      *International Foundation, and National Rifle*
*Association, Scott Meyer and Robert*      *Association*
*Stafsholt*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| HUMANE SOCIETY OF THE UNITED STATES, HELP OUR WOLVES LIVE, ANIMAL PROTECTION INSTITUTE, AND FRIENDS OF ANIMALS AND THEIR ENVIRONMENT, | ) ) ) ) ) | Case No. 1:07-cv00677-PLF |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | |
| DIRK KEMPTHORNE, Secretary of the Interior, U.S. DEPARTMENT OF THE INTERIOR, AND U.S. FISH AND WILDLIFE SERVICE | ) ) ) ) | |
| Defendants, | ) ) | |
| SAFARI CLUB INTERNATIONAL, SAFARI CLUB INTERNATIONAL FOUNDATION, AND NATIONAL RIFLE ASSOCIATION, | ) ) ) ) ) | |
| Defendant-Intervenors, | ) ) | |
| and | ) ) | |
| U.S. SPORTSMEN'S ALLIANCE FOUNDATION, WISCONSIN BEAR HUNTING ASSOCIATION, SCOTT MEYER, AND ROB STAFHOLT, | ) ) ) ) | |
| Defendant-Intervenors. | ) | |

**DEFENDANT-INTERVENORS' REPLY TO PLAINTIFFS' OPPOSITION TO
DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT**

{G:/101002/42/00000797.DOC}

**TABLE OF CONTENTS**

<u>**Page No.**</u>

INTRODUCTION ..................................................................................................1

ARGUMENT ......................................................................................................5

    A.    Recovery in All Significant Portions of WGL-DPS Range.....................5

           1.    Irrelevance of Current v. Historic Range Debate........................5

           2.    Unsuitable Habitat is not a Significant Range Portion ................6

    B.    Irrelevance of Areas Outside DPS ..........................................................9

    C.    Recognition of DPS at Time of Delisting ..............................................11

    D.    Collateral Attacks on Wolf Recovery Plan............................................13

    E.    Section 1533(a)(1) Risk/Threats Analysis Factors ................................13

           1.    Adequacy of Regulatory Mechanisms/State Wolf Management Plans .....14

           2.    Disease and Predation .................................................................17

           3.    Depredation Control in Dispersal Areas ....................................18

    F.    Post-Delisting Monitoring and Emergency Relisting ............................21

    G.    Harmless Error Standard and Remedy if Error is Found .......................23

CONCLUSION...................................................................................................24

TABLE OF AUTHORITIES

**FEDERAL CASES**

Page No.

*Center For Biological Diversity v. Hamilton,* 453 F.3d 1331,
1334 (11th Cir. 2006)...................................................................... 13

*Defenders of Wildlife v. Babbitt* (lynx) 958 F. Supp. 670,
684 (D.D.C. 1997) ............................................................................ 10

*Defenders of Wildlife v. Norton (Florida Black Bear),* Civil Action
No. 99-02072-HHk at 10-11 (D.D.C. Dec. 13, 2001) ..5*Defenders of Wildlife v. Norton (Lizard),*
258 F.3d 1141, 1143 (9th Cir. 2001) ...............................................5

*Defenders of Wildlife v. Norton (Lynx),* 258 F.3d 1141, 1142 (9th Cir. 2001)......................5, 6, 9

*Defenders of Wildlife v. Norton (Lynx),* 239 F.Supp.2d 9 (D.D.C. 2002) (Kessler, J.),
*vacated in part on separate point*, 2004 WL 438599, 89 Fed.Appx. 273
(D.C. Cir. 2004) ...............................................................................9

*Defenders of Wildlife v. Secretary, U.S. Dep't of the Interior (Wolves),*
354 F.Supp.2d 1156 (D.Or. 2005) ...................................................11

*Firestone Tire & Rubber Co. v. Burch*, 489 U.S. 101,
114, 109 S.Ct. 948, 956 (1989) .......................................................7

*Friends of Wild Swan, Inc. v. U.S. Fish & Wildlife Serv.,*
12 F.Supp.2d 1121, 1132-34 (D.Or. 1997)......................................11

*National Wildlife Federation v. Norton (Wolves)*, 386 F.Supp.2d 553,
560 (D. Vt. 2005)..............................................................................13

*O'Gilvie v. United States*, 519 U.S. 79, 90, 117 S.Ct. .452, 458, (1996)......................................7

*Strahan v. Linnon*, 1998 WL 1085817 *4(1st Cir. 1998) ....................................................13

*Strahan v. Linnon*, 967 F.Supp. 581, 607 (D.Mass.1997) ...........................................13

*Southwest Center for Biological Diversity v. Norton (Queen Charlotte Goshawk),* 2002 WL
1733618, *16, No. 98-0934 (D.D.C. Jul. 29, 2002)..........................................................5

*U. S. v. Atlantic Research Corp.*,127 S.Ct. 2331 (2007) ..........................................7

*U. S. v. City of St. Paul*, 258 F.23d 750, 752 (8th Cir. 2001) .....................................22

*U.S. v. Lara*, 541 U.S. 3 206 (2004) ………………………………………………………23

**Page No.**

**FEDERAL STATUTES**

5 U.S.C. § 706.....................................................................................................15

16 U.S.C. § 1532............................................................................................ passim

16 U.S.C. §1533 ............................................................................................. passim

28 U.S.C. § 2401................................................................................................13

**FEDERAL REGISTER**

43 Fed. Reg. 9607 (March 9, 1978) ............................................................... 11-12

61 Fed. Reg. 4722, 4725 (February 7, 1996)....................................................9-11

72 Fed. Reg. 6092 (February 8, 2007)............................................................ passim

72 Fed. Reg. 30819 (June 4, 2007)...................................................................21

**OTHER AUTHORITIES**

House Report 97-567 (May 17, 1982) ................................................................8

FWS Post Delisting Monitoring Plan for the Western Great Lakes Distinct
Population Segment of the Gray Wolf("PDM")................................................. passim

N.D. Cent. Code 20.1-07 (2007) .......................................................................20

S.D. Codified Laws § 41-8-20 (2007) ...............................................................20

Illinois Endangered Species Act, 520 ILCS 10 .................................................20

Iowa Code § 491A (2007 Merged) ....................................................................20

Wis. Stat. § 29.604 ...........................................................................................15

Wis Stat § 29.057 .............................................................................................15

Wis. Sta. 71.40.................................................................................................15

Minn. Stat. 97B.645..........................................................................................19

Minn. Stat. 97B.646..........................................................................................19

{G:/101002/42/00000797.DOC}iii

Defendant-Intervenors U.S. Sportsmen's Alliance Foundation, Wisconsin Bear Hunting Association, Scott Meyer, Rob Stafholt, Safari Club International, Safari Club International Foundation, and National Rifle Association ("Defendant-Intervenors") hereby reply to Plaintiffs' Opposition to Defendants' Cross-Motions for Summary Judgment ("Pl. Opp.", Docket 53).

## <u>INTRODUCTION</u>

A careful examination of Plaintiffs' Opposition reveals that Plaintiffs, in challenging the delisting of the Western Great Lakes Distinct Population Segment of wolves ("WGL-DPS"), misconstrue the statutory delisting criteria in 16 U.S.C. § 1533 and try to impose their own totally subjective set of delisting criteria not found in the statute. Try as they might, Plaintiffs cannot overcome the fact that the FWS complied with all ESA requirements and lawfully delisted the WGL-DPS wolves.

Plaintiffs' Opposition muddles the ESA delisting criteria. Section 4 of the ESA includes three interrelated obligations for the removal of a species from the "endangered" species list. The FWS must 1) consider the extent to which the objective criteria established for recovery in the species' recovery plan have been satisfied, 16 U.S.C. § 1533(f)(1)(B)(ii); 2) conduct a review of the status of the species and take into account any conservation efforts of the pertinent state or local authority, *id*. at (b)(1)(A); and 3) based on the best scientific and commercial data available, conduct an analysis of five statutorily identified factors to make certain that none of them pose a risk so great that it (they) place the species in danger of extinction throughout all of a significant portion of its range, *id*. at (a)(1)(A)-(E), 16 U.S.C. § 1532(6), (16) (20).

Where the FWS chooses to recognize a distinct population segment ("DPS") of a species, the "species" that is considered for listing or delisting is the DPS. 16 U.S.C. § 1532(16) (defining a DPS as a species). Consequently, contrary to the subjective aspirations of the

{G:\101002\42\00000797.DOC}1

Plaintiffs, delisting of the WGL-DPS could not be conditioned upon the return of wolves to all

suitable habitats within the conterminous United States, or upon the day when wolves face no

risks or threats from any source.  The ESA is not the Endangered Species *Forever* Act.  Instead

the ESA obligates the FWS to recognize when a DPS has recovered and to remove it from the

"endangered" species list, subject to the obligation to relist if a "significant risk" to the recovered

DPS later emerges. *Id*. § 1533(f), (g)(1), g(2).

Recovery plans, where applicable, establish the blueprint that instructs the FWS to

determine when to examine a species for the purpose of delisting. The ESA directs the Secretary

of the Interior (the FWS) to "develop and implement" recovery plans that include:

> objective, measurable criteria which, when met, would result in a determination,
> in accordance with the provisions of this section, that the species be removed
> from the [endangered or threatened species] list

*Id*. § 1533(f)(1)(B)(ii).  The FWS complied with that requirement by formulating and

implementing the Eastern Timber Wolf Recovery Plan in 1978 and revising it in 1992

("Recovery Plan") which established very objective and very measurable criteria for wolves

living in the WGL-DPS.  A~R~ Doc. 468A, p. 13769.

Plaintiffs, in their Opposition, do not contest the FWS's finding that the wolves of the

WGL-DPS met and substantially exceeded the numerical recovery goals set forth in the

Recovery Plan.  As Defendant-Intervenors discussed in their Opening Brief ("DI. Opn. Br.",

Docket 43-2), the Recovery Plan, as it was revised in 1992, defined recovery to require, for at

least five consecutive years, at least two viable populations within the 48 contiguous states

including a growing or stable population in Minnesota of 1550 to 1750 wolves and a second

population outside of Minnesota and Isle Royale having at least 100 wolves in late winter if

located within 100 miles of the Minnesota population.  AR Doc. 468A, p. 13769, 13773, DI Opn.

Br. at 4. The wolves of the WGL-DPS long ago met and then surpassed those criteria. In 2003-2004, the FWS estimated a growing and/or stable population in Minnesota of approximately 3,020 wolves, and in 2005-06, the FWS estimated the Wisconsin population to be 465, and the Michigan population to be 434. *Final Rule Designating the Western Great Lakes Population of Gray Wolves as a Distinct Population Segment, Removing the Western Great Lakes Distinct Population Segment of the Gray Wolf from the List of Endangered and Threatened Wildlife,* 72 Fed. Reg. 6052, 6053-56 (Feb. 8, 2007) ("Final Rule").

The second step in the delisting process requires that the FWS take into account the status of the DPS as well as *any* efforts being made by any state or subdivision of a state to protect or conserve the species. *Id.* 1533(b)(1)(A). In accordance with these requirements, the FWS analyzed the current status of state statutes, regulations, and state management plans to conserve the WGL-DPS wolves. The FWS noted that Michigan's Wolf Management Plan received state approval in late 1997, Wisconsin's plan was approved in 1999 and Minnesota completed its management plan in early 2001. 72 Fed. Reg. at 6083-84.[1]

Finally, Section 1533(a)(1) of the ESA directs the FWS to conduct a "threats" analysis, based solely on the "best scientific and commercial data available," of five factors: **(A)** the present or threatened destruction, modification, or curtailment of its habitat or range; **(B)** overutilization for commercial, recreational, scientific, or educational purposes; **(C)** disease or predation; **(D)** the inadequacy of existing regulatory mechanisms; or **(E)** other natural or

---

[1]     Because Michigan was in the process of revising its wolf management plans, the FWS appropriately relied on the current Michigan plan, but also appropriately examined but did not exclusively rely on the Recommended Guiding Principles for Wolf Management in Michigan drafted by Michigan's stakeholder roundtable, which will be used to revise Michigan's wolf management plan. 72 Fed. Reg. at 6084.

manmade factors affecting its continued existence.[2]  Although Plaintiffs appear to argue that absolute elimination of risk is an essential prerequisite to delisting, that is not the law.  The ESA does not require the Secretary to retain a species on the "endangered" or "threatened" species lists simply because one or more of those risk factors are present, or even because the population size of the DPS may be negatively impacted by any or all of the risk factors.  The law simply states that the Secretary must retain (or place) a species on those lists, if one or more of the factors has such a profound impact so to cause the species to be in danger of extinction throughout all or a significant portion of its range.  16 U.S.C. §§ 1532(6)(20), 1533(a).

In its delisting rule, the FWS analyzed in detail and at length all five factors, 72 Fed. Reg. 6072-6101, and based on the evidence before it, reasonably concluded that the five factors "will not individually or in combination be likely to cause the WGL-DPS of the gray wolf to be in danger of extinction in the foreseeable future in all or a significant portion of the species' range." 72 Fed. Reg. 6101.  This analysis was supported by the record.  Nothing more was required.

The number of wolves in the WGL-DPS now far exceeds the recovery plan goals, and these numbers provide an ample margin of safety that FWS can take into account in analyzing the significance and magnitude of future risks to the WGL-DPS.  Nevertheless the FWS has demonstrated extreme caution with respect to its analysis of the five risk factors.  As demonstrated by its post-delisting monitoring plan ("PDM Plan"), the FWS committed itself to consider relisting if the number of wolves falls below specific trigger levels that actually *exceed* the numerical thresholds established in the Recovery Plan for delisting.[3]

---

[2]    Plaintiffs address only two (adequacy of existing regulatory mechanisms and disease/predation) in their Opposition.

[3]    See Point F to this Reply for a discussion of the Post-Delisting Monitoring Plan.

{G:/101002/42/00000797.DOC}4

## ARGUMENT

In the following arguments, Defendant-Intervenors more specifically demonstrate the legality of the delisting as well as the particular inaccuracies of Plaintiffs' challenge.

**A**. **Recovery in All Significant Portions of WGL-DPS Range.**  Plaintiffs make no attempt to dispute two key FWS findings described in Defendant-Intervenors' Opening Brief:

(1)  unsuitable habitat is not "significant" in deciding whether the WGL-DPS of the wolf is "endangered" or "threatened" throughout "all or a *significant* portion of its range," 16 U.S.C. § 1532(6), (20), 72 Fed.Reg. at 6071, and

(2) there is no significant area of *suitable* wolf habitat within the WGL- DPS except for the core recovery areas of Minnesota, Wisconsin, and the Upper Peninsula of Michigan (the "Core Recovery Areas").  72 Fed.Reg.at 6072-75.

*See* Pl. Opp. at 7, n. 6; DI Opn. Br. at 23-37.  Coupled with the overwhelming evidence that wolves have recovered within the Core Recovery Areas,[4] these two FWS findings lead inexorably to the conclusion that the WGL-DPS wolves have recovered in all "significant portions of [their] range" ("SPR") and so are no longer statutorily defined as "endangered" or "threatened".  *Id.* § 1532(6), (16), (20).  Plaintiffs make no attempt to distinguish the holdings in the Lizard, Florida Black Bear, and Goshawk cases that unsuitable habitat is properly discounted by the FWS in the SPR analysis.[5]  *See* DI Opn. Br. at 32-34 (reviewing these cases).

1.     Irrelevance of Current v. Historic Range Debate.  Rather than attempt to identify some significant area of suitable habitat within the WGL-DPS in which wolves have not yet recovered, Plaintiffs argue at length that the term "range" in the phrase "significant portion of its range" ("SPR") means "historical range" rather than "current range."  Pl. Opp. at 5-10.

---

[4]     See DI Opn. Br. at 2 to 4, 22, and pages 2-3 above.

[5]     *Defenders of Wildlife v. Norton (Lizard)*, 258 F.3d 1141, 1143 (9th Cir. 2001); *Defenders of Wildlife v. Norton (Florida Black Bear)*, Civil Action No. 99-02072-HHK at 10-11 (D.D.C. Dec. 13, 2001) (copy supplied as Ex. 1 to DI Opn. Br., Docket 43-4); *Southwest Center for Biological Diversity v. Norton (Goshawk)*, 2002 WL 1733618, *16, No. 98-0934 (D.D.C. Jul. 29, 2002), *remedy modified on review of Magistrate's Recommendations* (D.D.C. May 24, 2004).

This debate over what "range" means is in fact entirely academic to the outcome of this case. First, although the FWS expressed its view that the statutory term "range" refers to "current range," the FWS in its delisting rule nevertheless elected to play it safe and clearly and succinctly stated that "[f]or the purposes of this notice, we consider the range of the gray wolf to be the *entire geographical area delineated by the boundaries of the WGL DPS*." 72 Fed. Reg. at 6070 (emphasis added). Thus for the purpose of delisting the gray wolf, the FWS analyzed all the area within the DPS, including both current and historical range.

In addition, the case law confirms that unsuitable habitat is not "significant" (and thus is not a SPR) even if it was once part of historic range, see DI Opn. Br. at 32-36 (collecting cases) and note 5 above, and there is no significant suitable habitat in the DPS, except for the Core Recovery Areas where recovery has already occurred. 72 Fed.Reg. at 6072-75. Thus, there is no merit to Plaintiffs' historical range argument under any factual or legal analysis.

On a related issue, Plaintiffs' discussion of the FWS's revision of its interpretation of the term "significance" in the SPR phrase has no bearing on the outcome of this case, as the FWS, in doing so, did nothing more than respond to and implement the direction of the 9th Circuit. Not only did the FWS provide a reasonable explanation for the modified approach, citing *Defenders of Wildlife v. Norton* (lizard) 258 F.3d 1141, 1143 (9th Cir. 2001), but the revised interpretation accommodates Plaintiffs' criticism of the earlier interpretation and so is not prejudicial to Plaintiffs. 72 Fed.Reg. at 6071.

Should the Court still find it necessary to address the current range versus historic range debate, Defendant-Intervenors have demonstrated the term "range" means "current range." *See* DI Opn. Br. at 29-32. Plaintiffs' attempt to use a reference in a 1978 House Committee Report to define the meaning of a term "range" as it was drafted into the 1973 original ESA is not

persuasive and does not overcome the presumption that the present tense wording of the relevant statute is controlling.  16 U.S.C. § 1532(6)(20); *see* DI Opn. Br. at 28-31.  The view of a subsequent legislative committee discussing how the term range would be used in a separate component of the ESA should not be the basis for judging the intent of an earlier Congress. *O'Gilvie v. United States*, 519 U.S. 79, 90 (1996) ("the view of a later Congress cannot control the interpretation of an earlier enacted statute.").  Some courts have gone so far as to refer to views of a subsequent Congress as a "hazardous basis for inferring the intent of an earlier one." *Firestone Tire & Rubber Co. v. Burch*, 489 U.S. 101, 114, 109 S.Ct. 948, 956 (1989) (internal quotations omitted).  The fact that a subsequent House Committee would discuss its interpretation of the term "range" when enacting a relatively unrelated provision pertaining to the designation of "critical habitat," offers little to clarify the meaning of the term "range" as it refers to the definition of "endangered" and "threatened" species.  The subsequent legislative history upon which Plaintiffs rely does not show any effort by that House Committee to associate their discussion of the term "range" with the previous Congress' use of the phrase "significant portion of its range.

     Similarly, the fact that in 1982, another subsequent Congress used the term "current" to modify the term "range" in an amendment  regarding the introduction of experimental populations does not automatically render the term "current" superfluous, or force this Court to assume that the earlier-enacted term "range" in the phrase "significant portion of its range" refers only to "historical range."  Even aside from the obvious point that two different Congresses were doing the drafting nine years apart, an ostensibly superfluous term can function to clarify the meaning of other portions of the statute.  In the case of *U.S. v. Atlantic Research Corp*., the Supreme Court acknowledged "our hesitancy to construe statutes to render language superfluous

{G:/101002/42/00000797.DOC}7

does not require us to avoid surplusage at all costs." 127 S.Ct. 2331, 2337 (2007) (Court refused to ignore phrase "any other person" in statute pertaining to environmental clean-up.) The legislative history of the 1982 amendment regarding experimental populations demonstrates Congress' intent to make certain that experimental populations would be introduced outside their current range. "It may be helpful to clarify in legislative history that although these populations will be established outside of their current range, the intent is to remain within historical range." H.R. Rep. No. 97-567 at 46 (1982). There is nothing in the committee's discussion that evinces their opinion as to the definition of the term "range" standing alone.

      2.   <u>Unsuitable Habitat is not a Significant Range Portion.</u>  Plaintiffs virtually concede that unsuitable habitat cannot be a SPR when they respond to Defendant-Intervenors' point that metropolitan Chicago (which is within the DPS) is unsuitable wolf habitat and thus cannot be a SPR, even if wolves may once have roamed there. Disclaiming any intent to demand wolf recovery in Chicago, Plaintiffs assert that the FWS must adequately explain delisting *if* the delisted areas include "broad swaths of suitable habitat" in which recovery has not occurred:

> Intervenors set up a straw man by suggesting that Plaintiffs seek wolf recovery in "the skyscrapers, suburbs, and exurbs of Chicago." Far from it. Plaintiffs merely contend that, should FWS seek to downlist or delist the gray wolf, **the agency must** conduct a Section 4(a)(1) threats analysis across the wolf's historic range and, at a minimum, **demonstrate why broad swaths of** *suitable* **habitat in the** ***Northeast, Pacific Northwest*, and elsewhere are not significant portions of its range.**

Pl. Opp. at 7, n. 6 (emphasis added, internal quotations omitted).[6] However, the only allegedly "suitable habitat" that Plaintiffs identify and claim the FWS should have considered classifying as a SPR is ***outside the DPS boundaries:*** the "Northeast" and the "Pacific Northwest." *Id.*

---

[6]    So long as the WGL-DPS wolves have recovered in the areas of its range that are SPRs, here the Core Recovery Areas of Minnesota, Wisconsin, and the Upper Peninsula of Michigan, whether any stray animal that enters a non-significant range portion (e.g. Chicago) is in jeopardy from one or more of the (Footnote Continued)

**B.   Irrelevance of Areas Outside DPS.**   The FWS was not required to consider the potential significance of allegedly suitable habitat outside the WGL-DPS (e.g., in the Northeast and Pacific Northwest) in deciding whether to delist the wolves within the WGL-DPS.

A DPS constitutes a species.  The ESA defines the term "species" to include "any subspecies of fish or wildlife or plants, and ***any distinct population segment*** of any species of vertebrate fish or wildlife which interbreeds when mature."  16 U.S.C. § 1532(16)(emphasis added).  According to the *Policy Regarding the Recognition of Distinct Vertebrate Population Segments under the Endangered Species Act*, ("DPS Policy") a DPS is "discrete" or markedly separated from other populations of the broader species or subspecies. 61 Fed.Reg. 4722, 4725 (Feb. 7, 1996).  The health and survival of the species is independent of the health and survival of other DPSs or other subspecies.  *Id*.  Thus, when the FWS must determine the listing status of a DPS, it looks to the population of the DPS itself to determine that status, and not to the status of other DPSs or other species.  Accordingly, when looking at whether the "species" is "endangered" or "threatened" "throughout all or a significant portion of its range," the "species" the FWS must look at is the DPS, not the species as a whole.  The "range" that is examined is the range within the DPS, not worldwide or nationwide range.  16 U.S.C. § 1532(6), (16), (20).[7]

As noted by the court in the case of *Defenders of Wildlife v. Norton* (lynx), 239 F.Supp.2d 9, 15 (D.D.C. 2002), the FWS is not permitted to determine the listing status of a population of wildlife based on the health or status of another species or distinct population.

---

Section 4(a)(1) listing factors, 16 U.S.C. § 1533(a)(1), is immaterial.  By the terms of the ESA, a species that is in danger of localized extinction in a non-significant portion of its range is not "endangered" or "threatened."  16 U.S.C. § 1532(6), (16), (20).

[7]      The DPS Policy gives the FWS the same flexibility to delist a recovered DPS even though the species elsewhere remains "endangered" or "threatened" as it gives the FWS authority to list a DPS as "endangered" or "threatened" despite the presence of healthy populations in other places.  DPS Policy, 61 Fed.Reg. at 4725; *Defenders of Wildlife v. Norton (lizard),* 258 F.3d at 1144.

Citing its earlier decision in *Defenders of Wildlife v. Babbitt* (lynx) 958 F. Supp. 670, 684

(D.D.C. 1997), the District Court explained how the FWS was prohibited from determining the

status of the lynx population of the conterminous United States based on the health of Alaska and

Canada populations of the species.  Contrary to Plaintiffs' interpretation, *Norton (lynx)* does not

stand for the proposition that the FWS must make listing decisions by considering portions of a

species' range outside the designated DPS.  In that case, the FWS had designated the entire

conterminous U.S. as a lynx DPS, and the court rejected the Service's conclusions regarding

habitat *within that DPS.  Norton (lynx),* 239 F.Supp.2d  at 16, 21.

 Although Plaintiffs insinuate nefarious motives for the FWS's designation of the WGL-

DPS, Plaintiffs do not challenge the FWS's technical finding that the wolves of the WGL-DPS

are markedly distinct from other wolf U.S. populations, and thereby qualify as a DPS in

accordance with the DPS policy.  *See* Pl. Opp. at 21-23 (complaining about the location of DPS

boundaries, not the finding that WGL-DPS wolves were distinct from other wolf populations).[8]

 **C.  <u>Recognition of DPS at Time of Delisting</u>**.  In crafting the policy for defining DPSs,

the FWS explicitly identified DPSs as a tool for the purpose of delisting as well as listing:

> The Fish and Wildlife Service and the National Marine Fisheries Service
> (Services) have adopted a policy to clarify their interpretation of the phrase
> "distinct population segment of any species of vertebrate fish or wildlife" for the
> purposes of listing, ***delisting***, and reclassifying species under the Endangered
> Species Act of 1973, as amended (16 U.S.C. 1531 et. seq.) (Act).

---

[8]     The scientific evidence supports the FWS's conclusion that the wide areas of unsuitable habitat
and formidable physical barriers between the Core Recovery Areas in Minnesota, Wisconsin, and the
Upper Peninsula of Michigan on the one hand and the far away Pacific Northwest and Northeast on the
other hand prevent all but the rarest intermingling between wolves in the DPS and wolves elsewhere in
the Nation. 72 Fed.Reg. at 6059.  As the FWS demonstrated, a wolf would have to travel 400 miles
across unsuitable habitat to reach the  Northern Rocky Mountains population, the nearest U.S. population
outside the WGL DPS.  *Id.*  Further, the WGL-DPS wolves are the only wolves inhabiting a Mixed-
Laurentian Forest in the United States.  72 Fed.Reg. at 7060.  Thus the WGL DPS wolves are "distinct"
from other wolves and the FWS properly recognized the DPS.

DPS Policy, 61 Fed. Reg. 4722 (February 7, 1996) (emphasis added).

The delisting of the WGL-DPS population of wolves is not the first occasion on which the FWS has designated DPSs for the purpose of removing a species from the "endangered" species list. The FWS designated three DPSs for wolves in 2003 when it promulgated a rule to reclassify the Eastern and Northern Rocky Mountain wolf DPSs. And although the Oregon federal district court disagreed with the boundaries that the FWS chose for the DPSs, the Court found nothing wrong with the FWS's decision to create DPSs for the purpose of the reclassification. Observing no distinction between using DPSs for listing, reclassification and delisting, the Oregon Court simply explained that:

> The DPS Policy is designed to draw a line around a population whose
> conservation status differs from other populations within that species.

*Defenders of Wildlife v. Secretary (wolves)*, 354 F. Supp. 2d 1156, 1170 (D. Or. 2005).

Plaintiffs offer no case that holds that a DPS cannot be recognized at the same time as a decision to delist. Plaintiffs chiefly rely on *Friends of Wild Swan, Inc. v. U.S. Fish & Wildlife Serv. (bull trout),* 12 F.Supp.2d 1121, 1132-34 (D.Or. 1997), which in fact supports the FWS's action in this case. That opinion upheld the general legal authority of the FWS to separately evaluate on a DPS-by-DPS basis whether and where it should originally list the bull trout. 12 F.Supp.2d at 1133-34 (emphasis added). The case remands for additional explanation because the FWS did not adequately respond to a citizen petition filed under 16 U.S.C. § 1533(b)(3) asking the FWS to list the bull trout nationally, and because the FWS had determined **just two years earlier** using the "*same information*" that a national level listing would be warranted by the evidence, and did not adequately explain its shift to a DPS-by-DPS approach. 12 F.Supp.2d at 1132 (emphasis added). By contrast, **thirty years have passed** since the 1978 decision to list the wolf at the National level. 43 Fed.Reg. 9607 (Mar. 9, 1978). During this 30 year period

there has been a night-to-day recovery by the wolves in the area encompassed by the WGL-DPS.

Moreover, Congress gave the FWS a new tool when the legislature added a provision to the

ESA, authorizing creation of DPSs.  P.L. 95-632 (Oct. 1978).   The information and

opportunities before the FWS in 2007 were obviously not the "same information" and

opportunities that were before the FWS at the time of the original 1970s listing.[9]

The FWS has never uniformly listed or protected all wolves of the conterminous United

States.   In 1966 and 1967, the FWS individually listed subspecies of wolves as the agency

determined each subspecies' need for the protection. [10]  Then, in 1978, the FWS, for the sake of

convenience, listed almost the entire species, as "endangered" throughout the conterminous

United States when it became apparent that the entire species required federal protection. 43

Fed.Reg. 9607(1978).   Even then the FWS drew geographical distinctions, by designating

Minnesota wolves "threatened" and wolves in other states "endangered."   *Id*. Just as it was then

necessary to distinguish the more populous wolves of Minnesota from those of the remainder of

the conterminous United States, so is it now necessary to respond to the excellent recovery that

some DPSs have demonstrated, and to distinguish their protections from other populations that

have shown limited or no recovery.  Recovery and delisting is the ESA's goal.  16 U.S.C §

1533(f).

---

[9]      Further, in the *Friends of the Wild Sw*an case, the Court directed the FWS to conduct a two tiered
analysis, by which it first considered the listing status of the species throughout its range, and then
considered the appropriate listing status for individual DPSs.  In the instant matter the FWS has already
followed the two tiered approach, initially providing protection for the individual populations of wolves
under a single umbrella and then later, removing federal protections from only those DPSs that no longer
qualify as "endangered."

[10]      On March 11, 1967, the FWS listed as "threatened" the "timber wolf – canis lupus lycaon"[10]
under the Endangered Species Preservation Act of October 15, 1966 (80 Stat. 926; 16 U.S.C. § 668aa(c)),
32 Fed. Reg. 4001, (March 11, 1967).  And on January 4, 1974, the FWS listed as "endangered" both the
Eastern Timber wolf (canis lupus lycaon) and the Northern Rocky Mountain wolf (canis lupus irremotus).
39 Fed. Reg. 1175 (January 4, 1974).

**D.  Collateral Attack on Wolf Recovery Plan.**  While Plaintiffs appear to agree that the numerical criteria for delisting set forth in the Recovery Plan have been met, Pl. Opp. at 24, Plaintiffs collaterally attack the Recovery Plan by seeking to establish a different set of objective recovery criteria – more specifically criteria for nationwide recovery. However, the FWS bears no obligation to develop a nationwide wolf recovery plan.  The Vermont federal district court that reviewed the 2003 rule that reclassified gray wolves from "endangered" to "threatened" held that "the Secretary's decision to proceed with three recovery plans for the gray wolf rather than one comprehensive national plan must be afforded *Chevron* deference."  *National Wildlife Federation v. Norton*, 386 F. Supp.2d 553, 568. (D.Vt. 2005)

Plaintiffs' attack on the Recovery Plan must also fail because Plaintiffs waited too long to wage their challenge.  The Recovery Plan was a final and reviewable agency action.  *Strahan v. Linnon*, 1998 WL 1085817 *4 (1st Cir. 1998); *Fund for Animals v. Babbitt (Grizzly Bear),* 903 F.Supp. 96, 105 (D.D.C. 1995); *see* 16 U.S.C. § 1533(f) (1)(B)(ii).  Any attacks to that plan are barred by the statute of limitations.  Although the ESA itself contains no express limitation of action period, ESA actions are governed by 28 U.S.C. § 2401(a), the general six-year statute of limitations for civil actions against the federal government. *Center For Biological Diversity v. Hamilton,* 453 F.3d 1331, 1334 (11th Cir. 2006). The Plaintiffs have never sued to overturn the Recovery Plan.  The six-year statute-of-limitation to challenge the 1992 Wolf Recovery Plan expired in 1998.

**E**.  **Section 1533(a)(1) Risk/Threats Analysis Factors.**  Plaintiffs also argue that the FWS paid too much attention to the objective recovery criteria set forth in the Recovery Plan pursuant to 16 U.S.C. § 1533(f) and not enough attention to the five listing factors set forth in 16 U.SC. § 1533(a)(1).  Subsection (f) injects a quantifiable element into the delisting decision,

providing that satisfaction of the "objective, measurable criteria" set forth in a recovery plan

"***would result*** in a determination, in accordance with the provisions of this section, that the

species be removed from the list" of endangered or threatened species.  1533(f)(1)(B)(ii)

(emphasis added).  Plaintiffs' argument has no merit since the FWS discussed at length each of

the five (5) listing factors set forth in sub-section (a) and appropriately concluded that none of

those listing factors either individually or collectively placed the WGL-DPS in danger of

extinction throughout all or a significant portion of its range. 72 Fed.Reg. at 6071-6101.

Plaintiffs offer no basis for overturning FWS's findings.

        1.     Adequacy of Regulatory Mechanisms / State Wolf Management Plans.

Plaintiffs focus on factor (iv), "Inadequacy of Existing Regulatory Mechanisms," alleging that

the Michigan Wolf Management Plan ("Michigan Plan") is a draft and that the Michigan Plan

and Minnesota Wolf Management Plan ("Minnesota Plan") are underfunded.  Contrary to

Plaintiffs' contentions, Michigan currently has an ongoing effective state wolf management plan

that was adopted in 1997.  A.R. Doc. 468A at 15209. Michigan's existing plan is not a draft.  72

Fed.Reg. at 6092-94.  The fact that the Michigan Plan is currently undergoing a periodic update

and that the FWS properly made note of this fact, does not undermine the adequacy of the

operative Michigan Plan as an ***existing*** regulatory mechanism.  The FWS carefully examined and

found that the existing Michigan Plan was adequate.  72 Fed.Reg. at 6094. In addition, the FWS

found that the draft plan, when finalized, would ***also*** be adequate.  *Id.*  Because the existing

Michigan Plan was itself adequate and in place, Plaintiffs have no grounds for claiming that the

FWS was relying on "future" regulatory mechanisms in order to approve delisting for wolves.

        There is no evidence in the Administrative Record ("AR") of inadequate funding.  Even

if there were, Plaintiffs have not demonstrated anything to indicate that any hypothesized

{G:/101002/42/00000797.DOC}14

insufficiencies in funding are significant enough to reverse the remarkable recovery of wolves in the WGL-DPS. It is not enough for Plaintiffs to show the existence of a risk factor. They must show that the risk is so serious as to cause the DPS to be in danger of extinction. §§1533(a)(1), 1532(6)(20).

Plaintiffs do not provide any factually based comparison of the funding of state wolf management plans before and after delisting. Each state's long record of willingness to engage in wolf population monitoring is just one example of each state's established track record in wolf management. *See* 72 Fed.Reg. at 6053-6056. For example, the record shows that Wisconsin has long found ways to fund wolf management and in recent years has been funding a greater share of those costs through state funds.[11] That state also adequately funds its wolf management program through a variety of stable statutory mechanisms not contingent upon continued ESA listing.[12] Minnesota, the state with the largest wolf population, also confirmed to FWS in 2006 that it would continue its 2001 wolf management plan, which includes wolf monitoring and many other management tasks, post delisting.[13] Michigan, whose management plan is discussed above, similarly agreed in 2006 to conduct post-delisting monitoring. A.R. Doc. 228 at 8286.

---

[11]     2006 Wolf Management Plan Addendum to 1999 Wolf Management Plan, AR Doc. 468A at 13407 (total annual expenditures on State wolf management ranged from $217,885 to $349,972 between 1999/2000 and 2004/2005 fiscal years and State share of that funding increased to $172,861 in 2003/2004 and then to $195,747 in 2004/2005). In its 2006 comments on the proposed delisting, Wisconsin agreed to engage in post-delisting monitoring on behalf of FWS, requesting "cost-sharing" to help it conduct this federal monitoring duty, and FWS responded by explaining the availability of federal funding sources.ee A.R. Doc. 228 at 8233; Final Post-Delisting Monitoring Plan Appendix at 3-4 (Ex. B. to this Reply).

[12]     Funding sources include the State Endangered Resources Tax Check-Off, Wis. Stat. § 71.30(10) (2006), License Plate Revenue, Wis. Stat. § 341.14 (2006), Wis. Stats., and voluntary donations, Wis. Stat. § 71.10(5)(b). State endangered resources funds pay for depredation programs in accordance with Wis. Stat. § 71.10(5)(am).

[13]     A.R. Doc. 228 at 8222 (comments); A.R. Doc 468A at 14933 (State Wolf Management Plan); *see also*, Minn.Stat.97B.646 (confirming state objective of ensuring wolf survival). The Minnesota comments did not condition continued state management on federal funding.

[G:/101002/42/00000797.DOC]15

It requested federal funding assistance for post-delisting monitoring but did not condition its commitment on that funding, which the FWS in any event has indicated is available. *Id.*, *see* Post-Delisting Monitoring Plan App. at 3-4 (Ex. B. to this Reply, also discussed in Point F to this Reply). In short, Plaintiffs have made no showing that the FWS acted arbitrarily and capriciously in concluding that each state would, in some way, adequately carry out each state's management responsibilities. 5 U.S.C. § 706(2).

  In addition, Defendant-Intervenors and the State Government Amici have also submitted documents to supplement the Administrative Record that refute Plaintiffs' post-decisional evidence concerning the adequacy of state wolf management funding. Plaintiffs have already admitted that the Stark Declaration, regarding Minnesota's funding (Docket 43-5), should become part of the AR if Plaintiffs' own extra-record evidence regarding Minnesota funding becomes part of the AR. [14] Read correctly, the Stark Declaration confirms that Minnesota spends more on personnel who work on wolf management than the $695,000 figure that framers of the Minnesota plan originally budgeted. Plaintiffs misconstrue the Stark Declaration by incorrectly contending that the $354,000 being spent by Minnesota Department of Natural Resources annually for professional staff dedicated to wolf management, population research and monitoring, enforcement and education represents a shortfall of $141,000 from the wolf related costs anticipated by the drafters of the state's wolf management plan. However, in making this assessment, Plaintiffs assume that all professional staff with wolf responsibilities and all wolf enforcement activities are paid for from the $695,000 allocated by Minnesota for wolf management. That might have been the case, had Minnesota chosen to merely establish and fill three new Conservation officer positions related to wolves. However, Minnesota DNR did not

---

[14] Plaintiffs' Reply Supporting Plaintiffs' Motion to Supplement A.R. at 12 (Docket 35).

{G:/101002/42/00000797.DOC}16

simply establish those three positions but also filled 20 *additional* positions with individuals

whose responsibilities include regularly engaging in wolf protection and monitoring activities.

Although these individuals have responsibilities for wolf management, their salaries are paid

from other, non-wolf portions of the Minnesota DNR budget.  As Mr. Stark explained:

> "Instead of simply establishing three new officer positions, Minnesota DNR filled
> 20 vacant Conservation Officer positions in wolf range since the wolf plan was
> drafted.  Although the three lead officers serve as the primary internal and
> external contacts for wolf issues, there are now 71 DNR Conservation Officers
> stationed in or adjacent to Minnesota wolf range.  Each of these officers respond
> to grey wolf management issues and each is involved, at least in part, in wolf
> management and wolf-related enforcement activities."

Declaration of Daniel Stark at page 3 (Exh. 2 to Defendant-Intervenors' Motion for Summary

Judgment, Docket 43-5).  As a result, contrary to Plaintiffs' allegations, not only is there

"enough" money for wolf protection and monitoring, there is in fact more funding being devoted

to these areas than was deemed necessary by the drafters of the Minnesota plan.

   With regard to Michigan, State Government Amici have filed a motion requesting that

the AR be supplemented by the Hogrefe Declaration and Defendant-Intervenors expect to shortly

file their own motion joining in that request.  If admitted, the Hogrefe Declaration provides

supplementary information about the funding and implementation of Michigan's Wolf

Management Plan.  *See* Hogrefe Declaration (Docket 40-2); A̶ R̶ Doc. 228 at 8286; Doc. 418 at

11491 and 11496 (various Michigan commitments clarified by Mr. Hogrefe).

   2.   Disease and Predation.  In their Opposition, Plaintiffs devote three sentences to

their argument that there is inadequate monitoring by Minnesota, Michigan and Wisconsin of

wolf numbers and therefore potential for diseases or human predators to kill large numbers of

wolves without being detected by state managers.  Pl. Opp. at 31.  Contrary to this argument, all

three states have numerous game wardens in the field who are poised to detect any surge in the

number of wolf carcasses spotted.  The FWS Post Delisting Monitoring Plan explains that

{G:/101002/42/00000797.DOC}17

Minnesota, which has the largest and thus most difficult to count wolf population, will conduct formal wolf censuses in the first and fifth years following delisting.  PDM Plan at 3-4 (copy supplied as Exhibit "B" to this Reply).  Further, in these years and intervening years DNR personnel "will continue their collection and analysis of scent post data, winter track surveys, and verified wolf depredations," which activity "will furnish independent annual indices of wolf population trends and changes in occupied range …."  *Id.*  Wisconsin and Michigan conduct annual wolf population counts, with Michigan now using a sampling method as wolf populations have increased greatly.  *Id.*  at 4-5.

Inexplicably, Plaintiffs misrepresent the Final Rule to suggest that the gray wolf populations in those States could decline significantly before such decline is detected.  Pl. Opp. at 31.  The actual statement in the Final Rule is that "Wolf management plans for Minnesota, Michigan, and Wisconsin include disease monitoring components that we expect will identify future disease and parasite problems in time to allow corrective action ***to avoid a significant decline in overall population viability***."  72 Fed.Reg. at 6081 (emphasis added).

3.     <u>Depredation Control in Dispersal Areas</u>.  Plaintiffs erroneously suggest that the FWS has drawn unnecessarily broad boundaries around the core populations of wolves in the WGL-DPS, and that by doing so, the Service has created a rule that "virtually ensure[s] that dispersing wolves cannot contribute to wolf recovery" by dispersing to the areas of the United States where the classification status of wolves remains "endangered."  Pl. Opp. at 22.  Plaintiffs go so far as to suggest that post-delisting, the States of the WGL-DPS plan to simply eradicate all wolves in these dispersal areas.  Nothing could be farther from the truth.  Although several of the States have authorized depredation control measures for problem wolves, none of the states has approved regulated seasons for wolves and not one has authorized unlimited removal of wolves.

{G:/101002/42/00000797.DOC}18

Plaintiffs make a point of singling out wolves that disperse through Minnesota, inaccurately identifying Zone B in Minnesota as a "free-fire zone."  Although it is true that Minnesota has divided the state into two zones and has designated stronger wolf protections within Zone A, there is no truth to Plaintiffs' allegations that the less stringent wolf protections in Zone B will result in the eradication of all wolves traveling through the area.  According to the Minnesota Plan, only the following types of wolf removal are being allowed in Zone B:

> • state administered wolf control by certified predator controllers will be limited to cases of verified losses within the previous five years, and conducted within a one-mile radius of the depredation site
>
> • owners of livestock, domestic animals, or pets may shoot wolves to protect their animals, on land owned or leased by the owner, under certain conditions. Additionally, owners of livestock, domestic animals, or pets may employ a State certified predator controller to trap wolves to protect their animals on and within one mile of land owned or leased by the owner

Minnesota Plan, p. 3, AR Doc. 215, p. 5256.  Minnesota DNR plans to monitor the wolf removal in Zone B since the taking of a wolf within that zone must be reported within 48 hours to the Minnesota DNR.  *Id*. at 24, AR Doc. 215, p. 5277.  The Minnesota Plan specifically notes that, within Zone B, wolves will continue to be fully protected on federal land, with the exception of certain areas of public land immediately adjacent to private land.  *Id*. at 20, AR Doc. 215, p. 5273.  Minnesota's Plan also specifically refutes any suggestion that the less restrictive protections will remove the Zone's entire wolf population.

> Although these depredation procedures will likely result in a larger number of wolves killed, as compared to previous ESA management, they will not result in the elimination of wolves from Zone B.

*Id*. p. 23, AR Doc. 215, p. 5276; see also Minn. Stat. 97B.645 (codifying wolf protections).  Plaintiffs simply have no basis for challenging the breadth of the area within the boundaries of the WGL-DPS.  The DPS appropriate incorporates the normal dispersal distances of the core population of wolves.  However, wolves that range within those normal distances will not be at

[G:/101002/42/00000797.DOC]19

risk of eradication even in areas with less restrictive wolf protections, and wolves that range

beyond the normal distances will have the opportunity to inhabit areas of the U.S., beyond the

boundaries of the WGL-DPS, where wolves continue to be under federal protections.

With respect to depredation control, Minnesota, Wisconsin, and Michigan have all

committed to the FWS to track each depredation control action they authorize and report the

number of wolves so taken to FWS under the PDM Plan.  Post-Delisting Monitoring Plan at 6

(Ex. B to this Reply).  They will also report to the FWS other forms of wolf death.  *Id.*

Moreover, the resiliency of the wolves and their ability to quickly regain population even after

substantial levels of regulated authorize take demonstrates that depredation control is unlikely to

pose any risk of major population decreases that will cause the WGL-DPS to become in danger

of extinction throughout all or a portion of its range.  ~~A.R.~~ Doc. 215, p. 5893 (citing studies

showing wolves rebounded from annual loss of 20% to 30%, and even 50%).

Also contrary to Plaintiffs' dispersal argument are the state-law protections that wolves

enjoy in the surrounding States of North Dakota, South Dakota, Iowa and Illinois, the only other

States that have substantial territory in the DPS.  Hunting and trapping of wolves is not allowed

in these States.[15]  So the dispersal zones within these States do not constitute "free-fire zones"

for any wolf that attempts to cross through.

---

[15]     North Dakota classifies gray wolves, to the extent they exist at all in the State, as furbearers with a closed season, so they cannot be hunted or trapped. N.D. Cent. Code § 20.1-07 (2007); North Dakota 2007 Furbearer Guide, *available at* www.gf.nd.gov/regulations/furbearer/pdf/furbearer-guide.pdf.  South Dakota only permits hunting or trapping of species for which an open season is established, and it has established no open season for wolves, and there is no indication it has plans to do so.  S.D. Codified Laws § 41-8-20 (2007); S.D. Furbearer Regs., www.sdgfp.info/Wildlife/Trapping/SDfurbearerregs.pdf. Iowa (most of which is in the DPS) similarly lists gray wolves as furbearers with a closed season.  Iowa Code § 481A (2007 merged); Iowa Hunting Regs. (www.iowa.dnr.com/law/files/07huntingregs.pdf). Illinois (the northern fifth of which is in the DPS) protects wolves under the Illinois Endangered Species Act, 520 ILCS 10.  Ohio and Indiana have only tiny fragments of  territory in the DPS (which includes (Footnote Continued)

**F.  <u>Post-Delisting Monitoring and Emergency Relisting</u>**.  Contrary to Plaintiffs'

argument, the FWS had a PDM Plan in place as required by 16 U.S.C. § 1533(g) at the time of

delisting.  *See* Pl. Opp. at 32.  The FWS labeled the original PDM Plan a "draft" because it was

in the process of refinement at the time of delisting, but the draft PDM Plan itself explained that

it was put into effect on an interim basis to avoid a gap in monitoring:

> "We began developing the PDM Plan in advance of making a final decision on
> the delisting proposal in order to be able to implement the PDM activities in a
> timely manner in the event that we determined that delisting the WGL DPS is
> appropriate. We are implementing the PDM [Post-Delisting Monitoring] as
> described in the Draft PDM Plan, although we recognize that the PDM Plan may
> be modified as a result of this review."

72 Fed.Reg. 30819, 30820 (June 4, 2007).  The draft PDM Plan is attached as Exhibit "A" to this

Reply. The Final PDM plan was recently completed following opportunity for public comment

and is attached as Exhibit "B."

Plaintiffs also complain that the PDM relies on data from the states; however, this

cooperation with the states is what the ESA requires. "The Secretary shall implement a system ***in***

***cooperation with the States*** to monitor" delisted species. § 1533(g)(1) (emphasis added).

Plaintiffs complain that the FWS could not be assured that the states would fund the

monitoring program, but absolute assurance is not required.  The FWS, in the Final Rule, noted

that the states had been conducting wolf monitoring "for several decades with significant

assistance from numerous partners, including the U.S. Forest Service, National Park Services,

USDA-APHIS Wildlife Services, Tribal natural resource agencies, and the Service. … All three

state DNRs have committed to continue their previous wolf population monitoring

methodology." 72 Fed.Reg. at 6101; *see also* Point E.1 above.  There was no reason to believe

---

them only so the DPS boundary follows Interstate-80), and no wolves are known to have been seen there,
so there States have not had occasion to address wolf conservation matters.

that work the states had carried on for decades and committed to continue would suddenly stop. The Final PDM Plan lists multiple sources of federal funding that are available to help states conducting post-delisting monitoring on behalf of FWS.  *See* PDM Plan – Appendix  at 3-4 (Ex. B).[16]  Finally, the FWS emphasized that it retained "responsibility" for conducting monitoring, and so would step in directly if the states did not fulfill their commitments.  72 Fed. Reg. at 6101.  In satisfying the monitoring requirement of 16 U.S.C. § 1533(f), FWS also satisfied the Recovery Plan criteria that called for an adequately funded monitoring plan to be in place.

The draft PDM Plan (and the final PDM Plan which supersedes it) provides that FWS will consider relisting in the event of:

(a)     either the Wisconsin or Michigan wolf population fell below 100 wolves, or

(b)     the lower-end confidence level for the estimated Minnesota Wolf population (i.e. worst-case scenario estimate) falls below 1,500 wolves.

Additionally, FWS will investigate further in the event of the following:

(c)     a substantial and widespread increase in mortality from known or unknown cases occurs, or

(d)     evidence of a new wolf disease or substantial increase in virulence of a previously known wolf disease, even in the absence of demographic, impact on wolf population, or

(e)     any one of several other warning signal events occur.

See Ex. A at 9-10 and Ex. B. at 10-11. The PDM Plan's relisting criteria exceed those established by the Recovery Plan.  For example the PDM Plan insists on the existence of populations of 100+ wolves in both Wisconsin and Michigan, while the Recovery Plan required

---

[16]     The Court may take judicial notice of the PDM Plans.  Fed.R.Evid. 201.  The PDM Plans implement a mandatory ESA process and so have independent stature as agency action.  16 U.S.C. § 1533(g) (statutory monitoring process).  They may also be considered by the court like other agency policy pronouncements.  *See U.S. v. City of St. Paul*, 258 F.3d 750, 752 (8th Cir. 2001) (taking judicial notice of agency handbook)

in some scenarios only one such population for both states. The PDM Plan also includes a disease trigger which was not found in the Recovery Plan. *Id.*; A. R. Doc. 468A, p. 13795-95.

**H.    Harmless Error Standard and Remedy if Error is Found**.   Should the Court find some error in some aspect of the FWS's hundred page delisting decision, the Court will need to consider whether the error is prejudicial or harmless under the Administrative Procedure Act's ("APA") harmless error standard. 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error"). Given the large margin by which the number of wolves now exceeds the Recovery Plan targets and the narrow nature of many of Plaintiffs' objections, it is difficult to see how any error could be prejudicial. Should the Court find prejudicial error, it must consider remedy under the APA remedy standards. *See* DI Opn. at 38-39 (reviewing caselaw).

> **Formatted:** Font: Italic

Plaintiffs explain that "to the extent that the [Oregon and Vermont decisions regarding the 2003 downlisting rule] provide any guidance at all, they would support at most a tight [delisting] line around the existing wolf populations in northern Minnesota, northern Wisconsin, and Michigan's Upper Peninsula," i.e. the Core Recovery Areas. Pl.Opp. at 22. As Plaintiffs' statement suggests, Plaintiffs offer little response to Defendant-Intervenors' point that temporary relisting in the Core Recovery Areas during a remand to address curable issues would be needlessly disruptive to state wolf management. *See* Pl. Opp. at 32-33 (addressing disruption to Defendant-Intervenors but not disruption to states); DI. Opn. at 40-41 (addressing both types of disruption). Those state management plans have been in operation for almost a year since delisting, and have required the investment of considerable resources. *E.g.* State Governments Amici Brief at 25-28 (Docket 40) (describing Michigan's plan).

Plaintiffs do not deny that remand without vacatur for further explanation or a temporary stay of remedy to give the FWS a chance to act before disruption occurs are available remedies

in appropriate ESA cases, as in any other case reviewed under the APA.  Pl. Opp. at 33; DI Opn.

at 39-41.  Plaintiffs do not appear to contend that the FWS will inevitably have to redesignate the

wolves of the Core Recovery Area as "endangered" or "threatened."  *See* Pl. Opp. at 22.  16

U.S.C. § 1533(c) in fact precludes listing in "portions of [the species or DPS] range" in which

the species (or DPS) is no longer endangered or threatened, e.g. the Core Recovery Areas.[17]

Plaintiffs' argument that allegedly "endangered" wolves in the Core Recovery Areas are

of irreplaceable value (Pl. Opp. at 33) presumes that the wolves in the Core Recovery Areas are

in fact "endangered" or "threatened" (and also ignores the broader interests of the state

governments implementing wolf management plans).  However, as discussed above, all the

evidence available to the FWS establishes that wolves in the Core Recovery Areas have

recovered and are no longer "endangered" or "threatened."  Consequently, a remedy that would

impose the listing of a recovered species would defy the purpose of the ESA.

## CONCLUSION

For the foregoing reasons and those stated in Defendant-Intervenors' Opening Brief and

the briefs of the Federal Defendants and Amici State Governments, National Wildlife Federation,

and Pacific Legal Foundation, the Court should affirm the FWS's decision to delist the WGL-

DPS wolves and grant Defendant-Intervenors' Motion for Summary Judgment.

---

[17]    16 U.S.C. § 1533(c)(1) provides flexibility for listing in any more limited areas where threats are found to exist, as it directs that FWS when listing a species (a DPS is a "species") shall "specify .. what portions of its range it is endangered or threatened …."  *See also Defenders of Wildlife (Lizard)*, 258 F.3d at 1141, 1144 (FWS has flexibility to list only where threats exist); 43 Fed.Reg. 9607 (Mar. 9, 1978) (classifying wolves in Minnesota as "threatened" and wolves elsewhere in conterminous 48 states as "endangered");  DOI Solicitor's Memorandum on the Meaning of "in Danger of Extinction Throughout All or a Significant Portion of its Range" at 16-19 (Mar. 16, 2007) (Exh. 3 to DI Op. Br.); see *U.S. v. Lara*, 541 U.S. 193, 206 (2004) (Court may consider Solicitor's opinion like other precedent).

{G:/101002/42/00000797.DOC}24

Corrected Per Errata: April 7, 2008

Dated:  March 7, 2008                              Respectfully submitted,

*/s/ William P. Horn*
William P. Horn (D.C. Bar No. 375666)
James H. Lister (D.C. Bar. No. 447878)
Birch Horton, Bittner & Cherot
1155 Connecticut Avenue N.W., Suite 1200
Washington, D.C.  20036
(202) 659-5800
Fax:  (202)659-1027
whorn@dc.bhb.com
jlister@dc.bhb.com

*Counsel for U.S. Sportsmen's Alliance*
*Foundation, Wisconsin Bear Hunters'*
*Association, Scott Meyer and Robert Stafholt*

*/s/ Anna M. Seidman*
Anna M. Seidman (D.C. Bar No. 417091)
Douglas S. Burdin (D.C. Bar No. 434107)
Safari Club International
501 2nd Street NE
Washington, D.C.  20002
(202) 543-8733
Fax:  (202) 543-1205
aseidman@sci-dc.org
dburdin@sci-dc.org

*Counsel for Safari Club International,  Safari*
*Club International Foundation, and National*
*Rifle Association*

Formatted: Indent: Left:  0 pt

Formatted: Indent: Left:  0 pt, Tab stops: 234 pt, Left

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, HELP OUR WOLVES LIVE, ANIMAL PROTECTION INSTITUTE, and FRIENDS OF ANIMALS AND THEIR ENVIRONMENT, | |
| Plaintiffs, | |
| vs. | Civil Action No. 1:07-cv-00677(PLF) |
| DIRK KEMPTHORNE, Secretary of the Interior, U.S. DEPARTMENT OF THE INTERIOR, and U.S. FISH AND WILDLIFE SERVICE, | |
| Defendants, | |
| and | |
| SAFARI CLUB INTERNATIONAL, SAFARI CLUB INTERNATIONAL FOUNDATION, and NATIONAL RIFLE ASSOCIATION, | |
| Defendant-Intervenors, | |
| and | |
| U.S. SPORTSMENS' ALLIANCE FOUNDATION, WISCONSIN BEAR HUNTERS' ASSOCIATION, SCOTT MEYER, and ROBERT STAFSHOLT, | |
| Defendant-Intervenors. | |

**DEFENDANT-INTERVENORS' STATEMENT OF**
**UNCONTROVERTED MATERIAL FACTS IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

Pursuant of Local Civil Rule 56.1, Defendant-Intervenors U.S. Sportsmen's Alliance

Foundation, Wisconsin Bear Hunting Association, Scott Meyer and Rob Stafholt and Defendant-

Intervenors Safari Club International, Safari Club International Foundation, and National Rifle Association (collectively, "Defendant-Intervenors") submit this Statement of Uncontroverted Material Facts in Support of their Motion for Summary Judgment.

## Delisting Criteria in Wolf Recovery Plan

1.      The 1978 Recovery Plan for the Eastern Timber Wolf and the 1992 revised Recovery Plan (collectively, the "Recovery Plan") contain the same two criteria for delisting wolves.  72 Fed. Reg. at 6052 (February 8, 2007).

2.      The first delisting criterion of the Recovery Plan provides that the survival of the wolf in Minnesota must be assured, which means the population must be stable or increasing. 72 Fed. Reg. at 6052, 6053-55.

3.      The Recovery Plan established a planning goal of 1,250-1,400 animals for the Minnesota wolf population (USFWS 1992, p. 28), which would increase the likelihood of maintaining its genetic diversity over the long term. 7 2 Fed. Reg. at 6052.

4.      The second delisting criterion in the Recovery Plan provides that at least one viable wolf population should be reestablished within the historical range of the Eastern Timber wolf outside of Minnesota and the isolated population on the island of Isle Royale, Michigan.  72 Fed. Reg. at 6052

5.      The second population (the one not in Minnesota or Isle Royale) was required in order to enhance both the resiliency and redundancy of the recovery program.  72 Fed. Reg. at 6052.

6.      If the second population was an isolated population, that is, located more than 100 miles (160 km) from the Minnesota wolf population, the second population had to consist of at

least 200 wolves for at least 5 years (based upon late-winter population estimates) to be considered viable.  72 Fed. Reg. at 6072.

7.    Alternatively, if the second population was located within 100 miles (160 km) of a self-sustaining wolf population (for example, the Minnesota wolf population), it was considered viable if it maintained a minimum of 100 wolves for at least 5 years.  72 Fed. Reg. at 6053.

8.    In 1998, FWS clarified the application of the delisting criterion for the second population by stating that the criterion would be satisfied by Michigan or Wisconsin populations if six consecutive late-winter surveys yielding a full five years of population data (the five years between the first and sixth survey) all showed a population above the threshold number.  72 Fed. Reg. at 6053.

9.    The Recovery Plan did not specify where in the eastern United States the second population should be reestablished.  *Id.*

10.    Neither the 1978 nor the 1992 recovery criteria suggested that the restoration of the gray wolf throughout all or most of its historical range in the eastern United States, or to all of these potential re-establishment areas, was necessary to achieve recovery under the Act.  *Id.*

**Fulfillment of the Recovery Plan Criteria**

Minnesota

11.    There were fewer than a 1000 wolves in Minnesota when wolves were listed under the ESA in 1974.  72 Fed. Reg at 6053.

12.    In 1976, the estimated Minnesota wolf population was 1,000 to 1,200 wolves.  72 Fed. Reg. at 6053 (citing -USFW 1978, pp. 4, 50-52).

3

13.    In 1988-89, the Minnesota Department of Natural Resources ("DNR") estimated the Minnesota wolf population as being 1500 to 1750 wolves.  72 Fed. Reg. at 6053.

14.    In 1997-98, the Minnesota DNR estimated the Minnesota wolf population as being approximately 2,445 wolves, with a 90 percent confidence interval that the population was between 1995 to 2,905 wolves.  72 Fed. Reg. at 6054 (*citing* Berg and Benson 1999, p. 4).

15.    In 2003-04, the Minnesota DNR estimated the Minnesota wolf population as being approximately 3,020 wolves.  72 Fed. Reg. at 6054.

16.    This 2003-04 population estimate was more than double the target number of Minnesota wolves (1,250 to 1,400) set in the Recovery Plan.  72 Fed. Reg. at 6052-54.

17.    The estimated wolf range in Minnesota in 1970 was 11,954 square miles.  72 Fed. Reg. at 6054.

18.    The estimated wolf range in Minnesota in 1997-98 was 33,971 square miles.  72 Fed. Reg. at 6054.

19.    The estimated wolf range in Minnesota in 2003-04 was not substantially different than that in 1997-98.  72 Fed. Reg. at 6054.

20.    Based on the increase in the number of wolves in Minnesota and their range, the survival of the wolves in Minnesota is assured, satisfying the first Recovery Plan criterion.  72 Fed. Reg. at 6052 (Minnesota population is stable and increasing), 6060 (Minnesota wolves have occupied substantially all suitable habitat in the State).

Wisconsin

21.    In 1979-80, the Wisconsin DNR estimated the Wisconsin wolf population as being approximately 25 wolves.  72 Fed. Reg. at 6054.

4

22.    In 2005-06, the Wisconsin DNR estimated the Wisconsin wolf population as being approximately 465 to 502 wolves.  72 Fed. Reg. at 6055.

23.    Since 2002, Wisconsin wolf numbers exceeded the Recovery Plan criterion for a second wolf population where the second population was less than 100 miles from the first wolf population.  By 2002 Wisconsin had had a minimum of 100 wolves for a minimum of five consecutive years as measured by six annual late-winter counts.  72 Fed. Reg. at 6055.

24.    The Wisconsin wolf population is less than 100 miles from the Minnesota wolf population.  72 Fed. Reg. at 6053.

25.    Moreover, since 2004, Wisconsin wolf numbers exceeded the Recovery Plan criterion for a second wolf population that was more than 100 miles from a first wolf population.  By 2004 Wisconsin had had a minimum of 200 wolves for a minimum of five consecutive years as measured by six annual late-winter counts.  72 Fed. Reg. at 6055.

26.    Accordingly, Wisconsin has met the Recovery Plan criterion for a second wolf population regardless of whether that population is less than or more than 100 miles from the Minnesota population.  72 Fed. Reg. at 6055.

Upper Peninsula of Michigan

27.    In 1994, the Michigan DNR estimated there to be 57 wolves in the Upper Peninsula of Michigan.  72 Fed. Reg. at 6055.

28.    In 2006, the Michigan DNR estimated there to be 434 wolves in the Upper Peninsula of Michigan.  72 Fed. Reg. at 6055.

29.    By the date of the issuance of the 2007 Final Rule to Delist the WGL DPS (Feb. 8, 2007), the Upper Peninsula Michigan wolf population had satisfied the Recovery Plan criterion for a second wolf population that was more than 100 miles from a first wolf

population.  By February 8, 2007, there were more than 200 wolves in the Upper Peninsula for

five consecutive years as measured by six annual late-winter surveys.  72 Fed.Reg. at 6055.

### Suitability of Habitat Outside Minnesota, Wisconsin, and the Upper Peninsula of Michigan

Criteria for Habitat Suitability

30.    The Recovery Plan concluded that 10,000 square miles of contiguous suitable

wolf habitat is necessary to support a viable permanent isolated gray wolf population.  AR

Doc., p. 459.  72 Fed. Reg. at 6074.

31.    An isolated wolf population is one not periodically refreshed by immigration from

another nearby wolf population.  72 Fed. Reg. at 6072, 6074.

32.    The Recovery Plan concluded that 5,000 square miles of contiguous suitable wolf

habitat is necessary to support a viable permanent wolf population that is replenished by

immigration from another nearby wolf population.  72 Fed. Reg. at 6072.

33.    For habitat to be suitable for wolves, the road density must generally be equal to

or less than 0.9 to 1.1 miles of road per square mile.  72 Fed. Reg. at 6071 (*citing* Thiel, 1985,

pages 404-06; Jensen *et al*., 1986, pages 364-66 ; Mech *et al*., 1988, pages 85-87; Fuller *et al*.,

1992, pages 48-51; and Mladneoff, 1985, page 289).

34.    Forests provide more suitable habitat than open terrain for wolves, as forests

provide better cover for escape and denning.  72 Fed. Reg. at 6074.

35.    For non-forested habitat to be potentially suitable for wolves, the road density

may need to be substantially less than the 0.9 to 1.1 miles per square mile figure applicable to

forested habitat.  72 Fed. Reg. at 6074.

36.    For any habitat to be suitable for wolves, there must also be a sufficient number of

deer or other ungulates to serve as prey for the wolves.  72 Fed. Reg. at 6076.

The Northern Lower Peninsula of Michigan

37.    Analyzing road-density data, Gehring/Potter concludes that there are about 850 square miles of suitable wolf habitat in the Northern Lower Peninsula ("NLP") of Michigan. 72 Fed. Reg. at 6072; A.R. 459.

38.    Gehring/Potter reached that conclusion after determining that areas in the NLP with satisfactory road-density are highly fragmented, and excluding from the count fragments of habitat with suitable road-density that were less than 19 square miles in size.  72 Fed. Reg. at 6072; A.R. 459.

39.    Potvin concludes that there are about 3090 square miles of suitable wolf habitat in the NLP; however, Potvin includes small habitat fragments of suitable road-density in that count, even if fragments are less than 19 square miles in size.  72 Fed. Reg. at 6072; A.R. 459.

40.    Despite their differences in methodology, both the Gehring/Potter suitable habitat figure for the NLP and the Potvin suitable habitat figure for the NLP fall below the 5,000 square mile threshold judged necessary by the Recovery Plan for establishing a permanent wolf population that is periodically replenished by another wolf population.  72 Fed. Reg. at 6072.

41.    While Potvin concludes the NLP might support more wolves, Gehring/Potter conclude that the NLP might support a population of only 46 to 90 wolves.  72 Fed. Reg. at 6072.

42.    Gehring/Potter also conclude that "Given current land-use and road patterns, the NLP may never support a significant, large wolf population given the likely reduced dispersal rate from a source population."  72 Fed. Reg. at 6074; A.R. 16823 468B at 16283.

43.    The NLP has no present permanent wolf population, i.e. wolves other that occasional wolves dispersing from elsewhere. 72 Fed. Reg. at 6072.

44.   Wolf reproduction in the NLP has never been documented.  72 Fed. Reg. at 6072.

45.   Several wolves have been seen crossing the Straits of Mackinac from the Upper

Peninsula to the NLP.  72 Fed. Reg. at 6072.  However, follow-up surveys by the Michigan

DNR in the winter of 2005 and 2006 revealed no wolf tracks in the NLP.  72 Fed. Reg. at

6072.

46.   Thus there is no established wolf population in the NLP even though any wolves

there were federally protected there for thirty-four years (1974 through 2007) by the

Endangered Species Act ("ESA").

47.   No other area in the Lower Peninsula of Michigan has any suitable wolf habitat.

72 Fed. Reg. at 6072.

<u>The Turtle Mountains of North Dakota</u>

48.   Based on the road-density criteria, the only area outside Minnesota these three

states and within the WGL DPS that potentially might hold wolves on a frequent or possibly

constant basis is the Turtle Mountain region that straddles the international border in north

central North Dakota in the northwestern corner of the DPS.  72 F.R. at 6074.

49.   The Turtle Mountains area is an island of forest surrounded by a landscape largely

modified for agriculture and grazing.   The surrounding landscape is unsuitable for wolves

because it provides negligible cover for denning and escape.  72 Fed. Reg. at 6074.

50.   The Turtle Mountains habitat is marginal for wolves.  72 Fed. Reg. at 6074.

51.   The Turtle Mountains area contains 579 miles of potentially suitable low-road-

density habitat, 384 of which are in North Dakota, and so within the Western Great Lakes

Distinct Population Segment ("WGL DPS"), and 185 of which are across the border in

Manitoba, Canada, and so outside the WGL DPS.  72 Fed. Reg. at 6074 (*citing* Licht and

Huffman 1996, p. 172).

52.    The 579 square miles of potentially suitable habitat in the Turtle Mountains falls

below both (a) the 5,000 square mile minimum contiguous suitable habitat criterion that the

Recovery Plan sets for a wolf population that is periodically replenished by immigration from a

nearby population, and (b) the 10,000 square mile criterion that the Recovery Plan set for an

isolated population.   72 Fed. Reg. at 6072, 6074.

53.     The Turtle Mountains are isolated, so the higher 10,000 mile minimum applies.

72 Fed. Reg. at 6074.

54.    There is no evidence in the record that wolves have reproduced in the Turtle

Mountains.

55.    There is no evidence in the record that wolves have been seen in the Turtle

Mountains.

56.    Thus there is no established wolf population in the Turtle Mounts even though

any wolves there were protected there for thirty-four years (1974 through 2007) by the ESA.

Other Areas within the WGL DPS

57.    In addition to evaluating the NLP of Michigan and the Turtle Mountains of North

Dakota, the FWS concluded that the remaining portions of  the WGL DPS outside the Core

Recovery Areas (Minnesota, Wisconsin, and the Upper Peninsula of Michigan) do not contain

sufficient contiguous suitable wolf habitat to support a permanent wolf population.  72 Fed.

Reg. at 6074.

Significant Portion of Range Conclusion

58.    Accordingly, no areas within the WGL DPS but outside the Core Recovery Areas constitute a significant portion of the range of the wolves in the WGL DPS.  72 Fed. Reg. at 6073-74.

### Wolves are a Resilient Species

59.    Numerous scientific studies analyzed by the FWS for the purpose of deciding on the listing status, demonstrated that wolf populations can continue to thrive despite significant population reduction.  AR Doc. 215, p. 5893 (listing studies finding wolves rebound from 20-30% and even 50% annual population losses).

### Wolf Management Plans

60.    Minnesota, Michigan and Wisconsin each developed and adopted wolf management plans.  Minnesota's plan was completed in early 2001, Wisconsin's was adopted in 1999 and updated in 2006, and Michigan's was completed and approved in 1997.  72 Fed. Reg. 6084-85.

61.    Each of the plans includes a minimum population level, (1600 in Minnesota, 350 in Wisconsin and 200 in Michigan) which if reached, triggers the pertinent state's enhanced wolf protections.  *Id*. at 6083.  These minimum population standards each exceed the minimum population numbers established by the Eastern Timber Wolf Recovery Plan for the species' recovery and removal from the "endangered" and "threatened" species lists.  (1550 for Minnesota, 100 for Wisconsin and Michigan collectively) AR Doc. 468A, p. 13770, 13773.  Consequently, even if one or more of the state's wolf populations did, for some reason, drop to these minimum levels, the population reduction(s) would not qualify the WGL DPS for "endangered" or "threatened" listing status.

62.    Michigan's wolf management plan has been in effect for over 10 years and remains in effect while the state develops a revised plan.  *Id*. at 6068.  In delisting wolves, the FWS relied on the adequacy of the existing plan, and not on the forthcoming revised version. In the Final Rule to delist the WGL DPS, the FWS explained that "the current Michigan plan . . . will provide adequate regulatory mechanisms for Michigan wolves.  72 Fed. Reg. at 6094.

63.    The FWS observed that "[n]ecessary wolf management actions detailed in the Michigan Plan include public education and outreach activities, annual wolf population and health monitoring, research, depredation control, and habitat management."  72 Fed. Reg. at 6092.

64.    In making its decision to delist the wolves of the WGL DPS, the FWS also took into consideration state efforts for the protection of wolves in addition to the mandatory regulatory mechanisms, such as its *Guidelines for Management and Lethal Control of Wolves Following Confirmed Depredation Events*.  *Id*. at 6068.

65.    Minnesota's wolf management plan's goal is "to ensure the long-term survival of wolves in Minnesota while addressing wolf-human conflicts that inevitably result when wolves and people live in the same vicinity", and focuses on population monitoring and management, management of wolf depredation of domestic animals, management of wolf prey, enforcement of laws regulating take of wolves, public education, and increased staffing to accomplish these actions.  *Id*. at 6084.  The plan divides the state into two zones, with wolves in Zone A receiving stronger protection than wolves in Zone B.  Even in Zone B, significant restrictions apply to the take of wolves.  For example, only depredating wolves may be killed and only on lands owned, leased or managed by the owner of a domestic animal attacked or threatened by a wolf on the land or within a one mile radius of that land.  According to Minnesota's Wolf

Management Plan, "[a]lthough these depredation procedures will likely result in a larger number of wolves killed, as compared to previous ESA management, ***they will not result in the elimination of wolves from Zone B***."  AR Doc. 215 at 5276 (*emphasis added*).  *See* A.R. Doc. 215, p. 5893 (wolves are resilient and a healthy population that can rebound from substantial losses.

      66.   The FWS properly assumed that Minnesota's wolf management efforts would be "funded and implemented largely as written."  72 Fed. Reg. at 6068.  As demonstrated by the Declaration of Daniel Stark, Wolf Management Specialist for the Minnesota Department of Natural Resources, the state's collective financial resources for wolf management, including in-kind depredation control assistance from the Wildlife Services Division of the U.S. Department of Agriculture and state funding from multiple budgets, as well as the 20 new Conservation Officers each tasked, at least in part, with wolf management responsibilities, far exceeds the management expectations identified in the state's wolf management plan. Declaration of Daniel Stark, attached as Exhibit "2" to Defendant-Intervenors' Memorandum in Support of Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment.[1]

      67.   In his Declaration, Daniel Stark discusses the fact that since 1986, the federally funded Wildlife Services branch of the U. S. Department of Agriculture has been the agency that has conducted Minnesota's gray wolf depredation control activities.  Daniel Stark also explains how Wildlife Services has *continued* to provide and fund the State's depredation control activities.  Declaration of Daniel Stark, attached as Exhibit 2 to Defendant-Intervenors'

---

[1]    Defendant-Intervenors requested this document be included in the Administrative Record in their response to Plaintiffs' Motion to Supplement the Administrative Record, as an alternative to denial of Plaintiffs' Motion to Supplement the Administrative Record.

Memorandum in Support of Motion for Summary Judgment and Opposition to Plaintiffs'

Motion for Summary Judgment.

      68.   Although Michigan has Michigan's decision to change its population monitoring

strategies, the new strategies will continue to enable the state to adequately monitor its wolf

population.  As explained by Thomas Drummer, PhD of Michigan Technological University,

who helped design the new monitoring strategy:  "The results of the simulations indicate the

proposed monitoring program based on geographic stratification will produce unbiased, precise

estimates of total wolf abundance."  AR Doc 241, p.  8527.

      69.   According to the Executive Summary of Michigan's Five Year Evaluation Report

of its Gray Wolf Recovery and Management Plan "many objectives of the plan were met

during the first five years of plan implementation."  AR Doc. ~~215~~142~~, p.~~ at 767.  Michigan,

Minnesota and Wisconsin each have plans to monitor and assess the impact of disease on their

wolf populations.  The 1997 Michigan Wolf Recovery and Management Plan states that wolf

health and disease monitoring will receive a high priority for a minimum of five years post

delisting.  *Id.* at 6080.  Wisconsin's post-delisting approach is to test for disease and parasite

loads through periodic necropsy and scat analyses.  In addition, the 2006 update to Wisconsin's

1999 plan recommends that all wolves live-trapped for other purposes should have their health

monitored and reported to the state wildlife health specialists.  *Id.*  Minnesota's disease

monitoring strategies involve DNR personnel who "will collaborate with other investigators

and continue monitoring disease incidence, where necessary, by examination of wolf carcasses

obtained through depredation control programs, and also through blood/tissue physiology work

conducted by DNR and the U.S. Geological Survey."  AR Doc. 215, p. 5285.  In addition,

Minnesota's DNR personnel will engage in the "regular collection of pertinent tissues of live

captured or dead wolves" and periodically assess wolf health "when circumstances indicate that diseases or parasites may be adversely affecting portions of the wolf population."  AR Doc. 215, p. 5273.

<u>The Western Great Lakes Distinct Population Segment</u>

70.     The WGL wolves represent the only U.S. wolf population to reside in the Laurentian Mixed Forest Province or to use any form of eastern coniferous or eastern mixed coniferous-broadleaf forest in the United States.  The recovered Western Great Lakes wolf metapopulation is the only gray wolf population in the conterminous United States east of the Rocky Mountains and currently constitutes about 80 percent of North American gray wolves that occur south of Canada.  72 Fed. Reg. 6051, 6059-6060.

71.     The boundaries of the WGL-DPS encompass Minnesota, Wisconsin, Michigan, small segments of Ohio and Indiana, approximately 1/4 of Illinois, 2/3 of Iowa and less than half of the Dakotas.  72 Fed. Reg. at 6052.

72.     The gray wolf population of the Western Great Lakes has long and consistently been dealt with as distinct from other wolf populations of the conterminous United States.  On March 11, 1967, the FWS listed as "threatened" the "timber wolf – canis lupus lycaon"[2] under the Endangered Species Preservation Act of October 15, 1966 (80 Stat. 926; 16 U.S.C. 668aa(c)), 32 Fed. Reg. 4001, (March 11, 1967).  Then on January 4, 1974, the FWS listed as "endangered" both the Eastern Timber wolf (canis lupus lycaon) and the Northern Rocky Mountain wolf (canis lupus irremotus).  39 Fed. Reg. 1175, (January 4, 1974).  In 1978, the FWS converted these two individual subspecies' listings into a single listing, for the sake of "convenience,"

---

[2]     Canis lupus lycaon is the scientific name for the Eastern Timber Wolf that resides in the WGL-DPS.

explaining that "[i]n any case, the Service wishes to recognize that the entire species

Canis lupus is Endangered or Threatened to the south of Canada, and considers that this

matter can be handled most conveniently by listing only the species name."  43 Fed.

Reg. 9607 (March 9, 1978).

73.    Despite the joint listing, the FWS continued to deal with the Eastern

Timber wolf as an entity separate and distinct from other U.S. populations of wolves.

In 1978, the FWS published the Eastern Timber Wolf Recovery Plan, which was

revised in 1992.  AR Doc. 468A, p. 13770.  The Eastern Timber Wolf Recovery Plan

was separate and distinct from the recovery plan developed and published for the

Northern Rocky Mountain population of wolves.  68 Fed. Reg. 15804, 15810 (April 1,

2003).  The recovery goals of the Eastern Timber Wolf Recovery Plan established

objective recovery different from the recovery goals identified by the Northern Rocky

Mountain Recovery Plan.  Each wolf population achieved their recovery objectives

independently of the other.

74.    To delineate the boundary of the WGL DPS, the FWS "considered the

current distribution of wolves in the Midwest and the characteristic movements of those

wolves and of gray wolves elsewhere" and "examined the available scientific data on

long-distance movements, including long-distance movements followed by return

movements to the vicinity of the natal pack"  72 Fed. Reg. at 6060.  The FWS

"concluded that wolf behavior and the nature of wolf populations require that we

include within the area of the DPS some subset of known long-distance movement

locations."  *Id*.  The FWS determined that "wolf biology and common sense argue

against the inclusion within the DPS boundary of all known or potential long-distance

movements. . . ."  *Id*.  The FWS drew the boundaries of the DPS "to include the core

recovered wolf population plus a wolf movement zone around the core wolf

populations."  *Id*.  The DPS boundaries were "not intended to include all areas to which

wolves have moved from the Great Lakes population" but instead to "include[] the area

currently occupied by wolf packs in Minnesota, Wisconsin, and Michigan; the nearby

areas in these States, including the Northern Lower Peninsula of Michigan, in which

wolf packs may become established in the foreseeable future; and a surrounding area

into which Minnesota, Wisconsin, and Michigan wolves occasionally move but where

persistent packs are not expected to be established because suitable habitat is rare and

exists only as small patches."  *Id*.  The FWS designated boundaries so that "[t]he area

surrounding the core wolf populations includes the locations of most known dispersers

from the core populations, especially the shorter and medium-distance movements from

which wolves are most likely to return to the core areas and contribute to the recovered

wolf population."  *Id*.

    75.   The FWS has developed and published a post-delisting monitoring plan

for the WGL DPS. 72 Fed. Reg. 30819 (June 4, 2007).  The Federal Register Notice

announcing the plan states that it is already being implemented.  *Id*. at 30820.

Corrected Per Errata: April 7, 2008

Dated:  January 18, 2007                        Respectfully submitted,


s/ James H. Lister                              s/ Anna M. Seidman
William P. Horn (D.C. Bar No. 375666)           Anna M. Seidman (D.C. Bar No. 417091)
James H. Lister (D.C. Bar. No. 447878)          Douglas S. Burdin (D.C. Bar No. 434107)
Birch Horton, Bittner & Cherot                  Safari Club International
1155 Connecticut Avenue N.W.,                   501 2nd Street NE
Suite 1200                                      Washington, D.C.  20002
Washington, D.C.  20036                         (202) 543-8733
(202) 659-5800                                  Fax:  (202) 543-1205
Fax:  (202)659-1027                             aseidman@sci-dc.org
whorn@dc.bhb.com                                dburdin@sci-dc.org
jlister@dc.bhb.com

*Counsel for U.S. Sportsmen's Alliance*         *Counsel for Safari Club International,  Safari Club*
*Foundation, Wisconsin Bear Hunters'*           *International Foundation, and National Rifle*
*Association, Scott Meyer and Robert*           *Association*
*Stafsholt*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, HELP OUR WOLVES LIVE, ANIMAL PROTECTION INSTITUTE, and FRIENDS OF ANIMALS AND THEIR ENVIRONMENT, <br><br>        Plaintiffs, <br><br>    vs. <br><br> DIRK KEMPTHORNE, <br>Secretary of the Interior, <br>U.S. DEPARTMENT OF THE INTERIOR, and <br>U.S. FISH AND WILDLIFE SERVICE, <br><br>        Defendants, <br><br> and <br><br> SAFARI CLUB INTERNATIONAL, SAFARI CLUB INTERNATIONAL FOUNDATION, and <br>NATIONAL RIFLE ASSOCIATION, <br><br>        Defendant-Intervenors, <br><br> and <br><br> U.S. SPORTSMENS' ALLIANCE FOUNDATION, WISCONSIN BEAR HUNTERS' ASSOCIATION, SCOTT MEYER, and ROBERT STAFSHOLT, <br><br>        Defendant-Intervenors. | Civil Action No. 1:07-cv-00677(PLF) |

**DEFENDANT-INTERVENORS' RESPONSE TO**
**PLAINTIFFS' RULE 56.1 STATEMENT OF MATERIAL**
**FACTS NOT IN GENUINE DISPUTE**

    Defendant-Intervenors U.S. Sportsmen's Alliance Foundation, Wisconsin Bear Hunting

Association, Scott Meyer and Rob Stafholt and Defendant-Intervenors Safari Club International,

Safari Club International Foundation, and National Rifle Association (collectively, "Defendant-Intervenors") respectfully submit this Response to Plaintiffs' Statement of Material Facts not in dispute ("Plaintiffs' Rule 56.1 Statement") (Docket 27-3).[1]

1.      Admitted in part and denied in part.  It is admitted that the gray wolf is the largest member of the canine family.  Defendant-Intervenors ("Defendant-Intervenors") also admit that wolves prey primarily on wild ungulates such as deer, elk, moose and bison, as well as smaller mammals like beavers and rabbits.  Defendant-Intervenors deny the accuracy of Statement 1 in that it is an incomplete depiction of the materials referenced by Plaintiffs.  More specifically, Plaintiffs fail to explain that wolves do not simply prey on wild ungulates, but "most often kill very young ungulates."  AR. Doc. 215, p. 5264.  In addition, Defendant-Intervenors note that wolves do not restrict their killing of ungulates for the purposes of obtaining food.  "Under unusual circumstances, such as when there is extremely deep snow late in the winter, wolves may kill many more ungulates than they can eat."  AR. Doc. 215, p. 5265.  It is also necessary to recognize that in the Western Great Lakes Distinct Population Segment ("WGL-DPS"), during the last 25 years, wolves have not only preyed upon wild animals but have also killed domestic animals including horses, cattle, sheep, goats, llamas, pigs, geese, ducks, turkeys, chickens, guinea fowl, pheasants, dogs, cats and captive deer.  71 Fed. Reg. 15266-67.

Defendant-Intervenors deny that wolves can live "almost anywhere."  Wolves generally require areas with a road-density of 0.9 to 1.1 miles of road per square mile or less to live.  72 Fed. Reg at 6071 (citing multiple studies: published and major unpublished literature relied upon by FWS are in the A.R. starting at A.R. 12836).  Forested areas are best, because they produce cover for denning and nesting.  72 Fed. Reg. at 6074.  Less than 0.9 to 1.1 miles per square mile

---

[1]      Any "admit" responses are solely for purposes of the pending Summary Judgment Motions with respect to which this Response is filed.

may be necessary for wolves to live in non-forested areas. *Id.* Under the Wolf Recovery Plan, 51000 square miles of contiguous suitable habitat is reconsidered necessary to support a permanent wolf population that is replenished by another nearby population, and 10,000 square miles is necessary if there is no nearly supporting wolf population. 72 Fed. Reg. at 6072.

Defendant-Intervenors deny that regulated take by humans in reasonable amounts threaten wolf populations. In fact, wolves can most certainly survive in the presence of significant take by man. AR- Doc. 215, p. 5893 (it has been demonstrated that annual mortality of 28 percent (Fuller 1989, Keith 1983, Peterson et al. 1984) to 50 percent (Mech. 1970, 64, Ballard and Stephenson 1982, Ballard et al. 1987) can be sustained by healthy productive wolf populations.) In addition, if wolf populations become too dense in a particular area and/or allowed to prey too aggressively on the existing ungulate, *etc.* population, wolves themselves will prey on other wolves.

> The most common natural causes of mortality to both pups and adults are starvation and intraspecific strife (i.e. wolves killing other wolves). This happens when food is scarce and when wolves must 'trespass' into adjacent wolves' territories to hunt. Resident wolves defend their territory and food supply and often the result is the death of one or more members of both packs.

AR- Doc. 215, p. 5266.

Defendant-Intervenors admit that wolves historically ranged across much of North America, excluding the Southeast, California and Nevada, and possibly the northeastern states. A great deal of question exists over whether it was the gray wolf or the red wolf that historically inhabited the northeastern United States. 69 Fed. Reg. 43665 (July 21, 2004).

2.    Admitted in part and denied in part. Defendant-Intervenors admit the first sentence of paragraph 2. Defendant-Intervenors deny the second sentence due to the fact that Plaintiffs have referenced it out of context. The statement from the Administrative Record

referenced by Plaintiffs applies only to the average pack territories for wolves of Wisconsin and Minnesota. A.~~R.~~ Doc. 215 at 5125-26.

       3.     Admitted in part and denied in part. Defendant-Intervenors admit the first and second sentences but deny the third sentence, as written. The Administrative Record citation referenced by Plaintiffs indicates that dispersal is "important" to the gray wolf as opposed to "essential." Defendant-Intervenors admit the fourth sentence, but deny the fifth sentence as Defendant-Intervenors can find no Administrative Record reference for this statement. Further dispersal will not result in wolves occupying unsuitable habitat, as wolves cannot occupy unsuitable habitat on a long term basis. *See* 72 Fed. Reg. at 6071-75.

       4.     Admitted in part and denied in part. Defendant-Intervenors admit that wolves can potentially play the role of an "umbrella species" However, Plaintiffs cite the statements relating to the wolf's role in biodiversity out of context, by neglecting to mention that wolves' ability to enhance biodiversity is contingent on the need to prevent carnivore-human conflict. Plaintiffs fail to add that "[f]ailure to effectively reduce or prevent carnivore-human conflict (*e.g.* wolf-human conflict) can lead to an erosion of social tolerance for carnivores and possible the management agencies involved." AR~~.~~ Doc. 468B at ~~p.~~ 16281.

       5.     Admitted in part and denied in part. Defendant-Intervenors admit the first two sentences of Statement 5. Defendant-Intervenors deny the third sentence to the extent that it is made out of context. In the third sentence, Plaintiffs reference the Michigan Gray Wolf Recovery and Management Plan which explains the fact that the majority of individuals polled do not wish to coexist with wolves that pose threats to livestock and pets. AR Doc. 215 at ~~p.~~ 5135.

6.      Denied as immaterial.  Defendant-Intervenors deny the materiality of Statement 6 in that the level of "persecution" described is now prohibited by both federal and state laws. Limited take of wolves by no means constitutes "persecution" and can be sustained by healthy wolf populations.  Please see Defendant-Intervenors' response to Statement 1 for citations.

7.      Denied as immaterial.  Defendant-Intervenors deny the materiality of Statement 7 in that the level of "persecution" described is now prohibited by both federal and state laws. Limited take of wolves, even take of up to 50% percent of wolf populations, by no means constitutes "persecution" and can be sustained by healthy wolf populations.  Please see Defendant-Intervenors' response to Statement 1.

8.      Admitted in part and denied in part.  Defendant-Intervenors admit that individual subspecies of gray wolves were listed under the Endangered Species Preservation Act and that individual subspecies were later listed under the Endangered Species Act.  Defendant-Intervenors admit that the FWS initially listed four subspecies of the gray wolf as "endangered," including the Mexican wolf (canis lupus baileyi), of Mexico and the southwestern United States, the northern Rocky Mountain wolf (c.l. irremotus), of Wyoming, Montana and Idaho; the eastern timber wolf (c.l. lycaon) of northern Great Lakes Region, and the Texas gray wolf (c.l. monstrabilis) formerly of Texas and Mexico that the FWS believed to probably be extinct. Defendant-Intervenors further note that in the March 9, 1978 Federal Register Notice, the FWS specifically identified the gray wolves of Minnesota as "another 'species.'"  43 Fed. Reg. 9610. Finally, Defendant-Intervenors admit that on March 9, 1978, the FWS listed the entire species canis lupus as "endangered," with the exception of the gray wolves of Minnesota that were listed as "threatened." Defendant-Intervenors deny the materiality of the collective listing since the FWS's action was based on convenience."  ("So that this matter can be handled most

5

"conveniently" by listing only the species name.")  Defendant-Intervenors deny any remaining

components of this statement as inaccurate paraphrases of the Administrative Record references.

In addition, Defendant-Intervenors wish to add that, since the March 9, 1978 Federal Register

listing notice, the FWS has obtained significant information indicating that it was the red wolf,

and not the gray wolf that inhabited the northeastern part of the United States, which would

substantially diminish what the FWS, in 1978, believed to be the wolves' original range.  69 Fed.

Reg. 43665 (July 21, 2004).

    9.    Admitted in part and denied in part.  Defendant-Intervenors deny the first

sentence of Statement 9 as inaccurate.  Instead Defendant-Intervenors wish the Court to

understand that in the 1978 listing decision, the FWS stated that "as delineated by recent

systematic sources, the original range of the subspecies C.l. lycaon included most of the region

from Georgia to Maine, and between the Atlantic and Great Plains."  43 Fed. Reg. 9608.

Defendant-Intervenors further admit that the FWS, in the 1978 listing decision explained that C.l.

lycaon remained in the upper Great Lakes region, including a group on Isle Royale and possibly

a few in northern Michigan and Wisconsin.  The FWS went on to describe a "major population

of the gray wolf" in northern Minnesota that had "not itself undergone a significant decline since

about 1900."  43 Fed. Reg. 9610.  The FWS further noted that during the last decade, the

Minnesota population "appears to have [experienced] a numerical increase in some areas, and an

overall range increase."  *Id.*  Defendant-Intervenors admit the second sentence of Statement 9.

Defendant-Intervenors deny the third sentence of Statement 9 as inaccurate, and instead admit

that the FWS noted that there were still some places in the lower 48 States such as Washington

and North Dakota, where wolves may have occurred and where they were not under Federal

protection.  43 Fed. Reg. 9611.  Finally, Defendant-Intervenors admit the fourth sentence of this

statement.  In addition, Defendant-Intervenors wish to add that, since the March 9, 1978 Federal

Register listing notice, the FWS has obtained significant information indicating that it was the

red wolf, and not the gray wolf that inhabited the northeastern part of the United States, which

would substantially diminish what the FWS, in 1978, believed to be the wolves original range.

69 Fed. Reg. 43665 (July 21, 2004).

      10.     Admitted in part and denied in part. The first sentence of statement 10 is admitted.

The second sentence is denied as incomplete.  Although Defendant-Intervenors admit that

between 1979 and 1998 the wolf range in Minnesota was estimated to have more than doubled, it

is also important to note that between 1998 and 2004 the range in Minnesota was found to have

stabilized.  71 Fed. Reg. at 15270.  Defendant-Intervenors admit sentence three of Statement 10.

Sentence four is denied as incorrect. Defendant-Intervenors can find no reference in the

Administrative Records document cited by Plaintiff for Statement 10 that includes the

information found in the fourth sentence.  Defendant-Intervenors admit that a pair of wolves was

verified in Michigan in 1989 and produced pups in 1991.  Defendant-Intervenors deny sentence

five of the statement as vague. Minnesota's wolf population was estimated to be between 2301

and 3708, in 2004, greater than Wisconsin and Michigan.  *Id.* at 15269.  However, the Michigan

and Wisconsin population were estimated at 405 and 425 respectively, in 2005 which would

constitute over 20 percent of the GLDPS.  *Id.*  Additionally, the Wisconsin and Michigan

population were found to be increasing rapidly while the Minnesota population has stabilized or

slowly increased.  *Id.* at 15270.

      11.     Defendant-Intervenors admit the first and second sentences of Statement 11, but

deny the third sentence as inaccurate, noting that the wolves reintroduced to the Northern Rocky

Mountain area are managed as a "nonessential" experimental population.  Finally, Defendant-

Intervenors deny the fourth sentence as vague, but admit that the wolves of the Western Great

Lakes Distinct Population Segment and the Northern Rocky Mountain Distinct Population

Segment are large, recovered species of gray wolves.

       12.      Defendant-Intervenors deny this statement as immaterial.  It constitutes a

discussion about the Northern Rocky Mountain Distinct Population Segment of wolves that, at

this time remain "endangered" and are not the subject of the delisting that Plaintiffs have

challenged in this litigation.  Defendant-Intervenors wish to note however, that Plaintiffs'

Statement 12 mentions only select portions of the Administrative Record that Plaintiffs reference

for this Statement and neglects to mention the fact that wolves may be having a detrimental if not

irreversible impact on the elk population upon which wolves are dependent for survival.

Plaintiffs fail to mention that "the elk population which had swollen to 20,000 by the 1990's is

now less than 10,000."  AR Doc. 228 at 8120.  This phenomenon may be occurring, at least in

part, because of the fact that, in summer, wolves feed on newborn ungulates.  AR ~~doc~~Doc. 215 at

5733.  If wolf populations continue to prey on ungulate populations, the wolves may decimate

the very animals they need to survive.  Defendant-Intervenors wish to point out that not all

species benefit from the presence of wolves.  Songbirds in the Northern Rockies may actually

suffer from the presence of wolves.

      With fewer coyotes, their prey – voles, mice and other rodents – have exploded in
      number.  That has benefitted red fox and raptors.  But red fox prey on songbirds
      as well, and more foxes could mean a great toll on birds."

AR Doc. 228, p. 8122.  Defendant-Intervenors also wish to note that not all biologists agree that

wolves have a beneficial impact on the broader environment.

      Some researchers, however, are agnostic about the effects of the wolf.  Crabtree,
      for example, says that yes, willows are rebounding and imaging data show the
      regrowth dramatically.  But a strong correlation between the nature of wolves and

the new growth is far from demonstrated. 'Claiming wolves are responsible verges on bad science' he states. 'The ecosystem in Yellowstone is a multicausal interactive system, and there's never a single cause. Even a predominant cause is rare. At the same time the wolf numbers were coming back, there was flooding along the river, and the climate is a lot warmer. Wolves probably have a role, but it is confounded by those factors. It will take 20 years or more before we know definitely. Duncan Patten is a research ecologist who served on a National Academy of Sciences study of Yellowstone published in 2002. Yellowstone has not had a hard winter since wolves reached high levels, he observes, and elk may not have needed to resort to trees for food. "When winters are hard, elk take a lot of chances to put something in their belly. Give me two hard winters in a row and I'll buy the argument."

AR -Doc. 228, p. 8122-23.

13.     Defendant-Intervenors deny this statement as immaterial. The delisting rule that Plaintiffs have challenged in this litigation focuses on the Western Great Lakes Distinct Population Segment of wolves. The status of wolves in most of the "range" that Plaintiffs discussed in Statement 13 remains "endangered."

14.     Defendant-Intervenors deny this statement as immaterial. The delisting rule that Plaintiffs have challenged in this litigation focuses on the Western Great Lakes Distinct Population Segment of wolves. The status of wolves outside the boundaries of the WGL-DPS is immaterial to Plaintiffs' challenge. Currently, wolves in the Northeast, more than half of North Dakota, the Pacific Northwest and the entire west, including Oregon, Utah, and Colorado, continue to be listed as "endangered."   In addition, the FWS has obtained significant information indicating that it was the red wolf, and not the gray wolf that inhabited the northeastern part of the United States, which could make it inappropriate for the FWS to attempt to reintroduce gray wolves to that area. 69 Fed. Reg. 43665 (July 21, 2004). Finally, FWS found that unoccupied potential habitat in North Dakota (the Turtle Mountains) and the Northern Lower Peninsula of Michigan is too small, fragmented, and marginal to support a viable wolf population. 72 Fed. Reg. at 6072-74.

15.     Defendant-Intervenors deny this statement as immaterial.  The population status of wolves in the 1970's and 1980's is not the same as it is at present and consequently any court's reaction to wolf related decisions 20 and 30 years ago has no bearing on the current delisting of wolves.

16.     Admitted (except that the Downlisting Rule did not downlist wolves in Minnesota from endangered to threatened status because wolves in Minnesota had long been listed as threatened rather than endangered).

17.     Admitted (except that the Downlisting Rule did not downlist wolves in Minnesota from endangered to threatened status because wolves in Minnesota had long been listed as threatened rather than endangered).

18.     Admitted in part and denied in part.  Defendant-Intervenors deny the first sentence of Statement 18 as inaccurate because, on April 1, 2003, the FWS announced its intention to "conduct rulemaking" "to propose to delist" wolves.  68 Fed. Reg. 15876. Defendant-Intervenors admit the second sentence of Statement 18.

19.     Admitted.

20.     Admitted in part and denied in part.  Defendant-Intervenors admit the first through fourth sentences of this statement, but deny the fifth sentence as incomplete.  Defendant-Intervenors can admit the fifth sentence if it is supplemented to state that the FWS and Defendant-Intervenors Safari Club International *et al*. appealed the ruling to the Court of Appeals for the D.C. Circuit.  Once the WGL-DPS wolves were delisting, the FWS and SCI *et al.* moved to vacate the opinion as moot.  The motion is currently pending before the Court of Appeals for the District of Columbia Circuit.

21.     Admitted in part and denied in part.  With regard to the first sentence of Statement 21, Defendant-Intervenors deny that the FWS began an effort to delist gray wolf populations in the WGL-DPS and Northern Rocky Mountain DPS on February 1, 2005.  On that date, there was simply an e-mail exchange that discussed how the FWS should respond to the Oregon court's ruling on wolf reclassification.  AR Doc. 4 at 43.  Defendant-Intervenors admit the second sentence of Statement 21.

22.     Denied.  Defendant-Intervenors deny this statement as incomplete.  The Options paper described by Plaintiffs in statement 22 included more than three options.  Other options were described in AR Doc. 3548, p. 160-161 and Option 4 was described on p. 20896.  The Options paper included separate options for Northeast wolves.

23.     Admitted in part and denied in part.  Defendant-Intervenors deny the first sentence of Statement 23, as immaterial since the FWS did not select Option 1 and it is not Option 1 that Plaintiffs are challenging in this litigation.  In addition, Defendant-Intervenors deny the first sentence because it is an inaccurate oversimplification of the FWS's discussion of Option 1.  Plaintiffs neglect to discuss the elements of Option 1 that address the nonessential experimental populations, the potential for delisting because of the fact that wolves did not historically range in the southeastern United States and parts of Nevada and California, or the fact that taxonomic questions exist as to whether the wolves of the northeastern United States were gray wolves or red wolves.  Defendant-Intervenors admit the second sentence of Statement 23.

24.     Admitted.

11

25.     Admitted in part and denied in part.  Defendant-Intervenors admit that Option 3 was similar to Option 2, but note that the in Option 3 the DPSs would use state lines for boundaries.  Defendant-Intervenors admit the second, third and fourth sentences.

26.     Defendant-Intervenors deny the materiality of Statement 26.  The wolves of the northeastern United States are not material in that they remain "endangered" and are not part of the delisting rule that Plaintiffs challenge in this litigation.  In addition, in Statement 26, Plaintiffs inaccurately describe the 1992 Recovery Plan for the Eastern Timber Wolf with respect to wolves in the northeastern United States. The 1992 Recovery Plan did not require the reestablishment of a wolf population in the northeast.  The 1992 Recovery Plan stated:

> Although the 1978 Recovery Plan specifies the need for two viable populations (including the Minnesota population) it did not specify the characteristics of the second population.  In 1981 (letter from Ralph E. Bailey, Eastern Timber Wolf Recovery Team Leader, to Harvey K Nelson, Regional Director, U.S. Fish and Wildlife Service, Twin Cities, Minnesota, dated Sept. 15, 1981; memorandum from Assistant Regional Director (SE) to holders of the Eastern Timber Wolf Recovery Plan, dated October 19, 1981) the Eastern Timber Wolf Recovery Team clarified this.  It recommended adopting either of the latter two approaches listed above by characterizing "viable population" in two different ways: (1) a population of at least 200 wolves established at a distance greater than 200 miles from the Minnesota population (e.g. northern New York or northern Maine) is believed to be large enough to be viable, as well as to have sufficient genetic diversity, to exist indefinitely in total isolation from any other wolf population. (2) A smaller population (greater that (sic) 100 wolves) in Wisconsin/Michigan, closely tied to the Minnesota population will be able to remain viable, and by occasional immigration of Minnesota wolves will retain sufficient genetic diversity to cope with environmental fluctuations.

AR Doc. 215, p. 5902.  Defendant-Intervenors also deny Statement 26 because it ignores the fact that the FWS's efforts have no impact on nonfederal restoration or recovery efforts for wolves in the northeast.  "Although we believe that additional wolf restoration is not necessary within the eastern United States before delisting the EDPS, delisting will not preclude states and tribes from undertaking additional wolf restoration programs."  69 Fed. Reg. 43672.

27.     Denied and immaterial and incomplete.  Defendant-Intervenors deny the

materiality of Statement 27 in that all wolves other than those of the WGL-DPS remain

endangered and are therefore not the subject of delisting rule that Plaintiffs challenge in this

litigation.  Plaintiffs do not have the ability to challenge "possible future" steps since they are not

ripe for review.  Moreover, Defendant-Intervenors deny Statement 27 as incomplete because

Plaintiffs fail to include in the statement a discussion of the other option discussed in AR Docs.

35 and 46, which is to leave the wolves of the remaining states endangered indefinitely.  AR

Doc. 35 at p. 159 and AR Doc. 48 at p. 204.

28.     Denied as immaterial and incomplete.  Defendant-Intervenors deny the materiality

of Statement 28 in that all wolves other than those of the WGL-DPS remain endangered and are

therefore not the subject of delisting rule that Plaintiffs challenge in this litigation.  Plaintiffs do

not have the ability to challenge "possible future" steps since they are not ripe for review.

Defendant-Intervenors also deny the statement as incomplete because it fails to completely and

accurately provide an accounting of the Administrative Record document that Plaintiffs

reference for the statement.  Plaintiffs fail to fully account that the FWS determined that

establishing recovery plans for the remaining states "is contrary to FWS's understanding that the

ESA focuses on long-term viability, rather than requiring the filling of all available habitat with

the taxon." AR Doc. 35 at p. 159.

29.     Admitted in part and denied in part.  It is denied that the FWS decided on Option

2 as early as July 2005.  AR Doc. 66 at 280 merely indicates that Ron Refsnider was asked to

work up a "new approach for a wolf DPS in the Midwest."  Defendant-Intervenors admit the

remainder of Statement 29.

30.     Admitted in part and denied in part.  Defendant-Intervenors deny the first
sentence as inaccurate, but admit that in February 2006, the FWS issued an Advanced Notice of
Proposed Rulemaking, stating its plans to conduct rulemaking.  71 Fed. Reg. 6634.  Defendant-
Intervenors admit the second sentence of Statement 30.  Defendant-Intervenors deny that the
proposed boundaries of the WGL-DPS were "expansive" in that they encompassed Minnesota,
Wisconsin, Michigan, only a tiny piece of Ohio and Indiana, approximately 1/4 of Illinois, 2/3 of
Iowa and less than half of the Dakotas.

31.     Denied as immaterial.  While it may be true that the FWS received hundreds of
comments, the distribution of those in support and opposition is immaterial because the FWS's
decision to delist wolves was not based on a popularity contest, but instead on the best available
science.  While it may also be true that Plaintiffs provided comments on the Proposed Rule, their
comments merely addressed their subjective impression and not the conclusive facts or law
pertaining to the delisting of wolves in the WGL-DPS.

32.     Admitted in part and denied in part.  Defendant-Intervenors admit the first and
second sentences of Statement 32.  Defendant-Intervenors deny the third sentence as inaccurate
since it ignores the five year federal monitoring period required by the ESA for species delisting.

33.     Denied.  Defendant-Intervenors deny Statement 33 as incomplete and inaccurate.
The first sentence of Statement 33 fails to mention that the FWS found that the Great Lakes wolf
population was "significant" because WGL-DPS wolves occupy the unusual or unique
ecological setting of the Laurentin Mixed Forests.  "WGL wolves represent the only use by gray
wolf packs of any form of eastern coniferous or eastern mixed coniferous-broadleaf forest in the
United States."  72 Fed. Reg. 6060.  Defendant-Intervenors also deny the second sentence of
Statement 33 as incomplete because it fails to note that the WGL-DPS is discrete from the

14

Northern Rocky Mountain population because of the unsuitable habitat/inhospitable conditions

between the two populations. 72 Fed. Reg. at 6059.

      34.     Admitted in part and denied in part. Defendant-Intervenors deny the first

sentence of Statement 34 in its characterization of the boundaries of the DPS extending "far"

beyond the wolf's distribution. The boundaries are not set "far" but are appropriately designed

to account for normal wolf dispersal distances. Defendant-Intervenors also deny the second

sentence of Statement 34 that mischaracterizes the boundaries of the WGL-DPS as including

"vast" portions of several states. The WGL-DPS includes Minnesota, Wisconsin, Michigan,

only a tiny piece of Ohio and Indiana, approximately 1/4 of Illinois, 2/3 of Iowa and less than

half of the Dakotas. Defendant-Intervenors also deny the third sentence of Statement 34 as

incomplete. The complete reference states:

> As discussed below, this DPS has been delineated to include the core recovered
> wolf population plus a wolf movement zone around the core wolf populations.
> This geographic delineation is not intended to include all areas to which wolves
> have moved from the Great Lakes population. Rather, it includes the area
> currently occupied by wolf packs I Minnesota, Wisconsin, and Michigan; the
> nearby areas in these States, including the northern Lower Peninsula of Michigan,
> in which wolf packs may become established in the foreseeable future; and a
> surrounding area into which Minnesota, Wisconsin and Michigan wolves
> occasionally move but where persistent packs are not expected to be established
> because suitable habitat is rare and exists only as small patches. The area
> surrounding the core wolf populations includes the locations of most known
> dispersers from the core populations, especially the shorter and medium-distance
> movements from which wolves are most likely to return to the core areas and
> contribute to the recovered wolf population.

72 Fed. Reg. at 6060.

      35.     Denied. Defendant-Intervenors deny the first sentence of Statement 35 as there is

nothing in the document referenced by Plaintiffs for this statement that defines "management of

dispersing wolves" as "killing dispersers." The management strategies for dealing with

dispersing wolves are determined by the individual states. Defendant-Intervenors deny the

15

second sentence of Statement 35 as immaterial. The fact that the FWS may have acknowledged that North and South Dakota would be very angry if wolves dispersing from Minnesota "being fully endangered when they cross the state line even after delisting in MN" does not mean that the FWS failed to make its decision to delist based on the best scientific evidence available. *See* 72 Fed. Reg. 6052-6070 (explaining rationale for DPS).

36.    Denied. Defendant-Intervenors deny the first sentence of Statement 36 as an incomplete representation of the AR documents referenced. In Statement 36, Plaintiffs fail to mention that the FWS relied on the state management plans "because these plan have received the necessary approvals with the state governments." 72 Fed. Reg. at 6068. Defendant-Intervenors also deny the second sentence as incomplete, because Plaintiffs fail to accurately describe the AR Doc upon which they rely for the statement. Plaintiffs fail to mention that the FWS stated that they "believe[d] it is reasonable to assume that the plans [would] be funded and implemented largely as written." *Id.*

37.    Denied as immaterial and inaccurate. Defendant-Intervenors deny Statement 37 as immaterial because whether or not Michigan's plan was in the midst of revision at the time of delisting, Michigan's 1997 wolf recovery plan was in effect at the time of delisting and wolves were classified by the state of Michigan as a state "endangered" species. MI ADC R. 299.1027. Defendant-Intervenors also deny Statement 37 as inaccurate because it fails to relate the fact that the FWS noted that "the current Michigan plan . . . will provide adequate regulatory mechanisms for Michigan wolves. 72 Fed. Reg. at 6094.

38.    Denied as immaterial and inaccurate. Defendant-Intervenors deny Statement 38 as immaterial because whether or the FWS pointed to a series of "guiding principles" at the  time of delisting, Michigan's 1997 wolf recovery plan was in effect at the time of delisting and

wolves were classified by the state of Michigan as a state "endangered" species.  MI ADC R.

299.1027.  Defendant-Intervenors also deny Statement 38 as inaccurate because it fails to relate

the fact that the FWS noted that "the current Michigan plan . . . will provide adequate regulatory

mechanisms for Michigan wolves.  72 Fed. Reg. at 6094.

   39.  Denied as inaccurate.  While Statement 39 accurately identifies the minimum

wolf population targets for Michigan, Minnesota and Wisconsin, there is no indication from the

AR Docs referenced for this statement that any or all of the states would take measures to reduce

their current populations to these minimum target numbers.  To the contrary, for example,

Minnesota's Wolf Management Plan states that:  "wolf populations in Minnesota will be allowed

to continue to expand with a minimum population goal of 1,600" and that "no general public

taking of wolves will be proposed for the first 5 years following federal delisting."  72 Fed Reg.

at 5255.

   40.  Admitted in part and denied in part.  Defendant-Intervenors deny that state

management programs "sharply" increase the circumstances in which wolves can be killed.

Defendant-Intervenors admit that the Minnesota Wolf Management Plan authorizes Zones,

including Zone B.  Defendant-Intervenors deny the veracity of Statement 40 because Plaintiffs

grossly misrepresent the nature of wolf management available in Zone B.  In Zone B, only

depredating wolves may be killed and only on lands owned, leased or managed by the owner of a

domestic animal attacked or threatened by a wolf on the land or within a one mile radius of that

land.  Defendant-Intervenors also deny the accuracy and completeness of Statement 40 because

Plaintiffs fail to make reference to the following statement from the Minnesota Wolf

Management Plan that specifically states: Although these depredation procedures will likely

result in a larger number of wolves killed, as compared to previous ESA management, they will

17

not result in the elimination of wolves from Zone B."  AR Doc. 215 at 5276.  Plaintiffs

misrepresent the description of "predator control areas" by failing to specify that in Zone A,

predator control areas can only be opened for up to 60 days.  *Id.*  Plaintiffs also incorrectly

characterize Minnesota's Wolf Management Plan's approach to wolf harvest, by failing to note

that public harvests will simply be "considered" by the Minnesota DNR not sooner than 5 years

after federal delisting.  *Id.* at 5274.  Defendant-Intervenors admit the final sentence of

Statement 40.

      41.     Denied as immaterial.  Defendant-Intervenors deny Statement 41 because the

presence of wolves in Zone B has never been deemed necessary for the recovery or sustainability

of wolves in the WGL-DPS.  Defendant-Intervenors deny statement 41 as incomplete and

misleading because it fails to offer the following information from the AR documents upon

which it relies:

> The limitation of this broad take authority to Zone B is fully consistent with the
> Federal Recovery Plan's advice that wolves should be restored to the rest of
> Minnesota but not to Zone B (Federal Zone 5) because that area "is not suitable
> for wolves" (USFWS 1992, p. 20). The Federal Recovery Plan envisioned that the
> Minnesota numerical recovery goal would be achieved solely in Zone A (Federal
> Zones 1-4) (USFWS 1992, p. 28), and that has occurred. Wolves outside of Zone
> A are not necessary to the establishment and long-term viability of a self-
> sustaining wolf population in the State, and therefore there is no need to establish
> or maintain a wolf population in Zone B. Therefore, there is no need to maintain
> significant protection for wolves in Zone B in order to maintain a Minnesota wolf
> population that continues to satisfy the Federal recovery goals after Federal
> delisting.

72 Fed. Reg. at 6087.

      42.     Admitted in part and denied in part.  Defendant-Intervenors admit that

Wisconsin's wolf management program includes "proactive control" if the wolf population

exceeds 350 wolves.  Defendant-Intervenors deny that population declines are also nearly certain

under this program.  Instead, these strategies would do little more than slow the growth or

18

stabilize the population numbers.  In making this inaccurate statement, Plaintiffs fail to provide a

complete depiction of the proactive control strategy described in Wisconsin's wolf management

program:

> Proactive control by government trappers would be used by Wisconsin DNR to
> control the wolf population once the management goal of 350 is achieved.  This
> would consist of lethal controls in areas with a history of depredation problems, or
> in areas with a high probability of wolf-human conflicts.  Such control would
> have the effect of slowing or perhaps stabilizing the growth of the wolf
> population.

AR Doc. 215 at 6001.  Plaintiffs also misrepresent the role of public harvests.   The

Wisconsin wolf management plan states that harvests can be considered only if other

control activities do not adequately maintain the population near the 350 goal and only

after all other control activities are first attempted.  Moreover, "[t]he Wisconsin state

legislature would have to approve authority for a controlled public harvest of wolves."

*Id.*

43.     Admitted in part and denied in part.  Defendant-Intervenors admit that prior to

delisting, many of the costs of wolf management were borne by the federal government.

However, many of these costs were also borne by the states.  Although Defendant-Intervenors

admit that since delisting, the states are responsible for wolf management, Defendant-Intervenors

deny the implication that the states have assumed all financial responsibility for this

management.  For example, according to the Declaration of Dan Stark, Wolf Specialist for the

state if Minnesota, the federal government continues to assume much of the financial

responsibility for depredation control.

44.     Admitted in part and denied in part.  Defendant-Intervenors admit the statement

generally, but deny that Plaintiffs accurately referenced the Administrative Record.  Plaintiffs

fail to mention that the FWS stated that they "believe[d] it is reasonable to assume that the plans [would] be funded and implemented largely as written." 72 Fed. Reg. at 6068.

45.     Denied. Please see the Declaration of Minnesota Wolf Specialist Dan Stark.

46.     Admitted in part and denied in part. Defendant-Intervenors deny as immaterial the vague unspecified allegations included in the first sentence of Statement 46 because it offers little information about Michigan's wolf management efforts or funding. Defendant-Intervenors admit that the Executive Summary of the Five Year Evaluation of Michigan's Wolf Management Plan does include the quoted statement, but Defendant-Intervenors deny that there is any evidence of Michigan's failure to manage its wolves in a way that would preclude delisting. Although Defendant-Intervenors admit that Michigan may have written a letter to the FWS for funding assistance, Defendant-Intervenors deny the materiality of the fact, since Plaintiffs offer no evidence of whether or not Michigan received the requested funding. Considering that Minnesota continues to receive federal funding assistance for wolf depredation efforts, it is not unreasonable to assume that Michigan receives similar assistance. See Declaration of Daniel Stark, Minnesota Wolf Management Specialist. Finally, Defendant-Intervenors deny the fourth sentence as misleading and incomplete. While Thomas Drummer of Michigan Technological University may have conjectured that a switch to statistical sampling to estimate the size of the Michigan wolf population may have been cost driven, he also offered a detailed discussion about how the new sampling method would be designed to provide the same level of data as was available through the previous system. AR Doc. 241 at 8527.

47.     Admitted in part and denied in part. Defendant-Intervenors admit that the documents Plaintiffs quote in Statement 47 contain references to the funding of Wisconsin's wolf management strategies. Defendant-Intervenors deny the materiality of Statement 47 in that

Plaintiffs offer no information as to whether Wisconsin received additional federal funding and/or whether funding has had an impact on Wisconsin's ability to carry out its wolf management strategies. Finally, as there is evidence that Minnesota continues to receive federal funding for its wolf depredation efforts, it is reasonable to assume that Wisconsin also continues to receive this federal assistance. Declaration of Dan Stark.

48.     Denied as immaterial and inaccurate. Although unregulated, unmonitored killing may have played a role in the decline of the gray wolf prior to 1978, the delisting of wolves has not and will not result in unregulated or unmonitored killing of the species.   It is denied that human-caused mortality constitutes a serious problem. Numerous scientific studies have shown that wolf populations can continue to thrive despite significant population reduction.

> Despite an annual kill of perhaps 20 to 30 percent of the estimated number of wolves in Minnesota in earlier years, there was no noticeable decline in the statewide population. This should not be surprising because it has been demonstrated that annual mortality of 28 percent (Fuller 1989, Keith 1983, Peterson et al. 1984) to 50 percent (Mech 1970, 64, Ballard and Stephenson 1982, Ballard et al. 1987) can be sustained by healthy productive wolf populations.

A.R. Doc. 215, p. 5893.

49.     Admitted in part and denied in part. Defendant-Intervenors admit that disease is a factor that the FWS was obligated to consider in its determination as to whether the WGL-DPS should be delisted. Defendant-Intervenors also admit that, in the Final Rule to delist the WGL-DPS of wolves, the FWS acknowledged the need for continued monitoring of diseases and parasites. Defendant-Intervenors deny that diseases or parasites constitute a threat that would make it necessary for wolves to be listed as "threatened" or "endangered." According to the FWS, despite the presence of certain diseases and parasites, the number of wolves in the WGL-DPS has continued to grow.

21

Despite these and other diseases and parasites, the overall trend for wolf populations in the WGL DPS continues to be upward. Wolf management plans for Minnesota, Michigan, and Wisconsin include disease monitoring components that we expect will identify future disease and parasite problems in time to allow corrective action to avoid a significant decline in overall population viability. We conclude that diseases and parasites will not prevent the continuation of wolf recovery or the maintenance of viable wolf populations in the DPS. Delisting wolves in the WGL DPS will not significantly change the incidence or impacts of disease and parasites on these wolves. Furthermore, we conclude that diseases and parasites will not be threats sufficient to cause the WGL DPS gray wolves to be in danger of extinction in the foreseeable future in all or a significant portion of the range within the WGL DPS.

71 Fed. Reg. 6081.

50.     Denied as inaccurate, incomplete and immaterial.  Defendant-Intervenors deny Plaintiffs' characterization of Minnesota's monitoring efforts as inaccurate and incomplete, in that Plaintiffs failed to include a discussion of all the strategies that Minnesota uses to monitor wolves.  The Minnesota Wolf Management Plan states:

Annual changes in wolf distribution and abundance will be monitored by means of currently used indicators such as wolf depredation complaints, autumn scent station surveys, winter furbearer track surveys, and other observations of field personnel from all natural resources agencies.

AR Doc. 215 at 5272.

In addition, the Minnesota Wolf Management Plan states:

Monitoring the health of wolves necessarily includes consideration of the effects of infectious diseases and parasites.  Examples of health monitoring include collection and analysis of biological samples from live-captured wolves, analysis of wolf scats, and necropsies of dead wolves.  Regular collection of pertinent tissues of live-captured or dead wolves will be initiated, and periodic assessments of wolf health will be carried out under authorization of DNR, when circumstances indicate that diseases or parasites may be adversely affecting portions of the wolf population.

AR Doc. 215 at 5273.  Minnesota's Wolf Management Plan further explains that the Minnesota DNR "will collaborate with other investigators and continue monitoring disease incidence, where necessary, by examination of wolf carcasses obtained through depredation control programs, and

22

also through blood/tissue physiology work conducted by DNR and the U.S. Geological Survey. DNR will also keep records of documented and suspected incidence of sarcoptic mange." AR Doc. 215, p. 5285.

Defendant-Intervenors deny as immaterial Plaintiffs' statement as to minimum goals for disease assessment. As noted by the FWS, Minnesota's approach to disease monitoring is appropriate "in light of its much greater abundance of wolves than in the other two states.' 72 Fed. Reg. 6081.

51.     Denied. Defendant-Intervenors deny that there is any evidence that the Michigan DNR will not carry out the monitoring plan called for by its wolf management program. Although it is true that Michigan is in the process of revising their wolf management plan, there is no evidence that the existing plan is not being fully implemented. In fact, in the five year evaluation Report dated September 2004, Michigan acknowledged carrying out many of the objectives of Michigan's Wolf Recovery and Management Plan during its first five years of implementation. AR Doc. 142 at 767. Defendant-Intervenors deny as immaterial Michigan's use of a new monitoring strategy. As explained by Thomas Drummer, PhD of Michigan Technological University, who helped design the new monitoring strategy:

"The results of the simulations indicate the proposed monitoring program based on geographic stratification will produce unbiased, precise estimates of total wolf abundance." A.R. p. 8527.

52.     Denied as immaterial. Plaintiffs' assumptions of insufficient funding for wolf management are baseless and unfounded. As indicated by the Declaration of Daniel Stark, Wolf Management Specialist for Minnesota DNR, Plaintiff falsely represented Minnesota's funding and implementation of their wolf management efforts. Also as indicated by the Declaration of

23

Daniel Stark, federal funding for wolf depredation control continues to be made available to Minnesota post-delisting and presumably continues for Wisconsin and Michigan. Moreover, Plaintiffs offer no evidence to indicate that wolf recovery and management efforts under federally listed status would be better funded than currently under state management.

53.     Denied as inaccurate. In the Final Rule, the FWS explained that they "are developing a [Post Delisting Monitoring] plan for the gray wolves in the WGL DPS with the assistance of the Eastern Gray Wolf Recovery Team." 72 Fed. Reg. 6101. The FWS published a draft version of that plan on June 4, 2007. 72 Fed. Reg. 30819 (June 4, 2007) and have stated that the plan is currently being implemented. *Id*. at 30820.

54.     Admitted.

55.     Denied. The 1992 Eastern Timber Wolf Recovery Plan focused on the eastern timber wolf species. The ESA defines the term "species" to include "subspecies." 16 U.S.C. Section 1532 (16). That species did not lose recognition, but was instead merged with the other species of wolves for the sake of "convenience." 43 Fed. Reg. 9610. March 9, 1978.

56.     Admitted in part and denied in part. Defendant-Intervenors admit that the 1992 Eastern Timber Wolf Recovery Plan does include the statement quoted by Plaintiffs. However, the statement is immaterial in that wolves existing or dispersing into much of the area encompassed by the Eastern Timber Wolf Recovery Plan are still classified as "endangered." Moreover, it is unclear that the historically ranging species for the northeastern United States, which is a significant portion of the area that was the focus of the 1992 Eastern Timber Wolf Recovery Plan, was the gray wolf. *See* Defendant-Intervenors' Response to Statement 27.

57.     Defendant-Intervenors admit the first and second sentences of Statement 57. Defendant-Intervenors deny the third sentence as immaterial.

24

58.    Denied.  As evidenced by the January 10, 1998 Addendum to the Recovery Plan

for the Eastern Timber Wolf, numerical recovery was not aimed solely at preventing complete

extinction:

> If the Recovery Plan criteria are met and the population segment is delisted, it is
> the purview of state and tribal governments to determine, collectively and
> individually, long-term conservation strategies for the Gray Wolf Eastern
> Population.  The Team underscores the importance of cooperative management
> among states and tribes, to provide a coordinated strategy for wolf conservation,
> and a strong commitment to providing the public with timely information and
> comprehensive education regarding wolves and wolf management.  In order to
> avoid even a remote chance of backsliding into a relisting situation, we hereby
> clarify our recommendations and comment further on the adequacy of the original
> minimum numerical target of 100 wolves in Michigan and Wisconsin as well as
> assurance criteria for this second population.

AR Doc. 215, p. 6860 14884.

59.    Denied.  Please see Defendant-Intervenors' response to Statement 53.

60.    Denied as Immaterial.  Plaintiffs have filed suit to challenge the delisting of

wolves in the Western Great Lakes Distinct Population Segment.  Wolves in much of the area

that was the subject of the 1992 Recovery Plan continue to be classified as "endangered."  Please

see Defendant-Intervenors' response to Statement 56.

Corrected Per Errata: April 7, 2008

Dated: January 18, 2007                              Respectfully submitted,

s/ James H. Lister                                   s/Anna M. Seidman
William P. Horn (D.C. Bar No. 375666)                Anna M. Seidman (D.C. Bar No. 417091)
James H. Lister (D.C. Bar. No. 447878)               Douglas S. Burdin (D.C. Bar No. 434107)
Birch Horton, Bittner & Cherot                       Safari Club International
1155 Connecticut Avenue N.W.                          501 2nd Street NE
Suite 1200                                           Washington, D.C.  20002
Washington, D.C.  20036                              (202) 543-8733
(202) 659-5800                                       Fax:  (202) 543-1205
Fax:  (202)659-1027                                  aseidman@sci-dc.org
whorn@dc.bhb.com                                     dburdin@sci-dc.org
jlister@dc.bhb.com

*Counsel for U.S. Sportsmen's Alliance*              *Counsel for Safari Club International, Safari Club*
*Foundation, Wisconsin Bear Hunters'*                *International Foundation, and National Rifle*
*Association, Scott Meyer and Robert*                *Association*
*Stafsholt*

26

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| HUMANE SOCIETY OF THE UNITED STATES, HELP OUR WOLVES LIVE, ANIMAL PROTECTION INSTITUTE, AND FRIENDS OF ANIMALS AND THEIR ENVIRONMENT, | ) ) ) ) ) ) | |
| | | Case No. 1:07-cv00677-PLF |
| Plaintiffs, | ) ) | |
| vs. | ) ) ) | |
| DIRK KEMPTHORNE, Secretary of the Interior, U.S. DEPARTMENT OF THE INTERIOR, AND U.S. FISH AND WILDLIFE SERVICE | ) ) ) ) | |
| Defendants, | ) ) | |
| SAFARI CLUB INTERNATIONAL, SAFARI CLUB INTERNATIONAL FOUNDATION, AND NATIONAL RIFLE ASSOCIATION, | ) ) ) ) ) | |
| Defendant-Intervenors, | ) ) | |
| and | ) ) | |
| U.S. SPORTSMEN'S ALLIANCE FOUNDATION, WISCONSIN BEAR HUNTING ASSOCIATION, SCOTT MEYER, AND ROB STAFHOLT, | ) ) ) ) ) | |
| Defendant-Intervenors. | ) | |

## LIST OF EXHIBITS

**EXHIBIT 1**      **Corrected Defendant-Intervenors' Consolidated Memorandum in Support of Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment**

**EXHIBIT 2**      **Corrected Defendant-Intervenors' Reply to Plaintiffs' Opposition to Defendant-Intervenors' Motion for Summary Judgment**

**EXHIBIT 3**      **Corrected Defendant-Intervenors' Statement of Uncontroverted Material Facts in Support of Motion for Summary Judgment**

**EXHIBIT 4**      **Corrected Defendant-Intervenors' Response to Plaintiffs' Rule 56.1 Statement of Material Facts Not in Genuine Dispute**

**EXHIBIT 5**        **Redline Version of Exhibit 1**

**EXHIBIT 6**        **Redline Version of Exhibit 2**

**EXHIBIT 7**        **Redline Version of Exhibit 3**

**EXHIBIT 8**        **Redline Version of Exhibit 4**