UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                                )
THE HUMANE SOCIETY OF THE          )
UNITED STATES, *et al.*,                             )
                                                                )
            Plaintiffs,                                      )
                                                                )
    v.                                                          )          Civil Action No. 07-0677 (PLF)
                                                                )
DIRK KEMPTHORNE, Secretary,           )
United States Department of the Interior, *et al.*,   )
                                                                )
            Defendants.                                   )
_____)


OPINION

      The Endangered Species Act of 1973 affords protection to species that are listed

as "endangered" or "threatened."[1]  In 1978, the gray wolf (*Canis lupus*) was listed as threatened

in Minnesota and endangered throughout the rest of the conterminous United States.  On

February 8, 2007, the United States Fish and Wildlife Service ("FWS"), an agency within the

Department of the Interior, promulgated a final rule revising the wolf's listing status.  See 72

Fed. Reg. 6052 (Feb. 8, 2007) (the "Final Rule").  The Final Rule did not affect the listing status

of the gray wolf everywhere.  Rather, it designated a cluster of gray wolves in the western Great

Lakes region as a "distinct population segment," or DPS.  It then removed the wolves within the

western Great Lakes DPS from the endangered species list.  See id., 72 Fed. Reg. at 6066.  The

_____

[1]     A designation of "endangered" triggers a broad scope of protections, including a
prohibition against "taking" individual organisms.  See 16 U.S.C. § 1538(a)(1)(B).  (The term
"take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to
attempt to engage in any such conduct." 16 U.S.C. § 1532(19).)  A designation of "threatened"
requires the Secretary to "issue such regulations as he deems necessary and advisable to provide
for the conservation of such species." 16 U.S.C. § 1533(d).

Final Rule did not change the listing status of gray wolves outside the boundaries of the western Great Lakes DPS.[2]

Soon thereafter, plaintiffs The Humane Society of the United States, Help Our Wolves Live, Animal Protection Institute, and Friends of Animals and Their Environment (collectively, "plaintiffs") brought this suit.  They challenge the Final Rule under the Endangered Species Act of 1973, 16 U.S.C. §§ 1531 *et seq.* ("ESA" or "the Act"), and the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*, claiming that FWS violated the ESA and acted arbitrarily and capriciously by simultaneously designating and "delisting" the western Great Lakes DPS.[3] On May 30, 2007, the Court permitted two groups to intervene in this matter: (1) the U.S. Sportsmen's Alliance Foundation, the Wisconsin Bear Hunters Association, Scott Meyer and

---

[2]    On the same day that FWS promulgated the Final Rule at issue here, it also proposed a rule that would designate and delist a DPS of gray wolves in the northern Rocky Mountains.  See Proposed Rule Designating the Northern Rocky Mountain Population of Gray Wolf as a Distinct Population Segment and Removing this Distinct Population Segment from the Federal List of Endangered and Threatened Wildlife, 72 Fed. Reg. 6106 (Feb. 8, 2007).  The northern Rocky Mountain gray wolves are the only other significant cluster of gray wolves in the conterminous United States.  That proposal was ultimately finalized, but a federal district court in Montana preliminarily enjoined FWS from removing the northern Rocky Mountain wolves from the endangered species list pending the final disposition of a challenge to the rule.  See Defenders of Wildlife v. Hall, Civil Action No. 08-56, 2008 WL 2780917 (D. Mont. July 18, 2008).

[3]    The papers submitted in connection with this matter include: Plaintiffs' Motion for Summary Judgment ("Pls.' Mot."); Defendants' Cross-Motion for Summary Judgment ("Defs.' Mot."); Defendant-Intervenors' Motion for Summary Judgment ("Ints.' Mot."); Plaintiffs' Memorandum in Opposition to Defendants' Cross-Motions for Summary Judgment and Reply Memorandum in Support of Plaintiffs' Motion for Summary Judgment ("Pls.' Opp."); Reply in Support of Federal Defendants' Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment ("Defs.' Opp."); and Defendant-Intervenors' Reply to Plaintiffs' Opposition to Defendant-Intervenors' Motion for Summary Judgment.  In addition, amicus curiae briefs have been filed by: (1) the Center for Biological Diversity, (2) a group composed of the National Wildlife Federation and several of its affiliate organizations, (3) the Pacific Legal Foundation and the Center for the Defense of Free Enterprise, and (4) a group composed of various states and their natural resources departments.

Robert Stafsholt, and (2) Safari Club International, Safari Club International Foundation and the

National Rifle Association.  These two groups (collectively, "defendant-intervenors") have

jointly submitted briefs in support of FWS' position.

Upon careful consideration of the parties' papers, the oral arguments presented by

counsel at a hearing on August 4, 2008, and the entire record in this case, the Court concludes

that FWS failed to acknowledge and address crucial statutory ambiguities in the course of

promulgating the Final Rule.  The Court therefore vacates the Final Rule and remands to the

agency for further proceedings consistent with this Opinion.[4]

## I.  THE GRAY WOLF

Gray wolves are the largest wild members of the *Canidae*, or dog family.  See

Proposed Rule Designating the Western Great Lakes Population of Gray Wolves as a Distinct

Population Segment; Removing the Western Great Lakes Distinct Population Segment of the

Gray Wolf from the List of Endangered and Threatened Wildlife, 71 Fed. Reg. 15266 (March 27,

2006).  Gray wolves are "frequently a grizzled gray, but . . . can vary from pure white to coal

black."  Id., 71 Fed. Reg. at 15266.  They prey primarily on medium and large mammals,

including white tailed deer and elk.  Id., 71 Fed. Reg. at 15266.

---

[4]     Both FWS and defendant-intervenors raise half-hearted challenges to plaintiffs'
standing.  These challenges are premised entirely on plaintiffs' failure to attach to their opening
papers affidavits or declarations in support of their standing.  See Defs.' Mot. at 13 n.3; Ints.'
Mot. at 2-3.  Because (1) plaintiffs have now submitted declarations in support of their standing,
(2) neither FWS nor defendant-intervenors have identified any deficiencies in those declarations,
and (3) these declarations establish all of the elements of constitutional and prudential standing,
the Court concludes that plaintiffs have standing to pursue this action.

"Although the gray wolf once roamed across most of North America, by the 1960s the wolf had been almost completely extirpated from the conterminous United States."  Pls.' Mot. at 1; see also Defs.' Mot. at 8.  In 1978, FWS concluded that "the entire species *Canis lupus* is Endangered or Threatened to the south of Canada."  Reclassification of the Gray Wolf in the United States and Mexico, with Determination of Critical Habitat in Michigan and Minnesota, 43 Fed. Reg. 9607 (Mar. 9, 1978).  FWS thus listed the wolf as endangered throughout the United States and Mexico, with the exception of Minnesota, where the wolf was listed as threatened. "Nevertheless, even today the gray wolf remains extirpated across 95% of its historic range." Pls.' Mot. at 1.  As of this writing, the gray wolf is concentrated in two regions: the western Great Lakes region (which includes Michigan, Minnesota and Wisconsin) and the northern Rocky Mountains region (which includes Idaho, Montana and Wyoming).  Only the status of the western Great Lakes population is at issue in this case.

## II.  LEGAL FRAMEWORK

### A.  *Endangered Species Act*

#### 1.  Overview

The Endangered Species Act is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."  Tennessee Valley Authority v. Hill, 437 U.S. 153, 180 (1978).  Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species or threatened

species." 16 U.S.C. § 1531(b).[5]  "The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost."  Tennessee Valley Authority v. Hill, 437 U.S. at 184.  The Department of the Interior is ultimately responsible for implementation of the ESA with respect to terrestrial species.  It has delegated primary enforcement authority to FWS, an agency within the Department of the Interior.  See Spirit of Sage Council v. Norton, 294 F. Supp. 2d 67, 75 (D.D.C. 2003).

       The ESA's protections are triggered when FWS lists a species as endangered or threatened.  A species is endangered if it is "in danger of extinction throughout all or a significant portion of its range."  16 U.S.C. § 1532(6).  A species is threatened if it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  Id. § 1532(20).  FWS must determine whether a species should be listed as endangered or threatened based upon five statutorily prescribed factors.  See id. § 1533(a)(1)(A)-(E) (hereinafter the "listing factors" or the "Section 4(a)(1) factors"); see also 50 C.F.R. § 424.11(c). The listing factors are: (1) present or threatened destruction, modification, or curtailment of a species' habitat or range; (2) overutilization for commercial, recreational, scientific, or educational purposes; (3) disease or predation; (4) the inadequacy of existing regulatory mechanisms; and (5) other natural or manmade factors affecting a species' continued existence. See 16 U.S.C. § 1533(a)(1)(A)-(E).

---

      [5]    "The terms 'conserve', 'conserving', and 'conservation' mean to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary."  16 U.S.C. § 1532(3).

The ESA further instructs FWS to monitor the status of listed species and, when appropriate, to reclassify or delist species.  See 16 U.S.C. § 1533(c).  The same five factors that determine whether a species is endangered or threatened also determine whether threats to a species have been diminished or removed to the point that reclassification or delisting is appropriate.  See id. § 1533(c)(2); see also 50 C.F.R. § 424.11(d).  FWS is required to make listing determinations "solely on the basis of the best scientific and commercial data available."  16 U.S.C. § 1533(b)(1)(A).

## 2.  Distinct Population Segments

The ESA authorizes FWS to list, delist and reclassify "species."  When the ESA was enacted in 1973, the term "species" was defined to include species, subspecies or "any other group of fish or wildlife of the same species or smaller taxa in common spatial arrangement that interbreed when mature."  Pub. L. 93-205, 87 Stat. 884, 886 (1973).  Congress revised this definition in 1978 so that the definition of "species" now includes species, subspecies and any "*distinct population segment* of any species of vertebrate fish or wildlife which interbreeds when mature."  16 U.S.C. § 1532(16) (emphasis added).

It is common ground for the parties that because the ESA authorizes FWS to list endangered or threatened "species," and because the term "species" is defined to include "distinct population segments," FWS may list a distinct population segment of a vertebrate species even "when the species as a whole is neither threatened nor endangered."  Pls.' Mot. at 5; see also Defenders of Wildlife v. U.S. Dep't of the Interior, 354 F. Supp. 2d 1156, 1169 (D. Or. 2005).  In this way, the "DPS tool" (as the parties frequently refer to it) permits FWS to "protect and

conserve species and the ecosystems upon which they depend before large-scale decline occurs

that would necessitate listing a species or subspecies throughout its entire range." Policy

Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered

Species Act, 61 Fed. Reg. 4722, 4725 (Feb. 7, 1996) (the "DPS Policy").[6] The central issue in

this case is whether FWS may use the DPS tool in a different way as well: to simultaneously

designate and "delist" a distinct population of animals that is thriving even though the broader

species of which it is a part remains endangered (and listed as such) elsewhere.

## B.   Standard of Review

FWS' listing decisions are subject to review under Section 706 of the

Administrative Procedure Act. See, e.g., American Wildlands v. Kempthorne, 530 F.3d 991,

997-98 (D.C. Cir. 2008). The standard of review under the APA "is a highly deferential one. It

presumes agency action to be valid." Ethyl Corp. v. EPA, 541 F.2d 1, 34 (D.C. Cir. 1976).

Nevertheless, a reviewing court must reject agency action if it is "arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is

arbitrary and capricious if the agency:

---

[6]      FWS and the National Marine Fisheries Service adopted the DPS Policy to clarify
the meaning of the term "distinct population segment." See DPS Policy, 61 Fed. Reg. at 4722.
Under the DPS Policy, the agencies consider three factors when deciding whether to recognize a
DPS: (1) the discreteness of the population segment in relation to the remainder of the taxon to
which it belongs; (2) the significance of the population segment to the taxon; and (3) the
conservation status of the population segment in relation to the ESA's standards for listing. See
id., 61 Fed. Reg. at 4725. Plaintiffs do not challenge the validity of the DPS Policy.

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Assoc. v. State Farm Mutual Auto. Insurance Co., 463 U.S. 29, 43 (1983).

As explained in more detail below, plaintiffs' principal argument calls into question FWS' interpretation of the ESA. When the action under review involves an agency's interpretation of a statute that the agency is charged with administering, the court applies the familiar analytical framework set forth in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). "Under step one of Chevron, [the court] ask[s] whether Congress has directly spoken to the precise question at issue, in which case [the court] must give effect to the unambiguously expressed intent of Congress." Secretary of Labor, Mine Safety and Health Admin. v. Nat'l Cement Co. of California, Inc., 494 F.3d 1066, 1073 (D.C. Cir. 2007) (internal quotation marks and citation omitted); see also Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. at 842-43. In determining whether Congress has directly spoken to the precise question at issue, the court should use all the "traditional tools of statutory construction," including textual analysis, structural analysis, and (when appropriate) legislative history. See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. at 843 n.9; see also Bell Atlantic Telephone Co. v. FCC, 131 F.3d 1044, 1047 (D.C. Cir. 1997). If, after employing these tools, the court concludes that "the statute is silent or ambiguous with respect to the specific issue . . . , [the court] move[s] to the second step and defer[s] to the agency's interpretation as long as it is 'based on a permissible construction of the statute.'"

Secretary of Labor, Mine Safety and Health Admin. v. Nat'l Cement Co. of California, Inc., 494 F.3d at 1074 (quoting Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. at 843).

In the D.C. Circuit, Chevron step two review is similar to (but conceptually distinct from) the standard "'arbitrary and capricious' style analysis" described in the first paragraph of this subsection. Continental Airlines Inc. v. DOT, 843 F.2d 1444, 1452 (D.C. Cir. 1988).[7] Thus, a "'reasonable' explanation of how an agency's interpretation serves the statute's objectives is the stuff of which a 'permissible' construction is made . . . ; an explanation that is 'arbitrary, capricious, or manifestly contrary to the statute,' however, is not." Northpoint Technology Ltd. v. FCC, 412 F.3d 145, 151 (D.C. Cir. 2005) (quoting Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. at 844). "'Reasonableness' in this context means . . . the compatibility of the agency's interpretation with the policy goals . . . or objectives of Congress." Continental Airlines Inc. v. DOT, 843 F.2d at 1452. As a result, "the critical point is whether the agency has advanced what the Chevron Court called 'a reasonable explanation for its conclusion that the regulations serve the . . . objectives [in question].'" Continental Airlines Inc. v. DOT, 843 F.2d at 1452; see also I RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 3.6 at 172-73 (4th ed. 2002) (under Chevron step two, courts must determine, among other things, "whether the agency adequately discussed the relationship between the interpretation and pursuit of the goals of the statute").

---

[7]     The Court disagrees with those commentators who regard this distinction as unnecessary and confusing. See, e.g., I RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 3.6 at 174 (4th ed. 2002). In any event, this Court is bound by the law of this circuit.

When an agency wrongly concludes that its interpretation is mandated by the statute at issue, a court will not impose its own interpretation of the statute.  Rather, a court will vacate the agency's action so the agency can "interpret the statutory language anew."  Peter Pan Bus Lines, Inc. v. Federal Motor Carrier Safety Admin., 471 F.3d 1350, 1354 (D.C. Cir. 2006); see also Secretary of Labor, Mine Safety and Health Admin. v. Nat'l Cement Co. of California, Inc., 494 F.3d at 1075 ("Because the Secretary did not recognize the ambiguities inherent in the statutory terms, we do not defer to her plain meaning interpretation but instead remand for her to treat the statutory language as ambiguous.").  Conversely, when an agency acknowledges statutory ambiguity, it must offer a sufficient explanation for its chosen interpretation.  In such cases, "it is incumbent upon the agency not to rest simply on its parsing of the statutory language"; rather, "[i]t must bring its experience and expertise to bear in light of competing interests at stake."  PDK Laboratories, Inc. v. DEA, 362 F.3d 786, 797-98 (D.C. Cir. 2004); see also Peter Pan Bus Lines, Inc. v. Federal Motor Carrier Safety Admin., 471 F.3d at 1354.

## III.  DISCUSSION

According to plaintiffs, FWS' Final Rule should be vacated for any one of four reasons:

> First, by delisting piecemeal parts of the gray wolf's range, FWS has unlawfully circumvented the requirement that a species be protected so long as it remains endangered "throughout . . . a significant portion of its range." . . .  Second, the ESA and the DPS Policy preclude the agency from using DPSs as a delisting tool.  Third, even *if* the agency could lawfully create a DPS for delisting purposes, the boundaries of the western Great Lakes DPS contravene the ESA's directive that species protection be given the highest of priorities.  Finally, even assuming the creation of this DPS were otherwise permissible, . . . the Great Lakes wolf

population remains endangered due to inadequate regulatory
mechanisms, human predation, and disease.

Pls.' Mot. at 19.   Plaintiffs' second argument is a sufficient basis on which to resolve this case.

The Court therefore need not address the others.   See, e.g., PDK Laboratories, Inc. v. DEA, 362

F.3d at 799 (Roberts, J., concurring) (arguing that "if it is not necessary to decide more, it is

necessary not to decide more").[8]

### A.  The Parties' Arguments

Plaintiffs' second argument is, at bottom, an argument that FWS is misconstruing

the ESA and thus disregarding the intent of Congress.  See Pls.' Mot. at 28-29; Pls.' Opp. at

16- 20.  It therefore implicates one of the core purposes of the Chevron doctrine: to ensure that

administrative agencies stay within the bounds of their delegated authority.  See Arent v. Shalala,

70 F.3d 610, 615 (D.C. Cir. 1995).

Specifically, plaintiffs argue that FWS is misconstruing those provisions of the

ESA which, by authorizing the agency to list, delist and reclassify "species," also authorize the

agency to list, delist and reclassify DPSs of vertebrate organisms.  According to plaintiffs,

Congress added the term "distinct population segment" to the ESA's definition of "species" for a

specific and exclusive purpose: to permit FWS to list a struggling sub-population of an organism

that is not endangered or threatened on a broader taxonomic level.  See Pls.' Opp. at 16 (arguing

that "through this definition Congress extended the protections of the ESA to locally-vulnerable

populations of vertebrate fish or wildlife in circumstances where the species as a whole is not

---

[8]       Moreover, because the Court concludes that FWS has misread the statute, it need
not address plaintiffs' related argument that the Final Rule conflicts with the DPS Policy.

endangered or threatened"). Plaintiffs acknowledge that the authority to list DPSs in this manner implies the authority to reclassify or delist DPSs once they have recovered. See Pls.' Opp. at 17. But they argue that Congress did not intend to authorize FWS to simultaneously designate and delist DPSs within broader listings – that is, to "carve out" healthy sub-populations of otherwise endangered or threatened species and remove from those sub-populations the protections of the Act. See Pls.' Mot. at 31 ("A DPS must be designated and listed in the first instance in order for downlisting to later be considered. Nothing in the Act or the DPS Policy authorizes FWS to carve DPSs out of a species-level listing for the sole purpose of delisting that species."); Pls. Opp. at 17 ("[T]he plain language of the statute does not sanction FWS's tactic of carving a DPS out of a special-level listing for the purpose of *reducing* the protections of the Act."). According to plaintiffs, the Final Rule's use of the DPS tool conflicts with the text, structure and legislative history of the ESA, as well as with various judicial interpretations of the statute and the statute's fundamental conservation goals. See, e.g., Pls.' Mot. at 29 ("In the Final Rule, . . . FWS shunted aside the ESA's intent that DPSs be used as a 'proactive measure' [to protect species by listing locally vulnerable populations] and instead wielded this tool to achieve the opposite effect.") (internal quotation marks omitted).

FWS, of course, disagrees that it is misconstruing the ESA. See Defs.' Mot. at 13 (arguing that "the Final Rule is based upon a valid interpretation of the ESA"). According to FWS, by revising the definition of "species" to include "distinct population segments," Congress authorized FWS to designate and list a struggling population of an unlisted species (as contemplated by plaintiffs) *and* to designate and delist a healthy sub-population of a listed species without delisting the species as a whole. See Defs.' Opp. at 3-4. Importantly, FWS

contends that this interpretation of the statute is compelled by the plain meaning of the ESA.  For

example, in response to a comment arguing that "DPSs can only be established for listing species

as threatened or endangered" – an argument largely similar to the argument put forth by plaintiffs

in this case – the Final Rule states:

> DPSs can be utilized for both listing and delisting species.  Section
> 4(a)(1) of the Act directs the Secretary of the Interior to determine
> whether "any species" is endangered or threatened.  Numerous
> sections of the Act refer to adding and removing "species" from the
> list of threatened or endangered plants and animals.  Section 3(15)
> defines "species" to include any subspecies "and any distinct
> population segment of any species of vertebrate fish or wildlife
> . . . .".  Therefore, the Act authorizes us to list, reclassify, and delist
> species, subspecies, and DPSs of vertebrate species.

Final Rule, 72 Fed. Reg. at 6064.  See also id., 72 Fed. Reg. at 6065.  The agency relies on this

plain meaning argument throughout its papers as well.  See, e.g., Defs.' Mot. at 15 (arguing that

"[p]laintiffs' assertion that the Service cannot utilize DPSs to delist a population is belied by the

plain language of the ESA"); Defs.' Opp. at 4.

Ultimately, the Court need not choose between the parties' competing

interpretations to resolve this case.  As explained below, the ESA is ambiguous with respect to

the precise question at issue: whether the ESA permits FWS to use the DPS tool to remove the

protections of the statute from a healthy sub-population of a listed species, even if that sub-

population was neither designated as a DPS nor listed as endangered or threatened beforehand.

As the Final Rule is based on FWS' erroneous conclusion that the ESA is unambiguous on this

point, the Court may neither defer to the agency's construction nor endorse plaintiffs'

construction.  Rather, it must remand the Final Rule to FWS to permit the agency to address the

ESA's ambiguity in light of its expertise, experience and insight into the ESA's objectives.

*B.   The Statute is Ambiguous*

FWS argues that the ESA unambiguously supports the Final Rule because the statute unambiguously permits FWS to delist "species" – a term which, by definition, includes DPSs of vertebrate organisms.  See, e.g., Defs.' Mot. at 15 (arguing that "any action that the ESA or its implementing regulations authorize or require for a 'species' – including delisting – is also authorized and/or required for a 'distinct population segment'").  FWS reasons as follows: First, the ESA defines "species" to include distinct population segments of vertebrate organisms.  See 16 U.S.C. § 1532(16).  Second, the ESA requires FWS to "determine whether any species" – including a DPS – "is an endangered species or a threatened species" on the basis of the five statutorily prescribed factors.  16 U.S.C. § 1533(a)(1).  Third and finally, the ESA and its implementing regulations require FWS to delist a species – again, including a DPS – that is no longer endangered or threatened.  See 16 U.S.C. § 1533(c)(2)(B) (instructing FWS periodically to review all listed species and "determine on the basis of such review whether any such species should – . . . be removed from such list; . . . be changed in status from an endangered species to a threatened species; or . . . be changed in status from a threatened species to an endangered species"); see also 50 C.F.R. § 424.11(d)(2).  Therefore, FWS argues, the ESA and its implementing regulations unambiguously authorize the agency to designate and delist previously unlisted DPSs which are no longer endangered or threatened according to the factors set forth in Section 1533(a)(1).

At the outset, it is important to note that FWS' argument obscures a distinction between a premise that *is* compelled by the plain meaning of the ESA and a conclusion that, for reasons explained below, *is not* compelled by the plain meaning of the ESA.  The indisputable

premise is that FWS may delist DPSs when appropriate.  As plaintiffs acknowledge, see Pls.'
Opp. at 17, the ESA unambiguously defines the term "species" to include DPSs, see 16 U.S.C. §
1532(16), and therefore it clearly authorizes FWS to delist DPSs under some circumstances.  See
16 U.S.C. § 1533(c)(2)(B).  From this general premise FWS reasons to a more specific
interpretive conclusion: that is, that the agency can designate as a DPS a sub-population of a
listed species and then "delist" that sub-population – even if it had not been recognized as a DPS
or listed beforehand.  Thus, the critical question is whether this particular interpretation of the
ESA – the one that underpins the Final Rule and lies at the heart of this case – is compelled by
the plain meaning of the ESA.  The Court concludes that it is not.

### 1.  Text and Structure

To begin with, the text and structure of the statute do not unambiguously support
FWS' view of its DPS authority.  In the Final Rule, for example, FWS appears to read Section
1533(a)(1) of the ESA to mean that FWS is not only authorized but required to designate as a
DPS and delist any healthy sub-population within a broader listing.  See Final Rule, 72 Fed. Reg.
at 6064 ("Section [1533(a)(1)] of the Act directs the Secretary of the Interior to determine
whether 'any species' is endangered or threatened.").[9]  But this reading of Section 1533(a)(1) – a

---

[9]     Section 1533(a)(1) provides, in pertinent part:

The Secretary shall, by regulation promulgated in accordance with
subsection (b) of this section determine whether any species is an
endangered species or a threatened species because of any of the
following factors:

(A) the present or threatened destruction, modification, or
curtailment of its habitat or range;

reading that emphasizes one part of the provision and ignores the others – is hardly the only

plausible one.  See United States v. Villanueva-Sotelo, 515 F.3d 1234, 1237 (D.C. Cir. 2008).

Read in its entirety, Section 1533(a)(1) does not necessarily instruct or authorize FWS to

designate as a DPS a healthy sub-population within a broader listing and then revise the status of

that DPS.  Instead, Section 1533(a)(1) could be read to mean, more generally, that *when* it is

appropriate to evaluate and/or revise the status of "any species," *then* the agency must apply the

factors prescribed therein.

   Of course, that reading of Section 1533(a)(1) would lead one to ask when it is

appropriate to evaluate and/or revise the status of a species – and in particular to ask when it is

appropriate to "delist" a species.  FWS notes that "[n]umerous sections of the Act refer to adding

and removing 'species' from the list of threatened or endangered plants and animals," Final Rule,

72 Fed. Reg. at 6064, but cites only one such section in its papers: Section 1533(c)(2)(B).  That

provision does indeed contemplate the reclassification or delisting of species and hence DPSs.

But contrary to FWS' view, Section 1533(c)(2)(B) does not suggest that FWS may

simultaneously designate and delist a previously unlisted sub-population of vertebrates within a

broader listing.  Rather, it quite strongly suggests – consistent with common usage – that the

---

    (B) overutilization for commercial, recreational, scientific, or
    educational purposes;

    (C) disease or predation;

    (D) the inadequacy of existing regulatory mechanisms; or

    (E) other natural or manmade factors affecting its continued
    existence.

16 U.S.C. § 1533(a)(1).

*listing* of any species (such as the western Great Lakes DPS) is a precondition to the *delisting* of

that species.  See 16 U.S.C. § 1533(c)(2)(B) (instructing FWS periodically to conduct a review of

all species "*included* in a list, . . . which is in effect at the time of such review," and to determine

whether any particular species should be "*removed* from such list") (emphasis added); cf. Pls.'

Mot. at 31 (arguing that "the Act requires symmetry for the listing and delisting of DPSs.").[10]

       The text of the ESA resists FWS' interpretation in other ways as well.  As

plaintiffs point out, Congress's definition of "species" does not encompass DPSs of all

organisms; rather, it includes only DPSs of "vertebrate fish or wildlife." 16 U.S.C. § 1532(16).

That definitional choice limits the use of the DPS tool to vertebrate organisms.  See Pls.' Opp. at

17 ("Congress consciously decided not to extend this tool to locally-vulnerable populations of

insects and plants; those invertebrate species can only be protected under the ESA if they are at

risk throughout all or a significant portion of their range.").  Plaintiffs read this definitional

choice as a statement of congressional intent.  Specifically, they argue that by limiting the DPS

tool to "those species that [it] deemed most valuable, such as mammals, birds, and fish,"

Congress expressed an intent – or at least revealed an assumption – that the DPS tool would be

used only to *list* species in the first instance.  Pls.' Opp. at 17; see also Pls.' Mot. at 29

---

    [10]    Perhaps FWS takes the view that a species-wide listing (such as FWS' 1978
listing of *Canis lupus*) constitutes a "listing" of every subordinate DPS later identified, and bases
this view on a reading of Section 1533(c)(2)(A) under which a DPS is "included in a list" if a
broader taxonomic unit of which it is a part is listed.  This may be a permissible reading of the
statute – but it is not an inevitable reading.  One might, for example, argue to the contrary that no
species – including a DPS – may be said to be "included in a list" unless *that species itself* is
subjected to the five-factor analysis of Section 1533(a)(1).  See 16 U.S.C. § 1533(a)(1) (requiring
the agency to determine the conservation status of "any species" according to prescribed factors).
In any event, FWS has offered no interpretation on this score to which the Court could defer.

("Congress was not willing to incur the costs of protecting DPSs of insect and plant species, [but was willing to incur the costs of protecting DPSs of] keystone species like the grizzly bear and gray wolf.") (citing KATHERINE M. HAUSRATH, The Designation of "Distinct Population Segments" Under the Endangered Species Act in Light of National Association of Homebuilders v. Norton, 80 CHI.-KENT L. REV. 449, 455-56 (2005)).[11]  Of course, Congress may have excluded plant and insect DPSs from the definition of "species" for other reasons – for example, out of concern that identifying and managing "distinct populations" of plants and insects would be unwieldy.  Nevertheless, while the inference plaintiffs draw from Congress's definitional choice is not inevitable, it is not implausible either.

After careful consideration of the parties' arguments and a close reading of the statute, the Court concludes that the text and structure of the ESA are "reasonably susceptible to more than one meaning" with respect to the precise question before the Court.  McCreary v. Offner, 172 F.3d 76, 82 (D.C. Cir. 1999).  The Court therefore disagrees with FWS that plaintiffs' arguments "are belied by the plain language of the ESA."  Defs.' Mot. at 15.

---

[11]     Stated differently:

The [exclusion of insect and plant DPSs from the] definition of "species" makes no sense if the DPS tool could be used, as [FWS] assert[s], for delisting purposes.  Why would Congress make it possible for the DPS tool to remove protections from core populations of vertebrates, while forbidding this "flexibility" for invertebrates?

Pls.' Opp. at 17.

2.  Legislative History

Nor can legislative history dispel the ambiguity identified above.  According to defendant-intervenors, the ESA's legislative history demonstrates (1) that the purpose of revising the ESA's definition of "species" was to give FWS "'more flexibility in [its] approach to wildlife management,'" and (2) that this evident desire for flexibility is consistent with FWS' reading of the statute.  Ints.' Mot. at 17 (quoting Defenders of Wildlife v. Norton, 258 F.3d 1141, 1144 (9th Cir. 2001)).  Defendant-intervenors rely principally, if not exclusively, on the following statement by Senator John Tunney, made during a floor debate on the original 1973 bill:

> An animal might be "endangered" in most States but overpopulated in some.  In a State in which a species is overpopulated, the Secretary would have the discretion to list that animal as merely threatened or to remove it from the endangered species listing entirely while still providing protection in areas where it was threatened with extinction.  In that portion of its range where it was not threatened with extinction, the States would have full authority to use their management skills to insure the proper conservation of the species.

Senate Consideration and Passage of S. 1983, with Amendments (July 24, 1973) (statement of Sen. Tunney), *reprinted in* Congressional Research Service, A Legislative History of the Endangered Species Act of 1973 at 360 (1982).

Defendant-intervenors place far too much reliance on this single statement made by Senator Tunney on the floor of the Senate.  To begin with, Senator Tunney's statement was made in 1973.  It therefore tells us little about what Congress intended by adding the term "distinct population segment" to the definition of "species" in 1978.  Moreover, even assuming that Senator Tunney's statement could shed some light on the issue before the Court, it is at most inconclusive.  Nothing about Senator Tunney's statement is inconsistent with plaintiffs' view

19

that the purpose of the DPS tool is to list locally vulnerable populations, and thus that a DPS

must be designated and listed before it can be delisted.[12]

3.  Judicial Interpretations

Finally, both parties invoke certain judicial interpretations of the ESA.  FWS

relies heavily on two recent decisions by other district courts to demonstrate that its interpretation

is compelled by the plain meaning of the ESA: Defenders of Wildlife v. U.S. Dep't of the

Interior, 354 F. Supp. 2d 1156 (D. Or. 2005) and Nat'l Wildlife Federation v. Norton, 386 F.

Supp. 2d 553 (D. Vt. 2005).[13]  According to FWS, the former case supports its interpretation

because, in the context of a challenge to an earlier gray wolf-related rule, the District of Oregon

observed that (1) the DPS Policy "provides FWS the flexibility to list, downlist, or delist discrete

and significant populations, even though the conservation status of the species may differ

elsewhere," and (2) FWS "can downlist a DPS if that discrete and significant population is no

longer endangered."  Defenders of Wildlife v. U.S. Dep't of the Interior, 354 F. Supp. 2d at 1169.

In the latter case, which involved a challenge to the same gray wolf-related rule, the District of

Vermont stated (without analysis) that "[n]owhere in the ESA is the Secretary prevented from

[designating and reclassifying a DPS within a broader listing merely because it would] creat[e] a

---

[12]     Moreover, the only other legislative history of note suggests that Congress thought
of the DPS tool primarily – if not exclusively – as a tool for listing locally vulnerable
populations.  See Pls.' Mot. at 28-29 (citing S. Rep. No. 96-151 at 7 (May 15, 1979), reprinted in
CONGRESSIONAL RESEARCH SERVICE, A LEGISLATIVE HISTORY OF THE ENDANGERED SPECIES
ACT OF 1973 at 1397 (1982) (directing FWS to "use the ability to list populations sparingly and
only when the biological evidence indicates that such action is warranted")) (emphasis added).

[13]     The Court need not address the cases upon which plaintiffs rely because, for
reasons explained below, the key analytical point is that FWS erroneously concluded that its
interpretation of the statute was compelled by the plain meaning of the ESA.

20

'non-DPS remnant' designation [outside of the DPS], especially when the remnant area was already listed as endangered." <u>Nat'l Wildlife Federation v. Norton</u>, 386 F. Supp. 2d at 565.

There are three problems with FWS' reliance on these cases to demonstrate that the statute unambiguously supports the Final Rule.  First, neither case directly addresses the interpretive issue before this Court.  Second, there is nothing inconsistent between the District of Oregon's observations and plaintiffs' view that a DPS must be listed before it is delisted.  Third, while the District of Vermont's statement about "'non-DPS remnant' designation[s]" may be consistent with the approach taken in the Final Rule, it hardly stands for the proposition that FWS' interpretation is *compelled* by the statute.  Thus, these cases can not and do not demonstrate that the ESA compels FWS' interpretation.

### 4.   Conclusion

In sum, the ESA could be construed in the way urged by FWS.  But it is one thing to say that the statute *could* bear FWS' interpretation; it is another thing to say that it could bear no others and therefore is unambiguous on the precise question at issue.  <u>See</u>, <u>e.g.</u>, <u>Air Transport Ass'n of America v. FAA</u>, 169 F.3d 1, 4 (D.C. Cir. 1999) ("Although the inference petitioner would draw as to the statute's meaning is not by any means unreasonable, it is also not inevitable" and thus not mandatory).  For the reasons stated above, the Court concludes that the ESA is "silent or ambiguous with respect to the specific issue" before the Court.  <u>Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. at 843.  Therefore, the Court cannot endorse FWS' "plain meaning" reading under <u>Chevron</u> step one.  <u>See Peter Pan Bus</u>

Lines, Inc. v. Federal Motor Carrier Safety Admin., 471 F.3d at 1354.  Furthermore, for reasons described below, the Court may not defer to the agency's reading under Chevron step two.

### C.  FWS' Reliance on the ESA's "Plain Meaning" Precludes Chevron Deference

Because the ESA is ambiguous with respect to the issue at hand, the Court is required to defer to any permissible agency construction under Chevron step two.  See Defs.' Mot. at 13; Defs.' Opp. at 4.  In this case, however, there is no permissible construction to which the Court can defer.  The Final Rule and FWS' papers rely exclusively on a "plain meaning" reading of the ESA which the Court already has rejected.  And even assuming that the Court could look elsewhere for an interpretation to which it could defer, there is none in sight.  The DPS Policy does not qualify as a construction to which this Court can defer because the DPS Policy does not directly address the interpretive issue before the Court.  The purpose of the DPS Policy is to clarify the meaning of the term "distinct population segment" and to set forth criteria for deciding whether a sub-population should be designated as a DPS.  It does not address the propriety of simultaneously designating and delisting a DPS within a broader listing, and the Court finds both parties' arguments to the contrary strained and unpersuasive.  Nor may the Court look to the ESA's implementing regulations for a Chevron-worthy interpretation.  Those regulations largely track the statutory provisions discussed in part III.B and, like those statutory provisions, do not directly address the interpretive issue before the Court.

"Chevron step 2 deference is reserved for those instances when an agency recognizes that the Congress's intent is not plain from the statute's face" and proceeds to grapple with that ambiguity.  Peter Pan Bus Lines, Inc. v. Federal Motor Carrier Safety Admin., 471 F.3d

22

at 1354; see also Secretary of Labor, Mine Safety and Health Admin. v. Nat'l Cement Co. of California, Inc., 494 F.3d at 1074-75 (it will not do for an agency "to rest simply on its parsing of statutory language" when confronted with ambiguity) (internal quotation marks and citations omitted).  On the other hand, "deference to an agency's interpretation of a statute is not appropriate when the agency wrongly believes that [its] interpretation is compelled by Congress." PDK Laboratories, Inc. v. DEA, 362 F.3d at 798.  As discussed above, it seems clear that FWS erroneously concluded that its interpretation of the ESA was compelled by Congress.  See, e.g., Final Rule, 72 Fed. Reg. at 6064.  That erroneous conclusion precludes Chevron step two review and therefore precludes Chevron step two deference.  See PDK Laboratories, Inc. v. DEA, 362 F.3d at 798.

## IV.  REMEDY

When an agency "erroneously interpret[s] [statutory terms] as bearing a plain meaning," the Court is not to defer to the agency's "plain meaning interpretation."  Secretary of Labor, Mine Safety and Health Admin. v. Nat'l Cement Co. of California, Inc., 494 F.3d at 1074-75.  Nor is the Court to "choose between [the litigants'] competing meanings." PDK Laboratories, Inc. v. DEA, 362 F.3d at 798.  Rather, the Court is to "remand for [the agency] to treat the statutory language as ambiguous."  Secretary of Labor, Mine Safety and Health Admin. v. Nat'l Cement Co. of California, Inc., 494 F.3d at 1075; see also PDK Laboratories, Inc. v. DEA, 362 F.3d at 798 ("The law of this circuit requires in those circumstances that we withhold Chevron deference and remand to the agency so that it can fill in the gap.").  Thus, the Court will

remand the Final Rule to FWS so that the agency can provide a reasonable explanation for the interpretation of the Act which underlies the Final Rule.

On remand, the agency should bring its expertise and experience to bear on the question of whether the ESA permits it to use the DPS tool in the fashion it has proposed.  At a minimum, the agency must explain how its interpretation of the statute conforms to the text, structure and legislative history of the ESA; how its interpretation is consistent with judicial interpretations of the ESA (if there are any on point); and how its interpretation serves the ESA's myriad policy objectives.  It must also address any legitimate concerns that its interpretation could undermine those policy objectives.  See, e.g., Secretary of Labor, Mine Safety and Health Admin. v. Nat'l Cement Co. of California, Inc., 494 F.3d at 1076-77.[14]

The only question remaining is the listing status of the western Great Lakes DPS pending FWS' revised interpretation of the statute.  FWS and defendant-intervenors argue that the procedural error identified above does not justify returning the wolves in the western Great Lakes DPS to the endangered species list.  Rather, FWS and defendant-intervenors would have the Court remand the Final Rule but not vacate it.  See Defs.' Opp. at 23-24; Ints.' Mot. at 38-41. Plaintiffs insist that remand *and* vacatur are appropriate.  See Pls.' Opp. at 33.  The Court agrees with FWS and defendant-intervenors that it is within the Court's discretion to remand without vacating the Final Rule, but in the context of this case it declines to do so.

_____

[14]     At the Court's request, FWS submitted supplemental papers identifying each time the agency has designated a DPS and explaining how (if at all) it revised each DPS' conservation status upon designation.  Those papers suggest that FWS has rarely – and only very recently – used the DPS tool in the way challenged here.  See generally Notice of Filing [68].  Thus, it may also be prudent for the agency to explain whether its interpretation represents a change in position and, if so, to provide an adequate explanation for that change.

"While unsupported agency action normally warrants vacatur, . . . this court is not without discretion [to remand without vacating]." Advocates for Highway and Auto Safety v. Federal Motor Carrier Safety Admin., 429 F.3d 1136, 1151 (D.C. Cir. 2005); see also Allied-Signal, Inc. v. Nuclear Regulatory Comm'n, 988 F.2d 146, 150 (D.C. Cir. 1993) ("An inadequately supported rule . . . need not necessarily be vacated."). The decision whether to vacate hinges on "the seriousness of the [regulation's] deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences" of vacatur. Int'l Union, United Mine Workers of America v. Federal Mine Safety and Health Admin., 920 F.2d at 967.

The Court concludes that both factors militate in favor of vacating the Final Rule before remanding it to the agency. First, while the Final Rule's deficiency is procedural, it is also fundamental: FWS failed to acknowledge crucial statutory ambiguities, and failed to explain how its interpretation of the ESA comports with the policy objectives of the Act. For that reason, the Court cannot be sure that the agency will arrive at the same conclusion after further consideration – let alone whether, on further judicial review, this or a similar Final Rule will withstand challenge under the APA. Second, while it is true that vacatur will have a palpable regulatory effect – specifically, management responsibility for the western Great Lakes DPS will be reposed in the federal government rather than in the states – the Court concludes that "disruption" is not a substantial concern in this case. Little confusion or inefficiency will result from reinstating a regulatory regime that was in place from 1978 to 2007, particularly given the fact that state and federal wolf management authorities have been working in tandem for years. Finally, the Court agrees with plaintiffs that the ESA's preference for protecting endangered species counsels

strongly in favor of vacating the Final Rule while FWS revisits its statutory interpretation.  <u>See</u>

<u>NRDC v. U.S. Dep't of the Interior</u>, 275 F. Supp. 2d 1136, 1145 (C.D. Cal. 2002).  The Court

therefore will vacate the Final Rule and remand it to the agency for further proceedings.  An

Order consistent with this Opinion will be issued this same day.

      SO ORDERED.


                /s/_____
                PAUL L. FRIEDMAN
                United States District Judge

DATE: September 29, 2008